Newmark Knight Frank

# 2.47 Acre Tract on Turtle Creek Boulevard

2999 Turtle Creek Boulevard
Dallas, Dallas County, TX 75219

NKF Job No.: 21-0158771-1






**Appraisal Report Prepared For:**

John J. Kane
KANE RUSSELL COLEMAN LOGAN PC
901 Main Street
Dallas, TX 75202

**Prepared By:**

**Newmark Knight Frank**
Valuation & Advisory, LLC
2515 McKinney Avenue, Suite 1300
Dallas, Texas 75201

Newmark Knight Frank

December 9, 2021

John J. Kane
KANE RUSSELL COLEMAN LOGAN PC
901 Main Street
Dallas, TX 75202

RE: Appraisal of a 2.47 Acre Site located at 2999 Turtle Creek Boulevard, Dallas, Dallas County, TX 75219, prepared by Newmark Knight Frank Valuation & Advisory, LLC (herein "Firm" or "NKF")

NKF Job No.: 21-0158771-1

Dear Mr. Kane:

The subject is a tract of land containing 2.47 acres or 107,424 square feet of land area located at 2999 Turtle Creek Boulevard. The site is irregular in shape and located at the northwestern corner of Turtle Creek Boulevard and Dickason Avenue with additional frontage along Gillespie Street. The area in which the subject is located is known as Uptown/Turtle Creek and known as one of the more desirable area in which to live within the city of Dallas. The area surrounding the subject is developed with high density, high rise developments which include mixed uses (office, residential, retail, hotel). The site is zoned for high density development. The site is currently improved with a two story, office building, built in 2004, containing approximately 28,940 square feet which is an under-utilization of the site.

Based on the analysis contained in the following report, the opinion of market value for the subject is:

| Value Conclusions | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value Conclusion** |
| As Is Market Value | Fee Simple | 12/8/2021 | $39,750,000 |

*Compiled by NKF*

### Extraordinary Assumptions

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1. With regard to the size of the subject site and improvements, we have relied on information provided by the site contact via the survey. If it is found that the size of the subject site should differ from what is reported in this Appraisal Report, then we reserve the right to alter and amend our findings and conclusions.

2. An environmental assessment was not provided to the Appraisers. If it is found that the subject site suffers from any environmental contamination, then we reserve the right to alter and amend our findings and conclusions.

The use of these extraordinary assumptions might have affected assignment results.

**Hypothetical Conditions**

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1. None

The appraisal was developed based on, and this report has been prepared in conformance with the Client's appraisal requirements, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

# Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
4. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
5. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
6. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
7. This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.
8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of Texas.
9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

0\. As of the date of this report, None completed the continuing education program for Designated Members of the Appraisal Institute.

12. Hayden D. Littlefield made a personal inspection of the property that is the subject of this report.
13. No one provided significant real property appraisal assistance to the person(s) signing this certification.
14. The Firm operates as an independent economic entity. Although employees of other service lines or affiliates of the Firm may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.
15. Within this report, "Newmark Knight Frank", "NKF Valuation & Advisory", "NKF, Inc.", and similar forms of reference refer only to the appraiser(s) who have signed this certification and any persons noted above as having provided significant real property appraisal assistance to the persons signing this report.
16. Hayden D. Littlefield has not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

Hayden D. Littlefield
Senior Director
Certified General Real Estate Appraiser
Texas # 1324546-G
Telephone: (469) 767-2073
Email: hayden.littlefield@nmrk.com

# Table of Contents

**Appraisal Transmittal and Certification**
Certification
Table of Contents
Subject Maps
Subject Photographs

| | |
|---|---|
| **Executive Summary** | **9** |
| **Introduction** | **11** |
| **Neighborhood Analysis** | **15** |
| **Land and Site Analysis** | **20** |
| **Zoning and Legal Restrictions** | **26** |
| **Real Estate Taxes** | **28** |
| **Highest and Best Use** | **29** |
| **Appraisal Methodology** | **30** |
| **Sales Comparison Approach** | **31** |
| **Reconciliation of Value** | **35** |
| **Assumptions and Limiting Conditions** | **37** |

**Addenda**
A. Glossary of Terms
B. Engagement Letter
C. Appraiser Qualifications and Licenses




Aerial Photo




Location Map




*View of Subject Site from corner of Turtle Creek Blvd. and Dickason Ave.*



*Alternate view of subject site.*



*View from Dickason Blvd. onto the subject site*



*Alternate view of Subject site from Gillespie Ave.*



*Street View along Turtle Creek Boulevard, Subject on the Right.*



*Street View along Dickason Avenue, subject to the left*

# Executive Summary

| 2.47 Acre Tract on Turtle Creek Boulevard | |
|---|---|
| Property Type: | Land |
| Street Address: | 2999 Turtle Creek Boulevard |
| City, State & Zip: | Dallas, Dallas County, TX 75219 |
| MSA Name: | Dallas |
| Market Name: | TX - Dallas/Fort Worth |
| Submarket Name: | Dallas/Fort Worth |
| Land Area: | 2.466 acres; 107,424 SF |
| Zoning: | PD-193 (Sub-147) |
| Assessor's Parcel ID(s): | 001031000A0040000 |
| Highest and Best Use - As Vacant: | A Mixed Use Use |
| Highest and Best Use - As Improved: | Interim Use Until Redeveloped |
| **Analysis Details** | |
| Valuation Dates: | |
| Market Value "As Is" | December 8, 2021 |
| Inspection Date and Date of Photos: | December 8, 2021 |
| Report Date: | December 9, 2021 |
| Report Type: | Appraisal Report |
| Client: | KANE RUSSELL COLEMAN LOGAN PC |
| Intended Use: | Litigation/Expert Witness Testimony |
| Intended User: | KANE RUSSELL COLEMAN LOGAN PC |
| Appraisal Premise: | As Is Market Value |
| Intended Use and User: | The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to non-client, non-intended users does not extend reliance to any other party and Newmark Knight Frank will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety. |
| Interest Appraised: | Fee Simple |
| Exposure Time (Marketing Period) Estimate: | 12 Months (12 Months) |
| **Site Characteristics** | |
| Total Land Area (Gross): | 2.466 acres; 107,424 SF |
| Usable Land Area (Net): | 2.466 acres; 107,424 SF |
| Surplus Land Area: | None |
| Excess Land Area: | None |
| Shape: | Irregular |
| Topography: | Gently Sloping |
| Flood Zone: | Zone X |
| Flood Map / Date: | 48113C0345J / 8/23/2001 |
| Zoning | PD-193 / SD 147 |
| Legally Conforming | Yes |
| Easements / Encroachments: | None noted |
| Environmental Hazards: | None noted |

*Compiled by NKF*

| Valuation Summary | | |
|---|---|---|
| Land Value | | $39,750,000 |
| **Market Value Conclusion** | **As Is** | **$39,750,000** |
| Concluded Exposure Time | 12 Months or Less | |
| Concluded Marketing Time | 12 Months or Less | |

*Compiled by NKF*

## Extraordinary Assumptions and Hypothetical Conditions

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1. With regard to the size of the subject site and improvements, we have relied on information provided by the site contact via the survey. If it is found that the size of the subject site should differ from what is reported in this Appraisal Report, then we reserve the right to alter and amend our findings and conclusions.

2. An environmental assessment was not provided to the Appraisers. If it is found that the subject site suffers from any environmental contamination, then we reserve the right to alter and amend our findings and conclusions.

The use of these extraordinary assumptions might have affected assignment results.

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1. None

*Compiled by NKF*

# Introduction

## Ownership History

As of October 29, 2021, title to the subject property is vested in HNGH Turtle Creek, LLC., who acquired title to the property in lieu of foreclosure as recorded in Document Number 202100327172 of the Dallas County Deed Records. This has not yet been reported in the Dallas County Appraisal District records as of the date of this report.

The Dallas County Appraisal District records indicate the current owner to be MO 2999TC, LLC who acquired the property September 23, 2019, a period in excess of three years from the date of this report. The following summarizes the last sale, the current listing status, and pending transactions for the subject property (as applicable).

| Ownership History | | | |
|---|---|---|---|
| To the best of our knowledge, no sale or transfer of ownership has taken place within the three-year period prior to the effective date of the appraisal. | | | |
| Listing Status: | Not Listed For Sale | | |
| Current or Pending Contract: | None Reported | | |
| **Previous Sales** | | | |
| Sales in the Previous Three Years: | None | | |
| Most Recent Reported Sale: | September 23, 2019 | | |
| Buyer: | MO 2999TC, LLC | | |
| Seller: | TURTLE CREEK DICKASON LTD | | |
| Purchase Price: | $43,849,909 | $408.19 | Per SF (Gross Land Area) |
| Deed Information: | | | |

*Compiled by NKF*

To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective date of the appraisal. Additionally, the subject is not currently reported to be on the market, listed for sale or under contract as of the date of this report.

## Intended Use and User

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to non-client, non-intended users does not extend reliance to any other party and Newmark Knight Frank will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety.

- The intended use of the appraisal is for Litigation/Expert Witness Testimony and no other use is permitted.
- The client is KANE RUSSELL COLEMAN LOGAN PC.
- The intended user is KANE RUSSELL COLEMAN LOGAN PC and no other user is permitted by any other party for any other purpose.

## Definition of Value

Market value is defined as:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their own best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)*

## Interest Appraised

The appraisal is of the Fee Simple interest.[1]

- ***Fee Simple Estate:*** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

[1] The Dictionary of Real Estate, 6th Edition, Appraisal Institute

## Appraisal Report

This appraisal is presented in the form of an appraisal report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of USPAP. This report incorporates sufficient information regarding the data, reasoning and analysis that were used to develop the opinion of value in accordance with the intended use and user.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the as is market value of the Fee Simple interest in the property.

**Purpose of the Appraisal**

| Appraisal Premise | Interest Appraised | Date of Value |
|---|---|---|
| As Is Market Value | Fee Simple | 12/8/2021 |

*Compiled by NKF*

## Scope of Work

### Extent to Which the Property is Identified

- Physical characteristics
- Legal characteristics
- Economic characteristics

### Extent to Which the Property is Inspected

NKF inspected the subject property on December 8, 2021 as per the defined scope of work. Hayden D. Littlefield made a personal inspection of the property that is the subject of this report.

The inspection consisted of walking the perimeter of the site as no interior access was permitted to the improvements.

### Type and Extent of the Data Researched

- Exposure and marking time;
- Neighborhood and land use trends;
- Demographic trends;
- Market trends relative to the subject property type;
- Physical characteristics of the site and applicable improvements;
- Flood zone status;
- Zoning requirements and compliance;
- Real estate tax data; and,
- Relevant applicable comparable data.

### Type and Extent of Analysis Applied

We analyzed the property and market data gathered through the use of appropriate, relevant, and accepted market-derived methods and procedures. Further, we employed the appropriate and

relevant approaches to value, and correlated and reconciled the results into an estimate of market value, as demonstrated within the appraisal report.

# Neighborhood Analysis



Area Map

## Boundaries

The subject is located in the central portion of the city of Dallas, Texas. This area is part of the Uptown/Turtle Creek area and is generally delineated as follows:

| | |
|---|---|
| North | Wycliff Avenue |
| South | Woodall Rogers Freeway |
| East | North Central Expressway (Interstate Highway IH-75) |
| West | Interstate Highway 35E (North Stemmons Freeway) |

## Surrounding Area of Influence Trends

**Description**

The subject's surrounding area is viewed as urban in nature. The immediate area surrounding the subject can be described as a densely developed urban core. The Turtle Creek area is well known a highly desirable area in which to live and work given its proximity to the Dallas CBD and Uptown areas to the south, Love Field Airport to the east and good access to all other areas of the Metroplex via the bordering roadways (North Central Expressway, North Stemmons Freeway and Woodall Rogers Freeway).

## Access

**Primary Access**

Primary highway access to the area is the via Interstate Highway 35 East (North Stemmons Freeway), Interstate Highway 75 (North Central Expressway), and the Woodall Rogers Freeway. Public transportation is provided by DART (Dallas Area Rapid Transit). However, the primary mode of transportation in the area is the automobile.

**Major Thoroughfares**

Major thoroughfares include Wycliff Avenue, Turtle Creek Boulevard, Cedar Springs Road, Lemmon Avenue, Oak Lawn Avenue, Hall Street, McKinney Avenue, McKinnon Street, Interstate Highway 35 East (North Stemmons Freeway), Interstate Highway 75 (North Central Expressway), and the Woodall Rogers Freeway.

**Distance from Key Locations**

The commute to the Dallas Central Business District is about 10 minutes, depending on traffic, and the drive to Love Field Bush is about 5-10 minutes, depending on traffic. The drive to DFW International Airport is roughly a 20-25-minute drive time from the subject, depending on traffic.




Drive Time Map

## Land Use

Within the immediate area of the subject, property uses include the following:

- Residential (Mostly high end);
- Office; and,
- Hospitality

## Demographics

A demographic summary for the defined area is illustrated as follows:

| Demographic Analysis | 1-Mile Radius | 3-Miles Radius | 5-Miles Radius | 75219 | Dallas City | Dallas County | Dallas-Fort Worth-Arlington, TX MSA | Texas |
|---|---|---|---|---|---|---|---|---|
| **Population** | | | | | | | | |
| 2010 Total Population | 28,628 | 150,152 | 321,707 | 23,231 | 1,197,681 | 2,368,139 | 6,366,542 | 25,145,561 |
| 2021 Total Population | 45,373 | 217,395 | 413,556 | 26,913 | 1,367,628 | 2,680,115 | 7,830,258 | 29,969,514 |
| 2026 Total Population | 52,068 | 246,867 | 456,479 | 31,137 | 1,455,786 | 2,846,506 | 8,579,984 | 32,346,738 |
| Projected Annual Growth % | 2.8% | 2.6% | 2.0% | 3.0% | 1.3% | 1.2% | 1.8% | 1.5% |
| **Households** | | | | | | | | |
| 2010 Total Households | 18,251 | 69,071 | 138,279 | 8,904 | 458,012 | 855,960 | 2,296,410 | 8,922,933 |
| 2021 Total Households | 28,238 | 103,199 | 181,294 | 10,154 | 521,974 | 962,528 | 2,802,401 | 10,615,809 |
| 2026 Total Households | 32,151 | 118,136 | 201,228 | 11,746 | 556,118 | 1,020,637 | 3,063,595 | 11,454,078 |
| Projected Annual Growth % | 2.6% | 2.7% | 2.1% | 3.0% | 1.3% | 1.2% | 1.8% | 1.5% |
| **Income** | | | | | | | | |
| 2021 Median Household Income | $96,977 | $79,200 | $74,103 | $52,570 | $55,600 | $61,992 | $73,903 | $63,524 |
| 2021 Average Household Income | $132,723 | $117,032 | $117,606 | $81,969 | $89,160 | $90,765 | $100,795 | $90,115 |
| 2021 Per Capita Income | $82,355 | $56,468 | $51,936 | $30,926 | $34,148 | $32,669 | $36,118 | $32,007 |
| **Housing** | | | | | | | | |
| 2021 Owner Occupied Housing Units | 19.4% | 22.5% | 29.6% | 19.0% | 35.1% | 44.1% | 56.4% | 57.3% |
| 2021 Renter Occupied Housing Units | 70.1% | 64.8% | 58.3% | 64.0% | 53.8% | 46.6% | 36.9% | 33.1% |
| 2021 Median Home Value | $483,246 | $492,540 | $479,053 | $386,834 | $283,915 | $247,223 | $266,838 | $224,879 |
| Median Year Structure Built | 2000 | 1993 | 1982 | 1976 | 1977 | 1980 | 1988 | 1987 |
| **Miscellaneous Data Items** | | | | | | | | |
| 2021 Bachelor's Degree | 45.6% | 36.5% | 32.2% | 24.3% | 22.2% | 20.9% | 23.9% | 20.3% |
| 2021 Grad/Professional Degree | 33.3% | 23.6% | 21.7% | 11.4% | 13.4% | 12.3% | 12.9% | 11.0% |
| 2021 College Graduate % | 78.9% | 60.1% | 53.9% | 35.7% | 35.6% | 33.1% | 36.8% | 31.3% |
| 2021 Average Household Size | 1.59 | 1.97 | 2.19 | 2.65 | 2.58 | 2.75 | 2.76 | 2.77 |
| 2021 Median Age | 34.5 | 34.3 | 34.7 | 31.8 | 33.6 | 34.1 | 35.2 | 35.3 |

*Source: ESRI; Compiled by Newmark*

## Office Market

Per CoStar, the metroplex has experienced fallout from the pandemic and recession. Net annual absorption is well into negative territory, with -1.1 million SF over the last 12 months. For the first time since 2010, the market has reported five consecutive quarters of negative net absorption. Since April, the area has reported 1.1 million SF of positive net absorption. The pandemic has accelerated the flight to the quality narrative. While 4 & 5 Star properties encompass 43% of the total inventory, they capture 71% of the total net absorption during this period. Leasing activity is improving, as well, with 3.6 million SF, for a total of 7.1 million SF for the first half of the year. Vacancy is 18.0% and increasing, asking rents average $28.03 per square foot and is increasing.

## Multi-Family Market

Per CoStar, the Dallas-Fort Worth apartment market is performing well compared to other major markets, despite the widespread economic disruption to the local economy in the past year. Leasing activity has surged in 2021 with the highest net absorption on record. With a surge in demand, rent growth has accelerated, registering the best performance on record. The trend is pervasive across asset classes and communities in both urban and suburban settings. That rapid turnaround is after steep rent cuts in the urban core and supply-heavy submarkets, leaving rent

growth in the market essentially flat last year. Vacancy is 5.4% and decreasing, asking rents average $1,404 per unit and are increasing. This product type is in high demand.

## Conclusion

The area is in stable phase of its real estate cycle.

# Land and Site Analysis



Site Plan-Survey


GE CEDAR
SPRINGS PHASE 1
A/1035
1031
1035
1A
3424
GILLESPIE
TURTLE
CREEK
OFFICE
A/1031
4
1031
3
SUMMERS/CEDAR
SPRINGS
OFFICE TOWER
A/1027
993
DICKASON AVE
GILLESPIE ST
TURTLE CREEK BLVD
SALE ST

Plat Map


Dallas, City of 480171
48113C0345J eff. 8/23/2001
Zone AE
Streets
Esri, USDA Farm Service Agency
esri
PIN
Approximate location based on user input and does not represent an authoritative property location
MAP PANELS
Selected FloodMap Boundary
Digital Data Available
No Digital Data Available
Unmapped
Area of Minimal Flood Hazard Zone X
Effective LOMRs
Area of Undetermined Flood Hazard Zone D
Otherwise Protected Area
SPECIAL FLOOD HAZARD AREAS
Without Base Flood Elevation (BFE) Zone A, V, A99
With BFE or Depth
Regulatory Floodway Zone AE, AO, AH, VE, AR
OTHER AREAS OF FLOOD HAZARD
0.2% Annual Chance Flood Hazard, Areas of 1% annual chance flood with average depth less than one foot or with drainage areas of less than one square mile Zone X
Future Conditions 1% Annual Chance Flood Hazard Zone X
Area with Reduced Flood Risk due to Levee. See Notes. Zone X
Area with Flood Risk due to Levee Zone D
Cross Sections with 1% Annual Chance Water Surface Elevation
Coastal Transect
Base Flood Elevation Line (BFE)
Limit of Study
Jurisdiction Boundary
Coastal Transect Baseline
OTHER FEATURES
Profile Baseline
Hydrographic Feature
GENERAL STRUCTURES
Channel, Culvert, or Storm Sewer
Levee, Dike, or Floodwall

**Flood Map**

| Land Parcels | | | | |
|---|---|---|---|---|
| **Parcel Summary** | **Associated APN(s)** | **Classification** | **Land Area (SF)** | **Land Area (Acres)** |
| Parcel 1 | 001031000A0040000 | Primary Site 1 | 107,424 | 2.47 |
| Total Gross Land Area | | | 107,424 | 2.47 |
| Total Primary Land Area | | | 107,424 | 2.47 |
| Total Surplus Land Area | | | 0 | 0.00 |
| Total Excess Land Area | | | 0 | 0.00 |

*Compiled by NKF*

| Land Description | |
|---|---|
| Total Land Area | 2.47 Acres; 107,424 SF |
| Usable Land Area | 2.47 Acres; 107,424 SF |
| Excess Land Area | None |
| Surplus Land Area | None |
| Source of Land Area | Public Data |
| **Site Characteristics** | |
| Primary Street Frontage | Turtle Creek Blvd (189 FF) |
| Secondary Street Frontage | Dickason Avenue (404 FF) |
| Additional Street Frontage | Gillespie Street (101 FF) |
| Traffic Control at Entry | None |
| Traffic Flow | Moderate |
| Accessibility Rating | Average |
| Visibility Rating | Average |
| Shape | Irregular |
| Corner | Yes |
| Topography | Gently Sloping |
| Site Vegetation | Typical |
| Easements / Encroachments | None noted |
| Environmental Hazards | None noted |
| **Flood Zone Analysis** | |
| Flood Area Panel Number | 48113C0345J |
| Date | 8/23/2001 |
| Zone | Zone X |
| Description | Area of minimal flood hazard, usually depicted on Flood Insurance Rate Maps as above the 500-year flood level. |
| Insurance Required? | No |
| **Utilities** | |
| Utility Services | Electricity, Gas, Sewer, Water |
| Utility Service Providers | |
| Water | City of Dallas |
| Sewer | City of Dallas |
| Electricity | Various Providers |
| Natural Gas | Various Providers |

*Compiled by NKF*

While the flood map shows the subject is located outside the designated flood hazard area, it is possible given the proximity of Turtle Creek that a portion of the subject might be susceptible to flooding at some point.

## Easements, Encroachments and Restrictions

We were not provided a current title report to review. Further, we are not aware of any easements, encroachments, or restrictions that would adversely affect value. Our valuation assumes no

adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title.

## Environmental Issues

No environmental issues were observed or reported. NKF is not qualified to detect the existence of potentially hazardous issues such as soil contaminants, the presence of abandoned underground tanks, or other below-ground sources of potential site contamination. The existence of such substances may affect the value of the property. For this assignment, we have specifically assumed that any hazardous materials that would cause a loss in value do not affect the subject.

## Building Improvements

As mentioned previously, the site is presently improved with a two story office building containing approximately 28,940 square feet which was built in 2004. The property also has a one level underground garage. There is also a detached second office building which is one-story and totals approximately 4,091 square feet. The property is landscaped and has a small paved area for surface parking, etc.

It is considered the current improvements are a under-utilization of the site given the high density zoning district in which the subject site is located. Therefore, the value in the property is considered to be within the underlying land. The current improvements are reported to be owner occupied and could be considered an interim use until such time as the site is purchased and redeveloped with a high density mixed use development.

## Conclusion

Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for mixed use development inclusive of office, hotel, retail, and residential uses. The subject appears to be functional for its current (office) use, although it would also be acceptable for a wide variety of mixed use development, which would be high-density in nature and similar to surrounding uses along Turtle Creek. We are not aware of any other particular restrictions on development.

# Zoning and Legal Restrictions

| Zoning Summary | |
|---|---|
| **Category** | **Description** |
| Zoning Jurisdiction | City of Dallas |
| Zoning Designation | PD-193 (Sub-147) |
| Description | Planned Development District -193 / Subdistrict 147 |
| Legally Conforming? | Yes |
| Zoning Change Likely? | Likely - See Comments |
| Permitted Uses | All physically possible uses including mixed use development, office, retail, residential and hotel. |
| Other | None noted |

*Compiled by NKF*

We are not experts in the interpretation of zoning ordinances. A qualified land use/zoning expert should be engaged if there are any zoning concerns or if a determination of compliance with zoning is required.

The site contact provided a zoning memorandum, excerpts of which can be found below:

1. **Zoning: PDS 147**

A. Generally

PDS 147 was established by Ordinance No. 31169, passed by the City Council on April 10, 2019.[1] The PDS includes only the Property[2] and generally defaults to the PD 193-O-2 Office District (the "O-2 District") regulations in PD 193. This memorandum focusses primarily on zoning regulations specifically applicable to the Project; however, it is important to note that the PDS allows for any development that complies with the O-2 District regulations.

The O-2 District allows for uses including multifamily, hotel, and office and allows for a maximum floor to area ratio ("FAR") of 4 to 1[3], a maximum 240 feet of building height, and maximum 75% lot coverage.[4] Restaurant is allowed as a "limited use", meaning it may not have exterior signage and must be contained entirely within a main building for the primary use of the building occupants.[5] Retail and personal service uses are primarily allowed as "street level uses", meaning they are restricted to a maximum building floor area of 2,000 square feet and may not constitute more than 50% of all street-level uses in a building combined.[6]

At a development density of 4:1 for office uses, the subject site could be developed with 429,696 SF of improvements.

At a development density of 4.75:1 for hotel development the subject site could be developed with 510,264 SF of improvements.

Based on the potential for development of the site, the current improvements would appear to be an underutilization of the site.

# Real Estate Taxes

| Taxes and Assessments | | | | | |
|---|---|---|---|---|---|
| **Tax Year 2021** | **Assessor's Market Value** | | | **Tax Rates** | **Taxes and Assessments** |
| Tax ID | Land | Improvements | Total | Land & Improvements | Ad Valorem Taxes |
| 001031000A0040000 | $11,355,960 | $3,144,040 | $14,500,000 | 2.6380% | $382,508 |
| | $11,355,960 | $3,144,040 | $14,500,000 | 2.6380% | $382,508 |

*Compiled by NKF*

## Subject Tax Conclusion

| Ad Valorem Tax Analysis | | |
|---|---|---|
| | **Subject History** | **Conclusion** |
| | 2021 | |
| Total Assessed Value | $14,500,000 | $14,500,000 |
| Total Assessed Value/SF | $134.98 | $134.98 |
| Tax Rate | 2.63800% | 2.6380% |
| Actual / Pro Forma Taxes | $382,508 | $382,508 |

*Compiled by NKF*

Based on the current assessed value for the subject per the Dallas County Appraisal District, the assessed value appears to be reasonable.

# Highest and Best Use

## As Vacant

The site is zoned for high density development (PD-193/SD-147). Based upon the allowable uses, the site could be developed with higher density of development which would provide a higher return to the land that the current improvements which are an underutilization of the site. Permitted uses include all physically possible uses such as office/retail, residential, hotel. The subject site contains 107,424 square feet or 2.47 acres and is adequately served by utilities, has an adequate shape and size, sufficient access, etc., to be a separately developable site. The subject site would support a site layout for any of the legally probable uses, which include office/retail, residential, hotel and other similar uses. There are no known physical reasons why the subject site would not support any of these legally probable developments.

Based on the preceding analysis and upon information and analysis contained in the area, neighborhood, and market analyses, the highest and best use as vacant would be high density mixed use development. It is considered that sufficient demand exists for development to occur in the near term. Our analysis of the subject and market yields the conclusion that the most likely buyer, as if vacant, would be an investor or developer.

## As Vacant

The site is improved with a two story office building containing approximately 28,940 square feet which was built in 2004. The property also has a one level underground garage. There is also a detached second office building which is one-story and totals approximately 4,091 square feet. The property is landscaped and has a small paved area for surface parking, etc.

The site is zoned for High Density development. At a development density of 4:1 for office uses, the subject site could be developed with 429,696 SF of improvements. At a development density of 4.75:1 for hotel development the subject site could be developed with 510,264 SF of improvements. It is considered the current improvements are an under-utilization of the site given the high density zoning district in which the subject site is located. Therefore, the value in the property is considered to be within the underlying land. The current improvements are reported to be owner occupied and could be considered an interim use until such time as the site is purchased and redeveloped with a high density mixed use development.

# Appraisal Methodology

## Cost Approach

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

## Sales Comparison Approach

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier. Adjustments are applied to the property units of comparison derived from the comparable sale. The unit of comparison chosen for the subject is then used to yield a total value.

## Income Capitalization Approach

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

**Application of Approaches to Value**

| Approach | Comments |
|---|---|
| Cost Approach | The Cost Approach is not applicable and is not utilized in this appraisal. |
| Sales Comparison Approach | The Sales Comparison Approach is applicable and is utilized in this appraisal. |
| Income Capitalization Approach | The Income Capitalization Approach is not applicable and is not utilized in this appraisal. |

*Compiled by NKF*

The subject property is being appraised as a tract of vacant land. In the absence of ground leases, subdivision, or other income sources, the sales comparison approach is viewed as most applicable in the valuation of land parcels. Therefore, the sales comparison approach is the sole approach to value utilized in this appraisal. The exclusion of the other two approaches does not impact the reliability of the appraisal.

# Sales Comparison Approach

Land value can be developed from a number of different methodologies. In this case, we have employed the sales comparison as sufficient comparable data exists from which to derive a reliable indication of value. Sales comparison includes the following steps.

- Research and verify information on properties in the market that are similar to the subject and that have recently sold.
- Select the most relevant units of comparison in the market and develop a comparative analysis.
- Examine and quantify via adjustments differences between the comparable sales and the subject property using all appropriate elements of comparison.
- Reconcile the various value indications to a value indication.

Based on a review of market activity, the appropriate unit of comparison is price per usable land sf.




Land Comparables Map

| Comparable Land Sales Summary | | | | | |
|---|---|---|---|---|---|
| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
| Address | 2999 Turtle Creek Boulevard | 2610 Maple Avenue | 2601 Olive Street | 3001 Maple Avenue | 2505 Turtle Creek Blvd |
| City, State | Dallas, TX | Dallas, TX | Dallas, TX | Dallas, TX | Dallas, TX |
| Use at Sale | Vacant | Vacant | Assumed Vacant | Assumed Vacant | Assumed Vacant |
| Proposed Use | Mixed Use | Mixed Use | Mixed Use | Planned Redevelopment | Future MF development |
| Useable Acres | 2.47 Acres | 1.08 Acres | 0.69 Acres | 3.37 Acres | 1.37 Acres |
| Useable Land SF | 107,424 SF | 46,956 SF | 30,056 SF | 146,884 SF | 59,677 SF |
| Shape/Topography | Irregular/Gently Sloping | Irregular/Generally Level | Irregular/Generally Level | Irregular/Nearly Level | Irregular/Nearly Level |
| Utilities Available | Electricity, Gas, Sewer, Water | Electricity, Gas, Sewer, Water | Electricity, Gas, Sewer, Water | Electricity, Gas, Sewer, Water | Electricity, Gas, Sewer, Water |
| Zoning | PD-193 (Sub-147) | PD-193 | PD-193 | PD-193 | O-2-Office |
| Transaction Type | | Closed | Closed | Closed | Closed |
| Buyer | | RREEF Management, LLC | Kaizen Development Partners | 3001 Maple, LP | MM Turtle Creek, LLC |
| Seller | | Terry Enterprises, LP | Firebird Restaurant Group | Kensington Maple, LLC | GG TC, LP |
| Interest Conveyed | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Sale Date | | Nov-18 | Oct-18 | Jan-20 | Jul-21 |
| Price | | $17,500,000 | $12,000,000 | $32,000,000 | $19,395,090 |
| Adj. Sale Price | | $17,500,000 | $12,000,000 | $32,000,000 | $19,395,090 |
| Price per Usable Land Acre | | $16,234,347 | $17,391,304 | $9,495,549 | $26,571,273 |
| Price Per Usable Land SF | | $372.69 | $399.25 | $217.86 | $325.00 |

*Compiled by NKF*

## Analysis of Land Comparables

The following paragraphs analyze the most relevant comparable data against the subject property.

### Comparable One

This transaction represents the sale of 1.08-acres of vacant land located at the northeast corner of Mahon Street and Maple Avenue (2610 Maple Avenue). The property sold for $17,500,000 or $372.69 per square foot. The land is zoned PD 193 and is not located in a designated flood zone. This tract was purchased for an investment with a high-rise apartment project planned for the site to be built by Kairoi in partnership with RREEF. The site is one of the last vacant high-rise development sites in the Uptown neighborhood. This property is not located within a designated flood hazard area and is zoned PD-193.

### Comparable Two

This transaction represents the sale of two adjoining tracts totaling 0.69 acres or 30,056 square feet of land located at 2601 Olive Street. The site is bordered by Akard Street on the west, Olive Street on the north, Harry Hines Boulevard on the east, and Ashland Street to the south in Uptown. The site was acquired for the development of a 24-story office building knowbn as "The Link at Uptown" which began construction in April 2019. The sale price also included an additional $1mm as a tenant imporvement allowance to the seller as part of new restaurant on the ground floor. This property is not located within a designated flood hazard area and is zoned PD-193.

## Comparable Three

This is the acquisition of a 3.37 acre parcel located at 3001 Maple Avenue in Dallas, Texas. The site was purchased with plans to re-purpose a few of the existing buildings and develop the remainder with office and residential uses. The existing improvements had a historic designation adding to cost of re-development. However, the true value was in the land. This property is not located within a designated flood hazard area and is zoned PD-193.

## Comparable Four

This is the acquisition of a 1.37 acre parcel located at 2505 Turtle Creek Boulevard in Dallas, Texas. The site was purchased with plans to build a mixed use development. The site is partially within a designated flood hazard area. The property is zoned O-2 Office with a 4:1 FAR.

Based on our comparative analysis, the following table summarizes the adjustments warranted to each land sale.

| Comparable Land Sales Adjustment Grid | | | | | |
|---|---|---|---|---|---|
| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
| Address | 2999 Turtle Creek Boulevard | 2610 Maple Avenue | 2601 Olive Street | 3001 Maple Avenue | 2505 Turtle Creek Blvd |
| City, State | Dallas, TX | Dallas, TX | Dallas, TX | Dallas, TX | Dallas, TX |
| Usable Land Area (Acres) | 2.47 Acres | 1.08 Acres | 0.69 Acres | 3.37 Acres | 1.37 Acres |
| Usable Land Area (SF) | 107,424 SF | 46,956 SF | 30,056 SF | 146,884 SF | 59,677 SF |
| Transaction Type | -- | Closed | Closed | Closed | Closed |
| Transaction Date | -- | Nov-18 | Oct-18 | Jan-20 | Jul-21 |
| Price Per Usable Land SF | | $372.69 | $399.25 | $217.86 | $325.00 |
| Transaction Adjustments | | | | | |
| Property Rights | | 0% | 0% | 0% | 0% |
| Financing | | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% |
| Market Conditions (Time) | | 8% | 8% | 5% | 1% |
| Subtotal | | 8% | 8% | 5% | 1% |
| Physical Adjustments | | | | | |
| Location/Access | | 5% | 0% | 5% | 0% |
| Corner | | 0% | 0% | 0% | 0% |
| Frontage | | 0% | 0% | 0% | 0% |
| Size | | -5% | -10% | 5% | -5% |
| Shape | | 0% | 0% | 0% | 0% |
| Topography | | 0% | 0% | 0% | 0% |
| Flood Zone | | 0% | 0% | 0% | 5% |
| Zoning | | 0% | 0% | 0% | 0% |
| Subtotal | | 0% | -10% | 10% | 0% |
| **Gross Adjustment** | | **18%** | **18%** | **15%** | **11%** |
| **Overall Adjustment** | | **8%** | **-3%** | **16%** | **1%** |
| **Indicated Price Per Usable Land SF** | | **$402.51** | **$388.07** | **$251.63** | **$328.25** |

*Compiled by NKF*

## Land Value Conclusion

| Land Value Conclusion | | |
|---|---|---|
| Useable Land SF | | 107,424 |
| **Comparable Sales Indications** | **Range** | **Average** |
| Unadjusted Price Per Usable Land SF | $217.86 - $399.25 | $328.70 |
| Adjusted Price Per Usable Land SF | $251.63 - $402.51 | $342.61 |
| Reconciled Value Per Usable Land SF | | $370.00 |
| Total Indicated Value | | $39,746,880 |
| | Rounded | $39,750,000 |

*Compiled by NKF*

## Listing

Additionally, there is a listing available located at 2727 Turtle Creek Boulevard, Dallas, Texas. The site contains 2.10 acres or 91,476 SF with a list price of $34,303,500 or $375.00 per square foot. This tract is 2 blocks from the subject and generally similar in location and is zoned for Hotel development. This would tend to set the upper limit since it is a listing and not affected by negotiations between buyers and sellers. This site is being marketed by JLL.

# Reconciliation of Value

The values indicated by our analyses are as follows:

| Land Value Conclusion | |
|---|---|
| **Primary Land Area (Attributable to Improvements)** | |
| Primary Site 1 | $39,750,000 |
| Total Indicated Land Value - Primary Site | $39,750,000 |

*Compiled by NKF*

## Cost Approach

As previously discussed, the Cost Approach was not utilized for valuation of the subject property as it is land.

## Sales Comparison Approach

The Sales Comparison Approach is focused on comparing the subject to sale and other market transactions with the aim to develop an indication of value that is founded on the theory of substitution. Basically, the intention is to determine value through considering the prices of properties which would be a substitute property to the subject. In this case, a selection of reasonably similar sales were obtained and the adjustment process was well founded by reasoning and direct evidence. In the absence of ground leases, subdivision, or other income sources, the sales comparison approach is viewed as most applicable in the valuation of land parcels. Therefore, the sales comparison approach is the sole approach to value utilized in this appraisal.

## Income Capitalization Approach

As the subject property is a tract of land and is not leased (or has any other reasonable income source), the Income Capitalization Approach was not applicable and not utilized.

| Value Conclusions | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value Conclusion** |
| As Is Market Value | Fee Simple | 12/8/2021 | $39,750,000 |

*Compiled by NKF*

**Extraordinary Assumptions and Hypothetical Conditions**

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1. With regard to the size of the subject site and improvements, we have relied on information provided by the site contact via the survey. If it is found that the size of the subject site should differ from what is reported in this Appraisal Report, then we reserve the right to alter and amend our findings and conclusions.

2. An environmental assessment was not provided to the Appraisers. If it is found that the subject site suffers from any environmental contamination, then we reserve the right to alter and amend our findings and conclusions.

The use of these extraordinary assumptions might have affected assignment results.

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1. None

*Compiled by NKF*

## Exposure Time

Exposure time is the estimated length of time the subject property would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. It is a retrospective estimate based on an analysis of past events assuming a competitive and open market.

Recent sales transaction data for similar properties, supply and demand characteristics for the local land market, and the opinions of local market participants were reviewed and analyzed. Based on this data and analysis, it is our opinion that the probable exposure time for the subject at the concluded market value stated previously is 12 months.

## Marketing Time

Marketing time is an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. As no significant changes in market conditions are foreseen in the near term, it is our opinion that a reasonable marketing period for the subject is likely to be the same as the exposure time. Accordingly, we estimate the subject's marketing period at 12 months.

# Assumptions and Limiting Conditions

The Appraisal contained in this Report (herein "Report") is subject to the following assumptions and limiting conditions:

1. Unless otherwise stated in this report, title to the property which is the subject of this report (herein "Property") is assumed to be good and marketable and free and clear of all liens and encumbrances and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. No responsibility is assumed for the legal description, zoning, condition of title or any matters which are legal in nature or otherwise require expertise other than that of a professional real estate appraiser. This report shall not constitute a survey of the Property.
2. Unless otherwise stated in this report, it is assumed: that the improvements on the Property are structurally sound, seismically safe and code conforming; that all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; that the roof and exterior are in good condition and free from intrusion by the elements; that the Property and improvements conform to all applicable local, state, and federal laws, codes, ordinances and regulations including environmental laws and regulations. No responsibility is assumed for soil or subsoil conditions or engineering or structural matters. The Property is appraised assuming that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report is based, unless otherwise stated. The physical condition of the Property reflected in this report is solely based on a visual inspection as typically conducted by a professional appraiser not someone with engineering expertise. Responsible ownership and competent property management are assumed.
3. Unless otherwise stated in this report, this report did not take into consideration the existence of asbestos, PCB transformers or other toxic, hazardous, or contaminated substances or underground storage tanks, or the cost of encapsulation, removal or remediation thereof. Real estate appraisers are not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater or other potentially hazardous materials and substances may adversely affect the value of the Property. Unless otherwise stated in this report, the opinion of value is predicated on the assumption that there is no such material or substances at, on or in the Property.
4. All statements of fact contained in this report as a basis of the analyses, opinions, and conclusions herein are true and correct to the best of the appraiser's actual knowledge and belief. The appraiser is entitled to and relies upon the accuracy of information and material furnished by the owner of the Property or owner's representatives and on information and data provided by sources upon which members of the appraisal profession typically rely and that are deemed to be reliable by such members. Such information and data obtained from third party sources are assumed to be reliable and have not been independently verified. No warranty is made as to the accuracy of any of such information and data. Any material error in any of the said information or data could have a

substantial impact on the conclusions of this Report. The appraiser reserves the right to amend conclusions reported if made aware of any such error.

5. The opinion of value stated in this report is only as of the date of value stated in this report. An appraisal is inherently subjective and the conclusions stated apply only as of said date of value, and no representation is made as to the effect of subsequent events. This report speaks only as of the date hereof.

6. Any projected cash flows included in the analysis are forecasts of estimated future operating characteristics and are predicated on the information and assumptions contained within this report. Any projections of income, expenses and economic conditions utilized in this report are not predictions of the future. Rather, they are estimates of market expectations of future income and expenses. The achievement of any financial projections will be affected by fluctuating economic conditions and is dependent upon other future occurrences that cannot be assured. Actual results may vary from the projections considered herein. There is no warranty or assurances that these forecasts will occur. Projections may be affected by circumstances beyond anyone's knowledge or control. Any income and expense estimates contained in this report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

7. The analyses contained in this report may necessarily incorporate numerous estimates and assumptions regarding Property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by the analysis will vary from estimates, and the variations may be material.

8. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraphs, several events may occur that could substantially alter the outcome of the estimates such as, but not limited to changes in the economy, interest rates, capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. In making prospective estimates and forecasts, it is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

9. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. This report shall be considered only in its entirety. No part of this report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the Firm. Possession of this report, or a copy hereof, does not carry with it the right of publication.

11. Client and any other Intended User identified herein should consider this report and the opinion of value contained herein as only one factor together with its own independent considerations and

underwriting guidelines in making any decision or investment or taking any action regarding the Property. Client agrees that Firm shall not be responsible in any way for any decision of Client or any Intended User related to the Property or for the advice or services provided by any other advisors or contractors. The use of this report and the appraisal contained herein by anyone other than an Intended User identified herein, or for a use other than the Intended Use identified herein, is strictly prohibited. No party other than an Intended User identified herein may rely on this report and the appraisal contained herein.

12. Unless otherwise stated in the agreement to prepare this report, the appraiser shall not be required to participate in or prepare for or attend any judicial, arbitration, or administrative proceedings.

13. The Americans with Disabilities Act (ADA) became effective January 26, 1992. No survey or analysis of the Property has been made in connection with this report to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. No expertise in ADA issues is claimed, and the report renders no opinion regarding the Property's compliance with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

14. Acceptance and/or use of this report constitutes full acceptance of these Assumptions and Limiting Conditions and any others contained in this report, including any Extraordinary Assumptions and Hypothetical Conditions, and is subject to the terms and conditions contained in the agreement to prepare this report and full acceptance of any limitation of liability or claims contained therein.

# Addendum A

# Glossary of Terms

The following definitions are derived from The Dictionary of Real Estate Appraisal, 6th ed. (Chicago: Appraisal Institute, 2015).

- ***Absorption Period:*** The actual or expected period required from the time a property, group of properties, or commodity is initially offered for lease, purchase, or use by its eventual users until all portions have been sold or stabilized occupancy has been achieved.
- ***Absorption Rate:*** 1) Broadly, the rate at which vacant space in a property or group of properties for sale or lease has been or is expected to be successfully sold or leased over a specified period of time. 2) In subdivision analysis, the rate of sales of lots or units in a subdivision.
- ***Ad Valorem Tax:*** A tax levied in proportion to the value of the thing(s) being taxed. Exclusive of exemptions, use-value assessment provisions, and the like, the property tax is an ad valorem tax. (International Association of Assessing Officers [IAAO])
- ***Assessed Value:*** The value of a property according to the tax rolls in ad valorem taxation; may be higher or lower than market value, or based on an assessment ratio that is a percentage of market value.
- ***Cash Equivalency:*** An analytical process in which the sale price of a transaction with nonmarket financing or financing with unusual conditions or incentives is converted into a price expressed in terms of cash or its equivalent.
- ***Contract Rent:*** The actual rental income specified in a lease.
- ***Disposition Value:*** The most probable price that a specified interest in property should bring under the following conditions: 1) Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market. 2) The property is subjected to market conditions prevailing as of the date of valuation. ***3)*** Both the buyer and seller are acting prudently and knowledgeably. 4) The seller is under compulsion to sell. 5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests. 7) An adequate marketing effort will be made during the exposure time. 8) Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto. 9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. This definition can also be modified to provide for valuation with specified financing terms.
- ***Effective Rent:*** Total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions; the rent that is effectively paid by a tenant net of financial concessions provided by a landlord.
- ***Excess Land:*** Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. See also ***surplus land.***

- ***Excess Rent:*** The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the landlord (lessor) and may reflect unusual management, unknowledgeable or unusually motivated parties, a lease execution in an earlier, stronger rental market, or an agreement of the parties.

- ***Exposure Time:*** 1) The time a property remains on the market. 2) [The] estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

- ***Extraordinary Assumption:*** An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. See also ***hypothetical condition.***

- ***Fee Simple Estate:*** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

- ***Floor Area Ratio (FAR):*** The relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area.

- ***Frictional Vacancy:*** The amount of vacant space needed in a market for its orderly operation. Frictional vacancy allows for move-ins and move-outs.

- ***Full Service Lease:*** See ***gross lease.***

- ***General Vacancy:*** A method of calculating any remaining vacancy and collection loss considerations when using discounted cash flow (DCF) analysis, where turnover vacancy has been used as part of the income estimate. The combined effects of turnover vacancy and general vacancy relate to total vacancy and collection loss.

- ***Going-Concern Premise:*** One of the premises under which the total assets of a business can be valued; the assumption that a company is expected to continue operating well into the future (usually indefinitely).

- ***Going Concern Value:*** An outdated label for the market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the market value of the going concern or market value of the total assets of the business.

- ***Gross Building Area (GBA):*** 1) Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved. 2) Gross leasable area plus all common areas. 3) For residential space, the total area of all floor levels measured from the exterior of the walls and including the superstructure and substructure basement; typically does not include garage space.

- ***Gross Lease:*** A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called full-service lease.

- ***Hypothetical Condition:*** 1) A condition that is presumed to be true when it is known to be false. (Appraisal Institute: The Standards of Valuation Practice [SVP]) 2) A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. See also ***extraordinary assumption.***

- ***Intended Users:*** 1) The party or parties the valuer intends will use the report. (SVP) 2) The client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser on the basis of communication with the client at the time of the assignment. (USPAP, 2016-2017 ed.)

- ***Investment Value:*** 1) The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. ***2)*** The value of an asset to the owner or a prospective owner for individual investment or operational objectives. (International Valuation Standards [IVS])

- ***Land-to-Building Ratio:*** The proportion of land area to gross building area; one of the factors determining comparability of properties.

- ***Lease:*** A contract in which the rights to use and occupy land, space, or structures are transferred by the owner to another for a specified period of time in return for a specified rent.

- ***Leased Fee Interest:*** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

- ***Leasehold Interest:*** The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease.

- ***Lessee:*** One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement.

- ***Lessor:*** One who conveys the rights of occupancy and use to others under a lease agreement.

- ***Liquidation Value:*** The most probable price that a specified interest in property should bring under the following conditions: 1) Consummation of a sale within a short time period. 2) The property is subjected to market conditions prevailing as of the date of valuation. 3) Both the buyer and seller are acting prudently and knowledgeably. 4) The seller is under extreme compulsion to sell. 5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests. 7) A normal marketing effort is not possible due to the brief exposure time. 8) Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto. 9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone

associated with the sale. This definition can also be modified to provide for valuation with specified financing terms.

- ***Market Rent:*** The most probable rent that a property should bring in a competitive and open market reflecting the conditions and restrictions of a specified lease agreement, including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

- ***Market Value:*** A type of value that is the major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined, such as the following. 1) The most widely accepted components of market value are incorporated in the following definition: The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress. 2) Market value is described, not defined, in the Uniform Standards of Professional Appraisal Practice (USPAP) as follows: A type of value, stated as an opinion, that presumes the transfer of a property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal. [2]

- ***Market Value of the Going Concern:*** The market value of an established and operating business including the real property, personal property, financial assets, and the intangible assets of the business.

- ***Marketing Time:*** An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal.

- ***Modified Gross Lease:*** A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a double net lease, net net lease, partial net lease, or semi-gross lease.

- ***Net Lease:*** A lease in which the landlord passes on all expenses to the tenant. See also ***gross lease; modified gross lease.***

- ***Net Net Net Lease:*** An alternative term for a type of net lease. In some markets, a net net net lease is defined as a lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management; also called NNN lease, triple net lease, or fully net lease.

[2] The actual definition of value used for this appraisal is contained within the body of the report. The definition of market value given above is general in viewpoint and is only provided for amplification.

- ***Occupancy Rate:*** 1) The relationship or ratio between the potential income from the currently rented units in a property and the income that would be received if all the units were occupied. 2) The ratio of occupied space to total rentable space in a building.

- ***Overage Rent:*** The percentage rent paid over and above the guaranteed minimum rent or base rent; calculated as a percentage of sales in excess of a specified breakpoint sales volume.

- ***Percentage Rent:*** Rental income received in accordance with the terms of a percentage lease; typically derived from retail store and restaurant tenants and based on a certain percentage of their gross sales.

- ***Prospective Opinion of Value:*** A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

- ***Rentable Area:*** For office or retail buildings, the tenant's pro rata portion of the entire office floor, excluding elements of the building that penetrate through the floor to the areas below. The rentable area of a floor is computed by measuring to the inside finished surface of the dominant portion of the permanent building walls, excluding any major vertical penetrations of the floor. Alternatively, the amount of space on which the rent is based; calculated according to local practice.

- ***Retrospective Value Opinion:*** A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion."

- ***Shell Rent:*** The typical rent paid for retail, office, or industrial tenant space based on minimal "shell" interior finishes (called vanilla finish or white wall finish in some areas). Usually the landlord delivers the main building shell space or some minimum level of interior build-out, and the tenant completes the interior finish, which can include wall, ceiling, and floor finishes, mechanical systems, interior electricity, and plumbing. Typically these are long-term leases with tenants paying all or most property expenses.

- ***Surplus Land:*** Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. See also ***excess land.***

- ***Turnover Vacancy:*** A method of calculating vacancy allowance that is estimated or considered as part of the potential income estimate when using discounted cash flow (DCF) analysis. As units or suites turn over and are available for re-leasing, the periodic vacancy time frame (vacancy window) to release the space is considered.

- ***Usable Area:*** 1) For office buildings, the actual occupiable area of a floor or an office space; computed by measuring from the finished surface of the office side of corridor and other permanent walls, to the center of partitions that separate the office from adjoining usable areas, and to the inside finished surface of the dominant portion of the permanent outer building walls. Sometimes called net building area or net floor area. See also floor area. 2) The area that is actually used by the tenants measured from the inside of the exterior walls to the inside of walls separating the space from hallways and common areas.

- ***Use Value:*** The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Use value may or may not be equal to market value but is different conceptually. See also ***value in use.***

- ***Value In Use:*** The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Value in use may or may not be equal to market value but is different conceptually. See also ***use value.***

- ***Value Indication:*** A valuer's conclusion of value resulting from the application of an approach to value, e.g., the value indication by the sales comparison approach.

# Addendum B

# Engagement Letter

NEWMARK VALUATION & ADVISORY

December 3, 2021

John J. Kane
Director
KANE RUSSELL COLEMAN LOGAN PC
901 Main Street
Suite 5200
Dallas, TX 75202
Phone: 214.777.4261
Email: jkane@krcl.com

Re: Appraisal of the property described as:
2999 Turtle Creek, Dallas, TX 75219 ("**Property**")

Dear Mr. Kane:

Newmark Knight Frank Valuation & Advisory, LLC ("**Firm**") agrees to provide Kane Russell Coleman Logan PC ("**Client**") an appraisal of the above Property in accordance with, and subject to, the terms and conditions set forth below and in the attached Schedules (collectively, "**Agreement**").

| | |
|---|---|
| APPRAISAL FEE: | $12,500.00 (inclusive of expenses). |
| ADDITIONAL HOURLY FEES: | Should court time and preparation be required, it will be billed at $450.00/hr with a 2-hour minimum plus expenses. |
| RETAINER: | $12,500.00 with the return of this letter signed by the Client. |
| REPORT DELIVERABLES: | The appraisal, draft and/or final, shall be delivered in electronic format (typically, pdf). One original hard copy of the final appraisal will be provided to Client upon request. |
| COMMENCEMENT AND DELIVERY DATE: | Delivery is as follows:<br><br>December 9, 2021<br><br>The appraisal process will commence upon receipt by the Firm of (i) this Agreement, signed by Client, (ii) the retainer, and (iii) information and materials identified in Schedule "B." The appraisal process will conclude upon delivery of the final appraisal report, unless terminated sooner by the Firm or Client or as provided herein. |
| REPORT TYPE: | Appraisal Report |

| | |
|---|---|
| VALUATION PREMISE: | Market Value |
| INTEREST IN THE PROPERTY APPRAISED: | Fee Simple Estate |
| DATE(S) OF VALUE: | Prospective as of: the Date(s) of Completion/Stabilization |
| INTENDED USER(S): | Intended users of the appraisal include only Kane Russell Coleman Logan PC, and no other party is permitted to use or rely on the appraisal.("**Intended Users**") The identification of Intended User(s) of the appraisal is to determine the type and extent of research, analysis and reporting appropriate for the assignment. Designation of a party other than Client as an Intended User is not intended to confer upon such party any rights under this Agreement. |
| INTENDED USE: | The intended use of the appraisal is solely for litigation purposes ("**Intended Use**") and no other use. |
| RELIANCE LANGUAGE: | None |
| GUIDELINES: | The analyses, opinions and conclusions are to be developed based on, and the appraisal will be prepared in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP) as published by the Appraisal Foundation. |
| SCOPE OF WORK: | The appraiser will use and properly apply all applicable and appropriate approaches to value sufficient to produce credible assignment results. The scope of the analysis will be appropriate for the appraisal problem. |
| ASSUMPTIONS/ LIMITING CONDITIONS: | The appraisal will be subject to Firm's standard Assumptions and Limiting Conditions, which will be incorporated into the appraisal report. In addition, the appraisal may be subject to, and the appraisal report may contain, Extraordinary Assumptions and Hypothetical Conditions. |
| ACCEPTANCE: | This shall constitute a binding agreement only if countersigned by the Client, or by an officer, director or other representative of Client who, by signing and accepting this Agreement, represents and warrants that he/she is authorized by Client to do so. |
| PAYMENT: | Client will be invoiced the appraisal fee (and any expenses) which will be earned in full upon initial delivery of the appraisal |

report (draft or final), with such appraisal fee (and expenses) payable within 30 days of invoicing.

Payment of the fee is not contingent upon any predetermined value or on an action or event resulting from the analysis, opinions, conclusions or use of the appraisal.

CHANGES TO THE AGREEMENT: Any significant changes to the assignment as outlined in this Agreement, such as the identity of the Client, Intended User, or Intended Use, will require the preparation and execution of a new Agreement.

CANCELLATION OF ASSIGNMENT: Client may cancel this Agreement at any time prior to the Firm's delivery of the appraisal upon written notification to the Firm. Client shall pay Firm for all work completed on the assignment prior to Firm's receipt of such written cancellation notice, unless otherwise agreed upon by Firm and Client in writing. The Firm may withdraw without penalty or liability from the assignment(s) contemplated by the Agreement before completion or reporting if the Firm determines, in the Firm's sole discretion, that incomplete information was provided to the Firm prior to the engagement, that Client or other parties have not or cannot provide documentation or information necessary to the Firm's analysis or reporting, that conditions of the Property render the original scope of work inappropriate, that a conflict of interest has arisen, or that Client has not complied with its payment obligations under this Agreement. The Firm shall notify Client of such withdrawal in writing.

NO THIRD-PARTY BENEFICIARIES: Nothing in the Agreement shall create a contractual relationship or any legal duty between Firm or Client and any third party, nor any cause of action, right, or claim in favor of any third party and against Firm or Client. In addition, this Agreement is not intended to, and shall not be construed to, render any person or entity a third-party beneficiary of this Agreement. Client acknowledges and agrees that the appraisal report shall reflect the foregoing. In addition, the appraisal report shall state that no party other than an Intended User identified in the Agreement is entitled to rely upon the appraisal.

---

This Agreement may be rescinded by the Firm unless signed and returned to the undersigned within 10 days from the date hereof.

If this Agreement correctly sets forth the Client's understanding of the services to be rendered, and if the terms are satisfactory, please execute and return the Agreement together with any required retainer.

Respectfully,

Hayden D. Littlefield

Hayden D. Littlefield
Senior Director
Certified General Appraiser
License No. TX 1324546 G
Hayden.Littlefield@ngkf.com
469.467.2073 Office Direct
713.725.0365 Cell

Agreed:
KANE RUSSELL COLEMAN LOGAN PC

SIGNATURE: [signature]

PRINT NAME: John Kane

TITLE: Director

DATE: 12/6/21

Schedule "A"

# TERMS AND CONDITIONS

ATTACHED TO AND A PART OF THE AGREEMENT DATED DECEMBER 3, 2021 TO PROVIDE APPRAISAL SERVICES FOR KANE RUSSELL COLEMAN LOGAN PC

1. These Terms and Conditions are attached to and incorporated into the above referenced Agreement as though fully set forth in full therein. Capitalized terms if not defined herein shall have the same meaning as defined in the Agreement.

2. With respect to any appraisal report, use of or reliance on the appraisal by any party, regardless of whether the use or reliance is authorized or known by the Firm, constitutes acceptance of these Terms and Conditions as well as acceptance of all other appraisal statements, limiting conditions and assumptions stated in the Agreement and appraisal report.

3. It is assumed that there are no matters affecting the Property that would require the expertise of other professionals, such as engineers or an environmental consultant, for Firm to provide the appraisal. If such additional expertise is required, it shall be provided by other parties retained by Client at Client's sole cost and expense.

4. Client acknowledges that the Firm is being retained as an independent contractor to provide the services described herein and nothing in this Agreement shall be deemed to create any other relationship between Firm and Client, including but not limited to an agency relationship. The parties neither intend nor have any expectation that any such relationship will arise as a matter of law or as a result of this Agreement. This assignment shall be deemed concluded and the services hereunder completed upon delivery of the appraisal described herein to Client.

5. All statements of fact contained in the appraisal report as a basis of the appraiser's analyses, opinions, and conclusions will be true and correct to the best of the appraiser's actual knowledge and belief. The appraiser is entitled to, and shall rely upon the accuracy of information and material furnished to the Firm by Client. Appraiser is also entitled to, and shall, rely on information provided by sources upon which members of the appraisal profession typically rely and that are deemed to be reliable by members of that profession without independent verification.

6. The Firm and the appraiser shall have no responsibility for legal matters, or questions or issues involving survey or title, soil or subsoil conditions, engineering, zoning, buildability, environmental contamination, structural matters, construction defects, material or methodology, or other similar technical matters with regarding the Property. Furthermore, the appraisal will not constitute a survey of the Property.

7. The appraisal and the data and information gathered in its preparation (other than the confidential data and information provided by Client) is and will remain, the property of the Firm. The Firm shall not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished by Client to the Firm. Notwithstanding the foregoing, the Firm and the appraiser are authorized by Client to disclose all or any portion of the appraisal and appraisal report and the related data and information, including confidential data and information provided by Client, to appropriate representatives of the Appraisal Institute if such disclosure is required to comply with the

Standards, Bylaws and Regulations of the Appraisal Institute, as well as, such disclosure as required by law and regulations, including compliance with a subpoena and licensing authority regulatory inquiries. The Firm is also authorized to include both confidential and non-confidential data assembled in the course of preparing the appraisal and which may be incorporated into the appraisal report in a database controlled by the Firm for the aggregation of such data and information to produce analytics and other metrics or products.

8. Unless specifically noted in the appraisal report, the appraisal will not take into consideration the possibility or probability of the existence of asbestos, PCB transformers, other toxic, hazardous, or contaminated substances and/or underground storage tanks (hazardous material) at on or in the Property, or the cost of encapsulation, removal or remediation thereof.

9. Client shall indemnify, defend (by counsel to be selected by Firm), protect, and hold Firm and Firm's appraisers, agents, employees, affiliates, representatives, successors and assigns (each, a "**Firm Party**"), free and harmless from any and all claims, liabilities, losses, penalties, fines, forfeitures, amounts paid in settlement, judgments, and all reasonable attorneys' fees and related litigation costs, fees and expenses incurred by the any of such indemnitees, which result from (i) any failure by Client or Client's agents or representatives to provide Firm with complete and accurate information regarding the Property; (ii) any material breach by Client of the provisions of the Agreement; (iii) if delivery of the appraisal to a third party is permitted by the Firm, Client providing an incomplete copy of the appraisal to such third party; or (iv) arising from Client or Client's agents or representatives providing a copy of the appraisal to a party not authorized by the Firm to receive such copy.

10. In preparing the appraisal, it is possible that the appraiser will discover conflicting information. In that event, appraiser will utilize information and data considered to be the most authoritative and for critical information will document the source. Information and data referred to may include, but is not limited to, legal descriptions; physical street addresses; assessor parcel numbers; property history; dimensions and areas of the site/land; dimensions and areas of the building improvements; physical unit counts; rent rolls; leases; lease abstracts; income and expense data; and any other related data. Any material discrepancy and/or error in any of the above data could have a substantial impact on the conclusions reported, and the Firm therefore reserves the right to amend conclusions reported if the Firm is made aware of any such discrepancy and/or error.

11. The appraisal may not be used, included or referenced, in whole or in part, in any offering or other materials without the prior written consent of the Firm, which consent may be conditioned upon the receipt by the Firm of an indemnity agreement, in form and content, satisfactory to Firm and provided by an indemnitor satisfactory to Firm. Client agrees to pay the fees of the Firm's legal counsel for review of any materials which is the subject of the requested consent. Except as agreed by the Firm expressly in writing, the Firm disclaims liability to any party other than Client.

12. The Firm shall not provide a copy of the appraisal to, or disclose the results of the appraisal to, any party other than Client, unless Client authorizes same, except as provided in the Confidentiality Section of the ETHICS RULE of the Uniform Standards of Professional Appraisal Practice (USPAP) or as otherwise required by law or regulations.

13. Client and any other identified Intended User should consider the appraisal as only one factor together with its own independent considerations and underwriting guidelines in making any decision or

investment or taking any action regarding the Property. Client agrees that Firm shall not be responsible in any way for any decision of Client or any Intended User related to the Property or for the advice or services provided by any other advisors or contractors.

14. Unless otherwise stated in this Agreement, Client agrees that the services pursuant to this Agreement shall not include participation in or preparation for, or attendance at, any legal, judicial, administrative, or arbitration proceeding relating to this assignment. In the event the Firm or any Firm Party is required, whether through the service of a subpoena or otherwise, to produce documents or participate in or prepare for any discovery, testimony or attendance, relating to the appraisal or this assignment, where the Firm or Firm Party is not a party to the action or proceedings involved, Client agrees to reimburse expenses incurred by the Firm or Firm Party, including attorney's fees, in responding to such subpoena or other legal process and compensate the Firm therefor based upon the appraiser's prevailing hourly or daily rate for providing services as an expert consultant or witness.

15. Except as expressly provided herein, Firm makes no representations or warranties to Client or to any other person or entity with respect to the appraisal and the services to be provided by Firm under this Agreement. To the maximum extent permitted under applicable law, in no event will the Firm or any Firm Party be liable to Client or any third party (regardless of whether such party's claimed use or reliance on the appraisal was authorized by the Firm or a Firm Party) for any indirect, special, exemplary, incidental, or consequential damages (including loss of profits) arising from or relating to this Agreement or the appraisal, even if such party knew or should have known of the possibility of, or could reasonably have prevented, such damages. In no event shall the total liability of the Firm or any Firm Party to Client or any third party (regardless of whether such party's claimed use or reliance on the appraisal was authorized by the Firm or a Firm Party) arising from or relating to this Agreement or the appraisal, whether based on tort, contract, or any other legal theory, exceed the amount of fees paid to the Firm for the appraisal and the services described herein. Legal claims or causes of action relating to the appraisal are not assignable, except: (i) as the result of a merger, consolidation, sale or purchase of a legal entity, (ii) with regard to the collection of a bona fide existing debt for services but then only to the extent of the total compensation for the appraisal plus reasonable interest, or (iii) in the case of an appraisal performed in connection with the origination of a mortgage loan, as part of the transfer or sale of the mortgage before an event of default on the mortgage or note or its legal equivalent.

16. Federal banking regulations require banks and other lending institutions to engage appraisers where FIRREA compliant appraisals must be used in connection with mortgage loans or other transactions involving federally regulated lending institutions. In view of that requirement, the appraisal may not be accepted by a federally regulated financial institution.

17. In the event Client fails to make payments of any fees or sums when due and payable under this Agreement; then from the date due and payable until paid, the amount due and payable shall bear interest at the maximum rate permitted under the laws of the state in which the Property is located. If the Firm is required to undertake collection efforts including institution of legal action against Client relating to the Agreement, the Firm shall be entitled to recover attorney's fees, litigation expenses, and costs from Client.

18. To the extent permitted under applicable law, any legal action or lawsuit or other proceeding by Client or any Intended User of the appraisal against Firm or a Firm Party whether based in contract, tort,

---

warranty, indemnity or otherwise, relating to the appraisal shall be commenced within two (2) years from the date of delivery of the appraisal to the claimant in such action or proceeding, unless the applicable law provides for a shorter period, and any such claimant waives the right to a jury in any such legal action or lawsuit or other proceeding. Notwithstanding the state of domicile or residency of either party to this Agreement, this Agreement shall be governed and construed under the laws of the state in which the Property is located, and venue for any action or proceeding arising out of this Agreement shall be deemed proper only in the court of competent jurisdiction located in the state in which the Property is located.

19. Throughout the performance of services under this Agreement, the Firm shall maintain at its sole cost and expense the following insurance:

    (a) Workers' Compensation, so as to provide statutory benefits as required by the laws of each state within the United States in which the Firm's services are being provided, and Employer's Liability insurance with limits of liability of $1,000,000 each accident, $1,000,000 disease each employee and $1,000,000 disease policy limit covering all employees of the Firm engaged in the performance of such services.

    (b) Fidelity insurance or bond with a limit of $1,000,000 to insure the Firm against loss of its or Client's assets caused from the dishonest acts of the Firm's employees.

    (c) Professional Liability insurance with a limit of liability of $1,000,000 each claim and $1,000,000 aggregate, which limits may be provided by a combination of primary and excess policies.

    (d) Commercial General Liability insurance providing coverage against damages due to bodily injury (including death), property damage and personal and advertising injury arising in connection with the Firm's services provided under this Agreement, which insurance coverage shall: (i) be occurrence-based; (ii) provide limits of liability in an amount of $1,000,000 each occurrence and $1,000,000 aggregate (including excess and/or umbrella limits), (iii) include at least those coverages generally included in the most current ISO Commercial General Liability insurance policy form (or its equivalent); and (iv) include Client, and such other persons or entities as Client has identified in writing, as additional insureds solely with regard to claims arising out of this Agreement.

    (e) Commercial automobile liability for owned, hired and non-owned motor vehicles, with a $1,000,000 combined single limit.

# Addendum D

# Appraiser Qualifications and Licenses



# Hayden D. Littlefield

*Senior Director*

t 469-467-2073
hayden.littlefield@ngkf.com

**YEARS OF EXPERIENCE**

32

**AREAS OF SPECIALTY**

Appraisal Valuation

Estate Valuation

Consulting

Hayden D. Littlefield joined Newmark's Valuation & Advisory team in 2017 and currently serves as a Senior Director in the Dallas office, where he provides valuation and consulting services for the acquisition, disposition and financing of investment-grade real estate.

Hayden's experience extends to numerous property types, including apartments (proposed, investment-grade, garden-style), industrial (warehouse, self storage, manufacturing/distribution facilities), professional and medical office (high-rise, garden-style, mid-rise), retail (strip, neighborhood, big box, lifestyle, regional mall), land (raw, finished lots) and special-purpose (marinas, farms, ranches).

Since the start of his career, Hayden has acted as a real estate broker or appraiser on a wide variety of properties throughout Alabama, Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Mississippi, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington and Wisconsin.

Prior to Newmark, Hayden worked for nearly 15 years as Vice President with CBRE Valuation Services. Previously, he served as a Senior Appraiser for Houston-based Aaron & Wright Technical Services, Inc. Hayden began his appraisal career in 1989 with Rhodes Appraisal Service. He began his career in real estate five years earlier, when he obtained his Texas real estate salesperson's license.

## Professional Affiliations

- Certified real estate appraiser, states of Louisiana, Oklahoma and Texas
- Candidate for designation, Appraisal Institute

## Education

Hayden earned a Bachelor of Business Administration degree in marketing from the University of Texas. He obtained his appraisal education from the Appraisal Institute as well as various other education providers. He continues to pursue appraisal education and is currently a candidate for designation in the Appraisal Institute.

HAYDEN DEE LITTLEFIELD
875 HARBOR COURT
SOUTHLAKE, TX 76092

TALCB
TEXAS APPRAISER LICENSING & CERTIFICATION BOARD

# Certified General Real Estate Appraiser

Appraiser: **Hayden Dee Littlefield**
License #: **TX 1324546 G** License Expires: **12/31/2022**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Occupations Code, Chapter 1103, authorization is granted to use this title: Certified General Real Estate Appraiser

For additional information or to file a complaint please contact TALCB at www.talcb.texas.gov.

Chelsea Buchholtz
Commissioner