IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Friday, June 10, 2022<br>10:36 A.M. |

TRANSCRIPT OF TELEPHONIC HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

For the Debtor:

Joyce Lindauer Attorney, PLLC
BY: JOYCE LINDAUER, ESQ.
1412 Main Street, Suite 500
Dallas, Texas 75202

Simmons Legal, PLLC
BY: CAMISHA SIMMONS, ESQ.
6060 North Central Expressway
Suite 500
Dallas, Texas 75206

Robin Phelan Law
BY: ROBIN ERIC PHELAN, ESQ.
4214 Woodfin Drive
Dallas, TX 75220

Fee Smith Sharp & Vitullo LLP
BY: OSCAR REY RODRIGUEZ, ESQ.
13155 Noel Road, Suite 1000
Dallas, Texas 75240

APPEARANCES CONTINUED ON NEXT PAGE.

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES VIA WEBEX (CONTINUED):

| | |
|---|---|
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |
| For Centennial Bank d/b/a Happy State Bank: | Weycer Kaplan Pulaski & Zuber, PC<br>BY: JEFF CARRUTH, ESQ.<br>2608 Hibernia Street<br>Dallas, Texas 75204 |
| For the United States Trustee: | Office of the United States Trustee<br>BY: ASHER BUBLICK, ESQ.<br>1100 Commerce Street<br>Room 976<br>Dallas, Texas 75202 |

# I N D E X

| | Page |
|---|---|
| Case called | 6 |
| End of Proceedings | 174 |
| Certification of Transcriber | 174 |

WITNESSES

FOR THE DEBTOR:

| | |
|---|---|
| RANDY MARX | |
| Direct Examination by Ms. Lindauer | 125 |

FOR HNGH TURTLE CREEK:

(None)

# I N D E X

EXHIBITS


| | | ID | EVD |
|---|---|---|---|
| FOR THE DEBTOR: | | | |
| 1 through 9 | | -- | 121 |
| 12 through 14 | | -- | 121 |
| 16 through 24 | | -- | 121 |
| 26 and 27 | | -- | 121 |
| FOR HNGH TURTLE CREEK: | | | |
| 1 through 22 | | -- | 81 |
| 24 through 36A | -- | 116 | |
| 38 through 46 | | -- | 116 |
| 47 | | -- | 115 |
| 48 and 49 | | -- | 116 |
| 51 through 53 | | -- | 116 |
| 54 | | -- | 115 |
| 54A | | -- | 115 |
| 55 | | -- | 115 |
| 56 | | -- | 115 |
| 56A | | -- | 115 |
| 57 | | -- | 115 |
| 57A | | -- | 115 |
| 57B | | -- | 115 |
| 57C | | -- | 115 |
| 58 | | -- | 118 |
| 59 | | -- | 115 |
| 60 | | -- | 116 |
| 61A | | -- | 116 |
| 61 | | -- | 116 |
| 62 | | -- | 119 |
| 63 through 64 | | -- | 116 |
| 65 | | -- | 115 |
| 65A | | -- | 115 |
| 65B | | -- | 115 |
| 65C | | -- | 115 |
| 65D | | -- | 115 |
| 66 | | -- | 115 |
| 67 | | -- | 115 |
| 67A | | -- | 115 |
| 68 | | -- | 115 |
| 69 | | -- | 116 |
| 69A | | -- | 116 |
| 70 | | -- | 116 |
| 71 | | -- | 115 |

**I N D E X**

EXHIBITS (CONTINUED)


| FOR HNGH TURTLE CREEK: | ID | EVD |
|---|---|---|
| 72 | -- | 117 |
| 72A | -- | 117 |
| 73 | -- | 117 |
| 74 | -- | 115 |
| 75 | -- | 115 |
| 76 through 84 | -- | 117 |
| 85 | -- | 102 |
| 86 | -- | 117 |
| 87 | -- | 117 |
| 87A | -- | 115 |
| 88 | -- | 105 |
| 89 through 94 | -- | 117 |
| 95 | -- | 115 |
| 95A | -- | 115 |
| 96 | -- | 118 |
| 97 | -- | 105 |
| 99 | -- | 81 |

(Proceedings commenced at 1:31 p.m.)

THE CLERK: All rise.

THE COURT: Thank you. Please be seated if you're not already seated.

We have one matter on the 10:30 docket, the 2999TC Acquisitions case. I apologize for the slight delay in getting started. Since I'm borrowing courtrooms for the next few months, we had to get some techy people to get my equipment to work, and it appears that we are good to go. So I'll go ahead and take appearances.

MR. KANE: Your Honor, John Kane of Kane Russell Coleman & Logan on behalf of the movant, HNGH Turtle Creek, LLC, the secured creditor and lender in this case.

THE COURT: Good morning.

MR. PHELAN: Your Honor, Robin Phelan for the reorganized debtor.

THE COURT: Any other counsel wish to make --

MR. METZGER: Your Honor, Steve Metzger representing Tim Barton.

THE COURT: I'm sorry. I spoke over you. Could you announce your name again, please?

MR. METZGER: Steve Metzger on behalf of Tim Barton, individually.

THE COURT: Thank you.

MR. CARRUTH: Good morning, Your Honor. Jeff Carruth

for Centennial Bank doing business as Happy State Bank.

THE COURT: Good morning. Thank you.

Any other counsel wish to make an appearance?

MS. LINDAUER: I'm on.

THE COURT: Okay. Ms. Lindauer, I --

MS. LINDAUER: Yeah. I'm having some technical issues.

Your Honor, we are trying to run the audio through the phone, and that's not working. So hang on, let me switch to the computer.

Your Honor, can you hear me now?

THE COURT: I can. Thank you.

MS. LINDAUER: Okay, good. Sorry, Your Honor, about that little technical (indiscernible) trying to get things set up this morning. Thank you.

THE COURT: Not a problem. So you and Mr. Phelan are both appearing for the debtor this morning, correct?

MS. LINDAUER: That is correct, Your Honor, the reorganized debtor.

THE COURT: All right. We have just one matter on the docket.

Mr. Kane, it's your motion. I guess I'll hear from you first.

MR. PHELAN: Your Honor, I think there is some threshold issues procedurally that need to be dealt with first

before we get into any opening statements or the merits.

THE COURT: Mr. Kane? Mr. Kane?

MR. KANE: Your Honor, I know Mr. Phelan is brand new to this case, but I'm curious exactly what those threshold issues are before opening statement. If we want to talk about admissibility of evidence, if that's what he's referring to, I'm happy to discuss that on the front end.

THE COURT: Okay.

MR. PHELAN: Okay. That's not it, but it's something a little broader.

Your Honor, I'm a little confused as to why we're here today. The emergency motion of HNGH asked for three things, none of which sound like an emergency. So maybe a continuance is in order.

MR. KANE: Your Honor?

MR. PHELAN: (Indiscernible) --

MR. KANE: I'm going to stop Mr. Phelan right there. We filed a motion for expedited hearing, coordinated with debtor's counsel to see if they would contest that or if they were available for hearing dates. They did not contest the motion for expedited hearing and did provide hearing dates and their willingness to participate in this hearing. That's a dead issue.

MR. PHELAN: That's fine. I'm not sure that's right, but there's something more important.

The emergency motion of HNGH asked for three things: first, that this Court rule that they own the property in dispute; second, they want an order that the debtor release the lis pendens the debtor filed against the property; and third, they want a holding that the debtor and Tim Barton as the principal of the debtor be held in contempt if they interfere with HNGH.

Now HNGH admits in their motion that the first ruling isn't necessary. At best, it's a comfort order. If HNGH thinks that there's a breach of the plan and the agreed orders, they can go ahead and sue us somewhere else or just ignore us. In any event, who owns the property is a request to determine an interest in property and requires an adversary proceeding under Rule 7001.

THE COURT: But your side I believe --

MR. PHELAN: And second --

THE COURT: Mr. Phelan, your side agreed that this hearing would be set without raising that issue. Is that correct?

MR. PHELAN: I'd have to defer to Ms. Lindauer on that one.

MS. LINDAUER: Your Honor, the only thing we agreed to was to set this matter on a short notice expedited hearing. We didn't agree to any of the terms of the motion itself. That was done as an accommodation to Mr. Kane. But, Your Honor, we

didn't agree that the motion itself has any particular merit, only that we would allow it to be heard on short notice.

So I think those are two different issues. But we did not oppose setting the hearing today. But obviously, with our objection and response, we oppose the contents of the motion itself. So I think Mr. Phelan is addressing the relief sought in the motion itself, which we do contest. And so I think he was going through the relief that's been requested and why we don't think it's appropriate, why we think they're simply asking for a comfort order from this Court, and why the motion overall should be denied.

So, Your Honor, I know Mr. Phelan doesn't have the history with this case, but I do. I've been debtor's counsel since the inception. I'm very familiar with the pendency of this case and all the orders that were entered. And it was the parties' intention in those orders that Judge Hale signed, which are agreed orders that are the subject of this dispute, that they be self-effectuating.

There was never any intention that either party would have to come back to this Court asking you for some relief. We did file last night an adversary proceeding because I agree with Mr. Phelan. If you're going to tee up these issues, they have to be done in the proper context. It's not a motion to enforce. It's an adversary proceeding.

So that's why we filed that last night to give the

parties an opportunity should they continue to want to pursue this matter to have it set it in the right forum. But that may be a long way to say, Your Honor, I did accommodate Mr. Kane on this setting. I thought that was appropriate. He's worked with me; I've worked with him. But that doesn't mean we agree to anything that they're trying to do today. So I want to be clear about that. Thank you.

MR. PHELAN: Your Honor, I think they're separate things. Agreeing to a setting to determine issues is different than a determination as to what procedurally should be done to tee up the merits of the issue, and it's real clear that a request to determine an interest in property requires an adversary proceeding.

The second thing they asked for also requires an adversary proceeding. It's a request for an affirmative order. It's a little hard to tell because the connection between the orders and the *lis pendens* are a little complicated. But again, ordering us to remove a *lis pendens* requires a determination of an interest in property. Again, an adversary proceeding. It's also effectively a request for a declaratory judgment that we have no interest in the property and affirmative relief for us to release the *lis pendens* because of that.

The third request by HNGH requests a prospective contempt ruling of some sort, which is effectively a request

for a prospective finding or a stealth injunction. This also requires an adversary proceeding. Now, HNGH calls their request an emergency motion to enforce orders. But it's not an emergency and those aren't motion requests. You can't get around the rules by calling something a motion. The appropriate thing to do is to tell everybody to come back when the pleadings comply with the rules and have a nice weekend.

Thank you, Your Honor.

MR. KANE: Your Honor, this is John Kane for the record.

This little mini dispute at the beginning of this hearing is a perfect fantastical microcosm of this case. Debtor agrees to the setting, the debtor files responsive pleadings, the debtor provides a witness and exhibit list, we have a scheduled hearing that the parties have been working towards, and at the outset of the hearing, what the opposing party says is never mind our prior agreement, we just need more time. We just want additional delay.

So let's look at what we're actually requesting, right. The Court under Section 105(a) has all power and authority to enforce its own orders that have already taken place in this case. The opposing party has just acknowledged that the Court's orders are, in essence, self-effectuating orders. Now, Mr. Phelan is saying, well, the release of the *lis pendens* is something that should be adjudicated in an

adversary proceeding. Mr. Phelan isn't familiar with this case and so appears ignorant of the fact that it already has been adjudicated in an adversary proceeding, that the exhibits that we've submitted to this Court, and to which Ms. Lindauer has said she is not opposed, includes an agreed judgment in the adversary proceeding waiving all of the claims in which the debtor contested the validity of our position of our title of our deed in lieu of foreclosure.

The *lis pendens* is filed. It is, in essence, a recorded instrument showing that a complaint alleging that the deed in lieu of foreclosure, that special warranty deed that was filed on October 29th, should be unwound. That's already been administered. And in it, the debtor released and waived all these claims and causes of action. And yet, here the debtor is saying, well, wait a second. We're not saying we don't have a claim to this property. We're not saying that we don't have some kind of potential cloud on title. So we need an adversary proceeding.

It's the exact same thing that we've dealt with throughout this case. And it is one of the key focuses of my presentation as we move forward beyond this purported threshold issue. And it's just a reason that we need a comfort order. And I don't want to go too far into this here. We can do it while we're in the presentation addressing this on the merits. The reason that we need a comfort order is because the debtor

does not believe it should be bound by this Court's own prior orders. And, frankly, Your Honor, we just need some protection from the bad guys, the people who will agree to something and then turn around on the day of the hearing, the day of the payoff deadline, the maturity date, and say that shouldn't apply to me.

So what we would ask, Your Honor, is that this contested matter continue forward. It's continuing forward on the pacing that the debtor has previously agreed to. And we have moved for relief from this Court related to the enforcement of its own Court orders that are already in existence. And, Your Honor, what we would point out is that in each instance, the Court's orders that Judge Hale entered were agreed orders. They were forms that had been previously approved by the debtor to which the debtor no longer wishes to be bound.

And so we'd like to just move past this threshold issue, address this as a contested matter. If we have to come around at a later date and file a motion to dismiss and for sanctions for the adversary proceeding that the debtor filed last night, as we anticipated it would, we'll do that. But we're here. The opposing party has agreed to be here. They filed responsive pleadings. We're ready to go.

MR. PHELAN: Your honor, that's a total mis-characterization.

MR. KANE: It isn't.

MR. PHELAN: We're the ones that want to enforce the Court orders. The Court orders obviously contemplate that we would have an interest in the property and they are the ones that are in default of the Court orders. And we want simply for them to comply.

We can get into the merits later. But this is not an enforcement of the orders by them. They're asking for additional relief. They're asking for determinations that have not been made. The orders very clearly and the plan very clearly provides a procedure that recognizes we have an interest in the property.

So they're the ones that are improperly asking for additional relief, which requires an adversary proceeding. I understand Mr. Kane is outraged and his client's outraged. We're just as outraged. And when we get the pleadings, when the pleadings are in an appropriate format and the evidence can be presented, I think this Court will see that it's very clear that this reorganized debtor is not the one in default, that it's HNGH that is in default, and they are clearly not entitled the relief they seek.

In addition, when we get further on, I think we have a solution to the underlying merits. That's a separate issue. For right now, their so-called motion requests affirmative relief. It does not request enforcement of the order. It

requires determinations with respect to that order that are beyond the scope of the order. So, to me, it is very clear that an adversary proceeding is required on the face of their so-called motion.

Thank you, Your Honor.

THE COURT: Any other comments before I -- I'm going to consider Mr. Phelan's request an oral motion to continue the matter.

Mr. Kane, do you have any other replies before I rule on that request?

MR. KANE: I do not, Your honor.

THE COURT: Okay. I've considered the oral request to continue the motion and in connection with that request, I'm considering all of the documents that we reviewed in preparing for this hearing, including, but not limited to Bankruptcy Docket Number 64, which is the first agreed order that was entered back in December; the Docket Number 94, which is the second agreed order that was entered on March 17th. So the first order was entered on December 10th. The second order was entered on March 17th.

Each of those orders contains a provision providing that this Court shall retain jurisdiction over all matters pertaining to this order. And I construe the motion that's on the docket today as relating to both of those orders and I think that makes sense based on the response that was filed,

which is the debtor's initial response at Docket Number 145 and the supplemental response at Docket Number 149.

I think those responses fairly joined the request for relief that was requested in the motion, which is consistent with the terms of the agreed order, so I do interpret today's motion that's pending as enforcement of the Court's prior order. I'm aware of the adversary proceeding that was -- one or more adversary proceedings that were encompassed as being resolved by the terms of those agreed orders and I do not believe that a separate adversary proceeding, at least for purposes of today's hearing, justifies continuing the motion that's on the docket that was adequately noticed that was -- at least the setting was consented to by the parties.

And based on the very detailed and very well-briefed responses that were filed, the witness and exhibit lists that were filed, it appears that everybody's ready to go and I'm going to deny the oral request to continue the matter. I'll go ahead and turn over the podium back to Mr. Kane so he can make his opening statements on the merits of his motion.

MR. KANE: Thank you, Your Honor.

As far as opening statements go, I'm happy to make an opening statement or just transition straight into our case-in-chief and offer evidence and then walk this Court through our evidence. We're happy to do that. We can just split the time equally if opposing counsel is interested in doing that as

well. So Mr. Phelan and Ms. Lindauer, I'm not sure who's going to be arguing your side, are you comfortable just going case-in-chief, case-in-chief?

MR. PHELAN: No, Your Honor. I'd like to make an opening statement.

MR. KANE: Okay.

THE COURT: And Mr. Kane, I'm interested in opening statements, too, because I have questions for both you and either Mr. Phelan or Ms. Lindauer. And ordinarily, I believe in one riot, one ranger, but given Mr. Phelan's recent appearance to the case, do you have any opposition to two counsel appearing for the debtor in the matter today or arguing before the Court?

MR. KANE: No, Your Honor. I don't. I do not.

I know Ms. Lindauer has a lot of understanding about exactly what did take place. I can't say the same for Mr. Phelan. He's a late arrival. But I have no opposition to him arguing matters on behalf of the debtor.

THE COURT: Okay. Well, with that, I'll go ahead and ask Mr. Kane to go ahead and start with your opening arguments. I do have a couple questions for you based on the pleadings that I believe Mr. Phelan was involved in the preparation of the most recent filings by the debtor, but that the debtor made in his papers. So go ahead and start with your arguments and I'll ask some questions maybe when you're done.

MR. KANE: Yes, Your Honor.

This is about our client, HNGH Turtle Creek, LLC, seeking protection from this Court through the enforcement of its orders against what we believe to be bad faith actors. And, you know, Mr. Phelan asked initially, as part of his preliminary matters, why we're here, and I do think that that is a good thing to start with from an opening statement perspective. Why are we here?

The other side says that we have an automatically executing Court order. Okay. Well, if that is the case, Your Honor, the payoff deadline passed, a default occurred. Because the default occurred, the stay automatically lifts, the party has waived -- sorry, when I say the party, the debtor has waived all right to contest the validity of the deed in lieu of filing that took place by our client on October 29th before the bankruptcy case was filed.

We are the rightful owner of the property. There's been no motion to stay that deadline. There's been no motion to preclude or otherwise abate our rights to the property, so we own the property. Now, that in a normal bankruptcy case, at least from my experience, would mean, okay, we own the property. We have all right, title, and interest to the property. We are moving forward. We are going to evict any tenants that are on the property that we don't want to be on the property, and there is no real contest over the validity of

our title to the property.

And what we've seen here is that with this bad faith actor, that's never the case, and it hasn't been the case at any stage of the relationship between the parties here. And what we've seen is one failure after another followed by what we consider vexatious litigation in order to create a cloud on title, in order to create delay so that this debtor, this bad faith actor, can go to this Court and try and seek some kind of alternative remedy, whether it's on an equitable basis or otherwise.

And what we see repeatedly is when the debtor tries to do that, it is based on mischaracterizations, material misrepresentations, or what I like to call a distraction, or a smoke show, a red herring. Look at this over here, a misdirection. And so what we felt was necessary, especially following the emergency motion to extend the deadline that was filed by the debtor and later withdrawn, was that there's no way on a go-forward basis we're not going to have the exact same actions by this debtor.

And we felt, as we were in this bankruptcy case, that the only way to deter that type of bad faith action was through agreed orders entered by Judge Hale with a retention of jurisdiction so that we knew at all times we could hold this debtor accountable. So what happens? Well, Your Honor, the debtor isn't accountable. The debtor botched its closing and

the evidence will show that none of the debtor's lending sources were prepared to close by May 31, 2022, regardless of what HNGH did.

What the evidence will show is that even despite that fact, those are facts which are admitted to by at least three different lenders that the debtor was working with, the debtor decided to, in bad faith, shift the blame to HNGH. Not only that, the evidence will show that the debtor did it intentionally through a trap. Evidence will show that the first time --

THE COURT: I'm sorry, Mr. Kane.

MR. KANE: -- the debtor received --

THE COURT: -- through a, did you say through a trap?

MR. KANE: Through a trap.

THE COURT: Trap?

MR. KANE: I said a trap. Yes, Your Honor, a trap.

The evidence will show that there was a trap set. That HNGH received from the debtor a list of demands that needed to be delivered to the title company on March -- I'm sorry, on May 30th at 3:24 p.m.

The evidence will show that Khudabuksh Walji, counsel for the debtor, later said HNGH's failure to deliver all of the documents that were requested by 5:00 p.m. on that very same day, Memorial Day, May 30th, was a material breach of the agreed order. Again, Your Honor, this is even despite the fact

that the debtor's own lenders could not have closed by May 31, 2022.

Evidence will show that's even after HNGH provided the debtor six months during the bankruptcy case to try and find a payoff party to raise the money to close this deal. The reality of this situation, the evidence will show it, is that the debtor just can't get a closing done. The debtor's principals have been trying this. The initial maturity date was October 1, 2020. And here we are, it's June 10, 2022. And on May 31st at 5:00 p.m., the debtor had an obligation to close, and it couldn't.

Now, knowing that that took place, unfortunately, HNGH anticipated that the debtor was going to file specious motions, which it did, for which the evidence will show I provided a Rule 11 notice shortly before the hearing was withdrawn, which I think should tell this Court everything it needs to know about what happened.

Even so, when we sought an order seeking the enforcement of this Court's orders, the evidence will show that we received an additional complaint filed last night in an effort to cause delay so that the debtor can have a proposal for this Court. And what is the proposal? It's the same thing that we've gotten every single time, Your Honor. Give us more time. Give us an opportunity to close. We'll get it done this time.

Well, what happens then, right? Our anticipation is the debtor will fail in that closing and we'll be in the exact same position we're in. And the only thing that will have happened is that my client will have been deprived of the opportunity to move forward with this property. It's another waste of time. All the while, the debtor is seemingly obtaining the benefit of the property, which we find out and the evidence will show, that the debtor may have an unreported lease on this property generating over $3 million in revenue that it has affirmatively not disclosed to the Court despite direct questioning. But that's what we're dealing with.

We're dealing with a botched closing. We're dealing with almost certain insider roadblocks. We're dealing with the debtor's efforts to cloud title. And we're dealing with a picture, a series of red herrings that the debtor is going to paint, to try and misdirect this Court to providing equitable relief. Things like, the property's going to be worth a $100 million, so you're depriving us of all this equity, right. Let's ignore the fact that the debtor started the bankruptcy case alleging that the property was worth $50 million.

You're going to hear that HNGH's failure to provide a rescission deed was what caused the debtor not to close. You're going to see evidence that the debtor has asserted that HNGH interfered with the debtor's efforts to obtain financing and that precluded closing, which is materially false.

So, Your Honor, we have to come to you, unfortunately, asking for this Court to enforce its orders and to provide us protection from parties that are bad actors, parties who have entered into releases of claims and causes of action on multiple occasions in multiple agreed orders in this Court, parties that have agreed to specific findings of fact in an agreed adversary judgment that now pop up throughout their responsive pleadings as, oh, we're going to go back and question whether you have authority to execute your deed in lieu of foreclosure, even though there's already a Judge Hale finding a fact that they agreed to that says we did.

It's that type of issue, Your Honor, that we're dealing with, repeated disregard of the Court's prior orders. And so despite the fact that we have a self-executing order at Docket Number 94 and Docket Number 64, we've got to come to you to ask for additional relief. So, Your Honor, that's why we're here.

And what you're also going to see is 120 exhibits that show exactly that. HNGH is here to be open kimono. And I know that paints a little bit of a funky picture, especially since it's come out of my mouth. But the reality is we have nothing to hide. We want to show this Court the world of correspondence related to this closing so you know that what the debtor is doing is attempting to paint an incorrect picture.

It's no surprise to us that the debtor has filed an objection on hearsay grounds to a hundred of our exhibits, including admissions by a party opponent, or statements by a party opponent, right, emails by representatives of the debtor. It simply doesn't want the Court to see the truth.

So, Your Honor, that's our opening statement. We are prepared to deliver our case-in-chief. We have an exorbitant amount of evidence that substantiates our position. And we can't wait for you to see it.

THE COURT: Mr. Kane, before I ask you a couple questions, there's something I forgot to notify the parties of before we started. Because I'm borrowing Judge Larson's courtroom, we're going to have to break at noon today because she is going to come out shortly after noon to make a ruling in another matter. So I just wanted you to be aware for purposes of planning that we have a hard break at noon and that may or may not be an appropriate time to take lunch.

We might see if I can get some information from Judge Larson on how long she thinks the ruling might be. But, in any event, that might be a good time for a lunch break, even though I know we're gonna be just getting started. Just a heads up that we have a hard stop at noon.

MR. KANE: That's fine, Your Honor. I understand.

THE COURT: So Mr. Kane, the first question I have, I did read very carefully your motion and in the background

section, you asked for the new judge to read a number of pleadings, including the main case dismissal motion. I'm just going by the definitions that are in your motion that's before the Court today.

MR. KANE: Yes, Your Honor.

THE COURT: The adversary dismissal motion, the adversary proceeding, the adversary judgment, the two agreed orders, Docket 64 and 94, and the stipulation. And I did read all of those. And as I understand it, the principal that's behind the debtor may have been involved in other bankruptcy cases, correct?

MR. KANE: I believe at least 15 other bankruptcy cases, yes.

THE COURT: Right. And so I understand your argument about bad faith, but I guess one thing that jumped out to me when I saw Mr. Phelan's response, and I think he may have had a couple of typos in his chart. But in the response that they filed at Docket Number 145, he laid out a chart of the payments that his client made both before and after the bankruptcy filing. And that's on Page 4 of 17 of Docket Number 145.

And it may or may not be relevant, but it looks like the debtor made, you know, a little over $400,000 of property tax payments in February 2022, correct?

MR. KANE: That is correct.

THE COURT: And then, Mr. Phelan has five $500,000

payments, I think if I'm reading the prior order correctly, it was either 94 or 64, I think that's supposed to be five $100,000 consideration payments for an aggregate of 500,000. Is that correct?

MR. KANE: Yeah. The debtor's off by $2 million.

THE COURT: But the debtor also paid a $1 million on March 15, 2022, correct?

MR. KANE: That's correct.

THE COURT: And a $2.5 million payment on March 25, 2022. And your client doesn't dispute that those payments were made. I understand there's multiple deadlines in this case that were set by the prior orders, but at least those prior payments were made timely. And I'm just wondering, does that go to the debtor's bad faith? That's one thing that jumped out at me that I didn't see happening in the prior cases, at least as you relayed them to me, but --

MR. KANE: Yeah. I'm happy to talk about that. I mean, that is part of our red herring section.

First, that the debtor has now submitted in multiple different pleadings a materially false accounting to the Court, over-inflating the payments by $2 million. Also, you know, a debtor in possession making ad valorem property tax payments has an obligation to do so. So, for us, those are not payments that we received. Those are payments that the debtor would've had to make under the terms of the note, no matter what.

So if you actually look at what the debtor has paid since January 1, 2021, Your Honor, it's $6,178,496. Now, the agreed principal amount as of January 1, 2021, and this is in the forbearance agreement, it's attached as an exhibit to a number of different pleadings that we've presented, was $40,073,171, and the note rate was 12.4 percent. So even if you just took the note rate for the last 17 months, the debtor's interest payment obligations alone would be $7,149,944.

So what we're really talking about is that, you know, during the time period that's referenced in Mr. Phelan's incorrect accounting, the debtor actually got a million dollar break, a million dollar break, on what the interest obligations would've been under the note on account of the extensions that were granted and the forbearances that were entered into by HNGH.

So I understand the question about whether there's bad faith because they made payments during the case. What I would do, Your Honor, is if they're admitted, or even for a demonstrative basis, look at our Exhibits 100 through 120, and what you'll see is that some of these payment obligations are retreads, right.

On May 15th, there is a $3.5 million payment obligation. Now, if you go look at some of the exhibits that we have, what you'll see is that the debtor said it was going

to make that payment and then couldn't, waited until Mr. Nambiar was in Dubai, I was in Hawaii, and the general counsel for HNGH was in New Mexico, and then filed an emergency motion before the $3.5 million payment was due in an effort to get an extension on its deadlines, for which it paid us $1 million dollars and then later entered into a separate agreement to pay an additional $2.5 million.

So this is -- it's laid behind the log and re-traded deals even related to the payments that it's made. So let -- I mean, being as clear as we can here, we provided material extensions and a below-note rate to this debtor and earned a bunch of litigation because of it. So for us, we still believe that that is absolutely bad faith.

The fact that the statements that are being made to the Court by the debtor are inflating the amounts that they've paid to us by over $2 million plus amounts paid to taxing authorities, call it $3 million to HNGH, is in our opinion an additional sign of bad faith.

THE COURT: All right. Thank you for that response.

And I just wanted to get your take on what I understood one of the arguments to be in the response that was filed at Docket Number 145. The debtor appears to be arguing that one or both of the agreed orders is a contract between the parties, and it's a little bit more than a contract because it's an order as well.

But as I understand the argument, the debtor considers those orders to be contracts. And if they can prove that your client, and again, I'm just paraphrasing what I understand their argument to be and I just want to get your take on it. If the debtor can prove that your client breached the agreement or the orders and they can prove, you know, I guess the elements of a breach of contract, you know, duty, breach, causation, damages, is that the appropriate way to look at the hearing today? If they can prove that your client had some obligation to provide something and you didn't and that caused the closing not to happen, would they be entitled to relief?

And, again, I'm not asking you to agree because I understand, based on your opening statements and papers, that you don't agree with the underlying premise of it, but is that the correct analysis that this is -- if there was a prior breach by your client that caused them not to perform, that excuses their obligation to make that payment?

MR. KANE: Yeah. I don't think that it excuses the obligation to make the payment. They may have some money damages claim, or alternatively, I think it does require some analysis of whether they've waived the right to assert the claims that they are asserting given some of the releases and indemnification obligations that are included in a stipulation in two separate agreed orders. But I think that the evidence

will show, Your Honor, that regardless of that, we didn't cause the breach --

THE COURT: I understand.

MR. KANE: -- and that there's no possibility that they can satisfy that obligation, and so the Court's order should be enforced.

THE COURT: So I understand your position's going to be the evidence is not going to show what Mr. Phelan and Ms. Lindauer have alleged in the pleadings, but on the obligation to provide documents, he has a number of them that are listed in the detail of the breaches that they allege your client did, for example, you know, failure to provide the rescission deed. I guess I'm curious to know --

MR. KANE: I readily acknowledge -- yes, sir. I'm sorry. I apologize for speaking over you, Your Honor.

THE COURT: No, that's okay.

MR. KANE: My client had an obligation under the agreed order to provide a rescission deed.

THE COURT: Okay. And looking at that agreed order, which is Docket Number 64, when I read the reply, it indicated that there was an obligation. At least the allegation was that your client had an obligation to have that deed in escrow. I don't see the word escrow in that original order of Docket 64. So I went back to look at the order to see where that came from and the order provides that, and this is Docket Number 64,

Page 2 of 4. I don't know if you have that in front of you, or --

MR. KANE: I do.

THE COURT: -- you might know it by heart.

MR. KANE: Pretty close.

THE COURT: So in the first ordered paragraph on that page provides that -- three or four lines from the bottom of that paragraph -- provides that counsel for HNGH shall hold the rescission deed during the pendency of the term of this agreed order and shall have no liability to the debtor or any other party, you know, for holding such deed.

So I guess one question I have is, I know the form of what your side considers to be the rescission deed was sent on May 12th. Is that correct?

MR. KANE: That's correct.

THE COURT: So the argument on the other side is this order indicates that a rescission deed will be held during the pendency of the term of the order, which started on December 10th. So I guess one question I have is, was there a rescission deed that counsel for HNGH was holding on that date?

MR. KANE: On December 10th?

THE COURT: Correct.

MR. KANE: On which date? On December 10th, no it hadn't been drafted yet.

THE COURT: Okay.

MR. KANE: I mean, this order was entered on December 10th. We had an agreement. The rescission deed was drafted in advance of May 12th. It was provided at the debtor's request, or actually, it was provided at Sendera Title Company's request to the debtor for review on May 12th.

We received no comments. The evidence will show on May 27th, at the direction of Sendera Title, which was one of the debtor's title companies that it was working with leading up to closing. Having gotten no comments from the debtor on the form that we had previously submitted, we had our client sign and execute it and deliver a wet signature copy into escrow in preparation for closing so they'd be ready to go by the 31st.

THE COURT: And so what was it that prompted the sending of that draft on May 12th, 2022?

MR. KANE: I believe it was on May 10th, Sendera Title sent an email that was forwarded to me by, I believe Khudabuksh Walji, who was one of the debtor's attorneys, that requested three documents, Your Honor.

The first document was a payoff amount for HNGH, which I understand the debtor was struggling from April 29th to figure out, even though it was an agreed amount that was previously submitted to the Court. So we provided that on the same day.

THE COURT: What was -- and I apologize.

MR. KANE: The next thing that they requested was --

THE COURT: What was the date of that request?

MR. KANE: Yes.

THE COURT: And I know we're going to get into this in the evidence, but it's going to help me --

MR. KANE: Yes, Your Honor. May 10th.

THE COURT: So May 10th, Sendera Title. Was that the only closing?

MR. KANE: Yes.

THE COURT: Was that the only escrow company that's involved?

MR. KANE: No.

THE COURT: There was another one.

MR. KANE: No. There were at least three.

THE COURT: Okay. So on May 10th, Sendera sent a request to your side for payoff amount. Is that right?

MR. KANE: Yes, a payoff amount.

THE COURT: And what were the other two things?

MR. KANE: The second thing was a copy of the rescission deed, which I sent to Joyce Lindauer for her review in case they wanted to review it before we delivered it to Sendera Title.

THE COURT: That's what went out on May 12th, correct?

MR. KANE: Yes. That's correct.

THE COURT: Okay. And the third thing?

MR. KANE: And the third thing was the confirmation order, or a DIP financing order. And the confirmation hearing I believe had taken place on May 10th, and so there was no confirmation order. So that was Joyce's obligation, Ms. Lindauer's obligation.

THE COURT: Thank you.

I was just curious what was it that prompted --

MR. KANE: Sure. And that was the totality of the request.

THE COURT: Okay. Who were the deal -- on your side, I assume that your firm was the deal lawyer for your client on the deal, obviously, right? There's no other firm involved and all the documents that were requested on May 30th of your side, it's just your firm on the deal side for that, correct?

MR. KANE: That's correct.

THE COURT: And on the debtor's side, who is or was the deal lawyer for this transaction? Does the debtor have in-house counsel? Is it Ms. Lindauer or somebody else? Do you know?

MR. KANE: It was my understanding that the debtor's deal lawyer was a gentleman named Khudabuksh Walji, and Ms. Lindauer was also facilitating the delivery of requests and intake of documents on behalf of the debtor.

THE COURT: Is that the same individual that's

Number 2 on their witness and exhibit list? Mr. Walji? Is that correct?

MR. KANE: Yes, Your Honor.

THE COURT: So at least your understanding was he is the deal lawyer on the other side and I'll ask the same thing of Ms. Lindauer and Mr. Phelan.

MR. KANE: Yes, Your Honor.

And I know we're not really there yet, but Exhibit Number 100 is an introduction from Khudabuksh Walji in which he holds himself out as the outside general counsel for the debtor, that he has full authority from the client, the debtor, which Joyce can confirm, that he'll be working on all matters related to getting us paid off.

THE COURT: Okay.

MR. KANE: And when I say, "us," HNGH.

THE COURT: All right. Thank you.

All right. Mr. Kane, appreciate responses and I'll go ahead and turn it over to Mr. Phelan for his opening arguments.

MR. PHELAN: Thank you, Your Honor.

You've just heard a long list of name calling and why everything's the debtor's fault and how evil the debtor is and how the debtor's going back on agreements. We believe that's a total misdirection. We aren't saying anything inconsistent. We just want to enforce the orders and the plan.

It also said the debtor is just a dead beat and stalling for more time. Of course, we totally disagree. HNGH is the one in default and was in default long before May 30th. The debtor is the one seeking enforcement. And as the Court noted, HNGH has been paid several million dollars so far, which is a little inconsistent with dead beat debtors.

Property taxes, for example, are for HNGH's benefit if, as they claim, they own the property. That's all a sideshow. We believe that HNGH didn't provide the necessary documents to get them paid, and they didn't comply with the plan and agreed orders. And to resolve that dispute, you'll hear a lot of evidence from both sides debating who's at fault. Of course, the burden is on them to prove that the debt defaulted and that they're entitled to relief.

And there will be lots of witnesses and lots of exhibits. We believe that most of HNGH's exhibits aren't admissible. And we're prepared to defend ourselves.

So you don't need to get into that swamp. The bankruptcy court is a place to solve problems, not perpetually litigate. There's a practical way to rapidly accomplish everyone's objective.

Now, I only got into this case on Monday, and it looks like a very complicated case with lots of history and a lot of animosity. But after I give you a couple of observations, there's a simple solution. On one hand, you have

the debtor with a confirmed plan and two court orders that dictate a procedure for paying HNGH.

The property in question is 2.47 acres in Turtle Creek with a good-sized office building and another building. We believe that the property is worth plus or minus $80 million. Now, that number wasn't pulled out of the sky. The debtor has appraisals and loan commitments that justify that valuation.

On the other hand, you have HNGH, which was the lender. And now has a deed in lieu that was delivered to HNGH pre-petition but wasn't recorded until after the filing of the Chapter 11 and it's still on the title record, even though the automatic stay came into a effect prior to the recording. That's not an issue for today because there are orders that deal with how the property is going to be dealt with.

HNGH is entitled to plus or minus $40 million. Given that difference between $80 million and $40 million, it's understandable that HNGH would want to obtain the property. The plan and the two orders provide for a rescission of the deed in lieu, reinstatement of the $40 million note, mortgage, and related documents and payment by the debtor of the $40 million to HNGH as if the deed-in-lieu transaction had never happened and the note had been paid.

The confirmed plan also stated that this would be accomplished by the debtor transferring the property to a newly

created entity, which would obtain financing and pay HNGH what it was owed. After several revisions, as indicated by Mr. Kane, all this was to have been done by May 31st of this year. It was a conceptually simple transaction. HNGH would rescind the deed-in-lieu transaction, reinstate the note and related documents, get paid the payoff amount, and cancel the restated note and related documents. Of course, as in all commercial real estate transactions, especially one as unusual as this, these components of the rescission and payment can only be mechanically and logistically accomplished by a simultaneous closing at a title company. Nothing else really makes sense.

Lenders who loan dozens of millions of dollars or provide other forms of financing aren't stupid. They require clear title to their collateral. And that's where things got off the rails. Unfortunately, HNGH did not provide the appropriate documentation to provide clean title and carry out the provisions of the plan and agreed orders.

I'll give a couple of examples, and there are many more. There had to be a rescission. That means it's like it never happened. The result of a rescission is that the debtor continuously owned the property. Instead, HNGH insisted on a special warranty deed. That's something entirely different and doesn't accomplish a rescission. A special warranty deed is, by law, a conveyance and transfer of property, not a

rescission.

A special warranty deed evidences the property was conveyed to HNGH and then, after several months, reconveyed to the debtor. That's not a rescission. It has serious negative effects for just the claim depreciation, for example, during that GAP period. Who's liable if someone was injured on the property while it was purportedly held by HNGH? Who's responsible for environmental stuff? We still don't have a rescission deed.

There was another problem with a special warranty deed provided by HNGH. It added a use restriction on the property in favor of HNGH that was not included in the original deed. That doesn't make any sense in a rescission because things don't change in a rescission. A rescission takes everybody back to where they were before the deed-in-lieu transaction. Additional use restrictions are totally incompatible with a rescission.

HNGH also failed to deliver several other customary documents and assurances necessary to accomplish a rescission and complete a closing by May 31st and ensure delivery of unencumbered title. I'll give you another example. Out of the blue, the debtor heard that HNGH had borrowed $26 million from Happy State Bank and had given them a collateral assignment of the note and mortgage. The debtor asked HNGH about Happy State Bank and was told they weren't involved.

At the last minute, Happy State Bank shows up and directs payment of money to Happy State Bank, which was contrary to the instructions of HNGH. In fact, yesterday, we got a pleading that seems to say that Happy State Bank is fine with whatever HNGH wants but doesn't clarify how they're involved.

And there's an email in the evidence that'll be presented from HNGH that requires Happy State Bank to sign off on the transaction and execute releases and other documents. It was impossible for the debtor to close in May because it couldn't produce clean title to its lenders since Happy State Bank was still involved, among other things.

Now, I'm glad that Happy State Bank is now happy, but that's not what they told us in May and it doesn't fix the problem. We don't even know if HNGH or Happy State Bank has the note. That's a small sample. There were many other normally routine documents that were not produced by HNGH. Since the title wasn't clean, there was no closing.

As you've heard, HNGH says that everything is our fault. Of course, we absolutely disagree. So if the Court wants to determine which party defaulted, it will have an entertaining day and possibly many days hearing testimony and reading exhibits. The witness and exhibit list of HNGH is 120 exhibits for an emergency hearing, most of which will have to be ruled on because we don't believe they're admissible.

And it will be complicated by the debtor's reasonable suspicion that HNGH persuaded lenders to back off from the debtor and deal with HNGH once it obtained the property. Now, before Mr. Kane pops up with outrage and indignation, it's just a suspicion and is not yet fully explored. Hopefully, it'll never need to be explored. They say we breached. We say they breached. And both sides have lots of evidence.

But as I said before, whatever possible, the Bankruptcy Court is a place to solve problems, not spend tons of money in Court time arguing who is more to blame and who breached first. Obviously, our position is we are not obligated to perform under the plan or those orders until they provide the mechanism that's provided in the plans and orders so that we can perform, which clearly contemplated there would be clean title.

So here's a simple solution. HNGH is entitled to money and the debtor is entitled to documents so that its lenders will release the money. And here's how this can happen. First, this Court should appoint a first-string knowledgeable real estate person as a mediator or Court-appointed expert under Rule 706 of the Federal Rules of Evidence to assist the parties and resolve disagreements and generally act as the adult in the room.

Now, personally, I prefer a Rule 706 expert, but Mr. Kane may prefer a mediator because a Rule 706 expert can

report to the Court and testify and do things like that. The expert would call balls and strikes for closing. The expert would handle requests, would direct the title company, would oversee the closing checklist, and address the content and form of the closing documents. The expert will pick a title company of his or her choosing to obtain and submit all documentation required and requested by and from the parties. Parties wouldn't need to provide Court-filed records that can be obtained by the title company.

We already have the list and forms of documents needed to get HNGH paid. We want to get them out of our hair. And we can give them to the expert as soon as that expert is appointed. The debtor will provide to the expert, on a confidential basis, the binding loan commitment from the debtor's selected lenders committed to providing funding to the debtor for this transaction.

Along with this commitment, there will be good proof of funds ready to fund and close in an amount necessary to close the transaction. These will be provided to the expert as soon as the expert asks for them. The expert will certify to HNGH and the debtor of good proof of funds, ready to close with no contingencies, other than the documents identified as necessary by the expert.

HNGH will give comments on the documents to the expert and the debtor's counsel as requested by the expert.

Any disagreement, controversy, or conflict concerning the need for a particular document, its forms or its substance, and any suggested amendments, changes, and corrections will be resolved by the expert. The expert will send all closing documents to the title company for execution by the parties.

Closing will occur at the title company as scheduled by the expert. All funds are be to be delivered to the title company in time for the closing. And the expert will supervise the closing. The payoff amount will be determined by the expert.

The expert will report to the Court as to whether the transaction has closed, and if not, the reason or reasons for the failures of the parties to close. If necessary, the Court could set a hearing for the Court to consider the report of the expert and take whatever steps the Court deems appropriate.

All litigation would be suspended until the Court says otherwise. This straightforward solution will accomplish the objectives of all parties in an expedited fashion consistent with the plan and agreed orders and will avoid additional unproductive litigation or delay, for that matter, animosity.

Taking a cue from Happy State Bank, I'm happy to answer any questions and I believe that this issue can be resolved in a rational fashion. On the other hand, we can just settle back and hear a few days of evidence about who breached

the plan and the agreed orders and what bad guys each side has been.

Your Honor, I believe this procedure makes a lot of sense and I'll be happy to answer any questions that you have.

THE COURT: Thank you, Mr. Phelan. I do have some questions for you and I'm going to go in kind of reverse order and I'm going to ask you first about this last request that you made. And I saw that in the supplemental response that you filed at Docket Number 149.

In a nutshell, it appeared to be a request to have this person perform duties consented to by the parties and kind of to make proposed findings to the Court, among other duties. Is that correct?

MR. PHELAN: That essentially is correct, Your Honor, I believe, if I understood what you said.

THE COURT: So my first thought when I saw that request is that that sounds like a special master, and I looked at Federal Civil Rule 53, which provides that a Court may appoint a master to perform duties consented to by the parties, to hold trial proceedings and make recommended findings of fact of issues to be decided. So that sounds an awful lot like a special master, as opposed to an expert, and under Bankruptcy Rule 93(1), I'm not allowed to appoint a special master. So that was my first thought when I saw that request was sure sounds like a special master rather than an expert.

The second thing that came to mind was, if you put aside the legal issues about who is responsible for the closing not happening, it sounded like a business solution that kind of made sense which led me to wonder why didn't the debtor hire somebody like this on their own dime several months ago. I don't know what the evidence is going to show as far as why this email with the list of source documents that they thought was going to be required for closing went out the day before closing. So maybe you can, we'll get into it in the evidence, but can you just briefly respond to those two issues? Is this a special master? I think it is. And why didn't the debtor hire somebody like this before?

MR. PHELAN: The first one I can address. If you think it's a special master, I don't know that I'm going to convince you otherwise. But Rule 706, you can have a court appointed expert. The expert can go out and find out whatever he wants to do and whatever he can. If you believe that some of the duties that I have outlined are not within the scope of an expert witness, I guess we can trim them back. But what, at minimum, the expert would do would be to evaluate the situation and report to the Court.

The animosity between those two parties is, as you can tell, off the charts. I said the expert would be the adult in the room and it seems to me that's what we need. Just because, you know, there is a provision against the appointment

of a special master, that doesn't mean that a Court appointed expert can't do a lot of that stuff.

Now, you could also appoint a mediator. You could theoretically appoint an examiner. These are overlapping duties with respect to all of those. And I believe that this procedure can be accomplished by a Court appointed expert, possibly by a mediator and, if necessary, an examiner. Although that will obviously delay things for a long time.

HNGB [sic] wants things expedited. The debtor wants things expedited. These two parties need to go there separate ways. And I believe this is a practical way to do it and it seems to me that we can wedge it into some Court appointed individual, whatever label that individual has, to accomplish this objective.

With respect to your second question, I'm going to have to defer to Ms. Lindauer.

MS. LINDAUER: Your Honor, on the second question, the debtor did retain a title company. Mr. Kane mentioned that we retained Sendera Title the first part of May, about a month before the closing, to go through what was filed of record in Dallas County in order to help assist us with the title issues. And that's what sort of started that ball rolling.

Depending upon how much evidence you actually take, you will see a number of emails, requests, document requests from Sendera Title and Sendera Title was working on our behalf

to assist us with the closing and the documents that would be necessary to close this transaction. So they were involved. They were working with Mr. Kane's group. They were working with various lender groups. They were working with the debtor. So we were getting direction from a title company.

The problem, Your Honor, with the closing -- well, multiple problems -- but one of the main problems was, and Mr. Kane will readily admit that he basically gave us some bad information. He told us in writing that Happy State Bank was not involved in this transaction. We asked him that early on in May because we did have concerns that Happy State Bank may be involved. We were point blank told no, they had absolutely no involvement in this transaction.

Sendera then picked up about mid-May that there was a collateral assignment of note and lien showing up of record. And, of course, we had been told that HSB had nothing to do with this particular deal. So we weren't paying a lot of attention to that because Mr. Kane had told us they were not involved. We didn't know why they were showing up, but they were.

It wasn't until May 31st, and Mr. Carruth is on here, that we first got an email from counsel for Happy State Bank saying, here's our payoff demand, here's where you need to send the money, and we've been asked to draft some sort of a release of the collateral assignment. This is all coming May 31st, the

day of the closing, that we're starting to get additional documents contrary to what we had been told was the case.

So, Your Honor, we started this closing a month early. We had Sendera directing us on what needed to be provided. We expected that HNGH would have, Mr. Kane told us that he had various real estate partners that were working on the closing, so we were expecting to see documents flowing at least a week before the closing. And the only document we had seen from them was a special warranty deed.

We actually drafted the rescission deed, sent it to Mr. Kane and said this is the document that we need for a rescission. Mr. Kane got us some comments back. All this is going on May 30th and 31st that we're actually starting to get meaningful discussion regarding closing documents.

THE COURT: I'm going to -- Ms. Lindauer, I'm going to --

MS. LINDAUER: And then the next thing that we --

THE COURT: Ms. Lindauer, I'm going to just interrupt you because I don't want to lose my train of thought.

MS. LINDAUER: Sure.

THE COURT: You're going a little bit beyond what I was asking.

MS. LINDAUER: Okay. Sorry, Your Honor.

THE COURT: It sounds like you're saying that Sendera is the entity that you are requesting in Docket Number 149.

It's your position that you had somebody that was supposed to be, or maybe was, I guess the evidence will show, doing the things that your pleading now requests be done by a mediator or an expert or a special master. Is that correct? Was there anybody other than Sendera and Mr. Walji?

MS. LINDAUER: Yeah, Your Honor. So JMJ and the debtor and related Barton entities, I'll just call them that, have real estate counsel. Mr. Randy Marx is one of the real estate attorneys that they used on their transactions.

Mr. Marx assisted by drafting the actual rescission deed that was provided to Mr. Kane after we didn't receive one from their side. Mr. Marx had --

THE COURT: When was Mr. -- I'm sorry. When was Mr. Marx retained?

MS. LINDAUER: Mr. Marx has been in-house real estate counsel for Mr. Barton's companies for, I don't know, I think several years. But as it relates to this matter, I believe he got involved about the first part of May, about the same time that Sendera got involved.

We specifically asked him to draft the rescission deed, which was done right before that holiday weekend. He has since drafted, and I told Mr. Kane, all of the required documents for closing. We have all of the documents now drafted that would need to be provided for closing. And we have those --

THE COURT: But let me -- I just want to --

MS. LINDAUER: Sure.

THE COURT: I just want to understand. He is in-house counsel. Is he at an outside firm or he's an employee of the debtor?

MS. LINDAUER: He has his own law firm, Your Honor, but he acts as they're, more or less, their in-house real estate counsel. So, but he is a private attorney with his own firm.

THE COURT: Okay. And with respect to the transaction that was contemplated by the two prior agreed orders, he began working on that in early May. He was retained or asked to start working in early May. Is that correct?

MS. LINDAUER: Your Honor, I would have to really ask Mr. Marx, who I think is on here, but my understanding, you'll see these in one of the boxes below. My understanding, as far as actually drafting documents and reviewing title, it was early May, but it may have been earlier. I don't know. So I don't want to mislead you on that.

But my involvement with Mr. Marx started in the first part of May and then of course extended until now, basically. So but when he actually started, I couldn't -- I know when I was involved with him. I don't know if he started earlier. So that may be a question for him or someone else.

THE COURT: All right. Thank you. I'm going to go

back to Mr. Phelan --

MR. PHELAN: Your Honor.

THE COURT: I'm going to go back to Mr. Phelan.

Mr. Phelan, I'm just going to ask you a couple more questions about some of the statements that you made in your response at 145 and it kind of goes to what I was understanding your legal theory to be.

The debtor alleges that -- do the parties mind if I call Mr. Kane's client the lender. For some reason, my tongue trips up when I repeatedly try to say HNGH. If I refer to the lender, does everybody understand I'm referring to HNGH Turtle Creek, LLC, who is the movant.

MR. KANE: Your Honor, that's fine with the lender.

MR. PHELAN: That's fine with the debtor.

THE COURT: So in the lender's response that was filed at Docket 145, you mentioned in a couple place that the lender has obligations to provide these documents, or there was an agreement to provide these documents and to work together to provide the documents. What, Mr. Phelan, is the source of that obligation? Is it the terms of the agreed orders? Is there something other than what's in the agreed orders?

I didn't see specific language in the agreed orders that required providing documents other than the rescission deed. So if you could first address what is the source of the obligation that you allege existed on behalf of the lender to

provide various documents in connection with closing?

MR. PHELAN: Your Honor, the plan and the two orders contemplate that there would be a rescission. They contemplate that there would be a transfer of the property to the new entity and that there would be funding obtained. It's all laid out in the plan. That cannot be done unless there's clean title.

And in my estimation, it's pretty clear. Now, was it detailed in the orders? No. Are all the steps detailed in the plan and in the orders? No. But you can't accomplish what's in the plan and the orders without providing clean title, without doing a rescission. It just doesn't happen.

And let me go back for a moment to the special master issue.

THE COURT: Actually, before we go back --

MR. PHELAN: I'm looking at --

THE COURT: Before we go back to the special master, I just, I want to just -- the way my mind works, I want to get this issue resolved because I want to know what I'm looking for. Other than the plan --

MR. PHELAN: That's fine.

THE COURT: Other than the plan and the two agreed orders, which are at Docket 64 and 94, those are the sources you believe require the lender to provide documents in connection with the closing. Is it just a -- well, I don't

want to put words in your mouth, but is it an implied duty of commercial reasonableness? Or what is it that requires them to provide the documents? It doesn't appear to be spelled out anywhere. So is it just, you believe it's something is implied from the terms of this order with respect to what the lender is required to do, because again, the only specific document that is mentioned is the rescission deed.

So I guess if you could just address that before we go back to the special master.

MR. PHELAN: Certainly, Your Honor. I think it's more than implied. You can't accomplish those transactions without normal commercial documentation.

Now, if there are other documents involved, I'm going to have to defer to Ms. Lindauer who is the person that will be -- is familiar with the documentation.

THE COURT: But as far as you know, there's no other written agreement that details what you believe the lender was required to provide. It's just based on the orders and the plan?

MR. PHELAN: Personally, I do not. But, again, I will have to defer to Ms. Lindauer who is familiar with the documents.

THE COURT: Ms. Lindauer, just on that specific question, and I'll just ask you to be brief. Is there anything else besides the two orders and the plan and the confirmation

order that I'm supposed to look to find out what the obligations of the lender are for the closing?

MS. LINDAUER: Your Honor, I think that's it. And I was just looking at the plan and I'll highlight for you at some point when I can get them all lined up, but there are terms in the plan itself that I think might be helpful that talk about -- well, they were supposed to -- the plan was supposed to implement the orders, right? It absorbs the orders and implements the orders.

So obviously, to the extent that there would be additional documents required, those would in part be in accordance with the terms of the plan, which, you know, plans always provide that, so I was looking for you for that you know, that the parties will cooperate with each other in order to provide documents reasonably required to effectuate the terms of the plan. That's pretty consistent.

And I think important, if you look at implementation of the plan and the actual plan itself talks about in order to implement the plan, debtor intends to seek the consent to allow the debtor to convey the property to affiliated special purpose entity which will obtain a loan, simultaneously pay off HNGH in accordance with the terms of the agreed orders, and to issue payments to holders, et cetera. So --

THE COURT: Ms. Lindauer --

MS. LINDAUER: -- and that got --

THE COURT: Can I stop you? I do --
MS. LINDAUER: Yeah. Sure.
THE COURT: I just pulled up the debtor's third amended plan. Is that what you're reading from, Docket Number 108 in the main bankruptcy case?
MS. LINDAUER: Right. Right. And in particular, Section 6.01.
THE COURT: What page is that?
MS. LINDAUER: But I was also looking to see if --
THE COURT: Pages 1 through 23 at the top right hand corner. Could you direct me to --
MS. LINDAUER: Page 12.
THE COURT: -- where you were just reading?
MS. LINDAUER: Sure. Page 12 on implementation of plan.
And then, what happened, Your Honor --
THE COURT: Article? Article? I apologize, Ms. Lindauer, when you were reading, I was looking, so --
MS. LINDAUER: Article 6.
THE COURT: Tell me what you were --
MS. LINDAUER: Article 6.
Okay. I'm sorry. Article 6, Page 12 of 23, Section 6.01, implementation of plan. All right.
So the plan actually spelled out how the transaction would go down. And then, if you look at the confirmation order

itself, which is Docket 123, it further had in Page 3 of 4 -- and then, I'm moving kind of fast -- Subsection (k), and that explains that there would be new financing, et cetera.

And, Your Honor, the other thing I haven't done, and I'll be happy to do that at the lunch break, is go through the actual plan and mark all the places that talk about essentially working together to get the documents. But I will tell you, there is no place that specifically spells out exactly what documents were required except the first order that you looked at, that December order. And I guess I get the benefit, as Mr. Kane does, of being involved in this from the very get go.

But I think what's important -- so the takeaway is you've got a plan, you've got a confirmation order. If you look at the very first December order, I'll call it the December order, and in particular, if you look at the top of Page 2 of 4, and again, maybe at lunch, you can have an opportunity to read this. But what it says, and this is very important is, "Ordered, adjudged, and decreed that the automatic stay will remain in full force and effect."

But jump down, after the paren, the payoff amount, it specifically says, "which note shall be reinstated immediately prior to the debtor's payment to HNGH of the payoff amount and counsel for HNGH shall hold the rescission deed." You looked at the part about the rescission deed.

So there were two specific components spelled out in

that order. There was to be a reinstatement of the note prior to payment and there was supposed to be delivery of a rescission deed.

THE COURT: Right. I see that language. We have just a few minutes left. I'm going to -- and this leads, actually, to the next question that I had for Mr. Phelan or for you.

Mr. Phelan, you had mentioned in the debtor's pleading and in your argument, you say the debtor says that a simultaneous closing was required. And in your response, you indicate that it is after the rescission deed is recorded, that's when the rescission happens. And I guess I'm a little bit confused because there's two provisions in the order that seem like the timing is the other way around.

The provision that Ms. Lindauer was just reading that's on Page 2 of 4 provides that the payoff deadline is that date. "Counsel for the lender shall hold the rescission deed during the pendency of the agreed order." And then, the next paragraph provides that "If the debtor pays the lender the payoff amount," which is the "payoff event," then "simultaneously with the payoff event, the deed in lieu filing shall be deemed rescinded and avoided."

So that language indicates that it's actually the payoff event that deems the deed in lieu rescinded and avoided. And then, further down in the order, it's the third to the last

decretal paragraph, but halfway down, it says "If a payoff event occurs, upon notice of the payoff event to the Court and request by the debtor, this Court shall enter an order ruling that the deed in lieu filing is avoided and rescinded and that lender shall take all reasonable actions necessary to immediately instruct its counsel to deliver the rescission deed to the debtor and to ensure title to the property is returned to the debtor."

So at least under the strict terms of the order, it looks like the timing is backwards from the way you described it, that the payoff event occurs first. After the payoff event occurs, then the deed is delivered to your client. So you can think about that while we're on break.

I'm going to -- it is noon, and I'm going to -- since I'm borrowing Judge Larson's courtroom -- one minute, please.

So that's something that you can think about during the break, Mr. Phelan and Ms. Lindauer. I did have maybe one or two other questions, but I think we're just about done with opening arguments. But, Mr. Phelan, your suggestion about a simultaneous closing, I understand the business argument that that's how it has to happen, but the order suggests, at least technically, the payoff event happens, that rescinds the deed in lieu, then the deed in lieu, or the rescission deed is delivered. So that's just something to think about while we're on break.

It's noon and --

MR. KANE: Your Honor, I know -- excuse me. Your Honor, John Kane for the lender.

I know that we're trying to get off the bench and we're trying to go to break. If you could give me 30 seconds of time to address this specific issue and I want to do so in good faith to the Court.

THE COURT: Well, I do --

MR. KANE: Because I think we can wrap this up and address this.

THE COURT: Mr. Kane, I promised --

MR. KANE: And even if --

THE COURT: I promised Judge Larson I'd get off at noon.

MR. KANE: Okay. Understood.

THE COURT: I will let you start when we pick back up because I don't want you to lose your thought. But I did promise Judge Larson that I would have a hard break at noon. So we'll go ahead and recess.

What I'd like to do is start back at 1:30, and Mr. Kane, you'll have the floor then to address what we were just talking about. But I'm going to give Judge Larson her bench back during the lunch break, then we'll pick back up at 1:30.

Does that work for everybody?

MR. PHELAN: Don't forget about the special master when we come back, Your Honor.

THE COURT: I'm sorry, Mr. Phelan.

MR. PHELAN: Don't forget about the special master when you come back.

THE COURT: Yes. We will pick back up. I'm not intending to cut anybody off in their arguments. It's just a function of having to share the courtroom and keeping my promise to Judge Larson, and I'm already two minutes over. So we'll recess and we'll pick back up at 1:30.

MR. PHELAN: Got you.

(Recess at 12:02 p.m./Reconvened at 1:32 p.m.)

THE CLERK: All rise.

THE COURT: Thank you. Please be seated.

Sorry, I've got to get situated here, again.

Bear with me one minute.

Okay. So before we broke for lunch -- we're back on the record on 2999TC Acquisitions. And before we broke for lunch, Mr. Kane, you had the floor.

I was asking Mr. Phelan a question about the terms of the agreed order and at least, the way I read the order, the timing appeared to be backwards from the way Mr. Phelan and Ms. Lindauer described it in their motion because the strict terms of the order appear to provide that the payoff occurs and then the rescission deed is delivered to the debtors. And you

were going to provide some comments on that. So you have the floor.

MR. KANE: Yes, Your Honor. John Kane on behalf of HNGH, the lender.

Mr. Phelan's analysis (audio interference). The goal here was a simultaneous closing. And I just wanted to make sure you hear from me confirming Mr. Phelan's position should put to rest whether this was supposed to be a simultaneous closing or whether there were supposed to be certain steps.

The parties anticipated that the payoff of the note would (audio interference) when the rescission deed was filed). So, in essence, Your Honor, and I believe there's correspondence from me to the debtor's attorneys about all this -- whether they submitted as evidence or not, I don't recall.

But we gave an explanation of what we anticipated (audio interference), and it was in essence, okay, you've got funding. It's paid into escrow. We've got all the documents. Now, we know the (audio interference) funded into escrow. All we have now is the series of events to make sure things take place in the right way.

So to reinstate a note, we have to have a rescission deed. For a payoff to take place on the note obligations, the note needs to be reinstated. So we have a series of buttons that get punched at closing all at the exact same time so nobody is exposed and everybody kind of has the same thing take

place all in one closing at one title company. That was the expectation, Your Honor.

THE COURT: Okay. Thank you for that clarification.

I suspected that everybody had in mind a simultaneous closing, it's just that the terms of the order, I want to make sure there's no dispute that somehow the payoff was supposed to occur first and then the deed was delivered. So I think you've addressed that question.

Before I continue, Mr. Kane was -- I don't know, we have a slight delay in our video feed. Did anybody else notice that? Or was it just the Court?

MR. PHELAN: I didn't have a problem.

THE COURT: Okay. So I did hear your statements, Mr. Kane. And before I turn it back over to Mr. Phelan because I did promise him that he would be able to finish his thoughts on the examiner issue, I would like to just button up something that I began to address with you earlier on. And I know we have to get to evidence, but, again, Mr. Phelan and Ms. Lindauer have framed this as kind of a who breached first. And the reason I was asking Mr. Phelan and Ms. Lindauer about, you know, what is the source of the duty that they alleged your client breached that caused them not to fund.

So they've identified the two agreed orders, the confirmation order, and the plan. It appears that the two orders are by far more the specific of the documents, and so I

guess I'm trying to get some guidance from you, Mr. Kane, do you agree that had the debtor requested information from your client, or documents from your client that were reasonably required for a closing, and had they requested that information, you know, sufficiently far in advance or a commercially reasonable, you know, time frame in advance of the closing, would your client have had any obligation to do anything?

I understand your position is, they didn't send those requests in a reasonable amount of time. I've seen the May 30th letter. But setting that aside, had they requested documents or assistance from your client for the closing, would you agree that your client would've had some legal obligation under the orders, whether express or implied, to help or assist with the closing?

MR. KANE: Yeah. Certainly not expressly, Your Honor. I do think that if we want to talk about whether something is (audio interference), I don't think that we would have been able to affirmatively preclude closing from taking (audio interference) by refusing to send (audio interference).

You know, whether we had an obligation to draft those documents, I don't believe that we did. Did we have an obligation to deliver certain customary documents, that are --

THE COURT: Mr. Kane?

MR. KANE: Yes.

THE COURT: Let's pause briefly. We're having a slight delay in the video and audio. Are we able to tell, Ms. Smith, if that's on our end or on their end?

THE CLERK: It's the WebEx.

THE COURT: Okay. So I guess our system is having a kind of a system-wide slowdown on WebEx, so if you're talking and I interrupt you, I apologize, but I'll have to ask you to repeat what you said just so I -- the other counsel apparently are hearing it, but I'm hearing slight delays in your answers. So if you could try again, Mr. Kane, to answer where --

MR. KANE: Yes.

THE COURT: -- answer my question. I'm sorry.

MR. KANE: I believe that there are no documents that provide an express obligation for us to produce documents for the debtor's closing. We are the lender. (Audio interference) payoff.

I do not believe that we would have been able to refrain from executing customary documents required for a normal real estate closing or, in fact, the (audio interference) in order to (audio interference) preclude a valid closing from taking place.

Now, regardless of whether we had kind of implied to provide certain documents, like -- look, I'll be, I'll be very straightforward. The note if paid in full, some document needs to be executed that shows that the note is paid in full and the

note is signed, paid in full, or (audio interference) paid in full.

So we recognize that at some point, there might be some documents required. Some of those documents may be in our possession or in our control at our direction. If we had received those reasonable responses, as the evidence will show, we worked hard to provide them. We assured the debtor that by close we would provide them if a closing was going forward.

THE COURT: Okay. I think that answers my question, and I'll go ahead and flip it back to Mr. Phelan.

Mr. Phelan, you wanted to --

MR. PHELAN: Your Honor --

THE COURT: -- address the examiner issue. And I know, I do want to get to the evidence, but if you could briefly address the examiner issue, I do have a few follow-up questions for your side. And by the way, I appreciate all counsel's patients with my questions. This helps me kind of frame what I believe the issues are and it helps me understand what I need to look for. So I do appreciate everybody's patience with my questions for both sides.

So Mr. Phelan, go ahead.

MR. PHELAN: Well, when you look at the Rule of Evidence, excuse me, (audio interference), it says the Court may appoint a master. (Audio interference). We're not asking for that. We're asking did you order it.

THE COURT: Mr. Phelan?

MR. PHELAN: Number two --

THE COURT: Mr. Phelan?

MR. PHELAN: Yes.

THE COURT: Let's pause for a minute.

(Pause)

THE COURT: We're going to pause for about five minutes. I'm going to stay here. We're waiting for technical support to come up because we are getting delays in our courtroom as part of that system-wide issue.

We're going to try to figure out if we need to potentially switch over to Judge Jernigan's courtroom or what we might do. So we'll just go ahead and pause for a few minutes.

(Pause)

THE COURT: Okay. We're going to take a -- I apologize. We're going to take a short recess to see if they can assist in getting this courtroom to work because unfortunately, counsel are cutting out. So we're going to take a short recess and we'll let you know in a few minutes what the plan is.

Hopefully, everybody heard that.

(Recess at 1:44 p.m./Reconvened at 1:46 p.m.)

THE COURT: Okay. Counsel, we're going to switch courtrooms. Judge Jernigan is done for the day. We understand

that they're not having the same issues that we are in this courtroom. So if you will bear with us, we are going to relocate and I think you should just be able to stay on. And we will --

MR. PHELAN: Your Honor, do we have to go off of this WebEx and log in to her WebEx?

THE COURT: No. I believe you guys don't do anything.

MR. KANE: This is -- yeah. Don't do anything. (Audio interference). You're fine.

MR. PHELAN: Okay.

THE COURT: You stay where you are and I will magically reappear in a few minutes, I hope, in Judge Jernigan's courtroom with a functioning system.

(Recess at 1:46 p.m./Reconvened at 1:52 p.m.)

THE COURT: Okay. We are back on the record. Can you all hear me okay?

Mr. Kane, can you hear me?

MR. KANE: Yes, Your Honor. Loud and clear.

THE COURT: Ms. Lindauer?

MS. LINDAUER: Yes. Loud and clear, Your Honor.

THE COURT: Mr. Phelan? Mr. Phelan, are you still on? Mr. Phelan --

MS. PHELAN: I'm on now.

THE COURT: You're there, Mr. Phelan?

MS. PHELAN: I am now.

THE COURT: Okay. And you all can hear me okay. And I can hear you. So I think we'll have better luck in this courtroom this afternoon.

Mr. Kane, I did, even though it was a little sketchy with the recording, everything was recorded properly. And I was able to understand your answers, so we're good there.

Mr. Phelan, I'll go ahead and turn it over to you.

MS. PHELAN: All right. Before I get to the special master issue, right before the break --

THE COURT: Ms. Lindauer, if you want to --

MS. PHELAN: I'm sorry?

THE COURT: -- mute yourself while Mr. Phelan speaks?

MS. LINDAUER: I will, Your Honor. I'm just trying to get -- there we go.

MS. PHELAN: Before the break, Your Honor, you were interpreting the order Docket Number 64. And if you -- I think you've got it backwards. If you look at Page 2 of that Docket 64, 2 of 4, the first paragraph, I believe it says that the note has to be reinstated prior to the payment, and counsel for HNGH has to be holding a recision deed prior to the payment.

Our position is we still don't have either one of those. I explained this morning why the deed that they provided is not a recision deed. And when we get to the

evidence, we'll have expert testimony on that, testimony on that. And with respect to the reinstatement, we don't have anything that says the note is reinstated. We don't even know who has the note.

Does the debtor, does HNGH have it? Does Happy State Bank have it? We don't know who has it. So our position is that that order, Docket 64 says that before we do anything, before we have to pay, they have to have those two things, the recision deed held by their counsel -- and of course this was dated December -- held by their counsel during the pendency of the order, and the reinstatement of the note. Neither of those happened.

They're conditions precedent to our obligation of the form under the order. So since they are in default, they cannot enforce that order. We would be the ones that could enforce the order, and that's what we want to do.

You mentioned that those two orders are the operative documents. The plan actually is also pretty darn specific. It does lay out the how it's going to happen in general terms at least. The debtor, and this is on Page 8 of 23 of the plan. It's the last four lines of Section 2.01.

Do you want me to wait for you, Your Honor?

THE COURT: No, I'm there.

MS. PHELAN: Okay. In order to satisfy its obligations under the agreed orders, the Debtor intends to

convey its interest in the property to a new single-purpose entity that will obtain a loan and concurrently pay off HNGC. And as soon as reasonably practical thereafter, fund the plan payment as described herein. But those are best something separate.

It's clear to me that that was going to be the structure. We were going to get a loan and pay them. You can't get a loan without clear title. And I think you read that together with the agreed orders. It just, they defaulted and we haven't.

Now, with respect to the special master issue, I'm looking at Federal Rule of Civil Procedure 53 which provides for the appointment of special masters which you can't do in a bankruptcy. It says the Court may appoint a master only to perform duties consented to by the parties. We're not asking that. We don't care if they consent or not, not that they're nice guys, not that they won't be reasonable or ask in the court order the appointment of the expert.

B, hold trial proceedings and make recommended findings whether or not you need a jury. We're not asking the expert to hold trial proceedings. Far from it. C, address pretrial and post-trial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge. Well, that contemplates stuff that judges do, not what we're asking the expert witness to do.

So it seems to me that the special master duties are not even, they're not there. They're not close to what we're asking for. We're asking for an expert witness to go in, deal with the paperwork, make an investigation, in essence to some degree help as a mediator to resolve the issues, and then come back and testify as to whether it worked or it didn't work.

And if it didn't work, why didn't it work. Then you can decide what to do. So near as I can tell, if you read the face of Rule 53, the contemplation of the expert in this case just doesn't fall into any of those categories, much less all of them.

THE COURT: I do understand your position on that, Mr. Phelan. A couple other follow up questions on some issues I touched on earlier, and then I'd like to get to the evidence. In the response that was filed at Docket Number 145, the Debtor says in Paragraph 19 that the Debtor had secured funding and was preparing to make the final payoff on May 31st, 2022, as required by the agreed orders.

However, after and because HNGH failed on May 30th, 2022 to comply with the terms of the agreed orders, the lenders, plural, would not loan without compliance. And then the order goes on. So my question is if you could just briefly, without elaborating, tell me what are the names of those lenders with whom you had secured funding.

MS. PHELAN: Your Honor, because what we said earlier

about the suspicions of the Debtor regarding HNGH that this may be coincidental, but every time we provide a lender to them, strangely enough the lender changes its mind. Again, I'm not making an allegation. I'm simply saying that the Debtor is reasonably cautious and will be happy to provide, subject to Ms. Lindauer telling different, will provide those names and any details that you need in confidence and under seal --

THE COURT: Under seal, okay.

MS. PHELAN: -- for the Court.

THE COURT: Without telling me the names for right now, are they in any way related or affiliated with the Debtor, or Mr. Barton?

MS. PHELAN: That's not my understanding.

THE COURT: I'm sorry?

MS. PHELAN: I'm sorry. That is not my understanding, but I could be corrected by Ms. Lindauer.

THE COURT: Ms. Lindauer? You're muted, Ms. Lindauer.

MS. LINDAUER: Your Honor, the lender -- can you hear me now?

THE COURT: I can hear you.

MS. LINDAUER: Okay, good. Your Honor, the lenders that we had been dealing with are not related to Mr. Barton. They're not insiders and they're not affiliates of the Debtor or any related parties. They're third parties.

THE COURT: And how many are there?

MS. LINDAUER: Well, we were dealing I think with three or four. But at the time of actual closing, we had narrowed it down to one primary lender.

THE COURT: I'm referring to --

MS. LINDAUER: As the --

THE COURT: I'm referring to what's in Paragraph 19 of the response where it says the lenders, plural, would not loan.

MS. LINDAUER: Right.

THE COURT: How many lenders are there within the meaning of that sentence?

MS. LINDAUER: I believe there are three within the meaning of that sentence.

THE COURT: Okay. And did any of those lenders ever provide a list of what is described in your response as customary documents and assurances? Did those lenders ever provide a list of what they would require to fund to your client?

MS. LINDAUER: I believe that some of them did. I know that at least two provided us letters saying that they did not have sufficient documents.

THE COURT: But did they ever --

MS. LINDAUER: I don't remember the --

THE COURT: Ms. Lindauer, I really would like to get

on with the evidence.

MS. LINDAUER: Okay.

THE COURT: If you don't know, that's fine.

MS. LINDAUER: Sure.

THE COURT: But did they send a list of documents that they thought were required of Mr. Kane's client for their proposed loan? And if so, when because I'm going to be looking for that in the evidence.

MS. LINDAUER: Okay. Your Honor, my understanding is one did provide that list.

THE COURT: And when was that?

MS. LINDAUER: Your Honor, I'm being told around May 20th, around the 20th to the 23rd. There may be some exhibits that address that. I can't recall. But it's in that time frame.

MS. PHELAN: Your Honor, let me kind of add to that, that my understanding is around May 12th, the title company did send a list of the required documents to HNGH.

MR. KANE: That's not true.

THE COURT: Okay. So that's disputed. We'll get into the evidence. One final question I have before I hope we can get on with the evidence. I was trying to identify the persons on the Debtor's side that I can look out for just so that I know who they are. And I was trying to figure out who the deal people were that were working for the Debtor on this

transaction. I have Mr. Walji, who is a lawyer, correct?

MS. LINDAUER: Correct.

THE COURT: Mr. Marx who is also a lawyer, correct?

MS. LINDAUER: Correct.

THE COURT: I have Sendera Title.

MS. LINDAUER: Correct.

THE COURT: They were employed, or they were employed by the Debtor I take it, correct?

MS. LINDAUER: Correct.

THE COURT: And do they have in-house counsel working on it, or non-lawyer title people?

MS. LINDAUER: They do have -- both. Primarily non-lawyer title people. But they do also have in-house counsel.

THE COURT: Okay. And then, Ms. Lindauer, I saw you at least had sent that letter on May 30th to Mr. Kane. My understanding the bankruptcy lawyer. Were you involved in the deal transaction documents?

MS. LINDAUER: I only -- only peripherally, Your Honor. That's not really my area of expertise. So I have to rely on others. But only kind of as a gatherer, not as a drafter.

THE COURT: I understand. And so was there anybody else on the Debtor's side who were kind of the deal people that I should be looking at for as you're getting into the evidence?

MS. LINDAUER: I don't believe so, Your Honor. I

could be mistaken on that. We do have another lawyer, Vance McMurry who also was assisting. But he's more on the litigation side of things. But not necessarily on real estate docs. So to the extent that there was an order dismissing a case or something, he might be assisting on that side. But not real estate docs that I'm aware of.

THE COURT: Okay. All right. Thank you.

MS. LINDAUER: And let me clarify one thing Mr. Phelan said. The business points of who was prepared to fund, we do have those documents. And I'll make it simpler than that. We're happy to provide those to you in camera rather than under seal. So those, we do have them downloaded. We can make those available in camera. But we just didn't want to put those out to the world, as you may be aware. So they don't have to necessarily be under seal. That's more complicated.

THE COURT: Again, I appreciate all patience, Counsel, with my questions. It has helped me. The back and forth took longer than I thought. Does anybody else have any brief closing arguments they'd like to make because I really would like to get to the evidence.

So hearing none, before we start, I know this was given a three-hour time estimate. And I'll put it on myself for not having gotten to the evidence yet. I'm suspecting from the list of exhibits, three hours is probably not what we're

looking at. Is that correct? I'll look to you first, Mr. Kane.

MR. KANE: Three hours from when? I can get my -- I mean, depending on how long the dispute over the admissibility of evidence takes, our presentation, our case in chief where we walk through our documentation for this Court should take about an hour. We're happy to incorporate our closing argument into that, so call it an hour to an hour and 15 minutes, and we're done. We'll reserve a little bit of time for rebuttal, but we can even cap that at, you know, five, ten minutes and we'll just hit the high points.

THE COURT: Okay. That's helpful to know. I'll go ahead and turn it over to you, Mr. Kane, to put on your case in chief.

MR. KANE: All right. Your Honor, I think we should start this rodeo that I will move for the admission of Exhibits 1 through 120.

MS. LINDAUER: Your Honor, and I'll address the admission of exhibits because I think that is the first issue. Your Honor, we did file written objections to exhibits. I know that's not required necessarily for hearings like this, but we did. That appears at Docket 150. And running through that, there are a number of exhibits that we have agreed to admit, and there are a number that we have agreed to object to.

So looking at that objection, a number of these that

where we say admitted for notice, those are pleadings, as the Court is aware. And those are pleadings on this Court's docket. So the Court can take notice of a particular pleading. Obviously the contents of the pleading are going to constitute inadmissible hearsay in most instances.

So we identify when I say admitted for notice, that is referring to a specific pleading on the Court's docket for which the Court can take notice of the filing of that pleading. But as to what it actually says, I believe that that would not be appropriate. So that applies to Exhibits 1 --

THE COURT: So just to --

MS. LINDAUER: -- 2, 3, 4 --

THE COURT: -- make sure I'm on the same page, we're looking at Mr. Kane's witness and exhibit list, right?

MS. LINDAUER: We are. He moved for admission of 1 through 20 -- 1 through 120 on his list. And so that's what we're looking at. So --

THE COURT: So --

MS. LINDAUER: So what -- yeah.

THE COURT: Go ahead. Go ahead again. Tell me --

MS. LINDAUER: Okay. So --

THE COURT: -- one by one.

MS. LINDAUER: Okay. So 1, 2, 3, 4 we said can be admitted for notice. Those were part of the Court's docket, but not as to the truth of the matters asserted therein because

those are pleadings. So typically, those are not admitted for the truth, only that they have been filed. They appear on the Court's docket. And the Court can admit those for notice. So that applies to 1, 2, 3, 4, 10, 11, 12, 13, 17, 20, and those are the initial pleadings on that basis.

Then, Your Honor, jumping to Exhibits --

THE COURT: Just a --

MS. LINDAUER: -- 5, 6 --

THE COURT: Just a minute, please.

MS. LINDAUER: Sure.

THE COURT: So, Mr. Kane, with respect to Exhibits 1, 2, 3, 4, 10, 11, 12, 13, 17, and 20, you agree that those can be admitted for notice purposes?

MR. KANE: Yes, Your Honor.

THE COURT: Okay. Go ahead, Ms. Lindauer.

MS. LINDAUER: Okay. Then, Your Honor, for Exhibits 5, 6, 7, 8, and 9, those we agree can be admitted. There's no restriction on those. 14, 15, 16 admitted. 18, 19 admitted. 21, 22 admitted. Then I'm going to jump down a bit and we'll come back to some of these. 57B and C admitted. 80A admitted.

THE COURT: I'm sorry, Ms. Lindauer.

MS. LINDAUER: 90 --

THE COURT: You have 57B and C, correct?

MS. LINDAUER: Correct.

THE COURT: And --

MS. LINDAUER: Then go to 80A. Then 99. All of those, Your Honor, can be admitted by agreement. We have no objection to those.

THE COURT: Okay. So first, to the extent I didn't already fully admit them, the documents that were admitted for notice purposes which were 1, 2, 3, 4, 10, 11, 12, 13, 17, and 20 are admitted for notice purposes.

(HNGH's Exhibits 1, 2, 3, 4, 10, 11, 12, 13, 17, and 20 admitted into evidence)

THE COURT: Exhibits 5, 6, 7, 8, 9, 14, 15, 16, 18, 19, 21, 22, 57B, 57C, 80A are all admitted.

(HNGH's Exhibits 5, 6, 7, 8, 9, 14, 15, 16, 18, 19, 21, 22, 57B, 57C, 80A admitted into evidence)

MS. LINDAUER: Your Honor, there's one more, 99.

THE COURT: 99?

MS. LINDAUER: Yeah, in case I missed that.

THE COURT: Oh, I'm sorry. Yeah.

MS. LINDAUER: That can be admitted.

THE COURT: Yeah, 99 is also admitted.

(HNGH's Exhibit 99 admitted into evidence)

MS. LINDAUER: Okay. Now, Your Honor, now I'm going to get into the weeds a little bit. But starting with Exhibit 23, and then going to 26, and then 27 through 39, then 40 through 57A, 58 through 80 --

THE COURT: Ms. Lindauer, before you -- tell me

whether there's an objection or not because -- are they going to be admitted or not? Or are there objections to these?

MS. LINDAUER: Oh, no. These are -- yeah, there are objections to them. I'm just identifying the ones that we have objections to. And then I'll state what our objection is. I just was putting on the record which ones fall into the same kind of bucket of objections. So that's what I was identifying for you. If you have my Exhibit 150, or Docket 150, we kind of identified all of those. It makes it a little bit easier to follow through these.

THE COURT: All right. I have that list now.

MS. LINDAUER: I think -- yeah. Yeah. Okay. So working with that list, first of all let me pick out a few. 26A is a document that was sealed. So that one is still subject to a seal. So I don't think that one should be admitted.

THE COURT: So before we --

MS. LINDAUER: That would be our --

THE COURT: Before we go through all these, I think my preference, Mr. Kane, were you planning on covering each of these in your case in chief and having me look at each one, because if that's the --

MR. KANE: No. Not all of them. Not all of them, Your Honor. So many of them, yes. They will be presented in the case in chief. But we also wanted to get many of these on

the record that we would have just by reference for you to look at at a later date. Or, you know, as part of your review, if you were going to draft an order.

What I can say is these hearsay objections, there's essentially two types of objections here. One, it's hearsay to a bunch of documents that came from Joyce Lindauer and Khudabuksh Walji and Sendera Title who is a representative of the title company. All of those are admissions by a party opponent. It's an exception to hearsay under 801. Those are admissible documents.

And the rest of them come from me, or from my emails during this closing period are all contemporaneous business records. And we've submitted a business records affidavit. And I'm prepared to address an argument from Ms. Lindauer on whether business records as emails are admissible.

So if we'd like to hear that objection, more than happy. I can tell you, we can go through each one of these and I can tell you which one is an admission by a party opponent and which one is a business record.

I can also address the issue on the seal on number 26A. The payoff period is passed. The document was sealed exclusively to provide the Debtor a potential upside benefit should it obtain financing or a purchaser attempting to buy the property at an amount greater than the payoff amount.

As Ms. Lindauer said on the record at the beginning

of this hearing, the order is self-executing. We are essentially the owners of the property. The payoff is no longer valid. Ergo, the sealed document does not need to be under seal. There is no beneficiary party of the seal.

MS. LINDAUER: Do you want me to address those in the order he presented them, or --

THE COURT: So --

MS. LINDAUER: I'm happy to do that.

THE COURT: Mr. Kane, the documents that were objected to on grounds of hearsay, all the emails, I guess let's just start with the bucket of emails, the emails that are to or from you.

MR. KANE: Yes.

THE COURT: Are any of those being offered for the truth of what's asserted in the emails, or are they simply being offered to show that the documents were sent in the status of the negotiations, or for some other purpose other than the truth of what is asserted in the emails?

MR. KANE: I think it, I mean, I think the emails, that's a -- I'm trying to be careful here on my response, Your Honor, because the emails are being presented to show this Court exactly what happened on a contemporaneous basis during this closing period. And our goal is to provide all of the email documentation that we could that reasonably addressed closing between Ms. Lindauer, me, Khudabuksh Walji, and I think

there's a couple emails between Ms. Lindauer and Jeff Carruth who's also present who's counsel for Happy State Bank.

So any of the emails that we received, regardless of whether they are offered for the truth of the matter or not from Mr. Walji, Ms. Lindauer, Sendera Title, or Mr. Barton would all be admissible exceptions to hearsay.

THE COURT: So I think I'd rather try to figure out if we even have to get to an exception. Are there individual statements in any of those emails that you would be, you know, for example if your client sent an email to their client saying whatever it is, are you trying to get any of those statements into evidence to prove what they said in the emails, or is it solely to show the status, because I'm not sure that any of these would be hearsay to begin with. And I'm not sure that --

MR. KANE: Right.

THE COURT: I don't know how to do this on a global basis without looking at each individual email.

MR. KANE: No, I appreciate that. It's to show the status of the hearing, or to show the status of the closing. You know, what documents were being provided, what work was being done by the parties as this progressed from April 29th to May 31st.

THE COURT: So can they not be admitted for that purpose, to show that the documents were sent, that the communications were made, that that is what was happening

without admitting them for the truth of the matters asserted in the emails? Isn't that an easy way to maybe resolve this evidentiary objection?

MR. KANE: Yes. Let me clarify, and I'm trying to find one that's -- that would be very specific here. So you know, there are emails let's say from me to Joyce Lindauer in which I'm saying I've been waiting for hours for comments and I haven't received anything. So let's say that something like that, for example, as a hypothetical. We are submitting that to show that we have been waiting for hours and have not received comments from the Debtor.

So I think that is offered for the truth of the matter asserted. It is also offered just to show that we are trying to make progress on behalf of HNGH, and we do not appear to be making the progress that we are hoping for.

THE COURT: So I don't know how to make a global ruling on these without looking at each individual email then because you might be offering some of them for a couple purposes, for the truth of the matter asserted, and there might be exceptions that apply. So is it going to be too cumbersome to go through these emails individually.

And, Ms. Lindauer, are you -- do you understand where I'm coming from on this?

MS. LINDAUER: No. No, I am, Your Honor.

And I think Mr. Kane's example is a perfect example of why we objected because Mr. Kane did not put himself down as a witness. So he says we've been waiting for hours for your documents. I should have the right to be able to call him as a witness and say okay, isn't it true, Mr. Kane, that we called you on the telephone ten times and told you that the documents were on the way.

That's the dilemma here. That's why these emails, (indiscernible) emails from attorneys back and forth are problematic. I'm not designated as a witness. John is not designated as a witness. We don't have anybody from Sendera Title here. I mean, there's a lot of these that are just going to fall into the bucket of they should not be admitted. There's no foundation.

So I hate to tell you you almost have to go email by email, but if they're admitting them to just say I sent you a copy of something, that's one thing. Okay? If they send one that says I sent you a copy of something and I haven't heard back from you in two days, that's a different story. So that's why we objected to all of these.

I don't think you get around the objection with a business records affidavit, and we explained to you why. These are not business records. Lawyers' statements outside of court are hearsay. And I think that they are problematic because Mr. Kane would have the right to ask me questions. I would

have the right to ask him questions about those emails.

So one thing I think we could do is if Mr. Kane is saying hey, there's some of these that I really want you to look at, and there are some that maybe aren't as important right now, maybe a five-minute break for him to go through these and pull out the ones, and maybe if they are ones that just say see attached, we may be able to work through that. But if there are ones that say more than that, we're going to have an issue.

MR. KANE: Okay. What --

MS. LINDAUER: Yeah.

MR. KANE: Yeah. Your Honor, I would like -- I'm happy to go through our presentation and first offer these just to show what the status of this ongoing proceeding is. And if you believe an email goes outside of just tracking the status of where things are, then you can determine whether that needs to be deemed admissible or subject to further discussion.

I do think it is worth addressing this business records deal and whether I could have been called as an adverse witness by the opposing party, which I think perhaps I could have been. I'm not sure. But lawyers' statements outside of court are hearsay, or could be hearsay. The telephone conversation that I had with Joyce Lindauer could be hearsay except that my statement, if I am representing my client in that correspondence, and it isn't privileged or confidential

settlement correspondence, could also be an admission by a party opponent made by a representative of that opponent.

THE COURT: And admission --

MR. KANE: So Joyce's statements --

THE COURT: Your statement?

MR. KANE: Yes.

THE COURT: Would be --

MR. KANE: If I'm representing my client, if I am, like, saying, you know, my client says it can deliver this by this time, and Joyce comes later, and I have that in writing and I send that to Joyce, Joyce can absolutely use that exhibit to show HNGH, through their counsel, asserted that they would deliver this product by this time. That's an admission by a party opponent. It is an exception to the hearsay rule.

THE COURT: I understand that. But I guess I was thinking --

MR. KANE: Right.

THE COURT: -- of the hypothetical that you gave me to begin with which was you were saying --

MR. KANE: Certainly.

THE COURT: -- you are delaying --

MR. KANE: Certainly.

THE COURT: -- for five hours, that would not be an admission. That's --

MR. KANE: Right.

THE COURT: So --

MR. KANE: No, no. So let's address that because that comes into where the business records affidavit and the treatment of these emails as business records comes into play. And the whole purpose of 803(6) is to allow documents that have inherent reliability as business records. I think it was United States v. Wells, a Fifth Circuit decision where a court said, you know, the rationale for allowing documents in as business records is supplied by the systematic checking by regularity and continuity which produce habits of precision, but actual experience of business relying on them. Okay?

Alternatively, there can be a duty to preserve the record. And that can establish, you know, a grounds for a document that is an out of court statement that is being offered to the Court to be admissible as a business record. So we've got 803(6) has in essence three requirements. It's is there a record of an act, event, condition, opinion, or a diagnosis and it is admissible for the truth of the matter asserted within the record if the proponent of the record, that's me, they're my emails, can show three elements: record was made at or near the time. Okay. I've attested to that, right?

These emails are taking place contemporaneously with the closing that is the issue of the dispute, and the emails were preserved at the time they were being prepared. So that

comes to and then you have to look at by someone with knowledge. I had knowledge. I was the one sending and receiving the emails. I've been participating in this case. I think I had my notice of appearance in October 29th or November 1st, then filed pleadings and acted throughout.

The record was kept in the course of a regularly conducted activity of a business. And this is where some courts have looked at that and said well wait a second, you know, just because you use emails doesn't mean the email was conducted, or was kept in the course of a regularly conducted activity in business. But as a lawyer, we are representing clients on finite matters.

And a closing for a lawyer requires the preparation of documents, exchange of correspondence and documents with opposing attorneys, and the preservation of those documents so you can maintain a track record of what took place. You owe a duty to your client to be a zealous advocate, but also maintain the client file which is the property of your paying client.

So then (C), the record was made as a regular practice of that business activity. And that goes to the same point I just made. When a lawyer is actively engaging in a closing with an opposing party, it is completely ordinary practice for the attorney to maintain those email records of transactions of correspondence between the parties engaged.

So we would argue, Your Honor, that even if I did

send an email to Joyce that said we've been waiting on this for two hours, where do things stand, that is a business record that even if it was an out of court statement, even if it's being offered for the truth of the matter, it satisfies the admissibility requirements under Section 803.6.

THE COURT: So to stick with the example --

MR. KANE: And the --

THE COURT: To stick with the example that you started with where you make a statement to Ms. Lindauer that you are being unreasonable in your delay, if you're offering that for the truth of the matter asserted, then you're the party who's testifying, correct?

MR. KANE: I'm the declarant under that business record. Yes.

THE COURT: But the statement that you're trying to get into evidence is you're the witness making an allegation that they are unreasonably delaying the closing. I'm kind of paraphrasing what the hypothetical was. Correct?

MR. KANE: Yes.

THE COURT: And I guess I'm asking are you sure you want to offer that for the truth of the matter asserted because Mr. Phelan has raised the issue of do they then get to cross-examine you, and are you then required to recuse yourself? Just before the hearing we looked at the rules for, you know, attorney's testifying.

And when I came in here, I was thinking that the emails that you were going to offer from to and from you would be just to show that the documents were sent, to show the status because otherwise, isn't the, in this example, the allegation that they are being unreasonable in the closing, does that not go to a contested issue, but potentially a contested material issue in the litigation?

So I'm asking that, and I guess I'm proposing is a better answer to this to offer documents for not for the truth of the matter asserted, at least emails to and from you, to show the status without necessarily offering them for the truth of the matter asserted. So that's one observation. The other --

MR. KANE: Yeah --

THE COURT: The other observation is --

MR. KANE: -- I'll address that.

THE COURT: -- with this many exhibits, I don't want either side to think that there's going to be a data dump of exhibits and say, judge, go find what you think is relevant. If an individual document is relevant and is something that you think I need to look at, I think it might be more productive to go through these one-by-one because we're talking about hypotheticals where they might be admitted for the truth of the matter asserted. I suspect that maybe many or most are not.

Does it make sense to just, I hate to say it but if

there's something that you think is important for me to look at in connection with this hearing, I think I'm going to expect you to point it out to me. And does it make more sense --

MR. KANE: Yeah, I will. We plan on -- certainly plan on doing that. And let's go ahead and go forward. And I'll have these documents, we'll submit them as evidence of the status but not necessarily for the truth of the matter asserted. And we can proceed if there are any specific disputes over documents in my presentation.

THE COURT: So why don't we --

MR. KANE: We can go from there.

THE COURT: So this is the third category. The first category was admitted for notice. The second category that I admitted were admitted for all purposes. Do you have a list, or was it on this list that you directed me to at Docket --

MS. LINDAUER: Your Honor, the -- yeah. Your Honor, the second category, or third category would be subject to seal. My only point on that is we have documents --

THE COURT: Let's come back to that. Ms. Lindauer, let's come back to that.

MS. LINDAUER: Okay.

THE COURT: I'm looking for --

MS. LINDAUER: All right. And then the --

THE COURT: Is there a list of --

MS. LINDAUER: The hearsay no foundation? Yeah.

THE COURT: Is there a list of --

MS. LINDAUER: Those are --

THE COURT: Are there a list of exhibits that both parties would agree would be admitted not for the truth of the matter asserted but to show the status of a negotiation? Is there an easy, identifiable bucket that we can go down and admit those?

MS. LINDAUER: Your Honor, it will take me a few minutes to go through those. But the problem I've got is a significant number of these emails are not from me or Mr. Kane. They're from other people like Julie Lissey (phonetic) with Sendera Title Company. There's just no way that those are not hearsay.

So Mr. Kane can -- I'll give you a perfect example. Exhibit 33 --

THE COURT: Let's not go through examples.

MS. LINDAUER: -- if you go --

THE COURT: Let's not go through examples.

MS. LINDAUER: Okay. So anyway, so the problem, it would take -- to answer your question, probably yes. But it would take me a few minutes to go through them and tell you which ones just say attached is something. Okay? So --

THE COURT: Mr. Kane, do you just want to --

MS. LINDAUER: -- I don't know if you want to --

THE COURT: Do you want to start and cover these

individually? Or what --

MR. KANE: I can, Your Honor.

THE COURT: Tell me, would it be productive to take a break to come up with the list of further agreed exhibits, or do you just want to get going and go through them one-by-one?

MR. KANE: I kind of want to get going. And I'll tell you this, I can give you a list of documents that I have on my list that are statements by a party opponent. And contrary to Ms. Lindauer's position, they've stated that Sendera Title was working as a representative of the Debtor overseeing this closing. So a statement by Sendera Title, we would argue, is an exception to hearsay because that is a statement by an opposing party.

MS. LINDAUER: That's just flat wrong, Your Honor. That is not the law. You hire a third-party title company to help you --

THE COURT: All right. Let's not do this now. Let's go ahead and get started with the evidence. And to the extent there aren't any -- during a recess, if we don't finish today, if you guys want to work on a stipulation of any further exhibits that will be admitted by agreement, that's fine. But otherwise, I'd like to get going. And we'll just cover these one-by-one.

MR. KANE: Okay, Your Honor.

MS. LINDAUER: Your Honor, if we're going to, and I

do want to reserve our right to call anybody like Mr. Kane, even though he didn't put himself down as a witness, I would like to reserve the right to call him as a witness to the extent that you admit any email that has any substantive statements in it to which Mr. Kane should be required to be able to be cross-examined. I do think I have the right to do that in this context. So I do want to reserve that right to do that.

THE COURT: All right. Mr. Kane, why don't you go ahead and put on your first witness.

MR. KANE: Thank you. Your Honor, actually I'm going to do a presentation where I'm going to be citing to exhibits that we believe are admissible, if you don't mind.

THE COURT: So you want to go through these exhibits?

MR. KANE: Yes, Your Honor. In a way. I'd like to in essence walk through our evidence and present this in a kind of concise presentation, if that makes sense.

THE COURT: All right. We'll try --

MS. LINDAUER: Your Honor, I don't --

THE COURT: Go ahead, Mr. Kane.

MR. KANE: I'm going to screen share, and we'll go through a slide deck. Okay. Your Honor, we had a conversation earlier about why we were here since we have this self-executing order. We've got language that in essence says that we already take ownership of this property. It takes place

automatically upon the existence of a --

MS. LINDAUER: Your Honor, I'm going to object to this presentation. This is not evidence. This is argument. This is a great closing argument.

THE COURT: Okay. Let's --

MS. LINDAUER: But aren't we --

THE COURT: Let's pause. Ms. Lindauer, let's pause for a minute.

MS. LINDAUER: Yeah.

THE COURT: Mr. Kane, are you sharing a document on the screen somewhere?

MR. KANE: Yes, I was.

MS. LINDAUER: He's showing a PowerPoint, Your Honor, which is basically his closing argument.

THE COURT: So I don't -- I'm looking around the courtroom and I'm not seeing that show up on any screen. So give us a --

MR. KANE: I just stopped sharing it. But here, I mean, if this is what we're going to do, then this is fine. I can walk through the exhibits and explain exactly what we are seeking to have admitted. And then we'll save our argument for the end here.

THE COURT: Okay, because whatever you were trying to show did not show up on my end. So I do have your exhibits from the thumb drive on a separate screen. So I'm able to pull

up any exhibit that you want me to look at. But at least on the first try, your screen sharing was not working.

MR. KANE: Okay. Your Honor, I would direct you then to -- we'll do this by star. If you could please turn to Exhibit 71. We would like to move for the admission of this exhibit. It is an email from Joyce Lindauer to me which Ms. Lindauer discusses whether the transaction can be closed by the closing deadline and requests an opportunity to buy some time so Mr. Barton can purportedly get the funding he needs and to pay off your client's loan.

MS. LINDAUER: Your Honor, for the record, I would state that this is hearsay. It's an out of court statement offered -- being offered for the truth of the matter asserted. It's a statement of counsel. There's no foundation, there's no exception. I think the way to actually present this would be he would have to call me as a witness to prove up this particular email. You don't just get to put in people's emails and say I'm offering this as an exhibit. So --

THE COURT: Ms. Lindauer, is that your email address, Joyce@JoyceLindauer.com?

MS. LINDAUER: It is, Your Honor.

THE COURT: Mr. Kane, are you offering this for the purpose of showing the status of negotiations, or is there a statement in here that you were offering it for the truth of the matter asserted?

MR. KANE: No. Status of negotiations, Your Honor.

THE COURT: Okay. Exhibit Number 71 is admitted for that purpose.

(HNGH's Exhibit 71 admitted into evidence)

THE COURT: Next?

MR. KANE: Yes, Your Honor. We'd like to offer Exhibit 85A.

THE COURT: Okay. I have it. It's --

MS. LINDAUER: Your Honor --

THE COURT: Ms. Lindauer, if you could just wait. I'm identifying the document to make sure I'm looking at the right one. It's a letter dated May 31st, 2022.

MR. KANE: Yeah. And, Your Honor, what I'd like to do is, I apologize, start with offering Exhibit 85.

THE COURT: 85, okay. Hold on. Okay. Exhibit --

MR. KANE: This is document --

THE COURT: I now have Exhibit -- I have Exhibit 85 open which is an email dated May 31st, 2022 from Mr. Walji to Ms. Lindauer copying you. Is that correct?

MR. KANE: Right. As Mr., or as Ms. Lindauer stated, Mr. Walji is counsel overseeing this deal transaction on behalf of the Debtor.

THE COURT: And you --

MS. LINDAUER: Your Honor, first of all I would object that -- I would object that it's hearsay. Second, it's

marked confidential. These were confidential documents that were being provided to me and Mr. Kane regarding the prospective closing. They were not to be introduced at the time of any trial or hearing. That's why they say subject confidential.

So, Your Honor, I believe it's inappropriate to offer these at this time. And I think they also contain somewhat of some privileged information that was being provided to Mr. Kane. So, Your Honor, on multiple grounds, we would object to Exhibit 85.

THE COURT: So the --

MS. LINDAUER: And then we'll also address Exhibit --

THE COURT: So the first objection, Mr. Kane, was that it's hearsay. Do you have a response?

MR. KANE: Yeah. Not offered for the truth of the matter asserted. This is to show the status of the document deliveries between the parties at closing.

THE COURT: The second objection was that this was a confidential document.

MR. KANE: Yeah, Your Honor. This is not a piece of settlement correspondence. There's no federal rule of evidence that would preclude the admissibility of this document on the grounds of confidentiality or privilege.

THE COURT: And privilege was the last one, I believe. To the extent there was a privilege, it's been shared

with you. So I will --

MR. KANE: Privilege is what --

THE COURT: So I'll admit -- I'll overrule the objection and admit document number, Exhibit Number 85.

(HNGH Exhibit Number 85 admitted into evidence)

MR. KANE: Moving on to the next document is Exhibit 85A.

THE COURT: All right. I have it.

MR. KANE: Okay. This document was just the attachment on the prior email. It is not being offered for the truth of the matter asserted.

MS. LINDAUER: Your Honor, it's clearly hearsay. There's no reason to offer this. And so to say well it's not offered for the truth of the matter, then what's the point of offering it? There's no way he can get this in as something other than hearsay. So it doesn't even come in as -- it doesn't come in for his purpose. It doesn't come in for any purpose. You can't qualify a hearsay document and say oh, well I'm only -- I know it's hearsay, but I'm just using it for some kind of notice.

THE COURT: Ms. Lindauer, what statements in here are hearsay? It's a multiple-sentence letter.

MS. LINDAUER: Well, it's Mr. Garrison Kickham (phonetic) is not a party to this proceeding. He's a third party. His letter to anyone is hearsay. There's no way that

you can authenticate this.

THE COURT: What is the truth of the matter asserted that you think is hearsay?

MS. LINDAUER: Lack of satisfactory documentation, and whatever else he says in here. But it's an out of court statement being offered. For any purpose it is a hearsay document. Now, if he wants to call Mr. Kickham (phonetic) and prove it up, that's different. But you can't admit this document on its face.

And Mr. Kickham is not working for the Debtor. He's not a representative of the Debtor. He is clearly a third party. He's the Private Lender Network, whoever that is.

THE COURT: So, Mr. Kane, so we have a hearsay objection. And before I rule on that --

MR. KANE: Right. So --

THE COURT: Go ahead and respond.

MR. KANE: So again, it's not offered for the truth of the matter asserted. And to be clear again, this is an attachment that was provided to the debtor by us. Right? So this is, again, part of an admission by a party opponent.

But even aside from that, it is not being offered for the truth of the matter asserted. I have no idea whether this gentleman intended to close and fund this loan in an expedited manner. But this does go to show that around the time of closing, Mr. Walji was submitting documents to us from

potential lending sources about interest in closing.

THE COURT: Okay. Exhibit Number 85 is admitted.

MS. LINDAUER: Is it admitted based on the restriction of Mr. Kane, or is it admitted for the truth of the matter asserted therein?

THE COURT: I believe Mr. Kane said he was offering it to prove the status of the negotiations and not for the truth of the matter asserted.

MS. LINDAUER: Okay. Thank you for that clarification, Your Honor.

MR. KANE: Your Honor, next one is 88. And this is the exact same set of discussion points. Right? It's an email from Khudabuksh Walji, a representative of the debtor, attaching in 88A correspondence from a purported potential lender, or from Mr. Marx who had some unclear role with debtor's affiliates or whatever. But it's the exact same set as Exhibit 85 and Exhibit 85A.

THE COURT: Is there an objection, Ms. Lindauer, to Exhibit Number 88?

MS. LINDAUER: Yes, Your Honor. Same objection, Your Honor. Hearsay. It's a statement of counsel outside of court, obviously. And I would also point out it's marked confidential. And it was delivered to Mr. Kane in confidence and should not be admitted.

THE COURT: Okay. I'll overrule the objection to

Exhibit 88 which is admitted.

(HNGH's Exhibit 88 admitted into evidence)

THE COURT: Mr. Kane?

MR. KANE: Yeah, Exhibit 97, Your Honor. This is offered to show that Ms. Lindauer had confirmed receipt of our Rule 11 notice at 11:27 a.m. on June 1st, 2022.

MS. LINDAUER: Your Honor, I'm going to object. Number one, I don't think it's relevant. And number two, I want to reserve my right to ask Mr. Kane some questions about this. But that said, I think it's just not relevant to these proceedings at this point. So I don't think it should be admitted, not to mention that it's hearsay. But I don't think it's relevant.

THE COURT: Okay. I'll overrule the hearsay and relevance objections and admit Exhibit number 97.

(HNGH's Exhibit 97 admitted into evidence)

MR. KANE: Okay. This is a -- well, this one doesn't matter so I'm going to move on from that. Let's go to Exhibit 38.

THE COURT: I'm sorry. Exhibit Number 38?

MR. KANE: This is offered to show the status of closing progress. I'm not offering it to show that the lender is putting together a creditor payoff list. I have no idea if they were or not. I'm sorry, the debtor.

THE COURT: Ms. Lindauer, do you have any objections

to the admission of Exhibit Number 38?

MS. LINDAUER: I think, Your Honor, my main objection would be relevance. What does this have to do with a motion to enforce two agreed orders and the terms of a plan for an email back in end of April dealing with an Enoch (phonetic) Trust lease agreement. So, Your Honor, I don't think it's relevant to anything you've got before you.

THE COURT: Mr. Kane, response on the relevance objection?

MR. KANE: Yeah. This relates to payoff information in part, which was sought, which is purportedly an item that needed to be addressed at closing. So this is very relevant to the process of closing, what took place during the closing process, who was in breach, and who was responsible for failed closing.

MS. LINDAUER: Your Honor, I don't think this is what this was about at all. But if he wants to say that as of April 29th we asked him for payoff information and he didn't provide it, then I'm happy for it to be admitted.

THE COURT: So the relevance objection to Exhibit Number 38 is overruled, and Exhibit Number 38 is admitted.

(HNGH's Exhibit 38 admitted into evidence)

MR. KANE: Your Honor, that leads to 39 and 39A. I understand that there is a seal argument on 39A.

THE COURT: So we'll start with --

MR. KANE: This is offered --

THE COURT: We'll start with 39. 39 is an email dated April 29th.

MR. KANE: Right. This is offered for the status of closing progress.

THE COURT: Ms. Lindauer, any objection to offering it for the purpose of showing the closing status?

MS. LINDAUER: Not 39, Your Honor.

THE COURT: 39's admitted for that purpose.

(HNGH's Exhibit 39 admitted into evidence)

MR. KANE: Next, Your Honor, is 39A.

MS. LINDAUER: Your Honor, we maintain our objection to that. That's a document under seal. There's been no motion filed to remove the seal on those documents. I don't think Mr. Kane just saying well we're past that point in time, Your Honor, removes the seal on this document. So that still remains a document under seal and should not be admitted.

MR. KANE: Your Honor, I think we'd be fine with having this admitted under seal so long as it is admitted to show that the actual amended Exhibit A payoff amount was provided.

THE COURT: All right.

MS. LINDAUER: Well, Your Honor -- okay. That's fine, Your Honor.

THE COURT: We'll go ahead and admit Exhibit

Number 39A under seal.

(HNGH's Exhibit 39A admitted into evidence)

THE COURT: Next?

MR. KANE: All right, Your Honor. Number 40. This is again offered just for the status of closing. It's just a discussion between the debtor and HNGH about status of payoff amount due.

THE COURT: Ms. Lindauer, any objections to the admission of Exhibit Number 40 for that purpose?

MS. LINDAUER: No objection, Your Honor, for that purpose.

THE COURT: Okay. Exhibit Number 40 is admitted for that purpose.

(HNGH's Exhibit 40 admitted into evidence)

THE COURT: Next?

MR. KANE: Yeah, Your Honor. Number 41. This is offered for the same reason.

MS. LINDAUER: Your Honor, if it's being offered solely for the reason of the discussions regarding the proposed payoff as of April 29th, 2022, and that reason only, no objection.

THE COURT: Mr. Kane, your -- is it being admitted for --

MR. KANE: That's fine, Your Honor.

THE COURT: -- that purpose. Is that correct?

MR. KANE: That's fine.

THE COURT: Okay.

MR. KANE: That's fine.

THE COURT: Exhibit 41 will be admitted for that purpose.

(HNGH's Exhibit 41 admitted into evidence)

MR. KANE: Number 42, Your Honor.

THE COURT: All right. I'm there.

MR. KANE: This is the same, discussions about the payoff amount offered for that, not to say that, you know, I did this or that. But it's just offered to give the court guidance on what was taking place at that time.

THE COURT: Ms. Lindauer, are you -- do you have any objections to the admission of Exhibit 42 for that purpose?

MS. LINDAUER: For that limited purpose, no, Your Honor.

THE COURT: All right. Then 42 is admitted for that purpose.

(HNGH's Exhibit 42 admitted into evidence)

MR. KANE: Next, Your Honor, Exhibit 43 for the same purpose.

THE COURT: Bear with me. My computer has a little bit of a delay pulling these up.

MR. KANE: Your Honor, can we just take a five-minute recess where I get on the phone with Ms. Lindauer and we see if

we can knock as many of these out as possible because this is, in my opinion, a tremendous waste of time.

THE COURT: That's fine because if there's no agreement, I don't know of any other way to do it other than looking at each individual exhibit.

So why don't we take a recess, and you can notify my judicial support specialist, Ms. Smith, when you're ready to come back on. Just as a practical matter, if there's no agreement, I don't know any other way to do it that to look at each exhibit one by one.

MR. KANE: No, I understand, Your Honor. Let me ask you this. Can I get your judicial assistant's email address or phone number so we can make sure we take care of that in prompt order.

THE COURT: She's going to stay on WebEx. And even though we're --

MR. KANE: Okay.

THE COURT: -- going to go off the record, she'll be able to hear you.

MR. KANE: Okay. Very good. Thank you.

MS. LINDAUER: John, I'll take the notebook and call you, okay?

MR. KANE: Okay, thank you.

MS. LINDAUER: Thank you.

THE COURT: Thank you. We'll be in recess.

(Recess began at 2:50 p.m./reconvene at 3:40 p.m.)

THE COURT: All rise.

THE COURT: Please be seated. All right. Mr. Kane do you have an update on the exhibits?

MR. KANE: We do have an update, Your Honor. Joyce, I think, wanted to take a lead on acknowledging which matters she has agreed to admit. I think there's only one for me to actually offer and try and prove up. And then there are two that we have withdrawn as exhibits. And I'll tell you, I guess there's 22. So the debtor is not going to be offering into evidence for the sake of this hearing, Exhibits 100 through 120.

THE COURT: Did you say the debtor?

MS. LINDAUER: HNGH.

MR. KANE: I'm sorry. HNGH. My apologies, Your Honor.

THE COURT: All right. So I'm sorry, tell me the numbers again.

MR. KANE: 100 through 120.

THE COURT: Your client's not offering them?

MR. KANE: That's correct. In addition to numbers 37 and 98.

THE COURT: 37.

MR. KANE: That's correct.

MS. LINDAUER: Right.

THE COURT: And 98. Not offered.

MR. KANE: That's correct.

THE COURT: Okay. And is that the only other -- were there any other agreements on any other exhibits or are we --

MR. KANE: Yes, there are. Sorry, Your Honor.

THE COURT: Okay.

MR. KANE: I'll go ahead and deliver it and Joyce you can -- I guess you can correct me if I'm wrong.

MS. LINDAUER: Yeah.

MR. KANE: We had a series of documents that we are going to admit in full, as is. And I'll read those off; 47, 54 --

THE COURT: 47.

MS. LINDAUER: I'm sorry 47. I'm sorry, John, what was the next one?

MR. KANE: 54.

MS. LINDAUER: Correct.

MR. KANE: 54A.

MS. LINDAUER: Correct.

MR. KANE: 55.

MS. LINDAUER: Correct.

MR. KANE: 56.

MS. LINDAUER: Correct.

MR. KANE: 56A.

MS. LINDAUER: Correct.

MR. KANE: 57 A through C.

MS. LINDAUER: Correct.

MR. KANE: 59.

THE COURT: Hold on, I'm sorry.

MS. LINDAUER: Correct.

THE COURT: Bear with me just a minute.

47, 54, 54A, 55, 56, 56A, 57, 57A, 57B, 57C, correct?

MR. KANE: Yes, Your Honor.

MS. LINDAUER: Correct.

THE COURT: Okay, keep going.

MR. KANE: 59.

THE COURT: 59.

MR. KANE: 65.

MS. LINDAUER: Okay.

THE COURT: 65.

MR. KANE: 65 -- yeah, 65A, 65B, 65C and 65D. So 65 A through D.

THE COURT: Okay.

MR. KANE: 66. 67A, 68, 71, 74.

THE COURT: 71 was admitted for limited purposes.

MS. LINDAUER: Right.

THE COURT: Is that coming in for all purposes now?

MS. LINDAUER: Correct.

THE COURT: So 71 admitted for all purposes. Continue.

MR. KANE: 74, 75, 95, and 95A.

THE COURT: 95 --

MS. LINDAUER: Yeah.

THE COURT: -- and 95A did you say?

MR. KANE: Yes, Your Honor.

THE COURT: Okay. I've caught up.

MR. KANE: Okay. There is a long list of documents that are going admitted to show -- for the limited purpose of showing the status of pending matters and steps towards closing.

THE COURT: Okay. And before I do that, I'll just go ahead and formally admit the ones we just discussed, which is -- I'll admit for all purposes 47, 54, 54A, 55, 56, 56A, 57, 57A, 57B, 57C, 59, 65, 65A, 65B, 65C, 65D, 66, 67A, 68, 71, 74, 75, 95, 95A. Did I get them all.

MR. KANE: Your Honor, I did not hear you say 67. I heard 67A, but not just 67.

THE COURT: I didn't have that, but is that -- that's agreed for -- to be admitted for all purposes?

MS. LINDAUER: Yeah.

THE COURT: I'll add 67 is also admitted.

(HNGH's Exhibits 47, 54, 54A, 55, 56, 56A, 57, 57A, 57B, 57C, 59, 65, 65A, 65B, 65C, 65D, 66, 67, 67A, 68, 71, 74, 75, 95, 95A admitted into evidence)

MS. LINDAUER: Okay.

THE COURT: Okay, Mr. Kane, sorry. If you'll go to the next category. You're offering a list of documents to show the status of the negotiations and the progress towards closing. Is that what that was?

MR. KANE: Yes. It's the status of pending matters and steps towards closing.

THE COURT: Okay. We'll go ahead and start with those.

MR. KANE: Okay. Would you like me to list the individual number, or I can do it in document ranges, might be a little bit faster.

THE COURT: Ranges if fine if you have ranges.

MR. KANE: Okay. Then it's documents 24 through 36A.

THE COURT: Okay. 24 through 36A are admitted for that purpose.

(HNGH'S Exhibits 24 through 36A admitted into evidence)

THE COURT: And then documents 38 through 46.

THE COURT: 38 through 46 are admitted for that purpose.

(HNGH's Exhibits 38 through 46 admitted into evidence)

MR. KANE: Document 48 and 49.

THE COURT: 48 and 49 are admitted for that purpose.

(HNGH's Exhibits 48 and 49 admitted into evidence)

MR. KANE: Documents 51 through 53.

THE COURT: 51 through 53 are admitted for that

purpose.

(HNGH's Exhibits 51 through 53 admitted into evidence)

MR. KANE: Documents 60, 60A and 61.

THE COURT: 60, 60A and 61 are admitted for that purpose.

(HNGH's Exhibits 60, 60A and 61 admitted into evidence)

MR. KANE: Documents 63 and 64.

THE COURT: 63 and 64 are admitted for that purpose.

(HNGH's Exhibits 63 and 64 admitted into evidence)

MR. KANE: Document 69, 69A and 70.

THE COURT: 69, 69A and 70 are admitted for that purpose.

(HNGH's Exhibits 69, 69A and 70 admitted into evidence)

MR. KANE: Document 72, 72A and 73.

THE COURT: 72, 72A, 73 are admitted for that purpose.

(HNGH's Exhibits 72, 72A and 73 admitted into evidence)

MR. KANE: Documents 76 through 84.

THE COURT: 76 through 84 are admitted for that purpose.

(HNGH's Exhibits 76 through 84 admitted into evidence)

MR. KANE: Documents 86, 87 and 87A.

THE COURT: 86, 87 and 87A are admitted for that purpose.

(HNGH's Exhibits 86, 87, and 87A admitted into evidence)

MR. KANE: Documents 89 through 94.

THE COURT: 89 through 94 are admitted for that purpose.

(HNGH's Exhibits 89 through 94 admitted into evidence)

MR. KANE: Document Number 96.

THE COURT: 96 is admitted for that purpose.

(HNGH's Exhibit 96 admitted into evidence)

MR. KANE: And Document Number 58 is admitted to show that there was a disagreement between the parties regarding an extension to the payoff deadline.

THE COURT: And give me that number again, Mr. Kane, I'm sorry.

MR. KANE: 58.

THE COURT: And could you repeat it? It was admitted for the purposes of showing that there was a disagreement?

MR. KANE: Regarding an extension of the payoff deadline.

THE COURT: Okay, 58 is admitted for the purpose of showing that there was a disagreement regarding the extension of the payoff deadline.

(HNGH's Exhibit 58 admitted into evidence)

MR. KANE: Your Honor, that leave just one document for us to try and finish proving up on our case in chief. And that is document number 62.

MS. LINDAUER: 62.

MR. KANE: Which is offered to show the status of pending matters and steps towards closing. Email consists of a chain, whereby I had sent an email to debtor's counsel regarding a termination -- a recorded termination of Access Bank. Was instructed to send it to title. Informed them I didn't know who to send it to. Was under the understanding that they were working with three different title companies and wanted to defer to them to send it along. Which the debtor said that's fair.

We're trying to show here that there is a -- you know, there are multiple, I suppose title companies involved. And that there's at least some lack of clarity about to whom documents should be sent.

THE COURT: And I take it there's an objection to this one?

MS. LINDAUER: No, Your Honor, we'll go ahead and admit it on that limited basis of what he just said. That's fine.

THE COURT: Okay, 62 will be admitted for that purpose. Which I'm not going to try to summarize, but that's admitted for that limited purpose.

(HNGH's Exhibit 62 admitted into evidence)

MR. KANE: Now, thank you, Your Honor.

And to expedite things, that will conclude our presentation of our case in chief. We'll reserve our argument

and inferences for closing argument, where we will cite to and walk through a series of what we believe are very pertinent exhibits.

THE COURT: So no witnesses?

MR. KANE: No, Your Honor. I don't believe any are necessary here.

THE COURT: So you rest and close?

MR. KANE: I'm resting on my case in chief, yes.

THE COURT: Okay.

Ms. Lindauer or Mr. Phelan?

MS. LINDAUER: I think this is coming to me. But, Your Honor, at this time, we'll go ahead and pull up our exhibit list.

THE COURT: Okay, I have it.

MS. LINDAUER: Okay. And by agreement for the hearing, we worked out that Exhibit 1 would be admitted, which is just the docket sheet in the case. Exhibit 2, which is a pleading. Exhibit 3, likewise is a letter. Some of these may overlap, but it's easier to go through them.

Exhibit 4 is admitted. Exhibit 5 is admitted. Exhibit 6 is admitted. Exhibit 7 is admitted. Exhibit 8 is admitted. 9 is admitted.

10 and 11 are not admitted. Exhibit 12 is admitted. Exhibit 13 is admitted. Exhibit 14 is admitted. Exhibit 15 is not admitted by agreement. Exhibit 16 is admitted. 17 is

admitted. 18 is admitted. 19 is admitted. 20 admitted. 21 admitted. 2 admitted. 23 admitted. 24 admitted. 25 not being admitted at this time. 26 admitted and 27 admitted.

That was our agreement that Mr. Kane and I reached prior to the hearing.

THE COURT: Mr. Kane is that -- you -- is that your understanding?

You're on mute, Mr. Kane. But just so that we get it down, you agree, I take it with that?

MR. KANE: Yes, Your Honor.

THE COURT: So we'll go ahead and --

MR. KANE: That sounds accurate.

THE COURT: Thank you. We'll go ahead and admit Exhibits -- Defendant's Exhibits 1 through 9, 12, 13, 14, 16 through 24, 26 and 27.

(Debtor's Exhibits 1 through 9, 12, 13, 14, 16 through 24, 26 and 27 admitted into evidence)

THE COURT: Ms. Lindauer, the exhibits that you say are not being admitted, are those being withdrawn or is that for a later time, or what are we doing with those?

MS. LINDAUER: Yeah, later time. If we need them we'll prove them up, Your Honor. We just didn't have any stipulation on those.

THE COURT: Okay. Bear with me just one minute, please. Okay. I understand that Defendant's Exhibit Number 2

is not -- let's see that's the debtor's response in opposition to the motion to enforce agreed orders.

MS. LINDAUER: Correct.

THE COURT: Okay, so that is -- it wasn't on the thumb drive, but that would be docket number --

MS. LINDAUER: Oh, Your Honor, I'm sorry. 145. It wasn't, Your Honor, because we hadn't filed it at the time we delivered our exhibit list.

THE COURT: Okay, so, but that --

MS. LINDAUER: It is -- yeah.

THE COURT: Docket Number 145, I don't see -

MR. KANE: We're fine with admission of that for notice purposes.

THE COURT: Okay. So and again Defendant's Exhibit Number 2, we're going to make ECF Number 145, correct.

MS. LINDAUER: Correct, Your Honor.

THE COURT: That's admitted for notice purposes.

(Defendant's Exhibit Number 2 admitted into evidence)

THE COURT: Okay. So we covered all of the exhibits?

MS. LINDAUER: We have, Your Honor.

THE COURT: All right. Ms. Lindauer, do you have any witnesses?

MS. LINDAUER: We do, Your Honor.

At this time, I'd like to call Randy Marx. He should be on the WebEx at this time.

THE COURT: And before we begin, just so that we have an idea. It's almost 4:00. How many witnesses do you plan to call?

MS. LINDAUER: Little bit depends on what they say, but I would think probably between three to five at this point. We have designated, let me see, one, two, three, four, five -- we had designated seven. I know of the ones we designated, the ones we will be calling are Mr. Marx, Mr. Walji, Mr. Kickham (phonetic), Mr. Dooley (phonetic), Mr. Nambier, possibly. And possibly Mr. Barton. We are not calling Mr. Blanchard. Some of these are going to be shorter than others.

But right now we're pretty much working down our witness list.

THE COURT: All right. Mr. Kane.

MR. KANE: All right. Your Honor.

THE COURT: So when this setting came out, you know, there was a discussion about whether it was going to be two hours or more than two hours. I know we're well past that based on the evidentiary issues and a series of questions related to open. But certainly concerned about our ability to complete this given I think that the time estimate Ms. Lindauer is proposing based on the number of witnesses she has is -- Ms. Lindauer can you -- what is the estimate that it's going to take to get through your case in chief?

MS. LINDAUER: I would say -- a little bit depends on

your cross, John, but I would think probably an hour and a half to two hours. Something like that. Couple of hours.

So I guess, Your Honor, we've got a couple of choices. We can start some witnesses this afternoon and I don't know how late you want to go tonight. Or we can pick another date when we can come back. So I'll kind of leave that to you, Your Honor. I know this has been taking a little longer than everybody anticipated. But we didn't really start getting into the evidence until -- well, as you know, so --

THE COURT: So unless Mr. Kane believes otherwise, I think we ought to get started and we'll just see how long it takes. We'll just play it by ear.

MS. LINDAUER: Okay.

MR. KANE: I'd like to get started. Yes, Your Honor.

THE COURT: So, Ms. Lindauer, go ahead and call your first witness.

MS. LINDAUER: Your Honor, at this time, I'd call Randy Marx.

THE COURT: Okay. I'm looking on the screen, hopefully -- is he behind you?

MS. LINDAUER: No, he is not. He is on the WebEx, I think. I see the little box that says Randy Marx.

THE COURT: Okay, Mr. Marx, I'm going to swear you in, but I'm waiting to see if you could just say a couple of words so that you can pop up on the screen. If you're on mute,

take it off mute.

MS. LINDAUER: Is Randy on here?

Where's Randy? Have you all called him to see -- he shows up right there.

UNIDENTIFIED SPEAKER: Yeah, he's here.

MS. LINDAUER: Okay. Do we need to call him?

THE COURT: Thank you.

MR. MARX: Hi, this is Randy Marx.

MS. LINDAUER: Oh, good. Okay. Thank you, Randy. Appreciate it.

MR. MARX: Yeah, just one second, though.

MS. LINDAUER: Okay.

MR. MARX: One second, please.

MS. LINDAUER: Sure.

MR. MARX: I'm getting a low battery thing here. I wanted to make sure that we're charging. Let me mute it one second.

THE COURT: Go ahead. We're going to swear you in before we start, so hook up your -- whatever you need to hook up.

MR. MARX: Yes, Your Honor.

THE COURT: You ready to go? Mr. Marx are you ready?

MR. MARX: I am, Your Honor.

THE COURT: I'll put the camera back on you.

MS. LINDAUER: But what happened there?

THE COURT: All right, Mr. Marx, if you would, raise your right hand.

RANDY MARX, DEBTOR'S WITNESS, SWORN

THE COURT: All right, Ms. Lindauer.

MS. LINDAUER: Thank you.

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Marx, could you state your full name for the record?

A Randy Patrick Marx.

Q Okay. And Mr. Marx, how are you employed?

A I am an attorney. I have my own practice, the Marx Firm.

Q Okay. Mr. Marx, do you also do work for various clients directly?

A I do.

Q Okay. Do you do work for a gentleman named Timothy Barton?

A I have done work for some of his affiliated entities.

Q Okay. And for approximately how many years have you done work for Mr. Barton's -- some of his affiliated entities?

A Approximately a year.

Q And have you been involved at all in doing work for 299TC Acquisitions, LLC?

A Not directly. That's the debtor?

Q Yes.

A I've been engaged more for the represent the purchaser

and/or their lenders respecting this property.
Q Okay. Have you done work though also for the debtor entity as well?
A I think so, yes. Certainly I have. But my primary source of responsibility has been in connection with the purchasing the property and/or representing the lenders connected with the purchase of this property.
Q Okay. More specifically Mr. Marx, have you been involved at all with title issues as they relate to the property of 299TC Acquisitions?
A Yes.
As counsel to the purchase or its lender, when I first got involved pretty in April or May of this year, basically discussions in those regards. And then subsequently as those discussions matured, or went forward, I had occasion to interact with Sendera, the title company involved in this transaction.
And I reviewed their commitment, et cetera, et cetera.
Q All right. One of the questions the judge had asked, and I don't know if you were on the WebEx at the time, was he had asked about attorneys that had been involved in connection with the debtor and the closing that's at issue between the debtor and HNGH.
Do you remember that question asked by the judge?
A I remember the discussion. I don't remember a specific

question.
Q Okay. All right. Did you and I or you and the debtor have discussions regarding documents necessary for closing the HNGH transaction?
A Yes.
If I remember, those discussions were with the title company. But then I relayed my concerns from my perspective I guess through your offices. Yes.
Q Okay. When you say your discussion were with the title company, and I know we've mentioned his name a few times, but could you identify for us which particular title company you're having discussions with?
A I only dealt with -- yeah, I really only dealt with Sendera. Sendera was the title company for this transaction from my perspective, from the beginning.
Q Okay.
A I know there was another title company that kind of ran parallel track because that was preferred by one of the rival lenders, I'll call it. But all of my interactions were with Julie Lissey if I'm pronouncing that name right, at Sendera.
Q Okay. All right. And do you remember when -- on or about when those discussions with Sendera started regarding title to the property?
A Well, as these funding sources became closer and closer to the mark, I had occasion to visit with Sendera probably mid-

May. May 10th is the date that comes to mind.

Q Okay. And were you provided a copy at some point of Sendera's title commitment and requirements for the closing between HNGH and 299TC?

A Yes. I would think that I would have got that maybe previously, but certainly at or about May 10th.

Q I'm going to ask my assistant, who's on here, to help us pull up some exhibits. So Sydney, I'm going to give you some exhibit numbers and if you can pull those up for us, we'll see if they'll share. I don't know if they're going to share okay, but we'll try.

It will take just a second.

A That's all right. While you're doing this, I was listening to the discussion about the schedules. And --

MR. KANE: Objection, narrative. If we're talking about scheduling things, we're going off questioning. This is just purely a discussion about availability or what?

MS. LINDAUER: I'm sorry. Here we go. I got it. Okay.

THE COURT: So the objection is sustained. I don't think there was a question pending. Ms. Lindauer was looking for a document that I think she was going to ask you about.

MS. LINDAUER: Right.

MS. LINDAUER: If we could look at Exhibit 33. Sydney, if you could pull that one up for us.

THE COURT: Ms. Lindauer, are you talking about Mr. Kane's exhibits?

MS. LINDAUER: I am, Your Honor. I'm sorry. I should have been clear about that.

MR. KANE: I'm sorry, Joyce. Which exhibit?

MS. LINDAUER: Exhibit 33.

MR. KANE: Okay, I have it.

BY MS. LINDAUER:

Q Mr. Marx, you were -- okay, Mr. Marx you were cc'd on this letter or email, I'm sorry, from Julie Lissey at Sendera Title, dated May 24th, 10:51 a.m. Do you see that? It's directed to Mr. Kane.

A I do.

Q Okay. And it says, "Good morning, John." And it says, "I'm hoping you can help me with some items on Schedule C of the title commitment." Do you see that?

A I do.

Q Okay. All right. And you were familiar, Mr. Marx, with the title commitment that Sendera had prepared for the 299TC and HNGH closing; is that right?

MR. KANE: Objection, leading.

THE WITNESS: I am familiar with the title commitment received from --

THE COURT: Sorry, Mr. Marx. Ms. Lindauer do you have a response?

MS. LINDAUER: I do, Your Honor. I'll just rephrase the question and move along.

BY MS. LINDAUER:

Q Mr. Marx, you received this email; is that correct?

A Yes.

Q And it has as Exhibit, right behind it, 33A. If we could pull that up, Sydney. This is a document called commitment for title. Do you see that?

A I do.

Q Mr. Marx, do you recall the first time you saw this Exhibit 33A?

A Well, I may have seen an earlier one in May. I certainly would have seen this one on or about May 18th because by then I was in correspondence with the title company.

Q Okay. Sydney, if you could pull to page 7 of this document. Do you see a page, Mr. Marx, that says commitment for title insurance issued by Title Resources Guarantee Company, schedule C. Do you see that?

A I do.

Q And Mr. Marx, for the record, what type of legal work do you do?

A Primarily now it is real estate. Complex commercial real estate, I'll call it. Somewhat of a national practice. I help find buy, build, lease, as appropriate, manage, dispose, primarily of real estate with like we buy it and then we

improve it and then dispose of it. I've been doing this, I guess since, since basically 1987 when I got out of school.

Q And are you familiar with what a Schedule C is?

A Yes. A Schedule C is provided by the title company and it is the items, they call them requirements, that the title company will require to basically as admission to issuing a title policy.

There are on this one, 18 listed. Some of them are multi-faceted. But yeah, that's what a Schedule C is. It's a title commitment that the title company provides to the buyer and the seller, the lender. And that's why, you know, I was involved in reviewing it.

Q Okay. All right. And are you familiar with the items that were listed on the Schedule C that was provided by Sendera Title?

A Yes. The listing is there and typically the title company will provide either a copy, a PDF copy of each of the items listed on Schedule C, or if not, they'll provide a link. I think this one happens to be a hyperlink. So if you put your mouse over any of these items and click, it would pull it to the actual instrument that they discovered of record that, you know, presents a problem to clear title.

Q Okay. And you kind of led into my next question, which is the items on Schedule C, what typically has to be done with those items, to resolve issues concerning title?

A Well, that depends on what the item is. But essentially, if it is, oh, there will be an instrument to correct it and typically the authority documents to support it. They'd be signed by all the parties at interest that, you know, created the interest or the question, or the instrument that, you know, gets on this Schedule C.
Q Okay.
A To clear the items --
A And I don't want to belabor this too much, but looked at number 5, deed of trust. Okay. That's on Schedule C. What has to be done on Schedule C to resolve the issues concerning the deed of trust?
A Well, the deed of trust is an encumbrance on title. And typically we will require that that instrument be released. And I would like to see a release of the deed of trust and all of its ancillary interests, I'll call it, or related. Oftentimes there is an assignment of rents. There could be some UCC's both from the state and the county. And in the normal course, we would ensure that all of those -- I would -- it would be my job to assure that all of those items are taken care of.
To that degree, the title company and I kind of have a mutual interest. In other words, they are insuring the title, but I am the one who is authorizing my client at the end of the day, when I'm satisfied and my client is satisfied to go

ahead and advance funds. So --
Q If you look at the second category on 5, it says notice of collateral assignment of deed of trust and loan documents to Access Bank. Do you see that? There's a little red dot next to that item on the screen?
A Well, just one second.
Q Okay. Can you see that?
A This is in the way of your exhibit.
Q I'm sorry. What's in the way of your exhibit?
A My face, but it's gone now.
Q Okay.
A Okay.
Q Do you see where we placed that little red dot?
A Yes.
Q Okay. All right. So there on title it showed a notice of a collateral assignment of a deed of trust and loan document Access Bank. Do you see that?
A Yes.
Q Okay. And in order to resolve a notice of collateral assignment, what type of document would need to be presented to show that that particular issue had been resolved?
THE COURT: Ms. Lindauer could you -
THE WITNESS: I believe it would be --
THE COURT: Ms. Lindauer, would you mind pausing for a minute?

MS. LINDAUER: Sure.

THE COURT: Can you call Jeff? Everybody is going to have to bear with me. We're having more technical issues.

MS. LINDAUER: That's all right.

THE COURT: All right. We're going to be in recess for a few minutes.

MS. LINDAUER: All right, thank you.

(Off the record from 4:17 p.m. to 4:27 p.m.)

THE COURT: All right, Ms. Lindauer, are you there?

MS. LINDAUER: Yes, Your Honor.

THE COURT: Apologies again to everybody, we're experiencing --

MS. LINDAUER: That's all right.

THE COURT: We're experiencing what it's like to interface new judge's equipment with the other judges and their benches. And we have some glitches that we're working through and we'll get better as we go along.

MS. LINDAUER: Yep.

THE COURT: So we were -- you were on Exhibit Number 33A, discussing the notice of collateral assignment --

MS. LINDAUER: We were, Your Honor. Yeah.

THE COURT: Go ahead.

BY MS. LINDAUER:

Q Okay, Mr. Marx, are you back with us now?

THE COURT: Mr. --

THE WITNESS: Yes, I am.

THE WITNESS: Before you start, can I just say --

THE COURT: All right, Ms. Lindauer, why don't you re-ask the question so that we can start again?

MS. LINDAUER: Okay.

THE WITNESS: Before a question is presented, can I make the -- relates to the scheduling that you guys were talking about? I'm only available until 5:00. I thought this was going to be this morning. And I wanted to be sure somebody was aware of that before -- before I have to go.

THE COURT: All right. Well, we will keep going. So Ms. Lindauer, go ahead.

THE WITNESS: Okay.

THE COURT: Thanks for letting us know.

THE COURT: Your Honor, I'll do my best to work through Mr. Marx.

BY MS. LINDAUER:

Q Mr. Marx, we talked about the assignment documents, the notice of collateral assignment to Access.

A Yes.

Q Okay. And what would need to be done to address that notice of collateral assignment to Access Bank?

A Well, this looks like it was collaterally assigned back in 2019. And it is appearing here because unclear as to what happened with that interest. And I had discussions with the

title company and at first she could not find what --

MR. KANE: Objection, hearsay.

THE WITNESS: I could not get satisfied that it was clear.

MS. LINDAUER: Okay. All right, Mr. Marx --

THE COURT: Mr. Kane, Mr. Kane, you cut out. Was that a hearsay objection?

MR. KANE: It was a hearsay objection. His answer resolved the hearsay objection. He changed his statement. That's fine.

BY MS. LINDAUER:

Q Mr. Marx, I think I'm going to -- because you have a little shortage of time, I'm going to try to be a little more poignant on the questions. What document would need to be provided to resolve the notice of collateral assignment of deed of trust and loan documents for Access Bank?

A Either a further assignment or a more -- typically a release of that instrument.

Q Okay.

A Depends on the factual pattern.

Q All right. If you look down you see another collateral transfer of note and lien to Happy State Bank. Do you see that?

A I do.

Q Okay. And what documentation would be necessary to

resolve a collateral transfer of note and lien to Happy State Bank?

A Well, a number of issues are related there. Collateral transfer, unlike an assignment of a deed of trust, is essentially, it would appear that HNGH, or the lender here, further collaterally assigned its rights in the underlying note and so when I saw that of record, a question includes where is the note, number one. Because typically in those arrangements, a note goes to Happy State Bank and then secondly, I guess, I would like a release of that instrument as well. To be at the title company before I would ask my client to move money.

Q All right. There were some other items listed below that. Do you see appointment of substitute trustee? Do you see that recording?

A I do.

Q Okay. Does anything need to be done to resolve that appointment of substitute trustee?

A Well, it too could be, you know, released or terminated. But more often than not, it's addressed in the, what I'll call the omnibus release of lien. Item 5 generally relates to the encumbrances that are on the property. And that item because it is controlled by presumably HNGH, could be satisfied with a -- at a proper forum of release of lien, that typically the title company prepares.

And that would then be executed by, in this instance,

HNGH.

Q Okay. Item 6 on the next page, UCC financing statement. Do you see that item?

A I do.

Q Okay. And what would be necessary to resolve item 6?

A Well, I real estate transactions such as this, there are a number of UCC matters. Typically in a loan like this, the lender, and I believe that was the case in this, you realize that the original lender here was not Happy State Bank or Access or HNGH. But the original lender was 299 Turtle Creek, LLC. That name is very similar to that of the borrower. So that original lender is not here now. But relative to these UCC's, there are typically two types of UCC documents executed in connection with a transaction like this.

One is a -- I'll call it a UCC/fixture filing. And that's filed in the Deed of Records here in Dallas County. I think this item that you are referring to, that must be quote, the fixture filing. There are other UCC's that were filed in the state of jurisdiction, where the borrower was organized. And those are different UCC's. Those are, I'll call them SOS, or Secretary of State filings that are filed with the Delaware Department of State.

In any regard, I would look for releases or terminations of those filings. This item 6 could have been handled in a release of lien executed by HNGH and delivered to

the title company.
Q Item 7, a *lis pendens* that's against the property. Are you familiar with that document?
A I've looked at each of these items, as is, you know, typical in these types of transactions, you know, from the purchaser, counsel's perspective, and I believe in -- you know, when I represent the buyer, I certainly look at them as well.
And I am familiar with each of them.
Q Okay. So again, Mr. Marx, I'm trying to get you out of here by 5:00. What would you need in order to resolve the *lis pendens* that shows as item 7?
A Well, typically a *lis pendens* is simple -- a *lis pendens* is notice of litigation. That's all it really is. There's certain types of litigation that relate to, or that will support a *lis pendens*.
In this case, I would look for a dismissal of the underlying litigation and a release, or maybe a termination. And they could have different documents then. The documents have different titles, but it would be a release or a termination of the *lis pendens*.
Q Okay. Number 9 deals with the bankruptcy proceedings. And it says will require compliance with Chapter 11 plan confirmed on May 18th. Do you see that item?
A I do.

And you realize this is the -- this is the title company listing their items. I use this as a guide. And I too would be looking to satisfy each of these items, and anything else that caused me some concern.

Q Do you know what would resolve item 9?

A What I would look to in Item 9 would be the confirmation order and maybe the underlying plan. And then typically that would be all. In this -- in their circumstance I -- one might consider going back to the Court for like a clean-up order. But primarily I would just be looking to see that the seller had the authority as permitted by this item 9.

Q Okay. And do you know what number 10 is? Order was submitted without the name of lender. Do you see that?

A Yeah. And that's just because in my workings with Sendera, you know, I was -- I was involved on behalf of one group of -- on behalf of the TCCNC. But I know that there were other lenders and/or funding sources. And so essentially I just let -- had this left blank and they're just making a comment that, you know, when the policies finally issue they're going to insert the name.

Q Okay. Number 11 is -- and again where it says the company, who are we talking about?

A Well, the company here in this item 11 relates to HNGH. This is a little --

Q No. No, no, no, no. Randy, look at it. It says the

company requires.

A Oh, excuse me, I misspoke.

Q That's all right.

A The company --

Q Who is the company?

A The title company.

Q All right. And what are they requiring in item 11?

A Well, this case is a bit unusual. This is a reasonably complicated transaction. And the parties are at, you know, involved in litigation. And -- and title to the property is not with the debtor, okay. That has brought this entire process than a big problem. Because, you know, I am trying to review this from my client's perspective. And it's highly unusual for the borrower or the seller not to be in fee. Okay.

And this is because of that deed in lieu that's in dispute here. But in any regard, oftentimes if a lender is simply just getting a pay off, this is not on there. This is -- this is a request from the title company requiring that HNGH provide its authority documents.

And the reason that that's there is because here HNGH is not simply collecting money as a --

MR. KANE: Objection. Calls for speculation.

THE WITNESS: Well, I know that's true.

MR. KANE: He's testifying about why Sendera has an inclusion on a title policy.

THE WITNESS: It's because --

THE COURT: Ms. Lindauer, what's your --

MS. LINDAUER: Hang on Mr. Marx.

THE COURT: Ms. Lindauer, what's your --

BY MS. LINDAUER:

Q Mr. Marx -- Mr. Marx, do you have any understanding as to why --

THE COURT: Ms. Lindauer? Ms. Lindauer --

MS. LINDAUER: Yes.

THE COURT: -- do you have a response to that, or are you withdrawing the question?

MS. LINDAUER: Your Honor, I think he can attest to why it's listed on there since this is something he was working on, but I think I can maybe remedy it with a follow up question.

THE COURT: All right, go ahead.

BY MS. LINDAUER:

Q Mr. Marx, do you know why item 11 was included on this Schedule C?

A Yes.

Q And can you tell us why it was included on Schedule C?

A Because HNGH was called upon to sign a deed --

MR. KANE: Your Honor, same objection. I mean this is Sendera's title policy. I question how Mr. Marx could know, unless he had some correspondence with Sendera. The rest

otherwise would be speculation.

MS. LINDAUER: Your Honor, I --

THE COURT: Ms. Lindauer, you can ask him what his understanding is. And if he has an understanding he can tell us what it is.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Marx, do you have an understanding of why item 11 was included on the Schedule C?

A I understand that the title company required that for the same reason that I would. HNGH here is signing a deed contemporaneous with the closing.

Q Okay.

A This is not a usual circumstance.

Q HNGH was not merely receiving a pay-off at closing. Is that correct?

A Correct. They were executing or were to have executed a recision of deed. That is why item 11 is there. And even if it wasn't, I would require that, as part of my job.

Q And let me understand this. The reason item 11 would be included with all these requirements for HNGH, the lender, is because the lender at the time of the closing was the party in title to the real estate that was the subject of the closing. Is that what I'm hearing?

MR. KANE: Objection, leading.

THE WITNESS: Yes.

THE COURT: Why don't you rephrase that, Ms. Lindauer?

MS. LINDAUER: Thank you, Your Honor.

THE COURT: The objection is sustained, so you can ask another question.

MS. LINDAUER: Sure.

BY MS. LINDAUER:

Q Mr. Marx you made the comment that this was a bit of an unusual closing. What did you mean by that?

A In this circumstance, the lender had a deed to the property, which is substantially different from a deed of trust. I read the bankruptcy orders calling for a recision. If that deed is going to be executed contemporaneous with the closing, it is customary in my experience, for the title company to require that the signature on that deed be supported and I, as purchaser in this environment, would do the same.

Specifically in these regards, I have occasion to go back and look at the manner in which HNGH Turtle Creek, LLC has signed other documents that were made available to me. And I see and question why in one document the purported manager is HN Capital Partners, LLC, and in another signature, again by HNGH Turtle Creek, LLC, the manager is a different entity. And I don't know if that entity on the second transaction or on the second signature is in the name of HN Green Hollow Capital

Partners, LLC. So there's a mismatch, unless there's two managers, or maybe more.

Or maybe they changed managers. But, you know, I get paid to look at things carefully. And this creates a question in my mind, which is yet another reason why I would have required item 11 regardless of what the title company was going to do.

Q Mr. Marx, let's take a look at Exhibit 17 now. My assistant will put that up for you. I'm sorry, Sydney, it's Debtor's Exhibit 17.

Okay. And Mr. Marx, are you familiar with a document called a proof of claim?

A I have had occasion throughout my practice to review and prepare and even file a few unfortunately.

Q Could you take a look at the third page of this Exhibit 17? Sydney, if you could drop down a bit to signatures. So we can see the signatures. And Mr. Marx, who executed this proof of claim for HNGH Turtle Creek, LLC?

A Just one second. Well, see, here's a different -- it's different, still.

Q Well, I'm not asking that. I'm just saying who signed this particular proof of claim for HNGH Turtle Creek, LLC?

A It looks like a certain Nate Christianson.

Q All right. And do you know what Mr. Christianson's title with HNGH Turtle Creek, LLC is?

A Well, it says managing director. And I don't know what

that necessarily means relative to an LLC. There are managers, typically, but not directors. But then it goes on to say general counsel.

Q There are a series of loan documents attached to this particular document. If you would look with me at -- I'm going to have my assistant help on these.

MS. LINDAUER: Sydney if you look at page 137 of 148 using the numbers at the top. Do you have that one? All right.

BY MS. LINDAUER:

Q And Mr. Marx, if you would look at Page 139 of 148.

MS. LINDAUER: Sydney, let's go ahead 3 pages.

BY MS. LINDAUER:

Q Do you see a box HNGH Turtle Creek, LLC?

A Yes.

Q And who is shown at -- who is HN Green Hollow Capital Partners, LLC?

A Here it says its authorized signatory.

Q Okay. And who signed this document on its behalf?

A It looks like James Glasgow.

Q Mr. Marx, you're familiar with the documents, and is the loan documents in this case, of HNGH Turtle Creek, LLC; is that correct?

A I was not involved in those transactions, but I've looked at them.

Q Okay. All right. And as you sit here today, looking at this signature block, do you have an understanding of the relationship of HN Green Hollow Capital Partners, LLC to HNGH Turtle Creek, LLC?

A No, there's nothing that really demonstrates. It says authorized signatory.

Q Okay. Now you mentioned that you had seen other documents for HNGH Turtle Creek, LLC that I think your term was were a mismatch. Can you tell me what you meant by that?

A Well, the -- the lender, at some times seems to act through a manager, acting by and through a Mr. Nambiar. And at other times the lender purports to act through a authorized signatory, which is a different entity, evidently not its manager, by and through a different person named Mr. Glasgow.

And yet in a third instance, it seems to act from time to time, again through its purported authorized signatory. This time being -- acting by and through Mr. Nambiar. And really the only way to drill this down is to get a consent resolution and a certificate from HNGH at the title company, that I can review, so that I know that the chain of title is restored. And then I'm not going to have a problem and my client's not going to have a problem down the road.

Q Mr. Marx, if you'd look at, and my assistant will pull up, this same document, at page 105 of 148. Drop down a little bit, Sydney. You see an HNGH Turtle Creek signature block. Do

you see that?
A Yes. That one is s--
Q And who is shown as the manager for HN Capital Partners LLC? Do you see that?
A This one is a different -- or it's different or incomplete. It's similar to one I referred to earlier, where the HNGH is report stacked through HN Capital Partners in Delaware. But then it goes on printed name/title. So I don't know if that was intended to be signed by Mr. Nambier or perhaps -- well, I don't know.
Q Okay. And I just want to be clear. I think you explained some of this to the Court already, that the lender, HNGH Turtle Creek, LLC was not the original lender of 299TC Acquisitions, LLC, correct?
A Yes.
The original lender is long gone. These entities basically bought into the note. Sometime after the acquisition loan. I think at or near the COVID crisis came to be.
Q Mr. Marx, have you seen a copy, or I shouldn't say a copy. Have you been made aware of where the original note that is the subject of the HNGH Turtle Creek loan -- where that resides at this time?
A I have no idea. I would think from the paper trail that it should be in the hands of Happy State Bank. But --
Q Okay. And Mr. Marx, have you seen requests made by

various persons asking for an understanding of who has or who is holding the original note?

A Yeah.

I was the one who prompted that question. And I never -- I don't know the answer. I mean I saw some correspondences, but I never saw a clear answer.

Q Okay. And for the record, if we look at -- again Sydney this is page 9 of 148. Same document. It's a document called Secured Promissory Note. Do you see that?

A I do.

Q Okay. Who was the original lender on this loan?

A Well, the name of the lender originally was 2999 Turtle Creek, LLC. And I know that's confusing. But that was a group that -- that typically I refer to simply as Madison. It was a third-party group presumably --

MR. KANE: Objection. There's no foundation for this testimony or the source of Mr. Marx knowledge, about who the original lending groups are on a note for which he is not a party.

THE WITNESS: Okay. I mean you're right. I was reading the document. I don't know who 2999 Turtle Creek, LLC is.

THE COURT: So the objection --

THE WITNESS: I just know that they're not --

THE COURT: The objection is sustained. The

objection is sustained. Mr. Lindauer do you want to ask a different question?

MS. LINDAUER: Yes, Your Honor.

If Ms. Oler (phonetic) will pull up Page 6, same document of 148 and, in particular, Paragraph 9.

BY MS. LINDAUER:

Q I'll represent to you, Mr. Marx, this is the proof of claim affidavit of Nate Christianson, attached to the proof of claim. And do you see the representation in paragraph 9?

A Yes. It says that HNGH is now the owner and the holder of a note and the liens.

Q Okay. And if you drop down, the date of this document -- drop it down a little bit further. Is what date?

A 12/1/21. December 1st, '21.

Q Do you know approximately when Happy State Bank took its collateral assignment of note and lien?

A From the commitment and the collateral transfer of note document, it says December 4th of 2020. About a year or so before that affirmation.

Q And if Happy State Bank has a collateral assignment of the note and lien, in your experience Mr. Marx, who would be holding the original note?

A Happy State Bank in my experience. I have not come across a situation where there are -- one, these collateral transfer transactions that we're talking about, basically a note secured

by a note, are not that common. And two, at the end of the day, those -- you know, Happy State doesn't really have a lien on the dirt as much as they've got a lien on those papers, or security interest in those papers.

And so in my experience, somebody in the shoes of Happy State would insist on holding the note. Because in effect, they are -- they are as much an owner, or more, in that note, than is the front group, in this group, the HNGH.

Q So when HNGH filed a proof of claim saying it was the owner and holder of the note, would that be an accurate statement?

A No, it's not accurate.

It's obviously not accurate. I can't say anymore than that at that time I doubt-- I doubt -- they could have, I guess that would be the question. That Happy State or whoever signed that, if the note was in fact in possession of Happy State, that's a false statement.

Q Looking at the various Schedule C proof of claim filed by HNGH Collateral Assignment of Loan and Note of Happy State Bank, looking at all these documents, do you have any understanding of where the original note is, related to this transaction?

A I don't know where the note is. It should be in the hands of Happy State. But that's not what this other gentleman said, so I don't know where it is.

Q Is it a fair question to ask where the note is?

A I would like to know that, and I would like to know that from my perspective, independent, because there is going to be somebody executing a release of deed of trust. And I want to know that I've got the right people signing that. And I would think that the debtor, for the current purposes, and certainly me representing the ownership of the property going forward, don't want to have any issues with this adversary thing going on.

And I'd want somebody to show me that the note was marked paid in full.

Q In order to conclude the transaction between HNGH and 299TC, was it a requirement that the note ultimately be marked paid in full?

A In my experience that would be a requirement. It's certainly customary that the note be marked paid in full and returned, the original note.

Q Okay. If you could look at -- and this will be an HNGH Exhibit 8. Sydney, yeah, thank you. If you look at the second page of this document. Are you familiar with the brief orders, Mr. Marx, that Judge Hale signed in connection with this case?

THE COURT: Ms. Lindauer?

THE WITNESS: I did review them.

THE COURT: Ms. Lindauer, I'm sorry. Are you on Defendant's Exhibit Number 8?

MS. LINDAUER: I am, Your Honor.

THE COURT: That's an email dated May 31st?

MS. LINDAUER: I don't know if you call it defendant. It's HNGH. It's the -- Mr. Kane's exhibits, Your Honor.

THE COURT: All right.

MR. KANE: Your Honor, this is the first order at docket number 64.

MS. LINDAUER: Correct.

THE COURT: I'm sorry. I was in the wrong folder. Bear with me.

MS. LINDAUER: Sure.

THE COURT: All right. I'm with you. Docket Number 64.

BY MS. LINDAUER:

Q Okay. All right, Mr. Marx. Looking at the first full paragraph, the top of this order. Do you see that? Where it says ordered, adjudged and decreed that the automatic stay. We put a little red dot by that paragraph.

A I see it.

Q All right. And if you read down, it says:

"The automatic stay shall remain in full force and effect as to HNGH through 5:00 p.m. Central Time, March 15, 2022, the payoff deadline, by which the debtor shall make payment to HNGH any amount set

forth on Exhibit 8 of this order, which exhibit is filed under seal. And in full and final satisfaction of the note, the payoff amount, which note shall be reinstated immediately prior to the debtor's payment to HNGH of the payoff amount."

Do you see that?

A I do.

Q How do you go about reinstating a note?

A Well, it's not that common, number one.

MR. KANE: I'm sorry, Your Honor. I'm going to object. This is what now, expert testimony on reinstatement of a note. Mr. Marx was offered as a real estate attorney with experience closing real estate transactions.

MS. LINDAUER: Your Honor, I think reinstatement of a note would fall well within that types of things that somebody dealing in real estate would be dealing with. These are real estate documents, notes, deeds of trust. I think the reinstatement, he can tell us what document would be necessary to reinstate the note.

MR. KANE: Your Honor, there's been zero foundation laid to show that Mr. Marx has any experience with note reinstatements or is an expert on the subject and can make a legal opinion about what needs to be done to reinstate a note.

THE COURT: Ms. Lindauer, are you offering this as an expert opinion or is it -- how are you offering Mr. Marx's

testimony on this point?

MS. LINDAUER: Well, my point, Your Honor is, is if it's going to take an expert to clarify Judge Hale's order then I think all of us are in big trouble. I think he can tell us, as a real estate attorney what his understanding would be of what needed to be done to reinstate this note. So -- and that's all I'm asking for is what -- Mr. Kane may disagree. Mr. Kane can cross-examine him, but I think he can give us a statement as to how you go about reinstating a note.

THE COURT: Why don't you ask him --

MR. KANE: Your Honor, I'm fine with Mr. Marx offering lay testimony about what he thinks needs to be done, to reinstate a note.

THE COURT: All right. If that's what Ms. Lindauer wants to do, go ahead.

MS. LINDAUER: That's fine, Your Honor.

THE WITNESS: In my experience, I've represented borrowers and lenders and in looking at this order, and related, I would anticipate that a reinstatement of the note would need to be -- because it relates to the deed, too, and I -- in my experience, and what I would look for her, is I would look for an affirmation, a document, recorded of record that has words of reinstatement, okay.

And it would be signed, not just by the lender, but by any and all lender parties. And it would be signed by the

borrower. Okay. I don't think a lender can unilaterally reinstate an obligation if the borrower doesn't agree to it. And I don't think that a lender can, unless everybody that holds the lender group, those bundles of sticks that we learned in laws school, signs off on that.

It's unusual here because what we're trying to do is -- what the parties are trying to do, what's in the order, okay, it kind of goes against what they have in -- it's called a merger doctrine, but I don't know if you want me to go into that.

It's the merger of the lesser in the greater estates.

BY MS. LINDAUER:

Q Well, you answered my question about reinstating the note. Let me ask you, if Happy State Bank has the collateral assignment of the note and lien, would they have to also be involved in the reinstatement of the note?

A In my experience, that's what I would anticipate.

Q So from what you're telling us then it would require involvement of Turtle Creek -- I'm sorry, HNGH. It would involve involvement of 299TC and also the involvement of Happy State Bank. Is that correct?

A In my experience, that's what I (audio interference).

Q Mr. Marks, did you have an opportunity to review documents that were prepared for the closing between HNGH and 299TC?

A Yes.

Q And in fact, I think you were copied on a number of the emails regarding the actual closing and the closing documents. Am I correct about that?

A Yes.

Q And did you, Mr. Marx, see a reinstatement of note document amongst the closing documents?

A Not -- I did not see a separate instrument in that regard. There was recitations of reinstatement in the revised recision of deed instrument.

Q Okay. And were you involved at all in the, what you call the revised recision of deed instrument?

A Yes.

At some point, I reviewed the special warranty deed that was prepared by the lender. And I pointed out some deficiencies in my opinion And they got incorporated, I believe, into a redline that was sent over -- a revised that sent over to the lender.

Q So we talked about the note that's mentioned in the order, and again we still have this language up, and it says that:

"The note shall be reinstated immediately prior to the debtor's payment to HNGH of the payoff amount, and counsel for HNGH shall hold the recision deed during the pendency of the term of this agreed order."

Do you see that?

A Yes.

Q Mr. Marx, do you have any understanding of whether HNGH's counsel was in fact holding an executed recision deed during the pendency of this agreed order?

A Yes. I think Mr. Kane testified that he prepared it in May. Six or so months later.

Q All right. Was it -- your understanding, Mr. Marx --

MR. KANE: Objection, Your Honor. The witness's testimony mischaracterizes statements made previously.

THE COURT: Response, Ms. Lindauer.

MS. LINDAUER: Your Honor, I think he may recall what he recalled Mr. Kane telling the Court. So, Your Honor, I don't have any recollection of exactly what Mr. Kane told the Court. But I can rephrase the question.

THE COURT: Sure.

Objection sustained.

BY MS. LINDAUER:

Q All right. The actual language says Mr. Marx, Counsel for HNGH shall hold the recision deed during the pendency of the term of this agreed order. Do you know what the term of the agreed order was?

A It would have commenced, I believe, December 10th. May have been the 18th of that year.

Q Do you have any understanding, Mr. Marks, of whether counsel for HNGH was holding a recision deed back in or about

December of 2021?
A All I know is whatever Mr. Kane said.
Q Okay. When was the first time you saw the documents prepared by HNGH to constitute a recision deed?
A It would have been the one that I reviewed in May of this year.
Q Okay. Prior to May of this year, had you seen a document that was purported to be a recision deed?
A Not in connection with this transaction.
Q If we could take a look at what is marked as Exhibit 31A. And I'm sorry, this is in the Lender's exhibits. Mr. Marx, you have in front of you a document marked or titled special warranty deed. Do you see that document?
A I do.
Q Okay. And is this the document, Mr. Marx, that you saw in or about May of this year in connection with this transaction?
A Yes. This is the one that was -- that I reviewed and made comments to because I didn't think this worked for recision because this -- this looks to me more of an instrument of reconveyance I'll call it.
Q If you take a look at the Exhibit 31 which is the cover page to this document. There you go. That's an email from John Kane to me. Do you see that?
A One second.
Q And we have it up on the screen if you can follow what's

on the screen.
A It's just easier here. I see it.
Q All right. And do you see the date and time of that particular document?
A End of business Thursday, May 12th of this year.
Q Okay. And what's the subject?
A Well, it says recision deed, then it goes on.
Q Okay. And HN Capital Partners, who is that?
A I don't know. I think it's one of the various either managers or purported signatories. That could be an abbreviation for the purported manager of the lender.
Q Okay. All right. And let's flip back now to the actual document, the special warranty deed. Okay? And it says special warranty deed dated effective October 29th, 2021. Do you see that?
A In the first whereas?
Q Yes.
A Yes.
Q And if you drop on down, it does describe an entity called HNGH Turtle Creek, LLC. Is that right?
A Yes.
Q Okay. If you look at the Page 4 of this document, you see a box, I'm sorry, go to Page 3. See a box for HNGH Turtle Creek, LLC.
A Sorry. I don't understand the question.

Q Okay. Do you see that signature box?

A Yes.

Q Okay. Is this document signed?

A No. And it just points out one more thing of confusion in that here it says it's a Texas limited liability company. And on these other documents, it says it's a Delaware company.

Q So if we flip back and look at the proof of claim documents I pointed out to you, they say Delaware company?

A I believe so. We looked at that a few minutes ago.

Q Right. And, Cindy, if you can switch back. There you go. And again, my question to you is is this document signed by HNGH Turtle Creek, LLC, and is it dated and notarized?

A This instrument is not.

Q Look at the next page, 299TC Acquisitions LLC. Do you see their signature block? Is it signed by 299TC Acquisitions?

A No.

Q And do you se ea signature block for Happy State Bank?

A No.

Q All right. Let's go back to the first page of the special warranty deed.

A Okay.

Q All right. In your experience, recitals in a document, are those conveyance provisions?

A Generally not. People get them confused. But generally not. Normally, the operative language is after the

consideration. You know, afterward. The preambles are usually not operative.

Q Okay. So if you look -- so when we talk about preambles, we're talking about the whereas paragraphs, correct?

A Generally.

Q Okay. In this document, look at this second block of whereas. Whereas pursuant to that certain agreed order. Do you see that?

A Yes. Just one second, please.

Q Sure.

A Can you take this call and tell my family I'm running late? Sorry. I'm turning into a pumpkin. Just explain who you are. All right. Say again, please?

Q I'm sorry. We're looking at the second whereas paragraph. Whereas pursuant to that certain agreed order.

A Yes.

Q Okay. And under the whereas, there's a one, the deed in lieu is rescinded and avoided effective as of October 29th, 2021 in order for fee simple title to the property to remain vested in 299TC. Do you see that?

A I do.

Q If that were intended to be a conveyancing provision, would it be in a preamble, or would it be in an actual conveyance provision down below?

A It should be in a conveyance provision, or operative

provision as opposed to a preamble.

Q Okay. Paragraph 2, it says the following are reinstated effective immediately, prior to the occurrence of the payoff event it goes on to say. And again, that provision appears in a preamble provision. Is that right?

A It does.

Q And then it also says in Paragraph 3, the payoff event occurred and currently with execution and delivery of this special warranty deed. Do you see that?

A Yes.

Q And what's the purpose, Mr. Marx, of a special warranty deed?

A Well, it conveys title form the grantor to the grantee. Special meaning, and typically there's a warrant. And as opposed to a general warrant, it's a special. It's they're warranting as against title defects five through or under the grantor but not otherwise. That's the special component. But a warranty deed transfers title.

Q And this particular warranty deed, to be dated and scheduled in 2022, would be effective as of when?

A Well, probably the date that it gets recorded.

Q Now is a recision deed the same thing as a special warranty deed?

A No. I mean, if you think about it, I think the purpose of a recision is to put the parties back to the position they were

in previously, whereas the purpose of a warranty deed is to convey, or in this case reconvey title.

Q Okay. Is there anything in the conveyance provisions of this document starting as the now therefore provisions and going forward that says that the conveyance itself is effective on a date different than the date this document would be signed?

A In the one, two, three, in the -- in the fourth line under the now therefore, it does have a reference that its effective in October '21. You know, they try to back date. But this is just a back dated deed as opposed to a constant conveyance as opposed to, in my opinion, to a recision of deed.

Q Okay. All right. And we'll just look at a recision of deed in a minute.

But the other thing I was going to point out is do you see in the little paragraph at the bottom of the first page? Cindy will put a little dot by there. There is a restriction contained in this deed. It says restriction running with the property and binding the (indiscernible) that the property may only be used for hotel and residential condominium purposes. Do you see that?

A Yes.

Q Would you normally find such a provision in a recision deed?

A No. Typically there would only -- the purpose again is to

put the parties back to where they were before. So there would be no additional or repetitive or other encumbrances necessary, certainly, and/or appropriate in the -- in a recision of deed.

MS. LINDAUER: Your Honor, the next document I'm going to look at would be the proposed recision deed. And my question for you, Your Honor, is we're not going to get done with Mr. Marx in the next few minutes. How long are you intending to go this evening?

THE COURT: Well, I was going to take guidance from the parties. Mr. Kane, you would agree there's no reasonable chance that this hearing is going to conclude today?

MR. KANE: I believe, Your Honor, Ms. Lindauer said she had seven witnesses, and we're not even close to be done through her first witness. So I think that the filibuster has been effective and we will not be finished today.

THE COURT: So I'll ask first, Mr. Kane, what would be your preference? Would you -- it sounds like Mr. Marx, as he said, is turning into a pumpkin.

THE WITNESS: Yeah. I apologize.

THE COURT: Would you rather cross examine Mr. Marx now or would you rather start off the next time we reconvene with Mr. Marx on the stand to be finished up? Or do you want to try and go on with another witness today? I guess that's a question for Ms. Lindauer. But it's also I'm interested in Mr. Kane's thoughts on whether he thinks this is an appropriate

stopping point or would he want to go on. Would he prefer that Ms. Lindauer continue with another witness.

MS. LINDAUER: Your Honor -- wait a minute. Hang on one second, Your Honor. I hate to interrupt, but point of clarification. I'm not done with the direct on Mr. Marx. I was just going to switch to another topic. And so before I switch to looking at additional exhibits, that's why I raised the question of perhaps stopping.

So I don't know that we would get to Mr. Kane's cross of Mr. Marx tonight. I don't want to mislead the Court on that. I doubt we would finish Mr. Marx tonight unless we went for about another hour tonight. So that being said, I feel like I've already pretty much burdened Mr. Marx already, and the Court. So that's why I stopped and said maybe this would be a good place to recess.

And then we can finish up Mr. Marx's direct, and then Mr. Kane can -- and I will tell you, Your Honor, that this is probably I won't say the longest witness, but certainly probably one of the longer witnesses, and maybe will be the longest witness because I think the other ones may be a little bit shorter. So I just, I really want the Court to understand that we're not trying to -- but anyway, that's where we are.

THE COURT: I understand.

MR. KANE: Your Honor --

THE COURT: I understood. I understood you were not

finished. I was just --

MS. LINDAUER: Okay.

THE COURT: -- asking Mr. Kane's opinion if we're done with this witness for the day. Mr. Kane, do you believe this is a good stopping point, or would your preference be for Ms. Lindauer to call the next witness? I'm not advocating for that because at 5:25, this might be an appropriate stopping point. But I'd like to hear your thoughts.

MR. KANE: Sure. I think I would like to know what the Court's availability is to make that call on Monday or Tuesday of next week. And the witness availability. I mean, this is -- it was supposed to be, I mean, stretched to call it a three-hour hearing or so.

It sounds like Ms. Lindauer, you know, who said maybe she had an hour and a half of case in chief, she's been questioning this witness for that long. I'd like to know what we're really looking at from a time estimate and court availability standpoint.

THE COURT: So part of the problem that we have is that I don't -- unfortunately, they decided to renovate my courtroom right as I started. So I don't have my own courtroom. We have to coordinate with the courtroom deputies for both Judge Jernigan and Judge Larson.

I know that I have some other matters set on Monday afternoon. I don't know as we're sitting here today whether

Judge Jernigan or Judge Larson has court on Monday morning. So I'm not sure. Hold on one minute, please.

MR. KANE: Your Honor, I'd be inclined to say I'm fine to continue going as long as we want. I would like to, before we transition to the next witness, have an opportunity to cross Mr. Marx. So if Mr. Marx is capable of going another 20 minutes, great. If he's done, then this is an appropriate stopping point.

THE COURT: So just a minute, Mr. Kane.

(Pause)

THE COURT: Just a minute, please.

(Pause)

THE COURT: All right. Can everybody hear me now?

MS. LINDAUER: Yes, Your Honor.

THE COURT: So we believe with a reasonable degree of confidence that we have access to Judge Larson's courtroom on Monday morning from 9:30 to 12:00 and then all day on Tuesday.

MS. LINDAUER: Okay. Your Honor, Monday morning is fine. Tuesday I have a trial with Judge Morris on a complaint to discharge that I think is scheduled for the whole day. But I'll make an effort to move with all due haste Monday morning. But yeah, I think Tuesday may be a problem.

THE COURT: All right. Mr. --

MS. LINDAUER: Unless you want Judge Morris -- I'd be happy for Judge Morris to reset my trial.

THE COURT: Mr. Marx, are you available on Monday morning starting at 9:30 or 9:00? You're on mute, Mr. Marx.

THE WITNESS: Say again, please. Did you say Monday at 9:30?

THE COURT: Are you available Monday morning at 9:30?

THE WITNESS: Yes. I drive in from Rice. And it's a bit earlier, but I'll be glad to make myself available then if I can go now because I need to get home.

THE COURT: Mr. Kane, are you available Monday morning 9:30?

MR. KANE: Yes, Your Honor.

THE COURT: So it looks like I have hearings Monday afternoon. So it looks like we only have a three-hour window on Monday. And so the hope would be to finish up with Mr. Marx and maybe some other witnesses. I don't know that we're going to finish on Monday. Looking at --

(Pause)

MS. LINDAUER: Your Honor, just, and maybe this, you're already doing this, do you want to try to pick up a backup date later in the week in case we don't get done on Monday?

(Pause)

THE WITNESS: I hate to interject, but if you're working on schedules and I'm available Monday, may I be excused?

THE COURT: Let's go off. Yes, Mr. Marx, we'll plan on picking up with you on Monday morning at 9:30. You're excused. And everybody else can hang on. We're trying to find out what other days and times might be available the rest of the week.

THE WITNESS: Thank you, Your Honor. I just had no idea that it would be this late in the day.

THE COURT: I didn't either. So I understand. You are excused, and we will see you Monday morning at 9:30.

THE WITNESS: All right. Thank you all.

(Pause)

THE COURT: Okay. So we were looking at our calendar and checking on availability. So Monday morning we're going from 9:30 to 12:00. We are also available it looks like on Wednesday starting at noon.

Ms. Lindauer, you have a motion to dismiss in this case set for 1:30. Is that your understanding?

MS. LINDAUER: Yes, Your Honor. We're not going to be going forward with that, obviously. But we were already I think with you that afternoon. So Wednesday afternoon is fine.

THE COURT: Okay. So between --

MS. LINDAUER: Are they with Judge Everett? Who are they with? Hang on. I think they're checking to see. I think I have two other matters also set, but I'm not sure who they're set with.

THE COURT: Mr. Kane, are you available on Wednesday starting at noon?

(Pause)

THE COURT: Okay. You're both on mute. So while Ms. Lindauer is chatting, Mr. Kane, you're on mute. If you could let me know if you're available Wednesday starting at noon.

MR. KANE: I am, Your Honor. I was wondering off the record for comedy's sake whether with the way things were going you were contemplating trying to push this to Thursday and just drag Judge Hale out of his retirement party.

THE COURT: I don't think he would appreciate that. So no, I really don't want to go --

MS. LINDAUER: So I think --

THE COURT: Ms. Lindauer, go ahead.

MS. LINDAUER: I think Wednesday, yeah, I think Wednesday afternoon is problematic. I have two other hearings. Your hearing we're not going to go forward with. But one of them is with Judge Mullin. And it is pretty hotly contested. So that one probably is going to mess up Wednesday afternoon.

THE COURT: What time --

MS. LINDAUER: We do have --

THE COURT: What time is your hearing with Judge Mullin?

MS. LINDAUER: Is that 1:30? 1:30. So we could

start after that, when that's over. But that would be more like about 3:00.

THE COURT: So you're attending that by WebEx?

MS. LINDAUER: I should be, Your Honor. They're running and checking, but I believe so. I believe Judge Mullin and Morris are both WebEx. Yeah, they are. Okay. Yes, they are.

THE COURT: I'm sorry. Yes they are what?

MS. LINDAUER: Oh, they're WebEx. Yeah. So that's I don't have to go to Fort Worth.

THE COURT: So, Mr. Kane, do you want to start on Wednesday, go from noon to 1:30, take a break, and when she's done, pick back up? Otherwise I'll tell you that on Friday of next week, I have a trial on an involuntary. So if we don't get any time in on Wednesday, we're going to have to -- I'm going to have to have you get with my courtroom deputy to look at time the following week.

MR. KANE: Your Honor, this is a priority for us. I mean, we filed this on an expedited basis because we wanted to get in front of the Court. I mean, this was supposed to be a, what, two to three hour time setting. We're ready to go Monday, we're ready to go Wednesday. Any time that we can get, we're ready.

MS. LINDAUER: Okay. So, Your Honor, I marked it down for Wednesday noon to 1:30 and then 3:00 to whenever

Wednesday.

THE COURT: All right. We'll get as much done as we can on Wednesday.

I don't know who provided the original three-hour time estimate, but given the number of exhibits, probably wasn't a fair estimate. But in any event, I'm not sure that we can schedule any other days today. We'll just plan on Monday from 9:30 to noon, Wednesday starting at noon, and we'll keep going until Ms. Lindauer has to stop for Judge Mullin's hearing, and then we'll pick back up when she's finished.

MR. KANE: Thank you, Your Honor.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: So I didn't ask and I don't really want to ask, but since you were doing the Q&A, Ms. Lindauer, I'm just going to assume that Mr. Phelan is either available or you're going to handle it. So on that basis, we'll be in recess until Monday morning at 9:30. There's no other counsel on, I believe.

MS. PHELAN: I am available.

THE COURT: Who is that? I'm sorry?

MS. PHELAN: That was Robin Phelan.

THE COURT: Oh, Mr. Phelan, I'm sorry.

MS. PHELAN: I just put my video on here.

THE COURT: There we go. Okay. We will be in recess until Monday morning at 9:30. I do apologize for the

technology glitches today. That's just something we'll have to get better at. We'll be in recess.

(Proceedings concluded at 5:42 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, KAREN WATSON, and PATTIE MITCHELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel
DIPTI PATEL, CET-997

/s/ Karen Watson
KAREN WATSON, CET-1039

/s/ Michelle Rogan
MICHELLE ROGAN
LIBERTY TRANSCRIPTS

/s/ Pattie Mitchell
PATTIE MITCHELL
DATE: June 20, 2022