IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Monday, June 13, 2022<br>9:33 A.M. |

TRANSCRIPT OF TELEPHONIC HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

For the Debtor:

Joyce Lindauer Attorney, PLLC
BY: JOYCE LINDAUER, ESQ.
1412 Main Street, Suite 500
Dallas, Texas 75202

Simmons Legal, PLLC
BY: CAMISHA SIMMONS, ESQ.
6060 North Central Expressway
Suite 500
Dallas, Texas 75206

Robin Phelan Law
BY: ROBIN ERIC PHELAN, ESQ.
4214 Woodfin Drive
Dallas, TX 75220

Fee Smith Sharp & Vitullo LLP
BY: OSCAR REY RODRIGUEZ, ESQ.
13155 Noel Road, Suite 1000
Dallas, Texas 75240

APPEARANCES CONTINUED ON NEXT PAGE.

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES VIA WEBEX (CONTINUED):

| | |
|---|---|
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |
| For Centennial Bank d/b/a Happy State Bank: | Weycer Kaplan Pulaski & Zuber, PC<br>BY: JEFF CARRUTH, ESQ.<br>2608 Hibernia Street<br>Dallas, Texas 75204 |
| For the United States Trustee: | Office of the United States Trustee<br>BY: ASHER BUBLICK, ESQ.<br>1100 Commerce Street<br>Room 976<br>Dallas, Texas 75202 |

**INDEX**


| | Page |
|---|---|
| Case called | 4 |
| Motion for A Continued - Denied | 14 |
| End of Proceedings | 113 |
| Certification of Transcriber | 114 |

WITNESSES

FOR THE DEBTOR:

| | |
|---|---|
| RANDY MARX | |
| Direct Examination (Resumed) by Ms. Lindauer | 21 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 9:33 a.m.)

THE COURT: Good morning, everybody. Please be seated. We're back on the record on the 2999TC Acquisitions case, Case Number 21-31954. I'll go ahead and take appearances.

MR. KANE: Your Honor, John Kane of Kane Russell Coleman and Logan on behalf of the lender HNGH Turtle Creek, LLC.

THE COURT: Good morning.

MS. LINDAUER: Your Honor, Joyce Lindauer.

THE COURT: Ms. Lindauer, I think we got a bad echo on your part.

MS. LINDAUER: Yeah, we got a reverb. Yeah, I was getting people to turn their laptop volumes off. Thank you, Your Honor. Joyce Lindauer, Camisha Simmons, and Rey Rodriguez, and Robin Phelan here on behalf of 2999TC Acquisitions.

THE COURT: Good morning.

MR. METZGER: Your Honor, Steve Metzger on behalf of Tim Barton individually.

THE COURT: Good morning.

MR. CARRUTH: Excuse me, Your Honor. Jeff Carruth on behalf of Centennial Bank doing business as Happy State Bank.

THE COURT: Good morning. Anybody else wish to make an appearance, or did we get everybody?

MR. BUBLICK: Good morning, Your Honor. Asher Bublick on behalf of the United States Trustee.

THE COURT: Good morning. Anybody else wish to make an appearance?

(No audible response)

THE COURT: Okay. Well, I think we left off on Friday when we had to break for the day, Ms. Lindauer, you had Mr. Marx on the stand. Do you guys have any updates or housekeeping matters before we continue with Mr. Marx?

MS. LINDAUER: Yes, Your Honor. I think there are two housekeeping matters, one Ms. Simmons is going to present and one Mr. Rodriguez is going to present. So I'm going to turn over the floor to first Ms. Simmons. Thank you.

MS. SIMMONS: Good morning, Your Honor.

You know, and I know the Court just asked if there are any housekeeping matters. Before we begin, could the Court confirm and so we can have a clear record, confirm the exhibits that were admitted into evidence on Friday during the hearing? We just want to make sure the record is clear, and we're clear on which exhibits are in and for what purpose, Your Honor.

THE COURT: You want me to go through all of them?

MS. SIMMONS: Yes, Your Honor.

THE COURT: For both sides?

MS. SIMMONS: Yes, Your Honor. We just want to have a clear record and know what's in into evidence, that has been

read into evidence and admitted on Friday at Friday's hearing.

THE COURT: Okay.

MR. KANE: Is there -- this is John Kane. I'm sorry. Is there a concern that the record is not clear? I mean we went through on them number by number and they were agreed to by Ms. Lindauer.

THE COURT: Yeah.

MR. KANE: So what exactly is under consideration here?

THE COURT: Right.

I guess my first reaction was we really need to get going. And we went through these kind of painstakingly. So tell me what the concern is, because otherwise I think if we have time at the end of the day, I think that's when I'm more likely to redo the exhibits one by one.

So, Ms. Simmons, what is the concern about the exhibits?

MS. SIMMONS: We just wanted to make sure we were all on the same page. I know, you know, everyone was quickly taking notes in terms of what was came in and for what purpose, Your Honor.

But we're fine, you know, at some point if there's time at the end, if Your Honor has time at the end, you know, this morning to actually go over what has been admitted because, you know, I know Ms. Lindauer, our co-counsel, did

take notes on what was admitted. We just want to be clear on what that was and for what purpose.

THE COURT: Okay. I think we'll do that -- I think we'll do that later because I think we need to get going given the limited amount of time that we have this morning. And you can also confer on break. But at some point during the day if we have time, either today or on another day, we can re-tread which exhibits are already in evidence.

So what was the second housekeeping item?

MS. SIMMONS: That was it, Your Honor.

And yesterday, you know, I'm not sure if Your Honor had a chance to see it, but at Docket 158, the reorganized debtor filed a motion for continuance of the evidentiary hearing. And we are requesting, you know, given that it affects what goes forward this morning, we're requesting that the Court hear it now and determine the motion.

Pursuant to the motion, the reorganized debtor is requesting --

THE COURT: Ms. Simmons? Ms. Simmons?

MS. SIMMONS: -- a continuance --

THE COURT: Ms. Simmons?

MS. SIMMONS: Yes, Your Honor.

THE COURT: Did you notify my courtroom deputy that you had filed a motion to continue?

MS. SIMMONS: No, Your Honor. I don't think --

Joyce, was anyone on our team --

MS. LINDAUER: (Indiscernible.)

MS. SIMMONS: No, Your Honor. It was filed -- yeah.

MS. LINDAUER: It was filed last night. Yeah.

THE COURT: So --

MS. LINDAUER: I don't think they had a chance to (indiscernible).

THE COURT: So I have not seen it. Can you tell me in one minute or less what the motion for -- what the basis for the motion for continuance is?

MS. SIMMONS: Sure, Your Honor.

Overall, it's for efficiency and judicial economy. It's, you know, there is a lot of evidence that is going to be presented during these, you know, probably multiple days of hearings. And you know, everything was put forward on an expedited basis. And this was before, you know, my time as co-counsel. But everything was put forward on an expedited basis.

And after there was a setting on this evidentiary hearing for Friday, June 10th, the day before, you know, Mr. Kane filed a witness and exhibit list that, I mean, there's over 100, I think it's 120 now exhibits on his list. And on our supplemental witness and exhibit list that was filed last night, we are, the reorganized debtor, going to file -- we're going to question at least at a minimum ten to eleven witnesses.

And we have not, you know, our counsel for the reorganized debtor and Mr. Kane and his team, we have not coordinated on when these witnesses are going to be available to testify. So we can go forward today, Your Honor, and we can continue plowing through. However, there is 11 witnesses, and we don't even know if they're here right now to go forward and testify.

And so for, you know, for efficiency purposes and for judicial economy purposes, you know, Your Honor, you know, just like you I've clerked. You know, I clerked at, you know, the bankruptcy court in Wilmington, Delaware for Judge Wary Walrath and, you know, I know what goes on behind chambers. And we respect the Court's time, and we also respect, you know, the witnesses' time and the other parties' time.

And you know, if we could have this time, you know, outside of court to agree and try to figure out how can we have an orderly schedule, how can we -- we need more information on when these witnesses, and some of them are rebuttal witnesses that are then offered up by Mr. Kane and his team, we need to know when they're going to be available, we need to get with the Court, court staff and set something that is more definite for everyone involved.

The kids are off for summer. People have, you know, family matters just like you saw on Friday with Mr. Marx who had to rush off to a family matter. At the end of the day, we

just want to make sure everything runs smoothly and that everyone, especially the reorganized debtor, given the importance of this property to the Dallas community, that the reorganized debtor gets the opportunity to present the evidence in an efficient manner and respectful of everyone's time involved, Your Honor.

And for those reasons are why we're asking the Court to allow us time to coordinate and cooperate with HNGH's team to figure out when these witnesses are going to be available, the dates, any available dates, and then get with the court staff to try to get a whole day hopefully for the next setting for us to present this evidence to the Court given the what's at stake in terms of the property that's, you know, really going to have a positive impact on if it gets developed by the reorganized debtor is going to have a positive impact on the Dallas community and, you know, the economics.

And just, you know, it's, you know, it's something that the community has a stake in and not necessarily just the reorganized debtor. And we want to make sure that we have the full opportunity to argue and to support our objection to make sure everything is done to make sure this property gets developed as intended and as for the vision for this property, it goes forward and the Dallas community overall benefits from that.

So just to make it short, Your Honor, it's basically

efficiency and being respectful of everyone's time, we just think if we could have that time outside of Court to coordinate, figure out when the witnesses are going to be available, and come back to the Court and say here, these are dates that we have. Is this a full day that you have on your calendar because our slate of witnesses are available on these dates.

MR. KANE: Your Honor, this is John Kane. I really would appreciate an opportunity to respond to this, if I may.

THE COURT: Yeah. Go ahead, Mr. Kane.

MR. KANE: What Ms. -- first, you know, I appreciate that Ms. Simmons just filed a notice of appearance last night, and she's new to this case and may not have had an opportunity to review some of the documents that are referenced in our motion. But I also want to address a little bit more fulsome what this motion is about. This is not a motion to continue just so that we can coordinate the witnesses that were on the debtor's preexisting witness and exhibit list timely filed on June 7th.

What this is after the debtor has already begun its case in chief, and after the lender has already closed its case in chief, what this motion to continue proposes to do is to completely alter the witnesses that are identified on the debtor's witness and exhibit list to add as a brand-new fact witness, John Inabnett, an attorney at my firm who represents

the lender, Charles Aster, an attorney at my firm who represents the lender, Nate Christiansen, the general counsel of my client, HNGH, me now as a fact witness, Ms. Lindauer now as a new fact witness.

These are parties that were not included on anybody's witness and exhibit list for the conclusion of the lender's case in chief. And so what the debtor is actually asking for is an opportunity to get a whole bunch of time to add new witnesses as they are already progressing through their evidentiary presentation, their case in chief, with no prior notice to any party so that they can have a whole bunch of additional time to prepare all those new witnesses in a last-ditch effort to dramatically affect not only my role in this case by trying to call me as a fact witness, but how this evidentiary proceeding plays out.

So this is not just a basic we want to continue this because we're not really sure if Mr. Marshal Dooley (phonetic) who we previously noted is going to be available despite the fact that we were all on this Court's call on Friday and compared calendars and went forward. This is a rejigger of the entire evidentiary presentation of the debtor with no prior notice after the close of our case in chief.

But not only that. This is again an opportunity for the debtor to misdirect the Court and to make misstatements to this Court even before we've begun the evidentiary

presentation. Ms. Simmons is noting that we filed a witness and exhibit list on June 8th, 2022, two days before the hearing and after the witness and exhibit list deadline when we filed 120 exhibits.

The reality is that's wrong. Our witness and exhibit list was filed timely under this Court's local rules on June 7th. The amended witness and exhibit list that we filed on June 8th did not change any exhibits that had already been served on opposing counsel. The only thing it did was attempt to correct a statement in the title that just incorrectly referenced the date.

The body of the witness and exhibit list had the correct reference to the hearing and the date of the hearing and the time of the hearing. It was just an oversight by our firm when we were getting this on file on Tuesday. There's a reference to June 14th instead of June 10th. That was the only thing that changed. So there was no after this court's local rules deadline we bombarded them with all these exhibits and they had no timely notice of it before this trial began. That's not true. It's just not true.

This is just one of two last-ditch efforts by the debtor to try and derail this evidentiary hearing. And, Your Honor, I'll go ahead and say the other one is a motion to compel and a Rule 106 objection that was filed by another new attorney for the debtor that says that we are now, or is trying

to get some kind of ruling from the Court to show that my client, the lender, is compelled to produce additional attachments or incomplete documents not previously provided to the debtor as part of the evidence that's already been admitted.

This is an untimely objection. The documents that we proposed to have admitted, we conferred with counsel. Counsel agreed that X number of documents -- we can go through it again if we need to at the end of this hearing -- would be admitted and the plan that they were presented for various purposes. And after the fact, on Sunday night at 9:45 p.m., the debtor comes in and files a Rule 106 evidentiary objection to the exhibits that they already agreed would be admitted.

So again, Your Honor, I can't help but question the good faith of the -- the good faith of the debtor as we progress through this evidentiary hearing. We would ask, Your Honor, that this Court absolutely deny both of the motions that were filed last night, as there is no ground for either of them.

THE COURT: Okay. Unfortunately, when I came on the bench --

MS. LINDAUER: Your Honor --

THE COURT: -- I was not aware of the two pending motions. I did look at the motion to continue which is the one that Ms. Simmons argued. And I've considered that motion which

appears at Docket Number 158. I'm going to deny the motion to continue.

I do note I think Mr. Kane is correct that their exhibits were timely. And counsel on each side worked through admission of those exhibits at the beginning of the last hearing. So the parties have had sufficient time to review the exhibits. And in fact, as Mr. Kane pointed out, they already put on their case in chief.

And as far as the number of witnesses, I'm looking at the witness and exhibit list that was filed and that I went through for the hearing last week. Mr. Kane, I understand, is not going to call any witnesses for his case in chief because he's already rested. And the debtor has identified seven main witnesses, one of which they said they were not going to call.

So as I sit here today, I do not find that there is cause to continue the hearing. So I'm going to deny the motion to continue. I have not reviewed the other motion, and it's not set. Just as a matter of practice, if you file an emergency motion, typically I would look at the docket before I walk out here on the bench. We were again getting prepared for the hearing and making sure my computer equipment worked.

So I have not reviewed the other motion. And right now it's not set. I'm not going to hear it right now. So we're going to go ahead and continue with the witness that was testifying last Friday, Mr. Marx, and if he's available.

Ms. Lindauer, why don't you go ahead and put --

MR. RODRIGUEZ: Your Honor?

THE COURT: -- him on the stand.

MR. RODRIGUEZ: Your Honor, this is Oscar Rodriguez. May I just be heard for 30 seconds? The motion is an objection --

THE COURT: Mr. Rodriguez, we have a --

MR. RODRIGUEZ: -- of --

THE COURT: Mr. Rodriguez, there's a bad --

MR. RODRIGUEZ: Yeah?

THE COURT: There's a bad echo on your part. We're getting some type of feedback. Do you have a phone and a laptop going?

MR. RODRIGUEZ: Apologies. Can you hear me better now?

THE COURT: Much better.

MR. KANE: Your Honor, it's Ms. Lindauer's mic is on and Mr. Rodriguez's mic is on. And they appear to be in the same room I think which is causing some of that feedback.

MR. RODRIGUEZ: Okay. Trying again. No?

THE COURT: No, same problem.

MR. RODRIGUEZ: Let me turn off my cell phone.

THE COURT: Just a minute, please. Ms. Lindauer, can you turn your speaker down?

MR. RODRIGUEZ: Can you hear me now? You know what,

Judge, if I can move over to Camisha's seat, I can just make what I needed to say for the record, Your Honor.

THE COURT: All right. Mr. Rodriguez, you appear to be muted now. If you could unmute?

MS. LINDAUER: Try it again. Yeah, try that.

MR. RODRIGUEZ: Yes. Can you guys hear me now?

THE COURT: Okay. I think we're good now.

MR. RODRIGUEZ: All right. Apologies. Your Honor, Oscar Rey Rodriguez. Actually an appellate order.

I'm here to assist in helping the Court get this right for the right reasons. I too clerked for Chief Justice Nathan L. Hecht when I graduated law school. And that is something that has been drilled into me.

We're all here to get things right for the right reasons. And we don't want to come back and try this again. So, Your Honor, what I did is I raised Federal Rule of Evidence 106.

THE COURT: You know what, Mr. Rodriguez --

MR. RODRIGUEZ: Why?

THE COURT: Mr. Rodriguez --

MR. RODRIGUEZ: During these proceedings --

THE COURT: Mr. Rodriguez, are you arguing the other motion that's set?

MR. RODRIGUEZ: It's not a motion, Your Honor. It's an objection under the Rules of Evidence which we have to raise

while the proceedings are occurring. And I did it in writing so that no one would say they were surprised, that there wasn't a basis. That's why I sent it. The exhibits that have been admitted by Mr. Kane says he is the custodian of records are not complete. They all reference, many of them say there's attachments, attachments, attachments. He never produced the attachments.

THE COURT: Mr. Rodriguez?

MR. RODRIGUEZ: He's never offered the --

THE COURT: Mr. Rodriguez --

MR. RODRIGUEZ: -- documents are therefore --

THE COURT: Mr. Rodriguez.

MR. RODRIGUEZ: Yes, Your Honor. Sorry, I can't hear you.

THE COURT: Could you direct me to the docket number of the pleading that you're referring to that you say is not a motion? I'm not sure what you're -- are you arguing a motion that has been filed on the docket?

MR. RODRIGUEZ: No. Your Honor --

THE COURT: There's a motion --

MR. RODRIGUEZ: I saw --

THE COURT: There's a motion to compel immediate production and review of potential admission of missing documents. Is that the motion that you're arguing?

MR. RODRIGUEZ: Yes, Your Honor.

Invoking the authority of Federal Rule 106 which is a trial evidence rule. Because Mr. Kane has produced incomplete and misleading documents -- to use his word -- we are entitled now to get the remainder of those documents, all of those attachments so that we can examine them, decide whether or not to offer them to the Court, or call any of the witnesses that Mr. Kane represented to the Court and to us in his trial witness list that he was going to present. Had he brought those witnesses, we'd have the opportunity to continue this expedited hearing, Your Honor.

But you know, to use Mr. Kane's word, a question in good faith, I wonder if those witnesses were even available, or if this was a classic fake move and he faked us out.

THE COURT: All right. Mr. --

MR. RODRIGUEZ: Well, it worked.

THE COURT: Mr. Rodriguez?

MR. RODRIGUEZ: It faked us out.

THE COURT: Mr. Rodriguez?

MR. RODRIGUEZ: Yes, Your Honor.

THE COURT: The motion that you're referring to, bear with me --

MR. RODRIGUEZ: It's Docket 160, Your Honor.

THE COURT: Right. I've reviewed it. And you're arguing a motion that was filed apparently on an expedited basis that is not set. So when we took a break from the

hearing on Friday, everybody indicated to me, and it was my intention to start this morning with Mr. Marx on the stand.

I did review the motion to continue because I thought that was something that I could handle on the fly. I've now denied the motion to continue. The other motion that you're arguing is not set. Apparently nobody notified my courtroom deputy that it had been filed. And unfortunately, I'm not prepared to address it. And I don't think that it's something that needs to be addressed right now.

So we are going to go ahead and continue with Mr. Marx. I'll give you the chance to make your arguments at the appropriate time. That's not right now.

So, Ms. Lindauer, go ahead and call --

MR. RODRIGUEZ: Thank you very much, Your Honor.

THE COURT: -- Mr. Marx to the stand. We're going to continue with Mr. Marx.

MS. SIMMONS: Your Honor, Camisha Simmons. Could I just clarify one point on the motion for continuance, although it's denied is that the witnesses that we supplemented on the witness and exhibit list are rebuttal witnesses that were offered up by Mr. Kane after Randy was on the stand on Friday.

So, and in our original witness and exhibit list, we said that we would call anyone designated by any other party. So he designated them as rebuttal witnesses. So his colleagues at his firm were designated as rebuttal witnesses. And so

that's why they're on our witness and exhibit list, and it was supplemented.

And I, you know, as a professional, don't like being accused of making misstatements. And so you know, I wish we could be more professional in these proceedings.

THE COURT: So if that -- Ms. Simmons --

MS. SIMMONS: And John Kane --

THE COURT: Ms. Simmons, that issue is not teed up for me right now. So we'll --

MS. SIMMONS: Okay. I just wanted --

THE COURT: At the appropriate --

MS. SIMMONS: I just wanted to clarify. I just wanted to clarify, Your Honor. These exhibits that we added are within our authority to add. And it was nothing that we did that was not within our authority under the rules to do.

THE COURT: So I understand --

MS. SIMMONS: (Indiscernible) fax it over --

THE COURT: You've made your clarification. I'm not going to address that issue right now. We're going to continue with Mr. Marx. Ms. Lindauer, go ahead and --

MS. SIMMONS: Thank you, Your Honor.

THE COURT: -- recall Mr. Marx to the stand.

MS. LINDAUER: Thank you, Your Honor.

Mr. Marx, are you -- looking to see where you are on the screen up here. There he is.

Mr. Marx, can you go ahead -- there you are. Okay. All right. Mr. Marx.

THE COURT: Mr. Marx, if you could just quickly tell me your name, I want to get the camera on you so I can see you.

MR. MARX: My name is Randy Marx.

THE COURT: There you are. Thank you, Mr. Marx. I'll just remind you you're still under oath.

RANDY MARX, DEBTOR'S WITNESS, PREVIOUSLY SWORN

Ms. Lindauer, you may continue.

MS. LINDAUER: Thank you.

DIRECT EXAMINATION (RESUMED)

BY MS. LINDAUER:

Q Mr. Marx, I wanted to go back and clarify a couple of points from Friday that I don't know that were completely clear.

Mr. Marx, in connection with these proceedings, the 2999TC Acquisition proceedings, who have you represented?

A I represent a purchaser and/or a purchaser's lender anticipated to advance funds once I've completed my task of reviewing title and survey and related matters.

Q All right. So you've represented a potential lender, or a lender. Have you represented anybody else in connection with these proceedings?

A Well, I've interfaced with th debtor. But my primary scope of responsibility has been relating to representing the

purchaser or the lender to that purchaser.

Q And the reason I wanted to clarify it, Mr. Marx, is some of the documents that you reviewed and were going to go through with the Court, I wanted to clarify that you reviewed those potentially with different hats on perhaps than we discussed on Friday. So I wanted to be sure that as we go through these, who you were reviewing those documents for. Does that make some sense, sir?

A Sure. And like I said, it was primarily for the benefit of the purchaser or the lender to the purchaser because they were -- they were taking parallel tracks.

Q All right. All right. What I'd like to do is turn back to --

MS. LINDAUER: -- and Sydney (phonetic), if you can pull this up, it's Lender's -- I'll call it Lender's Exhibit 33-A which was the commitment for title insurance.

Q And, Mr. Marx, I know you've got these exhibits in front of you on your computer. We're also going to put them up on the screen so that everybody can follow along. Is that fine?

A What was the number?

Q I'm sorry, 33-A. And we've also got it up on the screen, Mr. Marx, as well.

A Okay. So I think it might be better to start with 33 because 33-A is just a part of 33, it appears.

Q Okay. Well we can pull up Exhibit 33. Is this the

document you're referring to, Mr. Marx?
A Yes. Looks like an email from Julie at Sendera to Mr. Kane on the 24th.
Q All right. And it looks like you were also copied on this email. Is that correct?
A I was.
Q Okay. And, Mr. Marx, for the record, when did your involvement come to be as it relates to the particular issues that are before the Court at this time?
A Well, it started in connection with my representation in late April or early May. I moved to review title probably on or about May 10th by interacting with Julie at Sendera.
Q Okay. All right. And who do you understand Julie at Sendera to be?
A Julie's been the point person as it relates to the closing of the transaction. Essentially, I think she's one of the more senior people there at Sendera. I first had occasion to interact with her, like I said, on or about May 10th respecting getting a copy of the commitment.

THE COURT: Mr. Marx --

MS. LINDAUER: And I was --

THE COURT: Mr. Marx? Ms. Lindauer, I don't usually interrupt the questioning. But I was multitasking. I just wanted to make sure I had what Mr. Marx said. You began working on this title commitment, these title commitment issues

on May 10th. Is that correct?

THE WITNESS: I believe that was approximately the time, Your Honor. It may have been a day or two one way or the other.

THE COURT: Thank you.

THE WITNESS: But -- okay.

THE COURT: Ms. Lindauer, you may continue.

BY MS. LINDAUER:

Q And, Mr. Marx, that's sort of where I was going with this. This particular email you're looking at that includes the Schedule C is dated May 24th, as you pointed out to the Court. Is that correct?

A Yes.

Q Okay. You, Mr. Marx, and seen the title commitment prior to May 24th. Is that right?

A Yes. It's my recollection that other of these correspondences similarly indicated that Mr. Kane may have received it sooner. But I'm -- this suggests to me, I mean, he was copied on it. So certainly he had it as well on May 24th. I don't know if he had it before or not.

Q All right. Well, we'll go through I think some of the emails and maybe we can clarify when these documents first traded hands. But this particular attachment of Schedule C sent by Sendera to Mr. Kane was addressing some particular issues. Do you see that?

A I do. They're referencing the Access Bank (phonetic) position. And they're also referencing the Happy State Bank position.

Q Okay. Do you have any understanding of why the Access Bank position was being mentioned in this particular email?

A Yes. It's a -- if you take the commitment that's referenced here, it says I have attached the commitment with hyperlinks to the Schedule C documents. It's in the second paragraph there. I too had those hyperlinks.

Basically you put your mouse or whatever over the appropriate link in Schedule C, and then the operative instruments, the ones that appear as items to be resolved or required to be resolved appear. Now, unfortunately in this instance although -- and this is why I guess we start with this one, more of a predicate I'll call it, is that this Exhibit 33, although it includes the commitment itself at 33-A, okay, does not include all the documents I reviewed.

Q Okay. And when you're saying that, is that because the hyperlinks that you're mentioning are really not included as part of 33-A? We just have the commitment itself. Is that right?

A Yes. To answer your question, I would refer to these underlying documents. But they're not part of this. Now, I have them here because when I got the commitment initially, of course I went to each of those hyperlinks and printed off each

of the underlying so that I knew what was required to resolve or to respond to Julie.

And so your question goes to these two items. But I guess my answer had went to the broader. I reviewed the entire commitment, not just those, the Access positions, the Happy State Bank position.

MR. KANE: Your Honor, this is John Kane. Mr. Marx referenced a series of documents that he had in front of him. I'm going to object to the extent Mr. Marx has documents that are not exhibits that are being presented for his testimony as notes or other references that he's using to support his testimony.

THE COURT: Response?

BY MS. LINDAUER:

Q Mr. Marx, you heard the statement by Mr. Kane. Is that correct?

A Well, I don't need to look at them. But I just wonder if -- it's up to you.

Q Okay. Well first of all, Mr. Marx, I guess --

A They should have been a part, and I guess I didn't realize until I looked at the exhibits that these items that were in Schedule C just somehow didn't make it into his Exhibit 33-A.

THE COURT: So I'll go ahead and --

MS. LINDAUER: So just to be --

THE COURT: I'll will sustain the objection.

Mr. Marx, if you would just review the exhibits that Ms. Lindauer's walking you through for purposes of this hearing.

THE WITNESS: Okay.

BY MS. LINDAUER:

Q Mr. Marx, just for point of clarification, the documents that you referenced that you have in front of you, are those the hyperlinked documents that would be part of the Schedule C? Is that what you were referring to?

A Yes. When you typically get a commitment, you get the listing which is on Schedule -- well, these documents could appear on Schedule B or C. And so these are the documents that I looked at to identify what was required of the respective parties. But they're not included in the exhibit. I mean I've read them before. I don't need to look at them. I just thought I would have them in case a question specifically came up. But --

Q SO I just want to be clear that with regard to Schedule C, there are further attachments to Schedule C that have not been included, at least up to this point, as exhibits for this hearing. Is that correct, Mr. Marx?

A Yes. Correct.

Q Okay. All right. Mr. Marx, and again going back to this cover letter for just a minute, cover email, you mentioned that Access Bank assignment. There is also a reference to a Happy

State Bank document. Do you see that?
A I do.
Q Okay. And again, Ms. Lissey with Sendera is asking Mr. Kane a question about the Happy State Bank document. Do you see that?
A I do.
Q And we'll look at these in a minute. But can you explain to me, Mr. Marx, what the issue with Happy State Bank and its documents was?
A Happy State Bank, well actually put it this way. The HNGH was not the original lender to the borrower. The public records, some of which I previously reviewed when I got this commitment, indicated that HNGH basically bought in to a minority position in the loan. And here it would be helpful to look at the underlying so I can give you the precise date. But let's say in I think it was 2020.
And then subsequently, they obtained a loan from Happy State Bank. For that loan, this is not the loan from the borrower in Madison, the original lender. This is behind the scene loan --
Q Mr. Marx, I'm going to stop you there for a second just to be clear on the record. Based on the documents that you've reviewed and the documents we'll go over with the Court this morning, when you referred to they bought in or they wired an interest, who are you referring to for the record?

A Sorry. I misspoke. I'm referring to HNGH.

Q All right. And if you want to continue, that would be fine. Thank you.

A The public record and Schedule C being the commitment, demonstrated that HNGH was not the original lender. The debtor here basically obtained a loan from somebody else. I refer to them as Madison. Madison then sold a piece of the loan to HNGH. Or think of it this way, HNGH bought into the loan for a minority interest. Okay?

Then I believe at or about that same time, maybe a bit later candidly, HNGH in turn borrowed money from Happy State Bank. Okay? And then the Happy State Bank took a collateral assignment from HNGH.

Q There's -- then there's a mention, Mr. Marx, of an Access Bank. How do they fit into the summary that you just gave us regarding Madison and then HNGH and then Happy State Bank?

A I'm sorry, will you restate the question?

Q Sure. The email that we're looking at specifically mentions, and you discussed with us the Happy State Bank situation. There's also a reference to an Access Bank. Do you have an understanding of how Access Bank had fit into this transaction?

A Yes. I believe Access similarly at a point acquired an interest in the loan. Okay? And then sold it off or was removed. And what the title company here is looking for is

some evidence that Access no longer had any interest in the loan. That I believe was substantively resolved. But she is asking here for help because it still at that point in time appeared on her commitment.

Q Do you have any understanding, Mr. Marx, why Sendera would be asking Mr. Kane for assistance with regard to these particular documents?

A Well, you have to realize this is an unusual situation where the HNGH group, I'll call them, the lender's side of the transaction had filed a deed purporting to grant them title. That instrument we have referred to as a deed in lieu. So one, HNGH was being called upon to I guess provide the recision of deed, specifically to your question here, because HNGH bought in and then Access bought in, and then HNGH had collaterally assigned the record had a lot more instruments that required to be cleared than the typical situation where you just have one lender and one deed of trust.

Here, in a sense, there was the original under Madison, then Access, then HNGH, then by collateral assignment Happy State Bank. He was just looking for help from HNGH counsel to be sure these items were taken care of. And that's why really HNGH here is really the seller as much as anything. And those Schedule Cs, those title commitments are provided to both the seller and then the buyer so that they can, you know, take steps.

Q Okay. Mr. Marx, now that we looked at the email cover, if we could turn back to then the 33-A which is the commitment itself. All right. And do you see that document up on the screen?
A Just one second. It's easier to read --
Q Sure.
A 33-A?
Q Yes, sir.
A Okay.
Q On the first page, Mr. Marx, and I don't want to belabor this, but we didn't go through everything that was in this document on Friday. So I do want to go back through a few items. The first one is the effective date. What was the effective date of this commitment?
A The effective date on this as reflected on Page 1 was May 15th of 2022.
Q And, Mr. Marx, did you have an understanding of when the closing of a transaction was to occur that would involve the items on this commitment for title insurance?
A Yeah. I think it was pursuant to the agreed order. And then the as amended it would have been May 30th, which was the Monday holiday. It would have rolled to May 31.
Q So the effective date of this was about two weeks prior to the agreed order deadline. Is that right?
A Yeah. The gap here, which is what we refer to that as,

was approximately 15, a little bit more than two weeks.
Q And just for the record, these commitments for title insurance, are they something that evolves over time prior to a proposed closing?
A Yes. And there's a reason --
Q So -- go ahead. I'm sorry. I didn't mean to cut you off.
A No. And that's because they're usually called preliminary title commitments. And then as items are cleared, when you first get it, I mean, basically me from the lender's side as well as the counsel to HNGH for I think from the seller side I call it have an outline of what is required.
And so then typically as those items are, you know, resolved, then the title company issues updates so that sort of it's a mutual checklist they'll call it that, you know, typically I work through whether I'm the buyer or the seller. And everybody knows, you know, the process.
Q Okay. And if you drop down, there is a -- it says commitment number blank issued May 18th at 8:00 a.m. What is that referring to?
A Well, that's really when the commitment sort of came out. But they only got through the search of the public records I guess through May 15th. And there's always a little bit of a delay there. It takes them some time to process it, I guess, and get it out. And again, it's that there's always going to be a little bit of gap. And that's why the title company

addresses that in their requirements.
Q Okay. Do you see a sub-C loan policy of title insurance, that heading?
A Yes. That's on Page 1, I guess Section 1-C.
Q And it shows proposed borrower TCC2022 LLC. Do you see that?
A It does.
Q Okay. Do you know who that entity is?
A That's my client.
Q And I want to be clear. When you say that's your client, that was your client that was going to participate in this transaction and loan money. Is that right?
A Actually, at this -- there were a number of manners in which this transaction was anticipated to close if we could get to a state of clear title. One of them was anticipated that TCC2022 would be the buyer/borrower, and it would obtain the loan. There were other parallel tracks for the potential funding, all which were I guess delayed because of these title issues. But I didn't want to have five different commitments or two different commitments. So we just put this in TCC2022 as a placeholder.
Q All right. Do you know, sitting here today, Mr. Marx, was the proposed borrower changed at some point after May 15th?
A I don't specifically recall. There were one of the parallel tracks was with a group called Enoch (phonetic) as the

purchaser. But again, I don't think this commitment was ever changed because it was just easiest to use one commitment moving forward.

MS. LINDAUER: Okay. If you could drop down just a little bit, Sydney, to Paragraph 3.

BY MS. LINDAUER:

Q So on Paragraph 3, Mr. Marx, it shows the record title to the land on the effective date, and I'll represent to you that that would refer I believe to the May 15th date, appears to be vested in you see 299TC Acquisitions LLC?

A Yes.

Q And then does it show another party, as well?

A Yes. It shows HNGH Turtle Creek, LLC.

Q And then if you drop down, it says by virtue of a special warranty deed. Do you see that?

A Yes. And there's actually two deeds referred to there. This was, you know, sort of a funky transaction from the outset because title here was not in the name of 2999TC Acquisitions. It had acquired the property by way of the deed dated September 23 of 2019.

But then HNGH had filed a it says special warranty deed, but typically I've been referring to that as the pocket deed, and that was filed November 1 of '21. So the real lay of the land is that that deed which I understand in the bankruptcy context has been disputed. But that was of record. So I guess

this was a best way to demonstrate both.

This was sort of an issue that I faced because you know, that November 1st deed had a chilling effect, or constituted sort of a cloud I'll call it, which was addressed in Schedule C, obviously.

Q And I was going to ask you, the way the title to this property looks as of the effective date, you're showing essentially two owners to the property. Is that what I'm seeing?

A Yeah. And that's unusual. That's a little bit funky, I'll call it. And it's just because they made more sense to -- I mean, it could have been handled either way. It could have reflected it one or the other. But they were more comfortable reflecting it in this fashion. And I was fine with that because the reference to HNGH here in I guess A-3 resolved itself, or would have or should have resolved itself by a recision deed, a recision of deed which was referenced in the requirements.

Q Okay. So to be clear, on your item three, had a recision deed or recision of deed been filed, that would have resolved the second indication of ownership in the name of HNGH. Is that my understanding?

A Yes.

Q So that would return the title clearly then to 299TC by virtue of a special warranty deed dated September 23rd, 2019.

Is that correct?
A Well, the special warranty deed of November 1, '21 was actually the problem. It would have resolved or should have been, would have been resolved by a recision instrument which is referenced as one of the requirements on Schedule C.
Q Mr. Marx, did you have any understanding of when the actual bankruptcy case was filed?
A It was -- would have been filed I believe I think either October 29th or 30th of '21.
Q So again, looking at the record, this commitment C, this would indicate that there was a deed filed a couple of days after the bankruptcy was filed. Is that correct?
A That is my understanding. Yes.
Q Does that create any issues for title when you're looking at the title to this property and you see a deed recorded a couple of days after a bankruptcy filing?
A Well, yes. And then obviously. And so when you see this from my perspective as the, you know, the buyer or the buyer's lender, and as one looks at this from in this case counsel to the seller which is HNGH, when I looked at this, and presumably when they looked at it, they would go to Schedule C and see what has been required of them, or what's required of me, candidly.
Q But just to be clear, to resolve the issue of the November 1st, 2021 special warranty deed, because it was recorded a

couple of days after the bankruptcy case was filed, was it important that a document be filed that would remove that particular deed?

A Yes. And the title company referenced that specifically. If you'll turn to Schedule C --

Q Correct.

A -- at Page 8.

MS. LINDAUER: Sydney, can you pull that up?

BY MS. LINDAUER:

Q Okay. We're on the same exhibit. This is Exhibit 33-A, Page 8 which is I believe the second page of Schedule C, Mr. Marx. And could you tell us what you're looking at?

A Yeah. If you go down to item, excuse me, yeah C-9. It's on the middle or so of Page 8. You'll see how the title company referenced that item C is sort of the action to be required either of me on the seller side, excuse me, me on the buyer, the buyer's lender's side. And HNG counsel arguably in this situation on the seller's side, and the one who gave rise to that instrument, the deed that you're referring to, the November 1st, '21 deed, this is how the title company reflects that action item.

THE COURT: Mr. Marx, just --

MS. LINDAUER: So --

THE COURT: I want to make sure -- I want to make sure I'm looking at the same paragraph. You're on continuation

of Schedule C, and then the bottom of the page it's Page 8 of 16, correct?

THE WITNESS: Yeah. And if I could, item 9 though, it's about mid-page. And it starts out bankruptcy proceedings were filed --

THE COURT: Right. That's where I am. I just wanted to make sure I was --

THE WITNESS: Yeah.

THE COURT: -- on the same page as you. So Paragraph 9, I understand.

THE WITNESS: Okay.

And then just, in furtherance, Your Honor, when I looked at this reference, of course, I went to the December 10 agreed order as amended by the March 17th extension to look to see what was required both of -- it's confusing because HNGH's -- because of that deed, it's sometimes easier just to refer to them as the seller. That's what was required of that party and then what was required of anything sort of on the debtor's side. I'm just looking to see that it gets resolved for the benefit of my client.

BY MS. LINDAUER:

Q Mr. Marx, could you -- and I want to break this down a little bit. Could you read for us Number 9? And we're going to break it into pieces, but the first sentence of Number 9.

A "Bankruptcy proceedings were filed in bankruptcy court on

October 29, 2021, in Cause Number 21-31954-HDH-11 by 2999TC Acquisitions, LLC."

Q All right.

And that's -- obviously that's the debtor we've been discussing. And that was -- I think you testified that was the date of the bankruptcy filing itself. And then we had previously seen that the deed recorded by HNGH was recorded on November 1st. Correct?

A Yes.

Q Okay. So the title company, when it says we, that would refer to the title company. Is that right?

A Yeah. The next sentence is we, referring to the title company or the title insurer.

Q Okay.

A Because these commitments are actually issued by Title Resources Guaranty Company, and Sendera is acting as the -- as a closing agent, I'll call it, for the title insurer. So that is probably -- it's Julie on behalf of Sendera on behalf of Title Resources Guaranty Company.

Q Okay.

And if you look at the second sentence where it starts off we, and if you could read that, just that one sentence for us.

THE COURT: Ms. Lindauer. I have it --

THE WITNESS: We --

THE COURT: Ms. Lindauer.

MS. LINDAUER: Yes, sir.

THE COURT: I have it in front of me. There's no need for the client to read it out loud. I'd kind of like to speed it along.

MS. LINDAUER: Okay. All right. Well, let's --

THE COURT: You can ask your question about the sentence, but there's no need to read it out loud. Please do --

MS. LINDAUER: I will. I will, Your Honor.

BY MS. LINDAUER:

Q All right. Mr. Marx, it's asking in particular that a certified copy of any action the bankruptcy court exempting the herein described property from claims of creditors as well as any other action affecting validity, party of liens cited herein. Do you see that sentence?

A Yes.

Q Do you understand what the title company was requesting in that second sentence?

A Well, they're -- they're looking for comfort that that instrument will be removed. By this reference, they're -- it's really more of the next sentence where they're moving toward those -- that settlement agreement between the parties.

Q All right. Let me have you look into --

MR. KANE: Your Honor, this is John. I just want to clarify for the record that was just Mr. Marx's understanding

of what this document says. Is that correct?

THE WITNESS: Yeah. And it's the information that I acted upon in doing my job.

MS. LINDAUER: Mr. Marx, I was going to direct your --

THE COURT: I understand.

BY MS. LINDAUER:

Q Mr. Marx, I was going to direct your attention to the parenthetical that says paren prior owner paren. Do you have an understanding of why that was put in parentheticals like that?

A Well, because the prior owner, referring there to 2999TC Acquisitions because of the intervening pocket deed recordation on November 1, 2021.

Q Okay. And then the last sentence, will require compliance with the Chapter 11 plan confirmed by May 18, 2022. Do you see that?

A I do.

Q Mr. Marx, do you have any understanding of what the title company was looking for in compliance with the Chapter 11 plan?

A Well, what I understand that they were looking for and what I was looking for is satisfaction that the agreed order, the contract between the parties as amended by the -- that one dated, I think, December 10th, is extended by the, I think it was March 17th agreed order, what was required of the seller

and or the debtor in that regard so that when the property got conveyed to my client, TCCC2022 (phonetic), LLC, that, you know, I could be assured that I'm getting good title and that the title insurer was comfortable in basically providing the insurance in that regard.

Q Okay. I guess, Mr. Marx, you have a history with this particular case and the underlying documents and the parties, but I don't see any reference in Paragraph 9 to any of the agreed orders. I know you've said that was your understanding, but do you see where there's any mention of the agreed orders in Paragraph 9?

A Not especially, but it references the -- you know, the bankruptcy court proceedings and then the confirmation. And it wasn't that hard for me to, you know, locate and review the December 10, 2021, and March extension so that I knew what was required of the parties.

Q So I understand you're saying you knew what was required of the parties. Do you see anything in this title commitment that discusses what the title company was requesting with regard to those particular orders?

A Well, do I see something here?

Q Yes, sir.

A I know what they were requiring, but for an -- well, here's the deal. They were requiring a recision of the deed. Is it expressly referenced in this item 9? No. But if you go

to those orders, the requirement for a recision instrument and a reinstatement instrument or one or both or combined is clearly evident. Does that help?

Q Yeah. Let's go back, if we could while I've got you looking at Schedule C now again, and go back to the prior page. That would be Page 7 of Schedule C. And, in particular, Paragraph 5.

A Okay.

Q There is a reference to a deed of trust dated September 20, 2019, filed September 23, 2019. Do you see that reference?

A Yes.

Q And what's your understanding of who held that particular deed of trust?

A Well, if you look at the -- well, when I got this, I looked at each of those documents, the ones that are not included as part of Exhibit 33A, okay. And from those public records as listed here, I knew that a number of things were required to, you know, one, two, three, four, five, six.

Q So in a --

A There are like eight -- excuse me -- eight items there listed.

Q Right.

A I don't think there are eight curative documents, but something needed to be done respecting each of these eight instruments referenced in as part of that one Exception 5.

Q Okay. So there -- I was going to ask you to help me break this down a little bit. So there was a note -- do you see that reference -- of (indiscernible) date for $32,500,000. Do you see that reference?
A Yes.
Q Okay. And it says it's payable to 2999 Turtle Creek, LLC, a Delaware limited liability company. Do you see that?
A It does.
Q Okay. Is that your understanding, Mr. Marx, of the original loan that was taken out in connection with this particular transaction between ultimately the debtor and then was later acquired by HNGH?
A Yes.
I think more accurately that should be described as the $32,500,000 payable to the order of 2999 Turtle Creek, LLC, because it had in effect been held by a number of -- by that party and by a number of other parties, either directly or by collateral assignment in the intervening, what, '19 to '22 now, two and a half to three year period.
Q Do you have an understanding is 2999 Turtle Creek, LLC was the original lender on the note?
A Yes. That is what is reflected here and that has typically been referred to as Madison (phonetic). That's the Madison.
Q Okay. So wait a second. So just for to be clear so all

of us can follow you, 2999 Turtle Creek, LLC is also known by the name Madison. Is that correct?

A That's the vernacular that I have used because if you look at the name of the borrower in the original transaction of the '19 transaction, it's MO2999, and the lender at that time is also 2999. And it's -- can be confusing unless you adapt some vernacular. So I've always referred to 2999 Turtle Creek, LLC simple as Madison. And that was the original lender.

Q Okay. And do you know where the reference to Madison comes from?

A I believe that Madison was the name of the lending group. They likely formed this entity as maybe a special purpose lender is what I would imagine. I've seen reference to them at --

MR. KANE: All right. Objection. This calls for speculation and I question this line of questioning on relevance.

THE COURT: Response.

MS. LINDAUER: Well, Your Honor, I understand on the speculation issue, but we -- and we can go back through some documents. I really didn't want to go back through the laundry list of loan documents, but we for sure can do that. I was just trying to understand why we call 2999 Turtle Creek Madison. And I think Mr. Marx is doing a good job of explaining that to us.

THE COURT: So I'll sustain the objection. Go ahead and ask another question.

Ms. Lindauer, make -- I'm going to ask you. What's your time estimate to get through Mr. Marx's direct?

MS. LINDAUER: Well, I would have thought maybe quicker than it's going right now. I'm hoping that we'll get done with him before we break is my goal, watching my time, Your Honor. But there's a -- Mr. Marx, as I mentioned on Friday, is probably one of our longer witnesses and has a lot of information that he's been involved with. So he will, I think by far, be the longest. But that being said, I think once he goes through all of the things we'd like to ask him, it may expedite some of the other witnesses. So my goal, Your Honor, is --

THE COURT: Ms. Lindauer.

MS. LINDAUER: Yes, Your Honor.

THE COURT: Some of this is starting to be a little bit repetitive because I know we've heard some of this before.

MS. LINDAUER: Okay.

THE COURT: I would just ask you to try to be a little bit more brief in your questions and move it along a little bit.

MS. LINDAUER: Sure.

THE COURT: I would like to give Mr. Kane the opportunity to cross-examine the witness today, so I'll just

ask -- encourage you to keep moving forward a little bit more expeditiously.

MS. LINDAUER: Well, I guess in that regard, Your Honor, how late are -- I know everybody's got some things this afternoon. How late were you going to go today?

THE COURT: So we have some other hearings at 1:30 and we'll break. Let's just keep going. We'll break maybe sometime between 12:00 and 1:00, so just keep moving forward.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q All right. Mr. Marx, I'm sorry. So looking at this laundry list on Page 7 of particular items, and I think you mentioned there's a total of one, two, three, four, five, six, seven items referenced under Number 5. Is that right?

A Yes.

Q The first of those shows an assignment of leases and rents dated September 20, 2019. Do you see that?

A Yes.

Q Okay. What would be the curative requirement with regard to the assignment of leases and rents referenced under sub 5?

A Well, the other day, I think sort of report or told you my thought processes as relates to this item. I think in the context of Exhibit 33 and this being Exhibit 33A, what this says to me is that the HNGH Group would see this and generate a release of lien document and which could be a single document,

or it could be a release of lien and a release of this item that you asked about, assignment of leases and rents, that could have been in a -- you know, in a combined document. But by what I was trying to get to is that this Schedule C informs both parties what's required of them. And that's what I was looking for from the other side from the seller's side is a release of lien maybe including an assignment of rents and such to have been delivered and signed to the title company.

Q And I want to be clear. I think you mentioned something. When you say seller's side, who are you referring to, for the record?

A Well, and I apologize because it is a bit confusing, but in this context it's easier to consider the HNGH Group as sort of the seller because if you recall on that -- on Page 1 of the commitment, they're referenced as being in title to the property. And in the orders in the contract between them, there is the recision deed. So, you know, recision transactions are not that common, okay. They don't have a commitment to Schedule C specific just to recision transactions.

And so I think duly Sendera did an adequate job in referencing here the stuff that would be required of the -- it would be required of Madison if they had -- if it had just been a simple transaction, but since there have been these interim transactions and apparent parties at interest, that's why

there's more than just a simple release of lien. And then I refer to the HNGH Group kind of as the speller primarily as it relates to this item 9 that we talked about on Schedule C. That's the bankruptcy proceeding and the disputed deed.

Q Let me ask you, Mr. Marx. On this first one, the assignment of leases and rents, that was held by I assume at HNGH, would a recision deed resolve this particular title issue?

A No. This would be resolved by a release of lien. Actually, I take that back. Yes and no. The proper answer there is this matter would only be resolved by really two or three documents, depending on how they were drafted. Sequencing here, it would be a instrument of recision, okay. So that guy has to put the debtor back in title. And then either as part of that or a separate document, an instrument of reinstatement because absent that, I think they -- the estates have merged. And then third would be a release of the reinstated note and the reinstated deed of trust and the reinstated assignment of leases. Again, that could have been done in one, two, or four instruments.

Q And so just to be clear so I'm following your thinking here, that as a result of a recision transaction that the underlying lien documents, including, for example, an assignment of rents and leases would be -- need to be shown on the record in Dallas County as reinstated and then subsequently

released. Is that correct?
A Yes. That's what I -- I would -- regardless of the documents, I would call it a three step: the instrument of recision, the instrument of reinstatement, because you've got to feed title back into the debtor, and then secondly, there's that merger doctrine. And I didn't see anything in the disputed deed, the deed dated way back in November 1, 2021 that would have prevented a merger.
Q Okay.
A So that's why I think it would be real important for -- well, for all the parties to have a clear reinstatement.
Q Okay. And as your representation of a potential lender slash buyer of this particular asset, how important would it be that these steps that you just outlined for us, the one, two, three, occur in that particular order with regard to acquiring clear title to this asset?
A Well, I think it's critical. I think it's critical. You don't want -- I mean, when you -- you want a clean slate moving forward. You don't want to have any issues going back. And candidly, you know, there's three perspectives to review these checklists, I'll call them, from, the title company. One is from obviously the seller side. It informs them what they need to do. Two, from the title insurance company's side. It's saying this is what is required. And then there's always, you know -- the litmus test at the end of the day is is it going to

set aside the purchaser or its lender that there are not going to be any problems. So the -- it is not -- I don't feel like I'm doing my job if all I have at the end of the day is a lawsuit against the title company. I am trying to do my job to see that the title company does theirs so that I don't have a lawsuit against anybody.

Q So I'm following you. So let me be clear. So not only would these required documents need to be prepared, but they would also need to be filed of record in a particular order, as I understand it, to make sure that any subsequent lender, borrower, owner, whatever, would be able to track through what happened with regard to each of these documents. Is that my understanding?

MR. KANE: Objection. Leading.

THE COURT: Response.

MS. LINDAUER: Let me ask it a different way.

THE COURT: So that objection is sustained.

MS. LINDAUER: Your Honor, let me just --

THE COURT: That objection is sustained.

MS. LINDAUER: Your Honor, I'll just rephrase the question.

BY MS. LINDAUER:

Q So, Mr. Marx, some party would have to prepare each of these documents. Is that correct? That you just mentioned.

A Yes.

Q And who typically would prepare those documents?
A Well, in -- typically, and in this instance, the corrective instrument which I call a recision of deed, just so that we're clear, would be generated by the grantor that in by the HNG seller side, I'll call it. That would be what's customary. And moreover, in this situation, when I have read the agreed orders, the contract, it appeared to be that that was an obligation of HNGH counsel. Those orders speak to that document was to have been held by HNG counsel. I think it said in escrow. I just know that it was to be held by them. So that's where that instrument should have been prepared and held.
Q Okay. What about the other two documents you mentioned, the reinstatement document? Who would be required to prepare that?
A That would be the second step. And in this instance, it would be prepared by HNGH as the kind of wearing their lender hat. Again, that could be done in a standalone instrument or it could arguably be done as part of the recision of deed, but it's critical that it be done, in my opinion, properly.
Q All right. And what about the third document you mentioned, which is the release itself?
A The release of lien, in my practice, it more customarily comes from the title company. But I think that's the preferred practice. There have been times when the HNGH wearing its

lender hat would generate such an instrument, but then it certainly wouldn't come from my offices.

Q All right. Mr. Marx, now we've gone through -- and I know I kind of belabored that a little bit, but I think it's relevant to the other documents we're looking at here. The next item is notice of collateral assignment of deed of trust and loan documents to Access Bank (phonetic). Do you see that reference?

A I do.

Q And what was required by the title company with regard to this particular document?

A This item, I guess, or it's a second item addressed in requirement C5. It is what she was looking for help from the HNGH counsel. What was your question?

Q Well, my question is what would be the document that would be prepared that would be curative of the notice of collateral assignment of the deed of trust and loan documents?

A That instrument was generated, I think, in 2019, but has appeared subsequently. Access sold out of their position, okay. And so what one would look for in the public record is some evidence of that. I can --

MR. KANE: Your Honor, I object to this line of questioning. It's duplicative. Am I mistaken? I thought we went through this Access Bank issue on Friday of last week.

THE COURT: Ms. Lindauer, what's --

THE WITNESS: Well, I was trying to clarify.

THE COURT: Ms. Lindauer, what's your response? I do believe it's -- we've heard this before. What's your response?

MS. LINDAUER: Your Honor, I think we touched on it. I'm not sure we touched on it in quite as much detail as perhaps we should have, which is the reason, again, just to -- and I'm almost done with this particular item anyway, but I wanted to at least clarify for the record that what the requirement was and whether, in fact, this had been satisfied or not.

THE COURT: For now, I'll overrule the objection.

Mr. Marx, do you have any clarification on your prior testimony on this point?

THE WITNESS: Yes. I don't think we got to is (audio interference) that was (audio interference) on this.

On the first item, the assignment of leases and the deed of trust, it's my understanding that a release of lien was never delivered to the title company. On this item specifically, the Access item, what I know is that in response to Julie's request, Mr. Kane did assist in finding and helping her find of record the item that cured this Access issue.

What I understand is that in her first search, it did -- the release of this, it did not appear because normally these are handled by release instruments or instruments of assignment. With Mr. Kane's assistance, because he was working

with Julie at that time, he in one of the subsequent emails that I believe was admitted, found the document and sent it to her. And then indeed she was able to confirm. She had trouble finding it because this one in this instance previously was entitled a termination as opposed to release.

So that was the one item here in this section 5 that I believe was satisfied. And it demonstrates that there was dialogue between the two and that, you know, they were at least on that one item working with the title company to resolve at least that item on Schedule C.

BY MS. LINDAUER:

Q All right. And then the next item, Mr. Marx, the assignment of deed of trust and assignment of leases or rents to HNGH Turtle Creek by instrument dated December 7th, could you be more specific about what that particular item relates to and what the curative item would be for that item?

A Well, it's referenced again in the letter from Julie to Mr. Kane. And she is suggesting there -- her understanding at the time was that H -- Happy State Bank was not going to be receiving funds, and yet their interest appeared of record, so she was looking for something from them.

Q Actually, actually, I think I'm on the item right above that one, Mr. Marx. And the reason I'm pulling this out is there was an assignment of the deed of trust and assignment of leases to HNGH by an instrument dated December 7th, recorded on

December 8th. Do you see that?
A Yes. Excuse me.
Q Okay. So that would have been -- correct me if I'm wrong. That would be the actual underlying deed of trust that secured the original note for $32,500,000 that was assigned to Mr. Kane's client, HNGH. Is that your understanding?
A Yes.
Q All right. And that instrument, as we pointed out, was dated December 7th. And when was it actually filed of record?
A The following day apparently, December 8th.
Q Now the item you were looking at and my question to you would be what would the curative requirement be for that particular document, looking at this from a title perspective, as Ms. Lucy (phonetic) was doing?
A I would have anticipated and it is customary that HNGH would have executed a release of lien and a release of assignments of leases and rents either prepared by them or the title company and had that at the title company in escrow.
Q All right. Then the next item is the collateral transfer of the note and lien to Happy State Bank. Do you see that item?
A Yes. And that's what I was trying to move -- or I looked at just a second ago.
Q Okay. If you look at that particular item, I want you to focus on the date. That particular collateral transfer

occurred on December 4th, or instrument is dated December 4, 2020. Do you see that?

A I do.

Q And if you look at the item immediately above that, it appears that the note and lien were collaterally assigned to Happy State Bank three days before they were actually transferred to HNGH. Do you see that?

A Yes.

Q Is that --

MR. KANE: Your Honor, objection. Relevance here.

THE COURT: Relevance?

MS. LINDAUER: Your Honor, all of this is relevant because of -- I'm sorry. Your Honor, all of this is relevant because at the end of the day to close this transaction, while we focused on the question about a recision deed and a note, reinstatement, and other things, there were a myriad of problem with the underlying transactions here that created issues. And you'll see that more May 30th and May 31st. That created problems for this particular closing.

Everyone in good faith was trying to work through those issues to get this transaction closed, but this was not a simple deliver money and get a deed transaction. All of these dates being out of order, parties being out of order, I mean, Your Honor, I --

THE COURT: All right. You've satisfied. I'm going

to overrule the relevance objection for now.

MS. LINDAUER: Okay.

THE COURT: Go ahead and continue with your questions about the collateral transfer to Happy State Bank.

MS. LINDAUER: All right. Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Marx, what I was having you focus on was the December 4, 2020 date and the fact that collateral transfer was dated, appears three days prior to the assignment of the deed of trust and assignment of leases. Is that right?

A Yes.

Q And from a title company perspective, what issues does that raise?

A Well, aside from the discrepancy in the dates, it looks like they got the cart ahead of the horse. But really I think just from the title company's perspective, what this would require is that they would need evidence of the Happy State Bank has released or terminated its position. And if I had been on the other side of this transaction, this list would have informed me and that would have been done in the customary and the standard fashion.

Q Okay. So to be clear, Mr. Marx, what would have needed to be prepared on this title issue would be a release of the collateral transfer of note and lien. Is that right?

A Yes. And I happen to know that there was no such document

signed, delivered at the title company at the targeted closing date.

Q Mr. Marx, did you have any indication that Happy State Bank was involved in this transaction sooner than your review of these title commitments?

A No. And it's my understanding that there had been statements that they didn't have a position, so when I --

MR. KANE: Objection. Hearsay.

THE WITNESS: But when I saw this, I was surprised.

THE COURT: Mr. -- Mr. Marx, Mr. Marx, when the -- when counsel objects, go ahead and let Ms. Lindauer respond to the objection before you continue your testimony.

Ms. Lindauer, what's your response to the objection?

MS. LINDAUER: Your Honor, I think he was stating his understanding. And I could be incorrect about what he was testifying to, but I believe he was stating that it was his understanding that Happy State Bank did not have an involvement in this transaction until these commitment documents started being circulated.

THE COURT: Okay. Based on his answer, I'm going to sustain the objection. You can ask another question if you'd like.

MS. LINDAUER: Okay. Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Marx, did you ever discuss the Happy State Bank

transaction with any persons involved in -- other than, for example, the title company -- did you ever discuss that with Mr. Kane or any of the parties on his side?

A No. I may have discussed it with you, Joyce. I don't have a specific recollection.

Q Okay. So going back on that though, you were relying on what you were being told by 2999TC's counsel, not any specific personal knowledge you'd gained yourself talking with HNGH or its counsel. Is that right?

A The other day we looked at some materials in the bankruptcy court and I think I had seen those --

MR. KANE: Objection. Non-responsive.

THE COURT: Response, Ms. Lindauer.

MS. LINDAUER: Your Honor, I think he can finish his answer. I think he may be referring to the proof of claim that we looked at, but I'd like him to have an opportunity to finish his answer.

THE COURT: I'll sustain the objection. Why don't you ask another question?

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Marx, what documents do you recall seeing in connection with these proceedings that leads you to conclude that you were not provided with any document or any evidence regarding Happy State Bank from HNGH?

A I think I saw the proof of claim before I saw this title report.

Q All right. And to be clear for the record, you never have seen an executed release of the collateral transfer and note and lien held by Happy State Bank. Is that right?

A I believe a draft was tendered at the eleventh hour, but I know that it was not delivered to the title company for an orally closing, which would be customary in a transaction like this.

Q And how critical would that release of a collateral transfer of note and lien to Happy State Bank be in connection with a closing of this transaction?

A Well, all of these items are important. You know, I can't overemphasize that. And it's a little bit like if you don't -- if it's not ready, it's just not ready. If the requirements, if, you know, let's say there are ten, depending on how you count them, 18 here. If 17 -- if 1 is -- if 17 are done and 1 is not, it's not ready. If half of them are done and half are not, it's not ready. So they're all critical. It's not a 50/50 deal or 17 out of 18 works.

That's not how I view things on behalf of my client, and I don't think that's how buyers and lenders generally see these things. I've had lots of closings in the past held up by one last item on Schedule C. And typically, the title company and always the -- well, in my experience. I take that back.

In 99 percent of my experience, these items are not just passed or waived or accepted as, you know, post-closing covenants, particularly if they relate to something as essential as the essence of title such as property. They're all important.

Q All right. The next one, appointment of substitute trustee by instrument dated June 30, 2022, was anything required in order to address that particular item?

A That could have been easily dealt with in the release of lien and the assignment of rents. Typically in a preferred practice, by including them all here, that informs HNG's counsel when they prepare the release of deed of trust to be sure to catch those ancillary instruments. A release of lien signed and delivered to the title company in escrow again did not occur.

Q And so, just to be clear, when you say these ancillary instruments, we're talking about, first of all, the appointment of a substitute trustee. That's the first one. Then there's another appointment of substitute trustee. Do you see that? Dated August 2, 2020?

A Yes.

Q And then there's a notice of foreclosure sale dated August 6, 2020. Do you see that one?

A Yes. And again, all these were not resolved, even though they could have easily been, candidly. They could have easily been resolved. They just weren't.

Q And I think your comment on resolution was that these could have been resolved in the form of a release of lien document. Is that right?
A Yes. Well, the deed of trust in these ancillary ones, I'm of the opinion that the Access situation resolved itself, but the Happy State Bank required a document from them as well.
Q You know, I think I missed that last part. Explain that to me again about Happy State Bank. I think I missed your answer on that.
A All of these Schedule C5 items, could have been resolved with an appropriate instrument signed by HNGH which would have released the deed of trust, the assignment of the deed of trust, the appointment of the substitute trustee, the second appointment of the trustee, and the no support closure. All of that could have been easily resolved by a document signed by HNGH delivered to the title company in time for the target closing, but it wasn't. And the same thing, in my opinion, with the fourth item referenced in Schedule C5, the collateral transfer in favor of Happy State.
Q Okay. All of the documents, the releases that we've discussed, recision and release documents, the release documents in particular, are those documents that are commercially reasonable to be requested as part of a closing like this?
A Yes. Like I said, the title company would require it and

I would require it. And I know at some point ask that the title company just undertake to prepare that so that it would be available at the closing.

Q Do you know if the title company ever prepared the requested releases that we've been discussing?

A I don't know if it was ever requested by HNG counsel, and it wasn't my job to do so, but I asked the title company to prepare a release of lien because that was -- these items were still on Schedule C, and I had not heard that any signed instrument that cleared these items had been delivered to the title company.

Q All right. Item 6, I think we already discussed the UCC financing statement, both one at the county level, and then, of course, there was one at the state level also that would require releases. Is that right?

A Oh, yeah. The only comment there would be simply that when Mr. Kane got Exhibit 33 this would inform what the seller's side, or there I guess that here they're kind of wearing the lender hat, would be required to provide. And my only testimony is that I was monitoring and acting upon documents that just got to the title company time by the targeted date. And this -- we'll see item 6, Schedule C, item 6 actually relates to the fixture filings. Your question really went more to the Secretary of State filings. In any regard, signed documents by HNGH respecting either of the --

either the UCC fixture findings or the UCC state of -- SOS filings. None of that was delivered tot he title company by the target closing date.

Q To be clear, your client who was going to be involved in this transaction, were they going to be comfortable closing on this transaction without these various documents at least having been drafted and delivered to the title company?

A No. My client wasn't comfortable and I wasn't comfortable. I performed myself a search of the UCCs that had been filed in the Delaware Secretary of State's office, and I think there are 11 filings there. Now, granted, those relate to the seller, but I am concerned when I see that, that going forward I'm not going to have any issues on behalf of my client, either in the real property records or in the Secretary of State records.

Q So is it commercially reasonable to expect someone to loan some 40-odd million dollars into this transaction and then after closing have to get copies of all of these releases?

A In my experience, although I have had a circumstance where the title company would move forward with simply a payoff letter, when the parties of a long history of litigation like this and in many other transactions, the title company will require and certainly in this circumstances, I think custom and practice and it would have been my preference to have the releases of liens and these state fixture filings, okay, as

well as the UCCs filed in Delaware all to be at the title company, okay. I'm closing a deal today, guys, with a defeasance transaction and the lender there with their instruction letters as is customary has sent --

MR. KANE: Objection. Relevance. I mean, there's no background on the facts of this and this is hearsay.

THE COURT: Response, Ms. Lindauer.

MS. LINDAUER: Your Honor, I would tend to agree with Mr. Kane. We'll move on.

THE COURT: All right. That objection is sustained.

BY MS. LINDAUER:

Q Mr. Marx, looking at item number 7 which is the lis pendens that was recorded, what's the curative on the recording of the lis pendens?

THE WITNESS: Before we go into that, could I take a comfort break or can we --

MR. KANE: Yeah. And, Your Honor, I object on this grounds. This is duplicative. He actually addressed this exact question on the stand on Friday.

THE COURT: So --

MS. LINDAUER: Your Honor --

THE COURT: -- Mr. Kane, I understand we've heard Number 7 before. I am -- I will give Mr. Marx a comfort break. We'll take a five minute recess. And, Ms. Lindauer, when we come back, if you would try to stick to items that we haven't

already covered unless Mr. Marx has a clarification. So we'll take a five minute recess.

MS. LINDAUER: Thank you, Your Honor.

(Recess taken at 11:28 a.m./Reconvened at 11:36 a.m.)

THE COURT: All right. We're back on the record.

Mr. Marx, are you there? Mr. Marx, are you with us?

THE WITNESS: I am here. One second, please. I am here. Okay. Give me --

THE COURT: So before we broke, there was an objection to the question and your answer about Number 7, which was the lis pendens. I believe you covered this in your testimony last week. Do you have any clarifications or additions to what you testified about last week with respect to the lis pendens and what would be required to address that in connection with closing?

THE WITNESS: Not unless Joyce had a question for me to clarify. I don't -- I think I'm clear, but, you know, I don't --

THE COURT: You cut out. I'm sorry. On our speaker system, you cut out. Did you say you do or do not have any clarifications or additions to your testimony from last week on this point?

THE WITNESS: I'm unsure of what -- if you or she think that I was unclear, I'm here to answer, but I don't recall --

MS. LINDAUER: Your Honor, I just had a point of clarification on this particular point for Mr. Marx that I don't think I covered with him on Friday which I wanted to come back just briefly if I might.

THE COURT: Go ahead.

MS. LINDAUER: Thank you.

BY MS. LINDAUER:

Q Mr. Marx, on item 7, which references a lis pendens recorded November 5, 2021, do you see that?

A Yes.

Q Okay. November 5, 2021, would have been about six -- correct me if I'm wrong -- six or seven days after the Chapter 7 bankruptcy case was filed. Is that your understanding?

A Yes.

Q Okay. And that lis pendens seems to relate to a lawsuit between 2999TC and HNGH Turtle Creek, LLC. Do you see that?

A Yes.

Q The curative reference on that says released at closing for confirmation of the Chapter 11 and can be released. Do you see that note?

A Yes.

Q There's no mention of the (audio interference) of dismissal of a lawsuit. Do you know if the lawsuit, in fact, has been dismissed?

A No.

By this reference, I don't. I think it has not yet been. And I guess my only point of clarification is that in every other item on this list calls for action by HNGH or Happy State Bank.

Q Okay.

A This is the only item -- this is maybe what the clarification is.

This is the only item that although it involves HNGH, it also involves your client, Joyce. Everything else on here, like item 11, for example, is something clearly within the sole control and the sole responsibility of HNGH, okay. That relates to all these items, I think.

Q All right. For this item in particular, do you know if a release or a release of lis pendens was ever drafted to be filed by 2999TC Acquisitions, LLC?

A Yes.

Because when I got the -- this mutual checklist, I'll call it, Schedule C, I saw that was something that HNGH counsel may not be generating, so I asked that the title company prepare that instrument.

Q All right. And do you know if the title company in fact did prepare that instrument?

A Yeah.

Q And do you know if that instrument is actually filed anywhere?

A No.

That would be appropriately handled in my opinion by delivering that instrument as well signed to the title company to be held pursuant to a -- either a joint instruction letter, which is my preferred practice, or a several separate and the closing instruction letters. But they have to be, you know, sequenced, I'll call it, where everybody agrees. And then the title company signs the joint instruction or each of the several instructions so that we all have assurance and clarity that will post simultaneously in the normal course.

Q If you drop down to item 10, and I know we covered this just briefly also, but it says this order was submitted. Can you clarify for me for the record, what does this order was submitted refer to?

A Oh, I think the order there is simply the order for a title commitment and a request for the preparation of a commitment. And they are just pointing out that I'm -- I mentioned earlier -- that the name of the actual lender would need to be inserted before the title policy actually issued.

Q Okay. And whose lender would have their name inserted in this particular document?

A The lender to my client or the lender to the other prospective purchased, but the -- whoever actually lent money to the buyer to close the deal.

Q And was your client going to pay monies from a third party

lender to close this deal?
A Yes.
Q So there would have been a need to insert a lender name ultimately in the title commitment. Is that right?
A Yes.
Q All right. If we look at the next one, 11, we did cover some of this also and I don't want to rehash something we went over, but the requirements of HNGH Turtle Creek, LLC to show that it's in good standing and to provide a number of its corporate covenants (phonetic). Do you see that?
A Yes.
Q Do you know, Mr. Marx, if any of those documents have ever been provided?
A I know that it -- that item was something to be performed by HNGH and I know that no such documents were ever delivered to the title company prior to the closing date.
Q Looking at number -- item number 12, we did not cover this, where it says the company will amend item 2 on Schedule B regarding shortages in area. Can you explain for me the need for that particular provision in this transaction?
A Well, in the normal course in a real estate transaction, the rights and obligations of the parties are set forth in a 15- or maybe 20- or 30- page purchase sale agreement which details this.

Here, the orders are and the contract between the parties,

they attempt to do so, but it's not -- it wasn't addressed. But in the normal course, I, as the buyer, have the right to try to get additional coverage. It's called a survey endorsement. Basically, they amend -- the title company has to amend the title policy that they're issuing to ensure, for example, that there are no encroachments.

So they don't have -- (indiscernible) get a good and valid survey. And then they satisfy themselves, for example, that there is no -- the building isn't straddling the property line, and then they'll give me that endorsement called the survey endorsement.

Here -- oh, and to get that, one would typically -- the title company would typically require that the seller -- HNGH in this situation -- provide what's called a survey affidavit. That protects them from anything happening between the time the survey is prepared and the time that this policy is issued, that they haven't then constructed a new building not shown on the survey that encroaches, okay.

In this context though, when I thought to point out the deficiencies of HNGH, I did not list the fact that the survey endorsement or their failure to provide a survey affidavit because it wasn't, you know, in the -- we didn't have a 30-page contract. So I did not demand that and it's not on my sort of list of HNGH outstanding or deficiencies. It's something that I possibly could have reasonably requested and required, but I

did not.
Q And just to be clear, HNGH took title to this property November 1, 2021, and has had title to the property through today by way of a deed that was recorded on November 1st. Is that your understanding?
A Yes.
And that's why you would, in a typical transaction, you would get the survey endorsement, and if the title company would require, you would get a survey updated from the seller party.
Q Mr. Marx, are you aware of any changes that HNGH may have made to the property during the time that it had held title to the property?
A No.
I'm not aware of any changes, then so the need for a survey endorsement was less in my mind. But what was important to me as a part of the recision of deed and going back I guess on the commitment to item 2 is that we got a gap affidavit from HNGH to cover this seven or eight month period, whatever it is.
Q Okay. So let me understand that last sentence that you told. You said that as part of the closing you would expect to see what you mentioned as a gap affidavit. Is that right?
A Yeah. They could be called different thing.
Q Okay.
A If you recall, the commitment is dated effective May 12th.

Then if the closing is scheduled, let's say, for the end of the month, well, there's always going to be a gap. And so the title company, in my experience, always requires a gap affidavit. In this case, it's likely to be titled a bills paid and parties in possession affidavit. It basically provides for the seller, in this case whoever is in fee. That would be HNGH, affirms that they give you the commitment that they didn't create any additional exceptions that aren't reflected on there. And it's designed to catch mechanic's liens or any sort of encumbrances or recordation that may have occurred during the gap. That's for the title company's protection and for my protection, candidly.

Q All right. So just to be clear, that was one of the documents that you were looking to see, the bills paid affidavit or the gap affidavit. Is that right?

A Yeah. That's at some point none of these documents coming are not -- when they remained one or more of these items and the target date was imminent, I did not want -- I wanted it to be of record that these items are outstanding and we still haven't got them.

Q Okay. Also, let's look at on the next page, Paragraph 18, which is just a note which talks about the property had changed hands within the 24-month period prior to the effective date. And that references a special warranty deed dated October 29, 2021. Do you see that?

A Yes.
Q Okay. And I think is that the document we've been calling the pocket deed?
A Yes. It could be called the pocket deed. Some refer to that as a deed in lieu, but I don't think that's an accurate characterization, so I try to avoid that vernacular. But it's just the deed, the pocket deed, it's what put HNGH at least of record into title. That's what --
Q And let me ask you. Why is there a reference in the commitment, number 18, to that particular document? Is there a reason that would be included there?
A Well, it was just for notice, I think. I mean, it obviously size (phonetic) to the items that we talked about in A-3, trying to explain the unusual nature of this transaction.
Q All right. Is there anything else, Mr. Marx, that we've gone through pretty carefully the Schedule C? Is there anything else in that Schedule C or in the title commitment that you believe we should take a look at or you would call the Court's attention to?
A I think it's unfortunate that we don't have the underlying documents referenced here for the record. Other than that, I'll note that the B items that appear generally seemed acceptable to me.
Q Okay.
A But that the Schedule C items had a number of

deficiencies, any one of which was required for the closing to occur. I think that we've addressed most of the items that I was concerned about on Schedule C. And I think we addressed whose responsibility, in my opinion, would be required for each of the items, which is what I wanted to try to clarify today that we didn't talk about on Friday is that I think 33 informs that HNG counsel all had this checklist and knew or should have known what was required of them.

Q Mr. Marx, and again, I'll take you back to the original email dated May 24th, which was about a week before the scheduled closing. Is that your understanding?

A Yes. May 24th was the date of that Exhibit 33.

Q The week before the closing, would that be enough time in the normal business world to have prepared these particular documents that you've mentioned, the deeds, the liens, the releases, those documents?

A Yes.

The only thing that -- all this was within the ability in the normal course of counsel to HNGH. The one that may have taken longer may relate to this Happy State Bank instrument of record, but even that, a week should be -- should have been time sufficient to get all these documents prepared, to a satisfactory form, most of them a recordable form, all of them executed and delivered to the title company with appropriate closing instructions.

The instructions are not here, but in my experience, are a integral part. That way everybody knows that the items are taken care of. Everybody has confidence in the escrow agent. And the transaction goes in a commercially reasonable manner. Certainly a week is ample time.

Q Okay. Let me ask you. You mentioned closing instructions. Are those typically in the form of a letter to the title company instructing them with regard to the documents to be recorded as part of the closing?

A Yeah.

And it can be done in a variety of ways. I prefer, and I think it's a better practice, is to have prepared joint closing instructions.

Q Okay.

A That's what this office typically does. They're (audio interference) nature. And they're -- come from, you know, all the counsel involved for any parties at interest or it can be done with several of them, but then each -- you know, the title company at a minimum.

And the better practice is for me, for example, to be able to review the instruction letters from other parties at interest so that we're all coordinated and there won't be a conflict in terms of something that's not in recordable form, something's not signed. Maybe there's not an authority document to support some of the signatures. Maybe there's an

outstanding good standing certificate. There might be an inconsistency in the sequencing.

And that gives us all an opportunity to kind of vet so that there's not a conflict. And then at the end of the day, it's my practice to request and indeed require that the title company sign that instruction letter binding itself to do just what, you know, we -- I or we are directing to do.

Q All right. And just to be clear, Mr. Marx, you already told us that of the laundry list of items on Schedule C that should have been provided to the title company, were any of those items actually provided to the title company by HNGH?

A I think some of them were or belatedly drafts of some of them were.

MR. KANE: Objection. This calls for hearsay and speculation. He doesn't represent the title company. He would have had to receive some correspondence from the title company which is how (indiscernible) for the truth of the matter.

THE COURT: So there's --

MS. LINDAUER: Your Honor, let me --

THE COURT: Pause for just a minute, please.

MS. LINDAUER: Thank you, Your Honor.

(Court and Clerk confer briefly)

THE COURT: Okay. Mr. Kane, could you -- we had a little bit of a garbled transmission. Could you restate your objection?

MR. KANE: Yes.

The objection is that the response and the question call for hearsay, as it is inherently -- you're asking what was received by the title company, means the only way that Mr. Marx could know that correspondence with the title company just being offered for the truth of the matter asserted. So that's hearsay, Your Honor. Alternatively, it just calls for speculation.

MS. LINDAUER: Your Honor, I think Mr. Marx can testify his understanding being involved in this transaction what of these documents were and were not provided to the title company.

THE COURT: Mr. Marx, before I either sustain or overrule the objection, were you copied on all of the correspondence going back and forth between the title company and Mr. Kane about the deliverables that were requested of Mr. Kane's client and whatever the responses were?

The email that I'm looking at, which is Exhibit Number 33, is an email from Julie Lissey (phonetic) to Mr. Kane and it copies you, Ms. Lindauer, and some other folks.

Were you copied on all of these emails going back and forth?

THE WITNESS: Your Honor, the information I acted on was some of those emails -- if you're asking me if I know that I saw every one, I can't say that. I am -- my client is not

the debtor, and this would (audio interference). I did not --

THE COURT: All right. Mr. Marx, we're going to have to pause. We're getting a little bit of garbled transmission again. Let's pause for just a minute.

(Pause)

THE COURT: All right. Mr. Marx, please -- I apologize for interrupting, but we're getting intermittent delays in the transmission from various people on the Webex, but I think I've heard most of your answer. Go ahead and finish your answer, if you haven't already.

THE WITNESS: I know -- all right.

THE COURT: So let me ask -- let me break it down. You were copied on this mail. I think I understood from your prior answer that you were copied on some emails but not all of the emails going back and forth between the parties. Is that correct?

THE WITNESS: That's what I believe. I don't know what I didn't see, so I assume that there were a bunch of things on. The ones that were in title performance, I think came to me because it was -- you know, I was going to rely on that information with how I involved myself in in what I dealt -- you know, how I dealt with my client.

THE COURT: So you would have seen if there were not required documents that you thought would have been delivered, you would have known about it based on either the emails or by

some other method of finding out. Is that correct?

THE WITNESS: The information I acted upon, Your Honor, were either emails that I saw or my conversations with the -- with Julie. But it was all stuff that I dealt with and acted upon because that was part of my job responsibility.

THE COURT: Okay. So I'm going to sustain the objection.

But Ms. Lindauer, feel free to ask any follow-up questions that you think are necessary to get the answer you're looking for.

MS. LINDAUER: Okay. Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Marx, I'm going to have as a follow-up, I'm going to ask if can take a look at what has been admitted as Exhibit D-3. I'd ask if you could pull that up.

THE COURT: Pause for just a minute, please.

MS. LINDAUER: Okay.

UNIDENTIFIED SPEAKER: One minute or two minute technical break.

THE COURT: Yeah, we're going to take a quick two-minute recess. I'm going to stay out here on the bench, but we're going to take a quick recess to see if we can figure out what the problem is with the equipment.

So we're in recess. I'm going to stay here. I'll let you know when we're back on.

(Recess at 12:04 p.m./Reconvened at 12:07 p.m.)

THE COURT: All right, we're back on the record. We're going to give it a shot. Ms. Lindauer, why don't you follow up with your next question for Mr. Marx.

MS. LINDAUER: Thank you, Your Honor. I will.

BY MS. LINDAUER:

Q Mr. Marx, I want to turn to a slightly different document, if we could.

MS. LINDAUER: If you could -- Sydney, if you could put up Exhibit D-3, which has been admitted.

BY MS. LINDAUER:

Q Mr. Marx, I'll represent to you, this is a letter from my office to John Kane regarding closing documents related to the HNGH and 299 Turtle Creek Boulevard transaction. Have you seen this letter before?

A Yes.

Q And, Mr. Marx, were you -- did you assist my office in preparing the letter dated May 30th, 2022?

A Yes.

Q All right. And have you seen the numbers in this letter prior to today?

A Uh, yes.

Q And, Mr. Marx, does this letter substantially incorporate many of the items that we saw on the Schedule C to the title commitment?

A Yes.
Q All right. And the letter starts off with my asking, "John, please confirm the following matters to ensure that title of the property is clear and particularly not encumbered." Do you see that note?
A Uh, yes.
Q The first item that's shown is rescission of D. Do you see that?
A Yeah, I guess I do.
Q All right. And we'll get -- go over -- we started going over that on Friday and I'm going to come back to that in just a minute. But that was the first item listed in this letter. Is that right?
A Uh, yes.
Q The second item is Standard Bills Paid and Parties in Possession Affidavit. Do you see that?
A Yes.
Q That's 1.2 on that list. And is that what you called, Mr. Marx, the -- I think it's a gap affidavit, you also called it?
A Which reference was that?
Q I'm sorry. The Item 1.2, the Bills Paid Affidavit.
A I have up the same thing there, but it's easier to read here.
Q Okay.
A 1.2. Yeah, I'm referring to there that documents

sometimes has different titles. It can be an Owner's Certificate, Bills Paid, and Parties in Possession Affidavit is how I customarily see it. And I apologize, but the slang, I call it, is the gap affidavit. That's my vernacular.

Q Okay. All right, fair enough. Item 2.1 is the Release of the Deed of Trust. Is that right?

A Uh, yes.

Q And Item 2.2 is the Release of Any Prior Collateral Assignment to Access?

A Uh, yes. That's the one item that I think with Mr. Kane's assistance I know was resolved based upon the information given to me and acted upon by me.

Q Okay. Item 2.3, Release of Prior Collateral Assignment to Happy State Bank?

A Yes. My information is that no such document was actually delivered into title with an appropriate close instruction at the time of the target closing.

Q All right. Number 2.4, Release of Assignment of Leases and Rents?

A The same. That got on the list because I wanted to be of record that this too was outstanding. At the time that this letter was drafted, no such instrument was at the title company. At this time, they were in escrow ready for this closing.

Q Okay. Mr. Marx, we'll go through the rest of these

quickly, but at the end of the day, this list basically tracks the Schedule C to the title commitment that we looked at, right?

MR. KANE: Objection, leading.

MS. LINDAUER: Let me ask it a different way.

Mr. Marx, when you assisted --

THE COURT: That objection's sustained.

MS. LINDAUER: Okay.

Mr. Marx, when you assisted us in preparing this letter, what documents were you looking at in order to assist with the preparation of this letter?

THE WITNESS: I'm not sure how I organized it or sequenced it, but essentially it was extra items or in some circumstances questions or concerns that I, and it looks like some others, generated. In my case, after review of the commitment and each of the underlying --

MR. KANE: Hold on, Your Honor. I object to this line. I think I just heard Mr. Marx say that he didn't create this document and he said maybe others may have. So this is speculation and this all ties to hearsay.

THE COURT: Response, Ms. Lindauer?

MS. LINDAUER: Your Honor, I think what he was -- I'm sorry. Go ahead, Your Honor.

THE COURT: What's your response, Ms. Lindauer?

MS. LINDAUER: Your Honor, I think he said he

assisted our office in preparing this particular letter that was sent over to Mr. Kane on the 30th, and that what I was trying to get to was just, and I think he was addressing it, was that the items on here came from the Schedule C commitment at least in part. There may be additional items on here, but at least in part they were coming from the Schedule C. That's all I was trying to get him to say.

THE COURT: All right.

I believe, Mr. Marx, I believe I heard you say that you helped prepare this letter, correct? Is that correct?

THE WITNESS: Yes, Your Honor.

THE COURT: And in preparing the letter, did you look at the Schedule C that we've gone over at length in preparing this letter?

THE WITNESS: Yes.

And what I was trying to say, and --

THE COURT: No, no, no. You've answered my question for now, so I'll overrule the objection.

Ms. Lindauer, go ahead and ask your next question.

BY MS. LINDAUER:

Q Oh. Mr. Marx, there is an item on here, Item 2.5, Release of Prepaid Interest Agreement to Madison and released by HNGH if it was assigned. Can you tell us what that particular item is referring to?

A No, I do not know. I did not -- my contribution is

related to the title requirements of Schedule C, and I don't remember making that a question or a comment so I can't answer that question.

Q Okay. So that's not something that you contributed to this specific letter that you recall?

A Correct.

Q All right. Then looking at items under the UCC filing categories, all of those, 3.1 through 3.5, and again these are a little bit more colloquial versions of, but do these more or less track what was in the Schedule C, Mr. Marx?

A Most of them do. 3.3 was a comment of mine. It didn't really appear on Schedule C, but the manner in which this Participation Agreement was historically of record did cause me some concerns.

Q Okay. Can you clarify for us the issue regarding the Participation Agreement?

A Again, it wasn't a title objection, per se. It was just that when I reviewed the Participation Agreement -- and what I'm referring to is a document dated January 24th of 2020. It's where HNGH bought in, I'll call it, to the position of Madison.

And what struck me as odd and the reason I wanted to try to get some clarification is, there was a section there that indicated that even though they're a minority interest that in the event of a problem or an issue with the loan that

HNGH would control basically the disposition of the asset. And that just struck me as unusual, so maybe it was more of a discussion point. I never did get resolution of that issue.

MS. LINDAUER: Okay. What I'd like to do is just spend a minute looking at the Participation Agreement.

That is under Exhibit D-17, Sydney, page 89 of 148 in a document that's already been admitted.

THE COURT: Ms. Lindauer, before you go to D-17, just so I don't lose my own track of thought on this issue, I'm going to ask the witness just to go back quickly to look at Exhibit Number 33, which is the May 24th email from Ms. Lissey to Mr. Kane.

Are you with me, Mr. Marx?

THE WITNESS: Just one second, Your Honor. Are you referring to Exhibit 33?

THE COURT: Correct.

THE WITNESS: The email --

MS. LINDAUER: I think it's up on the screen too, Mr. Marx.

THE WITNESS: Oh, okay. I have it.

THE COURT: So could you -- after reading the email, it looks like Ms. Lissey is asking Mr. Kane for help with respect to two items that are on Schedule C, correct? Those that are dealing with Access Bank and Happy State Bank?

THE WITNESS: I think that's a fair characterization,

Your Honor.

THE COURT: So you don't -- do you read this email as requesting assistance with everything that's on Schedule C? Because the way I read it, it was asking for help with two items. Is that your understanding?

THE WITNESS: No, Your Honor. I think this is -- by sending the commitment with Schedule C, you have to realize, oftentimes there's nothing on Schedule C. It's a blank checklist. Typically, there's going to be that gap affidavit and authority documents. Oftentimes that is all, okay.

By tendering this Schedule C to him with the hyperlinks, it's customary that if there's something on Schedule C, and she's telling him there is -- look at it and fix it. That's how I would read the letter. If I was the recipient, that's how I would read the letter.

And when I got Schedule C, I looked at it and the underlying that evidently are not in evidence to see what is required of all the parties. And specifically there, I want to be sure that there's nothing required of me and what I should be on the lookout for, Your Honor.

THE COURT: So you interpreted this email as a request by Ms. Lissey for Mr. Kane's client to address everything on Schedule C that was within their purview, not just the issues with Access Bank and Happy State Bank. Is this correct? That's your understanding?

THE WITNESS: Sure. Certainly, Your Honor.

THE COURT: Okay.

Ms. Lindauer, go ahead and go to D-17.

MS. LINDAUER: Thank you, Your Honor.

There we go. There's the Participation Agreement, I believe, that you were mentioning, Mr. Marx. Is that right?

THE WITNESS: Yes.

BY MS. LINDAUER:

Q Okay. And what provision in the Participation Agreement caused you concern?

A Well, Participation Agreement is between -- there's where I picked up the term --

THE COURT: Ms. Lindauer, I apologize.

MS. LINDAUER: Sure.

THE COURT: I pulled up what I thought was 17. You're looking at Mr. Kane's exhibits. Is that right?

MS. LINDAUER: I'm sorry, Your Honor. These are the Debtor's exhibits. D-17. We framed all the Debtor's exhibits with the initial letter D, so this would be a Debtor exhibit. It's D-17, which is the Proof of Claim.

THE COURT: Proof of Claim, yeah.

MS. LINDAUER: HNGH.

THE COURT: I got it. I'm sorry. I'm with you. Go ahead.

MS. LINDAUER: Okay. No, no. Not a problem. And

we're on Page 89 of 148, which is the Participation Agreement.

THE COURT: Bear with me one minute.

MS. LINDAUER: Sure.

THE COURT: All right. I'm there. Go ahead.

MS. LINDAUER: All right, then.

All right. Mr. Marx, you mentioned this document in your testimony and I think you also mentioned that this is where you picked up the name Madison. Is that right?

THE WITNESS: Yes, because on the top of the Page 1, it refers to the 2999 Turtle Creek LLC entity as Madison and that was the original lender.

BY MS. LINDAUER:

Q Okay. And this says the HNGH Turtle Creek entity, LLC, a Delaware Limited Liability Company. Do you see that?

A I do.

Q Okay. Is there also an HNGH Turtle Creek LLC referred to as a Texas Limited Liability Company?

A Uh, yes. We talked about that a little bit last week. That was just one more question posited or posed upon my review of this document.

Q Okay. What was it in the Participation Agreement that caused you some concern when you were looking through this document as it relates to the transaction between the Debtor and HNGH?

A Well, in the third recital --

Q Okay.
A -- where it says, "Whereas, Madison desires to sell," "that GHE desires to purchase," a "junior subordinate participation interest?"
Q Correct.
A Okay. And I think that they -- oh, I think it was a seven million-dollar investment. There it is in Paragraph 2 on Page 3, that's a seven million-dollar purchase, a buy-in.
MS. LINDAUER: Sydney, go ahead and go to Page 3, please --
THE WITNESS: Yeah.
MS. LINDAUER: -- of this document.
THE WITNESS: Yeah, it's Page 3 --
MS. LINDAUER: I'm sorry. No, Sydney, go back to the Participation Agreement. You were in the right document, just go to the third page. Yeah. Oh. Yeah, there you go. There you go. All right. I'm sorry.
BY MS. LINDAUER:
Q And what are you calling the Court's attention to, Mr. Marx?
A Just a little bit down.
Q Okay.
A Right after the definitions.
Q Keep going.
A There. And that just demonstrates that the HNGH piece,

they bought $7 million of an approximate 32.5 loan, and it's characterized as a junior and subordinate participation interest. And yet when you get to the guts of the deal on Page 7 --

MS. LINDAUER: Sydney, go to Page 7.

BY MS. LINDAUER:

Q And is there a particular section?

A Yeah, it's just up a bit. It's Section 6B, kind of above where you're pointing to.

Q Okay.

A This Paragraph B, 6B, requires certain unanimous decisions.

So essentially, the junior subordinate interest, here, has got, you know, all or veto power, I'll call it, over specifically romanette -- (ii) that essentially Madison, who at that point in time still had the bulk of the interest, could not do anything other than, you know -- without unanimous decision, and specifically in paren or (ii), to enter into any type of workout or settlement with the borrower under any circumstances, okay.

And that just struck me as odd because I've not seen that before for a junior subordinate participation (indiscernible). It's sort of the tail wagging the dog, candidly, and it posited a question in my mind.

BY MS. LINDAUER:

Q I'm sorry. And what question did it cause in your mind with regard to that particular provision?

A Um. I guess I wanted to be, I mean at some point in time, I was thinking that we should get the confirmation from somebody because that just seems highly unusual. Now I did not later insist on anything. I just noted it and it found its way into the letter. As we sit here, I don't have an explanation.

MS. LINDAUER: Okay. If we could take a look at -- it's marked as Exhibit 4. It's under the same document.

Sydney, if you look at Page 137 of 148. There you go.

BY MS. LINDAUER:

Q Mr. Marx, are you familiar with the First Amendment to Participation Agreement?

A I have looked at it. I do not have a copy readily available here.

Q Okay, there's a -- it's up on your screen, if you can follow that.

A I'll try.

Q Okay. And did you generally know what was happening with regard to the First Amendment to Participation Agreement?

A I'm having trouble making out the (audio interference). I think this is where they -- I'm not sure. I think this is where they consolidated their interest.

Q All right. This -- I'm sorry. Go ahead. I'm sorry. I

didn't mean to cut you off.

A It would be easier if I could -- I don't know if I can scroll through with what you have to refresh my recollection. I don't -- I can't really read it very well, but I will.

Q Well, I think I can narrow down the questions on it for you. On the First Amendment to -- first of all, is this a document that's filed of record in Dallas County?

A No, I don't think it was. I think this came to me otherwise. It was not referenced in the -- as I mentioned before, it wasn't referenced in the title work, but I thought it pertained enough where it caused a concern for me.

Q Okay. Do you know, Mr. Marx, if these documents, the Participation and then the First Amendment to Participation, would have required consent of the various participants to the granting of collateral assignments? Did you ever look at that particular issue?

A I have to look at it again.

Typically, these instruments will address that. Essentially, you have two. The note is now held not just by Madison but it's held by Madison and this group, HNGH, who bought in. Okay. And then typically, these instruments speak to and either of them further hypothecate their interest in the note to one of these collateral lenders such as Happy State Bank.

And as we sit here today, I don't recall what this one

says, but if you just page down a bit further --

Q And we're slowing it down so you have an opportunity to look at it, Mr. Marx.

A Yeah. Keep going.

Continue.

MR. KANE: Your Honor, I'm going to question the relevance of this testimony and the need for continuing testimony on this item. Mr. Marx has testified that it was an issue that gave him a cause for pause. The issue showed up on that May 30 letter from Joyce Lindauer to me, and then he said, but you didn't end up requiring its delivery regarding a written confirmation of the termination of Participation Agreement.

So that's the role that the testimony, we don't need to keep going through this document to find out why he had a concern about something that he later didn't require delivery of.

THE COURT: Response?

MS. LINDAUER: Your Honor, if I might.

Mr. Marx -- the termination of the Participation Agreement did appear in my letter under 3.3 as a document that you were requesting. And I guess just to clarify it, maybe I missed your testimony on this, but did you say that you no longer were requiring that or that you felt that it was still an important document, the termination?

THE COURT: So, Ms. Lindauer, before you ask your question, just respond to the --

MS. LINDAUER: Sure.

THE COURT: -- relevance objection so I can either sustain or overrule it.

MS. LINDAUER: Okay. Your Honor, I do think it's relevant under the --

THE COURT: Or do you want to withdraw the question and ask another question?

MS. LINDAUER: That would make it simpler, Your Honor. I think, yeah, it would move things along a little bit.

THE COURT: All right. Next question.

MS. LINDAUER: Sure.

Mr. Marx, just to be clear, the Participation and Amendment to Participation, those two documents that we just looked at, those were late and I now I'm going back to the letter.

Sydney, this is D-3 again, and Item Number 3.3, which is the termination of the Loan Participation Agreement.

When you make that mention or that's mentioned in the letter, those are the documents that we just looked at, correct?

THE WITNESS: Uh, yes.

BY MS. LINDAUER:

Q And I guess I didn't pick up on it, maybe Mr. Kane did,

but was that something that you were still looking for as part of the closing between HNGH and the Debtor would be a termination of the Participation Agreement?

A Well, that would have been -- the concern here is that who honed and holds the note. That's really the focus of my inquiry as it relates to, I think, in my earlier testimony, I mentioned that it's customary that the title company gets authority documents from the HNGH and the situation.

In addition to just confirming the signature there, I was looking for comfort or assurance that when we get a release from HNGH of the Deed of Trust that it truly is at that moment in time the sole owner and holder of the note because that's the party that has the authority to release the liens and the other things that we saw there.

In my letter, what worked into a requirements list, I'll say it, was a signature from HSB. I got satisfied later that the original lender Madison was no longer involved. I would have liked to have seen more, but as long as I could get assurances that the owner and holder of the note was indeed HNGH, that's what I was looking for.

And candidly, I haven't seen it yet. I don't know who the original, I mean I don't know where the original note is. I don't know who's presently the holder of that because in the collateral transfer between HNGH and its lender, the collateral transfer, there is provision it indicates there that Happy

State Bank is the holder.

And so -- I mean it's an appropriate comment on the letter, but it's not so much the Participation Agreement that I'm worried about with Madison, it's who holds the note. And as we sit here today, I don't know.

Q Okay, so let's drop down. That is mentioned, actually, in 4.1, "original note marked paid in full delivered to title company, make sure original is provided."

Do you see that?

A Yes.

Q Okay. All right. And I think you just told us that as of -- I think as of today, you're not clear as to where the actual original note is. Is that right?

A Yes.

And that was a bit covered on Friday. But the point I wanted to clarify is that in the list of items to be provided, okay, it is true that sometimes the lender, the people sitting in HNG's [sic] shoes, will provide the note after the fact and/or it's paid in full, okay.

But in my practice, particularly with an adversarial type closing like this, the better practice is to see that that note is actually delivered to the title company and preferably instructed by closing instruction letters that will authorize the title company to mark as paid in full and to return it, deliver it to the borrower or at least a commitment to do so.

In this case, because I didn't want to have any issues going forward with my client and because of the question created in my mind about where that note is, because as we talked earlier, I saw in the proof of claim about a year after the fact that HNGH said that they were the owner and holder of the note and I know by in looking at the collateral transfer that that document in favor of HSB, in favor of Happy State, that that document contemplated that it would be in the hands of Happy State.

MR. KANE: Your Honor, I'd like to object again to this testimony is getting duplicative. We've talked about this multiple times today and Mr. Marx testified about this on Friday.

MS. LINDAUER: We did, Your Honor, and I'll move on on that point.

THE COURT: All right. That objection is sustained.

MS. LINDAUER: Okay. On 4.1 on the note, if you could, Sydney, could you pull up Exhibit D-17 again? This is the Debtor's exhibits again. And in particular, Page 9 of 148.

BY MS. LINDAUER:

Q Mr. Marx, I've put up on the screen for you a document called Secured Promissory Note. Do you see that document?

A Yes.

Q Okay. And do you understand this to be the secured promissory note that when we talk about in the letter "the

note" that in fact this would be the note?

A Well, the original that would be.

Q Okay, fair enough. This would be before you had a true and correct copy?

A I cannot say to that. I acted upon that that was what --

Q Well, assuming that all the pages are here and that this is being proposed, I think, as part of the claim as a true and correct copy, do you have any reason to believe that this is not a copy of the promissory note?

A No. I have no reason to believe that it's not a true and correct copy.

Q Let me have you look, if we could, at Page 23 of 148. All right. And do you see that this note is signed by Timothy Lynch Barton on behalf of an entity called MO 299TC LLC? Do you see that?

A I do.

Q Okay. And do you have some understanding today, Mr. Marx, the relationship between a company called MO 299TC LLC and the Debtor 2999TC Acquisitions LLC?

A Yes. I went to the Delaware Secretary of State site and saw that the Debtor when it was organized in Delaware was titled MO 299TC LLC and that subsequently in Delaware it changed its name to 2999TC Acquisitions LLC.

MS. LINDAUER: Okay. If you look at the next page of this document that would be Page 26 of 148, do you see that as

an additional signature that accompanies an addendum that's attached to the note?

You might run it back up a little bit, Sydney, so he can see the prior pages on that. There you go.

BY MS. LINDAUER:

Q So there's an addendum. Do you see that?

A Oh, okay.

BY MS. LINDAUER:

Q And in particular, it says "Texas." Do you see that?

A Um, yes.

Q Okay. All right.

And then, Sydney, if you can scroll down to Page 27 of 148. All right.

BY MS. LINDAUER:

Q And that's the start of Exhibit 2.

Do you see that, Mr. Marx?

A I do.

Q Okay. So the document that we just looked at, starting on Page 9 and going through Page 26 of 148, purports to be a copy of the secured promissory note with two signatures by Mr. Barton. Do you see that?

A Uh, yes.

Q Now, Mr. Marx, I'm going to ask you --

MS. LINDAUER: Sydney, if you would, pull up same document, if you would pull up -- okay. If you'll pull up for

me Page 141 of 148. And this is marked as Exhibit 5. And for the record, the promissory note itself was marked as Exhibit 1 as remarks to this document. We saw that, right?

THE WITNESS: Okay.

MS. LINDAUER: Okay. All right, so let's look at Exhibit 5. Can we go to the next page, Sydney?

MS. LINDAUER:

Q And what does this document purport to be?

A Oh. That's the allonge. It's the endorsement.

Q Okay. And is this a freestanding document?

A I would say not. Typically, they're attached to the note but not in --

Q Well, Mr. Marx, you saw the note was Exhibit 1 and this is Exhibit 5. Is this allonge attached to the note as presented by the secured lender?

A Apparently not. It might be in their -- it's part of one and the same. It's the --

MR. KANE: Objection, relevance.

BY MS. LINDAUER:

Q Mr. Marx, again, looking at an allonge --

THE COURT: Ms. Lindauer, what's your response to the relevance objection?

MS. LINDAUER: Your Honor, I think it is relevant because it goes to the issue of the fact that we have asked and it was in my letter and it's been asked repeatedly for

information regarding the place or who has the original note. And I think the fact of the use of an allonge to a note does support the question about where the original note is, and particularly when it shows up as Exhibit 5 and not attached to the promissory note itself.

MR. KANE: Mr. Marx can't testify as to the location of the note.

MS. LINDAUER: No, but he can --

MR. KANE: But is this relevant for his --

MS. LINDAUER: -- testify to the fact that this is an allonge and that it's presented as part of the crucial claim not attached to the note.

MR. KANE: Again, what is the relevance of that to this proceeding?

MS. LINDAUER: Because the original of the note is a key document as part of the closing for this transaction and we'll get to it further in a minute when we look at the orders. But I think the fact that this was done with an allonge lays his questions about where the original note is.

MR. KANE: Okay. So Mr. Marx has a question about where the original note is. I think we're happy to stipulate to that. If he wants to testify, "I have a question about where the original note is," fine. But he can't testify where the original note is, so let's get the relevant part of his testimony and let's move on.

MS. LINDAUER: Okay.

Well, Your Honor --

THE COURT: So Ms. Lindauer, I'm going to sustain the objection unless you ask another question that appears to be relevant, because you haven't persuaded me yet that this witness knows anything --

MS. LINDAUER: Okay.

THE COURT: -- about this document that might be relevant.

MS. LINDAUER: Okay.

And, Mr. Marx, my only point to you is in commercial transactions that you walk on, how can you endorse a promissory note? What are the types of endorsements we see?

MR. KANE: Objection, relevance.

MS. LINDAUER: Your Honor, I think it is relevant. I think he can attest of the types of endorsements that you see.

THE COURT: I'm going to ask a couple questions of Mr. Marx.

When you were preparing and assisting Ms. Lindauer in preparing the letter with the deliverables from HNGH, were you concerned at all about the document that we're looking at right now which is called an allonge?

THE WITNESS: Well, I was concerned as to where the note is and, you know, because they wanted to just stipulate. If Mr. Kane would tell us where the note is that would placate

that concern.

THE COURT: But my specific question to you so that we can be done with this document is, have you seen this allonge before today?

THE WITNESS: You know, I looked at a bunch of documents, Your Honor. I don't know specifically if I've seen this before. I have seen the Participation Agreement and the note and, you know, the report as it relates to the whole success of assignments of the holder's rights either directly or by collateral assignment that has prompted the question that I still don't have an answer to.

THE COURT: Well, I understand. But do you recall seeing this allonge prior to your testimony here today?

THE WITNESS: Your Honor, I don't have a recollection whether I did or whether I didn't. I know I reviewed the note when I reviewed the other documents we've talked about today. I don't have a specific recollection of having looked at this, because when I --

THE COURT: I think that answers my question. I'm going to sustain the objection.

BY MS. LINDAUER:

Q Okay. Mr. Marx, the allonge is dated what date?

A 12/7/20.

Q And if we flip back to Page 137 of 148, the first Participation, and I think you testified that your

understanding of this document was that this was allowed HNGH Turtle Creek to acquire 100 percent of the interest in the underlying note. Is that correct?

A If you're referring to the allonge, that would appear to be correct.

Q Correct. So my question is, this is dated February 4th, 2020 and the allonge is some, almost nine, ten months later, December 7th of 2020. Do you see that?

A Uh, yes.

Q Wouldn't it be customary that when you obtain a hundred percent interest in a document that you receive that document right away, as an allonge would be dated in or about the same time as the Participation Agreement?

MR. KANE: Objection, relevance.

THE COURT: So I'm going to sustain the objection, Ms. Lindauer. If you want to make a point about this in your closing argument that's fine. But the witness has testified that he does not recall ever seeing the allonge prior to today, and I don't believe he's testified this was something that he either did or didn't consider when putting together the list of deliverables for the lender.

So let's ask him about something other than the allonge, and if you want to make a point in closing argument, you may.

MS. LINDAUER: Thank you, Your Honor.

Ms. (indiscernible), let's go back to Page 204 of Exhibit -- pardon me. Going back to Exhibit D-3.

THE COURT: I'm sorry, Ms. Lindauer. What exhibit are we on?

MS. LINDAUER: We're back to Debtor's Exhibit D-3, which was the letter dated May 30th.

THE COURT: All right.

BY MS. LINDAUER:

Q All right. And under Authority of Lender Entities, Mr. Marx, do you see that section in the letter dealing with Authority of Lender Entities?

A I do.

Q Okay. And if we look at 5.2 that's a little bit different than what we saw on the Schedule C. Did you include the 5.2 that was included in this letter?

A Yes. And that was --

Q And why was that ratification of (indiscernible) and consent being requested as part of the closing documents?

A Because when I reviewed the collateral assignment in favor of Happy State Bank, it provides that HNGH had to obtain Happy State Bank's consent. And in other documents I reviewed, it appeared that HNGH in their proof of claim indicated they alone have that authority.

And so on this (indiscernible) you're asking, I'm looking for confirmation that despite the apparent contractual

provision to the contrary in the collateral transfer in favor of Happy State that, indeed, HNGH have the authority when it entered into those contracts that form the basis of this transaction I'm working on, I'm looking for comfort that HSB's position has been satisfied.

Q All right. Item 5.3, which are documents related to Access, why was there a request being made for these documents?

A This relates to what we discussed in that Access too was on an earlier commitment and their position was outstanding, but that was the one item that (indiscernible) title company was able to resolve. I think on this list it's the only item that was resolved.

Q The inclusion of Item 5.4 dealing with Happy State Bank, what was the reason for including this item in this letter?

A Well, unlike the Access position which had been cleared previously when they found that historic document, Access is not signing any documents at this closing. And in light of the question presented that we just discussed, I included on the list -- I'll be earnest. This was not initially, or this item is not on the agreement as a Schedule C item.

This is me expressing my concern that because I've read the collateral transfer and I wanted assurances that I'm not going to have any problem going forward with that Happy State position. So I've asked for something from Happy State Bank elsewhere in the document which is that release that to my

knowledge has not yet gotten to the title company. I was just looking here in 5.4 for some authority for that signature in light of my review of that collateral transfer document.

Q Okay. The next one, 5.5, everything executed by HNGH should be executed by HN Green Hollow as the sole member, or consented to by the sole member and not just executed by Vipin. What was the requirement that you saw there?

A This simply relates to the title company's request requirement on Schedule C. One second.

It's Schedule C, Page 8, Item 11. This is where the company, the title company, requires evidence of authority for HNGH. And so maybe this is a little duplicative, here, at 5.5 with the other comment about that. In other words, 5.5 is somewhat duplicative of 5.1. I listed it 5.4 separate -- 5.5 separately, because I just wanted to point out that I've seen various signatures.

We talked about this a little bit the other day, I've seen various different signatures for HNGH and this is just a point of emphasis of how important it is that we get appropriate 5.1 because I've seen various signatories at various times (indiscernible). That's all.

Q Okay. The next item, 5.6, deals with the guarantees at HNGH. Do you see that?

A Yes. I do.

Q Okay. Did you ever see, Mr. Marx, in the documents

provided, an assignment of the actual guarantees from Madison to HNGH?

A No, I haven't. Sometimes that's reflected in a single document. Sometimes that's reflected in a separate document.

Q Okay. If we take a look at -- and again, this is looking at Exhibit D-17, Pages 144 and 145, this is a document entitled, "Assignment of Deed of Trust and Assignment of Leases and Rents." This is the assignment from 299 Turtle Creek to HNGH Turtle Creek. Do you see that?

A Uh, yes.

Q Okay. Do you see any mention in this assignment of an assignment of the guarantees?

A No, I don't recall seeing that language here.

Q Do you recall, Mr. Marx, that as part of the settlement agreement or the agreed order that there was supposed to be a dismissal of a lawsuit against Mr. Barton as the guarantor?

A I did see that in the -- I think it's the first one, the December 2021 document.

Q Okay. So would it be important to know that HNGH actually holds the assignment of the guarantor's obligations in order for that suit to be dismissed?

A Uh, yes. And --

THE COURT: All right. Mr. Marx, we're going to recess from this matter because we have to take a quick lunch break before we have some other matters on the docket at 1:30.

After I get off the bench, I'm going to ask everybody to stay on. My plan is to pick up with this matter after we are finished with this afternoon's docket.

I don't have a good feeling for how long those are going to take, but I'd like everybody to be on standby because I want to continue with Mr. Marx this afternoon when our other matters are concluded. So we'll be in recess. And I'm going to walk off the bench. Everybody stay put. And Ms. Smith is going to let you guys know how we are going to notify you when we're ready for you to join back on the Webex.

All right. We'll be in recess.

(Recess at 12:58 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, CRYSTAL THOMAS, and PATTY ENGLISH, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel
DIPTI PATEL, CET-997

/s/ Crystal Thomas
CRYSTAL THOMAS, CET-654

/s/ Michelle Rogan
MICHELLE ROGAN

/s/ Patty English
PATTY ENGLISH, CET-843

LIBERTY TRANSCRIPTS

DATE: June 20, 2022