IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Wednesday, June 15, 2022<br>12:03 P.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

For the Debtor:

Joyce Lindauer Attorney, PLLC
BY: JOYCE LINDAUER, ESQ.
1412 Main Street, Suite 500
Dallas, Texas 75202

Simmons Legal, PLLC
BY: CAMISHA SIMMONS, ESQ.
6060 North Central Expressway
Suite 500
Dallas, Texas 75206

Robin Phelan Law
BY: ROBIN ERIC PHELAN, ESQ.
4214 Woodfin Drive
Dallas, TX 75220

Fee Smith Sharp & Vitullo LLP
BY: OSCAR REY RODRIGUEZ, ESQ.
13155 Noel Road, Suite 1000
Dallas, Texas 75240

APPEARANCES CONTINUED ON NEXT PAGE.

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

---

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES VIA WEBEX (CONTINUED):

| | |
|---|---|
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |
| For Centennial Bank d/b/a Happy State Bank: | Weycer Kaplan Pulaski & Zuber, PC<br>BY: JEFF CARRUTH, ESQ.<br>2608 Hibernia Street<br>Dallas, Texas 75204 |
| For the United States Trustee: | Office of the United States Trustee<br>BY: ASHER BUBLICK, ESQ.<br>1100 Commerce Street<br>Room 976<br>Dallas, Texas 75202 |

**I N D E X**

| | | | Page |
|---|---|---|---|
| Case called | | | 4 |
| End of Proceedings | | | 92 |
| Certification of Transcriber | | | 93 |

WITNESSES

FOR THE DEBTOR:

RANDY MARX

| | Page |
|---|---|
| Redirect Examination by Ms. Lindauer | 19 |
| Recross-Examination by Mr. Kane | 58 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 12:03 p.m.)

THE COURT: All right. We are back on the record in the 2999TC Acquisitions case, Case Number 21-31954. I'll go ahead and take appearances.

MS. LINDAUER: Your Honor, Joyce Lindauer for 2999TC Acquisitions, LLC, the debtor.

MR. PHELAN: Robin --

MR. KANE: Your Honor, John --

MR. PHELAN: Robin --

MR. KANE: Go ahead.

MR. PHELAN: Robin Phelan, also for the debtor.

MR. KANE: Camisha, you're muted.

MS. SIMMONS: Camisha Simmons on behalf of the reorganized debtor.

MR. RODRIGUEZ: Good morning, Judge.

Good morning, everyone.

Oscar Rey Rodriguez on behalf of the reorganized debtor.

MR. KANE: Your Honor, John Kane of Kane Russell Coleman and Logan on behalf of HNGH Turtle Creek, LLC, the movant and pre-petition lender.

MR. METZGER: Your Honor, Steve Metzger on behalf of Tim Barton individually.

MR. BUBLICK: Good morning, Your Honor. Asher Bublick on behalf of the United States Trustee.

MR. CARRUTH: Jeff Carruth on behalf of Centennial Bank d/b/a as Happy State Bank.

THE COURT: All right. Did we get everybody? Does anybody else wish to make an appearance?

(No audible response)

THE COURT: All right. So when we left on Monday, Mr. Marx was on the stand, had not yet finished his direct testimony.

Before we start, I just wanted to make a couple of observations and give you an update on one thing. I understand that this is an expedited motion. And given the expedited nature of the motion, I understand all counsel have to do the best they can under the circumstances to prepare including preparing their witnesses for testifying.

I'm reluctant to set time limits on witnesses generally because I know I was not a fan of that when I was in private practice. But there are some cases where reasonable time limits on testimony for the witnesses -- I think there are cases where that might be reasonable.

And Mr. Marx's testimony I thought over the two days that we've heard so far, a lot of it was duplicative and took really a lot longer than I thought it probably should have. And, again, I understand this was an expedite and everybody's doing the best they can. But I want everybody to be thinking about the possibility of reasonable time limits for your cases.

And, Mr. Kane, I know you've already rested and closed on yours. But for the debtor's side, I just want everybody to be thinking about that because I thought may be we would have been farther along than we are right now just on the first witness. So that's something to keep in mind.

The other thing I wanted to update the parties about is to date, since I took the bench on June 2nd, I've been sharing courtrooms with Judge Jernigan and Judge Larson. But I was aware when I was working for Judge Mullin I knew that Judge Morris when his courtroom was being renovated, that they figured out a way to get the recording equipment out of the courtroom into a separate secure location. And Judge Morris handled a lot of hearings from his office remotely with his judicial support specialist operating that equipment not in the courtroom.

So we are -- I've asked the IT group here at the court to get to work on that, and I understand they're making progress. My hope and expectation is that starting next week, we're going to have a lot more available court days where I won't have to borrow Judge Larson's or Judge Jernigan's courtroom, which will be especially helpful for cases like this that are WebEx only and nobody's in the courtroom physically other than the court staff and myself.

So just be aware that we are working on trying to get more available court days for WebEx hearings like this.

So my strong preference is to finish Mr. Marx's testimony today. And before I take up any other housekeeping matters, I would like to ask Ms. Lindauer what is your time estimate for getting through the direct testimony of Mr. Marx?

MS. LINDAUER: Your Honor, my anticipation was to pass him to Mr. Kane by no later than probably about 1:15 today, so about another hour I think covers everything that I had. I'm going to abbreviate a little bit on his questions because I know we have kind of gone over and over. So I would say about an hour on him, probably -- I know you have a docket at 1:30 --

THE COURT: Actually --

MS. LINDAUER: -- so it's going to start at --

THE COURT: -- everything else is resolved. So we are free for the afternoon. I understand from you and from talking to Judge Mullin that you have another matter in front of Judge Mullin at 2:30. Is that correct?

MS. LINDAUER: That is correct, Your Honor.

THE COURT: Is that --

MS. LINDAUER: And I checked his docket, and I think I'm the only thing at 2:30, so --

THE COURT: Okay. What is your time estimate for that matter in front of Judge Mullin?

MS. LINDAUER: I'm hoping -- again, I don't know if he's going to have me call any witnesses or not. But if it's

just argument, then I think we're looking at about an hour. If we have to call a witness, it could be a little bit longer, but I was hoping about an hour. I've got two opponents on that. So I kind of have to see. But I'm hoping about an hour. That will put us back here at 3:30.

THE COURT: Okay. Thank you. That is helpful.

Mr. Kane, do you have a time estimate for your cross of Mr. Marx?

MR. KANE: I would think that we can get in and out in an hour, Your Honor. That's my best guess. I mean maybe an hour and 15 minutes, but something like that. We should be moving pretty quick.

THE COURT: Okay.

So I hate to ask this, but I'm going to ask. And we may not -- I might not address everything that you asked me to address. But before we get Mr. Marx back on the stand, which I really want to get to, are there any housekeeping items that can be addressed quickly before we get Mr. Marx back on the stand?

MS. LINDAUER: Your Honor, there is one matter that's come up. And so Mr. Carruth is on here, also, because he and I've been going back and forth this morning and a little bit last night.

Yeah, I see him. Okay. He's up here at the top.

Anyway, Your Honor, on the exhibit and witness list,

Docket 144, and this was the HNGH witness list, there is a witness listed Julie Blakeley, Happy State Bank, was listed. On our list, of course, we did the normal any witness designated by any other party.

So we expected to call Ms. Blakeley this afternoon, our guess possibly on Friday if we go forward on Friday. And so we went ahead and prepared a subpoena because I think she's -- since she's a non-party third party and sent a copy of it over to Mr. Carruth. And he had concerns about her actually testifying.

So she would have been our probably -- I can replace her, but she would have been our next witness to call from Happy State Bank.

If you can pull up that list, Sydney (phonetic), real quick.

Your Honor, what we did just to kind of show graphically a little bit -- Sydney, do you have that?

So, Your Honor, we went through every one of the exhibits that are part of this case, and we identified all of the exhibits that include something to do with Happy State Bank. The first group of exhibits, and you'll see there are a significant list of them, are the lender exhibits. And then if you drop down, we have some debtor exhibits, as well, that involve Happy State Bank.

Most of these exhibits have already been admitted,

but we do have questions of Happy State Bank as it relates to this transaction. And so, Your Honor, we did request that Happy State Bank make Ms. Blakeley available for testimony. I understand from Mr. Carruth that they are opposed to that request.

And so this is -- he basically told us he would file a motion to quash. Where we are is we did actually try to serve our subpoena. Ms. Blakeley wasn't at the bank. So it hasn't formally been served other than on counsel. But as part of our case, we do have some questions for Ms. Blakeley. I made a couple of offers to Mr. Carruth if she wasn't available today that we pick another day that she could come testify or during the break between these hearings, happy to take a quick deposition of Ms. Blakeley and ask her some questions.

But -- and out of fairness, Mr. Carruth offered me a sworn statement, but again I'm not sure that would cover all of the things that we have questions about. So we do have an issue, Your Honor, about this particular witness coming to testify. I'm guessing it won't be today given the fact that we haven't served our subpoena yet. Mr. Carruth is opposing her testimony. But I am asking the Court since she was timely designated as a witness that she be required to testify based on us subpoenaing her to be available.

So we do have this housekeeping matter that's arisen, Your Honor.

THE COURT: All right. Mr. Carruth?

MS. LINDAUER: (Indiscernible).

THE COURT: Mr. Carruth?

MR. CARRUTH: Yes, Your Honor. Thank you.

So the idea or the potentiality of either party requesting Ms. Blakeley's testimony first arose at three or four yesterday afternoon when I was contacted by Ms. Lindauer. A subpoena showed up in my email last night addressed to Ms. Blakeley individually and not to Happy State Bank seeking a corporate representative. And then Ms. Blakeley was not in the office this morning.

So I think our first -- you know, we've got the procedural concern about the form of the subpoena. I'm sure Ms. Lindauer could correct that. We have a bigger concern about if this -- if the witness list were exchanged on this matter last week, if the subpoena was going to come, it should have come last week when the witness lists were exchanged and witnesses were designated for this hearing. We could have addressed the subpoena and any testimony issues in a somewhat orderly fashion under the time circumstances.

THE COURT: Have you --

MR. CARRUTH: But ultimately, I --

THE COURT: Mr. Carruth, sorry to interrupt. But you were at the first hearing by WebEx. Correct?

MR. CARRUTH: Yes, Your Honor. Yes, Your Honor.

THE COURT: Had you seen the witness and exhibit list that the debtor filed or that -- I'm sorry, that Mr. Kane filed that listed Ms. Blakeley as a witness?

MR. CARRUTH: Yes, Your Honor. We -- I was in possession of the witness list, but as far as anybody actually wanting to bring her to court to testify by subpoena or procuring her testimony, that had not been discussed.

THE COURT: So I mean the witness and exhibit list was filed on June 7th that listed her. Nobody picked up the phone to call the other side to say, hey, let's discuss Ms. Blakeley? Did that not happen on either side?

MR. CARRUTH: Correct.

MR. KANE: And, Your Honor, this is John Kane for HNGH. I'm happy to address that.

I mean we wanted to preserve our right to call Ms. Blakeley but determined that her testimony as a friendly witness if she was willing to testify voluntarily on behalf of Happy State Bank wasn't going to be necessary. And we did not submit a 30(b)(6) subpoena to Happy State Bank to have a corporate representative arrive to testify, though we would have assumed or at least attempted to ensure that that was Ms. Blakeley. So we did not call Ms. Blakeley in our case in chief.

THE COURT: I understand.

MR. KANE: I mean that's (indiscernible).

THE COURT: And, again, I'm not casting blame on anybody. I was just trying to figure out if there were any discussions earlier on about whether the parties anticipated that she would be called as a witness.

And, Ms. Lindauer, I know you --

MR. KANE: Yeah. Your Honor, I --

THE COURT: She was not on your list, Ms. Lindauer, but were you anticipating calling her earlier on?

MS. LINDAUER: Your Honor, yes. I really thought that we would call her in response to Mr. Kane calling her. But Mr. Kane, obviously, rested without calling her. So --

THE COURT: Okay. So nobody --

MS. LINDAUER: So, yes --

THE COURT: -- nobody picked up the phone to try and expedite that discussion. I understand that didn't happen. So when did you serve the subpoena?

MS. LINDAUER: We actually served it yesterday afternoon. Well, we haven't actually served it on Ms. Blakeley yet because -- but we sent a copy over to Mr. Carruth. I think I sent him an email middle of the afternoon yesterday saying, hey, can you make your witness available without the need of the subpoena.

THE COURT: Okay.

MS. LINDAUER: And that prompted the phone

THE COURT: Mr. Carruth?

MS. LINDAUER: -- yeah, phone call.

THE COURT: Mr. Carruth, are you -- and I'm not trying to pressure you either way, but are you going to require the service of a subpoena or will you accept service?

MR. CARRUTH: Well, I'm trying -- if the Court is going to require Ms. Blakeley's testimony, Ms. Blakeley would ultimately testify, of course. I think the concern that we have is the line of testimony is really peripheral to what is at issue and at stake in this case.

And we -- as I understand the debtor's position or concern is that could Happy State Bank deliver this collateral note at closing and whether -- under what circumstances would that occur, was Happy State Bank prepared. And they're trying to use that as a hook to say, well, you know, the debtor -- or, I'm sorry, HNGH could not have closed.

And as a practical matter in a real estate closing when there's a collateral assignment that is unresolved, when the -- that is something on the seller's -- or not the seller's side, but the statement side of HNGH. So it's a line item where HNGH would pay off its obligation to Happy State Bank, Happy State Bank would -- upon receipt of payment would release its items whether its collateral holding the note, the collateral assignment, whatever it is.

And so I think it's unnecessary to go through an hour or two or 30 minutes or 15 minutes, whatever it is, on this

minutia and side issue of a closing sequence when Happy State Bank receives funds out of the anticipated closing on this transaction and what would occur because that -- I think that is an obvious item from anybody who's practiced and experienced in real estate closings. It is something that other witnesses for HNGH can testify to as to the location of the note, which is, you know, suddenly become an issue or I think a non-issue.

But, you know, ultimately, you know, Happy State Bank is on the periphery of this matter as the creditor of HNGH. And upon receipt of funds under the closing statement of HNGH, Happy State Bank would have performed certain actions with respect to its borrower HNGH. And that included release of the collateral assignment and handing the note back over that would have occurred.

And so I don't think we need testimony to understand the closing mechanics of this case. Now that said, if the Court feels that ultimately Ms. Blakeley ought to testify and that there would be a ruling that Ms. Blakeley must testify, she's prepared to do so. We would ask that occur today. She is already scheduled to be gone Thursday and Friday. And the bank would just as soon get that over with sooner rather than later.

THE COURT: Ms. Lindauer, is it possible for you to tell me in one minute or less what you anticipate getting out of Ms. Blakeley? I mean I understand -- I'm familiar with the

Happy State issue, and it was explained very well by Mr. Marx.

Can you just very briefly describe what you need her testimony for and is it possible to get whatever you need by stipulation as opposed to her testimony? If you could very briefly address that?

MS. LINDAUER: Your Honor, I contemplated with Mr. Carruth's stipulation -- first of all, let me tell you we did discuss that yesterday. And the problem that I ran into, Your Honor, is that there are 30 exhibits -- that's why I showed you that list -- that talk about, refer to, include -- and I'm not going to ask about all of those, of course, but there are 30 exhibits where Happy State Bank is implicated.

Really the questions, Your Honor -- Mr. Carruth actually did a pretty good job of just testifying right now to a lot of what Ms. Blakeley would testify about which is how Happy State Bank was involved with the loan, how Happy State Bank was to be involved with the closing, their role in connection with the closing, the payoff statements that they've provided to us and then ultimately would have been part of possibly the closing.

Who has the original note, that remains an issue. And Ms. Blakeley surely can testify about the actual loan documents themselves and who maintains the originals of those.

And so, Your Honor -- and there's a few other things, but what I wanted to point out -- I told Mr. Carruth this,

look, I didn't invite Happy State Bank into this fray.

THE COURT: Okay. Ms. Lindauer?

MS. LINDAUER: They filed --

THE COURT: Ms. Lindauer, I was really just trying to get a brief summary of what you were trying to get out of her.

MS. LINDAUER: Your Honor, that's sort of --

THE COURT: So --

MS. LINDAUER: That's sort of a summary, Your Honor. I would say it's about an hour's worth of testimony.

THE COURT: An hour's? An hour?

MS. LINDAUER: (Indiscernible).

THE COURT: Okay. And Mr. --

MS. LINDAUER: Yeah, about an hour.

THE COURT: Mr. Kane, how much time will you need, if any, for cross?

MR. KANE: Oh, I don't think I need more than about 15 minutes.

THE COURT: Okay.

MR. KANE: I mean maybe --

THE COURT: So --

MR. KANE: Maybe less than that.

THE COURT: So, Mr. Carruth, I think right now I want to get Mr. Marx back on the stand and get going. But I'm inclined to give the debtor the hour that they requested for Ms. Blakeley. So, again, I'm not ordering you to make her

available, but if that's something that you're interested in, in producing her without a subpoena, it sounds like we might be able to get her done this afternoon if we can get done with Mr. Marx.

MR. CARRUTH: Thank you, Your Honor.

I will confirm the bank's desires at this point. But if -- what I anticipate the bank's response is going to be if we're going to be served eventually or have to deal with something else, we would just as soon testify today. So I will mute myself and get to work on that.

THE COURT: Sure. And, again, I'm not trying to pressure you one way or the other. But I'm just letting you know that if that's an option, I will try to get that done this afternoon assuming everybody can get going on their witnesses.

So anyway, thank you very much for your statements, and we'll go back now to Ms. Lindauer.

Are you prepared to put Mr. Marx back on the stand?

MS. LINDAUER: I am, Your Honor. And I believe Mr. Marx is on our WebEx at the bottom row. He'll need to turn on his camera and audio.

THE COURT: All right. Mr. Marx, are you there?

MR. MARX: Yes. I am kind of on my own today. Is that working?

THE COURT: So, unfortunately, on my screen, Mr. Carruth is frozen. And I don't yet see Mr. Marx. Is that an

issue on our end, Ms. Smith?

MS. LINDAUER: I think it is, Your Honor, because we see Mr. Marx and Mr. Carruth is gone.

THE COURT: So hang tight for a minute. We're going to try to figure out what's going on. I can hear Mr. Marx just fine, but all I see right now is a frozen picture of Mr. Carruth.

So sit tight while we try and figure it out.

(Pause)

THE COURT: All right. Mr. Marx, if you are there, if you can unmute yourself. I think maybe we have the issue resolved.

MR. MARX: Okay.

THE COURT: All right. Mr. Marx, you are still under oath.

RANDY MARX, DEBTOR'S WITNESS, PREVIOUSLY SWORN

THE COURT: Ms. Lindauer, I'll turn it over to you.

MS. LINDAUER: Very good. Thank you, Your Honor.

REDIRECT EXAMINATION (RESUMED)

BY MS. LINDAUER:

Q Mr. Marx, when we were last together, we were concluding an exhibit which was Exhibit D3.

MS. LINDAUER: Sydney, if you can pull that up.

BY MS. LINDAUER:

Q And I marked that we were on Page 3 of 4 of that

particular document.

And, Mr. Marx, we were going through in some detail the letter that had been sent by our office to Mr. Kane that you testified you assisted in procuring. Do you remember that testimony from earlier this week?

A Yes.

Q Okay. And we were about at point 5.7 is what I flagged on that document when we broke. And I'm going to go a little quicker through these points. But if you can, Item 5.7 says: "HNGH was intervenor in the guaranty case, so Madison is still a party. Both will have to dismiss with prejudice."

Could you tell me what you were addressing in that particular point that we listed?

A My point's more related to the deficiencies or the items still outstanding relative to title.

Q Okay.

A I think this point came out of a review of the agreed orders which references that. But it wasn't really a specific requirement that I -- I mean it's part of the agreement, but it's not really part of my purview on title.

Q Okay. We're going to look at the agreed orders in just a minute. But do you recall Mr. -- well, first of all, Mr. Marx, you're familiar with both the December and the March orders. Correct?

A Yes.

Q Okay. Do you recall part of the requirements in those orders was dismissal of certain litigation?

A That's correct.

Q And one of the litigations that was to be dismissed was a lawsuit, a guarantee suit against a gentleman named Timothy Barton. Do you recall that?

A Correct.

Q And the 5.8 raises the issue as if Madison had assigned all the loan documents to HNGH, not just the recorded documents. Do you know what that is referring to?

A Yes.

Madison is the name that has been used for the original lender. And at some point in time, the public record indicates that HNGH sort of acquired that position. I think this may have just been a discussion point.

But I had not seen the underlying assignment. And when I looked at what was of record, I just couldn't tell where that claim related, or who held the guarantee as it were. But again, that wasn't really a part of the title aspects. It's just I had to review the orders or the contract to see what did and did not affect title. And I think these just got -- these other items just got added into one letter.

Q Okay. I'm going to jump you a little bit.

A Okay.

Q If we go back, so we're going to keep our fingers on this

particular exhibit, D3. And I'm going not jump you to Exhibit D17.

MS. LINDAUER: And in particular, Sydney, if you can pull up Page 144 of that exhibit.

BY MS. LINDAUER:

Q And, Mr. Marx, have you seen this document before, this assignment of deed or trust, and assignment of leases and rents?

A Yes. That was one of the underlying instruments that -- or public record and were accessible by hitting that hyperlink if you recall on Schedule C of the commitment that we talked about the other day. I think it's Exhibit 33.

Q Okay. And, Mr. Marx, in reviewing Exhibit D17, and we did that before the hearing, one document that I believe you just referenced that appears to be missing is an assignment of the guaranty of Mr. Barton. Is that correct?

A Well --

MR. KANE: Your Honor, I object to the relevance of this. This is a proof of claim for a claim against the debtor, not a claim against a guarantor. So what does this have to do with closing?

MS. LINDAUER: Your Honor, it has to do with closing because one of the requirements in the order, and we'll see that particularly I believe in the March order, is that the lawsuit against Mr. Barton was supposed to be dismissed at the

time of the closing. And it appears, from the documents at least that have been provided, that HNGH Turtle Creek did not receive an assignment of the guaranty.

So I don't know how they could have possibly dismissed the lawsuit against Mr. Barton if in fact they were not the assignor of the guaranty. That would have to be filed by 299 Turtle Creek, LLC if they're still holding the guaranty.

The reason it becomes relevant is in their proof of claim, Exhibit D17, they do include a copy of Mr. Barton's guaranty, yet there's no evidence anywhere in this record that we've been able to find of an assignment of that guaranty over to HNGH Turtle Creek. So that was a material term of the parties' agreement for which we were not provided any documentation.

And the issue, Your Honor, is whether in fact HNGH Turtle Creek could have performed the term of the order that required dismissal of the guaranty lawsuit. So, Your Honor, I think it is a material fact. And Mr. Kane, if he's got the assignment, obviously can provide that to the Court.

THE COURT: Mr. Kane --

MR. KANE: Unsurprisingly --

THE COURT: Mr. Kane --

MR. KANE: Yeah.

THE COURT: -- brief reply.

MR. KANE: Yeah. Unsurprisingly, this has never been

an issue that's been raised even in the guaranty suit that's pending in state court. Also, Your Honor, I'd ask that you take judicial notice of the terms of the agreed order. A dismissal is only required after a payoff event has occurred. There's not been any payoff event. There's no obligation to dismiss.

This idea of authority for a dismissal of Mr. Barton's personal guaranty suit as a potential causal item for a failure of the debtor to close a transaction is preposterous, and the debtor knows it.

THE COURT: So --

MS. LINDAUER: Your Honor, I'm not addressing --

THE COURT: Hold on. I understand your -- I understand the argument, Mr. Kane. I'll for now overrule the objection and just ask Ms. Lindauer to very, very briefly finish up on this topic with Mr. Marx.

BY MS. LINDAUER:

Q Mr. Marx, again, the only issue that I was pointing out was in the documentation we have been provided today that you had an opportunity to review prior to this hearing and the hearings over the last couple of days, have you ever seen an actual assignment of the guaranty to HNGH?

A I have not.

Q Is that a document that would typically, in your experience, be filed of record in the county indicating that

that guaranty has actually been assigned?
A Normally it is handled in my practice in an instrument similar to this that would reference expressly the note and all the loan documents. And here I did not see that provision.
Q Okay. Moving along, the next point on the letter, if we go back to the Exhibit D3. And I don't want to belabor this point because we've already asked you questions about this.
But Item 5.9, the collateral assignment to HSB, you raised an issue there. I believe this was your issue regarding authority. And we saw the request for authority documents in Schedule C. This looks to be a little different issue.
Can you just briefly for the Court explain what the issue on 5.9 is?
A In the underlying instrument, it appeared to me that after basically HNG had borrowed money from HSB, then at that point in time HSB had the authority I'll say, and HNGH did not have authority to sort of deal with the underlying collateral.
And so I raised the question of whether in entering into the orders if HNGH at that moment had contemporaneous authority that was, you know, acquired contemporaneous with all those signing of documents. Or if not, then at least require or pos the question of HSB had they ratified all that action because of the manner in which the collateral assignment verbiage that was in there. And so I think that was an item that I requested.

Elsewhere in the instrument, it's a little bit duplicative elsewhere in the instrument. I just made a general statement that we need to be sure that HSB, because they are of record when I didn't anticipate that they would be, that they were -- had authorized what was happening with the collateral.
Q All right. And moving along, the Point 6.1, we've already mentioned this briefly, was the dismissal of the guaranty litigation. We've addressed that that was a term of the two orders, and that that would be affected also. Is that right?
A Yes.
Q 7.1, again, moving a little quick, sequencing the agreement or joint closing instructions, what was the purpose of that particular entry?
A Well, in complex transactions generally, when I for example were to deliver either the money or the deed, whether I'm on the buyer or the seller side, I typically just don't give that to the escrow agent. I typically control how that's handled with an escrow instruction letter.
And what I was suggesting here, because it was supposed to occur by, you know, simultaneously, that everybody agree what's in and get their documents in to the title company in advance, signed and reviewed from both sides. And then we would either have one joint closing instruction letter, or several assuming that each party would have the title company as escrow agent sign those instructions. All right?

And that way then the title company has satisfied itself that there are no inconsistencies in the sequence of events. Here for example it was important that, if I recall, for instance the deed that would be prepared and held, and then secondly that there would -- immediately prior to the payment there would be a reinstatement. And then, you know, the ultimate payoff.

And I think from a logical and sort of a control, and assuring that we have a clean record, a clear record, I thought that that would be important. It's customary in my practice that instruction letters are prepared, and in a case like this, I would have preferred to have, you know, joint instructions. But I think it's essential to the transaction.

Q On sequencing, I think you mentioned, and we're going to go through this pretty quickly. But on sequencing, it would be important to record certain documents in a particular order because of the way this transaction was being structured. Is that correct?

A Yes. It would make no sense to record the release of lien first, okay, because at that moment in time the recision deed had not been recorded. And there had been no reinstatement. So sequencing is not just a matter of control. It's a matter of logical order to create a clear record in the -- in the real property records.

Q All right. A couple of issues that come up also. I'm

just going back for a minute to Items 5.2 and -- well I think it was really 5.2. And maybe we covered this and I just missed it. But what was your understanding of the involvement of Green Hollow Capital Partners?

MR. KANE: Objection, duplicative.

MS. LINDAUER: Okay. I couldn't remember if we asked, went over that or not, which is why I wanted to just be sure it was in the record.

THE COURT: Mr. Marx, do you recall your prior testimony on 5.2?

THE WITNESS: It was -- he, Mr. Glasgow, was one of the signatories --

THE COURT: No, but before --

THE WITNESS: -- that I see --

THE COURT: I'm sorry, Mr. Marx. Before I ask you to explain, do you recall now that you had previously testified about 5.2?

THE WITNESS: (No audible response).

THE COURT: Do you recall in your prior testimony just a couple days ago, or maybe the first day testifying about 5.2 because I'm really trying to find out if you had anything you need to add or clarify that you didn't already testify about.

THE WITNESS: I recall. And I don't know of any point of clarification.

MS. LINDAUER: Okay. All right, Your Honor. I just wanted to be sure we had covered that.

THE COURT: So I'll --

MS. LINDAUER: All right. Mr. Marx --

THE COURT: I'll sustain the objection. But go ahead.

BY MS. LINDAUER:

Q Okay. Mr. Marx, if we could, let's look at Exhibit D12 which is the first of two agreed orders. First of all, this order, Mr. Marx, you'll see at the top, was signed.

MS. LINDAUER: Go back down for a second, Sydney. There we go.

BY MS. LINDAUER:

Q Signed December 10th, 2021. Do you see that?

A Yes.

Q Okay. Good. And it's a document entitled agreed order regarding motion to lift stay, motion to dismiss, motion for sanctions, and motion to enforce stay. Do you see that reference?

A Yes.

Q Okay. So this order was intended to address Dockets 10, 9, 15, and 14 of the Court's dockets. Do you see that?

A Yes.

Q All right. Were you involved at all, Mr. Marx, in the drafting of this particular agreed order?

A No, I was not.
Q Do you happen to know who was involved in the drafting of this order?
A I think you and Mr. Kane. Beyond that, I don't know.
Q Okay. And the first ordered, adjudged, and decreed provisions of this order again speak to some pending motions that have been filed that were being resolved by this agreement. Do you see that?
A Well, it's a little hard --
MR. KANE: Objection, relevance to his understand of what the order says on this stuff. I mean, this, the order says what it says. And the Court's accepted this order I think already as an admitted exhibit.
THE COURT: So what's the --
MS. LINDAUER: Your Honor, I'll move on to the next one.
THE COURT: What's the objection?
MR. KANE: Relevance to this line of questioning.
THE COURT: So for now, I'll overrule it. But go ahead and ask your -- ask another question, Ms. Lindauer.
MS. LINDAUER: I will, Your Honor.
BY MS. LINDAUER:
Q Okay. Let's go to Page 2. And the first order judged and decree provision, do you see that at the top, Mr. Marx?
A Yes.

Q Okay. The first provision says that the automatic stay will remain in force and effect through five p.m. on March 15th, 2022. And that's defined as a payoff deadline. Do you see that?

A Yes.

Q All right. And what was supposed to occur on March 15th, 2022, pursuant to the terms of this particular order?

A Well, if you read that paragraph as a whole as I did and --

THE COURT: I'm sorry, Ms. Lindauer. Did you just ask -- I was a little bit distracted. Were you just asking him what the order says?

MS. LINDAUER: Right, right. What his understanding of what was to occur on March 15th, 2022.

THE COURT: So why don't you ask a different question unless is there an ambiguity about the order or it sounds like --

MS. LINDAUER: Well, I think, Your Honor, just the mechanics, Your Honor, of what was actually to occur on March 15th in this first paragraph is what we are breaking down.

BY MS. LINDAUER:

Q So, Mr. Marx, on March 15th, 2022, there is mention of a payoff deadline reading the order. And I know that the payoff

was actually put under seal. But there was supposed to be a payoff event. Is that right?

A Yes.

Q All right. And so the payoff event would be obviously the debtor tendering a payment amount to HNGH. That's mechanics one, right?

A Well, it's at the end of the mechanics. But yes.

Q Okay. All right. Well then that's really where I was going because then it says which note shall be reinstated immediately prior to the debtor's payment to HNGH of the payoff amount. Do you see that?

A Yes.

Q Okay. First of all, do you know what note that is referring to?

A It's the original note that was made by the debtor payable to the order of the Madison entity.

Q And the note was supposed to be reinstated. As a real estate attorney, do you have an understanding of what occurs when a note is reinstated?

MR. KANE: Objection. Duplicative testimony. He testified to not only what would happen if the note was reinstated, but his belief of what needed to take place if a note was to be reinstated in his prior testimony over the last two days we were in court.

THE COURT: And I think --

MS. LINDAUER: Your Honor, I don't --

THE COURT: Ms. Lindauer, response?

MS. LINDAUER: Your Honor, I don't recall him actually describing for us what documentation would actually be required for a note reinstatement per se. I understand that that was an item that may have been identified on some of these documents. But I don't think we've actually had testimony from Mr. Marx as to what a note reinstatement would in fact look like as far as actual documentation.

MR. KANE: Your Honor, may I respond to that?

THE COURT: Mr. Marx, did you not testify previously regarding the sequencing and what is involved in the reinstatement of the note? I'm fairly certain we've -- you've covered that before. Do you recall your testimony on that point, Mr. Marx?

THE WITNESS: Your Honor, I've gone through these documents a number of times. I don't expressly remember what I was asked about on the earlier testimony.

THE COURT: All right. So I'll overrule the objection for now. If you could, just briefly address Ms. Lindauer's question which I believe was what is involved in reinstatement of the note. Is that the question, Ms. Lindauer?

MR. KANE: Your Honor, I'd like -- I'm sorry, Your Honor. I'd like to re-raise this objection. And maybe this will refresh your recollection. But I specifically objected to

Mr. Marx line of testimony on what would be required to reinstate a note.

I asked whether he was being offered as an expert on this issue because he had been offered as this real estate attorney. And then I asked whether his testimony was only being offered for his layperson's understanding of what he believed needed to happen for the reinstatement of the note. Ms. Lindauer agreed that that's what he was being offered for. And he was allowed to provide his testimony, step-by-step, on what as a layperson he understood needed to happen to reinstate a note.

THE COURT: Ms. Lindauer, I do recall --

MS. LINDAUER: Your Honor --

THE COURT: I do recall that now.

MS. LINDAUER: Yeah. Your Honor, let me, if I might, move off this question and just ask a different question.

THE COURT: So I will reverse myself and sustain that objection based on my refreshed recollection. So ask your next question.

BY MS. LINDAUER:

Q Under this provision, Mr. Marx, who would be responsible for providing a reinstatement of the note?

A The HNGH group, the purported holders of the note, the I guess obligees, in addition then that instrument would have to be signed by the obligors because you can't reinstate those

obligations unilaterally.

Q So just to be clear, what you just told us is that whatever document that would constitute the note reinstatement would need to be executed by both HNGH and 299TC Acquisitions. Is that correct?

A Yes.

Q In your review of all of the title company documents, the letters, the Schedule C, have you seen such a document?

A No. There was the deed at the title company. But it did not effectively either rescind or reinstate.

Q And when you talk about the deed, I want to be very clear on that. What document are you referring to?

A It was an instrument entitled special warranty deed. I believe it was delivered by HNG counsel on the 27th, I believe.

Q Okay. And I want to be clear for the record because these are important issues. If we pull up Exhibit 36-A.

MS. LINDAUER: This is going to be a lender exhibit, Sydney.

BY MS. LINDAUER:

Q This is a document titled special warranty deed. And is this the document that you're referring to, Mr. Marx?

A Yes. What number is that, exhibit number?

Q It's Exhibit 36-A, Page 1 of 7.

A Okay. I can see it better here.

Q Okay. And just to be clear, that's the document that you

are referring to. Is that correct?
A Yes.
Q All right. Keep your finger on that document for a minute. Let's flip back to the order. And that was Exhibit D-12 that we were looking at. So we talked about the reinstatement of the note. The next provision says counsel for HNGH shall hold the recision deed during the pendency of the term of this agreed order. Do you see that provision?
A Yes.
Q Under the order, who would draft the recision deed?
A HNGH was to draft it and hold it.
Q And can you tell from the order if HNGH was drafting and holding, was that an executed document?
A Well, I think that, you know, any contract you should use the plain meaning. And hold in this context means to have prepared, and more than a draft. It should be a final instrument, and it should be signed because if you're missing any of those, I don't really think you're holding anything. If the document hadn't been prepared, you're not holding it. If it's if you're holding a draft, I don't see what that means. So I would say that holding here means just what I said.
Q Okay. And during the pendency of the term of this agreed order, what would be the term of the order?
A I believe it began December 10th and ran through, you know, the targeted payoff. And I think that it would have been

helpful had they had such a deed of recision been held because as a part of my job, it would have been easier to satisfy ourselves that title was going to be clear.

Q All right. The last paragraph or part of that sentence says and shall have no liability to the debtor for any other party by way of holding such deed, are releasing the deed in accordance with the terms of this agreed order. Do you see that provision?

A Yes.

Q Okay. What deed would that be referring to?

A It's the recision deed, or deed of recision, however you want to characterize it.

Q If the recision deed wasn't held during the term of the order, would there ben any reason to have a release for lack of liability provision here as a term of this order?

A I don't think so.

Q So if the deed wasn't being held, there would be no reason for this part of the order to have been included. Is that correct?

A Correct. I think the reason for the holding concept and the having it being held would have been helpful as I go through or went through my efforts to bring a funding source to the table. And so we were somewhat delayed by that not being held.

Q Okay. If we look at the next order to judgment provision,

again it talks about if the debtor pays HNGH the payoff amount within the payoff period, then simultaneous with the payoff event the deed in lieu filing which was submitted for filing pre-petition but recorded on November 1st shall be deemed rescinded, avoided, and the debtor shall retain all title to the property. Do you see that?

A Yes.

Q Okay. So simultaneous with the payoff, the deed in lieu, right, would be deemed rescinded, avoided, and the debtor shall have title. And my question to you, Mr. Marx, is obviously there would have to be some sort of documentation to make that happen. Is that right?

A Yes. An instrument of recision which means to put the parties back where they were before the disputed instrument was recorded.

Q If you read the next part, to effectuate this provision of this order, the parties shall submit to this Court, and shall enter an agreed order in adversary proceeding 21-03085 avoiding the deed in lieu filing and recording granting no damages to any party, and dismissing the adversary proceeding with prejudice to refiling. Do you see that?

A Yes.

Q All right. Do you know if in fact that provision has been taken care of?

A No, it has not.

Q So you don't know if the adversary proceeding has actually been dismissed or not at this point?

A I don't know.

Q Okay. You would agree with me though that that was a requirement of this particular order. Right?

A Yes.

Q All right. Dropping down, a current -- simultaneous with the occurrence of the payoff event, HNGH shall have and possess a $2 million allowed claim against the debtor and debtor's estate, which the debtor shall be obligated to satisfy in full within 12 months of the payoff event. And then it goes on to talk about from first proceeds, from any sale, from a construction loan or any equity raised, et cetera, which exhibits filed under seal, da, da, da.

So that provision, what's your understanding, Mr. Marx, of that particular provision of the order?

MR. KANE: Objection, relevance.

THE COURT: Response?

MS. LINDAUER: Your Honor, I do think it's relevant to just hit -- I think to explain mechanically again what was supposed to happen under the terms of this order. The mechanics sadly are a bit missing here. But --

MR. KANE: but, Your Honor, this is the bad faith element of this kind of line of questioning because this order was modified. And this specific paragraph and the contents of

this paragraph were materially changed by the agreed order at Docket Number 94. So we're just wasting time.

MS. LINDAUER: Your Honor, we're going to get to that. But I think it helps for the record that we go back through some of these provisions, and then we go to the next order which does, I agree with Mr. Kane, address some of these provisions that were in fact changed. But at the time that this order was entered, this was a material term of this order that these particular matters be handled this particular way.

THE COURT: But there's no --

MS. LINDAUER: And so, Your Honor --

THE COURT: Ms. Lindauer, there's no dispute that the provision that you're now asking about isn't really relevant to the issue that's before the Court because it's my understanding as well that this has been supplemented by the next order. So I think I'm going to sustain that objection because asking him his understanding about a provision that, unless you tell me otherwise, does not appear to be operative for this hearing would appear to be --

MS. LINDAUER: Okay.

THE COURT: -- either irrelevant or -- well, would appear to be not relevant.

MS. LINDAUER: Okay. And, Your Honor, I'll lead into the why I think it's still relevant.

BY MS. LINDAUER:

Q Do you see the bolded allowed claim term right there to the left?
A Yes.
Q Okay. The next sentence says in order to provide parties in interest notice of the allowed claim, HNGH shall be entitled to file a UCC-1 against substantially all of the debtor's assets attaching this order for reference. Do you see that?
A Yes.
Q Do you know, Mr. Marx, if a UCC1 was in fact filed, and has it been released?
A I did do a search of the Secretary of State UCC filings in Delaware. I noted that there were approximately 11, if I recall, instruments. I do not recall specifically if this was one of them.
Q Well, you would agree with me though that if in fact this provision is changed three months later, that if in fact the UCC1 had been filed, that it would have needed to be released. Is that correct?

MR. KANE: Objection, leading.

THE COURT: Response?

MS. LINDAUER: Your Honor, if I need to phrase it as a direct question, I will. But --

THE COURT: Sustained.

MS. LINDAUER: Okay. Your Honor, let me move on.

BY MS. LINDAUER:

Q All right. The next provision, Mr. Marx, reflects a series of payments to be made as part of this order. Is that right?

A Yes.

MR. KANE: Objection, relevance. I think we addressed this in opening that the consideration payments were made and that they were $100,000 made on this schedule.

MS. LINDAUER: If Mr. Kane is agreeing to that, then, Your Honor, I won't spend time on that provision. All right. And then looking at --

THE COURT: So I'll sustain the objection.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Looking at the final, or the bottom paragraph of that page, that provision obviously would not be effective if in fact those payments as agreed were made. Is that right, Mr. Marx?

A Correct. I think that --

MR. KANE: Again, Your Honor, I object on relevance. We just stipulated that those payments were made.

THE COURT: Ms. Lindauer, it doesn't appear to be a dispute that the payments were made. The witness has already testified that he was not prepared -- he did not prepare and was not involved in the drafting of this order. So what's the relevance of this pending question?

MS. LINDAUER: Your Honor, I'll move past that question.

THE COURT: All right.

MS. LINDAUER: All right. And then, Mr. Marx --

THE COURT: I'll sustain the objection.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Marx, if you look at the next full ordered, adjudged, and decreed provision starts off, "The adversary proceeding."

A Yes.

Q Okay. The last full sentence of that paragraph starts, "If a payoff event occurs." Do you see that?

A Yes.

Q And that provision reflects that if a payoff event occurs, and a notice of the payoff event is given to the Court, and request by the debtor, is there anything that HNGH has to do to request relief from the Court under this provision?

MR. KANE: Your Honor, objection. Relevance. This provision was also modified by the agreed order at Docket Number 94.

MS. LINDAUER: Okay.

MR. KANE: The adversary proceeding that this would relate to has already been dismissed with prejudice pursuant to an agreed order that the debtor's counsel agreed to.

MS. LINDAUER: Okay. So if Mr. Kane is willing to

stipulate on the record that this provision is no longer of any force and effect, Your Honor, that's fine.

MR. KANE: Your Honor, I believe that I said that this was modified by the agreed order. Like, if a payoff event occurs, upon notice of a payoff event to the Court, this Court shall enter an order ruling that the deed in lieu filing is voided and rescinded. That is no longer applicable because the adversary proceeding has already been dismissed with prejudice.

MS. LINDAUER: Okay. So, Your Honor --

MR. KANE: This is --

MS. LINDAUER: I'm sorry, Mr. Kane. Go ahead.

MR. KANE: There's an admitted exhibit that's a transcript of a court's prior hearing where this is addressed. And this is one of those things that, you know, we agreed that we would handle this through the recision deed instead of through the dismissal process. And Judge Hale acknowledged that it sounded like that would work.

That is -- I mean, if we want, if there is a question by Ms. Lindauer to the voracity of that statement, we can always throw that agreed admitted exhibit up for the Court to review. I mean, I believe that is a court's transcript from a March 22nd hearing.

THE COURT: Ms. Lindauer, does that satisfy your concern, because --

MS. LINDAUER: It does, Your Honor. I think really

it was teed off of an issue maybe that you had raised, Your Honor, which was if you read that last sentence of that paragraph, it does seem to potentially be in conflict with earlier sections of the order as to when things were supposed to occur. So if Mr. Kane --

THE COURT: And I think that has been clarified by Mr. Kane's statements both at a prior hearing when I was asking about this paragraph. So based on Mr. Kane's statements then and now, I'll sustain the objection.

MS. LINDAUER: Okay. All right.

BY MS. LINDAUER:

Q And if we look at the next full sentence, or paragraph, "Ordered, adjudged, and decreed upon entry of this agreed order of the personal guaranty case against Timothy Barton shall be abated. And then upon occurrence of a payoff event or a default"

Do you see that, Mr. Marx?

A Yes.

Q Okay. So if there was a payoff event or a default, then Mr. Barton would be released from his guaranty, and the personal guaranty case shall be dismissed with prejudice. Do you see that?

A Yes.

Q Okay. As you sit here today, Mr. Marx, do you know if Mr. Barton's personal guaranty case has been dismissed?

A It has not.

MR. KANE: Objection, Your Honor, foundation. Mr. Marx is counsel for TCC2022. He hasn't appeared or participated in that dismissal proceeding. So what basis does he have to issue this testimony?

MS. LINDAUER: Your Honor, if Mr. Kane wants me to ask him that, I'm happy to ask his basis for that testimony.

THE COURT: So I'll sustain the objection. You can ask another question.

BY MS. LINDAUER:

Q Mr. Marx, are you familiar with the guaranty suit against Mr. Barton?

A Generally.

Q Okay. How are you familiar with that action?

A I guess in the context of reviewing these orders as it relates to what I was doing on behalf of TCC. I inquired if the litigation had been dismissed. And I've seen correspondences, I think many were in --

MR. KANE: Objection. Hearsay.

THE WITNESS: They're the exhibits in this case. Excuse me.

THE COURT: So I'm going to overrule the objection for now because he hasn't stated -- well, continue your response. I'll overrule the objection for now.

BY MS. LINDAUER:

Q Mr. Marx, as you sit here today, what is your understanding of the personal guaranty suit and whether it in fact has been dismissed or not?

A My understanding is that it has not been dismissed.

MR. KANE: Then objection, Your Honor, to relevance of whether it's been dismissed or not. This is a dispute over whether there is a causal relationship on the closing issue. If dismissal is required after closing, I would not see that that has relevance whatsoever to the matters that are before this Court.

THE COURT: Response?

MS. LINDAUER: Your Honor, I would tend to disagree with Mr. Kane. But if that's the position that he wants to take, then, Your Honor, then I'm fine with moving on. So, Your Honor, if we could we'll move on to Exhibit D13.

THE COURT: So are you withdrawing that question?

MS. LINDAUER: I'll withdraw that question.

THE COURT: Ms. Lindauer, we're 45 minutes into Mr. Marx's continuing direct. You indicated you could do it in one hour.

MS. LINDAUER: Your Honor, this --

THE COURT: Are you almost done?

MS. LINDAUER: I am, Your Honor. This is my last document to ask him about at this point.

BY MS. LINDAUER:

Q Mr. Marx, are you familiar with the March 17, 2022 order?

THE COURT: And I apologize, Ms. Lindauer. You mentioned the exhibit, but I did not hear what you --

MS. LINDAUER: Oh, I'm sorry. D13. It would be in the debtor's exhibits.

THE COURT: Thank you.

MS. LINDAUER: Thank you.

THE WITNESS: Yes. I am.

BY MS. LINDAUER:

Q Okay. And, Mr. Marx, just to speed things up a bit, you'd agree that this order modified in certain terms the prior December order. Is that right?

A Yes. In light of various payments, substantial payments that were made, this revised that section that we looked at a few minutes ago.

Q Okay. If we go to Page 2. The second order provision. And what was the extended payoff deadline pursuant to this order?

A May 30 of this year.

Q And what was to happen with the automatic stay as part of this particular order?

A Just that the automatic stay shall remain in force.

Q Okay. And how long would it remain in force?

A Until May 30th which was I think the holiday.

Q Okay. Does it say May 30, or does it say something else

about the occurrence of a default or expiration of the modified payoff deadline?

MR. KANE: We can stipulate that the document says what it says.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Okay. There are also payments in this particular order. Do you see that, Mr. Marx?

A Yes. The ones aggregating to about 3.5 million.

Q Okay. Do you know if those payments were in fact made?

A It's my understanding that they were made.

Q Okay. Do you know if they were made on time?

A I believe so. I don't know.

Q Okay. So for the period of time from the middle of March to the end of May, the debtor agreed to pay HNGH a total of $3.5 million. Is that right?

MR. KANE: Again, I mean objection, leading. The document says what it says.

MS. LINDAUER: Okay. Mr. Kane, if you'll stipulate that the payments were made on time and in that amount, we can move on.

MR. KANE: I believe I already have. But yes.

THE COURT: Based on that, based on those comments of each side, the objection will be sustained.

BY MS. LINDAUER:

Q Going to the top of Page 3 of the agreed order, you see a release and waiver provision, Mr. Marx?
A On the top of Page 3, I do.
Q Okay. All right. And do you know if any separate document was required to be executed in order to effectuate this particular release and waiver?
MR. KANE: Objection. Calls for speculation.
MS. LINDAUER: I think, Your Honor, if he knows, he can testify to that fact or not.
MR. KANE: There's no foundation for his knowledge. He wasn't a participant in this case, at least to anybody's knowledge, and wasn't an authorized -- there's no application to employ him as a debtor's attorney in this case.
MS. LINDAUER: Your Honor, let me ask it a different way then.
THE COURT: So I'll sustain the objection. And you can ask another question.
BY MS. LINDAUER:
Q Mr. Marx, have you seen in your review of the documents before the Court or otherwise a separate release agreement that would reflect the terms of this particular order in this particular provision dealing with release and waiver of claims?
A I am not.
Q If we look at the next provision, do you see that the debtor and Barton, Mr. Barton, agreed to dismiss the adversary

proceeding with prejudice? You see that provision?
A Yes.
MS. LINDAUER: One second, Your Honor.
(Pause)
BY MS. LINDAUER:
Q Mr. Marx, just quickly, if you look at that agreed order, if you'll glance at the pages to that order, there is a reference I believe to an exhibit in that order to a stipulation as Exhibit B.
A Yes.
Q And just to be clear, there is no Exhibit B attached to this order. Is that correct?
A Correct. Not on mine here, not on the one that I see on your screen even.
Q Do you know if there ever was an Exhibit B to this order?
A I don't know.
MS. LINDAUER: Your Honor, I'll pass the witness at this time.
THE COURT: Mr. Kane, are you ready? Looks like you're muted, Mr. Kane. Are you prepared for your cross, or do you need a break?
MR. KANE: No, I am prepared. I would like to just kind of keep moving. I just need just one second to get a couple of exhibits --
THE COURT: Sure. Take your time.

MR. KANE: -- ready to roll. And I'm going to try to share my screen here. It's just me solo. My wonderful paralegal, Theresa Garcia (phonetic), who had been with our firm for 28 years and worked with me for 13 years sadly retired on Monday of last week before our trial. So I'm doing things on my own a little bit. And I hope you guys will be patient with me while I try and --

THE COURT: Sure. It's always tough to lose good help like that.

MR. KANE: No kidding. So now, let's see. Mr. Marx, on your screen --

THE COURT: And just so you'll note -- I'm sorry, Mr. Kane. Just so you'll know, even if you can't, if you have problems sharing the screen, I do have all of the exhibits and I can pull them up and review them separately from whatever you're going to try to show me.

MR. KANE: Okay. And I believe, Mr. Marx, you also have copies of both exhibits with you?

THE WITNESS: You're referring to the HNGH exhibits and the debtor exhibits?

MR. KANE: Yes, I am.

THE WITNESS: Yeah, I have them up because candidly it's hard to read on that screen.

MR. KANE: Oh, I understand. So if you looked at your screen right now, and, Your Honor, I am attempting to

share the screen here, do you see a PDF that's moving a little bit here that is Exhibit 16? HNGH, the Lender's Exhibit 16? It says at the top Docket Number 94. Can you see that?

THE COURT: So, Mr. --

THE WITNESS: Yes. It's --

THE COURT: Mr. Kane, let's pause for just a minute. At least on the screen that I'm looking at, I see Mr. Kane's face frozen in time. I don't see a document. So give us just a minute. I have the exhibit --

MS. LINDAUER: Your Honor --

THE COURT: I have the exhibit on one screen. I don't have the exhibit on the shared screen. But if you'll give us just a minute.

(Pause)

MR. KANE: I have no objection to that. That's fine. And I've withdrawn that exhibit from my screen share to respond to Ms. Lindauer.

THE COURT: So I apologize, I missed something. Hold on, please.

MS. LINDAUER: John, I've got my associate pulling up exhibits. If you want, I don't mind you having Sydney help you. So if you can tell her what you would like, she'll pull it up for you.

MR. KANE: Well, my question, Joyce, is when I shared my screen, were you able to see it?

MS. LINDAUER: Yes. I could see it fine.

MR. KANE: Okay. So that's what I thought. I mean, I've had to do this in Judge Jernigan's court a couple times. So I figured it was working okay.

MS. LINDAUER: Okay. Well, if you do need any help, Sydney's available to help pull stuff up. Okay?

MR. KANE: Okay, thank you.

THE COURT: Mr. Kane, why don't you try it one more time? Tell me when --

MR. KANE: Yes, Your Honor.

THE COURT: Tell me when you think you have it up on the shared screen, and I'll tell you if I can see it.

MR. KANE: It's a bad start then because it's up on the shared screen right now.

MS. LINDAUER: And we can see it on our end.

THE COURT: So I'll give you the option, Mr. Kane. You can -- we can take a recess. If you want me to follow along on the shared screen, we're going to have to take a recess and try to reset something because it's not showing up on my screen. But I do have, if look to the right instead of to the left, I have my own set of electronic exhibits. So I can follow along separately. Or if you want to take a five-minute recess, we'll see if we can get the shared screen working.

MR. KANE: So, Ms. Lindauer requested a five-minute

recess anyway. And I'm perfectly fine doing that. And when we come back, if there appear to be any kind of technical difficulties, what I'd like to do is just go ahead and proceed. I'll share my screen for the witness and for the rest of the attorneys present. And if it's not up on your screen, Your Honor, I'll do my best like in a deposition to be as descriptive about the location that we are discussing so you can follow along and make sure you understand exactly where we are.

THE COURT: Sure. All right. We'll take a five-minute recess.

MR. KANE: And, Your Honor, real quick, I believe Mr. Carruth has an update for the Court.

THE COURT: Mr. Carruth?

MR. CARRUTH: Yes, Your Honor. Thank you. And so the bank will produce Ms. Blakeley this afternoon. And I presume that that would start three or after for terms of getting her in position.

THE COURT: I believe so because I think Mr. Kane's cross he said might take an hour, at which time Ms. Lindauer's going to have to jump off to join a WebEx hearing with Judge Mullins. So it will be probably at least three o'clock.

MR. CARRUTH: Thank you, Your Honor.

MS. LINDAUER: Thank you.

THE COURT: So we'll take a short recess.

(Recess at 1:23 p.m./Reconvened at 1:32 p.m.)

THE COURT: All right. Are we back on the record?

THE CLERK: Yes.

THE COURT: Mr. Kane, are you there?

MR. KANE: I am, Your Honor.

THE COURT: Okay. Why don't you give it a shot? I'm looking to my left anxiously awaiting your exhibit.

MR. KANE: And, viola. Your Honor, do you see anything? This is Exhibit 16.

THE COURT: Unfortunately, I see Jeff Carruth's name typed on the screen or his name -- one minute, please.

UNIDENTIFIED SPEAKER: Hi. This is courtroom IT support. Are you sharing from an iPad? Typically, that doesn't work with the strange screen size in the courtroom.

MR. KANE: We're actually so old school that I'm sharing from a desktop.

UNIDENTIFIED SPEAKER: Is the monitor resolution very low? I'm seeing it in a vertically oriented resolution. It's like taller than it is wider. I think that's the problem we're having here. Typically, if you use a standard wide screen monitor it shows up in the courtroom more reliably.

MR. KANE: I'm using -- yeah. I'm using an HP 27W. It's a 27-inch high-definition wide screen. I think I'm running either 1440 --

UNIDENTIFIED SPEAKER: Is it turned vertically

though?

MR. KANE: It is not. It is horizontal.

UNIDENTIFIED SPEAKER: Okay. Because it's showing up on my screen here as like it's vertical. Is it possible you're just sharing the Word? Can you share the whole screen as opposed to sharing the Word application?

MR. KANE: Yeah. Let me try and do that. Just a moment.

UNIDENTIFIED SPEAKER: Yeah. So just screen sharing on the WebEx side. And instead of clicking the application when you choose share, click screen.

MR. KANE: Okay. Let's try that.

UNIDENTIFIED SPEAKER: And, Judge, if you see it pop up, please let us know.

THE COURT: I'll let you know. There we go. I see Docket --

UNIDENTIFIED SPEAKER: -- Docket Number 94 is on the screen.

MR. KANE: Miraculous. All right. Let me try and move this little bar here because it's blocking some of my stuff here.

MS. LINDAUER: Your Honor, I'm going to ask a favor of the Court. If you'll remember, we were going to go to 1:30 today. And I know we're going past 1:30, but I actually do have to do a little bit of preparation before 2:30. If we

could stop at 2:00 to break so that -- I had thought we were going to stop around 1:30, but I understand where we are time wise, but if we could stop around 2:00, that would at least give me a few minutes before the next hearing I have to be at to get ready for that hearing.

THE COURT: Mr. Kane, why don't you go ahead and get started and we'll see what we can do in 20 minutes.

MR. KANE: Yes, Your Honor.

MS. LINDAUER: Thank you.

RECROSS-EXAMINATION

BY MR. KANE:

Q Mr. Marx, can you see this document? It's Exhibit 16. I just want to make sure that you also have access to it or can see it, on screen, in front of you, either way, doesn't matter to me.

A It's the March 17th one?

Q Yes, it is.

At the top it's file stamped and shows Docket 94. And I just want to make sure you have access to that. I'm going to ask you some questions first and then we'll go back to taking a look at it a little bit. But generally speaking, before this kind of closing mayhem took place, would you agree that you had very little involvement in the debtor's bankruptcy case?

A Yes. I agree with that.

Q And there is -- debtor never filed an application to

employ you as counsel at any time?

A No. I am a real estate and finance guy. Not bankruptcy.

MR. KANE: Objection. Non-responsive. Yeah. It's a yes or no question.

THE COURT: Response, Ms. Lindauer? Ms. Lindauer, are you on mute? I'll just go ahead and sustain the objection.

MS. LINDAUER: Your Honor, I was just going to say -- yeah. Go ahead.

THE COURT: I'll sustain the objection. Go ahead, Mr. Kane.

MS. LINDAUER: Thanks.

MR. KANE: Thank you.

BY MR. KANE:

Q Just big picture, Mr. Marx. I'm going to ask you a series of questions. Sometimes they'll be yes or no questions. Sometimes they'll leave an opportunity for a narrative or some explanation. Do you understand the difference between those questions?

A Yes. And I apologize. I was just trying to help. But then --

Q Understand. Understand.

A I forgot your question.

Q Okay. That's okay. If I need additional information from you I'll ask a follow up question.

A Okay.

Q The question that I asked you was to your knowledge, the debtor never filed an application to employ you as legal counsel in the bankruptcy case.
A That's correct.
Q And to your knowledge, there was never an order entered in this case approving your retention by the debtor in this bankruptcy proceeding.
A That's correct.
Q You never participated in any hearing. Is that correct?
A Other than this, yes.
Q Okay. And you never made an appearance at any hearing prior to, let's call it, to June 1st. Is that correct?
A Yes.
Q And during the debtor's bankruptcy case, you never sent HNGH's counsel any direct correspondence. Is that correct?
A Correct.
Q And you never --
THE COURT: I'm sorry, Mr. Kane. I was just momentarily distracted. Could you re-ask that question for me?
MR. KANE: Yes, Your Honor.
BY MR. KANE:
Q Is Mr. Marx -- isn't it correct that you never sent any direct correspondence to HNGH's counsel during this bankruptcy case?
A I did not send any correspondences myself.

Q Thank you. And you never negotiated any pleadings that were filed in this bankruptcy case, any agreed pleadings. Is that correct?
A Correct.
Q And you never negotiated the terms of any of these agreed orders during the bankruptcy case.
A Did you say negotiated?
Q That's right.
A Yes. That's correct.
Q Now you just testified that you don't know of any agreement other than the order that's on the screen, this Exhibit 16, that documented the waivers and releases that were contained herein. Is that correct?
A I don't recall that that was my testimony.
Q Okay. Well, let's -- let me ask a series of different questions. You see right here on the top of Page 3, this is the first full decretal paragraph on Page 3 of this Exhibit 16.
A This is the first decretal paragraph on top of Page 3.
Q Yes.
A Yes.
Q And this -- is it your understanding that this contains certain waivers and releases by the Barton parties in favor of the HNGH parties?
A Yes.
Q And the scope of these releases is all claims whether

known or unknown in any possible way relating to the property, the loan documents, or any other corresponding matter now or in the future. You understand that, correct? You read that correctly?

A You read it and I think that was correctly. It was right after the HNH parties parenthetical.

Q Thank you. And do you understand that there is an indemnification obligation in the following sentence?

A That's what I understand. Yes.

Q Okay. And you said that you were unaware of any other document that included these settlement, release, and indemnification obligations. Is that correct?

A I think the question was whether I was aware of any others ancillary to this provision and --

Q Okay. So, are you?

A Relative to this provision? No, I'm not.

Q Yes. Now the very next decretive sentence discusses towards the end of that sentence says -- this is a dismissal of the adversary proceeding with prejudice pursuant to the form of order attached to. And then there's a capital S stipulation as Exhibit B. Did you see that?

A Yes.

Q And I believe you testified that Exhibit B, there is no Exhibit B to this document. Is that correct?

A Yes.

Q And that makes sense, right, because it says it's attached to the stipulation as Exhibit B?

A Yeah. I don't -- yes. I mean, that verbiage, I agree with.

Q Okay. I'm going to show you another exhibit. This is Exhibit 15. Let me shrink it down a little bit so that it's manageable for me.

Do you see the title of this pleading? It says joint stipulation and agreed order modifying order on motion to dismiss and for relief from stay.

A One second, please. Yes.

Q Now you've been around the block a little bit. A joint stipulation, that's typically a document that's agreed to and executed by the parties that are going to be bound by that agreement, correct?

A Yes.

Sometimes they're signed by counsel only, and other times they are signed by the underlying parties.

Q Now that's a good point, Mr. Marx. So let's scroll down here to this signature area of this document. And here we have a series of signatures. Do you see that? This is on the fifth page of six of the main exhibits, Exhibit 15, Docket Number 91. Do you see this?

A I do.

Q And this appears to be executed on behalf of HNGH Turtle

Creek, the debtor, and also Tim Barton, correct?
A I think that's right. Did you say that it was signed? I mean, it says attorney for Timothy Barton. I'm not really sure.
Q Right. On behalf of Timothy. The stamp says by Timothy Barton though, doesn't it?
A Yes.
Q And you see this document as titled joint stipulation and agreed order?
A Yes.
Q Okay. Now I'm going to switch back to Document Exhibit Number 16. And we go back to that reference to a stipulation as Exhibit B. Now, do you have any idea whether this Exhibit 15 is this stipulation that that's referring to?
A It appears to be the case.
Q And so if we look at Exhibit B to this stipulation, we might see that proposed -- oh, I see. There we go. That agreed order of judgment and dismissal of the adversary proceeding with prejudice to refiling. Do you see this?
A Just one second. What page is that?
Q It's the fourteenth of 17 total pages on Exhibit 15.
A I don't see it. Just give me one second. Yeah. You're on the front page of the first. And there are the signatures. I'm looking for Exhibit B. Okay. Sorry. Okay. Exhibit B.
Q And so is it your understanding given that this was a

stipulation that this was an agreed order that the parties agreed to be submitted to the Court for entry?

A Yes.

Q And that by its title that this was an agreed order of judgment and dismissal of the adversary proceeding with prejudice to refile it. Is that your understanding?

A That's what the document says and that is my understanding.

Q Okay. Now I want to go back up to this stipulation because I think you had testified earlier that you weren't aware of another document that included those waivers and releases and indemnification obligations.

Now, do you see on Exhibit 15, if you're scrolling through the main pleading, there's a marker that says Page 3 of 6 towards the bottom. And there's a paragraph with a heading that says Barton and debtor releases.

A Okay. What page number is that?

Q It is Page 3 of 17 in Exhibit 15.

A Okay. I'm with you.

Q Okay. I'm going to give you an opportunity to just review this Paragraph 11 and then Paragraph 12.

And then I want you to let me know if this appears to be another document agreed to by Timothy Barton, the debtor, and HNGH, in which these parties defined as the Barton parties are providing the waivers and releases that were identified in

Exhibit C of that Docket Number 94.

A This appears to be additional Barton and debtor release language.

Q Okay. Now I'll move on from that kind of painstaking process a little bit and let's do a little bit more fun stuff. Now, I think you said you've testified that you've done work during this closing for the debtor.

Is that right?

A Ancillary, yes.

Q Okay. And I think you also said, you testified that you've done work for other Barton related entities of which TCC2022, LLC was one of them. Is that right?

A No. I've done work. I've created T -- that's a tongue tie-er. TCC2022. That's correct. That was not for a Barton entity. Ultimately, it's for my funding source.

Q Which has nothing to do with Tim Barton or any of his affiliates or related entities.

A Well, it has something to do because the debtor would be conveying the asset to this T --

Q No. But I'm referring to the funding source. I'm sorry. Let me clarify, Mr. Marx.

Did your funding source have anything to do from a legal standpoint with Tim Barton? Was it an affiliate of Tim Barton? Was this an entity controlled by, managed by, or in which Mr. Barton had any interest whatsoever, directly or indirectly?

A No.
Q Okay. Did you represent other Barton related entities in an effort to close a transaction by May 31st?
A Yes. Because they were running parallel paths. And so I did attempt to assist the debtor here.
Q And what were those entities?
A The debtor --
Q What were the Barton related entities that you were representing on parallel paths?
A The debtor.
Q Just the debtor?
A Yes.
Q Okay. Did you represent Enoch Investments, LLC?
A Yes.
Enoch is one of the prospective purchasers and it has been seeking a loan from First Guaranty Bank. And I've helped Enoch in connection as the borrower in connection with that loan.
Q And does Enoch Investments have any relationship to Tim Barton?
A Enoch is owned by a trust in which Mr. Barton is a beneficiary.
Q And you said Enoch Investments was trying to raise funds from, I think you said First Guaranty Bank.
A Enoch is -- yes. I guess to answer your question, yes.
Q Was Enoch Investments also trying to raise equity capital?

A Not that I know of.
Q Did Enoch Investments already possess any equity capital required to bridge a gap between the First Guaranty Bank loan and what was the structure of that proposed deal?
A I'm sorry. Could you restate?
Q Sure. What was the proposed structure of the Enoch Investments deal that you were trying to help close?
A Enoch Investments is the borrower, is in the process of obtaining a loan from First Guaranty Bank.
Q Is it still in the process of obtaining a loan?
A I am continuing to work on that, yes.
Q Was the loan of sufficient size to satisfy the payoff amount?
A The loan was in the approximate amount of 30 million.
Q That's quite a serious shortfall, right? That's almost a, what, $10, $11 million shortfall. Is that correct?
A Yes.
Q And so what was Enoch Investments' plan to bridge that gap?
A With the funds that might be provided with my client.
Q So loan wasn't big enough to do it?
A Not with the First Guaranty Bank loan. And I apologize. It's either 30 or the 33.
Q Okay. And to --
A I don't have --

Q That's fine. Ballpark it, 30, 33. Still short of $40,882,500?

A The loan, yes.

Q And now you said you're still in the process of obtaining the First Guaranty loan on behalf or First Guaranty Bank loan on behalf of Enoch Investments. I take it that loan was not prepared to fund on May 31st.

A Well, there have been some delays in that underwriting related to --

MR. KANE: Objection. Non-responsive.

THE COURT: Response, Ms. Lindauer?

MS. LINDAUER: Your Honor, I think he asked the question. I think Mr. Marx was trying to answer it, so.

THE COURT: So I'll --

MR. KANE: No. I asked a yes or no question.

THE COURT: I'll sustain the objection.

MS. LINDAUER: Okay.

MR. KANE: Thank you. Mr. Marx --

THE COURT: So let me -- why don't you re-ask the question because I'm not sure I caught the answer. I think the question was --

MR. KANE: Mr. Marx --

THE COURT: And, Mr. Kane, you're referring to Enoch Investments, LLC, when you said they were not prepared, or is that the entity that you were asking about?

MR. KANE: I'm actually asking about First Guaranty Bank.

THE COURT: I'm sorry. First Guaranty Bank.

BY MR. KANE:

Q Mr. Marx, First Guaranty Bank was not prepared on May 31st to close and fund the 30-some odd million dollars of financing that you were seeking from it on behalf of Enoch Investments, LLC, correct?

A That's correct.

Q Now I'm going to share my screen and show debtor's Exhibit D4. Do you see this, Mr. Marx?

A Yes, I do. Let me see if I can get it where I can read it better. Go.

Q Okay. This is the loan amount. This is the $33,840,000 that you were referencing, correct?

A That's correct.

Q And, you know, I'll go ahead and assume that you were working very diligently with First Guaranty Bank, but they did not even provide a loan commitment letter until the business day before the closing deadline, correct?

A I believe that to be true. I don't see where -- there it is. 5/27.

Q That's here on this screen. Do you see that on Page 3 of 3? Borrower acknowledges having read all the provisions of the commitment, accepts and agrees to the terms of the commitment

as of 5/27/2022.

A Right. That's the date that I was looking for.

Q Right. And that's not countersigned, but I assume that that is the correct date that First Guaranty Bank issued the commitment to Enoch Investments, LLC. Is that right?

A I think that's correct.

Q Okay. And even in this commitment, First Guaranty Bank disclosed that it would need ten business days or more to finalize a loan closing. Is that right?

A I believe that's correct.

Q And that's right here in this passage that says estimated closing date. Estimated date of closing is ten business days from the acknowledgment date of this commitment subject to any additional time identified in order to obtain good title, insurance, legal review, other common ordinary needs of First Guaranty Bank.

And so that was your understanding, that there is no closing on May 31st from this commitment?

A Correct.

Q Now I want to turn back to TCCC2022. TCC20 -- well, let me ask you this question.

You said you have been continuing to work with First Guaranty Bank on obtaining a loan on behalf of Enoch Investments. That's related to this same property, right, just in case there's a potential for a closing at a later date? Is

that right?

A Correct.

Q Okay. Is First Guaranty Bank using Sendera Title?

A There are two title companies involved, and I believe that they have a preference for a Republic Title.

Q Okay. But TCC2022 was using Sendera Title. Is that right?

A Correct.

Q Now, was it your understanding that SEndera agreed to issue a title policy for your TCC2022 closing, but only if TCC2022 accepted HNGH's form of recision deed?

A Say that again.

Q Okay. Is it your understanding that Sendera Title agreed to issue a title policy for the TCC2022 closing, but only if TCC2022 accepted HNGH's form of recision deed?

A No.

Q Did you ever have any correspondence with Sendera Title's underwriting attorney?

A I know Paul Pruitt. Have I had correspondences with him? No.

At some point, Julie at Sendera and I -- well, we corresponded on a number of occasions.

Q But you did not personally have any correspondence with Paul Pruitt, who you acknowledge was Sendera's underwriting attorney?

A I don't recall any correspondences directly with Paul. There were a number of correspondences with Sendera.

MR. KANE: Objection. Non-responsive. It was a very specific limited question, Mr. Marx. I'm just asking about Sendera's underwriting attorney only.

THE COURT: So response, Ms. -- just so everybody knows, any time there's an objection, I always try to give the other side an opportunity to respond to the objection.

So, Ms. Lindauer, do you have a response to that objection?

MS. LINDAUER: No, Your Honor. I don't. If he wants to clarify his question, that's fine.

THE COURT: So I'll sustain the objection.

BY MR. KANE:

Q Okay. So let me ask it again just so I ensure that that record is clear. You never had any correspondence directly with Paul Pruitt, who you acknowledge was Sendera's underwriting attorney?

A I don't recall. There was --

Q Okay. That's fine. Do you understand, or is it your understanding that some representative of the debtor may have?

A I don't --

MS. LINDAUER: Your Honor, I'm going to object to the form of that question. I think that's -- yeah. There's no foundation for that, some representative the debtor may have.

I just -- I don't think that's a proper question.

MR. KANE: All right. Let me try again.

THE COURT: Respond, respond.

MR. KANE: I agree with that.

THE COURT: Okay. So objection sustained.

BY MR. KANE:

Q Mr. Marx, do you know if the debtor had any correspondence with Paul Pruitt?

A At some point, I received correspondences from K where he was in, I think.

Q And can you explain to the Court who K is?

A Mr. Walji.

Q Is that Mr. Khudabuksh Walji?

A Yes.

Q Is it your understanding that Sendera Title approved HNGH's recision deed for title insurance purposes?

A Yes. I do think that there was an expression along those lines from Sendera.

Q And Sendera did not approve your form of recision of deed for title purposes. Is that correct?

A That is not correct.

Q Did Sendera approve your form? Is it your understanding, your testimony for the Court, that SEndera Title -- for the issuance of a title policy, right, for a title insurance policy purposes, approved your form of recision deed?

A I objected to the form that was provided directly to --

MR. KANE: Objection. Non-responsive.

THE COURT: Response.

THE WITNESS: I don't know if --

THE COURT: Ms. Lindauer.

MS. LINDAUER: Hang on. Hang on. Hang on.

Your Honor, I think that he was trying to answer the question. I'm a little confused on the questioning, so I'm having a little trouble following what we're asking, but I think he was trying to answer the question. Maybe Mr. Kane can --

THE COURT: All right. I'll sustain. I'll sustain the objection. I'll sustain the objection.

Mr. Kane, go ahead.

BY MR. KANE:

Q Mr. Marx, is it your testimony for this Court that Sendera Title for the purpose of issuing a title policy approved your proposed form of recision deed?

MS. LINDAUER: Your Honor, I think -- Your Honor, I think that I'm going to object to that question. I think it misstates the facts.

When he says your form of recision deed, I don't know what that was Mr. Marx's form. Again, I think it's misstating the form of recision deed. I think Mr. Kane needs to clarify his question because it's assuming facts not in evidence, so I

don't know that Mr. Marx prepared a form of recision deed, so I'm going to object.

THE COURT: So I'll overrule. I'll overrule the objection.

MS. LINDAUER: Okay.

BY MR. KANE:

Q Yeah. Let's take it step by step to clarify, Mr. Marx. Can you go ahead and check your screen?

MS. LINDAUER: Your Honor, Your Honor, Your Honor, Your Honor, I hate to do this, but it is a little after 2:00. I was kind of letting Mr. Kane go a little bit, but if -- I would aks the Court if we could take a break now so that I can talk to my witnesses for the next hearing I have and then we'll come back as soon as we get done with that hearing. Hopefully it won't take long, but I don't know.

THE COURT: Mr. Kane, I was eyeballing the clock and let it go for a few minutes after 2:00.

MS. LINDAUER: Yeah.

THE COURT: So we will go ahead and recess. And then, Ms. Lindauer, if you would, let us know immediately when you're done with --

MS. LINDAUER: I will.

THE COURT: -- Judge Mullins' hearing. I'll ask them to do the same so that we can pick back up when you are finished.

MS. LINDAUER: Very good. Thank you, Your Honor.

THE COURT: Anything else, Mr. Kane, before we recess?

MR. KANE: No, Your Honor. That's fine. Thank you.

(Recess at 2:04 p.m./Reconvened at 5:03 p.m.)

THE COURT: -- record in the 2999TC Acquisitions case.

I understand from my judicial support specialist that we have everybody back on including Mr. Kane, Ms. Lindauer, Ms. Phelan, Ms. Simmons, Mr. Carruth. So, just I need to give you all an update. And so I hate to be the bearer of bad news.

First of all, it sounds like Ms. Lindauer's one-hour hearing went long, so we are just now back up. Judge Hale has a retirement happy hour for his staff at 5:30. And so I don't mind staying late, but unfortunately I have to have support staff to run the equipment.

And, unfortunately, Mr. Kane, I think that means we're not going to be able to continue this hearing this afternoon. And just to be -- yeah. So I don't know that we're going to be able to continue this afternoon.

Something else I did not know when we were last here earlier in the week is that I had mentioned we have a trial on an involuntary starting at 9:30 on Friday morning. It looks like there is a funeral scheduled in the afternoon that I was not anticipating that I need to go to, so I don't know that I'm

going to be able to offer you time on Friday, Mr. Kane.

MR. KANE: Okay.

THE COURT: So does everybody have their calendars open? Because I would like to lock in at least the next few available dates.

And just a heads up to Ms. Lindauer, there's -- it looks like you have added quite a bit of firepower to your team, including Mr. Phelan, Mr. Simmons, Mr. Garcia. I do not intend to allow this hearing to be stretched out over a month based on attorney unavailability. I understand that you're busy. I got a report from my courtroom deputy about some of the correspondence going back and forth about availability next week.

Given the firepower that you have added to your team, Ms. Lindauer, I would like to lock in some days right now for next week. Unfortunately, I don't have an update yet on when my virtual courtroom is going to be ready. I'm hoping it will be ready next week all week, but I don't know that yet. So I do know that we have some available days with Judge Larson's and Judge Jernigan's courtroom. So let's look at our calendars.

The first thing -- Monday is a holiday. Monday -- bear with me one second. Monday, the 20th, is a holiday. The 21st, as of right now, we have Judge Jernigan's courtroom available on the afternoon starting at 1:30.

Ms. Lindauer, are you available, and Mr. Kane, are you available on the 21st starting at 1:30?

MR. KANE: Your Honor, I am available. This is John Kane.

THE COURT: Ms. Lindauer.

MS. LINDAUER: Okay. So, Your Honor, I'm being told I have a status hearing at 2:00 and a show cause hearing in a bankruptcy case.

What time is the show cause, Sidney? 1:45.

That's a Western District case called Primo's. So the only thing I could do is talk to some of our other counsel and see if any of them are available to do those hearings. Of our group, Your Honor, I think Mr. Rey is primarily just an appellate attorney. Ms. Simmons is a bankruptcy litigation attorney.

Of course, Mr. Phelan, but I don't think Mr. Phelan had really anticipated questioning witnesses. So I know Ms. Simmons is on here.

Ms. Simmons, what is your schedule look like on the 21st afternoon?

MS. SIMMONS: As of right now, I am open from 1:30 on on the 21st.

MS. LINDAUER: Okay.

MS. SIMMONS: So if I need to fill in, I can fill in.

THE COURT: Okay. I hope to have an update tomorrow

on whether my virtual courtroom would be available on the morning of the 21st. If that happens, is everybody available first thing on the morning of the 21st?

MR. KANE: This is John Kane. Yes, Your Honor.

MS. SIMMONS: Yes.

MS. LINDAUER: I know I'm not, so I know Ms. Simmons would have to cover that for us.

THE COURT: Say that again, Ms. Lindauer.

MS. LINDAUER: I know I'm not on the morning of the 21st because I've got an order out of Judge Moyer's Court to appear with my clients, so I know I'm out.

THE COURT: At what time?

MS. LINDAUER: But --

THE COURT: What time?

MS. LINDAUER: That morning. What time is it, Sidney? 9:30 in state court, but if Ms. Simmons can cover that morning, then Ms. Simmons would be available.

THE COURT: Ms. Simmons, are you -- if we pick up with the cross-examination of Mr. Marx that morning, will you be prepared to be able to do any necessary redirect or to address any objections?

MS. SIMMONS: Yes, Your Honor.

THE COURT: And you are -- Ms. Simmons, you are available on the morning of the 21st if necessary?

MS. SIMMONS: Yes. I can make myself available on

the morning of the 21st. My calendar is currently open on the morning of the 21st, so I will make myself available if need be.

THE COURT: And you are sufficiently up to speed on the case to know -- to be able to step in?

MS. SIMMONS: Yes, Your Honor.

THE COURT: Okay. So we will -- I'm going to get an update from my IT folks and we will let you know tomorrow if possible. I hope to know tomorrow. As soon as I know, I will let everybody know, but pencil in the AM. Let's say 9:00 on the 21st. Does that time beginning -- starting time work for everybody?

MR. KANE: Yes, Your Honor.

MS. LINDAUER: Yes.

THE COURT: So pencil in 9:00. If for some reason my virtual courtroom is not ready, then we'll just have to wait until 1:30, but we will let you know hopefully tomorrow, no later than Friday, whether we're going to start at 9:00 or 1:30.

Okay. On the 22nd, it appears that we have all day. I have some preliminary hearings at 1:30 that I don't anticipate will take much time, but we have all day on the 22nd, I'm told, in Judge Jernigan's courtroom or perhaps my virtual courtroom.

Mr. Kane, are you available on the 22nd?

MR. KANE: Your Honor, I am in the morning. I have a 1:30 docket call in the Reagor Dykes case over in Lubbock with Judge Jones. We are -- I am working with opposing counsel to try and either get that settled or that trial setting continued. I can commit now to 9:00 to 1:00.

THE COURT: Just a minute.

Okay. So at least right now on the 22nd I'm told we only have the afternoon in Judge Jernigan's courtroom, but I'm going to bank on having my virtual courtroom ready to go that morning. If that changes, I will let you know.

So, Mr. Kane, you're available on the 22nd from 9:00 to 1:00 at the very least.

Ms. Lindauer or Ms. Simmons, what about you on the 22nd from 9:00 --

MS. LINDAUER: I am not available. I am not available in the morning, but I am in the afternoon. I don't know about Ms. Simmons.

MS. SIMMONS: I am during the lunch hour unavailable, so I'm not sure how that would work, but I can do the morning up until around 11:45 and then after 2:00 p.m.

THE COURT: And, Ms. Lindauer, what is your availability again? Tell me again. For the 27th.

MS. LINDAUER: I've got a Sub V status report at 1:30, and then I'm free after that. I do have a hearing in the morning.

THE COURT: Okay.

MS. LINDAUER: So, but I could do the afternoon.

THE COURT: What's your hearing in the morning?

MS. LINDAUER: Again, it's a state court case, Your Honor. I'm always involving some clients that have a dispute over a piece of property. And we've actually been ordered to appear in front of the judge, so that's at 9:30.

THE COURT: So you're available only in the afternoon on --

MS. LINDAUER: Afternoon.

THE COURT: -- on the 22nd.

MS. LINDAUER: 22nd.

THE COURT: Just a minute, please.

MR. KANE: I'll be happy to report to this court if we happen to resolve our matter that's currently pending.

I think our side is working pretty diligently to try and get a settlement done, but we're not getting a lot of responsiveness period on our docket call. And the dollars involved are like under $10,000, so I would desperately like to get that one resolved so we can work the afternoon in this case.

And I'll provide opposing counsel and the Court an update on a daily basis through Friday if we can possibly get it resolved.

THE COURT: Bear with me one second here. I'm

getting pinged and nervous looks from my staff on these dates that I'm floating. Bear with me one sec.

MS. LINDAUER: And, Your Honor, we checked our calendar, just to give you a heads up. 23rd and 24th we're open both of those days, both afternoon and morning, so that --

THE COURT: Okay. Just a moment.

MS. LINDAUER: -- if that helps at all.

THE COURT: I'm going to make sure that I'm -- that I was correct in what I told you about the 21st and the 22nd. Bear with me one second.

(Pause)

THE COURT: All right. I didn't see it on my docket or on the calendar, but I see it now. On the 21st, I do have a two-hour time estimate in another matter that starts at 1:30. So on the 21st, we're back possibly just the a.m.

And Mr. Kane and Ms. Simmons are available in the a.m. from 9:00 to 1:00, correct?

MR. KANE: That's correct, Your Honor.

THE COURT: So the 21st from 9:00 to 1:00. And I'm sorry. Bear with me. Just a minute.

(Pause)

MS. SIMMONS: Joyce, are you available on the 23rd and 24th? Are you wide open? You said you were wide open, right?

THE COURT: I'm sorry, Ms. Simmons. Who are you

asking?

MS. LINDAUER: I'm open both those days.

MS. SIMMONS: Yeah. Your Honor, in time for the 21st, if we want to maintain continuity for, you know, who's lead counsel and examining and the witnesses, is there any way we could move, instead of going -- have me go from 9:00 to 1:00 on the 21st that we just, you know, work with Ms. Lindauer's schedule on the 23rd and 24th because she's wide open.

THE COURT: Table that. First, I'm going to find out everybody's availability and then we'll decide.

MS. SIMMONS: Okay. Great. Thank you, Your Honor.

THE COURT: The 22nd I'm just again going to bank that we're going to have my virtual courtroom necessary if we need to. I have on the 22nd some preliminary lift stays at 1:30 that likely will not take much time. So, okay. Back to my notes on the 22nd. I have Mr. Kane available from 9:00 to 1:00, correct?

MR. KANE: That's correct, Your Honor.

THE COURT: Ms. Lindauer is not available in the morning. Ms. Simmons is available from 9:00 to 11:45, correct?

MS. SIMMONS: Yes, Your Honor.

THE COURT: And then in the afternoon, Ms. Lindauer is not available, and Ms. Simmons, you're available after 2:00?

MS. LINDAUER: I'm actually available after 2:00. I have that Sub V thing. And once I do that, then I'm okay. I

should be okay.

THE COURT: So you have a matter at 1:30 on the 22nd, correct?

MS. LINDAUER: 1:30. I'm on at 1:30. Yeah.

THE COURT: Is that -- I would appreciate --

MS. LINDAUER: I think that's with Judge Morris in a case called Cath Corp at 1:30. That hearing shouldn't take that long. I just don't know what else he has on his docket, but that hearing is probably going to take about ten minutes. So 2:00 would be fine on the 22nd, 2:00 after.

THE COURT: Okay. The 23rd and 24th, I think I had just heard Ms. Lindauer say she's available all day both days. We have -- I have my Wichita Falls video docket at 10:00. I don't have a good feel yet for how long that's going to take. I'm thinking it's not going to take a whole lot of time.

Is everybody available on the 23rd? Assuming that that's a short docket, if we were to start at, let's say 11:00 on the 23rd? I'm sorry.

MR. KANE: This is John Kane. Yes. I am available.

THE COURT: Hold on.

(Pause)

THE COURT: Okay. Part of this is a learning curve for me on the Wichita Falls docket, and I had not had my first docket there yet. I'm told that it could be relatively quick, but there could be -- it could be a couple of hours. So I

think it's safest to say that on the 23rd we would be looking at starting at maybe 1:00 in the afternoon.

So I know you've probably answered this already, but Mr. Kane, are you available on the 23rd starting at 1:00?

MR. KANE: Yes, Your Honor.

THE COURT: Ms. Lindauer?

MS. LINDAUER: Yes, Your Honor. I'm available.

THE COURT: Ms. Simmons.

MS. SIMMONS: Yes, Your Honor.

THE COURT: Mr. Phelan.

MR. PHELAN: Your Honor, that's the only that I'll have any issues. I have a 2:30 hearing in front of Judge Jernigan. It shouldn't last very long. I'm doing the closing argument, so as long as we're not that far along, I can -- you know, I'll just duck out for an hour or so.

THE COURT: Okay. So I think we'll just have to plan. I want everybody to have, if possible, your counsel available that you need there. But given the need to get this evidence going, we will pencil in the 23rd at 1:00.

And how about the 24th, Mr. Kane?

MR. KANE: Your Honor, I am open all day on the 24th.

THE COURT: Ms. Lindauer.

MS. LINDAUER: Open all day, Your Honor, on the 24th.

THE COURT: So on the -- so I'm looking at my calendar, and it looks like I have -- hold on, please.

(Pause)

THE COURT: Okay. So I have confirmed that I do have all day on the 24th available.

Mr. Kane, you said you are available all day?

MR. KANE: I am. Yes, Your Honor.

THE COURT: Ms. LIndauer.

MS. LINDAUER: I'm available all day, Your Honor.

THE COURT: Ms. Simmons.

MS. SIMMONS: Yes, Your Honor. I'm available all day on the 24th.

THE COURT: And Mr. Phelan, you're available.

MR. PHELAN: I am.

THE COURT: Okay. So I'm just thinking out loud here, Mr. Kane.

Given that I have not yet used my virtual courtroom, I'm thinking that we may want to do some test runs since Monday is a holiday. And I'm just not confident that between now and Monday -- we might be ready to go. I just don't -- I don't know yet if it's going to be ready to go first thing Tuesday morning.

So why don't we hold the 21st from 9:00 to 1:00 open and either tomorrow or Friday we will notify the parties if it looks like we're going to be ready to go. If we have the opportunity this Friday to get it up and running and do some testing, we will know by hopefully a reasonable time on Friday

that we are good to go on the morning of the 21st from 9:00 to 1:00.

So, given all that, Mr. Kane, I've heard -- Ms. Simmons said her preference is to not start on the 21st, but start on the 23rd and 24th.

Mr. Kane, is your preference if my virtual courtroom is available on the 21st from 9:00 to 1:00, do you want to start then or what is your preference before I hear the other attorneys' preferences?

MR. KANE: Yes, absolutely that's my preference.

THE COURT: Okay. Ms. Simmons, I know you said you would prefer just for continuity to have Ms. Lindauer continue that, but you -- if necessary, you would be prepared to start that morning from 9:00 to 1:00, correct?

MS. SIMMONS: Yeah, Your Honor. If I -- yeah. If I have to work through the weekend to get up to speed in order to take, you know, lead counsel on this, at least on the examination of witnesses placed and fill in, I can definitely make myself available, but our preference is, you know, with the continuity of lead counsel and examination, to stick with Ms. LIndauer.

THE COURT: So normally I would agree. I would try to do that. Just given how long it's taken to get through even the first witness, I think my plan is to go ahead and start, again subject to confirmation that I can get my virtual

courtroom up and running this week and tested, to start on the 21st at 9:00 to 1:00.

And very briefly, do we have an agreement on who the next witness is so that we're not going to be arguing about whether we have a witness ready to go on the dates that we've all talked about?

MS. LINDAUER: Your Honor, I -- well, I won't be able to do it, but I think what we're doing is we're going to finish Mr. Marx. I think we'll make sure he's available that morning. And then our next witness was Ms. Blakeley.

So, again, Mr. Carruth, is Ms. Blakeley, can she be available that morning? I guess probably somewhere around 11:00. Is she available?

MR. CARRUTH: Yes. We've been communicating throughout the last several minutes, and the 21st and the 22nd she is available.

MS. LINDAUER: Okay.

MR. CARRUTH: Her availability is diminished on the 23rd and 24th, so if we can commit to 11:00-ish on the 21st, I think that would be great.

MS. LINDAUER: Okay.

MR. CARRUTH: And I guess -- Ms. Blakeley is on the line also. And this doesn't sound fussy, but we are not intended to sound fussy, but we did a lot and got her ready to go and she's been waiting and ready to go this afternoon. So,

Ms. Blakeley, if 11:00 on the 21st is acceptable, would you text me, please, and let me know? Yes. She says yes.

THE COURT: Okay.

MS. LINDAUER: Okay.

THE COURT: And Ms. Blakeley and Mr. Carruth, I do appreciate your courtesies. It's not -- I wasn't trying to pressure you into starting early before you were prepared, but I do appreciate your making Ms. Blakeley available. So we'll pencil her in for the 21st at 11:00.

And we'll just play it by ear on that day. If, God forbid, we're not finished with Mr. Marx by 11:00, we can decide whether we take a break to get Ms. Blakeley in so that she can be released. We'll just have to play that by ear on Tuesday morning.

MR. CARRUTH: Thank you, Your Honor.

THE COURT: I did see Mr. Garcia earlier. Did I not have his name correct, Ms. Lindauer? You said Mr. Rey.

MS. SIMMONS: Rodriguez.

THE COURT: I'm sorry.

MS. SIMMONS: Rodriguez, Mr. Rodriguez, Your Honor.

MS. LINDAUER: Rodriguez.

THE COURT: Oh, I apologize.

MS. LINDAUER: Yeah.

THE COURT: Mr. Rodriguez, and Mr. Rodriguez, are you with us?

MS. LINDAUER: He actually had to leave, but we can -- we'll work him in.

THE COURT: Okay. I apologize. You said Mr. Rey and I didn't have his notice of appearance handy, and I apologize for that.

So I think we'll recess so that my staff can get to the happy hour for Judge Hale. I apologize about Friday afternoon. There's just something I'm going to have -- I'm going to have to attend this funeral, not that I have to. I want to attend this funeral.

And we will send the parties an email either tomorrow or Friday confirming that we have my virtual courtroom up and running hopefully Tuesday morning at 9:00.

MS. LINDAUER: Okay.

MR. KANE: Very good. Thank you, Your Honor. We appreciate the accommodation.

MS. SIMMONS: Thank you, Your Honor. Thank you, Your Honor.

THE COURT: All right. All right. Thank you all for working with me on your schedule.

(Proceedings concluded at 5:29 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, and CRYSTAL THOMAS, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Michelle Rogan

MICHELLE ROGAN

/s/ Crystal Thomas

CRYSTAL THOMAS, CET-654

LIBERTY TRANSCRIPTS DATE: June 23, 2022