IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Tuesday, June 21, 2022<br>9:33 A.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

For the Debtor:

Joyce Lindauer Attorney, PLLC
BY: JOYCE LINDAUER, ESQ.
1412 Main Street, Suite 500
Dallas, Texas 75202

Simmons Legal, PLLC
BY: CAMISHA SIMMONS, ESQ.
6060 North Central Expressway
Suite 500
Dallas, Texas 75206

Robin Phelan Law
BY: ROBIN ERIC PHELAN, ESQ.
4214 Woodfin Drive
Dallas, TX 75220

Fee Smith Sharp & Vitullo LLP
BY: OSCAR REY RODRIGUEZ, ESQ.
13155 Noel Road, Suite 1000
Dallas, Texas 75240

APPEARANCES CONTINUED ON NEXT PAGE.

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES VIA WEBEX (CONTINUED):

| | |
|---|---|
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |
| For Centennial Bank d/b/a Happy State Bank: | Weycer Kaplan Pulaski & Zuber, PC<br>BY: JEFF CARRUTH, ESQ.<br>2608 Hibernia Street<br>Dallas, Texas 75204 |
| For the United States Trustee: | Office of the United States Trustee<br>BY: ASHER BUBLICK, ESQ.<br>1100 Commerce Street<br>Room 976<br>Dallas, Texas 75202 |

**I N D E X**


| | Page |
|---|---|
| Case called | 4 |
| End of Proceedings | 96 |
| Certification of Transcriber | 96 |

WITNESSES

FOR THE DEBTOR:

RANDY MARX

| | |
|---|---|
| Examination by the Court | 10 |
| Cross-Examination (Resumed) by Mr. Kane | 17 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 9:01 a.m.)

THE COURT: -- heard in the 2999TC Acquisitions case, Case Number 21-31954. Hopefully, you can all hear and see me just fine. This is my first attempt at the virtual courtroom where I'm actually in my temporary office instead of borrowing Judge Jernigan's or Judge Larson's courtrooms.

So, first, let me take appearances.

Mr. Kane, why don't we start with you just so that we can not talk over each other.

Mr. Kane, are you there?

MR. KANE: I am. Thank you, Your Honor.

This is John Kane on behalf of HNGH Turtle Creek, LLC, the movant and pre-petition lender.

THE COURT: Ms. Lindauer?

MS. LINDAUER: Your Honor, Joyce Lindauer here on behalf of 2999TC Acquisitions, LLC, the reorganized debtor.

THE COURT: Mr. Phelan?

MR. PHELAN: Robin Phelan also for the reorganized debtor.

THE COURT: And somebody is kind of in a dark shadow. I can't see who that is. Anybody else making an appearance this morning?

MR. METZGER: Your Honor, Steve Metzger representing Tim Barton individually.

THE COURT: Good morning, Mr. Metzger.

Anybody else on that wishes to make an appearance?

(No audible response)

THE COURT: Now, Ms. Lindauer, I wasn't expecting you this morning. Has there been a change of plans?

MS. LINDAUER: Well, Your Honor, I rearranged my schedule as the change of plans. So I've got other people covering some of my other matters for me this morning. So with that break on Friday, I was able to do some shifting around, so that is correct, Your Honor.

THE COURT: Okay. And before we get started, I thought it just might be helpful to make sure we're all on the same page as far as the schedule for this week. I had anticipated going from 9:00 to 11:45 this morning based on Ms. Simmons' availability. And that actually matches my schedule because I have an internal meeting here at the court at noon that I really plan -- I had planned to attend.

So for planning purposes for today, I think we ought to plan from 9:00 till 11:45. Is that roughly what you were all expecting I believe based on Ms. Simmons' schedule. I think that's what we were planning anyway.

MR. KANE: That's fine, Your Honor.

MS. LINDAUER: That's fine, Your Honor.

THE COURT: Okay. And let me ask you all, are you all able to hear and see me okay?

MR. KANE: Your Honor, well. Yes.

MS. LINDAUER: Yes, very well. Thank you, Your Honor.

THE COURT: Okay. Well, I think this will help me quite a bit not only in this case but all the other matters that I need courtroom time for or where we are able to do these hearings by WebEx instead of having to rely on borrowed courtrooms.

So I had in my notes that after this morning, we were going to pick back up, I believe, on the 23rd at 1:00. Am I correct on that?

MR. KANE: That's my understanding, as well, Your Honor.

MS. LINDAUER: And that's fine, Your Honor.

THE COURT: Mr. Phelan, are you on board with that?

MR. PHELAN: Yes, Your Honor.

THE COURT: And then I also had penciled in that we had all day available on the 24th.

MS. LINDAUER: And that date is fine, Your Honor.

THE COURT: So I think so that we can get going this morning, at some point this week, we will touch base on where we are, how many more witnesses we have, whether we think it's likely that we're going to finish this week or not, and then start penciling in some dates for the following week. But I would like you all in the meantime when we're not on the record maybe after this hearing to start having those discussions so

that we can try to get some additional days lined up if we need them.

So is Mr. Marx -- I see a bunch of initials, but I can't tell if Mr. Marx is on. Oh, I do see his name.

Mr. Marx, are you with us?

MR. MARX: Good morning, Your Honor.

THE COURT: Good morning.

All right. Before we pick back up with Mr. Marx, are there any other housekeeping items that we need to address before we try to get finished with Mr. Marx?

MS. LINDAUER: Your Honor, we did file a couple of motions yesterday, but those are not set for hearing yet. I suspect that we will ask you to set those probably towards the end of these hearings. They will not require any new evidence be presented. They're really more in the nature of additional relief being requested on behalf of the reorganized debtor.

But, again, those are not set for today. So we'll deal with those, I guess, if and when they get set. But I just wanted to alert the Court that we did file a couple of motions yesterday really just asking for what would amount to sort of alternative relief in connection with these proceedings.

So we'll take that up when we get there, but I just wanted to let the Court know that those had been filed. And I know Mr. Kane will probably want to respond to those. So we'll set those when we get an opportunity with your Court.

THE COURT: Okay. I did see those, and that sounds like a good plan. You can get with Mr. Kane on scheduling those.

MS. LINDAUER: Okay. And I wanted to -- I for sure wanted the Court to understand we are not expecting any additional evidence. The record that we're making here should be more than adequate to cover the issues in those motions.

THE COURT: Okay. Ms. Lindauer, your team filed another motion. I know your side attempted to start arguing it last week or whatever day that was, and I kind of put a hold on that. Have you ever discussed a hearing date on that with Mr. Kane?

MS. LINDAUER: What I do know just from the emails that have been traded, that was a motion that was filed by I believe Mr. Rodriguez dealing with some attachments to emails. I know there's been some exchanges between those folks regarding providing that documentation.

I suspect that that may get resolved without the need for a hearing. But at this point, we have not set that for hearing. If it isn't resolved in the next several days, I suspect we'll ask to have it heard before the conclusion of these proceedings, but again, I'm optimistic that based on the email traffic and everyone's review of those emails, that matter may get resolved.

So we have not specifically set that yet.

MR. RODRIGUEZ: Good morning, Your Honor, and good morning, Counsel. Yes, Oscar Rey Rodriguez. And Mr. Kane and I have been communicating. We're narrowing the issues down, so I think we'll probably get that resolved without the need to actually set a hearing and consume more judicial resources.

Thank you.

THE COURT: All right. I appreciate that.

And I see Mr. Carruth's name. I don't see him. But, Mr. Carruth, are you on with us?

MR. CARRUTH: Yes, Your Honor.

THE COURT: Have you all talked -- I'm really hoping that we're going to finish with Mr. Marx this morning. Have you all discussed Ms. Blakeley's (phonetic) schedule and is she available today or, if not, have you all discussed when she's going to get on? I think she was the next witness you had planned to put on. Is that correct?

MR. KANE: Well, yes, Your Honor. And I emailed Ms. Lindauer last night. And as far as I know, the plan is try to get her on at 11:00 today. But I -- there may be other things that changed that. I understand Ms. Blakeley is standing by to go on at 11 a.m. today.

THE COURT: Okay. Well, we'll try to get going and we'll just see how we go. So any other housekeeping matters before Mr. Marx retakes the virtual stand?

(No audible response)

THE COURT: Okay.

Mr. Marx, why don't you at least say your name so that you pop up on the -- oh, there you are, Mr. Marx.

MR. MARX: Yes, sir.

THE COURT: Mr. Kane, you were in the middle of cross-examining Mr. Marx. And I don't usually like to interrupt counsel's examination of a witness.

There are a couple of questions, if you don't mind, I would like to ask Mr. Marx. I think there are some basic factual questions that maybe I don't have a complete understanding of, and I think it will help me understand the matters and it will help me understand your cross-examination better if we can -- if you don't mind if I ask Mr. Marx a few questions before you start -- restart your cross-examination?

MR. KANE: Please proceed, Your Honor.

RANDY MARX, DEBTOR'S WITNESS, PREVIOUSLY SWORN

EXAMINATION

BY THE COURT:

Q Mr. Marx, earlier in your testimony, you had discussed -- bear with me just a minute -- TCC2022, LLC, as the potential buyer/borrower or at least that's what I had in my notes.

THE COURT: And if you would, pull up -- if somebody could pull up for Mr. Marx Exhibit 33A. I believe that would be Mr. --

MS. LINDAUER: Sydney, if you can pull that, that

would be helpful.

THE COURT: -- Mr. Kane's exhibits.

BY MR. KANE:

Q Mr. Marx, I think you're probably familiar with this exhibit because we covered it quite a bit. This is the commitment for title insurance. Do you recall this document?

A Yes, Your Honor.

Q And I notice under Paragraph 1(c), the proposed borrower is TCC2022, LLC, which I think is consistent with your earlier testimony that this was -- that that entity was a proposed buyer/borrower. Correct?

A Yes, Your Honor.

Q Okay. Now if you could switch over to the Debtor's Exhibit D4.

This is the commitment letter from First Guaranty Bank, and it's addressed to Enoch Investments, LLC. I think you probably also recall testifying about this document. Is that correct?

A Yes, Your Honor.

Q So earlier in your testimony, you discussed parallel tracks, and I guess I'm playing catch-up to you all because I know the lawyers know their cases inside and out. Help me understand the relationship between Enoch Investments, LLC, and TCC2022, LLC.

As I understand the commitment letter from First Guaranty

Bank, the borrower on that document is Enoch Investments, LLC. And if I understood your testimony and the document correctly, Enoch Investments, LLC, under the proposed transaction that's discussed in the First Guaranty Bank would be the borrower and the purchaser of the property from the debtor.

Is that correct?

A Yes, Your Honor.

As you indicated properly, we were pursuing parallel tracks. First Guaranty Bank, the borrower in that circumstance, would have been Enoch, and that's the commitment letter that was issued to Enoch from First Guaranty Bank.

Q And can you -- tell me the relationship again between Enoch Investments and TCC2022, LLC. And help me understand why there were two different parallel tracks going, because I'm not -- you testified about it. By the end of your testimony, I realized that I didn't fully understand why there were two different entities and two different parallel tracks.

So would you mind just explaining that to me.

A Enoch is the borrower in connection with the -- or anticipated borrower in connection with the First Guaranty Bank loan, because it seemed that that made the most sense if they were going to go forward with that lender.

And subsequently or actually I think parallel-ly, simultaneously, there were discussions with another client of mine, TCC, about possibly just buying the entire property in

which case then we would revise the commitment with Sendera and close instead with more of a sale transaction to TCC. I think that the debtor-in-possession and Mr. Barton were pursuing a number of negotiations on parallel fronts to see what made most sense for the, I guess, the reorganized debtor.

Q And so I'm going back through my notes. Enoch Investments, LLC, is affiliated with Mr. Barton. Correct?

A Yes.

There's a family trust upstream of Enoch that Mr. Barton has an interest in.

Q So I've written down that he's the beneficiary of the trust that owns Enoch Investments, LLC. Is that correct?

A Yes, Your Honor. That's correct.

Q And then the other entity -- TCC2022, LLC -- that's also a Barton-related entity. Is that correct?

A No, Your Honor.

I created that entity with the anticipation that in the event that my client acquired the property, that that would be the entity that it used.

Q So TCC2022, LLC, is in no way related to Mr. Barton, directly or indirectly?

A I think that's correct, Your Honor.

The -- the ultimate ownership of TCC was never settled. It was organized with the anticipation that it would be available for a buyer to hold those interests, and it would

have been more of a third-party sale, Your Honor, as opposed to the Enoch situation which would have then had some overlap on -- relative to the Enoch and the Barton interest.

Q So when you say you set up TCC2022, LLC, was that on behalf of a specific client or is that something that you just did to have a, I'll call it a shell and don't read anything into that, but you have a shell entity ready to go if somebody else comes along? Is that --

A It was with the anticipation that the principal client that I'm working with would acquire the property. There was some discussion as to whether or not he would prefer to acquire it or simply serve as a first-lien lender going forward.

Q So there was a specific unrelated client that was behind TCC2022, LLC?

A Yes.

Q Completely unrelated to Barton, whether directly or indirectly?

A Well, yes, Your Honor.

Now if the -- if my financing group or the funding group would have preferred to take a lender -- a first lien as opposed to acquire the property, then that loan would have come in and TCC could have served as the borrower, which is sort of what that commitment from the title company anticipates in which case then that would likely have been owned if that -- those funds came in strictly as a loan, then the borrower there

would have been likely a Mr. Barton affiliate, probably Enoch.

Q Okay. And I guess that leads to another question that I had. So hopefully all counsel don't roll their eyeballs when I ask this one, but if you'll go back to Exhibit 33A, which is the commitment for title insurance issued by Title Resources Guaranty Company.

A Yes, Your Honor.

Q Could you explain to me the relationship between Title Resources Guaranty Company and Sendera Title, because I know there's ben a lot of testimony about Sendera. I've seen the emails from the Sendera representative. It's just not clear to me, the new guy, what is the relationship between Title Resources Guaranty Company and Sendera.

A Your Honor, we interfaced for the most part with Sendera.

Sendera is a title company or a title agency, okay. And they basically provide the escrow services in connection with the closing of this type of a commercial transaction. They will have a plant. They pull title. They will basically generate the commitment.

They have an affiliation with an actual insurer. In this situation, that's Title Resources Guaranty Company. So in effect, Sendera is acting as an agent in connection with issuing this commitment. I think -- well, if you go to -- I don't know, does this exhibit have the front page if you go scroll up?

MS. LINDAUER: Actually, I think what might help the Court, Mr. Marx, is if you look at Schedule D.

Sydney, pull that up.

I think that explains the relationships between the entities.

THE COURT: Right. I saw that on D. I think that's where I saw the reference to Sendera.

MS. LINDAUER: I think Item Number 2.

THE COURT: So Silver Star Title, LLC, d/b/a Sendera Title.

BY THE COURT:

Q Are you with me, Mr. Marx?

A Yes. I think that's accurate. It reflects them as the -- as the title insurance agent.

And so most of the work, most of the services that we obtain are through the agent. The underwriter services, the actual policy is issued by the insurer, which here would be insurer, which here would be Title Resources.

THE COURT: Okay. I think I'm going to have some more questions for you after Mr. Kane is finished. But I think for now that helps me, especially the questions about Enoch and TCC2022, LLC.

So I appreciate your patience, all counsel, with my questions. And I'll turn it back over to Mr. Kane.

MR. KANE: Thank you.

CROSS-EXAMINATION (RESUMED)

BY MR. KANE:

Q Mr. Marx, just kind of continuing this line a little bit, was it your understanding that the debtor was -- had more than just two parallel tracks leading to closing?

A Yes.

Q About how many different tracks did you understand the debtor was pursuing on, let's say, May 27th to May 30th?

A I don't know; multiple tracks.

These several that I was involved with, as well as a number of others. And I really can't speak to the ones that I was not involved with.

Q But you were aware generally that there were several others that you weren't involved with?

A A number of them, yes.

Q Got it.

And you've pointed out to this Court too that you were involved with -- were there other parallel tracks that we have not discussed, parallel tracks other than Enoch and TCC2022 that you were actively involved in?

A There was a -- yes, there were others.

Q How many?

A At least two that I had some involvement with.

Q At least two other than Enoch and TCC2022?

A Yes.

Q So -- and that's as of May 27th you were still working with four different potential closing parties?

A Yes.

Yes. I think one, the Garrison -- actually, there were one other that -- so there were those two that we talked about, Enoch and TCC, and then three others that I was working with.

Q So that's five total, and you said you were aware of several other ones that other debtor representatives were working to try and close. Is that right?

I just want to make sure I have that correct.

A Could you repeat that, please?

Q Yeah. So you've now listed five that you were actively working on, but I believe just a little bit ago you testified that the debtor or debtor's representatives were also working on several others that you didn't have involvement with. Is that right?

A Correct.

Q What's your best guess or what's your understanding of about how many the debtor was working on where you didn't have an active role?

A I really don't -- I don't know.

Q Okay.

But we've got at least five different parallel tracks on May 27th, the business day before the payoff deadline. That's right?

A (No audible response).

Q Okay. I'm going to go ahead and just share my screen and then we'll go ahead and continue. Let's see.

THE COURT: Mr. Marx, did you nod or did you answer that question? I didn't hear your answer.

THE WITNESS: Yes. I think that's correct.

BY MR. KANE:

Q All right. Mr. Marx, if you look at your screen, do you see this Exhibit 8?

A Is it Exhibit 8 you said?

Q Yes.

I just want to make sure that you can see it on your screen or at least that you have Exhibit 8 handy.

A If it's okay, I can pull it here where I can read it better.

Q That's fine with me.

I'm going to ask you some questions before I turn your attention to this exhibit. I just want to make sure that you had access to it because this will be the first exhibit we discuss.

A Okay. Go ahead.

Q Now before we got cut off during your testimony, I believe Ms. Lindauer was asking you some questions about Mr. Barton's guaranty. Do you remember that?

A I remember a discussion with Ms. Lindauer. I don't

remember that you and I had visited about this yet.
Q No, that's correct. That's what I asked, if you recalled Ms. Lindauer's questioning to you about Mr. Barton's guaranty.
A Yes.
Q Okay.
And you recall Mr. Barton's a guarantor under the note at play in this case? Is that your understanding?
A Yes. I've seen that in some documents.
Q But there was a question about whether the entity that I believe you were referring to as Madison had actually assigned the guaranty to HNGH. Is that right?
A That is a question that I raised at some point, I believe.
Q And that was important to you because the dismissal of Mr. Barton's guaranty suit is required under Exhibit 8, the agreed order. Is that right?
A That's my understanding. And the existence of that guaranty litigation came up in my discussions with the funding sources that I was dealing with.
Q So let me make sure I get that straight. It was a concern of the funding sources that Mr. Barton's guaranty suit be dismissed?
A That it was out there. And so it was I think a concern that it had not yet been dismissed.
Q Okay. And was it your understanding that the dismissal of that guaranty lawsuit was required once a payoff had occurred?

A I don't specifically have a recollection as to the sequencing. I just know that it served as an impediment.
Q Okay.
Can I turn your attention to Exhibit 8, the second to last decretive paragraph.
A Okay. Exhibit 8?
Q Yes. And tell me when you've got that in front of you.
A I have Exhibit 8 on Page 1. I didn't hear the last part.
Q Okay. It's the second to last decretive paragraph.
A As opposed to the -- as opposed to the preamble-type paragraphs?
Q That's correct.
A Okay. Second to the last, you said?
Q Right. It starts "Not upon the entry of this agreed order after the order objection decree?" Do you see that?
A One second, please.
(Pause)
Okay. Yes, I do.
Q That appears to suggest that after a payoff event or default has occurred, Mr. Barton shall be released from his guaranty and the case dismissed with prejudice.
Is that your understanding of what your client's funding concerns were, whether that would be dismissed?
A Well, I read this to be more of a simultaneous transaction. And my comment related simply to the fact that I

did have discussions relative to the fact that the guaranty was out there. And I think I had seen email correspondences where -- where that timing was the subject of those emails.

I think you and Mr. Barton were involved in an email string that at some point I saw.

Q Okay. But I believe in your testimony from -- with Ms. Lindauer you expressed concerns about whether actually HNGH, the lender, had authority to dismiss the guaranty suit.

Do you recall that?

A Well, the question that I had is that when I looked at the assignment instrument, I didn't see a specific assignment of the guaranty.

Q Okay. Now I'm curious when you were talking about the assignment instrument, I don't recall Ms. Lindauer showing you a copy of any assignment instrument during your testimony. Can you explain what you're referring to?

A When you get the -- the title commitment, there's a reference to the Schedule C items. Those are the underlying documents that were not included in I think it was 33 or 33A. But those underlying documents, the ones that are listed, it was 33.

Excuse me.

I'm looking at your Exhibit 33 where Lissey (phonetic) sent you the commitment with the Schedule C documents. And then when I went there to the Schedule C documents,

specifically I'm referring to in Item 5 that refers to the deed of trust, then an assignment, then a notice. But it's the fourth -- it's the fourth one, the actual assignment of the deed of trust and the assignment of leases and rents to your client of December 7, 2020.

I reviewed that instrument. And -- and in the -- in my experience, it will refer to not only the assignment of the -- of the deed of trust and the leases and rents which are the lien instruments (indiscernible). Those assignments in my experience also refer to the underlying indebtedness, obviously, and any of the other rights regarding the loan documents.

Q I see.

A And I didn't see that language there. And it just --

Q Okay. Did you ask --

A (Indiscernible).

Q Did you ask the debtor if there were any other documents that might have shown the assignment of the guaranty?

A Well, I got to be careful here because in connection with this work --

Q Here, Mr. Marx, let me try and help you out on some of that carefulness. I'll rephrase my question.

A Okay. So you understand my concern. I just didn't want to inadvertently get into conversations with the client. So please do.

Q I understand.

You also said you -- yeah.

So before May 31st, or let's say at any time during May 31st, any time prior to the May 31st 5 p.m. payoff deadline, did you try and obtain from the debtor a copy of some other document that might show the assignment of the guaranty if that was a concern for your client?

A I do not recall seeing anything.

MR. KANE: Objection. Nonresponsive. I asked if Mr. Marx made the effort to try and find it or get it, not whether --

THE COURT: Ms. Lindauer?

MS. LINDAUER: Your Honor, I don't have an objection to his question. If Mr. Marx can answer it, he can answer it.

THE COURT: Then the objection is sustained.

You can answer the question, Mr. Marx.

THE WITNESS: Yeah, just one second. I'm trying to just --

THE COURT: Mr. Kane, do you want to re-ask the question in case -- I think I know what you're asking, but I'm not sure if Mr. Marx -- well, why don't you re-ask the question.

MR. KANE: Sure.

BY MR. KANE:

Q Mr. Marx, before the expiration of the payoff deadline at

5 p.m. on May 31st, did you ever take any efforts to obtain from the debtor a document that showed the assignment of Mr. Barton's guaranty from Madison to HNGH Turtle Creek?

A I don't think so.

Q Okay. I'm going to have you turn your attention to Exhibit -- it's Debtor's Exhibit D17. And Page 89.

A Okay. Debtor's Exhibit?

Q Yes. Debtor's Exhibit D17, Page 89 of 148 on the top file mark. The page is titled "Participation Agreement." Tell me when you're there.

A Okay. I'm at Exhibit D17. I'm sorry, again, the page number?

Q It's 89 of 148.

A One second.

Okay. I'm at Page 89 of 148 entitled the "Participation Agreement."

Q And was it your understanding this is a -- this is the agreement by which HNGH purchased a participation in the note from Madison?

A Yes. That's my understanding that this was the instrument by which HNGH first acquired an interest in the loan from Madison.

Q Thank you.

Will you scroll to Page 135 of 148?

A 135?

Q Yes, sir.

It's titled "Schedule I." Will you tell me when you're there?

A Okay. I'm at Page 135, it says "Schedule I Our Loan Documents."

Q And do you see Item Number 4, reference to a guaranty?

A Yes.

Q Your understanding that that's the Barton guaranty related to this Madison note?

A Yes.

What is this -- I don't recall reviewing this, though. What is this Schedule I a part of?

Q The participation agreement, but you're welcome to scroll up to confirm that.

Now I'd like you to turn to Exhibit 82.

A Just one second.

That was an attachment to the participation agreement.

Q Thank you for that confirmation.

A Okay.

Q Will you turn to Exhibit 82, please?

A Exhibit 82?

Q Yes.

A Can I turn this one off?

Q Yes, you may.

A That is now over on the HNGH list?

Q Yes. It is the Lender's Exhibit 82.
A One second.
82, Exhibit 82. Okay. I'm there.
Q Does this appear to you to be correspondence from lender's counsel to debtor's counsel on the closing date?
A It's dated Tuesday, May 31 at 3 p.m.
Q Is that a yes or a no?
A Yes.
Q And do you see the attachment that says "Assignment and Assumption Agreement?"
A One second.
Yes, I see it.
Q Okay. I'm going to have you turn to Exhibit 82A which is the attachment from this email.
A Okay. Execution version assignment and assumption of assigned rights and obligations.
Q Have you ever seen this document before?
A It came in at 3:00 that afternoon. I do not recall seeing this. I think I've seen it more recently in connection with reviewing, you know, the exhibits.
Q But not before the expiration of the closing deadline?
A In -- I don't recall seeing it on May 31st.
Q Okay. So you don't recall whether the debtor ever provided you this before the expiration of that payoff deadline?

A I do not recall.
Q To the best of your knowledge, the debtor did not provide it to you before the expiration of the payoff deadline?
A Correct. If I -- if I had been provided this, I think I would have reviewed it right away.
Q Okay. And, Mr. Marx. if you'll scroll down. Well, first, I'll give you a minute or so to take a look at this document to familiarize yourself with it.
You can tell me what you believe this document is after you've had an opportunity to take a look at it. I'll limit it to about a minute if you don't mind unless you need additional time and we keep moving.
A Just one second, please.
(Reviewing document)
Q It might help if you go to numbered paragraph 2 below the recitals.
A Yep.
Q It's a short synopsis of what this might be.
A That's the paragraph 2 that says "assigned rights and obligations?"
Q Yes.
A And then that's where I am. I'm looking back to the schedule reference there.
Q Right. Would you direct your attention to Page 8 of 9 on this document?

A One second
Schedule 1, a list of loan documents.
Q Okay. So does this document appear to assign all of Madison's interest in these loan documents to HNGH upon closing?
A Yes. I see now that the guaranty is listed as Item 4.
Q Thank you.
Now I'd like you to turn to Debtor's Exhibit 3, please.
Tell me when you're there. You can scroll to numbered paragraph 5.6.
A Yes. I'm at 5.6.
Q And I believe you previously testified that you helped prepare this list of documents that were needed at closing. Is that right?
A I made contributions to this list. Yes.
Q And that executed assumption assignment that you just looked at that was Exhibit 82A, does that satisfy this 5.6 concern here?
A I think so. But, again, I don't remember having seen the -- that document that day.
Q Okay. So now I do just want to clarify something about this.
Up at the top, there's this introductory paragraph here on Exhibit D3.
A D3 to -- oh, excuse me. Go ahead.

Q And it says: "Please confirm the following matters to ensure that title to the property is clear."

Now was it similarly your understanding that all of these documents were required to ensure clear title?

A No. Most of these are.

But there are some of these other concerns or provisions here I think relate more to the agreed order and/or to the (indiscernible) the guaranty or the guaranty litigation.

Like I said, it's most of them are title-related, at least my -- and/or related to the orders -- my input. But some of this is, you know, Joyce's concerns or -- or others.

Q And what day did you begin working with the debtor to prepare this list of documents?

A Well, in the normal course, I would put together a list like this. But as --

Q Mr. Marx, I'm really not asking about normal course. Please listen to my question. On what day did you start working on this document with the debtor?

A I think that day. I had been previously involved in review of title. And --

Q Mr. Marx, again, I appreciate that. I only asked what day you started working on this document with the debtor. I'll ask you follow-up questions if you don't mind. But please just --

A Okay.

Q -- answer my questions. Okay?

A I think that's when I was asked to assist.
Q Thank you. And it's to the best of your knowledge this document was sent to lender's counsel that very same day, May 30th. Is that right?
A Yes.
Q And you do understand May 30th was Memorial Day. Is that right?
A Yes.
Q And that's a federal holiday, correct?
A Yes.
Q You said I think you have a lot of closing experience is what you testified to earlier. I imagine a lot of that work's with institutional lenders, banks. Is that correct?
A Yes.
Q Like First Guaranty Bank, for instance. Is that right?
A Yes. And a wide variety of banks. First Guaranty I think is more a regional bank. But yes.
Q Okay. Your understanding that based on your experience, most banks are not open on federal holidays?
A Correct.
Q Now this list has, and I'll let you count it if you want, but 25 separate requests for deliverables. Is that right?
A Approximately. Some are requests for deliverables, and some are like that comment on 56.
Q Now this isn't broken down into a section of needs, a

section of wants. So is it your understanding that all of these were required for closing on May 31st?
A No. The ones that I were involved with I think are the more material. And even some of -- and but there are others that I did not attribute toward and are less material to me.
Q Okay. And do you see anything in this document that says hey, we don't need these until after closing, or these are the closing-related items and, you know, these can be delivered post-closing? Do you see anything that clarifies or delineates documents that must be delivered and documents that can be delivered post-closing?
(Pause)
THE WITNESS: The letter does not put an asterisk by the material ones or by the needed ones. But those would be the ones referenced in the title commitment.
BY MR. KANE:
Q Thank you, Mr. Marx. I'll tell you what, we can put this exhibit away for a bit. And I want to talk just about some real estate basics based on your experience. I think you've testified that you're an experienced real estate attorney. That's correct?
A Yes.
Q And that you have a national practice. Is that right?
A In certain areas it's a national practice.
Q But you are experienced in Texas commercial real estate

transactions. Is that right?
A Yes.
Q Based on your best guess, how many Texas commercial real estate closings have you been a part of over the last 20 years or so?
A Goodness.
Q Hundreds?
A Possibly.
Q I take it then that you are generally familiar with the Texas property code?
A Generally.
Q So let me ask you, it might be a little bit of a basic question, so humor me. But under Texas law, are there certain things that are required for a deed to be a valid, enforceable deed?
A Sure.
Q And can you tell the Court what some of those things might be?
A Well, a deed is very much like a contract. So the elements of a contract, and even at the meeting of the minds per se, but you know, competency, authority are your basics there. But moving I think to what you're inquiring about, it would need to have a legal description, it would need to be signed by the grantor. The grantor needs to be a person or entity close to authority. There are others. You want me to

keep going?
Q Yeah, let me ask you this. Is there some kind of language granting or conveying the grantor's interest in the real property?
A Yes. There'd be a grant clause.
Q Okay. Now didn't you testify that the problem with HNGH is the lender's recision deed was that it was a special warranty deed. Is that right?
A Well, there are a number of issues created by the instrument of May 27th that was prepared in your office entitled special warranty deed. It wasn't just the title. But the instrument that you prepared, if you want to refer to that one as the special warranty deed, there were a number of issues with it.
Q And if we can, Mr. Marx, just for the sake of some accuracy here, I'll ask that you not refer to it as the one that I prepared. I actually didn't prepare that document.
A I apologize.
Q So if we can call it HNGH's recision deed or the lender's recision deed, I would very much appreciate that. Can we agree to do that?
A Let's call it the lender's, if it's all right because HNGH doesn't --
Q Sure.
A And if it's okay with you so that we're clear, it was

entitled the special warranty deed, let's refer to that one because I do think at some point we'll be comparing that one to the instrument that I had input on which we sort of referred to as the recision of deed. Okay?

Q Okay. Let's do that. I'm fine with that. So let's go back to the problems that I believe you testified were involved with the lender's special warranty deed.

A Okay.

Q One of the concerns that I believe you had was that it had granting or conveyance language. Is that right?

A Yes.

Q It also had a use restriction, and you found that problematic, correct?

A Yes. I think the use restriction did not -- in favor of the lender here, in favor of HNGH, was different than imposed another encumbrance on the property that was not on the property before the deed in lieu, if I can refer to that, and that's a third deed, candidly.

Q Sure. I'll give you an opportunity. We can walk through and name those. But I agree, we'll use the October 29th deed, we'll call that the deed in lieu. And how about the deed that existed before that, we can call the debtor's deed. We'll run through that in an exhibit here in just a bit. But at least we can start getting the lingo right. Mr. Marx, do those definitions work for you?

A Okay. So let's -- in time order, the first would be the debtor's deed?

Q Yes.

A And then we're going to call the October 29 instrument the deed in lieu?

Q Yes.

THE COURT: Just so I'm on the same page, Mr. Kane, debtor's deed, you're referring to the deed that Mr. Marx helped prepare. Is that correct?

MR. KANE: No. Your Honor. It's the deed that predated the deed in lieu.

THE COURT: Oh, I got you.

MR. KANE: So the --

THE COURT: I got you.

MR. KANE: -- deed that was enforced on October 28th of 2021.

THE COURT: I got you. Thank you.

THE WITNESS: The date on the debtor's deed was sometime in I think September of 2019.

BY MR. KANE:

Q That's correct.

A And then the deed in lieu, let's say November 1. It was dated the 29th.

Q It was recorded November 1st but, yeah, dated October 29th. And we'll walk through this. This is all on

Debtor's Exhibit 14. So we'll have an opportunity to discuss this, Mr. Marx, in just a second.

A Okay.

Q But just for the sake of this continuity, the form of special warranty deed, we'll call it the, in quotes for this, the recision deed that was submitted by the lender we'll refer to as the lender's special warranty deed. And then, Mr. Marx, the document that you submitted, or that TCC2022 submitted we'll call the recision of deed.

Would it be easier, Mr. Marx, if we just referred to it as the recision instrument?

A I am fine whatever vernacular as long as we're kind of consistent. Recision instrument you said?

Q Let's call it that.

A Okay.

Q Now I believe it was your testimony that you believe the appropriate instrument to clear title or return title back to the debtor was TCC 2022's recision instrument. Is that correct?

A I do.

Q And I believe you testified that TCC 2022 didn't want a deed at all because of the conveyance concern. Is that right?

A Well, it's the issue there was more of one of reconveyance, whereas I think the recision instrument was more in line with the agreed orders.

Q Okay. And if you turn back to Exhibit D-3.
A D-3?
Q Yeah. That's the Debtor's Exhibit D-3. It's the list that you helped prepare.
A Okay.
Q In Section 1.0 and 1.1, these documents are referred to not as a recision deed, but a recision of deed, the of being the operative term, correct?
A That's what 1.0 reads, yes.
Q And 1.1 as well?
A Yes.
Q And that was -- did you assist with the preparation of those parts?
A Yes.
Q And again, that's because you wanted to ensure that there was a recision instrument, not actually a deed conveying the property back to the debtor. Is that right?
A I wanted it to be clear that the recision was effective as if the deed in lieu had not been recorded.
Q And you believe that the only way to accomplish that was a recision of deed, that recision instrument. Is that right?
A I certainly am of the opinion that the recision instrument is more in comport with Texas law and the agreed orders than the lender's special warranty deed.
Q Okay. Can we turn to Exhibit 8 please, Mr. Marx?

A Exhibit 8? Which list?
Q Lender's list. And we're going to be looking at the first full paragraph on Page 2.
A The first section on Page 2?
Q Yes.
A Okay.
Q Now do you see here the third full line from the bottom starts, the payoff amount and counsel for HNGH?
A I do.
Q Do you see that?
A I do.
Q Okay. Now it says HNGH shall hold the, it says recision deed next, doesn't it?
A It does.
Q It does not say recision of deed?
A Correct.

THE COURT: Mr. Kane, I apologize. My computer froze for a minute. I know you're on Lender Exhibit 8. Could you tell me again where you are?

MR. KANE: Yes, Your Honor. First paragraph on Page 2, third full line from the bottom. It begins, the payoff amount and counsel for HNGH shall hold.

THE COURT: I got it. Thank you.

MR. KANE: Mr. Marx has just acknowledged that it says the recision deed, not recision of deed or recision

instrument.

BY MR. KANE:

Q That's correct, Mr. Marx, right?

A It does say recision deed.

Q Okay. Now if we keep going down a little bit to this last full sentence, you see where it says holding such deed?

A Yes.

Q Okay. That doesn't say such recision instrument or recision of deed. It just says such deed, correct?

A Correct.

Q And four words later, or releasing the deed in accordance with the terms of this agreed order. Do you see that?

A I do.

Q Now I want you to scroll to the first full paragraph on the next page, Page 3. And now this second to last sentence. Do you see where it says HNGH shall take all reasonable actions necessary to immediately instruct its counsel to deliver the, and then it begins recision deed on the last full line of that paragraph. Do you see that?

A No. You -- oh, I see it. It's in the next -- I see it now. Continue.

Q And do you see where it says recision deed?

A It's in the last line.

Q Right.

A On the first full paragraph on that page.

Q Okay. There's no reference to recision of deed in that paragraph, is there?

A No, there's not.

Q And there's no reference to a recision instrument, is there?

A I think -- no. The operative word being recision.

Q Right. So this is a reference to the delivery of a recision deed to ensure title to the property is returned to the debtor. Is that an appropriate reading?

A That's what that part of the order says. Yes.

Q Okay. I believe you just testified that under Texas law, a deed requires grantor, grantee, description of property, and some form of conveyance language. Is that right?

A In the typical situation, yes.

Q Okay. And let's look at Debtor's Exhibit D-14. Are you there?

A I'm on the front page of Exhibit D-14.

Q And we just threw out a whole bunch of definitions. But am I correct in saying that this is what we've defined as the debtor's deed? On Page 1 here.

A Yes.

Q Now do you see the second full paragraph of this debtor's deed?

A I do.

Q Above the first have and to hold?

A I do.
Q Now is that a use restriction that suggests the property may only be used for hotel and residential condominium purposes?
A That is a use restriction that the property may only be used for hotel and residential condominium purposes in favor of Turtle Creek Dickason, Ltd.
Q And it appears to say it's binding on the grantee, correct?
A It is binding upon the grantee, yes.
Q Okay. Who's the grantee under this debtor's deed?
A It's MO 299TC, LLC.
Q And is it your understanding that that's a former known as of the debtor?
A Correct.
Q So it's actually binding on the debtor?
A Yes, in favor of Turtle Creek Dickason, Ltd.
Q Okay. Now let's turn to Page 7.
A Page 7 of this D-14?
Q Yes, sir. Are you there?
A I'm not sure. What is it read at the beginning?
Q It's titled special warranty deed effective as of October 29, 2021.
A Yes. That must be Page 7 then.
Q Okay. And this is the deed in lieu, isn't it?

A Yes.

Q And the second paragraph here says this conveyance is made and accepted subject to restriction running with the property and binding upon grantee and its successors and assigns. Property may only be used for hotel and residential condominium purposes. You see that?

A I do.

Q And to the best of your understanding, is that the same use restriction that was in the debtor's deed?

A Yes, it appears to be.

Q Okay. Now let's turn to Page 12 of this same exhibit. And that document is not recorded of record, and is titled special warranty deed. Now this is the document that we have defined as lender's special warranty deed for the sake of this cross-examination. Is that correct?

A Yes.

Q Now if you'll scroll down to the very last little paragraph here on this front page, Page 12, there's a statement that says this conveyance is made and accepted subject to the terms of the agreed order. And B, and then it contains a use restriction, correct?

A Yes. On the bottom of Page 1 in that last paragraph, there's a parenthetical B which is a use restriction imposed and in favor of HNGH.

Q Is that use restriction consistent with the prior use

restrictions?
A In scope.
But it is materially different in terms of who the enforcing party is. This instrument purports to put a use restriction upon the property in favor of HNGH Turtle Creek, LLC, the lender. That was not of record, that enforcement party was not of record --
Q And so --
A -- (indiscernible) the debtor's deed.
Q Am I correct in saying that the use restriction would still bind the debtor to use the property only for hotel and residential condominium purposes?
A I'm sorry. Would you please restate that?
Q Am I correct in asserting that this use restriction would bind the debtor, if this was enforced, to use the property for hotel and residential condominium purposes?
A The key there is the enforced part of your question. Here it's different because HNGH would have the right to enforce that use restriction which was not the case at all as a part of the debtor's deed.
Q But the use restriction still existed?
A Yes. But if one wanted to have it removed, the lay of the land in connection with the debtor's deed is that they would go to the Dickason to see if that could be modified. Here in this lender's special warranty deed, they're purporting, or it,

sorry. Not you, but it is purporting to create a new enforcement party, being the lender. And that was not of record. That is a material change. And of my various comments to the instrument, it is I believe the most material default.

Q And did you ever provide that comment to counsel for HNGH before May 30th?

A I provided comments to the attorneys on this side, from the problems, the material problems this creates. I don't know how much was communicated or when.

Q Now --

A Instrument was my instrument, to take ownership of it which we haven't got to yet. Deleted that objectionable portion and --

Q Right. Mr. Marx, I appreciate that. I want to talk about this special warranty deed, lender's special warranty deed. I'm going to provide you an opportunity to talk about the recision deed in just a moment, or your recision of deed.

On this special warranty deed, if the use restriction had been removed in its entirety, would this form of special warranty deed have been acceptable to your client?

A That was the most material. Would it have been acceptable if that would be the only change, is that your question?

Q Yes.

A No.

THE COURT: Mr. Kane, before you go to your next

question, I don't think I heard Mr. Marx's response to your question, or maybe I didn't catch it.

I think Mr. Kane had asked you if you had ever provided that comment to HNGH's counsel before May 30th. So specifically that question was asking whether you provided it to HNGH's counsel. Is your answer to that question no?

THE WITNESS: The answer, Your Honor, is --

THE COURT: I'm going to ask you next about whether you provided it to the debtor's counsel. But did you provide that comment to HNGH's counsel directly before May 30th? I guess I'll just supplement that question because --

THE WITNESS: I understand. One, I didn't deal directly with HNGH counsel. But at some point, I did review the lender's special warranty deed, and I provided the recision instrument. I'm not sure when that was sent to HNGH. But that would have been as a direct of a communication I had was when the instrument that I prepared was sent there. And it's the --

THE COURT: But the specific -- I thought I understood the question to be whether you ever provided that comment. And I think, and Mr. Kane can correct me if I'm wrong, I think he was asking by that comment it was your comment that it was a different enforcement party.

So I guess did you ever specifically provide that specific comment about how the enforcement party is different? I think I understand your answer to be that you never provided

that comment directly to lender's counsel, correct?

THE WITNESS: Right. I never generated a narrative of why the instrument was defective. I just sent them one that would work. And that --

THE COURT: So did you -- so I want to be specific on this. On the lender's proposed deed, your specific comment about the enforcement party being different, is it correct that you never provided that specific comment directly to lender's counsel? That's correct, isn't it?

THE WITNESS: Yes.

THE COURT: Did you ever provide that specific comment to debtor's counsel? Your specific comment that it was a different enforcement party.

THE WITNESS: Yes. I'm sure I did because that was the objectionable nature of it. It's a material change to add a new enforcement party when throughout the agreed orders there's discussion of a recision which is to put the parties back to keep a new lender and chain of title.

THE COURT: So which debtor's counsel did you provide that specific comment to?

THE WITNESS: I -- honestly, I don't remember. Any of them that asked me about my comments specifically to the instrument, if the occasion arose, I'm sure I gave -- shared with them, you know, I don't remember, Your Honor. I really don't.

THE COURT: You don't recall if it was Ms. Lindauer or one of the other lawyers working on the case for the debtor?

THE WITNESS: I didn't interface directly with Joyce. I was moving my comments to Mr. K. And then he would typically communicate. And so --

THE COURT: Mr. K? I'm sorry, Mr. K is mr?

THE WITNESS: Mr. Walji.

THE COURT: Mr. Walji. And can you remind me, is he a lawyer?

THE WITNESS: Yes.

THE COURT: He's a lawyer. Okay. So you have a specific recollection of providing that specific comment to somebody on the debtor's side, but you don't recall who it was.

THE WITNESS: Well, I'm sure it was to Mr. K. I don't know if Ms. Lindauer was present. I don't specifically recall.

THE COURT: Okay. I'm sorry for the interruption, Mr. Kane. Just the way my brain thinks.

MR. KANE: Sure.

THE COURT: I just wanted to understand that answer before you moved on. So, please continue.

MR. KANE: Very fair.

BY MR. KANE:

Q Let's stay on that line a little bit, Mr. Marx. When was the first time that you saw a draft of lender's special

warranty deed, what day?
A I'm not sure. Can you -- I do not know.
Q Mr. Marx, did you ever see a draft of this document before it was executed? And to be clear, before it was executed by the lender.
A One second, please. Are you referring to before May 27th?
Q Yes.
A I think so. Do you know when the instrument I prepared, when that was sent?
Q I believe your counsel can work with you o that. But I'll go ahead and tell you that in evidence, the document that I believe that you provided was circulated at 3:24 p.m. on May 30th.
A Okay. So what was your question?
Q When did you first see a draft of lender's special warranty deed?
A Certainly before May 30th. Maybe several days. I don't specifically recall.
Q Did you ever mark up or provide a redline of lender's special warranty deed to debtor's counsel, or did you simply prepare and deliver an alternative document?
A You know, I'm not sure of what I sent. But I probably started with the instrument, the lender's special warranty deed, and provided a redline. That's how I typically do things. I'm reasonably sure that's what I did.

Q Does that suggest, do you believe, this document could be saved?
A What's the question?
Q So do you believe this document, this deed, the special warranty deed could have been remedied, or did it need to be an alternative document?
A Well, the -- and honestly, the changes were substantial.
Q Okay. Do you see this numbered paragraph on here, Mr. Marx?
A I'm sorry?
Q Do you see this numbered paragraph here? We're still on Exhibit D-14, Page 12.
A Excuse me. This is in the lender's special warranty deed?
Q Yes.
A One second. Let me get back to it. This is the one dated October 29? No, sorry. Okay. I'm at the lender's special warranty deed.
Q Okay. Do you see at the bottom of the second whereas paragraph, it says 2999TC and HNGH acknowledge and agree as follows? Do you understand that those entities are the debtor and the lender? Is that right?
A Oh, you're in the second recital, whereas?
Q Yes.
A In the --
Q Last line.

A Point number one?
Q Just above that where it says 2999TC and HNGH acknowledge and agree as follows. You understand that to be the debtor and the lender?
A Yes.
Q Okay. So in this document, if it was executed by both parties, they would be acknowledging and agreeing to what comes next. Is that right?
A Yes. This is --
Q Okay. So number one says that the deed in lieu is rescinded and voided effective as of October 29, 2021, correct?
A Yes.
Q And it says in order for fee simple title to the property to remain vested in the debtor. Is that an appropriate reading?
A That's what the instrument says.
Q Okay. And then this section two, does that show an intent or an agreement of the parties to reinstate the note?
A Well in -- I don't know how you want -- how to answer that.
Q Mr. Marx, I'm asking you of numbered Paragraph 2 shows an agreement between the debtor and the lender to reinstate the note and deed of trust?
A Yes. But this would be better -- have been stated in a more operative section of the instrument as opposed to up here

in the recitals.

MR. KANE: Objection, non-responsive. Your Honor, I ask that the Court strike everything after yes.

THE COURT: Ms. Lindauer?

MS. LINDAUER: Your Honor, I think he answered the question that was asked. But maybe Mr. Kane can clean that up a bit. But I'm not sure I followed Mr. Kane's original question about the sub 2 provision. But in any event, I think Mr. Marx tried to answer the question was posed to him. So I would object to striking his answer.

THE COURT: Well, I'll sustain the objection, strike the answer. Mr. Kane, why don't you re-ask the question.

BY MR. KANE:

Q Okay. Mr. Marx, I want to clarify here. I'm not asking if you believe this could have been done better a different way. I'm asking you if it is your understanding from this reading that the debtor and lender are agreeing in Paragraph 2 that the note will be reinstated, as will the deed of trust.

A Yes.

Q Thank you. Now if you scroll down past number 3, you get to a now therefore, HNGH, and then below that a to have and to hold. Are those conveyance language provisions typically found in a deed?

A Typically, yes.

Q Okay. Will you please turn to Page 20 of Exhibit D-14?

A This is the recision instrument? Is that what you're -- okay. I see it.

Q And yes, I believe this is the recision instrument. Is this the instrument that you prepared on behalf of TCC 2022 LLC?

A At one point, your office -- I think this is the one that I sent. Yes. But I might want to compare it to a very similar one that appeared you accepted or that the HNG accepted because they were quite close to my version. I think this one is the -- is my suggested version.

Q Okay.

A Is that helpful?

Q Yes. I believe this is the version that TCC 2022 prepared. I don't believe this includes any of the revisions that were proposed by my offices, Mr. Marx.

A Okay. Just to clarify, first and foremost, was this document the document that TCC 2022 was going to require for clean title at closing?

A It was the draft that I thought was closer to the desired result. It was sent with the idea that it would be reviewed. And I'll apologize in advance if there's any typos in there. But subject to final review, yes.

Q And so, Mr. Marx, I just want to clean that up a little bit. Did you believe that this would get the parties closer to closing, or did you believe that this would accomplish the

goals required by your client to close specifically related to this special warranty deed against the recision of deed issue?

A I think this was the more appropriate form. Is that --

Q Yeah, that's fine. Mr. Marx, this is not a deed at all, is it?

A It's an instrument of recision.

MR. KANE: Objection, non-responsive.

THE COURT: Response?

MS. LINDAUER: I think he said it was an instrument of recision. I'm not sure if he specifically answered Mr. Kane's question.

THE COURT: I'll sustain the objection.

BY MR. KANE:

Q Mr. Marx, please answer my question. This is not a deed at all, is it?

A It does not include the words to grant that was in the special warranty deed.

Q Okay. Let's try and get there. And you testified that that was required, that conveyance language was required for a deed under Texas law. Is that correct?

A In a typical transaction, yes.

Q Okay. So this is not a deed under Texas law. Is that correct?

A It is an instrument of recision --

MR. KANE: Objection --

THE WITNESS: -- and not a deed.

BY MR. KANE:

Q Okay. Thank you, Mr. Marx. I appreciate it.

A Okay.

THE COURT: So I heard an objection.

MR. KANE: No objection, Your Honor. He answered the question.

THE COURT: All right.

BY MR. KANE:

Q If the record is unclear, Mr. Marx, is it correct that you just acknowledged is not a deed under Texas law?

A In the typical sense, yes.

Q And instead, this is a recision instrument.

A Yes.

Q Now, Mr. Marx, are you familiar with any provisions of the Texas property code that address recisions of deed outside of the context of residential foreclosure proceedings, or the correction of Scrivener's Errors?

A I'm sorry. Can you repeat the question?

Q Yeah. Are you familiar with or can you point me to any portion of the Texas property code that addresses recisions of deeds outside of the context of a residential foreclosure proceeding or correction of a Scrivener's Error?

A I'm unaware of any specific in the code.

Q Okay. And this deed in lieu -- or let me rephrase that.

The deed in lieu that we've been discussing, that didn't arise out of a residential foreclosure, did it?
A Correct.
Q And the deed in lieu was not being addressed due to any Scrivener's Error, was it?
A Correct.
Q Okay. I'm going to ask you to look at Exhibit 7, Lender's Exhibit 7. It is titled agreed order of judgment and dismissal of adversary proceeding with prejudice to refiling. Tell me when you're there.
A This is on the lender's list?
Q Yes, sir. Yes, sir.
A I'm sorry, 7 you said?
Q Yes, sir.
A Signed March 18th of 2022?
Q Yes, Mr. Marx.
A All right. What was the question?
Q Will you scroll down to the second full paragraph of this order? That paragraph begins, the Court, having found among other things. Do you see that paragraph?
A I see it.
Q And will you look at Roman numerette iii? Do you see that?
A One second. Okay. I see romanette iii.
Q Okay. So this is a finding from the Court, correct, that

states the following -- that following the debtor's default, HNGH properly exercised its right to file the deed in lieu in accordance with the terms and conditions of the forbearance agreement. Do you see that provision?
A Yes.
Q So just confirming, there's really nothing at all related to the deed in lieu about any kind of error or residential foreclosure proceeding at all.
A I'm sorry. I didn't understand that question.
Q Sure. Based on the Court's finding of fact that you see here at Roman numerette iii --
A Okay.
Q -- there's really no debate between the parties that the deed in lieu was properly exercised and filed?
A I can only speak -- it says in accordance with the terms and conditions of the forbearance agreement.
Q Right. So do you see anything in here that suggests that the recording of the deed in lieu was in error or related to a residential foreclosure proceeding?
A I don't see anything in this instrument that there was an error, although there was.
Q Okay. That's an odd take, Mr. Marx, that there was. This agreed order was executed by debtor's counsel, HNGH's counsel, Mr. Barton's counsel, and Mr. Barton personally, right?
A It appears to be. Yes.

Q Okay. Now let's look back at Exhibit D-14 and the recision instrument that you prepared. And you said you believe there was an error, or there were errors. Is reference made in this document to some of the errors that you perceive? I believe the fourth whereas has a parenthetical that says which dating was not consented to by grantor.

There's another parenthetical there in that last paragraph on Page 1 of this recision instrument that says with recordation to is not consented to by grantor. Are those some of the concerns that you had?

A No. The problem with the deed in lieu that was recorded by the lender, it's really up a bit. There.

THE COURT: Mr. Kane, I apologize. My computer froze and I had to restart Adobe Acrobat. We're on D-14, which page in that file are we on now?

MR. KANE: It's Page 20 of 25, Your Honor.

THE COURT: All right, thank you.

THE WITNESS: And then, Your Honor, I was trying to respond to the question of what was wrong. And so I was going to refer --

BY MR. KANE:

Q Actually, Mr. Marx, I didn't ask what was wrong.

A Oh.

Q I asked if those parentheticals were in reference to items that you believed were wrong with the deed in lieu.

THE COURT: And, Mr. Kane, since I had to play catch up, so we're now on Page 20. This is the document that Mr. Marx helped prepared, correct?

MR. KANE: Yes, Your Honor. And the parentheticals are in the final whereas provision.

THE COURT: Okay. Would you mind re-asking the question because I was preoccupied with trying to get my exhibits reopened. What was your question about this paragraph.

MR. KANE: Yes. So when we looked at Exhibit 7, Mr. Marx noted that he believed that there were things wrong with the deed in lieu, acknowledged that Exhibit 7 was executed by the debtor, the lender, Mr. Barton's counsel, and Mr. Barton in his individual capacity.

So then we turned and looked at this last whereas where there are these parentheticals, and I asked Mr. Marx if those parentheticals identified items that he believed were wrong with the deed in lieu. And he testified no, and then began to have additional narrative --

THE COURT: Right.

MR. KANE: -- which, Mr. Marx, I'll object as non-responsive after the answer of no.

THE COURT: So normally I ask the other side for a response. Just because I'm playing catch up, I'll sustain the objection. And then go ahead and ask the question again.

MR. KANE: I'll just move on. I mean, I'll ask a different question.

MS. LINDAUER: Your Honor, while we're kind of switching a little bit right now, could we just take a five-minute bathroom break and come back? We've been going for a little over a hour and a half. If you don't mind.

MR. KANE: Your Honor, that's fine.

THE COURT: All right. We'll take a five-minute recess.

THE WITNESS: Thank you.

(Recess at 10:38 a.m./Reconvened at 10:46 a.m.)

THE COURT: Okay. We are back on the record.

Mr. Marx, are you ready?

MR. MARX: Just now, Your Honor.

THE COURT: And I'll remind you now. I can't remember if I reminded you when we started or not, but you are still under oath.

Go ahead, Mr. Kane.

MR. KANE: Thank you.

BY MR. KANE:

Q Sorry, Mr. Marx. I've got this a little bit confused. Give me one second to get back to where I need to be.

THE COURT: Mr. Kane, are we still on Defendant's Exhibit 14?

MR. KANE: Yes, we are. There we go.

BY MR. KANE:

Q Mr. Marx, when did you prepare this recision instrument?

A Before May 30th and sometime before that.

Q Can you be a little bit more specific than sometime before May 30th? Is it after May 28th, after May 29th?

A I don't remember when it was sent over to HNGH.

Q That's okay, Mr. Marx. That's not what I asked you.

A Oh.

Q When did you prepare this?

A I think a day or two before it was sent over to HNGH.

Q Okay. So May 28th or May 29th?

A I don't specifically have a recollection.

Q So you don't know when? Even aside from your preparation, can you tell me when you sent it to the debtor?

A On or about the 25th or 27th. I know I had seen the lender's special warranty deed and I had to redline through that. And so I think it took a day or so. And I would anticipate that was around 26th or 7th.

Q Okay, Mr. Marx. I'm just trying to clarify here. When you initially prepared your red line of lender's special warrant deed, was that special warranty deed in draft form or were you preparing a red line against the executed version?

A I don't specifically recall.

Q If you prepared this document on the 26th or 27th, do you have any idea why it wasn't delivered by the debtor to HNGH,

the lender, until May 30th at 3:24 p.m.?
A I can -- only that they had to review it too.
Q And do you understand that HNGH, the lender, provided comments to your form of recision instrument?
A Yes. I believe I saw a red lined to it substantially similar to my suggested recision instrument as opposed to the lender's earlier special warranty deed.
Q And when did you receive the lender's comments to your proposed recision instrument?
A Can I look at these exhibits? Because I think I saw it in the exhibits.
Q Here. Let me see if I can help you out here. Just one second.

THE COURT: Mr. Kane, while you're looking that up, if I just -- for planning purposes, we have about an hour. And I'm wondering is there any reasonable chance or is there any reason why we should keep --

MR. KANE: Ms. Blakeley? No.

THE COURT: Yes. Ms. Blakeley, or should we excuse her? Because it does not look like we're going to get to her today.

MR. KANE: Your Honor, I believe we should excuse her.

THE COURT: Mr. Carruth, are you there? We'll give him a minute. Mr. Carruth, are you with us still?

MR. CARRUTH: Yes, Your Honor. I will inform Ms. Blakeley. Thank you. I may stick around and listen, however.

THE COURT: Okay. I just -- I didn't want her to waste her morning thinking that she was going to be up, so it doesn't look like we're going to get to her today.

Ms. Blakeley, if you're on, I apologize for keeping you on the hook this morning, but you are excused if you would like to drop off if you are still on here.

MR. CARRUTH: She's been on standby, Your Honor, and I will so inform her.

THE COURT: Okay. Thank you.

MR. CARRUTH: Thank you.

THE COURT: Go ahead, Mr. Kane.

BY MR. KANE:

Q Sure. Mr. Marx, will you go ahead and take a look at Exhibit 67? That's Lender's Exhibit 67.

A Okay. I see it.

Q Now, do you see this correspondence from Ms. Lindauer to Mr. Kane on May 30th, at 3:28 p.m., it says, on the recision, and we want to go with the agreed recision. Do you see that?

A Yes.

Q Is it your understanding that the agreed recision is referring to your form of recision instrument?

A Excuse me. Yes.

Q Okay. I'm going to have you look at just above that.

There's correspondence from HNGH's counsel that says, Joyce, this is what I will advise my client to agree to. Do you see that?
A Yes.
Q And did you understand that was referring to what is attached to your attachments? It says HNGH revised agreed recision deed, JJK revised.
A You're referring now to Exhibit 67A?
Q Well, I was actually still looking at Exhibit 67.
A Okay. I'm sorry. I missed your question then.
Q Okay. There is correspondence from HNGH's counsel to Ms. Lindauer. Do you see that correspondence that says, Joyce, this is what I will advise my client to agree to?
A Yes.
Q You understood that, the what I will advise my client to agree to is referring to what was attached to this email, correct? And we're going to look at that attachment in just a second. I just want to make sure I have your understanding.
A And I think so.
Q Okay. And then take a look at Exhibit 67A, will you? Now this document looks very similar to your form of recision instrument, correct? But if we go down to this last whereas, those parenthetical are missing, aren't they?
A In the last whereas?
Q Yes. On Page 1 of Exhibit 67A.

A Yeah. I don't see a red line here, but that section is -- has been revised to some degree.
Q Right. So this does have -- this is not the same as the document that you had originally submitted?
A No. But it's much, much closer to the form that I submitted and evidently the one that your client was amenable to.
Q Okay. And did TCC2022 have any issues with this revised document that was returned by the lender?
A I don't remember when I saw this. My comment at the time was that it is much closer. I didn't ever make a final sign off on it.
Q Why not?
A Because this was late in the day on the holiday and I don't remember seeing this. I don't know when I saw this.
Q Wait. Wouldn't you agree that this document, this recision deed that's required in the agreed order was a critical component of closing?
A I guess. That was one of my requirements.
Q But you couldn't sign off on this document?
A I don't remember seeing it that night is what my testimony was.
Q Okay. How about on May 31st, the next day? Did you see it then?
A I think so.

Q Okay. About what time during the day do you recall seeing that?

A What I recall is trying to generate a red line and I do not recall when that I was doing that, but it was the -- that afternoon or that day, the day of the -- let me take a look -- the 31st.

Q Okay. And you never made a decision about whether this form would be acceptable to your client before the expiration of the payoff deadline?

A I'm just trying to determine what the red -- what the changes were. They were -- they appear to me to have addressed most of the material items. There was an additional problem that was noted here that has yet -- so I couldn't sign off on this form, not without something more.

Q Okay. And why not?

A Because there's a -- in my opinion, a defect in the chain of title because the deed in lieu that HNGH recorded purported to be in favor of HNGH Turtle Creek, LLC, a Texas limited liability company. And, in turn, the instrument that like the lender special warranty deed carried forward that there, a Texas, LLC. When I --

THE COURT: Mr. Marx, just for my benefit, where are you seeing?

THE WITNESS: Oh, I apologize, Your Honor. The instrument that first established the error was the deed in

lieu.

THE COURT: No, no, no. On I'm looking at 67A.

THE WITNESS: Okay, Your Honor. I corrected it in my instrument. And then this is, I think, the HNGH's acceptance thereof. And here, HNGH is appropriately identified as a Delaware LLC because it is.

THE COURT: Okay. Are you looking at the signature page? I'm catching up to you.

THE WITNESS: Yeah. I mean, it's -- actually, it was in the recitations in Paragraph 2, whereas, and then it was also appears in the signature block. And in this instrument, the one that I've essentially prepared that the lender essentially agreed, the HNGH is properly identified as a Delaware LLC. What I would refer you to then is I think it's D14, the debtor's versions of the special warranty deed. And it's -- I'm referring specifically to the lender's special warranty deed which is on Page 7. It's Page 7 of D.

THE COURT: On -- I'm sorry. Are you on D14 now?

THE WITNESS: Yes, Your Honor. And Page 7 of that PDF.

THE COURT: All right. Hold on. I'm catching up.

THE WITNESS: Okay.

THE COURT: Okay.

THE WITNESS: This is the instrument that we sometimes refer to as the deed in lieu. It's the one that was

recorded by the lender. And here, it purports to move title into HNGH Turtle Creek, LLC, a Texas limited liability company. That's in the first paragraph, Your Honor, with that effective as of October 29th.

THE COURT: I see it.

THE WITNESS: Okay. Well, there is no HNGH Turtle Creek, LLC in Texas. That entity was never organized in Texas and it is not qualified to conduct business in Texas. And yet, it appears here in the instrument that was filed by HGH there on that Page 1, I'll call it, and on -- okay. So that's where title rests after that deed in lieu was filed.

And then if I went back to the next to the lender's special warranty deed, which I think is just down a little bit. There you go. That's on Page 12. And that first paragraph that the error was just carried forward again. It says, one, two, three, four, fourth line down, granted and conveyed to HNGH Turtle Creek, a Texas limited liability company. And then further this instrument, this is again the lender's special warranty deed, the one that I made comment to. It purports to be signed by HNGH Turtle Creek, LLC, a Texas limited liability company. There is no such entity in Texas. And I was not in a position to sign off.

Well, the instrument that came back from Mr. Kane's office corrected this because I was the one who corrected it in the instrument. Btu I am of the opinion that these types of

errors, these breaks in the chain, should be repaired with, well, I'll call it a corrective instrument or a corrective deed or maybe a correction of deed. There are various ways to do it. It too was not done, and so I'm not in a position then, as of May 30th when I got the revised instrument from Mr. Kane's office or now, to sign off on a title until that I think that a necessary corrective step.

BY MR. KANE:

Q Okay, Mr. Marx. That necessary corrective step, that would be an additional document. I believe you said a corrective deed or something like that, right?

A Yes. I think so. I think that that's what should be required. That's what I would require.

Q Okay. So now turning back to this revised lender's agreed recision of deed instrument that was returned to the debtor on May 30th just a few hours after we received your draft. Would this document satisfy just this recision component? Not the other corrective deed components that might need to be addressed, but just the recision component from your perspective?

A No. Because that corrective instrument needs to be filed first.

Q Okay. And did you ever raise that issue directly to HNGH at any time before the expiration of the closing period?

A Well, I corrected the fact that that identify was

misidentified.

MR. KANE: All right. Objection. Non-responsive.

THE WITNESS: Well.

THE COURT: Response, Ms. Lindauer?

MS. LINDAUER: Your Honor, I think he answered the question, that he addressed it in his version of the document, so I think he did answer the question.

MR. KANE: Your Honor, Mr. Marx has already testified that he believed that the corrective documents would need to be filed as separate documents. The question was whether he raised that issue at any point and time.

MS. LINDAUER: Maybe Mr. Kane can ask him that question again. I wasn't clear on the question either.

MR. KANE: Your Honor, I'll --

THE COURT: I will sustain the objection, and Mr. Kane, why don't you re-ask it.

BY MR. KANE:

Q Mr. Marx, did you ever point out to the lender that a corrective deed or some other document other than the recision instrument needed to be filed to clear title prior to closing or at closing?

A I did not provide them a narrative as to why I made I made the change in the identification of HNGH Turtle Creek, LLC.

Q Well, hold on, Mr. Marx, right. There's a difference between changing it on this document and needing some separate

document to clear title, correct? Didn't you just testify to that?

A Yes. There are two instruments. I would suggest that a corrective instrument is required. And then which fixes these signature blocks and properly identifies the entity because if not, I don't know the effect of an instrument, you know, carried over with an entity that's not here in Texas.

Q Okay. And did you specifically address that issue in any correspondence with the debtor or with any correspondence with HNGH, the lender?

A With the debtors, I changed the name. I corrected it in the instrument I prepared. And, yeah. I -- I don't recall them asking me on every one of these changes why I made them. I think on that one I probably told them that that entity does not exist. It's a break in title and it needs to be fixed. And I fixed it on the recision instrument that you appear to have accepted.

Q Okay. And you say that I appeared to accept it. You're referring to the lender?

A I apologize. Yes. I'm referring to the email we looked at a few minutes ago.

Q But even though the lender proposed to accept this draft at Exhibit 67A, isn't it your testimony that you never provided any acknowledgment to the lender that this would be an appropriate form if these other corrective actions were taken?

A I did not have direct correspondence with HNGH throughout the whole entire process.

Q Okay. Did you ever tell the debtor that, hey, we've go this other corrective issue that needs to be addressed, but HNGH, the lender's proposed revisions to the recision instrument are acceptable?

A I don't recall that type of discussion.

Q Okay. Let's take a look at Exhibit 33A. I believe you had quite a bit of questioning on this and referenced it earlier in your testimony. Will you tell me when you've turned to that document?

THE COURT: I apologize, Mr. Kane. I don't want to hijack you again, but could we stay on 67A for just a minute?

MR. KANE: Yes, Your Honor.

THE COURT: As I was scrolling through it, I don't see the use restriction in this form. Is that correct? It referred to the condo. Am I -- or am I missing?

MR. KANE: No, Your Honor. That's correct. So if you look at -- if you look at D14. Hold on. I've got to --

THE COURT: 67A was the document that you sent back over saying that you would advise your client to accept this form, correct?

MR. KANE: Yes. This is the form of -- a revised form of the recision instrument that the debtor circulated on May 30th, at 3:24 p.m., on behalf of TCC2022.

THE COURT: Right. And maybe Mr. Marx answered or -- and maybe I don't remember the answer. But, Mr. Marx, does this 67A, if you set aside this issue that you're raising about the Texas versus Delaware references, does 67A address your concern about the use restriction?

THE WITNESS: Yes, Your Honor.

THE COURT: So is there any problem with 67A other than -- other than the issue of -- you have identified about Texas versus LLC in reference to the lender?

THE WITNESS: Which one is it, Your Honor? 67A?

THE COURT: 67A. As I understand the testimony, this is the document that last -- well, this is the document that came over from Mr. Kane to the debtor's side where Mr. Kane advised Ms. Lindauer that he was going to recommend to his client, Mr. Kane's client, that they use this form. And so my question to you, Mr. Marx, is does this form that the lender indicated they would use satisfy your previous concerns about the use restriction?

THE WITNESS: Yes.

THE COURT: Including -- so the whole issue about there being a different enforcement party, that's now resolved by this document, correct?

THE WITNESS: Right. I pointed out the error or the objection, and that -- they appear to have agreed.

THE COURT: So the only outstanding issue with 67A is

what you testified to just a couple of minutes ago about the lender being referenced previously as either a Texas or a Delaware LLC inconsistently. Is that correct?

THE WITNESS: Yeah. I call that the chain of title issue, Your Honor.

THE COURT: Okay. Thank you.

THE WITNESS: Are you asking me is there anything else objectionable about this?

THE COURT: I think I understood your prior testimony to be that this resolved everything other than the chain of title issue. Is that correct?

THE WITNESS: I'm just double checking, Your Honor. There are a number of other provisions which I would probably go back on, but I wouldn't say -- I'd say that they're not fatal to the cause. And so they fixed the most material, one of the most material.

THE COURT: All right. So I think you have answered my question. Thank you.

Mr. Kane, go ahead.

BY MR. KANE:

Q Yeah. Let's stick with this because I want to clarify that last statement, Mr. Marx. To be clear, you did not provide additional comments. You did not go back with revisions on this document, did you?

A No.

Q Okay. Now will you please turn to Exhibit 33A? Specifically, I want to take a look at Section 5. Tell me when you're there, please.
A 33A is the commitment.
Q Yes.
A Effective May 15, 2022?
Q Yes. Will you turn to Section 5 of Schedule C?
A Section 5.
Q Are you there, Mr. Marx?
THE COURT: Mr. Kane, are you on Page 4 of the PDF file?
MR. KANE: It's actually -- it's actually Page 7 of 16, Schedule C, Number 5 in bold.
THE COURT: 7 of 16. Okay. Got it.
THE WITNESS: Yes.
BY MR. KANE:
Q Okay. Mr. Marx, do you see below this main deed of trust there are a series of subdocuments that are referenced. There's an assignment of leases and rents, and there is a notice of collateral assignment of deed in trust and loan documents to Axis (phonetic) Bank. Do you see that?
A I do.
Q And I believe you testified that the lender actually provided the documentation necessary to resolve this concern. Is that right?

A You're referring to the notice of collateral assignment in favor of Axis Bank?

Q Yes.

A Yes. What I testified before is that the title company subsequently found a "termination" of that as opposed to earlier they, for whatever reason, could not locate it. And so I've seen, I believe, an updated -- that item has been removed.

Q Okay. I take it what you were saying is you've seen an updated Schedule C. Is that correct?

A I think I have.

Q Okay. When did you see that?

A I don't know.

Q Was it before the expiration of the closing deadline on May 31st?

A I think I saw it in connection with reviewing these documents for -- I don't recall. I don't recall. I know that -- I know the matter has been cleared.

Q Okay. So you are -- but there is. You're telling this Court there is an updated Schedule C on the title commitment form from Sendera. Is that right?

A I have been continuing to try to get updates as we go forward.

Q Mr. Marx, that was a yes or no question. Is there an updated Schedule C from the title company?

A I think so.

Q Okay. And you've seen that document?
A Well, I think so.
Q Okay.
A But maybe -- I thought I had seen one where this was cleared, but maybe it was just a mental note. But I thought -- I know that the Axis deal has been found.
Q Okay. Now I thought you previously testified that it was the lender that resolved the Axis deal. It sounded like you just testified that Sendera found it. Which one of those is your testimony?
A My testimony is based upon -- my testimony is that Julie at the title company indicated that she had found it and it had been removed. And she explained to me it was because it was the instrument that removing the Axis exception was not what -- when she first looked for it, she was looking for words, I think of release or assignment or cancellation. And she found it under some instrument entitled termination. That's my recollection. I do know that it -- that it is not on that -- it's not of record anymore. They had satisfied themselves on that one.
Q Okay. Now, if there are recorded documents on the official public records of Dallas County that resolved these concerns, would you say that generally speaking it is the obligation of the title company to go locate and pull those public records?

A Yeah. They pull -- yes.

Q Thank you. Now, I want to turn here to Exhibit -- Debtor's -- this is Debtor's Exhibit D3. We're going to flip back to that. Specifically looking at deliverables at 2.2 and 5.3.

THE COURT: I'm sorry, Mr. Kane. What paragraphs or numbers?

MR. KANE: 2.2 and 5.3. Let's start at 2.2.

BY MR. KANE:

Q Mr. Marx, are you there?

A 2.2. Yeah.

Q This is on the debtor's May 30th, 3:24 p.m. list of documents that are needed to purportedly clear title, correct? And is this that same Axis Bank issue that pops up in Section 5 of 33A?

A Yes.

Q Okay. So, just to be clear, this was on May 30th, right?

A Correct.

Q Okay. Can I have you turn to Lender's Exhibit 56? Tell me when you're there, please.

A 56?

Q Yes.

A That's an email of May 27th?

Q Okay. And who is Khudabuksh referenced in the body of that email?

A He's an attorney that works with Joyce.
Q Is that the gentleman you've referred to previously as Mr. K?
A I do, and I apologize.
Q That's Mr. -- it's Khudabuksh Walji is his name. Is that right?
A Yes.
Q Okay. And this email purports to have the lender sending over the recorded termination regarding Axis Bank, correct?
A Right. The termination is probably why Julie said she couldn't find it initially.
Q And this is dated May 27th, correct? Do you see that?
A Yes.
Q Okay. So this is three days before the debtor sent over its Memorial Day letter in the document we've been referring to as Exhibit D3, right?
A Yes.
Q Okay. Will you turn to 56A, please?
A Yes.
Q Now this is the termination of notice of collateral assignment of deed of trust and loan between 2999 Turtle Creek, LLC, and Axis Bank, right?
A Yes.
Q And is it your understanding that this is the termination that resolved that Axis Bank line item on Section 5 of 33A. Is

that right?

A Yes.

Q Okay. And would you be surprised to learn that the debtor actually had this document in its possession since December 6, 2021, at the latest?

A That the debtor had that in its possession?

Q Yes.

A No. I wouldn't -- I can't speak to that.

Q Okay. Can you turn to Exhibit 1, please?

A Exhibit 1 on which list?

Q I'm sorry. It's the Debtor's Exhibit D1.

A Docket sheet?

Q Yes. Now, if you scroll down to docket entry 44, do you see here December 6, 2021?

A One second. Is this by -- how are these organized?

Q By docket entry.

A Okay. And which docket entry are you looking for?

Q 44. It's also in chronological order, so that will be on December 6, 2021.

A All right. Tell me the docket number again please. I'm sorry.

Q 44, Mr. Marx.

A All right. I see it, 44.

Q It's a --

A 12/06/2021.

Q Right. That's a witness and exhibit list from the lender related to a hearing that was before this Court. That's what that looks like, right?
A That's what that looks like.
Q Right. And there's a bunch of exhibits that were filed with that document. Do you see that? And they have some subnumerals so that you could have a, you know, entry 44A goes to this Exhibit 8. Do you see that?
A Okay.
Q Now, I'm going to pull up a document that I'd like the Court to take judicial notice of. And this is just a demonstrative. I'm not trying to seek admission for the truth of the matter asserted. Let's take a look at this. Do you see this file stamped across the top of this? You may have to actually look on your screen, Mr. Marx. Now do you see at the top here it says case 21 dash -- and it's a little bit tough, but 31954. And if you keep going over, it's tough to see again, but there's a 44-8. It says File 12/06/21, entered 12/06/21 at what is 7:35 p.m. Do you see that?
A Barely, yes.
Q Okay. And do you see that this is the same termination of notice of collateral assignment of deed of trust and loan between 2999 Turtle Creek, LLC, and Axis Bank? I'll scroll down if you need to to confirm it's the same document.
A Now what was the other one over here?

Q That is Exhibit 56A.
A Right. And that -- which -- what are you wanting me to compare it to?
Q The one that's on your screen. Here, I'll even click over. You can tell me if you see anything move, okay. This is Exhibit 56A. This is Exhibit 44-8.
A Okay. And just scroll down. I can verify, but if you'll just go down a little bit more.
Q That's 44-8. This is 56A. The same execution.
A Okay. And there --
Q Do you see any difference in these two when I click on them at all?
A No. Are those just -- they're both two pages?
Q Well, they're actually -- it's four pages because it has the recording information on each.
A Okay. If it's on both, then they're the same.
Q Now do you know if you ever asked the debtor if this document was just in its possession?
A No. I just reviewed the commitment and it appeared.
Q Okay. Did you believe that up until May 31st finding this Axis termination was a critical issue for the debtor or for Sendera Title?
A Well, I'm not sure when Joyce -- I said Joyce -- when Julie found it, but when I gave my input for the letter that went to you on the 30th, it was still on the commitment then

and that's how it got on that list.

Q Okay.

A Look at the --

Q Even though we see that this document was provided. If we go back to Exhibit 56, this document was provided to the debtor on May 27th. Here, I'm going to keep this open.

A All right. And I think that was the time that -- that Julie at Sendera likely removed it or maybe she found it separately.

Q Okay. I'm going to have you take a look at Debtor's Exhibit 8. Now this was included in the debtor's witness and exhibit list. Now you can see here I'm not a party to this correspondence and neither is any attorney or representative of HNGH. Is that correct?

A I was reading it. I'm sorry. What was the question?

Q That there aren't any representatives of HNGH who are a party to this email. Is that correct?

A Correct. This is from Julie at Sendera to Joyce.

Q Okay. And this is May 31st at 11:22 a.m. Is that right?

A Yes. That's what it reads.

Q And based on this correspondence, does it look to you like Sendera Title still hasn't received that termination resolving the Axis Bank and 2999 Turtle Creek title issue?

MS. LINDAUER: Your Honor, I'm going to object to the form of the question. That is not what the email is

addressing. It's addressing an assignment, not a termination. So it misstates the substance of that email.

THE COURT: I'll overrule the objection.

THE WITNESS: I apologize. Can you repeat the question?

BY MR. KANE:

Q Yeah. Let's walk through it.

I think you just said that it was your understanding that Julie Lissey (phonetic) at Sendera was struggling to find the termination because she was looking for an assignment. Did you testify to that issue previously?

MS. LINDAUER: Your Honor, I think he misstates the record. I think the testimony was that Julie was looking for a release, not an assignment. And I wrote down specifically what Mr. Marx said was that Julie was looking for a release document, not a termination.

THE COURT: All right. Well, I'll overrule the objection.

Mr. Kane, why don't you ask the question?

MR. KANE: Sure.

BY MR. KANE:

Q Let me just ask it a different way, Mr. Marx. Is it your understanding that the Axis Bank termination we've looked at that was on Exhibit 56A would have resolved this assignment concern or whatever concern it is -- sorry -- whatever concern

it is that Ms. Lissey is providing to Joyce in this email on May 31st?
A I think so.
Q And you saw that the debtor had that document in its possession on December 6, 2021?
A I know it was on, from what you showed me, on the docket.
Q Okay. And otherwise, you saw that it was provided to the debtor on May 27th, correct?
A Yes. It looks like it went to Ms. Lindauer on that day.
Q Now, do you have any idea why the debtor wouldn't have resolved this issue with Sendera Title by 11:22 on May 31st?
A I can only speculate.
Q I'll take it that that's a no then. Is that correct?
A Well, I don't -- I don't know.
Q I'd like you to turn back quickly to Exhibit 33A. We're still at Item 5 in Schedule C. Now, below the Axis Bank issue is a collateral transfer of note -- two down. Is a collateral transfer of note and lien to Happy State Bank.
A Just one second, please.

THE COURT: Mr. Kane, we're on 33A, and which paragraph are we on now?

MR. KANE: Schedule C5, second to last paragraph there down at the bottom of Page 7 of 16.

THE COURT: All right. Happy -- the Happy State Bank paragraph.

MR. KANE: Yes.

BY MR. KANE:

Q Are you there, Mr. Marx?

A I am.

Q Okay. Now I believe you had quite a bit of testimony about this Happy State Bank issue. Was this a matter that was of serious concern to TCC2022?

A Yes.

Q And did this call into question who was the actual holder of the note leading up to closing?

A It appears as an exception of title and in response to your question, yes.

Q Okay. Was it your concern that if Happy State Bank had been collaterally assigned the lender's note and lien that would need to be released back to the lender to ensure clear line of title and the correct payoff party at closing?

A That, and it also raised an issue as to the authority of HNGH during the -- during this time period, since December 4, 2020.

Q Was it your understanding that the Happy State Bank release was a critical component to closing?

A Yes, something. It would have to be recorded to clear this issue.

Q So TCC2022 absolutely needed that document to fund and close on May 31st, among others?

A In this situation, yes.

Q Okay. And on May 31st, you were included on correspondence between the debtor and Happy State Bank's counsel, correct?

A If you can show me that, I'll look. I don't have a specific recollection.

Q Okay. Let me ask a different question first then. Do you understand that Jeff Carruth, who has appeared in this hearing, was Happy State Bank's outside counsel?

A That's my understanding.

Q Okay. I'd like you to turn to Exhibit 90. That's Lender's Exhibit 90.

THE COURT: Mr. Kane, while he's pulling that up, just a reminder, we have ten more minutes and we're going to stop at 11:45.

MR. KANE: I want to get as far as I can by then, Your Honor.

THE WITNESS: You're at Exhibit 90?

BY MR. KANE:

Q Yes. Now if you scroll all the way down, do you see there is correspondence involving Joyce Lindauer, Jeff Carruth, Khudabuksh Walji, me, Randy P. Marx. And the subject is Happy State Bank. Is Randy P. Marx, is that you?

A Yes.

Q And that's your email address, randy@themarxfirm.com?

A Yes.

Q Okay. And do you see here at 4:26 p.m., if you go about halfway down, there's a line that starts, of the loan right above that? Let's look at the line right above that. Do you see where Ms. Lindauer says, I think you were trying to get a release also. I don't recall seeing a release of the loan. We did not see an executed release. Do you see that?

A Yes.

Q When you received that email, was it your understanding that was talking about this Happy State Bank release of collateral assignment of note and loan?

A I am not sure. There are two releases anticipated. One is of HNGH's position and the other is what we're talking about, this HSB exhibit.

Q Yeah.

A And I'm not sure which one she is referring to, or maybe she's referring to both. I'm just unsure from that context.

Q Okay. Well, let's scroll up a little bit then.

A Up?

Q Yeah. To the next line of correspondence. Let's do that. The last one was at 4:26. This one is at 4:32. You're again included on this correspondence from Jeff Carruth, aren't you?

A Yes.

Q Okay. And do you see where it says, I asked for the title co info repeatedly today and had no information about where to

send a release? Release was ready to roll all day, but no response as to where and who to send wet or scan signature, et cetera. Do you see that?

A Yes.

Q When you received this, was it your understanding that HSB, Happy State Bank's lawyer, Mr. Carruth, was referring to the Happy State Bank release?

A Yes.

Q Was it disconcerting to you since you just testified that this was a critical document for closing that Mr. Carruth was representing that he had repeatedly tried to deliver the release, but that the debtor would not provide him the information for the title company or where to send it?

A But certainly you were aware that Sendera Title and Julie were the title company.

Q Mr. Marx, does that mean that the debtor is incapable of providing that information to Mr. Carruth upon his request?

A I think anybody on that email string was capable.

Q Did you provide it?

A No. I was not, you know, in -- directly or indirectly, I mean, I wasn't the -- it didn't look like he was asking it of me.

Q Okay. And you testified -- I'm sorry, Mr. Marx. Go ahead.

A I just don't remember when I saw this.

Q Okay. You testified earlier that in your representation of Enoch Investments, LLC, you were working with First Guaranty Bank, correct?

A Yes.

Q And First Guaranty Bank was choosing to use a different title company, correct?

A Right. They were running parallel with -- with another title company of their preference. I do not recall the name of it now.

Q Okay. So you were working on five parallel tracts is what you testified to, and at least one of them was using a different title company.

A I think that was the only one.

Q Okay. And will you turn to Exhibit 62, please? Now, before we get into this exhibit, Mr. Marx, were you aware that the debtor was running parallel tracts with other entities that you were not representing? I believe you testified there were several other parallel tracts. Is that right?

A Yes.

Q And do you have any idea if some of those entities or funding sources were using other title companies kind of like First Guaranty Bank?

A Not that I am aware of.

Q Okay. Now, this may come as a bit of a surprise then, but let's scroll down to the bottom correspondence on Exhibit 62.

Now there's correspondence from HNGH's counsel where Khudabuksh and Joyce, attached is the recorded termination re Axis Bank. Do you remember seeing this email previously? This is the email that included the Axis Bank termination on May 27th, correct?
A Are you referring to the bottom part of this email?
Q Yes, Mr. Marx.
A Yes. This looks like the one that we saw earlier. Please send to title. Thanks.
Q Yeah. So that next one that you just read, that's May 27th at 5:11 p.m. That's debtor's counsel instructing lender's counsel to please send the Axis termination to the title company. Is that your reading of that email?
A Yes.
Q Okay. Now let's scroll up to the next one, May 27th, at 5:11 p.m. HNGH's counsel wrote, don't know which title co to send to. You are working with three. I'll let you forward it to the appropriate parties. Do you see that?
A Oh, that's your email to -- to who?
Q Well, let's see who responded to it, Mr. Marx. Do you see up at the top this correspondence that says from Joyce Lindauer to John Kane, cc Mr. Walji.
A Okay.
Q And what is Ms. Lindauer's response to that prior email?
A The email says, that's fair.

Q So does that suggest to you that the debtor had acknowledge it was working with at least three different title companies and there could be some confusion about where things should be sent?

A Well, it's your statement that we're working with -- that you're working with three. I don't know what Joyce knew.

Q Well, let me stop you there, Mr. Marx. Do you see Ms. Lindauer, a response refuting that they were working with -- that the debtor was working with three title companies?

A No.

Q Do you see any direction from Ms. Lindauer that says, just send it to Sendera Title?

A We're talking here about the termination of the Axis title assignment that would have gone to Sendera because they were the one asking for it.

Q Okay. And do you see anything in Ms. Lindauer's response that clarifies that point or that directs HNGH's counsel to send it directly to Sendera?

A No.

MR. KANE: Okay. Your Honor, it's 11:43. I'm going to shift directions a little bit during cross. This might be a good time to stop if we're going to just be shutting it down in the next two or three minutes anyway.

THE COURT: Yeah. And I apologize. I just have a busy day today. I have a complicated matter at 1:30, a meeting

at noon, and I've got to grab some lunch before then, so I appreciate everybody's patience with our schedule.

So we'll recess and we're going to pick back up at -- I'm trying to find it in my notes. Was it 1:00 on the 23rd?

MR. KANE: Yes, Your Honor. I believe that's correct. And just for some clarity for the Court, I've got maybe 30 minutes left, so just for a scheduling for witnesses, I wanted to make that clear for all the rest of the parties involved. I really don't have a whole lot left, but I don't have a short enough amount to get done by then.

THE COURT: Mr. Carruth, are you on and did you hear that?

MR. CARRUTH: Yes, Your Honor. And I'm sorry. Is it 11:00 or 1:00 on Thursday?

THE COURT: So we're picking back up at 1:00 on the 23rd. Mr. Kane indicates he has 30 more minutes of cross.

And so that we don't keep stringing out your client, Mr. Carruth, if we don't finish with Mr. Marx, unless Mr. Kane doesn't want to switch, I really would like to get Mr. Carruth's client done on Thursday. So we might pencil in or, Mr. Carruth, let me ask you. Does your client have a preference for the 23rd or the 24th?

MR. CARRUTH: She was waiting to hear when she might go next so she could move things around. So I don't believe there is a preference.

THE COURT: Okay. Let's pencil in the 23rd for your client. And what's the anticipated time for Mr. Carruth's client?

MS. LINDAUER: Your Honor, we thought probably about an hour on direct and then subject to whatever Mr. Kane may have for cross.

THE COURT: Okay.

MS. LINDAUER: And, Your Honor, we're probably going to have a bit of time with Mr. Marx on redirect to go back over a few of these things I think that may have been left a little fuzzy.

THE COURT: Right.

MS. LINDAUER: So I'm figuring -- yeah. I'm figuring about -- probably about an hour on redirect. With this break, we'll be able to, I think, focus a little bit more on just covering the things that maybe we need to revisit with Mr. Marx.

THE COURT: All right.

MS. LINDAUER: So I figured an hour on redirect and then if the next witness is Ms. Blakeley, probably an hour on direct, and then whatever Mr. Kane has. So we should finish her on Wednesday.

MR. KANE: And, Your Honor, I just want to clarify something. Mr. Marx is in the middle of his testimony and remains under oath. I just wanted to clarify that there's not

going to be a whole bunch of attorney coaching while he's in the middle of being on the stand. I mean, that's --

MS. LINDAUER: No, no, no, Your Honor. I'm just talking about going through my notes and streamlining the questions I would have for redirect.

I've written down a lot of things, so I'm going to try to use this time to streamline what we ask him on redirect, not with him, but with our -- with putting together our questions.

THE COURT: All right.

So, Ms. Lindauer, I would ask you to be prepared to be streamlined and efficient because I really do want to finish Mr. Marx and would like to finish with Mr. Carruth's witness. So cover what you need, but I would ask you to be a little more efficient maybe than you were with the first witness, with Mr. Marx, on his direct, so.

MS. LINDAUER: Understood, Your Honor.

THE COURT: Okay. We'll be in recess until Thursday, the 23rd.

MS. LINDAUER: No. Actually, that's Wednesday. Wait. Is that Thursday?

THE COURT: Oh, I'm sorry. I'm sorry.

MS. LINDAUER: Oh, I'm sorry. Is it Thursday we're coming back or Wednesday?

MR. KANE: That is Thursday because we lost Monday,

so today is Tuesday.

MS. LINDAUER: Oh, I missed yesterday. You're right. Thursday. I'm sorry.

THE COURT: The 23rd. We'll be back the 23rd at 1:00.

MS. LINDAUER: One o'clock.

MR. KANE: Thank you.

THE COURT: We're in recess.

(Proceedings concluded at 11:48 a.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, and CRYSTAL THOMAS, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Michelle Rogan

MICHELLE ROGAN

/s/ Crystal Thomas

CRYSTAL THOMAS, CET-654

LIBERTY TRANSCRIPTS DATE: June 22, 2022