IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Thursday, June 23, 2022<br>1:02 P.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

For the Debtor:

Joyce Lindauer Attorney, PLLC
BY: JOYCE LINDAUER, ESQ.
1412 Main Street, Suite 500
Dallas, Texas 75202

Simmons Legal, PLLC
BY: CAMISHA SIMMONS, ESQ.
6060 North Central Expressway
Suite 500
Dallas, Texas 75206

Robin Phelan Law
BY: ROBIN ERIC PHELAN, ESQ.
4214 Woodfin Drive
Dallas, TX 75220

Fee Smith Sharp & Vitullo LLP
BY: OSCAR REY RODRIGUEZ, ESQ.
13155 Noel Road, Suite 1000
Dallas, Texas 75240

APPEARANCES CONTINUED ON NEXT PAGE.

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES VIA WEBEX (CONTINUED):

| | |
|---|---|
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |
| For Centennial Bank d/b/a Happy State Bank: | Weycer Kaplan Pulaski & Zuber, PC<br>BY: JEFF CARRUTH, ESQ.<br>2608 Hibernia Street<br>Dallas, Texas 75204 |
| For the United States Trustee: | Office of the United States Trustee<br>BY: ASHER BUBLICK, ESQ.<br>1100 Commerce Street<br>Room 976<br>Dallas, Texas 75202 |

**I N D E X**


| | Page |
|---|---|
| Case called | 4 |
| End of Proceedings | 96 |
| Certification of Transcriber | 96 |

WITNESSES

FOR THE DEBTOR:

RANDY MARX

| | |
|---|---|
| Cross-Examination (Resumed) by Mr. Kane | 6/32 |
| Examination by the Court | 28/33 |
| Redirect Examination by Ms. Lindauer | 36 |

JULIE BLAKELEY

| | |
|---|---|
| Direct Examination by Ms. Lindauer | 68 |
| Cross-Examination by Mr. Kane | 102 |
| Redirect Examination by Ms. Lindauer | 125 |
| Recross-Examination by Mr. Kane | 146 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

FOR THE DEBTOR:

| | ID | EVD |
|---|---|---|
| 90 - Email | -- | 141 |

FOR HNGH TURTLE CREEK:

(None)

(Proceedings commenced at 1:02 p.m.)

THE COURT: We're back on the 2999TC case, Case Number 21-31954.

We'll take appearances, please.

MR. KANE: Your Honor, this is John Kane on behalf of HNGH Turtle Creek, LLC, the pre-petition lender.

THE COURT: Good afternoon.

MS. LINDAUER: Your Honor, Joyce Lindauer for 2999TC Acquisitions, the reorganized debtor in this case.

MR. RODRIGUEZ: Good afternoon, Your Honor and Counsel. Likewise, Oscar Rey Rodriguez here on behalf of the reorganized debtor.

THE COURT: Good afternoon.

MR. PHELAN: Your Honor, Robin Phelan also for the reorganized debtor.

THE COURT: Good afternoon.

MR. METZGER: Your Honor, Steve Metzger representing Tim Barton individually.

THE COURT: Good afternoon.

MR. CARRUTH: Jeff Carruth, Happy State Bank.

THE COURT: Good afternoon, Mr. Carruth.

Anybody else wish to make an appearance?

(No audible response)

THE COURT: Okay. When we last broke, Mr. Kane was cross-examining Mr. Marx.

Mr. Carruth, you're -- just so you all know, I'm hoping that Mr. Marx is here and ready to go.

MS. LINDAUER: Your Honor, I believe he's in the -- on my screen, he's in the box at the bottom. But he should be logged in wherever he is.

THE COURT: Okay. And Mr. --

MS. LINDAUER: There you are.

THE COURT: There he is.

And Mr. Carruth, is Ms. Blakeley also on?

MR. CARRUTH: She's no on, but she is on standby.

THE COURT: Okay. So you all know, I plan to get through Mr. Marx and Ms. Blakeley today, so I hope, Ms. Lindauer, you're prepared and, Mr. Kane, you 're prepared to be efficient with your questioning because we've been on Mr. Marx for a long time. I really would like to finish him up so that we can get Ms. Blakeley on and off the stand this afternoon.

Mr. Kane, do you -- would you mind reminding me roughly how much longer you have with your cross?

MR. KANE: Call it 30, 40 minutes, Your Honor.

THE COURT: Okay.

Ms. Lindauer, how long are you going to need for your redirect?

MS. LINDAUER: Your Honor, I'll try to do about the same, 30 to 40 minutes.

THE COURT: Okay. And how about for Ms. Blakeley?

MS. LINDAUER: On our side, Your Honor, probably a little over an hour -- hour, hour and a half, maybe.

THE COURT: Okay. Hopefully, we can stick closer to an hour, but if we can be efficient with Mr. Marx, we'll see where we are at the end of the day. I really would like to finish these two witnesses.

So with that, I will turn it back over to Mr. Kane.

Mr. Marx, you are still sworn and you're still under oath.

RANDY MARX, DEBTOR'S WITNESS, PREVIOUSLY SWORN

THE COURT: So, Mr. Kane, go ahead.

MR. KANE: Thank you.

CROSS-EXAMINATION (RESUMED)

BY MR. KANE:

Q Mr. Marx I know we've spent a lot of time on Debtor's Exhibit D14. I would like you to look at that and turn to Page 12, and I'll go ahead and start sharing my screen.

Can you tell me when you're there, Mr. Marx.

A D14 or 18?

Q No. Debtor's Exhibit D14, Page 12 of 25.

A I'm at D14. Page 12.

I think when we visited last, we were calling this one the --

Q Lender's special warranty deed.

A All right. Super. Okay.

Q I may have asked this before, and so I apologize if I have I just don't recall exactly what your testimony was.

But was it your understanding that Sendera or their underwriter had approved this form of special warranty deed for the purposes of issuing title policy?

A Yes. I understood that Mr. Pruitt proved this for insurability purposes.

Q Okay. Thank you.

Now can we turn to Exhibit 33A? This is the title commitment we've talked about for quite a bit.

A Excuse me. What was the number?

Q 33A.

A Oh, one second. I think I have that here.

THE COURT: Lender's exhibits. Correct?

MR. KANE: Yes, Your Honor.

BY MR. KANE:

Q And we're going to be at Schedule B, 10(c), and that's on Page 5 of 16.

A You are referring me to Schedule B of that document?

Q Yes.

A And which -- which B number?

Q Well, let's just start at Schedule B.

Was it your understanding that Schedule B lists exceptions from coverage under the title policy if the title policy was to be issued?

A (Clears throat) Excuse me. Yes.

Q Okay. Now let's turn to 10(c).

Do you see where it references rights of tenants in possession as tenants only pursuant to written but unrecorded leases?

A Yes.

Q Do you know if this matter was deleted from the later version of the title commitment that you saw?

A I do not know. And this would be an item that is -- would be dependent if Enoch was ultimately the purchaser or some other entity was the purchaser.

Q Why would that matter?

A Well, if Enoch was the purchaser, then there would be no tenancy, and this item could be removed.

Q Are you suggesting that there are tenants in possession or tenants in possession or tenants pursuant to unrecorded leases on the debtor's property?

A Enoch has been in possession with the debtor from day one.

Q Is it a tenant of the debtor?

A It's a co-tenant and tenant, yes. It's a tenant.

Q Okay. Does it have an executed lease with the debtor?

A It does.

Q And about how much is the annual rent under that lease?

A I don't specifically recall. It would be essentially the funding source for curing the property I think since -- since

the property was first acquired.
Q Now are you aware that the debtor has stated under penalty of perjury that it has no leases or executory contracts at all?
A I'm not familiar with that other than this is, like I said, a related party to the debtor.
Q Okay. I'm going to turn your attention to Lender's Exhibit 21.
I know, Mr. Marx, you said you've done some work for the debtor. Have you ever seen the debtor's schedules of assets and liabilities?
A No.
Q Okay. I'm going to represent to you that this is from the Court's Docket Number 29. This is Page 17 of that. This has been admitted into evidence already. But this is the Schedule G Executory Contracts and Unexpired Leases.
Do you see where it says the debtor does not have any?
A Tell me again.
Q It's right here under number one under the line Schedule G Executory Contracts and Unexpired Leases.
Is that representation here included on this document inconsistent with your understanding of the debtor's leases?
A I'm not familiar with this document. So state your question again.
Q Let me -- I'll state it a different way.
You understood that the debtor is a party to a lease with

Enoch Investments. Correct?
A Yes. A related lease, yes.
Q Okay. Do you have any understanding of why that wouldn't have been disclosed by the debtor in this bankruptcy case?
A Perhaps only because it's related as opposed to a, you know, unrelated.
Q And you said that that -- that Enoch Investments, it pays a considerable amount of money under that lease. Is that right?
A Yes.
I believe it's been carrying the asset the entire time. And it's been here the entire time.
Q And who does Enoch Investments pay under that lease? Is it your understanding it was paying the debtor?
A Oh, I don't know. I don't know how that was handled.
Q Okay. Now I want to move back to Exhibit 33A.
We're going to go down to Schedule C.
Now in addition to these items found on Schedule C, would you have expected the lender to deliver a payoff and release instrument for closing?
A Yes. In this circumstance both, specifically, though Item 5 is already lists -- Item 5 is referencing the release required of your client, the lender.
Q Okay. And did you ever see a draft of that release?
A I did not see one as closing approached. I asked the

title company to prepare one. And then subsequently, I think I saw one from your office.
Q Okay. So you didn't see one from the lender at any time prior to the expiration of the payoff deadline?
A I am not sure when I saw -- well, I'm reasonably sure I saw a release of deed of trust from the lender before the targeted closing date. But I was not -- I don't know, I didn't have time -- I saw one I believe prepared by your office, and it was before that date.
Q And did you ever provide any comments or approve that form?
A No. It came to me relatively late. I know that it was not delivered to the title company.
Q And when you say it came to you relatively late, did it come to you on the 31st or before then?
A It might be one of these exhibits. Do you recall?
Q Yes, Mr. Marx. So I'm asking you when you recall seeing it.
A Oh. I don't have a specific recollection. It would have been the day -- it would have been the 29th, 30th, or 31st.
Q Okay.
A It was --
Q I'm going to turn your -- I'll turn your attention to Lender's Exhibit 69.
Tell me when you see that document.

A Exhibit -- this is the Lender Exhibit 69?

Q Yes.

A And it purports to be an email it would b after business -- well, actually, that was Monday, the holiday, at 6:35.

Q Right. And do you see this language here, "Let me know if this works?" Looking at that now, do you understand that to be a request for confirmation from the debtor that the form is satisfactory?

A Yes.

MS. LINDAUER: Your Honor, I'm going to object to that question. Mr. Marx is not copied on that email from what I can see. So I don't know what knowledge he has regarding this document. So there's no foundation for the question that Mr. Kane just asked him.

MR. KANE: Your Honor, in response, I would say I asked Mr. Marx whether his understanding reading this now was that that language suggestive that I was asking for confirmation. He can testify his interpretation of these words.

THE COURT: I'll overrule the objection.

BY MR. KANE:

Q Now, Mr. Marx, I'm going to turn your attention to Exhibit 69 -- let me ask you. Let's stay here at 69 for one more question. Do you see --

THE COURT: Maybe I missed it. Did he answer that

question?

MR. KANE: Yes, I believe he did.

THE COURT: And I apologize, Mr. Marx. I did not hear your response, then.

THE WITNESS: I think he asked me to read it and tell him what he was talking about in the email that he sent to Joyce.

BY MR. KANE:

Q Right, Mr. Marx. Here I'll ask the question again.

A And I agreed.

Q Yeah. I asked Mr. Marx if your reading of this now you understood that HNGH was asking for confirmation that the attached form was acceptable.

A It's what you were asking. Is that the question?

Q Is that your understanding of what I was asking?

A Yeah. It's your email, but that's what I understand.

Q Okay. And you see the subject here, "HNGH Payoff and Release Draft?" Do you see that?

A Yes.

Q And then attachments "HNGH Payoff and Release Letter."

A Yes.

Q Okay. Now I'm going to ask you to turn your attention to Exhibit 69A.

Now is this the payoff letter that you said that at some point in time you actually did have an opportunity to see and

review?
A Sorry. 69A?
Q Yes.
A Yes. I think this came in response to the deeds list, I'll call it, that Ms. Lindauer had provided.
Q Okay. And I'm going to ask you again, do you remember ever providing any comments or approval for this form of document?
A I provided comments. I didn't have -- I never did approve. And was that responsive? I didn't catch all of your question.
Q That's responsive, Mr. Marx. Can you tell me when you provided those comments and to whom did you provide those comments to?
A To Ms. Lindauer probably by phone or orally. I don't recall having time to make a written objection.
Q Okay. And was your understanding that those comments would be relayed forward to the lender?
A I didn't have any specific understanding. I just wanted somebody to know that this instrument I think is still not sufficient.
Q Okay. I'm going to have you turn and look at Lender's Exhibit 77.
A Exhibit 77?
Q Yes.

A Okay.
Q Now you're not included on this email. Are you?
A No, I'm not.
Q What is your understanding of this correspondence? How would you interpret the words that I have written on this email?

MS. LINDAUER: Your Honor, he has no foundation for that. He would just be speculating. He wasn't copied on it. That's just an improper question --

MR. KANE: That's fair. I'll re-ask. I'll re-ask.

BY MR. KANE:
Q Mr. Marx, do you know whether the debtor passed along your comments to the lender about that payoff and release of lien letter?
A I do not know.
Q Did you have the expectation that those comments would be passed along?
A I said what I said. I wanted Ms. Lindauer to know the instrument was not acceptable.
Q Okay. I'm going to have you turn your attention back to Exhibit 33A. And let's look at Number 11.
A Excuse me. 33A?
Q Yes.
A Okay. 33A. Then what -- what portion?
Q Schedule 7 -- or, sorry, Schedule C Number 11.

Are you there?

A That's on Page 8 of 16.

Q Yes.

A Schedule C. Excuse me. Item 11.

Q You got it.

Now I think you've pointed out when Ms. Lindauer was asking you to testify about various things in the lender's proof of claim that you had concerns about the history of authority for HNGH Turtle Creek, LLC. Is that correct?

A Yes. And somewhat related to this Item 11.

Q And delivery of these documents in Item 11 might resolve those concerns. Is that correct?

A Yes. I never saw these documents. And my understanding is they were never delivered to the title company.

Q Okay. And would it be fairly common practice in a real estate closing like this for a lender to deliver an encumbancy certificate with supporting documentation that would address a concern like this?

A There are different ways it can be done. An encumbancy just speaks to, you know, who the officer is, for example. Sometimes it's called an officer's certificate, secretary's certificate.

Essentially what one looks for here, however, is that the entity is in existence and in good standing and then that the signature is authorized.

Q Right.

A And so to the extent you say encumbancy certificate, if it addressed those issues, so as in effect to cover A, B, C, and D, then it would likely be sufficient for the title company and as well as, you know, for me.

I'm -- I'm kind of just looking over the -- in many respects, I'm looking over their shoulder as well as safeguarding my client's interests.

Q Are you aware that the lender offered to provide an encumbancy certificate directly to the title company with escrow instructions prior to the expiration of the payoff deadline?

A One, I wasn't aware of that and, two, certainly not in time for me to have any opportunity because I had never seen that nor had I ever seen the operative instruments.

Q Okay.

A This type of thing where that -- the gap and the break in the -- in the identity of Turtle Creek, LLC, is -- this item here is designed in part to catch those types of errors.

Q Okay. Can I turn you to Lender's Exhibit 83?

A Is it 83?

Q Yes.

A I am at Exhibit 83.

Q Okay. Is it your understanding from this document that the lender was offering to provide an encumbancy certificate to

the title company at 3:04 p.m. on the payoff deadline?

A I did not receive that. But that's what -- that's what your email purports to represent at 3:04 on Tuesday, the 31st.

Q Was it your understanding that the closing was not going to be going forward at or shortly after that time period?

A I don't remember any understanding right at 3:04. Certainly, after the -- all of the materials that were, in my opinion, required with the May 30th listing, weren't satisfied. Even as of the 30th, it appeared to me that the closing was not likely to occur.

Q Okay. And you spent about nine hours on the stand testifying in part that that was due to a failure to deliver certain documents. Is that correct?

A Yeah. I mean that's generally correct.

Q Okay. At the end of the day, though, that didn't really matter because your client, TCC2022, had not funded any money into escrow for payoff. Had it?

A No, it did matter because those items, clear title, authority documents, and the like are typically delivered into the title company and reviewed and executed before the investor or lender is called upon to wire funds.

Q Okay. Let's look at Exhibit 88, Lender's Exhibit 88.

A 88?

Q Yes, sir.

Now you referenced down here in the bottom of this email,

"The legal counsel Randy Marx is available to speak with you and John today." Is that John in reference to me?
A Yes. I think you're copied on it, so I presume that that -- that's an email the 31st at about 3:55. And you're copied on it, so I'm -- I believe that Mr. K. was referring to you in that correspondence.
Q Okay. Now on this second full paragraph that starts "unfortunately," is it your understanding that Mr. Walji was referring to your client's principal "your money person?"
A Yes. There were a number of --
Q Mr. Marx, that's just a yes or no question.
A Oh, excuse me. So you're saying -- sorry.
Q Is it your understanding that the person who is referenced in this second full paragraph about losing their driver's license was your client's principal, "the money person?"
A Yes, one of them.
Q Okay. I'd like you to turn to Lender's Exhibit 88A
A Yes.
Q Okay. Will you scroll down to the bottom of that. Do you see that slash S Randy P. Marx?
A Yes.
Q Is that your electronic signature?
A Yes.
Q Okay. And you authorized the application of that signature?

A Yes.
Q And it was you who prepared this document on May 31st. Is that right?
A Yes.
Q And this explains in your words why your client didn't close and what date you thought it could reasonably close. Is that right?
A Well, the letter goes through a number of items. I guess I wouldn't agree with that characterization in isolation, but tell me --
Q I'm sorry. Were you done?

THE COURT: Mr. Marx or Mr. Kane, give me just a minute. I'm going to read this letter real quick.

MR. KANE: Yes, sir.

THE WITNESS: Yes. That will be better.

THE COURT: Mr. Marx, why don't you reading it -- why don't you read it while I'm reading it to refresh your recollection.

THE WITNESS: Okay. Do you want me to read it out loud, Your Honor?

THE COURT: Not out loud. Not out load.

THE WITNESS: Okay.

THE COURT: I'm going to read it, so take your time and read it so that you're prepared to answer.

THE WITNESS: Yes, Your Honor.

(Pause)

THE COURT: Okay. Mr. Kane, go ahead.

BY MR. KANE:

Q Mr. Marx, do you remember about what time you prepared this letter?

A Oh, I don't know. I'm not -- I don't know, sometime during the day.

Q Okay. If you glance back at Exhibit 88, that email is from 3:55 p.m. About how long before that did you provide this letter?

A I don't have a particular recollection.

Q Just sometime during the day before 3:55 on May 20 or May 31st. Is that right?

A Yes.

Q And to the best of your knowledge, you didn't include any material misstatements in this letter. Did you?

A Sorry.

Q I'm sorry, Mr. Marx. I didn't expect that to be a difficult question. I'll re-ask it.

To the best of your knowledge, you didn't include any material misstatements in this letter. Did you?

A No. I think that the second from the last paragraph -- I think it's all accurate.

Q Okay. You didn't have any efforts to mislead the lender or to fraudulently induce anyone into entering into an

extension as a result of this letter. Did you?
A No. I think the purpose was to just be on record like the outstanding items on May 30th that this one issue -- in addition to the title and other delivery concerns, this additional issue presented a problem unexpectedly for that funding source.
Q Right. So this --
A And so I --
Q Go ahead.
A I apologize.
Q No, please, finish. I apologize for interjecting.
A So that was the purpose of the letter, just to put you on notice of that -- those circumstances.
Q Okay. And this letter represents your best understanding of the events that were taking place at that time?
A As it relates to this topic that I was asked to address.
Q Okay. You were asked to address this. Who asked you to address this?
A Just like the items that were outstanding as of the 30th, as they had not been received, I was asked to contribute to that letter of May 30th kind of putting --
MR. KANE: Objection; non-responsive.
THE WITNESS: I'm sorry. Ask the question again.
THE COURT: Respond -- no, Mr. Marx. Anytime there's an objection, we let the lawyers speak and then I'll rule and

then -- Ms. Lindauer, what's your response?

MS. LINDAUER: Your Honor, I lost track of the question so I'm sorry. Maybe if Mr. Kane can restate his question.

THE COURT: So I'll sustain the objection.

BY MR. KANE:

Q And, Mr. Marx, just a very simple question. Who asked you to prepare this letter?

A K. Mr. K.

Q Now you note down in the last full paragraph that closing would require resolving issues presented by the deed in lieu. Is that correct?

A Yes. That's in the paragraph that starts "subject to."

Q Okay. But I think you testified previously that you would accept the form of rescission instrument provided by the lender with comments to your draft.

A My testimony was that the -- the lessors -- excuse me, the lender's special warranty deed was fatally flawed and that the rescission deed or rescission of deed or the rescission instrument, whatever nomenclature you wanted to use, that whereby you accepted most of my changes, including the most material thing -- the use restriction, additional enforceability issue -- might have been acceptable but for the fact that there was that break in title that we talked about.

Remember the corrective -- the need for the corrective

instrument? And the other thing that I guess my answers the other day presupposed is that there's the sufficient evidence of Happy State's consent or ratification of that because the reinstatement was not presented in a single document separate of its own but rather compressed into this rescission instrument.

And so depending on what I got from Happy State Bank and that corrective document we talked about, because of the fact that the deed in lieu and the rescission of were both have questionable effectiveness, I'll say, because it was an error relative to your client, HNGH Turtle Creek, LLC. That's the Texas or Delaware issue.

Q You also note in this, I guess it's the last full paragraph that you expected there still needed to be delivery of some documents to the title company. Correct?

Belated delivery of items to the title company or that was an incomplete delivery that was a problem?

A Yeah. And I'm referring there to --

Q That's okay, Mr. Marx. Your client can take you on redirect or your counsel. This is yes or no question.

A Yeah. There were belated and non-delivered items even at that time.

Q Okay. And then you mentioned finalization of contract documents.

Okay. So I understand from that that your lending source

or your funding source or TCC2022 didn't have or hadn't executed or was not ready to execute contract documents related to closing. Is that right?
A I think I was referring there to a number of contracts outstanding specifically relating, I think, to some of the deliveries we talked about earlier. The loan documents on this transaction have been prepared, but they had not been signed.
Q Okay. Is that because, as you stated in the first full paragraph, your money source still hadn't even decided whether this was going to be a first-lien loan or a potential preferred equity interest?
A Well, there were a number of other debt or equity sources that were being considered.
My main principal, the one that is the subject here, had committed to fund what was necessary as a equity contribution or to loan the entire amount. And which direction that was going to go had not yet been determined because the title documents had not yet been cleared, I'll call it, and this principal's preference would have been to provide the equity component if the First Guaranty Bank loan was allowed to proceed.
Q I thought Enoch Investments was associated with the First Guaranty Bank loan, not TCC2022.
A Correct. Enoch is the borrower in connection with the First Guaranty Bank.

And if the First Guaranty Bank transaction was the one once title had been satisfied, had they closed, then this money would have come in as a -- either as a mezz or as a loan to one of the principals, in which case TCC may not have been involved in that entity.

Q Okay. So the principal of this TCC or the money source was still looking at alternative transactions on May 31st?

A Yes.

Q And it would have preferred that alternative transaction with First Guaranty Bank?

A Would have preferred?

Q That was your testimony. Wasn't it?

A No, I didn't say that. What I said is that he was then willing to do either. I think that the preference may have been in favor of TCC or Enoch whether to take the equity funds combined with the First Guaranty Bank or to take the full amount from one lender.

Q So that's a pretty big delta, right? I mean if First Guaranty Bank is putting in $34 million in debt, significantly smaller amount needed for a payoff, right?

A Yes. The First Guaranty Bank loan is a -- is a -- was ready to go. And so I don't think the decision we made to --

Q Hold on, Mr. Marx. Didn't you testify earlier that it was ten business days out from May 27th before we would really be ready to close?

A You're referring to the First Guaranty Bank?
Q Yes.
A I think that's what their letter said. Really at the end of the day in my discussions with them --
MR. KANE: Objection; hearsay. I'm not asking about your discussions with First Guaranty Bank. I'm asking you about your prior testimony.
THE COURT: Ms. Lindauer, what's your response to the objection?
MS. LINDAUER: Your Honor, I think the hearsay objection was correct, and I think Mr. Kane rephrased his question. So --
THE COURT: So I interrupted him before he rephrased. I'll sustain the objection.
Mr. Marx, don't testify about what other people told you if there's a pending objection until I can resolve the objection.
So, Mr. Kane, go ahead.
MR. KANE: You know what, Your Honor. I'll phrase it a different way entirely.
BY MR. KANE:
Q Mr. Marx, you previously testified that First Guaranty Bank's commitment letter was executed on May 27th. Correct?
A I believe that's true.
Q And that commitment letter anticipated a closing

considerably after May 31st. Correct?
A I believe the commitment spoke in terms of ten days.
Q Okay. So First Guaranty Bank's not part of the picture. Your client has a much much larger financial obligation. Is that right?
A Yes. Or opportunity, depending on your -- your view. But yes.
Q And your client did not actually have access to its funds on May 31st. Correct?
A Of this principal, the one in Missouri did not for the reasons stated in the letter.
Q And the reasons stated in the letter is he lost his driver's license and couldn't get his money from Missouri?
A Yes, unfortunately.
Q Okay. So this principal could not fund on May 31st, period. Is that right?
A Correct, which is what I -- what I tried to put forth in the letter.

MR. KANE: Your Honor, I'll pass the witness.

THE COURT: Mr. Marx, just before Ms. Lindauer follows up, just a couple of quick questions to make sure I understand.

EXAMINATION

BY THE COURT:
Q Something maybe I was confused at the very beginning of

your testimony. Could you tell me again did you represent the debtor at all in this transaction?

This transaction meaning everything that we talked about during this hearing about the debtor trying to pay off Mr. Kane's client. I understand you represented your lending sources, one or more. Did you represent the debtor in this transaction?

A Your Honor, yes.

There was some level of overlap. And -- but -- but I had the consent of all the parties I was dealing with, so that's some level of overlap and joint representation. Primarily, I was looking at it because the debtor has litigation counsel. I was looking at it primarily from either my debt or equity source.

Q Bear with me just a minute.

So of these parallel tracks that we've talked about, at least five I think you mentioned, which two were the farthest along? Was it the FNB track that had the -- that was the one that you most recently testified about that was the subject of Exhibit D4. There was the First Guaranty Bank commitment letter that was dated the 27th, I believe.

Do you recall that document?

A You said D4, Your Honor?

Q D4. It's the letter that Mr. Kane was just referring to that talked about a closing that was ten business days from the

date of the letter.
A I'm familiar with that one, Your Honor.
Q So I'll call that the Enoch parallel track.
And then your letter about the driver's license issue, and I don't believe I've heard a name of that client -- I'll just call it the TCC2022 Missouri lender track. Do you understand what I'm talking about there?
A Yes, Your Honor.
Q Are those -- of all of the five parallel tracks, were those the two farthest along as far as having funding sources available to pay Mr. Kane's client on May 31st?
A Again, I wasn't involved with -- there are various. The other two that I was more involved with would be the Revere loan. I think that D11 over here, and that was for approximately $47 million.
There was another --
Q I understand there's other deals. My question is to your knowledge, were any of those other deals as far along as the two I'm asking about now, the First National Bank-Enoch parallel track and the TCC2022 Missouri lender track?
To your knowledge, were any of the other parallel tracks as far along as these two as far as having funding sources available, to your knowledge?
A I think that the -- what I'll refer to as the PLN, the Private Lending Network, with Mr. Garrison Kickman (phonetic),

was the -- of the ones that I was working on probably the closest. They had, I believe, committed to approximately 40,882,000.

Q And you call -- tell me again the name of that one.

A I call that the PLN, Private Lending Network. There may have been others, but of the ones that I'm familiar with, that one was -- they had shown proof of funds, they did also share these concerns that I've raised. But I believe they sent over proof of funds, and they were ready to go but for these delays, which is why, Your Honor, in my -- even with --

Q So I think I'm going to let Ms. Lindauer follow up.

THE COURT: Before I turn it back over to her, after I ask one or two more questions, I'm going to see if Mr. Kane has any other cross based on my questions.

MR. KANE: I do, Your Honor. I need just about one minute to try and find an email, a letter regarding that PLN network.

But let me ask a question first and then if I need a couple of minutes, I would ask that the Court humor me by just giving me a two-minute recess to try and locate that document. It's in our witness and exhibit list. I just got to get my hands on it to identify exactly which one it is.

THE COURT: That's fine. And you can look at your notes while I'm looking at my notes.

MR. KANE: Sure.

CONTINUED CROSS-EXAMINATION

BY MR. KANE:

Q Mr. Marx, you mentioned the PLN network. Was that an entity that you were actively working with to try and close?

A Let me see. I was involved and I had discussions with Garrison Kickman. He was the pointman on it. I did not have all of the discussions.

So I was -- yes, I was actively involved.

Q Okay. So You were actively involved. Were you then aware that the PLN or Private Lender Network has made it abundantly clear that they could not possibly close by May 31st because they couldn't get title underwriting until the plan confirmation order went final on June 1st or June 2nd?

A I did see that email from -- I think it was from Garrison directly. My understanding is that the order of confirmation was done I think May 18th, and they expressed a concern that there was a potential 14-day delay, maybe some potential objection rights thereto.

And so they were looking to have that issue resolved before they would, you know, close the transaction.

Q Thank you.

MR. KANE: Your Honor, I'll pass the witness.

THE COURT: Okay. I'm still trying to get my arms around the parallel tracks.

EXAMINATION

BY THE COURT:
Q And, Mr. Marx, you mentioned a Revere loan just a minute ago. I'm going to have to go back to my notes. Have we discussed the Revere loan in any detail during this hearing because if you did, I wasn't picking up on it.
A Not that I recall, Your Honor.
MR. KANE: Yeah, Your Honor, I can attest to that. No is the answer. And we objected to Debtor's Exhibit D11 any reference to Revere as an attachment on an affidavit that is based entirely on hearsay evidence. And that document is not admitted into evidence yet.
THE COURT: Okay.
BY THE COURT:
Q So based on everything that I've heard to date and everything that you've testified about, Mr. Marx -- well, let me ask you first, that letter -- your letter of May 31st that Mr. Marx was asking you about, about your Missouri client?
A Yes, Your Honor.
Q Did anybody with the debtor, either their lawyers or business people, help you draft that letter?
A No, Your Honor.
THE COURT: And then would somebody mind pulling up debtor's -- I'm not sure if it's an exhibit, but it's the debtor's response at Docket Number 145.
Would somebody be able to put that up on the screen

for Mr. Marx?

MS. LINDAUER: Your Honor, my person should be able to do that or Mr. Kane's got it.

THE COURT: Okay.

BY THE COURT:

Q Mr. Marx, this is a document that was filed by the debtor in this matter. It was filed on June 8th, and it's called the debtor's opposition to motion to enforce agreed order. Do you recognize that document?

A I was going to see if I happen to have that here, Your Honor. I do not.

Is this in the exhibit list or --

Q I don't know if it was in an exhibit list, but it's up on the screen now. It's a pleading filed by the debtor on June 8th, and it's kind of what kicked off this hearing process because Mr. Kane filed a motion, the one that we're hearing right now. The debtor filed a couple of different responses. The first one is this response they filed on June 8th.

So the first thing I'm just going to ask you, take a look at the cover page, have you seen this document?

A Yes, I think I have, Your Honor. I think I had printed that before my testimony started a week or so ago.

Q Did the debtor, either Ms. Lindauer or anybody else, ask you to assist with helping to prepare that response or opposition?

A I do not think so, Your Honor.

Q I'm sorry.

A I do not think so.

Q Okay. If you wouldn't mind just turning, if you could -- somebody could scroll down to Paragraph 19. So the first sentence, and I appreciate that you were apparently not involved in preparing it, but the first sentence says that, "The debtor had secured funding and was preparing to make the final payoff on May 31st."

Based on the evidence to date through your testimony and the questions back and forth from counsel, do you believe that is a true statement?

A Can you make that larger at all?

Q Sure.

A And the question is it was the first section --

Q Sure. Keeping in mind all the testimony about the parallel tracks and the difficulties that you testified about as far as the lending sources having their money available because of driver's license issues or plan confirmation issues or any other issues that I've heard about, do you believe that first statement, that first sentence is correct?

A I think so, Your Honor.

Q All right. Thank you.

THE COURT: All right. Based on that, unless Mr. Kane has any other redirect based on my questions, I'll turn it

over to Ms. Lindauer.

Mr. Kane, do you have any other follow-up before Ms. Lindauer starts?

MR. KANE: I do not, Your Honor. We'll pass the witness.

THE COURT: All right. Ms. Lindauer?

MS. LINDAUER: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Marx, I'm going to sort of start where we sort of left off here and actually my first group of questions really did address the question regarding parallel tracks.

Mr. Marx, is there someone on behalf of the debtor, 2999TC Acquisitions that would have greater knowledge of the, quote, parallel tracks for funding and financing that were being worked on prior to May 31st, 2022 than you?

A That would be Mr. Barton generally. But as it relates to that entity, to the extent that it was going to be made available to either serve as my client's needs or his, I can speak to TCC but not ultimately as to the equity and/or debt service opportunities that Mr. Barton has available to him.

Q So just to be clear, and Mr. Barton is listed as a witness, Mr. Barton would be the person on behalf of the debtor who would have the greatest knowledge of the various, quote,

parallel tracks that were being worked on with regard to paying off HNGH. I just want to be clear about --

MR. KANE: Objection, leading.

MS. LINDAUER: Your Honor?

THE COURT: Response?

MS. LINDAUER: I think this is just a foundation question. All I'm trying to do is identify the person that would have the greatest knowledge, Your Honor.

MR. KANE: Right. That's --

THE COURT: I'll sustain the objection.

MR. KANE: Thank you.

MS. LINDAUER: All right.

BY MS. LINDAUER:

Q Who besides Mr. Barton, Mr .Marx, would then have the second greatest knowledge about the funding that was being worked on to pay off HNGH?

A I would think Mr. Barton in the first instance and then K. would be in the best position to share information relative to the various parallel tracks.

I will say that it's not unusual in transactions such as this for developers such as this to have multiple tracks because it's --

MR. KANE: Objection; non-responsive.

MS. LINDAUER: Your Honor?

THE COURT: Response, Ms. Lindauer?

MS. LINDAUER: I think he had answered the question when he said Mr. Walji. So I think the rest of that was probably non-responsive.

THE COURT: So I'll sustain the objection.

MS. LINDAUER: Okay. All right.

BY MS. LINDAUER:

Q Mr. Marx, I just want to be clear that you were downstream from several of the negotiations that were going on --

MR. KANE: Objection; leading.

MS. LINDAUER: How --

THE COURT: Response, Ms. Lindauer?

MS. LINDAUER: Your Honor, I'll rephrase the question.

THE COURT: Objection sustained.

BY MS. LINDAUER:

Q Mr. Marx, what involvement, if any, did you have, for example, in the Tall Ships funding that was being negotiated?

A None. Very little to none.

Q And what involvement did you have in connection with the Private Lender Network funding that was being negotiated?

A It would be downstream or derivative. I did not -- I wasn't the pointman there.

Q What involvement, if any, did you have in connection with the First Guaranty Bank loan that was being negotiated?

A I reviewed the loan documents. I was providing materials to the lender and its loan committee. That loan process started I believe in April 15th. I know they had been involved with title before I got involved. And then I was --

MR. KANE: Objection; assumes facts not in evidence.

MS. LINDAUER: And, Mr. Marx, I think -- Your Honor, I again --

THE COURT: Response?

MS. LINDAUER: Your Honor, I think if I could get Mr. Marx to just answer the simple questions, I think it will go a lot faster.

THE WITNESS: I apologize.

MS. LINDAUER: So, yeah -- that's all right. That's all right.

THE COURT: I'll sustain the objection.

BY MS. LINDAUER:

Q And, Mr. Marx, I'm trying to be a little surgical here. I'm trying to get through this quickly, so again if you could just answer the actual questions, I think it will go faster.

Again, I think you mentioned one other transaction, and what was the name of that transaction that you had some familiarity with? I think it was called the -- was it the Revere loan transaction?

A Yes.

MR. KANE: Objection; foundation.

Objection; assumes facts not in evidence.

MS. LINDAUER: Your Honor, let me ask a follow-up if I might.

BY MS. LINDAUER:

Q What involvement, if any, did you have, Mr. Marx, with a transaction called the Revere loan transaction?

MS. LINDAUER: I'm sorry.

THE COURT: I will sustain the objection. Go ahead and ask again, Ms. Lindauer.

BY MS. LINDAUER:

Q What involvement did you have with the Revere loan transaction, if any, Mr. Marx?

A I assisted --

MR. KANE: Objection; assumes there was a Revere loan transaction. Assumes facts not in evidence.

MS. LINDAUER: Your Honor, I think he's testified that there were a number of parallel tracks, and one of them was called the Revere loan transaction. And Mr. Kane even said it's mentioned in an affidavit of Joey Howell (phonetic) that has not been admitted to date. So --

MR. KANE: But it's not in evidence.

MS. LINDAUER: Well, no, the point being is there is -- there has been mention of a transaction.

MR. KANE: There has been no evidence laid to support

this argument that there is a Revere transaction in progress. There is no foundation for that line of questioning.

THE COURT: So I'll sustain the objection.

Ms. Lindauer, if you want to ask a foundational question --

MS. LINDAUER: Sure.

THE COURT: -- go ahead.

BY MS. LINDAUER:

Q Mr. Marx, are you aware if there is a Revere loan transaction in process?

A Yes.

Q All right. Mr. Marx, what if any involvement did you have with loan agreements that were being worked out with Craig Hall (phonetic) as part of this transaction?

MR. KANE: Objection; assumes facts not in evidence. Lack of foundation.

MS. LINDAUER: Your Honor, I'll rephrase the -- we're not going to get done if Mr. Kane keeps objecting. These are --

MR. KANE: It's not my obligation to ask a question correctly.

MS. LINDAUER: That's fine. That's fine, Your Honor.

MR. RODRIGUEZ: We understand that.

THE COURT: I'll --

MS. LINDAUER: Yeah, I'll --

THE COURT: I will sustain --

MS. LINDAUER: I'll ask a foundation question.
THE COURT: I will sustain the objection.
BY MS. LINDAUER:
Q Are you aware, Mr. Marx, of there being agreements worked out with a gentleman named Craig Hall regarding providing funding to pay off HNGH?
MR. KANE: Objection; assumes facts not in evidence and lack of foundation.
MS. LINDAUER: Your Honor, I'm trying to establish a foundation. That was the purpose of the question.
THE COURT: So I'll overrule that objection.
THE WITNESS: Yes.
BY MS. LINDAUER:
Q What other individuals, Mr. Marx, are you aware of who were working on providing funding to 2999TC Acquisitions to pay off HNGH by May 31st of 2022?
A I know that Mr. Barton and Mr. K. were working with Revere about a potential $47 million loan as well as, as I've earlier testified, the PLN, the Private Lending Network, group in anticipation of a loan of 40,882,000. And that was Garrison Kickman that we talked about earlier.
Q And, Mr. Marx, is that the extent of your knowledge regarding the parallel tracks?
A Yes, as well as the First Guaranty Bank loan that we talked about and, of course, my Missouri client.

Q Can we look at Debtor's Exhibit D9?

MS. LINDAUER: Sydney (phonetic), if you can pull that up.

BY MS. LINDAUER:

Q I think this may have been a letter that Mr. Kane was looking for, Mr. Marx. Have you seen this letter before dated May 31st, 2022?

A I'm sorry. What's the -- what is the exhibit number, D9?

Q It's D9 in the debtor's exhibits.

A Yes. It's a letter dated May 31, 2022.

Q My question was have you seen this letter prior to today?

A Yes.

Q And what is the reference under the "To Mr. Walji," what does the actual reference say on that letter?

A "Lack of satisfactory documentation to clear title for the property."

Q And this letter is addressed to whom?

A It's Mr. Walji. I've been told to refer to him as Mr. K.

Q And the very first paragraph of that letter, what is being discussed?

A While they intended to close in an expedited manner from an underwriting standpoint, we -- or they -- Garrison could not properly proceed with the loan given the ambiguity in title.

Q And was there a particular document that they reference as

being defective?

A They're referring to the special warranty deed.

Q And ultimately, were they advising Mr. K. that they would be unable to close by May 30th?

A Yes.

Q Did they also point out some additional problems that they had identified that would create a problem with closing by May 30th or 31st?

A That's correct.

Q Just to be clear, this is the letter from Private Lender Network. Is that right? Is that your understanding?

A Yes.

Q The judge asked you, Mr. Marx, about Paragraph 19 in a pleading that was filed by the debtor indicating that the debtor was ready -- essentially ready, willing, and able to close by the deadline on May 31st.

Do you have any personal knowledge, Mr. Marx, of a loan or equity participation that would have been ready to close by that date?

A Well, but for the items referenced in the letter, I think the PLN loan was ready to go at that point.

Q Any other loans that you --

MR. KANE: Objection. That was non-responsive.

Your Honor, I understand that to be a qualified answer. She asked if anybody was ready to close on May 31st.

THE COURT: Response, Ms. Lindauer?

MS. LINDAUER: Mr. Marx I think and you addressed specifically the question that was asked.

THE COURT: So I'll sustain the objection.

Ms. Lindauer, why don't you ask another question.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Marx, again, the Court asked about a specific provision in a pleading that was filed indicating that there was a loan that would have been ready to close by -- or loan or equity participation by May 31st, 2022.

And my question to you is were you yourself aware of any such loan that was ready to close? Not which one. Were you aware of a loan or equity participation that would have been ready to close?

A But for the items referenced in my letter with Missouri, they were ready to go. But for --

Q All right.

A -- the Garrison title issue, they were ready to go.

I had to give the Missouri client the green light on title before they had to move money anyhow. So even though I was asked to write that letter, that was not the critical path item. The critical path item for my Missouri client was to have title cleared before he moved money.

Q And, Mr. Marx, to be clear, we've gone through ad nauseum

a lot of the title issues related to what you call clear title. Is that correct?

A Yes.

Q And in your letter, just to be clear, Exhibit 88A that we looked at?

A Yes.

MS. LINDAUER: Sydney, 88A. You're back on D whatever.

BY MS. LINDAUER:

Q Besides difficulty your client was having with his getting his driver's license so he could travel and get release of funds, were there other issues that your letter was addressing?

A Yes.

The items that we talked about with reference to the inadequacies of the delivery or lack of delivery of the rescission deed which was to have been held back starting in December, and then the other items that were referenced and still outstanding in the delivery list that was provided on the 30th.

Q If we could look at Exhibit -- if we could take a look at two documents. I think that these are all under Debtor's Exhibit -- it's Exhibit D14.

A Yes.

Q And just -- I think we jumped through this document some, and I think it might be helpful just to walk through it because

it is a compilation, Mr. Marx, of a number of documents. Is that correct?

A Yes.

Q Okay. And the first -- and I know Mr. Kane did this, but the first of those, the first special warranty deed is the original deed that conveyed the property to ultimately 2999TC Acquisitions. Is that right?

A Yes. That is what we'd call the debtor's deed.

Q Okay. The next document behind that is a special warranty deed dated October 29th, 2021.

A Yes. That's the one we referred to as the deed in lieu or the disputed deed.

Q All right. The next one behind that is a document called special warranty deed.

And that's what I believe HNGH has been referring to as the rescission special warranty deed or special warranty deed to accomplish rescission, something to that effect. Is that right?

A Yeah. I wrote down that we referred to it as the lender's special warranty deed.

And that's the one, among other things, that had the fatal enforcement party problem as the use restriction and, in my opinion, the fatal problem with the identification or the erroneous identification of a non-existing Texas LLC.

Q And then the last of that series is an agreed rescission

of special warranty deed that was drafted and presented to HNGH's counsel. Is that right?

A Right. That's the one I essentially prepared, and we've been calling it either the rescission deed or the rescission of deed or maybe, more broadly, the rescission instrument.

Q Okay. And the last of that series to date has never been signed. Is that correct?

A Correct. None of those have been signed or delivered to the title company. And again, that could have possibly been avoided had the document been generated and held back in December of the year before. That did not occur.

Q So explain to me why you just made that statement. Why would it have been prevented if this document had been prepared earlier signed and held?

A Well, I'd just offer that up because at some point the suggestion was made that I was dilatory responding to something either on the holiday or the following day at 3:24, when the fact of the matter is this rescission instrument -- whatever you call it -- was to have been prepared and held by HNGH's counsel, I believe.

Q All right. The actual special warranty deed, the document right before this one, can we flip to that one?

A Is that the lender's special warranty deed?

Q Correct. That one.

Can we look at the signatures on that one? What's the

date of the signatures on this document?

A This is the lender's special warranty deed, and it was -- purports to have been signed May 27th, five or six months after it was to have been held.

Q My point being is if the document was signed and held in December of 2021, would it have been dated May 27th of 2022?

A No.

If it had been properly prepared and held, that would mean it would have been actually prepared, approved, because an instrument like this that purports to reinstate --

MR. KANE: Your Honor, objection; relevance.

I mean, they've already acknowledged that they've rejected this document. Even if it had been prepared and held on December 10th, I think they've already acknowledged that they would not have accepted it. So this can't -- that issue of questioning can't have had a causal relationship to their failure to close. It isn't relevant.

MS. LINDAUER: Your Honor, the reason --

THE COURT: Your response, Ms. Lindauer?

MS. LINDAUER: Your Honor, the reason we think it is relevant is because under the agreed order, December 10th, 2021 agreed order, it's our position that the first breach of the order is on HNGH for not having prepared and placed into counsel's hands an executed recision deed or whatever you want to call it, that that did not happen as the parties had agreed,

and that that in fact is the first breach under the settlement agreement.

And, therefore, all of this is unfortunately terribly relevant because it establishes that in fact counsel did not follow the terms of the order as Judge Hale had ordered for that document to be placed with counsel back in December of 2021. So that is in fact why all of this is terribly relevant.

MR. KANE: There is no evidence presented by the debtor at all. This assumes facts not in evidence. There's no evidence presented by the debtor that it drafted this document, wasn't prepared months and months and months in advance of this potential closing.

MS. LINDAUER: And, Your Honor, our position isn't that the order --

THE COURT: I'll make it easy. I'm going to overrule the objection.

I understand Mr. Kane's point. I understand your argument, Ms. Lindauer. I can decide what weight to give to the evidence when it is time to rule.

So, next question.

MS. LINDAUER: All right.

BY MS. LINDAUER:

Q And just to be clear on the record, Mr. Marx, the execution page right there, signed by Vipin Nambiar, you see that?

A Yes.
Q Okay. The actual notary box that's made part of this document, does it identify Mr. Nambiar's position with HNGH Turtle Creek, LLC, a Texas Limited Liability Company?
A Correct. It doesn't say it in the acknowledgment, and it doesn't say it at the byline either. And --
Q And as we know today, HNGH Turtle Creek, LLC, a Texas Limited Liability Company, does that entity exist?
A Not in Texas. And nor has it qualified in Texas.
MR. KANE: Objection. Assumes facts not in evidence.
THE WITNESS: Well, I looked --
MS. LINDAUER: Mr. Marx -- Your Honor --
THE COURT: I will overrule the objection because we've beat that with a dead horse.
MS. LINDAUER: I think we've covered this many times, Your Honor.
THE COURT: So, overruled.
BY MS. LINDAUER:
Q Mr. Marx, ultimately, Mr. Kane did send over or did acknowledge that his client was prepared to execute a recision of deed. Do you remember that line of questioning?
A Yes. I think that was the 324 comment.
Q And the document that his client agreed to sign off on, or at least he said his client would sign off on, was that different than the document that you have prepared as the

recision deed?
A Yes.
MS. LINDAUER: Sydney, can you pull that up here?
MR. KANE: Which exhibit is it, Joyce?
MS. LINDAUER: It's aversion of exhibit -- I don't think Sydney's got it yet. I think it's Exhibit D. I believe it's 5. But it's -- Sydney, are you having trouble finding it? There we go. All right.
THE COURT: What exhibit is this?
MS. LINDAUER: Your Honor -- scroll down, Sydney. This is actually Exhibit D6. But what this actually is is a compare of Exhibit D6 with the special warranty deed, or the agreed recision document that Mr. Kane had sent over to us. So it's a comparison of the last version. And it's Lender's Exhibit 67-A. It's a comparison of those two documents, Your Honor.
THE COURT: I'm sorry. D6 is a comparison to which exhibit?
MS. LINDAUER: Well, it's not -- what's on the screen is not marked as an exhibit yet, Your Honor. What it is is it's a comparison of D6 with Exhibit -- I'm sorry. Yeah, it's D6. And what did you say the other one was?
MR. KANE: D5.
MS. LINDAUER: Is it D5 and 67?
THE COURT: So this Exhibit D6 is a redline of those

changes between Exhibit -- Debtor's Exhibit D5?

MS. LINDAUER: Correct, Your Honor.

THE COURT: To Lender's Exhibit 67?

MS. LINDAUER: A. 67-A.

THE COURT: To Lender's Exhibit 67-A. Do I have that right?

MS. LINDAUER: It is my understanding, Your Honor.

THE COURT: Mr. Marx, is that your understanding? I just want to make sure I understand what we're looking at. If you need a minute to look at it, great. The representation is that this redline shows changes between Debtor's Exhibit D5 and Lender's Exhibit 67-A. Is that right?

THE WITNESS: It appears to be -- that appears to be accurate, Your Honor.

THE COURT: All right. Next question.

MS. LINDAUER: Okay. Mr. Marx, and if we could scroll down a little bit, Sydney.

BY MS. LINDAUER:

Q Do you see the sort of green highlighted changes that are showing up on the screen?

A Yes.

Q And those are on Page 1 of this document. Is that right?

A Page 1, 2, and 3 I believe.

Q Well, I'm at the bottom of Page 1 right now.

A Yes.

Q Okay. On behalf of 299TC Acquisitions, were these changes acceptable that Mr. Kane and his client had made to the agreed recision of special warranty deed?
A I had not signed off on them, or my understanding, I don't think that the debtor had.
Q So to be clear, there was no agreement between the debtor and HNGH as to the actual document that would be signed to rescind the deed in lieu. Is that correct?
A Correct.
Q If we look at the next page.
A Yes.
Q Okay. And with regard to that particular change --
MS. LINDAUER: I think we're missing a page, actually. Go back up, Sydney. Okay. Wait a minute. Then go further down. Maybe it's the way it goes onto another page. There we go. Okay.
BY MS. LINDAUER:
Q And to be clear, Mr. Marx, these changes that had been requested, do you have any opinion on whether those were appropriate or not?
A Well, I know they had not been agreed to.
Q And --
MR. KANE: Objection. Non-responsive.
MS. LINDAUER: All right.
THE COURT: I'll sustain that one.

BY MS. LINDAUER:
Q Okay. Well, they weren't agreed to. But the other question I have is if you look at this one, this one in the middle there, whereas grantor have agreed as ordered by the bankruptcy court. Is there a request that there be an agreement that there was a condition precedent in the agreed order, and what the condition precedent is?
A I'm sorry. Can you read that section? And which page is it on on the redline?
Q It's up on the screen.
A Oh.
Q It actually shows up as the third page, I believe. And it -- where they added in about there being a condition precedent.
A Yes. I would prefer that not be there because it seems to want to subject this to the agreed orders.
Q Do you know what response the debtor's counsel made to the changes that were proposed by HNGH to this document?
A No, I don't. I would understand that they did not agree.
Q If you look at Page 67 -- Exhibit 67, Page 1 of 1. Do you see where I sent an email to Mr. Kane saying on the recision, we want to go with the agreed recision? Do you see that?
A Yes.
Q And then at 549 on May 30th, this one with the changes appears to have been sent over. Do you see that?
A That's correct, at 5:49.

Q As we sit here today, Mr. Marx, has there been any agreement reached between HNGH and the debtor as to the exact form of the agreed recision that is necessary to rescind the deed in lieu of foreclosure?
A No. There has been no agreement.
Q How important is it that that particular document be part of this transaction?
A Well, that -- it's critical that that re-reinstatement are completed in that sequencing. My understanding in reading of the agreed order is that the deed was to -- the instrument of recision, the recision deed was to have been prepared and held, and presumably shared and signed by the parties back in December. Had that been done, I don't think we would have been exchanging drafts, ultimately arriving at a non-agreement the day of or the day prior.

But the instruments, both instruments, or the one if drafted that way, recision cannot be done unilaterally. It needs to be signed by both parties. And the reinstatement, similarly, you know, the lender can't simply reimpose obligations without the borrower's consent. And so in some, in response to your question, these were critical first steps.
Q Mr. Marx, are you aware that the debtor has filed a couple of recent motions with the Court. They appear to Docket 174 and Docket 173. One if them is called a reorganized debtor's --

MR. KANE: Objection. This goes outside of the scope of cross-examination. It's not appropriate for redirect.

MS. LINDAUER: Your Honor, it's background to a question that I think does fall within the scope of redirect.

THE COURT: Well, why don't you ask the question that's within the scope, or tell me why you didn't refer to these motions in your direct.

MS. LINDAUER: Your Honor, I don't know that they were actually filed at the time that we were doing our direct. I'd have to go back and look at the date. But I believe that Mr. Kane was already in his cross at the time that these were filed.

THE COURT: Before we switch here, it sounds like we're switching topics slightly. If you don't mind, Ms. Lindauer, the way my brain works, if I have an open question about an issue that the witness is testifying about, I like to just follow up if I might.

MS. LINDAUER: Oh, that's fine, Your Honor. Go ahead. Sorry.

THE COURT: Mr. Marx, I know you've been on the stand a long time. And I'm going to have to go back and look at my notes. But at least my recollection of what I had written down from your prior testimony is that through the back and forth drafts of the deed in lieu or whatever you want to call it, that Mr. Kane had addressed all of your concerns about the

initial draft that they had sent over other than related to there being a different enforcement party for the condo use restriction. Actually, maybe that came out.

So I'll have to go back and look at my notes. What was the open issue on this recision deed? I thought everything was resolved other than the break in the chain of title issue which you've testified about. Was there any other issue that had not been resolved through the back and forth?

THE WITNESS: Yes, Your Honor. These -- you are correct in that Mr. Kane's office, or HNGH, the lender, had substantially agreed it appeared to the more appropriate instrument that I had drafted.

THE COURT: So what -- tell me again, at the end of the day, all of the items had been addressed other than what because I want to make sure I'm clear on this.

THE WITNESS: Well, I think my testimony the other day was, Your Honor, that the Kane revised form, or the HNGH lender revised recision of deed, I think you asked me did I find it objectionable. And I commented that other than as it relates to the Texas/Delaware issue, that I thought it was a sufficient instrument. What I believe Ms. Lindauer's question --

THE COURT: No, no, no. I'm just wanting to know your concerns. The issues that you had raised, the use restriction that had a different enforcement party, I think

maybe you're refreshing my recollection. The final document didn't even have that in there. So that was resolved, right?

THE WITNESS: Yeah. To my satisfaction, Your Honor, the use restriction issue had -- they had conceded the point.

THE COURT: And so the only open item was the issue about the Texas/Delaware designation next to their name. Is that correct?

THE WITNESS: Yeah, which I think is fatal. But go ahead.

THE COURT: And, Mr. Kane probably asked you this but I don't recall. Did anybody tell Mr. Kane on or before May 31st that that was an issue that had not yet been resolved? To your knowledge.

THE WITNESS: I don't recall, Your Honor. We had --

THE COURT: If you don't remember, that's okay.

THE WITNESS: Yeah. We had corrected that error in the instrument. But they still hadn't corrected the title. I don't know what he knew at that time.

THE COURT: But I'm asking you to your knowledge, had anybody on the debtor's side or your side, your being the lender or lenders that you're representing, had anybody made Mr. Kane or anybody else from the lender's side aware of the Texas/Delaware issue, that that specifically was an open issue on or before May 31st?

THE WITNESS: I don't know, Your Honor. I do not.

THE COURT: Okay. Thank you. All right.

Ms. Lindauer, let's go back. Well based on that, does anybody have any quick follow up from Mr. Marx on that?

Mr. Kane, I'll ask you first.

MR. KANE: No, Your Honor. Thank you.

THE COURT: Okay. All right. Ms. Lindauer, do you have any brief follow up to my questions for Mr. Marx on that issue? I think he's buttoned that up for me.

MS. LINDAUER: No, Your Honor. I think he addressed it.

THE COURT: Okay. So tell me, just quickly tell me what you're going to ask Mr. Marx about and why that couldn't have been addressed in his dir.

MS. LINDAUER: Oh, okay, Your Honor. I'm sorry. Back to those motions because I think, Your Honor, I think they were actually filed, I have to check, they were filed on the 20th. And I think that we're on the 23rd. And I think the 20th, at the time these were filed, we were in Mr. -- correct me if I'm wrong, I thought we were in Mr. Kane's testimony at that point on cross. I don't know that we were still on direct.

But, Your Honor, I just have a couple of very simple questions without actually going into a lot of detail on this.

THE COURT: All right. Ask your question, and then I'll see if there's any objections.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Marx, what effort have you made during these proceedings to put together a I guess actually the documents that would be necessary, at least from your standpoint, to complete the closing on the document side of this transaction?

A A number of them.

Q And to your best of your knowledge, Mr. Marx, have those documents been filed of record with this Court, and as attachments to pleadings that have been filed with the Court?

MR. KANE: Again, Your Honor, that -- objection. It's outside the scope of cross-examination. This is all new areas of testimony.

MS. LINDAUER: Your Honor, I don't know how much all knew areas of testimony it is. But all I wanted to do was bring the Court's attention to the fact, and we can do it in closing argument or at some other time, but that documents have been prepared by Mr. Marx that would address a number of the concerns with the documents that were not available at closing. That's the only point, Your Honor, we were making on that.

MR. KANE: Your Honor, our objection here is relevance. It's June 23rd. If they were prepared and submitted to the docket that has no relevance to these proceedings whatsoever. And it's outside the scope of cross.

MS. LINDAUER: Your Honor, I think it is relevant

because basically we prepared the documents, Your Honor, that should have been prepared, we contend anyway, by HNGH for the closing of this transaction. He was given a list of an exhibit on May 30th of the documents we thought were necessary, and to date HNGH has only provided I think one document which is we'll accept a recision deed but with our changes.

MR. KANE: Your Honor, that's just patently false. And the evidence that we've presented shows that Ms. Lindauer's statement is patently false. So this is, I mean, this is now testimony that's just inaccurate testimony by Ms. Lindauer. We'd ask the Court to --

MS. LINDAUER: Your Honor, I'm not --

MR. KANE: -- reject --

MS. LINDAUER: -- here to testify. I'm just explaining why we thought it might be of some relevance to these proceedings for the Court to be aware that the documents that we contend should have been provided, and we can bring it up with another witness. I don't need this witness to actually -- we got other witnesses that can attest to this.

But at the end of the day, I just wanted to call the Court's attention to the fact that Mr. Marx has taken the time, at our expense, to prepare the documents that we think were necessary for the closing. And, Your Honor, with that I can move on to another question.

THE COURT: All right. Go ahead and move on, then.

BY MS. LINDAUER:

Q Mr. Marx, what's the difference between what would be necessary to close this transaction from a title standpoint versus a legal standpoint with regard to the documents, the recision documents in particular?

A Well, let's put it this way. I would suggest that when one reviews a recision instrument, it can be reviewed from the most basic level would be whether it's insurable. And then secondly in this context, it would need to be acceptable. It would need to be consistent with the agreed orders. And then third, it would have to be in form reasonably acceptable to a third-party purchaser.

And I reviewed this transaction, including the listing that I contributed toward on May 30th with that in mind. So again, at the bottom, is the transaction insurable, and then second in this context, does the instrument or delivery or action comport with the agreed orders. And then third, is it acceptable to a reasonable third-party purchaser or lender to the transaction.

Q Mr. Marx, I just want to clarify a couple of things you just said. The form of the agreed recision with the changes made by Mr. Kane, was that an acceptable document to sign? I think I might gotten lost in your testimony.

A I apologize.

THE COURT: Ms. Lindauer? Ms. Lindauer, I thought

we've covered that about --

MS. LINDAUER: Did we cover that? I --

THE COURT: We've covered it about ten times.

MS. LINDAUER: Ten times? Okay.

THE COURT: Keeping in mind the need to get the other witness on and off today --

MS. LINDAUER: Right.

THE COURT: -- I think we've -- I've said we beat a dead horse before. I think we're beating a dead horse with another dead horse.

MS. LINDAUER: Right. And just a final question if we might.

BY MS. LINDAUER:

Q Mr. Marx, if you would look at Exhibit D8. Mr. Kane asked you a question about this email. And, Mr. Marx, you testified there was some discussion about a termination of the Access Bank (phonetic) collateral assignment. Do you recall that testimony?

A Yes.

Q Okay. As of May 31st at 11:22 a.m., was Ms. Lissey (phonetic) asking about a termination or another document?

A I think at that point in time, she had still not located the -- she was looking for --

MR. KANE: Objection. That calls for speculation.

MS. LINDAUER: Well, just read the email, Mr. Marx.

What was she looking for?

THE COURT: So I will sustain the objection.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Marx, I'll ask the question again. What document was July Lissey looking for on May 31st at 11:22 a.m. regarding Access Bank?

MR. KANE: Objection. Calls for speculation.

MS. LINDAUER: Your Honor, this is an admitted exhibit. I think if he would just read it, he can answer the question.

THE COURT: So I've read it.

MS. LINDAUER: Okay. All right.

THE COURT: I guess Mr. Marx can read it. We've all read it.

BY MS. LINDAUER:

Q Okay. Mr. Marx, what's the difference between an assignment and a termination?

A Well, assignment would be where that position or the rights pertaining thereto were typically conveyed to a third party as opposed to a termination where they sort of cease to exist.

Q Sitting here today, have you seen an assignment from Access Bank to 299 Turtle Creek, LLC?

A No. There wasn't one. Subsequently, she was able to

locate the termination.

Q She found the termination. But what assignment did Ms. Lissey find?

A Nothing.

MR. KANE: Objection. That calls for speculation and assumes facts not in evidence.

THE COURT: So I'll overrule the objection and just ask a quick follow-up.

Mr. Marx, did you not testify earlier that it was your understanding that the termination that Mr. Kane helped her find satisfied her concern about the assignment. Or am I missing something?

THE WITNESS: I believe that's correct. There was just a gap in the communications back and forth I think is what --

THE COURT: It was your understanding that the termination that was located satisfied the request for an assignment?

THE WITNESS: Yes.

THE COURT: All right. Next question, Ms. Lindauer?

MS. LINDAUER: Your Honor, I'm going to pass Mr. Marx at this time. Thank you.

THE COURT: Mr. Kane?

MR. KANE: Nothing further, Your Honor.

THE COURT: All right. Mr. Marx, thank you for your

time. You may -- Mr. Kane, are we releasing? I can't remember if you --

MR. KANE: Yes. We can release Mr. Marx. I have no further questions for him.

THE COURT: All right.

MS. LINDAUER: We can release him, also.

THE WITNESS: Thank you.

THE COURT: Thank you, Mr. Marx.

THE WITNESS: Thank you.

MS. LINDAUER: Your Honor, could we take a couple minute break before we get Ms. Blakeley on?

THE COURT: So, Mr. Carruth, are you on?

MR. CARRUTH: Yes, Your Honor.

THE COURT: So if you could contact your client and just let us know, or I guess let -- well, we'll take a ten-minute recess. If you could try to get your client available.

MR. CARRUTH: Will do, sir. Thank you.

(Recess at 2:49 p.m./Reconvened at 3:02 p.m.)

THE COURT: All right. Mr. Carruth?

MR. CARRUTH: Yes, Your Honor.

THE COURT: Ms. Lindauer?

MS. LINDAUER: Yes, Your Honor.

THE COURT: I see Mr. Kane. Are we ready to go?

MR. KANE: Yes we are, Your Honor.

THE COURT: All right. Ms. Lindauer, go ahead.

MS. LINDAUER: Okay. Oh, there she is. Okay. Ms. Blakeley, I don't know if you've been sworn in yet.

THE COURT: Yeah, you're correct.

Ms. Blakeley, if you would please raise your right hand.

JULIE BLAKELEY, DEBTOR'S WITNESS, SWORN

THE COURT: All right, thank you.

MS. LINDAUER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Ms. Blakeley, could you state your full name for the record?

MR. KANE: And, I'm sorry. This is John. Just for some clarification before we begin, are you calling Ms. Blakeley as an adverse witness or not?

MS. LINDAUER: I'm calling her as an adverse witness.

MR. KANE: Okay, thank you.

BY MS. LINDAUER:

Q I'm sorry, Ms. Blakeley. Could you state your full name for the record for us?

A Sure. Julie Blakeley.

Q And, Ms. Blakeley, how are you employed?

A I am a commercial officer here at Happy State Bank.

Q And how long have you had the role of commercial officer at Happy State Bank?

A Since July of 2019.

Q And prior to July of --

THE COURT: I lost video on my end. Did anybody else? Can anybody else still see Ms. Blakeley?

MS. LINDAUER: There she is.

(Pause)

THE COURT: All right. Well, we have her back now. The video's a little -- okay. I think we're back. So why don't we go ahead and we'll see if we can -- we'll see how it goes. We've had a little bit of glitchiness in your video. But right now it looks okay. So go ahead. And now she's gone again.

MS. LINDAUER: Okay. She's back.

THE COURT: Okay. Ms. Blakeley, are you on a laptop or an iPad?

THE WITNESS: Well, yes. We just went through a system conversion here at the bank. And so the video is not working on the desktop. So they had me using a laptop. It was working the other day. For whatever reason, today it's a little glitchy.

THE COURT: Do you have an IT person that can maybe hook you up with an ethernet cord?

THE WITNESS: I am connected in directly. I can see if there's something. I don't have anyone that's here physically that can do that. But I can -- I can see if I can

get help.

THE COURT: Mr. Carruth, do you have any thoughts here? She's going in and out on the video and cutting in and out. I'm not sure --

MR. CARRUTH: I think she is dialed in also. Ms. Blakeley, did you dial in, as well?

THE WITNESS: Well, I'm dialed in on my phone. So I have audio is working. It looks like the video is what's -- the camera is what's giving me trouble. It's the webcam connection.

MR. CARRUTH: If -- yeah. And, Your Honor, we're in two separate locations, actually. I mean, Ms. Blakeley is not that far from me if she wanted to come to my office. We could set something up here. It would take 20, 30 minutes maybe, but not impossible. Or we could just do audio only.

I mean, and I know Ms. Blakeley has worked on this diligently, and with the bank having been acquired by Centennial, they've gone through a lot of IT stuff the last two or three weeks. I know that.

THE COURT: How -- Ms. Blakeley, do you know how far you are from Mr. Carruth's office?

THE WITNESS: I can probably be there in about 25 minutes.

THE COURT: It's floating in and out. She's on and off, on and off.

(Pause)

THE WITNESS: I can try that on my cell phone. Okay.

MR. KANE: Your Honor --

THE WITNESS: And just --

MR. KANE: If Ms. Blakeley also was in on her laptop with the camera turned off, she'd still be able to review exhibits as we proceeded. So, Joyce, would you have any issue with that?

MS. LINDAUER: Yeah, that was one of my concerns was I doubt she has a set of exhibits in front of her. So we were actually going to pull up documents and show them to her. So I don't know how that's going to work if she doesn't. I just don't know enough about the technology to know if that's possible or not.

So she's using her phone. As long as we can see her and as long as she can see the documents, I think it's fine, however that can be coordinated.

THE COURT: Why don't we take a five-minute recess, see if Ms. Blakeley can get her phone on WebEx so that we can see her.

And, Ms. Blakeley, you're able to maybe continue using your laptop? Are you having any connection problems seeing us?

THE WITNESS: No. I can see everyone fine. It's just you're not able to see me.

THE COURT: Okay. So why don't we take five minutes, see if you can get WebEx working on your phone. If not, I hate to ask you, but you might have to toodle on down to Mr. Carruth's office. So why don't we take a five-minute recess.

And Mr. Carruth, if you want to -- you can call her or maybe walk her through getting WebEx on her phone if it's an app. I don't even know the answer to that. Ms. Smith, is it an app or is it something --

MR. CARRUTH: It's an app.

THE COURT: Okay.

MR. CARRUTH: Yeah.

THE COURT: All right. We'll take a five-minute recess. And Ms. Smith will stay on if you have any questions of her on that because she will be smarter about that than I am. All right. So we'll take a quick recess. But Ms. Smith will be on while you're trying to get her phone working.

(Recess at 3:09 p.m./Reconvened at 3:26 p.m.)

THE COURT: I can see Ms. Blakeley. And I'm assuming I'll hear her when she talks. So why don't we go ahead, Ms. Lindauer?

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Ms. Blakeley, can you hear me all right?

A I sure can.

Q Okay. And we can see you now.

And I think the last question I'd asked you, you told us that you're a commercial -- I believe a commercial loan officer for Happy State Bank, and had been since July of 2019 is what I wrote down. Is that right?

A Correct.

Q Okay. And I think my next question was prior to July of 2019, were you also employed by Happy State Bank?

A Not by Happy State Bank.

Q Okay. Who were you employed by before July of 2019?

A It was Southwest Bank which was acquired by Simmons Bank.

Q And how long were you with Southwest Bank?

A About seven years.

Q And what was your position with Southwest Bank?

A I was also a commercial loan officer.

Q And were you in any type of banking prior to your job with Southwest Bank?

A Yes.

Q And who were you with at that point?

A I was with American Bank of Commerce prior to that.

Q And what was your role at American Bank of Commerce?

A Commercial lender.

Q Have you had any position with a bank different than commercial lender?

A It's always been commercial lending in some capacity.

Q I don't want to spend a long time on this, but can you just briefly describe for us your educational background?

A Sure. I graduated from Texas Tech University with a degree in marketing, went to -- worked in banking right after that. I've been in commercial lending ever since. It was 1994.

Q And am I correct your office is located in far north Dallas. Is that right? The Happy State Bank?

A You mean Addison? Addison, Texas.

Q Addison?

A Uh-huh.

Q Okay. All right. Are you familiar with the loan made by Happy State Bank to a company called HNGH?

A I am.

Q Were you involved in the origination of that loan?

A Yes, I was.

Q And have you been involved in that loan continuously since its origination?

A Yes, I have.

Q And just to be clear, I should have asked you this. Does Happy State Bank have more than one loan with HNGH?

A No. That is the only loan.

Q So we're going to try pulling up some documents. And let's see if you can see these okay.

MS. LINDAUER: So, Ms. Olmer (phonetic), if you could

pull up Exhibit H. I'm sorry, it's not H but mine says H. It's actually 54. It's the lender's exhibits. 54(a).

BY MS. LINDAUER:

Q And, Ms. Blakeley, can you see this document on your screen?

A I can. It's very small. Let me see if I can --

Q Okay.

A Okay. Yes.

Q And can you identify this document for us?

A It shows to be the collateral transfer of note and lien.

Q And at the top, it says reported return to Happy State Bank. Do you see that?

A Yes.

Q And there's a person, Austin Nash. Who is that?

A That is my portfolio manager.

Q And is he still a portfolio manager for Happy State Bank?

A Yes, he is.

Q And physical location, are you at the 16633 North Dallas Parkway location, Addison, Texas?

A That is correct.

Q Can you tell me in sort of laymen's terms, what is a collateral transfer of note and lien?

A That is what we used when we did a note receivable. And we took an assignment of the note. And that was the instrument that was used.

Q So I understand, there is an underlying loan between Happy State Bank and HNG Turtle Creek, LLC. Is that right?
A HNGH Turtle Creek is our borrower.
Q Okay. And but just to be clear, there's an underlying loan between Happy State Bank and HNGH Turtle Creek, LLC, a Delaware Limited Liability Company. You see that?
A Correct.
Q And they transferred to you a note. And who was the note between that you received on that transfer?
A So we have an assignment of the note. Let's see the words on that a little closer.

MS. LINDAUER: Sydney, can you pull this -- scroll this up a little bit so we can see under the language agreement? There we go. Okay. Stop right there.

THE WITNESS: Yes. So that's referencing the note with MO 2999TC LLC is the underlying borrower for that note.

BY MS. LINDAUER:
Q And that references a note for $32,500,000. Is that correct?
A Correct.
Q And that note was dated September 20th, 2019?
A Correct.
Q And it shows that the principal is $32,500,000. Is that right?
A That is correct.

Q Do you have paperwork in your files that would indicate to you how much is still owed on that particular note today?
A I would have to look. I don't know if I have anything other than this note at this point. But we would have to look.
Q Okay. And going to that, does Happy State Bank have the original secured promissory note that's mentioned in item one here, collateral note?
A We do have that in safekeeping.
Q Tell me what that means. What does in safekeeping mean?
A It means it's a Dell Controlled Vault so that it's not easily accessible by anybody other than the people authorized.
Q And is that at your 1633 North Dallas Parkway location?
A Correct.
Q And did you yourself verify that in fact Happy State Bank has the original secured promissory note in its possession?
A I have.
Q How recently did you do that?
A I went and pulled that from the vault this morning.
Q When you say you pulled it from the vault, do you have it in front of you, the original?
A I pulled it in here for this hearing today. Yes.
Q So you have it sitting on the desk in front of you?
A Correct.
Q All right. Can you show that to us, that you have the original?

A It is in this bound package. I don't know if you can see what I'm holding up.

Q Okay. So did you actually open up the bound package to see that the original was in there?

A Yes.

Q And are you showing us -- I can't really see it that well, but are you --

A Sorry.

Q Are you holding up a copy of the original note?

A Yes.

Q Okay. Good.

A Yeah.

Q And your file right there that you have, is there anything appended to the note, attached to it?

A This is the original note package that was provided. So it has all of the original documentation in it.

Q Okay.

A Attached to the note there's not anything else attached other than what was originally signed that I can tell.

Q All right. The next item, again we're going back to the collateral transfer of note and lien. The next item on the list is the collateral note security. Do you see that item?

A Yes.

Q Okay. And this shows that there's a deed of trust security agreement fixture filing dated September 20th, 2019.

That is also part of the collateral transfer. Is that right?
A Correct.
Q And this particular collateral transfer of note and lien, was it actually filed of record in Dallas County?
A That's what is stated on here. And it's I can verify it in that package that that's what's listed.
Q Okay. If you look at the last page of that document, it shows Dallas County.
MS. LINDAUER: And, Sydney, can you go to the last page of it?
BY MS. LINDAUER:
Q It does have some filing information that shows that it looks like it was recorded on December 8 of 2020. Do you see that?
A Yes.
Q All right. And again, going back to the front of the document. It says on item three, there's the grantor executed and delivered to secured party a promissory note dated December 4th, 2020. Do you see that?
A I do.
Q It says in the maximum stated principal amount stated herein. How much is that amount?
A The amount on the note if I reference back, that's what I believe that that is referencing.
Q Okay.

A The amount of the note is $32,500,000.
Q The note that Happy State Bank has with HNGH, is that in the same amount?
A No.
Q So the way I read that is grantor has executed and delivered to secured party a promissory note dated December 4th of 2020 in the maximum stated principal amount stated therein. The $32,500,000 note was actually dated about a year earlier, right?
A This may be referencing the note between Happy and HNGH. I might be misreading what that's referring to.
Q Okay. No, that's fine. That's the way I would read it. I just want to be sure that I'm reading it the same way you are. And then with regard to this particular transaction, are there any other what I would call collateral or assignment documents that relate to the note and deed of trust being delivered to Happy State Bank?
A There's not anything else that's related to the MO 2999TC, LLC.
Q Okay. If you look at the next page, Paragraph E(1)(i). And there you go. It says grantor, and if we flip back, of course that's HNGH Turtle Creek, LLC, has endorsed and delivered the collateral note to secured party. And then you've already told us secured party is the holder of the collateral note. Correct?

A Correct.
Q It also says secured party recognizes that grantor has commenced foreclosure proceedings under the terms of the note, and hereby has secured parties expressed consent to continue such proceedings. Do you know what that's referring to?
A I don't recall off the top of my head.
Q Okay. Do you recall if there in fact was a foreclosure proceeding commenced about the same time that this agreement was signed?
A I know there were -- there was something related to some defaults. But I just don't recall at the moment.
Q And does Happy State Bank require in the event of a default on the underlying note, not your note but the underlying note, with 299TC, does it require your consent to any agreements that would involve a forbearance of a default?
A There is a requirement for notice, yes.
Q Beyond notice, is there any requirement that you sign off on any documents related to forbearance?
A I would have to look at exactly what was worded on that. But we would review what comes through related to any defaults.
Q If you look on -- there are under the collateral mode enforcement of power of sale provisions, it does have some notice provisions, I think as you mentioned, between HNGH and Happy State Bank. Is that correct?
A Correct.

Q If we look on the last page of that document, there's a category that says general. Do you see those items?
A Yes.
Q And is there a provision that would permit Happy State Bank to basically step in and take over the role as the lender on the underlying loan transaction?
A The way I understand it is we would -- as long as our borrower is not in default, we would not step in.
Q And as we sit here today, is your borrower in default?
A No.
Q If you look at little v, or I'm sorry, vi, those little romanettes down the side, it says this agreement will be construed according to Texas law. This agreement is to be performed in Tarrant County, Texas. Do you know why it was to be performed in Tarrant County?
A That is where our main office for the DFW Metroplex is located. That's where our in-house counsel and our executive team resides in Tarrant County.
Q Okay. All right. And just to be clear, this document looks like it was signed on or about December 3rd of 2020. Is that right?
A Correct.
Q And its by Vipin Nambiar, managing member of HN Capital Partners, LLC. Do you see that?
A Yes.

Q Okay. And it says that that's a limited liability company manager of HNGH Turtle Creek, LLC. Is that right?
A Correct.
Q Okay. Have you ever sent, Ms. Blakeley, any documents involving HNGH Turtle Creek, LLC that refer to it as a Texas Limited Liability Company?
A I mean, not off the top of my head I can't recall.
Q Is it your understanding today though that HNGH Turtle Creek, LLC is a Delaware Limited Liability Company?
A That's what it's stated there. I would have to verify it. But that would be my understanding.
Q Are those the type of documents that would be in your loan file that would show the ownership and authority of HNGH Turtle Creek?
A Yes. We have to obtain all of the entity documents and have that verified.
Q And looking on the next page, Page 5 of 5. Is that your signature as branch president for Happy State Bank?
A Correct.
Q Now to be clear, under this collateral transfer of note and lien, going back to the first page under the heading agreement, it references the note and also then of course we talked about the deed of trust and security agreement. Were there any other loan documents that were taken as collateral for this transfer of note and lien?

A There's other documents related to our borrower, HNGH, to that entity. So there are other documents related to our borrower.

Q Okay. And really where I'm going with that question is there is a guarantee of the underlying loan between HNGH and 299TC. Did Happy State Bank take any collateral or position with regard to that guarantee?

A No. Not that I'm aware of.

Q And, Ms. Blakeley, you've been the primary person at Happy State Bank that's been handling this particular loan you told us really since inception. Is that right?

A Correct.

Q Okay. Were you familiar with the bankruptcy of 299TC?

A Yes.

Q When did you first become aware of the bankruptcy?

A We had notice on that I believe it was around -- we had a written notice I believe it was around early November 2021.

Q All right. And have you been involved at all since early November of 2021 in the bankruptcy proceedings?

A I have referred that to our counsel to review. And they've kept us informed.

Q Do you know if you ever filed any type of a claim as part of the bankruptcy proceedings?

A I would have to refer to Jeff Carruth for that.

Q So as you sit here today, you don't know?

A Correct.
Q Okay. IN your experience for Happy State Bank, has the bank had other situations where the collateral transfer of note and lien has involved a bankruptcy case?
A That I do not know.
Q In your experience, have you dealt with any situations like this before?
A I have not.
Q And were you aware, Ms. Blakeley, of a deed in lieu that was recorded back on November I believe it was 1st of 2021 involving the real estate made the subject of your collateral transfer of note and lien?
A The borrower did make us aware.
Q And when you say the borrower did make you aware, how did they make you aware?
A That was part of the notice that they provided to the bank.
Q And do you know the first time you were made aware that a deed in lieu in fact had been recorded as it relates to this collateral transfer of note and lien?
A I don't recall the date. But I do know that when they provided the documentation with the forbearance agreement, that that was pointed out to us that that was included in one of their options that they did remedy.
Q Explain to me, options that -- I didn't follow the answer

on that. Options, what does that mean?
A I know that that was included in their forbearance agreement. And that was pointed out to us as one of the courses of action that HNGH could take.
Q Okay. So let me understand what you're saying. One of the actions HNGH could take was to file a deed in lieu, is that right, in the event of a default?
A Right.
Q All right. And as a result of filing that deed in lieu, that put the title of the property into the name of HNGH. Is that correct?
A I believe that's how that would work.
Q As a result of that, did the bank require any further assurances or documentation from HNGH at that point?
A I believe that's at the same point that same time that the underlying borrower on that note had filed bankruptcy. And I think we were working through that case. We were waiting for direction after that.
Q And when you say you were waiting for direction, who were you waiting for direction from?
A From our counsel.
Q Okay. But at least at the time of the filing of the bankruptcy, so that would be November of 2021, Happy State Bank didn't take any action with regard to the fact that the property had actually been transferred into the name of HNGH.

Is that correct?

A I'm not sure if I can state this exactly correct the way I understand it. But I think because if the bankruptcy, we were waiting for confirmation if the title would in fact be awarded to HNGH because I think with the bankruptcy in place, I think I understand it as the collateral was still the assignment of the note.

Q All right. So, okay. I'm following you on that. So, and Ms. Blakeley, were you made aware of any agreements or agreed orders that were reached between HNGH and 299TC Acquisitions?

A I know there were various extensions, and that there were I guess extensions to time to pay off the note was granted. And we were kept informed of that.

Q Let me have you look, if we could, at Exhibit -- we're going to look at Exhibit D12.

THE COURT: Which side's exhibits, Ms. Lindauer?

MS. LINDAUER: I'm sorry. That's the debtor's exhibits, D12. I think it's in both sets. And, Ms. Blakeley -- Sydney, you might scroll down a little bit.

BY MS. LINDAUER:

Q Do you see a document called agreed order regarding motion to lift stay, motion to dismiss, motion for sanctions, and motion to enforce stay?

A Yes.

Q Okay. Have you seen this document before?

A Prior to this, I can't recall. It's possible I have, but I just don't remember off the top of my head.
Q Okay.
A I believe that all the agreed orders were provided to us. I would have to look in the actual loan file. But I do believe everything that was filed has been provided to you. So I would assume that's in our record.
Q And just to be clear, up until very recently, Happy State Bank had not actually entered an appearance in the bankruptcy case. Is that correct?
A Not that I'm aware of.
Q All right. So I know Mr. Carruth has told us, told the Court that the bank was monitoring the bankruptcy case. But you hadn't actually taken any kind of role in connection with the case itself. Is that correct?
A I believe so.
Q If we look at this order, and I don't know how familiar you are with court orders. Have you had an opportunity to look at those before?
A I do see them from time to time. I'm not as familiar with this one.
Q Okay. All right. If we go to the top of the next page, Page 2 of 4. Okay. And I know this is kind of dense, but I'm going to ask a couple of questions if you can help follow me on this. You see the first, it says payoff deadline?

A Yes.

Q Okay. And then do you see in bold payoff amount?

A Yes.

Q Okay. And it mentions after the words payoff amount which note shall be reinstated immediately prior to the debtor's payment to HNGH. Do you see that?

A Yes.

Q Do you have any understanding of why the note needed to be immediately reinstated?

A No. I'm not sure if I can answer that. I don't know if I understand.

Q Okay. All right. So you showed us that Happy State Bank actually has the original note, right?

A Correct.

Q It's not -- okay. All right. And you understand that there was a deed in lieu of foreclosure filed that involved the 299TC property on or about November 1st of 2021, correct?

A Correct.

Q And do you have any understanding, Ms. Blakeley, of what happens when a borrower takes title to property that it has, or I should say actually a lender takes title to property that it's made a loan on?

MR. KANE: Object to the form of the question.

MS. LINDAUER: Well, Your Honor, let me rephrase it. Maybe that was a little too complicated. But, if that's all

right with the Court.

THE COURT: Sure.

BY MS. LINDAUER:

Q Ms. Blakeley, if you as a lender, let's say Happy State Bank were to foreclose on a piece of real estate and take title to that property, do you know what happens to the underlying loan that was made by the lender?

A On this particular case, it would be our borrower would have to be the one to foreclose on it. It wouldn't be unless he was in default that we would take action to foreclose.

Q No. I don't think you're understanding the question.

MS. LINDAUER: So object to non-responsive.

THE COURT: Ms. Lindauer, you called this witness as a fact witness, right?

MS. LINDAUER: I did, Your Honor. But she's still on the opposite side of -- she's, as Mr. Kane pointed out, she's actually an adverse witness.

THE COURT: So just keep in mind you have called her as a fact witness.

MS. LINDAUER: Sure.

THE COURT: It's 3:54. Can you, before we continue, how much more time do you expect with this witness, because I do plan to finish with this witness today, even if I have to impose time limits.

MS. LINDAUER: Your Honor, I think I can finish with

her in about another maybe 20 to 25 minutes.

THE COURT: Okay. I'm going to hold you to that. So go ahead.

BY MS. LINDAUER:

Q Okay. Do you understand, Ms. Blakeley, what I'm asking you?

A No. If you can restate it, I want to make sure I answer correctly.

Q Okay. So again, if a lender who's loaned money, has a note and lien, ultimately takes title to the property that's the subject of the lien, do you know what happens to the underlying note and lien?

A I'm not exactly sure how to answer what you're asking other than if our borrower defaults, then that assignment of the note, we would foreclose on that property if he's not able to bring our note current.

Q All right. Let me ask you, do you have any understanding of why the note that you're holding in that file you showed us would need to be reinstated prior to the debtor paying off HNGH?

A Not off the top of my head, no.

Q Has anybody reached out to you on behalf of HNGH to discuss with you the need to reinstate the terms of the note?

A I don't recall that.

Q The next part of the order says that, and counsel for HNGH

shall hold the recision deed during the pendency of the term of this agreed order. Do you have any understanding of what a recision deed was?

A No. I was relying on our counsel to review that.

Q And do you have any understanding of why a recision deed would have been necessary in connection with the payoff of the HNGH loan?

A Again, I'm going to have to refer to our counsel to advise us on that.

Q All right. Let's take a look at Exhibit 54 again, but not the A part. Just Exhibit 54.

MS. LINDAUER: And this is an HNGH document, Your Honor. And I've got it up on the screen.

BY MS. LINDAUER:

Q It looks like on May 26th, Thursday, you received an email from Mr. Kane. And do you know who Mr. Kane is?

A Yes.

Q Okay. And he says I represent HNGH Turtle Creek. And it discusses that 299TC Acquisitions, the debtor in bankruptcy, is steadily moving towards a closing that would fund on May 31st, '22, May 31st, 2022 by 5:00 p.m. Do you see this?

A Yes.

Q Okay. And then he says this is a funky closing to say the least. Do you see those terms?

A I do.

Q Okay. And then he goes on to explain that HNGH filed a special warranty deed taking title to the property, and that the deed in lieu would have satisfied the note. But because of the bankruptcy filing and case settlements through agreed orders, the debtor can still reinstate the note, and in essence buy back the property through a payoff. The debtor is marching in that direction. At closing, the following has to occur. And he lists four things. Do you see that?
A Yes.
Q Okay. And it says the title company is struggling with a hitch. On December 2nd, 2020, HNGH collaterally assigned its note and lien through the deed of trust to Happy State Bank via the attached document. We looked at that document, right?
A Okay.
Q Okay. It says we would like Happy State Bank to agree to rescind the collateral transfer of note and lien. The recision filing which we are preparing would be signed by Happy State Bank and held in escrow pending closing. Do you see that?
A I do.
Q Okay. Did Happy State Bank receive a recision filing document from Mr. Kane?
A I think that's what I was referring in my mind as a -- the release is kind of how we've worded it here in the office. And I did receive that, the release for lien.
Q Okay. Let's take a look at the documents we have and see

if this tracks with what you're remembering. If you look at Exhibit 72A, again this is a lender exhibit. We have a document called a payoff statement. Do you see that document?
A I do.
Q Is this what you're calling the release document?
A No. The payoff statement was one of the items that was requested. And that was the balance of the note we have with HNGH. The release that I was referring to would be releasing the collateral assignment.
Q Do you have that document in your file, the release of collateral assignment?
A The one that I'm referring to that we had -- were asked to sign, we executed it. We never had directions of where to deliver it. And so we have since -- we since shredded it. It was not put into force. But we did send an electronic copy of that to John Kane in preparation for instructions of where to send the original.
Q And you're saying it was never actually carried forward. Is that right?
A We executed -- it was approved and executed. We never did receive instructions for the closing. We were told the closing did not happen.
Q Okay. If you take a look at Exhibit 65B, it's a document called release of collateral transfer of note and lien. Is this the document that you're recalling that you received?

A Yes. Yeah. That's the one I was thinking of.

Q And its your testimony that in fact that document was signed by the bank but never delivered. Is that right?

A It was signed, and we sent an electronic copy of it. And we did not ever deliver the original because we did not have the instructions for that.

MR. CARRUTH: And I'm sorry, Your Honor. Can we see the full 8 by 10 or 8 and a half by 11?

MS. LINDAUER: Oh, yeah. Pull it up, Sydney.

MR. CARRUTH: And so I don't want to testify. But I think that might be the clean version of the modified release that somebody circulated.

MS. LINDAUER: Well, Mr. Carruth, if you want to be a witness, that's fine. But I think we have Ms. Blakeley on. She can tell us what she knows and doesn't know.

So, Your Honor, I'd object to Mr. Carruth's statements.

THE COURT: So I don't think he was -- I don't take his comments as testimony. So I will overrule the objection.

BY MS. LINDAUER:

Q All right. Ms. Blakeley, you have a release of collateral transfer of note and lien in front of you, correct?

A Yes.

Q Okay. And if you turn to the next document, that's 65C, Page 1 of 3, this appears to be a redline version of that

particular document. Is that correct?
A That's what I'm seeing.
Q And do you know if the one that's the first document, the 1 of 3, do you know if in fact that document was the one that was actually signed?
A I know I signed the original one that was provided to me. We did not have approval from our counsel to sign a revised document.
Q And you don't have in front of you, because you said you -- you didn't keep a copy of the one that you actually signed. Is that right? You told us those were shredded?
A The original one was. Yeah. I could locate the electronic copy, but I don't have the original.
Q All right. And what were you told with regard to the transaction?
A we had it ready to be delivered. We just didn't have instructions of what title company to deliver it to. And so we held onto that. And at the end of the day, we were told that the closing was not occurring that day.
Q And who told you the closing was not occurring that day?
A I believe that correspondence was happening between Jeff Carruth and John Kane. There may have been other parties to that. I don't recall. But our -- Jeff Carruth was the one that was corresponding with the bank.
Q Okay. And do you know approximately what time you were

told there was not going to be a closing that day?
A It would have been towards the end of the day, close of business.
Q And just to be clear, what day was that?
A I believe it was Tuesday, May 31st.
Q And was there any discussion that the closing might occur on another day?
A We were prepared to continue to have that release provided if it were moved to another day. We had not been provided any other dates.
Q And so when did you actually destroy the original of that document?
A I don't recall the exact date. It would have been I held it for a couple of days. We were getting ready for our conversion with the bank. We didn't want to have an executed document here that we didn't have a place to send it to. I can easily resign another one if it were needed.
Q Okay. Do you know if 299TC Acquisitions was made aware of the collateral assignment of note and lien to Happy State Bank?
A I wouldn't know if they were made aware.
Q Do you have any reason to believe that prior to May 31st, that they were aware of the collateral assignment?
A There was correspondence between our attorney and John Kane. And I don't know if they were corresponding with you on that. But I would -- I did not correspond directly with

them. But I would assume that the attorneys would have been communicating that.
Q And when you take a collateral assignment of a note and lien, do you give notice to the underlying borrower that's part of that transaction?
A I don't think we're required to give any notice to them.
Q Well in this case did you ever -- based on your files, did you ever give any notice?
A No.
Q Let's take a look at Exhibit 72. All right. This is an email from John Kane to me, Mr. Walji, and Julie Lissey, cc to Nate Christiansen on May 31st at 11:30 a.m. Do you see that?
A Yes.
Q And it says attached is the payoff statement for the Happy State Bank collateral assignment resolution. The amount due to HNG at closing is therefore the HNGH payoff amount previously provided minus this amount. Do you see that?
A I do.
Q And then if we turn to the next page, the payoff statement from Happy State Bank. Have you seen this document before?
A Yes.
Q It does show Happy State Bank at the top, attention Julie Blakeley. That's you, right?
A Correct.
Q And you were looking for a payoff of $26,000 -- I'm sorry,

$26,297,296.96. Is that right?
A Correct.
Q Okay. And were you expecting that at a closing funds would be sent to payoff this amount to Happy State Bank?
A Yes.
Q When did you understand that that closing would occur?
A We were told that was trying to close on May 31st.
Q And there is a where to submit payoff funds. Do you see that?
A Yes.
Q And there is either a wire or a mail. Do you see that?
A It's tiny print. But yes, I'm familiar with the form.
Q All right. So on or about May 31st at 11 o'clock, Mr. Kane sends notice to 299TC's counsel that part of the funds for the payoff need to be sent to Happy State Bank. Do you see that?
A Okay.
Q Is that your understanding?
A Yes.
Q You also see that it says in a little check box Happy State Bank will not prepare the release of lien. Please prepare a release of line and forward for signature to an address in Amarillo. Do you see that?
A Yes.
Q Is that sort of standard practice for Happy State Bank

when you get a payoff that then looks like some other party is required to prepare the release of lien?

A That is a template document that's basically stating that our back office does not typically prepare those for us.

Q Now let me ask you, go back to Exhibit D12 real quick. That was the court order that we were looking at. And we were at that top paragraph on payoff deadline. And I know, Ms. Blakeley, you said you're not terribly familiar with this court order. But do you see any mention, I'll let you look at it for just a minute, any mention in this order of Happy State Bank?

MR. CARRUTH: Objection, Your Honor. The document speaks for itself. We shouldn't make her have a reading assignment during the testimony.

MS. LINDAUER: Well, I don't think there's any dispute, Your Honor, that the document does not mention Happy State Bank.

THE COURT: Then I'll sustain the objection. And you have about ten minutes left.

MS. LINDAUER: I understand, Your Honor. I'm watching --

THE COURT: Are you almost done?

MS. LINDAUER: I'm getting close.

THE COURT: Okay.

BY MS. LINDAUER:

Q I'll represent to you, Ms. Blakeley, that there is no mention of Happy State Bank in this document. The payoff, who was that to be made to according to this court order, that first paragraph?

A Well, I'm not going to try to interpret from that standpoint. I know that a payoff that we would be expecting in order to --

Q Well, just look at line three. The debtor shall make payment to HNGH, do you see that, in the amount set forth on Exhibit A, right?

A Yes. Correct.

Q All right. It doesn't say pay HNGH part of the money, and pay part of the money to Happy State Bank, right? You agree with me.

A I'm just reading. Yes, it says HNGH.

Q Okay. If we look at Exhibit D13, that's a second order in March of 2022. That's an agreed order modifying order on motion to dismiss and motion for relief from stay. Do you see that?

A Yes.

Q Okay.

MR. KANE: Your Honor, and Ms. Lindauer, maybe to help move things along, if we stipulate, if HNGH stipulates that there's no reference to Happy State Bank in this document, is that sufficient?

MS. LINDAUER: That's fine, Your Honor.

THE COURT: All right. Next question.

BY MS. LINDAUER:

Q Okay. And were you ever told, Ms. Blakeley, that there was any problem with 299TC paying Happy State Bank?

A I'm not aware of what they were having working out other than that there was the potential for the closing, and that we were anticipating being paid off.

MS. LINDAUER: Your Honor, I'll pass the witness.

MR. KANE: Ms. Blakeley -- I'm sorry. I guess I shouldn't assume that I'm next.

THE COURT: Go ahead, Mr. Kane.

CROSS-EXAMINATION

BY MR. KANE:

Q All right. Ms. Blakeley, let's say at closing payment had been made to HNGH, the full payoff amount. Would that have been acceptable?

A Correct. Yes.

Q Would you have just expected then that HNGH would have to remit the payoff amount from its proceeds to Happy State Bank?

A Yes. We would have to have those full proceeds for a release to be provided.

Q Now, Ms. Blakeley, I want to kind of go back in time to the 26th. But I think you testified I emailed you on May 26th and alerted you to the fact that Happy State Bank, or that HNGH

would want Happy State Bank to provide a release or termination of that collateral assignment and of note and lien. Is that right?

A Correct.

Q And you saw that Exhibit Number 56? Here, I'll share my screen so you can have your recollection refreshed real quick. There was, let's see. Let me find it. Let's see. Sorry, it's Exhibit 54 and 54A. And I've got Exhibit 54 on the screen, not 56. This is the email where I informed you that HNGH would request this collateral assignment?

A Yes.

Q I'm sorry, the release of the collateral assignment?

A Okay.

Q And Exhibit 54, this was a copy of the collateral assignment, or collateral transfer of note and lien. And I sent that to you on May 26th so you would understand, or Happy State Bank would understand this is what we were seeking a release of. Is that correct?

A Correct.

Q And then did I provide you a draft of the proposed release the very next day?

A Yes, you did.

Q And is that transmittal email this Exhibit 60?

A Yes, it is.

Q And is 60A the release of collateral transfer and note

that HNGH provided?
A I believe so.
Q And do you recall on May 30th, HNGH through me sent an email with the debtor's proposed comments to this release of collateral transfer of note and lien?
A I believe so.
Q And that included a copy of the debtor's proposed draft and a redline showing the changes.
A Yes.
Q So Happy State Bank had the debtor's proposed redline on May 30th. Do you have any recollection about what time Happy State Bank received that?
A I don't have that correspondence in front of me to know what time that would have been received. It would have come through email.
Q Do you know if that was sometime around 6:00 p.m. on May 30th?

MS. LINDAUER: Your Honor, she -- objection, asked and answered. She answered the question before Mr. Kane gave her an answer to tell you. But she said she didn't have an exact time. So asked and answered.

MR. KANE: No. That's fine, Your Honor. I'll ask a different question.

BY MR. KANE:
Q Ms. Blakeley, I'm going to try and refresh your

recollection. If you saw a copy of that email that was directed to you with the attachments, would you think you'd be able to identify it as an email that you received on May 30th, those documents?

A I would think so.

Q Okay. I'm going to show you -- let me move this over.

THE COURT: Mr. Kane, before you go to that, the document we were just looking at, was that your Exhibit 60?

MR. KANE: The document that we're currently looking at is Exhibit 60A, Your Honor.

THE COURT: 60A. Thank you.

BY MR. KANE:

Q Okay. So let me scroll this down to size so you can see it. Is this the email where you believe Happy State Bank received a copy of the debtor's comments to that Exhibit 60A?

MS. LINDAUER: Your Honor, if we might, what exhibit is that?

MR. KANE: It's not.

MS. LINDAUER: It's not. So, Your Honor, it's not a document in evidence at this time.

MR. KANE: That's correct.

MS. LINDAUER: It hasn't been authenticated and hasn't been proven up.

MR. KANE: That's what I'm doing right now, Your Honor.

MS. LINDAUER: She's not on the list of people receiving that document.

THE COURT: So I believe I see her in the to field.

MR. KANE: Yeah. It says Julie Blakeley right there below May 30th, 2022.

MS. LINDAUER: Okay. But this isn't a document from the debtor. It's a document from you, Mr. Kane.

MR. KANE: That's right. And I'm using it to refresh the recollection of Ms. Blakeley. I haven't sought to have this admitted into evidence.

THE COURT: So I'll overrule the objection. And you may continue.

BY MR. KANE:

Q Ms. Blakeley, you're familiar with this email?

A Yes.

Q And down here in this to line, there's an email before that says to Julie Blakeley, and then it shows an email address Jblakeley@HappyBank.com. Is that your email address?

A That is my email.

Q And is it your recollection in this to line that this Julie Blakeley is you?

A Yes.

Q Okay. And I think you testified that you understood that this was the email that you received that had the debtor's revised versions of the release of collateral transfer of note

and lien.

MS. LINDAUER: Your Honor, I'm going to object. This is -- again, he hasn't offered it yet but it's hearsay. It's an out of court statement being offered for the truth of the matter. It's an email from Mr. Kane to various persons outside the court. And this would be a hearsay document as presented. And it also lacks foundation.

Just because she received an email doesn't make the information contained in there true and accurate. So this is Mr. Kane's testimony, not Ms. Blakeley's. So, Your Honor, we'd object that it's a hearsay document, and that no further questions should be asked about it at this time.

MR. KANE: Your Honor --

THE COURT: Well --

MR. KANE: -- I'm happy to respond to that. I think Ms. Lindauer's point is at least somewhat on target in that the actual email correspondence here talking about we are fine with these changes and how this would be proceeding that I sent to Ms. Blakeley is not being offered for the truth of the matter asserted.

We're not offering this to show that hey, we're good with these changes. It wouldn't matter if we were. It mattered whether Happy State Bank was. This is being shown, or brought forward to show that they simply received the documents. I mean, I think that --

MS. LINDAUER: What --

MR. KANE: -- the prior exhibits had been offered into evidence I believe it was to show the status of any matters and steps towards closing, not for the truth of the matter asserted. And that's exactly what this document shows.

MS. LINDAUER: Your Honor, if I might take the witness on voir dire just for a moment on this particular exhibit?

THE COURT: So the hearsay objection is overruled because it's not being offered for the truth of the matter asserted in the email. The other objection was I guess lack of foundation. Is that what you're wanting to ask the witness about?

MS. LINDAUER: That, Your Honor, yeah because Monday, May 30th was a federal holiday and the bank was closed. And if he's trying to say that she received this on Monday, May 30th at almost 6:00 p.m. on a day the bank was closed, then I think if he's offering it to show that she received it that day, that time, then I think that there is a lack of foundation there because unless she was working that day at almost six o'clock, that was not a -- that was a bank holiday. So I do think that if he's trying to show it for notice that day and time, I think there is a question there, Your Honor.

THE COURT: So, Ms. Blakeley, do you recall when you received this email?

THE WITNESS: I don't recall when I saw it. I know that the bank was closed on that day. But whether or not I would have saw it after hours, I don't recall. I know I addressed everything with them starting early on Tuesday the 31st.

THE COURT: But you did see this email either the 30th or the 31st?

THE WITNESS: The email looks familiar. I don't recall exactly when I opened it. But I do remember seeing it.

THE COURT: And were you monitoring your emails on or about this time even though it was a bank holiday either the 30th or the 31st?

THE WITNESS: I probably was looking at something at some point getting ready for the meetings that I had early on Tuesday. But I don't recall, I just can't recall if I looked at this late on Monday or if it was early Tuesday.

THE COURT: But it would have been one of those two days?

THE WITNESS: Yes.

THE COURT: All right. Mr. Kane, you can go ahead. The foundational objection is overruled.

MS. LINDAUER: Your Honor, if we're going to offer this, I'd like it marked as an exhibit. We need a number. And I would like Mr. Kane to please send me a copy of it.

THE COURT: So he hasn't offered it yet. But --

MS. LINDAUER: Okay. Well --

THE COURT: Are you going to offer --

MS. LINDAUER: -- fair enough.

MR. KANE: Yeah. Honestly, I don't think I even need to offer this. I mean, I'm happy to continue with this if you will.

BY MR. KANE:

Q But, Ms. Blakeley, there are two attachments referenced on this email, correct?

A It shows that there's two. Yes.

Q Okay. And do you recall seeing those attachments at some point before the end of May 31st?

A I believe so.

Q Okay. Do you recall this being one of those attachments?

A I believe so. I don't know what's the difference on it. But yes, that was one of the ones that was listed.

MS. LINDAUER: Your Honor, again, we're a little bit in the blind on here because I don't have this document, and I'm having to rely just what he's putting up on the screen. Could I ask --

MR. KANE: It's --

MS. LINDAUER: Could I ask Mr. Kane to please send us a copy of this document so that we can at least have a chance to look at it prior to redirect of Ms. Blakeley?

MR. KANE: Yeah. I'd be happy to, Joyce. I mean, I

will say that these documents are also in your exhibits, the attachments are. They're attachments that we received.

MS. LINDAUER: Yeah. I don't think your cover letter though, John, was in my exhibits.

MR. KANE: I'm happy to forward that to you.

MS. LINDAUER: Thank you. Appreciate it.

THE COURT: Why don't you take 30 seconds and send her that so that that's off the table.

MR. KANE: I'll do that right now.

(Pause)

MS. LINDAUER: Your Honor, y'all can continue. I've got somebody grabbing it for me. I appreciate that.

THE COURT: All right. Go ahead, Mr. Kane.

MR. KANE: Okay. Just one moment. Okay. Ms. Lindauer, I've sent that over to you.

MS. LINDAUER: Thank you. Appreciate it.

BY MR. KANE:

Q I'm going to share my screen again, Ms. Blakeley, make life a little bit easier here. Okay. We were on this first attachment A which take a close look at that if you can. And then I'm going to turn your attention to Exhibit 65B. And this is a document that has been admitted into evidence. Okay. I want you to take a good look at this. Does this appear to be the same document as this Exhibit 65B?

A Are you asking me if it's the same exhibit?

Q Yes.
A Yes.
Q If that's your understanding.
A It looks the same.
Q Okay. And then I'm going to show you a document that's been admitted into evidence called Exhibit 65C. Let me reduce this down. I believe Ms. Lindauer asked you questions about this previously as a redline of the release of collateral transfer and note?
A Yes.
Q Does that document appear to be the same as what is now being shown as Exhibit B? And just to make things easy, I can switch between them if you like. Here's 65C, and then here was that attachment B. Do you see any differences at all?
A Well, I just see the one that has the redline changes. And I do notice that, yes.
Q Right. So does that appear to be the same exhibit as Exhibit 65C which is now being shown on your screen?
A It looks the same to me.
Q Okay. So is it your understanding then that you received the document that's titled Exhibit 65C. It was at least emailed to you at some point in the evening on May 30th. Is that right?
A It was, yes.
Q And you believe that you saw that on either the 30th or

the 31st?

A Correct.

Q And same thing with Exhibit 65B. It's your recollection that this was emailed to you on the evening of May 30th?

A The original one that we had, because we have reviewed and executed. I believe that we had reviewed that on the 27th.

Q Okay. And but I want to make clear here, there was a redline that was circulated to you on May 30th. And that's that Exhibit 65C, correct?

A Correct.

Q And the redline that was forwarded to you or provided to you was provided by HNGH Turtle Creek, LLC's counsel. Is that your understanding?

A Yes.

Q And that document is the same as this document titled Exhibit 65C.

A Yes.

THE COURT: Mr. Kane, just so I'm understanding, the email that you did not yet offer into evidence, the one that was sent on the 30th and received either that day or the 31st, the two attachments 65B and C were attachments to that email. I think understand that, right?

MR. KANE: That's correct, Your Honor. And really, only thing I'm going for is Ms. Blakeley's acknowledgment that she received from HNGH the debtor's revised documents on

May 30th. Maybe she looked at them on the 30th or the 31st, but that's all I was trying to do was to refresh her recollection on that issue. And I think she's testified to that fact.

THE COURT: I understand. Is there any reason not to make that May 30th email an exhibit?

MR. KANE: I'm happy to offer it into evidence, Your Honor. And we will exhibit -- or we will mark it as Exhibit 121 and 121A and 121B. And we can file that as a supplement on this Court's docket.

THE COURT: That's fine. You can file it tonight or tomorrow just so that we have the official exhibit in evidence. So are you offering?

MR. KANE: I am, Your Honor. I'm offering that into evidence.

THE COURT: I don't hear any objection, so I'm going to --

MS. LINDAUER: Your Honor, just -- no, no, no. Hang on, Your Honor. I had to get off mute. I'm sorry.

And just for the record, we renew our objection, Your Honor, that I believe that for notice only I understand. But for the actual truth of the matters asserted therein, we would object that it's hearsay because it's an email from John Kane to Vipin Nambiar, his client, and Julie Blakeley, Nate Christiansen. So clearly, correspondence outside the

purview of this Court.

And then also, the email at the bottom is from Vipin Nambiar to Julie Blakeley, cc John Kane again. And there's no foundation for that piece of it because Mr. Nambiar obviously is not the one testifying here. But again, I think you have hearsay, and further hearsay in the email below.

THE COURT: So the hearsay objection I already overruled because I believe Mr. Kane said he was offering it not for the truth of the matter asserted but just to show that the document was sent and received.

MS. LINDAUER: Right.

THE COURT: Am I correct, Mr. Kane?

MR. KANE: That's correct. And, Your Honor, to address Ms. Lindauer's concern about that second portion of the email, I mean, I think that we can redact that out. But give me just one second because I believe that there's already been an agreement that that would be admitted into evidence. So just one second. Let me see if I can't --

THE COURT: Sure. While he's doing that, the hearsay objection is overruled.

MR. KANE: Yeah. Your Honor, Ms. Lindauer already agreed that Exhibit Number 55 would be admitted into evidence for the truth of the matter asserted. No objection, no status pending. I mean, just a full admission. And, Your Honor, here's the Exhibit 55. This is that lower part.

MS. LINDAUER: Your Honor, I'd have --

MR. KANE: I'm sorry, that might actually not be the right email. Hold on. Let me --

MS. LINDAUER: Yeah. Your Honor, I'll hold on that one because I don't have -- I'd have to go back and look at the exhibits to see which one we agreed just for notice and which ones we actually admitted. But --

THE COURT: Before you do that, Mr. Kane can tell us whether or not he thinks that was a previously admitted document.

MR. KANE: Your Honor, in any event, it either is admitted and we'll rely on just the isolated email that's been admitted. If Ms. Lindauer is concerned about that bottom half, we can redact that from the exhibit when we file it with the Court.

THE COURT: But that email string was also sent and was also sent, correct?

MR. KANE: Yes, Your Honor. It was sent to Ms. Blakeley. And Ms. Blakeley and Ms. Blakeley --

THE COURT: You're likewise not offering it for the truth of any matter asserted in the subsequent email train or prior email chain? I don't know if it's subsequent or prior.

MR. KANE: I believe it was prior, and that is correct, Your Honor.

THE COURT: But the email that you sent has the lower

chain in it, correct?

MR. KANE: Yes, Your Honor.

THE COURT: Ms. Blakeley, is there any dispute that you received that entire email chain?

MS. BLAKELEY: No.

THE COURT: And, Mr. Kane, you're offering it just for the truth -- or not for the truth of anything asserted in the email chain, but to show that that email and any other chain was sent and received, correct?

MR. KANE: That's correct, Your Honor.

THE COURT: All right. So the hearsay and foundation objections are overruled.

BY MR. KANE:

Q Now, Ms. Blakeley, I'll try and pick up the pace a little bit. Did you work to ensure that Happy State Bank could deliver a payoff and release of the collateral assignment by May 31st?

A We tried to be very responsive. I stepped out of training to make a special effort to make sure that got reviewed and approved timely. So we tried to be as responsive as we could.

Q And I believe that you testified that Happy State Bank provided a payoff statement and that that payoff statement is Exhibit 72A which is on your screen. Is that correct?

A Correct.

Q Was it your understanding that that HSB payoff would just

come out of the amount that was already due from the payoff amount to HNGH?

A Our understanding is that at the closing that we would receive those proceeds.

Q Okay. But that wasn't in addition to the 40 plus million dollars that was owed under the terms of the note, right?

A We were -- no. We were just concerned with getting the balance of our note paid.

Q Okay. Now to the best of your knowledge, did Happy State Bank's counsel deliver or attempt to deliver that release into escrow on the morning of May 31st?

A We did.

Q And your counsel, outside counsel, is Mr. Carruth, correct?

A Correct.

Q And he was acting on HSB, Happy State Bank's, behalf during the closing on May 31st. Is that your understanding?

A Yes. That is correct.

Q Is it also your understanding that the debtor never provided title company contact information to Mr. Carruth?

A We were never provided any of that information.

THE COURT: So, I'm sorry, Mr. Kane. Re-ask the question. I didn't catch that.

BY MR. KANE:

Q Okay. Is it your understanding, Ms. Blakeley, that the

debtor never provided title company contact information to Mr. Carruth?
A Yeah. We never did receive that.
Q Okay. Are you familiar with this exchange at Exhibit 90?
A Okay.
Q And I'll scroll down so you can see the further part of this exchange. Have you seen this exchange before?
A It may have been on one of the exhibits that was shown to me.
Q Okay. Do you know about when Happy State Bank tried to deliver its release of the collateral assignment of note and lien to the debtor?
A I signed that sometime probably in the morning on Tuesday, May 31st. I monitored that throughout the day. I sent the electronic copy and then waited for instructions of where we needed to route the originals. So we monitored it throughout the day.
Q Okay. Was it your understanding that the only reason that release wasn't provided for closing was because the debtor failed to deliver title company information to Happy State Bank's counsel?
A That's what we were told from our counsel was that we did not have the instructions of what the correct title company was. We did not have a place to send it.
Q Okay. Was it your understanding that if that release had

been filed and recorded at closing Happy State Bank would then have to remit the note and its lien back to HNGH?

A Correct.

Q And at that point, HNGH would be the holder of the note, correct?

A Correct.

Q And is it your understanding then at closing that HNGH would actually be the party delivering the note to be stamped paid once funds were actually released and paid out?

A Correct.

Q So then it is feasible, it's your understanding that it's feasible that an HNGH representative could have taken possession of the note on May 31st at closing and delivered it to the debtor upon a payoff.

MS. LINDAUER: Your Honor, objection. Speculation. She doesn't know that. She does know what an HNGH representative would have or could have done. She can testify as to what Happy State Bank might have done, but not what HNGH would have done. So, Your Honor --

MR. KANE: That's fair.

MS. LINDAUER: -- I would object to that.

MR. KANE: Your Honor, I agree. I'll restate the question.

BY MR. KANE:

Q Ms. Blakeley, was Happy State Bank prepared to deliver the

note to an HNGH representative?

A We were prepared to deliver the note.

Q Okay. Now I want to make clear here too. It's your understanding that Happy State Bank has possession of the note.

A We do.

Q I think you testified to that, right?

A Yes.

Q But that HNGH is still the payee under the note.

A Correct.

Q And subject to certain notices and consents, HNGH still has the authority to enforce its rights and remedies under the note.

A Yes.

Q And to the best of your knowledge, if and when HNGH was required to provide Happy State Bank notice and obtain its consents, it did so.

A It did.

Q And Happy State Bank had no objection to the steps that HNGH had taken in the bankruptcy case to enforce its rights and remedies under the note. Is that right?

MS. LINDAUER: Objection. There's no foundation for that. She doesn't know what steps and procedures HNGH had taken. She had never even seen the agreed order. So, Your Honor, I -- there's no foundation for that question.

MR. KANE: Your Honor --

THE COURT: Okay. I'll sustain the objection. If you want to ask a few more foundational questions, feel free.

MR. KANE: You know, and honestly, I don't think I need to, so let's -- I'll just move on.

BY MR. KANE:

Q Today would you say that Happy State Bank and HNGH Turtle Creek, LLC maintain a good and cooperative business relationship?

A We --

MS. LINDAUER: Objection. Relevance. Objection. Relevance. What difference does it make what Happy State Bank and HNGH do with each other today? So, Your Honor, it's not relevant to these proceedings.

MR. KANE: I think it goes to the cooperation between the two entities to follow through on a closing. I think it's very telling.

MS. LINDAUER: Your Honor, not today. He said do they maintain a good relationship today.

MR. KANE: It doesn't --

MS. LINDAUER: The closing was May 31st.

MR. KANE: I'm happy to address that if that's Ms. Lindauer's objection.

MS. LINDAUER: Your Honor, it's --

THE COURT: Go ahead and re-ask a different question.

BY MR. KANE:

Q Ms. Blakeley, would you say that Happy State Bank and HNGH maintained a good and cooperative business relationship --

MS. LINDAUER: Objection.

MR. KANE: -- through May 31, 2022, at 5:00 p.m.?

THE COURT: Ms. LIndauer, let him -- let him ask the question you --

MS. LINDAUER: All right. Understood.

THE COURT: -- state objection. So restate the question. Ms. Blakeley, don't answer because Ms. Lindauer is apparently going to object, but I'd like to get the question in first.

BY MR. KANE:

Q Ms. Blakeley, would you say that Happy State Bank and HNGH maintained a good and cooperative business relationship through May 31, 2022, at 5:00 p.m.?

THE COURT: Ms. Lindauer, I'm pausing. Do you have an objection to that question?

MS. LINDAUER: Well, I do, but I'm going to let her answer it and we'll see what she says.

THE COURT: All right. Then no objection. Go ahead and answer, Ms. Blakeley.

THE WITNESS: Yes. We had a good relationship. They were performing as agreed.

BY MR. KANE:

Q Okay. Can you think of any good reason why the debtor

wouldn't provide Happy State Bank the title company information when Happy State Bank was trying to deliver the release of collateral assignment of note and lien?

MS. LINDAUER: Your Honor, objection. No foundation as to what the debtor did or did not do on that day. And again, it's speculation on her part.

MR. KANE: Your Honor, Exhibit 90 has been admitted into evidence and we have testimony from Mr. Marx who acknowledged the foundation of that document.

MS. LINDAUER: Again, Your Honor, that doesn't have anything to do with the question he just asked her. And if he's already got an exhibit in, then the exhibit speaks for itself. It's been admitted.

THE COURT: So I'll overrule the objection.

Do you remember the question, Ms. Blakeley?

THE WITNESS: Oh, I'm sorry. Can you restate the question for me?

BY MR. KANE:

Q Yes, Ms. Blakeley. It's do you have any good reason why the debtor wouldn't provide Happy State Bank title company information when Happy State Bank was trying to deliver the release of collateral assignment of note and lien on May 31st?

MS. LINDAUER: And, Your Honor, same objection. No foundation. Speculation as to what -- why the debtor would or would not have provided such information, assuming that it

wasn't provided.

THE COURT: So I'll overrule the objection.

THE WITNESS: I don't know why they would not have provided it.

MR. KANE: Your Honor, I'll pass the witness.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q Ms. Blakeley, why is it that your --

THE COURT: The Court will now -- before you go, well, go ahead. Mr. Carruth, I was going to -- I assume you don't want to ask your client any questions before Ms. Lindauer does.

MR. CARRUTH: Correct, Your Honor. Thank you.

THE COURT: All right. Ms. LIndauer.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Ms. Blakeley, you've been corresponding in connection with this transaction with Mr. Kane, correct?

A Correct.

Q And you had a number of emails from Kane back and forth over several days prior to May 31st. We saw those, correct?

A Yes.

Q Did you -- Mr. Carruth also had listed Mr. Kane on emails as well. Is that right?

A Yes.

Q Okay. So why didn't Mr. Carruth simply ask Mr. Kane who the title company was that was handling the closing?
A I believe he was corresponding trying to get that information.
Q And Mr. Carruth could have gotten the information from Mr. Kane. Is that right?
A I don't know. I know that he was asking for that information.
Q Did you hear the name Sendera Title at any point and time?
A I believe I've seen it on some correspondence.
Q Why don't we take a look at Exhibit 72? You can pull that up, Sidney. And this is a lender's exhibit, Your Honor.
THE COURT: Thank you.
BY MS. LINDAUER:
Q This is an email from John Kane to me and Mr. K. Walji copied to a Julie Lissey. Do you see that?
A I do.
Q Okay. Do you know who Julie Lissey is?
A No.
Q If I tell you she's a representative at Sendera Title does that clarify anything for you?
A Okay.
Q All right. So on May 31st at 11:03 a.m. John Kane sends an email to me, Mr. K. Walji, and Mr. Walji and Julie Lissey at Sendera Title. Attached is the payoff statement for a Happy

State Bank collateral assignment resolution. Do you see that?
A I do.
Q So clearly Mr. Kane knew on May 31st at 11:03 a.m., the day of the closing, that Sendera Title was still in this loop because he provided your payoff statement to them. Do you see that?
A I do.
MR. KANE: Objection. Calls for speculation.
MS. LINDAUER: Well, there's no speculation. Mr. Kane provided your payoff statement to Sendera Title. Did you know that, Ms. Blakeley?
THE COURT: So I'll sustain the objection. I believe the witness said she doesn't know Julie Lissey.
Mr. Kane, is there any dispute that Julie Lissey is with Sendera Title?
MR. KANE: No, Your Honor, there's not. And I'll stipulate that I did provide that payoff statement to Julie Lissey at that point.
MS. LINDAUER: All right.
THE COURT: Okay.
BY MS. LINDAUER:
Q So the morning of the closing date there's correspondence with Sendera Title from Mr. Kane. Yet, a couple of hours later, Mr. Blakeley, when you guys are allegedly looking for a title company to send your documents to, you're saying no one

is telling you who the title company is. Is that correct?
A Yes. We had asked for that. We did not receive confirmation of who the title company was and where to send it.
Q Were you advised that your payoff statement had been sent to Sendera Title?
A No. I don't recall. All I sent the payoff statement, I sent it to John Kane as requested, but I wasn't party from that point forward.
Q Now you said you sent it to John Kane as requested. What did Mr. Kane request of you?
A The notice that he sent on the latter part of May requested a payoff statement and the review of the release.
Q And the payoff statement that you sent was actually directed to your borrower, HNGH Turtle Creek, LLC. Is that correct?
A It would be for our borrower, yes.
Q And do you have any understanding of what the transaction was that was supposed to close on May 31st?
A I did understand that there was a closing that was happening on the 31st that would have paid off their debt.
Q You said you were prepared to send the original note to the title company. Is that correct?
A We were prepared to release that upon payoff, yes.
Q Let's be clear about that. Upon payoff. So if you had gotten a wire transfer on the 31st of some $26,297,296.96,

let's say by 3:00 in the afternoon, would you have been prepared to deliver your note to HNGH or the title company that afternoon?

A We would have been prepared to deliver what we needed to, yes.

Q Had you actually retrieved the note from your safe on the 31st and you had it in your office ready to deliver?

A I had access to the safe to get it. I had not pulled it out. I was waiting for instruction.

Q Okay. What time does your bank close where you can no longer have access to your safe?

A I need to have one other employee that has access to stay with me.

Q Okay. What time would that cease for you to be able to do that?

A They'll stay as long as I need to. Our lobby closes at 5:00 p.m., but if I needed someone to stay past that, we have access.

Q Had you arranged for the original note to be delivered to someone on the 31st?

A I had it on standby, yes.

Q But you didn't actually have it -- when you say on standby, tell me what that means.

A It means the branch was open and I had staff that were here and ready to access the vault and to retrieve it if

needed.

Q Okay. What time do wire transfers cut off at your bank?

A We can usually transmit, I believe, up until 5:00 p.m.

Q If you transmit money at 5:00 p.m., when will it actually show deposit to the bank?

A I don't know on the receiving side. We typically send it prior to that so that the title companies that were -- we would submit to have time to receive it and take action on their end.

Q If a wire had been sent out at, let's say, 4:00 or 5:00 on the 31st and all you had at that point -- you would not have received that wire, right? You wouldn't receive it until the next day.

A If they're sending it past that cutoff, we may not be able to receive it until the next day.

Q And were you prepared to deliver documents having not yet received the actual funds into the bank?

A We have to receive the funds into the bank.

Q So then it'd have to be credited to the account of your borrower before you would actually have released those documents, correct?

A That is correct. Well, if the title company had receipt of that, yes, they would be able to send that to us. As long as we had receipt of those funds, then we would be able to release.

Q Well, when you say receipt of those funds, that means

actually receipt into your bank, right?
A Correct.
Q You're not going to release documents without the money actually going into your bank account, correct?
A I believe that is correct.
Q All right. And your wire information on your payoff statement is to a location in Happy, Texas. Is that right?
A I don't have that in front of me. It -- we have the --
Q 72, 72A. Where to submit payoff funds. Drop down a little bit, Sidney, or actually it's up a little bit, I bet.
A Okay. Yeah. It does go in electronically, but yes, that is correct.
Q Okay. And where is Happy, Texas, located?
A It's in the panhandle of Texas by Amarillo.
Q Okay. And what time does the location in Happy, Texas close?
A I'm not sure what time their lobby closes, but we operate usually until 5:00 p.m.
Q So the same hours as you have, correct?
A I would assume so.
Q And you have a routing number on there. Is that right?
A It does have a routing number.
Q Does that have a full wire transfer number for wire transfer purposes on that address? It has a routing number. Does it have an ABA number or any other related numbers it

could be sent from?
A No. That is the ABA number right there.
Q All right. And doesn't it require a phone call to the bank in order to verify before funds are actually sent?
A There is usually a verification process.
Q And who would that phone call have been made to in Happy, Texas?
A Well, it wouldn't have been to Happy, Texas. It would have been to our borrower.
Q Why would it be to your borrower?
A If we're receiving money -- okay. Well, I guess this is money that's coming to us. Is that what you're asking?
Q Yeah. Money would be --
A Okay.
Q You were sending a payoff or somebody was sending a payoff statement for 2999TC to send money to Happy State Bank. And so my question is, is who at Happy State Bank would they be calling in Happy, Texas to be able to verify the transmission of these funds?
A There should be a number on there or some kind of contact for our wire department. Our wire department would have handled that.
Q There's a phone number. There's not an actual person's name. So that would be the number that would be called?
A Correct.

Q And just to be clear, your bank was closed on May 30th, is that right, at all locations?
A Correct.
Q Do you have any knowledge when Mr. Kane sent over his wire transfer instructions for monies to be wired to HNGH? Do you know what time those were sent over?
A No, I do not.
Q And I assume you're not the person at the bank that handled wire transfers. Is that right?
A I do not.
Q Okay. Let's take a look at Exhibit 60. Pull that up. Mr. Kane asked you a few questions about those documents. This is an email from Mr. Kane to you copied to your borrowers, Mr. Nambiar and Nate Christensen (phonetic). Is that correct?
A Yes.
Q Okay. That was not copied to 2999TC, me or Mr. Walji or anybody else, right?
A Right.
Q Okay. And it says, please have your team review the attached. It will be held in escrow pending payment in full. Please also provide a payoff for May 31st if you can. Do you see that?
A I do.
Q Who was supposed to be holding these documents in escrow?
A You're asking who would be holding them?

Q Yeah. He said it will be held in escrow pending payment in full, so who was supposed to be holding in escrow the release of collateral transfer of note and lien?

A My assumption --

MR. KANE: Ms. Lindauer -- hold on. I just -- for clarification, are you asking her understanding?

MS. LINDAUER: Yes.

MR. KANE: Okay.

BY MS. LINDAUER:

Q What was your understanding of Mr. Kane's email to you?

A My understanding would be that that would be a title company.

Q Okay. So it wasn't going to be HNGH holding these documents in escrow?

A Correct.

Q And were you aware, Ms. Blakeley, that 2999TC had been advised a few weeks earlier that Happy State Bank had nothing to do with this particular transaction?

MS. LINDAUER: Objection. Assumes facts not in evidence and no foundation.

MS. LINDAUER: Your Honor, I can ask her about her knowledge, if she was aware that that information had been relayed to 299. Either she knows or she doesn't know.

MR. KANE: Well, and the basis is that the information was relayed. You're asking her if she knows

something and you're stating it like a fact. There's no fact to support even that question. There's no foundation.

THE COURT: So I'll sustain the objection and allow you an opportunity to ask whatever foundational questions you want to ask.

BY MS. LINDAUER:

Q Okay. Let me find the email. Okay. Take a look at Exhibit 90. This is an email. It actually starts on the next page, May 31st, from me to Mr. Carruth. And you've identified Mr. Carruth as being your counsel. Is that correct?

A That is correct.

Q And it's also copied to Mr. Kane. Do you see that?

A I do.

Q It's -- the time is 4:26 p.m. on the 31st. Do you see that?

A I do.

Q So, Jeff, my client is still trying to close his transaction, but all the title documents are coming in so late or not at all. We're not able to close today. Please make sure nothing happens on your end until we can sort this out. We never received anything except the payoff notice today. I think you were trying to get a release also. I don't recall seeing a release of the loan. We did not see an executed release. We are not obligated to pay off Happy State Bank in closing. We were told Happy State Bank was not in this

transaction until the last few days. Please advise to take -- not take any action until we can get some direction from the Court. Do you see that?

A I do.

MR. KANE: Your Honor, if Ms. Lindauer is suggesting that that is the truth of the matter asserted, then it's hearsay. This document was only admitted into evidence to show the status of pending matters and steps towards closing.

MS. LINDAUER: Your Honor, at this time, I'm going to go ahead and offer Exhibit 90, Pages 1 and 2, for the truth of the matters asserted therein. They are emails between Mr. Carruth, myself, and Mr. Kane and each instance are all copied on here. And, Your Honor, at this time, I would offer those as exhibits.

MR. KANE: Your Honor, I believe Ms. Lindauer has been very adamant in her argument early in this case that out of court statements by counsel are hearsay. I think that was her own argument. So --

MS. LINDAUER: I understand, Your Honor, but, Your Honor, the -- Mr. Kane has called into question the facts that are set forth in those emails and made them relevant. And so, Your Honor, at this time I would ask that we -- if he wants to object on the basis of hearsay to his own exhibits, that's fine and we'll get that in through Mr. Kane's testimony himself, but, Your Honor, at this time I think using the same ruling

that the Court used previously, I do think these are admissible now at this time as exhibits. And we would again offer Exhibit 90, Pages 1 and 2.

THE COURT: Give me -- before I rule, I would like -- give me a minute to read this email chain.

MS. LINDAUER: Sure.

MR. KANE: Hey, Joyce.

MS. LINDAUER: Yes, sir.

MR. KANE: Would you like to have -- and, Your Honor, maybe this can resolve this issue. But would you like to have just like a one minute discussion offline about a potential stipulation on this line of discussion?

MS. LINDAUER: Well, I think we're only dealing with this one exhibit right now and so I'd like to go ahead and just deal with this one particular --

MR. KANE: Okay.

MS. LINDAUER: -- exhibit if we could.

THE COURT: So we'll take a three-minute recess and you can -- Mr. -- Ms. Lindauer, why don't you give Mr. Kane your cell phone number so he can call you and --

MS. LINDAUER: Sure.

THE COURT: I'm not suggesting you have to agree to whatever he's proposing, but I need a minute to read these, this email anyway, so we'll take a three-minute recess and then we'll come back.

MR. KANE: Okay.

MR. CARRUTH: Can we give some guidance to Ms. Blakeley on how much longer?

MS. LINDAUER: Well, I assumed we were only going to go about 10 or 15 more minutes, but I could be wrong on that.

THE COURT: So, Ms. Lindauer, are you almost done?

MS. LINDAUER: I am.

THE COURT: Mr. Kane, do you anticipate any more recross? I think you're muted, Mr. Kane.

MR. KANE: Oh, the answer was no, Your Honor. At this point, I don't anticipate the need for recross.

THE COURT: Okay. We'll take a three-minute recess. Ms. Lindauer -- Mr. Kane, do you have Ms. Lindauer's cell phone?

MR. KANE: I do.

MS. LINDAUER: He does. He does.

MR. KANE: I'll call her right now.

MS. LINDAUER: Thank you.

THE COURT: Okay. Three-minute recess.

(Recess at 4:59 p.m./Reconvened at 5:04 p.m.)

MS. LINDAUER: We're ready to go, Your Honor. I mean, yes, ma'am. Thank you.

THE COURT: Okay. So where are we on Exhibit Number 90? There was an objection by -- well, where are we?

MR. KANE: Your Honor.

MS. LINDAUER: Your Honor. Go ahead.

MR. KANE: HNGH will stipulate to the admissibility of this portion of the exhibit to show Ms. Lindauer's state of mind or understanding at the time of this email.

THE COURT: Does that satisfy your -- so this document is already admitted.

MR. KANE: Right.

MS. LINDAUER: Right.

THE COURT: And Ms. Lindauer was asking a question of the witness about this document.

MS. LINDAUER: Right.

THE COURT: Remind me, because I have forgotten. What was the objection?

MR. KANE: Well, so this document was not admitted for the truth of the matter asserted in the provisions of the email. It was admitted to show the status of pending matters and steps towards closing.

THE COURT: Correct.

MR. KANE: Ms. Lindauer is seeking that bottom email from her to the recipients of that email for the truth of the matter asserted. As I understand it, just that specific portion.

THE COURT: Just the statement that says, "we were told?" The sentence that starts with "we were told?"

MR. KANE: I think it's that bottom one that says,

"Jeff, my client is still trying to close this transaction all the way through."

MS. LINDAUER: Right. Your Honor, for purposes of today, that portion will be fine.

THE COURT: So it's admitted previously for a limited purpose and now, Ms. Lindauer, you're offering the same exhibit to be admitted for a broader purpose?

MS. LINDAUER: For all purposes, Your Honor. Correct.

THE COURT: So is the stipulation that Mr. Kane just read, you did not agree to that?

MS. LINDAUER: No. I agreed to that.

THE COURT: I don't -- I didn't understand Mr. Kane to be offering it for all purposes. I think he just said --

MS. LINDAUER: Oh.

THE COURT: -- he was offering it to show your state of mind. Is that --

MS. LINDAUER: Oh.

THE COURT: Mr. Kane, why don't you restate what you think the --

MR. KANE: Yeah. I said HNGH will agree to have this portion, this bottom email from Joyce Lindauer sent Tuesday, May 31, 2022, at 4:26 p.m., to be admitted to show Ms. Lindauer's state of mind and understanding of the facts at the time.

MS. LINDAUER: Your Honor, that's fine. That will work. That's fine.

THE COURT: All right. Then it -- let me get out my witness and exhibit list. Number 90. Admitted to show Ms. Lindauer's understanding?

MS. LINDAUER: Correct. At the time.

THE COURT: Your understanding of the parties' steps towards closing at the time. Is that --

MR. KANE: No. It's her understanding, Your Honor, of the facts that are asserted in that email.

MS. LINDAUER: Correct.

THE COURT: Okay. Then I guess it's admitted for that incremental additional purpose. And I guess when we're finished here today we're going to talk about witnesses. So I will admit it for that incremental, limited purpose, but we're going to talk some more about this when we're finished with Ms. Blakeley.

(Debtor's Exhibit 90 admitted into evidence)

THE COURT: Go ahead.

BY MS. LINDAUER:

Q All right. Ms. Blakeley, if we could look at Exhibit 91.

And Mr. Kane asked a question of you as to why would the debtor not tell you what title company it was using in order for you to be able to deliver your documents.

This is an email from Mr. Walji dated May 31st at 5:00 to

me, copied to Mr. Kane, copied to your counsel, Mr. Carruth, saying:

"For the record, John was well aware that the title company is Sendera Title. Escrow officer is Julie Lissey. In fact, John was communicating with Julie Lissey. I am puzzled why John did not provide the title company information to HSB. That is HNGH's responsibility, especially when we have consistently informed that HSB was not involved in the 299 Turtle Creek property and today we find out there's payoff to HSB."

So this was sent to your counsel, Ms. Blakeley. Were you aware that your counsel was advised as to what title company was being used on May 31st?

And, Ms. Blakeley, I assume you're reading that email before you answer the question. Yeah.

A I'm sorry. Yes. I was reading the email.

Q Yeah. I figured as much.

But just to address Mr. Kane's point, at 5:00 on the 31st, your counsel was specifically advised as to which title company was being used and who the escrow officer was. Do you see that?

A I see the email that you're referencing.

If I recall, there was some confusion. What was relayed to me is there was some confusion on the title company, that

there was a change in that, so I don't -- I think they were still getting confirmation that that was still the correct title company.

Q Okay. Well, this is from Mr. Walji who's counsel for 299TC specifically telling your attorney, Jeff Carruth, that who the title company is and who the escrow officer was. Do you see that?

A I do see that in the email.

Q Okay. So my question to you is when you were provided with that information or Mr. Carruth was, what efforts were made to then transfer your documents over to Sendera Title that evening so that this could close on the 31st?

MR. CARRUTH: Objection. It misstates the email. This is from Mr. K., Joyce, not to me.

MS. LINDAUER: Yeah. But you're CC'd on there, Jeff. Are you saying you didn't receive this email?

MR. CARRUTH: No. I am just -- just the way you asked the question. That's what the objection is.

THE COURT: Why don't you re-ask --

MS. LINDAUER: I'll re-ask the question.

THE COURT: Re-ask the question.

BY MS. LINDAUER:

Q After 5:00 on the 31st, did you make any effort, Ms. Blakeley, to transfer any documents supportive of the closing to Sendera Title?

A I was waiting on instructions. We would have been prepared to send something. We did not receive instructions to send it to Sendera Title.

Q Well, your -- would you acknowledge that Mr. Carruth, in fact, was your counsel?

A Mr. Carruth is the counsel to the bank for this, yes.

MS. LINDAUER: And, Your Honor, I'm almost done. I have one more question.

BY MS. LINDAUER:

Q Will you take a look at Exhibit D23?

MS. LINDAUER: If you can pull that up, Sydney. That's a debtor's exhibit.

BY MS. LINDAUER:

Q Do you see an email at the bottom there, Ms. Blakeley, from John Kane to me, wire instructions for title company? Do you see that? HNGH?

A Yes.

Q Do you see the time that those instructions were sent?

A 3:53 p.m.

Q 3:52 p.m.

A Oh, the first one, yes.

Q That's in the second piece.

A Okay.

Q So 3:52. And a wire sent at 3:52 or 4:00, was that going to hit someone's account that particular day?

A Well, that depends on when we receive it.

Q But you told us for the most part your wires are going to cut off by 5:00, right?

A If they sent something at 3:52, I guess there's still a potential that we could receive those funds in time.

Q Okay. Okay. But do you absolutely know that for a fact or are you just speculating on that and you possibly could have received them?

A I'm speculating at this point because it would have to come through our wire department in time.

Q But the wire instructions from Mr. Kane, do you know, were those split for part to go to your bank and part to go to his client? Do you know what those wire instructions said?

A I'm sorry. Was that a question towards me?

Q Yeah. Well, okay. Let me make it easier, Ms. Blakeley. Let me just rephrase the question.

You don't know from these instructions whether any monies were being asked to be sent to HSB. Is that correct?

A No, I do not.

Q If the money was almost sent to HNGH, let's say at 4:00 in the afternoon, part of it would still have to have been sent to Happy State Bank. Is that right?

A Well, I don't -- I've not reviewed any settlement statement or closing instructions on this to know exactly how that was going to be sent. If we had received a wire and

payment in full at that time, it does look like that would be possible that that could be credited to their account on that same business day.

Q My point being that if the money was sent, all of it was sent to HSB at 4:00 on May 31st, monies -- I'm sorry -- to HNGH, HNGH would have had to have still sent you the 26 million and change that you were looking for. Is that correct? Before you could have transferred your documents.

A We would have to be in receipt of the money. So if they -- I don't know what their instructions were and where that money was going to be sent to know if they would have been at an institution that could have sent it in time. We would have to receive it before our settlement for the day is.

Q You'd agree with me that getting wire instructions at almost 4:00 in the afternoon is pretty late in the day, right, to get a wire sent out?

A It is late in the day. We can hold the wire open. If we have not settled, we can hold it open a little bit. We have some flexibility, but that is getting late, but there is still possibility for us to receive wires.

MS. LINDAUER: Your Honor, I'll pass the witness.

THE COURT: Mr. Kane.

MR. KANE: Yeah. I just have a couple of follow-up questions.

I will be very brief, Ms. Blakeley. I know you've

been on the stand for quite a while.

RECROSS-EXAMINATION

BY MR. KANE:

Q Would it make sense to you that the debtor -- if the debtor had already wired payments to HNGH previously throughout this bankruptcy case that it wouldn't actually need new wiring instructions?

MS. LINDAUER: Objection. Speculation on the part of the witness. She wouldn't know that.

BY MR. KANE:

Q Okay. I'll move to a different question then and I'll share my screen. Ms. Blakeley, I'm going to show you the Exhibit 91 Ms. Lindauer had up. Can you see this document?

A I can.

Q I'll try and make it a little bit larger so you can read it a little bit easier. Do you see the time stamp on this email that Mr. Walji sent to Mr. Carruth, among others?

A Yes, 5:00 p.m.

Q And is it your understanding that this is the first email from the debtor that ever identified the title company to your counsel?

A Not to my --

MS. LINDAUER: Your Honor, I'm going to object. She doesn't know the answer. No foundation for that question to this witness.

MR. KANE: Okay. I'll ask it a different way.

BY MR. KANE:

Q Was it your understanding from Ms. Lindauer's testimony, or I'm sorry, Ms. Lindauer's questioning that this email was purportedly evidence that your counsel had received information about the title company to whom he was supposed to send information?

A I believe that was the assumption that was made.

Q Okay. And do you see this time stamp?

A Yes.

Q And that's 5:00 p.m. May 31st?

A Yes.

Q Okay. I'm going to show you a document labeled Exhibit 16. Now, I'm assuming that you may not have seen this document previously hence the --

THE COURT: Mr. Kane, are we in debtors or lenders?

MR. KANE: Lender's, lender's, Your Honor, Lender's Exhibit 16.

THE COURT: And the only reason I ask is that on my screen your sharing is pretty small, so I've been following along on my own. So Lender's Exhibit 16?

MR. KANE: Yes, Your Honor.

THE COURT: All right. Go ahead.

BY MR. KANE:

Q And, Ms. Blakeley, if we scroll down here towards the

bottom of Page 2, this will be fourth from the top. Do you see this ordered, adjudged, and decreed statement that the payoff deadline shall be extended until 5:00 p.m. Central Time May 30, 2022?

A I do.

Q Did you understand that that payoff deadline was extended one day to 5:00 p.m. May 30th? Or, I'm sorry, May 31, 2022?

MS. LINDAUER: Objection. No foundation for that, Your Honor. No knowledge that she knows anything about the terms of these orders other than what she can read.

MR. KANE: I mean, the response was whether she knew it had been extended one day. I mean, she's participating actively in the closing.

THE COURT: So I'll overrule the objection.

BY MR. KANE:

Q So, Ms. Blakeley, was it your understanding that the payoff deadline had been extended until 5:00 p.m. on May 31, 2022?

MS. LINDAUER: Your Honor, I'm going to object. I'm going to object to no foundation.

MR. KANE: It's the same question. You already objected.

MS. LINDAUER: No.

THE COURT: It's the same question, so.

MS. LINDAUER: Your Honor, no foundation for the 5:00

p.m. There's no foundation.

THE COURT: I've already overruled the objection, so the --

MS. LINDAUER: Thank you.

THE COURT: I think he was re-asking it as a courtesy to Ms. Blakeley, so I'll give you a continuing objection so that you don't have to object again. Go ahead and ask the question so that Ms. Blakeley can answer.

BY MR. KANE:

Q Okay, Ms. Blakeley. Was it your understanding that that payoff deadline had been extended until 5:00 p.m. on May 31, 2022?

A It had been communicated to us that the closing could occur on May 31st.

MR. KANE: Okay, Your Honor. I'll pass the witness.

MS. LINDAUER: No further questions, Your Honor, of this witness.

THE COURT: Mr. Carruth. You're muted, but I think I read your lips that said no.

MR. CARRUTH: No questions, Your Honor. Thank you.

THE COURT: All right. Ms. Blakeley, thank you for your appearance and your time and your patience.

THE WITNESS: All right. Thank you.

THE COURT: You are excused.

(Witness excused)

THE COURT: Okay. It's 5:20. I believe we had set aside tomorrow. Let me take a quick peek at my calendar. So I think I had indicated previously that we would start again tomorrow morning at 9:00. Is that everybody's understanding?

MS. LINDAUER: Yep. That's fine, Your Honor.

MR. KANE: Yes, Your Honor.

THE COURT: Okay. Ms. Lindauer, tell me who else you intend to call and the order, if you can, the order you intend to call them in.

MS. LINDAUER: Okay. Well, depending upon their availability, Your Honor, we still have Vipin Nambiar and Nate Christensen to call.

THE COURT: And I'm sorry. Slow down.

MS. LINDAUER: Okay.

THE COURT: Tell me the next witness you intend to call.

MS. LINDAUER: It would be -- well, and again, it would be up to Mr. Kane which of his clients is available, but it would be Vipin Nambiar or --

THE COURT: Do we -- have you guys been discussing the order of the witnesses before right now?

MS. LINDAUER: No, Your Honor.

THE COURT: Why not?

MS. LINDAUER: Because I think that the way this has been sort of chopped up a little bit, we've been -- now, Mr.

Kane has been sending me emails saying when his people are available and not available. He has been doing that.

MR. KANE: Right. Ms. Lindauer asked whether she would need to subpoena Vipin Nambiar. This was last week. I said if she was calling him to testify on Wednesday, the answer was no.

MS. LINDAUER: Right.

MR. KANE: But the following Friday, which would be last Friday, he would be unavailable.

MS. LINDAUER: Right.

MR. KANE: She then said we may call Nick Christensen instead, who I said would be made available.

THE COURT: So I'm looking at the witness and exhibit lists.

MS. LINDAUER: So, Your Honor, of those two, and again, I'm a little bit relying on Mr. Kane's schedule with his clients, we can go with Vipin Nambiar and not Nate Christensen if we need to. Of those two, if one of them -- if he's not available, but --

MR. KANE: Your Honor, I have no idea whether Mr. Nambiar is available because we have never received this request from Joyce on timing.

MS. LINDAUER: Okay. Well, all right. Your Honor, we don't have to call him next. I'll give you the list of witnesses that we still have to call.

THE COURT: No. I want to -- I would like to figure out who's going tomorrow morning, so.

MS. LINDAUER: Okay. So we --

THE COURT: And this -- frankly, this is something that, Ms. Lindauer, you should be communicating to Mr. Kane.

MS. LINDAUER: Sure.

THE COURT: Because I have stressed before the need to be efficient and for counsel to communicate about the order of the witnesses so that this doesn't happen.

MS. LINDAUER: Right. Well --

THE COURT: So who?

MS. LINDAUER: Okay. So in the order of our witnesses, we would call -- and I'll hold on Mr. Nambiar because I understand Mr. Kane may not know if he's available. Then our next witness would be I think Garrison Kickham is the next witness off our list.

THE COURT: And somebody remind me. I don't -- I'm not sure that I remember who that is.

MS. LINDAUER: That's the PNL Lending person that we saw.

THE COURT: So have you confirmed that Mr. Kickham is available tomorrow morning at 9:00?

MS. LINDAUER: Your Honor, yes, we'll make him available.

THE COURT: You'll make him available?

MS. LINDAUER: Yeah. I believe so, Your Honor. We'll have to contact him, but we'll make him available. I have three people yelling at me. Hang on for a second. Okay. So, hang on.

John, do you know if Nate Christensen is available first thing in the morning?

MR. KANE: I will ask.

MS. LINDAUER: Your Honor, I think maybe Mr. Kane and I can coordinate offline, but I will --

THE COURT: No. I want to get the first witness lined up. If you haven't already discussed his client, then we're going to figure out right now who the next witness is. And if you just -- you just indicated that you could make Mr. Kickham available. He's a PNL representative you could make -- to the extent you have influence over PNL, that person is available tomorrow morning?

MS. LINDAUER: Well, I know that they've contacted him. I think they're waiting. They just texted him to see if he is available.

THE COURT: Just a minute ago you said you would make him available.

MS. LINDAUER: Try to make him available, Your Honor.

THE COURT: Can you -- if there's other counsel that you're talking to in the room, can everybody join the picture, please?

MS. LINDAUER: Sure. I've got Ray sitting here. Come on, Ray. Come on over.

THE COURT: Mr. Rodriguez, why don't you come into the camera. Are there any other lawyers in the room?

MS. LINDAUER: Yeah. We have also Mr. Walji is present, as well. Those are the lawyers in the room.

THE COURT: No. I don't need Mr. Walji. Just your -- just the outside counsel.

MS. LINDAUER: Okay. So, yeah. I've got Ray and myself.

MR. KANE: And if Mr. Walji is present, is there a reason why he's not -- I mean, never mind. It's not my case-in-chief.

THE COURT: So, Ms. Lindauer, I kind of expected you to have your witnesses available and lined up and ready to go, so who are you starting with at 9:00 tomorrow morning?

MS. LINDAUER: Your Honor, again, if I could have Mr. Christensen, that would be our choice, but if that's not possible then on our list -- and I understand Vipin may not be possible either. Then the next witness we would call, I believe --

THE COURT: So it sounds like the request for the lender's representatives wasn't made until just a couple of minutes ago, so.

MS. LINDAUER: Right.

THE COURT: We're going to start with somebody else. Who do you plan to start with tomorrow morning at 9:00?

MS. LINDAUER: Okay. All right. Mr. Walji will be the next witness, Your Honor, on our side.

THE COURT: Okay. So Mr. Walji.

MS. LINDAUER: Right.

THE COURT: Who's coming and how long do you anticipate that taking?

MS. LINDAUER: About an hour on our side and then whatever cross Mr. Kane would have.

THE COURT: Okay. I'm going to -- I'll be a little bit flexible, but I'm going to try to hold you to one hour.

MS. LINDAUER: Sure.

THE COURT: So prepare to be efficient.

Mr. Kane, any idea how long your cross might be?

MR. KANE: I have no idea what Mr. Walji is intending to testify on, so I'm really not sure, but if she's taking Mr. Walji for an hour, my cross will be shorter.

THE COURT: Okay. Ms. Lindauer, who's after Mr. Walji?

MS. LINDAUER: Okay. Can we check with Mr. Kane and see if either of his people will be available after Mr. Walji?

THE COURT: See, if that hasn't already -- if the request hasn't already been made.

Mr. Kane, have you -- is your client looking at

emails?

MR. KANE: Yeah. I expect my client can be made available sometime around lunch time. I mean, I just haven't had an opportunity to nail him down and they have other jobs.

THE COURT: Right.

MR. KANE: So I would expect that I can get my clients available sometime around lunchtime.

THE COURT: Okay. You said your clients. Is that both of them?

MR. KANE: No. That's Nate Christensen.

THE COURT: Okay.

MR. KANE: I mean, I don't have contact with Vipin on his availability tomorrow.

THE COURT: Okay. Ms. Lindauer, who else can you call after Mr. Walji in the morning?

MS. LINDAUER: Your Honor, I think we could call Mr. Barton.

THE COURT: And how long do you anticipate Mr. Barton's testimony taking?

MS. LINDAUER: Probably a little bit longer, so I would think probably about two hours. He's the person that's going to be able to answer your questions about the parallel tracks and things, so he's important in that report.

THE COURT: All right. Mr. Kane, I'll ask you. Would you prefer to have Mr. Walji and Mr. Barton go first and

we get to your client when they're done or do you prefer to try to get your client next after Mr. Walji to the extent he can be available?

MR. KANE: I think we'd be -- I think we can make it work afterwards. I would prefer that.

THE COURT: All right. So we'll start the morning with Mr. Walji, Mr. Barton, but your client will be available and on call for the afternoon when they're finished, right?

MR. KANE: Yes, Your Honor.

THE COURT: And that's Mr. Christensen.

MR. KANE: Yes, Your Honor.

THE COURT: All right.

MR. KANE: And I'm sorry. I do not know Mr. Nambiar's availability. I'm trying to get that information as this is proceeding.

THE COURT: That's fine. So Mr. Christensen.

And, Ms. Lindauer, how long do you anticipate Mr. Christensen's questioning will take?

MS. LINDAUER: I wrote down roughly an hour, 45 minutes to an hour, not that long.

THE COURT: Okay. Who are you going to call after Mr. Christensen?

MS. LINDAUER: Then our next witness would be, -- I think our last witness would be Marshal Dooley, if we get to him. Well, Vipin, we don't know. Vipin is going to work in

here, but Marshal Dooley.

THE COURT: Marshal Dooley, and who is Marshal Dooley?

MS. LINDAUER: He's an attorney, Your Honor, that we've retained as an expert on some of the matters regarding the documentation, real estate attorney, banking attorney.

MR. KANE: Is that in addition to Mr. Marx or I guess Mr. Marx was a lay witness?

MS. LINDAUER: Well, Mr. Marx really wasn't an expert. I don't think we qualified him as an expert.

MR. KANE: I think that's right.

MS. LINDAUER: But Mr. Dooley will be.

THE COURT: Okay. Who do you plan to call after Mr. Dooley? Who's next? And, I'm sorry. What's your time estimate for Mr. Dooley?

MS. LINDAUER: Probably about an hour.

THE COURT: Okay. Who's after Mr. Dooley?

MS. LINDAUER: Well, did we work Mr. Vipin in here? I don't know if we ever got him. That would be the -- last witness would be.

MR. KANE: I've got a notification that he can be available at 3:30.

MS. LINDAUER: Okay. Perfect.

THE COURT: Mr. --

MS. LINDAUER: Nambiar.

THE COURT: You were referring to Mr. Nambiar, Mr. Kane?

MR. KANE: Yes, Your Honor.

THE COURT: So Nambiar. Ms. Lindauer, how long do you anticipate your questions of Mr. Nambiar will last?

MS. LINDAUER: Probably an hour to maybe an hour and 15 minutes. They're all about the same, an hour to hour and 15 minutes.

THE COURT: Mr. Walji, Mr. Barton, Mr. Christensen, Mr. Dooley, Mr. Nambiar. Who do you intend to call after Mr. Nambiar?

MS. LINDAUER: That's all our witnesses, Your Honor. I don't have anybody else unless we call -- yeah. We may have a rebuttal witness, but yeah.

THE COURT: Well, I'm asking for anticipated rebuttal witnesses.

MS. LINDAUER: The only other person, Your Honor, might be Mr. Kane, but I think it might be what we can -- we'll talk to him about some stipulations and maybe we can do it and have it sort of addressed a few of them, but I'd like to have a chance to visit with him about that.

THE COURT: So since you had not discussed this before today, I want to get the list of anybody, any witnesses or anticipated rebuttal witnesses.

MR. KANE: Your Honor, I certainly haven't been

subpoenaed to appear. I wasn't on any witness or exhibit list.

I'm not sure exactly what testimony I would be rebutting since we didn't call any witnesses in our case-in-chief. We had provided notice to Ms. Lindauer that we may call Paul Pruitt as a rebuttal witness. I don't anticipate that we actually need to do that. Maybe depending on Mr. Dooley's testimony, that could come up, but honestly at this point, I don't necessarily think that that would be particularly additive.

THE COURT: Okay. Well, I'm not cutting you off. I'm just --

MR. KANE: Oh, understood, Your Honor.

THE COURT: Right.

MR. KANE: So part of this is I don't know what they're going to attempt to get on direct examination, so it depends in part on what Mr. Barton intends to testify to. If there is testimony about the value of the property, then we have a rebuttal witness from Newark (phonetic) who had previously appraised the property who we would seek to have as a rebuttal witness for 20 minutes of testimony, 15 minutes, and then he would be subject to cross on, I guess, the scope of my questioning.

THE COURT: Is that Mr. Pruitt?

MR. KANE: No. That's not Mr. Pruitt. That's a gentleman named Hayden Littlefield (phonetic)

THE COURT: Oh, so I don't get confused, who is Mr. Pruitt?

MR. KANE: Mr. Pruitt is a -- he is the underwriting title attorney for Title Resources Guaranty Company, which was the company that was to issue the title policy under that Exhibit 33A.

THE COURT: Got it. And so he's a potential rebuttal witness, although you said you don't anticipate calling him. I'm not foreclosing that. I'm just trying to get the list of all potential witnesses.

MR. KANE: That's correct.

THE COURT: And tell me again the name of the second gentleman, Hayden?

MR. KANE: Hayden Littlefield.

THE COURT: Potential rebuttal witness on valuation of property if they get -- I got it -- on valuation.

MR. KANE: Right. We don't really think that's a relevant issue, so we are kind of not necessarily anticipating a need to call him, but if it goes in that direction, that is an individual who we anticipate calling as a rebuttal witness.

THE COURT: Okay. Ms. Lindauer, other than Mr. Walji, Mr. Barton, Mr. Christensen, Mr. Dooley, Mr. Nambiar, and we'll talk about Mr. Kane in a minute, any other anticipated witnesses, whether it's for your case-in-chief or rebuttal?

MS. LINDAUER: Yeah. Your Honor, I missed one before and I mentioned him before, Mr. Kickham. He was our original first witness, but he's the ones that we've been texting about when he's available. So he's still on our list, Your Honor. And again, I think he would be pretty short. He's about one transaction, but so I'd still like to keep him on our list.

THE COURT: Mr. Kickham was with Mr. P -- with PNL?

MS. LINDAUER: PNL.

MR. KANE: I believe it's PLN, but.

THE COURT: PLN, I'm sorry, Private Lender Network, okay, PLN. I'm sorry. I had him, but I scratched him out because I thought you were taking him off, but you were just checking his availability.

MS. LINDAUER: Right.

THE COURT: So where in the lineup is he going, is he coming?

MS. LINDAUER: We can -- well, I'm hoping that we get ahold of him and that he would be after lunch. So he would probably be after Mr. Christensen, but maybe before Mr. Vipin, somewhere in that place. Because I understood Mr. Christensen was around lunch time is my understanding. Is that right, John? And then Mr. Vipin was 3:30, I wrote down. So he would slide in there somewhere between those two.

THE COURT: So we're going to take a lunch break at some point tomorrow.

MS. LINDAUER: Okay.

THE COURT: I will fall out of my chair if we finish with Mr. Walji and Mr. Barton and all cross by lunchtime, although that's possible. So your anticipated order is Mr. Walji, Mr. Barton, Mr. --

MS. LINDAUER: Christensen.

THE COURT: -- Christensen, Mr. -- then Mr. Kickham.

MS. LINDAUER: Kickham.

THE COURT: Then Mr. Dooley.

MS. LINDAUER: Then Mr. Nambiar.

THE COURT: I'm sorry. I'm going to --

MS. LINDAUER: I'm sorry. Mr. Nambiar would be after Mr. Kickham.

THE COURT: I had Mr. Dooley before that. Is that -- I want to get the order of the witnesses?

MS. LINDAUER: Yeah. No. Mr. Dooley would -- well, we can slide him in kind of wherever since he's an attorney, easier for us to get ahold of. I was going to put him after Mr. Nambiar.

THE COURT: Okay. So let me start again. Mr. Walji, then Mr. Barton.

MS. LINDAUER: Mr. Barton.

THE COURT: Then Mr. Christensen.

MS. LINDAUER: Right.

THE COURT: Then Mr. Kickham.

MS. LINDAUER: Right.

THE COURT: Then Mr. Nambiar.

MS. LINDAUER: Right.

THE COURT: Then Mr. Dooley.

MS. LINDAUER: Dooley.

THE COURT: And we'll talk about Mr. Kane in a minute. Your last potential witness would be Mr. Kane.

MS. LINDAUER: Potential, correct.

THE COURT: Okay. So tell me why you want to put Mr. Kane on the stand.

MS. LINDAUER: Your Honor, there are some of the emails that have not been discussed from Mr. Kane and I do think they are emails from him. They've been admitted for notice purposes, but some of them do contain additional information that I think would be probative. So, unfortunately, because they are his emails, he authored them, he's the person that actually would be to ask the questions about what's contained in those emails.

THE COURT: So give me an example of an email.

MS. LINDAUER: Sure.

THE COURT: And why you would have to put Mr. Kane on.

MS. LINDAUER: Well, for example, the perfect one would be the one he wrote to Julie Blakeley about HSB. That's a good example right there. That's an email that he authored

to her and --

THE COURT: Tell me the exhibit number.

MS. LINDAUER: That was exhibit -- it's the one that had the collateral assignment attached to it. Let me find it. Oh, 54, I believe was the email, and it's 54 and 54A. So that's an email that he provided to Julie Blakeley.

THE COURT: Give me a minute.

(Pause)

THE COURT: So I have in my notes that this document was admitted for all purposes. Is that --

MS. LINDAUER: That's correct, Your Honor. It was -- but we have a few questions, for example, on that particular email. In particular, the paragraph, we would like Happy State Bank to agree to rescind.

And again, Your Honor, that's just one example of I think some of the communications that are part of this file. Again, this is not a document we were copied on, of course, but we do have some questions about it and what was going on with regard to this particular transaction on the 26th at 7:00 at night.

Now, again, you know, Mr. Nambiar is on here, so we may be able to ask him the questions and get the answers from him. And if we do, then we -- and also Nate Christensen. We may not need Mr. Kane. But to the extent that it's his email discussing this particular transaction, we may have a few

questions of him.

THE COURT: But if you're able to get that information from the business representatives of the lender then you would not need Mr. Kane, correct?

MS. LINDAUER: Correct. That is correct, Your Honor. And we're going to ask those questions first obviously to try to avoid calling Mr. Kane.

But to the -- so I'm kind of holding him in advance, but to the extent that his clients say, I don't know anything about this or whatever, then I think there could be some questions there. And again, I'm just using that as an example. There are a number of emails that -- and again, potentially probably copied to his client on a lot of them, so may be able to get those questions in from his client.

THE COURT: So, Mr. Kane, if they are not able to get the information they think they need from your business representatives, I guess I want to get a preview of whether or not there's going to be an objection to Ms. Lindauer calling you as a witness.

MR. KANE: Yeah. I think that there is, Your Honor.

I mean, I personally think that this a very clear-cut attack to try and get me off of this matter, especially through closing argument, and that it isn't even particularly veiled. But to that, to the rest of that extent, rebuttal testimony has to require a direct contradiction.

And I'm not sure exactly that Ms. Lindauer has identified anything that would actually rebut an issue that would set forward in our case-in-chief. Clarification or additional information about an exhibit is not a rebuttal. That's -- it's inappropriate for a rebuttal witness in that case.

That's one of those situations where Ms. Lindauer had an opportunity to identify me and subpoena me as a fact witness in this case to provide clarity about exhibits or whatever, and she chose not to do so. And so here we are. We're well after the close of our case-in-chief. And for the first time now Ms. Lindauer has tried to identify a second means of getting me on the stand. And that is through rebuttal, but she hasn't pointed to any kind of email where there is a direct rebuttal required.

We have some questions about that. We think that additional questions would be probative. That is a stock case-in-chief fact witness.

MS. LINDAUER: Well, Your Honor, first of all, let's go back. So this is their motion and they've put on all of these emails and then they rested, okay. And we're now in our case.

And for me to be able to address emails Mr. Kane has put into evidence, whether for notice or for any other purpose, if it's an email he drafted then he is the person who would

need to respond to those particular emails, I would think. So that's the reason we're asking that.

Second, we are not seeking to disqualify Mr. Kane from continuing to participate in this proceeding. I mean, we have not asked for that. We don't intend to ask for that. So --

THE COURT: Didn't you -- I could be wrong. Wasn't that raised in one of your pleadings?

MS. LINDAUER: Did we raise that, Rey? I don't remember raising it.

MR. RODRIGUEZ: We may have.

Your Honor, the complexion of these cases changed. So if you need a stipulation from us right now that we are not going to move to disqualify Mr. Kane so that we can actually get his testimony and get behind these documents, we're happy to make that stipulation just to have a fundamentally fair proceeding.

The alternative, Your Honor, is to strike all the exhibits that have Mr. -- that come from Mr. Kane.

MR. KANE: (Indiscernible).

MR. RODRIGUEZ: (Indiscernible).

THE COURT: We're not going to go there right now because all of those exhibits were admitted by agreement --

MR. RODRIGUEZ: Yes, sir. They were.

THE COURT: -- I believe before Ms. Lindauer filed a

supplemental witness and exhibit list listing Mr. Kane as a witness, so.

MR. RODRIGUEZ: Yes. You're right, Your Honor. Absolutely.

But things have changed and Your Honor has plenary power over these proceedings and can change his rulings as appropriate to ensure the fair administration of justice. Mr. Kane doesn't want to take the stand because he doesn't want to answer questions about what's behind these documents. We're offering to stipulate we're not going to try to disqualify him or anyone at his firm for these proceedings.

THE COURT: So, Ms. Lindauer, tell me again what would you propose to get out of Mr. Kane on this -- let's just use this email as an example.

MS. LINDAUER: Okay. So, actually, there's probably a better one. Let me give you a better one because I just was flipping through these. That one is one, but take a look at Exhibit 76. So that was Mr. Kane's response, if you remember, to the May 30th letter that we sent out with the sort of laundry list of what we perceived as needing to be in the closing documents.

And so this was basically his response to our laundry list. I mean, this again is a document coming from him to me. And it basically is going point-by-point through those particular documents. And so, again, there would potentially

be some questions, like, for example, like Number 6, release of UCC. This is not necessary for closing and can be filed after with a UCC-3.

And so, again, just asking some questions, you know, on some of his positions, if you will, about what was necessary for the closing in order for us to fund. And again --

THE COURT: So you want to cross-examine him about his -- the legal basis for why he believes that's not necessary for closing?

MS. LINDAUER: Correct.

THE COURT: Why isn't that just an argument for each of your closing?

MS. LINDAUER: Well, I think it's that too.

THE COURT: He's stated the fact that's his position. I understand you'd take a different position, correct?

MS. LINDAUER: Right.

THE COURT: Haven't you made the point and you can each try to persuade me at closing why that was or was not necessary?

MS. LINDAUER: Well, I think we can do that too, Your Honor, but I mean I think it would be essentially helpful and yet --

THE COURT: Well, if we can do it too, I'm --

MS. LINDAUER: Yeah. Like what's the -- so like on this one, for example, Nate Christensen is copied on this, so

of course our first line of questions will be to Nate, not to John. But let's assume for a --

THE COURT: So but I'm asking you about what you anticipate asking Mr. Kane about. He's told you in this email -- and again, this email was not admitted. This is Exhibit Number 76. It was not admitted for the truth of the matters asserted in the email.

MS. LINDAUER: Right. And we would then offer it through Mr. Kane for the truth of the matters asserted in the email with the ability to ask him some questions about it. We didn't agree to allow these for the truth of the matter because we didn't have a sponsoring witness to ask questions from.

MR. KANE: But that's not a rebuttal witness. I mean, this goes back to my argument, Your Honor, is this isn't a rebuttal issue. They are not providing a separate witness to rebut the statements that are asserted.

So they could offer like say Marshal Dooley who could come in and say, because now it's their case-in-chief, in my experience as an expert, a release of a UCC-1 or a UCC-3, you know, release statement needed to be filed at the time of closing, so I believe Mr. Kane is incorrect. That's the purpose of a rebuttal witness. What they're trying to do is call me as a formative fact witness for their case-in-chief to testify about specific items related to closing in these documents.

MS. LINDAUER: Right.

MR. KANE: It's totally inappropriate. I was never designated as a witness. This is a last second collateral attack.

MS. LINDAUER: Well, you were designated as a witness on a supplemental exhibit and witness list that was filed with the Court.

MR. KANE: Which was denied.

MS. LINDAUER: Well, it's not denied. I don't think it was denied, Judge. It's a list. It's not a motion. We filed a supplemental list right after the hearings. I think it was the second day.

MR. KANE: After the close in chief. It was a motion. It was a motion.

MS. LINDAUER: It was a motion to continue that was denied, but the list was filed and you were on the list.

MR. RODRIGUEZ: And likewise, that list had the order of all of our witnesses, Judge. They've been there, so no surprise there.

Mr. Kane is probably best positioned to rebut the statements that are made in his emails because when we dig down to it, when we ask him, what was your rationale? What was the lawful reason behind what you said? I think it's going to be very telling to get those answers. I'm speculating here, but I think the rationale is that his client bosses told him so. He

didn't have any other reason to do this other than his clients told him so.

MR. KANE: Yeah. So --

MR. RODRIGUEZ: And we'll be able to show, Your Honor, that these clients have been overreaching from day one. They've taken millions of dollars from my clients (indiscernible).

MR. KANE: (Indiscernible).

MR. RODRIGUEZ: I'm still talking, Mr. Kane. I'm very quiet when you speak, so please let me finish speaking.

And so it's going to lay predicate to give the Court context for what's in these documents. Mr. Kane is very quick to use words like misrepresentation and misleading and bad faith. We'd like the opportunity to rebut his documents. He chose, Your Honor, to put a fictional list of witnesses together and he never intended to call them. We've heard that from witnesses saying, we were never called to come testify. He faked us out.

Now is the time we have to repair this. Had these witnesses been called, we could have gone into these topics, but they weren't.

He's a very savvy litigator, Your Honor. This is the way his clients want him to litigate cases, not the way I learned, not the way that's acceptable in my view, but this is where we are. And I have stipulated. I'm now not even going

to offer. I'm going to make the stipulation straight out. WE are not going to seek to disqualify Mr. Kane or his law firm in these proceedings on this motion to enforce. We just want to get the truth. That's all.

THE COURT: So I'm going to ask one -- I'm going to ask it again because I'm not sure I understand Ms. Lindauer's answer. This -- I asked this email that had a list of items. And the one I gave -- I think you suggested it as an example, Ms. Lindauer, was Number 6. You wanted to know why Mr. Kane thought a release is not necessary. Is that -- did I understand Ms. Lindauer correctly?

MS. LINDAUER: Well, Your Honor, that was just an example. Correct, Your Honor. 6A.

THE COURT: Right. But I kind of want to -- and you said this is the most relevant example and you're -- and I'm trying to understand. You want to put Mr. Kane on the stand to testify about his legal reasoning for concluding that a release for UCC-1 is not necessary. Is that correct?

MS. LINDAUER: Well, what's the basis for him saying that it's not necessary for closing when -- yeah, exactly. The point was that on May 31st when we were trying to close, we were trying to get all the documents lined up, this was the letter that we got at lunchtime basically saying that there's a number of documents on here. He didn't even address all of them, but that there are a number of them on here that did not

need to be provided.

And, you know, another question is what happened to the other -- all the other documents that we asked about? Of course, those were not provided either. But at least with regard to this particular list, fair enough to ask him some questions about this. I mean, this is his position.

THE COURT: Why?

MS. LINDAUER: Yeah.

THE COURT: That's his legal position. Why do you need to cross-examine him on his legal position?

MR. RODRIGUEZ: Your Honor, we --

THE COURT: I'm asking Ms. Lindauer first.

MR. RODRIGUEZ: Oh, of course. Apologies, Your Honor.

MS. LINDAUER: Your Honor --

THE COURT: I'll give you a chance to respond, Mr. Rodriguez. I'm just trying to finish with Ms. Lindauer.

MS. LINDAUER: Sure. Your Honor, first of all, I know that these are legal positions. I mean, like Number 1, agreed rescission deed, drafted and circulated 5/12, no comment, signed, notarized. So some of his statements in here, for example, no comments from debtor, is just not accurate. That is not true. And so, you know, again it's in --

THE COURT: If that's not true, then aren't there other emails or documents you can point to to show me why

that's not true?

MS. LINDAUER: Right. But the question is why would he say that there were no comments from the debtor? Why did he make that statement? I mean, honestly, you know, it makes us look bad that he says there's no comments from the debtor, so then I have to go in and pull every email that traded hands to show that there were comments from the debtor. I mean, why did he say that? The only one that knows why he said that is Mr. Kane.

THE COURT: But he either -- okay.

MS. LINDAUER: Signed, notarized, original provided. Original provided to whom? It says it was provided on 5/27. He claims it was provided to the title company. That's fine. So why would you sign, notarize, and provide a special warranty deed when you were aware that there were, in fact, issues arising with regard to the agreed rescission deed? And again, you know, and again, remember the timing. This is the 31st, the day of closing, that we're getting this letter with his responses to the various documents without really any direct resolution, I guess is the point. So again, more fundamentally, why are we even getting this on the 31st? I mean --

THE COURT: Well, that, I have some similar questions of your side, but I guess that will come in closing or I guess with your witness. So I guess you've given me a flavor.

And, Mr. Rodriguez, do you have anything to add? Because I'm not going to rule right now on your requests. I'm not sure you've convinced me yet, but just, Mr. Rodriguez, I didn't mean to cut you off. You can add on to what Ms. Lindauer was saying if you'd like.

MR. RODRIGUEZ: Yes. Thank you, Your Honor. I shouldn't have to reveal my trial or briefing strategy, but I'm going to. If you take a look at the Lender's Exhibit 67A, you are going to see the substantive revisions that Mr. Kane made to our presently effective rescission of deed. And if you look at Page 2, their umbered Paragraph 2, what you're going to see is that Mr. Kane -- and I've got to believe this came at the direction of his clients -- changes the legal instrument's effect from being a present and effective rescission of the deed that was filed and he turns it into a qualified possibility contingent instrument that is going to be void for vagueness. Look what he said --

THE COURT: Where? I'm sorry. I have pulled up 67A. Where are you?

MR. RODRIGUEZ: Their numbered Page 2. And it is the full, the fatter paragraph, Your Honor. It's about six sentences, okay.

THE COURT: Is it the paragraph that says, grantee and grantor have agreed?

MR. RODRIGUEZ: Yes, Your Honor. And if you look at

the third sentence, look at the language. It's future language. Grantee.

THE COURT: This is one long -- this is one long sentence. So are we looking at the same paragraph? I don't see a third sentence.

MR. RODRIGUEZ: Well, third line. Apologies, Your Honor. You're much more precise than I am. It's the third line. You're right.

THE COURT: Okay.

MR. RODRIGUEZ: One of the words he inserts is now "shall," grantee "shall" rescind and avoid the deed, not hereby does or agrees. It says they shall. And then the next paragraph, the next spread of words on that same third line says, "which shall be retroactive and effective as of October 29, 2021."

Is it right now? No. Only -- look at the rest of this in Line 4 -- "upon effectuation of all conditions preceding set forth in the agreed order."

And that is a singular term, okay. So there is no present rescission, Your Honor. This document now says we have to figure out what the conditions preceding are. We have to figure out what the agreed order is because he never defines singular agreed order anywhere in this instrument.

And we have to get an adjudication that the effectuation has occurred to make this rescission ostensibly

effective as of October 29, 201.

THE COURT: And it's your --

MR. RODRIGUEZ: That is not --

THE COURT: Your argument is that this language caused the debtor not to be able to get funding from its lender?

MR. RODRIGUEZ: My argument, Your Honor, I don't know the facts, but I can tell you this. I don't think there's any reasonably buyer, seller, or lender, and Mr. Kane will testify to this, I think, if we get him on the stand, that would think this is sufficient to clear title because it's not --

THE COURT: No. But my question is, is your argument, the language that you're talking about, caused the debtor not to be able to close because it could not get funding from the lender on that basis?

MR. RODRIGUEZ: Your Honor, I don't know factually what happened. I think that's --

THE COURT: Well, I kind of need to know. I kind of would like to know the answer to that because the --

MR. RODRIGUEZ: Well, my client would say the answer is yes. I don't know the facts. I wasn't there, but my client would say the answer is yes. My legal argument, Judge, sit hat this now, what Mr. Kane has created, is not a rescission deed. This is a future --

THE COURT: Okay. But Mr. --

MR. RODRIGUEZ: -- forward-looking contingent document that may or may not ever been deemed to be effective as a rescission deed. Who is going to tell us when all the conditions precedents have been effectuated? We can't even get agreement on what they are. That's my point.

THE COURT: So didn't Mr. Marx -- and again, we beat this like -- well, at least Mr. Marx's testimony for his clients was that all the issues were resolved with respect to the rescission document other than the issue of Texas or Delaware status for the lenders, for the lender.

MR. RODRIGUEZ: Mr. Marx is not the client. Mr. Marx is not involved with every aspect of the financing. He's already told you --

THE COURT: But he --

MR. RODRIGUEZ: -- he was only in some tracts or other. And, Your Honor, no --

THE COURT: But, sorry, but wait a minute. Wait a minute. For his clients, he indicated that all issues related to the rescission were resolved to his and his client's satisfaction other than the issue of Texas and Delaware status of Mr. Kane's client. Were you here for his testimony?

MR. RODRIGUEZ: I don't know, Your Honor, but I'll take your word for it. He's mistaken if that's what he said because you, Judge, as a matter of law get to construe our Exhibit 7, which is a rescission deed, and you get to compare

it to 67A. And you will see that 67A as a matter of law is not a rescission deed. And that is what the agreed order required. Irrespective of what Mr. Marx or Mr. Kane or what I may say about a document being substantially similar to another, that doesn't decide this case. Your Honor has to decide it as a matter of law on the printed words on the written page. People will testify from our witness --

THE COURT: Okay. But let me stop -- let me stop you there. Let me stop you there. If you didn't hear his testimony, I don't think anybody will disagree that Mr. Marx testified ad nauseam that all issues related to the rescission document were satisfied to his and his client's satisfaction other than a very limited issue concerning whether Mr. Kane's client was a Texas or Delaware entity. So I'll -- I heard that. I heard it over and over and over.

MR. RODRIGUEZ: Very good, Your Honor.

THE COURT: So my question -- my question is for you is it the debtor's position that there are other funding sources that did not lend based on this issue that you're raising now, Mr. Rodriguez?

MR. RODRIGUEZ: My understanding from speaking with my clients is yes, that is absolutely 100 percent accurate. And Mr. Marx is mistaken. And you will hear that from multiple witnesses, including from funding source individuals. I'm sorry.

THE COURT: Okay.

MR. RODRIGUEZ: Mr. Marx is a darling man, but Mr. Kane really did have his way with him. You saw what he did in the questioning better than I did. But that's where you --

THE COURT: All right. Okay.

So you've given me a flavor for what's coming. You haven't yet convinced me that Mr. Kane will be put on the stand for this. I'm not deciding that now, but you've given me a little bit of a flavor for what's coming, but we have a few witnesses to get to before then. So unless we have any other housekeeping matters, well, since it's 6:00, we'll recess for the day.

Let me ask you. Does anybody else have any housekeeping matters before we recess and commence again tomorrow morning at 9:00?

MR. KANE: Your Honor, this is --

MR. PHELAN: Yes, Your Honor. I'm doing the closing argument and just for timing purposes, it doesn't sound like we're going to get to that tomorrow afternoon. So would that be your reading?

THE COURT: I think that's -- I think I would bet your next paycheck, Mr. Phelan, that we are not going to finish tomorrow.

MR. PHELAN: That's all I needed tomorrow.

MR. KANE: And, Your Honor, this is John Kane.

I would like just a little clarification. And my assumption is that this will not be an issue because by the time we're prepared to call rebuttal witnesses, they'll be done with their main case-in-chief in the first place. And I don't think that that's going to take place tomorrow.

But our firm retreat is currently taking place and like 95 percent of our attorneys are in San Antonio starting today at noon and going through Sunday. And so if I am going to be forced on to the stand as some for of, and I'll put in quotes, rebuttal witness, I mean, to rebut other people's testimony from their case-in-chief is what it sounds like.

I will need some advance notice because I'm going to have to get an attorney up to speed from our litigation group to participate as counsel to raise objections for lines of questioning and the like. So, Your Honor --

THE COURT: Your firm retreat is going on right now?

MR. KANE: It is going on right now. Yes, sir.

THE COURT: Are you in San Antonio?

MR. KANE: No. I cancelled my flights and hotel reservations and golf for this, so I'm in Dallas.

THE COURT: All right. Sorry to hear that.

MR. KANE: All good.

THE COURT: So I don't think there's any way we're going to get to you tomorrow, if ever. And again, I'm not deciding that issue.

MR. KANE: Understood.

THE COURT: But yeah. There's no way we're going to get to you tomorrow and I'm not going to get to the issue of deciding you tomorrow. So I think at some -- maybe the first thing tomorrow morning what I'd like to do is -- has anybody contacted my courtroom deputy about hearing days for next week?

Ms. Lindauer, have you?

MS. LINDAUER: I would have to ask my staff. I don't know the answer to the question.

THE COURT: Well, ask.

MS. LINDAUER: Possibly, possibly.

THE COURT: Ask your staff if they're there.

MS. LINDAUER: Yeah. Let me see who's still here.

(Pause)

THE COURT: We do have a couple of things on the calendar today that are not hearings, but there are a couple of things that we can work around.

So, Ms. Lindauer, has your staff been in contact with my courtroom deputy about hearing days for next week?

MS. LINDAUER: Apparently not. They've traded some emails about the motions that we filed, but I don't think they actually have any dates that have been discussed. So, to answer your question, no, we don't have any dates.

THE COURT: So -- and you haven't discussed this with Mr. Kane? I guess I'm a little bit frustrated that nobody has

been doing this. This is kind of basic blocking and tackling, getting days lined up, getting your witnesses lined up. And I guess I shouldn't have to be doing this at 6:00 on a Thursday evening.

So we'll take a closer look at our calendar and I will chat with my courtroom deputy and Ms. Smith before we start tomorrow about our available days next week, but this is the type of thing you should be doing. Knowing that we have this many more witnesses, this is something that you all should be doing before we start.

MS. LINDAUER: Yes, Your Honor.

MR. KANE: Yes, Your Honor. And just for some clarity, we are available on Tuesday.

THE COURT: Okay. Okay. Well, I think we'll go ahead and recess and we'll -- I do expect everybody, especially Ms. Lindauer, since these are your witnesses, to be asking their availability for next week.

MS. LINDAUER: Understood.

THE COURT: This is kind of the thing that you would have had available days from my courtroom deputy and checking with your witnesses to find out when they're coming.

MS. LINDAUER: We'll do that, Your Honor.

THE COURT: Okay. We'll be in recess.

(Proceedings concluded at 6:08 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, CRYSTAL THOMAS, and MICHELLE ROGAN, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Crystal Thomas

CRYSTAL THOMAS, CET-654

/s/ Michelle Rogan

MICHELLE ROGAN

LIBERTY TRANSCRIPTS DATE: June 25, 2022