IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Friday, June 24, 2022<br>9:04 A.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For the Debtor: | Joyce Lindauer Attorney, PLLC<br>BY: JOYCE LINDAUER, ESQ.<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| | Robin Phelan Law<br>BY: ROBIN ERIC PHELAN, ESQ.<br>4214 Woodfin Drive<br>Dallas, TX 75220 |
| | Fee Smith Sharp & Vitullo LLP<br>BY: OSCAR REY RODRIGUEZ, ESQ.<br>13155 Noel Road, Suite 1000<br>Dallas, Texas 75240 |
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

# INDEX


| | Page |
|---|---|
| Case called | 3 |
| End of Proceedings | 245 |
| Certification of Transcriber | 245 |

WITNESSES

FOR THE DEBTOR:

KHUDABUKSH WALJI

| | |
|---|---|
| Direct Examination by Ms. Lindauer | 4 |
| Cross-Examination by Mr. Kane | 57 |
| Examination by the Court | 154 |
| Redirect Examination by Ms. Lindauer | 161 |

NATE CHRISTENSEN

| | |
|---|---|
| Direct Examination by Ms. Lindauer | 185 |
| Cross-Examination by Mr. Kane | 234 |
| Redirect Examination by Ms. Lindauer | 236 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| 11A Term Sheet | 22 | 22 |
| FOR HNGH TURTLE CREEK: | | |
| 100 Email Dated 2/24/22 Walji-Kane | 7 | 9 |

(Proceedings commenced at 9:04 a.m.)

THE COURT: -- in the 2999TC Acquisitions case, Case Number 21-31954.

I'll take appearances.

MS. LINDAUER: Your Honor, Joyce Lindauer for 299TC [sic] Acquisitions, the reorganized debtor.

MR. RODRIGUEZ: Your Honor, Oscar Rey Rodriguez, likewise, here for 299TC [sic] Acquisitions, reorganized debtor.

MR. PHELAN: Your Honor, Robin Phelan also for the reorganized debtor.

MR. KANE: Your Honor, John Kane for HNGH Turtle Creek, LLC, the pre-petition lender.

MR. METZGER: Your Honor, Steve Metzger representing Tim Barton individually.

THE COURT: I don't see Mr. Carruth, but I'm guessing he's probably not planning on joining given his client's finishing up on the stand yesterday. So anybody else wish to make an appearance?

(No audible response)

THE COURT: Okay.

Ms. Lindauer or Mr. Rodriguez or Mr. Phelan, I'll turn it over to you.

MS. LINDAUER: Your Honor, I think we're prepared to call our next witness. As we discussed yesterday, we'll try to

stick to the running order that we went over with the Court. We also are in contact with your court staff this morning to check available dates for next week, so hopefully while we're busy this morning, they'll be sorting out those dates unless you've already visited with them about that. So --

THE COURT: Okay. And your next witness is Mr. Walji?

MS. LINDAUER: It is, Your Honor. At this time, I would call Mr. Walji to the stand. He's sitting next to me.

THE COURT: All right. Mr. Walji, if you would, please raise your right hand. And if you could scooch over just a tad because you're off screen right now.

There you go. A tad more so that I can see your right hand.

There we go.

MR. WALJI: How's that?

KHUDABUKSH WALJI, DEBTOR'S WITNESS, SWORN

THE COURT: Thank you.

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Walji, would you please state your full name for the record?

A My name is Khudabuksh (indiscernible) Walji.

Q And, Mr. Walji, could you briefly describe for us your educational background?

A I have a bachelor's degree from the University of Texas in pharmacy and a J.D. degree from South Texas College of Law in Houston, Texas.

Q And, Mr. Walji, how are you currently employed?

A I have my own firm at the Law Office of K. Walji. And I'm also the outside general counsel for JMJ Development Group.

Q And can you tell us for the record who JMJ Development Group is?

A JMJ Development Group is based out of Dallas with the principal Mr. Timothy Barton and his entities.

MS. LINDAUER: Your Honor, can you hear Mr. Walji all right? He's speaking a little bit softly, so I want to be sure we're picking him up.

THE COURT: I can hear him.

Ms. Smith, is that being recorded satisfactorily?

UNIDENTIFIED SPEAKER: (Indiscernible).

MS. LINDAUER: Okay, thank you.

BY MS. LINDAUER:

Q Mr. Walji, you were explaining your role with JMJ Development. Do you have a role with what I will call other Timothy Barton entities?

A (Indiscernible).

Q Okay. Well, do you do work for other entities besides JMJ Development?

A For other clients, yes.

Q Okay. For other Timothy Barton entities besides JMJ Development?

A Yes.

Q And how long have you had an ongoing relationship with Mr. Barton and some of his companies?

A I have been involved in a case back in 2019, one in 2020, and then this year -- sorry, in 2022, I've been the outside general counsel.

Q When did you take on the title outside general counsel?

A It was earlier this year --

Q And --

A -- in 2022.

Q And can you generally describe for us your role as outside general counsel?

A Yes.

My role is to handle and oversee the legal matters related to JMJ Development and its related entities that are currently in litigation and also in the transactional side.

Q So just to be clear because I think there's two big categories there. One, you're overseeing litigation matters for JMJ Development. Is that correct?

A Yes.

Q And those oversights and those litigation matters, does that involve legal entities other than JMJ Development?

A Yes.

And just to be clear, it's not all legal matters, but I'm transitioning to getting myself up to speed with all the entities.

Q Okay. On the transactional side, can you explain to us what your role is?

A Yes.

These are transaction sides with respect to contracts related to real estate acquisition and (indiscernible) contracts for tracts of land and refinancing.

Q Okay. Also, I think you've been involved in zoning. Is that correct?

A That is correct.

Q As it relates to 299TC [sic] Acquisition, LLC, what has your role been?

A As the outside general counsel, I work with the special counsel that are engaged in different matters. So my way of an example, if it's a bankruptcy matter, then obviously that's your firm. If it is zoning matters, then it is another firm. So I -- we -- I ensure that we have domain experts where required in the representation of 2999TC Acquisitions, LLC.

Q If we could take a look at Exhibit 100.

MS. LINDAUER: Sydney, if you could pull that up for us?

THE COURT: Lender's Exhibit 100.

MS. LINDAUER: Correct, Your Honor.

And I will represent to the Court I don't believe this exhibit has been offered yet.

BY MS. LINDAUER:

Q Mr. Walji, this appears to be an email from you to Mr. Kane dated February 24th of 2022 11:18 a.m. If you want --

MS. LINDAUER: Sydney, can you scroll up a little bit on that one? There you go.

BY MS. LINDAUER:

Q Can you generally tell us the purpose of this particular email?

A Well, the purpose of this email was to introduce myself to Mr. John Kane and that I've been working within this matter and that I had the authority from the client, which is the debtor, and if he needed to confirm my role, he would speak with you.

I also talked to -- I also communicated to him in this email that you have asked me to speak with Mr. Kane to work out on the December 2021 -- December 10, 2021 court order to ensure that the client is satisfied with the proposed arrangements that can be made to facilitate the payment of the outstanding HNGH note and then going through some logistics. And I also tell him that I'll be in Dallas, to let me know when the preference is.

Q Do you believe at this time or do you have any understanding at this time, Mr. Walji, that prior to this email, there had been any communication between you and Mr.

Kane regarding 2999TC Acquisitions?
A Can you roll up to see the date, please?
I don't believe so.
Q All right.
A I believe this -- this may have been my first communication with Mr. John Kane.
Q Now this particular email that you sent focuses on the December 10th, 2021 court order. Is that correct?
A That is correct.
Q And with regard to this particular email and then the December 2021 order, what was your involvement to be in connection with the pending transaction?
A At that time, I had just been involved. I wanted to make sure that I had a complete understanding of the terms and conditions that needed to be undertaken to facilitate the payment of the HNG -- HNGH note. So that's my -- I believe my first email to get a handle on this matter.
MS. LINDAUER: Your Honor, at this time I would offer Lender's Exhibit Number 100 that we've been --
MR. KANE: No objection.
THE COURT: All right. We'll admit Lender's Exhibit 100.
And, Ms. Lindauer, I should have asked you when we started. You estimated yesterday you could do his direct in an hour. Are you still on track for that?

MS. LINDAUER: Maybe a little bit over an hour, but I'll try to go pretty quickly. I've got -- I'm going to try.

THE COURT: Okay. All right.

MS. LINDAUER: I hope so, Your Honor. Yeah.

THE COURT: Exhibit Number 100 is admitted.

(Lender's Exhibit 100 admitted into evidence)

BY MS. LINDAUER:

Q All right. Mr. Walji, when you got involved in February of 2022, as we mentioned, there was the December order which we'll take a look at in a minute, there was also a document, Exhibit -- this is I believe our exhibits -- D-14. If you'd take a look at that exhibit.

Okay. And if you'd go to Page 6. It will be a document called "Special Warranty Deed."

Mr. Walji, what was your understanding of this particular document?

A Could you please expand just a little bit more?

THE COURT: Ms. Lindauer, you're on Page 7 of the PDF file, not Page 6. Correct?

MS. LINDAUER: Oh, I'm sorry, Your Honor. By my count, I was on Page 6 but I may be wrong on that.

THE WITNESS: Could you please roll the document to its finality?

Further down, please.

Thank you.

I'm sorry. What was your question?

BY MS. LINDAUER:

Q My question was what familiarity did you have with this particular document when you got involved in February of 2022?

A My recollection is that there were two things that I was not clear about. One, that the document was signed in March of 2021 but on Page 1 -- if you could roll up, please -- it's an effective date of October 29, 2021. And then above that, there was a -- if you go above that, I believe there was a filing page. No. There you go.

So that was --

MS. LINDAUER: No, no. The wrong document, Sydney.

THE WITNESS: Yeah.

MS. LINDAUER: Go back. You're on the wrong document. There you go.

THE WITNESS: Right. And so right above that was a November 1, 2021 date. And the entity that I later discovered was -- that it was a Texas Limited Liability Company.

So I don't know if I could state here that all these factors were present on the same date that we're referring to being February 24, 2022. But the two specific issues were the date of the (indiscernible) with the date of October 29, 2021 and the signature which was March 2021. So that was something that was unclear, too.

MS. LINDAUER: Ms. Ollar, would you pull up Exhibit

D12?

BY MS. LINDAUER:

Q This is a court order signed by Judge Hale -- we've looked at it many times -- dated December 10th, 2021. Did you have any involvement at all, Mr. Walji, with this particular order?

A When you say involvement, what do you mean?

Q At the time that it was executed, did you have any involvement?

A No. No.

THE COURT: Ms. Lindauer, for my benefit since I don't have all these documents memorized quite the way you guys do, the special warranty deed that's at PDF 7 --

MS. LINDAUER: Yes, Your Honor.

THE COURT: I was delayed pulling it up on my end, And, unfortunately, on the WebEx, my screen's very small. So tell me the term that we gave this the other day, which one are we looking at?

MS. LINDAUER: This is called the deed in lieu of foreclosure, I believe, Your Honor.

THE COURT: Got it. Thank you.

MS. LINDAUER: Okay. You're welcome.

BY MS. LINDAUER:

Q And I'm back to that question. And what responsibility did you have, Mr. Walji, in connection with the terms of the December 10th, 2021 order?

A Well, I had to -- let me make sure I understand. You're asking about this specific order?
Q Correct.
A Well, when I received it, I wanted to understand because it made reference to several documents.
Q Let me back up for a second because we're going to get into extended narrative. But were you assigned -- I think you mentioned in your Exhibit 100 email were you assigned some involvement with making sure the terms of the December 12th order were being followed?
A Yes. It's just it's December 10th and not December 12th.
Q Oh, I'm sorry. December 10th order.
A Yes.
Q Okay. All right.
And then I'm going to jump ahead for a minute.
Exhibit D13, what involvement, if any, did you have --
MS. LINDAUER: -- scroll down, Sydney --
BY MS. LINDAUER:
Q -- in connection with this particular second order dated March 17th of 2022?
A Can you roll that a little bit, please?
Q Sure.
A (Reviewing document). Please continue.
This is -- this is the one that I was involved in the negotiations of getting the extension to the May 30th deadline.

Q So for the record, were you the person who negotiated on behalf of 299TC [sic] Acquisitions the terms of this particular March order?
A With respect to the amount of the extension and the date, yes.
Q As outside counsel, have the payments under Exhibit D12 and D13 all been made as agreed?
A Can we go one at a time?
Q We're going to burn up daylight on this.
A Okay. Well, on this one, yes, because I was involved.
Q Okay.
A I cannot speak to December 10th because I was not involved at that time except for payment of the tax -- that was on February -- due in February.
Q Okay.
A And I believe a couple of a hundred thousand dollar payments.
Q As you sit here today, are you aware of any payment defaults under the December 10th order signed by Judge Hale?
A Absolutely not.
Q And are you aware of payment defaults -- and, again, I'm not talking about the final payment but the interim payments that were supposed to be made -- payment defaults under the March order of Judge Hale?
A Absolutely not.

Q All right. Since your involvement from February of 2022, what involvement have you had in obtaining financing for the payoff to HNGH?

A Could you repeat the question, please?

Q Since February of 2022, what involvement have you had with obtaining a financing to pay off HNGH?

A I've been involved with a few parties since -- particularly after the March 17th, 2022 with respect to the payoff amount.

Q And on whose behalf were you working in connection with what you said were various parties?

A 2999TC Acquisitions, LLC, the debtor.

Q And your review of the various proposals that were being made to 299TC [sic] Acquisitions, were you reviewing those on behalf of 299TC [sic] Acquisitions?

A That is correct.

Q Approximately how many lenders did you have involvement with since February of 2022?

A At least four and maybe six. I -- I believe that's the number that I was directly involved in.

Q Okay. And how many of those between four to six that you worked on --

A Yes.

Q -- were at the point where they actually executed a term sheet?

MR. KANE: And just for clarification -- sorry, is this Mr. Walji's understanding of how many executed a term sheet?

MS. LINDAUER: Well, how many he -- yes. How many he was involved with. But it would be his understanding, correct.

THE WITNESS: I'm sorry. Are you asking me about my understanding or my involvement?

BY MS. LINDAUER:

Q Okay. Well, are they different? First of all, is your understanding different than your involvement?

A Yes.

Q Okay. How many -- now let me ask it two ways. How many actual term sheets were executed that you were involved in that involved funds that would be available to pay off HNGH?

MR. KANE: Objection. Assumes facts not in evidence.

MS. LINDAUER: Your Honor, I think --

MR. KANE: Lack of foundation.

THE COURT: What are the facts that are not in evidence?

MR. KANE: That there were executed term sheets.

THE COURT: Ask the question again, Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Walji, in your role on behalf of 299TC [sic] Acquisitions as more or less outside general counsel for JMJ,

were you involved in reviewing term sheets to pay off HNGH?
A Yes.
Q Were you involved in the execution of term sheets?
A Yes.
Q Approximately or how many term sheets were executed for the payoff of HNGH?
A At least three, but I believe there's a fourth one that I need to -- I don't recall whether I was -- I do not recall whether it was executed or not but three for sure.
Q Okay. And how many of those term sheets that you were involved with also provided proof of funds?
A Three of them.

MR. KANE: Objection. Hearsay. The term sheet would be an out-of-court statement offered for the truth of the matter asserted as the term sheet that provided proof of funds.

Also, there's no evidence of that so it assumes facts not in evidence. And there's no foundation for that. It hasn't been any evidence shown to show that there were executed term sheets or proof of funds.

MS. LINDAUER: Your Honor, we can get to those, but I was trying to expedite this a little bit. But I think his testimony is appropriate. He can testify as to his involvement with term sheets, how many he knew were signed and whether they were supported by proof of funds. That's all within his personal knowledge if in fact he knows.

Now if we want to get into what did the term sheets say and how much were the proof of funds and all of that, then I think Mr. Kane may have a point. But as far as his understanding, I think he can attest to what he's attested to.

THE COURT: Why don't you just go ahead and show him the term sheets so we can get that out of the way.

MS. LINDAUER: Okay.

THE WITNESS: Well --

MS. LINDAUER: That's fine.

Okay. Your Honor.

THE WITNESS: (Indiscernible).

MS. LINDAUER: Well, some of them have been identified.

THE WITNESS: Okay.

MS. LINDAUER: So --

BY MS. LINDAUER:

Q All right. So let's take a look if we could at Exhibit Number 11.

THE COURT: And, again, just for the record, when you identify exhibits, would you please identify them as Debtor's or Lender's.

MS. LINDAUER: Oh, I'm sorry, Your Honor. Yeah, it's confusing. This would be Debtor's Exhibit 11.

THE COURT: I only ask that because you guys are floating back between each other's exhibits, so it just makes

it easier for the record to identify which ones we're talking about.

MS. LINDAUER: If you could scroll down, Sydney, to the attachment.

BY MS. LINDAUER:

Q I'm going to show you what's marked as Exhibit Number 11 --

A Yes.

Q -- Mr. Walji. Have you seen this document before?

A Yes.

Q Okay. Could you identify it for us?

A This is one of the lender's --

THE COURT: Ms. Lindauer, just so I'm on the same page, I pulled up Defendant's Exhibit 11. Hold on.

MS. LINDAUER: Right. And, Your Honor, that should be a declaration of Joey Howell. And attached to that declaration is this particular financing statement, Reverifinancing. It's Exhibit 1 term sheet.

THE COURT: Give me just a minute.

MS. LINDAUER: Sydney, can you roll it down a bit?

Sydney, do back up a little bit.

THE COURT: Are we looking at the May 20th, 2022 Reverifinancing letter that's attached to that affidavit?

MS. LINDAUER: We are, Your Honor.

THE COURT: All right. Go ahead.

BY MS. LINDAUER:

Q Mr. Walji, could you identify this document for us?

A Yes.

This is the (indiscernible) proposal of term sheet that Reverifinancing --

MR. KANE: I'm sorry. I'm sorry. Joyce, I apologize. I can't hear Mr. Walji's testimony.

Mr. Walji, would you mind speaking up a little bit?

THE WITNESS: Yes. I need to just get a glass of water, please.

(Pause)

THE WITNESS: I'm ready.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q I think you were identifying this document for us.

A Yes. This is one of the parties that I was involved in named Reverifinancing.

Q And this particular term sheet if we look at the last page of this document, it's Page 7.

It does appear that --

MS. LINDAUER: -- hang on, Sydney, you're going too fast.

BY MS. LINDAUER:

Q It does appear that this was at least executed on behalf of TCC2022 and then also by Mr. Barton as guarantor. Is that

right?
A That is correct.
Q All right. Let's go back to the beginning of this document.
Is this one of the financing agreements that you mentioned that you were working on that makes up the three or four that you had a chance to review?
A Yes.
MS. LINDAUER: Your Honor, at this time this has not been an admitted exhibit. I'd like to mark it if we could as Exhibit Number 11, Debtor's Exhibit 11-1. It is an attachment. I'm not offering the actual affidavit, just the term sheet itself.
MR. KANE: Joyce, can you clarify what pages of this PDF the exhibit will be? Does that include the title commitment document?
MS. LINDAUER: No.
I'm sorry, Your Honor. It would conclude with the last -- just the signature pages which are the last page, Page 7. So it would be Pages 1 through 7.
THE COURT: Ms. Lindauer, just out of curiosity, where are you -- oh, never mind. Never mind.
Page 7 of the -- at the bottom of the page. I was going by PDF. So got it.
MS. LINDAUER: Correct.

THE COURT: So on the PDF page, it's a 32-page PDF file, you're offering Pages 6 through 11 of the PDF file which is the term sheet that at the bottom goes through Pages 1 through 7. Correct?

MS. LINDAUER: Correct, Your Honor.

All right. Mr. Walji -- oh.

THE COURT: I haven't -- is there an objection to that, Mr. Kane?

MR. KANE: No. We don't have any objection to the -- to this document.

THE COURT: So we're going to mark it Exhibit -- what did you want to call it? How about Exhibit 11A?

MS. LINDAUER: That would be fine, Your Honor. And make it a Debtor's Exhibit 11A just for the record.

THE COURT: 11A.

All right. Go ahead. It's admitted.

MS. LINDAUER: Thank you, Your Honor.

(Debtor's Exhibit 11A marked for identification and admitted into evidence)

BY MS. LINDAUER:

Q If we can now turn to Exhibit D --

MR. KANE: I'm sorry. I'm sorry, Your Honor. I think there may be a mistake, and I just -- I'll raise a Rule 106 objection here. I'm sure Mr. Rodriguez will appreciate that.

But this Exhibit D11-A appears to be missing Page 6.

THE COURT: Yeah, it's missing -- it is missing on mine, as well. It goes from Pages 5 to 7.

MR. KANE: So I think we would object to the admissibility of this document until a complete document is provided.

MS. LINDAUER: And, Your Honor, at a break I think we can find whatever the missing page is and ask the Court to substitute or provide that missing page. And I do apologize if a page is missing.

THE COURT: All right. So it's conditionally admitted, and it's conditioned on your providing Mr. Kane and maybe refiling on the docket this document as a stand-alone Exhibit 11A. How's that?

MS. LINDAUER: That's fine, Your Honor. We'll take care of that.

MR. RODRIGUEZ: And, Your Honor, just for the record, I would note that this exhibit was already admitted. Mr. Kane said squarely and unequivocally he had no objection and it wasn't until later after the document was admitted that he purports to raise a 106 objection, makes reference to me.

This Court's power and practice as I understand it is that 106 motions have to be handled and set for a hearing on an expedited basis and they're not going to be considered here.

So I'm --

THE COURT: Actually -- actually -- go ahead and finish.

MR. RODRIGUEZ: So I am going to to object to the Court's new ruling relative to this exhibit. I'm sure Ms. Joyce Lindauer will correct it and supplement it to Mr. Kane and the Court's satisfaction, but I do believe we all have to play by the same rules here. So I do lodge that objection, Your Honor.

THE COURT: All right. Any response, brief response before I rule on that objection?

MR. KANE: Yeah, Your Honor.

The 106 objection was raised concurrently with the submission and approval of this document. I mean it's a completely different situation.

THE COURT: So I will overrule the objection.

I will note that the document that you filed, Mr. Rodriguez, was a motion which frankly I had not read when you raised it. And so I think I had indicated at that hearing that I was not going to entertain your motion at that time.

Mr. Kane and the Court as we were scrolling through these documents did note that a page was missing. And I think under Rule 106, it indicates that an adverse party may require the introduction at that time of any other part that in fairness ought to be considered at the same time.

So this is I think materially different than what you

had raised before because what you had raised before were documents -- well, the documents that were admitted by agreement earlier on were done I think maybe before your involvement and then you filed a motion and began a hearing raising that 106 objection which under Rule 106 was not, quote, at that time, quote.

So I think that's a materially different situation than we have here. Mr. Kane did raise it relatively short time after the document was introduced. And, again, it appears to be just a missing -- I don't know what's missing, but since it appears that the material terms are all in evidence and because it says "signature pages to follow." So it appears to me that perhaps we're just missing a signature page.

So I will overrule that objection and, again, conditionally admit this exhibit conditioned on Ms. Lindauer providing the missing page and filing it as a stand-alone Exhibit 11A.

Again, to move things along, sometimes I will provide a little flexibility but it is a little bit strange to have two counsel making objections. So usually I believe in one riot, one ranger. Are you both intending to object as we go along?

MR. RODRIGUEZ: Yes, Your Honor. Thank you for hearing us. I will try to remain in my seat, but that just stuck out to me as an incongruity. But thank you for hearing us, Your Honor.

THE COURT: Okay. And, again, I know this whole hearing was set on relatively short notice, so I want to be a little bit flexible. Mr. Rodriguez, you can come back in if you'd like. I will give you a little bit of flexibility, but generally I would prefer one lawyer to handle one witness.

But anyway, with that in mind, you may proceed, Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Okay. We were -- okay, so I understand the rulings on this particular exhibit, so let's move on.

Let's take a look if we could at Exhibit D10. I'm sorry, Debtor's Exhibit D10.

And at the back of this declaration, there's an Exhibit 2.

It's a document called "Commitment Letter."

Mr. Walji, are you familiar with this commitment letter?

A Yes.

Q And who was --

A Can you -- can you just roll this down? I just want to make sure, please.

MR. KANE: Hey, Joyce, just for the sake of ease of use here, I think that this commitment letter is already Debtor's Exhibit D4. I could be wrong, but that may just make things easier from an evidentiary standpoint.

MS. LINDAUER: You're correct. And that may be

easier to work with.

Sydney, switch to D4.

BY MS. LINDAUER:

Q Mr. Walji, are you familiar with the terms of this commitment letter?

A I'd just like for her to roll it, please.

(Reviewing document)

Yes.

Q And, Mr. Walji, was this an additional set of terms, term sheet commitment letter that was being worked on for 299TC [sic] Acquisitions to pay off HNGH?

A Can you repeat your question, please?

Q Was this an additional commitment letter/term sheet that was being worked on by 299TC [sic] Acquisitions to pay off HNGH?

A I believe the -- this commitment letter was specific to one of the other entities. And I know that 299TC [sic] Acquisitions was involved, but this commitment letter was to Enoch Investments, LLC, which is a related entity of Timothy Barton.

Q Maybe I need to clarify my question.

The funds that would be obtained from Guaranty -- First Guaranty Bank, what would those be used for?

A To pay off the HNGH note.

Q Now the HNGH note was greater than 33,840,000. Is that

correct?
A That is correct.
Q What arrangement had been made to bridge the difference of about $8 million between the 33,840,000 and the 40-plus million that would need to be paid to HNGH?
A There was another lender that had deposited 12,500,000 in the escrow account of the lender's counsel.
Q Okay. And do we have the name of that particular lender?
A The lender's name is Matt Fleeger, I believe, and his attorney's name is Chris, last name starts with an S. I can't recall his full name.
Q Okay. And --
THE COURT: I'm sorry. Could you tell me the name of the lender again?
THE WITNESS: I believe it's -- the last name is Fleeger, F-L-E-E-G-A-R [sic].
THE COURT: Is that an individual?
THE WITNESS: It's an individual, but it was through his company. I don't recall the name of the company. And his first name I believe is either Matthew or Matt. And his counsel is the one that had in his account 12,500,000. The attorney's -- the counsel's name was Chris with a last name S something. I don't recall.
BY MS. LINDAUER:
Q And did Mr. Fleeger's counsel at any point in time to the

best of your knowledge communicate with Mr. Kane regarding Mr. Fleeger's involvement in assisting with paying off HNGH?
A Yes.
Q So Mr. Kane was aware of the Fleeger transaction is what I'll call it?
A This particular transaction, yes.
Q At this time if we could take a look at Exhibit -- this is Debtor's Exhibit D9.

THE COURT: While we're pulling that up, my brain is catching up to me. I will say in fairness to Mr. Rodriguez, I think Mr. Kane invited him into that objection by naming him. So anyway, my ruling is the same, but just that occurred to me after the fact that Mr. Rodriguez may have had a valid point in stepping in for that objection.

Go ahead, Ms. Lindauer.

BY MS. LINDAUER:
Q Exhibit D9 is a letter -- we've already discussed this -- involving Private Lender Network. This is addressed to you, Mr. Walji. Is that correct?
A Yes.
Q What involvement did Private Lender Network have in providing a term sheet or potential funding to pay off HNGH?
A I'm sorry. Could you repeat that?
Q Sure. What involvement did Private Lender Network have in providing funding to pay off HNGH?

A To provide the funds.

Q Correct.

A That's the role to provide the 40,882,000.

Q Okay. Did you ever get an executed term sheet from Private Lender Network?

A I believe so, but I don't recall at this moment for sure.

Q Okay. If you don't recall, is there a person that would have better knowledge of that than you?

A It would be Mr. Garrison Kickham with whom I was working.

Q And Mr. Kickham is listed as a potential witness in connection with this proceeding. Is that correct?

A Correct. He is the one that was involved with the -- represented the PLN entity.

Q If we could take a look at -- this would be a Lender's Exhibit 10.

And if we could go to at the top Page 5 of 13.

Mr. Walji, this is a term sheet from an entity called Tall Ship DTC, LLC. Do you see that?

MR. KANE: I'm sorry, Joyce. I missed that. Which exhibit was that?

MS. LINDAUER: That's Exhibit -- Lender Exhibit 10. And at the top, it's Docket -- well, it's actually a court document. It's Docket 85, but at the top it's Page 5 of 13 is where this document starts.

BY MS. LINDAUER:

Q My question, Mr. Walji, this is a term sheet with an entity called Tall Ship DTC, LLC. Is that correct?
A That is the title of it, yes.
Q And what's the date of this particular document?
A March 14th, 2022.
Q If we turn to the last page of this particular document, that would be Page 13 of 13.
There are two signatures on here, one with a Christopher Green and then a one with a Timothy Barton, President. Do you see that?
A Yes, I do.
Q Was this another term sheet that was being worked on in connection with obtaining funding to pay off HNGH?
A Yes.
Q Now we've now looked at I believe four --
THE COURT: Ms. Lindauer? Ms. Lindauer, I apologize.
MS. LINDAUER: Sure.
THE COURT: As I'm pulling up these PDFs on my computer, for some reason it's painfully slow and so I was a little distracted when you were asking the question. The term sheet that is Page 5 of 13 of this ECF document, is that at all related to PLN or are we on -- the Tall Ship entity, is that related to PLN or is this completely separate?
MS. LINDAUER: Completely separate. It's a different entity, Your Honor.

THE COURT: All right. Thank you.

MS. LINDAUER: Thank you.

BY MS. LINDAUER:

Q Mr. Walji, we've now looked at four commitments/term sheets/potential lending arrangements with the Court. Were there other besides the ones that we have now reviewed with the Court that you have had involvement with?

A Yes.

Q Okay. Could you tell us what other ones that you have had involvement with since February of 2022?

A One I would just call it the "N entities." I have a confidentiality agreement not to disclose, but the name of the entity starts with an N. And I was also involved with their counsel.

The second entity is a overseas entity.

Q And does that entity have a name?

A Well, I would just call it the Dubai entity. This is in the -- D-U-B-A-I, that's the overseas entity.

Q And is there any work or was there any work being done with any entities represented by Mr. Hall, Craig Hall?

A That was one that I was not directly involved but I'm aware of that discussion because that was directly handled by Mr. Barton.

Q Okay. So Mr. Barton would be the person with better knowledge regarding that particular transaction. Is that

correct?
A Yes. That is correct.
And I believe that came up yesterday. I don't recall in some context.
Q In your involvement with this transaction, Mr. Walji, we've gone through that you were involved in negotiating -- well, maybe I haven't asked that.
What involvement have you had in negotiating, for example, this Tall Ships term sheet? Was that something that you worked on?
A Yes, I did.
I worked with a Mr. -- well, let me correct myself. I spoke with Mr. Christopher Green directly. His partner or associate, I can't think of his name, Ali or some name of that nature. And subsequently, they engaged Jackson Walker, and I was working with Jackson Walker's deal counsel, I can't think of her name. It's a lady, and I could -- and then Jackson Walker also had the bankruptcy counsel Mike -- I can't think of his last name -- that Ms. Lindauer was handling.
Q All right. So to be clear, your role in connection with the payoff of HNGH included working the term sheets and the investor-lender side for the money. Is that correct?
A Sorry. Repeat that --
Q Say it again?
A Yeah, please.

Q Okay.

Your role in connection with paying off HNGH included working the investor-lender side to obtain the funds for the payoff?

A Yes.

Q Okay. All right. Did your role also include reviewing and preparing documents for what would be the -- I would say the closing side or the debtor's side for the documents to be submitted by May 30th or 31st?

A No.

I may have, but we have separate counsel that I was working with.

Q Okay. What involvement did you have, for example, with the rescission deed?

A Significant involvement in reviewing the drafts that were being prepared.

Q Okay. So, again, part of your involvement was on the debtor's side reviewing the actual closing documents from the debtor's perspective. Is that correct?

A That's partially correct. It wasn't just the documents. It was understanding what all the documents or the conditions and terms were that needed to be complied with.

Q So in that regard, you were working for basically for compliance with --

MR. KANE: Objection. Leading.

MS. LINDAUER: -- the requirements per closing. Is that my understanding?

THE COURT: So there's a -- I think there was an objection while you were asking the question.

MS. LINDAUER: I'm sorry.

THE COURT: Ask the question again because I didn't catch the whole question.

And then, Mr. Walji, wait and see if Mr. Kane has an objection before you answer.

THE WITNESS: I did not respond, sir.

THE COURT: Right, right.

THE WITNESS: That was Mr. Kane.

THE COURT: Thank you.

Ms. Lindauer, what was your question again?

MS. LINDAUER: Mr. Walji -- I'd be glad to, Your Honor.

BY MS. LINDAUER:

Q Mr. Walji, what compliance role did you play in connection with the actual documents that needed to be prepared for the May 31st closing?

A I would summarize it at two levels. The actual review of documents that came to my -- to my desk to review and make comments on and, also, the documents that were required.

By way of an example, the title commitment letters talked about what are the -- what needs to be required. So there

weren't actually documents there, but if only the title insurance commitment letter and documents, what I was looking for is to comply with the Schedule B and the Schedule C and to make sure we have those documentation.

Similarly, looking at the December 2021 agreed order and the March 2022 order of what the terms and conditions were to make sure that we were complying with that.

Q Okay. So let me understand.

You were looking at what we've called Exhibit -- Lender's Exhibit 33A which is the title commitment from Sendera Title. Is that correct?

A Could you pull that up, please?

Q Sure.

MS. LINDAUER: If you could pull up 33A, Sydney.

BY MS. LINDAUER:

Q I think this has been marked as 33A.

A Yes. This is the one.

Q Okay. All right.

So part of your role was to review and facilitate what was on 33A. Is that correct?

A Yes.

Q Okay. And then I want to go to Exhibit -- Debtor Exhibit D12 which is the agreed order of December 2021. And that was the second document you mentioned that you were making sure that the debtor was in compliance with. Is that correct?

A Could you roll that up? I don't see the date.

Yes. That's the one. Yes.

Q Okay. All right.

Let's go to this order for a second. Page 2 of 4.

And, Mr. Walji, upon your review of this order and the terms of this order, what compliance items did you identify that were needed as part of the December order?

A Could you -- this is Page 2 or 1?

Q Page 2. You want us to go to Page 1?

A Well, are you asking me -- if you're asking about the document. I need to review that. But if you're asking about this specific paragraph, I can respond to that. So I need your help.

Q So let me rephrase the question.

A Okay.

Q All right. You're familiar with this order, right? You've read it a number of times?

A Yes.

Q All right. What compliance items were required by the December order in order to facilitate the payoff to HNGH?

MR. KANE: I'm going to object, Your Honor. The document speaks for itself. If we're just trying to figure out what Mr. Walji understood after the fact, then I'm fine with that.

MS. LINDAUER: And, Your Honor, that's fine. He was

the one that was trying to facilitate performance of this order, so I think his understanding of what needed to be done at least would go to the knowledge of the debtor on the debtor's side. So I think that's fine with that limitation.

THE COURT: So I think your question was what does the order require. I agree with Mr. Kane. Since we're an hour into your examination, rather than just have him recite what the order says, why don't you get to what his understanding is.

BY MS. LINDAUER:

Q Can you answer the way the judge just asked it?

A Yes.

First, there was to be a rescission deed to be with the HNGH counsel in the December order. The second was that a note needed to be reinstated prior to payoff. And that that one -- and I believe there was a third one that's not clear in my mind. But the rescission deed and the -- the rescission deed that was to have been prepared in December and held in escrow by the debt- -- sorry, HNGH counsel and a reinstatement of a note are the two that I recall.

Q Once the note was reinstated, would the corresponding deed of trust, likewise, have been reinstated?

A Sorry, ask it again.

Q Once the note was reinstated --

A Yes.

Q -- would the deed of trust also have been reinstated?

A No. The note -- once the note was reinstated, it's the rescission deed, not the reinstated -- the rescission deed would be recorded. That was already prepared in advance but held in escrow by the HNGH counsel.
Q Was there any need for a release of the underlying deed of trust of HNGH?
A Yes.
Q And I'm not going to go back through because of time all the items on 33A. But as we sit here today, Mr. Walji, were you involved as of May 30th and 31st in the closing of the payoff to HNGH?
A Yes.
Q Were all the documents required for that closing provided to either the debtor or Sendera Title to close that transaction?
A No.
Q And you were present during Mr. Marx's testimony. Is that correct?
A Yes.
Q And Mr. Marx went through ad nauseam the items on Exhibit 33A. Is that correct?
A Yes.
Q One other topic I would like to go over which is the rescission deed issue just briefly with you.
If we could take a look at this would be Debtor's Exhibit

D6.

We have it up on the screen.

A Yes.

Q And I'll represent to you we visited about this. This is the form of the agreed rescission of special warranty deed that Mr. Kane sent over on I believe May 30th or 31st which edited the debtor's I guess version of this particular document.

Are you familiar with this document?

A Yes.

Q Okay. And you heard Mr. Marx's testimony yesterday that he had an opportunity to review this document?

A Yes.

Q And that from his lender standpoint, that he thought this document more or less satisfied some of his concerns. Is that right?

A I'm sorry. Could you repeat again?

Q Sure.

Did Mr. -- you heard Mr. Marx's testimony yesterday -- the Court mentioned it, as well -- that this particular document, D6, satisfied a number of Mr. Marx's concerns with regard to the agreed rescission of special warranty deed. Do you recall that testimony?

A I recall portions of that testimony where he did say that and portions of his testimony where he did not agree to the document. So I'm not sure how best to answer.

Q Okay.
A But there were instances where Mr. Marx did acknowledge that there were certain terms that were satisfactory to him and there were certain that were not.
Q Okay. On behalf of the debtor, 299TC [sic], was Exhibit D6 satisfactory to 299TC [sic]?
A Absolutely not.
Q All right. And I want to understand why you say that, all right.
Okay. So looking at this document, can you tell us on the first page why you do not believe this particular document was satisfactory? It has the changes proposed by Mr. Kane. Those are in the green. Do you see those?
A Can you expand that, please?
Okay. Yeah, this is better.
Q Okay.
A Can you roll up first?
Q Do you want to roll it to top?
A Right. I just want to make sure -- it should say rescission of deed. Is that the one?
Q Yeah.
A Yeah. Okay.
Agreed rescission of deed. Yeah, okay.
Q All right. Go down.
A So on the first paragraph -- no, I'm sorry, it's on the

second paragraph.

Which starts with "Whereas, grantee dated," which is I don't know the number. Yeah, that's the one. Sorry, that's the bottom paragraph.

This one concerned me because it made reference to the bankruptcy case which was not part of the -- of a rescission. And my version that -- well, our version or the debtor's version did not have that reference on this particular rescission.

Q All right. Let's go to the next page.

Anything else on that page?

A (Reviewing document).

Right. I think the -- I raised that issue earlier. Going back to the last paragraph again on Page 1, that the October 29, 2021 date was not consented by the grantor because it was signed in March 2021. And that was removed. And then additional provisions which are -- which we went over on this last paragraph of Page 1 were added by HNGH.

Q Let me understand your comment. We looked at the deed in lieu that bears the date October 29th, 2021. Correct?

A That is -- well, yes.

Q All right. And what you are describing there is that the date that Mr. Barton actually signed that document was not October 29th, 2021. Correct?

A What I'm saying is that what Mr. -- what that document,

the original document was signed by Mr. Barton in March 2021, and it did not have October 29th, 2021 date on that instrument that it was signed.

Q All right. Let's take a look at the next page.

This is a provision that was struck out.

A Yes.

Q Did you have any concerns about the section that was struck out of the deed of rescission?

A Yes.

Because, again, this recordation was not consented by 2999TC Acquisitions.

Q And this provision reflected that the grantee asserted that the filing was valid and enforceable. Is that correct?

A That's what the change that was made, yes.

Q And did the debtor agree that the filing of the deed in lieu was in fact valid and enforceable?

A No.

Q Let's take a look at the next page.

There's another strikeout there talking about the bankruptcy court proceedings.

And did the debtor agree with the removal of that particular "whereas" provision?

A No.

Q If we drop down to the next section, the next "whereas."

And the green changes, again, were those being proposed by

HNGH. What concern did the debtor have with regard to these particular changes?
A This is probably, you know, at the top of my list of concerns because it does not rescind as of that date. It talks about a future act, and it is adding conditions. That was not -- that did not make it a consistent with the rescission deed that I had signed off on.
Q If we can drop down a little further, all the way.
Any issue with the particular change that was made with regard to the documents completed in this particular document?
A I don't recall that other than Mr. Kane's -- HNGH agreed to pull these two clauses A and B from their original recital to a operative "now therefore" section of the rescission so that it has its proper legal implications rather than strictly recital.
And that was -- that was my concern in the initial one.
Q Okay. Did the debtor object or reject the form of this particular document?
A Could you repeat that?
Q Did the debtor reject this form of the document?
A Well, yes. Absolutely. If you're paying off, the rescission means nothing to the -- to the lender because they're getting paid and they're trying to dictate how rescission should be made by adding conditions that would require us to go back.

It was not a rescission. You know, you're paying off a note with the full amount, you're not leaving any penny back. But for to get the rescission because my understanding was that the rescission deed had to put the debtor back to its position prior to the deed in lieu filing on October 29, 2021 and recorded as of November 1, 2021.

It needed to put the debtor back into that place, and that was the sole purpose of this rescission and not to add other conditions to it. It was very simple. Prepare a rescission deed, they get paid, and it gets filed. There should be no conditions other than saying it is void abmonitio, et cetera.

So that was very disturbing, needless to say. But legally, this does not meet our requirements. I had finalized one on May 31st and sent it that we would have it. We not only get this revised version back, and it's conditional upon HNG's clients being recommended, not even agreeing to these -- not even agreeing to these changes. It's a draft --

MR. KANE: Your Honor, I'm going to --

THE WITNESS: -- (indiscernible).

MR. KANE: -- object to Mr. Walji's testimony in that it misstates facts that are in evidence. The draft was circulated to us on May 30th. That's been addressed ad nauseam. I believe Mr. Walji just testified that his revised draft was circulated on May 31st.

Unless I misunderstood the testimony -- was Mr. Walji

suggesting that he circulated revisions to this document on May 31st?

THE WITNESS: No.

What I said was that I -- I recall that the version before the revision that we agreed on, and I informed Ms. Lindauer we're getting close to closing, I need this rescission deed as I had sent it, which was I believe on May the 30th.

And this particular document that was revised on -- the agreed rescission that was submitted, came back with these revisions which were not only not acceptable but also were still in a draft form with a representation I believe by HNGH counsel that they would recommend that to their client to sign, which was I believe -- I'm not sure if it was May 30th or 31st.

But all I'm saying is that this instrument came after the final version that we agreed would be the appropriate rescission deed that needed to be signed off by HNGH.

MR. KANE: Yeah. And I want to again object to the testimony as misstating facts that are in evidence to the extent that Mr. Walji is saying when he references "we agreed" that there was any kind of agreement between HNGH and the debtor as to the form of rescission instrument circulated on the 30th.

THE COURT: So I'll overrule the objection because I already understand the point. So I'll take that testimony into consideration and give it the weight that it is entitled to

when I rule.

MS. LINDAUER: And, Your Honor, I'm going to turn to one last point.

BY MS. LINDAUER:

Q Mr. Walji, as part of this particular transaction, you had some involvement with the Happy State Bank piece of this transaction. Is that correct?

A I'm sorry.

Q As part of this transaction, you had some involvement with the Happy State Bank piece of this transaction. Is that correct?

A Yes.

Q If you look at Exhibit -- this will be Lender's Exhibit 84, Page 1 of 5.

A May I -- before you move on this document, I recall one other item on this matter.

Q Well, I'll come back.

A Okay.

Q But let's move on because I don't want to run out of time here.

A Sure.

Q Page 84.

This is an email from you to me copied to Mr. Kane. Is that correct?

A That is correct.

Q If you drop down, "As I mentioned below, the title company is Sendera Title and the escrow officer is Julie Lissey who also requested information described in Item 3."
Do you see that?
A Yes.
Q Okay. This is on May 31st at 3:17 p.m.
A I don't see that date, but I do see --
Q Roll it back up.
A Yes, it is.
Q Okay. So, again, Sendera Title was clearly identified as being the title company that was involved with this particular closing. Is that right?
A Yes. Since May the 10th, Mr. Kane has been communicating with Sendera.
Q Okay. And in fact, on May 27th, Mr. Kane sent over the executed special warranty deed that they had prepared to Sendera Title. Is that correct?
A That is correct.
Q The last part of this, it says, "Lastly, the Happy State Bank speaks to a payoff amount. Is there a current loan by HNGH with Happy State Bank which involves 2999TC as my understanding based on our earlier conversations was that it was not the case or did I misunderstand again?"
What were you referring to, Mr. Walji, when you made that statement in this email?

A So with respect to the note reinstatement discussion which was required on the December 2021, I repeatedly asked about the Happy State Bank because it appeared in Schedule C of the title commitment. And I was informed by Mr. Kane and I believe, Ms. Lindauer, you were also on that call, that HSB has nothing to do with it; number two, the original promissory note is with HNGH.

And that was troubling me because the -- I believe by March -- by the time we -- I wrote that letter, Mr. -- is it Jeff Carruth from Happy State Bank had communicated to Sendera with a payoff amount which threw me off because my understanding was that Happy State Bank was not involved in this transaction. We were told. And so it caught me off guard when I saw the payoff amount because we had asked this question more than once. And on the last date, it's a payoff amount at closing whereas we were to -- sorry, the debtor had to pay only to HNGH.

And so that's really at the last minute that Happy State Bank demanding payoff at closing was inconsistent with the prior representations that were made to us.

Q Now Mr. Kane did point out that there was a release of collateral transfer of note and lien that was being edited between the parties. Are you familiar with that document?

Mr. Marx testified about that document.

A I'm sorry. Which document again?

Q The release of collateral note and lien for Happy State Bank. Do you recall that document?
A I don't recall the document, but I recall the discussion.
Q And when was the first time -- I think you mentioned that you became aware of Happy State Bank but that you did not believe they were involved because of the communications you had had with counsel. Is that right?
A (Indiscernible).
Q Say that again.
A Yeah, there were two questions.
Q Okay. I know. That's all right. That's all right.
So you were aware of Happy State Bank, but you didn't believe they had any involvement because of the representations that have been made by counsel Is that right?
A That is correct. I raised an issue --
MR. KANE: Objection.
THE WITNESS: Yes.
BY MS. LINDAUER:
Q And you heard Ms. Blakeley's testimony yesterday regarding what Happy State Bank would require in order for them to release their collateral note and lien. Is that right?
A Yes.
Q And what were they requiring?
A They were requiring that they will not release the note which -- sorry, HSB required a payment of their $26 million and

after payment, they would then release the original promissory note which was held in the possession of Happy State Bank, which again was contrary to what was communicated to us that the lender was holding the original promissory note.

Q Did -- does or did 299TC [sic] have any contractual relationship with Happy State Bank?

A I'm sorry. Say again.

Q Did 299TC [sic] Acquisitions have any contractual relationship with Happy State Bank

A As to this matter, no. As to some prior matters, I'm not aware. i could not respond to that if there's a prior relationship.

Q But why as to this matter?

A Correct. On this particular matter, no, because I was informed that Happy State Bank is not involved. In fact, I believe there was also communication on this which is part of the exhibit that Mr. Carruth mentioned that it's between HNGH and Happy State Bank and that's a matter between themselves.

From my perspective, it really was not an issue because we were informed that that Schedule C collateral would be released by the lien but there was no -- because the promissory note was actually in possession of the lender and there was no payoff to Happy State Bank.

I think those two is what threw me off because you could not reinstate a note prior to payoff if you did not have the

note and that Happy State Bank yesterday says we will not release the note until HSB gets paid off.

So for me, that condition that the agreed order required would not have been -- be possible and, therefore, you know, that was a default from my perspective because the note would not be reinstated because it was not in the possession of HNGH prior to payoff. And we repeatedly asked about this original promissory note and were assured that it was in the possession of HNGH, which was untrue when Ms. Julie --

MR. KANE: Objection. That's hearsay.

MS. LINDAUER: All right. One more thing. If --

THE COURT: Response, Ms. Lindauer?

MS. LINDAUER: I think he was just quoting her testimony that that's what she testified to. So I think his answer was responsive.

MR. KANE: The objection is to the narrative where he says we were repeatedly told. That's an out-of-court statement offered for the truth of the matter asserted. That's hearsay. That testimony should be stricken.

MS. LINDAUER: Your Honor, I think that's an admission of a party opponent in the sense that he was repeat -- maybe I can clarify who repeatedly told him that.

THE COURT: So I don't recall any testimony about who told him that. So for right now, that objection is sustained.

BY MS. LINDAUER:

Q Mr. Walji, who told you repeatedly about possession of the note?
A Mr. Kane.
Q And Mr. Kane is counsel for HNGH, correct?
A That is correct. That is John Kane.
Q All right. And, Mr. Walji, had 299TC Acquisitions wired part of the payoff monies to HSB, Happy State Bank, what obligation would Happy State Bank have to deliver the original promissory note to 299TC Acquisitions?
A I didn't follow your question.
Q Okay. If 299TC had paid off Happy State Bank as they requested on the 31st, what obligation existed on behalf of Happy State Bank to deliver the original note to 299TC?
A Well, I don't understand that. I'm sorry, because --
Q Okay.
A -- the obligation was preceded. It was not subsequent.
Q No. Happy State Bank, did they have any contractual relationship with 299TC Acquisitions to require them --
A No. That's the problem.
Q Okay. All right. And, Mr. Walji, your involvement with this particular transaction, was the recision deed supposed to have been held by HNGH's counsel during the pendency of the term of the payoff?
A Yes. And that's the trouble to pay off at that time the deed was to be held from December 2021 during the pendency of

that agreed order which was through March 15, 2022.

Q And through this process, did we discover that in fact the deed was not being held?

A The first time I saw the draft was on May 12th was the first time I saw that.

Q Okay. And was --

A That came through Mr. Kane.

Q And was that an executed deed being held by Mr. Kane?

A No. That came on March 27.

Q And that's the special warranty deed that --

A Yeah. And that was -- and that's -- you know, that was the deed. I don't recall how what the terminology is. But that was the special warranty deed that was not a recision deed.

Q What is the debtor's position with regard to the performance of HNGH under the agreed orders?

A It defaulted the December 2021 for not having the recision deed held by the HNGH counsel. It did not have the promissory note in the original form in its possession to reinstate. It did not disclose that Happy State Bank would have to be paid as a condition of this order. There is no mention of Happy State Bank having to be paid according to that order.

And those were three things that were required of HNGH before the debtor would be responsible for paying, along with the documents, the authority documents reflected and other

documents reflected in the Schedule C which we've gone through the various releases. So the recision deed, the promissory note, the terms of the documents, the authority documents and other documents of Schedule C, not having possession of the note, HNGH not having possession of the note as of March 30th or March -- sorry, as of May 30th, 2022 or May 31st, 2022, to be able to reinstate that are all issues that I had in this matter.

Q Did you provide notice to Mr. Kane that it was the debtor's position that HNGH had defaulted on its obligations under the December and March orders of this Court?

A Yes. That's how the recision deed came into play because when we received the alleged special warranty deed, I mentioned that. We spoke about it. We went through several conversations. And finally, Mr. -- HNGH's counsel agreed to the form of the agreed recision of deed that I circulated. And they adopted that format, but then they made changes on that.

Q Let's look real quick at Exhibit 92. And this will be the Lender's 92, Page 1 of 3. This is an email from you to me, copied to Mr. Kane, Mr. Carruth, and others. And specifically it says HNGH's delay and insufficiency in providing documents is a material default according to the agreed court orders.

A That is correct.

Q And that was from you on May 31st. Is that right?

A That is correct.

Q After that letter was sent, were there any efforts on behalf of any parties to try to address what you said were material defaults?
A I don't -- I don't believe so because my statement at the bottom, if you could just roll up again. One, two, the fourth paragraph is really it was very intense at that point in time. And I don't believe there was any -- any attempt to correct the default that I had raised.
MS. LINDAUER: Your Honor, at this time, I'll pass the witness.
THE COURT: Does anybody need to take a break before cross-examination?
MR. KANE: Yeah, Your Honor --
MS. LINDAUER: Yeah, Your Honor. Could we just take a brief five-minute break? That would be very helpful.
THE COURT: We'll take a five-minute recess. And -- all right, we'll take a five-minute recess.
MR. KANE: Thank you.
(Recess at 10:33 a.m./Reconvened at 10:42 a.m.
THE COURT: Okay. We're back on the record. Before you start, I just wanted to let the parties know we've been advised by the U.S. Marshal Service to be out of the building by 4:30 due to the potential for protests downtown across from our building. So we have a hard stop at 4:30 this afternoon.
So please proceed, Mr. Kane.

MR. KANE: Okay. Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. KANE:

Q Mr. Walji, much has been made about this issue with Happy State Bank. But let me ask you this. You've been involved in other real estate closings, correct?

A Yes.

Q Have you ever bought a house?

A Yes.

Q Are you familiar with what a closing statement or settlement statement is?

A Yes.

Q And is it a correct description that that's a document that provides the line items of where funds are going to flow at closing?

A Yes.

Q And sometimes at a closing, a portion of funds are used to pay things like costs, expenses, commissions, items like that?

A Yes.

Q And here it was your understanding on May 31st that if HSB, Happy State Bank was going to be paid, the amount it was going to be paid was simply going to come out of the amount due to HNGH, correct?

A No. Absolutely not.

Q That was not your understanding? Did you --

A No.

Q -- understand that it was an additional payment obligation?

A There was no obligation to HSB, period, was my understanding.

Q Yeah. So I get that. So you were instructed by HNGH to have the title company simply issue a wire to HSB out of the proceeds due and owing to HNGH at closing, correct?

A No.

MR. RODRIGUEZ: Objection, Your Honor. No foundation, no evidence at this point. Counsel is attempting to testify. That question should be stricken.

THE COURT: All right. We're back to the two rangers, one riot. Ms. Lindauer, are you -- who's doing the -- who's speaking right now?

MR. RODRIGUEZ: I'm speaking right now, Your Honor. I've been asked by the witness to represent him for purposes of this questioning. And I think he's got a right to choose counsel of his choice. So I'd like to do it, and if the Court will permit me, please.

THE COURT: Mr. Kane, do you have any objections to counsel? I don't normally allow it, but --

MR. KANE: No, that's fine, Your Honor.

THE COURT: Okay. Could you restate the question and the answer because I need that information again.

MR. KANE: I'll do it a different way. Let's just look at some documents.

BY MR. KANE:

Q I'm going to share my screen, Mr. Walji. This is Lender's Exhibit 72. And I'll zoom in so you can see it a little bit better.

A Please.

Q You were a recipient of this correspondence, correct? This is your email address, K.Walji@WaljiLaw.com?

A That is correct. The address is correct.

Q Okay. And do you recall receiving this email on May 31st?

A Can you expand it a little bit? Yes.

Q And is this instructions from HNGH to you addressing that the amount due to HNGH at closing is therefore the HNGH payoff amount minus the Happy State Bank payment?

MR. RODRIGUEZ: Objection, Your Honor. The document speaks for itself. I'm not sure what the question is. Mr. Kane's asking for a legal conclusion. It's improper.

MR. KANE: This goes to Mr. Walji's understanding of how the payoff statement was supposed to look.

MR. RODRIGUEZ: Mr. Kane, your question did not ask of his understanding. You made an affirmative statement and asked him to agree with you. Same objection.

THE COURT: Why don't you ask him what his understanding is?

BY MR. KANE:
Q Mr. Walji, was it your understanding from this email that Happy State Bank's payment or a payment to Happy State Bank was supposed to just come out of HNGH's payoff amount?
MR. RODRIGUEZ: Objection, Your Honor. Supposed to come out is a legal conclusion, assumes facts not in evidence, and it is an improper question of this fact witness.
THE COURT: Response?
MR. KANE: That's not correct.
THE COURT: Overruled.
THE WITNESS: Would you repeat your question, please?
BY MR. KANE:
Q Yes. Mr. Walji, was it your understanding that the HSB payoff amount from this correspondence was supposed to be just a line item that was going to be paid out of HNGH's payoff amount?
A No.
Q And why didn't you understand that to be the case?
A Because as I mentioned earlier, HS -- Happy State Bank was not a party of this transaction because we were been -- because I had been informed that Happy State Bank was not involved in this transaction.
Q Mr. Walji, if that was the case, if Happy State Bank was just going to be paid out of HNGH's payment amount, that wouldn't have affected the total consideration paid to HNGH or

at the direction of HNGH, would it?

MR. RODRIGUEZ: Your Honor, objection. Improper hypothetical. This is not an expert witness. Calls for speculation.

THE COURT: Response?

MR. KANE: I think he can answer the question. I mean, it's his understanding of how the payment of funds would flow if HSB's payoff statement was just going to be deducted from the HNGH payoff amount.

THE COURT: Now --

MR. RODRIGUEZ: Your Honor, the witness has already testified that it is not his understanding, that it was not permissible, and it was not within the realm of what was contemplated in the orders or the agreement. This is all make-believe, improper.

THE COURT: I'll overrule the objection.

THE WITNESS: I'm sorry. Did you --

THE COURT: The objection is overruled.

THE WITNESS: Okay. Could you repeat your question, please?

MR. KANE: You know what, let's just move on.

THE COURT: No. Mr. Walji --

THE WITNESS: Yes, sir?

MR. KANE: I think the point's come across.

THE COURT: Do you remember the question?

THE WITNESS: No, I don't.

THE COURT: Can you --

MR. KANE: Mr. Walji -- I'll ask a different question, Your Honor. I think the point is well-made. So we'll just continue for the sake of expediency. Mr. Walji --

MR. RODRIGUEZ: Objection to the sidebar, Your Honor.

THE COURT: Next question.

BY MR. KANE:

Q Did the debtor ever provide HNGH with a settlement statement or a closing statement on or before May 31st, 2022?

A That was not the responsibility of the debtor. And it's not in the -- it was not in the order that required that.

Q So is it your understanding then that the obligations of the parties are expressly limited to what's in the agreed order?

MR. RODRIGUEZ: Objection, Your Honor. Mischaracterizes the witness's testimony, improper arguing, and badgering my witness.

THE COURT: Response?

MR. KANE: That's not true either. It's just an incorrect objection.

THE COURT: Overruled.

THE WITNESS: So as I mentioned to you that the December order required the recision deed and the promissory note. And the payment was to be made to HNGH after the

delivery of those two conditions.

BY MR. KANE:

Q So, Mr. Walji, did you have any understanding that a party was supposed to be preparing a settlement statement to circulate for closing?

A The title company.

Q And is it my -- was Mr. Marx's testimony yesterday correct that the debtor was using multiple title companies leading up to the 31st?

A Not as to 2999TC. There's only one which is Sendera. The other one had to do with Enoch. As to the debtor, it was Sendera. And you and I have been involved in it since May 10th.

Q Okay. So, Mr. Walji, are you aware of whether Sendera circulated a closing statement to HNGH on or before May 31st?

A I don't recall.

Q Was Reveri Financial using Chicago Title as their title company?

A Yes.

Q Do you know if Chicago Title provided the settlement statement to HNGH on or before May 31st?

A No. Chicago Title provided its title commitment which had the same conditions. So that transaction did not get to the point of a closing statement.

Q And I believe Mr. Marx testified that the one that got

closest to closing of the parallel tracks that he was aware of was PLN. Is that correct?
A No. That's one of them.
Q Okay. Was there an entity that you believe was closer to closing than PLN?
A Yes.
Q And which entity was that?
A That was the overseas one, the divide.
Q And is there any evidence in the record showing that there were loan documents executed, term sheets executed, funds paid into an escrow account, or anything like that submitted by the deb tortuous interference in this case so far?
MR. RODRIGUEZ: Objection, Your Honor. That calls for a legal conclusion. That's the Judge's purview of whether legally sufficient evidence is or is not in this record. This is not an expert. Improper question to be disallowed.
MR. KANE: I'll ask for Mr. Walji's understanding, and he is a lawyer and officer of the Court.
THE COURT: So I think the question was is he aware of any documents in the evidence reflecting that. So the objection is overruled. The witness may answer.
MR. RODRIGUEZ: Your Honor, clarification. Your restatement is whether or not this witness is aware of any documents or any evidence, whether already in this record or anywhere in the universe because those are two different

questions.

What I heard was Mr. Kane asking about this trial record. And what I heard you state was the existence of any evidence or any document anywhere. So which one is it? Could somebody just clarify, please?

MR. KANE: Yeah. I said in the record that's been submitted in this case so far. I did make that point clear.

THE COURT: So the objection is overruled. The witness may answer.

THE WITNESS: You're referring to which -- which question? I'm sorry.

BY MR. KANE:

Q You said the overseas entities.

A Yes. That's --

Q That's the entity I'm referring to.

A Sorry.

Yeah, that the overseas information is not in the evidence that has been -- that has been provided.

THE COURT: Mr. Walji, I couldn't catch what you said. Could you repeat that?

THE WITNESS: My understanding of the question is did the overseas party documents, were they part of this evidence, part of the exhibits. The answer is no.

THE COURT: Thank you.

BY MR. KANE:

Q Mr. Walji, who is Jeff Van Note?
A Jeff Van Note is with Reverifinancing.
Q Was he the principal of that entity, to your knowledge?
A He was my point of contact.
Q Okay. Did you --
A One of the principals. I don't know if he was the sole principal, but he was a principal.
Q And you said he was your point of contact then for Reveri?
A Yes.
Q Okay. And did you have email correspondence with that gentleman, Mr. Van note?
A I believe so.
Q And was it your understanding that Mr. Van Note had authority to make decisions and representations on behalf of Reveri?
A Yes.
Q Okay. I'm going to direct your attention to Exhibit D11-1. And I'll have it on the screen here in just a second. Actually, I'm going to direct your attention to Debtor's D-11. And this is Page 6 of 32.
A I can't read that. Can you expand it, please?
Q Yeah. And I'll just represent to you, consistent with Ms. Lindauer's prior testimony, that this is the Reverifinancing term sheet. And --

MR. RODRIGUEZ: And to correct the record, Your

Honor, Ms. Lindauer has never testified in these proceedings.

THE COURT: If he said testimony, I didn't catch that.

MR. KANE: Represented to him, which she's represented to him multiple documents on the stand, so.

THE COURT: I do believe that Ms. Lindauer did say something to that effect. So --

MR. RODRIGUEZ: She did indeed, Your Honor. But she did not testify. That's the phrase that Mr. Kane used.

THE COURT: I didn't --

MR. KANE: Oh, I'm sorry.

THE COURT: I didn't hear him say testify. So I'll overrule that objection. What's the question again?

MR. KANE: Mr. Walji, I just wanted him to make sure he understands what this document is. I was just trying to clarify for him as he was coming up to speed on this document. I haven't actually asked him a question about it yet other than you understand that this is the Reverifinancing term sheet.

THE WITNESS: Yes. Yes.

BY MR. KANE:

Q Okay. Now, if we scroll down, keep scrolling here, there is a reference just after that to Exhibit 2 title commitment. And then afterwards, there's some required language for title insurance commitment letter. And then if we keep scrolling behind that, we see there's a commitment for title insurance

issued by Chicago Title Insurance Company. This is at Page 15 of 32. Are you familiar with this? Have you seen this document before today?
A Yes.
Q Was it your understanding this is a title commitment letter issued by Chicago Title related to this Reveri transaction? Is that right?
A Yes.
Q Okay. And I want to scroll down here to proposed insured on this Schedule A. Do you see that?
A I can't. Can you expand it, please?
Q Yeah. Do you see this?
A Yeah, this is better. Thank you.
Q That's blank, isn't it?
A That is correct.
Q Okay. But just to clarify, and I think you may have already answered this so I apologize, but it was your understanding -- or who did you understand the proposed insured was going to be?
A At that time, we had 2999TC as a possibility, or TCC2022, LLC.
Q Okay. And I want to keep scrolling down here all the way to the bottom of this Debtor's Exhibit 11. I want to ask you about -- see where it says Exhibit 3 down here at the bottom. And there's this email that appears to be from a gentleman

named Jeff Van Note. And that was the individual that you said you had email correspondence with and who was the principal for Reveri, or your point of contact for Reveri, correct?

A Yes.

Q And this is -- do you recall receiving this email?

A Can you expand it a little bit? I see my name.

Q We're getting -- here. Let me try and cut it down a little bit.

A No, that's fine. Yeah, I can read portions. Yes.

Q I think that's about as big as I can get it. So I'm doing my best here. This K. Walji, that's your email address, right?

A That is correct.

Q Okay. And I'm not asking you whether this was true. You know, I'm not saying that this is being offered for the truth of the matter asserted. But was it your understanding when you received this that Reveri could not close by May 31st?

A Yes.

Q Okay. And did you understand that they couldn't close because the claim confirmation order was not a final, unappealable order by May 31st?

A That discussion happened. And they were not insisting on it if we had all the other documentations in place.

Q Okay. But this email at 5:19 on May 30th, you're saying that there was some later clarification where they were saying they might be willing to waive that?

A Yes.
Q But they were not capable of closing on May 31st, 2022. Correct?
A Because the conditions on the Schedule C of the title that you skipped had various other requirements that were not complied with.
Q Okay. And, Mr. Walji, we looked at Exhibit 33A many times. And that's the Sendera title commitment letter. Do you know if this Chicago Title C, or Schedule C from the Chicago Title commitment letter was ever sent to HNGH?
A Was what?
Q Was the Chicago Title commitment letter ever sent by the debtor to HNGH?
A I don't know.
Q Now I want to just go back to some earlier testimony. I'm going to slide over here to Lender's Exhibit 8. Sorry, I've just got a lot of stuff up here.
A Sure.
Q You're familiar with this document now? This is that December 10th order.
A Yes.
Q Okay. And you had no part in negotiating the terms of this order, correct?
A Correct.
Q And it shows here, or at least to your understanding, the

payoff deadline under this first paragraph was March 15th, 2022, correct?
A Yes.
Q And you were brought into this transaction sometime around February 24th. Was that your testimony?
A Yes.
Q Okay. And if you had this closing deadline on March 15, did you seek a title commitment letter before that date?
A I don't understand. A title commitment letter?
Q Yeah. Did the debtor seek a title commitment letter so it could start insuring it was prepared for closing at any time before March 15th?
A From the time that I got involved in late February to March 15, not to my knowledge.
Q And did you ever provide, prior to March 15th, a list of closing documents that would be required from HNGH?
A No. The closing documents were the documents that were reflected in the order which HNGH had provided.
Q Okay. So this order was entered December 10th. You understand that, right?
A Correct.
Q And the debtor had about a little more than 90 days, we'll say with some holidays mixed in, it was about three months to find a funding source and close the transaction that would pay off HNGH, correct?

A Yes.
Q But would you agree that coming up on March 15th, the debtor was not in a position to close a transaction?
A There were several conversations prior to that to get an extension. So we had the discussion was about extension --
Q Not closing?
A -- and not to the closing.
Q And at that time, I think that you pointed to a term sheet from Tall Ships, correct?
A I'm not sure what -- I don't recall the date on that.
Q Okay. Let's take a look at Lender's Exhibit 10.
A Okay.
Q Now, you were actively involved on behalf of the debtor at this point, correct? This document's dated March 14th.
A Yes.
Q And are you familiar with this pleading that was filed by the debtor on the Court's docket at Docket Number 85 titled 299TC Acquisition LLC's emergency motion to extend time for payment of amounts due and owing to HNGH Turtle Creek?
A Sorry. Could you just expand it? What's the date again?
Q March 14th, 2022.

THE COURT: Mr. Kane, I'm familiar with that motion. Is this also an exhibit? I missed whether this was an exhibit or did you just pull up a pleading.

MR. KANE: It's Exhibit 10, Your Honor, Lender's

Exhibit 10.

THE COURT: Thank you.

THE WITNESS: I don't recall the terms of that. I'm sorry. Can I read that? I'm not sure where you're going with this.

BY MR. KANE:

Q Sure. Well you see here in Paragraph 2 where it says on or about March 14th, the debtor entered into an agreement with Tall Ship Texas Partners, LLC for the acquisition and development of a property located at 2999 Turtle Creek Boulevard, Dallas, Texas?

A Yes.

Q That deal obviously never closed, right?

A No because an extension was agreed to.

Q Okay. And I understand that this -- was this term sheet entered into by the debtor to obtain or in an effort to obtain $3.5 million to pay for the agreed extensions?

A I can't read that. I don't know if that was the only source.

Q But you don't recall?

A Well, are you asking me the 3.5 million was from Tall Ships? The answer is no. It wasn't solely from Tall Ships.

Q Was any portion of that $3.5 million from Tall Ships?

A No.

Q Was there any effort to close the transaction with Tall

Ships on May 31st?
A On May 31st?
Q Yes.
A I don't know about the date. But there were -- yes, Michelle Moore Smith. But I don't recall that being a conversation on May 31st.
Q When were your last discussions with Tall Ships about closing a transaction related to this property?
A I don't recall.
Q What's your best guess? March, April?
MR. RODRIGUEZ: Objection, Your Honor. Calls for speculation and a guess.
THE COURT: Response?
MR. KANE: All right. Mr. Walji, do you recall having any conversations with Tall Ships in May?
THE COURT: Well, there was an objection. I was --
MR. KANE: I'll withdraw --
THE COURT: -- asking your response to the objection.
MR. KANE: I'll withdraw that question, Your Honor.
THE COURT: Okay, thank you.
BY MR. KANE:
Q Mr. Walji, do you recall having any conversations with Tall Ships about closing a transaction for the property in May of 2022?
A I don't recall. There was several, several parties that I

was speaking to. And Michelle Moore was one of them.

Q Do you recall having any conversations with Tall Ships -- well, let me go back and have a follow up question on your answer. So I'll withdraw the beginning of that next question. You said a Michelle who was it was one of them?

A Michelle Moore Smith at Jackson Walker.

Q And she was a representative for Tall Ships?

A That is correct. On the deal side. And there was another gentleman from Jackson Walker who was the bankruptcy counsel.

Q And was his name Mike Held?

A Yes, that sounds familiar. Yes.

Q But you don't recall whether you had any conversations with those individuals in the month of May of 2022?

A I cannot say yes or no. As I said, there was so many people we were talking to.

Q I take it if you can't remember if you had any conversations with him that they weren't close to closing by the payoff deadline?

A Sorry. Say that again.

Q I said is it fair to say if you don't recall whether you had any conversations with them during the month of closing, that Tall Ships was not close to closing by May 31st?

A No because Mr. Barton was also discussing directly with them. So this was sort of I would only be involved with the legal counsel. And then Mr. Barton was talking directly to the

principals.
Q Okay. But you still can't recall whether you had any conversations with their legal counsel in the month of May?
A I may have, I may not have. I don't remember.
Q Okay. Now, I want to turn your attention to Lender's Exhibit 17. I'm sorry, it's Lender's Exhibit 16. My apologies. It was dated March 17th. Now, Mr. Walji, are you familiar with this document?
A Is that number 94, the document?
Q Yes, it is.
A Yes. Yes, I am familiar with that.
Q Did you have an active hand in negotiating the terms of the modifications to this agreed order?
MR. KANE: I'm sorry, Your Honor. I'll restate that question. That was a little bit ambiguous.
BY MR. KANE:
Q Mr. Walji, did you participate in the negotiation of the terms of this document?
A I recall being involved with the monetary side of the $3.5 million because that's really where there were intense discussions with you, with Nate Christensen, Vipin Nambiar, Ambassador (indiscernible). And the focus at that time was about extension.
And I was involved in getting the terms of the extension of $3.5 to be paid for two separate occasions. But with

respect to the other aspects, I don't believe that I was involved in the legal or the bankruptcy side. It was strictly the financial side of the -- of this transaction.
Q And you did successfully negotiate for that extension to May 30th at 5:00 p.m., correct?
A Yes. And that was paid for, too.
Q Right. And so after the entry of this order --
A Yes.
Q -- did the debtor ever seek a title commitment?
A Yes.
Q When?
A It was early May.
Q Was that approximately May 10th?
A No, it was earlier than that.
Q And is it your understanding that the first time the debtor actually circulated the Sendera title -- well, let me go back. I'll ask you a different foundational question. I'll redact that question.
Mr. Walji, was the title commitment that the debtor received a Sendera title commitment?
A I'm sorry. Sendera Title? Yes.
Q And is that -- well, when was the first time, to the best of your knowledge, that the Sendera title commitment was delivered to HNGH?
A I don't know because I had introduced you to Julie Lissey

(phonetic), and I don't recall when. I believe it was early May.
Q And just one second.
A Sure.
Q Now I'm going to have you turn to Exhibit, Lender's Exhibit 24 which I'll put up on my screen. Mr. Walji, do you recall this email?
A Yes.
Q And this is, you know, I guess the part of an email in an email chain, correct? I'll scroll down here. Do you see this? There's correspondence from Ms. Lissey?
A Yes.
Q It looks like it was sent in part to you, Mr. Walji?
A Yes.
Q And is this what you recall submitting or introducing to the debtor? I'm sorry, to HNGH in early May? Is this the correspondence you're referring to?
A I believe, yes. I believe so. That's --
Q Now, is there a title --
A Sorry.
Q Go ahead, Mr. Walji.
A No. I know I forwarded the email from Julie Lissey. I just don't recall if that was the first time that I introduced you to Sendera.
Q Okay. And, Mr. Walji, there is no title commitment letter

attached to this email, to your knowledge, was there?
A I have to read that. But I believe the title commitment was sent -- was a direct communication between you and Julie Lissey.
Q Okay. And let's see. I believe that's Exhibit 33. So let me put that on the screen.
A Sure.
THE COURT: Are we at Lender's Exhibit 33, correct?
MR. KANE: Yes, Your Honor. And I apologize. I know this takes a little bit. I got to -- there we go. Yeah. Okay. I'm going to decline that. It looked like I got a request for annotation from somebody on a number that I was unfamiliar with. So that may have just been an accidental button click, but I'm going to decline that request.
BY MR. KANE:
Q Mr. Walji, is this the direct correspondence from Julie Lissey that you were referring to, and on which you appear to be CC'd?
A Can you just expand it a little bit, please? And your question is? I'm sorry.
Q Is this the email that you're referring to? I think you just testified you believe that Julie Lissey sent me something in direct correspondence. This is an email from Julie Lissey to me, but you're CC'd on this. Is this the email that you were referring to?

A No. I don't know because you were communicating directly from May 10th through the May 24th. But if you're asking me about this particular one, yes. But I don't know the communications that you and Julie Lissey had since May 10th.
Q And I'll ask the question a different way. Is this the first piece of correspondence that you were included on in which the Sendera title commitment was sent to me or HNGH's representatives?
A I don't recall because there were several communications between Julie Lissey that did include you, and did not include you. So I can't answer that.
Q So you just don't know.
A I don't know.
Q Understood. Now can you explain why the debtor waited from March 15 to early May before it sought a title commitment that knew that this was a drop-dead closing date?
A There were several discussions with respect to getting the May 30th funding. There were several communications that were being handled. You're not just -- maybe Tall Ships was way back in March, and there was some around that time and subsequently. But they were still under negotiations at that point in time.
Q I think you acknowledged no title commitment related to Tall Ships though, right?
A I don't know if that's the case. I don't know.

Q Now, Mr. Marx testified yesterday that there was a difference between a list of items that a title company would need to issue a title policy and a list of items that a lender would need to close the transaction. Did you hear that testimony?

A I don't recall.

Q Well, do you believe that to be correct?

A I understand the question.

Q And do you believe that to be correct?

A Which part?

Q That there is a difference between what a title company might need and what a lender might need?

A Whether it's a lender, borrower, title insurance, yeah, they're different needs requirements if you will.

Q And one lender might have a slightly different list of needs than another lender. Is that fair?

A Yes, including the borrower.

Q Okay. So when was the first time that the debtor sent a list of documents required by its potential financing source to close a transaction?

A The list of documents were self-explanatory in the -- in Schedule C.

MR. KANE: Objection, non-responsive.

THE COURT: Response?

MR. RODRIGUEZ: I think it's very responsive, Your

Honor. He said when were they first communicated. They were communicated via Schedule C.

THE COURT: So I'll sustain the objection. But why don't you re-ask it?

BY MR. KANE:

Q Okay. Mr. Walji, you just testified that you understood there is a difference between the list of documents a title company might need to issue a title policy and the list of documents a lender or finance party might need to close a transaction, correct?

A Yes. And also, the debtor would require.

Q Okay. And we've talked about what the title company might need. And that was sent -- is it your understanding that that was sent by Sendera to HNGH at the latest on May 24th?

A I cannot speak to this email.

Q Okay. Now, my question is to the best of your knowledge, when did the debtor first deliver to HNGH an independent list of needs from a lender to close the transaction?

A The two -- I communicated with Julie directly over the phone and by email that the biggest issue that we have with the lenders and ourselves is this recision deed. And the recision deed that was provided by HNGH on May 12th was not acceptable. And that's where the matter got stuck, along with this collateral assignment of HSB. Those conditions needed to be cleared before we could proceed.

Q Okay. And, Mr. Walji, you just described to me correspondence that you had with Ms. Lissey, correct?
A Yes.
Q And my question was when did the debtor deliver to HNGH a separate list of documents needed by its closing partner, its financing source, its potential lender needed for closing, when was that list provided by the debtor to HNGH for the first time?
A The Schedule C May 18th, I believe. But after the title commitment of May 18th was a list of documents that was outlined in the title commitment from Sendera.
Q And the satisfaction of those documents, that's all that was needed for any of your lenders or closing parties?
A Yes, to my knowledge.
Q Now I'm going to turn your attention to Exhibit 84. Well, hold on. Mr. Walji, before we do that, let's look at Debtor's Exhibit D3. Are you familiar with this document?
A Can you expand it a little bit? Yes.
Q And did you help prepare this document?
A Not in drafting it, but in communicating information to Ms. Lindauer, yes. Just to be clear. I did not physically type it.
Q Okay. And what is your understanding of this list of documents? Did you hear Mr. Marx -- I'll ask this question first. Did you hear Mr. Marx testify that this list of

documents was different than the list of documents on Schedule C, though there may be some overlapping items?

A I don't recall that.

Q Okay. Would you say that that is accurate?

A What is accurate?

Q That this list of documents is different than the Sendera Schedule C list, though there may be some overlap.

A You're asking me to review Schedule C of this document. I can't do that right now.

Q Okay. Well, do you have any idea of all that was needed was -- let me put it a different way. If all that was needed to satisfy all of your lenders' concerns was the completion of the items on Schedule C to the Sendera title commitment letter, then why did the debtor send this document to HNGH on May 30th at 3:24 p.m.?

A These are documents -- sorry. These -- these are information that another lender which Mr. Marx was representing required.

Q And do you recall which other lender that was?

A I believe we called it Missouri --

Q Ah.

A -- individual. I believe that was one of them. I'm not sure which other ones that he was referring to when he made this contribution to this letter.

Q Right, so --

A But I -- yeah.
Q Go ahead. I didn't mean to interrupt you.
A No, but there are specific items that were very clear to me was the recision deed, the reinstatement of the note, the authority of the documents because of the signatures of HNG Turtle Creek as a Texas Liability, and as a Delaware Liability. And the signature of Mr. Vipin Nambiar not clear as to who he was signing on behalf of because there was some HNG -- another entity involved.
So that authority documents which is reflected in the title company were, those are the major concerns that I had. I cannot read the entire document to tell you which were additional concerns that are not in Schedule C.
Q I'm not --
A I believe -- sorry. Go ahead.
Q No. So is your understanding then this document was really tied to the Missouri funding entity?
A No. I'm not saying that. What I'm saying is that I did not prepare that. I contributed to that. This document was not sent to me as it was being prepared. All I did, to my recollection, is saying these are the important things that we need because you had asked Ms. Lindauer what are the specific items that we would need to close on. And that was in response to your request that she provided that.
Q I see. So let me ask you this then. You really needed to

have documents nailed down for the one party that you were trying to close with, right?
A I'm sorry. Say that again.
Q If TCC2022 is not going to be able to close the transaction, remittance of documents satisfactory to their concerns is not important. But satisfaction of your closing party's concerns would be --
A Yes.
Q -- critically important, right?
A That is correct.
Q Okay. And isn't it true that you didn't disclose who your closing party was to HNGH until 3:17 p.m. on May 31st?
A I don't recall disclosing that.
Q Okay. I'm going to direct your attention to Lender's Exhibit 84. Are you familiar with this email?
A Can you just expand a little bit more, please.
Q Okay. I'll try.
A Is there an email below that?
Q Yeah. I mean, there's a series of --
A I'd like the details. I need to read that to get the context of my response.
Q Sure. I guess we got to go down so you can see who is responding to what on comments, Mr. Walji. But I'll make clear I'm most concerned about this first part, but happy to go through it.

A Well, there are several communications back and forth. So I'm trying to understand --

Q Yeah, I have no question. I'm simply asking you about the timing of your disclosure of the funding party. But we can go through this as well. So here I say my comments are below in black. Happy to get on a phone call with the title company or funding party. Do you see that?

A Yes, I do.

Q And again, I'm not saying anything for the truth of the matter asserted. I think this document was admitted for, let me make sure, yeah, just to show the status of any matters and the steps towards closing. Here you have your comments in red. So my comments in black, your comments in red.

A Okay.

Q And we scroll farther down, talking about, go all the way to the bottom here, it's actually Joyce asking which items on my list can you deliver today or not deliver. All right? Do you see that, Mr. Walji?

A That is the list -- that is the list that you earlier asked me about, the Joyce Lindauer letter of May 30th, correct?

Q Right. And so I have a response. And my response is in blue to start. And I provide a list of documents that we believe we can deliver for closing. Okay? You see these?

A I'm sorry.

Q I understand. You respond in red.

A Okay.
Q I'll go slow if you want to read this whole thing.
A Please, I do. Can we start from -- is this the last of the email?
Q Yeah. We've already gone through all the other parts. This is the only part that we haven't talked about.
A The email preceding this one.
Q Yeah, right.
A Yeah, that --
Q So these were comments layered on another. But so here's the bottom. This is the last of the emails on this chain. See, there's nothing else after that, just Page 5 down at the bottom.
A All right. So that's the May 31 email between you and Ms. Lindauer.
Q Right.
A Okay.
Q And then here's my response to Ms. Lindauer is in just blue.
A Right. Can you just stop it right here?
Q Yeah.
A Okay. This is John to Joyce to Nate. So this is my response to Ms. Lindauer --
Q No.
A -- not to you.

Q Just to clarify, just to clarify, you then provide a response where your comments are in red.
A So I'm just trying to look further below in red. Where is that?
Q It's right here. Joyce, pursuant to your request, I responded under each of the items below in red.
A Right. So can you go below?
Q I will. I will. I just, when you read it, I want you to understand what the comments are and the timing of the comments so we don't have to keep scrolling up and down, up and down. Okay?
A Well, you're scrolling, Mr. Kane. I can't follow you.
Q I understand. I'm trying to make it so you can follow. So after you provide your comments in red, you see here that I am responding to you with --
A Yes.
Q -- Ms. Lindauer also on this email?
A Yes.
Q And I say right here comments are below in black.
A Yes.
Q So you understand when we go read that whole chain, and I'll scroll at your speed, that it is initially my response to Joyce in blue, your response to my comments in red, and then my comments in black responsive to your statements. Do you understand that?

A It's your response to both me and Ms. Lindauer. It says to K. Walji and --
Q Yeah, that's right. That's right.
A I just want to be clear. But I did --
Q Okay. Now we can go through at your leisure. Again, this is ancillary to the question that I have for you about disclosure of your funding party. But I'm fine with you going through this. Tell me when you're ready for me to scroll further.
A I just want to get to that reattached recision deed. That's what I wanted to go through that. I said we're not going to the form of the recision deed. And I raised those issues. I don't see that document attached in there.
Q Yeah. There's not an attachment to any of these emails.
A And that's the critical issue. The recision of deed has, or recision deed or the recision instrument was the biggest issue for us to proceed.
Q And, Mr. Walji, that's not responsive to any of my questions right here. The questions that I've asked you --
A Well, you asked me to read.
Q When did you disclose the funding source for closing? When did you disclose to HNGH the party with whom the debtor was going to close the transaction?
A I had no obligations to disclose the funding source. My obligation --

MR. KANE: Objection, non-responsive.

THE WITNESS: -- was to deliver the funds.

MR. KANE: When -- objection, non-responsive. I'll wait for a response from opposing counsel.

MR. RODRIGUEZ: I think it is responsive. And the objection is incorrect.

MR. KANE: I asked a when question. And the response was I didn't have an obligation to. That isn't even close to responsive, Your Honor.

THE COURT: I'll overrule the objection. Mr. Walji, I think -- well, go ahead, Mr. Kane.

BY MR. KANE:

Q Mr. Walji, I'll ask you a different question then. Did you disclose on May 31st the name of the closing party to HNGH?

A One of them.

Q And on May 31st, were you going to have to obtain funding --

A Could you repeat the question, please?

Q On May 31st, did you disclose the closing party, the party with which the debtor intended to close the transaction, to HNGH?

THE WITNESS: Could I ask the court reporter to repeat that question because I don't believe that was the question you asked.

MR. KANE: And this is, like, a really easy one, Your

Honor. I'm struggling with this. So I would ask the Court to direct Mr. Walji to answer the question.

MR. RODRIGUEZ: Well, the answer, we can all agree, was one of them. You said was there a disclosure of funding source. The answer was one of them. We heard that crystal clear. So --

MR. KANE: Okay.

THE COURT: I think that --

MR. RODRIGUEZ: -- if you feel like that's the answer, let's just go on, Mr. Kane.

THE COURT: I think that's what -- Mr. Rodriguez, I think that's what Ms. Smith, my judicial support specialist, said that the record did not pick up. So that's why we're going over this again.

MR. KANE: If we can all stipulate that that was the answer to the question, then we should be good to go. And I hope that that's on the record.

MR. RODRIGUEZ: So stipulated.

BY MR. KANE:

Q Okay. Mr. Walji, which one of them?

A I don't understand your question.

Q Okay. I'll try and break it down. Mr. Walji, I asked you which -- I asked you whether the debtor provided HNGH with the name of its funding party on May 31st. You answered one of them. I said --

A Correct.
Q -- which one of them.
A The P&L, Garrison Kickham. I believe that's the one that I provided that information.
Q Okay. I'm going to turn your attention to Lender's Exhibit 85. Do you see this email dated May 31st, 2022 at 3:40 p.m.?
A Yes.
Q Are you familiar with this email?
A Yes. This was in response to Julie Lissey saying that they could not close.
Q Okay. Is Julie Lissey anywhere on this email?
A No.
Q Okay. So this is an email that was sent to Joyce Lindauer and cc'd me.
A That is correct.
Q And it had an attachment. Is that correct?
A Yes.
Q And I'm going to turn your attention to Lender's Exhibit 85A. Are you familiar with this document?
A Yes.
Q Did you help prepare this document?
A Can you expand that, please? No, I did not prepare the document.
Q Did you have conversations with Mr. Kickham about what

should be included in this document?
A No. I responded to his issues that are communicated in the letter. I gave him answers to the questions with respect to the status of the documents that were required.
Q Okay. But it's your testimony then that you had absolutely nothing to do with Mr. Garrison Kickham's preparation of this document?
MR. RODRIGUEZ: Objection, Your Honor. Misstates a witness' testimony.
THE COURT: Response?
MR. KANE: I'm asking him if that's correct. It's a question.
THE COURT: So, over --
THE WITNESS: I did not prepare that, no.
BY MR. KANE:
Q Okay. Do you have any reason to believe that Mr. Garrison Kickham may have made material misstatements in this document?
A I don't understand the question.
Q Okay. Do you -- was it your understanding that this letter reflected Mr. Kickham's inability to close?
A Yes.
Q And did you believe the statements included in this letter to be true?
A I can't speak for Mr. Kickham. I know that the issues that we were having trouble with was getting other documents

related to the recision and the reinstatement of the note. I need to read further if there's something else. But those are the two issues that were not satisfactory to them. And Ms. Julie Lissey was unable to provide that.

Q Okay. So now let's look at this second paragraph here. Assuming these issues are to be resolved today, and we receive confirmation from the title company, our underwriting department will require five business days to close and fund the transaction. Was it your understanding that then if the Schedule C requirements had been satisfied, the debtor would still be looking at a five-day delay before PLN could close the transaction and fund?

A Those, there were prior communications where the five -- it was beyond the five days for us to provide the required documentations which were not provided. So that's the context that I understood that the lender has previously requested that information. And that was more than five days earlier. And we requested that from Ms. Lissey and from you. And we were back and forth on this recision. So until they got that, those documents, they were not going to fund, similar to what -- well, I won't say that. That's fine.

Q So yeah, just I'm a little bit confused by your interpretation. Are you saying that you read this to mean that they had been waiting five days for the documents, or that if they got the documents, they would still need five days to

review and confirm and close?
A They had the funding in place. They needed the documentation five days in advance.
Q Of funding, of closing? I'm sorry, I'm not following. Can you just clarify your point?
A That in order for them to release the funds, they had advised us that they need these documents which was not on May 31st. It was earlier in May. I don't recall the exact date. And so we were working hard particularly trying to get this recision deed finalized so that we could go ahead and satisfy that one major issue. And the second one was the existence of the promissory note.
Q So, Mr. Walji, I guess I'm still scratching my head a little bit because it says assuming these issues are resolved or are to be resolved today, May 31st, 2022. So the way I read that is let's say all the issues with document delivery have been satisfied. Doesn't it still say our underwriting department will require five business days to close and fund?
MR. RODRIGUEZ: Objection, Your Honor. The document speaks for itself. I think that's an objection I've heard about 100 times in these proceedings. And I think it should be sustained. The witness has already asked and answered. We need to move on.
MR. KANE: I'm trying to get clarification, Your Honor, and the witness' understanding of the timing of when

this parallel track purported to be able to close.

THE COURT: Well, I'll sustain the objection because I think your question was is this what the letter says.

MR. KANE: Okay.

THE COURT: So if you want to ask a different question, go ahead.

BY MR. KANE:

Q All right. Was it your understanding, Mr. Walji, that PLN could not close before May 31st because the claim confirmation order had not gone final?

A No. That was -- that was one other factor that they noticed. But that wasn't the reason why they would not close. What they -- what Mr. Garrison provided was proof of funds, because that was important for us before May 30th, or May 31st. And they required it. They said well did you send us the documents? We can't review it right away.

We will need time to get our underwriters to review the documents because there was conflicting information from Sendera's underwriter and that we were trying to clarify. So they needed their underwriter to make sure that the final title documents will be satisfactory to them. And that was the five-day requirement, not the funding requirement because the proof of funds was already in existence as of March -- as of May 30th, 2022.

Q So this provision here that says could not have been

possible to satisfy our underwriter, you didn't think that that was right?

A Which part is not right?

Q So this bottom paragraph that says our underwriting stated that the May 18 court order has a 14-day appeal period, and that would be after May 30, 2022, i.e. June 1st, 2022. And thus, May 30, 2022 could not have been possible to satisfy our underwriter. Did you believe that to be false?

A I don't believe it's a question of -- we talked about it with Mr. Kickham. And he said we get those documents. But the recision deed, the reinstatement of note, the authority documents, and we will get a waiver from you to make sure this is not an issue.

Q And none of that is reflected in this document, is it?

MR. RODRIGUEZ: Objection, Your Honor. Again, the document speaks for itself. We don't need a narrative description of what's on the written page.

THE COURT: Response?

MR. KANE: That's -- I'll withdraw the question. The document does speak for itself.

BY MR. KANE:

Q Mr. Walji, I do want to talk a little bit about plan confirmation. Is it your understanding that the debtor had a shortened notice period for plan confirmation?

A I'm sorry. State it again.

Q Was it your understanding that the debtor had a shortened notice period for plan confirmation?
A I believe so.
Q And that was it your understanding that the debtor sought HNGH's approval for an expedited plan confirmation process?
A The debtor what?
Q Sought HNGH's approval for an expedited plan confirmation process.
A I don't know.
Q You don't have any recollection of that?
A I don't. No. I think that's between Ms. Lindauer and HNGH.
Q Mr. Walji, do you have any understanding whether the debtor was concerned that it would struggle to close the transaction before plan confirmation because it would have to find debtor in possession financing?
A No. I didn't recall that as being an issue from my standpoint.
Q And do you recall whether HNGH supported the debtor's efforts for an expedited plan confirmation process?
A I don't know. I was not part of that communications.
Q Were you aware that the plan was confirmed on May 10th?
A I don't recall the date. But I do -- I do remember the plan had been confirmed.
Q Do you have any idea when the plan confirmation order was

actually submitted to the Court for entry on the docket?
A No.
MR. RODRIGUEZ: Objection, Your Honor. Relevance.
THE COURT: Response?
MR. KANE: Well, it affects when the plan confirmation would be a final and unappealable order. And we've seen multiple exhibits provided by the debtor so far that have reference to the plan confirmation order going final as a condition precedent to closing.
THE COURT: It's overruled.
THE WITNESS: All right. I'm sorry, could you restate your question?
BY MR. KANE:
Q I said do you have any idea when the debtor submitted the confirmation order to the Court for approval?
A No.
Q During the week before closing, did you try and get an extension of the payoff deadline to June 2nd?
A It was a confusion between you and me with regards to certain documents that you did not have in your possession. And I offered that until you get those documents, we would extend that.
Q And that June 2nd date, did you understand that that would fall outside of the date on when the plan confirmation order went final?

A At that time, that was not my -- that was not in my mind. What I remember is Julie Lissey requested an assignment document of exhaust that you did not have. And I said if that's what it takes, we'll extend it day by day. And that was just an offer that I made so that we could conclude this closing of this transaction.

And I believe there is emails to that effect. This was one of the I think there were to, to my best of recollection there were only two lenders that raised this appeal issue out of their, you know, concern, one of which agreed to waive that. The -- so --

Q And there's no documentary evidence in the record so far of any party agreeing to waive that, is there?

A Well, I didn't really -- there's so much happening. My focus was to make sure that we had evidence of proof of funds --

Q Sorry, Mr. Walji. That was a yes or no question.

MR. KANE: So, objection. Non-responsive.

MR. RODRIGUEZ: Objection to counsel overrunning the witness. Can we at least let the witness finish the statement before you make an objection?

And, Your Honor, I'd like the Court to take judicial notice of the fact that these agreed orders we're talking about are agreed orders. So I don't understand how there was going to be an appeal of an agreed order. I think this is kind of a

rabbit trail. Just another observation.

MR. KANE: Mr. Rodriguez is not a bankruptcy attorney and doesn't understand the difference between an agreed order and a confirmation order which was not an agreed order. So that's a non-point for this discussion.

THE COURT: So I'll overrule the objection. Why don't you ask another question?

BY MR. KANE:

Q Okay. Mr. Walji, let me just turn your attention to Exhibit 58.

A Okay.

THE COURT: Are we on --

MR. KANE: Lender's.

THE COURT: -- Lender's exhibits?

MR. KANE: Yes, Your Honor. Lender's Exhibit 58.

BY MR. KANE:

Q And I think that you just described in your testimony an exchange where there was what you described as a miscommunication about an extension to June 2nd. Do you recall this email exchange?

A I can't read that. Is there an email below that?

Q There is.

A Okay. Can you continue, please?

Q Yeah.

A Is that it?

Q This bullet five.

A No, is there anything below bullet five?

Q There's nothing. Oh, there's something about a conference call at 3:15. Do you remember participating in that conference call?

A That's what I was wondering. Can we read up -- I don't know the answer. But my emails above that may help me clarify that.

Q Okay. Here's your email above that at 4:45 p.m.

A Yes. We had - -yes, I was part of that conversation.

Q Okay. And you reference in this there are five points, part of your call recap, correct?

A Correct.

Q And one of them is acknowledging that HNGH agreed to extend that payoff deadline from May 30th to May 31st, correct? And that's really not in dispute here. Is that right?

A This is Number 1?

Q Yes, sir.

A Yes, that's correct.

Q And then, you have an acknowledgment about this May 24th email where Julie Lissey sends an email requesting assignments from Axos Bank and Happy State Bank.

Do you see that?

A Yes. And that was the email I was referring to that Julie had asked for these on May 24th to you.

Q And I know that you heard Mr. Marx acknowledge that HNGH provided those Axos terminations. Do you agree that that was the case?
A No, I do not. They did not provide the assignment. They only provided the termination document, not the assignment from Axos, which is the subject of my Number 2.
Q Okay. And Mr. Marx testified at fair length yesterday that he understood that the terminations addressed those assignments. Do you believe that to be correct?
A No, I do not.
Q So you believe that this was a totally separate issue?
A Absolutely.
Q Okay.
A You cannot terminate something that you do not know what is in existence.
Q I don't think I understand that statement at all.
A You cannot terminate something unless you're terminating -- and what this document requested was the document preceding the termination and that was an assignment from Axos Bank --
Q Okay.
A -- which was not provided.
Q Let's address that because I think we can put this to bed right now. Let's go back and look at 33A.
A Okay.

Q And this is the -- well, let's look at 33 -- sorry. Let's look at 33 first. Let's go to Exhibit 33.
A Sure.
THE COURT: Lender's Exhibit 33.
MR. KANE: Yes, Your Honor.
BY MR. KANE:
Q And see where Julie Lissey states, "I'm hoping you can help me with some items on Schedule C of the title commitment regarding assignments from Axos Bank and Happy State Bank."
A Yes.
Q And you're saying that you can't terminate something you're not aware of. But this --
A No. I'm just saying that that is not the -- what she requested was not a termination, it was an assignment is what I'm saying.
Q All right. So she needed the assignment. All right.
Now, I want us to look at that Exhibit 33A.
A Sure.
Q And we are going to scroll down here to Schedule C, Number 5.
A I can't read that.
Q Okay. Do you see this reference to this notice of collateral assignment of deed of trust and loan documents to Axos Bank?
A I can't read that. I'm sorry.

Okay. No.
Which document is that?
Yeah. This is good.
Q Mr. Walji, doesn't it appear that she's identified in this title commitment Schedule C the assignment related to Axos Bank? It specifically lists the date and the instrument number, correct?
A That is not the email she sent. If you could -- I had attached the email when I raised that issue of Number 2. If you could just go back to the email because it says that I've attached the email from Julie. But I don't know if we have that email that I was making reference to on May 31st after our 3:15 meeting. If you could go back to that letter before you jumped to this one.
Q I don't have that in our exhibits currently.
A Okay. Well, that is what I was referring to, not -- I don't know. You could draw that conclusion. I'm just saying, I attached the email from Julie stating what she wanted and that was not provided. I'm just bringing it to your attention all the five points.
Q Okay. So we have -- let me -- hold on. Let me go and make sure I've got your email. This is your email.
A That's right.
Q Right?
A And that's what it says in Number 2.

Q And it says --
A (Audio interference) the attached email from Julie.
Q Right. It says, "On Tuesday, May 24th, Julie Lissey sent an email to John requesting the assignments from Axos and Happy State Bank."
A You're skipping the words "See attachment."
Q Right. I understand.
A Please read the --
Q But it's -- you don't recall whether this Exhibit 33 was the attachment?
A No, I don't. I don't know. I'd attached it. I don't know if that is the one.
Q Okay.

MR. RODRIGUEZ: Your Honor, I'd like to -- I'm sorry, Mr. Kane.

Your Honor, I'd like to interpose an objection under Rule 06. Mr. Kane has filed a sworn declaration that he is the custodian of records for his law firm so he has within his possession, custody, or control the attachment that is referenced in this email he's trying to question my witness about. I would ask that Your Honor order Mr. Kane to arrange for that attachment to be presented here in Court so that we can examine the witness properly relative to the entirety of this actual communication.

MR. KANE: Your Honor, it would be my pleasure. If

you want to give me like a one minute, I'll just turn my mic and my video off, I'll pull the document up. We can present it to the Court. We can do a comparative analysis to see if it's the same as this Exhibit 33.

And if it isn't, then I'm more than happy to provide it. If it is, everyone's seen this document a bunch of times throughout these questioning, no harm, no foul. Let's continue to have this questioning. Does that work for Your Honor?

THE COURT: Yes, it does.

MR. RODRIGUEZ: Thank you, Mr. Kane.

Thank you, Your Honor.

MR. KANE: Okay. I'm going to stop the screen share real quick.

(Audio paused from 12:01:26 until 12:04:49)

MR. KANE: (In progress) and I am ready to proceed if everybody else is.

THE CLERK: There we go.

THE COURT: All right. I'm ready.

THE CLERK: All right.

MR. KANE: Okay. I'll return to sharing screen so we can address this issue.

BY MR. KANE:

Q All right. Mr. Walji, this is your email in isolation, correct? Do you see how it references this attachment?

A Yes.

Q Okay. And this is the five points that was included in the prior exhibit we were reviewing?
A Yes.
Q I believe that was Exhibit 58.
Now, this is the attachment that was incorporated into that email. Do you see these redacted portions? There's reference in your email to a Julie Lissey email, so I'm going to continue to scroll down through the redactions. There's a begin forwarded message. We're working to try and get this issue resolved. And at the bottom here is the Julie Lissey email that you referenced.
Do you see that?
A Well, what's the redacted one because that's from Julie, too, isn't it?
Q I have no idea what the redacted is.
A I believe that's -- well, it's difficult because I believe that was a Julie -- I need to see the redacted to be able to comment if you would like to please.
Q Yeah. So just let me clarify then. Your expectation when you sent this -- I didn't redact it. I want to be clear. This is the form of attachment that was included with your email.
A Okay.
Q So I don't know what this redacted information said. I cannot provide you a clean copy of this email.
A Yeah. (Indiscernible).

Q Right. So in your email on this Number 2, you reference on May 24, 2022, Julie Lissey sent an email to John, see attachment, requesting the assignments from Axos and Happy State Bank.

Now, if we continue to scroll on your email, there is an email from Julie Lissey to John Kane dated May 24, 2022, in which Julie Lissey requests assistance with some items on Schedule C regarding assignments from Axos Bank and Happy State Bank.

Is that the email that you were referring to?

A You know, this is one of -- it could be the email or one of the emails that does reflect the actual matter. And also about the issue that we've been talking about, which is the Happy State Bank, that -- as you see that Happy State Bank will not receive any payoff funds or be signing a release with HNGH.

Q Hold on Mr. --

A So I had discussions with Julie. I said what closing documents are they providing, and that's when she pushed. I said you need to get whatever we need for closing from John or Mr. Kane, and that was a response to my request to Julie because she had not received the closing documents, not the -- not received the documents from HNGH that were necessary to close beyond the rescission deed and the promissory note.

Q So Mr. Walji, are you telling me that you don't know if this is the email that you were referring to in your May 27

correspondence, Bullet Point Number 2?
A I'm not saying it is.
Q Could be a different email?
A No, I'm not saying it is, but -- No, I'm not saying it's a different email. I'm saying there could have been another one but this is one of them. I don't know if there was another email on May 24th is all I'm saying. (Indiscernible).
Q I guess my struggle is on that Point 2, don't you say "see attached." So weren't you referring to this email on your Bullet Point 2?
A Yes.
Q Okay.
A I mean the point is. yes, but there could have been another email that raises the same question. I'm not disputing that, Mr. Kane.
Q Okay. So this -- I want to see just to make sure I understand this. This email, see the body here, that's the same text as in this email, right?
A No, because if you read that -- I can't compare it, but it looks (indiscernible) -- let's see.
Q It's formatted differently. I would agree with that.
A Can you go back? I mean, it looks pretty close is all I can say. I don't know if it's exact the way you're saying it's exact. But in substance, it does capture that. Because she has -- if you look at the bottom, she's attached some

hyperlinks so I don't know that's what I was -- I don't know what -- this is a long chain because it was, you know, it was, it was May 31st and I was going back and forth with her.

I said, where are the closing documents from HNGH? And she said, I'm waiting for Mr. Kane. He said he will be delivering that.

Q Okay. Mr. -- go ahead.

A And so I think that is either --

Q Sorry, I thought you were done. You can continue.

A Yeah. No. I recall during this last, you know, few days we were talking about getting all the documentations from HNGH and that's really my recollection because there's just several communications with a lot of parties. But there were specific communications with Julie to make sure that the Schedule C items that were to be provided by HNGH were in their possession.

Q Yeah. And one of those things that needed to be in their possession, at least it was your understanding, was the assignments, not the terminations. Is that right?

A You'll have to -- I'll have to look at the Schedule C. My focus was on Schedule C, whatever the Schedule C says.

Q Well, hold on. Hold on. Because I want to address.

A Sure.

Q This Number 2 --

A Yes, sir.

Q It's requesting assignments from Axos Bank and Happy State Bank.

A That is correct.

Q Right. And I want to talk, Mr. Walji -- let me finish asking my question. I want to talk about this --

A Sure.

Q -- Axos Bank assignment. Is it your understanding that HNGH provided the termination, the recorded termination, resolving the inquiry about the Axos Bank assignment?

A No. That was in response to you making the statement about Mr. Marx accepting the termination note.

Q So you don't believe that HNGH provided a recorded termination that resolved this concern for Sendera?

A Let me try again. You keep insisting the word termination. There is nothing in this Number 2 that references termination. It talks about assignments. I don't know why you keep repeating things that are not stated. There is no termination being mentioned in Number 2.

I said, what you're requesting is an assignment from Axos Bank and Happy State Bank as further described in the attached email, and you have the email that requires that information. And if you go up again, the date on this email that is May 27th. That was a communication to you. Okay.

So I'm just repeating -- well, recapping our conversation of how we are going to close. And I raised this issue because

Julie had raised that you had not provided that.

Q And I needed to provide an assignment from Axos Bank. That was your understanding, or that HNGH needed to provide that assignment?

A Right. And the Happy State Bank information. Can you --

Q Okay. So let's --

A Can you (indiscernible) that email, please? Let me just finish my reading of that so we don't --

Yeah. Number 3, that's where the Happy State Bank issue comes up about the rescission date, see the same attachment. I'm trying to make sure that -- if you can go down back to the attachment you are referring to from Julie, that further down.

Q The attachment from Julie?

A Right. The one that you just showed me that you had to -- when we took a break for you to retrieve that email.

Q Well, it was an attachment from you. That's why I was confused.

A I attached --

Q You want to see the attachment that you included on your email correspondence?

A Which was from Julie.

My Number 2 is really clear. I don't know what's creating that confusion, but I'm happy to walk you through that.

That is the attachment that I was referring to for Items 2 and 3, I believe, were Happy State Bank and Exxon -- sorry,

Axos Bank is an assignment.
Q I understand that, Mr. Walji. I want you to look at 33A.
A Okay. Where is 33A?
Q It's probably faster if I do it like this now at this point. Hold on.
A Sure.
Q This is the Sendera Title list, right? This is Schedule C? And there's reference to an assignment of deed of trust.
A No, sir. It is a notice, which is not the same thing. That is requiring a notice of collateral assignment.
Q Okay. And now down here you have a collateral --
A An assignment -- no. An assignment is a separate document. A notice is a separate document. Those are two separate things. One is notice of an existing assignment. That's what you're giving notice to.
So she's asking in the Schedule C a notice of that collateral assignment. And then on the email, she's asking for the assignment itself.
Q And your position is that those terminations that were provided don't address that issue. That's your understanding?
A I don't know where you're coming with termination. I have made no reference to termination.
Q Okay.
A There's nothing there that asks you about termination. I

don't know why you're bringing somebody else's testimony here.

I'm simply asking you what is being asked. I did not raise the question. Ms. Lissey asked for a assignment, not a notice of collateral assignment. If you choose to read that, I am not getting in the way. All I'm saying to you is that that information was not provided by HNGH. That's all.

And similarly, as you noticed on that email, as late as May 24th, you had represented, or HNGH represented that Happy State Bank has nothing to do with it by Ms. Lissey's own statements, and then we get sprung on May 31st with Happy State Bank saying we sent up the money.

MR. KANE: Objection, that misstates facts in evidence.

THE WITNESS: (Indiscernible).

MS. KANG: I'd like to strike Mr. Walji's testimony that there was correspondence on the 24th that suggested that we disavowed, or HNGH disavowed to Ms. Lissey or anybody of the involvement of Happy State Bank.

THE COURT: I'm waiting for a response.

MR. RODRIGUEZ: Yes, Your Honor.

I think we already have documentary evidence of record where Mr. John Kane makes the unequivocal statement that HSB Bank has nothing to do with this transaction. And I know Mr. Kane doesn't like that evidence and he doesn't like the testimony that my client is giving as to his communications

with Mr. Kane, but that's direct evidence. You can't keep evidence out.

There's no objection that says, hey, you can't bring anything that's bad for me. I'm sorry if the evidence is prejudicial, but there is a predicate in the documents and we have now gotten testimony from this witness about his communications with Mr. Kane. Mr. Kane can dispute them and clear them up when he decides to take the stand.

The objection should be overruled, Your Honor. It's a nonsensical objection.

THE COURT: You know, frankly, I have forgotten exactly what Mr. Walji said that was objectionable, so I'm only going to sustain the objection because I can't rule on it.

Why don't you ask another question?

MR. RODRIGUEZ: Well, Your Honor, I'm going to object that you are sustaining an objection when you just told us you can't understand what the predicates are for the objection. My witness --

THE COURT: Pardon me. Pardon me. I will over -- you are correct. I will sustain the objection and require Mr. Kane to ask another question because I've forgotten exactly what Mr. Walji said. I don't recall him referring to a document, which I think you indicated in your objection, Mr. Rodriguez, so I'll sustain the objection. I misspoke. Sustain the objection. Ask another question, Mr. Kane.

MR. RODRIGUEZ: Your Honor. I'm sorry. You're sustaining Mr. Kane's objection.

THE COURT: No, no. No, no, no.

MR. RODRIGUEZ: My witness's answer. My witness testified about his conversations with Mr. Kane. How is that objectionable?

THE COURT: Pardon me. I think it's probably because I'm hungry. I'm --

MR. RODRIGUEZ: I have Type 2 two diabetes, Judge. I'm with you. I'm hungry.

THE COURT: But I want to get through this, so I am overruling Mr. Kane's objection.

MR. KANE: I'll try and speed up.

BY MR. KANE:

Q Mr. Walji --

THE COURT: Thank you.

BY MR. KANE:

Q -- look down at this Bullet Point 5 on Exhibit 58. This is the bottom of your email. It states, "We will extend the closing date on a daily basis from May 31, 2022, until all the Item 4 deliverables are sent by John to the title company, which is anticipated to be accomplished by June 2, 2022."

Was that a request by the debtor for an extension of the payoff deadline to June 2, 2022?

A Absolutely not.

Q And why is that in here then?

A Because, as I pointed out, during our conversations, there were these four items that were not provided by your client or you, and I offered that we will wait and extend the closing date on a daily basis, not until June 2nd. You and I talked about it and you said you would find out because at that time you did not have those documents.

So I was just confirming our conversation that, a, on each of those items, what we had -- my understanding was that you would -- that the funding is on May 31st, that you're going to respond to Julie Lissey's request, that the May 26th -- this whole issue about the bank -- sorry -- Happy State Bank holding the note which you had earlier stated was in possession of HNGH, and moreover is, Happy State Bank had nothing to do with it, which is reflected in that email.

I wanted to clear that up because I just wanted the original promissory note available as a condition to payoff, which was the December order and the rescission deed. Those were the two documents that I'd been asking for before funding comes to play. You know, and I offered to say, bring those documents over, which is my Number 5. Which is Number 4, it says -- if you look at that, that John would send the rescission deed as prescribed by the Court, along with the Happy State Bank documentation and the Axos documentation.

And I said, look, we want to get this thing closed.

Our funding is contingent upon getting the rescission deed and the original promissory note, which has been mis-communicated, misrepresented. I don't want to go into that. As of that date, those two documents did not exist. And because of the different titles, I asked for the authority documents, which has been previously requested. It's not complicated.

Q That's not in this document, is it?

A No, I agree. The last part is not there. But this is consistent with complying with the points in Schedule C that were not provided. All I'm doing here is saying, John, let's work this thing out, and if you need it on a day-to-day basis, I'm happy to provide that to you because funding was already in place. So it's an offer to you, has got nothing to do -- it's just a coincidence that you find to relate June 2nd to some other letter.

Absolutely not that state of mind.

Q That's --

A I can (indiscernible).

Q That's your position, Mr. Walji, is that June 2 (indiscernible) --

A It is my communication to you. It's not my position.

THE COURT: Mr. Walji? Mr. Walji?

THE WITNESS: Yes, sir.

THE COURT: Mr. Kane was asking a question and you interrupted, and the record's not going to pick both of it up.

So if you would, let Mr. Kane finish his question.

MR. KANE: Mr. Walji?

THE WITNESS: Your Honor, I will be happy to do so if Mr. Kane reciprocates. I'm not completing my sentence. You're allowing him to continue. It's confusing.

MR. KANE: Your Honor, I'll try and do a better job of objecting to narrative and non-responsive on yes or no questions to clean that up so we can have a little bit tighter and faster exchange.

BY MR. KANE:

Q Mr. Walji, is it your testimony that you believe that June 2nd extension date was just a coincidence and had nothing to do with the plan confirmation going hard?

A I missed the last part.

Q Yeah, I'll restate that question.

It's your testimony that it was just a coincidence that the extension in Bullet Point 5 referenced June 2nd and that that would coincide with the confirmation order becoming a final non-appealable order?

A I had no -- no regular -- no. Yes. I had nothing to do with the confirmation date timings. I was simply saying, based on our telephone communications, it'll take a couple of days and that's what I added, a couple of days for May 31st. I had no recollection at that time of this plan of confirmation because I was really not involved in this bankruptcy side of

it.

Q And it was your understanding from my responsive correspondence that the debtor unequivocally denied an extension to June 2nd. Is that your understanding?

A Well, I had not requested an extension. I was giving you the opportunity that you were in default as of May 31st for not providing the documents to go ahead and -- we were extending what was already you in default. You're not obliging me. I was obliging you.

Q Okay.

I'd like to turn your attention to Exhibit 56.

THE COURT: Lender's Exhibit 56?

MR. KANE: Yes, Your Honor.

BY MR. KANE:

Q Do you see this document, Mr. Walji?

A Mr. Kane, I've repeatedly asked. I can't see. Please, a little larger. And I don't want to take time.

There you go. That's better. Thank you.

Yes. I see that.

Q And there's a reference -- or this is an email from me, HNGH's counsel, to you and Ms. Lindauer, May 27, 4:25 p.m.

A Correct.

Q And there's reference to a termination of notice of collateral assignment and a reference to it relating to Axos Bank. Did you understand that when you received this?

A Can you roll down the recorded termination, what are you making reference to?

Q The email says, "Attached is a recorded termination re Axos Bank." The name of the attachment is termination of notice of collateral assignment recorded. Would you like me to show you that attachment, Mr. Walji?

A I'm only asking for the attachment. I can read --

Q It's Lender's Exhibit 56A.

A Yes. I can't read that, Mr. Kane.

Q Do you see this is a recorded instrument dated December 7th that purports to be a termination of notice of collateral assignment of deed of trust and loan between 2999 Turtle Creek and Axos Bank?

A All right.

Q Have you seen this document before?

A I believe so, yes.

Q And is this the document -- do you believe that this was not responsive to Ms. Lissey's request? Is this what you were referring to in your earlier testimony?

MR. RODRIGUEZ: Your Honor, objection. Asked and answered many, many times.

MR. KANE: Didn't have the document in front of him, Your Honor.

MR. RODRIGUEZ: So what, Your Honor, the question has been asked and answered many times.

THE COURT: Overruled.

THE WITNESS: The document that I was looking to was the actual assignment first before the termination, and I did not see the assignment document.

BY MR. KANE:

Q And, again, the notice of collateral assignment you also felt was insufficient. So the fact that this had the instrument location was still insufficient. Is that correct?

MR. RODRIGUEZ: Your Honor.

THE WITNESS: No. That's not what I said.

MR. RODRIGUEZ: Asked and answered.

THE COURT: Response.

MR. KANE: Again, trying to ensure clarity here. He's got the document in front of him for the first time.

MR. RODRIGUEZ: It seems he's trying to get a different answer, Your Honor.

THE COURT: Overruled.

THE WITNESS: I think we are mixing the two issues.

This document is in response to a Scheduled C, which talked about a notice of collateral assignment. What you're providing is a termination document, but not the notice of collateral assignment or the assignment itself.

BY MR. KANE:

Q Okay.

I want to turn your attention to Exhibit 57.

A Sure.
Q Lender's Exhibit 57.
Mr. Walji, you had also asked for delivery of a rescission deed. Did you understand that this was the correspondence by which a wet deed was covered or that, that -- sorry. I'll restate the question.
Mr. Walji, do you recall this correspondence?
A I see my name on it, so yes.
Q Okay. Did you understand that this was a delivery by HNGH of its lender's special warranty deed with attachments that this was a copy of the documents that were sent to Sendera Title?
A Can you drop down, please?
Q There's nothing else.
I'll show you the attachments.
A Yes, sure.
Q Do you understand this to be the document that we've referred to in these proceedings as lender's special warranty deed?
A I don't recall this being into our exhibits. I haven't read it. Is it -- which exhibit number is this?
Q 57A.
And I'll scroll down so you can see this has an execution date of the 27th of May by Vipin Nambiar.
Does that refresh your recollection of what this document

is?

A Yes, it does.

Yes, it does. Thank you.

Q Okay. And I understand that the debtor disagreed with this form of deed but this was provided on Friday, May 27th, correct?

MR. RODRIGUEZ: Objection. Ambiguous. Provided to whom and in what form?

BY MR. KANE:

Q Provided to you, Mr. Walji, in the form that is being presented to the Court right now.

MR. RODRIGUEZ: As a PDF attachment to an email, not as an original wet signed instrument?

MR. KANE: Right. I believe, Mr. Rodriguez, that the email says the wet deed was couriered to Sendera to be held in escrow.

MR. RODRIGUEZ: I can see that also. Are you testifying that that actually occurred? Or are you now submitting your affidavit that your document here for the truth of the matter asserted? We're talking about what this witness received. He wasn't at Sendera. He can only talk about what received in his email, so I can't let him by accident adopt your assertion that you actually delivered a wet deed to Sendera.

MR. KANE: I never even asked that question,

Mr. Rodriguez. I mean --

MR. RODRIGUEZ: So, again, my objection is provided to whom?

MR. KANE: To Mr. Walji. I clarified that point of the question.

BY MR. KANE:

Q Mr. Walji, do you recall receiving this on Friday, May 27th, as an attachment to the email that we showed at Exhibit 57?

A I believe so.

This is the copy that I saw the PDF. Yes.

Q And do you see, Mr. Walji, that there are references in this document to exhibits? There's an Exhibit A, an Exhibit B, an Exhibit C referenced here on this front page.

A I see that Exhibit A and Exhibit B being referenced.

Q Okay. Do you see Exhibit C being referenced in this first "whereas" paragraph?

A Yes. Yes I do.

Q Okay. Now, if we scroll down on this document, do you see that there is an Exhibit A, which is a description of the property?

A Yes.

Q And then, if we look at Lender's Exhibit B, do you understand that this is what has been described as the deed in lieu?

A Yes, I do recall because that was a term defined by Judge Hale.

Q Okay. And now, if we go back to Exhibit 57A, there is a reference to a deed in lieu in this first "whereas" paragraph as Exhibit B. So you understood that Exhibit B to be that deed in lieu, correct?

A Yes.

Q Okay. And now, if you'll look at this 57A, there's a reference to the agreed order signed December 10, 2021, as Exhibit C.

Do you see that?

A Yes, I do.

Q And if we look at Lender's Exhibit 57C, is that the agreed order signed December 10, 2021, that you're familiar with?

A Yes.

Q Okay. So is it your understanding that what was provided to you by HNGH was a signed copy, a PDF copy of the signed lender's special warranty deed with all attachments?

A You're asking me if this -- all these attachments were provided with this email?

Q Yeah. Is that what you understood?

A Yes.

Q Now, Mr. Walji, I want to take a look at this Exhibit 90, Lender's Exhibit 90.

A Can you expand that again please? 9-0?

Q Yes.

A Yes.

Q And you were cc'd on this correspondence, correct? This is you, Khudabuksh K. Walji?

A Yes.

Q And there is correspondence here between Mr. Carruth and you and Randy Marx and Ms. Lindauer and I am also cc'd on this correspondence, correct?

A Yes.

Q And in this correspondence, Mr. Carruth appears to suggest that he was prepared to deliver a Happy State Bank release but for the fact that he did not receive title contact information. Do you recall this email?

A Which part are you reading? There are two different communications. Can you --

Q Sure. About right here. Mr. Carruth's correspondence to Ms. Lindauer and you, among others, at 4:32 p.m. in which he states, "I asked for title co. info repeatedly today and had no information about where to send a release. Release was ready to roll all day but no response as to where and who to send wet or scanned signature, et cetera."

A Right.

Q Do you recall?

A Yeah. I just want to make sure that this is in response to what? Can you roll down the email below, please?

Q This is in email from Ms. Lindauer to Mr. Carruth.

A Yep. Can you go -- is there something further down?

Q No.

A I'm just looking on the right side.

Q There's not.

A Okay. Bear me with.

This is May 31 at 4:26, which I'm copied to.

Q Oh, I'm sorry. Hold on.

A Okay.

Q I apologize. I didn't mean to do that.

A No, that's -- okay. Can you go one up?

This is -- yes. I see that I -- I was telling Joyce, I don't know why he got -- why Jeff Carruth is bothering you because John Kane knows that Sendera is on May 27th, sent that information to Sendera. Why is John Kane not communicating to Jeff Carruth? It was my communication to Joyce.

Q And it's your understanding that it was HNGH's obligation to provide that information to Mr. Carruth?

A The important thing is that I never knew that HSB was going to be part of this transaction. It's Mr. Carruth who jumped in and provided a payoff statement at the last minute. Look at the time, May 31st, 2022.

We had no knowledge. And, in fact, earlier communications between you that HSB was not involved. It is when he surprisingly sprung this payoff statement is when things got a

little chaotic. I was not looking for a release. I was not looking for anything because as far as I'm concerned, HSB was not involved in it.

It's when HSB interjected themselves with the payoff statement is when things -- that's when we had back and forth communications all in the -- I think the first time, I don't know what, when that payoff statement came in, but I believe it was on May 30th. And that's when I called up to the Joyce.

I said, where is this coming from? All along HNGH has said that HSB has got nothing to do with it. You're in possession of the note. And now, out of the blue, we get this from HSB. That's when things started getting a little more perplexing to try to reach this, you know, to try to get to this conclusion.

Q That's not true is it, though, right, Mr. Walji? You were aware that there was a Happy State Bank collateral assignment of note and lien no later than May 18th because it showed up on Schedule C of Sendera's title report. Isn't that right?

A Absolutely, and that's why I sought clarification from you, and you informed me that that has nothing to do with the HSB -- sorry -- with the 2999TC Acquisition and you'll take care of it.

Q And then --

A It was really not an issue.

Q Hold on. And then, on May 24th, didn't you put Ms. Lissey

in touch with HNGH so she could get clarification on the Axos and Happy State Bank issues?
A I noticed Ms. Lissey as early as May 10th to communicate directly with you for all matters pertaining to this closing.
MR. KANE: Objection. Non-responsive.
THE WITNESS: This was an -- this email --
THE COURT: So there has been a -- Mr. Walji, there is an objection pending.
THE WITNESS: Sorry, I'll pause.
THE COURT: What's the response?
THE WITNESS: I'll pause.
MR. RODRIGUEZ: It's an incorrect objection, Your Honor.
THE COURT: So I will sustain the objection. Why don't you ask it again.
MR. KANE: Yes.
BY MR. KANE:
Q Mr. Walji, you knew that the Happy State -- or you provided -- now, let me try and think about how I ask that question.
On May 24th, you put Ms. Lissey in touch with HNGH to specifically address a matter related to the Happy State Bank collateral assignment and note, correct?
A I don't know if I -- I just forwarded to you what I received from Ms. Lissey. We need to go back to that email to

see if I requested Ms. Lissey to do so to you.
Q Okay. Did you understand at that point that Sendera was still trying to work on a Happy State Bank issue on May 24?
A I really -- for me, I don't know, because it didn't matter to me because that was something you had communicated that it had nothing to do with 2999TC and you will take care of it. And as far as I'm concerned, it was not relevant, you will take care of it. That was not an --
Q So let's go back to your email on Lender's Exhibit 58.
A Can you just look up the date just to make sure what time I was communicating to you so I'm clear, please?
Q Yes. It should be on your screen, Lender's Exhibit 58.
A Sure. Now, I see. I see. Sure.
Q Now this is dated May 27th?
A Correct.
Q But you have an acknowledgment here on Point 3 that you were aware that on May 26th, I'd responded to Julie and was working on the Happy State Bank matter, right?
A Correct.
Q So you weren't really surprised --
A If you would also please complete a sentence, and you'll also circulate the rescission deed. Yeah.
Q Right. And we just looked at this Exhibit 57, Lender's Exhibit 57, in which the executed lender's special warranty deed was circulated. And you had, I think you testified that

you did receive it with its attachments.
A I don't recall that. I do recall seeing that. I'm not sure which exhibit, I'm sorry. I'm not keeping track of all the exhibits, but I do acknowledge receiving that special warranty deed signed by Mr. Vipin Nambiar on May 27th, or dated or signed on May 27th, so --
Q Now, just for a little clarification, I apologize. You testified earlier that you saw a draft of the rescission deed on May 12th.
A Yes.
Q Do you recall that?
A Pardon?
Q I said, do you recall that testimony?
A I recall, yes. It was early May 10th, 12th. I don't recall the specific date. But it was around May 12th, I believe.
Q When did the debtor first provide comments to that draft rescission deed?
A We had -- I don't recall the specifics, but I remember we spoke and I said to you, this is a conveyance document. We need a rescission deed that takes us back to the original -- to the original position before the filing of the deed in lieu. I don't recall the exact telephone communication dates that had. But that was very early when I got the draft that I communicated with you by phone and we spoke several times until

you finally agreed to modify what is now the rescission of deed.

MR. KANE: Your Honor, I'm going to object as hearsay to the statements that Mr. Walji purportedly made to me by telephone as they are being -- they are out-of-Court statements offered for the truth of the matter asserted, and I move to strike that testimony.

THE COURT: Response.

MR. RODRIGUEZ: Your Honor, these are not out-of-court statements. He's detailing a legally substantive conversation between the operative parties, my client and 2999TC Acquisitions representative, and Mr. John Kane, he's representative of the lenders. So these are legally operative statements and the witness is here and Mr. Kane wants to dispute them, he needs to take the stand.

Another reason to underscore our need to have it on staff. It also goes to my client's state of mind, what his understanding was relative to the course of transactions. So, you know, it should be permitted.

MR. KANE: Your Honor, in response to that, this is about the whether and when the debtor provided responses to the May 12th draft. Mr. Walji's only testimony is, "Well, I told you earlier." He can't provide a date. He hasn't provided any written evidence supporting that position. And so this is -- it relies entirely on Mr. Walji asserting that he made certain

out-of-Court statements and that those statements were true.

MR. RODRIGUEZ: Your Honor, that goes to the weight, and Mr. Walji has given you a time frame. He's told you that he's had repeated conversations with Mr. Kane giving him comments on Mr. Kane's fatally defective fake rescission deed, and that, finally, Mr. Kane relented and sent in another revised version.

So we do have timing. We do have documents. If he wants to contest the accuracy of the statement, you know, he can take the stand.

THE COURT: Give me just a minute.

(Pause)

THE COURT: So I think, Mr. Rodriguez, in your response to the objection, you said you were not offering it for the truth of the matter asserted. Did I understand that correctly?

MR. RODRIGUEZ: Your Honor, there are several layers that permit this to come in. You know, one, I think it's they're legally operative communications because these are part of the negotiations. So I think they have legal significance that permits them to come in.

Number two, I think because it's a conversation between the representatives of two parties, you're going to get into issues of admissions and adoptive admissions, taking it outside of the hearsay rule. But at minimum, it is going to go

to state of mind of my client in terms of where we were in these transactions and whether in fact he had in his mind responded to Mr. Kane's original form of special warranty deed. So I think it should come in without limitation.

But if Your Honor is inclined to somehow limit it, it would at least go to the state of mind and what he understood where things were.

THE COURT: All right. I'm going to allow the witness to answer. He's here and subject to cross-examination, so I'll give whatever weight I determine his answer is entitled to at the appropriate time. But I'll let the witness answer the question.

MR. KANE: Okay.

BY MR. KANE:

Q Mr. Walji, isn't it true that the debtor never provided written comments to HNGH's form of rescission deed or lender's special warranty deed until May 30th at 3:24 p.m.?

A I don't recall. I don't know the answer, if it was provided before or not. I know we spoke about it, but I don't recall one way or the other.

Q Is it your understanding that after the debtor circulated a rescission instrument to HNGH that HNGH provided its revisions and comments within three hours?

A I believe that's a good approximation of time. We had sent that email to say this is what we would want, and frankly,

was surprised that you received a response three hours later because it's a rescission deed that has no value to the lender who's getting paid off. Why are you making this --

MR. KANE: Objection, non-responsive. Again, move to strike.

THE COURT: Response.

MR. KANE: Yeah.

MR. RODRIGUEZ: Your Honor, I think the witness was giving context to, you know, his state of mind relative to this timing. Mr. Kane thinks it's legally significant that they sent back changes to a simple form of rescission deed and my client is saying, well, the timing sounds right, but you know what, I was really surprised you had any comments at all because this --

MR. KANE: This testimony by Mr. Rodriguez. Mr. Rodriguez will have an opportunity to redirect this witness. I'm sure he'll wow us with his prowess on that and allow Mr. Walji to have a narrative.

THE COURT: All right. So I understand the objection. I understand the response. Mr. Walji answered the question, yes. That part, I will allow. The rest of it was non-responsive narrative which will be stricken or disregarded.

You may proceed, Mr. Kane.

BY MR. KANE:

Q Mr. Walji, did the debtor ever provide written comments or

a further markup of HNGH's revised rescission instrument to HNGH before the expiration of the payoff deadline?

A Say it again, please.

Q Mr. Walji, did the debtor ever provide a red line, responsive comments, any written comments to HNGH's revised form of the rescission instrument before the expiration of the payoff deadline on May 31st at 5:00 p.m.?

MR. RODRIGUEZ: Your Honor, asked and answered. And Mr. Kane is trying to contradict the uncontroverted documentary record. There was an email that came from Joyce Lindauer that said we are not accepting your changes. We are going with the document that we have. This is what our lenders require. Sign it, deliver it, put it in escrow, and we'll send you your money.

THE COURT: So I'll overrule the objection. Those documents are in evidence. I'll consider them when I rule.

The question was to this witness after, as I understood the question, we were talking about HNGH provided written comments within three hours. Mr. Walji answered yes.

The next question was, did the debtor provide further written comments before the expiration of the payoff deadline?

Mr. Walji, what's the answer to that question?

THE WITNESS: Thank you, Your Honor, for clarifying.

The question was, if I understand, after receiving comments from Mr. Kane three hours later, did we provide any

response. Is that the question?

THE COURT: That's correct. That's what I understood it to be. So what's your answer?

THE WITNESS: I know I spoke with Ms. Lindauer, so --

THE COURT: No, I'm not -- because now I'm curious to know the response.

THE WITNESS: Please ask again.

THE COURT: The question wasn't whether you provided comments to Ms. Lindauer. The question is, did the debtor provide further comments to Mr. Kane or the lender -- I said the lender -- before --

THE WITNESS: I don't know.

THE COURT: You don't know. Thank you. Thank you.

Go ahead, Mr. Kane.

BY MR. KANE:

Q Yeah, I just have one last question for you, Mr. Walji. About how much time do you think it would've taken the debtor on May 31st to provide title company information to Mr. Carruth?

MR. RODRIGUEZ: Objection, Your Honor, calls for speculation and another guess.

THE COURT: Response.

MR. KANE: Presumably, Mr. Walji had the information. I think this is something he can easily testify to.

THE COURT: Overruled.

THE WITNESS: Could you repeat your question, please?

BY MR. KANE:

Q Mr. Walji, how long would it have taken you to provide title company information to Mr. Carruth on May 31st?

A I don't understand the question, I'm sorry. For me to communicate to Mr. Carruth?

Q Yes.

A I was not in communication with Mr. Carruth. Joyce Lindauer was. So I'm struggling. It's a hypothetical that you're asking me to communicate. I did not see the need to communicate with Mr. Carruth.

I mean, you know, you're asking me to do something that I'm not -- there was no responsibility on my side because HSB was non-existent as far as I'm concerned. And the fact that they start initiating documents, it's irrelevant to me because as far as I'm concerned, I was told HSB's got nothing to do with it and Ms. Lindauer was handling that.

MR. KANE: Your Honor, I'll pass the witness.

THE COURT: Just a minute, please.

MS. LINDAUER: Sure.

(Pause)

THE COURT: We're going to take a lunch break. It's almost one o'clock. Is 45 minutes enough time for lunch?

MS. LINDAUER: That would be fine, Your Honor. That would be (indiscernible).

MR. KANE: Yes, for us, Your Honor.

MS. LINDAUER: 1:40, that's fine, Your Honor.

MR. KANE: And we have just one request that the debtor's counsel not coach their witness during this break period.

MS. LINDAUER: Absolutely will not, Your Honor.

MR. RODRIGUEZ: Your Honor, I just would like to make an objection here. You know, Mr. Kane is a real wordsmith and, you know, he's used words about misrepresentation and misleading. To his credit, he apologized to my colleague, Ms. Simmons, at the Bankruptcy CLE. But now, he's talking about coaching. He's talking to you about me wowing you with my prowess.

Could you please ask him to tamp it down and be a little bit more civil with us here? This is a civilized undertaking in a federal court. I just don't appreciate those implications and really insults.

Thank you, Your Honor.

THE COURT: So I'll assume all counsel will comply with their ethical obligations. We're going to take a recess for lunch and we'll be back at, why don't we just plan on 1:45.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: We're in recess.

(Recess at 12:55 p.m./Reconvened at 1:47 p.m.)

THE COURT: All right. We're back on the record in

the 2999TC Acquisitions case. When we broke for lunch, I believe Mr. Kane had finished his cross examination of Mr. Walji. Is that correct?

MS. LINDAUER: That's what I show, Your Honor.

MR. KANE: Yes, sir.

THE COURT: And before you go, Ms. Lindauer, I did have a question of Mr. Walji, if you don't mind.

MS. LINDAUER: Yes, sir.

THE COURT: And I'm going to ask Ms. Lindauer again, if you wouldn't mind pulling up, it's your Debtor's response at ECF 145.

MS. LINDAUER: Okay. Did we mark it as an exhibit for this hearing, or is it just --

THE COURT: I don't know if it's an exhibit, but it's your response at ECF 5, it's the first response that the debtor filed to Mr. Kane's motion that we're hearing.

MS. LINDAUER: Opposition to motion at 145?

THE COURT: Correct.

MS. LINDAUER: Yeah, yes, Sydney's got it up there.

THE COURT: Okay.

Can you scroll down to Paragraph 19 and make it larger, because I'm going to ask Mr. Walji about it.

MS. LINDAUER: Sure.

MR. KANE: And Joyce, I have this up. If you want I can ditch it to Sydney, but I already have it up on my screen.

MS. LINDAUER: Oh, is that you that's running that?

MR. KANE: It's me. Would you prefer that I pull it down so your --

MS. LINDAUER: No, that's -- no, that's fine. That's fine.

Yeah, I don't know what that is.

THE COURT: So Mr. Walji, I guess I should have asked you first. Let's go back up to the beginning. I apologize. This is a document that was filed by the debtors on, let's see. June 8th, 2022,and it's the debtor's opposition to the motion to enforce agreed orders. Do you recognize this document?

THE WITNESS: Yes, sir.

THE COURT: And were you engaged, or I'm sorry, were you involved in helping the debtor prepare this opposition?

THE WITNESS: Not to my knowledge, unless Ms. Lindauer asked me some questions but not in the preparation of this document.

THE COURT: So do you recall seeing it before it was filed?

THE WITNESS: I don't remember, Your Honor.

THE COURT: Okay. Let's go ahead and scroll down to Paragraph 19.

Are you able to read that, Mr. Walji?

THE WITNESS: Yes, I can.

THE COURT: So the first sentence says debtor had

secured funding and was preparing to make the final payoff on May 31st, 2022 as required by the agreed orders. Can you see that?

THE WITNESS: Yes, sir.

THE COURT: Do you agree with that statement?

THE WITNESS: Absolutely.

THE COURT: And tell me, without elaborating, just tell me the names of the secured funding parties that, as you understand it, are referenced in this Paragraph 19.

THE WITNESS: Your Honor, I'm in a confidentiality agreement. I'm happy to disclose it in-camera without HNGH to know about it.

THE COURT: Well, we've talked about several potential funding sources during this hearing, correct?

THE WITNESS: Those were Mr. Marx's clients.

THE COURT: Okay. So I would like to know the answer to this question.

THE WITNESS: Your Honor, I --

THE COURT: Debtor had secured funding and was preparing to make the final payoff on May 31st, 2022 as required by the agreed orders.

THE WITNESS: Correct.

THE COURT: So let me ask Ms. Lindauer, are you planning on putting on evidence of who these secured funding parties are, Ms. Lindauer?

MS. LINDAUER: Your Honor, can I -- Mr. Barton is here with me. Can I ask him real quick? Because I had anticipated addressing some of those questions to him, so --

THE COURT: Well, but --

MS. LINDAUER: Yeah, I think --

THE COURT: I'm asking Ms. Lindauer now --

MS. LINDAUER: Yeah.

THE COURT: -- as part of your case-in-chief, are you planning on putting on evidence of the secured funding sources that are referenced in Paragraph 19 of this opposition?

MS. LINDAUER: Yes. My understanding is we are prepared to put on that information.

THE COURT: Okay. How are you going to do that without identifying the name?

Because I don't know how we can -- I'm not sure how to address this, because to me this is an important issue that was raised in the opposition. And I'd like to find out what the evidence is in support of that. And Mr. Walji is saying he can't disclose the names. So I would like suggestions from counsel on how we're going to address this.

MS. LINDAUER: Your Honor, I think Mr. Walji's suggestion may be the appropriate one. Which is provide to you in-camera information regarding the final payoff sources from May 31st, 2022. I think we can provide that information to you. And then you can make a decision about whether -- how far

that goes.

And then, of course, I do have Mr. Barton, also who I think can assist with answering that question as well.

THE COURT: But are you planning to put on proof that they actually -- proof of that funding availability?

MS. LINDAUER: Your Honor, I think we can be prepared to do that. That's not exactly our legal position here, but I think we can be -- you know, Your Honor, our position is, is that there were conditions precedent to us actually having to fund and that those conditions precedent were not met. Did we have lenders lined up to fund, I believe we can put that evidence on.

Was the funding --

THE COURT: Now, I'm asking specifically about this sentence in Paragraph 19.

MS. LINDAUER: Yes, Your Honor. I think we are prepared to put evidence on in support of that sentence.

THE COURT: Okay. Is it anything that we haven't heard already?

MS. LINDAUER: Yes.

THE COURT: Mr. Marx testified about his clients. Okay. So --

MS. LINDAUER: Yes. Yes, Your Honor, I think there are additional funding sources that we have not discussed with the Court.

THE COURT: And you're going to put on evidence about those?

MS. LINDAUER: Yes, Your Honor.

THE COURT: How is Mr. Kane and how am I going to, if I want to, ask the witness questions if you -- if we can't talk about the names of the secured lending sources?

MR. RODRIGUEZ: Your Honor, hi. Oscar Rey Rodriguez here.

Here's one suggestion. We provide to the Court a sworn list with the names numbered one through however many there are. And when the witnesses are examined about those, they can talk about lender 1, lender 2, lender 3, lender 4. And that way, Your Honor will know which one we're talking about, without breaching the confidentiality provisions and you know, it's a real issue here, Your Honor.

You're going to be able to hear testimony from Mr. Barton that each time he revealed his funding sources, that the adversaries, HNGH personnel would reach out, get in contact with those funding sources and besmirch him and his business practices and what he was doing.

And I believe there is even a statement from one of the witnesses on the other side. And you're going to hear that he was dedicated to smearing my client and making him unfinancible in this space. So it's a very real issue, but we're happy to disclose them, as we discussed in-camera. And

you know, get the testimony in that way.

THE COURT: Are you going to -- are there going to be documents with the names of those secured funding sources on them?

MR. RODRIGUEZ: Yes, Your Honor, there will be. We can submit those in-camera as well, and prove them up.

THE COURT: So how do you plan to do it. Are you -- you're going to put these in evidence and you're going to redact the names?

MR. RODRIGUEZ: Yes, Your Honor, we could. I mean we're trying to satisfy the Court here on your inquiry.

THE COURT: Are these -- I'm looking at your exhibit list and your supplemental exhibit lists. Are these documents anywhere on your exhibit list?

MR. RODRIGUEZ: No, Your Honor. Again, our legal position is we saw this case. The key issue is the interpretation of the orders and who committed the first material breach.

THE COURT: I understand that's your legal position. But really I'm just trying to be practical on if we're going to be talking about documents, how either Mr. Kane or how am I going to ask the witness about the documents. So am I to understand the documents that you're referring to are not on your exhibit lists?

MR. RODRIGUEZ: I think that's a correct answer, Your

Honor. But you want to see them, so we're happy to try to find a way to accommodate you, so that you can see them.

THE COURT: No, no, I'm not telling you can or can't put on additional documents. I'm trying to figure out how Mr. Kane or how am I going to ask questions of the witness about the identity of the funding source, if we don't know who the funding source is.

So I understand you propose to give me a list with the names. And you're proposing that when I ask the witness or when Mr. Kane asks -- or when your client testifies, that I refer to them as funding source 1, funding source 2, funding source 3. And what I was trying to ask is are those -- are you planning to just ask the witness about those funding sources, or are there documents that are on your exhibit list that discuss those funding sources, or that identify the funding sources?

MS. LINDAUER: Your Honor, my plan really had been to just ask Mr. Barton point blank those questions. We did provide some of the funding sources in the documents you've reviewed as exhibits.

There are additional funding sources, Your Honor, that we have not provided documents for, but we had anticipated Mr. Barton testifying regarding those funding sources and if we need more, I suppose we can get documents on those funding sources as well. And again, Your Honor, this is Mr. Kane's

emergency motion. And let's focus on what we're arguing about here.

This is not an adversary proceeding. This isn't a declaratory judgment action. So again, I don't know how far I have to shift the ball. But the point being is that his -- he's asked for emergency relief to enforce agreed orders, and that's what we're addressing. Frankly, I think it's our position that we don't even get to the funding question until they move the needle in their direction, which our position is they have not done.

But to the extent that the Court is requesting us to prove up a statement in our pleading, I think we are prepared to do that. I had anticipated --

THE COURT: Let me be clear. I'm not requesting you to prove up anything.

MS. LINDAUER: Right.

THE COURT: I was just asking your witness a question --

MS. LINDAUER: Sure.

THE COURT: -- if he could identify those secured funding sources. And he did not want to do it on the record, which I understand the concern that you stated. But let me be clear. I'm not requesting you to prove up anything.

I'm just -- I was asking a question about the identity of the secured funding sources that are listed in

Paragraph 19 because as I understood the argument that Mr. Phelan made in his opening argument, which corresponds with this paragraph, which is the debtor was prepared and able to fund. And it says right here. However, and after and because HNGH failed on May 30th, 2022 to comply with the terms of the agreed orders, the lenders, plural, that's my language, the lenders, plural, of course, would not loan without compliance by HNGH, with the agreed orders.

And so I was going based on the arguments that were made in opening statement. The arguments that are raised in the pleading. One of which is a factual assertion that the debtor had secured funding and was prepared to make the final payoff on May 31st, 2022, as required by the agreed orders.

That's a factual assertion in Paragraph 19. And I was asking the witness to tell me the names of the secured funding sources. So I think I understand now you're telling me that in addition to the names that Mr. Marx and the secured lending sources that Mr. Marx testified about, you're now telling me that there are additional funding sources that we haven't heard about yet. Is that correct?

MS. LINDAUER: I believe that's correct, Your Honor. And you would hear about that from Mr. Barton.

The ones I had Mr. Walji originally testify to were the ones that we actually had as exhibits, with term sheets and actual loan commitments and names that had been previously

disclosed. So those are the ones that we mentioned through the Court. And just to be clear, there are additional sources of funds to close this particular transaction that we had prepared Mr. Barton to speak to, not necessarily Mr. Walji, although Mr. Walji has been involved in those.

So however you want to handle that. But my understanding is, it's a disclosure question of names of entities. And I believe Mr. Rodriguez made a suggestion to you on how to handle that. There may be other ways to handle that issue.

Those are live lenders. They're still out there. They're still prepared to fund this deal. And so again, we don't want the well to get poisoned. We don't know how you're going to rule at this point. But I just want it to be clear on the record that we are still ready, willing and able to pay off HNGH and that's what the evidence will show. And we do have live funding sources that are prepared to assist with that. So again, I don't know where this goes at the end of the day.

I'm not sure the Court does yet either. But our position is that we should still have the right to pay off HNGH. We're not reneging on that obligation. We still want the ability to do that.

THE COURT: All right, Mr. Kane, could you weigh in on the proposal by Mr. Rodriguez to send me an in-camera list of these lenders, so that I can refer to them by something

other than their actual names, such as funding source 1, funding source 2, funding source 3?

MR. KANE: Yeah, Your Honor, I don't really have an issue with that. You know, I struggled to contemplate how, without any kind of supporting documentary evidence any of that testimony is particularly relevant. But that goes to the weight of that evidence.

So I don't really have an issue with that. And we can -- I guess my client will happily rely on your review and determination of whether continued confidentiality is appropriate.

THE COURT: So we'll do that. And I'll ask the lawyers to work together on providing -- I don't know providing a document under seal, or providing it for in-camera review. If you could work on that.

So I guess for now, I'll go back to Mr. Walji.

EXAMINATION

BY THE COURT:

Q Mr. Walji, let me first ask you about the sentence again. The debtor had secured funding and was preparing to make the final payoff on May 31st, 2022, as required by the agreed orders.

But you've been watching this hearing from the beginning, correct?

A Yes, Your Honor.

Q And you heard Mr. Marx's testimony in its entirety?
A No. I had to step out for a few times to take phone calls and make some phone calls.
Q Have you heard most of his testimony?
A I believe so, Your Honor.
Q So he identified various funding sources through his testimony. Do you recall those?
A Yes, I recall --those that I recall I can name those. But not sure if you want to go through a list and I can say yes or no.
Q So of the entities that Mr. Marx testified about, again, not the ones that we haven't heard about. But of the entities that Mr. Marx identified, which one of those do you believe fits this description in Paragraph 19, first sentence.
A The PNL. Private --
Q PLN?
A Yeah, by Mr. Garrison Kickham.
Q So you believe PLN fits the description in that first sentence?
A Absolutely, Your Honor.
Q Okay. Any others?
A I don't recall the other list. I just need a moment. The Reverifinancing and I know the balance of the funds for the Enoch Investments were secured at 12.5 million.
Q I'm sorry. Let's take those one at a time. Reveri?

A Reverifinancing. Yes.
Q Do you believe that entity fits the description in the first sentence of Paragraph 19?
A Yes.
Q Okay. And what was the next one?
A I don't recall the entire testimony of Mr. Marx, but I do recall that the First Guaranty Bank amount was not sufficient to make the payoff. And the balance amount exceeding the balance amount $12.5 million was in the escrow account of Mr. Fleeger's attorney, Chris. So that would have met the final payoff amount.
Q And tell me again the name of that entity. Whose escrow account?
A Mr. -- the attorney's name is Chris. And I'm sorry I did not --I can look up my phone book to get his full name. If you would allow me to.
Q Sure.
A Thank you.
(Witness checking phone)
It's Christopher McNeill.
Q McNeill?
A Yes. M-C-N-E-I-L-L. And he is with bmcounsel.com. Berry something. Boy merry counsel.com.
Q So that was the Enoch transaction, correct? If I remember right? I don't have it up in front of me.

A That is correct, Your Honor.
Q That payoff tract, you do believe or you do not believe the funds -- that the debtor had secured funding and was preparing to make the final payoff on May 31st, 2022?
A Subject to the recision deed and the conditions being provided. So that's the confusion here, Your Honor.
Q No, I'm just asking about this --
A Oh, the -- sorry. Please continue.
Q So the debtor had secured funding and was preparing to make the final payoff on May 31st, 2022 as required by the agreed orders. So you have identified the First Guaranty Bank Enoch transaction, correct?

MR. RODRIGUEZ: I think Mr. Walji had said just the Equity Bridge portion, not the First Guaranty Bank loan.

THE COURT: Right. That's correct. Thank you for that clarification.

THE WITNESS: Sure. So --

BY THE COURT:
Q Okay. Other than that gap, I'll call it the gap that was required because of the First Guaranty Bank amount not being sufficient. So I think I understand that one.
A Yes.
Q Are there any other parallel tracts or any other -- what about the Missouri client of Mr. Marx? Did you hear that testimony?

A Yes, I did.
Q The guy that lost his driver's license?
A Yes.
Q Do you also believe that that fits this description in Paragraph 19, sentence 1?
A Yes. Your Honor. The --
Q Okay. That's fine. Are there any others?
A As I mentioned to you, the overseas client one
Q The Dubai?
A Yes, thank you. Dubai. Thank you. Yes. Not client, but the Dubai party.
Q Okay. Are there any others that Mr. Marx testified about that you recall, but you believe satisfies or fits the description in Paragraph 19, sentence 1?
A There is the one that I mentioned to you, which starts with the letter N as in Nancy that we have confidentiality agreement.
Q Right. No, I'm not talking about the stuff. I'm talking about the stuff that Mr. Marx testified about.
A Oh, I'm sorry. Yeah, no, My apologies, no. No, not to my knowledge about any other entities that Mr. Marx made reference to.

THE COURT: I'll just ask Mr. Kane, Ms. Lindauer, Mr. Rodriguez, are there any others that Mr. Walji or myself might not be recalling that were covered in Mr. Marx's testimony?

MR. KANE: Without looking at the testimony, Your Honor, nothing comes to mind. I think you hit four.

MR. RODRIGUEZ: Yeah, not that I recall either, Your Honor.

MS. LINDAUER: Yeah, I'm not recalling any, but --

THE COURT: Okay.

BY THE COURT:

Q And then so those and then the new ones that were -- I have yet to hear about. And of the new ones that I have yet to hear about, how many are there?

A That is from Mr. Barton, that would be a better answer. Because he was dealing with them.

Q So you were not involved in any of those?

A Well, I was involved in the communication but not in securing the funding as -- I was not a recipient of the secured funding. Mr. Barton did.

Q I understand, but I guess I understood your earlier testimony to be that you were involved and you were at least familiar with the different --

A Yes.

Q So if you're familiar with them, do you have any idea how many more there were in addition to those that we just talked about that were identified by Mr. Marx. How many more were there to your knowledge?

A To my knowledge, one, two, three. I believe my testimony

earlier was at least four. Beyond Mr. Marx.

Q And those and any others that you may not be familiar with.

THE COURT: I understand Mr. Rodriguez and Ms. Lindauer, you're going to send me a list for in-camera review so that I can identify them if I decide I want to ask follow-up questions?

MS. LINDAUER: Yes, Your Honor, I'd be happy to do that.

THE COURT: Okay. Thank you for allowing me to ask those questions. I'll go ahead and turn it over to, is it Ms. Lindauer.

MS. LINDAUER: One second, Your Honor. I think we're on redirect of Mr. Walji. And we are going to take, because of our time this afternoon, a couple of witnesses out of order. I just wanted to alert the Court. I did visit with Mr. Kane at the break. We had planned on calling Mr. Barton next. But give the time of day and the hard stop at 4:30, I doubt we would get all the way through Mr. Barton.

My estimates have not worked so good because I did about an hour and a half with Mr. Walji and then, of course, Mr. Kane did a little over two hours. So I've been trying to track our time.

So in any event we'll finish Mr. Walji I believe in a minute or two. And then Mr. Kane has graciously said that Mr.

Christensen, his client reps and Mr. Nambiar would be available. And the reason I selected those is I think those we can hopefully finish this afternoon.

If I start Mr. Barton, I'm pretty certain we would get about halfway through him. And then have to take a break So I was hoping to actually finish up a couple of these intervening witnesses if we can do that. So -- if that's agreeable with the Court, then we'll finish Mr. Walji and then we'll call Mr. Christensen would be our next witness. Mr. Nambiar we had said 3:30 and I'm hoping we can finish him by your 4:30 stop.

And then whenever the Court has time next week. And I think we have gotten some emails from your courtroom deputy about time next week, so --

THE COURT: Okay. So go ahead and finish up with this witness.

MS. LINDAUER: Okay, thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Walji, I'm not going to belabor a lot of the issues that we've spent quite a bit of time on, but going back through some of the questions Mr. Kane asked you, with regard to the payoff to HNGH that was contemplated under the two orders that we've talked about, the December and the March orders, was a settlement statement required for that piece of the closing?

A No.

Q So when Mr. Kane asked if Sendera had circulated a closing statement, just to be clear, it was not expected that Sendera would produce a closing statement for the pay off piece, I will call it of the closing, to pay off HNGH?

A No, it was already part of the sealed Exhibit A.

Q All right. When you say the sealed Exhibit A, you're referring to the payoff amount, correct?

A Correct.

Q And prior to May 31st, we did reach out to Mr. Kane, and verified with Mr. Kane, on a couple of occasions, that the payoff amount was as has been anticipated in the sealed amounts. Is that correct?

A That is correct. Yes.

Q Okay. Mr. Walji, just to be clear, we spent a great deal of time with Mr. Marx, going through Exhibit 33A, which was the title commitment from Sendera. We spent a brief amount of time going over some of those points with you.

And you told us in your direct that there were two documents that you were looking at for closing. One were the court orders, which are actually two, and one was the title commitment. Is that still correct? That those were the two documents?

A Those are the two -- the two agreed orders and the title commitment in terms of understanding what it would take to

conclude the transaction with respect to the requirements that were listed in Schedule B and C. But -- sorry, go ahead.

Q But with regard to the Court orders, I want to be clear about this, what was the minimum required under the Court orders, for a closing to occur on May 31st?

A So the minimum requirement as I understand from the December 10th 2021 order is literally very simply put a recision date that that would be necessary that a recision date with specific specifications to reinstate 2999TC back into its position prior to the -- an approved filing -- the date in lieu of filing on October 29th of 2021 by HNGH.

So that was the first and the most important aspect of restoring the 2999TC in the position that it was. I'm not going to talk about the consideration because that was taken care of and we've established that there was no default in the payment. So that recision date was not provided. It was the first default on the part of HNGH.

Q Okay. Let me go back. I'm just trying to be -- that really wasn't the question.

A Sorry.

Q Just what were the minimum requirements --

A Okay.

Q -- for closing on May 31st to close the payoff to HNGH?

A My understanding is that there was no closing in the order as a term. But I don't recall seeing the word closing. What I

see is two things. A recision deed and a note to be reinstated were the two documents that needed to recede prior to the debtor's payments to HNGH. Open amount, which was reflect in Exhibit A.

Q Okay. So you identified for us three things that would have occurred on May 31st. There would be the providing and execution of a recision deed. The providing and execution of a note reinstatement. And then a payoff to HNGH.

Is that correct?

A Right. When you say note reinstatement, it's the note being reinstated.

Q Correct.

A I don't know if that's sone document or two, but --

Q Correct.

A -- the principal is it's the note should be reinstated. That's one component. And I don't know whether it's one or two documents. A recision deed is one document. Those are the two that will be required.

Q Okay. As of May 31st, close of business, 5:00 on May 31st, was there a recision deed executed by both 2999TC and HNGH and delivered into the title company?

A No.

Q Was there a note reinstatement, whatever that is, form, was that prepared and delivered to the title company?

A No.

Q Okay. The recision of deed document that Mr. Kane provided on that date, his marked up one, was that ever signed by his client and delivered to the title company or the debtor?

A No.

Q Was a note reinstatement document ever typed up, prepared, and signed and delivered to either the title company or the debtor?

A No.

Q Based on the testimony that you've heard from Mr. Marx, Ms. Blakeley and now some of your own statements, would this transaction have closed on May 31st?

A No. Because of the conditions that has already been testified, such as the promissory note not being in possession of HNGH and if HNGH had paid off their obligation prior to May 31st, they would have had the note. Then a note reinstatement could have happened.

But they had a liability that they had not cured and the -- the order required payment to HNGH and the representations made Happy State Bank was not an issue. So -- and then based on Ms. Julie Blakeley's testimony yesterday, they would not release the promissory note in their possession until after receiving payment, which was past 5:00 May 31st.

And the funding or the -- or the funding from H -- sorry. The funding from 2999TC was not a condition in the order. They could have paid that off earlier, got that note and then we

would have a different discussion. Then the only outstanding issue would have been the recision deed.

Q Was the debtor -- we looked at a couple of these different documents, one with PNL, one with Tall Ships, one with Revere Financing, different term sheets and commitments. Was the debtor working through issues with its lenders regarding things such as waivers of the time period between the order of confirmation and the closing on May 31st, or payoff on May 31st?

MR. KANE: You're just calling for Mr. Walji's understanding, right?

MS. LINDAUER: Correct.

THE WITNESS: So there are only two that had raised that issue to my knowledge. So I just want to make clear it's not all that have raised this issue about the plan.

BY MS. LINDAUER:

Q Okay. In the -- both orders, the December order and the March order, just to be clear. I think you've alluded to this, the debtor actually did pay for the extensions of time in those orders; is that correct?

A That is correct. They were paid -- they were made timely according to the agreed orders. In full satisfaction of that obligation.

Q Okay.

A So the only outstanding amount was the Exhibit A amount.

Q Take a look -- I'm not going to spend too much time on this, but just flipping back to this is the secured lender or lender's Exhibit 33. And it will be 33A, Sydney. There you go. And the effective date of this title commitment says may 15th, 2022.

A Yes.

Q And based on your testimony Mr. Walji, when on or about do you recall this Schedule A or this title commitment first being provided to either Mr. Kane or his client in connection with this transaction?

A I don't recall because Mr. Kane and Sendera were communicating directly in that regard. So I don't know the answer. But I had asked Ms. Lissey (phonetic) to make the effective date earlier because of the deed in lieu issue. And she was going to get back to the underwriter.

Q Well, we know it couldn't have been any earlier than the date of Exhibit 33A, correct?

A Well, the -- there was an issue between Julie Lissey and myself. But as it relates to a new party, that would have been the effective date. That's where we had the issue about this whole warranty deed because they were ensuring title to an entity for which a special warranty deed would be sufficient. But what I asked her is two things.

I need a title that would be retroactive by removing the deed in lieu and she did not come back to me because she said

she had to talk to the underwriter.
Q I think we're off the track.
A Sorry.
Q All I was trying to get at is, is the date of this document seems to be effective as of May 15th, 2022.
A Oh, sorry. Yes.
Q Was there -- was this exchanged any earlier than May 15th of 2022?
A I don't think so.
Q Okay. All right. If we could take a look at Exhibit -- this will be the lender's exhibits. Exhibit 29. Okay. And if we could go to Page 206. So it's the next page. You were copied on this email from Mr. Kane to Julie.
A Yes.
Q And you recognize the Julie is at Sendera Title; is that correct?
A Yeah, Julie Lissey, I guess.
Q Okay. And what's the date of this email?
A May 10, 2022.
Q And if we look at it, it says Julie, attached is the payoff amount of confidential Exhibit A filed under seal, which I circulated and approved by 299TC's [sic] counsel on March 11th and which previously I provided to 299TC's [sic] counsel again on April 29th, 2022. Do you see that?
A Yes.

Q Okay. So this, again, just to be clear, this is may 10th. This is about three weeks before the scheduled closing, right?
A Yes, ma'am.
Q The next thing it says, HNGH has a copy of the recision deed ready to file in accordance with the applicable orders. HNGH's expectation is that it will be filed and record a recision deed at closing, when funds are wired into escrow or HNGH's payoff and the filing of the recision deed is the only condition precedent to closing remaining. Do you see that?
A Yes.
Q And then he also says please let me know if there's any additional documentation you require from me on HNGH's behalf. Do you see that?
A Yes, I do.
Q Okay. Do we know today whether a recision deed ready to file was in the possession of Mr. Kane on May 10th?
A No.
Q No, we don't know, or no there wasn't?
A No, I don't know. Because the earliest I got was after May 10.
Q Okay, look at Exhibit 31.

THE COURT: Lender's Exhibit 31?

MS. LINDAUER: Yes, Your Honor. Lender's Exhibit 31.

BY MS. LINDAUER:
Q What's the date of this email regarding recision deed?

A Yeah, okay, Thursday May 12th, 2022.
Q Okay. That's two days later, correct?
A That is correct.
Q And if you look at the attachment that's 31A. That email.
A Yes.
Q It's a document called special warranty deed. Do you see that?
A Yes.
Q Is that a fully executed document ready to file in the deed records of Dallas County?
A I can't see.
Q Scroll down Sydney, please. Was that document executed?
A No.
Q So there was not a deed ready to be filed on May 10th when Mr. Kane represented -- made that representation to Ms. Lissey and to us; is that right?
A Yes.
Q Mr. Walji, I think we've tried to point out to the Court a few instances where there has been some confusion, some -- basically misstatements or errors made on various parties involved in this transaction. Did any of those have any type of negative effect on the closing on May 31st?
A Yes.
Q And can you tell the Court which ones?
A The last minute surprise of Happy State Bank having a bail

statement which was previously denied as being relevant to this transaction. And the promissory note being in the possession of Happy State Bank as late as May 31st of 5 something p.m.

The second was the recision date that we set -- sorry, the agreed recision of deed that we sent to Mr. Kane, as being our final version of that was not accepted and was revised, as pointed out three hours later. And again, I'm not sure if it was 30th or the 31st. But that recision date not being finalized or executed was a -- was very material to us not being able to close on May 30th or May 31st.

Q Did you also discover that the recision deed was not being held by counsel, as was represented with the orders?

A That I can only say from the point of the May 10th 2022 email which followed by the May 12th draft of the document, I was not involved in the December, so I can't comment as of the December date. But I was involved on May 10th when Mr. Kane represented to Julie Lissey that they have the recision deed ready to be filed and recorded. The only evidence I have was on May 12th, two days later was a draft and not a signed fully executed document.

Q Was there -- the reinstatement of note would have triggered the -- also the reinstatement of other loan documents, such as liens. Were there other UCC and lien documents that had been filed, that also needed to be released?

A Yes. And that -- there are two aspects to it. Those that

were recorded in the title policy and those that were not recorded in the title policy.

So for example the mis-information, mis -- whatever you want to call it. The inaccurate description of the entity being a Texas entity when it was not, would have rendered this document incomplete, inaccurate, and so that was the troubling part in terms of the deed -- the recision deed itself.

The remaining of the -- the requirements, and therefore the question of the authority of these individuals that were executing on behalf of which entity required verification that they are the -- the existence of the entities and they are the authorized representatives to executed on their behalf. Because in one -- I believe in the notary, you know, the notary language was, you know making that representation which would not have been accurate.

So -- and the we went through the other -- the other lists in the Schedule C, or in your side, I won't repeat that. But there were several of those that were not completed or executed.

Q Okay. Mr. Walji, why was it the responsibility of the debtor to provide title information to Happy State Bank?

A I'm not sure if I understand your question.

Q Well, Mr. Kane complained that we did not provide the title information to Happy State Bank's lawyer in a timely fashion for them to deliver documentation to Sendera Title.

And my question is, why was that our responsibility to provide that information to Happy State Bank's counsel?

A It wasn't. That's the part that is really perplexing because all along the representation was that HSB is not involved. Even the email from Julie Lissey saying that HSB is not involved in this transaction.

So I -- from my perspective. I did not pay any attention. Because as I was told, HSB has nothing to do with it and that literal assignment, that's between HSB and HNGH and it's nothing to do with 2999 Acquisition. And I think that's the very frustrating part for me or Mr. Carruth to have dropped at the last minute a payoff statement. They could have done it earlier.

Q Okay. Well we've covered that.

MS. LINDAUER: Your Honor, at this time I'll pass the witness.

THE COURT: Mr. Kane?

MR. KANE: Oh, I have nothing further, Your Honor, thank you.

THE COURT: Thank you, Mr. Walji.

THE WITNESS: Thank you, Your Honor.

MS. LINDAUER: Your Honor, at this time, can Mr. Walji be excused? I know he has another matter to attend to this afternoon.

THE COURT: Is Mr. Walji here under a subpoena, Mr.

Kane?

MR. KANE: He is not. He is not one of our designated witnesses.

THE COURT: So any reason he can't be excused?

MR. KANE: Not to my knowledge, Your Honor.

THE COURT: All right, Mr. Walji. You are excused.

THE WITNESS: Thank you, Your Honor.

Thanks everyone.

(Witness excused)

MS. LINDAUER: Your Honor, our next witness we would call would be Nate Christensen.

THE COURT: I'd like to take up kind of a housekeeping matter first.

MS. LINDAUER: Yes, Your Honor.

THE COURT: Is Mr. Rodriguez still with you? I can't see him in the picture?

MS. LINDAUER: Yes, he's here. I'm going to slide over. Thank you. He is right there.

THE COURT: All right.

MR. RODRIGUEZ: Yes, sir, I'm here.

THE COURT: So Mr. Rodriguez, I want to pick up with something. When you first appeared on August -- I think it was August 13th. Bear with me just a minute. So just if I have the dates correct, I think on August 10th was the date we started the hearing. Not August 10th. Sorry. June 10th. Bear

with me one second.

Mr. Rodriguez, I think you made your appearance on June 13th. Is that correct?

MR. RODRIGUEZ: I'm sorry, Your Honor. I don't recall the precise date, but it was this month.

THE COURT: So -- yeah, it was June 13th. June 13th, which I think was a -- yeah, it was a Monday. And the prior week at the start of the hearing, which I believe was on the 10th, we began the hearing without an agreement between counsel on the admission of exhibits, and then Mr. Kane asked if we could take a break, which I did. And I understand during the break, Mr. Lindauer and Mr. Kane worked out an agreement on the admission of various exhibits. And they came back on the record and we went through it in detail.

So those documents were admitted either, you know, just flat out admitted or they were admitted for a limited purpose, as was described at the June 10th hearing.

At the beginning of the June 13th hearing, we had just come back on the record. I think we were still in the middle of Mr. Marx's testimony. You had indicated that you wanted to argue a motion. I think it was Docket Number 160. And I indicated we were not going to take the motion up at that time because I -- first of all, I hadn't seen it and I think nobody had alerted -- at least at the time, I wasn't aware of it. It hadn't been set.

So I guess one thing I want to know has that motion been resolved?

I think at some point there was a representation that you guys were working that out or my understanding was that it had been resolved, but I'm just wanting to know where we are on that.

MR. RODRIGUEZ: Thank you, Your Honor.

Not quite yet resolved. The last set of communications Mr. Kane and I have had have established, number one, he represents that the emails that say attachments and upon which my clients or client representatives were copied that we already have those attachments. So I conclude from that that there are no other versions of attachments.

He does seem to identify a subset of emails that we were not copied on that have attachments that we haven't seen. And I believe that Mr. Kane as the custodian of records for his firm is going to provide those at some point, at least that's what I understood in the exchange of emails.

But, frankly, Your Honor, I've been so busy trying to prepare witnesses and get ready for these things, I haven't been able to refocus. But we've at least funneled things down. And certainly, Mr. Kane can explain what his intentions are in that regard.

MR. KANE: Yeah. I don't think that is an appropriate characterization of what I said. Immediately after

seeing the filing, I reached out to Mr. Rodriguez on the 12th in the evening.

And at that point, I did say, hey, listen, you know, I'm happy to provide you the full documents but we got 100 admissions or basically 100 exhibits that have been admitted. The ones that had already been sent to your client, you guys already have those in your possession. So if you want to identify any documents that have been admitted that are not emails that include your client that appear to be missing attachments, I will be happy to locate those attachments and deliver them to you.

And I reiterated that again sometime last week to Mr. Rodriguez. We have not had any identification of documents that he believes are missing attachments on which his client was not copied. So we haven't produced anything extra to Mr. Rodriguez.

MR. RODRIGUEZ: Well, then I clearly misunderstood, Your Honor. You know, this has been a moving-the-goalpost game not just as between the clients but between the lawyers. Mr. Kane asked me to identify, and I did. I said it's all of those emails that you have marked as exhibits that say attachments. And we don't have the attachments or they're not submitted as a subpart. Those are the ones.

I left him a phone message, can you please do me a favor. I'm getting on a plane getting ready to go on a trip,

and just send me those things. (Indiscernible).

THE COURT: When you say those things, there are 100 exhibits or more, right?

MR. RODRIGUEZ: Your Honor, we've seen Mr. Kane's email system. He's shown it to us. We can see the emails and which ones have attachments and which ones don't. It's a matter of storing them by attachment. And they're identified.

But I went ahead and entertained this. I prepared a letter, and I gave him a list of the number of emails that had attachments that I was asking him to produce. Instead of producing those, he writes me back again and says, well, you already have them. How he knows that I don't know because he's not our custodian of record. But that's what he maintains. He said there are --

THE COURT: Well, the exhibits were exchanged before the hearing, were they not?

MR. KANE: Three days before, Your Honor.

THE COURT: So these exhibits were filed on the docket, so the exhibits that were on his list and that were on Ms. Lindauer's list, each side already had the other side's exhibits before the hearing.

And so I guess I'm trying to figure out the exhibits that were admitted by agreement by Ms. Lindauer on the 10th without objection, have you identified in those exhibits any emails or documents that are missing that need to be considered

to be complete, specifically?

MR. RODRIGUEZ: Yes, Your Honor. I've put it in a writing, and I sent it to Mr. Kane.

MR. KANE: So Mr. -- I'm sorry. So Judge Everett, just for a very brief example and this is the response that I've provided to Mr. Rodriguez, is I'm trying to provide Mr. Rodriguez a professional courtesy here. And we're trying to deliver documents that they are missing.

And so what I specifically did was say if your client is CC'd on the emails, it has the attachments and it can verify that the attachments are accurate and complete. Okay.

So even despite that, what I got back was a list of documents that included like document Exhibit 33 and 33A. And it's an email that I believe Ms. Lindauer and Mr. Walji, who are the debtor's counsel were both CC'd on.

And Exhibit 33A, the attachment to that email, not only do they have it in their possession, but that's been an exhibit that they've referred to on the direct examination of each of their witnesses.

And so my response to Mr. Rodriguez is this is not productive. I mean this -- I don't believe that this is a legitimate request. You already have these documents. If you want to specifically identify documents that were not already received by the debtor's own counsel, I'm happy to provide them. So if there's some email between me and Julie Blakeley

and they believe that an attachment is missing, I'm happy to provide that attachment, and I made that abundantly clear.

THE COURT: So, Mr. Rodriguez, can you not provide specific documents? And I've seen a lot of these emails. I know Ms. Lindauer was copied on a lot of them. I know your client has a lot of them. If you have some question about whether an email isn't complete, do you not have the ability to check with your own client to see if they have the documents first before asking Mr. Kane to provide them or have you identified a specific list of documents that are not on the attachments or that are missing that your client doesn't already have?

MR. RODRIGUEZ: Two responses, Your Honor.

Number one, all electronic information and data is in constant flux. So whatever versions or changes or metadata exists on Mr. Kane's documents and emails may not be the same as what my clients received and have. But I understand Mr. Kane is taking the position that he doesn't have to produce any ESI if my clients were CC'd on an email.

Okay. So how about you just give me the attachments to those emails where my clients were not CC'd.

THE COURT: Have you identified those specifically?

MR. RODRIGUEZ: Your Honor?

THE COURT: That's a yes --

MR. RODRIGUEZ: Your Honor?

THE COURT: That's a yes or no question.

MR. RODRIGUEZ: I can't because not every email shows the attachment is there. Sometimes the attachment symbol is there or it's not.

THE COURT: Then how do you know it's missing?

MR. RODRIGUEZ: I know --

THE COURT: How do you know it's missing?

MR. RODRIGUEZ: Because Mr. Kane told me so in his written responses and what he said right here right now.

MR. KANE: That's --

THE COURT: I don't want to get --

MR. RODRIGUEZ: (Indiscernible) put together another list and I will send it and I will copy the Court and I will show you which emails my client was not copied on have attachments and we don't have the operative documents.

THE COURT: Okay.

MR. RODRIGUEZ: I'll do --

THE COURT: I'm going to take another stab at it. Have you sent a letter to Mr. Kane with a list of specific documents that you think you don't have the attachments for?

MR. RODRIGUEZ: Yes.

THE COURT: You have?

MR. RODRIGUEZ: Yes, Your Honor.

MR. KANE: Your Honor, I'm happy to put that letter on your screen right now.

THE COURT: All right.

MR. KANE: We can look at those exhibits.

THE COURT: I'm going to take from this that your motion which I don't think still nobody has contacted my courtroom deputy and asked for a setting. So we're not going to --

MR. RODRIGUEZ: Well, Your Honor, why don't we do this, Your Honor. Why don't we do this in the due order of things and let me go ahead and try to talk to Mr. Kane in person, whether at his office or mine, and try to resolve this issue. And if we can't resolve it, then I'll set a motion and we'll get in front of the Court, because I'm not prepared to have a hearing on a motion that Your Honor said I cannot hear unless I set for hearing and file a motion for expedited consideration.

THE COURT: I had asked --

MR. RODRIGUEZ: Could we just go ahead and continue with the witnesses, Your Honor?

THE COURT: I started out -- I'm sorry. I started out asking if it had been resolved. I now see it is not resolved. So I think you've both answered my question. Nobody has contacted my courtroom deputy about setting it.

And so I'd assume since I had not heard from your side, Mr. Rodriguez, that the matter had been resolved. I now understand it is not resolved. In the meantime, we're going

through witnesses and the exhibits, and so we're going to keep proceeding. And if somebody has a motion they want to set for hearing, it's incumbent upon you, Mr. Rodriguez, to set it.

So we're just going to go forward. And, Ms. Lindauer, you can go ahead and call your next witness.

MR. RODRIGUEZ: Thank you, Your Honor.

MS. LINDAUER: Thank you, Your Honor.

Your Honor, at this time I would call Nate Christensen.

MR. CHRISTENSEN: I believe I'm connected. Can you hear me okay?

MS. LINDAUER: I can hear you fine, Mr. Christensen. I can also see you. Thank you.

THE COURT: But before we start, Mr. Rodriguez, I would like you to correct me if I'm wrong, but nobody from the debtor's side has contacted my courtroom deputy and asked for a setting on that motion. Is that correct?

MR. RODRIGUEZ: To the best of my knowledge, Your Honor, no one has called to set that motion. I'm trying to be judicious in the consumption of judicial resources. I don't think I'm ever going to get anything from Mr. Kane. I'm going to try again informally. If it doesn't work, we will set it, Your Honor, maybe at the end of these proceedings just so the record can be complete if in fact there has to be an appeal But I appreciate the Court's time.

THE COURT: I understand. I was just trying to make sure -- you know, I understand there are a lot of emails going back and forth. It's a busy hearing. I just want to make sure I wasn't missing something that in fact maybe you had or Ms. Lindauer had asked for a setting.

Ms. Lindauer, have you asked for a setting on that?

MS. LINDAUER: I don't believe so, Your Honor. I --

THE COURT: Okay.

MS. LINDAUER: I kind of had left it to Mr. Rodriguez and Mr. Kane to work it out. So --

THE COURT: Great. I understand. I understand.

My whole point in that was to acknowledge that sometimes I make mistakes and I just want to make sure I hadn't missed a request to set that motion. So we're going to proceed.

So I appreciate your answers. You've answered my questions. And you can go ahead and start with Mr. Christensen.

MS. LINDAUER: Your Honor, I think if we could have Mr. Christensen sworn.

THE COURT: Yeah, I'm sorry.

Mr. Christensen, if you would raise your right hand

NATHANIEL CHRISTENSEN, DEBTOR'S WITNESS, SWORN

THE COURT: All right. Thank you.

DIRECT EXAMINATION

BY MS. LINDAUER:
Q Mr. Christensen, could you state your full name for the record for us.
A Sure. My legal name is Nathaniel Christensen.
Q And Mr. Christensen --
A I go by Nate.
Q I'm sorry. And you go by Nate. All right.
And, Mr. Christensen, could you tell us how you're employed?
A Sure. I am an employee of HN Capital.
Q I'm sorry. And help me with that, HN Capital?
A Yes.
Q And is that the full legal name of the company that you work for?
A No. The full legal name is HN Capital Partners, LLC.
Q All right. And how long have you worked for HN Capital Partners, LLC?
A Since last fall.
Q And that would be fall of 2021?
A Correct.
Q Okay. And approximately when in the fall os 2021 did you go to work for them?
A I can't remember the exact day. It was in August.
Q And what do you do for HN Capital Partners, LLC?
A I am the general counsel.

Q Are there any other attorneys who work for HN Capital Partners in the role of either general or associate counsel inside the company itself?
A None inside.
Q And as general counsel, can you just briefly describe for us kind of what your duties are for HN Capital?
A My main duty is to oversee outside counsel on various matters.
Q And do you have any responsibilities other than overseeing outside counsel?
A That's my primary duty.
Q All right. And can you tell us how HN Capital Partners relates to an entity called HNGH Turtle Creek, LLC?
A It is the manager of that entity. HN Capital Partners is the manager of HNGH Turtle Creek.
Q When you say the manager, HN Capital Partners is -- I'm sorry. HN Turtle Creek, LLC [sic] is a limited liability company. Is that a member-managed or a manager-managed entity?
A It's a manager-managed entity.
Q And is HN Capital Partners the only manager of that entity?
A It is.
Q Okay. And just for the record, who are the members of HNGH Turtle Creek, LLC?
A I'd have to ask my counsel.

Q So you don't know that information off the top of your head?

A I am not -- I'm not prepared under -- under oath to describe the exact ownership.

Q Okay. All right. Mr. Christensen, if we could take a look at Debtor's Exhibit -- can we look at Exhibit D17?

MS. LINDAUER: Sydney, if you pull that up?

BY MS. LINDAUER:

Q And, Mr. Christensen, do you recognize this document as a proof of claim that was filed in the bankruptcy of 299TC [sic] Acquisitions, LLC?

A I do.

Q Okay. And the name listed as creditor is HNGH Turtle Creek, LLC. Is that correct?

A Correct.

Q Okay. If we turn to the second page of that document, it asks how much is the claim and the amount shows $45,939,456. Is that right?

A That is correct.

Q All right. Did you actually compute that amount or did someone at your company compute that amount?

A It would have been someone in (indiscernible)

Q And under secured, it's marked basis for perfection. It shows deed of trust. Is that right?

A Yes.

Q Okay. And on the next page is your signature. Is that right?
A That is correct.
Q Okay. And you dated this March 8th of 2022, correct?
A Yeah, I'm having trouble seeing it, so I was trying to pull it up on my own screen.
Q Sure.
A Yes.
Q And your title is managing director and general counsel HNGH Turtle Creek, LLC. Right?
A Correct.
Q In your role as managing director and general counsel, who would be your immediate boss or superior? Who would you answer to?

THE COURT: Let's take a quick break. Ms. Smith and myself we are hearing echo, so.

MS. LINDAUER: Okay. That's fine, Your Honor.

(Off the record)

THE COURT: Okay. Right now I'm not hearing the echos. So sorry for the interruption.

Go ahead.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Christensen, if you turn to the next page of the claim, that's Page 4 of 148. There's a summary of proof of

claim. Did you prepare this summary?
A No, my counsel prepared that summary.
Q And just to be clear, when you say your counsel, are you referring to outside counsel then --
A Correct.
Q -- that would have assisted you?
A Yes.
Q All right. And if we look at the next page, it says Affidavit of Nate Christensen. That's you, right?
A Yes, that is me.
Q Okay. And did you prepare this affidavit?
A I did not.
Q Do you know who prepared it for you?
A My outside counsel.
Q Okay. If we look at Paragraph 3 of this affidavit. Number 3, it says I'm an authorized representative of a custodian of records for HNGH Turtle Creek, LLC. Is that right?
A Are you looking at the first line there?
Q Yes, sir.
A That's correct. That's what it says.
Q Okay. And then your next sentence says I've been personally involved in HNGH's dealings with 299TC, LLC [sic] and 2999 Turtle Creek, LLC., including but not limited to the dealings evidenced by the documents referenced below. Do you

see that?
A Yes.
Q Okay.
THE COURT: Okay. Let's pause.
MS. LINDAUER: Sure.
THE COURT: We're getting the echo again.
(Off the record)
THE COURT: All right. Let's try that.
THE WITNESS: All right. My apologies. Hey, Dave, this is John Kane, we lost you on video. Is there a way that you can turn off your computer and maintain the video.
COURT IT: This is the Court IT support.
(Off the record)
THE COURT: All right. Let's try again.
BY MS. LINDAUER:
Q So Mr. Christensen, I was asking you about Paragraph 3 of your affidavit that we have up on the screen. Do you see that?
A Yes.
Q Okay. And your second statement on Paragraph 3 is I've been personally involved in HNGH's dealings with 229TC LLC [sic] and 2999 Turtle Creek, LLC, including but not limited to the dealings evidenced by the documents referenced below. Do you see that?
A I do.
Q Okay.

THE COURT: Okay. I'm getting the echo again. Is that -- are you hearing that Ms. Smith?

MS. SMITH: I am.

(Off the record)

THE COURT: I don't hear an echo yet. All right. We'll knock on wood, we'll keep going.

MS. LINDAUER: Oh, that would be good. All right.

BY MS. LINDAUER:

Q Okay, Mr. Christensen we'll try this one more time. Hopefully we'll get it this time. I'd asked you about the last sentence in Paragraph 3 and you answered that question for us. So now I was going to look at the Paragraph 4, right below that. Now you see that paragraph in your affidavit?

A I do.

Q Okay. And just to be clear, you were not employed by HN Capital Partners in September of 2019; is that correct? You told us that.

A That's correct.

Q Okay. So you didn't really have any dealings with regard to 299 Turtle Creek, LLC or 299TC [sic] Acquisitions in September of 2019. Is that correct?

A That's correct.

Q The note that's attached as Exhibit 1 to your affidavit. When you completed your proof of claim for the Court, you did not have in your possession the original secured promissory

note. Is that correct?
A That is correct.
Q And so this note was taken from, I believe what, a copy that you had at your office?
A That's correct. From our closing file.
Q Okay. All right.
And the rest of the loan documents that you attached to your claim, did those likewise come from your closing file?
A That's correct.
Q Mr. Christensen did you have any involvement in the participation agreement that your employer had that's part of the proof of claim?
A I did not.
Q So did your involvement with this loan really commence after your employer, HNGH, actually acquired 100 percent interest of the note and lien made the subject of this particular matter?
A Correct.
Q At the time that the bankruptcy was filed, was there any litigation pending between 299TC [sic] Acquisitions and HNGH?
A I don't think I know the answer to that question.
Q Okay. When you mentioned that you rely or supervise outside counsel, as it relates to this particular transaction, who is your outside counsel?
A For this proceeding, it's Mr. John Kane.

Q Have you used any other outside counsel related to the relationship between HNGH and 299TC [sic] Acquisitions?
A Yes.
Q Okay. And who would that be?
A The law firm Wick Phillips in Dallas.
Q And beside Wick Phillips, any other outside counsel you've used in connection with this?
A Not that I can recall.
Q Were you involved at all with the Happy State Bank collateral transfer of note and lien?
A I was not.
Q So that is something that occurred prior to your employment with HN Capital Partners, correct?
A Yes. Yes.
Q And if you look at Paragraph 9 of your affidavit, go back to that, there's a representation made that HNGH is now the owner and holder of the note, deed of trust, and all related liens and security interests. Do you see that?
A I do.
Q Is that an accurate statement?
A I knew at the time, and when I looked at this that was prepared by my counsel, I knew we were the owner and the payee on the note. And that was my understanding of what I was attesting to. I think since this case is -- since I've been involved in this case I've heard a lot of reference to, you

know, holder and, you know, I refreshed my understanding of what holder means under the law. And I know that was a omission on my part. We were clearly the owner and we had all the ownership rights subject to any of the provisions in the documents, but I know now that that was something I should have been a little bit more careful in noting the collateral assignment to Happy State Bank.

Q And that was my next question is there is nothing in these documents discussing the collateral assignment of note and lien to Happy State Bank, correct?

A I don't know if the -- all the attachments have a reference or don't have a reference. I can't tell you that. I can tell you that in this affidavit it makes no mention. And if I were to do this today, I would have had a note in here that said, you know, explained that there was that collateral assignment.

Q Okay. Since this matter was called to your attention, nothing's been filed with the bankruptcy court to correct your affidavit. Is that correct?

A I can't speak to what's been filed or hasn't been filed. I don't -- I haven't -- I haven't --

Q You haven't signed --

A -- signed everybody's affidavits.

Q Right. Well, that would be my question. You haven't signed a revised affidavit. Is that correct?

A That is correct.
Q Have you been the one responsible for HN Capital Partners to oversee on behalf of the company the bankruptcy proceedings of 299TC [sic] Acquisitions?
A I would say I'm part of a team that's involved.
Q Okay. And could you tell who's on your team?
A Primarily Mr. Nambiar.
Q Okay. Anybody else on your team?
A In supporting roles, yes, but we've been the primary folks involved.
Q Okay. And let me just clarify. When you talk about Mr. Nambiar, you're referring to Mr. Vipin Nambiar. Is that right?
A That is correct.
Q All right. Looking at your proof of claim again, and I'm really looking at that primarily because it does contain a lot of the loan documents that are at issue here. If you look, for example, with me -- we'll pull these up for you and make it a little easier. For example, the first amendment to participation agreement, that's document Page 137 of 148, Exhibit 4 to your proof of claim.
A Okay.
Q Okay. You see a reference to HNGH Turtle Creek, LLC, a Delaware limited liability company. Do you see that reference?
A I do.
Q Okay. And is it your understanding, Mr. Christensen, that

HNGH Turtle Creek, LLC is, in fact, a Delaware limited liability company?
A Yes.
Q Is there in existence today in HNGH Turtle Creek, LLC, a Texas limited liability company?
A Not to my knowledge.
Q All right. If you look on the signature page of that document, Page 139 of 148, it's about three pages up. Okay. You see a reference to GHCP, and it says HNGH Turtle Creek, LLC, a Delaware limited liability company. Do you see that reference?
A I do.
Q Okay. And then there's an HN Green Hollow Capital Partners, LLC, its authorized signatory. Who is HN Green Hollow Capital Partners, LLC?
A They were a advisor to HN -- HNGH Turtle Creek, LLC. It's common in our business to have folks like HN Green Hollow Capital Partners be an advisor under an advisory agreement, and the advisory agreement gives them authority to execute documents on our behalf when acting in their advisory role. And that's what happened here.
Q Okay. And James Glasgow, he's shown as a manager of HN Green Hollow Capital Partners, LLC. Is that right?
A That's what this shows, yes.
Q All right. So, based on your testimony, HN Capital

Partners, LLC would also be a manager of HNGH Turtle Creek, LLC. Is that correct?

A Yeah. And I should be precise. I mean, that's my nature. I'm a corporate lawyer. So, look, HN Capital Partners is the manager under the constituent documents of HNGH Turtle Creek, LLC, but as a matter of ordinary course, what we do in our business all the time is if we had a party like HN Green Hollow Capital Partners acting in an advisory capacity, we have an advisory agreement. And under that advisory agreement, we give them authority to execute documents on our behalf under a very specific mandate. And it gives them the autonomy they need to go run, you know, do the things that we've asked them to do as our advisor. It's part of our business.

Q Okay. So just so I understand, HN Green Hollow Capital Partners, LLC, it's not a manager or member of HNGH Turtle Creek, LLC. Is that correct?

A That is correct. As I mentioned, it's a authority granted under an advisory contract.

Q Have you seen, Mr. Christensen, documents signed on behalf of HNGH Turtle Creek, LLC by HN Capital Partners?

A I'm sure I have.

Q Okay. All right. So does -- just to be clear, does HN Green Hollow Capital Partners, LLC still act in an advisory capacity to HNGH Turtle Creek, LLC?

A No. That advisory contract expired some time ago.

Q Can you tell us approximately when that would have expired?
A I can't tell you. I just know it was before I arrived.
Q Okay. So who at this --
A Or as far as they --
Q I'm sorry. I'm sorry. I missed that. I spoke over you. Could you repeat?
A No. No. No. I was trying to make a clarifying remark.
Q Can you restate your answer? Okay. All right. So just so I follow, because one of the issues that we've been trying to figure out here is kind of who's on first. So HNGH Turtle Creek, LLC had HN Green Hollow Capital Partners, LLC in an advisory role up until -- I'm sorry. And you -- I asked you when did that cease?
A My understanding is that they ceased to be an advisor before I started at HN Capital.
Q Okay.
A It would have been sometime before August of 2021.
Q All right. Now, Mr. Christensen, correct me if I'm wrong. I have not seen you copied really on very many, and in fact, probably very few emails related to the back and forth regarding these particular matters. Is that a fair statement?
A I have tried to participate in this hearing when time allowed and I've seen a lot of emails where I was not copied.
Q Okay. And I know Mr. Nambiar actually produced some

emails where, in fact, he kind of jumped in here on behalf of HNGH. So I think you mentioned that the two of you actually sort of tag teamed this situation. Is that right?
A Yeah. With support from our -- the rest of our team as we usually do.
Q And just to be clear, HNGH, does it own any other assets besides the one that's the subject of this particular litigation?
A That is correct.
Q It doesn't own any other assets. Is that right?
A None that I -- my understanding is that this is the only asset it owns. That's my understanding.
Q So HNGH, just so I know, is really set up as a single purpose entity. You're familiar with that term, correct?
A I am familiar. That is my understanding.
Q Okay. If we could look at Exhibit D14.
THE COURT: You're looking at the --
MS. LINDAUER: Debtor's Exhibit 14, Your Honor.
BY MS. LINDAUER:
Q And, Mr. Christensen, I'm going to ask you to look at -- or if you could look at the second special warranty deed. Mr. Christensen, were you working for HN Capital Partners at the time that this particular deed was filed of record in Dallas County?
THE COURT: Ms. Lindauer, what -- what page of the

PDF are you on? Are you on 7 of 25?

MS. LINDAUER: Yes. Yes, Your Honor, I am.

THE COURT: Thank you. Thank you.

THE WITNESS: As I'm looking at the dates here and that would have been after my -- my time started here at HN Capital.

BY MS. LINDAUER:

Q Okay. And did you have any involvement this? We've called this the deed in lieu document. But did you have any involvement with this document?

A Not in the drafting of this document. That was drafted before my time.

Q Okay. Did you have any involvement with the dating of this document, October 29th, and then the filing for record on November 1, 2021?

A I believe that was handled by the title company.

Q Okay. Did you have any involvement in this document being taken out of escrow and recorded on or about November 1, 2021?

A My understanding was that was what was occurring, yes.

Q Okay.

A The title company was the one that was physically, you know, taking that out of the files, dating it, and proceeding.

Q Did you have any involvement in instructing the title company to take this document out of its files and recorded in Dallas County?

A My only involvement would have been counseling my client, Mr. Nambiar, that it was completely within our rights to do so.
Q All right. If you look at the second page of this document, it was dated the first day of March 2021. Do you see that?
A I do.
Q Okay. And there is a note at the bottom. Scroll down a little bit. That says when recorded return to Wick Phillips. And that was your counsel. Is that correct?
A Previous. Previous counsel, yes.
Q All right. And looking at the first page of this document, do you notice that the conveyance of the property is from 299TC [sic] Acquisitions to HNGH Turtle Creek, LLC, a Texas limited liability company? Do you see that?
A I do.
Q Okay. Do you understand, Mr. Christensen, that that's an error in this document?
A Yeah. I understand that Wick Phillips, Wick Phillips or whoever drafted this missed that. It's just -- it's a clear oversight.
Q And just a -- you already told us there is no HNGH Turtle Creek, LLC, a Texas limited liability company, correct?
A None that we own.
Q Okay. All right. Mr. Christensen, has anything been done on your side on behalf of HNGH Turtle Creek, a Delaware limited

liability company, to correct this particular document?

A I think that's why we're -- I think that's part of why we're here. I think that I wasn't aware of this mistake until we got into this hearing, and so I was confused as to why the rescission deed had Texas, LLC on it. And then I came to find out that that's -- counsel that prepared the rescission deed used this as the -- as the example to tie it to. And so the error that was made by Wick Phillips at this time carried forward into the rescission deed. And I learned that through these proceedings. I didn't know that before we started and no one every communicated that that was a problem to me before we started the hearing.

Q Okay. And so on or about -- well, first of all, let me ask you. Were you involved at all in the closing or the payoff that was supposed to occur on May 31, 2022?

A Yes.

Q What was your involvement on that date?

A Well, in the weeks leading up to that date, I was involved on a daily basis with Mr. John Kane trying to make sure that we did everything possible to give the debtor everything that they might need to close.

Q All right. And your client, HNGH, was hoping to be paid off on or about May 31, 2022, correct?

A That was a deal that we struck in March and we -- so we had hoped that it would close out like that, yes.

Q Okay. And just to understand your testimony, on May 31, 2022, you were not aware that there was an error in the special warranty deed in the name of the grantee, HNGH Turtle Creek, LLC. Is that correct?

A I was not aware that it was in the document we're looking at right now.

Q Okay.

A In preparation of the rescission deed I saw that in the signature block and instructed Mr. Kane's team to fix it. And I see from some of the other documents that have been pulled up that the one that was signed retained that error. And I reached back out to Mr. Kane and said, you know, we've got to fix this. And in the next version of the deed I saw it was fixed. And so I was satisfied that we were landing in the right spot.

Q All right. And we'll look through ah couple of those deeds right now. So the next document, again, we're under Debtor's Exhibit 14. This would be the next special warranty deed document. And, Mr. Christensen, did you have any involvement in the preparation of this particular document?

THE COURT: Ms. Lindauer, since you're -- the PDF file is relatively small on your shared screen, tell me what PDF page you're on again, please.

MS. LINDAUER: Let me see if I can -- I think I had these counted wrong before, so let me see if I can get them

right this time. So 7, 8, 9 --

THE COURT: 12 of 25?

MS. LINDAUER: This would be 11 by my count.

THE COURT: So on my -- if I'm looking at the same thing you are, this is Page 12 of 25 pages of the PDF file. Is that correct?

MS. LINDAUER: I'm not sure why we're a little bit off on our numbers, but yes, Your Honor. Page 12. Okay. Mr. Christensen --

THE COURT: I think I see a Page 12 of 25 now if I look closely at the top.

MS. LINDAUER: Okay.

THE COURT: Go ahead.

MS. LINDAUER: Oh, thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Christensen, are you familiar with this document?

A Yeah. I'm trying to make sure. I can only see a piece of it.

Q We can -- we can scroll it down if that's helpful.

A That might be helpful. I just want to make sure I'm -- oh, yes. I think this is the one that I was just referring to. I think we're going to see down there the executed signature block that retained that error on accident.

Q Okay. So, actually, let's go back to the first page of this document. Mr. Christensen, did you have any involvement

in the actual drafting of this special warranty deed?
A You know, my counsel, Mr. John Kane and his team prepared this document. I recall reviewing it and I was very focused on making sure that it was completely in concert with the agreed order. And I liked the fact that it referenced and incorporated the order. And so I felt like this was appropriate and proper even though it was a little -- you know, in my own experience, it was a little bit, you know, kind of, you know, not completely customary as in it was kind of bespoke for this exact situation. And so I thought they did a pretty nice job of tailoring a deed with all the component parts with what we needed to do to incorporate the order.
Q When was the first time you saw this document, special warranty deed, that we're looking at here on the screen?
A I asked that it be prepared kind of as the moment we were leaving the Court on December 10th. And my understanding is that it was prepared a few weeks later. It might have been early January.
Q All right. So you saw it as early as January of 2022?
A Yes. A draft, yes.
Q Okay. And was it actually executed by anyone in or about January of 2022?
A No. No. It was our view that we were going to, when asked at the right moment, and at that moment we though it would be in the middle of March. You know, we would be sending

that to the debtor's counsel for their review. And so we had it in draft form. We thought it would be appropriate to make sure that it had all the agreed upon language and we felt like what we were proposing was something that was exactly what the -- what the Court ordered in the December 10th order.

Q All right. And when did you anticipate this document would actually be executed?

A Well, when we -- I'll go back to my mind set in January of this year. We had agreed on a payoff in March.

Q Okay.

A And so I thought that a payoff in March would include, you know, maybe in advance of the closing we'd have the usual closing documents exchange and this would be exchanged in that.

Q Okay. All right. And just to be clear though, the -- it may have been -- you're saying it was drafted in potentially January of this year and then you anticipated it would actually be completed and exchanged in connection with the March payoff. Is that right if I'm following your testimony?

A Yeah. But I pretty quickly realized that was not happening.

Q Sure.

A There was no discussion at any closing leading up to the March deadline. The only conversations I had leading up to the March deadline were requests for extensions. There was never any evidence of any financing party to pay off that was real

and there was no talk of actual closing documents. So this is not -- this is not, you know, this is not relevant at that time.
Q Okay. And who were you having those discussions with?
A Mr. Walji reached out to discuss an extension.
Q And prior to Mr. Walji reaching out to discuss an extension, who were you having those discussions with?
A I don't recall anyone other than Mr. Walji reaching out.
Q All right. So you dealt with Mr. Walji directly as part of the request for an extension?
A I did.
Q Okay. And was anybody else involved in those discussions regarding a request for an extension?
A I'm sure Mr. Kane was involved on our behalf.
Q All right. Anybody else?
A I'm sure Mr. Nambiar had some involvement in it in one way or another.
Q Okay. And anybody else that comes to mind?
A No.
Q This particular document that we have up on the screen, do you know when that was first delivered to 299TC [sic] Acquisitions to review and look at?
A I believe that we delivered it the, you know, within hours or a day of the first request. And that was earlier in maybe the first or second week of May. If I listened more carefully,

I'd have that date memorized by now, but.

Q All right. But it wasn't until the debtor actually requested a copy of the form of what we call the rescission deed that this document was delivered by HNGH over to 299TC's [sic] counsel. Is that right?

A That's exactly right. And that's how we intended it from the beginning. That was our understanding in December.

Q All right. So you had no understanding that you should have or could have provided that earlier than the request that was made by 299TC [sic]. Is that right?

A It was my understanding it was not relevant. There was no one that asked to review it and there was no funding party before, you know, because we were holding it and hoping that we had a funding party come our way where we would provide it and everyone would get what they need.

Q Okay. If we could, let's turn and look. You said you -- one of your jobs was to monitor compliance, if you will, with the agreed orders that had been signed in the bankruptcy case. Is that right?

A I think my testimony was that to the language in the special warranty deed that's on the screen.

Q Okay. Did you have any other responsibility with regard to the agreed orders that had been signed?

A Of course. I mean, part of my responsibility is to make sure that we manage these things, and so I was pretty focused

on it throughout the course of the.
Q Let's take a look at -- this would be Debtor's Exhibit B12. And, Mr. Christensen, you've seen this order before. Is that right?
A Yes.
Q Okay. And just for the record, I know you told us just a minute ago that you -- I think you've sat through pretty much if not all of this hearing, the vast majority of it. Is that right?
A As much as my schedule would allow.
Q Okay. Looking at this order that was signed on December 10, 2021, did you have any involvement in the drafting of this order?
A Yes.
Q Okay. Can you tell me what your involvement was?
A Well, I was -- I was involved on a daily basis in everything that led up to this order. And I was very focused on what this order said and the language that was in it.
Q Okay. And was Mr. Kane sharing the drafts of this order that were going back and forth between the parties prior to December 10th with you?
A I trusted that he would show us when we had decisions to make and things to review that he would review it with us.
Q Okay. Do you remember approximately when the terms of this order were actually agreed to by HNGH and by the debtor?

A We're looking at the December 10th order.
Q Right. December 10th order.
A I believe we walked into Court and said we just reached our resolution.
Q Do you remember how late in the night before that resolution the parties were working on this agreed order?
A I just remember we were all very tired. I don't remember what time it was.
Q Okay. All right. And we did show up at Court the next day and notify the Court that the terms of this order had been worked out. Is that right?
A That's my recollection.
Q Okay. If we look at the first full paragraph on the second page, there is an original payoff deadline of March 15, 2022. Do you see that?
A I do.
Q Okay. And on that date, the debtor was to pay off HNGH the amount set forth on Exhibit A, which was to be filed under seal. Is that right?
A That was my understanding.
Q Okay. Now were you involved at all in determining the actual payoff amount number?
MR. KANE: I'm sorry. Can I get -- I object on grounds of relevance. And payoff amount if an agreed amount. I don't understand why that's relevant.

MS. LINDAUER: Well, I mean, he said he was involved in working on this order and had input into it. And I guess I'm just asking did he have any input into the actual payoff amount or was that something being handled by someone else.

MR. KANE: I understand, but why is that relevant for this hearing?

MS. LINDAUER: I think it's relevant because we're going to ask about some other terms of this order, John. So I think it is appropriate to just find out what his involvement was in connection with this order. He said he had involvement with it, so was it involvement with the payoff amount? Was it with some of the other terms of this order? What was his specific involvement?

THE COURT: So I'll overrule he relevance objection.

MS. LINDAUER: Thank you.

BY MS. LINDAUER:

Q Did you have any involvement with the payoff amount aspect? I'm not asking you a number. Just with that aspect o fit.

A I would say that that's one of the material -- most material terms of this, if you can qualify material. It was a big deal in negotiation and we negotiated a number and attached it and filed it under seal.

Q Okay. As counsel for HNGH, do you understand the legal significance of the recording of the forebear -- what we call

the deed in lieu, special warranty deed, what legal significance that has?
A I'm sorry. Do I understand --
Q The legal significance of recording the what we call deed in lieu warranty deed.
A I certainly understand what it means to record a deed.
Q Okay.
A If that's what you're asking.
Q So, well, so when you recorded that deed, who became the owner of the 299TC [sic] property?

MR. KANE: I object to that because that is a very loaded question that is affected by all the litigation that led up to this agreed order, the other agreed order, the resolution of the adversary proceeding. If you're asking what his understanding is about what happens with, you know, typically when a deed in lieu is filed, I understand that, but about what happened when the deed was recorded post-petition, I think that calls for a legal conclusion and Mr. Christensen is not a bankruptcy attorney.

THE COURT: So I will --

MS. LINDAUER: I understand that.

THE COURT: I will sustain the objection because your question was what was the legal effect of the filing of the document which I think everybody knows is after the petition date. So I'll sustain the objection. If you want to ask him

what his understanding is, that's fine, but next question.

BY MS. LINDAUER:

Q Okay. Mr. Christensen, when that deed in lieu document was filed, did HNGH become the of record title owner of the 299TC [sic] property?

A I can't -- I'm not a -- I think that's again asking for a legal conclusion. I mean, I know -- I know what happened on that date. I know that there was a recordation. I know that there was other factors involved. I know that there was, you know, a bankruptcy petition filed on the preceding Friday.

Q Well, let me just ask it another way.

A I know the facts.

Q I think everybody is reading more into this question than what I'm trying to get at here. If I went and checked Dallas County records today, who would show as the owner of the 299TC [sic] property?

A If you pulled a title report?

Q Correct.

A Well, I think there's a lis pendens on this case in the title report, right?

Q I understand that, but who would show as the title owner of this property?

A I don't think you can read it like that. I think that you've got -- I think I've heard all this -- yeah.

Q All right.

A If you want to ask a --

Q Well, let me ask you. I mean, is it your position, Mr. Christensen, that HNGH sitting here today in front of this bankruptcy judge has title to the property at 299 -- 2999 Turtle Creek?

THE COURT: Ms. Lindauer, you're asking the same question three different ways.

MS. LINDAUER: I think he's trying to read more into the question. I don't think it's that complicated.

THE COURT: I don't think he's reading more into it. I think you're asking again. If you want to ask him his understanding, that's fine.

BY MS. LINDAUER:

Q Okay. Well, let me just ask you. Is it your position, Mr. Christensen, that HNGH does not today own the 299 Turtle Creek property?

A John, I think you're on mute.

MR. KANE: Sorry. I want to object because that's just the same question using a different word, right? One was in the positive, are you the owner? One was in the --

MS. LINDAUER: Well, he can just say he doesn't know if he doesn't know. I mean, good grief.

THE COURT: I'll sustain the objection. Ask another question.

MS. LINDAUER: Okay. All right.

BY MS. LINDAUER:

Q Let me ask you, Mr. Christensen. If you don't have an understanding of who owns the 2999 Turtle Creek property, then what was the purpose of a rescission deed?

A So I have spent a fair amount of time with the file. I understand the negotiations that led up to the forbearance agreement. I understand the consideration for forbearance was the deed in lieu and a no nonsense firm commitment to a payoff or the deed would be recorded.

MS. LINDAUER: Your Honor, I'm going to object. I'm going to -- Your Honor, I'm going to object. That is not responsive to the question I asked.

THE COURT: I think it is responsive. If you could just quickly wrap up your answer.

THE WITNESS: I was just trying to lay the predicate to the fact that we exercised our rights in the forbearance agreement in recording the deed in lieu.

BY MS. LINDAUER:

Q And again I would ask you, what's the purpose of a rescission deed in this order at the -- why was that provision put in this order?

A Oh, I'm sorry. I think -- I apologize, Ms. Lindauer.

Q That's fine.

A I think I missed part of your question before. Yeah. What was negotiated was very simple. We would -- we, HNGH,

would be paid in full to the payoff amount. And if that occurred, then we would kind of do what we needed to do for the debtor to have title to the property in its hands, and that's kind of it.

Q And during the time between October 29th and the debtor getting title back in its hands, who owned the property?

A Well, if I look at my law school bundle of sticks, we weren't receiving rent. We weren't doing anything that looked like we were the "owners of the property". I understand now that there was a lease. We weren't, you know, seeing any of the rent coming through that lease. I don't know what you're asking here. Is it that?

Q Okay. So I -- just to be clear. Your position, Mr. Christensen, is that HNGH was not the owner of the property after October 29th through today.

MR. KANE: Objection, Your Honor. That misstates --

THE WITNESS: Well --

MR. KANE: That misstates Mr. Christensen's testimony.

BY MS. LINDAUER:

Q Okay. Again who -- this is a simple question. Who is the owner of the property?

THE COURT: Ms. Lindauer, you're beating a dead horse.

MS. LINDAUER: Stop beating a dead horse.

THE COURT: Beating a dead horse again. I'm sorry. But you're --

MS. LINDAUER: All right.

THE COURT: -- asking him a legal conclusion. He's here as a fact witness, I believe. You're not asking him. I think you asked why the rescission deed was in the order, and I believe he said it was negotiated. So it's almost 4:00. We have to leave by 4:30. I would like to get Mr. Christensen finished today if possible and you're just, I think just asking him legal opinions about the effect of documents that were filed.

MS. LINDAUER: No. I was trying to get to the rescission deed and it's hard for me to get there when I can't establish that HNGH owned the property and still owns the property and there's a reason for the rescission deed. And so that was -- yeah.

THE COURT: You're now stating legal conclusions.

MS. LINDAUER: Understood.

THE COURT: And you're kind of arguing with the witness about a legal conclusion.

MS. LINDAUER: Understood.

THE COURT: If you have a question about him as a fact witness, why don't you ask those --

MS. LINDAUER: Okay.

THE COURT: -- so we can get him finished today.

BY MS. LINDAUER:

Q Okay. Mr. Christensen, the sentence before the rescission deed says which note shall be reinstated immediately prior to the debtor's payment to HNGH. Do you see that?

A I do.

Q What was supposed to happen to reinstate immediately the note?

A So my understanding at the time was we had a lot of sophisticated parties negotiating this, parties that had closed a lot of real estate transactions. And everyone had a common understanding of what would be delivered into escrow, being funds, documents, that would be --

MS. LINDAUER: Your Honor, I'm going to object as to non -- Your Honor, I'm going to object to non-responsive. Very straightforward question.

BY MS. LINDAUER:

Q What needed to be done to reinstate the note? Not who was involved, not who was sophisticated transaction, just what needed to be done.

A The actual steps to reinstate the note would be -- it would be taking the note, marking it paid in full, and delivering it into escrow for a simultaneous closing, as I was describing.

Q Where in that sentence does it say the note would be marked paid in full?

A I think on my -- I think you're looking at a micro step in between the steps I was trying to articulate. Like I think there was a common understanding of what would happen at closing and it would all be simultaneous.

Q That was your understanding of what would happen at closing.

A I think that was a meeting of the minds that brought us to this order. I think that was the view of all parties, that we were going to have an orderly closing if that was delivered, and counsel was trying to reduce that to writing here.

Q As you sit here today, can you tell the Court what document was drafted by HNGH prior to end of the day on May 31st to reinstate the note?

A I can't tell you when that document was drafted.

Q Can you tell me if a document was drafted?

A I would have to defer to my counsel on the closing documents they had in their possession.

Q We know from the testimony who was holding the original note on May 31st?

A I'm sorry. Was that a question?

Q Yeah. Who was holding the original note on May 31st?

A It is in possession with Happy State Bank.

Q And what was Happy State Bank requiring in order to release the original note?

A A simultaneous closing like I had -- like I described.

Q So just a simultaneous closing? That's all they were requiring?
A They wanted to see funds.
Q Did they want to see funds or did they want to receive funds?
A I could be more precise. They wanted to receive funds.
Q And who was obligated to pay Happy State Bank?
A Who had the legal obligation to pay that loan?
Q Yes, sir.
A It would have been HNGH Turtle Creek.
Q You would agree with me that there was no contractual relationship between 299TC [sic] and Happy State Bank, correct?
A I'm not aware of any contract between those parties.
Q And in your proof of claim you've admitted you didn't advise 299TC [sic] that, in fact, there was a collateral assignment of note and lien that affected 299TC's [sic] note and lien, correct?
A It was a matter of public record, but I did -- I did file something. I did file my proof of claim without that attached. That is correct.
Q Why had HNGH not made arrangements itself on May 31st to pay off Happy State Bank?
A Well, on the dates preceding, I saw a payoff statement requested of Happy State Bank and I saw them prepare it. And I knew that there were three different title companies involved.

I didn't know which title company would be the one at the closing, but I did know that at least one of the title companies received a payoff statement from Happy State.

Q Why would 299TC [sic] be obligated to pay off a payoff statement from Happy State Bank on May 31, 2022?

A It was my understanding that all parties understood that as customary in these sort of situations, the smoothest way to achieve a simultaneous closing on the timeline, especially on an expedited timeline, would be to have two wires sent by the debtor, one to, in this case, HNGH, and one to Happy State Bank.

Q Did the court order you're looking at in front of you say in any place that the payoff amount would be sent in part to Happy State Bank?

A I don't see it here, but I know that Sendera requested it. And it looked like a closing was going to happen, that the title companies wanted to see that and make that payment directly. So we were being very commercial and cooperative and trying to make that happen.

Q I don't want to spend a lot of time showing you documents, Mr. Christensen, but I will represent to you that Sendera never requested a payoff from Happy State Bank, that you, your company, or your counsel sent --

MR. KANE: Objection, Your Honor. This is -- this is a testimony by Ms. Lindauer.

MS. LINDAUER: That's fine, Your Honor.

MR. KANE: Mr. Walji previously testified that he wasn't aware of whether Sendera was having correspondence directly with me, counsel for HNGH, so I'm not sure exactly where Ms. Lindauer is coming up with this line of testimony.

THE COURT: Sustained. Next question.

BY MS. LINDAUER:

Q Mr. Christensen, let's go with your position, which is that on the 31st part of the payoff to HNGH was supposed to be paid to Happy State Bank. That's your request. Is that right?

A My understanding was that was all the parties were lined up to try to make happen.

Q Okay. Did you have anything in writing from 299TC [sic] whereby they were agreeing to make part of the payoff to Happy State Bank?

A There was no separate contract. I think the understanding that I'm referring to comes from correspondence between the parties.

Q And your understanding is that the debtor had agreed to pay part of the payoff to Happy State Bank. Is that correct?

A Look, I don't want to -- I don't want to be too general on this statement. What I understood was there was three different closing parties. We couldn't get an answer on who was the right or title company, I should say. We couldn't get an answer on who was actually handling the closings. We

couldn't get a closing statement. And we didn't see the usual kind of evidence of incentive documents and things that would happen at a closing. So I didn't see much of anything, let alone, you know, what you're talking about.

MS. LINDAUER: Your Honor, I'm going to object. Non-responsive. He didn't even address what I had asked him about Happy State Bank.

THE COURT: I'll overrule. I think it was responsive. You can follow up if you'd like.

BY MS. LINDAUER:

Q Okay. In order to get paid off on the 31st, why would you have to see a closing statement?

A Well, I think that it -- first of all, just a matter of practicality, the title company needs to arrange a lot of wires and it has a lot of steps to go through to have an orderly closing. And so typically, you know, in the week before closing, there's a lot of trading of information to line up for a smooth closing. And we -- I didn't see that and, you know, that's what I've been doing my career, so I -- I didn't see the typical stuff you see for everyone to be organized and have an orderly closing. There's a lot of things that need to happen simultaneously here.

MS. LINDAUER: Your Honor, again I'm going to object to non-responsive to the question asked. I specifically asked about a closing statement. That's all I asked about.

THE COURT: So I'll overrule the objection. You can ask again.

BY MS. LINDAUER:

Q Okay. Mr. Christensen, did you specifically ask your counsel to request a closing statement for this closing?

A Yes. I asked him for -- to please try to get all of the details we needed to close.

Q You've listened to the testimony over the last several days, Mr. Christensen. We've already established that. Is that correct?

A As much as my schedule would allow.

Q Okay. And you understand that there were some serious concerns about the "special warranty deed" that Mr. Vipin Nambiar signed, right?

A I'm trying to -- we've had like four different deeds. So we're talking about --

Q I'm only talking about the one he signed. I'm not talking about any other deeds. Just the one he signed.

A Okay. To be clear, the deed we showed on the screen a moment ago that had the wrong --

Q The special --

A -- (indiscernible).

Q Right. And I don't mean to talk over you, but the special warranty deed. Correct.

A Yes.

Q All right. When it came to your attention that there were some mistakes in that document and that document was not acceptable, were you provided a different document?

A We saw a draft from debtor's counsel that we thought we could make some modifications to and we made clear on -- in that document that we had the right party identified if you focus on that issue again.

Q All right. Let's take a look, if we could, at what you're talking about. Take a look, if we could, at Debtor's Exhibit D6. Do you see that document?

A Yes, I can.

Q Okay. All right. And are these the changes that you're referring to that were sent over in the agreed rescission of special warranty deed?

A That is my understanding.

Q And are you also aware that Mr. Kane said that he would recommend that his client execute this document? Do you recall that email?

A I do recall it.

Q Okay. And as you sit here today, Mr. Christensen, has this document been executed?

A It has not been executed, no.

Q Has it been delivered to a title company?

A To my -- I don't have any understanding that it was or was not delivered.

Q Is there any reason that it would be delivered if it hadn't been executed?
A Certainly, yes.
Q So you're saying it would be delivered even if it hadn't been executed?
A Look, it goes back to I think the big -- you know, it kind of goes back to the central issue here. We held a draft deed, rescission deed, because we knew that everyone was going to be very focused on the language and the language needed to tie in to the order. And so when we saw this draft, again, we wanted to make sure it tied in with the order. And I think that would be important to show to a title company as well or we could send them what we thought was right and they could comment if they didn't like it.
Q All right. But just to -- I just want to be clear. The only deed that was ever sent over to the title company was the special warranty deed that we first looked at that was prepared, you said the first part of, I think, January of 2022. Is that right?
A I don't have a -- I don't know of any other deed that was sent. I don't have a reason to know or not know what was sent to a title company.
Q And, Mr. Christensen, besides the special warranty deed that was sent over on May 27th, what other documents did HNGH send over to the title company in anticipation of the closing

on May 31st?
A I know there were several documents that we were working on, you know, in quick response to requests. And I think all of those were sent to whoever needed to see them, but again, I think that there was an information issue. There were three different title companies that we were aware of. And I kept asking Mr. Kane, well, who's closing this thing? If this is going to close, like who's closing it? I'm not seeing the stuff we need to see if we're going to close, so.
Q Well, you knew enough to send the special warranty deed over to Sendera Title, right, Mr. Christensen?
A I -- we knew that they were one of the three. I don't know if --
Q So did you send --
A -- that was in request.
Q I'm sorry. I cut you off. Go ahead.
A No. All I can tell you is we knew they were one of the three.
Q Did you send a special warranty deed over to two other title companies also on May 27th?
A I don't have -- I don't have knowledge of those being sent or not sent. I don't know.
Q Do you know who the other title companies were besides Sendera?
A I understood that Chicago Title was involved and I

understood that Republic Title was involved.
Q And you don't know if the special warranty deed was sent over to Chicago Title or Republic Title. Is that correct?
A I do not know.
Q How many copies of the special warranty deed were executed?
A Are you talking about the executed one? I believe that was executed and the original was sent.
Q Only one original was sent. Is that right?
A My understanding is that one original was sent to Sendera.
Q And why was it sent to Sendera and not Chicago or Republic?
A My understanding was that was in response to a request of us.
Q Are you familiar at all, Mr. Christensen, with Exhibit -- this is Lender's Exhibit 33A, the title commitment?
A I've seen it, yes.
Q When was the first time you saw this document?
A Within -- I would say within days of closing. Maybe the previous week.
Q Are you aware that your counsel had this document since on or about May 15, 2022?
MR. KANE: Objection. That is -- assumes facts not in evidence and is also factually incorrect.
THE COURT: So ask another question, Ms. Lindauer.

BY MS. LINDAUER:

Q Okay. So, Mr. Christensen, do you know when your counsel, your outside counsel, received a copy of Exhibit 33A?

A I do not.

Q All right. And just to be clear, you received a copy of it, you said, a few days before the scheduled closing. Is that right?

A Yeah. I mean, my memory is -- because we had a holiday weekend right in the middle. It could have been -- it could have been the week prior.

Q Okay. And did you make any effort --

A It could have been two.

Q I'm sorry.

A It could have been two weeks prior. I just can't -- I can't give you a specific date.

Q Okay. Did you make any effort, Mr. Christensen, to address the items on Schedule C of the title commitment?

A Absolutely.

Q And what efforts did you make to address the items on Schedule C?

A Well, I recall that there was some trouble finding the Axos Bank termination. And so I located that and sent it to Mr. Kane who I believe sent it where he was asked to send it.

Q Okay.

A And we also worked very hard with Happy State Bank to

provide what was necessary from Happy State Bank.

Q Okay. Anything else?

A I think there were a number of other things that Mr. Kane and his team were addressing, but it was my understanding that the request was focused on those two items as being "the last items necessary".

Q Can you look at Item Number 11 on the second page of this document? It's Page 8 of 16. And you'll probably need to blow it up a little bit.

THE COURT: Well, while you're pulling that up, are you -- how close are you to being finished, Ms. LIndauer?

MS. LINDAUER: I'll try to be done by 4:30, Your Honor. I think I'm on my last category with Mr. Christensen.

BY MS. LINDAUER:

Q Item Number 11. Were you aware of that particular requirement of HNGH Turtle Creek, LLC?

A Yes. We -- I drafted that and we were ready to send it to the title company that was prepared to close as a matter of, you know, common practice. Those are confidential documents and we were prepared to send it to a title company who was, you know, ready to close on this day.

Q Okay. Did you actually send those items to any title company?

A No. Because we could not get confirmation on who the title company was.

Q Okay. Well, you knew it was one of three different ones. Did you send it -- you didn't send it to any of them then?
A Well, these are very sensitive documents. I'm not going to blast them out to three title companies. I'm sorry. Pardon my --
Q All right. Well, let me go through these. So you're telling us that you had prepared a or had a current certificate of existence from the secretary of state for HNGH Turtle Creek?
A We had everything we needed for a normal, ordinary course incumbency certificate.
Q Well, I'm not asking about an incumbency certificate. I'm asking about these particular documents. Did you have these pulled and ready to deliver to a title company?
A I would have to go back and look at exactly what we prepared, but we had everything necessary for what a title company usually requires.
Q And you said what a title company usually requires. Did you have everything on this commitment that this title company was requiring?
A I'm sure we had each of those. I'm looking at 11A.
Q All right.
A And 11B. And I can't tell you what date that would have -- you know, something like that would have been, you know, marked if we, you know, if that was included in the package, but again, we had what is -- look, we do a lot of closings over

here. We had an incumbency certificate that had everything that we usually provide.
Q Okay. Was there a draft of a release of a deed of trust in your packet of documents?
A I believe that was among the documents that my counsel had prepared, but I can't -- I can't tell you -- I mean, that's a (indiscernible). I can't recall exactly what was prepared or not.
Q Okay. Was there a release of an assignment of leases and rents drafted and prepared?
A I guess that's in the same category.
Q Okay. How about UCC releases? Were those drafted and prepared?
A Same category.
Q And do you know if any of those documents that you just mentioned that evidently you saw were ever sent to the debtor or its counsel?
A I wasn't -- I don't recall being copied on a distribution where that was provided.
Q Mr. Christensen, were you aware that the debtor's counsels were advised that Happy State Bank had nothing to do with this transaction?
A I believe that's a mischaracterization of what I understood via the conversation.
Q All right. Well, you heard the testimony, right? You've

been sitting through the testimony?

A Well, it's clear from the title report that Happy State Bank has a recorded document.

Q Right. And if you were told by the other attorney that Happy State Bank had nothing to do with this transaction, would you then assume perhaps that there was an error on the title report?

MR. KANE: Objection. Calls for speculation.

THE WITNESS: Absolutely.

MS. LINDAUER: I'm sorry. I think he answered the question, but I'm sorry, John. What was your objection?

MR. KANE: I said objection, calls for speculation, but we'll -- if he answered, he answered.

MS. LINDAUER: Okay.

MR. KANE: We'll go with that.

THE WITNESS: I think anyone who knows what they're looking at would understand that there are things to work through for a closing.

MS. LINDAUER: Your Honor, I'll pass the witness.

THE COURT: All right. It's 4:18. Are you going to be able to finish your questioning, Mr. Kane, today? Because we also, before we leave at 4:30, have to try and pin down some dates for next week.

MR. KANE: Okay. So if I get five minutes I think I can do it.

MS. LINDAUER: Okay.

MR. KANE: And I'm prepared to begin now.

THE COURT: All right. Go ahead.

CROSS-EXAMINATION

BY MR. KANE:

Q Okay. Mr. Christensen, can you see this document? This is Debtor's Exhibit D14, Page 12 of 25?

A Yes.

Q And did you understand that this document was HNGH's proposed rescission deed?

A Yes.

Q And you received a question about what needed to be happen to -- or what document needed to be executed or what needed to happen to reinstate the note. Do you remember that?

A I do remember that.

Q Now, do you see this document here, Number 2? I'm sorry, Numeral 2, this paragraph, Number 2 here?

A Yes.

Q Did you understand that that was part of a contract that was going to be executed by both parties that would reinstate the note?

MS. LINDAUER: Your Honor, objection. Objection. Leading his own witness.

THE COURT: Well, sustain the objection. You want to ask another question?

MR. KANE: Sure.

BY MR. KANE:

Q Mr. Christensen, what did you understand the effects of this numbered paragraph 2 were going to be?

A It would be --

MS. LINDAUER: Your Honor, I believe that calls -- I believe that calls for a legal conclusion, and he's been presented as a fact witness. We would object.

THE COURT: Overruled. Overruled. He asked for his understanding.

MS. LINDAUER: Okay.

THE WITNESS: And my understanding was that would reinstate the note.

BY MR. KANE:

Q Okay. Now, Mr. Christensen, you talked a little bit about efforts that you took to help try and get this closed. And you referenced an Axos document. Can you provide a little detail from the Court on what you did to try to find and deliver that document?

A I recall received -- I recall receiving the requests and I knew that it was a recorded document, so I was a little bit frustrated by why it was being requested, but I quickly found it. I was actually on vacation and on the road and knew this was urgent, so I found a way to get it over to you, Mr. Kane.

Q How did you find a way to get it over to me?

A Well, if (indiscernible) those details. I was driving to Oklahoma on vacation and pulled over and found a wifi hotspot and connected to our system to go to our files and locate that in the closing file.

Q Thank you, Mr. Christensen. I have no further questions.

MS. LINDAUER: Your Honor, just one follow up, if I might.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Christensen, just to be clear, you found the Axos termination document -- I think that's what you're referring to -- in your closing files at your office. Is that right?

A Yes, but I could have also found it in the records.

Q Okay. Well, which is it? When you found it for Mr. Kane, was it from your files at your office or was it because you went on Dallas County and pulled it online?

A No. I knew precisely where it was in the closing -- in the closing file and so I just grabbed it from there.

Q Okay. So it was in your closing files. All right. No further questions, Your Honor.

THE COURT: Mr. Christensen, it was in your closing files, but am I correct from your testimony that that document was also filed publicly in the Dallas County records?

THE WITNESS: That is correct. I think it was the

very next page of the one that the title company found. They were just looking for under their own title or something. I don't really understand.

THE COURT: Thank you. Thank you, Mr. Christensen. You're excused.

So we have just a few minutes.

Ms. Smith, are you on the line? Okay. I was trying to confirm my -- hopefully my JSS and my courtroom deputy are both on because I'm having problems looking at my calendar and I'm trying to figure out some available times for next week.

THE CLERK: Judge Everett, this is Jenni, and I am on the line.

THE COURT: Thank you.

THE CLERK: You bet. We have all day Tuesday if parties are available. And Monday, going back to Monday, we have close to four hours available, but it's chopped up. There's a little time in the morning starting at about -- well, starting at 9:30 for a little time, and then we have a hearing at 10:30. It's kind of chopped up, but in the whole day we could get -- we can get close to four hours on the 27th. And then 28th is open all day.

THE COURT: There are a couple of things on the calendar. Not hearing related, but there are a couple of things, but we can work around those on the 28th. So tell me again the -- rather than chop it up on the 27th, I cannot tell

on myc calendar for some reason what is set in the afternoon. Is there anything set in the afternoon?

THE CLERK: On the 27th?

THE COURT: Yes.

THE CLERK: We have about an hour's worth of hearings at 1:30 on the 27th. So we have three and a half hours available, so we'd still have two and a half hours available, say starting at about 2:30.

THE COURT: Okay. So let's go -- so Monday we have, unfortunately, some chopped up hours available on the 27th. The 28th, we have most of the day other than a couple of items that are not hearing related, but I do have to attend to on the 28th. But we do have most of the day on the 28th. The 29th.

THE CLERK: The 29th we have from 9:30 to 10:30 open in the morning and we have preliminary hearings set at 1:30. Most of those will come off probably, so parties could be on hold or be on WebEx at 1:30 and as soon as that's done, they could go right into their continued hearing. And the afternoon is open after that.

THE COURT: So to --

THE CLERK: So they'd have basically from 2:00 on.

THE COURT: Well, okay. So roughly 2:00 on on the -- let's see. That was the 29th.

THE CLERK: Twenty-ninth.

THE COURT: The 30th.

THE CLERK: The 30th, we have a U.S. Trustee docket in the morning, but we don't have anything set. That's at 9:30. And then we don't have anything set until the Chapter 13 docket at 2:00.

THE COURT: Okay. So --

THE CLERK: So we have all morning. We have all morning and all day until whenever you start prepping for the Chapter 13 docket.

THE COURT: Okay. And then Friday, the 1st.

THE CLERK: That is open. We don't have any dockets set that day.

THE COURT: Okay. So I'll turn to the parties. We have some chopped up hours on the 27th. We have most of the day on the 28th except I have to take a short recess at 10:00, and then which might take 15 minutes. And then we also have something from 1:00 to 2:00. But other than those two items, most of the day on the 28th is available.

Does anybody want to start on the 27th or do you want to shoot for the 28th?

MS. LINDAUER: Okay. So, Your Honor, the 27th, I have a hearing with you at 1:30 right now on the 27th. And then I've got a hearing in downtown Dallas, another hearing, at 2:00, right behind that one. So the 27th doesn't look so great.

The 28th, I have a hearing with Judge Jernigan at

9:00 that morning. That should be pretty quick. But then I have an in-person hearing at 3:00 in Fort Worth. So that date doesn't look so great, Tuesday.

Wednesday, Wednesday is open. We have a deposition, but somebody else can cover that, so Wednesday is open right now.

THE COURT: Let's go back to the 28th. You said you have a hearing in the morning that will be quick.

MS. LINDAUER: Yeah. I have one. Just long as I can -- well, yeah. I have one at 9:00 with Judge Jernigan on the 28th.

THE COURT: Now, what time is your hearing?

MS. LINDAUER: Nine o'clock with Judge Jernigan.

THE COURT: No, the afternoon.

MS. LINDAUER: With Judge Jernigan. Yeah. But I do have a hearing in the afternoon at 3:00 in Forth Worth. So the morning would be free. I just wouldn't be able to do the afternoon.

THE COURT: Okay.

MS. LINDAUER: And then on Wednesday, it looks to me like Wednesday, the whole day, I have some things, but other people can handle them, so Wednesday the whole day would be free. And then Thursday I have a cash collateral hearing in the afternoon. I have a continued hearing with Judge Mullin, but the morning is free on Thursday. I have two things in the

afternoon. And then on Friday, Friday we -- I could be available there's -- that whole day.

THE COURT: All right. Having hear that, Mr. Kane.

MR. KANE: I have availability at your convenience. This is our number one priority. I will have to coordinate my witness schedule at least for Mr. Nambiar now that Mr. Christensen is done.

THE COURT: Okay. So, Ms. Lindauer, tell me again, the 27th. What do you have on the 27th?

MS. LINDAUER: The 27th, that's Monday, right? The only thing I have on the 27th, I have a brief hearing in the morning at 9:30. That's Fort Worth, so that will be WebEx. Then I have a hearing with you at 1:30 in MB Hotels. And then I have a in person hearing at 2:00 with Judge Moyer in downtown Dallas. So that one, there would be a break between 9:30 and potentially 1:30 on that day.

THE COURT: So you would be able to do 10:00 to 1:00 on the 27th.

MS. LINDAUER: Something like 10:00 to 1:00. Correct, Your Honor.

THE COURT: Jenni, is that 10:00 to 1:00 is available, correct?

THE CLERK: We have a hearing, a 30 minute hearing at 10:00.

MS. LINDAUER: Okay.

THE CLERK: It's a status conference.

THE COURT: So we could do 10:30 to 1:00 on Monday. Is that right?

THE CLERK: Yep. That's open.

MS. LINDAUER: Okay.

MR. KANE: And Mr. Nambiar can be available at that time.

MS. LINDAUER: Okay. So we could slide him in for that time.

THE COURT: We're going to plan on 10:30 to 1:00.

MS. LINDAUER: Okay.

THE COURT: And then we have something at 1:30. We'll play that by ear, depending on how much time we need for lunch and getting ready for the 1:30. So on Monday we'll go from 10:30 to between 12:30 and 1:00.

MS. LINDAUER: Okay.

THE COURT: Tuesday.

MS. LINDAUER: Tuesday was the day that I have the morning available.

THE COURT: We could do two hours on the 28th, I guess, from -- oh, wait. You're both available to start early on the 28th?

MS. LINDAUER: Well, I have a 9:00. I have a 9:00 with Judge Jernigan. I could do right after that.

THE COURT: Okay. Why don't we do 10:30 to 12:30 on

the 28th.

MS. LINDAUER: Okay.

THE COURT: 10:30 to 12:30.

MR. KANE: I do want to just, for fair warning, Mr. Nambiar is not available on Tuesday before 2:00, so if he goes long on Monday, you know, we're going to have to figure something else out.

THE COURT: That's fine. Ms. Lindauer, you can have somebody else on standby, correct?

MS. LINDAUER: Your Honor, I can.

THE COURT: Okay. So Monday we're going to do 10:30 to 12:30. Tuesday we're going to do 10:30 to 12:30.

MS. LINDAUER: Okay.

THE COURT: And hopefully either Jenni or my law clerk will shout out if I'm missing anything. 10:30 to 12:30 on Tuesday. Wednesday is the 29th. Everybody's available from 2:00 on, correct?

MS. LINDAUER: On the 29th?

THE COURT: Yeah.

MS. LINDAUER: Yes, Your Honor.

THE COURT: Right, Mr. Kane?

MR. KANE: Yes, Your Honor.

THE COURT: Wednesday from 2:00 on.

MS. LINDAUER: Okay.

THE COURT: Thursday, the 30th, there's nothing set

currently, correct, on the U.S. Trustee docket, Jenni?

THE CLERK: Yes. That is correct. There is nothing set on the 9:30 U.S. Trustee docket.

THE COURT: Since I'm new to the bench, how likely is it that we're going to have something? Probably not very likely, correct?

THE CLERK: Probably not very likely. That is correct.

THE COURT: So --

THE CLERK: You will need a little bit of time to get -- to prep for the Chapter 13 docket at 2:00.

THE COURT: Right. So on the 30th, why don't we go from 9:30 to noon?

MS. LINDAUER: Okay.

THE COURT: Does that work for everybody?

MR. KANE: Yes, Your Honor.

MS. LINDAUER: That should be fine, Your Honor.

THE COURT: And then Friday, and we are completely open, correct?

THE CLERK: That's correct.

THE COURT: Mr. Kane and Ms. Lindauer, you're both available all day on Friday, the 1st, correct?

MS. LINDAUER: I believe that was correct, Your Honor. That appears to be correct, Your Honor.

MR. KANE: Yes, Your Honor.

THE COURT: So we'll just plan on starting 9:00 that day. So let me go back to my list of witnesses. It's now 4:35. Okay. Well, we'll just see how far we get.

All right. Thank you, everybody, for your patience on working with me on the calendar. So we will be in recess on this matter until 10:30 on Monday.

(Proceedings concluded at 4:36 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, KAREN WATSON, PATTIE MITCHELL, and CRYSTAL THOMAS, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel — DIPTI PATEL, CET-997

/s/ Karen Watson — KAREN WATSON, CET-1039

/s/ Michelle Rogan — MICHELLE ROGAN

/s/ Pattie Mitchell — PATTIE MITCHELL

/s/ Crystal Thomas — CRYSTAL THOMAS, CET-654

LIBERTY TRANSCRIPTS DATE: June 29, 2022