IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Monday, June 27, 2022<br>10:33 A.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For the Debtor: | Joyce Lindauer Attorney, PLLC<br>BY: JOYCE LINDAUER, ESQ.<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| | Robin Phelan Law<br>BY: ROBIN ERIC PHELAN, ESQ.<br>4214 Woodfin Drive<br>Dallas, TX 75220 |
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |

APPEARANCES CONTINUED ON NEXT PAGE.

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES VIA WEBEX (CONTINUED):

| | |
|---|---|
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |
| For the United States Trustee: | Office of the United States Trustee<br>BY: ASHER BUBLICK, ESQ.<br>1100 Commerce Street<br>Room 976<br>Dallas, Texas 75202 |

**I N D E X**

| | Page |
|---|---|
| Case called | 4 |
| End of Proceedings | 77 |
| Certification of Transcriber | 78 |

WITNESSES

FOR THE DEBTOR:

VIPIN NAMBIAR

| | |
|---|---|
| Direct Examination by Ms. Lindauer | 6 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 10:32 a.m.)

THE COURT: Good morning. We're here on the 10:30 docket in Case Number 21-31954, the 2999TC Acquisitions matter.

I'll take appearances, please.

MR. KANE: Your Honor, John Kane on behalf of HNGH Turtle Creek, LLC, the pre-petition lender.

THE COURT: Good morning.

MS. LINDAUER: Good morning, Your Honor. Joyce Lindauer here on behalf of 299TC [sic] Acquisitions, the reorganized debtor.

THE COURT: Good morning.

MR. METZGER: Your Honor --

MR. PHELAN: Robin Phelan for the reorganized debtor.

THE COURT: Good morning.

MR. METZGER: Your Honor, Steve Metzger on behalf of Tim Barton individually.

THE COURT: Good morning.

MR. BUBLICK: Good morning, Your Honor. Asher Bublick on behalf of the United States Trustee.

THE COURT: Good morning.

Ms. Lindauer, are any of your other co-counsel here this morning?

MS. LINDAUER: The only person I have with me is Mr. Walji. I believe Mr. Rodriguez had a conflict. I believe Ms. Simmons, I'm no sure what her schedule was. I know we have Mr.

Phelan present, but I think we did lose a few of our other attorneys. So --

THE COURT: Okay.

MS. LINDAUER: -- we are prepared to go forward, Your Honor, this morning.

THE COURT: Okay. Well, I think we finished up last week with Mr. Christensen.

MS. LINDAUER: We did, Your Honor.

THE COURT: And rather than flip back through and see the order of witnesses, you're ready to go, who's your next witness?

MS. LINDAUER: Your Honor, Mr. Vipin Nambiar -- I believe he's on the screen -- is our next witness, Your Honor.

THE COURT: Good morning, Mr. Nambiar. Can you hear me?

MR. NAMBIAR: Yes, Your Honor.

THE COURT: Okay. Mr. Kane, are you ready?

MR. KANE: Yes, Your Honor. We're ready to proceed.

THE COURT: Okay. Mr. Nambiar, if you would, please raise your right hand.

VIPIN NAMBIAR, DEBTOR'S WITNESS, SWORN

THE COURT: Thank you.

MS. LINDAUER: Your Honor?

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Nambiar, could you please state your full name for the record?
A Vipin Nambiar.
Q And, Mr. Nambiar, just to be clear, Nambiar is N-A-M-B-I-A-R. Is that right?
A Yes, ma'am.
Q Okay. And, Mr. Nambiar, could you just briefly describe for us your educational background?
A Sure. I have an undergraduate degree in architecture and two master's degrees, one in flight economics and one an MBA in finance.
Q And could you also briefly describe for us your employment background?
A I am the managing partner of an investment manager called HN Capital Partners which is an exempt registered advisor here in Texas. I've been in the real estate private equity industry for 17, 18 years.
Q All right. And just so I understand, Mr. Christensen told us that HN Capital Partners is related to an entity called HNGH Turtle Creek, LLC. Is that correct?
A Yes, ma'am.
Q Okay. And HN Capital Partners, are they a member of HNGH Turtle Creek, LLC?
A HN Capital is the manager of HNGH Turtle Creek.
Q And do you happen to know who the members of HNGH are?

A Like I mentioned, we're an exempt registered advisor. HNGH Turtle Creek is a private fund organized. Its members are a series of family offices with individuals. We have a confidentiality obligation, so I'm not sure I'm able to disclose those. But I can -- I can tell you this. No -- no one member that has, you know, any -- any sway or ability to direct this investment other than HN Capital.
Q Okay. All right. And are you the primary person on behalf of HN Capital that is authorized to appear on its behalf?
A Well, I think my general counsel appeared on Friday last week. I am the managing partner of the firm. This is one of several investments I oversee, so I'm -- I'm able to appear on its behalf, yes, but there are several individuals here that help me oversee the investment.
Q Okay. And with regard to HNGH Turtle Creek, LLC, does it have multiple investments or simply one primary investment?
A This entity is an SPE. We do have a mezzanine fund that's a member in this investment that has other credit investments.
Q But HNGH itself, its primary investment would be the 299TC [sic] Acquisitions note and lien. Is that correct?
A Yes, ma'am. It's a special purpose entity.
Q Okay. And have you -- are the person that's been acting as the decisionmaker for HNGH?
A I have been exercising decisions. We do have an

institutional cadence here. I call the committee and make decisions that are informed by a little bit of an advisory board. But I act on behalf of the entity.
Q Okay. And is HNGH primarily a lender entity or a developer entity?
A Like I said, HNGH is an SPE --
Q Okay.
A-- that acquired a debt instrument and, therefore, in this -- in this instance, it is a lender entity.
Q Okay. HN Capital, does it primarily act as a lender or a developer?
A HN Capital is a real estate private equity manager. We invest up and down the capital stack in a variety of strategies. We do not necessarily invest actively in credit anymore, but this a legacy position related to a partnership we had.
Q Help me understand what you just said. This is -- so this particular transaction is a legacy position related to a credit position. Correct?
A Yes, related to a credit investment be made.
Q When did you first meet with a gentleman named Tim Barton?
A My first meeting with Mr. Barton was a chance meeting I want to say in October or November of 2019 at a -- at some social event.
Q And did Mr. Barton then approach you after that time to

get involved with 299TC [sic] Acquisitions?

A Mr. Barton did approach me, but he had independently met with some partners that we had, you know, an advisory agreement with to help us on some credit investments in New York called Green Hollow Capital. And he approached me and just informed me that he had learned about the affiliation of that entity with me and essentially discussed the project and encouraged me to make the investment.

Q All right. At that point, was he encouraging you to make an investment with his project and his company?

A No. He was encouraging me to be a co-lender with Madison -- Madison Capital. Madison was looking to not just originate a land loan but eventually roll that land loan into a larger construction loan and it needed to syndicate that position to some other investors.

That was the spirit of what they were recruiting us to do, and Mr. Barton was informing me about the success he was having in raising capital and that, you know, we should -- we should look at the -- we should look at the larger relationship with Madison seriously.

Q Okay. And approximately when was this, if you can help us on a timeline?

A It was in the fourth quarter of 2019. I can't remember the exact month and date.

Q So winter of 2019?

A Yes, ma'am.

Q Okay.

A Late fall/winter.

Q Okay. Did Mr. Barton also explain to you the ultimate development plan for this particular property?

A Very peripherally. You know, there were some pretty pictures and renderings which were generally out in the media. He had just previously thrown a big party announcing the project, and I was generally aware from being in the Dallas real estate circle that this project was being put together.

Q Was your company or one of your companies about the same period of time also working on hotel development projects?

A At that specific time, we were not working on any hotel development projects. Hotel investments are generally an active area for us which is specifically why someone like Madison thought that we would be a good partner since we understand the space.

Q All right. And I think Mr. Barton shared with you who the lender for 299TC [sic] Acquisitions was at the time that he me with you?

A No, actually. I -- I informed him that there was a relationship between me and Green Hollow who was working with Madison Capital to be a co-lender and, therefore, you know, we were evaluating whether that was an investment we wanted to make which he encouraged that I do.

Q When you say he encouraged you to do, is that Mr. Barton encouraged you to do?

A Yes, ma'am. He -- he basically, you know, told me that he had all the equity acquired and was looking for that and if we were looking to partner with Madison, he would be -- you know, that would be a good idea.

Q Okay. And did you at some point arrange a meeting with Madison?

A I did not arrange a meeting with Madison. Madison Capital invited my formal partners to a meeting with Mr. Barton before I met with Mr. Barton.

Q Who were your former partners, just so we can track names?

A It's a company called Green Hollow Capital.

Q Okay.

A It was (indiscernible).

Q And so (indiscernible) individual associated with Green Hollow?

A Yeah. James Glasgow, Jim Glasgow.

Q And is Mr. Glasgow still involved with your companies or businesses?

A He's not. We -- we had an advisory agreement with him for this investment. Like I said, this was supposed to be a performing high-yield loan. And it turned out differently, and we have since terminated our advisory agreement with them.

Q So just for the record, does Green Hollow have any

involvement still with HNGH Turtle Creek?
A It does not.
Q And so I understand, Green Hollow, was that Mr. Glasgow's company?
A Yes, ma'am. He's -- he's a partner in Green Hollow Capital, correct.
Q And just so I can follow who's on first a little bit, you heard -- did you hear Mr. Christensen's testimony?
A I did.
Q Okay. And Mr. Christensen said I think that you operate a lot with I think what you call advisory agreements. Is that right?
A Yes, ma'am.
Q And is there an advisory agreement still in place between HNGH Turtle Creek and now another entity?
A There is not.
Q So the last of those agreements would have been the one with Green Hollow. Is that right?
A That was the only one for this entity.
Q Okay. And as part of -- obviously, we haven't seen that agreement, but as part of that agreement, it's my understanding that Green Hollow would have some authority to execute documents on behalf of itself and also HNGH. Is that correct?
A It was given limited authority on approval to sign.
Q All right. We talked a little bit, you mentioned the

participation agreement. We'll take a look at that if we could.

MS. LINDAUER: Larry, are you following us where we are? If you could pull up for us Exhibit -- this is Debtor's Exhibit 17.

MR. KANE: Your Honor, I'm going to object on grounds of relevance. I mean we've had lots of testify about these participation agreements. I'm still struggling to figure out what the relevance is to the closing transaction that took place on May 31st of 2020.

MS. LINDAUER: Your Honor, the relevance -- first of all, a lot of this is simply background so that we have some good understanding of who the players are. But as we pointed out to the Court several times, there is a bit of confusion on who the various parties are that should have been participating in the execution of documents.

And so -- and also, just we're going to get into it in a minute, but the various roles of the various parties in connection with the orders that form the basis of the current dispute and the involvement as it relates to those particular orders.

And I'll make this fairly quick, but I do think it does help to go back a little bit on the history of the parties and kind of where we are and why we are where we are. And so that's, Your Honor, the purpose of some of this questioning.

THE COURT: Didn't we already cover some of this with Mr. Christensen?

MS. LINDAUER: We did, Your Honor, but if I recall, Mr. Christensen was not so good on remembering I think some of the more specific details. So that's the reason that I thought Mr. Nambiar might be the better person to ask a few of these questions of.

And, again, I think I can move through this fairly quickly. But I do think it would assist because I think Mr. Christensen, if you recall, did not get involved with this particular loan until after all of this had occurred. He came in to place about the fall of 2021. The actual participation agreements and related documents were in 2020. So Mr. Christensen wasn't actually involved in all of that transaction, so that's the reason we're asking Mr. Nambiar.

MR. KANE: I think that, you know, to continue this relevance objection, there have been multiple waivers and releases by the debtor and its representatives about anything to do with the loan documents. So I'm failing to see the relevance of this line of questioning to the closing on May 31st that was supposed to take place.

MS. LINDAUER: And, again, Your Honor, we're probably spending more time arguing over whether it's relevant than just simply asking a few questions, but I do think to make a complete record, we have the person that probably has the most

knowledge of the underlying transaction.

We're not challenging the underlying loan documents. All we're doing is trying to build a path towards who should have been involved at the closing, who should have been at the closing table in May of 2022.

So, Your Honor, that's the primary purpose for this line of questioning.

THE COURT: Okay. I will overrule the relevance objection. But I should have asked to start, Ms. Lindauer, what's your time estimate for Mr. Nambiar?

MS. LINDAUER: Well, I think you -- I figured probably about an hour and a half is what I was thinking, but it may hinge a little bit on things like this that -- but I'm going to try to move along very quickly --

THE COURT: Okay.

MS. LINDAUER: -- with (indiscernible).

THE COURT: Go ahead. But I'll ask you if it's background, you know, please do try to move through it quickly.

MS. LINDAUER: Okay.

THE COURT: I'm struggling to see the relevance, but I'll --

MS. LINDAUER: Okay.

THE COURT: Is it marginally relevant at best, but if you would, go ahead and proceed.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Nambiar, your company did acquire a participation in the Madison loan. Is that correct?

A We did.

Q Okay. And what was -- ultimately, your company acquired all of the Madison loan. Is that right?

A Yes, ma'am.

Q Okay. Sir, is there a reason why your company acquired all of the Madison loan?

A It was easier from a resolution standpoint to have one party, and we were able to access some cheaper lines of credit to finance this transaction than what the Madison participation would have cost us.

Q All right. And to be clear on that, once you acquired all of the Madison loan, did HNGH at any time promote the sale of the property itself?

A No, we did not.

HNGH was engaged in one potential transaction to sell the note to an entity related to Tall Ships Capital. And that entity was introduced to us by Mr. Barton, and I was encouraged to explore a sale of the note to that entity. And I spent several weeks negotiating a loan purchase agreement with that entity in the middle of 2021.

That's the only, quote/unquote, transaction related to the property that we've ever explored.

Q Did you have any involvement with an entity called First Texas Homes?

A I did not have any involvement with an entity called First Texas Homes.

I was in the process of what has been a relatively public situation here given the high-profile nature of this asset. I have been approached by several people at various times in this transaction proposing various things. But we ultimately did not move forward with any -- any transaction anywhere --

Q I understand that.

In July of 2020, on behalf of HN Capital Partners, did you sign a real estate commission agreement to transfer the -- or to market for sale the property located at 2999 Turtle Creek?

A I don't recall that.

I mean we didn't -- you know that would have been the time that we had posted the asset for foreclosure on default.

Q Okay.

A And, you know, it would have been customary for us to think through what we would do post-foreclosure. But, you know, it wasn't -- the foreclosure ultimately wasn't completed since Mr. Barton filed lawsuits in the state court and TRO.

Q All right. So just to be clear on your testimony that your efforts to sell this asset, the real estate, your position are tied to potential defaults and foreclosures. Is that correct?

A That's it, yeah.
Q We'll come back to that.
All right. Were you involved at all, Mr. Nambiar, in what happened on October 29th with regard to the deed in lieu transaction?
A I mean I was involved in that there was a default, and we exercised our remedies.
Q And at that point in time, had there been discussions between HNGH and 299TC [sic] Acquisitions regarding an extension or further forbearance?
A I recall some discussion around -- some discussion around an extension, but I don't recall coming to an agreement in any form.
Q And did you have any involvement, Mr. Nambiar, in any of the stories that got published in the Dallas Morning News in November of 2021 regarding this property?
A No.
MR. KANE: Objection; calls --
THE WITNESS: In fact --
MR. KANE: -- hold on, hold on.
Objection; assumes facts not in evidence. There's no evidence of any stories being published in the Dallas Business Journal.
MS. LINDAUER: I didn't say the Dallas Business Journal. I said the Dallas Morning News.

MR. KANE: Dallas Morning News, my apology.

I'll clarify my objection.

Objection; assumes facts not in evidence. There is no evidence in the record about any stories in the Dallas Morning News about this property.

MS. LINDAUER: Your Honor, I don't think there has to be -- let me respond to his objection if I might.

I don't think there has to be any --

THE COURT: Are you going to have in evidence any stories about the Dallas -- from the Dallas Morning News that you're referencing?

MS. LINDAUER: Your Honor, I can. I really just wanted to ask if he was aware of those stories and if he had any involvement in them.

THE COURT: So --

MS. LINDAUER: This was obviously a high-profile situation in November of 2021.

THE COURT: So why don't -- I'll sustain the objection. If those documents are in your exhibits, you can ask him about them.

MS. LINDAUER: Okay.

THE COURT: If not, go ahead and ask another question.

BY MS. LINDAUER:

Q Mr. Nambiar, were you the person on behalf of HNGH that

authorized the recording of the deed in lieu?
A Yes.
Q And, Mr. Nambiar, were you the person on behalf of HNGH that was responsible for the various motions that were originally filed in this case to dismiss the case, to lift the stay, and for sanctions?
A I think I've mentioned before the governing structure here. There's a team of people here that was a decision that was, you know, made jointly by my company and in -- in consultation with our counsel.
Q Early on in this bankruptcy case, was HNGH more interested in getting paid off or taking the property back?
A We've always been interested in getting paid off, which is why we now had a saga of 18 months of getting this debtor time in various formats to get paid off and have been unsuccessful in making that happen.
Q Okay. As part of the various motions that were filed early on in this case, did your company obtain an appraisal on the property?
A We did obtain an appraisal, yes.
Q And was that appraisal ever used in connection with any court proceedings?
A I believe so.
Q Do you recall who your appraiser was, the name of the appraisal company?

A We've -- you know, to ensure that we have a command on the value of the underlying collateral, Ms. Lindauer, we've -- we've had appraisals and BOVs, you know -- I mean we're required to pull them and, you know, I don't recall which specific companies we hired at various points in time to give us those values. I know that the most recent one was with Newmark -- Newmark Knight Frank which is an international brokerage firm --

Q Okay. And --

A -- and (indiscernible).

Q I'm sorry. I didn't mean to cut you off.

When was the last time HNGH had an appraisal done on the property?

A I believe it was at the end of last year.

Q So roughly December of last year?

A Yes.

Q Have you had an appraisal done recently on the property?

A We haven't had an appraisal done recently. We've just been tracking transactions and talking to brokers so we ensure that we have -- again, have some sense of what the value of our collateral is. But, you know, obviously, markets have done what they've done since December of 2020. We feel like our December 2020 appraisal is still relevant.

Q Just for the record, you said markets have done what they've done. Can you tell me what you mean by that

expression?
A Yes.
As you know, real estate is a highly interest-sensitive asset class, and the interest rate hikes by the Federal Reserve and the continuing interest rate hikes that are expected by the market has, you know, cost a correction in values both in equities and in, you know, we feel likely to appear in the real estate markets, as well.
Q From your experience, do you believe that the value of this particular asset has increased at all in the last six months?
A I do not.
Q Has not increased?
A No.
Q And I think you mentioned that you're in the market with brokers and different -- have any persons approached you about buying this property in the last six months?
A I mean -- I don't recall anybody trying to buy it. To the extent that someone, you know, made an inquiry, we basically have pointed people to, you know, the docket of this Court and told people that this was a matter that was pending. And to the extent that anybody wanted to have those conversations, we encouraged them to reach out to the debtor.
Q If we could take a look at -- I know we've looked at this a lot with different people, but the two orders that were

entered in this case involving both the debtor and HNGH. If we could take a look at those orders.

The first of those -- okay, the first of those would be Debtor's -- and they appear in both sets of exhibits, but Debtor's Exhibit 12.

MS. LINDAUER: Larry, are you able to pull that up for us? Debtor's Exhibit 12?

And if you could scroll down a little bit, Larry, on that document so Mr. -- no, the other way. Go the other way so that Mr. Nambiar can see, yeah, the whole document. There you go.

BY MS. LINDAUER:

Q Mr. Nambiar, are you familiar with this order dated December 10th, 2021?

A I only see the top of the page. But I -- yeah, I'm generally familiar, although I haven't read this order in some time.

Q Okay. Have you been sitting through the hearings over the last week or so regarding this motion to enforce filed by HNGH?

A As time allows, ma'am; not -- not all of them.

Q Okay.

A Several -- several duties, this is one of several assets I have the duty to manage.

Q Okay. With regard to this particular order, did you have an opportunity to hear any testimony from various witnesses

regarding the terms of this particular order?
A Is there someone specific you're referring to?
Q Well, were you here for Nate Christensen's testimony, for example?
A I was here for Nate Christensen's testimony.
Q Okay. All right. So let's take a look, Mr. Nambiar. Were you the person on behalf of HNGH that negotiated this order with 299TC [sic] Acquisitions, LLC?
A I'm -- I'm not a lawyer.
This is a bankruptcy court order. I would not have been the one to negotiate the drafting of this. There are some thematic business points that I was involved in discussing with -- with the business folks over at the debtor. But most of the details of this were drafted in negotiations -- negotiated between my counsel and I believe you, Ms. Lindauer.
Q Okay. Were you involved in -- I think you mentioned there are some business points in this order. Were you involved with the business points that are included in this order?
A Yes, ma'am.
Q And you're the person on behalf of HNGH that approved the business points in the order. Is that correct?
A Like I said, I have a governance structure, so I want to remind you one more time that --
Q Okay.
A -- I don't -- I don't just make unilateral decisions

nilly-willy.

Q I think you mentioned you have an advisory team. Is that right?

A Yeah. And there's a -- there's a governance structure that I'm not going to go into. But we -- we have a committee approach, and we try to manage some of these things by consensus.

Q Okay. All right. Looking at this order, if we could, if we go to the top of the next page, the first full paragraph there, Mr. Nambiar. Did you have any or your committee, I guess, have any input in the terms of the first full paragraph there?

A The date.

The date was set to be March 15th because Mr. Barton specifically told me that he thought he needed about 30 days, I believe, to complete his capitalization. And we thought that giving him from, you know -- giving him until March 15th, which would have been I believe 75 days or so from when we were having the discussion, would have been adequate time.

Q Okay. So you mentioned the date. And then if we drop down a little bit, did you have anything to do with the terms regarding the reinstatement of the note?

A No. I mean to me that's a --

MS. LINDAUER: Larry, go back up. We're still in that first paragraph. There we go. I'm sorry.

THE WITNESS: Yeah. I mean I don't recall that.

I think to me that was a purely procedural matter.

I mean we all understood what the issues at hand here was, which was, you know, we wanted to get paid off and Mr. Barton wanted to, you know, essentially get relief from -- from our efforts to collect on that loan and get possession of the title back.

Several strategies were discussed including, you know, maybe structuring this as a, you know, just a purchase and sale contract back to the debtor. And I believe that this was the procedure that was agreed to between you and my counsel.

BY MS. LINDAUER:

Q Okay. And if we look at that paragraph at the very top, you mentioned -- I do appreciate you pointing out the date for us.

You mentioned that so there would be a note reinstatement and then there would be a rescission deed. Do you see that term?

A Sure.

Q And there were discussions, I believe, about there simply being a special warranty deed deeding the property back to the debtor as part of this structure. Do you recall that?

A I -- I don't recall the specifics of that, but I'm sure if you are representing that, that's probably happened.

Q Okay. Mr. Nambiar, do you know why a rescission deed approach was selected in this order?
A I don't. Like I said, this was a procedural legal matter between my counsel and debtor's counsel.
Q And have you had any involvement, Mr. Nambiar, in connection with your businesses dealing with rescission deeds?
A I have been, like I said, in the real estate private equity world for, you know, nearly two decades and done several billion dollars of transaction. I am not familiar with that as a formal contract or any kind of form contract in Texas.
But I think I generally understood what this was trying to do which was to through some instrument transfer the deed back to the debtor to unwind the deed in lieu transaction.
Q All right. And -- but as far as the actual document or rescission deed, have you ever had this situation in one of your other dealings that you would have some reference for?
A Not specifically a rescission deed, but I think the -- you know, and these aren't capitalized items. I think the reason that the rescission deed language was put in here, I understood to mean that we would need some instrument that transferred the deed back to the debtor.
Q Okay.
A That was my understanding.
Q All right. If we look at the -- it says "HNGH shall hold the rescission deed during the pendency of the term of this

agreed order." Do you see that provision?
A Sure.
Q What was your understanding, Mr. Nambiar, of what that language meant?
A It meant that whatever the deed transfer instrument was my counsel was going to draft and -- and that would be executed and delivered in conjunction with the closing.
Q Okay. When was the first time you saw a draft of a document that was claimed to be a rescission deed?
A So, you know, I am not a lawyer, Ms. Lindauer. I am a business person.
Q Okay.
A And it would not be typical for me to review these types of documents.
Q All right. When was the first time you saw a document that you were asked to sign that you were told was a rescission deed?
A I believe it was in early May as we were following up with the debtor on the status of closing.
Q That's when you recall seeing a document that you would later sign. Is that right?
A Yes. I remember having conversations about this document, you know, like well in -- much much earlier than that. I just don't remember exactly when.
But, like I said, I wouldn't be the one to review these

instruments, and I think it was in early May when we started to get ready for closing that it was brought to my attention to sign.

Q Okay. And I understand you're more of the business person.

A Yes.

Q Would Mr. Christensen be the person more in touch with actually reviewing these types of documents for your signature?

A And our outside counsel.

Q Do you recall at some point in time Mr. Barton talking to you about dismissing the guaranty suit against him?

A Yes, ma'am.

Q Okay. Do you recall when that issue came up?

A It was -- it was sometime in April or early May. I can't recall exactly when. It was --

(Pause)

MS. LINDAUER: Hello?

THE COURT: Okay. Ms. Smith, are you there?

(No audible response)

THE COURT: So on my screen I lost the parties at about (indiscernible).

Was it just me?

MR. KANE: It was just you. We lost you on video, Your Honor, but I still had video of Ms. Lindauer and Mr. Nambiar.

THE COURT: Okay. So, Ms. Lindauer, just back up ten seconds and -- now we're getting the dreaded echo.

Okay. That's better.

All right. It appears that everybody's back on.

Ms. Smith, could you tell was the system recording fine shortly before I raised that?

(No audible response)

THE COURT: Ms. Smith, are you there?

(No audible response)

THE COURT: All right. So back up 20 seconds, Ms. Lindauer. Maybe re-ask your last question just in case it didn't get picked up on the system.

MS. LINDAUER: Sure.

BY MS. LINDAUER:

Q Mr. Nambiar, I think you were explaining a meeting that you had with (sound drop) that discussion?

A Yes, ma'am.

Q Okay. And had Mr. Barton contacted you to meet (sound drop) --

THE COURT: I don't see anybody. Is it -- yes.

(Pause)

THE COURT: So do we need to reset the system or do you have any recommendations? I think it's us because our -- Mr. Manns indicated it's freezing on his end, as well.

(Pause)

THE COURT: Okay. Well, I can see everybody now. Why don't you try it one more time, Ms. Lindauer.

BY MS. LINDAUER:

Q I know Mr. Barton reached out to you earlier this year to discuss with you in particular the dismissal of the personal guaranty claim. Do you recall that?

A Yes, ma'am.

Q Okay. And did y'all actually have a meeting to discuss that issue?

A Yes, ma'am. He asked to meet with me.

Q Okay. And do you approximately remember when that meeting occurred?

A It was either in April or May. It was after the second order was entered and a further extension was given.

Q And what was the result of that particular meeting?

A The request was to -- to dismiss the guaranty as Mr. Barton felt like a potential lender might be concerned about an outstanding guaranty suit. I immediately informed my counsel to offer our assistance in talking to such lender and providing some sort of, you know, either oral comfort or otherwise that once the payoff had occurred that guaranty lawsuit would be dropped.

Q All right. And in the March order which we haven't looked at yet, but was the guaranty lawsuit supposed to be dropped as part of the March order?

A It's supposed to be dropped on payoff, I believe.
Q Is there any reason --
A (Indiscernible) --
Q I'm sorry.
A Or -- it was an either-or task. I believe it was supposed to be passed or dropped either on payoff or once the deed in lieu was ratified by the bankruptcy court.
Q All right. And as we sit here today, that lawsuit is still pending. Is that right?
A Yes. Neither of those precedent things have occurred.
Q And for the record, you mentioned the precedent things. What other precedent things that would need to occur?
A Either a payoff as required by the order or the completion of the deed in lieu.
Q And just to be clear, as we sit here today, it's your position that HNGH has not received a payoff. Is that correct?
A Yes, ma'am.
Q Okay. And as we sit here today, does HNGH still have title to the property at 299TC [sic] Turtle Creek?
A I don't know how to answer that question. An instrument was recorded, but we're certainly not in possession of the property or acting or behaving like the owners of the property.
Q And just so all of us understand, there is nothing under the December or March orders that requires any further deed between the debtor and HNGH if there was a default in payoffs,

right? There wasn't any requirement that the debtor or any other party sign over any further deeds to HNGH. Is that right?

A That's a question for my counsel, Ms. Lindauer.

Q Okay. So you don't know?

A I don't know.

Q Okay.

MR. KANE: And if there's a concern, Ms. Lindauer, I think we'd be happy to stipulate that if there's no contest from the debtor about our right, title, and interest in a property in its completeness, we're happy to go ahead and dismiss that guaranty proceeding and that the dismissal motions have already been prepared.

MS. LINDAUER: Okay. All right.

: MS. LINDAUER: Well, just to be clear, the dismissal motions may have been prepared, but as we sit here today, nothing's been filed. Is that right?

THE COURT: Go ahead and ask your questions. I'd like to -- ask fact questions.

MS. LINDAUER: I know. I shouldn't be talking to counsel. I understand, Your Honor.

THE COURT: And, again, if you're just asking him what the order says, I don't -- or any of the orders say, I don't think we really need to do that because I'm familiar with the orders.

MS. LINDAUER: Understood, Your Honor.

BY MS. LINDAUER:

Q Just to be clear, Mr. Nambiar, you're familiar I think with the documents that constitute, for example, the original deed in lieu of foreclosure. Is that right?

A I am generally familiar with them, yes.

MS. LINDAUER: Larry, can you pull up Exhibit D -- Debtor's Exhibit 14?

BY MS. LINDAUER:

Q Mr. Nambiar, are you familiar with the various special warranty deeds and deed documents that have been discussed in connection with these proceedings?

A Not all of them.

Q Are you familiar with the one that's up on the screen right now which is the special warranty deed between Turtle Creek Dickison (phonetic) Limited and what's called I think Mo but it's really MO2999TC, which then became 299TC [sic] Acquisitions? Are you at all familiar with this document?

A I have seen this before, yes.

Q If we look at the next document, that's the next special warranty deed, we've looked at this I think several times.

MS. LINDAUER: And, Larry, if you could go to the next special warranty deed.

There you go.

BY MS. LINDAUER:

Q Are you familiar with this particular special warranty deed, Mr. Nambiar?
A Yes. I believe this was the -- the deed that was executed for the deed in lieu.
Q And if you look at the second page of this document, this was executed by 299TC [sic] Acquisitions on behalf or by Mr. Barton as the president. Do you see that?
A I do.
Q Has it come to your attention, Mr. Nambiar --
MS. LINDAUER: -- go back to the first page, Larry, of this document --
BY MS. LINDAUER:
Q -- that there's actually an error on the first page of this document? Are you aware of that?
A Yes. I heard that in Mr. Christensen's testimony.
Q Had you been made aware of that prior to Mr. Christensen's testimony?
A Yes, I had.
Q When was the first time it came to your attention that there was an issue with this particular deed?
A The error was pointed out to me by -- by my counsel, Mr. Kane, at some point after May 31st. I can't recall exactly when.
Q So --
A It was brought up because the -- there was essentially a

scrivener's error in the -- in the rescission deed instrument that we had drafted that carried the same signature block for where I was inquiring as to why that had happened, and -- and Mr. Kane explained it was carried over from this document.

Obviously, this document was the inducement we received for the forbearance agreement that -- that causes to grant time to Mr. Barton and the debtor in early 2021. And my understanding was that, you know, what we were settling and negotiating with the agreed orders previously when the adversary proceedings were -- were dismissed was that we were buying protection on items such as these.

Q Well, you'd agree with me, Mr. Nambiar, that the error that you pointed out which is the reference to HNGH Turtle Creek, a Texas Limited Liability Company, creates some issues because as I understand it from Mr. Christensen's testimony, there isn't an HNGH Turtle Creek, LLC, a Texas Limited Liability Company. Is that correct?

A Are you saying there is or there is not?

Q There is not, is there?

A I don't -- I don't -- I don't believe so. I don't know.

Q All right. So you don't know if there actually is or is not an HNGH Turtle Creek Texas Limited Liability Company. Is that right?

A Correct. Not to my knowledge.

Q Okay. All right. And in fact, I think HNGH Turtle Creek

is a Delaware Limited Liability Company. Is that your understanding?
A That is my understanding now, yes.
Q Do you know if your company were to retain title to this property, how this error in this document could be corrected?
A That's a question for my counsel.
Q Fair enough. And do you know if the debtor were entitled to keep or obtain ownership of the property through the recision deed, you know, anything about how this particular error would be corrected?
A Again, question for my counsel. Sorry, Ms. Lindauer.
Q Okay. No, that's fine. I think you mentioned that as part of the December agreement, there was an understanding that if there were any potential investors or buyers or people of that nature that came to your company, that you would refer those people to Mr. Barton. Is that right?
A I mean, there was no such understanding or agreement.
In fact, I was specifically asked for some sort of, you know, non-disparagement type language in the initial settled order, and we specifically quashed that request. You were part of that conversation, I recall, because we just -- we just didn't want any trip wires with this debtor that had embroiled us in a very long, you know, very long, unfortunate litigation.
And my position was as soon as a practical matter if something like that occurred, just in good faith as we'd been

helping this debtor for some time now by, you know, previously engaging with Tall Ship, another party that the debtor had asked me to sort of ultimately speak with or assist, providing releases with law firms that represented us so that other parties could work with those law firms when we were just cooperating over the last 18 months.

And you know, if something like that came up, you know, our position was we would -- we would try to direct them. But I mean, there was no such agreement.

Q Okay. Let me go back. I think maybe I could focus the question a little bit better.

I think you said that you had agreed that to cooperate with the debtor in its efforts for financing and quick potential sales of the property. Is that right?

A I had not agreed to doing anything or had any obligation to do so.

Q Okay.

A I think we were -- we were doing -- we were cooperating when requests, specific requests were made of us.

You know, for example, the Tall Ship entity with who we had -- I had spent significant time and money negotiating a loan purchase agreement on Mr. Barton's direction in the summer of 2021 I believe they had re-merged in early 2022. And I was asked to give a waiver so Jackson Walker could represent that party on this transaction. We provided that waiver.

There were parties that were brought to me as interested in this transaction that wanted to work with Happy State Bank, of all the banks in Texas, to finance this transaction. We provided those waivers. I mean, those -- I mean, we were just -- I mean, when specifically asked, we were responding and trying to help. But we had -- we had no agreement obligation or otherwise desire to get involved in anything.

Q Okay. All right.

And just to be clear, Mr. Nambiar, from time to time, I believe you did refer people to Mr. Barton and his company that did express some interest in working on this project. Is that right?

A I mean, I don't know if I -- I mean, I have told people in the marketplace if they were interested in talking about this they should contact Mr. Barton.

Q The orders that we looked at, remember the December order?

MS. LINDAUER: We don't have to pull them up, Larry.

BY MS. LINDAUER:

Q And then there was a subsequent March order. Do you recall those, Mr. Vipin? Mr. Nambiar, sorry.

A Yes, Ms. Lindauer.

Q Okay. And you negotiated, or your advisory committee negotiated some payments that would be made under those orders. Is that right?

A Yes.

Q And other than the final amount that hasn't been paid yet, were all the other payments made that were called for by those orders?

A I believe they were.

We did have an issue of not knowing what parties payments were coming from because they were not all coming from the debtor. I believe that my counsel had pointed that out to you several times. But we otherwise were in receipt of cash, unsure what parties were making them. But ultimately, applied those to the debtor. And up until the maturity default, didn't think that the debtor had defaulted.

Q Why would it make a difference as to where the monies were actually coming from that were paying you?

A I mean, the order was an obligation of the debtor. I wanted to know that the payments that were being made to us were authorized and by the debtor so that someone doesn't call me in six months and say that was a payment that I made to you erroneously.

Q Has anybody called you and advise you that any of those payments were erroneously made?

A Not yet. That's what we were trying to get comfort from you on.

Q And I think you said that the payments were applied on the obligations in those orders. Is that right?

A Yes.

Q So there's no issue on the application of the payments at this point. Is that right?
A I don't know where the matter between you and Mr. Kane clarifying this ultimately landed. But as a practical matter for our accounting, we have applied them.
Q And I think there was a further obligation also to pay the taxes related to the property. Is that right?
A Yes. The property tax lien would be senior to our client. It is -- it is my position and every lender's position that that is absolutely a requirement of a debtor, especially one that's in possession.
Q Can you tell the Court just for the Court's information how much has actually been paid during the pendency of the bankruptcy to the account of HNGH?
A I don't have that number in front of me, Ms. Lindauer. If you have a schedule that you want to throw up, I can try to do a better job. But I did not pull that number before my testimony today.
MR. KANE: Your Honor, I think we stipulated to that number under your questioning at the outset of this case.
THE COURT: That's my recollection, Ms. Lindauer.
MS. LINDAUER: That's my recollection also. I just wanted to clarify.
BY MS. LINDAUER:
Q The monies that you have been paid, or I shouldn't say

you, HNGH has been paid to date under these orders, how were those dollars to be applied?

A They -- we have applied those to, you know, essentially owed and accrued interest payments. Outside of one payment, I believe --

MR. KANE: Before you answer any further, I'm going to object to the relevance there. The payments that were made are subject to the express terms of the agreed orders. And the payoff amounts that are set forth under seal establish the amount that needed to be paid off at maturity. So I'm concerned about what the relevance could possibly be about how those payments were supposed to be applied during the bankruptcy case.

MS. LINDAUER: Your Honor, the reason I brought it up was -- and it stuck in my mind from the very beginning was that Mr. Kane complained that the debtor was acting in bad faith. And the debtors paid over $4 million during the pendency of this Chapter 11 case on behalf of HNGH and to taxes.

So I do think that it is important for us not to forget that there were significant sums paid to HNGH. And some of those were simply paid for extensions, and some of those were paid against monies owed. So I do think it helps support to understand that the debtor was acting in good faith by making significant amounts of payments to HNGH.

If Mr. Kane is willing to stipulate that those

payments were made and that they're evidences of good faith, then I really don't have an issue with that. But --

THE COURT: Well he has already stipulated that the payments were made.

MS. LINDAUER: Right.

THE COURT: I'm not going to ask him if he wants to stipulate to good faith.

MS. LINDAUER: Okay.

THE COURT: But I am not really seeing the relevance of your specific questions about how they were applied.

MS. LINDAUER: Okay.

THE COURT: So you said you didn't want me to forget that the payments were made. I haven't forgotten.

MS. LINDAUER: Okay. All right.

THE COURT: Why don't you move on to another question.

MS. LINDAUER: Okay. I will, Your Honor.

BY MS. LINDAUER:

Q All right. Mr. Nambiar, when you took an interest, participation interest in the loan with Madison, did you, did HNGH borrow money in order to acquire that interest?

A No, ma'am.

Q Okay. And did HNGH borrow money when it paid off Madison?

A We did.

Q And who did you borrow money from?

A Happy State Bank.

Q And how much did you borrow from Happy State Bank?

A I am not sure that I don't have a confidentiality obligation on it. So I would ask that I not be asked to reveal that.

Q Okay. Well, as part of a payoff that was provided, Happy State Bank was asking for a significant amount of money to be paid at the closing. Are you familiar with those documents?

A Yes.

Q Let's take a look at that. That is -- look at exhibit, Debtor's Exhibit D7. That's a payoff statement, Mr. Nambiar, that was sent to us by our counsel, Mr. Kane, on or about May 31st, 2022. Are you familiar with that statement?

A Sure.

Q The amount that was requested was 26,297,296.96.

A Okay.

Q Were these funds obtained from Happy State Bank as part of the purchase of the Madison loan that Happy State Bank acquired? I'm sorry. That HNGH acquired.

A Yes. Some of this is obviously interest. But in general, this loan was entered into as part of the payoff transaction from Madison and Axos Bank.

Q I think you mentioned Madison and Axos Bank. Can you explain how Axos Bank was connected with that payoff transaction?

A Sure.

Just as we acted as a lender here, Madison acted as a lender initially at the origination of this loan. It is very customary in the debt fund business and the credit business, and for several banks to actually lever their assets. And what we did here is essentially leveraged our asset which was the note instrument secured by this mortgage dealer trust.

Madison similarly had a repo lender about its fund. Axos Bank was Madison's lender. And so when we paid off Madison, we had to similarly pay off Axos Bank and remit the balance to Madison. It is an extremely common place, practice, and transaction most lenders, as you know, do leverage their balance sheets.

Q All right. So I think I followed what you said. So your transaction with Happy State Bank was very similar to the Madison transaction with Axos. Is that right?

A Yes.

Q And, Mr. Nambiar, did you ever disclose to Mr. Barton that your entity, HNGH, had obtained funds for Happy State Bank -- from Happy State Bank for you to be able to acquire the Madison loan?

A Sure. In fact, the initial interest statements for this loan were going to 299 Turtle Creek. And Mr. Barton handed them to me in -- in error.

Q I'm not following you. So the initial statements from Happy State Bank --

A Yes. The interest --

Q -- were being sent to --

A -- were being sent to -- to the actual property instead of my office. And Mr. Barton actually handed them to me.

Q Okay. But had Mr. Barton opened those statements?

A Oh, yeah. They were given to me open.

Q All right. So it's your position that Mr. Barton knew something about the Happy State Bank transaction?

A Absolutely.

Q How would Mr. Barton know that this related to a loan that HNGH took out from Happy State Bank as it related to Mr. Barton's property?

A Mr. Barton's a sophisticated party. He understands how these transactions work. Those, you know, I'm assuming his -- his counsel had sen the collateral assignment. You know, obviously he received these statements from the bank at the property which he informed me and we corrected.

The addressee for those statements, you know, we've talked about Happy State's involvement in this transaction, and you know, I mean, there's been no controversy around this. Mr. Barton and I have been negotiating these forbearance and settlement agreements for the last 18 months. There's no secret here.

Q Okay. Does Mr. Barton have some kind of understanding of how HNGH operates with regard to its loans that it's taken out, and the monies that it may owe to others?
A There's no reason for him to know that. It's out of his practice.
Q Okay. So the statements that Mr. Barton handed you, those could have related to any loan that you might have had with Happy State Bank. Is that right?
A Well, I think that's probably not right. I have to go back and look at the statement. But it probably referenced the name of the collateral.
Q Okay. Did Mr. Barton ever say to you, Mr. Nambiar, did you pledge my note in lien to Happy State Bank?
A Yeah. He -- he'd asked me where the note was I recall at some point because of this issue in a conversation. I don't remember when that was.
But like I said, this is a, you know, this has been an open matter between us and, you know, acting that it wasn't is just -- is just wrong.
Q Well, asking where the note is is a little bit of a different issue.
A Well no, the question was in relation to this Happy State Bank.
Q Okay. Did you --
A As I --

Q -- tell Mr. Barton that --

A As I recall.

Q I'm sorry. Did you tell Mr. Barton that Happy State Bank was actually holding the note of 299TC [sic]?

A I don't remember what my response was. But as a sophisticated market participant, I mean, I understand what it means to enter into a repo transaction. I imagine Mr. Barton does, too.

Q And you don't recall sitting here today telling Mr. Barton that the note was being held at Happy State Bank. Is that correct?

A I don't recall my answer now.

Q And, Mr. Nambiar, you're aware of some confusion over the Happy State Bank transaction that came up about the time of the closing on or about May 30th and 31st. Is that right?

A I understand that there's a confusion that's been stated. I am confused by the confusion, if you will.

Q Okay. Let me ask you, going back to your transaction with Madison and Axos, when you purchased the Madison loan and there was a payoff to Axos, did you pay off Axos or did Madison pay off Axos?

A It was done in a -- I don't recall exactly the mechanics of that transaction. But if I had to guess, it was done through an escrow agent, and proceeds were delivered as instructed.

Q How many days did it take to do that closing between Madison, Axos, and your company?

A To mechanically close the transaction? That was --

Q Right.

A I mean, a couple of days. I mean, just not -- once the instructions to the escrow agent were firmed up, I mean, there's nothing that should take much time.

Q Okay.

THE COURT: Ms. Lindauer, let me pause you. It's 11:45. We are -- I'm planning to stop at 12:30 because we need to eat lunch and prepare for a 1:30 docket. Can you tell me roughly how much longer you have because I would like to try to get Mr. Nambiar on and off the stand. And so if you can give me your best guess.

MS. LINDAUER: Best guess, maybe about -- well, maybe about 30 minutes. I was -- I'll try to get done before 12:30. But again, I don't know how many questions Mr. Kane has.

THE COURT: All right. If you are able to finish by 12:15, Mr. Kane, is that going to give you enough time for your questions?

MR. KANE: It's not. But we can pick Mr. Nambiar back up on Tuesday at 10:30 if we need to.

THE COURT: Okay. All right. Go ahead, Ms. Lindauer.

MS. LINDAUER: Okay. Sorry, Your Honor.

BY MS. LINDAUER:

Q Okay. Going back to the Happy State Bank transaction, so to be clear, you're familiar with -- well, I didn't really ask you, the D17 statement, are you familiar with this payoff statement, Mr. Nambiar?

A I'm looking at it now. I'm looking at it now. So, yes.

Q Okay.

MR. KANE: I'm sorry to interrupt, Joyce. I apologize, Your Honor. I'm not sure I've confirmed Mr. Nambiar's availability at 10:30 on Tuesday. I know he was available today through one o'clock, or through 12:30. I'll have to coordinate with him about that. We'll certainly try and make that happen.

THE COURT: That's fine. And just so you know, Mr. Nambiar, we were planning on picking back up tomorrow morning at 10:30. So sort of you all can discuss that when we're finished. And hopefully we can get it done today, but if not we'll pick back up later.

THE WITNESS: I'll have to move something, Your Honor. I'll do my best to appear.

THE COURT: Okay.

BY MS. LINDAUER:

Q Mr. Nambiar, we're looking at the payoff statement. And I guess my question to you is had you seen this prior to today?

A I think so, Ms. Lindauer. I'm not 100 percent. It's --

it's a partial payoff statement that should have gone to the title company. I'm not sure if there's a point to your question.
Q Yeah. So I think you may have just -- you said partial payoff statement. Tell me what that means.
A Well, I think the debtor knows what the amount owed under seal was. That's the actual required payoff amount.
And I think the way that this transaction was being handled is HNGH was providing instructions to the title company on where to send those funds that are owed to HNGH. And we wanted a subset of those funds to go to Happy State so we could reduce one step in wiring funds.
Q And did you provide instructions that the payoff statement should be sent from Happy State Bank over to 299TC's [sic] counsel and the title company?
A Yeah. I know that we were waiting to understand which title company to send these instructions to. I specifically asked Mr. Kane. He told me that you had told him on the 31st that you all were still working with three different title companies and we weren't sure where to send instructions.
Q Do you know where the recision document that you signed, or I guess the special warranty deed that was executed on the 27th, do you know what title company that document was sent to?
A The one on May 10th or 12th, I believe that was sent to Sendera. But my understanding is that we were still

negotiating a different document. And redlines were going back and forth on May 30th.

Q All right. So you would acknowledge that the document that was delivered on the 27th was still being negotiated between the parties on the 30th and then the 31st. Is that right?

A Well, I mean, comments were being made.

You know, I wasn't sure why comments were being made because, you know, our position was that Russell (phonetic) had drafted a document that did exactly what we thought the agreed order required us to do. But to the extent that those comments were acceptable, you know, I mean, we were working in good faith to see what those were.

Q Well, you would agree with me, Mr. Nambiar, that both parties needed to be involved in what the recision document looked like. Is that right?

A That wasn't my understanding.

I thought that we had the obligation to deliver an instrument that reinstated the note and transferred the deed, which is what I thought we did. But I was informed by counsel that you all had comments and he was working with you on that.

Q The document, I'm not going to pull it up, but the document that you signed and was sent over on the 27th, that did require a sign-off by 2999TC Acquisitions, right, to make it effective?

A I don't know, Ms. Lindauer. That's a question for my counsel.
Q Okay. Well, there's a signature block on it, right?
A Okay. Okay.
Q Yeah, we can pull it -- I mean, I hate -- I didn't want --
A That's fine. I mean --
Q Yeah.
A -- I'll stipulate to that.
Q Okay. All right. So it was always the intention of the parties that both parties would come to some agreement on the form of this document so that it could be signed off on by both parties, right?
A Yeah.
Again, I think that was not my understanding. My understanding was that we had to deliver an instrument that did the two things that the order needed to do. And that's what we had provided our counsel instructions to do. But I know that -- I know that comments were going back and forth based on, you know, conversations with the title company.
I was surprised by that, but that's what was occurring.
Q Okay. It came to your attention I'm sure, listening to some of the testimony that's gone on over the last week, that there were some technical issues with the document that you signed. Do you recall those discussions?
A The only one that I'm familiar with is the signature block

error. That was purely drafting error.

Q Okay. So there's a signature block error. There's also a reference, maybe that's what you're referring to, to the HNGH Turtle Creek, a Texas Limited Liability Company.

A That's what I'm referring to, correct. And I believe that we sent a draft that corrected that on the 30th.

Q Oh, you did send a draft that corrected that?

A I mean, again, I wasn't the one that did it. But my recollection from these hearings was that a correction was sent to your -- to the debtor at some point.

Q Okay.

A But maybe it wasn't.

Q All right. Did you also hear some issues about the fact that some of the critical terms in that document appear in the whereas provisions rather than in the actual now therefore provisions. Did you hear some discussion about that also?

MR. KANE: I'm going to object to this line of questioning that Mr. Nambiar is not an attorney.

MS. LINDAUER: Okay.

MR. KANE: And so if you're just asking him if he heard Mr. Marx assert that there were problems with the special warranty deed, I think we all heard Mr. Marx's testimony. His testimony is what it is. But Mr. Nambiar is a lay fact witness who's not a real estate attorney.

MS. LINDAUER: No, I understand that. The reason I'm

asking him those questions though, and we'll get to it, was that -- and it's more just that it's come to his attention that there were several issues with the document that he signed. I think he can --

MR. KANE: Hold on. I think what you're saying is it's come to his attention that your witness believes that there are issues. How is that relevant to Mr. Nambiar's testimony?

MS. LINDAUER: Well, then let's see if Mr. Nambiar thinks that there's any issues. And if he --

THE COURT: Ms. Lindauer, why don't you just ask -- I'm going to sustain the objection. Ask a more specific question, please.

MS. LINDAUER: Okay. Mr. Nambiar, maybe we just need to pull the document up. It's under Debtor's Exhibit 14. And then we'll come back to this Happy State Bank issue.

Mr. Boyd, if you could go to the next document behind that special warranty deed. And drop down. Go back up a little.

Okay. There we go.

BY MS. LINDAUER:

Q Mr. Nambiar, are you familiar with this document titled special warranty deed?

A Yes, ma'am.

Q Okay. And if we go to the next page of this document, one

more, is that your signature on this document?
A Yes.
Q Okay. And you signed this document on May 27th, 2022. Is that right?
A Yes.
Q Okay. And after you signed this document, was this document then delivered, at least the statements are that it was delivered to Sendera Title. Is that right?
A The executed version was.
My understanding was that a draft version of this document was also delivered either May 10th or May 12th. And when I executed this, we made an inquiry as to whether any comments were delivered by the debtor. And when I was told no comments were made, we executed this and sent it out.
Q Do you know approximately what time of day you executed this and sent it out?
A I'm sorry, Ms. Lindauer. It's a very specific question. I do not.
Q Okay. You mentioned that we did, the debtor's counsel did request a copy of the what we call the recision deed from your counsel the first part of May of 2022. Is that right?
A Yes.
Q Is there a reason that that document hadn't been delivered prior to the debtor's requesting a copy the first part of May?
A I mean, I would imagine it's because the debtor was busy

putting a transaction together. And this was a later domino in the transaction.

Q But you, your testimony and that of your counsel has been that this document was actually prepared much earlier in the year of 2022. Is that right?

A Sure.

Q I mean, am I correct on that?

A I mean, I don't know exactly when the document was prepared.

But you know, I think that my understanding is that as soon as, you know, it was a document that we had discussed right after the order was entered. And, you know, we were -- we were looking to be asked for this document on the March closing. We never received that request.

And then I believe Mr. Kane sent this document to you as soon as we did receive a request in the early part of May.

Q Okay. But go to the first page of this particular document titled special warranty deed. And just for the record, did you hear Mr. Marx's testimony regarding the whereas provisions that are contained in this document?

A I did not hear all of Mr. Marx's testimony.

Q Has it come to your attention other than the Texas Limited Liability Company issue that there were other concerns regarding this document, particularly the one at the very bottom about this conveyance is made and accepted subject to

that provision?

MS. LINDAUER: And, Larry, you can drop down a bit. That last sentence. That one. This conveyance is made.

THE WITNESS: I don't recall hearing that part of Mr. Marx's testimony.

BY MS. LINDAUER:

Q All right. When you signed this particular document, did you intend there to be a restriction on the property for hotel and residential condominium purposes?

MR. KANE: Objection. Calls for a legal conclusion by Mr. Nambiar that that effectively it's restriction.

MS. LINDAUER: Well, Your Honor, I think he can just testify to the document that he signed.

THE WITNESS: The document was drafted by my counsel, Ms. Lindauer. I don't understand the specific purpose for this provision. My guess would be that this is some sort of a precedent language that just got rolled into this document.

But I don't -- I don't -- I don't really have an understanding of what practically this provision being in here would do to the debtor or what restrictions it would -- it would impose.

I mean, anyway, you know, we're not the regulatory body here to restrict anything. And I'm not sure that this is actually doing anything by being in here. But that's a question for counsel.

BY MS. LINDAUER:

Q Okay. Mr. Nambiar, did you actually read this document before you signed it?

A Very quickly and briefly. Obviously I didn't read it carefully, and therefore missed the signature bar error. Generally, I rely on counsel to do that.

Q So just to be clear for the record, you had no idea with regard to the legal effect of this particular document what the various provisions may or may not do. Is that a fair statement?

MR. KANE: Objection. Misstates testimony.

MS. LINDAUER: Your Honor, I think that's what he's told us is that he relied on his counsel to prepare the documents for his signature, and that he did not --

THE COURT: No, I think he's answered your question then.

MS. LINDAUER: Okay. All right.

BY MS. LINDAUER:

Q After you signed this document, Mr. Nambiar, did you have any concerns about signing a different form of document if that was what was being requested by 299TC [sic] Acquisitions in order to close this transaction on May 31st?

A No.

If it was approved by my counsel, I had no problem signing it. And I was told that there was a revised version coming

that I was prepared to sign.
Q And as you sit here today, was a revised version signed by you?
A We were working on signing it, and that's when I heard from Mr. Kane in the afternoon that we had been told to go pencils down, no closing was occurring.
Q Who told you pencils down, no closing was occurring?
A My counsel.
Q Did you ever hear that from Mr. Barton or any of his people on behalf of 299TC [sic] Acquisitions?
A Ma'am, I was not corresponding directly with Mr. Barton or the debtor on this. All communication was occurring between our counsel and -- and debtor's counsel, I believe.
Q All right. Approximately what time on the 31st were you told to -- it was the 31st, correct?
A Yes. I think so.
Q May 31st. What time were you told to go pencils down, to use your term?
A It was sometime in the afternoon. It was pursuant to an email, I believe, from you to Mr. Kane.
Q Was it an email just advising Mr. Kane I thought it would be difficult to close this transaction on the 31st?
A Something to that effect. You know, you would need to ask Mr. Kane exactly what the wordings were. But that's what we understood the meaning to be.

Q Was it still possible for this transaction to have been closed on May 31st from your understanding, Mr. Nambiar?
A Yes.
My understanding is that everything that the title company actually required to close this transaction and provide a title policy, you know, I had provided instructions to our team to work through those diligently and to get to that point. And I believe we did until we heard that there was no closing occurring.
Q All right. Had you, and I know you sat through and I don't want to spend a ton of time on this. But the list of documents that showed up on the Schedule C from Sendera Title, were you ever provided a list of those documents?
A I was not provided a list of those documents. No.
Q And is that something that you were leaving to your counsel to handle?
A Yeah. I was mostly leaving that to our counsel to handle.
I mean, you know, we've been involved with several real estate transactions, and closing. They seemed competent to figure out exactly what was actually needed to get something done. And I believe that they had, you know, ultimately gotten to that end of fact.
Q The real estate deals that you've been involved with Mr. Nambiar, the types of documents that were being requested, were you -- have you had experience with those types of documents

needed for real estate closings?

A I mean, you're talking about a title policy.

Q Right.

A You know, every transaction I've been involved in has required title policy.

Q Do you understand that the confusion over the LLC entities, Texas versus Delaware, triggered some confusion on behalf of the title company and who would be closing this particular transaction?

A Yes. That's why we offered to --

MR. KANE: Objection. Assumes facts not in evidence.

MS. LINDAUER: Well, okay. Your Honor, I think it -- and again, I'm trying to move this along. But the schedule --

THE COURT: Ms. Lindauer, is there evidence in the record, or do you plan to put on evidence in the record that a title company expressed any concern about the Texas versus Delaware issue?

MS. LINDAUER: Your Honor, I think where it shows up is in the actual title commitment. The request for the organizational documents of the entities, Mr. Marx testified that that request specifically was put in there because of the confusion on whether it was a Texas or Delaware entity that was actually participating in this transaction. That's based on his testimony and Exhibit 33A of the lender's exhibits. And so my only question was really addressing some of those questions

to Mr. Nambiar.

MR. KANE: Your Honor, I think speculation on behalf of Mr. Marx is not the same as the title company saying we're concerned about this issue.

MS. LINDAUER: Your Honor, I don't think that was necessarily Mr. Marx's speculation. That was Mr. Marx's understanding working through Exhibit 33A with Sendera. And I don't believe any of that testimony was actually objected to at the time that it came into evidence, Your Honor.

THE COURT: So sitting here, I don't recall whether Mr. Marx testified that those formation documents were required at the request of Sendera based on Sendera's concern. I don't recall that testimony. So unless you can -- well, I don't have a transcript so you can't point it to me. But I think I'll sustain the objection. Why don't you just rephrase your question?

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Nambiar, and I've lost my train of thought here, but let's be clear. No organizational documents for your entity, HNGH Delaware, were provided by you to any title company. Is that correct?

A They were not provided by me. But I know that my counsel was sitting ready to provide them, waiting for instruction on what title company. I believe that that has been stated

before.

Q Okay. And how do you know that?

A Because I was checking in on the status of the closing on the 31st.

Q And I guess I'm still at a loss. You provided the special warranty deed to Sendera, yet three days later there was confusion about just simply providing further documents to Sendera.

A Because I believe you --

Q Is that your testimony?

A That is because I believe you had told Mr. Kane that there were additional title companies that were working on some parallel paths. And you weren't clear on who was ultimately going to close the transaction.

Q Did you see Mr. Walji's very specific letter to Mr. Kane and others, advising them that Sendera Title was and had always been the title company that was involved in this closing?

A I have not seen -- I have not seen such a letter. I have seen an email in which it was stated, you know, until the very end that there were multiple title companies.

Q Let's take a look just briefly --

THE COURT: Ms. Lindauer, just out of curiosity, and for my benefit, are you looking for the document that you're referring to?

MS. LINDAUER: I am, Your Honor. I'm looking for the

email Mr. Walji sent to Mr. Kane about Sendera Title on the 31st.

And also, I think Mr. Carruth was copied on that, as well, advising them that Sendera Title was the title company, had been the title company, and was still the title company that was handling this transaction. There seems to be some confusion over which title company was allegedly handling this. So I was trying to find the letter because I think Mr. Walji spelled it out pretty clearly.

Did you happen to put your hands on it?

MR. PHELAN: Can I jump in for a second? I think you may be looking for Lender's Exhibit 91.

MS. LINDAUER: Yeah, that's it. Thank you. Thank you, Robin. If we could pull up Lender's Exhibit 91.

BY MS. LINDAUER:

Q Mr. Nambiar, are you at all familiar with this particular email sent on May 31st at five o'clock from Mr. Walji to your counsel, Mr. Kane?

A I am not. As you see, I'm not copied here.

As I just told you, Ms. Lindauer, I was not familiar with this correspondence. But I see that this was at 5:00 p.m., which would be after the cutoff time for May 31st. I wish that this email was sent earlier in the day.

Q Okay. What was your understanding of the cutoff time for May 31st?

A Banks I work with, it's generally 4:30 p.m.

Q And were you told to put pencils down earlier than 4:30 p.m.?

A I don't recall.

Q Are you aware, Mr. Nambiar, that it would have been easy enough for someone to simply pick up the phone and call and ask what title company are you using today? Do you know if Mr. Kane ever did that?

A I can't testify to that. I'm sorry.

Q All right.

A But my understanding, my knowledge of Mr. Kane is he is an adept communicator. So I would not -- I would not bet against that that had actually happened.

Q What obligation did 299TC [sic] have to pay off $26 million to Happy State Bank?

A I don't believe it had an obligation to pay off Happy State Bank. It was being asked to -- the title company was being asked to direct funds on lender's instructions. It would be no different, for example, then if a real estate broker was involved in this transaction and we asked on behalf of a different party.

And we asked that the title company to directly wire a commission for example to that broker. It is not -- it is not novel for parties to eliminate additional steps of wiring when an escrow agent is involved and just complete everything with

one step. That's all that was occurring here.
Q Were you aware, Mr. Nambiar, that there had been some confusion over whether Happy State Bank was actually in this transaction or not?
A I think I just testified to that.
Q Okay. If you take a look at Exhibit 89 briefly. And drop down a little bit on that one. You see that Mr. Kane was copied on an email on May 31st at 3:17 advising that the title company is Sendera Title, and the escrow officer is Julie Lissey who's requested some information.
Do you see that?
A Yeah, I see the email.
Q And I know you said five o'clock was a little late in the day. But this is a 3:17 email, a little bit earlier in the day. Do you see that?
A Uh-huh.
Q Did you see the last sentence? Lastly, the Happy State Bank speaks to a payoff amount. Is there a current loan by HNGH with Happy State Bank which involves 299TC [sic]. It is my understanding based on an earlier conversation that it was not the case, or did I misunderstand again. Do you see that?
A I see it.
Q Okay. Did HNGH have the $26 million to pay off Happy State Bank on May 31st?
A HNGH did not owe Happy State Bank 26 million on May 31st.

The debtor owed the lender $40.something million on May 31st.

MS. LINDAUER: Objection, non-responsive. That wasn't the question.

THE COURT: Mr. Kane?

MR. KANE: Yeah. He specifically answered Ms. Lindauer's qu.

THE COURT: Overruled.

MS. LINDAUER: No. My question was did HNGH have the money --

THE COURT: Overruled.

MS. LINDAUER: -- to pay off --

THE COURT: Ms. Lindauer, overruled.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: So ask it again because I want to make sure the witness understood the question.

MS. LINDAUER: Sure.

BY MS. LINDAUER:

Q Mr. Nambiar, did HNGH have $26,297,296.96 to pay off Happy State Bank on May 31st, 2022?

A No. It didn't need to pay Happy State Bank on that date, unless there was an overall transaction occurring.

Q So let's go with your answer no. And is that why you were asking, or someone on your behalf was asking that 26 million of the monies would be paid over to Happy State Bank?

A We were asking that to occur for easing the transaction,

and for all of the various releases that the debtor was requesting to all occur in one swoop, in one simultaneous transaction.

THE COURT: Ms. Lindauer, I think you've asked the witness that a couple different ways, a couple different times. So I overruled the objection, but I think he's answered your question.

MS. LINDAUER: No, I think he just answered it there, Your Honor. I appreciate that.

BY MS. LINDAUER:

Q And you understood, Mr. Nambiar, that paying off Happy State Bank on the 21st was a requirement in order for Happy State Bank to release the note that it was holding. Is that right?

A Yes. Once payments are made, after payments are made, it is customary to return the note.

Q I'm sorry, let me clarify. That was on May 31st. Is that right?

A Yes.

Q And were you present during Julie Blakeley's testimony?

A Partially.

Q And did you hear her testify that they would not deliver the original note until monies were actually in the Happy State Bank account?

A I didn't hear that. But, I mean, I can tell you that we

would not have returned the original note until monies were in HNGH's account. Notes are returned after a payoff event occurs.

Q So I want to understand. If the money had merely been sent to the title company, would that have been sufficient for you to deliver the remaining documents to the title company?

A I mean, you know, again, I'm not a title company rep. But I'd imagine that we would have an ability to provide, you know, lender's instructions to the title company on how to direct funds. And we would have been able to ultimately accomplish what you're asking of me.

Q Did you, on behalf of HNGH, deliver lender's title instructions to any title company on the transfer of funds?

A Again, I think we were waiting to understand who the title company was.

Q So the answer is no. Is that right?

A I think that's right.

I think again, my understanding -- I was not handling the mechanics of the closing. But my understanding from making inquiries several times was we don't know who the title company is.

Q And I want to be clear that when you were told pencils down on this transaction, you made no further effort to close on this transaction after you were told pencils down.

A I mean, after we were told pencils down, I think we -- we

looked to this Court to help us resolve this issue. We've been, you know, we've been in some form of either modified forbearance or settlement with this debtor for over 18 months, Ms. Lindauer.

Q Mr. Nambiar, what's the emergency for having these hearings?

A That's a question for my counsel.

Q So you don't have any understanding of that?

A I have a layman's understanding. But that's a question for my counsel.

Q All right. Is there anything going on with HNGH right now that's causing it to suffer any damages as a result of these hearings?

A Absolutely.

We're not -- we have been underpaid our contract note rate since the time that we entered the forbearance. And I'm not getting, you know, every single day, there's cost of capital. This was a loan that had an October 2020 maturity. I have a fiduciary obligation to my investors in my fund to collect this capital and return this money.

It is now June 2022, almost July. Both by delaying the ultimate payoff event and by not collecting cost of capital, I'm damaged.

Q Okay. All right. And so let me understand. The delay in receiving your money is what's created your situation. Is that

right?

A Yes.

And you know, we -- we got very specific approvals pursuant to this debtor's request for extensions. And every single time, you know, we -- we basically face this same consequence, this, you know, some loophole that is threatened to me through litigation and -- and new -- new extensions are requested.

And we've just -- we've just, you know, reached the end of that rope and we came to this Court for relief.

Q And I want to be clear about that. You said you reached the end of that rope. The debtor did offer to go day-by-day to get the paperwork in order for this closing. Do you recall that?

A I don't recall that.

Q Okay. And do you recall being offered additional monies in order to --

MR. KANE: Objection. Objection. Is this the disclosure of confidential settlement offers by the debtor used as evidence of good faith efforts to try to extend the closing deadline?

MS. LINDAUER: I didn't say that. You said that. I just --

MR. KANE: No. Are you disclosing settlement --

MS. LINDAUER: -- asked Mr. Nambiar --

MR. KANE: -- negotiation terms? Are you disclosing the terms of settlement negotiations in violation of FRE 408?

MS. LINDAUER: I don't know that those were settlement negotiations, Mr. Kane. They were an offer that the debtor made.

MR. KANE: Well, that is dancing on a fine line, Ms. Lindauer.

Your Honor, I'll represent to the Court that those are proposals made in confidentiality as part of settlement negotiations protected by Rule 408 of the Federal Rules of Evidence. This is incredibly inappropriate.

MS. LINDAUER: Your Honor, I didn't ask about any terms. I just asked was an extension requested, and were offers of payment made.

THE COURT: So why is that not -- let me get the rule in front of me. Hold on.

MS. LINDAUER: I think it's actually in some of the emails. I'll go through the emails. But I'm pretty certain it's already in the email traffic that's been admitted --

THE COURT: Well, I'm recalling the email where your --

MS. LINDAUER: Right.

THE COURT: -- Mr. Walji had --

MS. LINDAUER: Had offered --

THE COURT: -- the last bullet point where he

purported to be reflecting the agreement of the parties, which I understand Mr. Kane rejects that there was any agreement of the parties. Are you referring to the bullet point, the last bullet point in Mr. Walji's email where he in his testimony where he allegedly offered to give a day-by-day extension? Is that what you're referring to?

MS. LINDAUER: That, Your Honor. And I think there may have been a little bit more to it. But that is part of it, yes.

MR. KANE: There is zero reference to any kind of monetary compensation as part of a request for an extension.

THE COURT: Yeah. I don't recall that, Ms. Lindauer, in the bullet. I don't have that email in front of me.

But I thought you were perhaps referring to that email that Mr. Kane replied to in saying that he disagreed that there was any agreement. So if you're referring to something other than that email which I've already seen, and I've already seen Mr. Kane's response to it. If you're asking about something else, any additional communications between the parties?

MS. LINDAUER: Your Honor, I think -- I'll pick it up with a different witness. I don't know that I have to -- it sounded to me like Mr. Nambiar was not aware of any of those discussions in any of them and what he said.

THE COURT: Okay. Then if the question is withdrawn,

I don't need to rule on your oral Rule 408 objection, Mr. Kane.

MS. LINDAUER: Your Honor, the question will be withdrawn.

Your Honor, at this time, I know we're running out of time, I'll pass the witness.

THE COURT: Mr. Kane, I'll give you the option. Do you want to start cross and stop in seven minutes, or would you rather recess for the day and pick up perhaps tomorrow morning if Mr. Nambiar's schedule permits. And if it doesn't permit, the debtor can put on a different witness.

MR. KANE: I think, Your Honor, that we'd be inclined to just recess and start fresh and go straight through, if you don't mind.

THE COURT: That's fine.

Mr. Nambiar, I don't want to put you on the spot. If you need to take a -- because we have eight minutes. Do you want to take a five-minute recess, talk offline with Ms. Kane about whether you are able to come tomorrow morning?

And, again, I'm not pressuring you because if your schedule does not permit, Ms. Lindauer can put somebody else on and we can come back to you at a different time. But at least we're scheduled to pick back up tomorrow morning at 10:30.

So do you want to take a short recess to discuss that, Mr. Kane?

MR. KANE: Yeah. That's fine, Your Honor. That

works for us. I'll give Mr. Nambiar a call right away.

And just to be clear, Mr. Nambiar, we can only talk about this rescheduling. We can have no discussions about any of your testimony or potential cross-examination or rehabilitation testimony.

THE COURT: So we'll take a three-minute recess. I'll just stop my video and we'll be back in about three minutes. Mr. Kane, when you're ready, if you could just notify Ms. Smith and then I'll pop back on.

MR. KANE: I will. Thank you, Your Honor.

(Recess at 12:23 p.m./Reconvened at 12:25 p.m.)

THE COURT: Okay. We're back on the record.

MR. KANE: Yes, Your Honor. Mr. Nambiar will be available tomorrow at 10:30.

THE COURT: All right. And I think tomorrow we had penciled in 10:30 to 12:30. Ms. Lindauer, who's after the current witness?

MS. LINDAUER: My understanding is Marshal Dooley (phonetic) will appear after this witness.

THE COURT: And the time estimate for that witness is?

MS. LINDAUER: Probably about an hour to an hour and a half on our side, Your Honor. And subject to Mr. Kane's cross.

THE COURT: Just a minute. Remind me, is Mr. Dooley

your expert?

MS. LINDAUER: He is, Your Honor. And part of what we're doing, Your Honor, is we're having to work with people's schedules on the other side, too.

THE COURT: Okay. Well, very good. We'll be in recess until tomorrow morning at 10:30.

Mr. Nambiar, I appreciate your cooperation in scheduling.

THE WITNESS: Yes, Your Honor.

THE COURT: Any other housekeeping matters before we recess?

MS. LINDAUER: I'm not aware of any, Your Honor.

MR. KANE: No, Your Honor.

THE COURT: All right. Very good.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: We'll be in recess until tomorrow morning at 10:30 in this matter. Thank you.

(Proceedings concluded at 12:26 p.m.)

* * * * *

**CERTIFICATION**

We, DIPTI PATEL and MICHELLE ROGAN, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Michelle Rogan

MICHELLE ROGAN

LIBERTY TRANSCRIPTS DATE: June 30, 2022