IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. 21-31954 |
| | . | |
| | . | |
| 2999TC ACQUISITIONS, LLC, | . | Earle Cabell Federal Building |
| | . | 1100 Commerce Street |
| | . | Dallas, Texas 75242 |
| | . | |
| Debtor. | . | Tuesday, June 28, 2022 |
| . . . . . . . . . . . . . . . . | . | 10:31 A.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS
FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For the Debtor: | Joyce Lindauer Attorney, PLLC<br>BY: JOYCE LINDAUER, ESQ.<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| | Robin Phelan Law<br>BY: ROBIN ERIC PHELAN, ESQ.<br>4214 Woodfin Drive<br>Dallas, TX 75220 |
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |

APPEARANCES CONTINUED ON NEXT PAGE.

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES VIA WEBEX (CONTINUED):

| | |
|---|---|
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |
| For the United States Trustee: | Office of the United States Trustee<br>BY: ASHER BUBLICK, ESQ.<br>1100 Commerce Street<br>Room 976<br>Dallas, Texas 75202 |

# I N D E X


| | Page |
|---|---|
| Case called | 4 |
| End of Proceedings | 81 |
| Certification of Transcriber | 81 |

WITNESSES

FOR THE DEBTOR:

VIPIN NAMBIAR

| | |
|---|---|
| Cross-Examination by Mr. Kane | 5 |
| Redirect Examination by Ms. Lindauer | 50 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 10:31 a.m.)

THE COURT: -- 31954. I'll take appearances.

MR. KANE: Your Honor, John Kane on behalf of HNGH Turtle Creek, LLC, the pre-petition lender.

THE COURT: Good morning.

MS. LINDAUER: Your Honor, Joyce Lindauer for 299TC [sic] Acquisitions, the reorganized debtor in this matter.

THE COURT: Good morning.

MS. LINDAUER: Good morning.

MR. PHELAN: Robin Phelan also for the reorganized debtor.

THE COURT: Good morning.

MR. BUBLICK: Good morning, Your Honor. Asher Bublick on behalf of the United States Trustee.

THE COURT: Good morning.

Is Mr. Metzger there? I think I see him.

MR. METZGER: Yes, Your Honor. Steve Metzger representing Tim Barton individually.

THE COURT: Good morning, Mr. Metzger.

I think that's everybody, unless you have any other co-counsel appearing this morning, Ms. Lindauer?

MS. LINDAUER: Your Honor, I don't believe so. I believe Mr. Rodriguez had a conflict this morning. So I don't believe he'll be appearing.

THE COURT: Okay. So when we broke, Mr. Nambiar was

on the stand. And I believe Mr. Kane was about ready to start his questions.

Any other housekeeping items before we begin?

MR. KANE: I do not believe so, Your Honor.

MS. LINDAUER: None on our side this morning, Your Honor.

THE COURT: Okay. Mr. Kane?

MR. KANE: All right.

VIPIN NAMBIAR, DEBTOR'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. KANE:

Q Mr. Nambiar, I believe at the end of your questioning, Ms. Lindauer was asking --

THE COURT: Hold on. Mr. Nambiar, you're still under oath. Thank you.

THE WITNESS: Yes, Your Honor.

BY MR. KANE:

Q I'll start again. Mr. Nambiar, at the end of your questioning by Ms. Lindauer, I believe Ms. Lindauer had asked you about damages. Do you recall that?

A Yes.

Q And do you believe that the agreed orders are self-executing orders?

A I do. That's my understanding.

Q But do you also feel like HNGH is in a bit of limbo based

on some of the debtor's litigation or past litigation?
A Yes.
Q And does that put HNGH in a position where it is not making any money on interest accrual?
A Correct.
Q Is it also incurring costs of capital on the HSB loan?
A It is.
Q Is HNGH able to collect any rent from tenants in the building on the property?
A It is not.
Q And are you aware that an adversary proceeding was filed by the debtor on June 9th, the day before these hearings began?
A Yes.
Q And do you have a concern that that may be a lis pendens clouding title to the property?
A Absolutely.
Q Now, does that lack of clarity on title and that potential lis pendens potentially preclude placing the property on the market, running a process for sale?
A It does.
Q And does that potentially jeopardize HNGH's ability to obtain a title policy on that property?
A It does.
Q Now, does a lack of possession of the property cause you some concerns about the security of that building on the

property?
A Yes. We have no idea of what the physical state of the building is, if any waste is being -- we just don't know what the state of the building is.
Q Now, the Debtor's filed at least four motions in an adversary proceeding. So is HNGH also incurring considerable litigation costs associated with this property?
A It is.
Q So just to be clear, is it your testimony then that HNGH is incurring very considerable and ongoing damages as a result of this suit?
A Absolutely.
Q And do you believe that there is pretty clear evidence for a need for court intervention here?
A Yes.
Q Now, do you remember Ms. Lindauer asking whether you thought Mr. Barton was aware of Happy State Bank's involvement with the 299 -- well, 2999 Turtle Creek Boulevard property?
A Yes.
Q And it was your testimony that you believe yes, Mr. Barton certainly knew about Happy State Bank's involvement, correct?
A Yes. He certainly knew that we had a leveraged position on our ownership of the note.
Q Now, do you recall prior to the closing deadline, Mr. Barton asking if you would clear conflicts at Happy State

Bank for a gentleman named Matt Fleeger?
A Absolutely.
Q Can you explain to the Court why you believe Mr. Barton thought there was a conflict with Happy State Bank that needed to be cleared?
A Because we were adversary -- we were basically in a -- we were in bankruptcy. And Happy State Bank was HNGH's lender. The thought was that if the debtor and a party collaborating with the debtor were to work with Happy State, then you know, Happy State would be conflicted out of that, out of reviewing that loan or making that loan. And they wanted us to provide a conflict waiver to Happy State so they can actually review that request and make a decision on their own.
Q Now, why would it be beneficial for a party coming in close to the closing deadline to try and get a loan from Happy State Bank?
A Because Happy State Bank was already involved or a lender in this transaction for HNGH and knew the property, and knew, presumably had an understanding of the collateral and could move faster.
Q And did you clear conflicts with Happy State Bank at Mr. Barton's request?
A I provided them. I provided the waiver, yes.
Q Okay. I'm going to share my screen, Mr. Nambiar. Do you see this? This is Lender's Exhibit 51. And I can zoom in if

you need to see it a little bit better. Do you see this?

A Yes.

Q Okay. And is this your email address, VNambiar@HNCapitalPartners.com?

A It is.

Q And do you recall sending this email?

A Yes.

Q You sent this on May 20th at 6:44 p.m.?

A Yes.

Q And this is to Julie Blakeley who's testified here before this Court on behalf of Happy State Bank. Is that right?

A Correct.

Q And now we can scroll down here a little bit. Had I forwarded you this email from Chris McNeal (phonetic) in which he is requesting a conflict waiver for Matt Fleeger?

A Correct.

Q And you directly reached out to Ms. Blakeley clearing that conflict. Is that right?

A Yes. And copied you, my counsel.

Q Right. I'm going to turn your attention now to Lender's Exhibit 52. And I'll scroll down here to the bottom. Do you see this says from Tim Barton to Vipin Nambiar?

A Yes.

Q Do you recall receiving this email?

A Yes.

Q And that's Saturday, May 21st at 8:00 p.m., right? Or 8:06 p.m.?
A Yes, sir.
Q And is it your understanding that again, this is Mr. Barton asking you directly to clear conflicts for Matt Fleeger's group?
A Yes.
Q Now I'm going to scroll up. Is this Mr. Barton? Did he send this email to you with email addresses for the people to whom you needed to send the conflict waiver?
A Yes.
Q Okay. And scrolling up here, this is -- well, I'll go one shorter. Is this an email -- do you recall receiving this email?
A I do.
Q It's from me, John Kane, to Tim Barton, CC Vipin Nambiar on Saturday at 9:20 p.m., May 21st?
A I do.
Q And did you understand that I was informing Mr. Barton that you had already cleared conflicts with Happy State Bank?
A Yes. I had copied you in my prior email, so you informed him that that had already occurred.
Q And then you received this email from Tim Barton. You were CC'd on this --
A Yes.

Q -- as was Mr. Walji?
A Yes.
Q And this was --
A Yes.
Q -- Saturday, May 21st, 9:34 p.m.?
A Correct.
Q And this is Mr. Barton thanking it appears me and you for the efforts to clear conflicts for Matt Fleeger for Happy State Bank. Is that right?
A Yes, sir.
Q Now, more generally speaking, did Mr. Barton's effort to introduce new potential finance parties on May 20th and 21st into a potential May 31st closing give you cause for concern?
A It did.
Q Did it suggest to you that the debtor was still scrambling to find a finance partner?

MS. LINDAUER: Your Honor, objection. Leading. Did it suggest to you, that's a leading question.

THE COURT: I will --

MR. KANE: Yeah. I'll withdraw the question and ask it a different way.

THE COURT: All right. Go ahead.

BY MR. KANE:
Q Mr. Nambiar, why did it give you cause for concern?
A I have been in the real estate private equity work for a

long time. The time from a conceptual term sheet to definitive documents to actually closing in my experience, you know, is not ten days. It's at least 60 days. And I had been previously communicating with Mr. Barton that he needed to focus on somebody that can, you know, close timely and not optimize for cost of capital.

And you know, when I saw this ten days prior to the deadline, you know, in my experience, you know, term sheets don't turn into documents, don't turn into closing within a week, typically. You know, I'm sure there are lenders that can -- can make that happen. But, you know, my view was Happy State was not one of those lenders since I had worked with them before, and didn't feel like it was feasible for this loan to occur within a ten-day time frame.

Q Now we're sitting here looking at this at May 21st, 9:34 p.m. Was it your understanding at that point in time that the debtor hadn't circulated to HNGH or its counsel any title commitment or list of documents pertaining to closing?

A Correct.

MS. LINDAUER: Objection, leading. Was it your understanding.

THE COURT: Overruled.

THE WITNESS: Yes, that was my understanding.

BY MR. KANE:

Q Now, as of May 20th, or even May 21st, the evening of

May 21st, did you have any faith that the debtor would be able to close a payoff transaction by May 31st?

MS. LINDAUER: Your Honor, objection. Leading.

MR. KANE: Your Honor, I'd like to address that. I'm asking if he did. That's a yes or no. It's not you had no faith, right? I'm not --

MS. LINDAUER: No, the question was --

MR. KANE: -- answering the question.

MS. LINDAUER: -- did you, did you. And that's a leading question.

THE COURT: Overruled.

BY MR. KANE:

Q You may answer, Mr. Nambiar.

A I did not have faith that this would happen on May 21st.

Q Now, I want to get into a little bit of the history of the relationship. Did the history of this relationship affect that belief?

A Yes.

Q Can you remind the Court how long you've been involved in this credit?

A Since basically December of 2019.

Q Was the original maturity date under the note October 1st, 2020?

A It is. Or it was.

Q Did the debtor default?

A They did. They defaulted before that. But they defaulted at maturity, as well.

Q Had the debtor previously failed to make monthly interest payments?

A Yes. I believe the first payment default was in July of 2020.

Q Had the debtor failed to make ad valorem tax payments?

A Yes. That default occurred February 1, 2020.

Q And had the lender, at the time, moved to foreclose on this property?

A We did eventually move to close -- foreclose on the property. I think my recollection is we had sent a PNA, a pre-negotiation agreement to have an actual work-out discussion with the lender -- with the debtor, and did not receive that back and instead got a -- got a lawsuit served, after which we independently and parallelly started exercising remedies including posting for foreclosure.

Q And you said that there was a lawsuit served. Was that a state court lawsuit?

A It was.

Q Was that in Judge Moye's court?

A It was.

Q And you may not recall, but was that Cause Number 20-05864?

A I don't remember the cause number. But it was in Judge

Moye's Court.

Q Okay. And did that lawsuit include claims against you personally?

MS. LINDAUER: Objection, Your Honor. Leading. And best evidence would be the lawsuit itself.

THE COURT: I'm going to overrule the leading objection. Mr. Kane, what's your response to the best evidence objection?

MR. KANE: Yeah. If Mr. Nambiar was a named defendant, he certainly would have personal knowledge of whether he had claims asserted against him. And so the best evidence rule shouldn't apply. He's allowed to testify to things that he has personal knowledge of.

MS. LINDAUER: Your Honor, there's been nothing established that he had personal knowledge of that lawsuit. Mr. Kane has led him through a series of questions about a lawsuit filed in Judge Moye's court. Mr. Nambiar said he didn't recall all of the particulars of that lawsuit. And then Mr. Kane led him by saying and you were a party to that lawsuit, et cetera, et cetera.

So after a series of leading questions, I don't think that there's been any proof that Mr. Vipin knows any particulars about that particular lawsuit. So I don't think there's been any foundation set, which is why I raised a best evidence rule question because I think the best evidence would

be a copy of the suit itself, not what Mr. Nambiar recalls about the lawsuit.

THE COURT: So I'm going to overrule the objection. The only thing that I recall the witness not being able to testify about is the specific case number. And I do believe he indicated he was familiar with the suit that was pending before -- foreclosure suit that was pending before, or the state court lawsuit that was pending before Judge Moye. So I'll overrule the objection.

MR. KANE: Okay. And just for clarification, there's a copy of the complaint that has been served on this Court's docket on that state court lawsuit at Docket entry number 44. I'm happy to pull that document up just to assuage Ms. Lindauer's concerns and to show this Court that there were in fact individual claims against Mr. Nambiar if that would be Ms. Lindauer's preference.

MS. LINDAUER: Well, I think the Judge overruled my objection. So I think he's allowing your witness to testify without looking at the actual document. So I think we maybe have moved past that.

THE COURT: Do you want to show me that document?

MR. KANE: Yeah. Just a moment. Okay. Your Honor, here is the screen share. This is at Docket entry 44-46. This is a state court complaint filed by the debtor against HNGH Turtle Creek and Vipin Nambiar in the 14th Judicial District.

THE COURT: And the case number appears to be the same one that you read out loud, Mr. Kane. So you may proceed.

MR. KANE: Thank you, Your Honor.

BY MR. KANE:

Q Now, Mr. Nambiar, do you recall whether the debtor was held in contempt of court or sanctioned in that case?

A He was.

Q And was the debtor successful on its claims against you or the lender in that lawsuit?

A It was not.

Q Is it your recollection -- or what was your recollection of whether the debtor nonsuited that case or proceeded to a final judgment?

A My recollection was as Judge Moye was getting ready to rule, the debtor nonsuited that also.

Q Now, did the debtor and Mr. Barton assert pretty much the very same claims against you and the lender in a federal district court proceeding shortly thereafter?

A Yeah, it was -- I mean, I recall it being basically the exact same lawsuit filed again in federal.

Q And did that lawsuit proceed in front of Judge Scholer in the Norther District of Texas?

A It did.

Q And you may not recall. I'll ask you this question again, though. Do you remember if that was Civil Action Number 20-

03229?

MS. LINDAUER: Your Honor, I'm going to object to this line of questioning. I'm not sure what it has to do with their motion to enforce the orders of this Court. Seems like we're drifting a little far afield to be going back to lawsuits that were pre-petition between the various parties. So, Your Honor, I would object to this line of questioning as to relevance.

THE COURT: Response, Mr. Kane?

MR. KANE: Yes, Your Honor. One of the assertions that we've made abundantly clear in our motion was that there's a very clearly established pattern of behavior here in which the debtor defaults, the lender attempts to enforce its remedies. And immediately following that, the debtor pursues a series of litigation claims with allegations of some purported wrongdoing by the individual representatives of the lender even though they are exclusively resolved against the debtor, and the debtor has never succeeded on any of those claims.

One of the reasons that we are seeking the Court's intervention in this case is because of that pattern of behavior. And what we have considered and repeatedly framed it as bad faith or vexatious litigation, which in each instance has been nothing more than a play by the debtor to try and obtain leverage for some settlement negotiations or forbearance request.

THE COURT: Okay. So I will overrule the objection. Go ahead.

MR. KANE: Thank you, Your Honor.

BY MR. KANE:

Q Now, in that federal court lawsuit, I believe you just testified that the debtor asserted substantially the same claims against you?

A Yes.

Q And can you just describe the nature of your understanding of those claims against you for the Court?

A It was basically turning a series of, you know, interaction that I had had with the debtor and mischaracterizing the nature of those conversations into, you know, some sort of a fraud toward conspiracy to sort of stead property type of a claim when, you know, it was just very distressing for me because each of those meetings, you know, in my opinion were -- were really convincing us -- I mean, the effect from those meetings were that we actually made an investment in this loan.

And each of those meetings were, you know, really, you know, helping us or, you know, the said meeting was really helping me understand this borrower's ability to execute that business plan and why my investment was ultimately going to be successful.

Q And did the debtor succeed in its claims against you in

that federal district court case?
A It did not.
Q Were those claims dismissed with prejudice by Judge Scholer?
A They were.
Q Now I'm going to turn your attention to Lender's Exhibit 5. Do you recall this document?
THE COURT: Lender's Exhibit 5 you said, Mr. Kane?
MR. KANE: Yes, Your Honor.
THE COURT: All right, thank you.
MR. KANE: I realize I'm not sharing, Mr. Nambiar. Here we go.
BY MR. KANE:
Q Do you recall this document?
A Yes.
Q And is this the order dismissing with prejudice all claims against you and the lender?
A Yes.
Q Now, did Mr. Barton and the debtor waive and release all these claims anyway?
A Yes. I remember that.
Q Was that when Mr. Barton and the debtor entered into a forbearance agreement?
A Yes.
Q Now, this is Lender's Exhibit 6. Do you recognize this

document, Mr. Nambiar?
A I do.
Q Is this that forbearance agreement?
A Yes.
Q Now if we go to Recital C, is this a list of the defaults that were addressed by this forbearance agreement?
A Yes.
Q And if we scroll down to Recital F, it shows that it is actually the debtor who is requesting the forbearance. Is that your recollection?
A Absolutely.
Q Now let's turn to Paragraph 11 here. Do you see this paragraph titled indemnification and release?
A Yes.
Q And do you see these provisions here?
A Yes.
Q Did you understand the debtor and Barton were releasing and waiving any and all claims against you and the lender related to the property, the loan, the administration of the loan, anything having to do with Barton, the debtor, their obligations under the loan documents?
MS. LINDAUER: Your Honor, I'm going to object. The document speaks for itself. It's been admitted as an exhibit. The Court can surely read it. We don't need Mr. Vipin's understanding, or sorry, Mr. Nambiar's understanding of the

document.

THE COURT: I understand your point, Ms. Lindauer. I'll overrule the objection. He can testify about his understanding if it's brief, Mr. Kane.

THE WITNESS: Yes, it was -- the forbearance was negotiated to have, as it says right there, material inducement. Part of the forbearance was that all of these claims would be dropped so we could move away from, you know, litigation as a strategy and start focusing specifically on how to commercially resolve this default.

BY MR. KANE:

Q Now, do you believe that Mr. Barton and the debtor honored those waivers and releases?

MS. LINDAUER: Objection, leading. Do you believe. That's a leading question.

THE COURT: I'll sustain the objection. Do you want to re-ask it a different way, Mr. Kane?

MR. KANE: Can I get clarification from the Court on why do you believe is a leading question? It's an open-ended answer in which he can answer yes or no. I'm not providing him the answer to the question ahead of time.

MS. LINDAUER: But you are providing him with the facts. That isn't the way to frame that question. You are assuming facts from a document or behavior and asking him to state his yes or no as to those facts. That's you're leading

him with your question.

THE COURT: Actually, I've changed my mind. Do you believe in this context I don't think is leading. So I will reverse myself and he may answer the question.

BY MR. KANE:

Q Mr. Nambiar, do you believe that Mr. Barton or the debtor honored their waivers and releases in this document?

A They did not. There was an adversarial filed as soon as the bankruptcy petition was in that basically restated some derivative of these claims again.

Q Now do you recall what the maturity date was under this document?

A It was in October --

MS. LINDAUER: Object. I'm going to object. The document, again, we have a written document. It speaks for itself. Rather than asking Mr. Nambiar to speculate on what he recalls, we can just look at the document and determine the maturity date.

THE COURT: I don't recall what the question was, honestly. Is this something you could just --

MS. LINDAUER: I think Mr. Kane's pulling it up.

MR. KANE: Yeah.

THE COURT: You said maturity date, Mr. Kane? Do you mean the --

MR. KANE: Yeah. So it's the maturity date --

THE COURT: The effective date or the maturity date for --

MR. KANE: This is the --

THE COURT: I got you.

MR. KANE: The maturity date of the note by extension through this forbearance agreement.

THE COURT: Got you.

MR. KANE: I'll tell you what, let's just move to --

THE WITNESS: It's right there, Mr. Kane, 2B and then 2C.

MR. KANE: Yeah, so I mean, it doesn't matter. It's okay. We'll move on.

BY MR. KANE:

Q I want to look at Lender's Exhibit 7. This document establishes that -- never mind. This document addresses the maturity date, correct? And this document was agreed to by both parties?

A Yes.

Q Okay. And it shows that the maturity date was 1:00 p.m. Eastern Time on October 29th, 2021?

A Yes.

Q Okay. Now, we talked, or I asked you if you believed that Barton or the debtor honored their waivers and releases under the forbearance agreement. I believe that your testimony was no, you did not believe that. Can you explain to the Court why

you believe that they did not honor those waivers and releases?

A Because they filed an adversarial, an adversary complaint in bankruptcy court right after this maturity default that you're highlighting, and asserted a whole bunch of similar claims that were substantially similar to what they already waived.

Q And is that adversary proceeding, is that this document here at Lender's --

A Yes.

Q -- Exhibit 3?

A Yes. Looks like it.

Q And I think you just testified to this. Did you think that this asserted some of the same claims that had already been adjudicated in the federal district court proceeding?

A Yes --

MS. LINDAUER: Your Honor, leading. Leading his witness.

THE COURT: Sustained.

BY MR. KANE:

Q Mr. Nambiar, did you believe that the filing of this complaint included claims previously waived?

MS. LINDAUER: Objection, Your Honor. Leading his witness again.

THE COURT: Overruled.

THE WITNESS: I believe it did.

BY MR. KANE:

Q Do you believe that the filing of this complaint evidenced a pattern of behavior?

MS. LINDAUER: Objection. Leading his witness again?

THE COURT: Overruled.

THE WITNESS: It was -- it was deja vu.

BY MR. KANE:

Q And why was it deja vu?

A It happened in January. It was threatened again somewhere along the way. And we had a clear understanding of what would happen October 29th. There was a deed in lieu signed by the debtor. It was a remedy we thought we had. We didn't have to go through litigation or bankruptcy again. It was an agreed matter. And you know, once again, we received a lawsuit. This was the third lawsuit that I had received.

Q And is it your understanding this law suit was also dismissed with prejudice to refile?

A It was.

Q And it's your understanding that that's shown in this Lender's Exhibit 7?

A Yes.

Q Now, if we scroll down on this Lender's Exhibit 7, to the bottom of Page 2 and the top of Page 3, first let me ask was this -- to your understanding, was this a negotiated agreed order?

A It was.
Q And did you advise your counsel on the terms and conditions that you wanted to see in this order?
A I did.
MS. LINDAUER: Your Honor, objection. Leading.
THE COURT: Overruled.
BY MR. KANE:
Q Did you request releases and waivers from Mr. Barton and the debtor?
A I did.
Q Was it your understanding that this bottom paragraph on Page 2 that carries over to the top of Page 3 of this order contained those waivers and releases?
MS. LINDAUER: Your Honor, objection. The best evidence is the document itself. It speaks for itself as to what releases were to be provided.
MR. KANE: In response, it does not speak to Mr. Nambiar's unding of whether the releases that he had requested in negotiations had been incorporated to the document, which is what I asked.
MS. LINDAUER: Your Honor, it's irrelevant whether they were incorporated or not. The document is now the operative agreement of the parties. And so what Mr. Nambiar thought or didn't think is really irrelevant. The document is the parties' agreement, and that's what's been made part of the

Court record.

What his -- there's nothing about an ambiguity here as to the actual provisions of this document. So there's no reason for Mr. Nambiar to opine as to whether it includes his understandings or not. It speaks for itself.

THE COURT: Well, I'm going to overrule the objection. I think, if I remember the question correctly was did this document include the requested waivers and releases. So I'm going to allow him to answer that question.

MS. LINDAUER: Okay.

THE WITNESS: yes. To my best of my understanding, it was -- it was captured here.

BY MR. KANE:

Q Do you have any reason to believe that Mr. Barton or the debtor will honor the Court's order and abide by these waivers and releases?

MS. LINDAUER: Objection, Your Honor. Leading, and assumes facts not in evidence at this point.

THE COURT: I'm going to overrule the leading objection. What is the facts in evidence?

MS. LINDAUER: Do you believe that Mr. Barton will not honor the terms of this agreement. He's assuming facts not in evidence that there -- that they won't honor the terms of that agreement. So, Your Honor, I --

THE COURT: I'll overrule that objection. Sorry.

I'll let you finish your --

MS. LINDAUER: Oh, that's fine.

THE COURT: I want to make sure the record was clear. Go ahead and finish your objection, Ms. Lindauer.

MS. LINDAUER: Your Honor, I stated my objection. I think I finished what I was objecting to. Thank you.

THE COURT: Okay, thank you. I will overrule that objection.

THE WITNESS: My response is that there's already I think been a new adversary filed. So you know, I generally expect more of the same which is why we're here in court.

BY MR. KANE:

Q Now, Mr. Nambiar, did you and your counsel negotiate for even more expansive releases in another order from that March 17th period?

A We did.

Q I'm going to show you Lender's Exhibit 16. Are you familiar with this order?

A Yes.

Q If we look at the first full paragraph on Page 3, are these the more expansive releases that you just referred to?

A Yes, they are.

Q Do you have any reason to believe that Barton or the debtor will honor this court order and abide by these waivers and releases?

MS. LINDAUER: Your Honor, objection. Again, leading.

THE COURT: Overruled.

THE WITNESS: My response is the same. No.

BY MR. KANE:

Q Now, I want to -- sorry, I'll move this. Just one second. You're familiar with what we've been referring to as the December 10th agreed order. Is that correct?

A Yes.

Q Okay. And did you understand that after that, after the entry of that order, the debtor had until March 15th to satisfy the payoff amount. Is that correct?

A That is correct.

Q Now, did you correspond with the debtor's representatives leading up to that date?

A I did.

Q The March 15th date?

A Yes.

Q Do you recall whether the debtor had any real prospects for a potential closing at that time?

A It was claimed that they did and needed a little more time. It was also claimed to me that the, you know, releases that I thought I had achieved or received in the prior order were not expansive, and there were loopholes. And for some incremental time, they would agree to these additional

expansive releases.

Q Okay. And they did make the consideration payments to obtain the extension and did provide the releases, at least in this agreed order, correct?

A Yes. And those releases, incremental releases were at least as important as those payments because of the prior pattern here.

Q And this Exhibit 16 extended the payoff deadline to May 31st. That's your understanding, right?

A Yes, sir.

Q And did --

A It was May 30th, but by -- because of the holiday.

Q Thank you. That actually goes to my next question, Mr. Nambiar. Did the debtor, or I'm sorry, did HNGH voluntarily extend the deadline from May 30th to May 31st?

A Yes, on account of Memorial Day.

Q Now leading up to May 31st, did you have any direct correspondence with the debtor's representatives about closing the payoff transaction by that date?

MS. LINDAUER: Objection, Your Honor. Leading.

THE COURT: Overruled.

THE WITNESS: After in this second extension period, I don't have any recollection of any outreach from the debtor's representatives, which outside of a few things that you've now highlighted seeking, you know, waivers from some law firms and

our lender, I had maybe had a text or two from Mr. Barton essentially claiming that all was well and a payoff was going to occur. But there had been no engagement from me after that.

BY MR. KANE:

Q Now, Mr. Nambiar, other than Matt Fleeger who we previously discussed, did you have any idea who the debtor was trying to close with by that May 31st deadline?

A In the meeting that the debtor requested with me to seek that relief on the guarantee lawsuit, a claim was made to me that he had come into some liquidity and was going to be able to fund, you know, the bridge equity on top of a traditional -- a traditional loan for the property with his own resources.

And that's why he was not worried about closing. It was important that's why that we agreed to this, you know, relief on the guarantee so that he could work with a regular bank lender to go get that -- to get that loan since they would be, in diligence, worried about this guarantee lawsuit.

I reminded him there were many other lawsuits that the debtor was, or at least Mr. Barton was personally involved in. This would be, you know, hopefully the least of the lender's concern. But you know, informed you to inform Mr. Barton's counsel that we would be willing to hop on a call or provide an email, some kind of a comfort letter for any lender that Mr. Barton was working with.

But outside of, you know, this last minute reference to

Mr. Fleeger, I think in that meeting I was -- I was given to understand that Mr. Barton had come into some liquidity himself and was going to be able to bridge the equity on top of a traditional mortgage that would take us out.

Q Now, Mr. Nambiar, did you take any affirmative steps to interfere with Mr. Barton, Mr. Walji, or Mr. Marx's effort to obtain financing to close the transaction by May 31st?

A Absolutely not. I have no -- I have no idea other than, you know, this request for Happy State Bank who they were working with, and neither we were interested in knowing. So I just didn't know.

Q Okay. Now much has been made -- I'm going to transition here to a discussion about some Happy State Bank matters. There's been much made about Happy State Bank's collateral assignment of note and lien. Have you heard some of the testimony on that topic, some of the questioning during these hearings?

A Yes.

Q Okay. I'm going to turn your attention to Lender's Exhibit 55. Are you familiar with this document?

A Yes.

Q And is this an email from you to Julie Blakeley?

A Yes.

Q May 27th at 9:35 p.m.?

A Yes.

Q And was this related to that collateral assignment of note and lien?

A Yes.

Q What were you asking of Julie Blakeley in this email?

A I was asking that she provide the collateral assignment and release document timely since I did not want a delay in providing that document to cause a closing on May 31st to be impeded.

Q Now, the debtor seems to have really been focused on a need for clean title based on some of the questioning. Is it your understanding -- would payment of Happy State Bank from HNGH's payoff amount help the debtor clear title?

A Yes.

THE COURT: Mr. Kane, I'm sorry. I was multi-tasking. Would you mind repeating that question for my benefit?

MR. KANE: Yeah.

BY MR. KANE:

Q Mr. Nambiar, would payment to Happy State Bank from HNGH's payoff amount resolve the termination of the collateral assignment of note and lien and help the debtor clear title?

A Yes. I think as I testified yesterday, on a payoff is when the lender would have returned the original note back to the -- to the debtor. And the obligation would have been satisfied.

Q And was it your understanding on May 31st that the payment amount or the payoff to Happy State Bank was going to come out of HNGH's payoff amount?

A Absolutely.

MS. LINDAUER: Objection. Objection. Leading and lack of foundation.

THE COURT: Response?

MR. KANE: Yeah, I'm asking him, again, a question that he can answer yes or no. I'm mot directing an answer to him. So it isn't a leading question. And the lack of foundation, I'm a little bit confused by that objection because the foundation is Mr. Nambiar's understanding.

MS. LINDAUER: Your Honor, there was no agreement. We've gone over this many times. There was no agreement for 299TC [sic] to bifurcate its payoff amount and pay Happy State Bank. So, Your Honor, there's no foundation in Mr. Nambiar's testimony that would support his position that there was some sort of obligation here for 299TC [sic] to pay off Happy State Bank on behalf of HNGH. So it's just a lack of foundation.

Mr. Nambiar has not attested to any document, order, email, anything that would have authorized 299TC [sic] to pay Happy State Bank. I know that's their position they want to take with this Court. But there just isn't any documentation. We went over that with Mr. Nambiar yesterday. And I understand Mr. Kane is trying to get him to say something different. But

there just isn't any basis for that testimony, Your Honor. And again, it's leading and it lacks foundation.

THE COURT: So I'll overrule both objections.

THE WITNESS: So my response, Mr. Kane, is I think it's similar to what I testified yesterday. I believe the instructions for the Happy State payoff went to the escrow agent, not the debtor.

We were simply providing instructions on where to deliver funds that were owed to us and bifurcating those funds to our lender or a commission agent as is -- is common practice in our business. Those instructions were for the title company, and that's what we were providing.

BY MR. KANE:

Q Okay. Now I want to turn your attention to Lender's Exhibit 89. Do you recall Ms. Lindauer asking you questions about this document yesterday?

A Yes.

Q And I believe Ms. Lindauer asked if these were payment instructions, or instructions to the debtor about the payment of Happy State Bank's payoff from the HNGH payoff amount. Do you recollect that?

A I think so.

Q And I believe Ms. Lindauer noted that this was at 4:07 on Tuesday, May 31st. And I believe that you agreed with Ms. Lindauer when she asked you whether that was pretty late in

the afternoon. Do you remember that?
A Uh-huh.
Q Now, do you see --
THE COURT: Mr. Nambiar --
THE WITNESS: My response was yes, Your Honor.
THE COURT: Yeah. Yeah. I was going to suggest yes or no rather than the uh-huh because that isn't always picked up in a transcript or the recording.
THE WITNESS: Yes, sir.
MR. KANE: Yeah. I appreciate it, Your Honor. Thank you for that.
BY MR. KANE:
Q Does this document have the Happy State Bank payoff attached to it? Do you see an attachment reference anywhere on this?
A I don't see an attachment reference.
Q Okay. Now how about if we scroll down to this email from Mr. Walji. There's no attachment of any Happy State Bank payoff or any reference to any attachment, is there?
A There is not.
Q Okay. And if we continue to scroll down, do you see any reference to an attachment on this lower email from me to Mr. Walji at 2:08?
A I don't.
Q Okay. How about from Mr. Walji to Ms. Lindauer at 1:44,

any attachment?
A I don't see it.
Q Okay. Now continuing to scroll down. This email from me to Ms. Lindauer, do you see any attachment?
A I don't.
Q Okay. We can continue to scroll all the way down, Lindauer to me. Any attachment here?

MS. LINDAUER: Your Honor, I'm going to object to this line of questioning. Mr. Nambiar isn't even a party named in any of these emails. So all he's doing is reading a series of emails to you between other persons. These are emails between Mr. Kane, Mr. Walji, and myself in most instances.

So all Mr. Nambiar is doing is authenticating documents to which he is not even copied on, not a party to. And whether there's an attachment or not, all he can do is read to you what's up on the screen or in front of him. So that is not probative evidence of anything. These are documents that have already been admitted. The Court can review them.

And there's no reason for Mr. Nambiar to be doing what he's doing which is going through these and saying no, I don't see an attachment, no I don't see an attachment. So, Your Honor, this is just an improper line of questioning.

THE COURT: So I'll overrule the authentication objection because as you just noted, the document, this email chain is already in evidence. And I'm not sure what the other

objection --

MS. LINDAUER: Your Honor, I think it's just an improper line of questioning. If I stick a document in front of someone that they're not a party to and say does this document say what it says, that is not probative evidence. So all of us can read these emails. We can see who the parties are to them. There is no reason for Mr. Nambiar to be testifying there are no attachments to these documents that he is not a party to.

So again, this is of no probative value. There's no foundation for this. He didn't establish that Mr. Nambiar had been copied on any of these emails or that he has any relevant knowledge of them. So, Your Honor, it's just improper line of questioning and I ask that the questions be struck and the answers be struck.

THE COURT: So, Mr. Kane, what about the point that -- I don't know that the witness has testified that he's seen these emails. So I can look at the emails. And I think I can tell whether or not the payoff is attached. But is that something that Mr. Nambiar is capable of testifying to?

MR. KANE: Probably no more than you so on these, Your Honor. But it is relevant to whether the Happy State Bank payoff that Ms. Lindauer showed to Mr. Nambiar was associated with this 4:07 p.m. email or not. And we're moving on. I mean, I'm done asking questions about this document. So to the

extent that Ms. Lindauer would like me to stop this line of questioning, I'm happy to do so.

MS. LINDAUER: Your Honor, I would like a ruling on my objection. As you're aware, we are making a record here, and I don't have the benefit of Mr. Rodriguez who has really been my warhorse on these types of objections. But I would like a ruling that this was just an improper line of questioning, there's no foundation for Mr. Nambiar to provide any testimony with regard to these emails. So, Your Honor, I would ask for a ruling on that.

THE COURT: So the authentication objection I overruled, and I'll stand by that ruling.

MS. LINDAUER: Okay.

THE COURT: I guess the other objection is that this -- again, I'm not sure what the objection is other than it's an improper line of questioning.

MS. LINDAUER: No foundation. No foundation, Your Honor, was the legal argument.

THE COURT: Mr. Nambiar, have you ever seen this email chain, do you recall?

THE WITNESS: Yeah. Mr. Kane I think had forwarded the last set of email here that I'm seeing to me to explain what was going on.

THE COURT: Contemporaneously with when this email chain was sent?

THE WITNESS: Then or shortly after.

THE COURT: Do you recall at the time seeing the attachment that the payoff attached to this email string?

THE WITNESS: I do not.

THE COURT: All right. I'll overrule that second objection, Ms. Lindauer.

MS. LINDAUER: Okay.

BY MR. KANE:

Q Mr. Nambiar, I'm going to turn your attention to Debtor's Exhibit D7. Do you recall Ms. Lindauer asking you questions about this document yesterday?

A I do.

Q Do you have any idea when -- scratch that question. I'm going to turn your attention to Lender's Exhibit 72A. Do you see this document?

A Yes.

Q All right. Does this appear to be the same document as Debtor's Exhibit D7? I'll show you D7 again.

A Yes.

Q Now 72A.

A Yes, it appears so.

Q Okay. Now I'm going to turn your attention to Lender's Exhibit 72. Are you familiar with this document at all?

A Yes. I think I've seen this.

Q Now does this reference an attachment?

A It does.
Q And do you understand that attachment to be this Lender's Exhibit 72A?
A Yes.
Q Is it your understanding that this email contains HNGH's instructions that a payment to Happy State Bank should be deducted from HNGH's payoff amount?
A Yes. And I see that you sent it to Julie Lissey who is the escrow agent.
Q And what's the date, or what's the time stamp on this?
A 11:03 a.m.
Q And that's about five hours before 4:07, wasn't it?
A Yes.
Q So is it your understanding that HNGH actually delivered these Happy State Bank payoff instructions considerably earlier in the day than Ms. Lindauer suggested yesterday afternoon?
A Yes.
Q Now, I want to get back to just, sorry, a fundamental series of questions about Happy State Bank. This is about payment of Happy State Bank's, or the amount to Happy State Bank from HNGH's payoff amount. I think you testified previously that if that had just been satisfied, it would make the closing easier. Is that right?
A Yes.
Q Now, would it ensure that Happy State Bank released the

note back to HNGH?

MS. LINDAUER: Your Honor, objection. Leading. And no foundation.

THE COURT: So I'll sustain the leading objection.

BY MR. KANE:

Q Okay. Why, Mr. Nambiar, do you think that payment would have made closing easier?

A We would have been immediately able to ask Happy State to release the actual physical note in their possession, and the collateral assignment would have been terminated.

Q Could HNGH then deliver the note stamped paid?

A Correct.

Q Now, based on your extensive experience, and I believe you testified yesterday that you had been involved in billions of dollars of real estate closings. Is that right?

A Yes.

Q Based on your experience, would it have been easy or simple for a title company to add a wire to Happy State Bank from HNGH's proceeds at closing?

MS. LINDAUER: Your Honor, objection. No foundation, speculation as to what the title company would or would not have been able to do.

THE COURT: Response, Mr. Kane?

MR. KANE: I'm asking about Mr. Nambiar's past experience and whether his experience has guided his estimate

of whether that would be a difficult task or not. Mr. Nambiar has testified that he's been involved in I believe it was close to 20 years of real estate closings involving billions of dollars of commercial real estate transactions. I think he's more than able to testify about whether he believes the addition of a wire on a closing statement would be a difficult task for a title company given his experience with this type of transaction.

MS. LINDAUER: Your Honor, and again, I think that's speculation because Mr. Nambiar doesn't work for a title company. He's never worked for a title company. He doesn't know what a title company has to do to add a party to a closing statement. He doesn't have any basis for that opinion.

So, Your Honor, again it's just pure speculation and I would object to that question. He doesn't know what this -- let's not -- let's remember that they weren't even convinced Sendera Title was the title company, yet we see on Exhibit 72 that they sent the payoff to Sendera Title. But when we asked them to deliver documents to Sendera Title later in the day, Mr. Kane sends me an email and says which of the title companies are we using.

So again, Your Honor, I don't think there's any foundation for this witness to testify as to what title companies find easy or hard to do. So, Your Honor, I object to that question.

THE COURT: I'll overrule the objection. His prior testimony I think on his experience will allow him to answer the question. And I'll give whatever credibility is warranted to his answer when I make my ruling.

MS. LINDAUER: Okay.

THE WITNESS: Yeah. I mean my response is not only is the title company able to do it, I think it is, you know, generally customary that -- that all parties that are essentially owed funds typically just work through the closing title company. There's also direct precedent here because, you know, I think it's procedurally almost exactly how it worked when HNGH purchased the note and paid off Axos Bank on behalf of Madison.

MS. LINDAUER: Your Honor, objection. Non-responsive. What happened with Madison and Axos is not before this Court. And we don't have any evidence as to what title company that was and whether in fact this is the same title company, and if in fact this would be hard or difficult for Sendera Title to do what's being requested. So again, I would object that his answer was non-responsive.

THE COURT: So I'll overrule the objection. I think he's again testifying about his experience with prior closings, and that being one of them. So I'll overrule the objection and let his answer -- I'll give whatever weight his answer deserves when I rule.

MR. KANE: Now, Mr. Nambiar, I'm going to share my screen and turn your attention back to Lender's Exhibit 55. And I'm almost done, Your Honor. I just have just a few questions left. At the time of this correspondence, this was the evening of May 27th, did you believe that the debtor had began to set a trap for the lender?

MS. LINDAUER: Objection. Leading.

MR. KANE: Again, it's a did you, which means he can answer yes or no. I have not provided him with an answer to that question.

MS. LINDAUER: I don't think that that's the proper definition of leading. When you ask somebody did you on your own witness, you're supposed to be asking open-ended questions, not -- yes/no questions don't make them non-leading. It's a leading question.

"Did you believe you were being set a trap" is a leading question. It also assumes facts not in evidence that a trap was actually being set. So it's clearly a leading question.

THE COURT: So I'll sustain the objection.

BY MR. KANE:

Q Mr. Nambiar, when you sent this correspondence to Ms. Blakeley, what was your thought? What was your state of mind about the debtor's actions around the closing?

A I had started to get worried that the pattern I had seen

before was reemerging. Questions were being raised. You know, trivial items were being, you know, posed as impediments to closing. You know, this whole line of questioning on how the debtor had no idea that Happy State Bank was somehow, you know, our lender was being used as an objection to delay closing. You know, this collateral assignment was being used to delay closing.

You know, I mean, I think I've testified to this. I mean, specifically Mr. Barton himself had requested that I waive conflicts with Happy State for another party to be involved in this transaction. Because Happy State was my lender, they had perfect knowledge, you know, just setting a series of communications on emails. It was a pattern I had seen all too many times with this debtor starting in July of 2020, and so I wanted to ensure by making it abundantly clear to all parties on my side that no delays would be tolerated. And I wanted to make sure that everybody provided everything that was requested timely so that there was no questions that we had done everything required to reasonably close this transaction on May 31st.

Q Now, Mr. Nambiar, at this point had the debtor informed the lender who it intended to close with?

MS. LINDAUER: Objection. Assumes facts not in evidence. Had the debtor informed the lender who it intended to close with. Why would the debtor inform the lender who it

intended to close with?

THE COURT: I'll overrule that objection.

MS. LINDAUER: Again, and, Your Honor, that would be a leading question as well.

THE COURT: Overrule that objection as well.

MS. LINDAUER: Thank you, Your Honor.

THE WITNESS: I had not heard who the ultimate partner or payoff party was going to be. I know we were seeking some clarity on proof of funds, but I don't believe we had received anything.

BY MR. KANE:

Q Now on this May 27th date, to the best of your recollection, had the debtor provided the lender of any drafts of any closing documents?

A No.

Q Now, to the best of your recollection on this date, May 27th, had the debtor provided the lender with any proposed settlement statement?

A No.

Q Do you know if at this time the debtor had provided any comments to lender's form of rescission deed?

MS. LINDAUER: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: I don't believe any comments came back until the 30th.

BY MR. KANE:
Q Now, did you believe that type of behavior was consistent with prior failed maturity date payment obligations?
A It was.
MS. LINDAUER: Objection. Leading.
THE COURT: Sustained.
BY MR. KANE:
Q Mr. Nambiar, did that give you cause for concern about the debtor's ability to close?
A Yes.
MS. LINDAUER: Objection. Leading.
THE COURT: Sustained.
BY MR. KANE:
Q Mr. Nambiar, were you concerned about the debtor's ability to close as of May 27th?
A Yes.
Q Why?
A We hadn't seen -- we hadn't seen any of the documents that would otherwise be required to complete this including, you know, comments on, you know, what we -- what we thought was the final rescission deed. We hadn't seen any closing documents. We hadn't seen a settlement statement.
I was being told that we didn't even know there was a -- who the ultimate title company or escrow agent was going to be. And even up until this point, and I believe Mr. Walji has

testified to this, the lender was still running paddle ads (phonetic) with four or five parties. That's not -- that's not indicative of a closing two days later.

MR. KANE: Your Honor, I'd pass the witness.

MS. LINDAUER: Your Honor, may I have a five minute break before we start redirect?

THE COURT: Sure.

MS. LINDAUER: Thank you.

THE COURT: All right. We'll be in recess for five minutes.

(Recess at 11:35 a.m./Reconvened at 11:44 a.m.)

THE COURT: Okay. We're back on the record.

Ms. Lindauer, are you ready?

MS. LINDAUER: Yes, Your Honor. I am. Thank you.

THE COURT: Go ahead.

MS. LINDAUER: Okay.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Nambiar, I'm going to go back sort of in the same order that counsel asked you questions. So I'm going to go back to some of your earlier testimony this morning. And --

THE COURT: Oh, Ms. Lindauer, I apologize.

MS. LINDAUER: Sure.

THE COURT: Just to let everybody know, we do need to stop at 12:30, so just -- that's just for your information. Go

ahead.

MS. LINDAUER: I appreciate that, Your Honor, and I'm going to work towards that deadline.

BY MS. LINDAUER:

Q Mr. Nambiar, again, I kind of want to go back. Mr. Kane opened up a lot of issues that we had not covered on the direct, so I'm going to go back and ask you a few questions about those things. First of all, Mr. Nambiar, you were mentioning that at this point and time you had some issues because you claimed that because you haven't been paid off that you have suffered some damages. Is that correct?

A Well, yes. We are suffering damages currently.

Q Okay. Since May 31, 2022, have you ever discussed with the debtor paying off the amount that's due to HNGH?

A We've been in Court since then --

MR. KANE: Object to the extent it calls for a disclosure of FRE408 settlement negotiations.

MS. LINDAUER: You're not -- Your Honor, I'm not asking for anything with regard to settlement negotiations.

MR. KANE: So that question is then couched outside of the scope of settlement negotiations, correct?

MS. LINDAUER: Correct.

BY MS. LINDAUER:

Q You want me to ask the question again? I think we might have lost it.

A I think I remember, Ms. Lindauer.
Q Okay.
A The answer is we've been in Court since then and it is not my understanding that it was appropriate for us to have any conversations with the debtor in that time.
Q Okay. Okay. And let me ask you, Mr. Nambiar. Why would it not be appropriate for you to make inquiry about whether 299TC [sic] was prepared to pay you off after May 31, 2022?
A 299TC [sic] is the payoff party. They're ready to enter into some settlement discussions, I would imagine that the onus is on them. There's been a default by them.
Q I'm not talking about settlement discussions.
A I think I just I don't --
Q I'm sorry. Answer your question. Answer.
A I don't believe that we have been approached by the debtor in any format that I'm aware of that offered anything other than, you know, some early requests for extensions that we denied.
Q As you sit here today, Mr. Nambiar, on behalf of HNGH, if you are tendered $42 million and some change, are you prepared to accept that payment to be paid off?
A I mean, again I don't -- it sounds like you're offering a settlement. I would need to have that discussion under Rule 408, but, you know, I have been here several times, Ms. Lindauer, for nearly two years. And forgive me for not

believing these -- these claims until the -- so I would need to have these discussions with your party on a confidential settlement basis.

Q Okay. It's not a question of a negotiation or a settlement. On May 31st you were looking on behalf of HNGH to receive roughly $42 million. Is that correct?

MR. KANE: Objection. Misstates facts in evidence.

THE COURT: Sorry. For my benefit, Ms. Lindauer, what was the question again?

MS. LINDAUER: Okay. Your Honor, as of May 31, 2022, you were looking to receive a payoff of just a little over $40 million. Is that correct?

THE COURT: So what -- is there still an objection to that question, Mr. Kane?

MR. KANE: Yeah. It's the wrong number too. I mean, just -- can we just call it the payoff amount? I mean, it's -- unless Joyce objects, I think I can say it on the record. I mean, it's been discussed ad nauseam.

MS. LINDAUER: I can -- yeah. I think the amount, Your Honor, and I'm not asking him for an exact number. I'm just asking him that he was expecting to receive on May 31st a payoff from 299TC [sic]. Is that correct?

THE WITNESS: Yes. Of course.

BY MS. LINDAUER:

Q Thanks. And since May 31, 2022, is HNGH still looking to

be paid off?
A No. Since there's been a default on May 31st, HNGH is looking to exercise the remedies under the prior agreed order.
Q And what is your understanding of those remedies?
A The remedies would be we would get title to our collateral and we would go monetize that collateral to get paid off.
Q And at that point, the debtor would have forfeited all of the payments that were made to you over the last six months. Is that correct?
A Yeah. You know, in general, when a loan is made, there is a cost --
MS. LINDAUER: Objection. Non-responsive. That's a yes, no question.
THE WITNESS: It would have forfeited the market payment.
MS. LINDAUER: Your Honor, objection. Non-responsive.
THE COURT: Mr. Nambiar, since I didn't immediately rule on the objection --
THE WITNESS: Sorry, Your Honor.
THE COURT: -- sometimes I will give the other counsel time to respond. If I think it's an easy one, I'll just answer.
Mr. Kane, what was your response to the objection?
MR. KANE: Yeah. Your Honor, I think that the term,

forfeited, calls for a little clarification, which I think Mr. Nambiar is trying to provide.

THE COURT: So I'll --

MR. KANE: It's not just the money disappears. I mean, there was an exchange of consideration.

MS. LINDAUER: Well, Your Honor, I appreciate Mr. Kane's answering for his client, but again, if Mr. Nambiar didn't understand the question, then he could have said, I don't understand the question. It was a simple yes no question. Would the monies that have been paid in the last six months by 299TC [sic] be -- okay. I'll put it a different way. Would they be lost or subject to being recovered?

THE COURT: So are you withdrawing your prior objection? And ask him -- you're -- it looks like you're asking a different question. Is that --

MS. LINDAUER: I'm asking a slightly different question since apparently there was some confusion over the word forfeited.

THE COURT: So re-ask your question again please for my benefit.

MS. LINDAUER: I can ask it even simpler.

BY MS. LINDAUER:

Q Mr. Nambiar, what happens to all the money that has been paid to HNGH over the last six months at this point and time?

A That was the cost of capital for 18 months that this

debtor has held up the lender's remedies.

Q Okay.

A It was just purely interest.

Q All right. So let me be clear. The payments made over the last six months cover the cost of capital for the last 18 months of HNGH's relationship with 2999TC. Is that correct?

A Those were extension payments that were characterized as such in those settlement and agreed orders.

Q Okay.

A -- from an accounting standpoint. From my standpoint, the question you're asking is were the monies lost. From an accounting standpoint, what I'm telling you is those monies apply to a contract note rate that we entered into would still be a significant underpayment to what this lender was owed by the debtor.

Q The $3.5 million that was paid to get an extension to May 31st would only cover your contract note rate. Is that correct?

A You know, again, we were not paid under this. You are trying to isolate payments to a three month window, whereas I am trying to look at what happened to my cost of capital and the contract I had over the life of this loan.

Q Okay. So you, by asking for $3.5 million in the March 2022 order, were trying to recoup your cost of capital over the life of the loan. Is that my understanding?

A I think a part of that was a reduction in principal, but otherwise, yes, from a commercial standpoint, the math that I was doing was to recoup as much of my lost opportunity cost and the delays that have occurred and, you know, quite honestly, the cost of litigation that has occurred.

Q How much of the 3.5 million was reduction in principal?

A I don't recall.

Q All right. And to be clear, the taxes were also paid in connection with the property in February of 2022, correct?

A Yes. It was -- it was the agreed understanding of all parties that the debtor was in possession and that was his obligation.

Q So if you're successful in enforcing the orders before the Court in your favor, you will have been paid by this debtor during the pendency of this bankruptcy roughly $4 million, had your taxes paid, and receive title to the property. Is that correct?

A This was specifically the transaction that the debtor agreed to.

Q I just want to clarify that what you're asking for is those things. Is that right?

A That was the terms of the settlement.

Q Okay. So you complained that you suffered some damages from May 31st forward, yet you just told us that some amount of the 3.5 million would be attributable to a principal reduction

that you would be entitled to retain if you are successful in enforcing the December and March orders. Is that correct?

A Some amount would be, but I'm happy for you to pull the forbearance agreement up one more time and show you that we provided meaningful relief during 2021 on the contract rate itself, suspended default interest even though this was pre-petition, even though the debtor was in default. It's --

MS. LINDAUER: Your Honor, I'm going to object. Non-responsible [sic]. I'm not object -- I'm not asking about pre-petition forbearance agreements. We can get to that. I'm just asking for what he is seeking in these proceedings and what the effect of what he is seeking is to the debtor and the creditors of this bankruptcy estate.

THE COURT: So I'll overrule the objection and allow him to finish his answer and then you can ask him another question.

MS. LINDAUER: Okay. Thank you.

THE WITNESS: And so from the lender's standpoint, the amounts that you're referring to are not just applicable for the period you're applying to. Over the entire forbearance period if you look at the -- the total amount of money collected by this lender versus what the original contract note was and the default rate was, the debtor got a deal. In fact, Mr. Barton himself had told me that I was his cheapest source of capital to continue while he was sourcing capital.

BY MS. LINDAUER:

Q Okay. We can ask Mr. Barton about that. All right. You complained about some lawsuits that had been previously filed. Do you remember that testimony?

A Sure.

Q Okay. Sidney, let's look at Lender's Exhibit 4, Page 12. Drop down a little bit. And I'll represent to you, Mr. Nambiar, this is a Plaintiff's First Amended Complaint filed in the United States District Court for the Northern District of Texas Dallas Division. Scroll up a little bit, Sidney, if you could. Thank you. It's filed by 299TC [sic] Acquisitions and Timothy Barton as Plaintiffs. Do you see that?

A Yes.

THE COURT: Ms. Lindauer, did you say Exhibit 4?

MS. LINDAUER: Your Honor, it's Lender's Exhibit 4, I believe.

THE COURT: Okay. I think it's 3.

MS. LINDAUER: Maybe another copy of it as Exhibit -- no. Exhibit 3, Your Honor, is the adversary complaint.

THE COURT: I'm sorry.

MS. LINDAUER: This is the federal district court complaint.

THE COURT: So I'm looking at lender's exhibits, and my Lender Exhibit Number 4 is a motion to dismiss.

MS. LINDAUER: Okay.

THE COURT: And for sanctions.

MS. LINDAUER: I think --

MR. KANE: Your Honor, it's an attachment.

MS. LINDAUER: I think that's correct, Your Honor. It's an attachment to that motion to dismiss.

THE COURT: Oh, I'm sorry. I'm sorry. Got you. So motion to dismiss, motion for sanctions.

MS. LINDAUER: Right.

THE COURT: And there is an attachment. I got you.

MS. LINDAUER: All right. Very good. Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Nambiar, this is one of the lawsuits that you mentioned to the Court that was filed prior to the filing of the bankruptcy. Is that right?

A Yes, ma'am.

Q Okay. And this is a lawsuit that was filed in federal district court by the debtor, 2999TC Acquisitions against an entity called 2999 Turtle Creek, LLC. Do you see that?

A Yes.

Q Is 2999 Turtle Creek, LLC, a party that you have any interest in?

A No.

Q Okay. It's filed against HNGH Turtle Creek, LLC. Is that a party you have any interest in?

A Yes, ma'am.
Q It's filed against HN Green Hollow Capital Partners, LLC. Is that an entity you have any interest in?
A Not anymore.
Q Okay. It's filed against Madison Realty Capital, LP. Is that an interest you have any -- entity you have any interest in?
A No, ma'am.
Q Filed against Vipin Nambiar. That is you. Is that right?
A Yes, ma'am.
Q Also filed against James Glasgow, Jr. Do you see that?
A Yes.
Q Mark Zegen. Is that right?
A Yes.
Q And Joshua Zegen. Do you see that?
A Yes.
Q So to be clear, Mr. Nambiar, you were not the only Defendant in this federal court lawsuit. Is that right?
A I was not the only Defendant. Correct.
Q And if you look at Page 19 of that lawsuit, it's again Exhibit 4, Page 19 or 80. There's a heading. Can you drop down a little bit further, Sidney? It says Madison sham investment pitch. Do you see that?
A Sure.
Q Okay. You would agree with me, Mr. Nambiar, that there

were claims in this lawsuit that had nothing to do with you. Isn't that correct?

A I mean, the specific paragraph you are referring to references HN Capital Partners, which is my company. So I'm not sure how you'd make that statement.

Q Okay. Well, take a look and see. It says Madison sham investment. You're not part of Madison, are you?

MR. KANE: Your Honor, objection. This is showing an incomplete portion. If you'll scroll down, this paragraph continues and references Mr. Nambiar about a half dozen times in the next three lines.

MS. LINDAUER: Okay. Well, we'll get -- we can get to that, Your Honor.

BY MS. LINDAUER:

Q Okay. Again, these facts are facts. Madison sham investment pitch. Do you see that?

A Uh-huh.

Q And there were claims being made against Madison as part of this lawsuit. I'm sorry. And I'll get the correct name. Madison Realty Capital, LP. Is that right?

A Yes.

Q Okay. The mentions of you on the next page refer to some emails and other things that were going back and forth with regard to certain transactions. Is that right?

A I haven't read this lawsuit in a long time, Ms. Lindauer.

Q Okay. Right.
A But I'm assuming that your description is accurate.
Q Okay. And I don't want to spend a whole lot of time on this, but I wanted to be clear that. Let's go to Page 37 of 80. These are the causes of action. The first one is misappropriation of trade secrets under the Defense of Trade Secrets Act. Do you see that?
A Uh-huh.
Q Okay. Can you take a look at Paragraph D on Page 41? That's a count that does include you for fraud. Do you see that?
A Sure.
Q Okay.
A And I'm sorry. Who did you say the misappropriate of trade secrets?
Q I think it was against all defendants.
A Yes. So that included me, correct?
Q Correct.
A Yes.
Q And ultimately, this particular lawsuit that we're looking at here was resolved. Is that right?
A Yeah. It was dissolved and I think it was dismissed with prejudice.
Q Okay. And that would include any claims against you. Is that right?

A Yes.
Q Yeah.
A In this particular lawsuit, that's correct.
Q Take a look if we could at Page 59 of 80. That's a document called Agreed Final Judgment. Do you see that?
A Uh-huh. Yeah.
Q The Plaintiffs and the Green Hollow defendants. And the Green Hollow defendants would be your parties, HNGH, Green Hollow Capital Partners, and Vipin Nambiar and James Glasgow. Is that right?
A Yes, ma'am.
Q And this was signed off on January 10th of -- next page -- 2021, correct?
A That's my recollection. Yes, ma'am.
Q Okay. If we look at the next document, Page 62 of 80, that's a forbearance and payoff agreement. Is that right?
A Yes, ma'am.
Q Okay. And the date on that document is March 1, 2021. Is that right?
A Yes.
Q Okay. So that's about two months after the federal court lawsuit was dismissed by agreement. Do you see that?
A Yes, ma'am.
Q Was part of the consideration for the dismissal of the federal lawsuit this forbearance and payoff agreement?

A I mean, given that -- that the timeline, I don't recall exactly how the events played out then, Ms. Lindauer, but, you know, since the beginning of January, you know, I had been approached by Mr. Barton through a common friend. And the general discussion was, you know, I need a little bit of time to get this payoff done. I don't believe you're trying to steal my property. Would you enter into a forbearance agreement? I said, you know, we would. We would consider giving him some time and, but, you know, I'm not going to have that discussion, you know, with this, you know, essentially nonsense lawsuit hanging over my head. And that lawsuit was dismissed and the specific consideration that was required in this forbearance agreement was a release from the debtor that they would not bring such preposterous claims in the future. That was, I think, in this forbearance agreement.

Q So the forbearance agreement says that the debtor will not bring preposterous claims in the future. Is that your understanding of the wording of this agreement?

A It says that they would, you know, release me and the HN parties from these types of claims. My characterization of those is they're preposterous because they're just based on falsehoods.

Q Okay. All right. Let's take a look, if we could, at this forbearance and payoff agreement, the first page. And if you'll drop down with me to the Subparagraph G under the

recitals, there is a reference to the JMJ parties have dismissed with prejudice a lawsuit against various parties. And if you read on, only against the defendants HNGH, Green Hollow, Vipin, and James Glasgow. Is that the federal court lawsuit we just looked at?
A Yes.
Q So as a culmination of the federal court lawsuit there was a forbearance agreement reached between the parties. Is that my understanding?
A Yes, ma'am. It was a pure commercial demonstration from me to the debtor that I wanted them to find a way to be successful, raise the capital, and pay us off in January of 2021.
Q Okay. If we look at Page 65 of 80 of this forbearance agreement, and again, we're on Exhibit 4 of the lender's exhibits. And we go to Paragraph 9. There is a mention there of a document called a deed in lieu. Do you see that?
A Yes, ma'am.
Q Okay. Is this the genesis of the deed in lieu document that we've been looking at in connection with the bankruptcy dated October 29, 2021?
A Yes, ma'am.
Q So to be clear, as part of this agreement, the debtor delivered to you and your company a deed in lieu as part of this forbearance agreement. Is that my understanding?

A Yes, ma'am.

Q If we look at Page 74 of 80, this is a document called special warranty deed. It shows form of deed. Do you see that?

A Yes.

Q Okay. And if we go to the next page, does it show that it's dated March 1, 2021?

A Yes. That's what I see.

Q And it's signed off on by Mr. Barton.

A Yes.

Q And just for clarity, who drafted the forbearance and payoff agreement if you know?

A It was a -- it was negotiated between Mr. Barton's counsel and Wick Phillips acting as our counsel, as HN's counsel. And, you know, I can't recall exactly. Mr. Barton had several counsel coming in and out of this matter, so I can't recall exactly who it was who held the pen on the initial draft who, but those were the parties involved in drafting and negotiating.

Q All right. And if we look at Page 73 of 80 of Exhibit 4, this is actually going up, Sidney, back. Okay. This is the signature page for the forbearance agreement.

A Okay.

Q And it shows that as lender, HNGH Turtle Creek, LLC, a Delaware limited liability company. Do you see that?

A Yes, ma'am.
Q And you would tell us that's a correct statement of the entity, HNGH Turtle Creek, LLC, correct?
A Yes, ma'am.
Q And this is signed as Mr. Glasgow as manager of HN Green Hollow Capital Partners, LLC, right?
A Yes, ma'am.
Q Okay. Now then we flip to the attachment, the special warranty deed. Do you see that's where an error occurs because it shows HNGH Turtle Creek, a Texas limited liability company. Do you see that?
A Yes, ma'am.
Q Okay. So that error originated in this original document that was attached to the forbearance agreement, right?
A Yes, ma'am.
Q Okay. And as you sit here today, you said that the scriveners of these documents were Wick Phillips, I believe, and some counsel for 2999TC Acquisitions. Is that right?
A Yeah. I recall it being a gentleman called Vance McMurry.
Q Okay.
A Acting on behalf of Mr. Barton and 299 Turtle Creek. And it was, I believe Mr. McMurry might have actually been the one to hold this deed in the interim initially before it was delivered to a title company.
Q And were you specifically involved in that transaction,

the holding of the deed?
A I was not involved in holding the deed. Like I said, the deed was -- initially the custodian was Mr. Barton's attorney, Vance McMurry, I believe. And then he ultimately delivered it to a title company and we were able to get a title company to agree to take possession.
Q If we look at Exhibit 4, Page 77 of 80, there is a reference to an escrow agreement in Exhibit B -- C attached. Do you see that?
A Uh-huh. Yeah.
Q And you would agree with me though if we turn the next page there's no copy of that escrow agreement, is there?
A Yeah. I don't see it in the PDF that you're showing me.
Q Okay. Was there an actual escrow agreement signed as part of the forbearance agreement?
A I don't recall if it was done as part of the forbearance agreement, Ms. Lindauer. I recall there being an issue with getting an escrow agent because the escrow agent that the lender proposed, Mr. Barton, if I'm remembering correctly, objected to them, said he was adverse to that title company with that escrow agent. And so we had to scramble to find a different escrow agent, which we ultimately did.
Q And who was the ultimate escrow agent you found?
A Yeah. I recall it being Old Republic Title.
Q And Old Republic Title ultimately was the title company, I

believe in New York, if I'm remembering correctly, that was holding the original in the deed in lieu. Is that right?

A Yes, ma'am. Mr. McMurry delivered Mr. Barton's attorney, Vance McMurry, delivered the deed in lieu to Old Republic.

Q Okay. If you take a look at, this again would be Lender's Exhibit 3, Mr. Kane asked you again about certain litigation. This was a lawsuit filed by 2999TC Acquisitions against HNGH Turtle Creek, Vipin Nambiar, and Green Hollow Capital Partners, LLC. I'm sorry. HNGH Green Hollow Capital Partners, LLC. Do you see that?

A I do.

Q And the title of this adversary proceeding is complaint to avoid and recover preferential and or fraudulent transfer pursuant to 11 U.S.C. Sections 548 and 550. Do you see that?

A Yes, ma'am.

Q Now you mentioned that some of the provisions in this lawsuit were similar to provisions that you had previously seen in the federal court lawsuit. Is that correct?

A I recall that there was similar assertions. I don't know if they were specific cause of actions in this adversarial, but the same narrative was repeated again.

Q Okay. Could you take a -- okay. Well, the same narrative was repeated as to the factual background. Is that correct?

A Yeah. On fraud and sham, I mean, those types of narratives were repeated here, yes.

Q Okay. Let's take a look if we could at Exhibit 3 again, Lender's Exhibit 3, Page 10 of 16. If we drop down to claims for relief. You would agree with me, Mr. Nambiar, that avoidance of a preference for transfer 11 U.S.C. Section 547 was not a claim that had been previously asserted by 2999TC Acquisitions against you or any of your companies. Is that correct?

A Yes. That specific one was not because we had not --

Q Okay.

A -- exercised this remedy.

Q Okay. Page 12 of 16. The count for avoidance of fraudulent conveyance, 11 U.S.C. Sections 548(a)(1)(B), is that a claim that had been previously asserted?

A No, ma'am.

Q Page 13 of 16. Recovery of voided transfers, 11 U.S.C. Section 550, is that a claim that had been previously asserted?

A No, ma'am.

Q Count 4. Disallowance of claims under Section 502(d) and (j), is that a claim that had been previously asserted?

A I'm actually not familiar with what claims this is referencing.

Q Sure.

A So I'm not sure I can answer that for you, Ms. Lindauer.

Q Right. If we look at Count 5, this is a claim for fraud by non-disclosure against HNGH, Nambiar, and HN Green Hollow

Capital Partners, LLC. Had that claim previously been asserted as it related to the facts in this particular matter?

A I believe it was.

Q Okay. But take a look at Count 6, fraudulent inducement on the next page. Had a claim of fraudulent inducement been made against you and HNGH previously?

A I believe so.

Q This is fraudulent inducement in connection with the forbearance agreement. It would be difficult to assert that claim as part of the forbearance agreement when the prior lawsuit did not include the forbearance agreement. You would agree with me, Mr. Nambiar, right?

A Yeah. I apologize. Let me rephrase. A fraudulent inducement type claim was made against me, HNGH, and other parties that related to the loan itself previously. So I was just referencing the fact that that claim had been made previously for giving this debtor money for acquiring the property and then subsequently for giving this debtor relief from a maturity default.

Q Okay. So, but this specific claim relates to the forbearance agreement, correct? If you look at Paragraph 57.

A Yeah. I mean, I trust your read of this, Ms. Lindauer, so.

Q All right. Now this particular lawsuit, adversary proceeding, was filed on or about November -- I believe it was

actually filed -- hang on. Yeah. November 11, 2021. That was about a week to ten days after the bankruptcy case was filed. Is that your understanding?

A Yes, ma'am.

Q And you understand, Mr. Nambiar, that there was substantial dispute when the deed in lieu was recorded by HNGH Turtle Creek, LLC. Is that right?

A Yes. That's why we're here.

Q Okay. And after the bankruptcy case was filed, 299TC [sic] Acquisitions sought to recover the property that had been the subject of the deed in lieu. Is that right?

A Yes, ma'am.

Q And the parties agreed to a series of orders that we spent some time looking at to resolve this complaint as well as other motions that had been filed by your counsel. Is that right?

A Yes, ma'am.

Q Okay. Now, Mr. Nambiar, you made some issues about Mr. Barton being aware of Happy State Bank's position with regard to the note and lien. Do you remember those questions that you've been -- were asked?

A Sure.

Q And you told us that part of your efforts were to allow a person named Matt Fleeger to have access to discuss Happy State Bank's note and lien. Is that right?

A Yes, ma'am.

Q Okay. Do you know sitting here today, Mr. Nambiar, if Mr. Fleeger also spoke with your counsel, Mr. Kane?

A I don't know that that happened.

Q You are aware though, Mr. Nambiar, that there was some information being disseminated that Happy State Bank had nothing to do with the note and lien just prior to the closing. Is that right?

MR. KANE: Objection. Assumes facts not in evidence or misstates facts in evidence.

MS. LINDAUER: Your Honor, let me ask the question a different way.

BY MS. LINDAUER:

Q Mr. Nambiar, did anyone on behalf of HNGH Turtle Creek provide information to its counsel that would indicate that Happy State Bank's note had been paid off?

A No.

Q Do you have any understanding of why Mr. Kane would tell Mr. Walji and others that Happy State Bank was not involved in this transaction?

A Yes. Because the way that our loan documents with Happy State Bank work is that as long as we are currently in our loan with Happy State Bank, which we were. We have significant term and duration. We have all rights to effectuate a transaction of this nature with the debtor. We are the effective owners of the note. Happy State is simply a creditor of the chain. And

on our instructions they had an obligation to perform to effectuate the payoff, which they did. And so, you know, from our standpoint, as a practical matter, we had to simply deliver instructions, but Happy State Bank was not an active party that had the ability to determine if a payoff would occur or not.

Q All right. And let's go back to your comments about -- you said Mr. Barton received some of the mail related to Happy State Bank that was addressed to HNGH. Is that right?

A Yes, ma'am.

Q Okay. When was the last time Mr. Barton received any mail that was addressed to HNGH?

A I don't remember the last time, but as soon as he informed me and handed me the interest invoice, I informed Happy State and got the issue corrected.

Q Okay. Is that more than a year ago?

A I don't know. I don't recall, Ms. Lindauer, honestly.

Q Well, but it wasn't last week, right?

A It wasn't last week.

Q Okay. Was it last month?

A No.

Q Was it before the bankruptcy was filed?

A It likely was before the bankruptcy was filed because I haven't had much interaction with Mr. Barton since.

Q You testified that in your experience -- I wrote down in the private equity world -- that you believe it takes anywhere

from 60 days or longer to close loans that would be similar to the type that 299TC [sic] Acquisitions would be receiving in order for it to pay off HNGH. Is that correct?
A I said it would be approximately 60 days.
Q Okay.
A But I was specifically referring to my experience with Happy State and Mr. Fleeger as a source of capital looking to Happy State to be their lender, you know, ten days prior to the closing date.
Q Okay. So just to be clear, your testimony on that point was limited to the Fleeger relationship. Is that right?
A That was the line of questioning that I received from Mr. Kane. I'm also happy to testify that in my experience from term sheet to closing, you know, generally in the loans that I'm involved in, it -- it takes about 60 days.
Q Okay. And do you know how long Mr. Barton had been working on the loan to pay off HNGH?
A I mean, I am hopeful that he had been working on it since day one on December 10th. The issue is not that he was not working on it. The issue is that he wasn't successful.
Q How do you know he wasn't successful?
A Because the payoff didn't occur.
Q Okay. And you understand, Mr. Nambiar, that there are all kinds of reasons this payoff didn't occur, don't you?
A Well, I mean, I understand the assertions that are being

made. I don't necessarily agree with them.

Q Okay. Let me ask you. Would you have loaned $40 million to anyone? You're in this business. Would you have loaned $40 million to anyone with the title issues that were outstanding on May 31st?

A Yeah. I think we specifically wanted to ensure that that line of questioning was property investigated. I think we have enough clarity and I believe Mr. Marx might have testified to this, you know, the --

MS. LINDAUER: Your Honor, I'm going to object. Non-responsive. He's going into the weeds. The question was very simple. Knowing the -- I'm sorry, Your Honor. I'll let him respond.

THE COURT: Why don't you -- honestly, I didn't understand the question myself. Will you mind asking the question?

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Nambiar, we've spent the greater part of two weeks with various witnesses including you going over all of the errors, mistakes, lack of documentation on May 31st. And my question to you is with all of that paperwork, errors in the names of your own companies in front of you, you're sitting here today telling me that HNGH would have loaned $40 million to a borrower looking at the state of title on May 31st. Is

that correct?

A Well, I mean, HNGH or a lender is not in the business of providing title. And so the question would have been is a title company, based on what HNGH provided, willing to write an insurance policy. And my understanding is Sendera was based on the document we provided --

MS. LINDAUER: Objection. Non-responsive. The question was as a lender, not as a title company.

THE WITNESS: As a lender, I would be looking --

MS. LINDAUER: As a lender.

THE COURT: No, Mr. Nambiar, Mr. Nambiar, so there's an objection pending.

Mr. Kane, what's your response?

MR. KANE: I think Mr. Nambiar's response was responsive, first of all, so I'll just kind of leave it at that.

THE COURT: Ms. Lindauer, he appeared to be responding to your question, so I'm going to let him finish his answer. And then if you want to follow up with another question, you may.

MS. LINDAUER: I will, Your Honor. Thank you.

THE WITNESS: Yeah. If I was the lender on the other side, Ms. Lindauer, I would be looking to a title company to provide a good title policy, a lender's policy, that I would sign off on with, you know, in a form that was acceptable. And

my understanding is that, you know, Sendera ultimately confirmed through their underwriting attorney that they were willing to provide a title policy or a lender's policy for this closing. And with that, I would have been comfortable if I was comfortable with the credit and the sponsorship closing a loan. It wasn't a title issue.

I think illustrative to this point is I was interested when a subsequent motion was filed by the debtor on what items it would require while these hearings have been going on for a closing to occur. And that list was significantly truncated from the large list of issues that you all pointed out in the Schedule C. So, you know, they were much more reasonable and I think items that we were ready with, had provided, or indicated we were ready to provide.

BY MS. LINDAUER:

Q Okay. And to be clear, the items that you were ready to provide or had in your hands to provide were, in fact, never provided, correct?

MR. KANE: Objection. Misstates facts in evidence.

MS. LINDAUER: Well, let me go back through it again. You said --

THE COURT: So I'm going to overrule the objection, but note that we have two minutes.

BY MS. LINDAUER:

Q Okay. So I think you can answer the question, Mr.

Nambiar.

A My understanding is that they were only not provided after either we were told to go pencils down or after an inquiry was made on where to provide them and no responses were received.

THE COURT: Ms. Lindauer, I think this is a good breaking point because we are -- we have to recess.

MS. LINDAUER: And, Your Honor, I'm sorry this is taking a little longer. I hadn't anticipated the -- quite the extensive line of cross.

THE COURT: That's okay. I want you to make sure you have enough time for your questions. So I'm not cutting you off. I'm just -- for today, I'm cutting you off, but we will continue the hearing.

MS. LINDAUER: I understand, Your Honor.

THE COURT: I think I had penciled in tomorrow starting at 2:00. Is that everybody's understanding?

MR. KANE: Mr. Nambiar, do you have any availability tomorrow at 2:00? And I apologize, Your Honor. I certainly didn't anticipate that Mr. Nambiar would be on the stand for both the Monday and Tuesday session.

THE WITNESS: I'm available tomorrow morning. I can be available for an hour at 2:00 p.m. tomorrow.

MR. KANE: Okay.

THE WITNESS: But I would have a hard stop at 3:00.

THE COURT: All right. We'll plan on -- Mr. Nambiar,

I believe, based on what I've heard so far, that we should be able to get you finished between 2:00 and 3:00. If not, we'll play it by ear, but I'm guessing we're getting closer to your conclusion. So we'll recess until tomorrow at 2:00.

MS. LINDAUER: Very good. Thank you, Your Honor.

(Proceedings concluded at 12:30 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, CRYSTAL THOMAS, and MICHELLE ROGAN, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Crystal Thomas

CRYSTAL THOMAS, CET-654

/s/ Michelle Rogan

MICHELLE ROGAN

LIBERTY TRANSCRIPTS DATE: June 30, 2022