IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Wednesday, June 29, 2022<br>2:17 P.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE THE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For the Debtor: | Joyce Lindauer Attorney, PLLC<br>BY: JOYCE LINDAUER, ESQ.<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| | Robin Phelan Law<br>BY: ROBIN ERIC PHELAN, ESQ.<br>4214 Woodfin Drive<br>Dallas, TX 75220 |
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |

APPEARANCES CONTINUED ON NEXT PAGE.

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES VIA WEBEX (CONTINUED):

| | |
|---|---|
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |
| For the United States Trustee: | Office of the United States Trustee<br>BY: ASHER BUBLICK, ESQ.<br>1100 Commerce Street<br>Room 976<br>Dallas, Texas 75202 |

# I N D E X


| | Page |
|---|---|
| Case called | 4 |
| End of Proceedings | 134 |
| Certification of Transcriber | 135 |

WITNESSES

FOR THE DEBTOR:

VIPIN NAMBIAR

| | |
|---|---|
| Redirect Examination (Resumed) by Ms. Lindauer | 8 |

MARSHAL DOOLEY

| | |
|---|---|
| Direct Examination by Ms. Lindauer | 73 |
| Voir Dire Examination by Mr. Kane | 109 |
| Direct Examination Continued by Ms. Lindauer | 110 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 2:17 p.m.)

THE COURT: -- Acquisition.

I'll take appearances, please.

MS. LINDAUER: Your Honor, Joyce Lindauer on behalf of 2999TC Acquisitions, the reorganized debtor.

MR. PHELAN: Your Honor, Robin Phelan also for the reorganized debtor.

THE COURT: Your Honor, Mr. Kane on behalf of HNGH Turtle Creek, LLC, the pre-petition lender.

MR. METZGER: (Indiscernible).

MR. BUBLICK: Your Honor, Asher Bublick on -- excuse me.

MR. METZGER: Excuse me.

MR. BUBLICK: Asher Bublick on behalf of the United States Trustee.

MR. METZGER: Your Honor, Steve Metzger representing Tim Barton individually.

THE COURT: Good afternoon, everybody.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: Give me just a minute. I have to close all the stuff I had open for that case. So bear with me just a minute.

Ms. Lindauer, you're not expecting any more appearances from other co-counsel?

MS. LINDAUER: I don't believe so, Your Honor. I

think this is everybody right now.

THE COURT: Okay. Any housekeeping matters before we pick up where we left off?

MS. LINDAUER: Your Honor, the only thing I think that may show up on the Court's docket is is that we did file this afternoon a declaration of Randy Marx. I know no one's probably had an opportunity to really look at that, but I did want to note that it does appear on the docket.

We may spend a little more time talking about that after everyone has a chance to review and read it, but I did want to alert the Court that Mr. Marx did prepare a declaration and ask that we file it, which we have done. So I did want to bring that to the Court's attention.

THE COURT: Okay. I have not read it yet.

MS. LINDAUER: I'm not asking --

THE COURT: I have not read that yet, honestly.

MS. LINDAUER: Yeah. And I'm sure nobody's -- I mean it was just recently filed, I believe.

THE COURT: Okay. Mr. Kane, any housekeeping items?

MR. KANE: I haven't read that either. Not entirely sure why we would have a fact witness issue a declaration after hours of testimony and cross and rehabilitation. But we can address that when it's time to address that.

THE COURT: Okay.

MR. KANE: I do have --

THE COURT: Ms. Lindauer, just out of curiosity, can you give me a ten-second summary of what that declaration says and why was it filed today?

MS. LINDAUER: Your Honor, my understanding having just briefly reviewed it before it was filed was that Mr. Marx was able to obtain a copy of his testimony from the Court, and after reviewing his testimony, I guess he had some concerns about what he had testified about and asked that he be allowed to file something with the Court to address -- not unlike you would do in a deposition, to address some statements that he made that he thought needed further clarification.

So that was filed specifically at the request of Mr. Marx who said that he would be happy to come testify to the Court as to why he requested that that be filed. But it was specifically filed at his request.

THE COURT: Okay.

MR. KANE: Your Honor, we would move to strike that. Mr. Marx had an opportunity to be rehabilitated by debtor's counsel. He sat on the stand for rehabilitation for an extended period of time after my cross-examination. He has been released as a witness, and any further testimony, especially through declaration in a written form with attachments is inappropriate.

MS. LINDAUER: Your Honor, I think we would still have the right to call him as a rebuttal witness any testimony

that's being presented by, for example, Mr. Nambiar.

But in any event, it's a housekeeping matter. It's not before the Court today. If Mr. Kane wants to file a motion to strike it, I assume the Court can take that up in due order. The Court simply asked what things were -- that we were aware of, and that's all I was doing is advising the Court that I was aware of that.

So, Your Honor, I think -- I'm not asking to take it up today. I'm not asking to have the Court rule on it. I'm just --

THE COURT: Okay.

MS. LINDAUER: -- alerting the Court.

THE COURT: For today -- I understand. So for today, I'm not directing anybody to file anything like a motion to strike. Right now I'm not considering it because I haven't even read it. So -- but that was helpful. I was just curious what it was, and now I know what it was.

MS. LINDAUER: Okay.

THE COURT: So when we left yesterday, I believe Mr. Nambiar was still testifying. Correct?

MS. LINDAUER: That's my understanding, Your Honor. That's how we left off.

MR. KANE: And, Your Honor, just as the last little bit of housekeeping, if you recall, Mr Nambiar is --

THE COURT: Three o'clock drop dead, right?

MR. KANE: Yes, the three o'clock drop dead for Mr. Nambiar. That's correct.

THE COURT: Very good. So let's go ahead, then. Thank you.

MS. LINDAUER: Thank you, Your Honor.

VIPIN NAMBIAR, DEBTOR'S WITNESS, PREVIOUSLY SWORN

REDIRECT EXAMINATION (RESUMED)

BY MS. LINDAUER:

Q Mr. Nambiar, you realize that you're still sworn and under oath from the hearings yesterday. Correct?

A Yes, ma'am.

Q Okay. Mr. Nambiar --

MS. LINDAUER: Sydney, can you pull up the HN Capital's information?

Okay.

BY MS. LINDAUER:

Q Mr. Nambiar, HN Capital Partners, LLC, is that a publicly-traded company?

A No, ma'am.

Q Is it a private company?

A It is.

Q Does it do any type of reporting with any governmental organizations?

A It is an exempt registered advisor in Texas, and so it voluntarily files what you've pulled up which is a Form 80-V.

Q And we did pull up the Form 80-V after you testified yesterday that the information regarding ownership of this company was confidential. Do you remember that testimony?
A Sure. I -- I -- I do, yes.
Q Okay. You would agree with me, though, that this is a public filing that's readily available that can be pulled up that does include information regarding the ownership of HN Capital Partners, LLC. Is that correct?
A So you are confused.
You asked me about the ownership of HNGH Turtle Creek and who the members were there. That is what I responded was confidential. What you're pulling up is the 80-V of the manager, HN Capital Partners.
Q And just to be clear, the manage, HN Capital Partners, what percentage does it own of HNGH Turtle Creek?
A I think I've already testified that we do not disclose ownership percentages with our private funds.
MR. KANE: An objection to relevance to this hearing.
MS. LINDAUER: Your Honor, I think it is relevant because there are issues, and as the Court has seen, regarding authority (indiscernible) proffer parties are to authorize certain actions, certain signing of documents. So I do think it does become relevant to how the documents were prepared, whose names appeared on them, and how they were structured.
Moreover, because Mr. Kane went into all of these

lawsuits yesterday with Mr. Nambiar and the parties to those lawsuits, again, I think that brings up the issue of the relationship of the parties that do appear as defendants in certain of those lawsuits.

So I do think it has become relevant through Mr. Nambiar's testimony.

MR. KANE: I don't understand --

THE COURT: Let me ask, those lawsuits I understand were covered as kind of background information. You haven't convinced me yet that this specific document really is relevant to the issue of signing documents and having the proper party on the documents, the Texas versus Delaware issue.

So before I go to Mr. Kane, help me understand that, Ms. Lindauer, because I'm not seeing the relevance.

MS. LINDAUER: Your Honor, and maybe I should ask Mr. Nambiar just a follow-up question regarding the relationship --

THE COURT: we have a pending objection. Are you withdrawing --

MS. LINDAUER: Sure.

THE COURT: -- your question?

MS. LINDAUER: I'm withdrawing the question, and I'll restate the question to a different question.

THE COURT: Okay.

BY MS. LINDAUER:

Q Mr. Nambiar, so I understand, HN Capital Partners, LLC, I

think you've told us is a manager of HNGH Turtle Creek. Is that correct?
A Yes, ma'am.
Q Is it the entity that would have authority to sign documents on behalf of HNGH Turtle Creek at this time?
A Yes, ma'am.
Q Are there any other persons or entities that would have authority to sign on behalf of HNGH Turtle Creek at this time?
A No, ma'am.
Q All right. So to be clear, HN Capital Partners is the authorized entity that would, for example, execute as a manager a deed for document related to HNGH as it relates to these proceedings. Is that correct?
A That's my understanding, yes.
Q Okay. All right.
And the structure, just to be clear, of HN Capital Partners, LLC, is set forth in this Form 80-V that we're looking at. Is that right?
A This is a stale Form 80-V. Obviously, it's not current. But, yeah, I think the -- the upstream ownership of the manager is disclosed in the Form 80-V.
Q And to be clear, HN Capital Partners, who would be the actual individual who would sign on behalf of that entity?
A There are officers of HN Capital Partners of which I am one, so I would be authorized.

Q All right. And just to be clear, your Nambiar Family Holdings and related entities have an interest in HN Capital Partners. Is that right?
A Yes, ma'am.
Q As does Hunt HN, LLC, and related various Hunt parties, as well. Correct?
A In the manager, yes.
Q Okay. Now you spent a great deal of time talking to us about there being an advisory committee to HNGH Turtle Creek. Do you recall that testimony?
A Or investment -- yeah, sure. Yes.
Q All right. And are you a party or member of the advisory committee for HNGH?
A Absolutely, yes.
Q All right. Let's go back if we could for a moment.
When HNGH became a participant in the Madison loan, were you actually involved in that party of the transaction?
A Yes, ma'am.
Q Okay. So you have some familiarity with those particular documents. Is that right?
A They are from 2019, so my memory on them is stale. But I was involved at the time, yes.
Q Okay. All right. And originally, HNGH had a minority ownership interest in the Madison loan. Is that right?
A I don't believe that that's how I would characterize it.

It was a structured transaction. I think you've highlighted that here before. The -- the participation essentially took some first-loss type dynamics with Madison and so, you know, the percentage exposure would not -- would not I don't think be -- be relevant in the way that you're describing it.

Q So let's break down what you just told us briefly so I can understand it better.

Okay. Did HNGH and Madison get into a dispute over their participation in this particular loan?

A No, ma'am.

Q So there was no dispute?

A No, not to my knowledge.

Q Okay. And did HNGH have any springing rights in its relationship with Madison?

A I don't know that there were any springing rights. They had rights pursuant to the participation agreement. I don't think they were springing on any particular event. I can't -- I don't remember that to be true.

Q Well, where I'm going with that is --

A Yeah.

Q -- is was there a dispute over not necessarily Madison but an issue regarding tax payments or taxes that were due to be paid?

A I don't recall.

Q Do you know at the time that you acquired -- when I say

you, I'm sorry, I should say HNGH, acquired the loan, 100 percent of the loan from Madison that there were monies being held in an interest -- in a reserve for taxes. Do you recall that?

A I do not.

MR. KANE: Objection; relevance. What does this have anything to do with the closing on May 31st?

MS. LINDAUER: Your Honor, again, it's just background information. But I do think it's helpful to understand, and we'll get to it more in Mr. Barton or other testimony. But just the nature of the relationship and that in fact that there were, at least our understanding was that there were some reserves for taxes that were being held.

The reason that becomes relevant is if you remember the debtor paid off the taxes in 2022 for I think almost a half a million dollars. So if in fact there were tax monies being held in reserve, it would seem to me like that should be an issue that needs to be resolved.

MR. KANE: I mean this is a totally separate issue about whether funds were being held in reserve by Madison on a deal that has waivers and releases at the time of the execution of the forbearance agreement prior to the petition date.

So, again, I'd like to restate my objection on relevance. What does this have to do with the closing on May 31st?

THE COURT: Ms. Lindauer, I'm not -- I heard what you said, but I'm not understanding the relevance. So you want to ask a different question?

MS. LINDAUER: Sure, Your Honor.

THE COURT: So I'll sustain the objection.

BY MS. LINDAUER:

Q All right. And let me just clarify this, Mr. Nambiar. At the time that your company took over the Madison loan, just for the record, were there any reserves that you obtained from Madison, if you know?

A I don't believe we obtained any reserves. That -- I don't recall that to be a conversation at all.

Q Now I'm going to turn to some issues regarding HSBC since that's become an issue here.

THE COURT: Ms. Lindauer, I apologize, I should have asked you this to start. I would like to finish by three. How much longer do you have so that Mr. Kane will have an opportunity for additional questions if needed?

MS. LINDAUER: I would think -- I'll try to be expeditious, but I would think I'm going to need probably right up to close to three. I don't think I'm going to get done any quicker than that.

I did the time. Mr. Kane took about almost two hours, hour and a half, with Mr. --

THE COURT: I was just curious.

MS. LINDAUER: Yeah.

THE COURT: Thank you. Go ahead.

MS. LINDAUER: Okay. You know, I'll try to be expeditious, Your Honor.

BY MS. LINDAUER:

Q Mr. Nambiar, when did you first advise your counsel that HSBC was still involved in this particular transaction?

A I don't -- I don't know that I understand the question.

My counsel and everybody in this transaction understands or did know or understand the org structure of the -- or the capitalization and the org structure of this investment. So I didn't have to inform anybody about anything.

Q Okay. You did hear some prior testimony that Mr. Walji was advised by Mr. Kane that Happy State Bank was no longer part of this transaction in the early part of May of this year. Did you hear that testimony?

A I did hear that, yes.

Q Okay. And I believe Mr. Kane stated on the record several times that that was a misunderstanding of his regarding the involvement of Happy State Bank. Did you hear statements to that effect?

A I don't think so.

Q All right. Is there some reason that Mr. Kane in the first part of May of this year would not have know that Happy State Bank was still involved in this transaction?

A No.

I think it's, as I testified yesterday, it's a -- it was a question of what the practical mechanics and rights of the various parties are. I think my own understanding still is that, you know, HNGH is in control of how this payoff is ultimately handled, and it provided instructions to Happy State Bank.

As long as we are not in default, I don't believe Happy State is an active participant in this transaction. That's -- that's my understanding. That's my testimony that I've already given before. I did hear Mr. Jeff Carruth that represents Happy State I think also testify something similar, but that was my understanding and I'm assuming that that was the spirit of what Mr. Kane communicated to Mr. Walji.

Q Okay. All right. So let me break down what you just told us.

Because HNGH was current on its loan with Happy State Bank and Happy State Bank had no agreement with the debtor, you did not believe Happy State Bank needed to be a participant in this transaction. Is that correct?

A An active participant in the transaction, correct.

Q Okay.

A Whatever releases were required, I think, we procured, and -- and I think our communication to procure the note on receiving a payoff were all on point.

Q So let me be clear we understand this.

It's your position with this Court that HNGH and Happy State Bank, that that relationship between those two parties was separate and apart from any transaction between HNGH and 2999TC Acquisitions. Is that correct?

A They are two separate transactions.

Yes, I think there were releases required. those were being procured and, you know, I know that Mr. Kane was working collaboratively with you all on what -- what -- with you all and the (indiscernible) of what releases were required. But they're -- yeah, they're two separate -- they're two separate obligations.

And, you know, my understanding of the way that the loan documents between HNGH and Happy State works is that HNGH has complete control and authority to -- to conduct this payoff transaction.

Q All right. So based on what you're telling us today, I just want to be clear I understand your testimony, that on May 31st -- all right -- assuming that the money had been sent into the title company by 2999TC Acquisitions --

A Yeah.

Q -- at the time of the payoff, right, then again what would have happened after that?

A Monies would have been released. HNGH would have procured the -- the note from Happy State's safe custody, marked it

paid, and sent it back.
Q And all of that would have happened on May 31st?
A You know, the last time I paid my mortgage, Ms. Lindauer, JPMorgan didn't return, you know, the document -- my note to me like for a week. I don't know that it needed to all happen at the same time. But the lender would have had an obligation to return -- return the note. I don't know what the -- if you're implying that it needed to happen, you know, within a few minutes, it would have happened maybe the following business day.
Q Or maybe the following week. Is that what you're telling us?
A You know --
Q Okay.
A -- I would need to --
Q And the reason I'm asking that is you understood, Mr. Nambiar, that one of the basis for 299TC [sic] Acquisitions to pay you off, to pay off HNGH was to borrow money from a third party. Is that right?
A That -- that may be the case for 299 [sic] Turtle Creek. If not -- you know, obviously, it's not -- it's not something I'm privy to or it's not -- it's not lender's problem.
Q Okay. And as part of borrowing of money from a third party, that third party would have an expectation that the underlying loans -- notes, liens, et cetera -- were in good

order at the time that they advanced their money. Correct?

A Yeah.

They would have -- they would have received confirmation from the title company that the note's been paid off. And we would have a obligation to deliver a physical copy of the paid note. But the obligation, the UCC terminations, all the other documents would have been filed and the title company would have been in receipt of those and would have provided a lender's policy.

Q And as we sit here today, nothing was ever sent to any title company indicating that the note was in the process of being paid off. Is that right?

MR. KANE: Objection; misstates facts in evidence.

MS. LINDAUER: Okay. Your Honor, I'll ask a different question.

THE COURT: Okay.

BY MS. LINDAUER:

Q I just want to be clear, Mr. Nambiar, that on May 31st, 2022, the only document the title company had received from HNGH was that special warranty deed you signed on May 27th. I know I've asked you this before, but is that correct?

A Yeah. Ms. Lindauer, I -- I really was not part of those email communications. I know that lots of documents were going back and forth between Mr. Kane and the title company and Mr. Walji and you. And, you know, I know there were communications

that were occurring that, you know, implied there were additional title companies and more parallel tracks with other partners.

I really don't -- you know, I can't testify since I wasn't a direct party to what all was provided to who.

Q And to be clear, on May 30th or 31st, were you asked by anyone to sign other documents that would have been delivered to the title company?

A Yes. I was -- I was asked to stand by to sign a number of documents. And it wasn't I think until we -- I was told that you had instructed Mr. Kane to go pencils down that I left the office.

Q Okay. Let me ask you, let's break that down.

Which ones were you prepared to sign on May 30th and 31st that were not signed?

A You know, I -- I don't follow a closing binder. I -- I rely on counsel to put those documents together. I was prepared to sign every single document that was reasonably needed to complete a closing.

Q But as you sit here today, those documents were never signed. Is that right? Those additional documents?

A I mean since the closing never occurred, I don't -- you know, there hasn't been a reason to sign anything.

Q Well -- and you're saying that I somehow instructed your counsel to put pens down. Is that right?

A I don't know the exact words that you used but, you know, I'm paraphrasing. I think I was -- I was told that we were informed that a closing was not going to be occurring on May 31st.
Q And were you told why it wasn't going to be closing on May 31st?
A My understanding of why it wasn't going to be closing is because you all had not delivered funds into an escrow.
Q And who advised you that no funds had been delivered into an escrow?
A I was -- I was requesting continuously some evidence that funds had been transferred. And on asking several times, I was told that nothing was provided by the debtor.
Q All right. Can you give me a time on the 31st, Mr. Nambiar, when you left your office?
A Let me pull up my calendar for the 30th.
Q Sure.
A I left at about 5:30 p.m.
Q And approximately when did you have an understanding that pens should be put down?
A I was told I think shortly before that. I don't recall exactly at what time.
Q So shortly before 5:30?
A Yeah.
Q If we could take a look at this is Lender's Exhibit 86.

Have you seen this exhibit before, Mr. Nambiar?
A I can't say that I have.
Q It's an email from John Kane to me regarding wiring instructions for title company. Do you see that?
A I see the email saying that, yes.
Q Okay.

MS. LINDAUER: And if you could scroll down a little bit, Sydney.

BY MS. LINDAUER:
Q Mr. Nambiar, do you see this as Exhibit 86, Page 1 of 1?
A Sure.
Q Do you see that?
A Yes.
Q Okay.

MS. LINDAUER: Go back up, Sydney.

BY MS. LINDAUER:
Q You say -- it says, "Wiring instructions, see attached for funding." There's no attachment to this Document 86. Is that correct, Mr. Nambiar?
A I don't -- I don't know. I don't see how I can tell that by just looking at a PDF.
Q Well, this is --

MR. KANE: Yeah. Objection, Your Honor. Just for -- I mean it does say attachment. I mean there's a document identified on the attachment part of this email.

Ms. Lindauer requested this document from me I believe sometime yesterday. It should have been in her email inbox since it was sent to her with the attachment. I provided her the attachment today. It's in her inbox right now if she'd like to pull it up for the Court.

MS. LINDAUER: Well, Mr. Kane, the reason I asked for that is I did make a search of our emails and I could not find -- first of all, I didn't find this email. But the copy you provided to the Court, for whatever reason, did not include the attachment. So --

THE COURT: Ms. Lindauer, do you have the email that Mr. Kane sent to you yesterday that has --

MS. LINDAUER: If he --

THE COURT: -- I'm understanding --

MS. LINDAUER: -- says --

MR. KANE: I sent it to her today, Your Honor.

THE COURT: Today?

MS. LINDAUER: Okay. What time did you send it to me, John, because I have not seen it. I'm sorry.

MR. KANE: Yeah. I think when we jumped on at 2:00, it triggered my memory that I hadn't sent it. So you should have it in your inbox. It should be pretty close to the top, probably around 2:05, 2:06, something like that.

MS. LINDAUER: Your Honor, I haven't seen it obviously because it's after the hearing started. But --

THE COURT: Do you want to pull them up?

MS. LINDAUER: -- I would be happy to -- yeah.

THE COURT: Why don't you pull it up?

MS. LINDAUER: Why don't we pull it up, Mr. Kane?

MR. KANE: Okay. I'm happy to share my screen if you'd like.

MS. LINDAUER: That's fine. If you've got it, you can share the screen, that would be helpful.

MR. KANE: Yeah, this is the attachment.

MS. LINDAUER: Okay. All right. Can we drop down a little bit?

MR. KANE: Sure. It's just one page.

MS. LINDAUER: Okay. So it's just this one page?

MR. KANE: Yes.

MS. LINDAUER: Okay. All right.

BY MS. LINDAUER:

Q Mr. Nambiar, have you seen this attachment to Mr. Kane's email prior to today?

A Yeah. These are just the instructions for HNGH's account at Frost Bank.

Q Based on the wiring instructions that are attached here, how much money were you expecting to be wired to HNGH on May 31st?

A Depending on how the closing mechanics would have worked, if Happy State received a wire as was provided for the payoff

that they requested, we would have received 40.something million. That was the payoff amount minus 26 million that -- 26.2 million that Happy State was owed.

MS. LINDAUER: Okay. Go back to the first page of that email again.

MR. KANE: You want me to just stop sharing then?

MS. LINDAUER: Sure. Sydney can share it with you. And we're going back to it's Exhibit 86.

BY MS. LINDAUER:

Q Mr. Nambiar, do you see anything in this email that says how much money was supposed to be sent to HNGH on May 31st, 2022 at 3:52 p.m.?

A No. But that's not how these things work. The instructions would have been provided to the title company or the escrow agent on how to split the lender's funds.

Q Okay.

A I'm seeing this as purely, you know, putting the wiring instructions in your inbox, you know, for you to forward along or just to, you know, send those instructions along to you. But to the extent that there would have been a escrow agent that was identified, my guess is that -- not my guess.

I know what we would have done is provided the exact splits of how funds were to be distributed for the lender. For example, we might have chosen to send some of Mr. Kane's outstanding invoices directly to the escrow agent. I mean,

those are things that are customarily done.

Q Okay. And where are those instructions on how these funds were supposed to be split by the title company?

A I think we were asking for who to send those instructions to.

Q Well, you didn't have any problem sending the wiring instructions for the title company to me. Did you send the instructions for the split to me?

A I don't know. That would be a question for Mr. Kane.

Q Did you ever see the instructions for any split of the funds being sent to anyone?

A Again, I think I know that we were looking for the escrow agent who was going to be handling. You know, when I do these types of transactions, buyer's side provides instructions on buyer's side. Seller's side provides instructions for seller's side. And escrow agents, you know, cross funds. We would have been the party to sort of provide those details.

Q Let's take a look at Exhibit, this is a Debtor's Exhibit D7.

THE COURT: Before we go to D7, Ms. Lindauer, I'm looking at the email dated May 31st at 3:52 p.m. that appears to be from Mr. Kane to you. Is there any reason not to have Mr. Kane file a corrected Exhibit 86, Lender's Exhibit 86 that has the attachment?

MS. LINDAUER: No. I think that would be

appropriate, Your Honor.

THE COURT: Does that make sense, Mr. Kane?

MR. KANE: Yeah. I don't believe that's an issue. I May confirm with my client whether they want to have any of the information on the wiring instructions redacted just since it will be a public document. But I don't think that should be an issue.

THE COURT: Yeah, I understand. If you need to redact, I understand that. Okay. Go ahead, Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Looking at Debtor's Exhibit D7, thank you. And we've looked at this before, Mr. Nambiar. This is the payoff statement. Is that right?

A Uh-huh.

Q And this is the Happy Bank payoff statement dated May 31st, 2022. You're familiar with this document?

A Yes.

Q Did you request this payoff statement, or did someone else request it?

A I believe Mr. Kane requested it. Mr. Kane requested it on behalf.

Q Okay. All right. And this payoff statement, who was supposed to actually receive this payoff statement?

A The escrow agent.

Q Do you know if this was ever in fact sent to the escrow agent by anyone?
A I mean, I think I've testified to this before, Ms. Lindauer. My understanding is that, and I saw some email communication where folks from Happy State Bank were asking for instructions of where to send this and a copy of the collateral assignment, release of collateral assignment.
Q Did your attorney ever send this payoff statement to the title company?
A I don't know.
Q You did not send it to the title company. Is that correct?
A I was not handling the mechanics of the closing, as I've testified before.
Q Based on this payoff statement, it was your understanding that roughly 26,297,296.96 was supposed to be wired to Happy State Bank on or about May 31st. Is that right?
A Yes. Simultaneous with the closing.
Q Was it your understanding that a title company was supposed to wire those funds, or that --
A Yes.
Q -- 2999TC Acquisitions was supposed to wire those funds?
A One hundred percent the title company, the escrow agent. The escrow agent is the agent acting in trust of both parties. And that's who would have crossed the funds.

Q Let me ask you, is there any reason -- Mr. Kane was able to send wire information to me. Is there any reason that there would have been any difficulty sending the same documents to me, as well, I think they were sent to me, to be sent to the title company. Is that right?
A They might have been. I don't know, ma'am. As I said, I was not involved in the mechanics of the closing.
Q All right. Had you sent any instructions to anybody that upon receipt of 100 percent of the funds, that you were directing that part of those funds then be sent to Happy State Bank?
A if that's how the closing mechanics were to work, that's how we would have set it up. Based on what I'm seeing here, I think the presumption was that we were going to have everything done in one step by using an escrow agent. But like I said before, I was not handling the mechanics of closing.
Q All right.
A So I mean, these --
Q Wasn't it --
A -- questions might be directed to somebody else better than me.
Q Mr. Nambiar, how did we know, how did 2999TC know that the 26,297,296.96 was a correct amount to even send to Happy State Bank?
A Because the lender's counsel endorsed it and told you.

Q Okay. And you have proof that the lender's counsel endorsed it and told me?

A I mean how would you know is the question. I said that would be the mechanism. I don't know if those things happened. Like I said, I did not handle the mechanics of this closing. So you know, if you were asking me about the mechanics of the closing, it's not a good use of your time to ask those to me.

Q Sure. Who would be the better person who would know the answers to some of these questions regarding the mechanics as it related to Happy State Bank?

A I don't know.

Q Mr. Nambiar, if we could, and I'm a little short on time here. But if we could take a look at the court orders again just briefly that are the main issues in this case. Well actually, let me do one other thing.

MS. LINDAUER: Sydney, can you pull up the motion to enforce that's been filed by HNGH? And drop down to the form of the order.

BY MS. LINDAUER:

Q Mr. Nambiar, you are familiar with the motion to enforce that's being heard by the Court right now?

A Yes. Broadly. I'm not an expert in this, in the content of the order that's been drafted here. But I understand thematically what we're trying to do.

MS. LINDAUER: Okay. All right. Sydney, if you

could drop down a little bit. And I want to ask you a few questions. Go back up, Sydney, a little bit. About the requested relief that you're asking for.

BY MS. LINDAUER:

Q Are you familiar with the relief that you've asked for?

A Again, these are -- I am not an attorney, Ms. Lindauer. And so, you know, the details of everything that my -- my counsel is trying to accomplish, that is a better question for my counsel than it is for me.

Q Well, the only reason I brought it up is that Mr. Kane did spend a great deal of time going through your testimony about things like harm, prior litigation, all of those points with you. And so I wanted to go through the relief that you've asked for as part of this hearing as it relates to some of your testimony. Does that make sense?

A If I'm able to answer in a manner that I understand, I will try. But if you're asking me details of certain provisions in this order, that is probably better answered by my counsel.

Q Okay. All right. Well, let's just look at a few of these if we could. One of the things that you've asked is that the deed in lieu that we've looked at, be determined to be a valid conveyance, and that HNGH is the owner of the property pursuant to that special warranty deed recorded as an instrument on or about November 1st, 2021. Do you see that.

A I read it here, yes.
Q All right. And is that still a relief that you're seeking with this Court today?
A Yes. It's in the motion, so.
Q And, Mr. Nambiar, that would ask the Court to determine the title and ownership of the property at 299 Turtle Creek, right? 2999 --
MR. KANE: Objection. Calls for a legal conclusion.
THE COURT: I'll sustain that one.
MR. KANE: The order says what it says. I mean --
THE COURT: I've already sustained the objection.
MR. KANE: Thank you.
BY MS. LINDAUER:
Q All right. The next thing you asked the Court to do is determine that the debtor has no further right, title, or interest in the property, nor any lien, claim, encumbrance, or cloud on title against the property. Do you see that?
A I don't read all that in the time that you said all that, Ms. Lindauer. But I trust that that's in there.
Q Okay. There is a reference to the debtor shall remove its lis pendens on the property. Could you tell us what lis pendens you're referring to here?
A It's a question for my counsel, Ms. Lindauer. I'm a business person. I don't --
Q Okay.

A I don't have the details of these types of issues.
Q Okay. And is that going to generally be your testimony with regard to each of these points that were looking at here?
A Yeah. I think if you're trying to ask me on the details of what's in the order, I think, you know, it's just, it's not -- it's not a business person's document to read. And so I generally understand what the document is trying to accomplish. But I can't -- I can't speak to the details that you're asking me.
Q All right. Mr. Nambiar, you are aware that the debtor, about the time that the closing on May 31st did not occur, filed an adversary lawsuit? Are you aware of that filing?
A Yes. I know there was an adversary filed.

MS. LINDAUER: Sydney, can you pull that up for us?

THE COURT: So before you do that, it is 2:59 p.m. Mr. Nambiar, you indicated you had a hard stop today at 3:00. If that's still the case, I'll respect that and you'll just have to come back at another date and time. So I'll leave that to you and Mr. Kane to decide.

Based on the questions so far, I'm not confident that -- well, I think you'll be up there for a little while longer because Mr. Kane hasn't gotten back. So do you want to stop today?

MR. KANE: Your Honor, I'll tell you right now, I haven't heard anything that I believe needs some kind of

rehabilitation. I might have one question total, and that's really about it. So if we want to -- it depends on Mr. Nambiar's availability.

THE WITNESS: I mean, if -- I don't know, Ms. Lindauer. But if I can probably be late by ten minutes. It's a call with 15 other people and I'm supposed to lead it. I can push it by ten minutes if you're able to wrap up.

MS. LINDAUER: I don't think I'll wrap up in ten minutes, Your Honor. So I don't want to put Mr. Nambiar out. I think if he is okay coming back tomorrow, perhaps, then we can just wrap him up tomorrow. But I would hate to put him in. I don't think I can honestly cover the -- I've got three more categories with him, and I don't think I'll get it all done in ten minutes. Even if I try to rush through the questions.

THE COURT: Yeah. I don't think that's feasible either.

So, Mr. Nambiar, I think -- I'm not going to tell you when to come back. I guess that's something I will expect counsel to confer on when you're able to come back. If you need to jump on your call, you're free to do so. And then Mr. Kane and Ms. Lindauer can discuss, you know, when you can come back.

THE WITNESS: Sounds good, Your Honor.

THE COURT: All right. You are excused.

THE WITNESS: Thank you.

MS. LINDAUER: Thank you, Mr. Nambiar.

THE WITNESS: Thank you.

(Witness excused)

MS. LINDAUER: Your Honor, our next witness is going to be Marshal Dooley. If we could take just a couple minute break to sort of shift places, I think that would be helpful.

THE COURT: That's fine. I do have some questions --

MS. LINDAUER: Sure.

THE COURT: -- about his proposed testimony. So go ahead and we'll take a recess.

MS. LINDAUER: Okay.

THE COURT: You want a five-minute recess? Ten-minute recess?

MS. LINDAUER: I'm being told ten minutes so people can run to the restroom if that's all right, Your Honor.

THE COURT: All right. We'll come back at 3:11-ish.

MS. LINDAUER: Very good. Thank you.

(Recess at 3:01 p.m./Reconvened at 3:12 p.m.)

THE COURT: All right. We are back on the record in the 2999TC Acquisitions case. We've finished for the day with Mr. Nambiar. I understand your next witness is Marshal Dooley. Is that correct, Ms. Lindauer?

MS. LINDAUER: That is correct, Your Honor.

THE COURT: Ms. Lindauer, you gave me a little bit of a preview of what Mr. Dooley was going to testify about the

other day. And I don't remember exactly what you said, but I understood he's your expert on the difference between a recision deed and a special warranty deed. But I don't want to put words in your mouth. Can you give me a synopsis of what Mr. Dooley's proposed opinions are?

MS. LINDAUER: Oh, his proposed opinions?

THE COURT: He's testifying as soon as a proposed expert, correct?

MS. LINDAUER: Right. Right, right, right. I don't know that I know exactly all of his opinions. But I guess I can summarize the points that I thought he would be covering. First of all, I think the going back to the two orders that are in play here, and as a real estate/banking expert, how one would interpret and apply the provisions primarily in the December order, and how someone in his role would review or interpret the requirements for the closing that are set forth there.

And then more specifically what documentation would be necessary for that closing based on that order, and what that documentation would look like versus the documentation that was being provided by both sides with regard to the closing. Also, what would be customary, and we heard this from Mr. Nambiar also, what would be customary in a commercial closing for, again, the types of documents necessary to complete that closing and pay off HNGH.

Mr. Dooley would have expertise in that particular area, and the requirements for both a lender and somewhat a title company with regard to, again, necessary documents and procedures for closing, in particular on the procedures. The order of events, we haven't focused on that too much, but how things would have to transpire as far as the order of events related to the particular closing.

Further, in connection with real estate transactions, the potential tax implications as, and he's not an expert on tax but he knows enough as a real estate attorney and banking professional to know about the tax implications of the document that was provided by HNGH, the special warranty deed and how that document would play in if in fact that had been the operative document used to close this transaction, and the consequences of the use of that document.

The information regarding for example the recision and reinstatement of the note, how that should have worked. And again, that goes somewhat to the procedures of how you would have to close this particular transaction. The mechanics of the closing are not spelled out in the orders themselves. And so again, he would be an expert on that.

He could also testify about the actual documents that the parties were trading back and forth, and basically I don't want to say the voracity but the effectiveness if you will of those documents. Appropriateness, maybe that's the better

word, of those particular documents. That's pretty much the points that he would be covering as our expert third-party looking at this particular transaction.

THE COURT: So, and the reason I asked you that was based on the preview that you gave me a couple days ago of his testimony and the requirements of Federal Rule of Evidence 702, that the expert is going to testify -- if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence, or to determine a fact at issue.

And at least two or three of the categories that you gave me don't appear to fall within that category. For example, how to interpret and apply the orders, that appears to me to be within my purview, which is a legal interpretation of the document. So why don't we start with that one.

Why would Mr. Dooley be put on as an expert to argue a legal issue about interpretation and application of the orders when he could simply do that at closing in the capacity of an advocate, because it doesn't sound like that's proper expert testimony.

MS. LINDAUER: Your Honor, I think it is proper expert testimony because based on the testimony you've heard so far, there is I think an element of confusion as to how in particular the December order was to be not necessarily read, but how it was to actually be applied.

And the reason I'm focusing on that is if you look at that first paragraph, the one on the top of the second page, the way that that document reads, it says which note shall be reinstated immediately prior to debtor's payment to HNGH. I think there is a question, a legal expert question regarding what mechanically a reinstatement of a note looks like, and why timing was such that the reinstatement had to occur immediately prior to the payment to HNGH. Just to read the language --

THE COURT: Is there a disputed fact issue on that?

MS. LINDAUER: Yes. Your Honor, there is because their contention is that the document they delivered on May 27th that mentions in a preamble that the note is reinstated, we don't believe, Your Honor, on a factual or legal basis is an effective document to reinstate the promissory note.

THE COURT: That's a legal conclusion though from looking at the face of the document.

MS. LINDAUER: Well, it's also a factual conclusion too as to what not just that document, what document would need to have been drafted and presented to reinstate the note. No one has told you what that document needs to look like if it isn't the language in that special warranty deed, which you've been told is not effective language.

So I do think, again, that that would be a topic for someone like Mr. Dooley to give you an opinion on what --

otherwise you're called to decide as the judge what a reinstatement of note looks like. And I think you need to have something in the record that tells you what the reinstatement of note looks like beyond what it doesn't look like.

So that's part of the reason for Mr. Dooley is to address that issue and why --

THE COURT: And he's going to describe what language in a legal instrument is required for a reinstatement of a note?

MS. LINDAUER: Reinstatement of a note, correct.

THE COURT: Again, that's a legal issue.

MS. LINDAUER: Well even if it's a legal issue, you have to have some sort of evidence. I can't tell you what -- I think it's a factual issue in the sense of what is required to reinstate a promissory note.

THE COURT: Again, that's a legal argument.

MS. LINDAUER: Your Honor, I think --

THE COURT: I guess maybe I'm not seeing the factual issue here.

MS. LINDAUER: Okay. Well, I think there is a factual description of a document that would constitute a note reinstatement. Everybody can have their opinion as to what they think that thing looks like. But to have an expert tell you this is the actual document, Your Honor, that you would need in order to create, draft, write to constitute a note

reinstatement. And that's what Mr. Dooley would attest to is that this is what that document looks like, Your Honor, and what the document --

THE COURT: Well, why couldn't he do that at closing in argument because again, that appears to be a legal argument on whether, you know, whether or not the document that Mr. Kane presented, you know, assuming that it's relevant.

MS. LINDAUER: Right.

THE COURT: I'm just going to state for now just --

MS. LINDAUER: Sure.

THE COURT: -- for purposes of this discussion, assume that the issue is whether the document that Mr. Kane sent over as their proposed special warranty deed, you know, whether or not that meets the, you know, the legal requirements of the order. Based on everything that you've told me, it still sounds like a legal argument about why or why not Mr. Kane's version of the document satisfies that.

MS. LINDAUER: Okay. So let me ask you --

THE COURT: So what --

MS. LINDAUER: Let me --

THE COURT: So it would be --

MS. LINDAUER: Let me play with your thoughts here. I get to the closing argument and I say Judge, the special warranty deed that was provided by HNGH that they allege is an effective reinstatement of the promissory note that we contend

is not a proper reinstatement of the promissory note, whose testimony am I going to point to to have you analyze whether that in fact was or was not a proper reinstatement? We've argued it's not. Obviously --

THE COURT: Right. You've argued it's not. But again, there's no questions about what documents went back and forth. And isn't it just a matter at closing argument of looking at the documents, and Mr. Dooley or whoever wants to advocate for the debtor, argue that that document or combination of documents was not satisfactory to reinstate the note. Just it sure seems like a pure legal issue.

MS. LINDAUER: Well, it seems to me like that you're going to ask us at closing where in the record, Ms. Lindauer, do we have testimony as to what a reinstatement of a note should have required in order to meet the requirements in that order --

THE COURT: I'm not going to ask you -- I can tell you right now I'm not going to ask you where the testimony is on that because that's, again appears to be a legal determination.

MS. LINDAUER: Okay. Your Honor, let's not forget, I mean, this is an agreed order that in essence in regards to these terms is a contract between the parties. And to the extent that this is a contractual provision that requires clarity, which we think that it does, there would need to be

evidence as to what that particular provision -- I think there is enough evidence in this record already that some of these provisions are clearly ambiguous, and that being the case, in order to provide clarity as to what these actual provisions should mean, could mean, or did mean, it seems to me like there is a need for clarity. And that would be evidence that you would take from someone like a Mr. Dooley, an expert. Not one of the parties to this proceeding because clearly we haven't heard from HNGH, their understanding because Mr. Nambiar doesn't have any understanding, and Mr. Christiansen doesn't have any understanding of what those provisions mean.

THE COURT: Again, I can appreciate, and I haven't heard his (indiscernible) yet, but I'm assuming Mr. Dooley has lots of legal background and understanding of these arguments. But I'm still struggling to figure out what the fact issue is that he's going to help me under Federal Rule of Evidence 702. Again, it appears to be simply a legal interpretation of the agreed order, which you characterize as a contract.

Let me open up -- I don't think I have it opened up. Since you have it handy, what is the document --

MS. LINDAUER: It's several places. But it's Debtor Exhibit D12 which is the December order.

THE COURT: Okay. So let's start, tell me the part that you think is --

MS. LINDAUER: Page 2. And this is really the

critical paragraph in that order for everyone's purposes is the first ordered, adjudged, and decreed provision.

THE COURT: Okay. The note --

MS. LINDAUER: The first --

THE COURT: The note shall be reinstated.

MS. LINDAUER: It says which note shall, mandatory, be reinstated immediately prior to the debtor's payment to HNGH of the payoff amount.

THE COURT: And so wouldn't Mr. Dooley, in closing arguments, provide me his authorities and arguments on why whatever documents you think were not sufficient to constitute a reinstatement? Why isn't that a closing argument issue as opposed to an expert testimony issue which appears to be --

MS. LINDAUER: Because, Your Honor, I think --

THE COURT: (Indiscernible).

MS. LINDAUER: Because I think that there is a factual issue as to what constitutes a note reinstatement.

THE COURT: And why isn't that a legal issue?

MS. LINDAUER: I don't think it's a legal issue. I think it's a factual issue as to what document constitutes a note reinstatement. That is not a legal question. That's a fact. What document -- now I guess your position --

THE COURT: It sure sounds --

MS. LINDAUER: -- is well (indiscernible).

THE COURT: It sounds like a legal issue. But --

MS. LINDAUER: Okay. So anyway, that's -- let's keep going on this provision. Which note shall be reinstated, and then again immediately prior to the debtor's payment. Why would the note have to be reinstated immediately prior to the payment? Why is that a required term?

The order doesn't tell us why. It just says it shall be done. Okay? So again, why under these set of facts as we know them would a note reinstatement have to occur prior to the payments? And again, that to me would require, unless you just want to take it for its face value that it had to happen, there is a reason why mechanically these events had to happen in a particular order. And I don't think it's clear from the order itself why there is a specific order that appears on these terms.

And again, I think that Mr. Dooley could explain to the Court the order and why the order has to appear in a particular sequence of events in order for this to appropriately happen. That's one.

Next, Counsel for HNGH shall hold, and we keep skipping this, the recision deed during the pendency of the term of the agreed order. And then this part, and shall have no liability to the debtor or any other party by way of holding such deed or releasing the deed in accordance with the terms of this agreed order.

And Mr. Kane will have you believe that what they

could hold is a draft of a recision deed. Why would holding a draft of a recision deed create any liability to anyone to the debtor or any other party for holding such deed if in fact it was not executed?

THE COURT: But that's --

MS. LINDAUER: And so, Your Honor --

THE COURT: There's no dispute about factually what happened. It's been clear in the evidence that there was no executed deed as of during the term of the order which was --

MS. LINDAUER: Right.

THE COURT: -- December 10th. So there's no factual dispute about that. And then I understand each side is going to make their legal arguments about whether that's relevant or not. I understand your position from your opening papers, and you've reiterated it throughout the hearing that because the lender was not holding a recision deed as of December 10th, 2021 during the term of the order, that was a breach that excused the debtor's performance. So I get that.

What is the factual issue here? Isn't that just a legal argument?

MS. LINDAUER: And again, I think maybe we're missing the point. Experts are called to give opinions, right? That's their basis is they're relying on the facts, they provide opinions. That's why you have an expert, right?

THE COURT: Legal opinions. Legal opinions.

MS. LINDAUER: Yeah. Well, legal or factual or whatever, but provide opinions. So my point being again Mr. Dooley, who's an expert on real estate and banking, can look at this and say this is a mandatory provision that no party, liability to the debtor or any other party for holding such deed.

Why would there be liability? Nobody's addressed this. Why would there be liability to the debtor or a party for Mr. Kane holding a draft of a deed? Why would there be liability if it was an executed deed. Why --

THE COURT: Okay. There's no -- there are no factual disputes. And I misspoke earlier when I said a legal opinion. That was --

MS. LINDAUER: I mean --

THE COURT: That was kind of my point that if it's strictly a legal opinion, attorneys are not prohibited from giving opinions just because they're lawyers. And the case law on that is clear. But I'm still struggling to figure out how his testimony is something other than telling me his legal interpretation of the documents.

MS. LINDAUER: But that's --

THE COURT: To me, there's no -- what are the disputed factual issues?

MS. LINDAUER: But that's what an expert does, Your Honor. An expert gives you his opinion of particular issues.

THE COURT: Factual issues.

MS. LINDAUER: An appraiser gives you an opinion of his value of the property. He's an expert. He gives you maybe his opinion. That's what Mr. Dooley is being called to do is give you his opinion. Now, you May not give it any weight, or you May give it great weight. I mean, that's for you to decide.

But again, to say, Ms. Lindauer, based on your comments as to what Mr. Dooley May or May not say, I don't see a need for an expert here, I would like to at least, if you're not going to allow him to testify, to make an offer of proof on what his exact testimony would be from him because again, if there's an appeal, I don't want there to be a point that you didn't offer your expert's testimony.

And irrespective, Your Honor, and I'm not being rude to the Court. I'm just saying I think that either I get it through his testimony and you allow it, or I ask to make it as an offer of proof through his testimony and we make a record of his testimony.

THE COURT: No. I understand.

MS. LINDAUER: So --

THE COURT: I was going through the examples that you gave for his testimony.

MS. LINDAUER: Sure.

THE COURT: The first one you gave me off the bat was

how to interpret and apply the order. So I guess --

MS. LINDAUER: That's right.

THE COURT: And based on that one, I'm still struggling to figure out why that's anything other than the legal opinion about how to interpret this order. So let's go --

MS. LINDAUER: Okay. The next one --

THE COURT: Let's go to the --

MS. LINDAUER: The next point, Your Honor, would be on the actual what we call the recision documents. And he would give an opinion that the special warranty deed that was provided by HNGH was nothing more than a deed, and as such does not constitute a proper recision document, and therefore was not an effective recision of the deed in lieu of foreclosure.

That is an opinion that he would give you from his testimony as an expert that that particular document is not an effective document to do what needed to be done to constitute a recision of the deed in lieu that was recorded. So that would be another opinion that he would be prepared to give. And then as to why --

THE COURT: No, wait.

MS. LINDAUER: -- that document --

THE COURT: No, let's stop there. That one --

MS. LINDAUER: Okay.

THE COURT: That one really appears to be a pure

legal issue.

MS. LINDAUER: Okay. And again, I mean, again, and Mr. Dooley is being offered as a legal expert, real estate expert, banking expert regarding his opinions in commercial real estate transactions as to the validity and effectiveness of the particular documents.

Again, that's why you have experts to tell you that in the world of real estate, this document would not be effective, and this is why.

THE COURT: It's because --

MS. LINDAUER: I hear you. That's his -- and that is his professional opinion.

THE COURT: But that's a legal opinion, is it not?

MS. LINDAUER: Yeah. But, Your Honor, lawyers -- there are experts who give legal opinions.

THE COURT: Do you have authority to cite to me that says experts can testify about legal opinions?

MS. LINDAUER: Sure. If that's his area of expertise. I mean, if you want me to go find some cases for you, I will. But if --

THE COURT: I've looked --

MS. LINDAUER: But that is --

THE COURT: I can tell you, we've looked at the cases. And I think it's kind of black letter law that attorneys are not allowed to give legal opinions as experts

under Rule 702 because there's no back tissue that you're helping me decide if it's a pure legal issue. So going down the items on your list, the first one was how to interpret the order.

MS. LINDAUER: The order.

THE COURT: That appears --

MS. LINDAUER: Second one is the --

THE COURT: That appears to be a legal issue. And the next one, which is whether or not the document that Mr. Kane sent over is effective as a recision.

MS. LINDAUER: Right.

THE COURT: That especially appears to be a pure legal issue. He --

MS. LINDAUER: Okay.

THE COURT: -- wants to give his legal opinion on why that document is not an effective recision, right? That's what his proposed opinion is?

MS. LINDAUER: Right, and why the documents that were drafted by the debtor's side were effective recision documents, and why they would accomplish what needed to be accomplished with regard to the issue of recision.

THE COURT: Okay. So let's stop at those two. The first one, I'm just categorizing it as how to interpret and apply the order. And then the second one was whether or not the document that the lender sent over is an effective recision

within the meaning of the order.

MS. LINDAUER: Right.

THE COURT: I'll ask Mr. Kane, are there any objections to Mr. Kane's [sic] giving a legal opinion on those first two points.

MS. LINDAUER: It's Mr. Dooley, actually. I'm sorry, Your Honor.

THE COURT: I'm sorry. I'm sorry. Mr. Dooley. What did I say?

MR. KANE: You said Mr. Kane.

THE COURT: Okay. So I know Mr. Kane's not a real estate guy, so I misspoke. Those are the proposed opinions of Mr. Dooley. Mr. Kane, are there any objections to Mr. Kane [sic] giving legal -- giving opinions on those first two points?

MR. KANE: I think you May have done it again. I just want to clarify the record. Are you allowing me to -- I think that what you're saying is do I have an objection to Mr. Dooley providing his opinion on those two points.

THE COURT: Yeah. If I didn't say that, then you've just said it for me. That's what I'm asking.

MR. KANE: I don't see how under Rule 702, Mr. Dooley can provide his opinion on the interpretation of an agreed order. I think that falls squarely under the purview of this Court.

THE COURT: Okay. The second one was whether or not the document would be -- the document that you sent over would be an effective recision deed.

MR. KANE: Your Honor, I actually don't -- you know, I'm going to say I don't really care if Mr. Dooley provides his opinion testimony on that so long as we are entitled to have a rebuttal witness who is similarly an expert provide contradictory testimony. But I do think that the reality there is it is a legal argument.

THE COURT: Okay. So, Ms. Lindauer, going down the list, the third thing I wrote down from what you said was what documents would be customary in commercial closings.

MS. LINDAUER: And, Your Honor, the issue that's been raised is 33A of the lender's exhibits which is the title commitment that had a list of the documents that were being required for this particular closing by Sendera Title, and is it reasonable and customary for those types of documents to be requested in connection with this type of a closing, and why would those documents be required in connection with this type of closing.

THE COURT: All right.

MS. LINDAUER: And are they in fact -- are they in fact necessary because apparently there is a dispute, it appears, as to whether in fact those documents were reasonable and necessary for this particular closing? I believe it's the

position of HNGH that they were not necessary, or that maybe some of them were necessary but not all of them. And then again, it would be our position that those documents were required for this particular closing.

And again, I think that's again an opinion, but also facts as to customary closing terms if you will for this type of transaction.

THE COURT: So let me --

MS. LINDAUER: And that would be --

THE COURT: Let me understand --

MS. LINDAUER: -- a factual issue.

THE COURT: Help me understand that one because I'm not recalling off hand. What documents did your side say were customary in commercial transactions that the lender said they should not have to provide? I'm not recalling that offhand.

MS. LINDAUER: Okay. So, Your Honor, I sent over a letter to Mr. Kane on the 30th listing out the variety of documents that we contend would be reasonable and necessary for this particular closing. Mr. Kane sent back an email I believe either later that day or the first of the next day on the 31st. It May have been later on the 30th saying that we recognize some of these documents, but some of them not. And so --

THE COURT: When you say we recognize those, I don't recall that --

MS. LINDAUER: Recognize them as necessary for a

closing of this type. So for example, a release of the deed of trust. That would be a typical -- we've talked a lot about the note. But there was also a deed of trust that would need to be released, right, because HNGH had a lien on the property, and that deed of trust was never released of record.

If you pull up the record in Dallas County today, there is a deed of trust of record in favor of HNGH that is still part of the documents in Dallas County. And so again, what document would be necessary to be drafted and executed in order to release that particular deed of trust lien.

There is also UCC filings that are of record. And a UCC3 would normally be drafted and filed of record in order to release the UCCs. When you pay off a loan, what are the normal, reasonable, and customary documents that are involved in a loan payoff, and that would be something that Mr. Dooley would attest to. And it's also reflected in some of the exhibits you already have before you including Exhibit 33 as well as my letter to Mr. Kane and his response. So I can't --

THE COURT: Okay. Mr. Kane, why don't you -- were you finished, Ms. Lindauer? Go ahead.

MS. LINDAUER: No. That's okay, Your Honor. That's the point on that.

THE COURT: Okay. I'm going to call that the third bucket.

MS. LINDAUER: Okay.

THE COURT: Mr. Kane, on this third bucket, is there a factual dispute about what is -- well, I guess specifically I don't recall offhand, you might remember better, is there a dispute between the parties about whether or not a document was necessary for closing?

MR. KANE: That's -- I want to be careful here. I believe Mr. Marx acknowledged that not all of the documents on that debtor's, you know, 3:24 p.m. list were necessary on the closing date. And I think maybe this is where there's a little bit of a disconnect. And so as much as I hate to say it, maybe there is. I really don't know.

But what documents were necessary to be provided on the 31st or before and what documents could be provided the day after closing or at two days after closing or something like that after the transaction had funded. You know, I don't think that any party was in dispute that a release of the deed of trust needed to be provided. And I think the evidence in the record is that a draft was provided to the debtor.

So I just, I don't really know how to address that, or address this in a manner where Mr. Marx hadn't already testified on this issue as the individual who is working with that Exhibit 33 and Sendera Title, and the individual who assisted in the preparation of the debtor's list of documents that needed to be provided.

THE COURT: Right. I mean, I seem to recall

testimony that there was a release of a deed of trust provided or executed. So I'm still, Ms. Lindauer, trying to understand is there a -- besides the release of the deed of trust, I mean, Mr. Kane, what about the UCC releases? I don't really, I don't recall --

MR. KANE: No. There's evidence in the record, Your Honor, that it was HNGH's position that we'll provide the UCC releases. But we're not going to provide the UCC releases on the 31st when we got all these other more important things that still need to get executed.

So this is again, it's not necessarily that there is a dispute that UCC termination statements needed to be filed. I think we recognized that, and that's in evidence. It was truly an issue of timing given what was -- given the list of closing documents that was delivered by the debtor at 3:24 p.m. on the 30th.

THE COURT: Right. So, Ms. Lindauer -- I'm sorry. Ms. Lindauer, as to the deed of trust and the release of the deed of trust, I don't think there's a dispute that that was requested in being prepared. So do you really need an expert to testify that that was necessary when there doesn't appear to be a dispute on that specific issue, the deed of trust release?

MS. LINDAUER: Well, to be clear, Your Honor, the only release that you have seen is a release of collateral transfer of note and lien. That was being drafted and

exchanged. I have not seen, and maybe I just missed it, was a draft of the release of the deed of trust. I don't think that that is a document that's been provided.

If Mr. Kane is willing to stipulate on the record that that was a document that would be required for closing for a loan payoff, then I'll accept his stipulation. And the same thing with regard to the UCCs, that those are required documents for a closing and a payoff. If he's willing to stipulate to that fact, then I think that's fine. I don't necessarily need Mr. Dooley on that particular point.

THE COURT: So I think on the -- well, Mr. Kane, I can't cite to the record where a draft of a release of a deed of trust was provided. Is that in the record somewhere?

MR. KANE: I believe it is. I mean, I'm happy to take, like, a two or three minute break and find that exhibit for this Court.

THE COURT: So that's okay. So I'm not hearing that there's a dispute on whether that's a requirement for closing. The UCC releases, I thought Mr. Kane was saying it was their position that it wasn't that they needed to be provided, but it was something that didn't need to be provided on that day given the other items that were still floating around, is that -- or that could be provided after closing. Mr. Kane, help me flush that out.

MR. KANE: Yes, Your Honor. I believe there's

correspondence between me and Joyce Lindauer that's in the record where we make clear that we've done bankruptcy closings before and did not believe that the UCC3 termination statements were a critical closing document as of the 31st, and could be provided after.

THE COURT: So, is --

MS. LINDAUER: And, Your --

THE COURT: -- Mr. Dooley going to testify that in a typical customary loan transaction, that those are things that have to be executed prior to closing?

MS. LINDAUER: Correct, Your Honor. And I think Mr. Kane just hit the nail on the head. He just said that that's our opinion based on our previous involvement with closings, that those things could be provided later. And I think the testimony from Mr. Dooley was when you are borrowing money from a third party --

THE COURT: Mr. Dooley --

MS. LINDAUER: -- $40 something million --

THE COURT: Mr. Dooley?

MS. LINDAUER: Yeah, Mr. Dooley. He's the expert.

THE COURT: I thought you said the testimony from Mr. Dooley was, or his proposed testimony is?

MS. LINDAUER: Correct, Your Honor. That those are necessary requirements. They were on the 33A checklist, that those are necessary closing documents that should have been

sent over to the title company on the 30th or 31st, or any time before that that would have been necessary to have on hand at the time of a closing.

And what I was focusing on was what Mr. Kane said which is he's relying on commercially reasonable I guess bankruptcy procedure to say that those things can be provided later. And that's not how a large commercial closing works. You don't provide documents later, releases later after you get your money. You don't provide those. It doesn't work that way.

What you force the title company to do is then hold the money pending a receipt of those documents. That's what would happen. If they have a checklist -- and again, that's Mr. Dooley's expertise is that based on -- if the money had been wired on the 31st --

THE COURT: Which --

MS. LINDAUER: -- Sendera --

THE COURT: Which it was not. And there's no dispute that it was not.

MS. LINDAUER: It was not.

THE COURT: And I haven't heard any --

MS. LINDAUER: That's --

THE COURT: I haven't heard any evidence yet that there was money on the 31st. So is his --

MS. LINDAUER: And we just had --

THE COURT: -- testimony going to --

MS. LINDAUER: Your Honor, we just haven't gotten there yet.

THE COURT: Okay.

MS. LINDAUER: We're getting there. Yeah, we're getting there. And I've been flagging every time you've asked about that. And we are -- and again, we're sending you I believe, Mr. Rodriguez is preparing the request of the list for you. And we're providing all of that to you. And then of course we have yet Mr. Barton to testify with regard to those particular matters.

But again, going back to the requirements for a closing --

THE COURT: So I think --

MS. LINDAUER: -- which I --

THE COURT: I think you've convinced me that expert testimony would probably be okay on number three. So --

MS. LINDAUER: Okay.

THE COURT: -- number four I wrote down was the requirements to the lender and the title company regarding necessary documents and procedures, and the order of events.

MS. LINDAUER: Okay.

THE COURT: Is that --

MS. LINDAUER: That would be correct, Your Honor. And the reason that the order of events becomes very important

in this particular matter is that there is a sequence here of how things had to flow. Let me give you a perfect example. The money goes into Sendera Title. All right? And at Sendera Title, there should have been certain things, certain documents.

And then based on the testimony you've heard, there was a request by HNGH that part of those funds be sent over to Happy State Bank. Well, then there would have to be a release and the original of the note at the title company before those monies could be released to Happy State Bank.

Yet we've heard Happy State Bank tell us that in fact they wouldn't have released the original note until the money was actually in their account, not the title company account. So again, there is --

THE COURT: But didn't she testify that she would provide the note to allow for a simultaneous closing?

MS. LINDAUER: She said she would provide the note at the time that the money was received in their account. She never said that she would provide the note to the title company if they had not in fact received the money into the -- she never said it was good enough if the title company had the money. She said it had to be in their account before she would release the note.

THE COURT: Okay. I'm not sure --

MS. LINDAUER: And that's --

THE COURT: I'm not sure that your summary of her testimony is correct. But put that aside.

MS. LINDAUER: Your Honor, we have the transcript. We can pull out her testimony.

THE COURT: No, no. Not necessary. Not necessary right now. As to category number four, Mr. Kane, any objections to Mr. Dooley testifying about the requirements for a lender and title company as far as necessary documents and procedures and order of priorities, or no, order of events for a closing?

MR. KANE: Sure. I don't actually have an issue with him providing his testimony of what he believes is generally required. And just for a clarification point, the exhibits in which the proposed payoff and release of deed of trust and assignment of leases and rents was circulated and is in evidence as Exhibit 69 and 69A.

THE COURT: Got it.

MS. LINDAUER: Okay.

THE COURT: All right.

MS. LINDAUER: Appreciate that.

THE COURT: So number -- the next one I wrote down was the potential tax implications of the lender's form of special warranty deed. Is there -- let me just ask Mr. Kane. Is there any objection to Mr. Dooley's proposed expert testimony on that point?

MR. KANE: I believe that Ms. Lindauer made clear he's not an expert on tax. So yes.

THE COURT: Okay. Your response?

MS. LINDAUER: Your Honor, he -- yeah. Your Honor, he's not an expert in the sense of the IRS and issues like that. But I do think he can qualify as an expert in real estate transactions and the effectiveness of the date of those transactions, and in particular with regard to the increase in basis of the value of the property potentially during a, in this case it would have been about a five-month delay if in fact the special warranty deed.

So again, it's not specifically with regard to the IRS. It's just as a real estate expert, what is the effect on the debtor in the sense that if the warranty deed that had been used was the deed provided by HNGH, and if it was treated as a special warranty deed as of May 27th or May 31st, what effect would that have on the value of the property as it would relate to tax implications.

And I do think he is qualified, and we'll qualify his require -- you know, when we get a chance to put him on, we can prove up his qualifications to attest about that change in basis and --

THE COURT: Okay. So you --

MS. LINDAUER: -- why that would be important.

THE COURT: So I guess we'll just defer on that one,

if you can qualify him. The next category I had was I just wrote the recision and reinstatement of the note.

MS. LINDAUER: Okay. And again --

THE COURT: Is that any different than what we talked about before?

MS. LINDAUER: No, I don't believe so, Your Honor. I think that's the same coverage of the similar issues that we've covered before. There is one other category too.

THE COURT: No. I'm still looking, I'm going down your categories.

MS. LINDAUER: Okay.

THE COURT: You talked about the mechanics of closing. That's kind of covered in -- I think that's covered under number four. So --

MS. LINDAUER: Okay.

THE COURT: -- no need to discuss that. And then I wrote down the effectiveness and appropriateness of the documents. I'm not sure what you were referring to there. Are you, again, does that go back to whether or not Mr. Kane's proposed special warranty deed was an effective recision?

MS. LINDAUER: Correct, Your Honor. I think it's that same issue.

THE COURT: All right. So I'm not going to give that another number because that's, I think that falls into category number two. And then were there any other categories that I

missed?

MS. LINDAUER: No, Your Honor.

I think just under mechanics of a closing, and I will tell you that Mr. Dooley is a -- sits on the board of a bank here in Dallas. Very familiar with banking practices and procedures. I do think there are some issues related to transfer of funds, in particular timing of wires and things like that, that I do think would be helpful to the Court. And I do think that Mr. Dooley is qualified to give his testimony on those particular issues.

So I think that, again, that May go more to mechanics issues. But again, I think transfer of funds and timing of transfer of funds would be of some relevance also.

THE COURT: Okay. Well I think you've convinced me on all the categories except the first two which was how to interpret and apply the order, and whether or not Mr. Kane's document is an effective recision deed. So I just, I'm not convinced that that's anything other than a legal opinion that under the 5th Circuit, Askanase 130 F.3d 657, and numerous other cases hold that it's not appropriate for a lawyer to give a legal opinion.

A lawyer can give a legal opinion. But if it's solely on a strictly legal issue, it's not appropriate. And I'm concluding right now that those first two categories are purely legal issues. The rest of the categories I think you've

convinced me. So I know that took a lot of time. But I'll go ahead and let you put Mr. Dooley on the virtual stand if you're ready, or do you have any other opening remarks?

MS. LINDAUER: No, Your Honor, just a couple points. I think we would like, before Mr. Dooley rests his testimony, to have an opportunity to provide some briefing on the questions that you've raised. Obviously we were not prepared for your questions regarding his being an expert on the issues that -- I know you had mentioned before briefly, but we didn't brief, as I would have like to have briefed, the issues.

Clearly your law clerks or someone looked at that with you, and I understand that. But so and again, I'm not asking necessarily to delay his testimony today. I'm just asking that we have an opportunity before we rest his testimony to brief those issues and provide you with a legal brief on our position at least as it relates to those issues.

Second, if you're not going to allow him to testify as an expert on the first couple of issues that we covered, that I be able to make an offer of proof. And I can do that at the end of his testimony with regard to what he would have testified to just in the event that there is an appeal of this particular matter, that we have a record so that the district court would have an opportunity to review.

I can either do it one of two ways. I can do it with an offer of proof, or I could actually have Mr. Dooley simply

put his testimony in the form of an affidavit, in the form of a written offer of proof. But I would like to have the opportunity to do that so that --

THE COURT: And again, I'm giving him the opportunity at closing arguments to make those same point. So I'll let you make an offer of proof, but --

MS. LINDAUER: Okay.

THE COURT: -- I'm curious to know are those not issues that Mr. Dooley can argue at closing?

MS. LINDAUER: Well, I think that actually Mr. Phelan is going to, and maybe we can click him on, but I believe Mr. Phelan is actually going to handle the closing. So I don't know if Mr. Phelan is going to be prepared to argue those points without there having been some sort of record made.

THE COURT: But I've been flexible before on allowing more than one ranger from the riot.

MS. LINDAUER: Sure.

THE COURT: And so I guess I'm telling you I have no problem since Mr. Dooley is the expert on his issues --

MS. LINDAUER: Okay.

THE COURT: -- to allow him to make whatever arguments he wants to make at closing to cover the points that I don't think are really appropriate for an expert opinion. But again, I'm going to allow him to make those arguments at closing. So with all that said, if you still want to make an

offer of proof, that's fine. But --

MS. LINDAUER: Okay.

THE COURT: -- I'm telling you, he has the ability to make his points --

MS. LINDAUER: Okay.

THE COURT: -- at closing.

MS. LINDAUER: All right. I just want to be sure, Your Honor, that that does get included, for obvious reasons, as part of the record. So that being said. But I would also like, and I'm not asking for a delay, but I would like to also have the ability to file a brief on these particular issues. And we'll have that to you tomorrow on at least our view of the particular issues that you have raised under the Federal Rules 702 and 704, and the rules dealing with experts.

So we would like to go ahead and file that brief. I don't know if I actually need your permission to do that, but I think it's appropriate to raise that point with you, as well. So we would request that we have that opportunity. Obviously, Mr. Kane would have an opportunity to respond to the extent that he wants to respond on that point.

But again, we'll file that timely so that we have it before this matter closes.

THE COURT: Okay.

MS. LINDAUER: So I did want to raise that --

THE COURT: I hate to ask for time estimates. And I

know I just went through 45 minutes of questions. I was hoping to kind of truncate the hearing. And maybe that was a mistake. But how long do you expect your expert testimony to take on direct?

MS. LINDAUER: Your Honor, I would have thought about -- probably about an hour and a half to two hours. I do need to kind of -- I'll need a brief break to kind of reconsider because I have obviously questions lined up more or less in the categories I had described to the Court. But it will take me a couple minutes to sort of turn those around.

But I would think we could go 45 minutes today. And then of course we have tomorrow morning. And we could use that morning. And then I don't know if Mr. Nambiar's going to be available tomorrow for us to complete Mr. Nambiar tomorrow also.

But that would be my goal, Your Honor, is to at least try to complete most of the direct of Mr. Dooley this afternoon. And then we can pick up on him in the morning. And again, I leave that to you, Your Honor. We have about three hours I think set aside for tomorrow.

THE COURT: So why don't we go ahead and get started with Mr. Dooley.

MS. LINDAUER: Okay. Your Honor, if I can just have a brief break just to kind of regroup for a moment, and then we'll call Mr. Dooley.

THE COURT: Sure.

MS. LINDAUER: Okay. Thank you, Your Honor. Appreciate that.

THE COURT: So we'll take a recess for three or so minutes.

(Recess at 4:01 p.m./Reconvened at 4:08 p.m.)

THE COURT: Okay. We're back on the record in the 2999TC Acquisitions case.

I want to correct something that I suggested before the break. I was thinking back to a case that I had in private practice where we successfully argued to a bankruptcy judge that a proposed expert was going to give legal opinions, and should instead just be allowed to argue at closing. And he was not allowed to testify as an expert.

But the way this is playing out, Mr. Dooley is going to testify as an expert as to some categories. And given his status as a neutral party, as an expert, I do not think it would be appropriate for him to be an advocate at closing arguments because then he's an advocate, he's not a neutral party.

So I'll perhaps let you address that through if the debtor wants to make a post-hearing brief on the issue, and I'll allow you to make your offer of proof. But I think that occurred to me during the break that this is not the same situation that I had in a prior case because Mr. Dooley is

going to testify as an expert. So I really don't think it is appropriate for him to make arguments as an advocate.

So with that said, I'll let you start with Mr. Dooley. Are you ready, Ms. Lindauer?

MS. LINDAUER: I am, Your Honor. Thank you very much. Your Honor, at this time, I would call Marshal Dooley to the stand.

THE COURT: I'm sorry. Hold on. Hold on one sec.

MS. LINDAUER: Sure.

(Pause)

THE COURT: Okay. Sorry about the delay. Mr. Dooley, you're going to testify about your background, so I will swear you in. If you would raise your right hand.

MR. DOOLEY: Yes, Your Honor.

MARSHAL WAYNE DOOLEY, DEBTOR'S WITNESS, SWORN

THE COURT: Thank you.

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Dooley, would you state your full name for the record?

A It's Marshal Wayne Dooley.

Q And, Mr. Dooley, could you briefly describe for us your educational background?

A I received a master of business administration with a degree in accounting from North Texas University, and then a JD from the University of Texas, and then an LLM from SMU law

school.
Q You mentioned you got your JD from UT. And you have an LLM from SMU. What was the course of study for your LLM?
A It was more oriented toward tax and securities law.
Q And how long ago did you get that degree?
A I got my LLM in 1976. I was going -- I was practicing law, but doing it on a part-time basis.
Q Okay. And since you graduated from law school, how have you been employed?
A Well, after I graduated from law school, I spent a year as a briefing attorney for the Texas Court of Criminal Appeals, the Chief Justice of the Court of Criminal Appeals. And then I was in the military. That was for one year. And then I was in the military for three years. And then I came to Dallas in December 1970, and I've been practicing law in Dallas since that time.
Q Okay. And your practice of law, what areas of practice has that included?
A Well, it's all been business related. Some business litigation, some real estate and finance law, et cetera. And so I've done -- I've represented sellers and buyers and financial institutions when it comes to real estate, both, you know, commercial improved property, unimproved properties, residential developments, the whole gambit of that area of practice.

Q Okay. Has that work been with law firms?
A I'm sorry?
Q Has that work been with any law firms?
A Yeah. That's --
Q Okay.
A -- basically what I've been -- I've done.

And then in the early '80s I formed a bank with some other individuals, some investors. And I've been a director. That was in '83 is when we opened the doors. And I've been a director and general counsel for that bank ever since then. And as a consequence, I've represented the bank with regard to all of its lending transactions that are not sort of boilerplate-type transactions as far as (indiscernible).
Q Okay. Let me go over the bank for a second. And what bank is that?
A It's Pavillion Bank.
Q Okay. And where is that bank located?
A It's -- it's located in Richland, Texas. It's part of a holding company. It's a state -- state bank. There are three other banks in the -- in the holding company.
Q And your testimony is that you served as the bank's general counsel. Is that correct?
A Correct.
Q You served as counsel in connection with their real estate transactions. Is that correct?

A Yes. This bank is -- specializes basically in doing real estate loans, commercial and residential real estate loans.

Q Okay. And have you also worked for the bank on financing type transactions?

A Yeah. That's essentially what in representing the bank in drafting the documents or making loans to commercial customers. That's essentially what that is.

Q All right. All right. And besides working with the bank, you've also had and have been in private practice as an attorney.

A Yes.

Q Okay.

A Since 1970.

Q And what firms have you been associated with since 1970?

A Well, I was with a firm by the name of Orman & Thomas (phonetic) when I first started practicing law. And then various iterations after that. And then I was with the Rass, Phillips, and Murray firm for approximately ten years. I've been in a solo practician circumstance since 2010.

Q Okay. You mentioned both on the banking side. On the legal side, have you been involved in commercial real estate transactions?

A Yeah. That's what I say. I, you know, documenting commercial loans for the bank, looking after the bank's interest, but and then I've represented buyers and sellers of

real estate.

Q Okay. Generally, what size transactions are you involved with?

A Well, they run the gamut, but they mostly -- it's a relatively small bank relatively speaking, so a three- or four-million-dollar loan is, you know, kind of at their capacity, sometimes up to six they participate out the loans, but they're generally of that nature.

Q Okay. All right. Have you been involved in transactions as large as this particular transaction of roughly $40 million?

A I don't recall having been involved in a transaction involving $40 million at issue in a real estate transaction.

Q Okay. What's the largest real estate transaction you've been involved with as an attorney?

A Probably $10 million.

Q And do you see any difference in the requirements for a $40 million versus a $10 million transaction?

MR. KANE: Objection. Calls for speculation. He testified he has no experience with $40 million transactions.

MS. LINDAUER: Your Honor, I think as a -- maybe I should ask a further question.

THE COURT: Go ahead.

MS. LINDAUER: And clarify that.

BY MS. LINDAUER:

Q Mr. Dooley, you're familiar with this particular

transaction. Is that right?
A To some degree, yes.
Q Okay. And we'll get into more detail about that in just a second. Mr. Dooley, do you have any relationship with Mr. Barton, 2999TC Acquisitions, HNGH, HN Capital, Vipin Nambiar, any of the persons or entities in connection with this case?
A No, not that I know of.
Q And were you retained by 2999TC to act as an expert in connection with this matter?
A Yes.
Q And do you have an engagement with 2999TC Acquisitions for the purpose of acting as an expert in connection with this matter?
A I really did not insist on an engagement letter. Of course, I have more of a verbal agreement.
Q Okay. And in connection with your engagement on this matter, were you provided with some documents?
A I was.
Q And can you tell me generally what documents you were provided with in connection with this matter?
A Fundamentally, a deed in lieu of foreclosure and then the two orders that have been mentioned. I think they're Exhibits Number 64 and 94. And then this special warranty deed that was signed and I guess went to the title company. And then a graph of other documents according to the rescission deeds. I think

that's all.
Q Okay. Did you see the title company requirements on their Schedule C for closing?
A It's been a while since I have, but I have seen it in the past.
Q Okay. Any other documents that you reviewed that come to mind in connection with this?
A Well, there's a draft of a release by Happy State Bank that -- an unsigned draft, that I've seen.
Q Okay. Now, Mr. Dooley, you have also sat through I think several days of testimony in connection with this matter. Is that right?
A Correct.
Q And you had an opportunity to listen to I think a substantial amount of Mr. Marx testimony. Is that right?
A I did.
Q Okay. Did you have a chance to also listen to Ms. Blakeley's testimony from Happy State Bank?
A I was not. I've gotten reports as to what her testimony was, but I did not -- I was not present.
Q Have you been provided with any transcripts of the various hearings that have occurred in connection with this matter?
A I have, but I must confess. I haven't read them very closely.
Q Okay. Were you present during Mr. Nambiar's testimony?

A Yes.

Q And all of that testimony?

A Correct.

Q Have you had a chance to review the various exhibit binders that have been prepared by both 299TC Acquisitions and also HNGH?

A I've had the opportunity, but I have not gone through all those documents and tried to digest the whole history of the relationship way back when. As I say, those documents I identified a moment ago are the ones that I was requested to focus on and the ones I have been focused on.

Q Okay. Let me go back to the question I asked you before. After you --

THE COURT: Ms. Lindauer.

MS. LINDAUER: Yes.

THE COURT: Apologies for the interruption. I do have a request of Mr. Metzger.

MS. LINDAUER: Okay.

THE COURT: Just because of the way WebEx works, I'm seeing Mr. Metzger, but not -- often not Mr. Dooley. So, Mr. Metzger, if you wouldn't mind turning -- stopping your video because I have it set. If somebody has their video off, they're minimized. There you go. Thank you. Go ahead, Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Dooley, I'm going to go back to a question I asked you a minute ago. After reviewing all of the documents that you've gone over with us, how would you describe the closing of this transaction that was to occur on May 31, 2022?

A There was no closing.

Q Okay. How would you describe for me what was to occur on May 31st?

A My understanding and from reading the order that was entered by the Court is that there were two fundamental aspects of it that were covered by the order, and that being that there would be rescission deed that was to be held in escrow. And I gathered that was supposed to have been prepared and executed a long while before the closing, as was extended by that subsequent order. And then my understanding was that in reading the order that the promissory note was to be reinstated immediately prior to the closing and the payoff. Immediately prior to the payoff.

Q And, Mr. Dooley, just to be clear, did you have any involvement in the preparation of any of the documents?

A None whatsoever.

Q And approximately how many real estate closings, Mr. Dooley, do you think you've been involved? And I want to focus on commercial real estate closings do you think you have been involved in over the last, let's say, ten years.

A Fifty at least.
Q Okay. And how about during the life of your career? How many do you think you've been involved in?
A You know, it'd be speculation.
Q Okay.
A I mean, I don't really know. It would be speculation to go back. It's 52 years.
Q Okay. Well, I was going to ask you that. How many years have you practiced law?
A Fifty-two.
Q And as you sit here today, are you in good standing with the state of Texas, State Bar of Texas?
A I am.
Q Okay. And do you have any specialties? I know you said you've been LLM (indiscernible). Do you have any specialties in the area of the practice of law?
A I've never applied for legal specialization, so I don't.
Q Okay. And as you sit here today, how much of your actual practice today involves the bank work that you do?
A It's less now than it has been in the past, but we've not had any issues. But the -- probably 15 percent, 20 percent.
Q Okay. And then how would you categorize the other 85 percent of your work?
A Well, as I say, I represent buyer, sellers, and purchasers of real estate. And I've got ongoing transactions that involve

that element of the practice. And sometimes dealing with borrowers who are being, you know, borrowing, and I look after the financing documents for them.

Q Okay. Mr. Dooley, focusing on one particular transaction, were you involved in the early part, I believe it was 2019, in a large real estate closing involving a series of apartment complexes called The Ravens, Gilbert, and related entities?

A Yes.

Q Okay. And do you recall how large a transaction that was?

A You know, I had forgotten about that either because there were several different entities. But in the aggregate, there's probably 40 million or plus.

Q Okay. All right. And what was your involvement in connection with that transaction?

A Well, it was a lot of restructuring going on with regard to the financing and some issues that were not totally dissimilar from what the parties are dealing with in this issue in that there were some issues between investors and the entities and complaints about how the management had handled matters and then (indiscernible) from the entities back to the investors. As I say, a lot of -- a lot of similar issues that we're dealing with here.

Q Okay. And ultimately did that transaction result in a significant closing that occurred and the payoff of the underlying lenders in connection with that case?

A There were multiple transactions. And I'm trying to recall how much, what the magnitude was of the settlement payments that were made, but in essence, say some of that litigation related matters are still going on as we speak.
Q Okay. And that transaction, was it closed through a title company?
A Yes.
Q Okay. Do you remember what title company?
A I don't.
Q No. That's fine. That's fine. In connection with this particular proposed closing, I think you mentioned you did review the two agreed orders. Is that right?
A Correct.
Q You did review the proposed I think versions of rescission deeds. Is that right?
A Correct.
Q And you did also -- did you review any of the underlying loan documents between HN -- well, it would be Madison Capital originally, but then HNGH and 299TC Acquisitions?
A I have not. You know, I understand that there is a deed of trust and collateral assignment. I've looked at the -- at those documents, but -- but I really didn't go into the in-depth history of the transaction.
Q What types of issues were you retained to look into, not just documents, but the actual issues, that would form the

basis of any opinions that you would be giving?
A Well, primarily whether or not the debtor was ever placed in a position where it had declined -- did the lender do what it was supposed to do to put the debtor in the position to go ahead and provide the payoff money.
Q Any other issues?
A That was the fundamental issue, the primary issue.
Q Okay. Now you heard us go over some issues with the Court. And the Court went through a number of sort of what I call sort of like groups or categories of issues. Did you hear that discussion?
A I did.
Q Okay. And so I'm going to try to sort of use that a little bit as our framework to ask you a few questions. Do you understand that?
A Yes.
Q And as part of your review of the documents, your listening to the testimony, your involvement with this particular case, were you able to form some opinions related to certain of these issues?
A Yes.
Q In your opinion, Mr. Dooley, the May 31st closing, did that appear to be a customary and normal real estate closing for the payoff of a lender?
A To categorize it as a closing, it was not a closing.

Q Okay.

A There were a lot of steps to be taken and a lot of hurdles to be jumped to be able to complete a closing.

Q And when you say it was not a closing, tell me what you mean by that.

A Well, you know, if there had been a closing, there would have been a rescission deed that was ready for the title company to record.

The promissory note in question would have been reinstated and there would have been releases of some of the exceptions on the title policy and there would have been a tender of the UCC termination statements, the UCC-3s all into the title company so that the title company then could assure the lender -- not the lender, but the debtor's financing source that they had good, clear title.

One of the big obstacles that I don't think I was made aware of initially was that the promissory note in question that needed to be reinstated was being held by Happy State Bank. And clearly that needed to be reinstated per the order prior to the payoff event. And here there is not that intention. I don't know that the lawyers who worked on the proposed order were aware of that obstacle. Otherwise, that order would have probably tried to address that issue in some way, shape, or form. But, you know, with -- the onus was on HNG to pay off Happy State Bank in order to be in position to

reinstate the note.

And I understood from the testimony from Mr. Nambiar that they did not have the funds to do that other than the proceeds -- they were relying on the proceeds to be paid by the debtor and its lender. And it's just sort of a -- it's not a catch 22 or a chicken and egg.

The issue was, per the order, that the note needed to be reinstated before the payoff event and the lender who was going to be making the financing available to provide the payoff amount clearly would want that note reinstated and be willing to -- and have the rescission deed and all the other documents that I described in the title company so that the new lender would be assured that it would have a first lien.

MS. LINDAUER: Sydney, if we can pull up the exhibits, the debtor's exhibit. It would be the confirmation order for the Chapter 11 case. I believe that's Debtor's Exhibit 27.

And, Mr. Dooley, we pulled it up on the screen here.

Sydney, can you -- yeah. Can you pull 27 up? There we go. I think she's trying to get it to where you can see it.

BY MS. LINDAUER:

Q Can you see that from here? We have it up on the big screen.

A Yeah. Okay.

Q Can you see it?

A Sure.

Q Okay. And I'll represent to you that that's the order confirming debtor's third amended plan of reorganization. It's Docket Number 123 on the Court's docket. It's dated May 18, 2022.

And, Mr. Dooley, I'd ask you to look at, if you could, Paragraph K on Page 3 of that document.

Okay. Do you see that under 1129(a)(11) provision?

A Oh, (indiscernible).

Q So the plan is feasible. Do you see that?

A Oh, well, yeah. Okay. I'm sorry.

Q Okay. All right. And in particular, Mr. Dooley, I'd ask you to focus on the provision that says the plan does contemplate that the debtor's property and rights and property will be conveyed following confirmation to a new entity that will obtain the required financing to pay off HNGH. Do you see that?

A Yes.

Q And then it says either such new financing or the debtor's existing ownership will pay off any remaining creditors in the case as called for by the plan including allowed unsecured claims, allowed administrative claims, and fees of the United States Trustee. Do you see that?

A I do.

Q Okay. All right. So if you look at the second sentence

that we just read regarding the plan does contemplate provision. Do you see that?

A I do.

Q Okay. So there was contemplated that there would be a transaction following confirmation that would require or would obtain required financing to pay off HNGH. Do you see that?

A I do.

MR. KANE: Objection, Your Honor. Mr. Dooley has no foundation for this line of testimony so far other than just reading off of this order. This is the debtor's assertion and was not circulated to HNGH before it was uploaded tot he Court in the first place.

MS. LINDAUER: Well, Your Honor, I'm not sure I --

THE COURT: You just asked him to read the order. Is there a better question?

MS. LINDAUER: Yeah. I think there is, Your Honor, but I guess I'm confused. As we sit here today, no one has asked that the order be rewritten or changed.

THE COURT: So go ahead and ask another question.

MS. LINDAUER: Okay. All right. Yeah. I didn't understand Mr. Kane's objection, okay.

BY MS. LINDAUER:

Q But in any event, Mr. Dooley, you've looked at that provision, right?

A I have. Just now is the first time I've ever looked at

it.

Q Okay. That's fine. And this provision would tell you that there was to be a financing obtained to pay off HNGH. Is that right?

A Right. That's why --

MR. KANE: Objection. Document speaks for itself.

MS. LINDAUER: Okay.

THE COURT: Sustain the objection.

MS. LINDAUER: All right.

THE COURT: If you could ask him something other than what the document says we could make some progress.

BY MS. LINDAUER:

Q Okay. Mr. Dooley, as to what was to occur on May 31st, were there actually two parts to what would happen on May 31st?

A Yes.

Q Can you describe for us, describe for the Court, what those two parts were that were to happen on May 31st?

A Well, the first part was a rescission deed that was -- to (indiscernible) a rescission deed would be executed and be held in escrow by the lender's lawyer. And then the other was the reinstatement of the note.

Q Okay. But what about the obtaining of required financing? Was that party of any of the May 31st transaction?

A Well, it was my understanding that that was the -- after these two things were done then the burden would shift over to

HNGH assuming all the other normal and customary requirements of the lender to -- excuse me -- to the debtor like we talked about. The UCC terminations, the release of that deed of trust of the land, addition to, you know, getting a rescission agreement, the basic collateral transfer. You know, there are several other documents that are not addressed in the order that, of course, would need to be done in order for a new lender to be willing to step in there and make the loan.

Q Okay. So in your experience as an attorney and as counsel for a bank, how important would it be to make sure that all of those required steps -- you just outlined some of them for us -- were taken as part of what happened on or about May 31st?

A All of those would need to be done that we're describing. Anything that would be any encumbrance on that property could be -- got to be out of the way simultaneously at the time the new lender funds the loan.

Q Okay. So as general counsel and counsel for a bank, would you be prepared to recommend to your client to make a loan if those steps had not been taken?

A No, not at all.

Q All right. If we take a look at Exhibit 33A, this is a lender exhibit. Okay. I know you've been sitting through this testimony, Mr. Dooley, and you've had an opportunity I think to look at this 33A. Is that right? The title commitment.

A It's been a few days, but I have seen it. Yeah.

Q Okay. All right. Is it customary in closings of this, I guess generally this type, that, first of all, is it customary that a title company be involved?
A By all means.
Q Okay. And why would it be customary to have a title company involved?
A Well, fundamentally to be able to get insurance for the -- either the lender and or the owner, depending on the nature of the transaction, but without doubt, but the lender is going to insist on getting a mortgage use title policy.
Q Okay. And what lender would require a mortgage use title policy?
A All lenders that I know of.
Q Okay. In connection with this transaction, in order to pay off HNGH, would there be a title policy required for simply the payoff of HNGH?
A Funding the payoff, yes.
Q Okay. And we know based on the confirmation that I had you look at that the funding was going to be coming from a third party. Is that right?
A Correct.
Q The requirements that are set forth on Exhibit 33A in Schedule C, and I'm not going to go through all of those with you, but I know you've had a chance to review those, okay. Are all of those necessary and customary in connection with a

financial transaction such as this?
A I can't recall all of them, but substantially all of them.
Q Okay. Do you recall any of them that wouldn't have been necessary?
A Can I look at it?
Q Oh, it's -- yeah. Sidney, can you scroll down a little bit? All right.
A Are you there?
Q Yeah. And there's a hard copy in front of you also. There you go.
A Yeah. Paragraph 5, all of those documents would need to be released.
Q Okay. All right. And that would be reasonable and necessary, customary for those requirements to be met.
A Yeah. The new lender would not be prepared to deal without that being done.
Q Okay. And just to be clear, all of the requirements in Paragraph 5 would have to be met.
A That's exactly right.
Q Okay. So there's nothing on Paragraph 5 that could be excluded.
A No.
Q Okay. Go ahead.
A Let me expound on that a little bit. Obviously, you know, all these things will be deposited with a title company in

escrow. And then in the event funding doesn't occur, then they'll be released back out to the people, so they'll have never be recorded or have force and effect. So, you know, but the title company normally will represent too the lender that they're prepared to issue the title policy without. And to remove those exceptions, they'll give them a clean title policy. Then when all that, the title company is willing to make those representations, then the lender will fund, the last step.

Q Okay. So I just want to be clear though that -- and I'm not going to go through point by point under Sub 5, but on your review of Paragraph 5, you -- it's your opinion that each of those items would be required for the funding of this particular transaction?

A It'd be essential.

Q All right. And you said each of those documents would normally be delivered to the title company either in advance or at the time of the closing. Is that right?

A Correct.

Q Okay. Is it your experience, Mr. Dooley, that some of those documents could be delivered after the closing date?

A That's not been my experience. You know, no lender is going to want to fund and count on somebody delivering the document that is needed to clear up a title. It just doesn't happen that way.

Q Okay. Would a title company issue a title policy if one or more of these documents were, in fact, missing?
A No. They would create an exception for those documents that they have not gotten that this would cure the problem.
Q Okay. If we go to my next page, the next list of items, it'd be under Item 6. The UCC financing statements, do you see that item?
A Right.
Q Okay. Did you hear Mr. Kane state to the Court that the UCC financing statements would be something that HNGH was prepared to deliver after May 31st?
A I don't recall that testimony, but on the other hand, again, the lender is not going to release their funds or transfer their funds to the title company until the title company can assure them those things that they have in their possession, that is the title company, a UCC 3 or a termination statement that will remove that.
Q Okay.
MR. KANE: Your Honor -- excuse me, Joyce.
MS. LINDAUER: Sure.
MR. KANE: I just need to clarify for the record. I did not testify to that. I acknowledged that there was documents in the record in which there were exchanges between me on behalf of HNGH and the debtor in which we made those assertions. Those exhibits, I believe, have been admitted not

to show the truth of the matter asserted -- in essence, my testimony -- but to show the status of pending matters and steps towards closing. So I just wanted to clarify that point for the record.

MS. LINDAUER: Understood, Your Honor.

THE COURT: I understood it was not his -- Mr. Kane's testimony, so go ahead, Ms. Lindauer.

BY MS. LINDAUER:

Q Item 7, a lis pendens that's been placed on the property.

A Right.

Q How --

A Needs to be released.

Q That would have to be released. Is that right?

A Correct.

Q Okay. And do you have any knowledge of what that lis pendens May relate to as it appears on this Schedule C?

A Well, lis pendens obviously is referencing the pending lawsuit that's applied on the title. And that's not as good as it should be.

Q Okay. All right. And do you know if (audio interference).

A (Indiscernible). Thanks.

Q Okay. All right. And as it relates to this transaction though, Mr. Dooley, that would be a required document to have provided.

A Without doubt. Without doubt.

Q Okay. And in your experience, would a commercial lender fund and close this transaction without that release of lis pendens being in the title commitment?

A No.

Q There is an Item 9 dealing with the bankruptcy court. And it says provide a certified copy of approvals with the bankruptcy court. Do you know what would meet the requirement under Article 9?

A I would -- you know, I don't know whether that -- that order that we looked at a while ago --

Q Right.

A -- would be sufficient or not. There may need to be something more specific.

And I noticed in the order that was entered, the Document 64, kind of a curious aspect of this case is there is a provision in that order about providing it once the payoff event occurs upon notice to the Court that says it occurred, that the Court would then enter an order ruling that the deed in lieu of foreclosure was voided, et cetera, et cetera, which, you know, I found a little bit curious given the fact that there is a requirement for a rescission deed to be executed and filed of record.

Q Okay. But as it relates to this particular title commitment, let's go back to that for a second. So there is a

-- there was a bankruptcy court order compliance requirement article, Point number 9. Do you see that?
A Yeah.
Q All right. Number 10, this order was submitted without the name of a lender. Prior to closing, furnish the name of the lender. Do you know what that requirement is referring to?
A Well, I think it's the lender that the debtor claimed. That will be -- they will be the mortgagee and will be getting a mortgagee title policy.
Q Okay. And that would be the debtor's requirement to furnish that name, right?
A Correct.
Q Number 11, with regard to authority documents. Is that a standard requirement --
A Yes.
Q -- in this type of closing that authority documents be provided?
A Yes. Yes.
Q So in your experience it would be customary and normal for a title company to require a list of these authority documents. Is that right?
A Yes. That would be essential.
Q Okay. Did you hear Mr. Nambiar's testimony where he said that they were pulling those documents together and would have been prepared to send them over to the title company? Did you

hear that?
A I don't remember specifically --
MR. KANE: Objection, Your Honor. I believe that misstates testimony. I believe that was Mr. Christensen's testimony, not Mr. Nambiar's.
MS. LINDAUER: Okay. I'm sorry if it was Mr. Christensen.
BY MS. LINDAUER:
Q Do you remember any of that testimony, Mr. Dooley?
A I really don't, but, you know, the company is located -- it's a Delaware corp, so some of those documents would be having to -- and a lot of that you can get online these days, and so it probably wouldn't cause too much of a delay.
Q Okay.
A But clearly that's something that the title company is going to insist upon.
Q Okay. If we look at the Number 12 requirement, is that anything necessarily that would have to be provided by either HNGH or the debtor as a normal and customary requirement for closing?
A Well, you know, in order to get the survey exceptions related, you know, pay more money. You've got to have a current survey. And when I say a current survey, something at least within six months typically. And so, yeah, that's not an unusual requirement.

Q Okay. Do you know in this instance if a survey, a fairly recent survey, had been provided by any party to the title company as part of this closing?

A Not that I'm aware, no. They never discussed that.

Q Okay. All right. And then the next of these Schedule C items really --

MR. KANE: I apologize. I couldn't hear that. Can you repeat the answer to that question?

BY MS. LINDAUER:

Q Sure. Can you restate your answer, Marshal?

A Well, and tell me again the question.

Q It dealt with the question of the survey.

A Oh, the survey, yeah. I --

Q The survey exception that --

A I was never -- no one has ever indicated to me that a current survey was available.

Q And then the last provisions -- Sidney, will you drop down -- 13 and so forth, those are specifically dealing with -- if you can drop down a little bit further. Those are all specifically title company type requirements. Is that right? That I'm looking at here. Arbitration provisions and things of that nature.

A Yeah. They appear to be, well, the title company has.

Q All right. And with regard to this particular closing, reasonable, necessary, customary, you went through those

different items. How many of those documents, Mr. Dooley, are you aware of having actually been provided to a title company?

A I have not seen any of them.

Q Okay.

A I mean, there was a purported rescission deed that was signed by the lender.

THE COURT: Ms. Lindauer, Ms. Lindauer, if your expert is -- during his testimony is going to opine on whether an effective rescission deed has been provided, I've already ruled that that's not the proper subject of his testimony, so I'll just ask Mr. Dooley not to go there.

MS. LINDAUER: Okay.

THE COURT: But you can go around it to other places if you'd like.

MS. LINDAUER: All right. Your Honor, I wasn't actually trying to go there. I was just trying to go with is it normal customary practice on a closing like this there would -- we just went through.

BY MS. LINDAUER:

Q There is a series of documents that would be pretty standard for this type of closing. Is that right?

A Yes.

Q Okay. And in your experience, would the title company have required each of those required documents or there would have been an exception required. Is that right?

A Yes.
Q Okay. Have you seen, Mr. Dooley, any exceptions to the requirements on Schedule C?
A No. I have not seen a revised Schedule C, no.
Q All right. And it's your testimony that of the documents required on Schedule C, you did have an opportunity to review one document. Is that right? You've seen one document.
A Once again --
MR. KANE: Objection. Leading.
MS. LINDAUER: Well, okay.
THE COURT: Overruled. She asked him which document. Overruled.
BY MS. LINDAUER:
Q Which document did you see? You were telling us about a particular document you saw that was delivered to the title company.
A Oh, the special warranty deed or what purported to be a rescission deed.
Q Okay. And I'm not going into the details of that, but your understanding was that document was delivered to the title company. Is that right?
A Signed by the lender.
Q Okay. All right. Mr. Dooley, as you sit here today, do you know if a title insurance policy has ever been issued in connection with this particular title commitment from Sendera

Title?
A No. I have not seen one.
Q And what would be, in your experience, be required for the title company to actually issue a title insurance policy?
A Well, that's kind of a double edged question in that, you know, they would go ahead and -- the title company would go ahead and issue that policy based on all those exceptions if a lender would ever accept them. And so, but the lender -- no lender is going to accept that mortgagee's title policy. And so the lender is going to want all of these things that I've testified to removed and deleted from the mortgagee's title policy before it will fund the loan.
Q Okay. If they were put as exceptions to title. They weren't cleared. They were just listed as exceptions to title. It's your testimony that no lender would loan on this transaction.
A Yeah. No lender would lend on this transaction.
Q And you know that because of your experience both as a practicing real estate attorney as well as an owner, director, and attorney for a bank. Is that right?
MR. KANE: Objection. Leading.
THE WITNESS: Correct.
THE COURT: Sustained.
BY MS. LINDAUER:
Q And based on your experience, Mr. Dooley, and your

opinions, what would have been or should have been, I guess is a better way to say it, the steps that needed to be taken in order for this transaction to close on May 31st?

A First, that a rescission deed signed by both parties and in --

MR. KANE: Objection. Asked and answered.

MS. LINDAUER: I don't think I asked him the actual steps, Your Honor.

THE COURT: I believe he did testify about that, rescission deed, then a reinstatement of a note, and then encumbrance of title would have to be. So he did testify about it, but I will overrule it for now.

MS. LINDAUER: Okay. And maybe let me re-ask the question, Your Honor, a little slightly differently if I might.

THE COURT: Go ahead.

BY MS. LINDAUER:

Q Okay. Mr. Dooley, is there a order of the steps? I know there are a number of steps, but do they need to be -- do they need to occur in a particular order?

A Well, you know, to abide by the order that was entered by the bankruptcy court, that rescission deed in truth and fact, an enforceable rescission deed would need to be signed by both parties and deposited with the title company. Then, again pursuant to the terms of the order, the note would need to be reinstated. And that would have required the lender to have

paid off Happy State Bank to be able to get the note back so that it could be reinstated. And then the various issues that we've gone through that are primarily identified on the title policy -- Schedule C, the exceptions, would have to be -- documents would have to be provided to the title company that would enable the title company to clear all of those. And then the lender would be able to confirm that it will have a first lien against a title to the property that would be enforceable and not have to jump over any of these other obstacles that the title company has identified.

Q In your experience, Mr. Dooley, a closing such as this, how long would it normally take to put together the papers required for such closing?

A Probably a week to ten days.

MS. LINDAUER: Your Honor, before I go to another topic, we're like two minutes before 5:00 and I think you were wanting to stop at 5:00. So before I switch topics --

THE COURT: I didn't -- I didn't -- actually, I don't recall saying we were going to stop at 5:00.

MS. LINDAUER: Oh, okay.

THE COURT: Maybe I did, but let me go offline for a minute.

MS. LINDAUER: Okay.

THE COURT: Pause just a minute, please.

MS. LINDAUER: Sure. Thank you, Your Honor.

(Recess at 4:58 p.m./Reconvene at 4:59 p.m.)

THE COURT: Okay. We're going to keep going until at least 5:30 and we'll touch base and see where we are at 5:30.

MS. LINDAUER: Okay. Thank you, Your Honor. I appreciate that.

BY MS. LINDAUER:

Q Okay, Mr. Dooley. I'm going to change to a little bit different topic here. Going back to your qualifications for a minute, you advised us that you do have an LLM in -- I wrote it down -- tax and finance. Is that right?

A Tax and securities, so the two areas that I try to focus on.

Q All right. And, Mr. Dooley, have you looked at the issue in this case of the effect of the recording of a deed in -- on May 31, 2022, called a special warranty deed?

A That is not a rescission, correct?

Q Right.

THE COURT: So if we're -- again, I'm going to ask both counsel and the witness not to opine on whether or not what you saw was an effective rescission deed because, again, I think that goes to one of the potential ultimate issues in the case if it's relevant. So I -- you kind of skirted around it a little bit, but you understand where I'm going with that, Ms. Lindauer?

MS. LINDAUER: I do, Your Honor. And I'll refocus

the question slightly if I might.

THE COURT: Go ahead.

BY MS. LINDAUER:

Q Mr. Dooley, if -- as an expert, if the deed recorded on May 31st is a special warranty deed, what's the effect of that transaction on timing? When would the potential transferee of that document actually take title to the property?

A On delivery of the deed to the transferee, it would be that day, presumably May 31st, and then the title company would record it. But the delivery of the deed would be the date that the transaction would be consummated and it would be deemed a sale.

Q And when you say it's deemed a sale, what effect does that have with regard to it being deemed a sale?

A Well, they're all sorts of -- the primary tax ramifications, such things as HNGC would be entitled to -- or excuse me -- HNGH would be entitled to the depreciation for a period of time that it had been holding that deed in lieu of foreclosure. I don't know what effect the basis would be, but the buyer would acquire a new basis to the property. So I can't think of all the various ramifications that would occur, but there would be some.

Q Okay.

A Primarily from a tax standpoint, I would think.

Q All right. And when you said the buyer would have --

would acquire it, a basis to the property.

A The debtor. The debtor.

Q Okay. I wanted to clarify that. So the debtor. If the value of the property changed between October 29th and May 31st and there was potential increase in value during that period of time, who would be responsible for that -- for that gain, if you will, on that transaction?

A I'm not sure that I understand that question.

Q Maybe I didn't word it right.

A If the debtor -- if the debtor acquired the type of property in the special warranty deed as of May 31, then, you know, its basis would be that promissory note that's been paid off with the money that was used to acquire that promissory note from -- and pay off the promissory note.

Q Okay. So it would be your testimony that would be the roughly $40 million. Is that right?

A That would -- yes. That would have been the new basis for that property.

Q Okay.

MR. KANE: Your Honor, I'd --

MS. LINDAUER: And --

MR. KANE: I'd like to take Mr. Dooley on voir dire on his expertise on real estate transaction tax matters.

MS. LINDAUER: Okay.

THE COURT: All right. Go ahead.

VOIR DIRE EXAMINATION

BY MR. KANE:

Q Mr. Dooley, what percentage of your practice over the last five years has related to real estate tax transaction advice?

A I typically do not give or hold myself out as a tax lawyer, but there are just fundamental aspects of real estate transactions that, you know, anyone who is involved in that area of practice are going to be sensitive to and be aware of. And that happens to be one of them.

MR. KANE: So, objection. Non-responsive.

THE COURT: Sustained.

If you could just answer his question, Mr. Kane -- or Mr. Dooley.

THE WITNESS: Could you please ask the question again, Mr. Kane?

BY MR. KANE:

Q What percentage of your practice over the last five years has related to providing clients advice on real estate tax matters?

A I don't advise clients on tax matters generally speaking.

Q And what real estate tax specific CLE have you taken the last five years?

A You know, I've taken several of the CLE courses about, you know, real estate law courses, many of which, you know, have interspersed in there or integrated in there some tax issues,

but I haven't focused on taking a tax CLE course.
Q Mr. Dooley, have you issued any tax opinions for any clients in the last five years?
A No.
MR. KANE: Judge Everett, I do not believe Mr. Dooley practices in real estate tax transactions. He does not show that he has any significant tax continuing legal education. He has not provided a single tax opinion for any client in the last five years. I do not believe that he is competent to testify as a tax expert on real estate tax transactions. I'd move to have his testimony stricken regarding this subject.
THE COURT: Ms. Lindauer.
MS. LINDAUER: Your Honor, if I might -- I hear Mr. Kane's objection. If I might ask Mr. Dooley a few more basic questions about his experience as it relates to tax and real estate transactions, I would appreciate that, Your Honor.
THE COURT: Go ahead.
MS. LINDAUER: Okay.

DIRECT EXAMINATION CONTINUED

BY MS. LINDAUER:
Q Mr. Dooley, in your practice, both for the bank and also in your private practice for buyers and sellers of real estate, are you familiar with the tax consequences of real estate transactions?
A Yes.

That's -- you don't have to be a tax expert in these fundamental issues that we're talking about. You know, I deal with buyers and sellers and I deal with the bank too, but on real estate transactions all the while. And I've become sensitive to the various tax ramifications of a transaction because they're normally with regard to improved property, always taken into consideration.

Q Okay. And tell me a little bit. When you say the tax ramifications of transactions, can you explain for the Court what you mean by the use of that phrase, tax ramifications?

A Well, you know, when someone or a buyer purchases improved property, the depreciation of that property is a factor that's taken into consideration when or thinking about the tax implications of operating that property because it offsets or creates a tax deduction that reduces the income tax that that entity will be required to pay in operating the property. So it's -- I'd say it's not a matter of any expert testimony. Most lay people know that.

Q Okay. What other --

THE COURT: I guess, Ms. Lindauer -- well, go ahead, but I think your witness just convinced me that it's not the proper subject of an expert because --

MS. LINDAUER: Sure.

THE COURT: -- he doesn't have the expertise and he said it's not needed to understand it because it sounds like

it's a fundamental issue, so.

MS. LINDAUER: Okay.

THE COURT: Did you have any other questions to kind of salvage that because --

MS. LINDAUER: No, Your Honor. I'll move to the next issue. I can cover it with another witness.

THE COURT: So I'll sustain the objection. I'll, I guess, strike his testimony in the subject on the specific tax matter questions that were asked because it does not appear that Mr. Dooley is an expert and he's admitted that you don't need an expert to understand these issues, that they're fundamental issues, so I think that's something that can be addressed by a non-expert in the case.

MS. LINDAUER: Understood, Your Honor.

BY MS. LINDAUER:

Q Mr. Dooley, you would agree that in connection with this transaction or this particular matter that there was what I'll call a gap period created between the filing of the deed in lieu and then the proposed closing on May 31st. Is that right?

A If then. Yes. If it had closed on that date, correct.

Q Okay. So if there had been -- I'm just -- what I'm really talking about is that period of time. Is that right?

A Right.

Q Okay. And in events -- in your experience, a closing such as this where there has been a gap or significant gap of time,

what issues can arise during that gap of time or that period of time? Maybe I could be more specific. I don't want to bog down the time on this.

But during that window here that we have between October and May, who is it that you understood had record title to 2999 Turtle Creek?

A My understanding is that HNGH did by virtue of the deed in lieu of foreclosure.

Q And because they held title for that roughly, let's say six month period, more or less, is it possible that additional claims, liens, charges could have been placed on the property during the time that HNGH held --

A Sure.

Q -- title?

A Sure.

Q Would that necessitate then the providing of additional documents such as an affidavit of debts and liens? Would that be customary that something like that be provided at such a closing?

A If there had been a deemed sale of the property as of March 31st, that would be the case, yes.

Q And when you say a deemed sale, if the transaction were effective as of May 31st. Is that what you're telling us?

A If the special warranty deed, as I'm understanding it, that was being held in escrow should be filed and become

effective, then all of those things you're talking about would be a problem.

Q And if there were such an encumbrance or debt or whatever that occurred during that window, who would be responsible for paying that at the time of the closing on May 31st?

A HNGH. They would have been the responsible party for having that debt incurred or liability incurred.

MR. KANE: Objection. That calls for a legal conclusion. We also take into account the party in possession of the property, the filing of the bankruptcy case, the issuance of the automatic stay, the debtor's operation of a debtor-in-possession during the course of a bankruptcy case.

MS. LINDAUER: Your Honor, I'm going to object to the form of that objection. I mean, that actually was a speaking objection that assumed facts presented to the Court. That's not an appropriate objection to talk about the automatic stay and things that were in place and all of that. I'd -- that's not a proper form of an objection.

THE COURT: So I took the objection to be you're asking for a legal conclusion, and I'll sustain that objection, if you want to ask another question.

MS. LINDAUER: I do, Your Honor.

BY MS. LINDAUER:

Q Mr. Dooley, based on the -- your experience as an expert and also the statements that you heard from Mr. Nambiar, once

the decision was made by HNGH to put their -- what he said, put their pens down, was there any possibility of this transaction closing on May 31st?

A I do not see it. I don't think there's any possibility.

Q Are you familiar with the flow of funds at banks with regard to transactions occurring through wire transfers?

A Generally speaking, yeah.

Q Okay. And what's the normal time for cutoff for a bank for a wire transfer?

A Three o'clock typically.

Q In your experience, can that time be extended beyond 3:00?

A I don't think -- I don't think so. You know, I've never really explored that, but I don't think so.

Q Okay. So if someone provided wire instructions at 3:52 on a given day, would that wire be able to actually be transmitted before the end of the day?

A No.

Q And just for the record so we have about -- how do you know that when you say no?

A Well, just, you know, the experience that I've had primarily with the bank that I'm the director of and serve as general counsel. And I, you know, have got some accounts at other banks, but I don't recall ever having an occasion to have to wire something out after 3:00 in the afternoon. But, no, the bank that I currently serve as general counsel and as the

director of, wires will not be sent. There's a cutoff at 3:00.

Q So if instructions were given to a bank for wiring funds after 3:00, is it your experience, Mr. Dooley, that that money would actually go that day or would it possibly go a different day?

A It would go the next day.

Q Have you heard any testimony or seen any exhibits admitted during these proceedings that indicated that HNGH had provided to the debtor wire transfer instructions for this particular transaction on May 31st for wire instructions prior to 3:00 on May 31st?

A The only evidence that I've seen is the -- an exhibit that was put into evidence earlier today about the wiring instructions from Mr. Kane's office.

Q And again, in your experience on behalf of working for a bank and also representing lenders in connection with this transaction or in connection to transactions similar to this, what would it take on behalf of a lender, there to be on hand for them to be prepared to push the button and send funds?

A These things we talked about, that a need to be assured from the title company that an acceptable mortgagee's title policy is available and all of the things that we talked about that the mortgage company is going to need to have or require prior to issuing a clean mortgagee's title policy. That would be what the lender would be needing.

Q There's an addition wrinkle you mentioned in connection with this particular transaction, which was the involvement of Happy State Bank. Is that right?

A Correct.

Q Does your bank or have -- in your experience as general counsel for your bank, does your bank make collateral assignment loans similar to the one that's involved here, one that Happy State Bank made?

A Well, we take a lien, sure.

Q Okay. And in the last ten years, if you can, in your experience, how many of these collateral assignments of note and lien have you run across either as a practicing real estate attorney or on behalf of a bank?

A You know, 10 or 20. I really don't know --

Q Okay.

A -- exactly, but it's not an unusual transaction.

Q Okay. And what's required, in your experience, Mr. Dooley, or your opinion to clear a collateral note and lien? What has to happen to make that go away?

A Well, fundamentally the release of the lien. And then the lender who has the promissory note pledged, if that's what the collateral is, you know, returned to the original holder.

Q In order for them to do that, for them to provide a release and return the note to the original holder, what would they have to receive?

A They'd have to be paid off, whatever the amount of the loan is that the borrower -- in this case, HNGH -- whatever amount that HNGH owed Happy State Bank, that they would use this promissory note from the debtor as collateral for.

Q Okay. Would it be normal and customary for a lender in the position of Happy State Bank to provide that release and deliver the original loan without actually having received the funds in connection with that transaction?

A It would all be done simultaneously. If I May elaborate a little bit, this transaction and the order that was apparently prepared maybe by the lawyers and presented to the judge leads me to believe that they were unaware of Happy State Bank. Otherwise, it would not have been drafted in that manner and the Court would not have entered the order in that manner because Happy State Bank probably would have been willing to, again, deliver documents to the title company to be held as collateral.

MR. KANE: Objection. That's speculation.

THE COURT: I'm sorry. What was the objection?

MR. KANE: This entire testimony is speculative. The question calls for speculation.

THE COURT: Ms. Lindauer, what -- help me here. I heard loud and clear his testimony that this could have been done at a simultaneous closing. I really missed the part after that. What was he --

MS. LINDAUER: Yeah. I think -- I think he was talking about -- what I wrote down was he was talking about, first of all, that it was clear to him that the lawyers who helped prepare the order the Court signed likely did not know about the Happy State Bank transaction. And then he was going into, I think, that had he known -- they known about it, that they would have. And then that's, I think, kind of where the objection came.

THE COURT: Right. So I will sustain the objection if you want to ask another question.

MS. LINDAUER: Sure.

BY MS. LINDAUER:

Q In your opinion, Mr. Dooley, what would have been done slightly differently or differently in connection with writing the steps of a closing had Happy State Bank or its involvement been known as part of that transaction?

MR. KANE: Objection. Calls for speculation. Objection. Assumes facts not in evidence.

MS. LINDAUER: Your Honor, I think that was what steps would have been required or would have been described perhaps differently if the Happy State Bank transaction had been known. I think that that's a fair question to ask him.

THE COURT: Tell me the question again because I'm not sure I caught the question. I mean, I --

MS. LINDAUER: Okay. No, Your Honor. I was just

asking what steps would have been described differently if the Happy State Bank transaction had been taken into consideration or known by the persons preparing the various orders for the Court?

THE COURT: So the objection to that question was assumes facts not in evidence. I'm going to overrule the objection and just allow it to go to the weight.

MR. KANE: You're -- okay. Your Honor, I also objected on grounds on speculation. The question is requiring Mr. Dooley to explain to the Court what he believes Ms. Lindauer and I would have done differently had we known something different at the time we drafted this document.

MS. LINDAUER: Well, I don't know about you -- me and you knowing something differently, but I think the point is, is that with regard to the steps necessary to close this transaction, had the HSB debt been taken into consideration, what steps would have been set forth perhaps differently than those that appear in the order today. Essentially, what steps would be different or would -- should have been changed or should be changed, I guess is the question.

THE COURT: I --

MS. LINDAUER: And, Your Honor, I think that's a fair question of an expert on this particular issue to address that.

THE COURT: So I think you can ask him -- that does sound speculative.

MS. LINDAUER: Okay.

THE COURT: You want to ask him usual and customary, because I'm not --

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Dooley, when there is a collateral assignment of note and lien, okay, what would the usual necessary customary steps be to describe how that would be taken care of in connection with this particular transaction?

A Again, you know, using the title company as an escrow agent, the documents necessary to -- for Happy State Bank to release the note, they would tender all those documents in to the title company with an authority for the title company to release the note upon payment of whatever that amount of money was that was owed by HNGH.

Q Okay. In this particular transaction, you've looked at the various court orders and related documents, correct?

A Yes.

Q Okay. Was there any provision in any of those documents to address the involvement of Happy State Bank in this transaction?

A Not that I saw.

Q And in your experience, Mr. Dooley, when there is a collateral assignment of note and lien, is it customary that that relationship be dealt with as part of a transaction such

as this?
A Could you repeat the question, please?
Q Sure. In your experience, when an assignment of note and lien are part of a transaction, is it customary that the relationship or the requirements of dealing with that transaction be part of what is described between, in this instance, would be 2999TC Acquisitions and HNGH?
A Oh, without doubt. Without doubt.
Q And if that is necessary, reasonable, and customary, why would that be part of the reasonable, necessary, customary requirements?
A Because Happy State Bank has got to be involved and participating in the process of the transaction because of the -- they're the holder of the note or the assignee of the note.
Q And you would agree that that step or their involvement is simply missing from all of the court orders that we've looked at?
A Correct. Yes. I do agree.
MS. LINDAUER: Your Honor, I'm going to go ahead and pass the witness at this time. I know Mr. Kane may have a few questions of Mr. Dooley. I don't know, but we are close to 5:30, so I'll go ahead and pass the witness at this time to Mr. Kane.
THE COURT: All right.
Mr. Kane, before you start, I've got to check

something on my end, but first, tell me what your time estimate is for your questions.

MR. KANE: Honestly, Your Honor, I don't think I have any questions for Mr. Dooley. I think we can let him go.

THE COURT: All right. Ms. Lindauer, I'm going to preserve your right to file whatever supplemental brief you want to file before he is released, but why don't you make your -- do you want to do anything else with this witness? You had mentioned an offer of proof. I'm not --

MS. LINDAUER: Yeah, Your Honor.

I would like to make an offer of proof very briefly. It is 5:30. It will take me a few minutes to kind of get my thoughts together on it. Could we do that the first thing tomorrow if I could call Mr. Dooley again just briefly on that? I think I could be much more expeditious on doing that if I have a little time to put that together before we finish up with Mr. Dooley.

THE COURT: I would prefer to start with Mr. Kane in the morning. Do you -- how much time do you need to prepare your offer of proof?

MS. LINDAUER: Well, I'm not sure Mr. -- oh.

MR. KANE: Ms. -- yeah. I can do that.

THE COURT: Oh, I'm sorry. Mr. Kane. Mr. Kane.

MR. KANE: Sure.

THE COURT: I wanted to start tomorrow.

MR. KANE: Right.

THE COURT: I want to start with Mr. Kane.

MR. KANE: Mr. Nambiar, I have confirmed, is available from 9:30 to 10:30 and then he gets on a plane.

THE COURT: Okay.

MS. LINDAUER: Okay.

MR. KANE: So we've got to finish him by 10:30.

MS. LINDAUER: So, Your Honor, if it's all right, what we'll do is we'll -- we could call Mr. Nambiar first in the morning so that he can meet his schedule. And then I would propose at that point we provide our offer of proof with regard to Mr. Dooley. And then I can confer with a few other witnesses to see who else we can slide in tomorrow for that -- whatever that remaining time slot is.

And then, but I think that really only leaves our last witness, which would be Mr. Martin, which may take a bit of time, but anyway, I think we can try to use your morning expeditiously on that. And that would -- and then we would follow up with Mr. Barton.

THE COURT: I mean, if we take a short recess now would you be able to get your offer of proof ready so that? Some of these witnesses are really taking a long time. I would really like to finish Mr. Nambiar.

Mr. Kane, how long did you say we have tomorrow?

MR. KANE: He has one hour and then he's getting on a

flight.

THE COURT: Okay. His testimony has taken, I thought, really longer than I was expecting. I really want to start with him in the morning, so would you be able to be prepared to make your offer of proof if we take a short recess?

MS. LINDAUER: Tonight?

THE COURT: Yes.

MS. LINDAUER: I'm not sure that I could get my thoughts together, Your Honor, that quickly. I mean, I really would like to be able to do it after Mr. Nambiar tomorrow if we could. Go ahead and let him and then do the offer of proof with Mr. Dooley immediately following Mr. Nambiar. That would give me some time to get my thoughts together on what to cover on that particular topic.

THE COURT: Hold on, please.

MS. LINDAUER: Sure.

THE COURT: Mr. Kane, what are your thoughts on that?

MR. KANE: Again -- yeah. For this, I would prefer to be done with Mr. Dooley this evening, Your Honor. I understand that this was, I guess, unexpected for Ms. Lindauer, so, you know, I'm trying to be accommodating to that. I'll have to defer to Your Honor on this. My focus is on ensuring that we can complete Mr. Nambiar's testimony tomorrow.

THE COURT: All right. So I'm not going to put Ms. Lindauer on the spot. I did raise the issue on my own, so we

will pick up in the morning with Mr. Nambiar. And again, tell me. We have one hour with Mr. Nambiar?

MR. KANE: Yes, Your Honor.

THE COURT: We --

MS. LINDAUER: And, Your Honor, we'll endeavor to complete Mr. Nambiar tomorrow.

MR. KANE: I mean, I anticipate that I'll have a couple of follow up questions for Mr. Nambiar, but limited. I will assure this Court that I will limit my follow-up questions to ten minutes and no more.

THE COURT: And, Ms. Lindauer, are you going to be able to finish your questions in 30 minutes or less?

MS. LINDAUER: Yes, Your Honor. I'll make sure Mr. Nambiar makes his airplane.

THE COURT: Okay. I'm going to hold you to that time estimate.

MS. LINDAUER: Understood.

THE COURT: And so we will pick back up tomorrow morning, what did I say, at 9:00?

MS. LINDAUER: 9:30. I think 9:30.

MR. KANE: 9:30, Your Honor.

MS. LINDAUER: At 9:30.

THE COURT: Hold on one second, please.

Okay. So we have Mr. Nambiar for 30 minutes plus 10 or 15 of follow up by Mr. Kane.

MS. LINDAUER: Okay.

THE COURT: Then you're going to do your offer of proof.

MS. LINDAUER: With Mr. Dooley.

THE COURT: And then you're calling Mr. Barton?

MS. LINDAUER: No, Your Honor. I don't know if I'll get to Mr. Barton tomorrow. I was going to look at calling -- we have a couple of shorter witnesses still to call and I need to --

THE COURT: I really -- I know I have a kind of wide discretion in the order of the witnesses. I really want to hear from Mr. Barton.

MS. LINDAUER: Okay. Well, I know Mr. --

THE COURT: Can you start with him tomorrow?

MS. LINDAUER: I can check with him and see what his availability is, Your Honor. Well, you mean start with him after Nambiar and Dooley?

THE COURT: Correct.

MS. LINDAUER: Okay. Let me -- can I let you know that first thing in the morning? I'll try -- well, I guess I could --

THE COURT: So who --

MS. LINDAUER: -- notify you this evening.

THE COURT: Who are the other witnesses?

MS. LINDAUER: So, Your Honor, I think we still have

-- let me look at our list. I don't see my list. Oh, let's see. I think we still have Mr. Kickham, which I have to confirm with. He was one of the funders, if you recall. I still have him on our list. And then we do still have, and you also have to rule on this, is whether we can call Mr. Kane or not on some points. So I'll leave that --

THE COURT: We're going to take that up at the end. We're going to take that up at the end, so.

MS. LINDAUER: At the end, okay.

THE COURT: So Mr. Kickham.

MS. LINDAUER: And then Mr. -- of course, Mr. Barton. Was there anybody else? I think that's it, Your Honor. And then there might be -- I think there is one possible. I don't know.

Mr. Kane, did you have any rebuttal witnesses you were planning on calling?

MR. KANE: At this point, probably not.

MS. LINDAUER: Okay. And, Your Honor, there is one other. I think you remember the name, Fleeger, Mr. Fleeger.

THE COURT: I remember the name.

MS. LINDAUER: There might -- yeah. There might be one or two questions of him, but again, he would be extremely short.

THE COURT: Is he on a witness list?

MS. LINDAUER: He is not on -- I don't think he is

on.

MR. KANE: No. He's not.

MS. LINDAUER: He would be being called as a rebuttal to some testimony of Mr. Nambiar.

THE COURT: Okay. But you --

MS. LINDAUER: Again --

THE COURT: You have not reached out to Mr. Kickham to find out what his schedule is for this week?

MS. LINDAUER: No, we have. We have. Mr. Walji and Mr. Barton have been in touch with him. I'll just have to reconfirm with them. If he's not available tomorrow, then we just won't call him, but I need to verify if he still is available.

THE COURT: And what's your time estimate for Mr. Kickham?

MS. LINDAUER: Probably 45 minutes max, something like that.

THE COURT: Your time estimate for Mr. Barton?

MS. LINDAUER: Oh, conservatively, maybe an hour to an hour and a half, maybe a little longer.

THE COURT: And Mr. -- if Mr. Fleeger is a rebuttal witness, what is your time estimate?

MS. LINDAUER: He'd be -- he would be like 15 minutes, Your Honor. He would be very short. Unless Mr. Kane has issues of him.

THE COURT: So it sounds like we're going to finish this week.

MS. LINDAUER: Oh, yeah. I think we'll finish this week.

THE COURT: Okay. Okay. That helps me kind of plan for the next couple of days. So if Mr. Kickham is not available, Mr. Barton is going to be up to bat.

MS. LINDAUER: Okay. Let me -- let me verify that with him, Your Honor, because I think Mr. Barton was anticipating testifying on Friday if that's possible. That's my only concern with is his schedule. Not unlike Mr. Nambiar, I think he's got transactions he's working on. But I know we had set aside Friday also for some time.

So I would ask the Court if Mr. Barton does have a conflict late in the morning tomorrow if we -- if we could take him first thing on Friday morning. I know -- I know the Court would like to obviously get to his testimony.

THE COURT: I'm just concerned because honestly the time estimates have not been accurate at all, so.

MS. LINDAUER: Well, I understand, Your Honor.

THE COURT: So we have -- so tomorrow morning we have from 9:30 to noon.

MS. LINDAUER: Correct.

THE COURT: So two and a half hours and I'm only hearing that maybe Mr. Kickham is available for, and if so, 45

minutes. So I was kind of expecting to have witnesses ready to go tomorrow from 9:30 to noon. I mean, that's part of the problem we've had so far is kind of being proactive and having witnesses available and ready. And we did set aside from 9:30 to noon tomorrow.

MS. LINDAUER: Right.

THE COURT: So I would like to fill that time.

MS. LINDAUER: Okay. Well, let me work on that right now, Your Honor.

THE COURT: Okay. Because you indicated Mr. Barton had a conflict in the late morning. How late?

MS. LINDAUER: What time? Hang on. Let me ask Mr. Walji if he knows what his schedule is.

My understanding is that Mr. Barton may be involved in another hearing starting late tomorrow morning and into the afternoon is what I'm being told. But, again, I don't have him here to ask, so I will definitely verify with him exactly what that looks like.

THE COURT: A hearing where?

MS. LINDAUER: I think it's in the Fort Worth court that he has a hearing.

THE COURT: Is this with Judge Mullin or Judge Morris case?

MS. LINDAUER: I think it's a Judge Mullin case. Judge Mullin agreed to reopen our evidence in a case. I know

that's set for a hearing tomorrow afternoon. I know that Mr. Martin and Mr. Barton are the two people involved in that case.

THE COURT: So let me look at Judge Mullin's docket.

MS. LINDAUER: I think it's at 2:30, Your Honor, if you want to check that. And then there is a 1:30 with Judge -- I have a 1:30 with Judge Rhodes also. I think you'll see it's down as BM318 is the name of the case in Judge Mullin's court.

THE COURT: I'm getting there.

MS. LINDAUER: Okay.

THE COURT: BM318 is a 2:30 matter.

MS. LINDAUER: I'm sorry. Is it a 2:30 matter, Your Honor?

THE COURT: Correct.

MS. LINDAUER: That is correct, Your Honor.

THE COURT: So Mr. Barton doesn't have a conflict in the morning then?

MS. LINDAUER: Well, I think what I'm being told is he's supposed to be preparing for that hearing, but oop.

THE COURT: I heard an oop. I wasn't sure what that was, Ms. Lindauer. Ms. Lindauer, are you with us?

Ms. Smith, can you -- it appears that she's still on and her camera appears to be functioning.

Mr. Phelan, are you still there?

MR. PHELAN: I am, Your Honor.

THE COURT: Do you have Ms. Lindauer's cell phone

number?

MR. PHELAN: Hang on. I might.

THE COURT: Mr. Kane, do you have Ms. Lindauer's cell phone?

MR. PHELAN: Yeah, I do. I've got it here.

THE COURT: Would you kindly -- you could put yourself on mute and hide your video. Would you kindly call her and ask her to rejoin?

MR. PHELAN: I will do that.

THE CLERK: Joyce, I've got you.

THE COURT: Ms. Lindauer, are you there?

THE CLERK: Sorry about that, Your Honor. We got her back up and she's coming back to this computer now.

THE COURT: Thank you.

MR. PHELAN: I assume I'm relieved from my obligation to call on her cell phone.

THE COURT: You are so relieved.

MR. PHELAN: Thank you, Your Honor.

MS. LINDAUER: I'm sorry, Your Honor. We lost power for just a second and the computer went dead. So I guess we're back now. Thank you.

We're confirming with Mr. Barton his availability late in the morning and I think that we'll be able to make him available. So when we get done with Mr. Dooley's offer of proof, if we don't have Mr. Kickham for a short period of time,

or even if we do, then we would call Mr. Barton next. We'll just have to make some arrangements on his schedule.

THE COURT: Yeah. I would appreciate that because I want to use all available -- all of the available Court time. And we have set a lot of time aside for this hearing.

MS. LINDAUER: Oh, I understand, Your Honor.

THE COURT: And --

MS. LINDAUER: And I do appreciate all the time you have set aside. Obviously, it's an important matter to both parties, so I do appreciate that.

THE COURT: So I would like to use up all the hours that we have tomorrow from 9:30 to noon. So we'll be in recess until 9:00 tomorrow morning. And I'll just ask you to have --

MS. LINDAUER: And, Your Honor, can I confirm? That's 9:30.

THE COURT: 9:00. Is that -- what did I say, 9:00 or 9:30?

MS. LINDAUER: 9:00, 9:30.

THE COURT: Yeah. 9:30 to noon tomorrow.

(Proceedings concluded at 5:43 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, and CRYSTAL THOMAS, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Michelle Rogan

MICHELLE ROGAN

/s/ Crystal Thomas

CRYSTAL THOMAS, CET-654

LIBERTY TRANSCRIPTS DATE: July 1, 2022