IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Thursday, June 30, 2022<br>9:33 A.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

For the Debtor:

Joyce Lindauer Attorney, PLLC
BY: JOYCE LINDAUER, ESQ.
1412 Main Street, Suite 500
Dallas, Texas 75202

Simmons Legal, PLLC
BY: CAMISHA SIMMONS, ESQ.
6060 North Central Expressway
Suite 500
Dallas, Texas 75206

Robin Phelan Law
BY: ROBIN ERIC PHELAN, ESQ.
4214 Woodfin Drive
Dallas, TX 75220

Fee Smith Sharp & Vitullo LLP
BY: OSCAR REY RODRIGUEZ, ESQ.
13155 Noel Road, Suite 1000
Dallas, Texas 75240

APPEARANCES CONTINUED ON NEXT PAGE.

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

---

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES VIA WEBEX (CONTINUED):

| | |
|---|---|
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |
| For the United States Trustee: | Office of the United States Trustee<br>BY: ASHER BUBLICK, ESQ.<br>1100 Commerce Street<br>Room 976<br>Dallas, Texas 75202 |

# I N D E X


| | Page |
|---|---|
| Case called | 4 |
| End of Proceedings | 115 |
| Certification of Transcriber | 115 |

WITNESSES

FOR THE DEBTOR:

| | |
|---|---|
| VIPIN NAMBIAR | |
| Direct Examination (Resumed) by Ms. Lindauer | 5 |
| Cross-Examination by Mr. Kane | 31 |
| MARSHAL DOOLEY | |
| Direct Proffer by Ms. Lindauer | 43 |
| MATTHEW FLEEGER | |
| Direct Examination by Ms. Lindauer | 66 |
| TIMOTHY BARTON | |
| Direct Examination by Ms. Lindauer | 73 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 9:30 a.m.)

THE COURT: Good morning. We are here on the 9:30 docket. We have the 2999TC Acquisitions case. I'll take appearances.

MR. KANE: John Kane of Kane Russell Coleman and Logan for HNGH Turtle Creek, LLC, the pre-petition lender.

THE COURT: Good morning.

MS. LINDAUER: Good morning, Your Honor. Joyce Lindauer and Rey Rodriguez, here for 2999TC Acquisitions, the reorganized debtor.

THE COURT: Good morning.

MR. PHELAN: Your Honor, Robin Phelan, also for the reorganized debtor.

THE COURT: Good morning.

MR. METZGER: Your Honor, Steve Metzger representing Tim Barton, individually.

THE COURT: Good morning, Mr. Metzger.

Do we have everybody? You're not expecting Ms. Simmons this morning, Ms. Lindauer?

MS. LINDAUER: No, we are not, Your Honor, and let me look at the names. I do believe that that is everybody that we're expecting this morning.

THE COURT: Okay. I believe, Ms. Lindauer, you said you needed 30 more minutes with Mr. Nambiar, so let's get started.

MS. LINDAUER: Okay. Thank you, Your Honor.

THE COURT: Mr. Nambiar, you're still under oath.

THE WITNESS: Yes, Your Honor.

DIRECT EXAMINATION (RESUMED)

BY MS. LINDAUER:

Q Mr. Nambiar, just for the record, since we sort of broke up your testimony a little bit, I want to go back and ask you a few questions based on your testimony over the last day or so. I believe -- do you have a set of the exhibits in front of you or are you pretty much relying on what we put up on the screen?

A I'm relying on what you put up on the screen.

Q Okay. So I'll try to be good about doing that so you can help me. One of the issues I asked you about, and I was a little confused by your answer, was on the springing nature of the underlying agreement that you had with Madison.

Do you remember, I had asked you a few questions about that particular situation?

A If you don't mind asking me again, I don't --

Q No. And that's fine. That's why I'm going to come back to it because I don't know that I understood your answer.

A Okay.

Q Honestly, I probably asked it very poorly, so I'm going to just revisit that for just a minute.

MS. LINDAUER: Ms. Ollar, if you're on the computer, if you could pull up Debtor's Exhibit 17.

Okay. And it's Page 89 of 148.

BY MS. LINDAUER:

Q And, this is a document we've already looked at, Mr. Nambiar, a couple of times, a document called a participation agreement, correct?

A Yes, ma'am.

Q Okay. And this is the document that gave your company interest in the loan that had been made by Madison to 2999. At the time, it was called MO, but MO 299. But now we know it as 299TC [sic] Acquisitions. Is that correct?

A Yes, that's my understanding.

Q Okay. If we take a look at Page 3 of that document, and again, the header on it is Page 91 of 148, and there's a Paragraph 2, purchase of participation interest.

A Okay.

Q All right. And your entity that purchased this participation is referred to in this document as GHCP.

Is that correct?

A Yes, ma'am.

Q All right. And I think that -- can you tell us? I think that was because there were a lot of 2999 Turtle Creek entities already floating around. Is that the reason they picked those letters?

A No. I think GHCP just stands for Green Hollow Capital Partners who --

Q Okay.
A -- all my testimony. They were the advisors that we had partnered with for sourcing and making credit investments for us --
Q Okay.
A -- in New York. And so this is just a short form for that company.
Q Okay. And just to be clear, the original participation of -- and it wasn't Green Hollow that was actually the participant. The participant was HNGH Turtle Creek, correct?
A Yeah. The funder was HNGH Turtle Creek, correct.
Q Okay. And the original participation was $7 million.
Do you see that?
A Yes, ma'am.
Q All right. And if we take a look at --
MS. LINDAUER: And we dropped down to Paragraph 7.
BY MS. LINDAUER:
Q This is a default provision that purports to provide that in the event of a default by the borrower, if GHCP, that's your company, elects to keep Madison current, then under (i) GHCP will make all the decisions as if GHCP is the lender under the loan documents. Is that right?
A Yeah, that's how I read this, correct.
Q Okay. So in the event of a default, basically your company under -- and I'm not going to read all of these

sections. But under this section of the participation agreement, it would basically be the decision maker as between Madison and HNGH going forward on this particular loan.

Is that right?

A Yeah. This was a junior subordination, so that would make sense.

Q All right. And was there at some time after HNGH acquired the participation interest, was there a claim of an event of default?

A Was there an event at default?

Q Yes.

A Yes, there was.

Q Okay. Can you tell us just briefly what that was?

A I mean, there was a series of defaults that occurred. The first one occurred when the borrower to this loan failed to make property tax payments. That was an event of default in the loan agreements I recall.

The next was after some of the initially reserved interest ran out, there was a payment default. I believe that happened in either June or July of 2020. And then, ultimately a maturity default that happened in October of 2020.

Q So at the time of the first of those defaults, which you claim was the tax payment default, do you know, Mr. Nambiar, if there was in fact a tax escrow being held by Madison that had funds that would have covered tax payments?

A I do not. I do not know that to be the case.

Q All right. And at the time that that --

MR. KANE: Your Honor, objection. Relevance. I mean, the forbearance agreement executed by the debtor acknowledges the defaults that had taken place at the time. So I'm struggling to understand the relevance of a discussion of defaults --

MS. LINDAUER: Your Honor --

MR. KANE: -- at this point.

MS. LINDAUER: Your Honor, Mr. Kane keeps doing this with introducing facts from other documents to coach his witness during his objections, and I would object to the way that he couched his objection. So he goes, well, let's look at this other document, Judge. This other document tells us -- that is not a proper objection.

But I understand his relevance objection and I'm getting to why this is relevant in just a minute. But all I was trying to do was establish that, at some point, there was a claimed default, whether it was a real default or not is not terribly relevant, but whether there was a claimed default that allowed his company, HNGH, to essentially become the decision maker with regard to this particular loan. That's all I'm getting to, Your Honor.

THE COURT: Okay. So I didn't take it as coaching his witness because I think we've heard this so many times

before, I'd be shocked if anybody (audio interference).

But tell me again the relevance, because I'm not sure I understand your relevance explanation, Ms. Lindauer.

MS. LINDAUER: Okay. So yesterday, I believe I asked, or maybe if it was yesterday, but whenever we had Mr. Nambiar on the stand before I asked him about the springing nature of this agreement and he provided me an answer that didn't make a lot of sense to me.

And so what I was trying to do is just actually look at the actual documents and how they operated with regard to Madison and HNGH with regard to the questions of control in the event of a default. So that's all I was going through with him is where that --

THE COURT: And how's that relevant to the issues before the Court? I still haven't heard -- I don't understand your explanation for that.

MS. LINDAUER: Okay. Well, in the bigger scheme of things, Your Honor, it will be, and is the debtor's position, has been the debtor's position, that HNGH came into this loan with one purpose in mind, which was to become the ultimate owner of the property. But they never intended to actually be a lender. They intended to be an owner/developer.

These types of provisions, these springing control provisions, decision-making provisions, I think the testimony will be from Mr. Barton, are very atypical. This is not a

typical type of lender arrangement. Now, Mr. Nambiar may disagree. But I think, Your Honor, as we go through the history of the relationship of the parties, which Mr. Kane spent a good deal of time with you going through some of that, that the goal here and the reason for provisions such as this was to ultimately give HNGH the control of the loan, ultimately put them in a position to acquire ownership of the property, and that's why today, when I asked Mr. Nambiar, would you accept a payoff today, I think the answer will be no. And so --

THE COURT: Okay. But as to the suggestion that they had some untoward motives in acquiring the loan, are you suggesting that the debtor has a claim against the lender for that?

MS. LINDAUER: I think, Your Honor, to the extent that we had a claim against them for that it's probably been released, but I do think --

THE COURT: So why is it relevant, then?

MS. LINDAUER: Well, because as we lead up to May 31st and the ultimate payoff of HNGH and the providing of various documents, I do think you will see, as Mr. Kane tried to explain to you, that there was a pattern here of the lender from the very inception to take ownership of this property. They never -- Your Honor, it's our position, and I understand you may disagree, but it's our position that they never

intended to close on May 31st, that if they had truly intended to close on May 31st, they would have done a number of things that did not happen.

And I know you're waiting to hear from Mr. Barton whether we actually had the money or not, but irrespective, they had things that they were supposed to do in order for us to close and they are the ultimate beneficiary of ownership of this property if, in fact, there was not a closing on May 31st, unless they did not fulfill all of the requirements necessary. And we can claim that, in fact, they were the first to breach or be in default, which is our position.

THE COURT: Okay. So connect the dots for me. I'm --

MS. LINDAUER: Okay.

THE COURT: I think I understand your argument is that they had no intention of closing. How does this connect the dots? How do these lines of questions have anything --

MS. LINDAUER: Okay. So they had --

THE COURT: -- to do with that?

MS. LINDAUER: Your Honor, from the very inception --

THE COURT: Ms. Lindauer? Ms. Lindauer? Ms. Lindauer?

MS. LINDAUER: I'm sorry.

THE COURT: We have to -- I know it's WebEx. We have to try not to talk over each other so --

MS. LINDAUER: Understood.

THE COURT: You started answering before I finished.

So help me connect the dots on how your allegation that they never intended to close. Help me understand how these questions have anything to do with that.

MS. LINDAUER: Okay. So, Your Honor, going back to their beginning of their inception of their relationship with the debtor, which starts with the participation agreement, the first document, that in the participation agreement, they contracted with Madison for various terms and provisions that would allow them, in the event of a default, real or otherwise, to claim position as primary lender, even though they had only paid $7 million of a $32,500,000 loan. They had paid $7 million to get a controlling position as lender under these documents.

And then, as you've heard, they ultimately bought out Madison and took over 100 percent control of the loan. And I believe that the testimony will show, to come, that as a lender, they were in the business of trying to sell the debtor's property at a time that the debtor owned the property.

So it's building that history, Your Honor, of why now, on May 31st, there was motive for them not to provide all of the needed documents and to cooperate, I know you hear them say, "Oh, Judge, we were cooperating," but at the end of the day, when they say we put pens down and we send wire transfer

instructions after wire cutoffs, and they do all the things that they've done, I think there's a history here of their interest in taking over ownership of the property. So that's all I'm --

THE COURT: Okay. So for now, I'm going to for now overrule the relevance objection. I don't know that it's relevant, but we're spending more time than I think maybe we need to, so let's get on with the questions if you could, and then -- anyway.

MS. LINDAUER: Okay, Your Honor.

THE COURT: Go ahead. For now --

MS. LINDAUER: Okay. Your Honor, I'm not going to --

THE COURT: -- I'm overruling the relevance objection --

MS. LINDAUER: I'm not going to belabor this point.

BY MS. LINDAUER:

Q The only reason I came back to it, Mr. Nambiar, is I was confused by your answer when I asked you about the springing rights, and so I just wanted to go back to the source documents and look at those as to what those springing rights were, if you will, and the source of those rights.

So, Mr. Nambiar, you claim there was a default, first of all, which was a tax issue, is that right?

A Yes. If you don't mind, since you were confused by my response, if I can clarify my response on the springing rights

that you just referenced.
Q Okay. Well, let me do this. Maybe I can ask another question that allows you to do that, all right.
A (No audible response)
Q Okay. So, Mr. Nambiar, under the participation agreement, that's the operative document, correct, that dictated the relationship between HNGH and Madison, correct?
A Yes, ma'am.
Q Okay. And under that document, if there were defaults, then HNGH was given the ability as the minority participant to assert certain rights in connection with things like foreclosure and other types of -- and they're spelled out here in this document. Is that right?
A Yes. And can I respond to that if you don't mind?
Q I think you just did. You said, yes.
Mr. Kane can ask you a follow-up, okay.
All right. So, Mr. Nambiar, and I don't want to belabor this point, but --
A No, but I think I just want to make sure you -- you just made an assertion and there was something about, you know, minority position that I don't think is accurate the way you just described it.
Q Okay. Well, and again, we'll let your counsel ask you those questions, Mr. Nambiar.
A Okay.

Q And, again, I don't want to -- I know you're on a short time fuse --
A Yeah.
Q -- this morning, so I'm trying to cover things fairly quickly.
There was, you said, at least your testimony is, is that there was a default after you became a loan participant. And then, the default you mentioned was a tax payment default. Is that right?
A That was the first one. There were multiple --
Q Okay.
A -- defaults, as you know.
Q Under this participation agreement, after that tax default, was there ever a time when Madison reacquired the position as the decision maker on the loan, or did HNGH Turtle Creek remain in that position throughout the loan until it bought out Madison?
A I -- you know, like I said, before Green Hollow Capital in New York was the actual advisor managing this investment until later in the process when I and HN Capital got involved, and so they were leading "the workout" with Madison. And my understanding at the time was that they were making all those decisions collaboratively with Madison jointly.
Q Okay. All right. So it's your testimony that HNGH was not exercising its right to be the sole decision maker after a

default. Is that right?

A Yeah. I mean, as I said, I was not managing this investment day-to-day at the time. Our advisors in New York were. And my recollection is that those, you know, it was a collaborative relationship between Madison and Green Hollow and those decisions were being made, you know, after discussion between respective counsel.

Q And was Green Hollow the owner of the participation or just the advisor on the participation? I'm not clear about that.

A Yeah. So, I mean, you know, I think you have to understand in the investment management business, an advisor is not just an advisor. They have -- they're acting on behalf of the -- because the investors in these vehicles have no discretion, no say. They're purely passive. There's a fiduciary contract that's overseen through these registered investment advisor paradigm and regulations and those are what we operate under. Those are what Green Hollow operated under and they were the advisor.

Q Okay. So you told me at some point, Green Hollow was taken out of the relationship with HNGH Turtle Creek.

Is that right?

A Yeah. We terminated that advisory agreement.

Q Okay. All right.

And maybe I've asked you this and I've just forgotten, but

is there some entity now that is acting as the advisor for HNGH Turtle Creek LLC?
A No. HN Capital has now taken over this investment.
Q And that's not in an advisory role, it's as a manager of -- well, I guess that's the question.
Is it a manager then of HNGH Turtle Creek LLC?
A Yes, it is.
Q Okay.
Now, you told us -- when I asked you the other day about the ownership structure of HNGH Turtle Creek, you generally described some of the ownership structure for us, but then you said that the actual members of HNGH Turtle Creek that there is some confidentiality associated with that. Is that right?
A Yeah. It's a private fund. I don't believe that I'm allowed, as the registered advisor here, to disclose client information. I did testify that there was, you know -- this is a registered offering, that there is no single member that owns more than 50 percent, for example, of this underlying entity and no downstream member exercises any control other than the manager.
Q And how would we know that without having access to your underlying corporate documents?
A I mean, I guess you're getting my testimony on it under oath.
Q But there's no way I could validate your testimony under

oath if there's some sort of confidentiality that prevents you from answering questions about the specific ownership structure of HNGH. Is that correct?

A Yeah. I don't know that -- I don't understand why that matter is so relevant here. But, you know, that would be a -- I would defer to my counsel on what we're able to provide, what the RIA regulations allow me to provide on client information. I would need advice on that.

Q Have you sought that advice since the beginning of these hearings about a week and a half ago?

A No. I just didn't -- I did not understand it to be relevant to this matter.

Q All right.

If we take a look --

MS. LINDAUER: Sydney, if you pull up Exhibit -- we've looked at this many times -- Exhibit 33A.

THE COURT: While you're pulling that up, Mr. Nambiar, what's your drop-dead this morning?

THE WITNESS: 10:30, Your Honor.

THE COURT: All right. Mr. Lindauer, I'm going to give you until about 10:15 to allow Mr. Kane time for cross.

MS. LINDAUER: I will, Your Honor. I was working towards his deadline from yesterday.

BY MS. LINDAUER:

Q Mr. Nambiar, I believe you have seen the title commitment

that was provided by Sendera Title as part of this closing transaction. Is that right?

A I have only peripherally seen it through the few testimonies that I sat through for Mr. Marx and others. But as I mentioned yesterday, I was not involved in the mechanics of the closing. We had competent counsel, both internal and external, that were handling this. They're, you know, adept lawyers that know how to finish a closing transaction. I was relying on them.

Q Okay. If we take a look of this exhibit, and this is lender -- for the record, Lender's Exhibit 33, and we're looking at 33A of that document, Page 7 of 16, which is the Schedule C. We've been over this several times. But --

MS. LINDAUER: And, Sydney, if you'll scroll to the next page, Page 8, Item 11.

BY MS. LINDAUER:

Q Do you see, Mr. Nambiar, there was a title company requirement that HNGH Turtle Creek LLC, limited liability company, which is a party to the subject transaction, provide a series of A, B, C, D, and E documents.

Do you see those?

A Yes. I believe you've asked my counsel this question. He was handling this and was right and prepared to provide an incumbency certificate to alleviate any concerns here.

Q Okay. Well, you said an incumbency certificate. Is that

specifically one of the items being requested here?

A You know, again, you know, it is my experience, Ms. Lindauer, that sometimes, we might have a solution to solving a series of questions from the title company that might be a more efficient way to solve that problem. And so, just because these points are here doesn't mean that an incumbency certificate would not have alleviated the title company's concerns. And I believe that they confirmed that it did.

But, again, that was a question for my counsel and I believe you've already asked him that. I was not involved in the mechanics of this closing.

Q Okay. So just to be clear, there was a draft, you're telling us, of an incumbency certificate prepared.

Is that right?

A That is my understanding.

Q Okay. And who executed that incumbency certificate?

A I was standing ready to execute it until I was told pencils down.

Q Okay. All right. But you didn't actually execute that document. Is that right?

A I don't recall that I did, to be honest. I'm not sure if it's relevant, but I know I was ready to execute it.

Q Okay. And just to be clear for the Court, you, on behalf of HNGH Turtle Creek LLC, were not going to provide items A through E under Paragraph 11. Is that right?

A Well, we might have very well provided it. I'm just saying that I know that we were also providing an incumbency certificate to, you know, quash any problems or questions on authority.

Q Okay. Let me ask it again, Mr. Nambiar.

You said we very well may have provided it, but as you sit here today, on May 30th and 31st, were you actually prepared to provide items A through E to the title company?

A Again, it would not be me to provide them, so your question of "were you prepared to provide" is problematic. But I think that you have asked my general counsel this question and he had confirmed that he was ready to provide this, I think, is the way I recall his testimony.

Q Okay. So let me ask you, because I'm trying to understand, you're telling us that the ownership of HNGH Turtle Creek LLC, for purposes of this hearing and other matters, is confidential. Yet, now you're telling us that you, or your general counsel, would have provided these documents, including articles of organization, regulations, resolution of members, that you would have provided all these documents to the title company, documents that you claim would be confidential in connection with the ownership of HNGH Turtle Creek LLC.

Is that correct?

A Providing confidential (audio interference) --

MR. KANE: Objection. (Audio interference)

testimony.

THE WITNESS: Sorry. Go ahead.

THE COURT: There's an objection. I couldn't quite hear Mr. Kane's objection.

MR. KANE: I said objection, misstates testimony.

THE COURT: So I will overrule it and allow the witness to answer.

BY MS. LINDAUER:

Q Mr. Nambiar, did you understand the question?

A Yeah, I did.

And, you know, again, I think you're going to have to confirm my counsel, but providing the debtor with confidential information is a different matter than providing the escrow agent confidential documents under the confidentiality, you know, and highlighting the requirement for confidentiality. That is the whole point of why we have an escrow agent in these types of transactions.

Q Okay. So let me be clear. It's your testimony that by providing these documents to the escrow agent or the title company, that they would be under some obligation to maintain the confidentiality of these documents?

A We would only provide it if they, you know, confirmed that they would maintain that confidentiality of member information and the, you know, other provisions of the lender's operating agreement.

Q Okay. Did you receive anything from any title company, Sendera, Chicago, any title company that indicated that they were willing to maintain the confidentiality of the Item 11 documents should you provide those to the title company as required by this title commitment?

A Yeah. Again, these are mechanics of how, you know, those types of agreements would have been worked out between title company. It is my experience that an incumbency certificate resolves these issues, and to the extent that anything further was required in the past, we have been able to confirm confidentiality with escrow agents, absolutely.

MS. LINDAUER: Your Honor, I'm going to object to non-responsive. He keeps coming back to an incumbency certificate and I didn't ask him about an incumbency certificate. So as to this -- to the extent that his answer was non-responsive on that point, I would ask that his answer be stricken and his answer be limited to his, I guess, he testified something to the effect of that's been his experience with title companies that they will enter into, I guess, some sort of confidentiality agreement is --

THE COURT: Overruled. I think his answer was responsive.

Next question.

MS. LINDAUER: All right.

BY MS. LINDAUER:

Q Mr. Nambiar, did you in fact have any type of confidentiality agreement with any title company as part of this closing?

A Ms. Lindauer, I have to keep telling you, I was not involved in the mechanics of this closing. So you keep asking me --

Q Okay.

A -- you know, closing mechanics questions, and I keep telling you I was not the person doing it.

Q So the answer is you don't know the answer to that question?

A I don't know.

Q Okay. And you're telling us that Mr. Christiansen or your outside counsel would be the people that would know the answers to those questions?

A Yeah. They were handling the mechanics of the closing.

Q And just to -- and we've asked this before, but I want to just clarify. The only document that was actually sent over to a title company was a special warranty deed on May 27th, 2022. Is that right?

A Yeah. Again, you're going to have to confirm with them.

Q Okay. So you don't know if any other documents were sent over --

A I don't --

Q -- between May 27th and May 31st?

A I know that there were extensive back and forth between, you know, my counsel, Mr. Kane, and various parties, including title companies, so it is just -- I just was not part of those -- that correspondence.

Q Okay. Let me ask you, you would have been the one responsible for signing a release of lien. Is that right?

A I would have been one of the officers that could have signed it.

Q Okay. Did you actually sign a release of lien between May 27th and May 31st?

A I don't recall.

Q Okay. Did you sign any other releases, note reinstatements, or similar documents between May 27th and May 31st, other than the special warranty deed that we looked at?

A I think the special warranty deed that we signed included the provision for (indiscernible) statements, so the answer to the question is --

MS. LINDAUER: Objection. Your Honor, objection. Non-responsive. I asked did he sign any other documents. I understand his legal position on that document, but did he sign any other documents, and his answer was not responsive.

THE COURT: Overruled.

You can ask another question if you'd like.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:

Q Mr. Nambiar, you're aware that as part of these proceedings, shortly after the May 31st closing did not occur, that the debtor filed a adversary proceeding.

Are you aware that?

A Yes.

Q Okay.

MS. LINDAUER: Ms. Ollar, can you pull that up real quick?

THE COURT: Just a reminder of the time, Ms. Lindauer, it's 10:02.

MS. LINDAUER: I'm watching, Your Honor.

BY MS. LINDAUER:

Q Mr. Nambiar, have you had an opportunity to review this particular complaint that's been filed?

A Not in detail, no.

Q All right. And you'll notice that the parties to this are just the debtor and HNGH Turtle Creek. Do you see that?

A Yes, ma'am.

Q Okay. And you're not named as a party in this, right?

A What I'm looking at the screen, I don't see that I am.

Q And it says, "Original complaint for breach of contract and declaratory relief." Do you see that?

A Yes.

MS. LINDAUER: And you can drop down a little bit,

Sydney. And if you could go just to the request for relief.

THE COURT: Was this one of the exhibits, Ms. Lindauer? Or did you just pull this up from the docket?

MS. LINDAUER: Your Honor, we pulled it up from the docket. It wasn't marked as an exhibit, but it is a docket reference.

THE WITNESS: I see a schedule with $9 million. Can you -- is that right?

BY MS. LINDAUER:

Q Well, I mean, Mr. Nambiar, your attorney can ask you some questions.

A Okay.

Q Mr. Nambiar, you see the first count is simply breach of contract?

A Yes.

Q I've got it up on the screen for you.

A Yes.

MS. LINDAUER: Okay. Go on down, if you could.

BY MS. LINDAUER:

Q The next one is request for declaratory judgment.

Do you see that request?

A Yes.

Q Okay.

MS. LINDAUER: And then going down, Ms. Ollar.

BY MS. LINDAUER:

Q And then prayer for relief. Do you see that?
A Yes.
Q Okay. Now, if you look at the request for relief, the prayer for relief, one of the items is "Ruling in favor of plaintiff on breach of contract claim and award actual damages and (indiscernible) as a result of the -- HNGH's conduct and award title -- award plaintiff the title to the property at issue."
Do you see that?
A Yes.
Q Okay. Is that request similar to a request that you've made in your motion to enforce?
MR. KANE: Objection. Calls for a legal conclusion.
THE COURT: Sustained.
MS. LINDAUER: Your Honor, he can answer --
THE COURT: Sustained.
MS. LINDAUER: Okay.
BY MS. LINDAUER:
Q Mr. Nambiar, do you have any understanding of the relief that you've requested of this Court in connection with these proceedings?
A No. I rely on counsel for that.
Q Okay. So you don't know that you're asking the Court to affirm or award your company, HNGH, title to the property at 2999 Turtle Creek. Is that right?

A I know that we are looking to enforce the prior order, agreed order that was entered into in March.

Q And just to be clear, Mr. Nambiar, during the pendency of these proceedings, have you had your deposition taken?

A No.

Q Has any discovery been sent on you or any parties at HNGH?

A I don't believe so.

MS. LINDAUER: Your Honor, I'd ask the Court to just simply take judicial notice of the complaint that's been filed. It does appear -- Ms. Ollar, if you can run up to the very top so we can reference the docket entry number for this particular document.

It does appear as part of the Court's docket, Docket Item 152.

I think, Sydney, if you can go -- there you go, 152. And then, of course it would be Docket Number 1 in 2203061, and we ask the Court simply to take notice of the filing of this complaint on June 9, 2022.

THE COURT: Any objection to my taking judicial notice of the filing of the complaint, Mr. Kane?

MR. KANE: No, Your Honor.

THE COURT: All right. I have taken judicial notice.

MS. LINDAUER: Thank you, Your Honor.

Your Honor, I'll go ahead and pass the witness at this time.

THE COURT: Mr. Kane, are you ready, or do you need a break?

MR. KANE: I'm ready, Your Honor.

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MR. KANE:

Q Mr. Nambiar, was this a loan to own?

MS. LINDAUER: Objection, Your Honor. Leading.

THE COURT: Overruled.

MS. LINDAUER: Your Honor, also calls for a legal conclusion and no foundation for him to understand what "loan to own" means. So, again, I would re-urge our objection.

THE COURT: So the original objection was leading, which I overruled. And tell me your other objection.

MS. LINDAUER: The further objection, Your Honor, is lack of foundation, assumes facts not in evidence, and asks for his legal opinion as to whether this was a "loan to own" loan, and that would call for a legal conclusion from someone who has already told us he is only a business person and has no legal background. So there's no foundation for him to tell us whether this in fact was a loan to own as a specific type of loan.

THE COURT: The assumes facts and evidence objection, I will overrule. As to the others, I'll just maybe ask Mr. Kane if he wants to maybe ask some foundational questions.

MR. KANE: Yeah, sure, Your Honor, I'll go ahead and do that.

BY MR. KANE:

Q Mr. Nambiar, did HNGH -- I think you've already testified, HNGH first obtained a participation interest from Madison.

Is that correct?

A Yes.

Q And then, I think you also testified that HNGH later acquired the entirety of the loan from Madison.

Is that correct?

A Yes, Mr. Kane.

Q At that time, was it HNGH's intent to obtain the loan to have an opportunity to foreclose or otherwise obtain the collateral securing that loan?

A Absolutely not. In fact, part of the reason we went ahead and did that --

MS. LINDAUER: Your Honor, objection. Objection. Non-responsive after "Absolutely not." That answered the question.

THE COURT: All right. Sustained.

You can ask another question, Mr. Kane.

BY MR. KANE:

Q Mr. Nambiar, can you provide some evidence from your experience or HNGH's experience with this loan to show that this was not, or that HNGH did not acquire the loan to

foreclose on the collateral?

A I have three points I would make.

One is, you know, there was a maturity default in October of 2020. I could have initiated foreclosure proceedings, proceeded through whatever forum that foreclosure proceeding took and just took title. Instead, I entered into a forbearance agreement, gave this debtor initially six months of time, and I think I was requested about 90 days of time relief to raise capital to pay us off. I discounted in that forbearance agreement the actual contract note to make the ongoing cost of capital payments for this debtor easier from 12.4 percent to 8 percent.

I further granted an extension in July for 90 days and then eventually, when we exercised our remedy with the deed in lieu under the forbearance agreement and bankruptcy was filed, we, through a settled agreed order, provided two extensions to this debtor all the way to May 31, 2022. So something that started in October of 2020, we're now sitting in July of 2022. I have given every available time that I could possibly grant this debtor to pay us off.

THE COURT: Mr. Nambiar, I was taking notes. The second point, or the third point was that you said you discounted the contract note, and you mentioned some percentages on the interest rate. Could you tell me? I didn't catch what you said.

THE WITNESS: Yes, Your Honor.

The original note had a 12.4 percent interest if I recall correctly. And to make the forbearance period easier while the debtor was raising capital, during the forbearance period, and assuming there were no defaults in the forbearance period, we agreed to take discounted carry payments, discounted interest payments to make it easier for this debtor to ultimately pay us off.

THE COURT: Right. I understood. I just didn't catch the percentage reduction.

THE WITNESS: So 12.4 percent to 8 percent. It was a 4.4 percent reduction.

THE COURT: All right. Thank you.

BY MR. KANE:

Q Now, Mr. Nambiar, I believe you testified earlier that the debtor paid it's $500,000 in consideration payments that were due under the first agreed order, correct?

A Yes, I believe so.

Q No dispute there.

And I believe you testified that those payments were made by wire. Is that correct?

A That's what I recall, Mr. Kane.

Q And did you also testify that some of those wires were transferred or paid by non-debtor entities on behalf of --

A Yes, I did.

Q -- debtor?
A Yes, I testified to that.
Q Had HNGH, to your knowledge, provided wire instructions to those non-debtor payors?
A We did not.
Q Had you provided wire instructions to the debtor during HNGH's administration of the note?
A Yes, we did.
Q Were those wires paid by non-debtor payors delivered into the Frost account that we saw earlier?
A Yes, I believe so.
Q Did you believe before May 31st then that the debtor already had wire instructions, sir?
A Yes.
Q And did you believe that the debtor had previously provided those wire instructions to payors to avoid default under the agreed order?

MS. LINDAUER: Your Honor, objection. No foundation for what the debtor may or may not have provided to non-debtors. He can testify that payments came from non-debtors, but how they got the wire information, he would have no personal knowledge of that.

THE COURT: Ask the question again, Mr. Kane. Or well, tell me the question again.

MR. KANE: It was do you believe that the debtor had

already provided, or the debtor was capable of providing wiring instructions for HNGH to avoid defaults under the agreed order?

MS. LINDAUER: Your Honor, again, his -- I'm sorry. Go ahead.

THE COURT: Well, and tell me your objection, Ms. Lindauer.

MS. LINDAUER: Well, the way he just phrased it, Mr. Nambiar's belief about what the debtor may or may not have done is simply there's no foundation for that. That's speculation on the part of Mr. Nambiar that that information was or was not provided to various persons by the debtor. We don't know that. It could have been provided by Mr. Barton. It could have been provided by Mr. Walji. There's no evidence of who provided that information.

THE COURT: Overruled. You may answer Mr. Nambiar.

THE WITNESS: Would you mind repeating the question for me, Mr. Kane.

BY MR. KANE:

Q Yes, Mr. Nambiar.

Did you believe before May 31st that the debtor was capable of providing the debtors, or HNGH's wiring instructions to parties to facilitate payments to avoid defaults under the agreed order?

A Absolutely.

MS. LINDAUER: And, Your Honor, just for the record,

I'd like to maintain my objection on the same basis I stated before.

THE COURT: That's fine. Overruled again. But I'm not sure. There was a little bit of talking over Mr. Nambiar. Repeat your answer.

THE WITNESS: Absolutely. The debtor had these wiring instructions, you know, for all of the payments, including the ones from 2021. Our wiring instructions, I don't believe have changed.

BY MR. KANE:

Q Mr. Nambiar, final question, then I hope you can go and catch your flight.

Did you have legal authority to bind HNGH Turtle Creek by executing legal documents?

A Absolutely.

MR. KANE: I'll pass the witness, Your Honor.

THE COURT: Brief questions, Mr. Lindauer?

MS. LINDAUER: No further questions, Your Honor, of this witness. Mr. Nambiar, thank you, and you hopefully, can go catch your airplane.

THE WITNESS: Thank you.

THE COURT: Thank you, Mr. Nambiar. You're excused.

THE WITNESS: Thank you, Your Honor.

(Witness excused)

MS. LINDAUER: Your Honor, our next witness is teed

up for 10:30. If we could just maybe take a brief break until 10:30 and get him arranged to be present.

THE COURT: Do you want to make your offer of proof?

MS. LINDAUER: Your Honor, actually I can. Let me see where they are. We were actually going to file that with you this morning. Can we just take a five minute break and I'll see if I've got that ready for you.

THE COURT: You're going to file it?

MS. LINDAUER: Well, I was going to read it into the record and then I was going to file it after we read it into the record.

If you don't want it filed, that's fine.

But, Your Honor, if we can take a break, I'll go grab it, bring it here, and then we can read it into the record.

THE COURT: That's fine.

So we're starting with Mr. Barton?

MS. LINDAUER: No, we have Mr. Fleeger very briefly as a rebuttal witness. We've scheduled him for about 15 minutes at 10:30. And then, our next witness after that would then be Mr. Barton.

The other thing, Your Honor, we are trying to arrange to get to you, prior to Mr. Barton's testimony is, you had asked for I believe a list of the qualified funders and we are working on that, too, to try to get that to you also this morning.

UNIDENTIFIED SPEAKER: In camera. not filed?

MS. LINDAUER: No, not filed. Correct.

UNIDENTIFIED SPEAKER: In camera only.

MS. LINDAUER: Yeah.

So if we could just take a few minute break, then I'll see if we can arrange --

UNIDENTIFIED SPEAKER: (Indiscernible) break, just go get what you need.

THE COURT: Let's take a five-minute recess so that you can come back and do your offer of proof. That way, we can get that done so that your next witness can start.

MS. LINDAUER: Okay. Thank you, Your Honor.

THE COURT: All right. Five-minute recess.

(Recess at 10:15 a.m./Reconvened at 10:23 a.m.)

THE COURT: All right. We're back on the record.

Are we ready to go?

MR. KANE: HNGH is ready, Your Honor.

MS. LINDAUER: Your Honor, 299 is ready, also. It's just getting -- I think Mr. Dooley should be on here now. We're just making sure he had logged in.

Mr. Dooley, are you -- can you access your screen right now? Mr. Dooley. You want to call him and see? His name is showing up.

(Pause)

MS. LINDAUER: Your Honor, we just spoke to Mr.

Dooley. He said he's having a little technical problem, but he'll be on the screen in just a second.

THE COURT: Okay.

MS. LINDAUER: Okay.

(Pause)

THE COURT: Ms. Lindauer.

MS. LINDAUER: Your Honor, I'm not sure what the difficulty on his end is. He really just needs to listen to the proffer that we're going to read in, our offer of proof. If he doesn't have an audio device that's connecting, I suppose we could have him call in on the phone and we could take him that way if that's agreeable to the Court.

THE COURT: Can he not keep his video on and dial in for the audio?

MS. LINDAUER: We could try that since his audio is not working. I tell you what. If you go get Diane to send him the phone number to call in to the Court right now. And you probably need to call him and tell him that that's what we're doing. I don't know how much -- Mr. Dooley, can you hear what's going on in the courtroom at all? Okay. Can you raise your hand to tell us that you can hear what's going on? Okay. Good. Thank you.

All right. So our problem is we can't hear you. You can hear. Okay. Well, here's what we're going to do, Mr. Dooley, is we're going to have you dial in on the telephone

since you're having trouble with your audio. I know your mouth is moving. We can't hear anything you're saying, sir. So, right. They're calling you right now to send you the phone number to call in on, all right?

(Pause)

MS. LINDAUER: Did you send it to him? Just come on back in then. Well, I guess just confirm that he got it, got the phone number.

And, Your Honor, I do apologize. This -- sometimes this technology works very well and sometimes it doesn't work so well, so.

THE COURT: No. I understand.

MS. LINDAUER: Yeah. We'll see what we can do.

THE COURT: Is your other witness ready to go?

MS. LINDAUER: 10:30, yes, sir, Your Honor. He'll be right behind Mr. Dooley. And then we also have Mr. Barton here at my office, so he'll be available also.

(Pause)

MR. DOOLEY: Hello. Hello.

MS. LINDAUER: Yeah. Mr. Dooley, can you hear us and say something for the record, please?

MR. DOOLEY: Yes. Hello. Can you hear me?

THE COURT: Okay. Ms. Smith, we're getting an echo. Are you catching that?

MR. DOOLEY: Hello.

THE COURT: Okay. So, Mr. Dooley, can you hear me? All right. Mr. Dooley, can you hear me?

MR. DOOLEY: Yes, Your Honor.

THE COURT: You're not catching that echo, Ms. Smith?

MR. DOOLEY: It's an iPhone.

THE COURT: Let's --

MR. DOOLEY: In other words, it's this phone.

THE COURT: Let's test this.

MR. DOOLEY: Close it out on my computer?

THE COURT: Let's test this for a minute, Mr. Dooley.

MR. DOOLEY: Yes, Your Honor.

THE COURT: Speak a few more words because I wasn't hearing the echo this last time.

MR. DOOLEY: Yes, Your Honor. Is the Court able to understand me, Your Honor?

THE COURT: I think I can hear that.

Ms. Smith, is that okay?

Okay. And, Mr. Dooley, I'm not super rigid on formalities, but probably the hat ought to come off for the hearing.

MR. DOOLEY: I apologize, Your Honor. I haven't taken a -- I've been working from home all morning and haven't taken a shower even.

THE COURT: Okay. Ms. Lindauer?

MR. DOOLEY: Okay. Hello. Does that help at all?

Okay. Thank you.

THE COURT: Ms. Lindauer.

MARSHAL DOOLEY, DEBTOR'S WITNESS

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Dooley, we have you present this morning via WebEx. Is that right?

A Yes.

Q Okay. And, Mr. Dooley, did you assist our office in preparing last night a offer of proof with regard to your testimony as an expert witness in this case?

A Yes. I dictated the information into your system.

Q Okay. All right. And, Mr. Dooley, I am going to read into the record your offer of proof for the record of your testimony that you would give as an expert witness if called as an expert witness. This is the testimony that was not allowed yesterday as part of your testimony.

You understand that, Mr. Dooley. Is that right?

A Yes.

Q Okay. After I read this into the record, I'm going to ask you to affirm that the information I have read into the record is in fact a true and correct statement of your testimony in connection with this offer of proof. Is that all right?

A Good.

Q Is that -- I'm sorry. Is that a yes?

A Yes.

Q All right. With that, Mr. Dooley, if called to testify in connection with the 2999TC Acquisitions, LLC proceedings, Case Number 21-31954-S -- I believe it's SWE, Chapter 11 case.

"My name is Marshal Dooley. I am over 18 years of age. I have never been convicted of a crime. And I am (indiscernible) to make this statement as my sworn testimony as an expert witness in the referenced bankruptcy case. The facts stated herein are all true and correct to the best of my knowledge.

"The first agreed order regarding motion to lift stay, what I will refer to as first agreed order, Debtor's Exhibit B12, set important triggering tasks which were to be completed. I recognize a copy of the first agreed order has been provided to the Court as part of the record in this case. On Page 2 of the first agreed order it states, debtor shall make payment to HNGH, which note shall be reinstated immediately prior to the debtor's payment to HNGH of the payoff amount, and Counsel for HNGH shall hold the rescission deed during the pendency of the term of this agreed order.

"Further of note, the first agreed order also states: 'If the debtor pays HNGH the payoff amount within the payoff period (the "payoff event"), then simultaneous

with the payoff event, deed in lieu filing, which was submitted for filing pre-petition and recorded on November 1, 2021, shall be deemed rescinded and avoided and the debtor shall retain all title to the property.'"

"Reading these sections together, my opinion of the first agreed order is that the sequence of events to close the transaction would require the rescission deed be agreed, signed, and put into escrow by the lender's lawyer. Immediately before the payoff event, the note must be returned and reinstated. These are two threshold hurdles to overcome which did not occur.

"Next, the next important threshold issue would be found in the commitment for title insurance ("title policy") (Lender's Exhibit 33A). A copy of the title policy is attached as an exhibit in connection with these proceedings.

"Looking to Schedule C of the title policy, several matters would have to be cleared including assignments of leases and rents by instruments filed with the official public records of Dallas County, Texas, notice of collateral assignment of deed of trust and loan documents to Axos Bank of the official records of Dallas County, Texas, collateral transfer

of note and lien to Happy State Bank, appointment of substitute trustee, notice of foreclosure sale, UCC financing statements and their amendments, and a release of lis pendens, all of which are filed of record in Dallas County, Texas, and have specific recording information and instructions. Most fundamentally of these would be to return the original note to the lender for it to be reinstated.

"As I understand from the evidence that has been provided in these proceedings and my careful review of the documents presented to the Court, the original note had been and was pledged to Happy State Bank for collateral for a loan of approximately $26 million. And Happy State Bank was requiring that the loan be paid before the note could be returned and reinstated. I surmise that the failure to include Happy State Bank in the order or provisions is because the lawyers did not know of the existence of the lien held by the note of Happy State Bank.

"The next crucial document of importance is the special warranty deed ("Lender's Exhibit 57A"). A copy of the special warranty deed has been made an exhibit in these proceedings. The special warranty deed had been signed by the lender, but was not cosigned or signed by the debtor. In my opinion, the

special warranty deed contained numerous errors and could not be considered as a rescission deed.

"First, I note that HNGH Turtle Creek was identified as a Texas limited liability company. My understanding based on the evidence presented to this Court and made part of this record, including the documentary evidence and the testimony presented, is that HNGH is a Delaware limited liability company, and no company in the name of HNGH Turtle Creek, a Texas limited liability company exists. I also note that at the bottom of Page 1 on Exhibit C -- I'm sorry. Page 1 of the special warranty deed states, this conveyance is made and accepted subject to (a) the terms of the agreed order, and (b) the restriction running with the property and binding upon 2999TC and its successors and assigns, that the property may only be used for hotel and residential condominium purposes).

"Such restriction would not be appropriate in my experience and in my opinion as part of a rescission deed. However, more fundamentally, the special warranty deed provided contained no rescission language in the addendum clause. The conveyance in the addendum clause describes the estate being conveyed and reflects that the conveyance is being

made as of the date of the instrument, not rescinding the November 1st recorded deed in lieu of foreclosure.

"It is my opinion a reasonable commercial real estate lender or borrower in the State of Texas would not and should not accept the special warranty deed provided by HNGH as of May 31, 2022, as an effective rescission deed that actually rescinded the deed in lieu of foreclosure previously recorded by HNGH on November 1, 2021.

"Additionally, I would not advice a commercial real estate lender or borrower to accept the proffered special warranty deed as a rescission deed because it does not actually rescind the deed in lieu as of its recording date of November 1, 2021, but only conveys the property to 2999TC Acquisition effective as of May 31, 2022, leaving a gap in debtor's legal title between those dates.

"Next, then my concern turns to the agreed rescission of warranty deed ("agreed rescission reflected at Lender's Exhibit 67A"). A copy of the agreed rescission of deed has been provided to this Court and has been made an exhibit in connection with these proceedings. I understand that this agreed rescission of deed was originally prepared by Randy

Marx and further edited by Mr. John Kane on behalf of HNGH Turtle Creek. Yet, it's why Mr. Kane rendered the deed unacceptable as a rescission deed.

"It is my opinion that no commercial real estate lender or borrower would accept the rescission of deed that was edited because it made such deed contingent upon events reflected in an agreed order not made part of the record title in connection with the property.

"On Page 2 in the last preamble it states, grantee and grantor have agreed that grantee shall rescind and avoid the deed which shall be retroactive and effective as of October 29, 2021, upon effectuation of all conditions preceding set forth in the agreed order and acknowledging or agreeing that no grant, sale, bargain transfer, or conveyance of the property occurred to the same extent as if the deed had never been executed or recorded. The deed is made contingent upon conditions precedent.

"The deed further provides the deed shall be retroactive and effective October 29, 2021, upon effectuation of such conditions precedent set forth in that certain agreed order. This rescission deed should not be subject to any conditions precedent, and in my experience as a real estate and banking and

finance attorney, I would not recommend that a lender loan money based on this version of the rescission of deed that was provided and commented upon and edited.

"The proposed deed on its face and the timing of its recordation, may it be an impediment on title for the fact that it was filed after -- I'm sorry. This isn't right. The proposed deed in lieu on its face and the timing of its recordation may be impediment to title subject to the fact that it was filed after the bankruptcy case and may constitute a further cloud on title that needs to be addressed in the rescission of deed.

"The issues described herein, which are not cumulative, but merely the most fatal issues to the deal as presented by HNGH would have caused lenders, in my opinion, to deny such documents. The threshold issues described above would have prevented this in broad strokes. The foregoing is made and sworn to under the penalty of perjury by me, Marshall Dooley, on this, the date, June 30, 2022."

Mr. Dooley, have you heard the proffer of evidence that has been read into the record as your testimony that would have been presented to the Court in connection to these proceedings as it relates to the matters set forth therein?

A (No audible response)

MS. LINDAUER: Mr. Dooley, we can't hear you right now, so whatever you need to do so that we can actually hear you.

(Pause)

MR. DOOLEY: -- now? Can you hear me okay?

MS. LINDAUER: I think, Mr. Dooley, I think you just clicked in. There does appear to be a little bit of an echo. You might want to state your name.

MR. DOOLEY: Can you hear me? Yeah. I don't know.

MS. LINDAUER: Well, Mr. Dooley, I can hear you. I just don't know how you're coming across to the Court.

MR. DOOLEY: Anyway, very briefly, yes, I agree with those -- that recitation that you read is reflective of what I had dictated to your assistant yesterday evening.

BY MS. LINDAUER:

Q Okay. And, Mr. Dooley, do you adopt that as your sworn testimony in connection with these proceedings?

A Yes.

MS. LINDAUER: Your Honor, at this time, I would end our offer of proof and I would pass Mr. Dooley.

THE COURT: So I guess I'll say I was surprised by what I just heard because I think about 90 percent of what I just heard is beyond what you indicated his opinion would be. So I'm not sure that that was an appropriate offer of proof. I think he's testified to numerous things. I think I'm going to

go back and look at my notes.

The first bucket I indicated that he would not be able to testify about because it was a legal opinion was how to interpret and apply the agreed orders. And then the second bucket was whether the documents, specifically the special warranty deed that was sent over by Mr. Kane, was legally effective as a rescission. And most -- I would say, I don't know, 75 to 90 percent of what I just heard goes way beyond that. So --

MS. LINDAUER: Your Honor, maybe I had a misunderstanding, but when I wrote down my notes of what you were not permitting, I wrote down agreed order and interpretation of the agreed order. And that was the first point that we went over with Mr. Dooley was the first agreed order, the December order. The second point that I wrote down dealt with the special warranty deed and the filing of the special warranty deed and its effect with regard to this particular transaction.

THE COURT: No, no, no. I don't think I said its effect with respect to this transaction.

I think -- I thought it was clear that the -- I thought you were indicating that the proposed opinion would be whether it was legally effective as a rescission. And I was trying to make clear yesterday that I was trying to avoid Mr. Dooley testifying about strictly legal opinions about the

effectiveness about that special warranty deed and his interpretation of the agreed orders. And again, what I just heard goes far beyond that.

MS. LINDAUER: Well, I understand that, Your Honor.

And, again, this is our offer of proof for if they're in fact -- I understand you may not consider this evidence as part of your record in connection with these proceedings based on your prior rulings. This is our offer of proof for perhaps another Court to review as the elements that would have been discussed with Mr. Dooley had he been permitted to testify with regard to these matters.

And I hear you that you may think we went beyond the scope, but again, this is an offer of proof for the purposes of, in effect, an appeal. So, Your Honor, I think it is what it is. And if the Court disagrees with that, I hear you and all that, but I do think it's our offer of proof and you may not agree with it, but I -- but it is for purposes of the record.

So I understand you may or may not give it any weight in connection with your decision. I think you've already indicated that you'll consider, but again it's really not being made so much for the purposes of this proceeding as it is for the review by other persons who might take an ultimate interest in these proceedings, and so.

MR. RODRIGUEZ: And, Your Honor, may I have just one

moment? I think I heard the Court's comments a little differently than my colleague, Ms. Lindauer, has. Your Honor, I'd like to go ahead and offer the testimony into evidence we just heard into evidence because I believe it does not run afoul of what the Court had instructed the guideline the lawyers on in terms of what Mr. Dooley's testimony could and could not be.

And so could Your Honor just give us a ruling on whether or not we can go ahead and admit this testimony that we've now had into the record for proper consideration? Because I do think it's proper. He's talking about his own experiences, what he would counsel, et cetera, just as many of the other fact and expert witnesses have in the past. And, of course, if Your Honor admits all of this, then there's no appeal point, right. So we thank Your Honor.

THE COURT: So I'll let Mr. Kane speak. And, Mr. Kane, I think you might be muted.

MR. KANE: Thank you, Your Honor. I apologize for that.

I think I may have had the same interpretation that Ms. Lindauer did where my understanding was that the majority of the testimony from Mr. Dooley on the offer of proof was largely a legal opinion about whether certain provisions, or I guess his interpretation of the agreed orders, first of all, and what the agreed orders required. And then second, legal

opinions about the enforceability of the special warranty deed as a rescission deed and his legal conclusions about why it wouldn't be enforceable.

What seemed new was discussions about the agree rescission instrument that was circulated, which I felt like was outside of the categories that he at least disclosed -- Ms. Lindauer disclosed that he was going to testify about. But again, it was legal opinion about why he believed it would not be a legally enforceable or valid document. So I think that would be inadmissible expert testimony.

THE COURT: So I heard some of that, which I think was partly what I indicated was not the proper subject of his expert opinion, but I heard quite a bit about what reasonable commercial lenders would do. And I don't think that was what I indicated in my ruling yesterday. I heard quite a bit of that, I thought, in this proffer about what reasonable commercial lenders would do and whether or not they would accept the deed. So I guess that, I, as I'm sitting here, seemed to be beyond the scope of what the proposed opinions were yesterday.

MR. RODRIGUEZ: So, Your Honor, are you going to go ahead and permit us to supplement the record of these proceedings with the summary of the testimony that you just heard or are you going to permit us to recall Mr. Dooley so we can put it in the record or are you simply not going to issue any kind of ruling here and just continue proceedings?

THE COURT: No. I'm going to issue a ruling, but we have another witness ready. So I guess I wasn't really prepared for what was just read into the record. As I'm sitting here, again, maybe during a break I can go back and listen to it, but it seemed to be -- it seemed to offer testimony that was beyond what the proposed opinion was yesterday.

So we have another witness ready to go that I had hoped to finish this morning, so I'm -- I am going to rule, but I'm -- I might have to go back and listen to this proffer again and listen to what I said yesterday because just sitting here, some of that -- some of what was read appears to be an appropriate proffer. Some of it, frankly, appeared to be stuff that I would not have had any concerns about had he testified about that yesterday. So I'm going to have to think about what to do about that. Again, I'm not -- I will give you a ruling and we will figure out how we're going to proceed, but for now, I would really like to get to Mr. Fleeger. Does that make sense?

MR. RODRIGUEZ: Thank you very much, Your Honor. It makes good sense.

THE COURT: All right. Ms. Lindauer, so Mr. Dooley, you are welcome to stay on and watch if you want, but you are also excused if you would like. At some point before the conclusion of the hearing, we're going to have to -- I'm going

to have to determine what to do about what I just heard and try to reconcile that with what I indicated yesterday you should not testify about.

So if you would like to drop off, you are welcome to. You are welcome to stay on. But just keep in mind that at some point we might ask you to get back on.

I think you're muted, Mr. Dooley, but if --

MR. DOOLEY: I do have some other matters I've got to take care of, Your Honor, so I will drop off, but I'll be available to be recalled if needed.

THE COURT: Okay. All right. I appreciate that.

MR. DOOLEY: Thank you, Your Honor. Bye.

(Witness excused)

MR. KANE: And, Your Honor, before Mr. Fleeger takes the stand, he is not on the debtor's witness and exhibit list. He wasn't included even in the motion to supplement the witness exhibit list that the debtor pursued. I understand he's being called exclusively as a rebuttal witness. The scope of rebuttal witness testimony is exclusively limited to rebutting prior testimony, contradicting prior testimony from one of our witnesses or evidence from our case-in-chief.

And so I would like to understand exactly what the scope of Mr. Fleeger's proposed rebuttal testimony is at this time.

THE COURT: Ms. Lindauer.

MS. LINDAUER: Thank you.

THE COURT: What is he rebutting?

MS. LINDAUER: Okay. So, Mr. Fleeger, who is present on this ring, was mentioned in several statements, I believe, by Mr. Nambiar with regard to his granting of a waiver to Mr. Fleeger to speak to Happy State Bank regarding their particular loan and his involvement or request with regard to that loan. He's specifically mentioned in Exhibits -- these are Lender Exhibits 50, 51, 52, and 53 and 54 of their exhibits.

Mr. Fleeger will testify, I believe, that he was advised that he could communicate with Happy State Bank regarding the lending relationship between Happy State Bank and HNGH and that he was specifically advised when he did reach out to make those contacts that, in fact, there was no relationship regarding the 2999TC property or the 2999TC loans. And so much like the debtor, he was surprised to find out that Happy State Bank was, in fact, involved in this transaction because as of May 23rd, end of May, he was told that they were involved.

And then when he went to discuss that with Mr. Nambiar and Ms. Blakeley with the bank, he was told that, in fact, there was no relationship with this particular debtor. And so it basically goes to rebuttal of two of the witnesses called by Mr. Kane or called by us, but they're witnesses. They're off their list. It was Julie Blakeley and Vipin Nambiar, Your Honor.

And Mr. Fleeger is prepared to testify. I think his testimony will be fairly brief, but it does rebut statements made by both of those witnesses. And again, those were witnesses specifically on HNGH witness list.

THE COURT: And help me. Maybe say it in a more abbreviated fashion because I'm not catching on.

MS. LINDAUER: Okay.

THE COURT: What specific testimony is he rebutting because --

MS. LINDAUER: He is rebutting the fact that Mr. Nambiar and Ms. Blakeley, or particularly Mr. Nambiar, testified that everyone knew about the collateral assignment of note and lien and that Happy State Bank was involved with this transaction and had been for a significant period of time prior to the May 31st proposed closing. And also, he testified that he was very cooperative in providing waivers to Mr. Fleeger in particular so that he could speak to Happy State Bank regarding that relationship. When Mr. Fleeger reached out to Mr. Nambiar and Happy State Bank, in particular, Happy State Bank, to discuss that relationship, he was advised by the bank that in fact there was no relationship that affected the property involved 299TC.

Your Honor, what it goes to is, is the continued confusion that was generated on the HNGH side regarding the involvement. And that's why, again, we've told you that as of

May 31st when we received the payoff from HNGH of Happy State Bank that was a bit of a surprise. Their testimony was, well, Your Honor, they knew all along about this. Mr. Barton opened the mail.

So all the testimony on their side has been that we were aware of this relationship and Mr. -- and again, let me clarify. Mr. Fleeger was an investor of -- that was looking at putting money into this deal for the closing on May 31st and was prepared to facilitate the closing on May 31st and then was basically misled into understanding the role of Happy State Bank. So, Your Honor, I think that's the substance of his testimony.

MR. KANE: And, Your Honor, again I'm trying to figure out what testimony from my witnesses Mr. Fleeger would be directly rebutting because Mr. Nambiar testified that he provided a conflict waiver to Happy State Bank. Ms. Blakeley acknowledged that Mr. Nambiar provided a conflict waiver to Happy State Bank. That is the extent of the testimony from our witnesses that involved Mr. Fleeger.

So I -- you know, if Mr. Fleeger is going to come on and try and argue, rebut that point that he was not provided a conflict waiver by Happy State Bank, you know, I guess he can testify to that. But the testimony was that Mr. Nambiar provided directly to Ms. Blakeley a conflict waiver.

So, again, I mean, the debtor's knowledge about Happy

State Bank's involvement in the transaction they can have addressed by Mr. Barton or they could have addressed with Mr. Walji, which he did testify to that point. So I'm not sure how this is anything other than just a normal fact witness for a witness who is not on their witness and exhibit list.

MS. LINDAUER: And, Your Honor, I think again Mr. Fleeger is being called as a rebuttal to two witnesses. He addressed Mr. Vipin's testimony in part. He did not address Ms. Blakeley's testimony. And Ms. Blakeley and Mr. Vipin both indicated, and I don't have the transcripts to quote to you, but both indicated that the underlying loan with Happy State Bank was a known quantity or whatever, that people knew about it. And up until, you know, the --

THE COURT: The debt -- well, wait. Let me stop you there. So with respect to the specific testimony that I recall about the conflict waiver, is he going to rebut that testimony?

MS. LINDAUER: No, Your Honor. I think he was provided conflict waivers. The problem is, is there was no reason for him to get a conflict waiver because then when he talked to Happy State Bank they said we have nothing to do with this particular transaction. So what was the point of a conflict waiver? He got a conflict waiver to talk to --

THE COURT: Well, no. Ms. --

MS. LINDAUER: Yeah.

THE COURT: I don't remember the Happy State Bank

witness testifying that -- well, I remember Mr. Nambiar's testimony about Happy State Bank. And he indicated that the debtor knew about Happy State Bank. And so, why isn't that Mr. Barton's bailiwick rather than this witness?

MS. LINDAUER: Well, because, Your Honor, the misrepresentation that was being made including to our investors who were funding this loan was that Happy State Bank had nothing to do with this transaction. And that came out of --

THE COURT: Misrepresentation to who? To the debtor, right?

MS. LINDAUER: No. To the debtor's investors, Your Honor. That's who Mr. Fleeger is. He was one of the debtor's investors that had wired over, I believe it was $13 million into his attorney's trust account to assist with the closing on May 31st. He was specifically told. And if you look at the emails, you can see the email traffic. I gave you the references and the secured lender's emails. He was specifically told by Happy State Bank, contrary to what Ms. Blakeley told you, that Happy State Bank had nothing to do with the property or the transaction with 299TC. That the loan that they had made to HNGH was collateralized by a guarantee or financial documents with Mr. Hunt. And that was the basis of their loan.

Mr. Fleeger made that inquiry of Happy State Bank.

And then as the debtor was surprised, Mr. Fleeger was likewise surprised to find out that then Happy State Bank in fact did have an interest in this property, did in fact have the collateral note and lien assignment, and learned that about the same time the debtor did on the 31st. And again, he was one of the funding sources for the particular takeout for HNGH.

So I think it's terribly relevant that he was basically misled with regard to this relationship. And I think --

THE COURT: Yeah. But the -- he was misled. Was that -- was the misleading statement in the testimony of Mr. Nambiar or the Happy State Bank representative in this Court?

MS. LINDAUER: Yeah. I believe that it was, Your Honor. And I'd have to go through the transcripts, as I said, and find it for you. If you're not willing to allow him -- but then again, Your Honor, I'll just ask to make an offer of proof as to his testimony.

THE COURT: No. I'm just trying to -- I'm trying to understand whether this is rebuttal or not rebuttal and --

MS. LINDAUER: But, Your Honor, if they lied to you and they lied to us, that's rebuttal, right?

MR. KANE: That's preposterous.

MS. LINDAUER: If we're saying, Your Honor, they misled the Court. They misled my client. They misled Mr. Fleeger as to what the relationship was of these parties at a

key time when the debtor was in the process of obtaining funding to pay off HNGH. I believe that's a rebuttal witness. It is --

MR. KANE: So, Your Honor, is the debtor seeking to rebut the nature of the relationship between Happy State Bank and HNGH? Because Mr. Nambiar and Ms. Blakeley testified that there was no direct contractual relationship between Happy State Bank and 2999TC Acquisitions, LLC. So is Mr. Fleeger -- I mean, that was the testimony that was presented to the Court. So is Mr. Fleeger going to rebut that position?

I mean, this is where I'm struggling. I've looked at these Exhibits 50 through 53. And there isn't anything about Happy State Bank not being involved in this transaction. Those documents are just related to the conflict waiver. That's it.

UNIDENTIFIED SPEAKER: (Indiscernible) That's false. He's misrepresenting your record in Court.

MR. KANE: Open them up. 50 through 53.

THE COURT: All right. I think I'm not convinced that it's rebuttal, but I have flexibility in either hearing evidence or not. So I'm going to allow Mr. Fleeger to testify and let's get started.

MS. LINDAUER: Okay. Thank you, Your Honor.

Your Honor, I think Mr. Fleeger would need to be sworn in.

THE COURT: Okay. Mr. Fleeger, if you would please

raise your right hand.

MR. KANE: Your Honor, Mr. Fleeger is not on video at the moment.

THE COURT: I can see him.

MS. LINDAUER: Yeah. He's right next to the judge.

THE COURT: Mr. Fleeger, can you hear me?

MR. MCNEILL: Yes.

MR. KANE: No. That's Mr. McNeill. That's Mr. Fleeger's counsel as I understand it.

MS. LINDAUER: Oh, okay. I'm sorry.

THE COURT: Oh, I'm sorry. In that case, I don't see him.

MR. FLEEGER: Well, I see you and I can hear everybody.

THE COURT: Is there a start and stop video at the bottom of your screen?

MR. FLEEGER: Okay. Did that fix it?

THE COURT: Nope. I just see initials, M.F.

MR. FLEEGER: Okay. Let me try my phone. I'm going to try my phone. No. I'm on a desktop.

(Pause)

MR. FLEEGER: Okay. Does that work now?

THE COURT: Okay. I do believe I see Mr. Fleeger.

MR. FLEEGER: I apologize. I could see and hear everything you all were saying, but for some reason you

couldn't see me. I was on a desktop, so I switched to my phone.

THE COURT: Okay. Ms. Smith, are you catching that okay?

All right. And I apologize. I did not catch Mr. Fleeger's counsel's name.

MR. FLEEGER: Chris McNeill.

MR. MCNEILL: Good morning, Your Honor.

THE COURT: Welcome, Mr. McNeill.

MR. MCNEILL: I'm just here to observe. Thank you for having me.

THE COURT: All right. Ms. Lindauer.

MS. LINDAUER: Mr. Fleeger, could you -- first of all, I don't think. Did we swear Mr. Fleeger in?

THE COURT: No, we didn't. I'm sorry.

Mr. Fleeger, if you would, you've already raised your right hand.

MATTHEW FLEEGER, DEBTOR'S WITNESS, SWORN

THE COURT: Thank you.

MS. LINDAUER: Thank you.

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Fleeger, could you state your full name for the record?

A Matthew Harris Fleeger.

Q And, Mr. Fleeger, I believe you're not in Texas today. Is that correct?
A No. I'm in Vail, Colorado.
Q And, Mr. Fleeger, just a couple of background questions. Were you involved in some of the financing that was being obtained by 2999TC Acquisitions in order to payoff a company called HNGH Turtle Creek?
A Yes.
Q And, Mr. Fleeger, had you transferred some money to Mr. McNeill's trust account in anticipation of being involved in that payoff?
A Yes.
Q Approximately how much money had you transferred to Mr. McNeill's trust account?
A Twelve million five hundred thousand.
Q And was that done before May 31, 2022?
A Yes.
Q Mr. Fleeger, you were given some permission by a gentleman named Vipin Nambiar, is that correct, to speak to Happy State Bank?
A Well, not directly. I believe Mr. Barton arranged it through Mr. Kane. I reached out. One of my investing partners is a large customer of Happy State Bank. His officer was the president of the Amarillo Bank, Scott Martin. We reached out to Scott Martin to discuss 2999 Turtle Creek. Scott said he

was unable to have any discussions with us without a release from the Hunts. And that's when I let Tim know that and Mr. Barton reached out to Mr. Kane, I believe, or -- and/or Mr. Vipin. I then received a call from Mr. Martin the next morning and he informed me that they had received approval and that he would have Julie --

Q I think you may be looking for Julie Blakeley.

A Blakely, yes. Julie Blakeley reach out to me, which she did shortly thereafter. And I -- my goal was if we could have the first lien bank be willing to, given the short time frame, be willing to continue providing the first lien financing, that it would allow us to get the closing done in the short time frame that we had. Ms. Blakeley proceeded to tell me that they did not have any --

MR. KANE: Objection. Hearsay.

MS. LINDAUER: Your Honor, I believe that as a rebuttal witness, he can specifically address the statements made by Ms. Blakeley that have already been put in this record and therefore -- and also, I believe Ms. Blakeley, to a certain extent, is also -- again, she is an adverse witness obviously to the debtor. She is a witness provided by Mr. Kane's client, HNGH. And I do think that this testimony has already been put in to the extent that these exhibits have been admitted and the testimony of Ms. Blakeley has already been allowed. So, at this point, I think any complaint about what Ms. Blakeley may

or may not have said essentially has been waived at this point and that as a rebuttal witness, Mr. Fleeger can make -- can describe or discuss what he was told. And that's what he was doing here.

THE COURT: That's hearsay, so I'm going to sustain the objection.

BY MS. LINDAUER:

Q Mr. Fleeger, were you led to understand from your conversations with Ms. Blakeley? I'm asking you about your understanding. What was your takeaway from those conversations with regard to the relationship between Happy State Bank and 2999TC Acquisitions?

A Very specifically that they did not have a lien or security interest in 2999 Turtle Creek, and therefore, there would be no basis for a discussion.

Q Were you surprised, Mr. Fleeger, to learn after those conversations that Happy State Bank requested a payoff as part of a closing with 2999TC Acquisitions?

A Yes. Somewhat.

Q And did you have any involvement at that point and time with the conversations between Happy State Bank and Mr. Barton's company?

A I had discussions with Mr. Barton's company, but not Happy State Bank.

Q Did you relay the message you had with Ms. Blakeley to Mr.

Barton and his company?
A I did that the day of my phone call with her.
Q Do you feel that the information you were being provided was true and accurate from Happy State Bank?
A I had no reason not to believe it.
Q Okay. And so you -- your takeaway was that they had no involvement with regard to the note and lien as it related to 299TC Acquisitions. Is that correct?
A I don't want to say that they had no involvement. Her specific words were, we do not have a lien or security interest in that property. I do know they had a relationship with the Hunts. So my assumption was it was some sort of a line of credit or something that was used to close on the property.
Q Did the statements that Ms. Blakeley made to you affect your decision regarding moving forward with the transaction as it related to 299TC Acquisitions?
A Well, it certainly made it a much more difficult transaction to close.

MS. LINDAUER: Your Honor, at this time, I'll pass the witness.

MR. KANE: Your Honor, I have no questions for this witness.

THE COURT: All right. Mr. Fleeger, you are excused.

Mr. McNeill, you are also excused unless you want to stay and watch some more.

MR. MCNEILL: No. Thank you very much, Your Honor.

MR. FLEEGER: Thank you.

MS. LINDAUER: Thank you, Mr. Fleeger. Thank you, Mr. McNeill.

MR. FLEEGER: Thank you.

(Witness excused)

MS. LINDAUER: Your Honor, my next witness would be Mr. Barton. If we might just take a brief restroom break for just a couple of minutes and then we'll swear Mr. Barton in.

THE COURT: Sure. Take a five-minute recess.

(Recess at 11:20 a.m./Reconvened at 11:32 a.m.)

THE COURT: Okay, Ms. Lindauer. Are we ready to go?

Mr. Phelan, are you there?

Mr. Kane, can you hear me?

MR. KANE: I'm clear, Your Honor.

THE COURT: Mr. Phelan, are you there?

MR. PHELAN: I am here.

THE COURT: Ms. Lindauer.

UNIDENTIFIED SPEAKER: Your Honor, can you hear us on our end?

THE COURT: Yes, I can.

UNIDENTIFIED SPEAKER: Okay. We can see you talking, but I'm not sure what just happened. Give me one more minute. We can see you, but we can't hear you. It helped last time.

MS. LINDAUER: Can y'all hear us now?

THE COURT: Yes. We can hear you.

MS. LINDAUER: Oh, we can't hear them.

(Pause)

MS. LINDAUER: Can you hear us now?

THE COURT: Yes, we can.

MS. LINDAUER: Okay. Good. All right. Thank you, Your Honor. We had in and out.

THE COURT: Are you ready, Ms. Lindauer?

MS. LINDAUER: I am, Your Honor.

THE COURT: Is that Mr. Barton?

MS. LINDAUER: It is.

MR. BARTON: Good morning, Your Honor.

THE COURT: Good morning. If you could scoot a little to your right momentarily. I can't -- no, I see Mr. Rodriguez. There you go.

MR. BARTON: She stepped out. She stepped out and she's back. Thank you.

MS. LINDAUER: I was just moving the screen so we could see him better.

MR. KANE: Could I clarify a housekeeping point? I believe Ms. Lindauer had said at our hearing yesterday that if they didn't call Mr. Kickham today they weren't going to call him. Is that still the case?

MS. LINDAUER: That is still the case.

MR. KANE: Okay. Thank you.

THE COURT: All right.

MS. LINDAUER: I believe, just for the record, I think Mr. Barton is our last witness unless something should change, but that's the plan right now.

THE COURT: All right. Mr. Barton, if you would please raise your right hand.

TIMOTHY BARTON, DEBTOR'S WITNESS, SWORN

THE WITNESS: Your Honor, one other note, I do have a pinched nerve in my neck and my arm is getting numb. But I was trying to get an MRI this week. I keep getting delayed. So if I move around or slouch a little bit, I don't want any disrespect to the Court. I'm just trying to alleviate once in a while.

THE COURT: Not a problem.

THE WITNESS: But I just don't want you to feel that's disrespectful.

THE COURT: Nope. I understand. No concerns at all.

Go ahead, Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Barton, would you state your full name for the record?

A Timothy Barton.

Q And, Mr. Barton, how would you describe your employment?

A I have a real estate development company.

Q And does your real estate development company go by any particular name?

A JMJ Development.

Q And other than JMJ Development, Mr. Barton, are you associated with any other real estate -- yeah -- development entities?

A We have single purpose entities for the actual real estate projects, so yes, we have several of those.

Q And can you generally describe for the Court what type of real estate development projects you're involved with?

A One of the divisions is in land development. We buy raw, unentitled land, usually larger tracts, 500 to 1,000 acres. And we work with the seller of the property and then we also work with the cities and get the zoning and the planning. And once all the approvals are in place, then we do what's called horizontal development, getting all the utilities and the roads and the infrastructure put in place, and normally selling those lots to various home builders. So that's the residential land development.

And then we also do multi-family development where we buy the land. We get it entitled similar to the residential land development. And once we get all the entitlements in the multi-family, we hire a contractor and oversee the construction of that process with -- which would end up with a multi-family development.

And also now what's becoming very popular is build to rent where we build single family homes and then do them in communities of 100 or 200. And those are built to rent, which is a new division.

And then we also, from time to time on very select projects, that we find special pieces of land or special opportunities. We build luxury, ultra luxury hotels and condominiums. Those are the three areas that we're active in.

Q And are you presently active in all three of those areas today?

A Yes.

Q And, Mr. Barton, what is your relationship to an entity called 2999TC Acquisitions, LLC?

A I'm the president.

Q And how long have you been the president of that entity?

A Since its inception.

Q All right. And is 2999TC Acquisition a single purpose entity?

A Yes.

Q And, Mr. Barton, if we might --

MS. LINDAUER: -- if we could take a look at, Sydney, Exhibit D.

THE WITNESS: Exhibit D?

BY MS. LINDAUER:

Q Yeah. This one right in front of me. D25 of the debtor's

exhibits.

A Yes, I see it.

MS. LINDAUER: And if you'd scroll down a little bit. Nope, nope, nope. I'm trying to just catch the picture, Sydney.

There we go.

BY MS. LINDAUER:

Q Is that what is located at 2999 Turtle Creek Boulevard, Dallas, Dallas County, Texas, that's reflected at the front of Exhibit D25 of the debtor's exhibits?

A That is one of the buildings that's on the site. That is correct.

Q Approximately how many acres is that location on Turtle Creek Boulevard?

A It's just under two and a half acres.

Q And how many square feet is the building that we're looking at right there?

A It's approximately 36,000 square feet.

Q You said there is also another building located on that site. Is that correct?

A Yes. This was built for another real estate developer, Mr. Ulich (phonetic). And this was his family office. It was his last building he ever built in his life. And he spent an enormous amount of money building this building. And he also wanted the pleasure of having his own restaurant. So there is

a full commercial restaurant dining room, as well as a gym that is in that annex building.

Q Okay. And the annex building is a building that sits behind the main building that we're looking at. Is that correct?

A That is correct.

Q Okay. If we turn to Page 36. And this is not an admitted exhibit, but I'm just asking to look at some pictures. 36 of Exhibit D25. Okay. Is that Page 36? I can't tell. All right. And again, that's an exterior shot of the building if we drop down. Is that what you call the annex building, the building that sits behind the main building?

A That is correct. Yes, that lower picture.

Q All right. If we go to the next picture, and then that would be -- it just says subject exterior. That's just a view of the driveway for the property. Is that right?

A That is the driveway and the view of the mansion on Turtle Creek.

Q Yeah.

A The world class hotel next door. Yes.

Q That's what I was going to ask you. And this is located on Turtle Creek Boulevard. I'm sure the Court has some understanding of where that is. The building that you see in the left-hand corner of this picture, I think you just told us is the mansion on Turtle Creek, that luxury hotel.

A That is the flagship of the Rosewood Corporation hotel chain, once designated as the finest in Texas, yes.
Q Okay. If we drop on down. Again, that's a picture of the -- what we called the annex building. Is that right?
A That is correct.
Q Okay. And if we drop on down to the next picture. What street is this that we're looking at here?
A That would be Dickerson Street.
Q Okay. Drop on down. And what street are we looking at here?
A That is looking down Dickerson across to Ross Perot's World Headquarters directly across from Turtle Creek. And we're looking from Dickerson down into Turtle Creek.
Q Drop on down. You mentioned the kitchen facility that's located in the building. Is that correct?
A That is correct.
Q Is this a picture of the kitchen facility?
A Yes.
Q Drop on down. This is shown as a meeting or assembly room. Is that right?
A That's -- right now it's set up as a meeting because there's no private dining. Before, that was the private dining room for Mr. Ulich.
Q Okay. And we'll go through these pretty quick.
MS. LINDAUER: Drop on down again, Sydney, to the

next picture. Again, we'll run through this.
BY MS. LINDAUER:
Q That's a bathroom area obviously.
A A locker room, yes.
Q Okay. Drop on down. Is that underground parking?
A That is the private underground parking, yes.
Q Okay. Drop on down. Conference room area?
A To be accurate, that's a conference area shot with a lot of closing documents on it.
Q All right. Next picture. What are we looking at here?
A That is the rotunda in the center of the building.
Q The pictures on the wall there.
A The one on the left looking at the screen is the project that we own, Los Ventanas. The Rosewood was also listed as the finest hotel in Latin America. We had that property. Then we finished those condominiums. And on the right is pictures of the Ascent at Beaver Creek, the luxury condo that we built there.
Q Okay. And we're almost through. Drop down if we could. This is shown as private office. Approximately how many offices are located in this building?
A It's close to 29.
Q Drop down. This is shown as the parlor. Is that right?
A That is correct. That is an area that's a sitting area. Mr. Ulich used to have a lot of his world class pieces of art

there on the walls.
Q All right. And I'm going to ask you a few other questions, but again, this is just a office area located inside the building. Is that right?
A That is correct.
Q Okay. And I believe you and your company's office in this building at this time. Is that right?
A That is correct.
Q Okay. Mr. Barton, when did you acquire this particular property on behalf of -- well, it had a slightly different name, but on behalf of 2999TC Acquisitions?
A September of 2019.
Q Okay. And what was your purpose for acquiring this property?
A To develop a Mandarin Oriental Hotel and residence condos, for sale condos.
Q And where in the United States is there such a project under the name Mandarin Oriental Hotel?
A Columbus Circle in New York City.
Q Are there any other ones?
A There's one in Boston, one in Miami. There is one being built in Boca Raton, Florida. There is a Mandarin Oriental residential luxury tower, new one that's being built in Manhattan. And I forget if there's any more. Those are the ones I remember sitting here today.

Q Okay. And again, when did you acquire this property in 2019?

A September of 2019.

Q Okay. And for the record, what happened in February of 2020 that affected the majority of development hotel projects in the United States?

A The Chinese virus, COVID. Unfortunately, that's what plague took over the world on that, a little bit earlier in some parts of the world, but I believe it was February pretty much, January, February.

Q Okay. So within about six months of your acquisition of this project property the COVID virus came into -- well, it was already in existence, but came into the specter. What effect did that have on this particular project?

A Well, right after the closing of the loan we had a joint venture agreement with Azu (phonetic) Hotels out of Korea. And they had come and visited the site and I believe it was in January. Yeah, I believe it was January, late January. And they were ready to move forward. And that's where I was saying COVID started a little bit earlier in other places. But the chairman of Azu, which has many hotels around the world, was very excited to be the joint venturer and capital partner on this project.

And, in fact, after they finished with our tour, one of the Korean brokers wanted them to go to the Virgin Hotel and

see that property. And ultimately, they had a drink and a chat with Mr. Vipin Nambiar. And surprisingly at that meeting, Mr. Nambiar, unbeknownst to me at that time. I did not know he owned my loan. He told me new equity partner that Mr. Nambiar owned my loan, which I thought was a little confusing to tell anybody. And I thought it was a little confusing to tell somebody that was a new capital partner ready to go forward on a project.

But in any case, that all transpired. And then about a week later after they had returned to Korea the country was shut down. And then shortly thereafter, you know, COVID plagued everywhere and that's when everything got on hold.

Q All right. Mr. Barton, this is one project that your companies had been working on, what we call the Mandarin Oriental project. Approximately how many real estate projects is your company working on at this time?

A We have close to 32 projects. I think it's, you know, average, you know, you would be between 25 and 50 projects. And that's when you're contracting to buy them. You're designing them. You're building them. You're finishing them. You're selling them. So there's a whole life cycle that the projects go through. But on an average it's between 25 and 50 projects that would be going on. And again, those are the residential developments, right? There's many of those, each one being separate projects.

And then the same thing with the multi-family. We have projects going in Opelika, Alabama, Ingleside, and throughout Texas and other parts of the country on that multi-family. And then we have the project, hotel project, that we're speaking of here today, and we have one other one.
Q And how long have you been involved in the area of real estate development?
A All my life.
Q Okay. So how old are you today?
A Fifty-eight.
Q All right. And, Mr. Barton, this project, as you mentioned, was slated to become a hotel, a luxury hotel, and residences. Is that right?
A The finest hotel in Dallas.
Q Is that still your plan for this project?
A Yes. We have ongoing architectural meetings last week that we had to adjust because of what was going on. And we just had another conference call this morning about the architects and getting the geotech done.
Q Is it your plan, Mr. Barton, to be able to retain the ownership of this particular project?
A It's the only plan.
Q All right. Mr. Barton, this entity filed bankruptcy, the entity, 2999TC Acquisitions, on or about October 29, 2021. Is that correct?

A Yes.

Q Can you tell the Court just briefly? I know Judge Hale had some experience with this. But why 2999TC Acquisitions filed Chapter 11 bankruptcy?

A Yes. After talking to my lawyers, this was considered a defensive bankruptcy. This was not a monetary. It was not a matter that's normally before a bankruptcy court. But the sequence of events that happened caused the necessity to have the bankruptcy filed. We had, as in the past, it's been advantageous for both parties to move forward on extensions. And once again, we were -- Mr. Vipin Nambiar and myself, were discussing -- is everything okay?

Q Yeah. I'm not sure what that was, but go ahead.

A Anyway, so Mr. Nambiar and I were discussing about two weeks before the October 29th maturity date, that we wanted once again to look at an option that was advantageous to both parties. We had discussions. And at time he said, well, if you make a pay down, then I'll -- that would be great. And then we talked about that. And then he finally came back with the strategy that Nate, his attorney, and I met at the W Hotel in the lobby which Mr. Nambiar owns with Mr. Bill Hutchinson. And in that hotel, we finalized that we would do another 90 days extension provided that we both hired a team to sell the hotel because his partners wanted, you know, to know that there was -- that opportunity was on the table because some of his

team felt that was important.

So we made those concessions. But it was a non-event to be able to hire that because basically we would move forward under that same period, have the payoff, and the arrangements were negotiated. Mr. Christensen was to prepare those documents at the direction of Mr. Nambiar. There was Jones LaSalle (phonetic) and two other brokers that Mr. Nambiar wanted to use. I didn't think they were the best ones, but I didn't really -- it didn't matter to me, so I left that decision to Mr. Nambiar and awaited the documents.

And then Mr. Nambiar and I were exchanging phone calls and I was not getting him on the phone. I was not able to get in touch with him. And I did not receive any documents, at which time became more concerning. Some of my lawyers and other advisors suggested that Mr. Nambiar was probably going to run out the clock. I didn't believe that. You know, we always have the good belief that people are going to work in good order.

And so we basically waited and kept checking on the documents. I got some feedback from Mr. Nambiar that he was in a meeting, that he would be out and we would be able to talk later. And eventually, I was able to get him on the phone on Friday, the 29th, which I believe was after 12:00, at which time he just said to me that it was too late. We weren't going to do anything. That we were just going to proceed and record

the deed and we'll talk later. But right now he was not going to send over any documents. And I was quite surprised. We had -- you know, everything was agreed to. We had a gentleman's handshake that that's what's going to happen. His lawyer was present in that meeting at the W Hotel. And so I was quite surprised.

And we talked to the -- to my lawyers and the advisors and the defensive bankruptcy was filed. And immediately I instructed him, Mr. Nambiar, that we filed. And he had no response other than, okay. We'll talk to you over the -- after the weekend on Monday, which was a little confusing to me. And, of course, later we found out that without proper authority they recorded the deed prematurely.

Q All right. And so just prior to the bankruptcy filing there was some discussions about an extension that didn't happen. The deed got sent in for recording and the bankruptcy was filed. Is that pretty much a summary of what happened that triggered the filing for the bankruptcy?

A That is correct.

Q You mentioned that this project had been ongoing for a little about almost two years by the time the bankruptcy was filed. Is that right?

A That is correct.

Q Okay. During that two year period, approximately how much money had been spent on this project by your companies?

A Well, at that point I had personally spent on top of the loan of $32.5 million, I approximately was at $21 million additional dollars that I had spent between wiring to Mr. Vipin and architects. We have plans and, of course, we had the hotel management agreement, which is not an easy thing to get done with Mandarin Oriental. That is, you know, close to a million dollars of legal fees in that process and over nine months of negotiating.

As you can imagine, Mandarin Oriental is a very selective company. They're one of the top five hotel companies in the world. And they're very selective and their agreements are very rigorous. And also, to sign that agreement, you have to invest a huge amount of money in the plans and drawings. Basically everything is decided of what the hotel will be to their standards and they dictate those standards and the cost of what you're going to spend and the style of the hotel.

It's collaborative, but at the end of the day, because it's their brand, they require, you know, all of that up-front expense to be done before they'll sign agreement. And that agreement was signed. That agreement is in place. And only as even as of this morning I spoke with Mr. Todd who is in charge of Mandarin Oriental in the Americas. And they're fully supportive and fully ready to --

MR. KANE: Objection. Hearsay.

THE COURT: Sustained.

THE WITNESS: -- let it go forward.

THE COURT: Sustained.

BY MS. LINDAUER:

Q Mr. Barton, and we'll come back to a little bit of this in a minute, but even though I think you just told us today, you're continuing to work on the Mandarin Hotel luxury residence project. Is that right?

A I was in a zoning meeting objecting to the narrowness of Dickerson Road just the other day for the Four Seasons Hotel and Condominiums. That's a $750 million project that's going right next to me from Mr. Perot and a developer out of Boston. And so, you know, we work tireless with our lawyers, Mr. Mikos (phonetic). And we went to the P&Z and I also went to the city council to explain that these two projects together should have a cul de sac and that worked very diligently.

Unfortunately, they didn't agree to that, but they did agree that Mr. Perot would add another lane of Dickerson to make it wider. So, yes, we're working on it today. On the drive over here I was on the phone with the Renaldi Construction Group out of New York City, world renowned, and they're building the Mandarin Oriental project in New York, discussing schedules and next week trying to take into consideration we had to delay the meetings this week.

Q All right. What's the total amount required for the completion of the construction of the Mandarin Hotel and

Residences?

A Three hundred and ninety five million U.S. dollars.

Q And has that changed over the last couple of years at all, the actual cost to complete?

A Yes, it has. You know, with the cost increase and the commodity issues, construction costs pretty much over the board have increased 20 percent. It's less of an increase in a commercial building like this as opposed to the residential development. But we originally had $376 million as our total cost. And that has now been adjusted for inflation and all the other issues. And some of it is also for the time delay we expect of getting all the materials.

Q How is it that you came to borrow money from the original lender, Madison?

A Originally, we talked to a group out of London to be the debt provider. We hired -- once we had the property under contract, we hired a broker to go out into the market and secure us our land loan, which is a temporary land loan, and then the full construction loan. And many of these debt funds that want to do the construction loan will get involved in the land loan because it's a temporary period before they roll to the construction as a way of marketing or getting those loans that they like. Because they are quite large, there are not a lot of them, and it's very competitive for those loans.

So the Teachers Fund out of London, they sent their

president over, Martin, and he was very excited. He looked at the project. And he's financed several Four Seasons in the world. He said, I get it. I like it.

MR. KANE: Objection. Hearsay.

THE WITNESS: We don't like --

THE COURT: Sustained.

BY MS. LINDAUER:

Q All right. You mentioned Teachers Fund from London was one of the entities that you were visiting with about providing the full construction project for this or full construction loan for this project. Is that right?

A Correct. They gave us a term sheet and we gave them the $500,000 deposit. And we went through the whole process of getting ready to close that loan, which is basically two loans, the land loan and then the construction loan. While we were going through that process, we were introduced to Madison. And Madison gave us better terms and offered to close quicker. And Josh Zegen and his brother, the two brothers, came down. They looked at everything. They were very excited. And basically, from the minute that they stepped on the ground to the day that we signed and executed all documents for the loan of $32.5 million was ten days.

It was quite impressive the way that they were able to put it all together, but that's kind of what they're known for. And that was tied to the construction loan, that we would

get more favorable terms on the exist of the land loan, which was to be 12 months, a simple land loan. And so we saw that was a better opportunity. And we were very pleased with Madison and they were very professional in everything that they did.

MS. LINDAUER: Your Honor, it's a little after 12:00. How long were you intending to go this morning?

THE COURT: Originally, I had intended to stop at 12:00 so that we could prepare for a Chapter 13 docket. I saw some materials to indicate that docket is not going to be that bad, so why don't we plan on going until 12:30.

And, Ms. Lindauer, your original time estimate for Mr. Barton was an hour and a half. Is that right?

MS. LINDAUER: I don't recall, Your Honor, but I think it will be a little bit longer than that, Your Honor, but I'll try to move forward.

THE COURT: So I do appreciate some background information, so but I do want to try to get Mr. Barton finished tomorrow. But go ahead. We're going to go until 12:30 today.

MS. LINDAUER: We will definitely finish Mr. Barton tomorrow. I have no concern about that, Your Honor.

THE COURT: All right.

MS. LINDAUER: Okay.

THE COURT: Keep going. Let's go until 12:30.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q So you were discussing with us that the Madison loan. And just to be clear, you called that the land loan. Is that right?

A That's correct. It was a short 12 months. It did have some extensions if needed, but a simple land loan and very -- there's a narrow group that likes to do a land loan. They get a little better yield and they basically get in and get out.

Q Now after you took out the land loan with Madison, did you discuss with Mr. Nambiar that the potential for the development of the 2999 Turtle Creek property?

A I had a couple of meetings with Vipin Nambiar. I met him at the Ritz Carlton with the ambassador of India. The ambassador introduced a few of us together and then Vipin was there. And I said hello to him and then we chatted. And then he explained that he was a hotel investor and that he was partners with Bill Hutchinson and they were the partners of the Virgin Hotel. And that was a business that he was active in.

So I took note to that and I think about four or five weeks later, so that was before we closed, before September. I had arranged a lunch and Mr. Nambiar set it at the Virgin Hotel. And I was there with Mr. David Mezersmith (phonetic) and one of my other assistants. And we had a nice lunch and a nice chat. We talked about the investment of this hotel. We did not talk about any debts. You know, we looked at him as a

check writer of equity as he's been known for his equity. And explained to him the project. He said it was interesting. He said, you know, it was a big job to get the Virgin done.

He was excited about it, that they were doing some other deals, and that he, you know, as people do, you know, closing turned to me and said, you know, I'm a very controlling partner. And I just laughed and I said, well, I've had controlling partners before and no big deal. And let me know if there's some interest. So we just shook hands. It was a very nice lunch. And not optimistic, not good or bad. Just, you know, you go through those meetings. So I thought it was very nice.

And then we checked back a few more times and never heard back from him. He didn't say yes or didn't say no. And then there was a hotel conference out in LA and we were excited that he was going to be in attendance along with other people. And we ran into him again and still he did not commit to any type of equity investment. He just was inquisitive and complementary and everybody was polite. And that was the only involvement that I got with Mr. Nambiar about investing in this project. He never committed to do that.

Q Okay. Did Mr. Nambiar then turn up later in connection with -- after you had closed the Madison loan, did Mr. Nambiar turn up later in connection with this particular project?

A Well, right after I closed in September, then right before

Christmas Mr. Zegen, who said, hey, I'm going to help you bring in equity for you on this --

MR. KANE: Objection. Hearsay.

THE COURT: Sustained.

BY MS. LINDAUER:

Q Okay.

A I apologize. I will try to take note of not doing that again. I apologize.

Q Okay.

A So what was --

Q The question was did Mr. Nambiar turn up again in connection with this project after you took out the loan with Madison.

A Yes.

The Madison president arranged a meeting for an investor and I went to New York City. And in the Madison office I was introduced to Mr. Glasgow of HNG Green Hollow. And Mr. Glasgow was introduced as an equity investor. And at that time, I presented all the evidence and information about our project and pursued him as an equity investor as Madison had put them forth. And it was a nice meeting. We went through the whole process.

And, of course, right before Christmas, you know, he said, look, we'll get back after the holidays. But we gave them all of our plans, all of our design, our management agreement. All

of our confidential information was given to Mr. Glasgow. And then we left and --

MR. KANE: Objection, Your Honor. Non-responsive and move to strike. The question was whether Mr. Nambiar was involved again later. This is narrative about Mr. Glasgow. It was not responsive to the question.

THE COURT: So I'll sustain it.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Barton, who -- what's your understanding of the relationship between Mr. Glasgow and what's called HNGH Turtle Creek, LLC? How does Mr. Glasgow fit in to that entity?

A Mr. Glasgow is a partner with Mr. Nambiar. That's how that I know that they're connected. And that's -- that was the first meeting I had with Mr. Glasgow and openly HN and HN Green Hollow is HN, the Hunts and Nambiar.

Q All right. So when you had this meeting in New York with Madison and Mr. Glasgow showed up at that meeting, did you have some understanding that his role was in -- would also -- was in connection with an entity called HNGH Turtle Creek, LLC?

A None of that was disclosed. We had no idea that he had anything to do with Mr. Nambiar.

Q Okay. Fair enough. And who did you think Mr. Glasgow was connected with?

A I believed he was just another funding source in New York

City.

Q Okay. Did you later find out that Mr. Glasgow did in fact have something to do with Mr. Nambiar and his entities?

A Yes.

Q When did that happen?

A Somewhere along the line during COVID we got a letter. And I opened it up and I remember the letters HN something, basically a notification that they had bought the minority share hold of my land loan, which is highly, highly confusing. When you have a 12-month land loan, there's almost no reason that someone would buy a minority position in a land loan of 12 months.

You buy a participation in a longer loan, something that has more reason to be there, but a 12 month loan, it didn't make sense to me. I didn't really pay attention to it. There was nothing I could do to object to, so I just took note of it. But as God is my witness, I looked at my paper and I said, I wonder if this was Vipin.

Q What made you think that it had anything to do with Mr. Nambiar when you saw those papers?

A I don't know other than it made no sense that anyone would buy it unless they were making a predatory move to control the loan and wait in abeyance if anything happened. So I've just been in the business for 30 years. And when you have the most sought after piece of property, people do want it. And so it

was not surprising that this would be potentially a prefatorial move. I just was surprised it was Vipin.

Q When did you actually determine that a part of your loan with Madison had actually been sold to an entity that Mr. Nambiar was connected with? When did you actually connect the dots there?

A I connected the dots in the middle of COVID while I was sitting on lockdown when the whole world was coming to an end. I got a phone call from somebody. I wish I could remember his name. And he said, I'm with HNG Green Hollow, I believe was the name. He said, we want to know when you're going to pay your taxes.

MR. KANE: Objection. Hearsay.

MS. LINDAUER: Your Honor, I think that that's actually an admission by a party opponent. I think HN Green Hollow was the managing entity for HNGH Turtle Creek based on Mr. Nambiar's testimony, so at this particular time. So I think that's actually an exception in the hearsay rule in the sense that it's an admission. It's not hearsay. It's an admission of a party opponent.

MR. KANE: But Mr. Barton said he didn't know who. He thought it was from HN. That's not exactly establishing foundation for an admission by a party opponent.

MS. LINDAUER: All right, Your Honor. Then let me ask Mr. Barton if he can clarify the answer to the question at

this point.

THE WITNESS: A gentleman --

BY MS. LINDAUER:

Q Hang on. Hang on.

A Oh, sorry.

Q Wait for a ruling.

THE COURT: So I'll wait on ruling on the objection. Do you want to ask him another question?

BY MS. LINDAUER:

Q Okay. Did you come to understand, Mr. Barton, that the contact that you had from this entity, HNGH, you believe Green Hollow, had something to do with HNGH Turtle Creek?

A He identified himself as a party that was my lender.

Q Who was the person? Do you recall his name?

A I don't. I cannot remember his name. I apologize. I have looked for it. I have tried to find it. I wish I could, but I just --

Q Okay. At the time that you received that call, had it come to -- you said you were aware that part of the loan had, in fact, been sold. Is that right?

A We received a letter. That is correct.

Q At that time though, had you actually had any other communication with anyone with HNGH Turtle Creek regarding their purchase of a part of your loan with Madison? Phone calls, letters, anything of that nature?

A Yeah. To be correct here, there was no HNG Turtle Creek at that time, I don't believe. I don't know when that entity was created. As we've seen in the documents, Mr. Glasgow's company was the owner of that participation.

Q And have you had -- did you have an opportunity? I know you mentioned you met him in New York. Since that meeting in New York the first part of 2020, did you have an opportunity to meet with Mr. Glasgow again?

A He called me and when we were in the middle of forbearance discussions and litigation. And he said, I'm going to do you a big favor. I'm going to write you a check for $150,000 and you can go away. That's the only thing I've ever heard from Mr. Glasgow after I met with him in the offices of Madison.

Q Okay.

A In December.

Q All right. Now you were telling us that shortly after COVID took over the world in February of 2020, you did receive a phone call regarding the payment of taxes on the 2999 Turtle Creek property. Is that correct?

A That is correct.

Q Okay. And had the taxes been paid on the property?

A So at the time when he called me, I had already spoken to Josh Zegen at Madison, told him that the lockdown was in place, that the city tax offices were not communicating, and we were unable to pay the taxes. And we also said we -- you know, with

everything that's going on, we want to agree with you that we could just delay this. There is no impact with the City of Dallas. It's a nominal cost if the payment of the taxes goes past the first month.

And we said, of course we're going to absorb that. They said, okay. Well, let's just monitor the situation. I mean, again, the world had come to an end. Everybody forgets we were all locked down in our houses.

And I get a call from a -- from this person of the lender who's stating he is the lender, not Madison. Another entity is the lender in charge. And he starts harassing, you know, aggressively saying, you have to pay this. If you don't pay it, we're going to foreclose. We're going to take your property. You're going to get out of there. Very aggressive. And I said, sir, I don't know. You know, we talked to Madison. We don't know who you are. We don't have any authorization from Madison to speak to you. And we ended the conversation.

Q Okay. When was the first time you saw a document called a participation agreement?

THE COURT: Just for my benefit, I'm not sure I was understanding who that phone call was with. Was that with the unnamed individual whose name you can't remember?

THE WITNESS: Yes. That was from HNG Green Hollow, the entity that owned the minority participation. And once that tax delinquency happened, that's when Mr. --

THE COURT: My question -- I'm sorry, Mr. Barton. I was just trying to understand who you were relaying that conversation was about. So you've answered my question. Thank you.

MS. LINDAUER: Okay. Sydney, if we could pull up exhibit -- this is lend -- no, actually this is a Debtor's Exhibit 17. We looked at this document before. At the top of the page on this document, and this is just to give some context to Mr. Barton's testimony.

BY MS. LINDAUER:

Q If we look at the document, it's marked -- it's Exhibit 17, Debtor's Exhibit 17, Page 89 of 148. All right. And this is the participation agreement, Mr. Barton, that you're aware of. Is that right?

A Yes.

Q Okay. Approximately when was the first time you became aware of and actually saw this document?

A It took close to eight months of negotiations, litigations, court orders, discovery to get this document which gives the authority to Mr. Nambiar's Green Hollow entity that they were in charge of our loan that we made with Madison. It took an enormous amount of money and work to get this out of their hands. And again, it was it's confidential. It's confidential. It's confidential.

Once you read it and understand it and the roadmap of how

in the end if he's successful in foreclosure, Madison would finance Mr. Nambiar 100 percent takeover of the property. You start to understand why they don't want this predatory document in the marketplace.

Q Let's take a look if we could at Page 106 of 148, which is the signature block on that document. And you were discussing an entity called HN Green Hollow Capital Partners, LLC. Is that correct?

A Yes. I know that Mr. Nambiar tried to reflect that this is a manger or an advisor or he's just some nobody, but he is the authorized signature for the Green Hollow Group. And it has HNG Turtle Creek as the Delaware company being the -- I don't understand why it says GHCP on top and then it has that entity.

So I don't really understand that signature block. It doesn't make sense to me. When I read the document, GHCP is the owner.

Q Well, Mr. Glasgow, and you've mentioned --

A Uh-huh.

Q -- is the one signing as manager for HN Green Hollow Capital Partners. Is that right?

A He is signing for HN Green Hollow Capital Partners, yes.

Q Okay. And it shows that HN Green Hollow Capital Partners, an entity again you've been discussing with us, is shown as having some relationship to HNGH Turtle Creek, LLC. Is that

right?
A I'd like to look at the document and understand what that relationship is.
Q Okay. Well, we can turn back to the beginning. I'll give you a moment to do that.
A Because I don't understand how that name appears when all the whereas's.
Q Okay. Well, and maybe we can do that during the break and when we break at 12:30 you can spend a moment looking at that.
A That's fine. Every time I read this I find something else surprising in it.
Q Okay. Well, anyway, you had nothing to do with the participation agreement, correct?
A We were not party to it.
Q And you had no knowledge of it until, I assume, sort of after the fact. Is that right?
A After I said after a very, very long fight to get it, yes.
Q Okay. All right. And you got a copy of this document and it indicated that HNGH Turtle Creek had paid $7 million to acquire a 21.54 percent interest in your loan. Is that right?
A Again, I (audio skip) Nambiar and his lawyers started aggressively taking charge of the process. We asked for forbearance, no negotiations, and they refused. They wanted us to sign all our legal rights away. We refused.
Eventually, after months of discussion, the interest was

still in place, and that took it to sometime in July I believe when we were ready to put up more interest and we finally signed a pared down release, which did not give up our legal rights. And they said if you sign that, we'll start forbearance negotiations. Again, they went dark.

They wouldn't do any forbearance, no discussion. And -- and they wouldn't accept any more interest. And at that time, the loan had matured. So there was no more interest, and the maturity -- I'm sorry, first, there was no more interest. They would not accept any more interest. And eventually, as the clock kept running, then the maturity date came around.

THE COURT: Mr. Barton, it's almost 12:30. Just for my own benefit, I think the original question was when did you first discover that HNGH had acquired the loan. Could you answer that question just briefly for me?

THE WITNESS: Late in 2020.

THE COURT: Can you be any more specific than that?

THE WITNESS: Sitting here today, Your Honor, I apologize, no. You know, it's been a long --

THE COURT: That's fine. That's fine.

So it's 12:30. We have to eat lunch and get ready for our Chapter 13 docket. So does this seem like an appropriate breaking point before we pick up tomorrow morning?

MS. LINDAUER: Your Honor, I think that's fine. At what time would you like to pick up tomorrow morning?

THE COURT: I'm looking to see.

MS. LINDAUER: And, again, Your Honor, this will be, as I mentioned, our last witness. I know that you had indicated you would like to conclude this matter tomorrow.

And so with that in mind, just so that the lawyers can be prepared, if we do complete Mr. Barton let's say around lunchtime-ish, and I don't know how much time Mr. Kane will need, are you anticipating then we would do our closing arguments tomorrow? Is that the anticipation?

I'm just trying to schedule. We have different people handling different things, so just trying to figure out timingwise how that will work out.

THE COURT: So the answer is I don't know.

MS. LINDAUER: Okay.

THE COURT: I think we're scheduled to start at 9:00 in the morning. At some point, we need to address Mr. Dooley, so I don't know if we're going to finish tomorrow or not. But did you just say you're going to have Mr. Dooley on through noon because I thought originally --

MS. LINDAUER: No.

THE COURT: -- you said an hour and a half?

MS. LINDAUER: No. Mr. Barton, Your Honor. Mr. Barton.

THE COURT: I'm sorry. Mr. Barton. Mr. Barton.

MS. LINDAUER: Yeah.

THE COURT: You indicated that --

MS. LINDAUER: No. I just said -- what I'm anticipating --

THE COURT: Ms. Lindauer --

MS. LINDAUER: I'm sorry, Your Honor.

THE COURT: So I thought you had indicated he would take about an hour and a half. I'm not strictly holding you to that, but can you give me a reasonable estimate of how much more time you're going to need with Mr. Barton tomorrow?

MS. LINDAUER: I would say an hour to an hour and a half. And, again, I probably have spent a little too much time on background, but an hour to an hour and a half I think is --

THE COURT: I thought that was your estimate yesterday, and we're already nearly there. So is -- I'm just trying to get some idea of whether we're actually going to finish with Mr. Barton tomorrow.

MS. LINDAUER: I will represent to the Court that we will finish with Mr. Barton tomorrow whether -- I mean I'll briefly -- I'll cut down if I have to, but we'll get him done tomorrow. And so I will represent to the Court we will get -- well, and again, I don't know about Mr. Kane but at least I know our part of it for sure we will finish tomorrow in time for Mr. Kane to ask some questions.

THE COURT: I was just trying to get a realistic estimate because --

MS. LINDAUER: Sure.

THE COURT: -- I thought your estimate yesterday was it would take about an hour and a half to two hours. So I don't think that was realistic, so I'm really just trying to get a more realistic estimate of how much more time. So I think you've answered my question.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: Any other housekeeping matters before we adjourn until 9:00 tomorrow morning?

MR. KANE: Yes, Your Honor.

Just from a notice perspective, you had asked if we intended to call rebuttal witnesses. At the time, we did not intend to call a rebuttal witness. I do think that we'll probably have 15 to 20 minutes of questioning of Charles Aster as a rebuttal expert to Mr. Dooley on some of these specific pieces of testimony that he had about whether banks would typically close a transaction if UCC-3s weren't present and how long it takes to prepare a certain document prior to closing.

But that would be the extremely limited scope of his rebuttal.

THE COURT: Right. So we'll have to address what to do with Mr. Dooley before we get to that, so I appreciate the heads up, though, that he's a potential or anticipated rebuttal witness.

Any other housekeeping matters before we adjourn

today?

MS. LINDAUER: Your Honor, we did file a notice for in-camera inspection of the financing that we'll discuss with Mr. Barton without I think a lot of names and things. But we did file that notice with the Court, I believe, about an hour ago. And then we are --

THE COURT: I saw that. I wasn't sure is that the list by names?

MS. LINDAUER: Well, it's actually names and it's also -- well, we didn't file the names with the Court, obviously.

THE COURT: I understand that, but was that -- does that document relate to the five names --

MS. LINDAUER: Yes.

THE COURT: -- nobody wanted to mention?

MS. LINDAUER: Yes, Your Honor.

Well, I think actually I'm not sure how many names are actually on that. I didn't get to see it because I was here. But, yes, it relates to whatever the names are, and I think we also sent you the actual loan commitments with the proofs of funds, as well, as part of that. So --

THE COURT: So I don't recall asking for that. I thought --

MS. LINDAUER: Well, then we may have given you more than what you asked for, then, because we did send I believe --

I will double check.

THE COURT: When you say sent it, other than the notice, what have you sent and who did you send it to?

MS. LINDAUER: We couriered to your courtroom for in-camera inspection the actual names of the persons or entities that were prepared to provide the funding for the closing. And I believe we actually also provided some supporting documents in the form of letters of commitment as well as proof of funds --

THE COURT: So I didn't ask for those. Were those documents listed exhibits?

MS. LINDAUER: They were not, Your Honor, because we would not -- we would want those to be in-camera. So if you don't want those, I suppose you can just ignore what we sent other than we did give you the names, obviously, of the various investment entities.

THE COURT: So as I understood, I think that was what my request was, was --

MS. LINDAUER: Okay.

THE COURT: You indicated that you did not want to mention names on the record. And so you indicated that you were going to be sending for in-camera review a list of those names so that I could see, you know, who lender -- proposed lender 1, 2, 3, 4, 5, was.

MS. LINDAUER: Right.

THE COURT: If you sent me more than that, I think we're going to have you come pick that package back up because I don't want to see anything else. I didn't ask for anything else.

MS. LINDAUER: Okay. Well, Your Honor, let me check where we are in that process, and if we need to, we'll pick it back up and just send you only the names attached to that notice.

THE COURT: Am I missing or am I -- I know I'm not perfect. Am I misremembering anything because I thought my request was pretty specific and I don't recall asking for documents.

MR. RODRIGUEZ: Your Honor, hi, this is Oscar Rey Rodriguez. And I do think we have maybe a miscommunication here. But the Court has repeatedly put up on the screen Paragraph 19 in our papers. And the Court sua sponte has been asking counsel and others repeatedly about the identity of these funders that were prepared to go.

And that questioning sua sponte continued even after Randy Marx's lawyer testified under oath and gave you a list in detail of four named sources who were ready to go. So, Your Honor, when you raise that issue yet again, I wanted to put the Court's mind at ease that there are in fact lenders, there are more lenders, and they are ready to go.

And I think I mentioned on the record that I would

submit any available documentation my clients were okay with me sending to show you that there are investors, lenders lined up committed to pay tens of millions of dollars to get this done. So I want to put this issue to bed, Judge. If I misunderstood, then please tell me exactly what you want and I will send it.

But I don't want there to be any question in this Court's mind about the bona fides (phonetic) of my clients or my colleagues or the accuracy of the papers and statements that are in our pleadings.

THE COURT: So I think you did misunderstand. I thought I was crystal clear that I wanted the names of the entities that were not to be named like Voldemort on the record. And I thought that was what was coming over. I didn't offer or suggest that you send over additional documents. So --

MR. RODRIGUEZ: Well, Your Honor, is it objectionable to you if you go ahead and take a look at them in camera? I'd feel a lot better if you would take a look at them. I really would.

THE COURT: So, again, I think you misunderstood what I asked for, and I'm pretty sure Ms. Lindauer was clear on what she would be sending over, which was the list of names that nobody wanted named on the record. So that was what I was expecting.

And so you've indicated that you've sent over more

than that. So I'll just ask you to make arrangements to pick up that package. We will not open it. I will not look at it. And I would ask you to send just what I asked for and just what Ms. Lindauer indicated would be coming which was the list of names that nobody wanted repeated on the record.

So why don't you do that sometime this afternoon. Who did you direct the package to?

MS. LINDAUER: I think we sent it, Your Honor, to just to chambers, so I assume one of your staff would probably -- and it was very clear on it what it was. So I don't know if it's gotten there yet because I don't -- I've been tied up here to check on it. But I'll make sure if it hasn't gone that it doesn't go but, if it has gone, that whoever brings you just the package with the list is available to pick that up from you.

So I --

THE COURT: All right. We will keep an eye out for that --

MS. LINDAUER: (Indiscernible).

THE COURT: We will keep an eye out for that package. I won't open it. We will keep it here for somebody to come pick back up. And then at some point, you can send back over I think what I originally asked for which -- and what you indicated was coming was the list of the names that your client did not want to reveal on the record.

So let's -- if you can do that this afternoon so that we can be prepared to go at 9:00 tomorrow morning.

MS. LINDAUER: We will, Your Honor. I'd be happy to do that.

THE COURT: Mr. Rodriguez, is that -- do you understand that?

MR. RODRIGUEZ: Your Honor, I understand that. And I think I also understand you are denying my request that you take a look at those loan commitment documents and those official business records. I guess it's not necessary for your analysis, but I did make that request. I just want the record to be clear that I did offer these, we did send them, they are there, and they will remain available to you.

But I want to put to bed any question you have in your mind that anybody made a misstatement in Paragraph 19 of our filings. You've been looking at those things like they're under a laser beam. So I want to put that issue to bed. I don't want to hear about it again. If we need to be worried about some sua sponte motion or something that's going to come down the pipe, I need to know about it so I can properly advise and protect my client. But if all you want --

THE COURT: So let me be clear again.

MR. RODRIGUEZ: Yes. (Indiscernible).

THE COURT: When I asked about the names, I don't really -- I guess you could consider that a sua sponte request,

but that was -- there was an objection to naming those people on the record. I was asking for information that I think had already been testified to about there were potential funding sources. So I asked who they were. I believe that's all I asked, and that's when this issue about not naming the names came up.

So all I asked for and all I expected to receive was a list of names. It appears that you're trying to get documents in evidence. I'm not sure what you're trying to do, but I didn't ask for those. If those are part of your exhibits, I guess you can try to get them admitted at the appropriate time. But I'm not going to receive documents that I didn't ask for.

So I think that's all I have to say about it. I will let you come pick up the package, and then we will be in recess until 9:00 tomorrow morning. Thank you.

MS. LINDAUER: Your Honor, hang on one second, if you don't mind.

I did just confirm that it hasn't actually gone yet, so that's good.

THE COURT: Okay. So --

MS. LINDAUER: So we won't need to pick it up. So those --

THE COURT: So go ahead and send over just the list of names --

MS. LINDAUER: Okay.

THE COURT: -- and I will look at that in camera and then we will pick back up at 9:00 tomorrow morning.

MS. LINDAUER: All right. With Mr. Barton. Thank you, Your Honor.

THE COURT: We are in recess until 9:00 tomorrow morning. Thank you.

(Proceedings adjourned at 12:3x p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, KAREN WATSON, and CRYSTAL THOMAS, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Karen Watson

KAREN WATSON, CET-1039

/s/ Crystal Thomas

CRYSTAL THOMAS, CET-654

LIBERTY TRANSCRIPTS DATE: July 5, 2022