IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Friday, July 1, 2022<br>9:33 A.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For the Debtor: | Joyce Lindauer Attorney, PLLC<br>BY: JOYCE LINDAUER, ESQ.<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| | Fee Smith Sharp & Vitullo LLP<br>BY: OSCAR REY RODRIGUEZ, ESQ.<br>13155 Noel Road, Suite 1000<br>Dallas, Texas 75240 |
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

# I N D E X


| | Page |
|---|---|
| Case called | 3 |
| Court's Ruling on Motion to Depose John Kane | 191 |
| End of Proceedings | 210 |
| Certification of Transcriber | 210 |

WITNESSES

FOR THE DEBTOR:

TIM BARTON

| | |
|---|---|
| Direct Examination (Resumed) by Ms. Lindauer | 9 |
| Cross-Examination by Mr. Kane | 77 |
| Redirect Examination by Ms. Lindauer | 139 |

MARSHAL DOOLEY

| | |
|---|---|
| Direct Examination by Ms. Lindauer | 195 |
| Cross-Examination by Mr. Kane | 202 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 9:05 a.m.)

THE COURT: -- for delay. My WebEx app was frozen, but I think I have it working now. I will take appearances, please.

MR. KANE: Your Honor, John Kane for HNGH Turtle Creek, LLC, the pre-petition lender.

THE COURT: Good morning.

MS. LINDAUER: Good morning, Your Honor. Joyce Lindauer for 2999TC Acquisitions, the reorganized debtor in this case.

THE COURT: Good morning.

MS. LINDAUER: Good morning, Your Honor.

MR. RODRIGUEZ: Good morning, Your Honor. Oscar Rey Rodriguez also appearing for the reorganized debtor.

THE COURT: Good morning.

MR. METZGER: Your Honor, Steve Metzger representing Tim Barton individually.

THE COURT: Good morning, Mr. Metzger.

I don't see Mr. Phelan or Ms. Simmons. Are they expected today?

MS. LINDAUER: They are not, Your Honor. Both of them have conflicts today. So we don't anticipate that they will be part of this.

THE COURT: Okay.

So before we start back up with Mr. Barton, I just

want to quickly talk about a couple of things yesterday.

First, with respect to the in-camera documents, during the hearing yesterday, we had some discussion about a package that was expected to be delivered to chambers. And during that discussion, I made a reference to Voldemort. Those of you who are Harry Potter fans might know who that is. It was my lighthearted attempt to refer to the funding sources whose names I understand the debtor did not want listed on the record for confidentiality reasons.

I did not want to suggest or imply that the funding sources had any of the characteristics that Voldemort has. So I just wanted to put that out there.

Second, the in-camera request when that came about, I was asking about evidence that was in the record. I really wasn't inviting, you know, ex parte communications about documents that had not been listed as exhibits. And so I do appreciate that Ms. Lindauer either retrieved the package or maybe I think she indicated that it had not been sent. And I do appreciate that.

We did receive a package that has styled --

(Background discussion between participants)

THE COURT: I'm sorry.

(Background discussion between participants)

THE COURT: So I can hear somebody. I don't know who that is, but if you wouldn't mind muting yourself.

Okay. So back to the in-camera review. I did receive yesterday a slimmed down package, a one-page document, styled "Court Requested In-Camera Only Submissions." And it has a list of five -- well, it has five short paragraphs describing some entities. I'll just leave it at that. And I think this was originally what I had in mind, and I understood the parties were suggesting as a way if Mr. Barton or Mr. Walji wanted to testify about these entities without naming them, I thought we had agreed this would be an appropriate way to do that.

I don't think Mr. Walji -- we didn't have much to discussion on that with Mr. Walji, but if Mr. Barton is going to testify about those, I just wanted you to know that I do have this document. And if you want to refer to them, you know, as funding source 1, 2, 3, 4, and 5, I will know what you were referring to because I have that list in front of me.

So anyway, we have that as far as the in-camera documents.

MR. RODRIGUEZ: Thanks very much, Your Honor. I appreciate the clarification. And I'm glad we're all on the same page.

THE COURT: So -- and then the final thing I want to discuss was Mr. Dooley's offer of proof.

So I had indicated yesterday that I was a little bit surprised about the offer of proof because I do believe that it

was broader than my Federal Rule of Evidence 702 exclusion rule. So after I indicated that, I was a little bit surprised by that offer of proof. I think it was either Mr. Rodriguez or Ms. Lindauer -- I think Mr. Rodriguez asked that I accept it as a proffer of his evidence.

My ruling on that is I am not going to accept it as a proffer of evidence. But to the extent there was any confusion about my ruling on what the expert could and could not testify about, I will allow you to recall Mr. Dooley. But my ruling on 702 I think was much narrower than either you interpreted it or your offer of proof indicates.

So I had -- I'll just quickly touch on that, and then we're going to get back to Mr. Barton.

MR. RODRIGUEZ: Thanks very much, Your Honor.

THE COURT: So the first thing I indicated that really would not be the proper subject of a legal opinion was how to interpret and apply the agreed order. So I had a back-and-forth discussion with that with Ms. Lindauer. She, you know, tried ably but was not able to convince me that that was anything other than a legal opinion. So that was excluded under my ruling.

And then I also indicated that Mr. Dooley would not be able to give an expert opinion on whether the document that -- you know, whatever version of document that Mr. Kane sent over or any of the documents floating back and forth, whether

those were effective as a rescission deed. Again, I had some back-and-forth discussion with Ms. Lindauer on that. She couldn't quite convince me that that was anything other than a legal opinion.

So that was my ruling on -- and I believe everything else that we -- you had a list of three or four or five other things that I said I did not have a problem with. And I think a lot of what was included in your offer of proof were in those other buckets. And I'll just give you some -- you know, the thing that real instantly spring to mind was I think there were several statements in there about what a reasonable commercial lender would do. I heard that several times. That was outside the scope of my ruling on what was excluded.

So to the extent there was any confusion about that, if you so desire, I'm going to allow you to recall Mr. Dooley. So that's all I have to say about those items. And with that, I think we're ready to start back up with Mr. Barton.

MS. LINDAUER: Your Honor, thank you. And we'll --

MR. KANE: Your Honor, sorry.

MS. LINDAUER: Sorry.

MR. KANE: Before we begin that, I think that there is -- there's one other housekeeping issue. And that is regarding the declaration of Mr. Marx that was provided six days after he was released from trial.

HNGH just filed a motion to strike that declaration

as that testimony and his exhibit attached to his declaration, I guess the debtor is seeking to have that as evidence in support of this hearing. Just before this hearing concludes, we would appreciate it if Your Honor would issue a ruling on that.

THE COURT: Yeah. I will rule on that before we conclude the hearing. When Ms. Lindauer mentioned that, I had not read it. And we will address that. If it looks like I'm forgetting to address it, feel free to stop me before we conclude. But I do have that on my list of items to discuss before I make my ruling before we, you know, conclude the evidence.

But so far I have not considered that declaration, but I will rule on your motion before we conclude.

MS. LINDAUER: Your Honor, on that point, I just wanted to advise the Court we are preparing a response to the motion that was filed yesterday. So we'll have that to you hopefully late this morning so it's part of your file when you take up that matter later. So I just wanted to let you know there is a response to come on that, so we're aware of Mr. Kane's filing. So we are addressing that. I just wanted to let you know that.

THE COURT: Very good.

All right. Mr. Barton, you are still under oath.

MR. BARTON: Good morning, Your Honor.

THE COURT: Good morning.

TIMOTHY BARTON, DEBTOR'S WITNESS, PREVIOUSLY SWORN

THE COURT: And you may proceed, Ms. Lindauer.

MS. LINDAUER: Thank you.

DIRECT EXAMINATION (RESUMED)

BY MS. LINDAUER:

Q Mr. Barton, I did want to go back and jut cover very briefly one point that we had covered earlier.

MS. LINDAUER: I think, Larry, if you're handling the exhibits, if you could pull up this is Debtor's Exhibit D17.

Very good. Thank you.

If you would -- if you look at the numbers at the top of the page on the right-hand corner, it says Page 1 of 148, if you would go to Page 89 of 148.

BY MS. LINDAUER:

Q And, Mr. Barton, this is a document that we looked at -- I think we've looked at several times, which is --

A Can I see the paper version?

Q Yes, you can.

A Just slide it over here.

Q I can. A participation agreement.

A Right. I remember this.

Q Okay.

A Yes, ma'am.

Q And if we could -- let's show this together.

A Yeah.

Q If we could look at Page 105 of that document.

A Okay. I see it.

Q And, Mr. Barton, do you see a signature block for Madison showing 2999 Turtle Creek, LLC?

A Yes, I do.

Q Okay. Do you see a signature block right underneath that one that says "CHCP HNGH Turtle Creek, LLC, a Delaware Limited Liability Company by HN Capital Partners, LLC?"

Do you see that?

A I see it says that HN Capital Partners, its manager.

Q Okay. If we go to the next page.

A Okay.

Q And we look at the signature block for that one, GHCP, same initials, HNGH Turtle Creek, LLC, do you see what entity signed this document on behalf of HNGH Turtle Creek, LLC?

A Well, it seems to be a different entity, HN Green Hollow Capital Partners, LLC, authorized signator.

Q Okay.

A It's a little confusing why there's two signatures on the same document. I know that sometimes when they collate I think is the word for when they -- two different -- one document can be signed by two parties.

And that's what's confusing me. When I looked at this document, this seems to be that they're trying to say two

different -- two different signature blocks on the same document. It's very confusing to me.

Q All right. Well -- and, again, Mr. Barton, where I was going with that was there has been and remains a fair amount of confusion over who HNGH Turtle Creek is and who the authorized signatories for that entity are. Is that correct?

MR. KANE: Objection; leading.

THE COURT: Sustained.

MS. LINDAUER: Let me ask it --

THE COURT: Sustained.

MS. LINDAUER: Let me ask it a different way.

BY MS. LINDAUER:

Q Mr. Barton, have you had -- what confusion have you had with regard to HNGH Turtle Creek and who is authorized to execute documents on its behalf?

A Well, we've seen people come and go like Michelangelo. I mean we got Mr. Glasgow is in one day. We saw Nate I think sign some documents. There was a few other parties, and then -- you know, they had the authorized signature. I guess they describe that as some agent, yet he was the owner. So it's very confusing.

That's why, you know, the title company needs authority documents, and they are the clearinghouse and check all the estate records as they do in all the closings.

MR. KANE: Objection; non-responsive. I move to

strike that last narrative about what the title companies need.

THE COURT: Sustained.

BY MS. LINDAUER:

Q All right, Mr. Barton. At the time that the bankruptcy case, Chapter 11 bankruptcy case was filed, had a deed been sent for recording that would have transferred the ownership of the asset owned by 2999TC Acquisitions to HNGH?

A There was a deed in lieu that was in New Jersey, the original was sent to New Jersey at the title company. And what we've come to find out is they filed that deed in lieu premature.

Q That's been your position, Mr. Barton, throughout these proceedings is that --

MR. KANE: Objection; non-responsive. The question was whether the deed in lieu had been filed as of the petition date. He testified that it had been filed premature. That was not an answer to the question.

MS. LINDAUER: No. I don't think that was my question. I think my question was had the deed in lieu been transferred for filing as of the petition date, not that it had been actually filed as of the petition date. So --

THE COURT: I'm not sure if that was the original question, but overruled. You can ask another question, Ms. Lindauer.

BY MS. LINDAUER:

Q Mr. Barton, the deed in lieu that you had placed in escrow as part of a forbearance agreement, we saw that document. Was that deed in lieu transmitted for filing on or about October 29th, 2021?
A Yes.
Q And if we look at Exhibit 14 in the debtor's exhibits, and we go to the second special warranty deed.

MS. LINDAUER: So go past the first one, Larry. Go to the second one.

Stop here.

BY MS. LINDAUER:
Q Mr. Barton, do you recognize this as being the deed in lieu that was dated October 29th, 2021 that is a copy of the deed in lieu that you had placed in escrow as part of a forbearance agreement?
A This is the one that I executed on March 1st. Yes.
Q And the bankruptcy itself was filed on October 29th, 2021.
Is that correct?
A Yes.
Q After the bankruptcy case was filed, what did you learn had happened with this actual deed in lieu that we're looking at here?
A What I learned is that the original that was in New Jersey on the 29th supposedly from what I understand, from what I understand. Is that the question, what I understand?

Q Yes.
A Okay.
What I understand is somehow that document left escrow from New Jersey early and was in Texas, and they -- the -- Vipin's group filed or attempted to -- I don't know exact details, but I do know that there was a filing and paperwork to that effect on the 29th.
Q And, Mr. Barton, on behalf of the debtor entity, you disputed that filing. Is that correct?
A That is correct.
Q Okay. And not only did you file the bankruptcy but you filed an adversary proceeding with the bankruptcy court immediately to dispute that filing. Is that right?
A That is correct.
Q And Mr. Kane's client at the same time also filed a motion to dismiss the bankruptcy case, a motion for relief from stay, and I think a couple of additional related motions.
You're aware of that. Is that right?
A I know that there was some actions on their part. I don't know all the details.
Q Okay. As a result of all those filings, a hearing was scheduled to occur before Judge Hale in the early part of December of 2021. Is that right?
A I'm just trying to remember that timing now.
Yeah, because I had my deposition; Mr. Nambiar was

supposed to have his. And then we had this hearing. That's correct.
Q Okay. And as part of all of those filings, you did in fact have your deposition taken by Mr. Kane for several hours related to the filings that I've mentioned. Is that right?
A That is correct.
Q And during your deposition, there were some discussions about trying to resolve the pending matters. Is that right?
A Could you repeat the question?
Q During your deposition, there were some discussions about trying to resolve the pending matters that were before the Court.
A Well, I think to be technically correct, I don't think it was while I was being asked questions. I think it was during that day. Is that what you mean or --
Q Yes, sir.
A Okay. So when there was a break, there were some discussions.
Q Okay.
A That's how I understood it.
Q All right.
A Okay.
Q And as a result of that, there were no additional depositions taken as part of those proceedings. Is that your understanding?

A That is correct.
Q All right. I'm showing you --
MS. LINDAUER: -- Larry, this is Exhibit D12. And that's Debtor's Exhibit 12.
BY MS. LINDAUER:
Q We've looked at this document several times. This is an agreed order.
A Can I have just a moment to look at it?
Q Sure.
A (Reviewing document) This is what number?
Q I'm sorry. Exhibit or --
A The -- this is one of the orders, right? It's 64 or 94.
64. Okay. Order 64. Yes.
Q Okay.
A Okay.
Q All right. And just to be clear, this order was intended to resolve, as it reflects, several pending matters that were before the Court, in particular, a motion to lift stay, which was Docket 10; a motion to dismiss, Docket 9; a motion for sanctions, Docket 15; and a motion to enforce stay, Docket 14.
Do you see that?
A I see that, yes.
Q Okay. And those were matters that were to be heard the first part of December by Judge Hale. Is that right?
A I believe that's correct.

Q Okay. Following your deposition, the parties did enter into pretty extensive discussions regarding resolving these matters. Is that right?
A There was -- yes.
Q And you were negotiating on behalf of 2999TC Acquisitions, LLC. Is that correct?
A That is correct.
Q Okay. And who was the representative in those negotiations on behalf of HNGH Turtle Creek, LLC?
A Well, John Kane was quite active in a lot of the discussions. And from time to time, there would be communication from Vipin Nambiar and -- and I don't know who else on the other side. I understood that Rey and Hunter Hunt were involved in their comments and feedback through the process. But other than Kane, the two Hunts, and Mr. Nambiar, I think -- I don't know Nate was involved at that time. I don't remember him being involved.
Q Okay. And Nate, you're referring to Nate Christensen, the --
A Yes.
Q -- in-house, the general counsel for --
A Right.
Q -- HNGH? Is that right?
A That is correct.
Q All right. If we look at this order, and the reason I'm

asking these questions is that you, yourself, was the person who was working on the terms of this order. Is that right?
A If I remember clearly, this one was 11:30 and 12:00 at night. We had discussions late into the evening about this.
Q Okay. But the question is you were the person that was discussing the terms of this order. Is that right?
A Yes.
Q Okay. All right. If we'll turn to the next page of this order, Page 2 of 4.
MS. LINDAUER: And, Larry, you might try to zoom in a little bit on that first paragraph.
By MS. LINDAUER:
Q Mr. Barton, we're looking at the very first paragraph. It's on Page 2 of 4 of what we've called Docket 64, the December order.
Have you read this provision before?
A I've read it a few times. Just give me -- just this first paragraph?
Q Yes, sir.
A Just one minute, please.
Q Okay.
A (Reviewing document)
Yes, I see that.
Q Okay. Were you involved on behalf of 2999TC Acquisitions in the negotiations of the terms of this first paragraph of

Docket 64 of this particular order?

A Yes. It was very important in the negotiations to basically undo the record -- the filing of that deed and all that went about with it because, you know, that -- the whole premise of the negotiation was to put us back where we were before the filing of the deed in lieu and the removal of it from escrow.

It should have never left escrow, and we were to be put back to that position and held in that position by the rescission deed being prepared at the same time as this order and held in pendency. Mr. Kane, I believe, was the party that was supposed to hold that rescission deed in pendency so that everything would basically be held in place as if it never happened until the next event.

Q Okay. All right. So when you heard -- you were here during Mr. Christensen's testimony. Is that right?

A I was here for some of it.

Q Okay. Do you remember Mr. Christensen, general counsel, for HNGH testifying when I asked him who owned the property after the filing of the bankruptcy, and he was somewhat unable to say who owned the property because I think he, like you, believed that the ownership of the property was more or less being held in abeyance during the first part of the bankruptcy.

Is that right?

A No.

I mean what -- what Mr. -- I'm sorry -- I'm sorry, Judge Hale and we all agreed on was that what they did by removing it from New Jersey somehow on a Friday and having it filed here in Texas on the same day was agreed that that was undone and that's why the rescission process was created and that that rescission process was effective as of the date of this order and agreement.

Basically, this was a meeting of the two parties agreeing that what that bad act that was done of the filing was undone, that Mr. Kane would be the steward of keeping everything safe. And -- and so that ownership would rest with us because if for not that, then the Happy State Bank collateral that apparently they borrowed money against --

Q Okay. Well, hang on, hang on. I think we're going a little --

A I'm sorry.

Q Yeah. Let's keep your answers to -- okay.

So just to be clear, you're understanding of these terms were that the rescission deed would be executed effective as of on or about December 10th and that document would place title as between HNGH and the debtor back into the debtor subject to the remaining conditions here. Is that right?

A Yeah.

MR. KANE: Objection; leading.

MS. LINDAUER: Your Honor, again, I ask I think these

are foundation questions, but really just asking for his understanding of these provisions.

THE COURT: So sustained. That was leading.

MS. LINDAUER: Okay. Let me ask it a different way, Your Honor.

BY MS. LINDAUER:

Q Again, Mr. Barton, and I want to take these in a little smaller bites if we can.

What was -- just what you said, what was your understanding of where title to the property of 2999TC Acquisitions would reside from and after December 10th of 2021?

MR. KANE: Objection; calls for a legal conclusion.

MS. LINDAUER: Your Honor, I think he can testify from his understanding of where title would reside during --

THE COURT: So overruled. But overall, are we just discussing what the -- I mean we've all read the order. You can ask -- I'll overrule the objection, but hopefully we won't spend a lot of time on this.

MS. LINDAUER: Your Honor, and let me explain a little bit for the record why I'm covering this.

I do think that from the testimony you've heard, and you may not think this, but I do think that there is a little bit of ambiguity and confusion on exactly the mechanics of how this document was supposed to read and be applied. And so all I'm doing is eliciting from at least our side of the case how

we read this document and how we anticipated it would be applied. So that's the purpose for this questioning, Your Honor.

You'll ultimately have to decide if you believe the order is or is not ambiguous. That's a question of law for the Court. But I think to have in the record at least our side of the story, if you will, may assist the Court in making some of those decisions. So I do think it's important as part of the record to have our understanding of how the mechanics of this particular provision and from the person --

THE COURT: Okay. I got it.

MS. LINDAUER: You understand.

THE COURT: I got it.

MS. LINDAUER: Okay. Okay. Yeah, I know --

THE COURT: You may proceed --

MS. LINDAUER: I know you didn't want me to go --

THE COURT: You may proceed.

MS. LINDAUER: Okay.

THE COURT: Okay, thank you.

BY MS. LINDAUER:

Q Okay, Mr. Barton. So, again, just very briefly, what was your understanding on behalf of the debtor where title would reside during the pendency of the bankruptcy case from and after the time that this particular order was signed by the Court?

A To use Judge Everett's comment about Lord Baltimore [sic], Judge Hale was basically with his Court's powers was going to, you know, hold this whole mess in -- in the suspension because if for not this rescission process and this holding and rescission, the deed and the notes, all these things can't be in two places at once.

So, obviously, in my opinion, I pay the bills, I have -- I take care of the building. And everything as far as I'm concerned was put back where it was. I was the owner of the property. The only thing that disputed that was Mr. Steve Brown's newspaper articles repeatedly saying that Vipin had bought the property. Other than that, in my mind, everything had been done by the Court to put it back in my possession.

Q Okay. And you raised a good point which is from and after the filing of the bankruptcy, who has had possession, use of the property?

A I have had possession, and Mr. Vipin Nambiar and I had had, you know, meetings in the building. So he -- he knew it and I knew it. We all knew it.

Q Okay. One thing Mr. Nambiar raised was the question of waste of the property. Has the property been damaged or misused during the time since the filing of the bankruptcy?

A He knows himself. He's been in the building many times and visited me there. It's in pristine condition.

Q And all the utilities are maintained on the property?

A Everything is in good order, maintained.
Q Okay.
A Everything.
Q Insurance is on the property?
A Everything is in good order. Insurance, all bills are paid.
Q Okay. And just to be clear, taxes have been paid. That was part of the agreement that as made was that the taxes would be paid. Is that right?
A That is correct.
Q Okay. All right. And then, again, turning -- I'm sorry, turning back to the order itself, okay, so the first part of the order just talks about the automatic stay remaining in effect through March 15th, 2022. Do you see that first sentence?
A Is this the second paragraph?
Q No, first paragraph.
A Oh, first paragraph. I'm sorry. Let me just look at it.
The audit -- yes, I see that.
Q Okay. And then there's a thing called the payoff deadline. Do you see that?
A Yes.
Q Okay. And it says, "By which the debtor shall make payment to HNGH the amount set forth on Exhibit A to this order, which exhibit is filed under seal, in full and final

satisfaction of the note, the payoff amount."

Do you see that?

A Yes.

Q Okay. And then it goes on to say, "Which note shall be reinstated immediately prior to the debtor's payment to HNGH of the payoff amount."

Do you see that wording?

A Yes.

Q Mr. Barton, what was your understanding of what was to happen with your note immediately prior to any payment to HNGH?

A Well, again, the rescission instrument that held everything in suspension is part of that reinstatement because, again, you can't have two things at the same time. So that note was extinguished by the filing of the deed in lieu incorrectly. And so that act had to be undone and then that note would have to be reinstated so that it could be presented for payoff.

And that was all part of the negotiations is because we needed to make sure that the steps would not show up in a title later or questioned anything after the payoff date because, you know, obviously, you needed to have everything done. There was going to be no chance for coming back after payment.

Q Okay. Let me ask you, so the way you read that provision and it was your understanding that the note would be reinstated immediately prior to the payment. You told us that. And what

would ultimately happen to the note after it had been reinstated?

A So after it's been reinstated, it would be marked paid in full, presented to the title company to be held in escrow for the next step of the process which would have been payment. After the rescission deed was executed in good order and the note was reinstated, then the next step has to be marked paid in full and delivered to escrow for payment.

Q And the next part of this provision says, "And counsel for HNGH shall hold the rescission deed during the pendency of the term of this agreed order and shall have no liability to the debtor or any other party by way of holding such deed or releasing the deed in accordance with the terms of this agreed order."

Do you see that provision?

A Yes.

Q Okay. So what was supposed to happen to this rescission deed from and after December 10th of 2021?

A I mean it was the change that bound everybody together. And we went through this long discussion and negotiations of how -- and, obviously, Mr. Kane created this document. We all made comments to it. There's no question about that, but the language and the process of how this was to come about was discussed at length.

And that rescission deed was what made the judge's orders

valid. And without that rescission deed, now we know that it wasn't done by Mr. Kane in December. And so that's -- in my mind, that's a problem because that is what held everything in abeyance to follow the judge's order, and that seems to not have followed this order that we all agreed to.

Q Mr. Barton, what was your understanding of whether or not that rescission deed that was going to be held needed to be executed in or about December of 2021?

A Well, it had to be executed to become valid, and that was the reason because it was going to be executed, it needed to be held in escrow and in trust.

And that trust was bestowed upon what I understood the counsel for HNG. Maybe it's not Mr. Kane; I apologize if it wasn't. But as it says, the counsel for HNG was to have an executed one and hold it. And that was why the language about, oh, we don't want any lawsuits, that if we have it, when anything happens to the property or anything during this pendency period, we don't want to be held liable about anything because in fact we are holding the Baltimore [sic] orders, if you will, of holding this thing in place during this period of time. And they felt there could be risks on anything happen during that period. They didn't want to be liable about it.

But that's what created the -- the importance of it, and that is why it needed to be held in trust and executed because it needed to be valid and on December 10th to follow the

orders.

Q And, Mr. Barton, your entity 2999TC paid valuable consideration for the provisions that we just covered in Paragraph 1 on Page 2 of 4. Is that right?

A There was obviously a lot of consideration that was paid. We had payments that were made of the $100,000 I believe it was five times. And more important to that, what was, you know -- was gone over and over although we thought everything was released, was the legal releases and the dismissals.

You know, as my case is still held in pendency, they did not release that case. But a part of our, you know, consideration that we gave was we double -- again, released everything and anything of their -- of their side. So there was a lot of consideration as far as I'm concerned, and we paid great value to make sure that we were put back where we were.

That was -- that was the whole thing. Something had been done that shouldn't have been done, and we all agreed it was going to be undone but we also agreed it was going to stay there in this suspension until they were paid. That was the quid pro quo, consideration was given, thought was given into the whole process, and both parties agreed that that was the best solution because there was tax consequences, there's all kinds of things that happens when you record a deed in lieu. And they didn't want that. Neither party wanted that to happen.

Q Okay. Let's take a look if we could drop down three paragraphs. Drop down a little bit further on this page.
You'll see a provision in bold that you see the words "consideration payments." Do you see that term?
A That would be the third paragraph.
Q Yes.
A Yes.
Q Okay. And these were actually called consideration payments. And so --
A Yes.
Q -- this was consideration for the terms that were being negotiated here in this order. Is that right?
A I believe I'm reading here it's a total of 500,000.
Q Okay. But my question's really --
A I'm sorry.
Q -- simpler than that, that that is the consideration for the terms that were made part of this particular order. Do you see that?
A As I said, that's the financial consideration.
Q Okay.
A There was other consideration, as well.
Q All right. And my point on the consideration payments is, is that those payments were all made on time.
A We paid. Always we pay. We pay. We pay the extra money for time and that -- we paid for that.

Q Okay. And so just to be clear, there's no dispute -- no one has disputed those payments that were made under this order. Is that right?

A I don't think there's anybody saying that we didn't pay any of our payments, no.

Q Okay.

A We always have paid it.

Q All right. And with regard to this order, I think you mentioned that the last paragraph, we haven't really focused on this.

MS. LINDAUER: Larry, if you could go to the last paragraph right above the "end of order."

Stop there.

BY MS. LINDAUER:

Q The last paragraph, Mr. Barton, if you take a look at that. I'll let you read through that real quick.

A One second.

(Reviewing document).

Yes, I read it.

Q Okay. Mr. Barton, that applies to you personally. Is that correct?

A Yes, it does. It is raising a question in my mind as I sit here if I -- I think there was a JMJ guaranty, as well, but I may be mistaken. But this does reflect Tim Barton.

Q Okay.

A And we need to check that. I'm sorry, Your Honor.
Q Okay. But anyway, irrespective --
A Yes. Timothy Barton.
Q Right. And your agreement or the agreement in this order was that the personal guaranty case that had been brought against you personally would be abated until the occurrence of a payoff event or a default. Do you see that?
A And this was part of the late-night craziness that if you're going to dismiss it if I pay you or if I don't pay you, then why is it sitting there. And they would not give in on that, and so that is why it's still there. It makes no sense to me. It's a cloud over my ability to finance, and it sits there today.
Q Okay. But to be clear, has HNGH at this point -- I know we dispute it, but have they declared or claimed that you've -- the last payment required has not been made? Is that why we're here in front of the judge right now?
A Could you repeat the question?
Q Okay. Has HNGH taken the position that they're -- maybe I make it simpler, that there's a default under the orders because it's their position that the last payment called for by these orders has not been made?
A That is --
Q Is that your understanding?
A That is their position.

Q Right. Today, has the personal guaranty suit against you been dismissed?
A No. And I've asked Mr. Vipin Nambiar to release this, and he said that Mr. Kane said he wanted to keep a collar on me, and he was never going to release this until this was over.
Q But I just -- all I'm asking is for the record as of today, which is July 1st, 2022, it's your understanding, Mr. Barton, that the suit against you personally on a guaranty has not been dismissed? Is that correct?
A It has not been dismissed.
Q If we take a look at Debtor's Exhibit 13, this is the second of the orders.
A Just a minute; one second.
Q This is 94.
A Okay. '94.
Q Docket 94.
And are you familiar with the terms of this order?
A You know, every time I read it, you know, it's good to re-read it and pay attention to what I'm reading. So I'm happy to review it with you.
Q Okay. We're going to go through a few terms of this one.
MS. LINDAUER: If you could blow it up a little bit?
And drop down.
By MS. LINDAUER:
Q All right. And there are some "whereas" provisions,

several "whereas" provisions. Do you see that at the very beginning?
A (Reviewing document).
Yes, I see several "whereas's."
Q Okay. And if you look at the third "whereas" on Page 2. Do you see that "whereas?"
A Yes.
Q Okay. It says, "Whereas, Barton acknowledges that he and certain of the entities that he manages or controls have financial interests in the success of the debtor's desired development of the property and Barton has agreed to provide additional consideration to incentivize HNGH to enter into this stipulation and this modifying order."
Do you see that?
A I do see that.
Q Okay. And let's talk a minute.
So generally, what does this particular order do without getting into the specifics?
A It just gives basically more consideration and more time for both parties, I believe.
Q Okay.
A And I don't know what else. I'd have to read it every line here, but --
Q Okay.
A -- that was the general understanding.

Q Okay. Well, if we look at the second ordered paragraph.

MS. LINDAUER: You can drop down a little bit, Larry. The second ordered paragraph. There we go.

BY MS. LINDAUER:

Q Now, this order, does it undo the prior order or is it just part of the prior order and makes some changes? Or do you know?

A Again, I'm not a lawyer as I sit here. But there are different terms in this than that. And if this one came after that, then these are additional terms that have been agreed to.

Q Okay.

A That's how I understand it.

Q Is that your understanding?

A Yeah.

Q Okay. All right. And with regard to what's been called the payoff deadline or payoff date, how did this order change the payoff date?

A Well, the "ordered and adjuded [sic], and decreed, the payoff deadline shall be extended until 5 p.m. Central May 30th, 2022. Consistent with the agreed order, the automatic stay shall remain in full force and effect as to HNGH until the occurrence of default or the expiration of the modified payoff deadline."

Q Okay. So to be clear, in that first ordered provision, two things were to happen. One, the payoff deadline would be

extended to May 30th at 5:00. Right?

MR. KANE: Your Honor, objection. The document speaks for itself.

MS. LINDAUER: Your Honor?

THE COURT: Sustained.

MS. LINDAUER: I'm sorry.

THE COURT: Sustained.

MS. LINDAUER: All right.

By MS. LINDAUER:

Q Mr. Barton, what was your understanding of what would happen with the automatic stay in this bankruptcy case as it applied under this order?

A It was extended until 5:00 on May 30th.

Q All right. And for the record, Mr. Barton, we've discussed this several times, May 30th was a federal holiday. Is that correct?

A We discussed that through the whole process, but everybody was concerned that Judge Hale was going to be off the bench and they didn't want it to go back past the May 30th date (indiscernible).

Q Okay. And that was going to be my question. Why was the May 30th date selected as the last date for the payoff deadline?

A I mean from our standpoint, we like the new judge, the old judge; it doesn't matter to us. But the other side, Vipin's

team, was very very focused that if the judge left the bench, they did not want to be dealing with this with anybody else other than Judge Hale or the change of it.

Whatever it was, I don't know. But that -- that was the sticking point on, which would normally have been the 31st not a holiday. I didn't understand it. But --

Q Okay.

A -- at some point, you just have to say okay.

Q All right. Now after the order was signed and entered by the Court, did the parties agree -- HNGH and the debtor -- that the deadline of May 30th would be extended further?

A Everybody has to come to the rational conclusion you cannot close on a holiday, so yes.

Q Okay.

A 31st.

Q All right. And there's no dispute over the fact that the closing would occur on the 31st?

A So the only thing that was supposed to happen on the 31st was the transfer of funds. By the end of the day on the 30th, all documentation was supposed to have been delivered to the title company and escrow. All of the documentations, everything that was required for the closing needed to be delivered to the title company and in escrow by the end of the day on the 30th.

Q Okay. So your understanding was the only thing that got

moved to the 31st was the payoff deadline?

A That is what was relayed to me by my lawyer, yes.

Q Okay. All right. So if you look at the next provision down again, this is the provision dealing with actual payments. Do you see that?

A Give me a moment to read it.

Q Sure.

A (Reviewing document).

Yes.

Q Okay. All right. So there was supposed to be a series of payments made under this order. Is that right?

A Yes.

Q All right. So the first of those payments was a million dollars to be paid under this particular provision by 5:00 on March 15th. Is that correct? Is that the way you read that?

A Yes. This million dollars was to pay down the two million dollars extra that they charged for the -- part of the negotiation was there was an extra two million added on to the -- to the debt on the last negotiations. And that two million was going to be paid when there was a construction loan or when additional -- certain amount of equity was raised or at a calendar period. And if none of those affected, then it would be turned into equity in the project.

And that two million, part of this order they required that that be accelerated into now and part of these funds that

we were going to be paying to be paid now to be allocated to that, as they pointed out, allowed claim, the additional claim.

Q Okay. So what you're referring to, if we go back to Exhibit D12, that's the prior exhibit that's Docket 64.

MS. LINDAUER: And, Larry, if you go to Page 2 of 4 of that order, there's a pretty dense paragraph right there in the middle of the page -- there you go -- where you see adversary proceeding, do you see those words?

BY MS. LINDAUER:

Q All right. Mr. Barton, what I think you're referring to is starting in -- and I'll let you read it real quick, but starting in the middle of that --

A Yeah, I see it.

"As simultaneous with the occurrence of the payoff event, HNGH shall have and possess a two-million allowed claim" -- basically an additional amount of money that was in excess of what was due -- "against the debtor and the debtor's estate which debtor shall be obligated to satisfy within 12 months of the payoff event from the first proceeds of any sale of the debtor's assets from a construction loan or any equity raised in excess of the new equity threshold which is in Exhibit A which is under seal." And then I'll -- "and from the debts raised, debtor to exclusively satisfy, make required consideration payments hereon, the payments of taxes, and other costs and expense (indiscernible)."

Q Okay. So there was a provision -- we haven't focused on this a whole lot.
A Right.
Q But there was a provision for an additional $2 million to be paid to HNGH.
A Yeah, like in Louisiana, they got a term called (indiscernible). You got to do this, but what's my (indiscernible), what's my little extra, what's going to motivate me to do this. And that's where the two million was negotiated as extra above compensation to motivate them which both parties thought it was agreeable.
Q Okay. The other provision I wanted to focus on is again at the bottom of that paragraph, there is an additional sentence starting with "In order to provide."
A "In order to provide the parties of interest notice of allowed claim, HNGH shall be entitled to file a UCC-1 against substantially all of the debtor's assets attached to this order and referenced. If it's allowed that the claim is not paid in full within 12 months of the payoff event, then HNGH at its sole and absolute discretion without recourse to any party may convert the allowed claim into senior most equity class of the debtor."
And it was -- we would be a senior partner in the -- in the project.
Q Okay. And what I wanted you to focus on was the ability

of HNGH to file a UCC-1. Do you see that?
A I do.
Q Okay. All right. So then when we go to the next order again, let's go back to Exhibit D13. And if we talk about again the million-dollar provision that we're looking at, you told us that this provision dealing with the early payment of the $2 million, that provision modified the prior provision in the earlier order to make those payments due now.
Is that right?
A That is correct. They moved them up.
Q They moved them up, okay.
And so instead of having a year to pay this, you had to pay it now. All right.
There's no dispute that the first million dollars was paid. Is that correct?
A That is correct.
Q Okay. Then not later on March 25th, that's ten days later, you were to pay 2.5 million to HNGH of which 1 million shall satisfy the debtor shall -- wait a minute, hang on -- "shall satisfy the remainder of the outstanding allowed claims."
Do you see that?
A That is correct.
MR. KANE: So, Your Honor, HNGH has already stipulated that these payments were made --

MS. LINDAUER: And Your Honor --

MR. KANE: -- (indiscernible).

THE COURT: Yeah. Ms. Lindauer, why are we going through terms of the order that don't appear to be disputed or ambiguous that I know you gave me a time estimate the time before and yesterday.

And I'm not seeing how you're going to keep it if we're -- again, if it's something really important, I don't want to cut you off. But a lot of this is just reading the order, which we've all seen.

MS. LINDAUER: Your Honor, the main reason, and again, you know, I don't want to spend time haggling with Mr. Kane over reading the order because obviously that's burning time. But Your Honor, I don't think we spent any time. And this is the debtor's representative. Any time going through these payments. And I do think it's important that the Court understand what the considerations were here for theses various deadlines and dates and how this was structured.

And again, I keep focusing on Mr. Kane's original statement that the debtor has always acted in bad faith. Has been a bad faith actor. Has just -- and I want the Court to understand how much money has been paid to HNGH by the debtor during the pendency of this Chapter 11.

In my experience, that's highly unusual that you would pay these kinds of dollars to then default on the very

last payment.

THE COURT: Well, I got -- Ms. Lindauer I got that point on the very first day of the hearing. I read the response. There was a chart that laid out very nicely --

MS. LINDAUER: Okay.

THE COURT: -- I think I even commented at the very beginning that this appeared to be different than the other cases that Mr. Kane directed me to. So I got this point loud and clear.

MS. LINDAUER: Okay, fair enough, Your Honor. I'll move on. As also --

THE COURT: Again, if you're -- I don't want to cut you off, if there's something that you want me to consider that I haven't already considered, by all means ask. But I got this point on the first day.

MS. LINDAUER: Okay. All right. Well, Your Honor, and again, just a little connect the dots here. But if you remember there was to be an allowed claim of $2 million, if you recall from the prior order. And all I was pointing out is now the payoff number in this order is 3.5 million. Which is a million 5 greater than the 2 million that was in the prior order.

So again, I'm just asking the Court to notice that distinction. And then the other issue I think that's going to become relevant is when the pay off was supposed to occur, to

the extent that there was any UCC filing, as permitted by the first order, that in fact there was no release of any -- of UCC filing that had been made as part of the first order.

And that would have needed to have also occurred on or about May 30th or 31st, as part of the closing. So again, with that, Your Honor, I can move on. And I'll wrap up this order very quickly.

BY MS. LINDAUER:

Q Mr. Barton, with regard to this order was there also further consideration given as part of this order as well?

A Yes. I think this gets into all the releases. We must have released them three times. So again I think that was very important to them. It was important to Kane and the lawyers on HNGH's side. They wanted a triple, triple, triple. I released everybody from everything.

Q Okay. All right.

Prior to May 31st or May 30th, did the debtor obtain from Sendera Title a title commitment and a checklist of documents necessary for closing?

A Yes, I believe so.

Q Okay. To your knowledge, Mr. Barton, did any other party contact the title company and obtain a checklist of documents that would be necessary for closing?

A No. Not that I know of.

Q And did in fact the debtor share that checklist with Mr.

Kane and his client?
A As did the title policy and the schedule C and all that?
Q Yes, sir.
A Yes, I believe they did.
Q So the debtor made HNGH aware that there were requirements in order for this payoff event to occur on or about May 30th or 31st, correct?
A That is correct.
Q What expectation did the debtor have that the documents provided in the title commitment that was provided HNGH would be prepared or provided by HNGH as required by that title commitment?
A I mean I'm sure all that goes on, I mean as professional business people, we respect each other and I respect Defendant. I respect Mr. Kane and his team. But as professionals that they're going to deliver the documents that are required to the title company. It's -- it's nothing that is that complicated. When I took the loan with Madison, I took the money and gave them promissory notes and deed, and collateral assignments. And all of the documents that I had to turn over to them, they had as part of their collateral.
And when -- if it was a simple process would have just returned all of those. So there's nothing really out of the ordinary to expect that a professional team like Vipin's team would do anything but deliver all the documents to the

title company. I mean if you want to get the money you deliver the papers.
Q So was it your understanding, Mr. Barton, that HNGH would be working through the Schedule C items in anticipation of receiving a payoff on or about May -- at this point May 31st?
A I remember -- I don't know if it was on a (indiscernible), but I thought I -- it was either a phone call or correspondence, but transfer by you, Joyce and Mr. Khudabuksh that John Kane had all of a sudden woken up. That there was Happy State. There was all these other things. And that he had put his five or -- you know, four or five of his real estate team on it. And that they were getting on it to get it done.
Q Okay.
A And that's what I remember towards the end of that prior week.
Q Okay. How involved Mr. Barton, were you in the closing that was supposed to occur on May 30th and May 31st?
A Well, we're involved on our side of what our responsibilities are.
Q Are you aware of what documents were being exchanged?
A I was not focused, nor concerned about the documents going back and forth. I trusted the lawyers to do what they were supposed to do.
Q Okay. Of the documents on the Schedule C, and again I'll

take a look at 33-A in the binder. Again this is Lender's 33-A.

MS. LINDAUER: The Schedule C documents if we can go to that, Larry. And if we go to the Schedule C, if you'll scroll down, you're on A. Keep going. Okay. Keep going a little bit further.

Starting with Item 5.

BY MS. LINDAUER:

Q Mr. Barton, I think you told us it was your expectation that the lawyers and parties would work through this list and provide documents as necessary to meet these requirements. Was that your understanding?

A If you could just give me one minute.

Q Sure.

A This is point 5 you're talking about?

Q Well, all the way through here. Without going into each individual one.

A Oh, well, yeah, yeah. Yeah, I mean these are all deed of trust. Everything as I was saying, there's a list of items that you give and then you also have to get the releases. Right. Because when you give it, then it has to come back and it has to come back with a release.

So then it can be recorded. So all of those documents are required for this closing to happen.

Q Mr. Barton, do you have any understanding of which, if

any, of these documents were actually provided by HNGH to the title company?

A Well, I was hopeful under my assumption, working on my side that I thought they were doing their side. But I was a little kind of shocked to hear that Mr. Nambiar said clearly nothing had been sent except for a special warranty deed had been sent to the title company. Nothing has been signed and a lot of as they say in Texas, fixin' to do something, but not done. I don't -- I really don't understand how that could be. In order to close and get the money you have to deliver the papers. The papers are light and easy. Money is heavier job.

Q Okay. Let me ask you, since May 30th or 31st, have any of the documents on this Schedule C been delivered by HNGH to anyone?

A No, the last thing I saw was the -- I mean what I understood the last thing that was sent over was Mr. Kane after 4:00 saying here's my wire instructions, wire the money to them. And then I understand it didn't make any sense to me how none of these documents could be sent to the title company. I don't -- this is not feasible to consider that you could actually expect to have a closing. Unless we're going to go out in the street with a bag of money and exchange papers in the middle of the high noon. I don't understand.

Q In your experience, Mr. Barton, for a 40 some odd million dollar transaction, do people go out in the street high noon

and exchange bags of money for a document?

A No, they follow -- the first thing they do is they follow the rules. And in this case we have a set of rules from the orders of the Judge, and we had to follow those orders.

Q And just to be clear, your company retained Sendera Title to make sure that there was a good understanding of what documents would in fact need to be prepared as part of the closing; is that correct?

MR. KANE: Objection. Leading.

THE COURT: Sustained.

BY MS. LINDAUER:

Q Okay. All right. And Mr. Barton since May 30th, have you requested that your own counsel prepare all the documents that would be needed for closing?

A From my standpoint in the real estate business, you close deals by getting it done. And the way to get it done is people said they didn't send it. I don't have it. I already sent it to you. All those excuses. Emails. All of that stuff.

What I was trained is you get those papers and you put them in front of those people, and say here we are guys. Are we closing or not. Got to remove all excuses. So that's when I heard what was going on, I said, hey, guys, this is getting ridiculous.

We need to just prepare all the papers. If they don't know what we want, perhaps John Kane's team is a

bankruptcy team. They don't understand real estate law. You know, it seemed like there was a disconnect of having qualified people handling this. And I could see how that could happen. You know, it's a bankruptcy issue.

He's handling it. But it's a real estate transaction. And it was not being done professionally or properly.

MR. KANE: Objection, non-responsive. And move to strike testimony. Mr. Barton was asked if he hired his own counsel to prepare all the documents. He still has not answered yes or no to that question.

THE COURT: So I will overrule the objection. But if Ms. Lindauer wants to ask that question or if you want to, when you have a chance, Mr. Kane, that's fine.

MS. LINDAUER:

Q All right. Mr. Barton, can you answer the question of whether your counsel has in fact now prepared all of the, I want to say necessary or needed documents, for this closing.

A Okay. He's prepared -- yes, he's prepared what we believe is required.

Q Okay.

A The ultimate, as you say, or Baltimore of the title company, has to finally -- everybody has to agree. This is not a --you know, there's our segments of what we believe is required and we know that these are required. The title

company may say there's more. And Mr. Kane's side may say there's more. But that is the last as we know it.
Q And those documents have been filed as exhibits to motions that have been filed by the debtor 299TC with this Court. Is that your understanding, Mr. Barton?
A I believe that is correct.
Q All right, Mr. Barton, I'm going to have you look at Exhibit D-2 of the debtor's exhibits. Okay. And the Judge has asked, I think a couple of times --
A Could I --
Q Sure. I'm sorry. I should show you what this is. Do you see this, it's Debtor's Opposition to Motion to Enforce Agreed Orders.
A Okay. I'm looking.
Q All right. All right. Are you familiar with this particular opposition that was filed?
A Basically.
Q Okay.
A But I did not write it, so.
Q All right. Understood. All right. If we take a look, Mr. Barton at paragraph 19. This is on page 7. And I'll give you a moment to read that paragraph.
A (Reviewing document)
Yes.
Q Okay. And Mr. Barton, I don't know if you were present

in Court when the Judge asked questions about this particular paragraph.

A I do remember some comment from the Court, but if you can refresh my memory, I'd appreciate it.

Q Okay. Well, I think the Court had asked about this particular paragraph. And I'm going to break a few of the statements down in this paragraph, and ask you some questions. All right.

A Yes.

Q Okay. Paragraph 19, the first phrase, debtor has secured funding. Do you see that provision?

A Yes.

Q Okay. On or about May 31st had the debtor secured funding to pay off HNGH's payoff amount?

A Yes.

Q And on or about May 31st -- I'm going to say May 31st, was the debtor preparing to make the final payoff on that date?

A Yes.

Q And that date was dictated by two agreed orders or at least the last of the two agreed orders. Order number 94 that you looked at; is that correct?

A Could you repeat the question?

Q The May 31st date was being dictated by a Court order. The date was moved one day forward, but dictated by Court order; is that correct?

A Was the 30th and then as I understand it, it moved from the 31st for payment.

Q All right. And then I'm going to come back to each of those points, because I think those are important for the Court. The next part of that paragraph says however, after and because HNGH failed on May 30th to comply with the terms of the agreed orders, the lenders, of course, would not loan in compliance by HNGH with the agree orders. Do you see that provision?

A That is correct.

Q Can you tell us what is meant by however after and because HNGH failed on May 30th to comply. What is your understanding of that particular provision in this document?

A Well, they -- the necessary documentation for the closing on all those items that we prepared were not at the title company. There was no promissory note. None of the documents that were required were being sent to the title company. And the only thing that we were -- that we had seen was basically a conveyance special warranty deed. Those were the only documents.

So without documents the lenders are saying guys you are in adverse situation. You're in bankruptcy. You don't get along with these guys. We can see all the paperwork. They still holding a guarantee over your head. So you know, we need everything in good order to fund.

MR. KANE: Objection, hearsay.

MS. LINDAUER: Your Honor, I think that was Mr. Barton's understanding as the entity that was working on the payoff as to what was going on with his various lending sources. So I do think that he can testify to that. It's his understanding.

THE COURT: The objection is sustained. The hearsay objection is sustained.

BY MS. LINDAUER:

Q Mr. Barton, I'm going to ask you again. The lenders that you were working with, okay.

A Yes.

Q On or about may 30th and 31st, what was your understanding of what needed to be done to provide clear title to this transaction, so that the money could flow to pay off HNGH?`

A The recision deed had to be in good order. The promissory note had to be reinstated and delivered to the title company. The UCC -- all of those documents that would release me, that could be recorded. And there could be no documents that are after the closing. You're in an adversary closing. No one's going to agree to believe that the other party is going to deliver something after closing.

It doesn't happen. It's not going to be allowed. They're supposed to deliver everything. There was no documents at the title company to close. There -- you know, there's just

nothing to close against.

Q You mentioned that the Happy State Bank issue arose also on or about May 30th-31st, as well; is that right?

A Yes. I don't even know what to say on that. I was always shocked about Happy State Bank because you know, they were a lender of mine. We went through a bankruptcy in another property. And four weeks later, they showed up as Vipin's lender, so -- and then at the end of this closing, they're saying they want me to pay him.

And I don't understand it at all. I don't have any relationship with them.

Q As it relates to 2999TC, there's no relationship between that entity and Happy State Bank?

A Zero. Other than they put a cloud on my title.

Q How did they put a cloud on your title?

A What the title company and the lawyers told me is that there's something on the title commitment that Happy State has some claim on it. And I'm telling -- you know, I'm telling my funding source that they got nothing to do with it. We're calling -- getting from Kane, they got nothing to do with it.

Vipin's saying, well, you can talk to them, but when you talk to them, they say we got nothing to do with it. Then what are you doing on my title. So I don't have a relationship with them. That -- that cloud -- we already got it in the

newspaper that I don't own the property. You tell them you don't have anything to do with Happy State Bank. They've involved. You tell them HNG is, you know, it's a complete craziness for a simple real estate transaction.

And they didn't need to make it so complicated. Just take your profit. Don't try to triple your profit by borrowing against my money.

Q All right. Hang on for a second now. Mr. Barton, I want to go back in the very first part of paragraph 19. The debtor had secured funding. Right?

A Yes.

Q And we did provide to the Court a list of funding sources; is that correct?

A Yes.

Q Okay. Mr. Barton you were present when we talked about other funding sources that were being considered on what's been called a parallel tract; do you recall that?

A Yes. In my business and my training, because I didn't go to Harvard. You know, I was taught by three Jewish guys. You always have three options as a minimum on any type of transaction in a real estate business.

So yes, we had multiple options to be ready to close no matter what happened. Because we don't have a choice. You can't say oops, you know, it was a mistake. We have to perform. And we have to have those options.

Q Okay. I'm looking at the letter that we delivered to the Court in-camera. And Your Honor we are actually going to, I think put up on the screen, some of the supporting documents redacted. That support this in-camera submission. But at this point, I'm first going to just ask some questions about the in-camera submission.

So Mr. Barton, with regard to item number 1, I'll call that lender 1 on your -- well, first of all, let me go back for a second. Mr. Barton, what is your concern about disclosing the financial parties that are on this list, that we provided to the Court?

A You know, all we got to do is listen to Mr. Nambiar and Mr. Kane. They have never, ever said anything good about me. And everybody that has ever been in touch with them has never come back and said Tim Barton's handsome, polite, productive. Nothing. There are no -- no words that come out of their responses, that is positive.

And we have the Silverstein Group, one of the largest real estate companies in the world negotiating with me. And then we find out that Mr. Vipin Nambiar sent my Mandarin Oriental Hotel package to them, negotiating with them to do business. And then they stopped talking to me.

The first Tall Ship communication with Vipin Nambiar he told them I've never been sued in my life. This guys is a terror. I can't deal with him. These are the people that are

supposed to invest with me, and they communicate with them. So there's been no positive response, and I appreciate Mr. Kane wanting to talk to people and explain why my Guaranty case is still there. But I don't need it. Because after FSB talked to him, they came back with concerns about the tone of Mr. Kane's --

MR. KANE: Objection. Hearsay regarding any response of what I believe he's referring to as First Guaranty Bank.

THE COURT: Sustained.

BY MS. LINDAUER:

Q Mr. Barton, no I'm just trying to understand --

THE WITNESS: I'd like to apologize to the Court. This is sensitive to me and I apologize.

BY MS. LINDAUER:

Q All right. Mr. Barton, I want just on the record why these funding sources have not been readily just provided to everyone who was made part of this record. There were -- you do have concerns about one that -- your funding sources in the past have been interfered with and that you've been disparaged with certain of your funding sources

Is that what I'm -- my takeaway is?

A So two things. One --

MR. KANE: Objection. Leading.

THE COURT: Sustained.

BY MS. LINDAUER:

Q Mr. Barton, what's our takeaway from the things that -- you said two things. What's the takeaway here from your prior experience of dealing with trying to obtain funding, to pay off HNGH?

A Two things. There is nothing positive that happens when Mr. Nambiar or his team learns about anybody that works with me. And I've never had anybody on the other side ask so much about what's going on, on my side. It's irrelevant to them. So (a) I don't trust them; and the track record has proven that to be true. And we have evidence in past cases to that effect.

Second, the other parties, two of the parties on this list are very concerned that they do not want to go against the Hunt Family. That Ray Hunt and Hunter Hunt and the Hunt Organization is --

MR. KANE: Objection, hearsay.

THE WITNESS: -- and they do not want to be disclosed.

THE COURT: I'm sorry, Mr. Barton, there is an objection. When there's an objection pending, you have to wait until I rule. And I'll sustain that hearsay objection.

BY MS. LINDAUER:

Q Okay. All right. Mr. Barton, let's go back. And again I want to focus on your understanding of why it is that you wanted this information to be considered by the Court, in-camera, without revealing specifically the names of each of

your funding sources that are listed on this particular list. Do you see that?

A Very simple. We've been damaged in the past. We don't want to be damaged in the future by disclosing any information to Mr. Nambiar or his team.

Q All right.

A There's no need for it.

Q All right.

A It's not required in the order.

Q Okay. Let's look at, if we could, items -- I think you've identified five funding sources here. Is that right?

A Yes.

Q Okay. And I'm going to go back through these in just a minute. But the first of those funding sources, who negotiated with that particular funding source?

A Mr. Walji did.

Q Okay. And have you had any personal experience negotiating with that funding source?

A No. This is a source that Mr. Walji has a long relationship with and has brought that relationship to bear for this project.

Q And what information did you have available to you on or about May 30th that indicated to you that this would be a viable funding source to pay off HNGH?

A Bank statements with an excess of $45 million.

Q Okay. What else did you have from this particular funding source that indicated that they would be interested in providing the money to pay off HNGH to your company?
A We had agreements in place with them.
Q And you have those in writing; is that correct?
A Yes.

MR. KANE: Objection. Those statements are hearsay. Any out of court statement by a funding source that's being offered for the truth of the matter asserted, like there was an agreement to fund is an out of court statement offered for the truth of the matter asserted and is inadmissible hearsay.

MS. LINDAUER: And Your Honor, again, this is Mr. Barton's understanding of what he had in hand as of May 30th, that would have provided funding to close this particular transaction. I think he can attest to what he had in his hands on that date.

And I think that the issue Mr. Kane has raised is not a hearsay objection -- not a valid one anyway. Mr. Barton can testify as to what he had in his hand, and I think he already has, as of that date, with regard to item number one.

And so Your Honor, again, I don't think that's a valid objection to his testimony.

THE COURT: It does appear to rely on the statements that are in whatever those documents are, they're prepared to fund. So I'll sustain the hearsay objection.

BY MS. LINDAUER:

Q Okay. Mr. Barton, and again I want to go back. Debtor had secured funding. That's the first statement in paragraph 19. Item 1. Do you believe item 1 supports your statement, debtor had secured funding?

A Yes.

Q Okay. You testified that you had in hand documents from item 1 that would have provided for funding to pay off HNGH on May 31st; is that correct?

A Yes.

MR. KANE: Objection, Your Honor. That was inadmissible hearsay testimony.

MS. LINDAUER: Your Honor, I'm going to dispute that again because I think that he's entitled to explain to the Court what he had in his hand on that date, that would have supported paragraph 19, debtor had secured funding. Again this is his understanding of what he had available on that date to pay off HNGH.

MR. KANE: All right, Your Honor. The response there is fundamentally Mr. Barton is testifying that he believed the documents that he had in his hand supported in essence the truth of the matter asserted. That source number 1 had provided, or would provide funding for the closing. That is again testimony based on out of court statement offered for the truth of the matter asserted.

THE COURT: So this -- you both can help me with this, because this question appears to be slightly different than the prior one.

MS. LINDAUER: Right.

THE COURT: She has -- did he have documents in his hand that would have provided funding.

MS. LINDAUER: Correct.

THE COURT: So that doesn't necessarily rely on an assertion in the documents. Those documents, which I haven't seen, and I'm not asking to see them, but those documents potentially could have independent legal effect regardless of whether or not the statements in them are true.

So I'm having trouble identifying what the hearsay statement is.

MR. KANE: Okay. We can continue then and you can overrule the objection.

THE COURT: So overruled.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Barton, with regard to funder number 2 that's listed on your list. Do you see that item?

A Yes.

Q Did you have in hand documents on May 30th or 31st, that would have provided funding from that entity to pay off HNGH?

MR. KANE: Your Honor, I'd like to reissue the

objection. The statement about what the documents in hand represent is an out of court statement made for the truth of the matter asserted. I believe that is inadmissible hearsay. And we can just have a continuing objection on this, if you intend to overrule. But I would like to preserve that for the record.

Thank you.

THE COURT: That's fine. You can preserve the objection.

But as I understand it, the only objection is hearsay and Ms. Lindauer, so that -- I want to make the questioning fair to both sides, the first question that you asked where I overruled the hearsay objection was that Mr. Barton had in his hands documents that would have provided funding. So are you -- to make this easier, are you willing to ask that same question as to each of the five funding sources?

You're varying the questions each time. And if you want to ask a different question, that's fine. But if that's the specific question that you are going to ask as to each of the funding sources on that page, I will grant Mr. Kane -- I will overrule the objection, but grant Mr. Kane a continuing objection.

But if you're going to ask a different -- slightly different question each time, I'm going to have to address it each and every time.

MS. LINDAUER: No, Your Honor, and I'll accept your statements and I will ask -- and I don't have it written down in front of me exactly how I worded each of those questions, but I would ask Mr. Barton the exact same question with regard to each of the five funding sources that has been provided to the Court.

THE COURT: And, again, just to be clear. At least what I wrote down was did Mr. Barton have in his hands documents that would have provided funding.

MS. LINDAUER: Correct.

THE COURT: If there's a different question you want to ask, let me know. But that's what I wrote down as the question. So I'd like to either give a continuing objection to that specific question or a different one, if you want to ask a different one.

MS. LINDAUER: No, Your Honor, that's fine. I think the way that that's been handled is fine. And we would go ahead and accept that same question on each of these -- or ask that same question on each of these five funding sources.

THE COURT: So Mr. Barton, you may answer -- well, Ms. Lindauer, you do the questioning.

MS. LINDAUER: Okay. Thank you, Your Honor.

MS. LINDAUER:

Q All right. Again, I'm going back to item 2, Mr. Barton. And I hope I'm going to ask this right. Did you have in hand

on May 30th or 31st, documents that would have provided funding to pay off the amount owed to HNGH?

A Not only did I have documents, but I had 32 years of transactions with this organization, and have closed hundreds of millions of dollars of deals with them.

Q Okay. And again, I'm looking at funding source 2; correct?

A That is -- yes.

Q Okay. And that particular entity, funding source 2, I think you just told us you have an ongoing business relationship with funding source 2; is that right?

A Yes. And I have $27 million of my money invested in this project. I have never not closed on transactions. This is -- this is what you do in the business that we're in. You have reliable people you can go to, whenever you have to, when you have an adverse closing. And that is what number 2 is.

Q Okay. Number 3 on the list. Did you have in -- on May 30th or 31st, documents that would have supported the funding by that entity of the payoff by 299TC of HNGH?

A Yes.

Q Okay. Item number -- and I'm going to come back to that one. Item number 4. Same question as to that particular funding source and on May 30th and 31st, did you have documents in hand that would have supported the funding of the payoff of HNGH on those dates, from that funding source?

A Yes.
Q And also with regard to item 5, same question.
A Yes.
Q Let's go back. You told us item 2, that particular lender, you have a relationship with, on an ongoing basis. What about with lender number 3? Do you have any relationship with that particular entity on an ongoing basis?
A We have multiple projects with them.
Q Can you describe a few of those projects for us, with that particular group?
A They are multiple family projects and residential projects.
Q All right. And you currently have loans with lender number 3 related to those projects?
A Not at this time.
Q All right. And is that a funding source that you have gone to in the past and will go to in the future, to provide funds on your projects?
A That is correct.
Q Funding source 4. Is that an entity that you have any ongoing relationships with at this time?
A No. It's a new relationship. So I haven't done a deal with them.
Q Okay. How about funding source 5. Is that an entity that you have an ongoing relationship with?

A This existing one only.

Q Okay. When you say this existing --

A This 299 Funding.

Q Okay. All right. So this again is a funder that you had in place, that you have a relationship with for purposes of this loan; is that right?

A That is correct.

Q Mr. Barton, is there any doubt that you would have had the money to pay off HNGH on May 31st, 2022 if all of the paperwork had been in order, as needed to be for you to fund that pay off?

A This is one of the most important pieces of real estate in the State of Texas and I have spent considerable time, money and effort to be prepared to pay off Mr. Nambiar. And yes, I am, was, and will always be ready to pay him off on this project. The time and place has come and we need to finish this once and for all.

Q Are you still prepared today to gather the money to pay off HNGH when all the papers are in place, that you believe, or the Court determines are needed in order for you to pay off HNGH?

A I don't have to gather anything, Ms. Lindauer. I need orders of this Court to be followed and the process with the title company to be complete, so we can finish this transaction.

Q Mr. Barton, I don't want to go through each of the documents. The recision deeds, the disagreements over all of those documents. You've heard all of that testimony over the last several days. Is that right?

A Well, when you say you don't want to go over them, I assume that you might have to, but yes. I understand the comment. I'm assuming you don't want to rehash all this.

Q Right.

A But there's a lot of people that have been talking and a lot of going back and forth about it. But the only one that has this kind of money and this kind of investment in this project is me. And Mr. Nambiar, on the other side, of course, we know it's not his money. He's borrowed against it. And the two parties understand what was supposed to happen and we're supposed to follow the Judge's orders.

So you know, happy to answer your question --

Q Sure.

A -- but I don't know what the question was.

MR. KANE: Objection, non-responsive, move to strike.

MS. LINDAUER: Fair enough, Your Honor.

THE COURT: Sustained.

BY MS. LINDAUER:

Q Mr. Barton, this particular project, 299 -- or I should say this particular property, 2999 Turtle Creek Boulevard. That particular property that the debtor owns. When you filed

the Chapter 11 bankruptcy petition, did you place on behalf of the debtor, a value on that property?

A I believe so, yes.

Q What value did you place on that property for purposes of filing the bankruptcy? And I was looking for the bankruptcy schedules. And we can pull those up if we need to.

A Yeah. I'd like to see that.

MS. LINDAUER: I don't know if Larry's on here or if Sydney is on here.

THE COURT: Sydney.

MS. LINDAUER: Okay, Sydney can you pull up the bankruptcy schedules for 2999TC, please? That were filed with the Court.

THE WITNESS: Just so everyone knows, I'm going to need a bathroom break in a little bit.

MS. LINDAUER: Okay, we'll take a -- Your Honor, could we take just a three minute break? I'm trying to get through the last maybe 5 or 10 minutes of this questioning. The last few topics.

THE COURT: Okay. We'll take a recess, but before we do, before I forget, Mr. Kane, I recalled this morning that you were going to file -- and again it doesn't have to be done this morning, or even today. But there's a -- I think a corrected exhibit that you were going to file.

Just a reminder. Doesn't have to be done today, but

I didn't want to forget that. And we'll take a five or ten minute recess.

MS. LINDAUER: Thank you, Your Honor, appreciate that.

MR. KANE: Thank you, Your Honor.

(Recess at 10:41 a.m./Reconvened at 10:49 a.m.)

THE COURT: Okay, we're back on the record.

Ms. Lindauer you may proceed.

MS. LINDAUER: Thank you, Your Honor. Ms. Ollar, can you pull up first the debtor's bankruptcy schedules filed in this case. And if you could scroll down just a speck. I don't know if that's got a filing -- no, the other way. There we go.

Your Honor, I'll represent to the Court this is Docket Number 29, 2999TC Acquisitions Schedules A and B filed with the United States Bankruptcy Court. And so if we drop down a little bit, Ms. Ollar.

BY MS. LINDAUER:

Q Mr. Barton, do you recall filling out these papers that were filed with the bankruptcy court?

A I believe so, yes.

MS. LINDAUER: Okay. If we could drop down to Schedule A, real property, Ms. Ollar.

BY MS. LINDAUER:

Q And what value did the debtor place on 2999 Turtle Creek

Boulevard, Dallas, Texas 75219, when it filed its sworn bankruptcy schedules?

A I don't know if --

Q Can you see? I don't have a paper copy. Can you see that?

A The land value is 58,500,000.

Q Okay. And Mr. Barton is that a value greater than the pay off to HNGH?

A That is correct.

Q And that's the value that the debtor placed on the property when it filed it's bankruptcy schedules with the Court, with just the item land. Do you see that?

A That is correct.

Q Okay. Is there actually a building located at 2999 Turtle Creek Boulevard?

A It's stated as one of the top three office buildings in the city of Dallas, yes.

Q Is there a reason why you identified the $58 million number as just the land and not the land and building?

A This project that we're going to build, the Mandarin Oriental will require this building to be removed. And so we just looked at the immediate land value for the real estate transaction of the Mandarin Oriental.

Q During the pendency of the Chapter 11, did you retain CBRE to also provide you with an appraisal on this property?

A Yes, we did.
Q And that appraisal that you obtained, did that also form the basis of your opinion on behalf of the debtor of the value of this asset?
A Yes. It was part of the process, yes.
Q Okay. And are you in part relying on that appraisal when you came up with the number of $58,500,000?
A Well, I mean I'm relying on it to make the paperwork, but I've been in the business 30 years and I know what the value of that property is. But yes, for this document, that is what we relied on.
Q Okay. And at $58,500,000, if you pay off HNGH the amount that they requested, would there still be roughly $18 plus million left in this estate to pay creditors and to compensate you for monies that you've put into this project?
A That is correct.
Q Okay. Today -- so this was filed back in November of 2021, today, do you have an opinion on behalf of the debtor, what the value of 2999 Turtle Creek Boulevard is in today's market?
A It's much higher. And as I tell people now, just like Austin, went through an incredible height of valuations, Dallas, so too is going through that. So there's been a rapid ascension. And also all of the surrounding properties are trading and being developed.

And the Four Seasons was just announced next to us, $750 million project. So the land every day is increasing in value and has gone up considerably. Which is a blessing.

Q So it would be your opinion that the value of the property at 2999 Turtle Creek Boulevard today is higher than $58,500,000. Is that correct?

A That is correct.

Q Mr. Barton, you did obtain, or there was obtained a recent appraisal on this property dated May 23rd, 2022; is that right?

A There was an appraisal that was done on the 23rd, yes.

Q And are you familiar with that appraisal?

A Yes, I am, briefly.

Q Okay. All right. And would that appraisal support your opinion that today the property is worth more than $58,500,000?

A Yes.

Q Mr. Barton, again I want to turn back to the funding sources, sources of funds that you had available to pay off HNGH. Why is it that the debtor could not simply exercise its commitments with one of those funding sources and have the money sent to the title company on May 31st?

A Could you restate the question?

Q Sure. Why was the money not sent to the title company on May 31st from one of your funding sources?

MR. KANE: Objection. Calls for speculation.

MS. LINDAUER: Your Honor, I'm asking why he -- his

company did not send the money on May 31st.

THE COURT: That's not what you asked.

MS. LINDAUER: Okay.

THE COURT: So I'll sustain the objection.

MS. LINDAUER: Okay. Let me ask it a different way.

MS. LINDAUER:

Q Mr. Barton, why did your company not have funds sent to the title company on May 31st, 2022?

A For us to move funds, I've already spent a significant amount of money to have funding ready to fund. But when you -- when you move money into a title company, you have to pay all of your commitment fees, which is hundreds of thousands of dollars. You have to block a minimum amount of interest for six months, depending on the transaction. So when you move money in a title company, you're basically committed to millions of dollars of costs. And if the other side's not ready, and they say, oh, send it back, the people that give you that money, they don't say, hey, it's fine. No, you move that money, you pay that money.

And without documents -- and the title company, it's like, okay, we're going to get married, but we're never going to consummate. It's never going to happen. It's a transaction. It's just -- it's ridiculous. It's very, very simplistically confusing that they don't have documents. They said they never sent them the documents.

We would never send the money to the title company just sitting there waiting for an adverse party to do something, that we have no evidence. We've seen no evidence that they were going to ever do what they were supposed to do.

They were supposed to do the recision deed in December. They breached the order of the Court. And from that date forward, they've -- today, they've never put the papers in for us to fund.

Q Is it your testimony, Mr. Barton, that on behalf of the debtor, that you were ready, willing and able to perform the requirements that were placed on the debtor under the agreed order 64 and 94 that we've looked at with the Court?

A That is correct.

Q Is it your position, Mr. Barton, that HNGH failed to perform the requirements under those orders to permit the payoff to HNGH?

A Absolutely. The only way -- they have to do what the order said. They didn't do it. They didn't perform. They didn't do the recision deed. They didn't restayed the loan. My god, they don't even have the money to pay off Happy State Bank to get my note back. So how are you going to have a closing, if the note is in possession of somebody else?

MS. LINDAUER: Your Honor, at this point I'll pass the witness.

THE COURT: Mr. Kane?

THE WITNESS: You're on mute, John.

MR. KANE: Thank you, Mr. Barton. Your Honor, I was apologizing, because I was trying to get this all squared away during the last break. Can we take another five minute recess while I just prepare some exhibits for cross-examination? And then if we could return at 11:05, I'd be very appreciative.

THE COURT: Yeah, that's fine.

MR. RODRIGUEZ: Your Honor, may I ask, are these going to be exhibits that are already in the record, or Mr. Kane, is this going to be something new? If it's going to be something new, we'd like the opportunity to look at them, please.

MR. KANE: Yeah, it --

THE COURT: Oh -- well, go ahead.

MR. KANE: I'm happy to disclose that. Yeah, so it is exhibits that are already in the record with the exception of whether Mr. Barton's deposition testimony is required to refresh his recollection or impeach his testimony on cross. And before this proceeding took place, we had the deposition excerpt in our witness and exhibit list. And I had, I believe, provided it to Ms. Lindauer, a copy of the complete deposition transcript. I'm happy to provide that, if required.

I believe that your side already has a full set of the deposition transcript with exhibits.

THE COURT: That's fine. We'll take a five or six

minute recess.

MR. KANE: Thank you, Judge.

MS. LINDAUER: Wait a minute. Wait a minute. I may have missed something. John, were those the only -- you said the other things are in the record. The deposition of Mr. Barton. Were there any other documents that you were anticipating using on cross. I just want to be sure that we -- I'll go pull some of these. I just want to be sure we have them.

MR. KANE: No.

MS. LINDAUER: Okay.

MR. KANE: I mean it's all stuff that's already in our exhibit list and I believe it's stuff that's already been admitted into evidence.

MS. LINDAUER: Okay, very good.

No, thank you, John, I appreciate that clarification.

THE COURT: All right. We'll be in recess.

(Recess at 11:00 a.m./Reconvened at 11:12 a.m.)

THE COURT: All right. We are back on the record and we are ready for cross-examination.

Mr. Kane.

MR. KANE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. KANE:

Q Mr. Barton, I wanted to just briefly address some

allegations that you had in your testimony about HNGH being a predacious lender.

Do you recall that testimony?

A Sir, I don't understand what that word means. Say it again.

Q I believe that you claimed that HNGH was a predacious lender. Do you recall --

A I don't even know what that word means and I didn't say it.

Q Okay. How about a predatory lender?

MR. RODRIGUEZ: Objection, Your Honor. Mischaracterizes the witness's prior testimony and no foundation for that statement from Mr. Kane.

THE COURT: Why don't you try a different question, Mr. Kane?

MR. KANE: Okay. I'm asking if Mr. Barton recalled testifying that he believed HNGH was a predatory lender.

MR. RODRIGUEZ: Objection. Again, Your Honor, mischaracterizes the witness's prior testimony and no foundation for that question.

THE COURT: Overruled. He asked if he recalled that. If he doesn't recall it, then -- overruled.

THE WITNESS: I don't recall that.

BY MR. KANE:

Q Did the debtor default on its October 1, 2020, maturity

date obligation under the note?

MR. RODRIGUEZ: Objection, Your Honor. Calls for a legal conclusion. This witness is not qualified as an expert.

MR. KANE: Your Honor, in response, I don't think that requires expert knowledge. He's the principal of the debtor. He's testified about certain obligations under notes and agreed orders. I think he can testify whether the debtor satisfied its maturity date obligation or not.

THE COURT: Overruled.

MR. RODRIGUEZ: You can answer Mr. Barton.

THE WITNESS: Can you restate the question?

BY MR. KANE:

Q Mr. Barton, did the debtor default on its October 1, 2020, maturity date obligation under the note?

A You'd have to refresh my memory with some documents. What October date are we talking about?

Q Okay. I'll turn your attention to Debtor's Exhibit D17.

Mr. Barton, do you have a paper copy of exhibits in front of you?

MS. LINDAUER: He does.

THE WITNESS: Yes.

MS. LINDAUER: I just handed it to him.

THE WITNESS: Thank you.

MS. LINDAUER: Thank you, John.

BY MR. KANE:

Q Will you turn to Page 9 of 148.
A Page 9. Yes, sir.
Q Okay. Are you familiar with this document?
A I need a moment to look at it.
(Reviewing exhibit)
I think this is the original Madison note. Is that correct?
Q Now, if we scroll down a couple pages through the definitions, in Section 1L, do you see the term "maturity date"?
A Yes.
Q And do you see where it says "shall mean the earlier of," and then numeralette [*sic*], October 1, 2020, and then it has additional language?
A You'll have to give me a moment to read. You're talking about L, "the term maturity date shall mean," that paragraph. Is that right?
Q That's correct.
A (Reviewing exhibit)
Yes. I read Paragraph L.
Q Does this refresh your recollection of the maturity date under the note?
A It is the maturity date for this document. Yes, sir.
Q And did the debtor pay off the note at maturity?
A I don't recall sitting here. I know that there was

extensive litigation going on. You know, there was a lot of litigation going back and forth in determining who had authority to act on behalf of the lender, whether it was Mr. Glasgow or Madison. So, sitting here today, I don't remember what happened on October 1st. If we were in litigation, if there was negotiations, or if there was an extension, I don't know.

Q And part of that lack of knowledge, are you saying that you don't remember whether the debtor paid off this note on that date?

A Well, we know it was not paid off on that date. We don't know if there -- there was extensions to the loan and we don't know -- I don't know, sitting here today, what the status was on October 1, 2020.

Q And I think you just testified that you were engaged in litigation at that time. Was that litigation with HNGH and Vipin Nambiar and others?

A You know, sitting here today, I don't recall. So if you have something and want to refresh my memory, I'd be happy to look at it.

Q Okay. Do you recall whether in January or February of 2021, the debtor was in default under the terms of this note?

A I don't know. I mean, this is in the middle of COVID and I -- you know, I don't -- if you show me something, I'd be happy to look at it. But sitting here, I can't -- I don't have

a photographic memory of those dates and events that was going on. There was a lot of things happening, and so I don't recall those dates.

Q And Mr. Barton, do you recall engaging in any discussions to obtain takeout financing or equity or construction loans at or around that time of January, February 2021?

A Could you restate the question?

Q Yeah. I'll ask it a little bit different way.

In January or February of 2021, was the debtor engaging in negotiations with potential financing partners to pay off the note?

A Again, sitting here today, I can't recall those dates or those events. If you have something to refresh my memory, I'd be happy to look at it.

Q Do you recall engaging in any discussions with an entity called Tall Ships in February of 2021?

A I remember --

MR. RODRIGUEZ: Objection, Your Honor. Asked and answered, I think.

THE COURT: Overruled.

MR. RODRIGUEZ: You can answer.

THE WITNESS: So I remember the Tall Ships group, yes. I don't know when that was, but I do remember speaking with them, yes.

BY MR. KANE:

Q And do you recall generally what the nature of those discussions with Tall Ships were focused on?
A Tall Ships was interested in being a joint venture partner. They had a project in Chicago to build a Mandarin Oriental and they had been referred to us as a potential joint venture partner that wanted to do more than one Mandarin. And they were referred by the Mandarin Oriental organization to us, so that's how we became aware of them.
Q Did those negotiations become fairly serious?
MR. RODRIGUEZ: Objection. Vague, ambiguous.
THE COURT: Overruled.
THE WITNESS: Could you restate the question?
BY MR. KANE:
Q Did those others negotiations become fairly serious?
A Could you define "fairly serious"?
Q Did you enter into a term sheet with Tall Ships?
Well, let me rephrase the question.
Did the debtor or a debtor affiliate enter into a term sheet with Tall Ships related to this property?
A I don't recall sitting there today if one was ever executed or not.
Q Okay. I'm going to try and refresh your recollection here. Mr. Barton, do you recall I took your deposition on December 3, 2021?
MS. LINDAUER: Hang on, John. We'll get that in

front of him.

THE WITNESS: It says here on December 3rd. Yes, sir.

BY MR. KANE:

Q And I took your deposition on a number of topics. Do you recall that?

A Yeah, it was -- we went on for some questioning. Yes, sir.

Q And do you recall that some of the topics of your deposition included conversations and negotiations that the debtor had had with potential financing partners prior to the petition date?

A I mean, I don't want to be disrespectful, but I prefer not to remember any of it. But I don't, you know, remember all the details, but if you have something to refresh my memory, I would be happy to answer.

Q Okay. I'm going to turn your attention to Page 82 of your deposition.

MR. RODRIGUEZ: Your Honor, I'd like to lodge an objection at this point. Mr. Kane represented to the Court and counsel that the materials he was going to use to cross-examine our witness had been previously disclosed in their amended witness and exhibit list. I'm looking at Exhibit Item 13 at Page 4 of that list, and the only pages that are designated are Pages 119 through 120. So by Mr. Kane's own account, he should

be prohibited from going anywhere other than Page 119 to Page 120 because this has not previously been disclosed. It's not admitted in evidence. It's not an exhibit.

MR. KANE: Your Honor, the easy response to that is Mr. Barton has provided prior sworn testimony. He says he can't remember. He can have his recollection reflect, or refreshed with his own prior sworn deposition testimony. The debtor has a copy of this document. It is Mr. Barton's own prior statement which would be admissible anyway as a statement by a party against interest or a party opponent.

But I also disclosed before we began that the document that we might be referring to if Mr. Barton could not remember was the deposition transcript of Mr. Barton.

THE COURT: Objection is overruled.

THE WITNESS: Could you restate the question?

BY MR. KANE:

Q Yeah. Mr. Barton, I asked you to please turn to Page 82 of your deposition transcript.

MS. LINDAUER: All right. John, we have Page 82.

MR. KANE: Okay.

BY MR. KANE:

Q Do you recall discussing a term sheet with Tall Ships or Tall Ship?

A I need to -- on the Page 82?

Q Yeah. You can actually even begin at, I believe it's --

well, let me make sure I have this correct because there's a reference to an exhibit. Could you turn to Page 80?

A Is there an exhibit that goes along with this? I know there was a lot of exhibits on my deposition. Do you have those exhibits?

Q Oh, sure.

There's a reference to Exhibit 12, I believe on Page 81 or 82. Do you recall this exhibit from your deposition, Mr. Barton?

A I'm just looking at it, the beginning of it, but it's a document. Could you scroll through it?

Q Sure. I'll stop right here so you can read this and if you can't read it, I'm happy to read it out loud.

MS. LINDAUER: John, just so I can keep up with you. What exhibit was this to Mr. Barton's deposition?

MR. KANE: His deposition?

MS. LINDAUER: Yeah. What exhibit number is this?

MR. KANE: Yeah, it's deposition Exhibit 12.

MS. LINDAUER: Exhibit 12. Thank you.

MR. RODRIGUEZ: And, Your Honor, I'd like to request that we please be provided with copies of these exhibits as Mr. Kane has them here electronically. We don't have them here in this office and I think my co-counsel has explained, all we have is the deposition, so very difficult for the client/witness to even see what's up here.

Would that be possible for Your Honor to direct Mr. Kane to email us what he's looking at right now so we can see it in real time, also?

THE COURT: Does the debtor's attorneys do not have this? Who defended the deposition?

MS. LINDAUER: I did, Your Honor, and we just went and pulled a copy of the deposition we had on our system but for some reason, the exhibits that we have to the deposition are not opening. It may be a technical issue, but they're working on it right now. But we have not been able to open the actual exhibits so we're looking for our hard copy to see if we have a hard copy of the deposition as well. So we're sort of in process of doing that.

So what I was able to do is just print out the actual deposition testimony, but I don't, as it sits right now, have a copy of all the exhibits, so.

THE COURT: I think I understood you to say that you have an electronic copy, correct, you're just having technical difficulties on your side?

MS. LINDAUER: Correct. Well, correct, Your Honor, with the exhibits. We have the deposition. It's the exhibits that we're not able to open and print out is the issue, so.

THE COURT: So I'm -- given that you have the exhibits and Mr. Kane is putting them up on the screen for everybody to see, I'll over -- I'm not going to direct Mr. Kane

to send them to you again. If Mr. Barton has any problems seeing the screen, he can let us know.

MS. LINDAUER: Well, Your Honor, again, I want to be clear. We think we have them. They're not opening. So I don't know exactly what we have. I guess we can get a hold of the court reporter during lunch and see if she can send us a copy of the exhibits that were attached to the deposition. But I want to be real clear that while our system shows there are exhibits, we have not been able to open them and I want to be clear about that because, again, I don't know if we are going to be able to open them.

And so, Your Honor, I want to be certain that you don't think we have something that we may or may not have. But in any event, I can see what's on the screen. I think Mr. Barton may be able to follow along with what's on the --

THE WITNESS: Yeah. I have a problem, but I'm happy to walk over the screen. I have a -- I can't see. I work off of paper.

MS. LINDAUER: Right.

THE COURT: Why don't you do that? Why don't you do that?

THE WITNESS: Okay. I'm over about his screen, so go ahead, Mr. Kane.

BY MR. KANE:

Q Okay. Tell me -- I'll scroll down. Tell me when and if

you recall this document from your deposition. Do you see this project owner? That references the debtor entity, correct?

A That is correct.

Q And this project address, that's the address of the property in question in this dispute, correct? 2999 Turtle Creek.

A Correct. Can you go down to the signature page first?

Q Sure.

A Go all the way down to the signatures.

Q Yeah. I will get there.

A I'd like to see if it's signed.

Q Sure. Sure.

Is that your signature?

A Yeah, this is my signature. Yes, sir.

Q Okay. And do you see this Carlos Montoya?

A Got it.

Q Who did you understand that to be?

A Well, scroll down so I can see that signature line again. There you are.

Yeah, it's saying it's its managing member. That was my understanding.

Q And managing member of the investor, right?

A (No audible response)

Q And if we scroll up to see what investor means, we see this term investor here. To you're understanding, that was

Tall Ship Management, LLC.
A That's what it says. Yes, sir.
Q Now, for this use of proceeds provision on this term sheet, do you see here where it says "purchase or payoff existing land loan"?
A I do see that. Yes, sir.
Q And right here, it says "land loan lender and land loan."
A Correct.
Q It talks about "land loan was purchased by HNGH Turtle Creek, LLC." Do you understand that to be my client in this case?
MR. RODRIGUEZ: You need to get on the record and you need to say that right now.
THE WITNESS: All right. I'm just going to read it again. It says the "land loan was purchased" -- yes, I do see that.
BY MR. KANE:
Q Okay. So for this use of proceeds, did you understand that, at the time as part of this transaction, that if this closed, the investor would be buying or paying off HNGH's note?
A That's what I recollect from reading this, yes..
Q Okay.
MR. RODRIGUEZ: Your Honor, this is Oscar Rey Rodriguez. Sorry to interrupt Mr. Kane.
But Your Honor made a statement on the record seemed

to believe that Mr. Kane had provided us with the deposition and the exhibits. And, in fact, I'm informed by my co-counsel that Mr. Kane provided only a copy of the deposition. So according to my colleague here, we have never received a copy nor do we have a copy of the exhibits.

I understand Your Honor is not going to compel Mr. Kane to send us an electronic copy, so I will simply ask as a professional courtesy if Mr. Kane would please open up his email system and send us an electronic copy of what he's doing right now so we can print them and have them here in real time.

THE COURT: Ms. Lindauer -- I think maybe you misunderstood my statement, Mr. Rodriguez. I was responding to what Ms. Lindauer said. She indicated that she had electronic versions of these since she was at the deposition and defended the deposition, so I was keying off what Ms. Lindauer said.

MS. LINDAUER: And, Your Honor, what I did was I stepped out to ask Ms. Gwinnup what we actually have in our system, and what we have in our system is a copy of the deposition that I have here sent over from Mr. Kane. Apparently, we did not get it from the court reporter. We got it from Mr. Kane.

What we have is a series of bookmarks down the side that track with the exhibits, but we don't actually have the exhibits. We have the bookmarks for the exhibits. We tried to go to those and there are no exhibits attached. So all I can

assume from what my paralegal tells me is that Mr. Kane sent us a copy of the deposition but not with the exhibits. So we actually do not have the exhibits.

We also searched our own files to see if we had a hard copy of the deposition with the exhibits and we don't. So I just wanted to be clear. I didn't want there to be any misunderstanding because we were trying to click on the bookmarks to see if it would open any of them and it won't because we weren't transmitted the exhibits. Mr. Kane probably can go back and find where he forwarded us the deposition back in December, but we did not actually get a copy of the actual exhibits with it.

THE COURT: Let me pause for a minute.

MS. LINDAUER: Sure.

THE COURT: I can swear that I've seen this document before. Was this not attached to a motion that the debtor filed in the bankruptcy case prior to December 2021?

MS. LINDAUER: Oh, I don't know about that, Your Honor. I'd have to go back and look. There is a Tall Ships --

THE COURT: Let me ask Mr. Kane.

Mr. Kane, am I mistaken, or did I not see a copy of this attached to a motion that was shown during this hearing?

MR. KANE: Your Honor, I believe this may have been attached. Well, hold on, let me clarify that.

MS. LINDAUER: No.

MR. KANE: There is a -- I actually don't think that's true related to this hearing. There is a Tall Ship term sheet from March 2022 that was attached. This is a different document. This may have been attached as an exhibit in December, but not for any motion before this Court on this hearing.

THE COURT: Okay. Thank you.

Would you have any problems just emailing this?

MR. KANE: No, I'll do it right now.

MS. LINDAUER: And, John, maybe when we have a lunch break, if you're still on these documents, you and I can coordinate the exhibits. We have contacted the court reporter also but if you have them handy, that's going to be a lot quicker. The ones that you're going to ask questions about. I don't need all of them, necessarily, but maybe the ones you have questions about.

MR. KANE: Yeah. Understood. I might have to get a paralegal for that just because some of the exhibits are fairly large in size and I'll need to do a liquid file or file shares to get them over to you.

MS. LINDAUER: But you and I can coordinate that.

MR. KANE: But I think I can get this one to you right now.

MS. LINDAUER: As long as Mr. Barton can read them off the screen, I think we're fine. Thank you.

THE COURT: You think you're okay if he can read them on the screen. Is that what you said?

MS. LINDAUER: Yeah. The way we're doing it right now, I think with him being able to read them off the screen for the moment, I think that's fine, Your Honor.

THE COURT: Okay. Well, let's keep going. Let's keep --

MS. LINDAUER: Yeah. We don't have the whole document, so there's going to -- that's why scrolling is not exactly the ideal, but I don't want to belabor the point.

Again, Mr. Kane and I work great together. I'll get this -- we'll get this part figured out.

THE COURT: So you indicated that he was doing fine. Mr. Barton is able to read this.

MS. LINDAUER: Sure.

THE COURT: May we keep going or do you want to wait for the paper copy?

MS. LINDAUER: No, no. No, Your Honor, I think, as it relates to this document, we can keep going for the moment. We're getting close to a lunch break anyway, so I think if we're just on this one document, I think that's fine.

So Tim, if you want to go ahead and just -- where we are.

MR. KANE: And just for full disclosure, I have emailed that over to Ms. Lindauer and Dian Gwinnup --

MS. LINDAUER: Thank you, John.

MR. KANE: -- Ms. Lindauer's paralegal, just to make sure they had a copy of it if they needed to have it handy.

I am almost done with this, so it really -- and I'm not offering it into evidence. This was really just to refresh Mr. Barton's recollection.

BY MR. KANE:

Q Mr. Barton --

MR. KANE: I'm sorry, Ms. Lindauer stepped away. I don't see Mr. Barton.

Mr. Barton, are you still by the screen?

THE WITNESS: Yes, but I think we're waiting for Ms. Lindauer to get back in the room.

(Pause)

MS. LINDAUER: And, John, just to be clear, we did print out a copy of this exhibit. Mr. Barton has got it in his hands.

THE WITNESS: Thank you so much. I really appreciate it. I have a bit of a problem with my eyes and the screens. I apologize for that.

MR. KANE: No. Happy to accommodate. It allows me to reduce this just a little bit, which makes it easier on mine for now.

MS. LINDAUER: Thank you.

THE WITNESS: Well, good. Good.

And what page were we on, sir?

BY MR. KANE:

Q We are on Page 3 of 19.

A Okay. I have it in front of me.

Q Okay. And I believe you testified it was your understanding that the investor was going to attempt to pay off or purchase HNGH's note. Is that correct?

A That is correct.

Q Okay. And you believed it to be true that HNGH actually delivered executed note sale documents to Tall Ship shortly thereafter, correct?

A I don't know anything about that. Say that again.

Q Did you understand that HNGH agreed to sell its note to Tall Ship at or around this time?

A No, I was not party of those negotiations. That was not with my involvement.

Q Okay. But that's not your understanding sitting here today?

A I don't know.

Q Sorry. Go ahead.

A You're saying loan documents were sent back and forth with Tall Ship is what you're saying?

Q Yeah. I said --

A I would not have been copied on that so I don't know what was transpiring at this time sitting here today, sir.

Q Okay. So just to clarify, you don't know whether HNGH agreed to sell its note to Tall Ship?

A I know that there was some discussion about a note as one option or pay off the loan. There was tax issues. There was a lot of things that they were talking about, which was better or worse for each of the two parties. But we were, shall I say, a benefactor of that process once it happened, as opposed to being the negotiating parties.

Q Okay. And do you recall in your deposition that I asked you if you believed it to be true that HNGH delivered executed note sale documents to Tall Ship?

A If you'd like to show me something to refresh my memory, I'd be happy to look at it.

Q Okay. I'm going to direct you to Page 86, Paragraph 21 of your deposition transcript.

A I have it here in front of me, 86.

Q Yes. Page 86, Paragraph 21.

A I see 21.

Q Okay. Do you see where I asked you, "Are you aware that HNGH sent executed note sale agreements and other related documents to Tall Ship for execution on the understanding that they also had a deal that would take out the note of 39.9 or 38.9?"

And you responded on Page 87, Paragraph 1. "I believe that to be true."

A Okay.
Q "Would you be surprised to learn that the folks at HNGH were also shocked that Tall Ships, or Tall Ship, walked?"
"I would not be surprised."
And then we talk about whether the debtor considered pursuing legal action against Tall Ship.
A I see all that. Yes, sir.
Q Okay. Does that refresh your recollection?
A Well, yes, at that time I'm confirming that. And, again, sitting here today reading what you're saying, so yes.
Q Okay. And do you recall --
A I'm reading what I said to be correct. I'm sorry about that. Not what you said. I apologize.
Q Thank you for the clarification.
Do you recall sitting here today about when those negotiations were taking place?
A You know, it's just the dates and all of that, you know, with COVID and the whole world coming to a stop in the middle of all this craziness and the aggressiveness of this whole process, it's hard for me to identify time sitting here today.
Q So Mr. Barton, do you recall generally whether that might have been at or around the time the debtor entered into a forbearance agreement with HNGH?
MR. RODRIGUEZ: Objection, Your Honor. Asked and answered. Calls for speculation, at or around the time.

THE COURT: Overruled.

THE WITNESS: Could you repeat the question?

BY MR. KANE:

Q Yeah. Mr. Barton, do you recall whether those negotiations with Tall Ship were taking place at or around the time the debtor entered into a forbearance agreement with HNGH?

A Again, it's hard for me to recall these times. If you have something that you'd like me to refresh my memory, I'm happy to look at it.

Q Okay. Well, we can go back to that Exhibit 12 from your deposition and we can scroll up. Do you see the top left corner, Mr. Barton?

A February 15th. Yes.

Q And do you remember the effective date of the forbearance agreement between the debtor and HNGH?

A No, I don't. And I will just tell you that I, as a person that works for these kind of problems, these dates and all that, I don't try to remember them. I try to get to the solution. So I apologize if you think I should be able to, you know, remember these dates, but it's just been historically that I don't. And so I'm happy to respond as we are and I hope that's okay for you. I just wanted to -- I try to block out whatever those problems are and go to the solution and that causes me not to be very good at remembering these kinds of dates.

Q Understood. I'll turn your attention to Lender's Exhibit 6.
A We have it here in front of us.
Q Are you familiar with this document?
A If you'll give me a moment to look at it to try to refresh my memory.
(Reviewing exhibit)
Big document, so --
Q I'll help you, go in the direction of the very first paragraph and the title on Page 1 of this document.
A Okay.
Q Why don't you read that and tell me if you understand what this document was.
A The forbearance and payoff agreement. "This agreement made effective as of this 1st day of March, 2021, is executed by and among 2999TC Acquisitions," and it goes on from there.
Q All right. So do you recall what this document was then?
A Well, again, I'm not a lawyer. I mean, I understand the words forbearance and payoff agreement, but I understand what this document is supposed to be, but not all the details of it.
Q Do you have a general understanding of the terms of things like interest rates, maturity dates, under this document?
A I do not sitting here. I'd have to review that and I'm happy to do that with you.
Q Okay. Do you recall whether this forbearance agreement

had a lower effective interest rate than the note?
A No, I'm not. I don't remember that.
Q Okay. I'm going to turn your attention to Section 2(d) of this document.
A Is that on Page 2, as well?
Q (Indiscernible) very bottom of Page 2, Section 2(d). It's a paragraph titled "Interest."
A Yes. Give me a minute here.
(Reviewing exhibit)
I do see that whole point (d), I've read if that's what you want me to read. Okay.
Q That's an interest rate of 8 percent per annum, correct?
A Yes, that's what it says.
Q All right. Now, if we go to Debtor's Exhibit 17 on Page 10 of 148.
A If you'll give me a --
Q If you'll look at Section 1(h).
A This is the -- hold on a minute. This is the original promissory note, right?
Q Yes.
A Okay. And what page did you need, sir?
Q It's Page 10 of 148 at Section 1(h) of this document.
A The interest rate.
Q Now, do you see it as the greater of and then it has a formula?

A Give me a moment, please.

(Reviewing exhibit)

It's quite the intricate formula of LIBOR and certain days rates and reset date and two business days dates, "rates shall be applicable from the date of this note." A lot of formulas there, but I see them. Yes, sir.

Q Okay. Was it your understanding from this note that the interest rate could not be less than 12.4 percent under the note?

A I seem to recall it was 10 percent as used in this note. You know, I'd have to ask my capital markets guys. But as used in this note, "shall mean interest of equal to greater of 10 percent per annum."

Q That says plus LIBOR, correct?

A Plus the LIBOR rate, which I don't know what that is. There's a formula of what time and what date.

Q Right, and it's the greater of that and 12.4 percent per annum. Is that right?

A Okay. That's what -- as I said, it's kind of a complicated formula, but that's what I'm reading as you're saying it. Yes, sir.

Q Okay. Now, let's go back to this forbearance agreement, Exhibit 6. Can you just provide me with your understanding of what this forbearance agreement was doing when you executed it on behalf of the debtor?

A Yeah, I mean, I'd really have to read this and refresh my memory about all the issues. As I said, you know, it's quite a long document and we have -- Mr. Glasgow and myself are the signators and it was back in March of 2021 is when this was effective. But all the details of it, no. I don't know them sitting here.
Q Okay. Do you recall that it granted the debtor a new maturity date to July 31, 2021?
A If you could show me where that is, I'd appreciate to look at it.
Q Yeah. Section 2(b).
A That would be on Page 2, 2(b), the term modified loan. Is that correct?
Q Yes.
A It says July 31st. Yes.
Q And it provides that that maturity date could be extended under that Section 2(c), right?
A Yeah. If you'll give me a moment.
(Reviewing exhibit)
It does look like there's a 90-day extension for certain amounts of payment and other consideration.
Q And did the debtor provide that consideration?
A I believe that we monetarily provide the consideration as well as I believe all the releases of the litigation that was going on. I think that was also part of the consideration in

this. But I -- they also have something about that my guaranty stays in full effect. So there's a lot of details in this document.

Q Was it your understanding that the maturity date did extend to October 29, 2021?

A To which date, you're saying?

Q October 29, 2021.

A Is that written here somewhere, that date, or are you calculating the 90 days?

Q Calculating the 90 days. Was that your recollection at the time?

A I mean, I don't know sitting here today, but I'll -- I mean, if you're saying that 90 days gets to that date, I certainly believe you.

Q Well, are you suggesting that you didn't know the maturity date under the terms of this forbearance agreement?

A No. What I'm saying is your -- I don't see that calendar date listed in this document, and I asked you if you did the math of the 90 days.

Q No, I understand. I understand Mr. Barton, but I'm asking for your recollection.

Did you understand that this forbearance agreement extended the maturity date to October 29, 2021? Is that your understanding?

A I think we're tripping over each other. Could you just

state the question again?

Q Is it your understanding that this forbearance agreement extended the maturity date to October 29, 2020?

A I mean, I have to go through this whole document and be sure of what the outcome of the full document is, but I really don't understand what the question is.

Q Well, I'll ask it again for you. Sitting here now, do you understand that the maturity date under this forbearance agreement was extended to October 29, 2021?

A Yeah. As I said, I have to read this whole document to understand, because as you know, many of these documents you create, you know, clauses in the back affects the front and they're all tied together. So --

Q So sitting here today, you don't know?

A Well, I can't recollect what you're asking me without reading this whole document.

Q Okay. Did you take steps to try and pay off HNGH by the maturity date deadline under this forbearance agreement?

A Every time we had an opportunity or requirement, we looked at our options of what the most favorable results was for us and we prepared for what we needed to prepare and negotiate for the best outcome.

Q Okay. So is that a yes or a no?

A Anytime we had a maturity event, we would prepare ourselves for that event.

Q And did that include trying to obtain payoff financing?
A Yes.
Q And leading up to October 29th, did you contact Liberty Bank in October?
A Liberty Bank? I don't know a Liberty Bank.
Q Okay. Do you recall contacting Colliers about takeout financing in October of 2021?
A Colliers? I don't -- who is Colliers? Is that somebody's name you're saying?
Q So you don't recall whether you contacted any entity named Colliers about takeout financing in October of 2021?
A I mean, if you have something to refresh my memory, but you know, we have a lot of people talking to us all the time. But I don't know what you're referring to.
Q Do you remember contacting Beal Bank some time in mid-October in an effort to obtain financing to take out the HNGH note?
A I've talked to Beal Bank over the years, yes.
Q But you don't recall anything about Colliers or Liberty Bank?
A Again, I don't know what Colliers you're talking about.
Q Okay. And --
A Or Liberty Bank.
Q Okay. You don't know those entities?
A No.

Q All right. And would you agree that it is difficult to obtain institutional financing within 30 days to take out a note like HNGH's note?

MR. RODRIGUEZ: Objection. Speculation. Vague and ambiguous.

THE COURT: Overruled.

THE WITNESS: Could you restate the question?

BY MR. KANE:

Q Yeah. Would you agree that it's difficult to obtain takeout financing from an institutional lender for a note like HNGH's note in this case?

A No.

Q Obtain financing within 30 days?

A No. No.

Q Okay. Do you recall I took your deposition testimony on that point in December of 2021?

A Yeah. You can refresh my memory if you would like.

Q Okay. Do you recall me asking you questions about what steps you took to obtain financing to take out HNGH's note before the maturity deadline on October 29, 2021?

A You can refresh my memory. If it's in the deposition, I'd like to see it.

Q Okay. I'd like to turn your attention to Page 94, Paragraph 15 of your deposition.

A I have Page 94.

Q Okay. And do you remember having a series of questions about your interactions with Mr. Nambiar --

A No.

Q -- about what steps you were taking to take out HNGH before maturity.

A Yeah. You can refresh me.

Q Okay. Let's go to Page 94, Paragraph 23.

I asked you, "Okay. And did you provide a response as to the status of refi?"

And you said, "Yes. The bank was looking at it and I'll update it when I get back."

I asked you, "Which bank?"

You said, "Liberty Bank, the life insurance company."

I asked, "When did you reach out to them to try and see if they would refinance this?"

You said, "I think it was -- I don't know, sitting here today. I mean, it was somewhere in October."

And I asked you, "So less than 30 days before maturity?"

And you said, "Yes."

I said, "Have you reached out to other banks to determine whether a refi was possible for them?"

"A I mean, a refi of that type of loan within 30 days is very hard to do. And that's why we were negotiating the extension. And we had no reason to believe we wouldn't secure the extension with Bipin." That's a misspelling.

"Q Okay. I'll ask you to please answer my question."

"A Repeat the question."

Again, my question. "Did you reach out to any other banks regarding a refi of the note before you reached out to the bank you just referenced?"

"A I think at the same time we reached out to Colliers. It's another group here in town."

"Q Did you reach out to Beal Bank?"

"A We did call Beal Bank, yes."

"Q Okay. When did you call Beal Bank?"

"A I'd have to check. I mean, that was like in the middle of October whenever -- whenever, you know, I would say in the middle of October."

Do you recall that testimony?

A I recall what you just said. Yes, sir.

Q And does that refresh your recollection about whether you had conversations with Liberty Bank?

A Yeah. It's actually not -- you know, obviously, I didn't see this to correct all this, but Liberty Life Insurance, I know who they are. But when you said Liberty Bank, I was confused that you were thinking about a regulated bank. There is a life insurance company called Liberty Life Insurance.

Q Okay. And you refreshed -- did this refresh your recollection about discussing a potential refi with Colliers?

A Yeah. I don't know if this is a typo or not, because I

don't know who Colliers is sitting here today. So, you know, it might be another name that I was talking about at that time, but I don't recall who Colliers is at this point.
Q And did this refresh your recollection about the timing of when you reached out to Beal Bank on a potential refi of the HNGH note?
A What I'm saying here, that was in the middle of October.
Q Okay. And was your statement at the time correct that a refi of that type of loan within 30 days is very hard to do? Is that correct?
A It's a -- it is what I said, that it's hard to do, but it's not impossible. I mean, the Madison closed in 10 days and we've had other banks and institutions that closed in less than 30 days. So it is certainly able to be done and -- but it's never easy in a situation like we are with Mr. Nambiar.
Q And about that, I believe you testified that you understood there was some kind of extension and that's why you didn't make the maturity date payment on October 29th. Do you recall that testimony from yesterday?
A That is correct. We had discussions and negotiations that were with Nate Christensen, their lawyer, and we were waiting for the documentation to execute.
Q Okay. And is there any evidence that you were aware of in your debtor's witness and exhibit list that supports that position?

MR. RODRIGUEZ: Objection. Calls for a legal conclusion.

THE COURT: Overruled.

THE WITNESS: Yeah, I -- could you restate the question?

BY MR. KANE:

Q Yeah. Are you aware of any exhibit in the debtor's exhibit list or in evidence that supports that position you just took?

A I mean, I have text messages back and forth but, you know, there was no discovery in this. So if it's not in the record considering this wasn't, you know, there's no discovery. I have the text messages to that effect. But other than that, I don't know what Mr. -- Ms. Lindauer, sorry about that, have put in as exhibits.

Q Okay. And are you sitting here today saying you couldn't have provided those text messages to Ms. Lindauer?

A I think this whole process was a expedited rush for a motion and it's basically turned into a trial with no discovery. So --

MR. KANE: Objection. Non-responsive. That was a yes or no question.

THE COURT: Sustained.

BY MR. KANE:

Q Mr. Barton, the question was, are you telling me sitting

here today that you could not have provided those text messages to Ms. Lindauer?

MR. RODRIGUEZ: Objection, Your Honor. Relevance and harassing my witness.

THE COURT: Overruled.

MS. LINDAUER: Your Honor, on the front of the basis of optional completeness taken from Mr. Barton's deposition, there are references to text messages marked as exhibits during his deposition that I do think reflect whatever discussion Mr. Kane is having with Mr. Barton, so I believe Mr. Kane actually has those text messages. I think one of them may have been marked as Exhibit 15 to Mr. Barton's deposition.

As I mentioned, we don't have the exhibits in front of us to his deposition, but there is a lengthy discussion in the deposition starting on Page 93 regarding those text messages. So I believe that those are messages that Mr. Kane may have in his possession that we may want to review with the Court. But as I said, I don't have them. So perhaps, when we take our lunch break, Mr. Kane and I can work on some of these exhibits. But I would ask the Court to consider those text messages as part of the testimony that was given in connection with his deposition. And I think they were offered during the deposition based on what I'm reading in the deposition. So maybe we can revisit that particular issue since Mr. Kane's raised that as an issue in these proceedings.

MR. KANE: I'll go ahead and stipulate right now and Ms. Lindauer, if you would like to have all those text messages and the deposition provisions that address those text messages submitted to the Court, we would be happy to do that.

MS. LINDAUER: Your Honor, I may do that, but I'd like to see them before we agree to that because, again, I don't have them in front of me. I'm reading quickly the deposition here where they're talking about the text messages and extensions.

And, frankly, Your Honor, I've allowed Mr. Kane --

THE COURT: Ms. Lindauer. Ms. Lindauer. Ms. Lindauer.

MS. LINDAUER: Yes, Your Honor. I'm sorry.

THE COURT: It's a little unusual to have kind of tag team lawyers doing this, but you just said for optional completeness, you want me to consider those text messages. Is that what I understood you to say?

MS. LINDAUER: It is, Your Honor, to the extent that they're part of the deposition. But I don't have them to look at so all I can do is read what I think they say from his deposition. So, like I said, maybe at a break, I can retrieve those from Mr. Kane and we can have the Court include those to the extent necessary as part of this record.

THE COURT: Is this a good time for a lunch break?

MS. LINDAUER: It would be from our side, Your Honor.

I will say that --

THE COURT: Let me ask -- go ahead.

MS. LINDAUER: I was going to say Mr. Barton has a doctor's appointment I believe, Your Honor, at Preston. Is it Preston and 635?

THE WITNESS: Yes.

MS. LINDAUER: Okay. That he is going to run to. I think that we could restart possibly, what 1:30? Are you going to be back by then?

THE WITNESS: I should be.

MS. LINDAUER: Okay.

THE WITNESS: I'm going to do it on my lunch break, so yes.

MS. LINDAUER: So I just wanted to alert the Court that he does have to leave and go to a doctor's appointment this afternoon.

THE COURT: Well, let me ask Mr. Kane. Do you want to break for lunch or do you want to keep going?

MR. KANE: I'm sorry, I was not aware that Mr. Barton was going to be leaving for an hour and a half. I guess to facilitate his -- as soon as he can possibly return, let's take a break.

THE COURT: So I'm not --

MR. KANE: What time is the doctor's appointment?

THE WITNESS: So I alerted them that it would be

between 12 and 12:30, and I just have to go there and get a treatment and then come back. So he said he's going to be able to take me. And I figured that, you know, it's an hour, an hour normally for lunch, so that's why I'm just -- I'm not trying to ask for anything extra.

I'm just saying I'm going there and coming back. It's a long weekend and if they don't do it will get worse, so.

MR. KANE: So we can stop now.

THE COURT: All right. So shall we take a recess, come back at 1:30?

MR. KANE: Yes, Your Honor.

MS. LINDAUER: That would be fine, Your Honor. Thank you for that. Appreciate that.

THE COURT: All right. We'll be in recess.

MS. LINDAUER: Thank you.

And John, I'll call you. Thank you.

(Recess at 12:06 p.m./Reconvened at 1:32 p.m.)

THE COURT: Good afternoon. We're back on the record in the 2999TC Acquisitions case. Do we have everybody back on?

MS. LINDAUER: Yes we do, Your Honor.

MR. BARTON: Yes, Your Honor. Mr. Barton's here.

THE COURT: And are we all squared away on the documents?

MS. LINDAUER: I believe, Your Honor, we do have a full set now of exhibits to the deposition from Mr. Kane's

office. So I do appreciate that. And we have those in a notebook here in front of us also. So to the extent we're referring to any of those, we have them.

THE COURT: Okay. Mr. Kane, you may proceed.

BY MR. KANE:

Q Okay. Mr. Barton, was it your recollection that there was an agreement extending the October 29th maturity date between HNGH and the debtor?

A Yes, there was an agreement between Mr. Vipin Nambiar and myself.

Q And do you recall whether that agreement was in writing?

A We were waiting for the lawyers of Mr. Nambiar, but we never got the document. So it was just verbal.

Q Okay. You're a -- would you consider yourself a sophisticated businessman?

A I don't know what that -- what do you --

Q You have to execute a lot of business documents in your role as president of JMJ, don't you?

A Well, I have a lot of lawyers and advisors. And I have been in the real estate business for a while. But I don't read every -- every single line item of every single document. But I am cognizant and have been doing this for a while.

Q Okay. I'm going to turn your attention to Exhibit 6.

MS. LINDAUER: Okay. Help me, which --

THE COURT: Is this lender or debtor's?

MS. LINDAUER: Yeah, I was going to say --

MR. KANE: Lender's Exhibit 6.

MS. LINDAUER: Okay. And, John, is that the forbearance agreement?

MR. KANE: It is the forbearance agreement.

MS. LINDAUER: Okay. Thank you. I've got it.

BY MR. KANE:

Q And, Mr. Barton, will you turn your attention to Section 15A, iii? Was your understanding from this provision --

A Hold on. I'm still trying to find it. What are you saying? On Page 9?

Q Yeah, it starts on Page 9 and proceeds to Page 10.

A And which letter are you looking at? Just there's only A, right?

Q Right, iii.

A Little i three?

Q Yes.

A Okay.

Q Did you understand this provision to mean that any negotiation or extension agreement had to be in writing to be enforceable?

A How about I just read this for a minute here.

(Pause)

THE WITNESS: Just let me read a little bit more for

one second.

(Pause)

THE WITNESS: Okay. I'm ready for the question.

BY MR. KANE:

Q Did you understand that this provision of the forbearance agreement would require any extension agreement to be in writing to be enforceable?

A Yes, that's what it says.

Q No I think you've testified that you now recall that you've had some conversations with various potential financing sources in mid-October of 2021. At that time of -- about how long do you think would have taken to obtain equity or financing necessary to take out HNGH's note?

A You jumped subjects there. So could you just restate that one more time?

Q Yeah. How long do you think it would have taken at this time, or I mean, let me put it a different way. When you were having these conversations with these various banks in mid October of funding sources, about how long did you think it would take to close a loan or close an equity transaction necessary to take out HNGH's note?

A Well, I could only talk about the Madison loan as an example from the time that Mr. Josh Zegen flew to Dallas, looked at the property, and the final documents were signed was ten days. So it -- it certainly can be done, and we've done

closings in ten days, ninety days. And sometimes even longer depending on how complicated it is. So I'm not really clear what your question is exactly because that depends on the lender, right?

Q And, okay. That's fine. And HNGH did agree to a series of agreed orders that provided the debtor with quite a bit of additional time to find that take out financing, did they?

MR. RODRIGUEZ: Objection, Your Honor. The agreed orders speak for themselves, calls for a legal conclusion, and also for speculation as to what HNGH, a third party, agreed to, believed or didn't believe.

THE COURT: Overruled.

THE WITNESS: Could you restate the question?

BY MR. KANE:

Q Yeah. I'll put it like this. The debtor and HNGH entered a series of agreed orders extending the deadline by which the debtor had to pay off HNGH's note. Correct?

A Both parties agree for consideration and for the benefit of both of us that there was no need to pay it off any sooner than what was agreed to.

Q Okay. And October 29th, 2021, that's the petition date. And the payoff under the agreed, the modified agreed order was May 30th, 2022. And that was extended to May 31st, 2022. Is that your understanding?

A Are we talking about agreed order 64 or 94?

Q Both of them. So 94.

A Ninety-four? So do we have that?

MS. LINDAUER: Yeah, I do.

BY MR. KANE:

Q Sorry, Mr. Barton, are you not readily familiar with when the payoff deadline was in this case?

A I'm readily available of a lot of things, but there's a lot of documents -- this is 64. He's talking about 94.

MS. LINDAUER: Oh, 94?

THE WITNESS: I like to be, you know, have the document in front of me that you're referencing, if that would be all right. You referenced the order, that's what I was looking for. Okay. I'm ready for the question.

BY MR. KANE:

Q Okay. So you understood that because of that second agreed order, the payoff deadline was extended to May 30th, 2022. Is that correct?

A I believe that is correct, yes.

Q And the parties had an agreement to extend that deadline, the payoff deadline to May 31st at 5:00 p.m.?

A I don't know if anything was signed. I don't remember seeing something that moved it from the 30th to the 31st. But if you say there is such a document and you were party to it, then I would confer that you're probably correct.

Q Okay. So October 29, 2021 through May 31st, 2022, that's

about seven months of additional time to find a take out party, correct?
A What were the dates again you say?
Q October 29th, 2021.
A Yes.
Q Through May 31st, 2022.
A Yes. Okay. I'm with you on those two dates. Go ahead.
Q So you said based on your experience with the Madison loan, you could get take out financing in ten days, sometimes ninety days, right? Is that your testimony?
A That is what I said. And with Madison it was quite quick. And sometimes it does take longer. But yes, sir.
Q Okay. So now under agreed order 64, the payoff deadline was March 15th, right?
A Could you repeat that again?
Q Under the first agreed order, the December 10th agreed order, that established a payoff deadline of March 15th, 2022, correct?
A Order 64 you're talking about.
Q Yes.
A Yes. I believe that's correct.
Q Okay. So from the petition date to that date, that's about four and a half months.
A If you say so. Okay.
Q I mean, you can count them off on your fingers if you

want. Is that your understanding?

A Just for the record, okay, I am a businessman. I've never gone to college. And I don't appreciate the Fred Flintstone let's take his shoes off to counting because yes, I'm not that fast. I'm counting in my head. And so I don't appreciate that, okay? I asked you, you're doing it. I'm asking you, I believe what you told me. You told me four and a half months, I believe it. You don't have to belittle me.

Q Okay. And that's a considerably greater time than the ten to ninety days that you referenced.

A It is four and a half months, period. That is correct.

Q And do you admit that on March 15th, the debtor did not have a party with which to close a payoff transaction?

A I do not.

Q And do you recognize that HNGH could have refused to provide an extension at that point?

A I struggle to answer that question.

MR. RODRIGUEZ: Objection, Your Honor. Calls for speculation. No foundation. And again, state of mind of a third party.

THE COURT: Overruled.

(Pause)

THE WITNESS: I'm sorry. What was the question again?

BY MR. KANE:

Q Is it your understanding that come March 15th, or even up to March 15th, HNGH could have refused to extend the payoff deadline?

A I mean, they could choose to do whatever the like. Yes. But they chose not to, so.

Q Okay. Debtor's not arguing it was trying to close and HNGH failed to close on March 15th.

A That is correct.

Q Now, is HNGH's agreement to extend the payoff deadline from March 15th to May 31st seem like something that a predacious or loan-to-own lender would agree to?

MR. RODRIGUEZ: Objection, Your Honor. Calls for speculation. Again, relies upon facts not in evidence. This term predacious is not one that my witness or I have ever used. So also relevance, and really prohibited by Federal Rule of Evidence 403.

THE COURT: Overruled.

THE WITNESS: So will you restate the question then please?

MR. KANE: You know what, I'll just, I'll go ahead and withdraw it, withdraw the question.

BY MR. KANE:

Q Now, you've mentioned a number of different sources of financing that you were not at liberty to share the name of, right? We called those sources one through five. Is that

right?
A Yes.
Q Are you aware of any documents in the debtor's exhibit list, even redacted documents that show that those entities were actually able to fund and close on May 31st?
A I don't know every exhibit that's been put in here. So I'd have to leave that up to the lawyers.
Q Okay. Did you ever direct your lawyers to file a motion to have those documents admitted, a motion to seal, a motion for protective order, anything like that, Mr. Barton?
MR. RODRIGUEZ: Your Honor, that clearly invades attorney/client privilege and attorney work product. So I'll object on that basis. If Your Honor is not going to sustain my objection, I'm going to instruct my witness not to answer that question. And of course, you'll have the ability to override that. But will you sustain the objection, or Mr. Kane, will you withdraw your question?
MR. KANE: I'll withdraw the question. It's a good objection. You're right.
BY MR. KANE:
Q Now I understand you testified earlier that your three Jewish mentors told you that you should always have, or that you learned from your mentors that you should have at least three parties ready for a closing. Is that right?
A That is correct.

Q But would you also agree that you can really only fund with one of those entities?
A That is -- that is normally correct, yes. You could cooperate on the funding, two parties could do it. But I would say normally, it's my practice that there only be one.
Q And if two parties were going to be doing it, it's still just one closing, right? That would be an aggregation of the funds to close?
A That is correct. Sorry for speaking over you.
Q And come end of May 31st, close to the expiration of that payoff deadline, was one of your unnamed sources going to be the actual funding party in the event of a closing?
A I had a preferred one. Yes, I did.
Q And am I understanding that then the entity that was going to be funding was not the Private Lender Network?
A That is correct.
Q Okay. So did you hear Mr. Walji's testimony previously?
A I heard some of it, but I was not here the whole time.
Q I'm going to put a document up on your screen.
A Could you re -- could you re-ask that question again because maybe I didn't understand it.
Q Did you witness Mr. Walji's testimony?
A I'm sorry, the one right before that about the PO whatever.
Q Okay. Let me put some context on that. You testified

that there could really be just one closing, correct?
A Correct.
Q And you would need one funding source or I guess an aggregation of funding sources to provide the money for that one closing.
A That's correct.
Q And I believe you testified that your preferred closing source, the source that you were intending to close with on May 31st was one of the unnamed sources.
A That had the best (indiscernible. So it was my preferred one. That's correct. I appreciate you going back to that, yes. I'm ready now.
Q Okay. And so is it your testimony here today that the funding source for closing was not Private Lender Network?
A Again, that final decision was not made because we were waiting on all the documents, and we were waiting for instructions from the title company. So there was no final, final decision. What I said earlier is that was my preferred one. And the other parties were ready, but I did not select which one it was going to be because we were nowhere near a closing.
Q Okay. So let me clarify then. Private lender network was not your preferred funding source?
A It was not the best deal. That's correct.
Q Okay. Are you aware that Mr. Walji represented that

Private Lender Network was the funding party on the closing date?
A Again, I don't really remember being here. But as I understand it, they -- they are and they were ready to fund. There's no question about that. And it comes to the final day of when all the documents are ready to go and we're ready to close, then that's when I make my final decision.
And there is cost in that. You know, we have to pay. If don't use these other groups, we do pay breakup fees. So everybody is paid and ready to go. And then when the title company calls and the papers are ready, then we make the final decision.
Q Did Private Lender Network ever fund money into Sendera Title for closing?
A There was no escrow account set up by Sendera because there was no documents sent to Sendera. And there was no protocol that was ready to accept funds from a title standpoint. So there was no call for funds yet.
Q Okay. I want to speak briefly, Mr. Barton, about your guarantee suit. Is it your understanding that the debtor is arguing that it did not default under the terms of the agreed order?
A We did not default. That's correct.
Q Okay. But would you agree that the debtor did not make the payoff on the payoff deadline?

A We were unable to make any payoff without the documents in the order. We followed the order, and the order was not followed by the other party. So as soon as that party complies with the order, then we can go ahead and fulfill our obligation.

Q Isn't it your understanding in regards to the guarantee suit that one of two things has to happen for the dismissal of the suit, either a default or a payoff?

A No, it's my belief and understanding that on the 15th, that should have been dismissed. It's a moot --

Q Is that March 15th?

A Okay. I think it was March 15th, yes.

Q So it's your argument -- I'm sorry. Let me rephrase that. I'll withdraw that question and re-ask. It's your understanding that under the agreed order dated December 10th, after March 15th's payoff deadline was extended, HNGH had an obligation to dismiss your guarantee suit?

A Yes. It was my belief. And as you know, I was operating, interacting with you. I told you I wanted the case removed and dismissed because it had no -- no -- if you pay, you don't pay, that's nothing. All it does is put a cloud and cause more trouble for me, and has people asking why is this case there.

So I talked to you, told you that I believed it should be removed. You threatened me to have me sanctioned and brought before the Court and all kinds of things that you wrote that

you were going to do to me. And it was set for a hearing.

And I wanted to go to that hearing, but then all this started. So I still want to go to that hearing and have the Court hear why you are, as Mr. Nambiar said, want to keep a chain on me so that I don't do anything until this is all over. You want this guarantee case hanging over my head. And I want the Judge and the Court to understand that, so I want that hearing. But yes, that's what I believe.

Q Thank you. I'm going to turn your direction to debtor's Exhibit 17. And it's going to be on Page 2 of 148. Part two, Section 7, how much is the claim? Will you tell me when you're there, Mr. Barton?

A I got part two. And what is the question?

Q Do you see the statement by HNGH that its claim as of the petition date was $45.939 million and change?

A First I need to understand what this is.

Q Go to Page 1. Do you see where it says proof of claim?

A Yeah, but I'd like to ask my lawyer.

THE WITNESS: What is this document, Joyce?

MS. LINDAUER: I can't answer the question.

THE WITNESS: Oh. Okay. 299TC Acquisitions [sic]. Okay. Proof of claim. Okay.

BY MR. KANE:

Q And you see that the claim that the debtors were alleging, they were -- I'm sorry, that HNGH was alleging it was owed is

$45,939,456?

A I see that. Those numbers on the page, yes. Yes, I see that.

Q Okay. And now if we scroll down to Page 4.

A Okay. That's the summary of proof of claim page.

Q Right. That's kind of explaining that there's a little bit of ambiguity still at this point about the nature of the claim. But did you understand that at the early part of this case, there was a dispute between the debtor and HNGH about the amount of money due under the note?

A Let me read this for a minute, please.

(Pause)

THE WITNESS: So where is this affidavit of Nate? Oh, okay. Here it is, yeah. Let me read that for a minute.

BY MR. KANE:

Q And to be clear, Mr. Barton, I'm asking you whether you understood there was a dispute between HNGH and the debtor about the payoff amount due under the note when the bankruptcy case was filed.

A I'm not reading that here. This is the deed in lieu was not recorded until November 1st.

MR. KANE: Objection, non-responsive.

THE WITNESS: Well I can't answer your question then.

THE COURT: Sustained.

BY MR. KANE:

Q You don't recall whether the debtor and HNGH disputed the amount due under the note when the bankruptcy case was filed?
A Yeah, I'm not -- what you're asking me is whether Vipin said -- I mean, you all filed this amount here. And are you saying that you -- that Vipin was saying this amount is not right? Is that the question?
Q Mr. Barton, please, please. I'm going to ask you to please listen to my question. Did you believe when this bankruptcy case was filed that the debtor and HNGH disagreed about the amount due under the note?
A Sitting here today, I don't remember. I apologize. I can't make out whether there's a discrepancy in this paperwork. So if you have something else that would help me remember it, I would appreciate it.
Q I'll ask you a different question. Do you recall whether entry into the agreed orders established an agreed payoff amount under --
A I do remember that, yes.
Q And that was a negotiated amount, correct?
A Yes.
Q Now if we turn to Lender's Exhibit 8. And I'll be very brief here.
A Sixty-four?
Q Yeah, if we go to Page 2. Yes, Mr. Barton. The second decretive paragraph, second paragraph that begins ordered,

adjudged, and decreed.
A I do see that paragraph, sir.
Q You had some testimony with Ms. Lindauer about this $2 million allowed claim, correct?
A I did talk about that. All right. Now I see. Simultaneous (indiscernible) shall have the possess of two million -- yeah, in the middle of the paragraph.
Yes, sir. I see that.
Q And that allowed claim would only be paid if the debtor was successful in a development of this project, correct?
A No. What I -- the $2 million would be paid if I had a construction loan, if I raised a certain amount of money, and then a certain amount of period of time, 12 months I believe. And if none of those happened, then Mr. Nambiar's group would have an equity partnership in the project.
Q And that would be a conversion of a $2 million claim into equity, correct?
A Yes. That's what I understood. Yes.
Q Now, earlier in your testimony you had a conversation with your counsel about the debtor's preparation of the documents that were required or that would be required for a closing. Do you recall that testimony?
MR. RODRIGUEZ: Objection, Your Honor. Mischaracterizes the witness' testimony. Paperwork needed to be prepared by the lender, not the debtor.

MR. KANE: Yeah. Response to that was I'm asking if he recalls his testimony about the fact that the debtor has prepared those documents.

THE COURT: Overruled.

MR. RODRIGUEZ: That's not what I heard.

THE COURT: Overruled.

MR. RODRIGUEZ: You can answer if you understand the question, sir.

THE WITNESS: I apologize to ask you, but every time they do all this, I just like to hear it again. I'm sorry, Mr. Kane.

BY MR. KANE:

Q I understand, Mr. Barton. Do you recall your testimony about the fact that the debtor has now prepared closing documents?

A I remember saying that one of our -- I told one of our lawyers get the paperworks together so that they -- they have them and they're available so, you know, we can expedite and get this done. I remember saying get those papers done. Yes, sir.

Q And that was after May 31st at 5:00 p.m., correct?

A I don't know when that was. Yeah, I don't know when that was done. But I know that at some point out of frustration, I said hey, just get them a set of documents so that they -- you know, everybody understands what needs to be done.

Q And please correct me if I'm wrong, but I understood your earlier testimony was that those were documents that the debtor believes are required?

A That's correct. Yes.

Q And I think you testified that those may be different than what HNGH believes is required, or what a buyer or financier, finance party might agree to?

A And I believe I also said the title company because --

Q Right.

A -- I want to be fair that everybody could have a view. At the end, when you have a closing, everybody has to agree. But yes, everybody could have a different set. That is correct.

Q So, Mr. Barton, you agree when those closing documents are prepared, they're typically subject to some review and negotiations?

A Yes.

Q Would you agree that it's important that comments to those documents should be promptly circulated then to facilitate a closing?

MR. RODRIGUEZ: Objection, Your Honor. Speculative, general question. Relevance.

THE COURT: Overruled.

THE WITNESS: I do believe that there's dialogue going back and forth. And the special warranty deed that was sent over signed is a good example. That was not negotiated.

There was no input, it was not correct.

And the process of dialogue going back and forth normally happens on if not all, most every document. It's a little bit tiring from an owner standpoint. But yes, all both sides, no disrespect to lawyers, you know, always have some comments going back and forth. That is a process of the closing.

BY MR. KANE:

Q Now, Mr. Barton, you also said in your testimony I believe that you never missed a closing. Do you recall that?

MR. RODRIGUEZ: Objection, Your Honor. Mischaracterizes the witness' testimony. He's attempting to mislead the witness, prohibited under Federal Rule of Evidence 403.

THE COURT: Overruled. He can answer whether or not he remembers.

THE WITNESS: Yeah. I don't know exactly what I said. But I pride myself on closing transactions. And I've done quite a bit, some harder and some easier. But yes, I do consider myself someone that gets it closed.

BY MR. KANE:

Q Okay. With that in mind, about how many voluntary bankruptcy proceedings have entities directly or indirectly controlled by you filed?

MR. RODRIGUEZ: Objection, Your Honor. Relevance,

harassing, prohibited by Federal Rule of Evidence 403. Irrelevant and no foundation.

THE COURT: Overruled.

THE WITNESS: Mr. Kane, we can get to the chase. You know the list is long. And even Judge Everett knows I get in and I get out. Every single case that I've gone into with -- in a voluntary bankruptcy, everybody's been paid every single dime, all their interest, even Happy State Bank. They got their penalty interest, they got their late fees interest, all their legal fees. So all of the cases.

We do come to the Court when predatory lenders and a COVID crisis came. A lot of our properties were wanted to be, you know, issues came up. We worked -- tried to work through them with lenders. Most lenders gave us forbearance. And the ones that didn't, that wanted the properties, we had to go through a process. And I am proud to say that many of those bankruptcies you'd like to list are actual new lenders of mine as we speak.

MR. KANE: Objection, non-responsive. Move to strike all testimony other than you know the list is long. I asked how many. I did not ask for a narrative.

THE COURT: I'll overrule that.

BY MR. KANE:

Q Mr. Barton, can you give me your best estimate of how many times entities that are directly or indirectly controlled by

you have been sued in relation to real estate transactions?

A Objection, Your Honor. Irrelevant, inadmissible, impermissible alleged bad acts-type evidence, and impermissible character evidence. Violates Federal Rule of Evidence 403. And harassing my witness.

THE COURT: Response?

MR. KANE: Your Honor, I think it goes to this debtor and Mr. Barton's litigious nature and history of failed closings, contrary to Mr. Barton's testimony.

THE COURT: Objection is overruled.

MR. RODRIGUEZ: Your Honor --

THE COURT: Objection is overruled.

MR. RODRIGUEZ: You can answer, I guess, if you know the answer about the number of lawsuits.

I'd ask the Court and Mr. Kane to take judicial notice using PACER or Lexus+ or Westlaw to get a firm number on the answer to this irrelevant, harassing question.

THE COURT: I've already overruled the objection. I've already overruled the objection. So your witness can answer.

THE WITNESS: I do not know the answer sitting here today, sir.

BY MR. KANE:

Q More than five?

MR. RODRIGUEZ: Objection, Your Honor. Asked and

answered.

THE COURT: Overruled.

THE WITNESS: Mr. Kane, you have the list. How many is it?

BY MR. KANE:

Q I'm asking you. I don't have the list.

A I don't know sitting here today, sir.

Q Now, I believe you've admitted that on October 1st, 2020, the debtor made no payment to satisfy the note, correct?

MR. RODRIGUEZ: Objection, Your Honor. Mischaracterizes the witness' testimony.

THE COURT: Overruled.

THE WITNESS: What was the date again, sir?

BY MR. KANE:

Q October 1st, 2020.

A I think you asked and I answered that. So --

Q Was the answer no?

A What I said is I don't believe that we were -- we were in default. There was litigation and I don't know whether there was extensions going on or what was going on in that time. So I don't know sitting here today.

MR. KANE: I'll pass the witness.

THE COURT: Ms. Lindauer?

MS. LINDAUER: Thank you, Your Honor.

MR. RODRIGUEZ: Your Honor, I'm sorry. Can I get a

bathroom break? Literally just, like, three minutes? I apologize. I drank too much Coke Zero.

THE COURT: That's fine. We'll take a short recess.

MS. LINDAUER: Thank you, Your Honor.

MR. RODRIGUEZ: Thank you, Your Honor.

(Recess at 2:10 p.m./Reconvened at 2:17 p.m.)

THE COURT: All right. We're back on the record. Ms. Lindauer?

MS. LINDAUER: Thank you, Your Honor. I've got everybody back now.

MR. RODRIGUEZ: I think you got to wait for Mr. Kane. Oh, there he is.

MS. LINDAUER: Oh, he is. Okay. I'm sorry. I'm sorry.

MR. RODRIGUEZ: Forgot about you, John.

MS. LINDAUER: May not have ever gotten everybody back.

MR. KANE: I'm not that easy to shake. It's okay.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q All right. Mr. Barton, I'm going to go back over -- and I'm not going to belabor some of these, but I am going to go back over a few things that Mr. Kane asked you about.

First of all, though, I want to ask you a few sort of background questions. You eluded to this, Mr. Barton. Can you

describe for the Court your education?
A I went to grammar school in St. Mary's, and then I went to Holy Cross High School. And that's the extent of my education.
Q And so no college degrees, no special certifications, none of that?
A No.
Q Okay. And what was your first job out of high school?
A I actually never worked for anybody in my life. I had a brother had a little cutting grass, and he got older. And so I started cutting grass for people, and painting houses. And I never worked for anyone.
Q Okay. How is it that you got involved in real estate like you are today, for example?
A There was three Jewish guys had some real estate, and I took care of all their maintenance. And then they taught me about sweat equity, and they taught me the business. And then I was able to make money that way and become a partner with them. And that's what started me.
Q How many years ago was that?
A Well, I started cutting their grass when I was 12.
Q How many years ago did you start working on the real estate with them?
A When I was 18.
Q And so, Mr. Barton, as you sit here today, other than just your own work experience, you have no specialized training in

real estate. Is that right?

A I have no formal training at all, architecture, engineer, building, I have an innate ability to find opportunities and make it happen.

Q All right. Mr. Kane asked you a lot of questions about what I would consider, I think you would consider fairly complicated legal documents. Is that right?

A I think the, you know, the -- what's going on is not that complicated. When you put it in all the documents, yes. There's a lot of ifs and thans and all a lot of details that make everybody comfortable for the paperwork. Yes, it gets complicated.

Q And, Mr. Barton, you have lawyers that help you. Is that right?

A I do.

Q Do you have county people that help you?

A Yes.

Q Okay. And you have business people that help you?

A I do have other advisors, yes.

Q And those people have law licenses and college degrees and things, and can advise you on looking at these types of papers?

A That is correct. What happens often is because I've done a lot of transactions, people believe that I've done them in the, you know, like a lawyer or, you know, through the whole process. But so they over-estimate some simple things that I

do have trouble with. I'm not perfect at everything. But that's where the miscommunication comes in.

Q Okay. Well, and the reason I brought that up is when you were answering some questions about for example the forbearance agreement that Mr. Kane asked you about, and he asked you to count the extended maturity date, is that something that you can easily do?

A I normally have somebody like Mark or somebody that's always with me, and they just do it. But if not, I have to get a calculator out. I have somehow lost some of the earlier skills of math, being fast at it. I'm not proud of that, but some of these smart devices make us stupid, and I can't do it in my head. And so I don't. I'm not that fast at it. I prefer to have a calculator.

Q Well, you understood under the forbearance agreement and the extensions that there of course was a deadline, a new extended maturity deadline.

A I understand deadlines.

Q Okay. All right.

A Very clearly. It's just that sometimes when they start asking, then I start --

Q Okay. And you understood that the deadline under the forbearance agreement --

MR. KANE: Objection, leading.

MS. LINDAUER: Okay. What did you --

THE COURT: Sustained.
BY MS. LINDAUER:
Q What did you understand, best of your knowledge, that the deadline under the forbearance agreement was for the extended maturity, if you know.
A The 29th of October.
Q Okay. So you knew that?
A Yes.
Q All right. And you knew what the deadline in this case under the orders were to come up with the payoff for HNG?
A Absolutely.
Q Okay. And that date was what?
A Payoff was on the 30th. It got extended. Like I said, I didn't see the paper. But everybody told me that it was extended to the 31st just for the payment as long as the 30th all the paperwork was done.
Q Now if I asked you, Mr. Barton, tell me what day is four months from today?
A I'd have to get a calculator and a calendar.
Q That's not something you could just do in your head?
A (No audible response)
Q Okay. So I didn't --
A I don't know why --
Q -- want the Judge to get the impression that you were trying to dodge those answers. You just don't have the ability

to do that.
A I'm not good at everything.
Q Okay.
A I get embarrassed by it and that makes it even worse.
Q All right. Mr. --
A And I don't want this thinking somebody's being disrespectful. Not to Mr. Kane.
Q All right. With regard to the Tall Ships transaction, Mr. Kane asked you some questions about that, there was some proposals going back and forth with regard to Tall Ships in the early part of 2021. Is that right?
A Yes. I believe that's correct.
Q Now, Tall Ships came back again during the bankruptcy case as a potential funder. Is that right?
A The have come back again several times. That is correct.
Q Okay. And that was a -- we saw some paperwork in this bankruptcy case with the name Tall Ships on it. Do you recall that?
A Yes.
Q And that was a potential funder that you had been working with during the bank case around the first of the year, maybe January/February of this year. Is that right?
A That is correct.
Q Okay.
A And they had a local investor here in town in Dallas that

was interested in going forward on the project.

Q Okay. And you made Mr. Kane aware of that potential funder. Is that right?

A You know, I believe they talked. I think their lawyers talked to Mr. Kane's lawyers. I think Mr. Walji was working with their lawyers. I didn't get too involved with them at that process.

Q Okay. But just to be clear, Mr. Barton, you have been working with various funders since the initial filing of this Chapter 11 case. Is that right?

A Yes. And again, you know, we have a lot of projects going on. So you're always talking to capital sources. And you're gauging what's going on in the market and making decisions accordingly.

Q Okay. Now, the last five sources of funds or lenders that we provided to the Court, that did not include Tall Ships. Is that right?

A That's correct.

Q Okay. So by May of 2022, Tall Ships was not a funder that you were working with any longer specifically on this project. Is that a fair statement?

A So I mean even up until a week ago, they're still asking. And they have, you know, wanted to work with Craig Hall (phonetic) as their --

MR. KANE: Objection, hearsay.

THE COURT: Sustained.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Kane asked you a lot about the length of time the closed transactions, and I just wanted to be clear from your testimony, Mr. Barton, that you're well-aware of the length of time that it does take to close various transactions. Correct?

A Yes.

Q And with regard to this transaction, you've been looking at sources of funds and sources of capital for quite a period of time. Is that right?

A Yes.

Q And we have provided to the Court sources of funds and capital, the source, the list of entities that you had narrowed down as to the entities that you were prepared to close with so that you could pay off HNGH. Fair enough?

A That is correct.

Q I think you mentioned that while you may not know exactly how you get there, you're always aware of deadlines. Is that right?

A Yes. I mean, they are what they are. And I think a lot of people fail to understand deadlines.

Q I mentioned this. I think we talked about this on your direct testimony but I want to just revisit for a second. The forbearance agreement was executed following the dismissal of

some pending litigation. Is that right? Do you remember that testimony?

MR. KANE: Objection, leading.

MS. LINDAUER: Your Honor, I'm doing more his background.

MR. KANE: I withdraw the objection.

BY MS. LINDAUER:

Q I'm sorry, you may want to state your answer again. Is that right? I'm sorry.

A You're going to have to repeat the question.

Q Okay. Well, the forbearance agreement came after the dismissal of some pending litigation. Is that correct?

A That is correct. Yes. Part of the consideration, yes.

Q Mr. Kane asked you about a couple of funding sources. One was identified as an entity called Liberty Bank which I think you mentioned in your deposition. What's the actual correct name of that entity?

A Liberty Life Insurance.

Q And Liberty Life Insurance is an entity here in Dallas, Texas. Is that correct?

A Yes, that's correct.

Q And do you know the manager or the owner of that business?

A I don't know the specific title of -- because I frankly never looked at it. But Brad Phillips is the controlling party of that Liberty and Life Insurance.

Q Okay. And Brad Phillips is the son of Gene Phillips. Is that right?

A Yes. Mr. Phillips passed, and that's his son.

Q Okay. And during the years, Mr. Barton, what was your relationship with a real estate developer/insurance person/ banking person named Gene Phillips?

A I had originally started out as a broker selling him real estate, and then became a developer on some of his projects, sold him some projects, bought some projects from him.

Q Okay. Do you have a close relationship with the Phillips family because of those relationships?

A Yes.

Q And Mr. Brad Phillips and his company have in fact provided financing to you in connection with --

MR. KANE: Objection, leading.

BY MS. LINDAUER:

Q Has Mr. Phillips and his company provided financing to you in the recent years?

A Yes.

Q And did Mr. Phillips' company provide financing to you in connection with a Chapter 11 bankruptcy case?

A Yes, he did.

Q Okay. And is that the one that you discussed where you paid off Happy State Bank?

A That is correct.

Q And so the funding for that bankruptcy case came from I think it's called Liberty Life Insurance?

A That is correct.

Q How long did it take you to close the loan with Liberty Life to pay off Happy State Bank?

A I believe it was less than 20 days. We had done quite a bit of work, you know, before we knew that we were going to get everybody agreed. So we kind of prepped it. So you know, if you look at that time of 10 or 15 days, plus the actual 20 days to close documents, that would be the total period.

Q And do you remember the name of that bankruptcy case?

A Well, it was Marine Creek, mentions Marine Creek.

Q Okay. And you remember what judge that was in front of?

A I feel like Mullins. Is that -- I'm --

Q Actually I believe it was Judge Morris.

A Morris.

Q Judge Morris?

A Yeah.

Q All right.

A Judge Morris.

Q All right. And in all that financing and those transactions are reflected as part of that Chapter 11 case. Is that right? We got court orders, we got motions, we got plans, all of that. Right?

A All of that was done I think in pretty efficient time.

And Happy State Bank, although they had their eyes set on the property, they ultimately took the payoff. And a few weeks later, they showed up here as this collateral lender. So I guess they like me.

Q I don't know about that, but anyway. Colliers, that entity, have you had a chance during the break to try to refresh your memory on who Colliers was?

A Yeah. I really don't know if that was a mistype. Or I think there is a brokerage firm, but it's not on the top of my list in my mind today.

Q Okay. You mentioned that you've also done some funding through an entity called Beal Bank. Is that right?

A Well, we haven't done anything with them in years. But Andy Beal, certainly one of the richest men in Texas, and we did chat with his Anthony Sassine which is his name that runs his debt side, the debt fund. So we did chat with him about this property. And when Andy saw me out in the town, he's asked several times about the project.

MR. KANE: Objection, hearsay.

THE COURT: Sustained.

BY MS. LINDAUER:

Q Beal Bank is not one of the five lenders on your list we provided to the Court. Is that correct?

A No.

Q And that would not have been one of the people that you

were looking to, in May of this year, to provide the take out money for HNGH. Is that right?

A Well, they're definitely the lender of last resort. And whatever that work that Mr. Kane was using I probably would apply, although I, you know, that's their business. There's no hiding it. They know what they are. But they are definitely a loan to own, and they just took over the JC Penny's deal on another friend of ours. So you know --

Q Okay.

A -- you've got to be careful if you do business with them.

Q Okay. Let me ask, just for the record, the word I think Mr. Kane was using was predacious.

A Yeah.

Q Okay. You position is that that's a word that could be used for them?

A I really don't know what it was. But I mean, he said it was a predatory. So you know, they -- but they don't hide it. You go to Beal Bank, you pay a lot of fees. If you have a problem, you're in trouble.

Q Okay. Mr. Barton, you testified briefly on questions asked by Mr. Kane about the guarantee case. And you answered some questions about that. That's a state court lawsuit, is that right, the guarantee case?

A I believe that's correct, state. Yes.

Q Okay. Do you know what motions, if any, have been filed

in that case by your side of the case to dismiss that case?
A Well, I'm confused there because I was pro se. And then when Mr. Kane was going to do sanctions and all that, I think Mr. -- is it Mr. Metzger? Well, I guess you can't answer for me. But I don't know today what the end result is. All this came up and we kind of took our eye off that ball.
Q Okay. The only reason I brought it up is I do have some notes that something had been set for a hearing in that case.
A Last I heard, there was a hearing. And I don't know if it's been missed or if it's coming up. I don't know.
Q And just to be clear, as we sit here today, as far as you understand, that matter is still pending in some sort of form or fashion. Is that right?
A I get asked by lenders every day what is it. So yes, it's still there.
Q Okay. I wrote this down, and I think this was a question Mr. Kane asked you. I wrote down never missed a closing. Do you recall that statement?
A I remember something like that, yes.
Q Okay. Is it your testimony to this Court that you have never missed a closing if everything had been ready to close?
A Yes.
Q And just so we're very clear with the Court, you were prepared to close on May 30th and May 31st if everything had been ready to close. Is that right?

A That's correct. If the orders were adhered to, the recision deed was in place, the promissory note was reinstated, and then to find out Happy State Bank was paid off, and the note was delivered, we were ready to push the button and fund and move on.

Q And just to be clear, Mr. Barton, you are still ready to push the button and fund and move on and keep this property. Is that right?

A We will be doing that. That is correct.

Q Okay. And so you're asking the Court to, in connection with these proceedings --

MR. KANE: Objection, leading.

BY MS. LINDAUER:

Q Okay. What are you -- are you asking for any relief from the Court today?

THE COURT: Sustained. You can ask --

MS. LINDAUER: I think I rephrased the question. I'll withdraw that question, Your Honor, and rephrase it.

BY MS. LINDAUER:

Q What relief, if any, are you asking for the Court, Mr. Barton, in connection with these proceedings?

A Vipin Nambiar, tell his friends and lawyers, everybody, take all those little pieces of paper that are required and I will take this heavy load of money, we'll go to the title company and exchange them like we're supposed to, like

honorable men. Show up with the papers, I'll show up with the money. That's all.

And it's so easy if he would just have done it just like the deed. He didn't have to file it. He could have waited ''til Monday. Just like now, he could have just delivered the papers. And if he doesn't believe me, then call my bluff, show up with all the papers. But he didn't show up with any, he didn't sign any.

So, yes, I would like the Court to do what Judge Hale said he was going to protect me and do, and the Court, and bring me back to where I was and let me pay my money. Let us go our separate ways. We're ready.

Q Mr. Barton, it's been about a month since the May 30th, 31st payoff deadline. Is that correct?

A I would say that's about right.

Q Okay. And you've heard Mr. Nambiar say that they've incurred costs of funds during that month. Are you aware of that?

A Yes.

Q If this Court required you to pay for any reason for the cost of funds in order for you to close, are you prepared to do that?

A We've always paid for the cost of funds. We've always paid what was agreed by both parties. It was in the interest of both of us. And you know, we offered to cover the costs.

It's about $100,000 to Happy State Bank. Yes, I did see the statement. And that's the cost of funds. And if he's got other costs, I'm not so inclined to -- for the legal costs, but --

Q Okay.

A -- for us to carry it.

Q And, Mr. Barton, you very much want to retain ownership of this property. Is that right?

A I have ownership of this property. And I do not plan on anything but getting Mr. Nambiar and his team paid as soon as they bring all the paperwork to the title company.

Q And you proposed in a supplemental motion that perhaps a third party could be appointed to call balls and strikes on the paperwork so that we could get this matter closed. Is that right?

A I think I'm the one that suggested if the Court would allow even --

MR. KANE: Your Honor, I have an objection. This is outside the scope of my cross-examination.

MR. RODRIGUEZ: I don't think so, Your Honor.

MR. KANE: This is not proper testimony.

MR. RODRIGUEZ: Mr. Kane was asking about other litigation and his litigiousness. And I think he's put into issue the bona fides of my client and his entities in this particular case. So I think it's very relevant. And frankly,

it offers the Court an avenue to get a real-world, business-minded solution to this case instead of continuing racking up attorneys fees.

THE COURT: So that question is beyond the scope of what we just heard a little while ago. But I have discretion and will allow the question. This proposal about a third party coming to call balls and strikes was requested in this case.

I think I gave my thoughts on that earlier, but I guess I haven't formally ruled on that. But at some point I will make a formal ruling on that request. So I will allow the question to go forward.

BY MS. LINDAUER:

Q Mr. Barton, a very simple question. Is that still part of the relief that you would like to see to occur in this case?

A It is. And Ambassador Sada Cumber who Nambiar came, all the lawyers know, has facilitated each and every process I would say is another good option. But whatever the process the Court wants us to go forward with so that they can be ready to accept payment, we're ready to work through it.

MS. LINDAUER: Your Honor, I'll pass the witness at this time.

MR. KANE: I have nothing further.

(Witness excused)

THE COURT: All right. I'm going to take a short recess in a minute. But before I take a recess and release

Mr. Barton, let me ask you, Ms. Lindauer, I'm aware of your two motions that are pending regarding the plan. And I purposefully have not yet set them. And I haven't yet decided when I'm going to set them.

But I believe you represented, could have been at this hearing or it could have been in those motions, that you are not going to require any additional evidence other than what was presented in connection with this hearing. Is that still correct?

MS. LINDAUER: That is still correct, Your Honor.

THE COURT: Okay. Take a little five-minute recess, please.

(Recess at 2:41 p.m./Reconvened at 2:48 p.m.)

THE COURT: All right. We are back on the record in the 2999TC Acquisitions case. Do we have everybody?

MS. LINDAUER: I think we -- well, we're missing Mr. Rodriguez. Was he on his --

UNIDENTIFIED SPEAKER: He's coming back.

MS. LINDAUER: Is he coming back? Okay. I think we're just missing that one person, Your Honor. I think he should be on his way back. Your Honor, I think we can go ahead and proceed. I'm sure he'll turn up in just a minute.

THE COURT: We'll wait.

MS. LINDAUER: Okay, thank you.

(Pause)

THE COURT: Okay. I think we have everybody back now, correct?

MS. LINDAUER: I think we do, Your Honor.

MR. RODRIGUEZ: Apologies, Judge. I got a call from my nine-year-old little girl Liana (phonetic) who is laying out my itinerary for the family this weekend for the 4th of July. So apologies.

THE COURT: Not a problem. I understand how that goes. So, Mr. Kane, you're finished with your questions. I don't have any questions of the witness. So Mr. Barton's excused from further testimony.

Does the reorganized debtor have any other witnesses?

MS. LINDAUER: Your Honor, I think you did offer us the opportunity to recall Mr. Dooley. So I think we do have him prepared to be recalled very briefly on his -- I think on some of his proffer points I think. So I think you did raise that issue. So we are prepared to that this afternoon, Your Honor.

And then we still do have the one issue of some questions for Mr. Kane as they relate to some of the transactions here. And I think that would be, barring my memory, I think that's the last two things, Your Honor, on our list.

MR. RODRIGUEZ: I'm sorry. Apologies. Maybe just one more, Your Honor. If the declaration for Randy Marx is not

going to be admitted and considered as part of the record, I thought the Court had already ruled that it was going to be. But I understand there's a motion.

If there's a danger or threat of that, I guess because of inability to cross again, then we would also like to call Randy Marx very briefly to provide that clarifying and amplifying testimony so the Court has a correct decisional record going forward. I understand Mr. Kane doesn't like the declaration approach, but that would be another witness, Your Honor. Thank you.

THE COURT: So let me start with Mr. Dooley. When do you expect him to be prepared?

MS. LINDAUER: Your Honor, we've already contacted him. I think we can have him in about five minutes, Your Honor, so we can use our time this afternoon if you'd like.

THE COURT: And then with respect to Mr. Kane, tell me your proposed subjects of inquiry of Mr. Kane.

MS. LINDAUER: Okay. Your Honor, first of all, I think the discussions regarding Happy State Bank have been put at issue. So that's one subject.

THE COURT: Can you be more specific?

MS. LINDAUER: I think the representations that were made by Mr. Kane to Mr. Walji, and I believe myself also, that Happy State Bank was not involved in this transaction. And when those representations were made to Mr. Walji in

particular, but also to myself, I think we were in the same -- yeah. So those specific communications regarding Happy State Bank, and I think those have already been sort of eluded to already, are an issue.

THE COURT: So Mr. Kane's representations to Mr. Walji and to yourself. Are those -- is that it?

MS. LINDAUER: I believe those are the only people that those representations were made to.

THE COURT: Okay. What else?

MS. LINDAUER: Okay. Second of all, Your Honor, the document delivery dates, in particular the delivery of the special warranty deed I think becomes an issue because --

THE COURT: What's your specific proposed questions that aren't -- are they questions that can be answered by looking at the dates of the emails? And if not, what questions do you intend to ask Mr. Kane that you cannot determine by looking at the documentary evidence including the emails of the drafts going back and forth?

MS. LINDAUER: Okay. And, Your Honor, I think again the issues regarding -- I think you might have hit on part of it right there which is the drafts of the various documents going back and forth a couple of days either before or right prior to closing. Also, the --

THE COURT: So my -- that was a question though.

MS. LINDAUER: Oh, I'm sorry.

THE COURT: My question is what questions do you have of Mr. Kane that are not already answered by looking at the dates of the emails going back and forth between the parties?

MS. LINDAUER: Okay. And then, Your Honor, there would not just be the communications via email. There would also be any discussions between the parties that were going back and forth during those periods of time.

THE COURT: I'm -- so your request to put Mr. Kane on the stand is a little unusual. So I'm asking you to be more specific --

MS. LINDAUER: Sure.

THE COURT: -- in your -- so you've identified specifically the representations that Mr. Kane made to Mr. Walji and to yourself.

MS. LINDAUER: Right.

THE COURT: That was the first category. I mean, we're going to go in buckets again.

MS. LINDAUER: Okay.

THE COURT: And I want to take really good notes.

MS. LINDAUER: Okay. The second bucket, Your Honor --

THE COURT: Second category you said document delivery dates.

MS. LINDAUER: Well --

THE COURT: And when I hear document delivery dates,

that to me that sounds like something that can be determined by looking at the emails. So, Ms. Lindauer, the question is what are the inquiries on document delivery dates do you need to ask Mr. Kane about that you can't get from looking at the emails?

MS. LINDAUER: Okay. So, Your Honor, any specific conversations between Mr. Kane, myself, Mr. Walji, and Ms. Blakeley regarding documents that were to be delivered during the two or three, well probably more than that, probably the two weeks before the actual closing date, and what was being discussed.

These aren't attorney/client communications, these are with third parties. What was being discussed with regard to those various documents. And the one that comes to mind in my mind the most is the email that Mr. Kane sent to Julie Blakeley saying that this was a rather unusual closing and questions about that email and the information being provided in that particular email.

Also along that same line --

THE COURT: Let me stop you. Let me stop you.

MS. LINDAUER: Okay.

THE COURT: So conversations --

MS. LINDAUER: So Julie Blakeley --

THE COURT: Conversations between Mr. Kane and Ms. Blakeley?

MS. LINDAUER: Correct.

THE COURT: Just a minute.

MS. LINDAUER: So that's one bucket is I would call the Happy State Bank bucket.

THE COURT: Conversations between Mr. Kane and yourself?

MS. LINDAUER: Well, only as to conversations that would not be reflected in emails with regard to preparation of various documents for closing and transmittal of those documents. Correct. And also Mr. -- not so much because I wasn't the only one that was working on this side. It would also be with Mr. Walji as well because he was involved in a number of those conversations.

THE COURT: So specific conversations between Mr. Kane and Mr. Blakeley. Ms. Blakeley.

MS. LINDAUER: Right.

THE COURT: Mr. Kane and yourself.

MS. LINDAUER: Right.

THE COURT: And Mr. Kane and Mr. Walji regarding documents that were to be delivered at closing?

MS. LINDAUER: Yes, sir.

THE COURT: Anything else?

MS. LINDAUER: Yeah. Then also communications with Sendera Title, between Mr. Kane and Julie Lissey with Sendera Title, and again, I --

THE COURT: Hold on.

MS. LINDAUER: -- was not --

THE COURT: Just a minute.

MS. LINDAUER: -- privy to all --

THE COURT: Just a minute. Just a minute, please.

MS. LINDAUER: Sorry.

THE COURT: I'm taking notes.

MS. LINDAUER: Okay.

MR. KANE: Mr. Dooley, do you mind putting yourself on mute for a bit?

THE COURT: So I'm looking at the witness and exhibit lists that were filed. Was the Sendera representative Julie, how do you pronounce her last name?

MS. LINDAUER: It's Lissey, I believe. It's L-Y-S-S-E-Y.

THE COURT: Was she on anybody's witness and exhibit list?

MS. LINDAUER: I don't believe so, Your Honor. I believe the person that was on the exhibit and witness list was a gentleman named Mr. is it Blanchard (phonetic) I think. And he I believe also is with Sendera Title.

THE COURT: Well I was told at the very beginning of the hearing according to my notes that he was not going to be called as a witness.

MS. LINDAUER: No, he's not going to be called. You asked about who was on the list. Bob Blanchard was on our

list. I believe he is -- and I may be wrong on this. I understood, I believe he was connected with Sendera Title.

UNIDENTIFIED SPEAKER: No.

MS. LINDAUER: Is he not?

UNIDENTIFIED SPEAKER: No.

MS. LINDAUER: Okay. I'm sorry. I misspoke on that. Okay. Okay. No, I think actually I misspoke. I think the gentleman Paul Pruitt who I think appeared in some emails after the hearing started as a potential witness is with Sendera Title.

MR. KANE: He was never listed, I don't believe.

MS. LINDAUER: No, he was not. He was not on the list. He was just provided in emails as a potential rebuttal witness that Mr. Kane said that he might call.

THE COURT: I understand. I was trying to get confirmation that nobody from Sendera was on anybody's witness and exhibit list. Is that correct?

MR. KANE: That is correct.

MS. LINDAUER: That is correct, Your Honor.

THE COURT: Okay. Just a minute. So I have first bucket was Kane/Blakeley communications. The second bucket is Kane/Joyce Lindauer communications. The third bucket is Kane/Walji communications. Fourth bucket is Kane/Sendera, Julie Lyssey communications. What other buckets are there?

MS. LINDAUER: And then, Your Honor, I think the last

bucket the way you're sorting it would potentially be Nate Christensen/Kane communications.

THE COURT: And why wouldn't -- well, what kind of questions are you intending to ask?

MS. LINDAUER: Well, I think Mr. Christensen indicated on multiple occasions that there were matters related to the closing that he was not handling, that those were being handled by outside counsel which was Mr. Kane and his firm. And questions regarding particularly the closing documents and mechanics, I think Mr. Christensen was very clear were all being handled by Mr. Kane and his firm.

So again, it would go to the closing documents and mechanics. But again, it would be the stemming off of the questions to Mr. Christensen regarding some of those matters. And --

THE COURT: The specific question is you said you wanted to ask about communications between Mr. Kane and Mr. Christensen who is his client, correct?

MS. LINDAUER: Well, yes. I would say inside counsel for his client. But correct.

THE COURT: Where the attorney/client privilege would apply, correct?

MS. LINDAUER: Well, I don't believe Mr. Christensen every raised attorney/client privilege. Yeah, well but I don't think that that privilege was raised by Mr. Christensen when he

said that that was a matter that was being handled by Mr. Kane or his firm.

THE COURT: But I'm asking you, I'm asking you what type of questions do you plan to ask Mr. Kane about his conversations with Mr. Christensen.

MS. LINDAUER: Well first of all, was his firm the primary persons or business that was to handle the closing documents that were being drafted for the closing to occur on May 30th or 31st.

THE COURT: So you want to ask is Kane Russell Coleman and Logan the primary firm for the lender on this deal?

MS. LINDAUER: No. Was it the primary lender -- no. Primary firm for -- not -- more narrow than that, Your Honor. Primary firm for handling the actual preparation of the documents that were supposed to be delivered by HNGH on May 30th and 31st.

And then Mr. Kane told us in phone conversations and emails that he had authorized several attorneys in his firm to work on the closing documents of I think he said three or four real estate attorneys had been brought in to work on the closing documents I believe it was on May 30th to assist with the closing documents.

And my question would be what documents were those attorneys working on to prepare for the closing on May 30th, and what documents were being drafted on May 30th that hadn't

already been drafted in previously. And then why were none of those documents delivered to Sendera Title or anyone signed and executed for filing. And those were all questions that I believe Mr. Nambiar and Mr. Christensen specifically referred to their outside counsel, Mr. Kane's firm.

So again, it's going into, Your Honor, basically I think really, and you know, again, some of this may be able to be handled with stipulations. But --

THE COURT: Let's attempt that because I'm concerned about your attempt to call Mr. Kane.

MS. LINDAUER: Sure.

THE COURT: So let's do it right now.

MS. LINDAUER: Okay.

THE COURT: You want to know who was preparing the documents. And, Mr. Kane, I don't mean to put you on the spot. We can address this some other way. Well, before we do that, before we do that, let's go through the rest of the buckets. Is there anything else that you want to ask Mr. Kane regarding the communications between Mr. Kane and Mr. Christensen because what you're telling me is it doesn't sound like those are the communications, that's not the information you want.

MS. LINDAUER: Well, I think, Your Honor, and maybe I misstated that, wasn't as clear as I should have been. It's the issues that come out of the testimony of Mr. Christensen with regard to the actual preparation of the documents.

I know Mr. Christensen said, I don't have his transcript in front of me, said on many occasions that the documents were being handled as far as preparation and delivery by outside counsel, which I understood to be Mr. Kane's law firm.

And so the question that I have in my mind is when Mr. Nambiar says that he instructed everybody to go pens down, I wrote that down several times, was that Mr. Kane's firm that went pens down, was that Mr. Christensen that went pens down, was that everybody that went -- who went pens down at that point. And what had actually been done at the point that they went pens down as far as drafting documents to close this deal on May 30th or 31st.

And so again, Your Honor, and you've got to remember, we're doing these hearings without any discovery, without any depositions, without anything, a little in the blind. And so again, just trying to figure out what happened. Why did the wheels fall off on May 31st and this transaction not close.

I understand some of the issues with the documents. I understand that. But it appears to us that the documents, a lot of them just never got done or never went anywhere or never got signed and delivered. And I guess we're still trying to understand why that happened.

THE COURT: And I guess based on what you've told me so far, I'm struggling to see anything that wouldn't be covered

by either the attorney/client privilege or work product.

MS. LINDAUER: Well, Your Honor, I think that the door has been opened. And maybe those will be the answers to the question. You don't have a right to know those answers. That is attorney/client privilege. And if that's what they assert to answer those questions, that's fine. That will be part of the record, Your Honor.

But again, I think we'd like to ask the questions of what happened when allegedly everybody went pens down, what exactly does that mean. And if Mr. Kane says I can't answer those questions because that's attorney/client privilege, then that in and of itself, Your Honor, is an answer.

So I don't have that answer. And if that's what they want to say, if they want to stand on attorney/client privilege for their defense to not providing documents as part of this closing, I am more than happy to accept that response. But I don't even have that. So if that's the defense that they want to assert, we'll hear it.

But again, Your Honor, this is a $40 million matter. And I do appreciate all the time that you've given to it. And but at the same time, we have an obligation to make the very best record for our client as Mr. Kane does for his client. And if either side elects to appeal this depending on what the ruling may or may not be, we want to have as complete a record as possible on what actually transpired on May 30th and 31st.

I know what happened on our side. I know what happened with regard to our side of the case. I do not know what happened to their side of the case. I do not know why documents were not sent to Sendera. And I do not know why we did not get documents responsive for this closing. And you know it's our position that we believe they breached first. I don't know how you're going to come out on that issue.

But at the end of the day, I think that what happened those two days is incredibly relevant to your making a final decision here. And so, Your Honor, that is why. And the only people that know the answer to some of those questions are myself and Mr. Kane and his lawyers.

So again, and that's why we wanted to ask some of those questions. And I've given you the buckets that I think they fall into. And that's why we asked to take Mr. Kane and ask him some questions. And I understand attorney/client privilege. And I understand that he can assert that.

MR. RODRIGUEZ: Your Honor, let me speak to that. Having worked with Professor Walkowiak on the ABA treatise attorney/client privilege for many years, kind of putting the cart before the horse. At the outset of these proceedings, you'll recall Mr. Kane using words like a lack of good faith, bad faith, impugning the intentions of my clients in these overall transactions.

And I think, Your Honor, A, by bringing this motion

to enforce in making these kinds of allegations, HN --

MS. LINDAUER: Time out. I heard time out. I saw time out. I think he might have lost the audio.

Can you hear me? Okay. So I'm not sure, Rey, why you're not coming through. Maybe you need to scoot over.

Oh, okay. You can hear us. I got it. Okay. Sure.

(Pause)

THE COURT: Okay. Can anybody hear me?

MR. KANE: Yes, Your Honor.

THE COURT: All right. So I don't know what happened, but I heard Ms. Lindauer say that this was a very important matter and you weren't sure how I was going to rule in the appeal, and then all of a sudden I couldn't hear. So I can see Mr. Rodriguez talking. I don't have a clue what he said.

And, Ms. Smith, was any of that recorded? Because I didn't hear any of it.

Okay. So I was just trying to go through the buckets of categories and I'm going to let Mr. Kane respond to see if he objects or doesn't object, but I was trying to get some feel for what the categories of questions that were going to be asked. Ms. Lindauer was talking about how important this matter was, so why don't you pick up from there because I didn't hear anything after that.

MS. LINDAUER: Okay. Your Honor, I think I had ended

the buckets of categories and I think that Mr. Rodriguez was addressing the issue regarding attorney-client privilege that the Court had raised as an issue in asking an attorney in the case to testify.

THE COURT: So I guess I probably should have waited to see what Mr. Kane's response is on that. So if those are all of the buckets before --

MR. RODRIGUEZ: One bucket, Your Honor. I'm sorry.

THE COURT: Go ahead.

MR. RODRIGUEZ: Yes. One bucket I'd like to add is Mr. Kane has filed a declaration. He's represented to this Court that he is the custodian of records for the Kane Russell Law Firm. He has represented to this Court that his provision of simple hard copy images, PDF images, of parts of email communications are the way that the records are ordinarily kept at Kane Russell.

We have seen from Mr. Kane's ability with great facility and great speed to pull up any document he wants to electronically in Word form with exhibits. We know that that declaration is incorrect. There is not a warehouse with thousands of hard copies of just emails without attachments. We know that there is not an individual saving of PDF pages without attachments. It's not searchable, signs, any kind of metadata.

So we have a right, Your Honor, to examine him on

that declaration. It goes also to the motion, request, objection, whatever you want to call it, Your Honor, for my client to have access to the actual documents in data form, to have access to the complete information that is currently before the Court.

Because facially, I know people are moving fast and trying to get things proved up, but there is no way that Mr. Kane is the official custodian of records for his firm. And we've seen that those records are not maintained the way they've been produced to this Court and served on these parties. So we've got a right to examine that relative to privilege. Let me just say this, Your Honor.

THE COURT: Well, before you go there -- I'm sorry. Before you go there, I really should have let Mr. Kane respond to the objections to see if that's a concern of his or not. So, before you go there, if you've listed all the buckets, I first want to hear from Mr. Kane preferably by bucket, but you can address these in whatever order you'd like, Mr. Kane.

MR. KANE: I'm sorry. Yeah. Your Honor, I was struggling with the which buckets were what. They seemed like they were moving targets. If you'd like to go by the buckets that you have written down, I'll address each one in turn, Your Honor. That might be --

THE COURT: You can address them however you'd like. I was just taking notes for myself, but you can address them

however you'd like.

MR. KANE: Okay. Well, I'm afraid I may have missed some. But conversations between me and Walji. Mr. Walji was a fact witness for the debtor who could have testified about conversations between me and him and did testify as a fact witness on behalf of the debtor about conversations between me and him.

So I don't understand exactly what I would be called for. And I'm trying to be careful here about whether I'm being called as a rebuttal witness for a limited scope of rebutting HNGH's case-in-chief items or if I am being called as a broad fact witness despite not being on a witness and exhibit list prior to the close of HNGH's case-in-chief. But on the Walji front, it's totally unnecessary. They were able to elicit the testimony that they sought from their own fact witness.

Conversations with Ms. Lindauer. Ms. Lindauer could equally be a fact witness to testify about the conversations between me and her. She is a representative as counsel for the debtor. She has multiple co-counsel who have been active participants in this case who could have had her take the stand to testify as a fact witness about the conversations that she is seeking information about. So I would again say that this is completely unnecessary, especially in light of the timing of the request to include me as a witness.

Conversations between me and Nate Christensen about

documents is certainly attorney-client privilege. Whether certain documents were produced and to who they were produced is found in evidence that was agreed to -- at least the admissibility of it was agreed to for various purposes -- in about 99 different exhibits submitted in HNGH's case-in-chief.

Ms. Lindauer can draw any inferences she wants in closing argument if there is a lack of evidence on behalf of HNGH regarding the submission of documents. And in various arguments to the Court, I believe she's already done that on a number of different occasions.

And I'm sorry. Help me remember the rest of the buckets, Ms. Lindauer, or Your Honor.

MS. LINDAUER: Happy State Bank.

THE COURT: I have --

MS. LINDAUER: The Happy State Bank bucket.

MR. KANE: Right. Conversations between me and Julie Blakeley. Julie Blakeley was called as a fact witness. She could have been questioned as an adverse witness called specifically by the debtor about her understanding of correspondence with me. So I think that the debtor has already had ample opportunity to develop that. And if it has failed to do and is seeking a second bite at the apple, that's inappropriate under the circumstances.

Questions about whether Kane Russell Coleman & Logan was the law firm that HNGH was using for this closing, Mr.

Christensen testified that while they had previously used Wick Phillips, they used Kane Russell Coleman & Logan during this bankruptcy representation and during closing. So I think that that testimony has already been elicited. They had an opportunity to develop that with Mr. Christensen on the stand. He has been released. So I'm trying to figure out what, if any, buckets did I miss.

MS. LINDAUER: Sendera Title. That's another bucket.

MR. KANE: Right. So I'll attest to this Court right now that I had no independent phone calls with Julie Lissey. And that I do not believe that I had any emails with Julie Lissey that are not already submitted in our witness and exhibit list. To the extent that I did, the debtor could have called, and chose not to, a representative of Sendera as a witness. Frankly, Your Honor, we think that's telling.

MS. LINDAUER: Record custodian, Mr. Kane. That was another category.

MR. KANE: Thank you.

The records custodian argument is a strawman argument repeatedly asserted by Mr. Rodriguez. There is not a single document in evidence that has been admitted in evidence as a business record. If it would make Mr. Rodriguez happier, I am happy to simply withdraw the business records affidavit as it is irrelevant to these proceedings.

THE COURT: Brief response, Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

I hear what Mr. Kane is saying, and he is really honestly, Your Honor, sort of missing the point. The fact that we have some I think 70 emails from Mr. Kane, no one else, just Mr. Kane, that are made part of this record. I look at their exhibit and witness list. There are some 70 emails that bear his name on them where he was sending to or receiving -- primarily sending. Those emails -- and not all of them, Your Honor, but clearly are emails that are at issue in these proceedings. I don't think I have to accept them for the truth of the matter set forth therein.

I have the right to ask questions about what was -- and those go into these buckets, but I'm telling you why Mr. Kane is a witness is by putting all of those emails into evidence, which he did. And if you remember, we had all kinds of issues about whether they were being admitted for limited purposes of notice only or for what purpose they were coming in for. But by putting those in evidence in these proceedings, Your Honor, I think it does open the door for us to ask him questions about -- I don't have to accept as true what he says in an email.

And so, Your Honor, I have the right -- and if there had been discovery in these proceedings, obviously we would have deposed somebody regarding those emails. But, Your Honor, that's the source documents for a lot of these buckets, if you

will, is what is in those emails. The fact that Julie Lissey received an email from John Kane about this being an odd transaction, that's not Julie Lissey saying that. That's John Kane saying that.

MR. KANE: You mean Julie Blakeley. Just I think the record is right here.

MS. LINDAUER: I'm sorry. But, Your Honor, I have the opportunity to ask Mr. Kane about that email and what he meant. Otherwise, I'm being handcuffed to accept that what he put in that email somehow is true, properly states the facts that were occurring at the time, that in fact that email was sent on the day that it reflects it was sent on and at the time.

Let me give you another example. He sends the --

THE COURT: Well, can you give me an example of an email that was admitted for all purposes that you're concerned about something --

MS. LINDAUER: I think the --

THE COURT: -- aside from the truth of the matter asserted.

MS. LINDAUER: I believe that one with Julie Blakeley ultimately was admitted, Your Honor, for the truth of the matter asserted.

THE COURT: What's the -- what's the exhibit number?

MS. LINDAUER: That's what I was just looking for,

Your Honor.

MR. KANE: It's Lender's Exhibit 54 and 54A.

MS. LINDAUER: Yes. If you look at Exhibit 54, Your Honor, if you have it up. That's an email specifically to Julie Blakeley from John Kane dated May 26, 6:54 p.m. You'll notice that I'm not on that email. Mr. Walji is not on that email. No one from the debtor is on that email. And it's specifically from Mr. Kane to Julie. I should like to have an opportunity to ask questions about that particular email. In particular, we would like Happy State Bank to agree to rescind the collateral transfer of note and lien, the rescission filing, et cetera, et cetera.

I mean, obviously I think that asking him some specific questions about that email is probative in connection with these proceedings. And therefore, because it's from Mr. Kane. It's not from his client. It's from him. What was intended with regard to this particular email. And this is just one example, Your Honor, but.

THE COURT: How many? How many do you have?

MS. LINDAUER: Of those? Well, like I told you, I think there's about -- I'm not going to ask about all of them. I'll have to narrow it down, but I think there's probably 50 emails. I said 70. There may be 50 from Mr. Kane to someone, but there's probably ten that we would like to ask questions about. It will take me a few minutes to identify all of those.

I can't -- I don't think I could do it -- I'm not that good that I can do it that quickly, but I think I can narrow it down pretty quick what was going on here.

And again, I'm just flipping through these emails. And I will tell you that the majority of them I'm flipping through are from Mr. Kane. Another perfect example is why did Mr. Kane send us wire instructions after a wire cutoff at a bank? And maybe he says he did not -- he didn't know that was the wire cutoff, but again, that's a question to Mr. Kane. He is the only one that will know the answer to that question.

THE COURT: So I'm looking at -- I'm just looking at the -- I was reading the email that you gave as an example.

MS. LINDAUER: Sure.

THE COURT: Which statements in here are you concerned about the truth of the matter asserted? Is it just the sentence that says, this is a funky closing?

MS. LINDAUER: Well, that would be a good start. What did you mean by, this is a funky closing to say the least?

THE COURT: Anything else?

MS. LINDAUER: And why did he -- why did he say that? Yeah. What did he mean by funky closing to say the least?

THE COURT: What other statements in this email do you have concerns about that they were admitted for the truth of the matter asserted?

MS. LINDAUER: Okay. So next would be the deed in

lieu would have satisfied the note, but because of the bankruptcy filing and case settlements through agreed orders, the debtor can still reinstate the note, and in essence, buy back the property through a payoff. What did he mean by that? What was going to be -- what was his statement with regard to the reinstatement of the note? What was he proposing that Happy State Bank do with regard to reinstatement of the note?

THE COURT: Okay. And you don't --

MS. LINDAUER: And then he said -- and then he said, the debtor is marching in the direction. What is marching in the direction in that email mean? What is that? Marching in the direction of what? Of closing, of funding, of -- and again, May 26th. At closing the following has to occur. These are his statements. Funding of the payoff amount into escrow, filing of a rescission deed revesting [sic] the property, reinstatement of the note, security deed of trust, release of payoff to HNGH.

So he outlines for you right there what -- at least what he says are the requirements for closing. Where do those requirements come from? Why were they listed in this letter? Why are you telling Ms. Blakeley that these are the requirements for closing. But title --

THE COURT: Okay. As to this -- as to -- well, go ahead. Are there any other statements in here?

MS. LINDAUER: Yeah. I mean, well, the title company

is struggling with a hitch. What does that mean? What hitch was the title company struggling with? Well, then he goes on to say on December 2nd, HNGH collaterally assigned its note and lien to Happy State Bank via the attached document. Okay. So is that -- what's the hitch that the title company had with regard to the collateral assignment of note and lien?

He acknowledged on May 26th there was an issue that was being caused by the Happy State Bank collateral assignment of note and lien. And then he goes on to say, we would like Happy State Bank to agree to rescind the collateral transfer of note and lien. He didn't say release the collateral assignment of note and lien. He said rescind the collateral transfer of note and lien. That's a little different. If you're just rescinding it, then that's different than releasing based on a payoff. So I don't know what he meant by that, but he asked them to rescind, not release.

And so again, Your Honor, I think there are -- and the only person that can answer those questions is not Julie Blakeley. It's John Kane. And so --

THE COURT: So are these -- are these representative of the types of questions that you want to ask Mr. Kane?

MS. LINDAUER: I think as they relate, yes.

THE COURT: Okay.

MS. LINDAUER: I would say that that's a fair summary, Your Honor.

THE COURT: So this --

MS. LINDAUER: And again, I'm going into -- I'm going -- wait a minute. And, Your Honor, I'm going into a lot more detail line by line in this email than I think I would actually go into with Mr. Kane, but I'm using this as an example for your purposes to understand why we would want to ask him these questions.

So, again, it's just for us to have an understanding of what was going on here. I think you understand a lot of these issues that everybody is struggling with. But again, I don't want to say that that's all I would ask him, but I also don't want to tell you that I'm going to ask him that many questions either. I just want you to understand that those are the reasons that we want to ask some questions if that's fair.

THE COURT: Okay. Mr. Kane, why don't you respond to this as a potentially representative sample of the questions? Why don't you respond?

MR. KANE: Yeah. I think that this is a document that's already been admitted by agreement for the truth of the matter asserted. So, I mean, I think that the answers to Ms. Lindauer's question are largely included within that document.

To the extent that, you know, why does it say rescission instead of release, I think that those are inferences that Ms. Lindauer can make as an advocate for her client one way or another on closing argument.

And I would further say, Your Honor, if I'm being called as a rebuttal witness, I'm not exactly going to be rebutting. I think Ms. Lindauer is seeking clarifying statements, which would again go to the debtor seeking to call me as an exclusively fact witness despite not including me as a witness on their witness and exhibit list in a timely fashion prior to the close of our case-in-chief.

MS. LINDAUER: And, Your Honor, if I could address that point. We did file a supplemental witness list right after I think these hearings started and did include Mr. Kane on our list. Again, and you're well aware, this was set on an expedited basis. We did not have normal notice and opportunity in connection with these hearings. This was set on short notice, which you have already pointed out, we did agree to as an accommodation to Mr. Kane. But we didn't give up, Your Honor, all of our procedural rights in doing that.

And so, Your Honor, I think the fact that witnesses may be added from time to time -- perfect example, Mr. Fleeger. I appreciate Mr. Kane not objecting to having Mr. Fleeger testify. We did call him as a, I think, rebuttal witness. And we did -- and he was not on anybody's exhibit or witness list, and he did testify.

Mr. Kane has known, I think, since probably day two of these hearings that there were some issues with regard to a number of the issues that he was involved with, and therefore,

that he would potentially be called as a witness. I'm not sure what Mr. Kane is asking you to do is to draw negative inferences from the fact that he won't testify.

I don't understand that. I mean, if that's what he's saying. He's saying, well, you can argue it in closing. I don't know what that means as far as arguing that we asked to call a witness. He happens to be an attorney, but he also happens to be the businessperson that was transacting these documents and these communications and that we have some questions for him.

So, again, I think I -- yeah. I identified the buckets for you, Your Honor. We've had this issue pending for quite some time. And so, Your Honor, I do still request that we be given the opportunity to ask some questions of Mr. Kane as it relates to the issues that I've brought before the Court, so.

MR. KANE: So, Your Honor, maybe a proposal here is enforce -- you know, if you are inclined to have me testify, that their stipulation that I will not be disqualified remains in place. And since I am flying solo during the entirety of these hearings, that I have the opportunity to raise objections on the stand and that I have the opportunity to rehabilitate myself with narrative testimony following the conclusion of their questioning.

MS. LINDAUER: Well, Your Honor, Mr. Kane is part of

a pretty large law firm in Dallas. And I think there -- hang on, guys. I think you've got other lawyers that are listening in on these proceedings too. Charles Astor, I think is with your firm. He is on.

MR. KANE: He is not a litigator.

MS. LINDAUER: Well, I understand that, Mr. Kane, but you do have lawyers in your firm that could --

THE COURT: Well, Ms. Lindauer, I'm going to start with you.

MS. LINDAUER: Okay.

THE COURT: And I'm not indicating one way or the other whether I'm inclined to allow Mr. Kane to get on the stand or not.

MS. LINDAUER: Right.

THE COURT: Before I decide that and it's -- before I decide, I want Ms. Lindauer's response to Mr. Kane's last suggestion.

MS. LINDAUER: Well, okay. So, Your Honor, I think part of that would be fine.

First of all, if he doesn't want to have representation during questioning, that's his election, right. That's fine. He can make that decision. Second, I think -- I'm trying to remember the three points. The only one I think I had an issue was with the last one, which was his ability to have a narrative response to the questioning that's been made.

I don't think I've seen that. Normally it's we handle this question and answer. So I don't know that a narrative response is appropriate. I think it --

THE COURT: So what you're suggesting though is you want to put him on the stand. And as I understood, what Mr. Kane was suggesting is after the Q&A rather than have an attorney from his firm who has not been in this case the whole time, rather than having to prepare another lawyer to come in and provide questions and answers to Mr. Kane, that he would basically Q&A himself. Is that kind of -- not in Q&A form, but that Mr. Kane would be able to testify after you're done with the questions and answers.

Is that kind of what I'm hearing, Mr. Kane?

MR. KANE: Yes, Your Honor. That's correct.

THE COURT: So, Ms. Lindauer, I would like your response to that suggestion.

MS. LINDAUER: Your Honor, if that's the way we can handle this, we'll accept that so long as we're clear that narrative testimony, of course, that we can launch objections throughout that. Well, yeah, obviously, and the potential for redirect obviously. It would be a normal witness questioning. So if he wants to do his cross in a narrative fashion, that's what I'm hearing. You want to do your cross in the narrative. Then that's fine, Your Honor. And then, of course, we would have the ability to redirect.

Your Honor, I would like to make this very simple. I don't want it to be super complicated. I don't want to spend hours with Mr. Kane. I think, again, we can focus our questions and buckets pretty narrowly to some specific categories, as I mentioned. And so that's fine. If he's willing to do it that way, we'll accept that if -- assuming the Court does -- as a means for dealing with this issue.

THE COURT: Okay. I'm not going to rule on this right now. I wanted to get everybody's arguments. I do -- let me ask you this. We're going to have to stop at 4:30 today. Are you going to have time to put Mr. Dooley on the stand today?

MS. LINDAUER: Your Honor, I've got to -- is he logged in here? I don't know if he's -- there he is.

MR. KANE: He's on.

MS. LINDAUER: He's up in the corner. Yeah.

Mr. Dooley, are you available to testify for the next 30 minutes or so? Let me make sure he's available. We had some problems with his equipment before.

MR. KANE: I think you may need to hit star six. I think he was using his phone early, not picking up any volume.

THE COURT: I can't hear Mr. Dooley. I hear a clicking noise. Is that just me?

MR. KANE: No. We're hearing that as well.

MS. LINDAUER: Your Honor, I think rather than maybe

trying to work through this with Mr. Dooley, if we could just adjourn and talk about a date to complete this.

THE COURT: I'd kind of like to -- he's here. It looks like he is available. We have 40 minutes, so.

MS. LINDAUER: Okay. Well, if we can figure out a way to get him I'm happy to use that time, so.

THE COURT: Let's work on it.

MS. LINDAUER: Okay.

THE COURT: I'm going to put myself on mute.

MS. LINDAUER: Okay. Thank you, Your Honor.

THE COURT: And, Ms. Smith, are you there? I can't hear Mr. Dooley, but I hear a loud clicking noise.

(Pause)

THE COURT: Should we -- I don't know. When I call the help desk they say reboot and check the connections. Should we ask Mr. Dooley to hang up and try it again or disconnect and try it again?

Why don't we -- let's take a recess. I will pause my video and mute, but I will stay on, but we'll be in recess. And, Ms. Smith, I'll let you -- Ms. Lindauer and Mr. Kane, are you still there? I see Mr. Kane.

MS. LINDAUER: Yes, Your Honor. We're still here. Thank you.

THE COURT: So do you have Mr. Dooley's cell phone?

MS. LINDAUER: We do. We can call him during the

little break and see if we can figure out what's going on.

THE COURT: All right. So I'm going to step out and I'll let Ms. Smith stay on and perhaps try to assist you with getting Mr. Dooley on, but I'll -- I'm going to step off for a little bit.

MS. LINDAUER: Thank you.

(Recess at 3:42 a.m./Reconvened at 3:52 p.m.)

THE COURT: Okay. I am back. Can everybody hear me?

MR. KANE: Yes, Your Honor.

THE COURT: Ms. Lindauer, are you there? I believe you're muted, Ms. Lindauer.

MS. LINDAUER: I'm sorry. Thank you. I was adjusting our camera.

THE COURT: Okay. Mr. Rodriguez.

MS. LINDAUER: Okay.

THE COURT: And Mr. --

MS. LINDAUER: I think I've got everybody back, Your Honor.

THE COURT: Okay. So before we start with Mr. Dooley, I am going to give you my ruling on your request to depose -- not to depose -- to call Mr. Kane to the stand.

MS. LINDAUER: Okay.

THE COURT: So the courts in the Northern District of Texas appear to have taken guidance from an Eighth Circuit case called In Re -- or called Shelton, Shelton vs. American Motors.

That's 805 F.2d. 1323. It's an Eighth Circuit case from 1986.

MS. LINDAUER: Okay.

THE COURT: As an example of one of the cases from the Northern District that follow the guidance of Shelton, I'll just cite you to the McKinney Pearl Restaurant case, which is a -- there's a Lexis cite, 2016 U.S. District Lexis 60270. And the Eighth Circuit test applies to depositions, but courts in the Northern District have also applied that same analysis to trial subpoenas, and it appears to be the same analysis that should apply here.

And as an example of a case that applied that same Shelton analysis to trial subpoenas, I'd refer the parties to Nautimill, N-A-U-T-I-M-I-O-L. Let me say that agin. N-A-U-T-I-M-I-L-L. That's a 2016 U.S. District Lexis 93022. Westlaw cite is 2016 Westlaw 38877977. So those are two representative cases where the Northern District of Texas have applied the Shelton analysis both to requests to depose opposing counsel and requests to enforce a trial subpoena on opposing counsel.

And in the Shelton case, that Court generally forbids a party from deposing opposing counsel unless: 1) no other means exist to obtain the information; 2) the information sought is relevant and non-privileged; and 3) the information is crucial to the preparation of the case. And that's at Star 29 in the McKinney case. And in the Shelton, the underlying Shelton case, that's at Page 209 of the Shelton opinion.

So what I'm going to do is allow Mr. Kane to testify, but I'm going to accept his suggestions that he be allowed to basically defend himself without requiring another attorney at his firm to get up to speed to defend him. I'm also going to allow him to provide narrative responses on his own cross-examination.

And I will let Mr. Kane object on a question by question basis, keeping in mind that three part test that I just mentioned, again, that, one, he can decide whether he wants to object based on any one of those three categories or any other basis that he believes he has cause to object to the question.

Do the parties understand that ruling? Mr. Kane, do you have any questions?

MR. KANE: I do not, Your Honor.

THE COURT: Ms. Lindauer, do you have any questions?

MR. KANE: I do not, Your Honor, and I appreciate your ruling and I understand it.

THE COURT: Mr. Rodriguez, do you have any questions?

MR. RODRIGUEZ: No questions at this time, Your Honor. Just maybe a point of clarification.

If we are going to be facing assertions of any kind of privilege, protection, or exemption, of course, you know, we're not waiving any challenge to that, so am I correct in understanding we would go ahead and just deal with that at that

point in the ordinary due course as we would in any other proceeding?

MS. LINDAUER: Yeah. He said question by question.

THE COURT: That's correct. All objections will be raised and ruled on on a question by question basis.

MR. RODRIGUEZ: Very good. Thank you, Your Honor.

MS. LINDAUER: Thank you.

THE COURT: I also want to state, you know, somebody floated this earlier, of the motion to strike. Well, scratch that. I didn't mean to put Mr. Kane on the spot. You know, I want to make sure Mr. Kane is, if he elects to go a different route, if he would prefer to have counsel defend him. None of this is happening today. This is going to happen next week. So, but I am going to allow the other side to ask Mr. Kane's questions.

If Mr. Kane changes his mind for some reason, you know, I will allow whatever flexibility you need and time you need to get somebody else up to speed if you decide to do that. If you don't decide to do it, you know, you will be called, I guess, when you're done with Mr. Dooley.

Does that make sense?

MR. KANE: It does. Thank you, Your Honor.

THE COURT: Okay. Before we -- we're going to have about 30 minutes from Mr. Dooley. Given that we're going to hear from Mr. Dooley today, Mr. Kane, do you anticipate any

rebuttal witnesses based on what we're about to hear or do you want to reserve and make that decision after we hear from Mr. Dooley?

MR. KANE: We've heard his offer of proof, so we have a pretty good idea. We will have a very brief rebuttal brief, Charles Astor, who is a 40-year real estate attorney at our firm.

THE COURT: Okay.

MR. KANE: And we will also have a very brief rebuttal witness in the form of Hayden Littlefield of Newmark regarding valuation rebutting Mr. Barton's opinion of value.

THE COURT: Okay.

MR. KANE: I have already informed Mr. Littlefield that he will not be taking the stand today.

THE COURT: All right. Thank you. All right. You may proceed, Ms. Lindauer, with Mr. Dooley.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: Mr. Dooley, we released you, but you've been called back. You are still under oath. Do you understand that?

MR. DOOLEY: I understand that, Your Honor.

THE COURT: All right. Ms. Lindauer, go ahead.

MS. LINDAUER: Thank you.

MARSHAL DOOLEY, DEBTOR'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MS. LINDAUER:
Q Mr. Dooley, again for the record, would you state your full name?
A Marshal Wayne Dooley.
Q Okay. And, Mr. Dooley, you have already been sworn and testified as an expert witness in connection with these proceedings. Is that correct?
A That's correct.
Q Okay. And, Mr. Dooley, do you recall your prior testimony?
A Generally, yes.
Q Okay. And do you recall your qualifications that you stated with -- to the Court with regard to the testimony that you gave?
A Yes.
Q Mr. Dooley, you did assist in the preparation of a proffer of Marshal Dooley that was read into the Court's record. Do you recall that?
A Yes.
Q All right. And, Mr. Dooley, you did I think previously testify to the Court what actual documents you reviewed in connection with your testimony. Do you recall that?
A Yes. I do recall that.
Q Okay. Mr. Dooley, what problems, based on the review of the documents, as an expert, what problems were you able to

identify in connection with the documentation that was being provided as part of this closing?

A I don't have those documents in front of me, but the -- my recollection is that there were multiple. You know, the order required that a deed and a rescission deed be held in escrow by the lender's attorney and that a -- the promissory note in question be rescinded prior to -- immediately prior to the payoff. And my understanding is now from the testimony that's been given that --

MR. KANE: Objection to the extent that Mr. Dooley is giving his opinion about the interpretation of the agreed orders.

MS. LINDAUER: And, Your Honor, I want to clarify. I think Mr. Dooley misspoke. I think he used the word rescinded in connection with the note.

BY MS. LINDAUER:

Q Did you mean rescinded when you said that?

A Rescinded is what I meant to say.

Q Okay. Did you want the note rescinded? What was -- I want to clarify your answer.

A The deed to be rescinded and the note reinstated, and that's what I meant to say. I apologize.

Q And, Mr. Dooley, with regard to your testimony as an expert, the transaction documents that you were able to review, the special draft special warranty deed and the related

documents that you've reviewed, in your opinion would a commercial -- would a reasonable commercial real estate lender or borrower in the State of Texas be satisfied with those documents in connection with a closing to occur on May 31, 2022?

A No. No.

Q Okay. All right. And can you tell us why those documents that you reviewed would not meet the requirements for a commercial real estate lender or borrower to accept those documents in connection with that closing?

A The first document was the special warranty deed that had been signed and being held, been signed by the lender and being held by the lender's attorney. And, you know, it was purporting to be a special warranty deed and there were some recitals in that document reflecting that. But then in the addendum provisions of that deed, it was a conveyance at that -- the date of the deed as opposed to, you know, A rescission which is an ab initio document that reinstates the -- or I mean rescinds the --

MR. KANE: Objection to the extent that he's providing his expert or his legal opinion about the enforceability of the document or errors with the document. I thought we were limiting his testimony to what was commercially reasonable, what provisions were generally accepted, that kind of thing.

THE COURT: Why don't you --

MS. LINDAUER: Your Honor, I think he --

THE COURT: Why don't you re-ask your question, Ms. Lindauer?

MS. LINDAUER: I can.

BY MS. LINDAUER:

Q All right. Mr. Dooley, and I know we sort of sprung this on you this afternoon and you may not have every document in front of you, but, Mr. Dooley, I think the question was that your testimony was that you would not advise a commercial real estate lender or borrower to accept the special warranty deed as a rescission deed. And you were telling us why you would not advice your commercial real estate lender or borrower to accept -- and I may have said that wrong. Yeah. Would not advise them to accept that document. And I think you were explaining to us why you would make or state that as your opinion with regard to, in particular, the special warranty deed.

A Correct. And as I say, it was not a rescission deed. The granting or addendum clause provisions of that deed were reflective of a transaction that was to close on the date of the deed as opposed to rescinding the deed in lieu of foreclosure.

Q What effect would that have with regard to the actual title to the property and when would the debtor basically be

taking title to the property if that document were recorded?

A On May 27th or whatever date that --

MR. KANE: Objection. Calls for a legal conclusion because this, again, is Mr. Dooley's legal opinion of how these documents would be enforced or enforceable.

THE COURT: Sustained.

MR. KANE: I'd like a little guidance from the Court on that.

THE COURT: Yeah. I'll sustain that objection.

MS. LINDAUER: Okay.

THE COURT: Ms. Lindauer, is Mr. Dooley aware of the ruling that I made that allowed him to get back on the stand?

MS. LINDAUER: I think generally. I don't know that we specifically told him the terms of your ruling, only that he was being allowed to be recalled on non-legal opinions that did appear in his proffer. I think that was your ruling, is that he could testify as to reasonable and commercial terms, if you will, that it did appear in there. I think there were three or four of those in his proffer. So he was advised as to that. I don't know if there was anything --

THE COURT: So, and the reason I'm sustaining that last objection because he was giving his legal opinion on the effect of title.

MS. LINDAUER: Right.

THE COURT: So why don't you ask a different

question.

MS. LINDAUER: I will. And that may be my bad, Your Honor, trying to phrase these so that they meet the requirements that the Court has considered.

BY MS. LINDAUER:

Q But in your opinion, Mr. Dooley, the special warranty deed, rescission deed, what would you -- would you advise your commercial real estate lenders or borrowers to accept that deed as a document effective as of May 31, 2022?

A I would advise them not to accept it as a purported rescission deed.

Q The revised rescission of warranty deed, the agreed rescission warranty deed that was being circulated, do you recall that document, Mr. Dooley?

A Yes. The one that I understand was being submitted by your office. And then the -- you know, the changes or the editing that was done by Mr. Kane's office.

Q Okay. Would you advise a commercial real estate lender or borrower to accept the agreed rescission of warranty deed as a commercially reasonable document for effecting a rescission of the deed in lieu of foreclosure?

A As I recall, the deed that was prepared by your firm, I think there was an error in there with regard to the domicile state of the lender, but generally speaking, I think that that deed would probably have worked.

Q Okay.
A But when the edits came back, there -- it would not work.
Q And would you recommend the use of the --

MR. KANE: Objection and motion to -- move to strike that testimony. It's, again, about the effectiveness of the respective legal documents. That's a legal opinion.

MS. LINDAUER: Your Honor, I think maybe I should re-ask the question. Maybe I asked it poorly.

THE COURT: I'll sustain the objection and allow you to re-ask your question.

MS. LINDAUER: Thank you, Your Honor.

BY MS. LINDAUER:
Q Mr. Dooley, from the standpoint of either a commercial real estate lender or borrower, would you advise them to accept the -- I want to say revised agreed rescission of warranty deed provided by HNGH's counsel?
A No.
Q And can you tell us why you would not advise or why you would advise them not to accept that document?
A Because the rescission was contingent on some matters that were included in the edits to the deed. And so you have to go to outside that document to be able to determine whether or not it was an effective rescission.

MS. LINDAUER: Your Honor, I have no further questions of Mr. Dooley at this time.

THE COURT: Mr. Kane.

MR. KANE: Your Honor, I don't -- let me ask.

CROSS-EXAMINATION

BY MR. KANE:

Q Mr. Dooley, how many commercial real estate transactions with an amount in controversy over $5 million, say, have you been involved in that required a rescission deed?

A Again, I don't recall. It's a fairly rare circumstance and I, you know, in 52 years, probably 4 or 5 times.

Q And were those, you said commercial real estate transactions?

A Yes.

Q Involving more than $5 million in controversy?

A Yes.

Q Okay. Do you recall the name of any of those transactions?

A Well, you know, the other day Ms. Lindauer had asked that question about a Ravens Gilbert and related organizations that involved some rescission deeds, as I recall, and those were over 5 million. You know, as I sit here, I don't recall others.

Q Did you prepare those documents?

A Say it again.

Q Did you prepare those documents?

A I prepared exchange -- you know, along with counsel on the

other side.

Q Have you ever done any work for any of Mr. Barton's entities?

A I am involved in sort of tangentially in one matter unrelated to this matter, yes.

THE COURT: Mr. Kane, were you waiting for --

MR. KANE: No, I passed, Your Honor.

THE COURT: Oh, I'm sorry. I didn't hear that. I apologize.

MS. LINDAUER: I didn't hear that. Your Honor, I don't have any further questions of Mr. Dooley and I ask that he be excused.

THE WITNESS: Thank you. May I be excused, Your Honor?

THE COURT: Yes, sir. Thank you, Mr. Dooley, for your time.

THE WITNESS: Thank you. Thank you, Your Honor.

(Witness excused)

MS. LINDAUER: All right.

THE COURT: It's 4:13. Why don't we get our calendars out? So, let's see here.

Mr. Kane is your last witness. Is that correct?

MS. LINDAUER: Your Honor, I'm going back -- yes. I think he's the last witness. I do think there is the Randy Marx issue, Your Honor, and there is a response due to you on

that motion to strike. So I do think that -- or depending upon how you want to handle that issue. Out of fairness, that may be one where Mr. Marx has to get back on the stand so Mr. Kane can cross-examine him, but however you want to handle that.

And then I think we were advised there would be then the rebuttal witness. I think Mr. Kane told us, was it one, just one? Hayden Littlefield.

MR. KANE: And Charles Astor very briefly.

MS. LINDAUER: All right.

MR. KANE: Those combined witnesses should take less than an hour, including with cross-examination.

MS. LINDAUER: Okay. And Charles Astor. Got it.

THE COURT: Danielle, look at the calendar for next week.

MS. LINDAUER: While we're doing that, Your Honor, Mr. Kane, on Charles Astor, are you -- you sent us over and I have a copy of the appraisal from Hayden Littlefield. Are you anticipating any documents with Mr. Astor other than things that are already part of the Court's record?

MR. KANE: I'm not anticipating any documents with Mr. Astor other than Exhibit 33A. That's it.

MS. LINDAUER: Okay. All right. 33A. Thank you. I appreciate that. That's helpful.

THE COURT: All right. Is everybody available on Wednesday, the 6th, starting at 9:00 a.m.?

MR. KANE: Yes, Your Honor.

MS. LINDAUER: Hang on. I'm looking. Your Honor, I think 9:00 is fine on Wednesday. It looks like it.

THE COURT: It looks like we have some lift stay hearings at 1:30, which I don't anticipate those are going to take a long time, but so potentially we have most of the day on the 6th.

MS. LINDAUER: Okay.

THE COURT: Are there any time restrictions on the 6th?

MS. LINDAUER: The only thing I do see on my calendar is a couple of hearings at 1:30 on the 6th. I can't tell -- I'm going to have to grab Ms. Ollar on that and see what those are, if they're things I need to be at or not. So that's all I'm seeing on my calendar.

THE COURT: Why don't you -- why don't you --

MS. LINDAUER: Check on that real quick.

THE COURT: Check on that, please. Also check on -- I'm looking at Friday, the 8th.

MS. LINDAUER: I have a 341 meeting at 10:30 in Judge Rhodes case. I can probably send somebody else to handle that, but that's the only thing I show on Friday.

THE COURT: So it looks like we have some matters at 9:30. So potentially, what about 1:30 on Friday?

MR. KANE: That works for HNGH.

MS. LINDAUER: That works for us, Your Honor. 1:30 on Friday. Just to be clear, that's July 8th. Is that right?

THE COURT: That's correct.

MS. LINDAUER: Okay. What are those two things?

THE COURT: So I'm expecting that we're probably going to finish next week, and so I guess I understood that Mr. Phelan was going to do the closing for the reorganized debtor. Is that correct?

MS. LINDAUER: Your Honor, I think we may have changed that. I think actually I may be the one that's handling the closing, so Mr. Phelan is going to co-help me, but I think I'm going to -- actually the one that's going to be taking that, so.

THE COURT: So we don't need to check on his availability then, is that correct?

MS. LINDAUER: That is correct, Your Honor.

And on that Wednesday I have a cash collateral hearing with Judge Morris. This is Judge Morris, right?

MS. OLLAR: Yes.

MS. LINDAUER: At 1:30 in a case called Cath (phonetic) Corporation. That should probably -- I don't know what else is on his docket, but that should probably take about maybe 30 minutes, I would think. I don't think that's contested. We do have some issues with the Office of the U.S. Trustee, but I'm not sure they're going to weigh in on that

particular matter. But so I do know I have that on the 6th at 1:30.

THE COURT: And, Mr. Kane, do you have any restrictions on the 6th?

MR. KANE: I do not, Your Honor.

THE COURT: So if we had to break for my lift stays at 1:30 and Ms. Lindauer's, whenever those are finished, we can ask you to rejoin?

MR. KANE: Yes, Your Honor.

THE COURT: And then I'm going to pause one second. And then Friday at 1:30 for the afternoon, nobody has any restrictions that day, correct?

MS. LINDAUER: That is correct, Your Honor. The only thing I have is in the morning, so the afternoon is fine.

MR. KANE: We're open the afternoon Friday as well.

THE COURT: Okay. I'm going to pause just one sec. I'll be right back.

(Pause)

THE COURT: Okay. So it looks like those times that I proposed are going to work. So Wednesday at 9:00 a.m.

MS. LINDAUER: Okay.

THE COURT: And we'll keep going until I have to stop to prepare for my 1:30s or Ms. Lindauer has to stop to prepare for hers. And then we will rejoin when we are both done.

MS. LINDAUER: Okay.

THE COURT: And then we will continue again Friday at 1:30.

The motion to strike related to Mr. Marx is not yet set. I'm not going to take oral argument on that.

So, Ms. Lindauer, you are filing a response today. Is that right?

MS. LINDAUER: Your Honor, I don't know if it's done yet because I've been tied up here, but that was our intention, Your Honor, was to try to file that today so you would have that in hand so you could take that issue up before we meet again.

So I will assure you it will be filed at the latest -- what's today? Friday. At the latest, Monday -- Tuesday morning, which will be before this hearing on Wednesday, so you have a chance to look at that issue. So it may be ready now. I just don't know. So but we'll the latest --

THE COURT: Okay. If you're able to file it today, that's great.

MS. LINDAUER: Okay.

THE COURT: If not, yeah. If you could today, that would be great.

MS. LINDAUER: Okay.

THE COURT: But Tuesday by noon at the latest, I think.

MS. LINDAUER: That would be fine, Your Honor.

THE COURT: But I would really prefer today if possible if it's almost done.

MS. LINDAUER: Okay.

THE COURT: All right. I think that's all I have, so we will be in recess until --

(Proceedings adjourned at 4:23 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, CRYSTAL THOMAS, KAREN K. WATSON, and PATTIE MITCHELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel
DIPTI PATEL, CET-997

/s/ Crystal Thomas
CRYSTAL THOMAS, CET-654

/s/ Michelle Rogan
MICHELLE ROGAN

/s/ Pattie Mitchell
PATTIE MITCHELL

/s/ Karen K. Watson
KAREN K. WATSON, CET-1039

LIBERTY TRANSCRIPTS

DATE: July 6, 2022