IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Wednesday, July 6, 2022<br>10:18 A.M.<br>AM SESSION |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS
FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

For the Debtor: Joyce Lindauer Attorney, PLLC
BY: JOYCE LINDAUER, ESQ.
1412 Main Street, Suite 500
Dallas, Texas 75202

Fee Smith Sharp & Vitullo LLP
BY: OSCAR REY RODRIGUEZ, ESQ.
13155 Noel Road, Suite 1000
Dallas, Texas 75240

For HNGH Turtle Creek, LLC: Kane Russell Coleman Logan, PC
BY: JOHN KANE, ESQ.
901 Main Street, Suite 5200
Dallas, Texas 75202

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

---

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

# I N D E X


| | Page |
|---|---|
| Case called | 3 |
| MOTION TO STRIKE RANDY MARX DECLARATION | |
| Court's Ruling - Granted | 48 |
| End of AM Session | 94 |
| Certification of Transcriber | 94 |

WITNESSES

FOR THE DEBTOR:

RANDY MARX

| | |
|---|---|
| Direct Examination by Ms. Lindauer | 52 |
| Cross-Examination by Mr. Kane | 73 |
| Examination by the Court | 90 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 9:03 a.m.)

THE COURT: -- 21-31954.

We'll take appearances.

MR. KANE: Your Honor, John Kane on behalf of HNGH Turtle Creek, LLC, the pre-petition lender.

MS. LINDAUER: Your Honor, Joyce Lindauer here on behalf of 2999TC Acquisitions, LLC, the reorganized debtor in this matter.

MR. RODRIGUEZ: And, likewise, on behalf of reorganized debtor, Oscar Rey Rodriguez.

THE COURT: Any other appearances? Are there any other co-counsel that you are expecting?

MS. LINDAUER: No, Your Honor. Mr. Metzger had a medical appointment, so he was not available this morning. And he would have been the only person I think that would have been appear this morning, and he notified yesterday that he would not be attending.

So, Your Honor, I think we're down to just me and Mr. Rodriguez.

THE COURT: Okay. So before we pick back up with any other witnesses, first, I want to put to bed something that was raised I think on day two of the hearings when Ms. Simmons asked me to go through and tell her which agreements were admitted and the conditions that they were -- on which they were admitted from the first day of the hearing.

I'm assuming based on the parties have the trial transcripts and there's been ample opportunity to discuss this with Mr. Kane, I'm assuming you all are familiar with which exhibits were admitted and why?

Ms. Lindauer?

MS. LINDAUER: Your Honor, I recall that discussion, and I believe I have an understanding of which exhibits were admitted and why.

THE COURT: Okay. Because I think I had indicated at that hearing at some point if we needed to I would come back and address it. But it's sounding like we don't need to do that given the notes everybody has taken, especially considering the availability of the transcripts from the hearings.

So correct me if I'm wrong.

MS. LINDAUER: So, Your Honor, the only thing -- issue that -- and maybe this is a different issue, but I do think there was still the issue, I guess, and I don't know if Mr. Rodriguez and Mr. Kane have resolved this -- I have not been in that loop -- regarding attachments to various of the documents. I think that was an open issue, too, but that may be a slightly different issue than what you're discussing this morning.

THE COURT: That's a different issue. The first issue that Ms. Simmons raised, she just wanted me to go through

and tell her which exhibits were admitted by agreement and the conditions from the very first day of the hearing.

MS. LINDAUER: Your Honor, I think that issue has been resolved --

THE COURT: Okay.

MS. LINDAUER: -- at this point.

THE COURT: Okay.

And then I think two or three times I had heard the parties say that if they had not resolved that second issue that you raised, they would get back with me. But nobody has, and nobody's set it for hearing. So I'm considering that put to bed since nobody has raised it again and we're now almost finished with the hearing. So --

MR. RODRIGUEZ: Your Honor, just so the record is clear, that issue has not been put to bed. I've tried to work out something with Mr. Kane and, you know, we are unable to come to an agreement. So you may be having to expend your time and resources on that hearing. It may turn into an evidentiary hearing, and it may be at the very end of these proceedings.

But I think what it will underscore is that, you know, one, despite his hurriedly filled-out and signed declaration, Mr. John Kane is not the official custodian of records for his law firm.

Number two, it will show that as he produced these things just images of emails, that is not the way these records

are electronically kept at Kane Russell.

And, number three, we'll also discover that the attachments exist of numerous iterations, and they show metadata, they show comment from his clients and others, and they show other changes. we have not been able to access any of this, of course, because this is a non-discovery proceeding Your Honor has declared. But we'll be able to establish those things at least for the Court to consider permitting formal discovery and ESI analysis.

You know, I don't want to derail or occupy the Court's time needlessly, but that is where we are going. And I believe that is where we're going to end up.

THE COURT: All right. Well, just to give you a heads up, we are almost done with all of the witnesses. We've been looking at exhibits all this time. Are there any particular exhibits that you are aware of that a witness has testified about that were incomplete?

MR. RODRIGUEZ: Absolutely, Your Honor. And I --

THE COURT: Okay. So let me ask you why weren't those addressed at the time because we've been going through all of the exhibits. I have not heard one peep about other than the original issue that you raised, I think there was one other time that I recall where there appeared to be an incomplete attachment to an email. And Mr. Kane indicated that he would refile that as a complete exhibit.

So I'm not going to rule on this motion now because it's not set, but I just want you to keep that in mind that we have been going through a very lengthy evidentiary hearing going through the exhibits. And with maybe one or two exceptions, nobody had raised the issue of incomplete exhibits. So for now, I think Ms. Lindauer addressed the issue that I had concerns about which was whether or not the exhibits that were read into the record by agreement, whether there was any open issues on that. And I think she's responded to that, and I appreciate that.

You're now raising an issue that's not set. I wasn't really planning to address that today. And just a heads up that we're almost done with this hearing. These witnesses have been reviewing exhibits, and nobody has raised this issue, you know, other than when you originally raised it and then the two or three times when I asked if that had been resolved and you indicated that we think we can get it resolved.

So we're not going to -- I'm not resolving that issue today. You've stated your position, but right now, we are where we are.

And let me ask Mr. Kane. When we left, you had indicated that you were still intending to call -- I'm sorry, the reorganized debtors were still intending to call Mr. Kane. We have the issue about Mr. Marx, which we'll discuss in a minute. And then, Mr. Kane, I believe you said you potentially

were going to have Mr. Astor and Mr. Littlefield testify. Is that correct?

MR. KANE: Yes, Your Honor. They should be very brief.

THE COURT: Okay. Give me just a minute.

So, Ms. Lindauer, can you tell me what your anticipated time for questioning of Mr. Kane is?

MS. LINDAUER: Your Honor, I'm estimating about two hours. I wrote down the same witnesses you wrote down. The only other witness, Your Honor, that we might want to call since Mr. Littlefield is being called is to call Mr. Donahue with CBRE. He also, likewise, is an appraiser that was retained in this case. But, again, I'm going to pull that back and see what Mr. Littlefield says. But if value is going to be an issue, which apparently is, then we did retain an expert early on in the case. Mr. Kane knows that. We both retained experts on value.

So anyway, I would like to reserve the right to call him again. He would be brief, and he would be in response to Mr. Littlefield. And then I believe that is it on witnesses. And I think there are a couple of rebuttal exhibits that we have or just cross really for Mr. Littlefield. But other than that, I think we're pretty much done on documents other than just going through what's already there.

So, Your Honor, that's -- I'm thinking that we --

unless I'm wrong, that we get done with all the evidence today and then I know you've set aside some time on Friday and I was hoping that we could use that time for the closing arguments if we get there. And then the matter would be to you, Your Honor, to decide.

THE COURT: So other than --

MS. LINDAUER: And, again, I don't want to put Mr. --

THE COURT: Other than those open issues, you indicate you're almost done. Right?

MS. LINDAUER: I'm close, Your Honor, I would think. But, of course, there's some rebuttal here, but yes. Yes, other than --

THE COURT: You said you're almost done with the documents, as well. Is that right?

MS. LINDAUER: That's correct. Well, other than asking questions about him. But I mean as far as offering any new documents, I don't anticipate that we would be offering any significant new documents other than a couple for rebuttal.

THE COURT: Okay.

MS. LINDAUER: So yeah, I think the record is getting close to being complete, Your Honor, as far as on the evidence for each side.

And, again, I don't want to speak out of turn on Mr. Rodriguez's issue. That's his issue, not necessarily my issue on that. So --

MR. RODRIGUEZ: And certainly before the close of evidence, Your Honor, we would like to set when the Court believes it's appropriate and convenient with the Court's schedule a hearing on that pending motion.

THE COURT: So let's take up Mr. Marx. And there's two motions that are pending. But before we do that, Mr. Marx, are you on the line?

MS. LINDAUER: He should be, Your Honor. We asked him to be present this morning. He's in the box down there on the bottom. I don't know where he is as far as connecting.

MR. MARX: Working on it.

MS. LINDAUER: Okay. Thank you, Randy.

MR. MARX: I've lost my helper, so I'm alone today. But I'm here. And I'll go ahead and mute unless you --

THE COURT: I do have a quick question for you. Does Ms. Lindauer have your cell phone because while we're doing the arguments, I'm going to ask you to disconnect. And then when we're ready for you, if we're ready for you, then we'll ask you to rejoin.

Ms. Lindauer, do you have Mr. Marx's cell phone?

MS. LINDAUER: I don't, but the people in the room do. So yes.

THE COURT: Okay.

MS. LINDAUER: Yes, we do.

MR. MARX: Okay. So then you want me to disconnect

and then when Ms. Lindauer calls? Is that right?

THE COURT: Yes. If you're -- you know we haven't decided or I haven't decided the motion to -- that addresses your declaration and Mr. Kane's motion to strike. So while we're discussing all that, I would like you to drop off. And then if you're -- well, if it turns out that you're going to be coming back, I will have Ms. Lindauer call your cell phone and ask you to rejoin.

MR. MARX: Okay. Sounds good. Thank you.

THE COURT: I'd just ask you to be on standby.

MR. MARX: I will do. Thank you.

THE COURT: Okay. So I think the two motions that I had asked my courtroom deputy to set this morning were the motion to strike that was filed by Mr. Kane, which I believe is Docket Number 205, and then the debtor filed a response which was docketed twice by the clerk's office both as a response and because it also contained a motion. I believe it was docketed at 214 and 215.

So why don't we take up those first. And since Mr. Kane's motion was filed first, I'd ask him to argue his motion to strike. Are you prepared to do that, Mr. Kane?

MR. KANE: Yes, Your Honor.

THE COURT: All right. And, Ms. Smith, are you there? Maybe just confirm for me I do believe Mr. Marx dropped off because I don't see him, but I just want to make sure.

Okay. Thank you.

And, Ms. Lindauer, are you prepared also to address your motion that was filed, your response/motion?

MS. LINDAUER: I believe so, Your Honor. I'll do my best.

THE COURT: Okay. All right, Mr. Kane, you're first on your motion to strike.

MR. KANE: Yes, Your Honor.

Our oral argument very closely mirrors our motion to strike that was filed before this Court. Primarily, we believe that attempting to get Mr. Marx in essence back on the stand or to supplement his testimony with additional declarations, additional opportunity to take the stand and a new revised exhibit from Mr. Marx makes a mockery of the trial process.

The initial estimate for timing from Mr. Marx was approximately two hours. I believe Mr. Marx was on the stand for close to eight hours on direct. He was on cross-examination I believe for close to four hours -- three or four hours. And then after all of that testimony, the debtor had an opportunity to rehabilitate Mr. Marx. So if the debtor believed that Mr. Marx's testimony was inaccurate or if it was incomplete, it had ample opportunity as this Court has given the debtor pretty much as much time as it could possibly ask for to continue to question Mr. Marx to ensure the truth and accuracy of Mr. Marx's testimony.

The debtor agreed that it had no further questions for Mr. Marx and agreed to release Mr. Marx from the witness stand. As the trial transcripts show, after Mr. Marx was released, Mr. Rodriguez had an argument before this Court explaining his trial strategy. Unsurprisingly, about six days later, Mr. Marx has assisted in the preparation of the declaration with counsel for the reorganized debtor.

Mr. Marx's declaration, perhaps unsurprisingly, very closely mirrors the argument set forth by Mr. Rodriguez to this Court. And, Your Honor, we don't believe that that is a coincidence. We believe that given the prodigious amount of time the debtor had with Mr. Marx that reopening his testimony to mirror an argument asserted by Mr. Rodriguez does make a mockery of the trial process.

It also abuses the judicial resources of this Court by creating a scenario in which any time the debtor or, you know, frankly, I suppose HNGH if it doesn't like the testimony of a rebuttal witness, then get a do-over. Wait, obtain the transcript, view the transcript, determine whether it likes the testimony that it received from its witness on the stand, assist with the preparation of its witness's revised declaration attempting to correct correspondence or correct testimony that it did not believe was beneficial to its case in chief, submit a declaration, and request that the Court, if necessary allow the witness to take the stand yet again to

testify on the exact same subject matter that the witness previously testified to.

We think that that is, especially given the time allotted to Mr. Marx to date, quite ridiculous to be honest, Your Honor. We think that this is a pretty clear attempt by the debtor to implement its self-proclaimed trial strategy through an assisted crafting of a declaration for a witness.

The debtor has admitted that its lawyers assisted with its witnesses or in preparation of Mr. Marx's declaration. Frankly, Mr. Marx's declaration is an out-of-court statement offered for the truth of the matter asserted.

Mr. Marx also prepares a new exhibit that would be offered into evidence by the debtor, was never previously disclosed, does not appear on any witness and exhibit list, has interlineations created by Mr. Marx outside of court after the close of his testimony, which is again, an out-of-court statement offered for the truth of the matter asserted commentaried by Mr. Marx on that proposed document, which again is an out-of-court statement offered for the truth of the matter asserted.

And it doesn't matter if he's allowed to take the stand to clarify those points. Those are hearsay statements, and that testimony is inadmissible. The exhibit is inadmissible. It was never disclosed. It has never been shown.

And so, Your Honor, we would ask under the Federal Rules of Evidence that this Court disallow any further testimony of Mr. Marx, strike the declaration, and disallow his purported new exhibit and the interlineations and commentary it includes thereon.

THE COURT: All right. Ms. Lindauer, since you filed a combo response motion, I'm just going to take whatever arguments you have in support of both of those now.

MS. LINDAUER: Okay. Thank you, Your Honor.

The first argument, Your Honor, is just to address in response form the motion to strike. And we went through I think in some detail the various rules that are implicated by what's happened here. I don't think the facts are really what's in dispute here. Apparently, Mr. Marx -- and, of course, the Court's aware we've been ordering the transcripts of each of these proceedings. Mr. Marx apparently was provided a copy of the transcript of his testimony, had an opportunity to review it, and raised some concerns.

So, first of all, looking through the Rules, of course, the Court has discretion in this instance to decide how to admit or not admit evidence. Of course, that's Federal Rule of Evidence 403, which leaves the decision to you on evidentiary matters.

I've never in 35 years had this come up to be perfectly honest because I haven't had a witness -- most of our

cases, first of all, we don't get transcripts back as quickly as we have in this case. But, second, I've not had a witness had an opportunity to review his transcript and raise concerns. So this is a little bit of a new one for me, as well.

But again --

THE COURT: So let me --

MS. LINDAUER: But it does --

THE COURT: Ms. Lindauer, let me ask you there. Who sent the transcript to Mr. Marx?

MS. LINDAUER: So I believe that Mr. Rodriguez's firm has been regularly ordering the transcripts at the end of the day, and I think the first two or three transcripts got hung up a bit because I understand that you have to review them before they're released. And then Mr. Rodriguez, I believe -- who's sitting next to me -- has been circulating those transcripts to everyone. So that would be Mr. Barton, to Mr. Walji, to Mr. Marx, just all the people that have been -- as you've noticed, Mr. Phelan, different people that have been involved in this proceeding.

So I believe it was Mr. Rodriguez -- because he was the one that's been ordering them and forwarding them -- did send a copy to Mr. Marx. And Mr. Marx then had an opportunity to review his testimony and that's what brought the issue up.

And, Your Honor, I do think going back --

THE COURT: Mr. Rodriguez, before Ms. Lindauer

continues, is that correct that you had sent the transcript to Mr. Marx?

MR. RODRIGUEZ: No, that's not correct, Your Honor.

MS. LINDAUER: Okay.

MR. RODRIGUEZ: My firm has been tasked with ordering the transcripts for the entire team for everyone working on this matter. And as those transcripts are received and paid for, I circulate them to the entire group without exception. My assistant has also circulated them to the entire group without exception.

This implication that I somehow made a special special communication to Mr. Marx or somehow --

THE COURT: No, Mr. Rodriguez --

MR. RODRIGUEZ: -- is false.

THE COURT: Mr. Rodriguez, that wasn't --

MR. RODRIGUEZ: (Indiscernible).

THE COURT: That wasn't my question. I was just trying to figure out who sent the transcript to Mr. Marx. And so if you sent it to Mr. Marx together with everybody else, you can tell me that. I'm not implying or suggesting anything. I'm trying to figure out who sent the transcript to Mr. Marx.

MR. RODRIGUEZ: Well, I know you're not implying anything, Your Honor. But Mr. Kane is. He's very fast and loose with his language, and I don't appreciate it. There will be an opportunity for there to be a reckoning and accounting

for all of his --

THE COURT: Well --

MR. RODRIGUEZ: -- baseless accusations and the positions he's taking.

THE COURT: -- Mr. Rodriguez?

MR. RODRIGUEZ: (Indiscernible).

THE COURT: Mr. Rodriguez?

MR. RODRIGUEZ: Yes.

THE COURT: Mr. Rodriguez?

MR. RODRIGUEZ: Yes. I'm trying to speak, Your Honor -- make a record.

THE COURT: Right. But now is not the time for either counsel to -- well, I was asking a question of you. I wasn't asking -- you'll have a chance, I guess, to make your arguments. But my question was who sent Mr. Marx the transcript, and Ms. Lindauer said it was you. And the first thing you said was that it was not you.

So I understand now that you sent it to Mr. Marx when you sent it to everybody else. Is that right?

MR. RODRIGUEZ: I sent it to everyone in the group including Mr. Marx. And I have continued to do so and will continue to do so unless your Court directs me otherwise.

THE COURT: No, I'm not directing you one way or the other. I was just trying to figure out who sent the transcript to Mr. Marx.

MR. RODRIGUEZ: En masse with the entire group. I did not send it individually to Mr. Marx with any kind of a special communication or anything else. That's not something I do, ever have done, ever will do. I had no hand in working with that witness, either.

So I am deeply resentful for the baseless accusations that Mr. Kane has made and that, frankly, Your Honor, you permit him to make without any evidence, without any predicate. I will just state that for the record.

THE COURT: So right now we're just taking arguments. Nothing that either side is saying I'm taking as evidence. This is typical arguments before I rule on a motion. So --

MR. RODRIGUEZ: I wish you would ask Mr. Kane the same kinds of questions you're asking me, Your Honor. What is the basis for his accusations against me and my firm and my colleagues? You've heard the words he's used throughout these proceedings. You have not asked him to substantiate anything.

But to answer your question, yes, Your Honor, I've sent the transcripts en masse. If you would like to see the emails in camera, I'm happy to get them and put to bed any questions you may have. But it's the ordinary course I think to circulate transcripts to of the defense team, in response to your question, my clients and the colleagues I work with.

THE COURT: So -- and that's one of the reasons I'm asking is that Mr. Kane has raised the issue that -- and I do

recall after the testimony of Mr. Marx, you said that his testimony was incorrect. You recall that, right?

MR. RODRIGUEZ: No, I don't, Your Honor. I don't have the transcript in front of me. I can't quote myself and what I argued or what I was talking about.

You know, at the very beginning of these proceedings, I understand Your Honor took a task with Mr. Phelan on his use of the word "deliver" of a rescission deed. And you thought that that was incorrect in the sequence of events that a deed would not be delivered until after there was payment. And, you know, my perception from reading the documents was very different.

What I understood Mr. Phelan to say when he was talking about delivery was for Mr. Kane to obtain and have executed by his client a delivery rescission deed that the client would deliver to him to hold in trust before there was a closing and a transaction.

So I think there's a lot of speaking past one another in this case. And, you know, I don't feel comfortable opining as to the precise terminology I used or what, you know, the basis of our argument is.

You have seen our response to the motion to enforce purported agreed orders, Your Honor. The arguments are there. They're the same arguments we've been making throughout this proceeding. There's nothing new.

And you know and you heard the testimony from Mr. Marx. He's an honest guy trying to give an honest answer and being helpful and taking Mr. Kane at his word when he says, what I'm giving you is a redline comparison between your last version and mine. It turns out that wasn't accurate. It wasn't the last version. It was a prior version.

So there's an attempt here, you know, by Mr. Marx, to correct and amplify the record. For what now Mr. Kane has told us is a trial. This is not simply a hearing or an evidentiary proceeding, this is supposed to be a full blown trial.

So, Your Honor, if you would like me to look at transcripts, I'm happy to. If you want me to address this argument that somehow I've come up with a brand new argument, a brand new trial strategy, I can go back and I can cite to you in the response papers that it's not anything new.

This is precisely what we have. But it's these kinds of baseless kind of phantom allegations that seem to get the Court's attention and then direct them, you know, to me. Which is fine. But I'd like fair opportunity, if Mr. Kane would like to file a motion and lay out his basis and his predicates for accusations against me and my firm, or my colleagues, or anyone else, let's go ahead and tee it up in the ordinary course.

And we'll file a response and we can have a hearing. But --

THE COURT: Well it's --

MR. RODRIGUEZ: -- you know, it's kind of do you remember saying that; do you remember saying this; do you see here. That's just -- that's an improper and inaccurate way to conduct any kind of proceeding.

THE COURT: Well, let me tell you that I've read the motion. The reason it has my attention is because they filed a motion. So it's my job to look at the motion, look at the allegations in the motion, and address the arguments and the allegations. And I'm looking at Paragraph 6 of the motion.

They cite Page 181 of the June 23rd transcript. And I went back and reviewed it because, again, it's in the motion. So I read the motion. I went back and looked at the transcript. And it appears to be correct that after Mr. Marx's testimony, you said that his testimony was mistaken. I think I said incorrect a few minutes ago.

But again it's in the motion. So I'm addressing the motion that Mr. Kane filed. And his is first. And when I'm done with this, I'm going to ask questions of both sides and same thing with Ms. Lindauer, so I'm not sure I agree with your characterization that this is an improper way to proceed. Because, again, I'm addressing the allegations that are in the motion.

So -- and again, Paragraph 6 of the motion, he cites to the June 23rd transcript, Page 181, Lines 22 through 24, where you stated Mr. Marx's testimony was mistaken. Does that

ring a bell at all?

MR. RODRIGUEZ: Your Honor, I haven't seen his motion. I haven't worked on a response. But I'm pulling up the transcript right now. And I will take a look at Page 181. Is that right?

MS. LINDAUER: No, it's Page 178.

MR. RODRIGUEZ: Page 178.

MS. LINDAUER: Yes, sir.

MR. RODRIGUEZ: Okay. Right. And this would have been right after Mr. Marx testified?

THE COURT: I believe that's correct. But if you need a minute to look at the transcript, that's fine. I assumed that everybody would be ready, since it was -- it's an allegation and I'm listening to the argument. So if you need a minute to prepare and respond, that's fine. But June 23rd transcript, Page 181.

MS. LINDAUER: Oh, 181.

MR. RODRIGUEZ: Page 181.

MS. LINDAUER: Yes.

MR. RODRIGUEZ: Okay. And so --

MR. KANE: Your Honor, we also -- we did cite it 178 through 183, for more full context of what -- when those statements were made and Mr. Rodriguez's arguments to the Court about trial strategy.

THE COURT: Right. So take a minute, Mr. Rodriguez,

and read those pages. I didn't expect this to be a surprise. But I want you to take as much time as you need to read those pages.

(Pause while Mr. Rodriguez reviews document)

MR. RODRIGUEZ: Okay. I've taken a look at Page 178.

THE COURT: No, keep going. I believe 178 to 183. Is that right?

MR. KANE: Yes, Your Honor, 183,Paragraph 4.

(Pause while Mr. Rodriguez reviews document)

MR. RODRIGUEZ: Okay. I'm arguing about the second paragraph on Page 2 of their Exhibit 67A. That's what I'm talking about on Page 178. Future language instead of the presently effective recision.

And then his use of the word "shall" being a future-looking word, not hereby rescind or agrees. It's a future-looking term again that Mr. Kane put in place.

And then the retroactivity language to become retroactive in the future, if and when it becomes effective. Talking about effectuation of all conditions preceding set forth in the agreed order. Again, that is the singular term of agreed order. No definition. So I say there's no present rescission.

That's legal argument as to the Court's construction of a legal instrument.

Okay. So now I'm up to Page 180. So that your

argument is, this language caused the debtor not to be able to get funding from its lender. I don't think -- then I argue I don't think there's any reasonable buyer, seller or lender, and Mr. Kane will testify to this, I think if we get him on the stand, that would think this is sufficient to clear title.

So Your Honor, that argument from Pages 178 to 180 --

THE COURT: No, keep going. I would keep going. I would just read through page 183. I'll ask the questions and then you can respond. I'm not asking you to give commentary on everything. I'm just -- read it so that you have the context and then I'll the question.

(Pause while Mr. Rodriguez reviews document)

MR. RODRIGUEZ: Okay. I'm looking maybe at page 181 where I think Your Honor says for his clients, he indicated that all issues related to the recision are resolved to his and his clients' satisfaction, other than the issue of Texas and Delaware status of Mr. Kane's client. Were you here for this testimony. I don't know, Your Honor. But I'll take your word for it. He's mistaken, if that's what he said. Because you, as Judge, as a matter of law, get to construe our Exhibit 7, which is a recision deed. And you get to compare to 67A.

And you will see that 67A as a matter of law is not a rescission deed. And that is what the agreed order required, irrespective of what Mr. Marx, or Mr. Kane, or I may say about a document being substantively similar to another. That

doesn't decide this case.

Your Honor has to decide it as a matter of law on the printed words on the written page. People will testify from our witnesses. And then the Court stops me there.

And you were recounting your recollection, Your Honor, about the rescission document, satisfied to his and his client's satisfaction, other than limited testimony, Texas or Delaware entity.

Okay. I've read the bottom of page 182. He's mistaken. If Your Honor is -- my view was if Your Honor's interpreting Mr. Marx to be making representations as to everyone he's ever represented relative to these transactions and he says they are prospective lenders.

And then I think at other points there was testimony that he's also done work for and represented the reorganized debtor. Though when he uses the term client, he was not clear, to my mind, who he was talking about. And in fact on page 183, I kind of underscore that. You know, he's a sweet, darling man, he's very agreeable. But there wasn't a definition of what he was talking about.

And it's contradicted by the pre-existing facts that you've already heard about, Your Honor, from the general counsel for this entity, and of course, Mr. Tim Barton, himself, as well as other financing sources, about what the problems were.

So you know, somehow --

THE COURT: So now I think we're in the same boat because --

MR. KANE: Yes.

THE COURT: -- you've now both read the things that Mr. Kane cited to in his motion.

MR. RODRIGUEZ: Right.

THE COURT: That's why I asked the question. Because twice in that -- in those few pages, you indicated that Mr. Marx was mistaken. So Mr. Kane has made his allegations. I'm just asking questions. So does that refresh your recollection? You're not testifying, but just wanted -- since you said you had not read this beforehand, you now know that Mr. Kane is referring to in his motion. Correct?

MR. RODRIGUEZ: I do, Your Honor.

THE COURT: Okay. Thank you.

So the only other question I have is when you contacted Mr. Marx, I think you indicated that you did not provide any other questions or commentary to Mr. Marx. Did you ask him, or suggest to him that some of his testimony was mistaken, when you sent him the transcript?

MR. RODRIGUEZ: No. I don't think I've ever suggested to him that his testimony was erroneous. From my read, again, Your Honor, he was not clear he was talking about relative to clients. And factually we know that for him to say

that everything was fine from the reorganized debtor's side, we know is incorrect. And --

MR. KANE: I don't believe --

THE COURT: Well, I don't believe he said that. And in fact, that leads to another question I have for Ms. Lindauer, because I'm -- Ms. Lindauer, reading your response -- and I'll let you get back to your arguments, Ms. Lindauer.

MS. LINDAUER: No, that's okay.

THE COURT: I didn't mean for this to become such a large aside, because I assumed everybody had read the pages that Mr. Kane was referencing.

In your response, counter-motion -- give me just a minute. I'll find the question that I had for you. So this is in Mr. -- in the notice of filing of declaration that was at Docket No. 198.

MS. LINDAUER: Okay.

THE COURT: I haven't decided whether this is going to come in as evidence or not. I'm just asking you about what's in the document.

I'm looking at paragraph 8.

MS. LINDAUER: Okay.

THE COURT: Second sentence. It says, "to which I generally responded, I thought the lender revised rescission deed was much improved, and may have been sufficient. Other than as it relates to the Texas/Delaware issue. And other than

the fact that it had not been agreed to by the debtor."

And then continuing down in paragraph 9, it says, "As to the first, I further testify that I thought the Texas/Delaware issue was fatal to the instrument. Secondly, though I thought the lender revised instrument was much improved and substantially addressed my previously expressed concerns on behalf of my lender client, I do not recall being asked to testify about the new concerns raised by someone of HNGH's changes, and why the debtor did not agree to those requested or required changes of HNGH."

So my question is are you asking Mr. Marx to -- are you trying to get new testimony about what concerns his lender/client had or what concerns the debtor had?

And if it's additional concerns that the debtor had, why couldn't that be addressed by Mr. Barton or Mr. Walji? Why are we recalling -- and again I'm suggesting that we need to recall anybody else. But if there were other concerns about what the debtor did or did not agree to, isn't that better addressed by -- or wasn't it better addressed by Mr. Barton or Mr. Walji?

MS. LINDAUER: Is that a question to me or --

THE COURT: Yes, it is.

MS. LINDAUER: Okay.

THE COURT: Why are you wanting to recall or to have Mr. Marx testify about the debtor's concerns as opposed to his

lender/client's concerns?

MS. LINDAUER: I think if you look at paragraph 11 in his declaration, I think he answers that question himself. He says, "That summary is incomplete in my opinion, as it does not reflect the fact that the form was not agreed to, nor the basis of the objections/new concerns, raised by some of HNGH's requested changes, which caused the debtor not to agree to such, even before I had an opportunity to review the revised form at the time.

I have now gone back through HNGH's required revisions provided in narrative, and the manner in which such are objectionable, see such narrative."

THE COURT: So are you asking -- as I read that, you appear to be suggesting that he is now raising additional concerns, not that he had at the time, but that he has now. Now that he's had more time to think about it. Is that correct?

MS. LINDAUER: I think in part yes, and in part no.

I think part of the confusion here was the form of the document that he was looking at. And you can blame me on that one. But apparently the document that he was looking at was not the, I guess final version, if you will, of the revised rescission of deed. And he's now, I guess, and again I want to be clear, this is something -- we did not prepare this declaration for him. He prepared this himself.

He might have gotten some assistance, but he didn't get it from us. So anyway, but that being said, it appears to me that he's concerned that the testimony he provided, whether it was for his lender/client or assisting the debtor, either one, that his testimony was not complete and was not accurate to the extent that he was not apparently looking -- at least he didn't think he was looking at the right version of the revised rescission deed.

What I recall as Mr. --

THE COURT: At the time in question he was looking at documents, correct?

MS. LINDAUER: He was looking at documents, Your Honor. I think he was maybe looking at a -- I'd have to go and look at his testimony, but I believe he was looking at an incorrect version.

THE COURT: No, I'm not talking -- and I apologize.

MS. LINDAUER: Sure.

THE COURT: I'm not talking about his testimony during the hearing.

MS. LINDAUER: Sure.

THE COURT: At the time back at the end of May, he was reviewing documents, and he was either satisfied or not, on behalf of his lender/client on whether the form was acceptable.

MS. LINDAUER: Right.

THE COURT: And I --

MS. LINDAUER: No, that's my understanding, Your Honor. What he was reviewing, yes.

THE COURT: Right. And I've also gone back and reread his testimony and he said that he was primarily working for his lender and lender/client. Although he said he was interfacing with the debtor. I'm not sure what that meant.

So I guess I'm concerned that he's now being asked to give an opinion on whether -- what additional concerns the debtor may have, not the concerns that he had at the time, but what additional concerns he may have now that he's had more time to think about it and he's looking at new documents.

I'm struggling to figure out why that would be appropriate for me to allow this declaration to come into evidence like this.

MS. LINDAUER: So, Your Honor, let me address kind of two points in the response.

First of all, I think the one issue that you're looking at is the question of admissibility of his notice of filing a declaration. And I want to be clear that the notice of filing of declaration was merely to put all the parties on notice, which has been done

That Mr. Marx has raised concerns about his prior testimony. Not unlike you would do if you were giving a deposition and you went back through and read your deposition and realized some of your statements could be misconstrued.

So, number one, the purpose of the filing of the affidavit was to provide notice, right. That Mr. Marx had concerns about his testimony. He's raised those concerns and he put them in the form of a declaration. Which he asked us to file and we did file for him.

Okay. We didn't file a motion. We just filed a notice of his declaration. Okay.

Then procedurally Mr. Kane, of course, on behalf of his client, filed a motion to strike.

There are two issues here. One should the Court admit the notice of filing of declaration as some sort of evidentiary document clarifying or further describing his testimony. That's one issue that I know the Court is considering.

But the second issue really I think is the debtor, the reorganized debtor has not rested its case yet. And so we passed Mr. Marx as a witness and allowed him to be excused.

The debtor is basically asking the Court to allow us before our case in chief is closed, to have the opportunity to recall Mr. Marx so that he can clarify his prior testimony.

I think that is the proper procedure in this situation where a witness comes and says, hey, wait a minute, I'm not comfortable with my prior testimony. The Court can then or should -- and that's the second part of our response is the request to reopen.

And because we haven't rested our case in chief at this point, we've only passed the witness, we're asking the Court to allow us to simply recall Mr. Marx, so that he can clarify his testimony. Mr. Kane can ask him some questions. And that puts the issue to rest.

So again while there was a notice of filing of declaration to clarify his prior testimony, it was simply that. Notice, Judge, that Mr. Marx had concerns about his prior testimony. Okay. Mr. Kane did a good job of teeing the issue up now in front of you. At which time we did file a request to reopen the testimony of Mr. Marx. I think that that is really the proper procedure here. Is not so much for you to necessarily accept. You can accept his testimony in the form of a declaration.

But I think if you look at paragraph 9 of our response, really what we're asking is to be allowed to recall Mr. Marx so that he can clarify his testimony on the record, and make it clear as to what he believes his testimony would or should have been.

And again, since we haven't rested our case yet, I do think we should have the ability to recall, frankly we could, I think recall any witness at this point, because we haven't rested.

But I think the proper procedure is to bring it in front of you to allow -- and actually his declaration merely

puts you on notice as to what his testimony would be, or will be, if allowed to recall him.

And so really I think we could -- we can probably put this whole thing to rest by simply recalling Mr. Marx for a brief series of questions.

Mr. Kane could ask him questions. The Court, of course, can always ask him questions. And that would put this issue to rest.

Which is why the second part of our response was a motion to merely reopen the testimony. So Your Honor I haven't focused so much on the question of whether you should admit his declaration for all purposes. But I am focusing on just the brief request to allow Mr. Marx to correct his testimony if he is so inclined, and is requesting the Court to allow him to do so.

THE COURT: Okay, so I read your motion as --

MS. LINDAUER: Yeah.

THE COURT: -- I mean you didn't just ask to recall him. You filed a motion -- or you filed a declaration, so I guess we're doing something you're suggesting was not the proper procedure to begin with, so --

I take it from your comments, though that you would rather just simply recall Mr. Marx to the stand. And if that's the case, you would withdraw this declaration. Is that -- I don't want to put words in your mouth, but let me ask you that.

MS. LINDAUER: Well, Your Honor, I think the declaration serves only for notice. It's notice. It's not -- so I don't know if it really needs to be withdrawn. I don't' think we've ever -- but for Mr. Kane's motion to strike it, I'm not sure that we actually asked to have it admitted.

THE COURT: Well, what -- it seems like it's more than just notice. I mean you --

MS. LINDAUER: Yeah.

THE COURT: -- he's been asked to sign a declaration under penalty of perjury. So it seems like it's more than just notice, right. You didn't just file a notice that you wanted to recall him.

MS. LINDAUER: Your Honor, I think we would be agreeable to withdrawing the notice of declaration -- what is it called. Notice of -- let me get its name correct -- notice of filing of declaration. I think we'd be willing to withdraw that subject to just recalling Mr. Marx very briefly, on the issues that are being raised in that notice of declaration.

So I don't think you need -- I don't think we need both, to be perfectly honest. And I do acknowledge that Mr. Kane has the right to cross-examine Mr. Marx on any testimony he would be providing.

But to make the record clear, I think, yes, rather than admitting that, just reopen the testimony. I think that would be sufficient, Your Honor.

MR. RODRIGUEZ: And Your Honor, just one point of clarification, before we go further, relative to my communications on the 6/23 transcript, I've now found my email where I simply talk about the team. "Hello team. I attach a transcript." And Mr. Marx actually is not on my email on transmitting that hearing transcript.

And I'll keep looking, but the first indication I have, where I've sent all of the preceding transcripts that I have received and that I included Mr. Marx, that happened on Tuesday, July 5th at 12:04 p.m.

So that, of course, is after this, I guess declaration was signed and prepared. So he got the transcript, but it does not appear he got it from me, Your Honor.

And, frankly, I think Mr. Marx needs to be on the stand so Mr. Kane can ask him all the questions he's intimating that he knows the answers to, relative to the origins of his testimony, his communications with me, et cetera. I think we're going to need that evidence, Your Honor, to clear that up.

THE COURT: Right. So your office -- you and your office didn't send the transcript to Mr. Marx?

MR. RODRIGUEZ: Okay, Your Honor. Now that's a different question. I just told you I did send it to Mr. Marx on 7/5. I don't know if my assistant sent it to him on some other time.

But my emails, and I was the one who was, you know, handling the communications, are on 6/25 just to team and representatives, not to Mr. Marx. And then the first indication I have that I sent it to Mr. Marx was on 7/5.

I can query, I can look through my emails from my secretary and I can ask her as well, if you would like me to do that, Your Honor.

THE COURT: No, that's okay. So you sent it just to -- one off to Marx on July 5th.

MR. RODRIGUEZ: He was part of a larger group.

I sent it to everyone: Joyce Lindauer, Vance McMurry, Randy Marx, of course, personnel from my client, to general counsel, and my secretary, so that everyone would have them in one email. That's the 3/1; 3/22; 6/10; 6/13; 6/15; 6/21; 6/23 and 6/27; 6/28 and 6/29 hearing transcripts.

And my transmittal was, "Hello team. I attach all hearing transcripts received to date. The transcripts for 6/30 and 7/1 are in process now. Thanks, Rey."

THE COURT: And nobody asked Mr. Marx to go look at his transcripts and make sure they're accurate? Or did he just pick up the phone after reading them, and call somebody to say I want to make some changed?

MR. RODRIGUEZ: You know, Your Honor, I don't know the answer to that question because I purposely stayed away from Mr. Marx. Mr. Kane likes to put his cross hairs on me, so

I wasn't involved in any of those kinds of communications.

But certainly it would be a proper topic to question Mr. Marx about, if that's an issue. But I don't know the origins of that.

THE COURT: So Ms. Lindauer, how did you become aware that Mr. Marx had changes then?

MS. LINDAUER: Your Honor, Mr. Marx contacted me saying that he had reviewed the transcript. And I don't think we sent it to him, but I can go back and check. I just don't know. I don't have those documents in front of me to look at, to see how he got a copy of it. But he contacted me. Said that he was concerned about some of the statements that he had made in his.

And I said, well, I think the best thing to do would be for you to put down in writing what your concerns are. Which he did. He drafted his declaration or, I forget what he calls it. Notice of declaration. And sent it to us and said here are my concerns.

And we filed it. And that's basically our part of the involvement. Now, I'm sure that Mr. Marx, who works with other people on behalf of the debtor, so I don't know who else he might have visited with. But our involvement was very narrow. Just basically telling us he'd like to make changes. That he was going to put them in writing.

I said that's fine and then send us his declaration

and we filed it. So that's -- yeah, so.

THE COURT: Your firm prepared the redline, correct? Did I hear that at a prior hearing?

MS. LINDAUER: We provided -- we prepared -- not the one that he's attached. I've never seen this thing before that he prepared. But no, we've prepared -- I think if you recall, there was a redline of two documents that were being compared. I think it was a copy of the debtor's version and Mr. Kane's version.

And we did -- Ms. Ollar did assist us in preparing that comparison, I believe. Again, I don't have transcripts in front of me. That may have been shown to Mr. Marx during his testimony. That redline comparison.

But yes, we did prepare that redline. I don't think it was actually admitted as an exhibit. I could be wrong on that. What Mr. Marx attached to his declaration, is something I believe that he prepared. Because I had never seen this before, with these boxes in it, with his -- apparently his comments.

So that's all Mr. Marx. That's not anything that we --

THE COURT: So the exhibit to --

MS. LINDAUER: His declaration.

THE COURT: Is the redline, correct?

MS. LINDAUER: No, well, I don't know -- you'll

probably have to ask Mr. Marx that, but --

THE COURT: No, I'm looking at the pleading that you filed.

MS. LINDAUER: Right.

THE COURT: So the notice of filing of declaration of trial witness, Randy Marx.

MS. LINDAUER: Right.

THE COURT: That's Document No. 198. Attached to that is an exhibit, Exhibit 1.

MS. LINDAUER: Right.

THE COURT: Exhibit 1 is a redline with commentary. Correct?

MS. LINDAUER: Exhibit 1 is a redline with commentary. That is correct.

THE COURT: And did I just understand you to say that you did not prepare that?

MS. LINDAUER: No. I didn't have anything to do with whatever he's got attached.

THE COURT: Okay, because now I'm really confused. Because I go back to your response. This is Docket No. 214 or you can look at 215.

MS. LINDAUER: Okay. And I'm sorry, what other response?

THE COURT: Bear with me.

MR. KANE: It's paragraph 6, Your Honor.

MS. LINDAUER: Okay.

THE COURT: Paragraph 6. HNGH questions whether the exhibit was prepared by Mr. Marx himself and, thus, whether the exhibit is authentic.

Okay, so here's where I saw that. It is true that debtor's counsel assisted Mr. Marx in preparing the exhibit. And I thought you just said you didn't.

MS. LINDAUER: No. I think what we did with Mr. Marx, if we -- and again I'd have to ask Ms. Ollar, because I didn't do this. I believe what we did was send Mr. Marx the rescission deeds. But we didn't actually prepare all these narratives and redlines he put in here.

That's -- I think when it says by only in an administrative capacity, I don't think we actually prepared. And again, I think the question may be better put to him. But I don't --

THE COURT: I'm just reading what you wrote.

MS. LINDAUER: Sure. No, I understand, Your Honor. And I may have misspoken in our response. But what I understood, and again it would have only been sending him, I think documents, but not this actual whatever he's got here. This is something he prepared.

So and again I'd have to go back and look and see what Mr. Marx was sent, but I don't really know exactly what is meant by that statement. And again, you know, my fault for

having associates draft pleadings, but I think it says only in an administrative capacity to formulate the document as he wished. It's his work. So I think it's just -- I think what that means is sending him the documents -- the underlying documents. So he could do whatever comparison's been done here.

THE COURT: So you didn't -- your firm didn't run the redline?

MS. LINDAUER: I don't think so, Your Honor. This doesn't look like any redline we would have run.

THE COURT: Okay.

MS. LINDAUER: So I think --

THE COURT: Okay, that's -- I guess that's what I took your paragraph 6 to mean. Was that you --

MS. LINDAUER: Yeah, I don't believe so, Your Honor. Because I don't -- I haven't -- I'm not familiar with this. And if you look at the notes in the back formatted by comments, I don't see where our firm did any of that formatting.

THE COURT: Okay.

MS. LINDAUER: Unfortunately --

THE COURT: Mr. Kane, what about just allowing Mr. Marx to be recalled, striking the exhibit -- or the declaration, and allowing Mr. Marx to be recalled. So then I can address -- I can assess his credibility when they ask questions and when you ask questions.

MR. KANE: Yes, Your Honor, and I'm happy to address that. And in doing so, would like to address some of the assertions made by Mr. Rodriguez.

THE COURT: All right. Let me -- Ms. Lindauer, are you finished with your arguments? I know I interrupted because the way my brain thinks --

MS. LINDAUER: No, that's fine.

THE COURT: If you say something that jars my memory on something, I kind of like to get it addressed, so --

MS. LINDAUER: No problem.

THE COURT: Do you have any other arguments that you'd like to make?

MS. LINDAUER: No, Your Honor, I think you -- we've covered the issues.

THE COURT: All right. Mr. Kane go ahead.

MR. KANE: I want to make it abundantly clear that I'm not making the argument that Mr. Rodriguez got done with the hearing on the 23rd, picked up the phone, called Mr. Marx and said you did a horrible job. We need you to prepare a declaration. It's got to fix all these other things. Okay. I'm not arguing that.

I want to make that abundantly clear, right now. Those allegations never came out of our mouth. Those allegations aren't included in our pleading.

The issue is that Mr. Rodriguez's arguments to this

Court specifically addressed very specific provisions of the documents that Mr. Marx had had in front of him on the stand for hours and hours and hours of testimony. Noted that Mr. Marx on multiple occasions was mistaken and other witnesses would testify otherwise. And walked through the corrections that Mr. Rodriguez would believe would be required of this document before I specifically identified this provision says shall. This creates a contingency. And lays forth very, very specific arguments about deficiencies in the document.

Okay. Those are the arguments of counsel. That's directed with counsel for the debtor. That transcript was then provided by the debtor to Mr. Marx. So when Mr. Marx reviews his transcript testimony, part of that if he reads all the way through is a review of the specific arguments of his counsel -- of the debtor's counsel, that note all of the spots where his testimony was mistaken -- purportedly mistaken, purportedly incorrect. Where there are deficiencies in Mr. Marx's analysis.

Where Mr. Marx should have come to a different conclusion for very specific provisions of this HNGH's revised form of agreed rescission instrument.

And that, Your Honor, in my opinion, taints Mr. Marx's potential testimony. Even if he is called back to the stand, there's no getting around the fact that he's reviewed the June 23rd transcript. That's specifically addressed in the

debtor's response. After reviewing the June 23rd transcript. Mr. Marx notes that some of his testimony may have been mistaken or incorrect.

And so Your Honor, the value of bringing Mr. Marx back to the stand to ensure that he provides that same testimony consistent with the arguments that were previously made by Mr. Rodriguez since we know what he's going to testify to because of his declaration, I think is wholly inappropriate. And this Court should exercise its powers under Rule 403 and 611 to preclude Mr. Marx from coming on the stand and regurgitating the argument set forth by Mr. Rodriguez in that June 23rd transcript.

Your Honor, so we would still propose to keep Mr. Marx out. We don't think that's necessary, especially given the tremendous amount of time that Mr. Marx was on the stand.

THE COURT: All right. We'll take a brief-five minute recess.

Thank you.

(Recess at 10:09 a.m./Reconvened at 10:18 a.m.)

THE COURT: All right. We are back on the record. Is everybody there?

MR. KANE: Yes, Your Honor. HNGH is here.

MR. RODRIGUEZ: Joyce is coming down the hallway as we speak.

THE COURT: All right.

MS. LINDAUER: Your Honor, you did ask me a question. And I did have a chance to go and pull up my emails. And what I show is on June 29th at 11:43, I did send Randy Marx an email, also Ella (phonetic) Marx in response to he sent me a document that he said that he was going to contemplate to be filed in the morning. I believe it was his notice of declaration.

And the only thing my comment says is I think this needs some editing just on format. And that was my entire email to him. So think that may be more or less consistent with, not worded as nicely, but as what we put in the response. But that was my comment.

And then based on what I can tell here, that was at 11:43. And then that declaration was filed at 2:05 same day, a couple hours later. So that's the only email trail I have on that. So I wanted to be clear. I may have misspoke when we said we sent him those redlines because I don't have any paper trail of that. This is the only thing I have is need some editing on format, and that was it.

THE COURT: Okay.

MS. LINDAUER: Just to be clear on that.

THE COURT: Thank you.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: So on the motion to strike Rule 2005 and the debtor's response at 214, and again it was docketed as a

kind of a counter motion to Docket 215, this ruling addresses both motions at 205 and 215.

Under Rule 611, the Court has reasonable control over the mode and order of examining witnesses and presenting evidence so as to make the procedures effective for determining the truth, avoid wasting time, and protecting witnesses from harassment or undue embarrassment. And under Rule 703, the Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence.

And we've looked at the case law on recalling witnesses. And it does appear that it is within my discretion whether or not to allow a witness to be recalled. And I'll direct the parties to United States vs. Tran, 433 Fed.Appx. 227. And the pin cite is Pages 234 and 235. That's a Fifth Circuit case from 2011.

I am going to strike the declaration because I don't think it's proper. It's not in evidence. I'm not considering the declaration. I don't think it was merely filed for notice purposes. But in any event, I'm striking the notice of declaration, and I'm not considering Mr. Marx's declaration or the attachment.

But I will allow the debtor to recall Mr. Marx to the

stand. And Mr. Kane can ask whatever questions he would like on cross-examination. And I'd like to take up Mr. Marx first. So if you would please call Mr. Marx and ask him to rejoin.

MS. LINDAUER: Your Honor, I think we're doing that right now. Can we take about a two-minute break? We'll get Mr. Marx keyed back up on the --

THE COURT: So I'll just stay on. I'm going to put it on mute.

MS. LINDAUER: Okay.

THE COURT: I'll stay on until Mr. Marx is on.

MR. KANE: Can I get -- oh, never mind.

THE COURT: I'm sorry. I'm sorry, Mr. Kane. Go ahead.

MR. KANE: No, just trying to get a clarification of timing. So how long does the debtor expect Mr. Marx will be on the stand?

MS. LINDAUER: I'm estimating about ten minutes. Not long. Fifteen minutes max.

MR. KANE: Okay. I've got my rebuttal witnesses on standby. And if I'm going to be on for two hours before any potential rehabilitation or, you know, recross or whatever, I'm just trying to get an idea. We have a hard stop I believe at one o'clock today. Is that correct? And then we'll resume if the 1:30 docket is complete? I'm trying to recall exactly what the timing is on this.

THE COURT: So we have some lift stays at 1:30. I previously had a call scheduled for noon, but it looks like that has been rescheduled. So I think I'm open until 1:00. I believe Ms. Lindauer said she had a hearing at 1:30. Is that correct, Ms. Lindauer?

MS. LINDAUER: I'm sorry, Your Honor. I do have a hearing at 1:30 with -- I'm drawing a blank -- with Judge Mullen, I believe, on --

THE COURT: Judge Morris.

MS. LINDAUER: Oh, no. It's Judge Morris, I'm sorry, on cash collateral. A final cash collateral hearing. It's not contested, but I don't know how long his docket is at 1:30. So --

THE COURT: So I think I had indicated last week that the plan was we would go until I thought I said noon, but I think we can go till 1:00 today, take a break while I do my 1:30 lift stay docket and Ms. Lindauer does her hearing. And then we can reconvene this afternoon when she is finished. Does that work for everybody?

MS. LINDAUER: Your Honor, I think we can work with that.

MR. KANE: I'm going to then, based on the time estimates, go ahead and tell my rebuttal witnesses that they need to just be on standby at some time after two o'clock.

THE COURT: Okay. And then, Mr. Kane, are you ready

for Mr. Marx?

MR. KANE: Sure, Your Honor.

THE COURT: Okay. All right. So I'm going to mute myself. And go ahead and call Mr. Marx and ask him to rejoin.

(Pause)

THE COURT: Okay. Mr. Marx, I can see you. Can you hear me?

MR. MARX: Yes I can, Your Honor.

THE COURT: Okay. So we had kind of a lengthy hearing deciding whether or not you would be allowed to testify either by your declaration or live testimony. So I did strike your declaration, and I'm not considering it. It's not in evidence. But I did allow the reorganized editor to recall you to the stand.

And so, Mr. Kane, before I forget, if you would upload an order on your motion to strike sometime, you know, after the hearing. And ask Ms. Lindauer to approve it as to form and content?

MR. KANE: We will, Your Honor. Thank you.

THE COURT: And then, Ms. Lindauer, your motion is at Docket 215. I guess I didn't construe it as a request to allow Mr. Marx to retake the stand. So I'm going to deny your motion at 215. But again, I'm allowing your client to recall Mr. Marx to the stand. So if you would prepare an order denying your motion, Ms. Lindauer, 215. And again, allow Mr. Kane to review

that as to form?

MS. LINDAUER: Yes, Your Honor. I'd be happy to do that.

THE COURT: Okay. Mr. Marx, it's been a while since you've been on the stand, but you are still under oath. You understand that?

MR. MARX: Yes, Your Honor. Thank you.

THE COURT: All right. Ms. Lindauer, go ahead.

MS. LINDAUER: Okay. Mr. Marx -- and, Your Honor, we may want to re-swear Mr. Marx since it's been a while. I don't know if you've done that, but I'd ask that he'd be re-sworn in.

THE COURT: Well, I just reminded him that he was still under oath. But --

MS. LINDAUER: Oh, okay. All right. Your Honor, I may have missed that.

THE COURT: We'll do belt and suspenders. Mr. Marx raise your right hand.

MR. MARX: Yes, sir.

RANDY MARX, DEBTOR'S WITNESS, SWORN

THE COURT: Thank you.

MS. LINDAUER: Okay.

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Marx, could you just for the record restate your name?

A Excuse me. I am Randy Marx, M-A-R-X.

Q Okay. And, Mr. Marx, have you previously testified in connection with these proceedings?
A Yes.
Q Okay. And just to clarify, in your prior testimony, who were you testifying that you had served as an attorney for just so we can clarify that.
A The lender. Oh, sorry. Excuse me. Let me get rid of this. I apologize. Sorry.
Q Okay. You said a lender. Is that right?
A Yes.
Q Okay. Had you also offered any testimony on behalf of the debtor?
A Indirectly. But primarily I was testifying on behalf of the lender as I went through this process.
Q Okay. If you look at --
MS. LINDAUER: Sydney, can you pull up Exhibit D6? That's Debtors Exhibit 6.
THE WITNESS: Yes, I see it.
BY MS. LINDAUER:
Q Okay. And, Mr. Marx, I believe you may have been asked questions about this Exhibit D6. Do you recall that?
A I do. That was the document that I was told was the redline from what was sent by your offices to Mr. Kane's offices, and then returned by him with those redlines. But subsequently, I was able to determine that that was not the

case, that it was an earlier, a redline to an earlier. And so I was confused then. And I do remember giving testimony about this document.

MS. LINDAUER: Okay. Can we drop down on this document a little bit, Sydney?

BY MS. LINDAUER:

Q And do you -- this one shows actually up as sort of green changes. Do you see those? The one I'm looking at shows sort of green changes.

A Yes. At the bottom of Page 1.

Q Okay. And, Mr. Marx, when you were shown this document, who did you understand had made what are showing up as these green changes?

A I think these green changes were requested or required by the -- Mr. Kane's office or the lender I'll call them. And what was told to me is that these were those, his changes to what was sent. And actually, I now understand that these are his changes to an earlier iteration.

Q Okay. If we can drop down a little further on this document. There are additional changes at the top of this page also. Do you see those?

A I do.

Q Okay. And if we can drop down a little further. Do you see there are further additional changes. Again, they show up as green. And to be clear again, Mr. Marx, when you were asked

questions about this document, what was your understanding of these green changes that show up on this document?
A They were required changes made by the lender. What I understood them when I was testifying previously is that they were redlines to the draft that was sent to Mr Kane's office. But I now understand that these are redlines to an earlier draft six or seven, I believe. And I do not know who generated these redlines. My recollection is that I don't -- I don't recall ever seeing a redline prepared by Mr. Kane's office.
Q Okay.
A At the time.
Q All right. So to be clear, you, as you sit here today, don't have any knowledge as to who actually asked for these what are showing up as green changes. Is that correct?
A Well, I mean, I are you asking who prepared this redline?
Q No. Do you know whose changes are reflected in this redline?
A Well, I think that they're maybe changes requested by the lender. But because it -- it was not as represented or as I understood, I don't really have a lot of confidence in that instrument, in that compare, which is why I generated a redline where I got I think from the lender's exhibits. And I ran it through an OCR and I compared. So I had what I knew to be an appropriate redline.
MS. LINDAUER: Okay. Can we take a look, Ms. Ollar,

if you could pull up it's at Docket Number 198, and the exhibit to that docket.

BY MS. LINDAUER:

Q Okay. Mr. Marx, we've got an exhibit up on the screen. And it starts at the top. There's a little box that's being cut off.

MS. LINDAUER: Sydney, if you could drop it down.

BY MS. LINDAUER:

Q It says legend, red boxed narration demonstrates objectionable nature of the HNGH required revisions. Do you see that?

A I do.

Q Okay. First of all, who made this redline that we're looking at here?

A I did.

Q Okay. And how is it that you were able to make this redline?

A I had the actual instrument that was sent to the lender in a PDF form. And I had a Word version that Mr. Kane on behalf of the lender responded. So I took the PDF of what I had confirmed was the instrument that was sent, and I -- what -- I ran that through an OCR, a character recognition program.

So I then had a Word version of what was actually sent. And then I compared it to the Word instrument that was received from the lender's counsel. And it generated these sets of

redlines or compare comments that are denoted on the right hand of the page.

Q Okay. So just to be clear, you're the one that exclusively prepared this redline that --

MR. KANE: Objection. Leading.

MS. LINDAUER: All right. What assistance, Mr. --

THE COURT: Sustained.

MS. LINDAUER: I'll rephrase the question.

THE COURT: Ms. Lindauer, Ms. Lindauer, when there's an objection pending, I have to rule on it. So that objection is sustained.

BY MS. LINDAUER:

Q What assistance did you receive, Mr. Marx, from anyone to prepare the redline that you've got in front of you now that we have up on the screen?

A None. I obtained the -- the instrument that was actually sent, I think from Mr. Kane's exhibits. And then I ran it through an OCR. And then I redlined that to the Word version that was received from the lender's counsel, Mr. Kane. And it generated this form.

Q All right. And what were you looking at when you created this particular redline document that we're looking at here?

A What was it? I was looking -- maybe I just don't understand your question. What was I looking at?

Q Well, let me --

A The actual --

MS. LINDAUER: Your Honor, if I might rephrase the question?

THE COURT: Go ahead.

BY MS. LINDAUER:

Q Okay. Mr. Marx, why did you run a new, or a redline, the redline we have up on the screen. Why did you run this redline?

A Well, after my testimony I think maybe that same day or anyhow, subsequent, I heard statements to the effect that I had approved in all regards this -- the testimony that was given on that other document. And I remember being confused at the time. And I didn't think that that was an accurate depiction of my testimony.

So I asked Bella (phonetic) here to -- who's been my assistant with the computers and stuff, to get me a copy of my a testimony so I could review. And that is when I noticed that, or confirmed that the redline that had been given to me or that we talked about in that testimony was not what I understood it to be. And so when I was aware of that, I thought it would be appropriate to compare redline on my own so that I could firm it up.

Q Okay. And let me ask you, you used the term firm it up. What does firm it up mean?

A I just wanted to be sure that my testimony was accurate as

it relates to the -- the lender redline. And what was -- I think I was looking at the wrong document. I -- I don't think that anybody knew, I certainly did not at the time, that it was a redline to an earlier internal version, I guess.

Q All right. So looking at what's up on the screen, which is the redline that you just told us you prepared after you testified in court, what changes -- or I think your comments, I guess, what comments did you have to the redline that you prepared?

A I believe I earlier testified that some of these changes had the effect of subjecting this instrument to an additional potential encumbrance. And specifically, when you use this redline, it's to my understanding, anyhow, better shown that on a number of occasions in this instrument there is language to the effect of upon satisfaction of the items in the agreed orders. And then shall. Sort of an if/then.

Basically it creates, in my opinion, a subject to, or an encumbrance that could create a cloud on title. And I made brief reference to that in my earlier, but I don't ever recall being asked specifically in terms of why I thought that -- that to be the case.

Q Okay. Mr. Marx and, and I'm trying to follow your testimony, what specific provision --

MS. LINDAUER: And you might need to zoom in, Sydney, a little bit on this.

BY MS. LINDAUER:

Q What specific provision in this redline are you referring to with regard --

A It's the --

Q -- to the testimony you just gave us?

A It's the same law, I'll say, in two different places.

Q Okay.

A It's the use of the word upon effectuation of all conditions precedent set forth in the agreed order. That's on Page 5. It's in the -- go down a little bit. All right. Stop there. Okay. It's in the third paragraph I'll call. And I highlighted in yellow. It says upon effectuation of all conditions precedent set forth in the agreed orders, or meant to be orders.

And then immediately above it, it's you know, basically it's in upon effectuation of all conditions precedent, then shall. And I think that makes it an if/then statement, and subjects this record title to conditions precedent set forth in the agreed orders, which I think, what, creates a cloud because we're -- it's referring to documents outside the instrument, and leads one to believe that this instrument may not be effective now, but that it might be effective in the future upon effectuation of all conditions precedent, set forth in the agreed order.

I think that is the flaw I mentioned subject to earlier.

And now if you'll go down, it sounded the same type of concept or the same flaw on the next page.

Q Okay.

A And again, it's -- it's the use of shall upon recision. Let me show you where that is. There. It's the first paragraph. And here it's upon recision shall. And again, I think that suggests that there's some other condition precedent, or some other act to occur in the future when really this is the instrument of recision. Okay? And so I think for both of those reasons, which I appreciate having the opportunity to amplify today, that this document is fatal as well as the other comments that I made previously as to the fact that rescission requires two parties. And this document was never agreed to. And there was initial I think we called it simply the Texas-Delaware flaw. Okay?

Q And, Mr. Marx, what is --

A Which I think we did talk about.

Q Okay. I'm sorry. Could you just repeat your answer? I may have fumbled over your answer.

A I think I was making reference that the upon rescission or the upon conditions -- satisfaction of conditions precedent is in effect subjecting this instrument to a potential additional incumbrance which is inconsistent with the idea of restoring the parties. And then I think I went on to state that I thought it necessary to clarify this because else wise, my

testimony was characterized, or summed up I'll -- I'll say, that there was just the one flaw relating to Texas and Delaware flaw when -- and more accurately there is the Texas-Delaware flaw, the fact that the document was not agreed to, and because of this subjecting to, or upon rescission insertions required by the lender which serve no purpose, there's no need for any of this language in this instrument. And as I understood, I think your office, Ms. Lindauer, objected to these requirements before I even --

MR. KANE: Objection. Hearsay.

THE WITNESS: -- had a chance to --

THE COURT: Sorry. What was the objection, Mr. Kane?

MR. KANE: Hearsay. He's testifying about Ms. Lindauer's statements.

THE COURT: So, I'll sustain that.

BY MS. LINDAUER:

Q Okay. Mr. Marx, now again, I think you told us that during your testimony, your primary representation was of a lender or lender's client or lenders that were interested in advancing funds to 2999TC Acquisitions. Is that correct?

A Yes.

Q Okay. Now that you've had an opportunity to go through this document a little more carefully and make some comments, I assume those red boxes are your comments. Is that correct?

A That's correct.

Q Would you find this particular document, obviously cleaned up, but this document satisfactory to your lender clients as a recision of deed?

A No. If -- if these required changes were, well, withdrawn by the lender, and the instrument that I had previously prepared accepted, that would've been acceptable. But there again, there's no need for these. And they, well, I don't know about the intent. But it certainly has the effect, in my opinion, of creating an unneeded and inappropriate encumbrance on the property.

Q Mr. Marx, has it come to your attention that there are any other versions of these particular documents?

A Well, I know that I had generated some draft comments. And -- and I think they were being reviewed I'll call it. And so I believe that there were a number of internal iterations where I reviewed the work that went into the -- a more appropriate form of recision instrument that was first tendered to the lender.

Q All right. But as we sit here today, a final version with the edited changes that you've identified here, have you actually seen that document prepared?

A No. The documents that -- that would be appropriate would be the one that I sent over prior to the targeted closing date. I haven't seen this instrument fixed or cleaned up to address these objections.

MS. LINDAUER: Your Honor, to complete the record I'd like to go ahead and offer this version of the redline prepared by Mr. Marx as Debtor's Exhibit D28. And we'll provide a copy to the Court as a designated exhibit. We can do that at a break.

MR. KANE: And, Your Honor, we object. HNGH objects to the admissibility of this document. It was prepared out of court. It's being offered for the truth of the matter asserted. Mr. Marx has in essence testified or has attempted to validate the statements that have been made on this document. So we believe that that it is inadmissible hearsay.

THE COURT: Ms. Lindauer, why can't this just be a demonstrative, because this wasn't exchanged as an exhibit earlier. So we heard Mr. Marx's testimony. Isn't that sufficient?

MS. LINDAUER: Your Honor, I think it would be. Then I would want to make sure that I've gone through. But as a demonstrative, that's fine. But I want to be sure then that we've gone through all of his comments. I think we have gone through most of them, but I'm not sure we went through all of them. So that was the reason I was going to offer it. But if we go through, and I'll try to do it reasonably quick, if we go through all of his comments, then I do think it could be considered as a demonstrative.

THE COURT: So if you have more questions to ask, go

ahead.

MS. LINDAUER: Okay. Mr. Marx --

THE COURT: I'm sustaining the objection and not admitting this as an official exhibit, but I'm considering it a demonstrative. And you may ask whatever additional questions you'd like to ask.

MS. LINDAUER: I will.

BY MS. LINDAUER:

Q Mr. Marx, what I'd like to do is, for the record so that we have a complete record of your testimony, I'd like to look at what are in the comment boxes that are made part of this document.

MS. LINDAUER: I think that first comment box on the first page, Sydney, we already looked at, we already talked about that one.

BY MS. LINDAUER:

Q If we turn to the next page, and I want to be clear, Mr. Marx, the comment boxes are your comments to the document. Is that right?

A That is correct.

Q All right. I don't see any on this particular page. Did you have any comments on Page 2 of the document, Mr. Marx?

A No, not on that page.

Q Okay. If we flip ahead, I think it's about Page 5 or 6 is when we pick up with I think some comments. Okay. If we stop

there, the first comment is in the parens. It says agreed orders. What did you mean by that comment, just so I'm clear?

A Well, I think agreed orders is a defined term up above, but not here. And so just to remove some -- any assertion of it being vague or referring to something else, I wanted to use the defined term there.

Q The next one is a box that starts with shall. What was your comment on the shall inserted here is?

A Well, these two go together, these two comments that I tried to address a minute ago. And that is as revised by the lender, this suggests upon effectuation of conditions precedent. So that's basically the subject to. Then, shall upon shall. And I think that creates an encumbrance which is what I was trying to explain earlier.

Q Okay. The box below that starts with upon effectuation of all conditions precedent. What's your comment in that box?

A This is what sets up the -- the conditional nature of what should be an effective instrument of recision. It suggests that there are other conditions precedent that may need to be satisfied. And so I think when you're (audio skip) goes to the upon effectuation shall, it creates the encumbrance that I'm referring to, and it effectively make this instrument subject to.

Q Okay. If we drop down, there's another box underneath that. What's the comment in this box?

A Can you make this go down a little bit further?
Q Sure.
A This is the RPM note. It's adjacent to a representation or recital that -- that HNGH is the holder of the note. And now whether it's -- whether it's done here or in some other instrument, I don't -- I understand that that -- that now that that affirmation was not correct.
And so either in this instrument or in some instrument recorded of record, we need to have, in my opinion, confirmation from Happy State Bank because, I mean, and that could be done here. You know, we're reinstating, as a part of this instrument, the obligations. And that requires the obligor and the obligee parties, in my opinion, to execute an instrument in writing.
And if it's going to revitalize the note in -- in liens, it should be signed by the obligor and the obligees. So the comment here is that we -- the record should require some document signed by Happy State Bank consenting to the reinstatement.
Q Okay. So I guess your comment, I'm reading require confirmation of such. What is that referring to?
A I think this instrument of rescission and restatement of the note should be signed by the holders of the note, one or more.
Q Okay.

A And the actual holder of the note, in my opinion.

Q All right. If we go to the next page of this document, there's a little box on the left hand side at the top. Can you tell us what that comment specifically is referring to?

A This paragraph, as originally drafted by me, was intended to address and get confirmation from the lender. Okay? But when it says grantee there, that refers to the lender, HNGH, to the matters that are set forth in that paragraph, essentially that it hasn't occupied the property, that it's not, you know, further encumbered the property.

And the -- the entire paragraph relates to that -- sort of like despite the rescinded deed or that by way of the deed that's being rescinded, it never acquired any of these rights, which I think are required to confirm that by way of this rescission instrument, the title and the properties have been restored. The exceptions that are added where it says except as set forth through the reinstatement of the note, and then elsewise other than restatement of its note in first lean, those concepts are addressed in -- in this instrument. Okay?

So I really think that the comparisons are inept. And so what I've thought -- what I have sought to do here is to confirm that this paragraph is -- is addressing the deed being rescinded. And so these two exceptions that the lender sought to insert I think just confuse the issue. And -- and is -- it's further objectionable for that purpose. And I think I

tried to explain that in shorter form in the box that's a little bit lower into the left.

MS. LINDAUER: Sydney, can you scroll up a little bit on that one so we can -- okay.

BY MS. LINDAUER:

Q So the box on the right there that we're looking at that starts upon rescission?

A No, it'd be the one further down.

Q Oh, the one underneath?

A There.

Q That one?

A Yeah.

Q Okay.

A That. And here, I'm trying to summarize that --

Q Sure.

A -- the purpose of that paragraph and how by these two insertions, the -- the document is made less clear and potentially ambiguous and inappropriate.

Q And so I understand, if you could just, because we're trying to put this in your testimony. Can you, again, the box at the bottom is referring, you got some little arrows going up there, but it's referring to right before except and right before other. Is that the way I read that?

A Yeah, that's correct.

Q And that's your comments as to those particular

provisions. Is that right?
A Right.
Q Okay. And --
A It doesn't make sense the way with those insertions. And so I've sought to clarify that that paragraph, we're just referring to the -- that by way of the deed being rescinded, these events did not occur.
Q If we drop back down again, there's a box on the right. So we've got a pretty thick text, pretty thick text in it. Can you tell us what your comment was in that particular box, starting with upon rescission?
A Well, upon rescission is just subject to rescission. And it almost speaks to as if there was something further to occur in this instrument, and that's not the case. This is the instrument of rescission. And so to insert the words upon rescission I think is suggestive of some additional future act, and there isn't any. And again, I think it -- I don't know the intent over the -- but the effect I think is that it clouds title.
Q All right. If we go to the next page, Mr. Marx. And I don't see any little red boxes, but I see a lot of compares. Were there any comments being made on this particular page?
A No. The -- there was no comment. This is the signature page, excuse me, for the for the borrower. And I didn't have any comment other than that rescission and reinstatement

requires the agreement of both parties.

Q All right. If we drop down to the next signature block. And any comments on this particular page?

A I guess I didn't note it there, perhaps because I think my testimony was clear relative to the Delaware-Texas flaw. And here, you know, unlike elsewhere, HNGH is appropriately identified as a Delaware limited liability company.

Q And, Mr. Marx, we've gone through the redline comparison that you provided to the Court and to counsel. Having now reviewed that document again, what other comments, if any, do you have to the version that you were comparing, which I believe was the lender's version with a I believe it was a subsequent debtor version. Do you have any further comments on those particular documents?

A I would just comment that my -- the concerns that I raised on my draft were addressed, but that these additional required revisions had the effect of subjecting this instrument to another encumbrance, which I think is inappropriate. We talked about the Texas-Delaware flaw. And we also talked about the fact that the instrument needs to be agreed. We can't have a rescission without the agreement of both parties in this context.

There is a context in the residential properties, but not applicable here. And you can't have a reinstatement without the agreement of record of all the obligors and obligees. And

there's the -- now whether it's addressed here or elsewhere, there is an outstanding defect, and that this instrument does not have a signature line for Happy State Bank.

And from what I understand the other testimony was is that it was the actual holder of the note.

Q So -- so my takeaway here is --

A I think that more accurately --

Q Sorry, Mr. Marx.

A Excuse me.

Q Go ahead, Mr. Marx. I'm sorry. I didn't mean to interrupt you.

A I was just trying to more carefully sort of summarize my testimony. And I think that addresses each of the items.

Q All right. So just to be clear, my takeaway from what you just said was that to be an effective rescission document, the parties to that document would have to, at least these two parties, HNGH and 2999TC Acquisitions would both need to sign off on an agreed form of a rescission document. Is that what you're telling us?

A Yes. I mean, you cannot reinstate obligations in this context or -- or rescind the prior disputed instrument without the signature of both parties.

Q So, and obviously in this instance, we don't have, we didn't have agreement as to the form of the document by both parties. That's evidenced by the redline that you've provided

to the Court. Is that right?
A Yes.
MS. LINDAUER: Your Honor, based on that testimony, I'll pass Mr. Marx at this time. Thank you.
THE COURT: Mr. Kane?
MR. KANE: Thank you.

CROSS-EXAMINATION

BY MR. KANE:
Q Mr. Marx, I believe you testified that you represented a lender party, correct?
A Say again, please.
Q You represented a lender party who was interested in providing financing or equity contribution or a takeout here.
A Yes. A funding source.
Q Right. And you're primarily testifying about comments on behalf of that funding source, correct?
A Yes.
Q Okay. And you read through the transcript of your testimony from June 23rd?
A I think I looked at all of them, candidly.
Q And when did you review those transcripts?
A It was the day that I -- it would've been June 27th or the 28th.
Q Okay. And did those confirm that you had testified about, or incorrectly testified about certain issues?

A Say again, please.
Q Did those confirm to you that you had incorrectly testified about certain issues?
A No, I don't think so. I think what I had heard was a incomplete characterization. And so I went back, and believe that amplification was required.
Q Now I'd like to -- I'm going to go --

MR. KANE: Ms. Lindauer, can you have Sydney stop screen sharing, please? Thank you.

BY MR. KANE:
Q I want to just ask you a couple basic questions. I know that you're practicing lawyer. Are you familiar with what a condition precedent is?
A Generally. I think that it's the plain meaning of the words would apply.
Q Okay. And you're very familiar, I believe you testified that you previously reviewed the agreed orders at Docket Entry 64 and 94 in preparation for your testimony. Is that correct?
A I generally reviewed them. If you have a specific question, I'd like to see them again.
Q Okay. I'll get there. You did testify though. Do you recall testifying about your interpretation of those agreed orders?
A I believe as it relates to certain sequencing, yes.

Q Okay. And are you generally familiar, would you agree, that you had to have a rescission deed, reinstatement of the note, payoff of the note by the payoff deadline? Is that correct?
A Sorry. Could you repeat that or maybe pull the document up?
Q Yeah, sure. I'll repeat it. Rescission of the deed, reinstatement of the note, payoff of the note by the payoff deadline.
A That is some of the sequencing, yes.
Q Okay. And what is your understanding of what would have happened if the rescission deed or rescission instrument was filed, and then a funding source pulled its funds and no closing took place?
A I guess -- I'm not sure your question -- it's like a hypothetical?
Q Yeah, it's a hypothetical.
A Okay. Tell me again.
Q Funding source pays money into escrow. Rescission deed is filed in anticipation of release of funds. Funding source decides nope, not going to do the deal. Pulls funds from escrow. What happens?
A I guess that would just depend.
Q Depend on what?
A I think you asked me to assume that the rescission deed

was recorded?
Q Yes, Mr. Marx.
A Okay. And the money was at the title company?
Q And then pulled from the title company. So no payoff takes place by the payoff deadline.
A Well, that -- I think that demonstrates the need to have, in this circumstance, an agreement of the parties relative to the delivery of funds and the release of those upon satisfaction of various items.
Q Okay. And in the hypothetical that I shared with you, what would have to happen to that rescission deed. Or rescission instrument.
A Well, in a transaction like this, where you'd have such longstanding dispute, what I would suggest is that we would have prepared appropriate instruments to avoid that. In other words, the title company --
Q Hold on Mr. Marx. I want to --
A -- would be instructed --
Q Let me stop you there. I agree that the parties should try and avoid it. I think you and I are probably on the same page on that. But what happens to the rescission deed if that hypothetical took place?
A Well, I don't -- I don't -- I don't agree with the assumption in your hypothetical because what is typically done is that the funds are at the title company. Okay? When all

these instruments have been prepared, reviewed, approved, the authority documents in this situation, some correction as to the parties that are actually represented, you know, the Texas-Delaware flaw, all those documents would be at the title company.

Then the funding occurs. Okay? The title company is possessed of everything. They will not record the rescission unless they are irrevocably committed at that moment in time to release the funds. So what you're suggesting is an incomplete hypothetical.

Q So you'd agree though, that in your changed hypothetical, there'd be a requirement that funding take place to close the transaction?

A I think it's impossible for you to suggest, or not you, the question, the hypothetical you suggest for the revision deed to go of record until the ability to fund was all within the control of the title company.

Q In other words, there's no way a lender could possibly get cold feet in a situation like that?

A No way ever under any sort of circumstances. I have not experienced a situation where when everything is in order and at the title company and the lender has signed off and wired the funds, that they've retracted. If they did, then the title company would not record any of the instruments.

Q Mr. Marx, I've got on my screen that same demonstrative

that Ms. Lindauer had. Do you have a copy of that handy with you? Or can you see this okay on my screen?
A I cannot. But give me just one second.
Q Try and make it a little bigger for you.
A Oh, okay.
Q Can you see that all right?
A Yeah. Just let me see. There's some pop up. Let me see if I can move it. I can see all but the very, very top. It's kind of blacked out. There's something else on my monitor, unfortunately.
Q Yeah. I'll try and keep the provisions that are relevant here a little bit farther down low. Now I'm going to highlight this. Do you see this, this highlighted provision here at this paragraph? It's at the bottom of Page 6 of 45. It starts whereas, grantee dated the deed as of October 29, 2021.
A Okay. I -- I see the -- the section you're referring to. Begins, whereas granted dated.
Q Right. Was it your understanding that those proposed revisions are factually correct?
A I really don't have any information about that. I can speak to the fact that the instrument was dated. And I know there was a recordation date.
Q Okay. I think you've previously given some testimony about HNGH's special warranty deed where there's a difference between these whereas provisions. And let's say a provision --

I'm having to scroll all the way down here to this shall be and are hereby reinstated, which is shown here at Page 11 of 45. Do you see that?

Can you explain for the Court the difference between those whereas provisions and the shall be and are hereby reinstated provisions again, or at least what your understanding is?

A The -- the section that's up now is now therefore.

Q Yeah. I want to just be clear here. See all these whereas provisions? See how they start, whereas? Whereas. But then below that you've got this shall be and are hereby reinstated language. Do you see the difference between those things?

A (No audible response)

Q I believe you've provided some testimony --

A The "whereases" are in the preamble or recitations, I'll call them, section. And then I think what you're referring to at the bottom of Page 5 is more in the operational, or maybe if it was decretive the non-recital portions.

Q And what's the difference between a recitation and an operational provision, in your understanding?

A Well, recitations are typically just designed to provide some context, candidly. They're typically not enforceable per se, and certainly require some level of construction if one seeks to try to address those whereas in the -- in the operative section, specifically what's important here is in a

reinstatement, it's the verbiage are hereby reinstated.

This is a present act. It's not a covenant to do a future act or something in the future. Are hereby reinstated. This is the operative instrument in the operative section of the instrument.

Q Okay. So up here on the same page where we have whereas, grantee and grantor have agreed as ordered by the bankruptcy court by order signed December 10. Do you see that?

A Yes.

Q And then there's a defined term for these agreed orders?

A In one place there is, but not the other.

Q Right. And it talks about grantee shall rescind and avoid the deed upon effectuation of the conditions precedent set forth in the agreed order. That's just, I believe as you said, enumerating the party's -- or maybe not you said, but that's just enumerating the party's understanding in a recitation, correct?

A Yes.

Q Okay. Now, when we scroll all the way down here, this is on Page 13 of 45. This is actually a representation and warranty of grantee in this paragraph, correct?

A (No audible response)

Q So these are binding on HNGH. Is that your understanding, Mr. Marx?

A Let me double check that they didn't -- HNGH Turtle Creek,

LLC of Delaware, LLC, is the grantee in this instrument.

Q Okay. So I want to go back and ask you that question again. Did you understand that this provision here at the top of 13 of 45 starts grantee represents, warrants, and affirms, that that was a set of representations and warranties by HNGH?

A Yes.

Q Okay. Now this document, as you have testified, you would have it say that HNGH then represents and warrants, and in this iii that it has no claims related to the property, period. Is that right?

A What this paragraph is -- is addressing is that by way of the deed being rescinded --

Q Hold on, Mr. Marx.

A And then all that would be extra.

MR. KANE: Objection. Non-responsive.

THE COURT: Overruled. But you can ask another question.

BY MR. KANE:

Q Okay. Mr. Marx, this document reflects HNGH's proposed revisions to a draft form of agreed rescission of deed that you prepared, correct?

A I now believe that to be true.

Q Okay.

A This is an accurate redline.

Q Okay.

A And your question?
Q Now in iii of this paragraph, do you see any deletions?
A And that's the double i?
Q Triple i.
A No. They --
Q Are there any deletions?
A No.
Q Okay. So you would have HNGH represent that upon the recording of this document, it had no claims related to the property?
A No. What -- with the insertion that I have sought to clarify that's by way of the deed being rescinded, it has no claims related to the property.
Q Okay. So you were aware though that the agreed order would have the concurrent reinstatement of the note and deed of trust, correct?
A Right. But that is in this instrument. That is not -- what we're saying here, or what was designed to be said here is that by way of the deed that's being rescinded, the lender didn't get any different rights. What the insertions suggest is that -- that somehow the reinstatement was effectuated by the deed in lieu.
And that was not the case. That the reinstatement was affected by the deed in -- was established by the deed in lieu. And that was not the case. Those items, those exceptions were

created in this instrument, or were established in this instrument, not by way of the deed being rescinded.

Q Okay. And just to clarify I think a prior point that you made that you would require in these comments an addition here that talks about by way of the deed being rescinded. That's right? Before Roman numeral --

A I think that clarifies why the insertions required by the lender are -- are inappropriate.

Q Okay. So your draft --

A I'm not asking the lender, never asked the lender to affirm that the restatement that's in this document was not effective. It's they didn't get any reinstatement or rescission rights dating back to the deed being rescinded.

Q And you believe that clarification is necessary?

A Yes.

Q Okay. So your form of agreed rescission of deed, I think you just said, required necessary revisions. Is that accurate?

A My -- my form?

Q Well, yeah. You said you'd need to have this clarification here before i, right?

A Well, they go hand-in-hand. If you -- if you would simply remove these objectionable conditions, these insertions that were requested, then as drafted by me, I think that the paragraph is not capable ambiguity. By these insertions, I think that it would be more appropriate to try to move toward

an acceptable instrument to include this by way of the deed being rescinded.
Q So by your draft, you would have HNGH represent, warrant, and affirm that it has no claim to the property, despite the fact that the agreed order proposed to have the note reinstated and the first lien deed of trust reinstated related to the property.
A No. These exceptions or carve outs are not appropriate in this section, which is referring to the deed being rescinded.
Q Got it. I'm going to stop sharing for a moment. I'm going to pull up a different exhibit. Mr. Marx, this is Debtor's Exhibit D14, Page 20 of 25. Do you have that document in front of you, or do you need me to zoom in on this?
A Which one is this?
Q Debtor's Exhibit D14 at Page 20.
A D14? Let me see. Just one minute, please. This is Exhibit D14?
Q At Page 20 of 25. And if you'll tell me when you're there, I'd appreciate it. I forgot to ask you a couple questions about that last document. You don't need to pull it back up. I don't think you'll need it to answer the questions, but I've got a couple additional questions for you.
A All right. Where do you want me to be, on this document or on the other one?
Q Be on this document at Page 20 of 25. Exhibit D14.

A Twenty. Okay. Just one second. Okay.

Q Now, before I ask you questions about this one, I want to just ask you a couple quick questions about that last document and some of your prior testimony. I believe you previously testified that you never had any direct correspondence with HNGH. Is that correct?

A I don't recall any direct correspondence with HNGH.

Q Okay. And so you never provided any of those comments that you've discussed with the Court about the form that HNGH circulated back to the debtor, did you, before May 31st at 5:00 p.m.?

A It's my understanding that Ms. Lindauer's office had communicated that it was objectionable.

MR. KANE: Object. Non-responsive.

THE COURT: Sustained.

BY MR. KANE:

Q Mr. Marx, please answer my question. You never provided any of those comments to HNGH prior to 5:00 p.m. on May 31st, correct?

A I did not directly have any communications with HNGH.

Q Okay. So is that a no?

A That was a yes. Tell me again.

Q You never corresponded -- you never provided your comments to HNGH's form of a agreed rescission instrument to HNGH before 5:00 p.m. on May 31st. Is that correct?

A Yes, that's correct.
Q Thank you. Now, you just indicated that you believe Ms. Lindauer provided those comments to HNGH. When did you provide those comments to the debtor?
A No, that's not what I said.
Q Okay. Let me ask you a different question. Did you ever provide those comments to the debtor before 5:00 p.m. on May 31st?
A Yes. I did, but not to this level of -- of detail.
Q Okay. So you provided some different comments to the debtor then before 5:00 p.m. on May 31st, is that your testimony?
A My statement was simply that it -- these revisions required by the lender appear to subject this instrument to these matters --
MR. KANE: Objection. Objection, non-responsive.
THE WITNESS: -- and it was not appropriate.
THE COURT: So, sustained. Mr. Marx, if you could answer the question that he posed.
BY MR. KANE:
Q Mr. Marx, you provided different comments to the debtor then before 5:00 p.m. on May 31st.
A No. The same comment, just summarily stated.
Q Okay. And what time and what day did you provide those comments to the debtor?

A Oh, I don't know. It would've been after the -- I do not recall the date and time that the your redline came in. But sometime after that.

Q When you say your redline, you're referring to the redline prepared by the debtor of HNGH's comments to your form of rescission instrument. Is that right?

A I'm referring to the redline that came from the HNGH's counsel, your office.

Q So would you be surprised to learn that no such redline came from my office?

A Right. That's the point. That's why we got confused with these redlines we're talking about here today. I don't think yours sent one. And so there was an effort made to review what had been -- of the flaws previously had been corrected and which had not.

Q Okay. So when did you receive a redline showing HNGH's changes to a draft of the document that you'd previously provided?

A I don't recall seeing a redline of that until I was being asked questions by Ms. Lindauer. And then it turns out that that was not an accurate redline. I think the only time I saw an accurate redline that I have confidence in is the one that I generated.

Q So, Mr. Marx, you don't know if you ever saw a redline of HNGH's comments to a draft of the document that you previously

provided? I'm a little confused by your testimony.
A I do not recall receiving a redline from your office, either directly or by way of Ms. Lindauer.
Q But you do recall receiving a redline from Ms. Lindauer's office before May 31st at 5:00 p.m.?
A No. I recall seeing that redline that she asked me about in my earlier testimony.
Q Okay. So when did you provide to the debtor your comments to HNGH's revised form of rescission instrument?
A Shortly after it came in, I commented that the insertions were not acceptable.
Q Okay. But you don't remember what date or time?
A It would've been not too long after it was received. And an effort was made to look at that and compare without having a redline being provided by your office.
Q And do you remember what time and date it was received by the debtor?
A Do I recall? No. I -- I don't have a specific recollection at this point.
Q Okay. Now let's turn your attention back to this Exhibit D14 at Page 20. This is the draft that you provided to the debtor, correct?
A Yes.
Q And this is a form that you believe would be acceptable for your client, correct?

A It was an effort to correct the flaws in the May 27 document.

MR. KANE: Objection, non-responsive.

THE COURT: So, sustained. But let me ask you, Mr. Kane, also, is this -- you're now referring to Defendant's Exhibit 14, correct?

MR. KANE: Yes. Debtor's Exhibit 14 at Page 20.

THE COURT: I got it.

BY MR. KANE:

Q I'll ask the question again, Mr. Marx. I'd ask that you please listen and answer my question.

A Okay. I'm sorry.

Q Okay. Was this the document that you believed was acceptable to your client as a rescission instrument?

A Yes.

Q Okay. Isn't it correct that Sendera's underwriter did not approve the use of this instrument for the issuance of title policy before May 31st?

A I don't recall them ever reviewing this instrument.

Q Okay. So you never received a confirmation from the title company then that this would be an acceptable form of rescission instrument for the issuance of the title policy?

A Not requested.

MR. KANE: I'll pass.

MS. LINDAUER: Your Honor. Before we do the

redirect, could we just take a five-minute bathroom break and come back?

THE COURT: Actually, I have a couple questions for Mr. Marx.

MS. LINDAUER: Sure, Your Honor.

EXAMINATION

BY THE COURT:

Q Something that you mentioned, Mr. Marx, at the beginning here was who you represented. And I had some questions in my notes from your earlier testimony. So when we began today, you mentioned that you were reviewing the documents that we're discussing for your lender client, correct?

A Yes, Your Honor.

Q And that was, what's the name of that lender client that you were reviewing these changes for?

A Well, that could be structured through TCC2022 is what is anticipated.

Q So that's what I had in my notes. And so you represented TCC2022 when all this was happening back at the end of May, correct?

A Yes, Your Honor.

Q And I think I had, either I asked you or somebody else asked you at the beginning of your testimony a few weeks ago who else you represented. And I went back and looked at the transcript. I'm not going to try to put words in your mouth,

but you said something to the effect that you also interfaced with the debtor. I didn't understand that. So I'll just ask you again. Did you represent the debtor in this transaction that was being proposed at the end of May?
A I represented Enoch, which is a potential borrower in connection with the First Guaranty Bank loan. And there is a commonality of interest, or some level of commonality of interest there.
Q And I --
A I don't think I ever -- sorry.
Q I'm sorry. I think I recall that also from your testimony. So you have TCC2022, LLC. Correct? And then --
A Yes.
Q And then Enoch. You represented both of those potential parties?
A Yes.
Q Did you represent the debtor in this matter that was being reviewed towards the end of May?
A Not directly. So in other words, the debtor was dealing with the bankruptcy matters. And I don't have any, you know, experience in that -- in that arena. The --
Q So were you reviewing these documents for the debtor? I guess that's what I'm asking. Did you represent the debtor when these drafts were done on the 4th?
A I would put it more accurately, Your Honor, that I was

representing the -- the successor in interest to the debtor. And so naturally, I -- I reviewed on behalf of both, if that's clear.
Q That's not clear.
A Apologize.
Q The successor to the debtor, meaning your proposed lender client, correct?
A Or a potential purchaser, because some lenders would prefer that the loan be made to a new, special purpose entity.
Q Okay. So I'm asking again, you represented TCC2022, LLC in connection with this proposed transaction, correct?
A Yes.
Q You also represented Enoch in the proposed transaction, correct?
A Yes.
Q Did you represent the debtor in this proposed transaction?
A Derivatively perhaps because there was a commonality of interest there, Your Honor.
Q You represented the debtor derivatively. Help me understand that because I was really just trying to jot down who all you represented. And this has been a continuing source of confusion for me. So that's why I'm asking the question. How do you represent somebody derivatively?
A Well, they're -- they have an interest in seeing that title is appropriate, and so do I.

Q So did you --
A At the end of the day, it would be my -- my client's money coming to the table.
Q Right. So you were representing your clients. I understand that the debtor has an interest in the transaction. But you're the attorney. Who did you perceive your clients to be? TCC2022, Enoch. Who else was your client?
A Those are the ones that I perceived as my clients, Your Honor. Those are where I thought my obligations rested.
Q TCC2022 and Enoch, correct?
A Yes.
Q Just those two, correct?
A That's how I saw it at the time.
Q Not the debtor.
A No, no. Certainly I wouldn't purport to serve as bankruptcy counsel.
Q Not bankruptcy counsel. I understand you were reviewing deal documents. So I think I --
A Say again, please.
Q You were reviewing the deal documents, not --
A Yeah.
Q Well, so your clients were TCC2022 and Enoch, correct?
A Yes.
Q Anybody else?
A Not that I -- no, Your Honor.

THE COURT: Okay. Thank you. Okay. We can take a short break, Ms. Lindauer, and then we'll come back in five minutes.

(Recess at 11:48 a.m./Reconvened at 11:59 a.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, and PATTIE MITCHELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Michelle Rogan

MICHELLE ROGAN

/s/ Pattie Mitchell

PATTIE MITCHELL

LIBERTY TRANSCRIPTS DATE: July 7, 2022