IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Wednesday, July 6, 2022<br>11:59 A.M.<br>PM SESSION |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS
FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For the Debtor: | Joyce Lindauer Attorney, PLLC<br>BY: JOYCE LINDAUER, ESQ.<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| | Fee Smith Sharp & Vitullo LLP<br>BY: OSCAR REY RODRIGUEZ, ESQ.<br>13155 Noel Road, Suite 1000<br>Dallas, Texas 75240 |
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

# I N D E X


| | Page |
|---|---|
| Case called | 3 |
| End of Proceedings | 116 |
| Certification of Transcriber | 117 |

WITNESSES

FOR THE DEBTOR:

RANDY MARX

| | |
|---|---|
| Continued Direct Examination by Ms. Lindauer | 6 |
| Cross-Examination by Mr. Kane | 23 |
| Redirect Examination by Ms. Lindauer | 26 |

JOHN KANE

| | |
|---|---|
| Direct Examination by Ms. Lindauer | 31 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 11:59 a.m.)

THE COURT: Okay. We're back on the record in the 2999TC Acquisitions matter.

MR. KANE: HNGH is present, Your Honor.

MS. LINDAUER: Your Honor, 2999TC Acquisitions, reorganized debtor is present also, Your Honor. Joyce Lindauer and Rey Rodriguez.

THE COURT: Okay. Ms. Lindauer, before you do your redirect --

MS. LINDAUER: Redirect.

THE COURT: -- before I forget, first, I want to clarify. I believe I was clear, but if not, I want to clarify. The motion to strike that Mr. Kane filed was Docket 205. That motion is granted. Your counter-motion or your motion was docketed at 215. That is granted in part and denied in part because I'm going back and looking at it. You did ask first for -- you wanted to allow the declaration and exhibit to be admitted into evidence, so I denied that.

Your alternative or your -- the additional request that you made was reopening the testimony to allow him to testify. That was granted. Is that clear? So your order, your proposed order that you need to circulate to Mr. Kane is granted in part and denied in part. Does that make sense?

MS. LINDAUER: It does, Your Honor. I'm following you.

THE COURT: Okay. The other matter I want to put to bed is the -- Mr. Rodriguez, your motion that you raised when you first appeared. I'm looking for the docket number. The motion to compel. I believe it's Docket Number 160. That will be set tomorrow at 1:30. So, Mr. Rodriguez, I'll ask you to file a notice of hearing for that. Are you with me?

MR. RODRIGUEZ: Yes, Your Honor. Will do. Thank you.

THE COURT: Okay. All right. Ms. Kane, or Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

Can we revisit the demonstrative? It's Debtor's D28 which was allowed as a demonstrative. Could you also consider allowing it as a summary of Mr. Marx's testimony only because apparently there's a lack of clarity as to what he may have been referring to in his little boxes. If you jump -- have that information. So I guess at least what I'm hearing that from others that are listening to these proceedings, that it's not clear on the record what Mr. Marx may have been referring to when he was testifying with regard to the demonstrative D28. So I just want to be clear that we have a clear record on that.

So if we could offer the information contained in that document not for the truth of the matter asserted, but just as a summary of his testimony, that might assist the record in that regard. Otherwise, I might need to run back

through some of these comments again just to make sure the record is clear because apparently it's a little confused right now from what I'm hearing.

THE COURT: Okay. First, I want to clarify. I'm always thinking I'm one day farther ahead given the holiday. I said that Mr. Rodriguez's motion at Docket Number 160 would be heard tomorrow at 1:30. I meant Friday at 1:30, which is when the other matters in this case are set.

MS. LINDAUER: Okay.

THE COURT: Okay. Mr. Kane, what's your response to that request?

MR. KANE: Your Honor, under the Federal Rules of Evidence, the summary is only admissible if the underlying -- if the underlying documents that make up the summary are also admissible. I'm not entirely sure that the document that is being offered as a summary is really an appropriate summary under the Federal Rules of Evidence. So we would suggest that it remain in place as a demonstrative only.

THE COURT: So I agree with Mr. Kane. It's not really a summary of his testimony. I don't think that qualifies as a summary of his testimony. And so you can ask whatever questions you'd like, but I think it's still a demonstrative exhibit.

MS. LINDAUER: All right, Your Honor. I was trying to avoid taking the time to go back through this again, but

again, I'm having people who are listening give me some input.

So let's pull out, Sydney, if we could, D28 again. That's the demonstrative.

RANDY MARX, DEBTOR'S WITNESS, PREVIOUSLY SWORN

CONTINUED DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Marx, I'm going to ask you and I want to get your comments very clearly on the record to this document. So this document does not exist as an exhibit other than a demonstrative. Does that make some sense to you, Mr. Marx?

A Yes.

Q Okay. So I'm going to ask you to be very specific so we make a clear record here of what is in the boxes and what exactly that relates to as far as the wording on the page that it matches with. Can you follow me on that?

A Okay

Q Okay. So, just assume with me, Mr. Marx, that somebody reading this transcript is not -- may not have the benefit of looking at this document, so we just need to be clear about our record we make here.

So again, turning to -- first of all, let me backtrack for just a moment before we do that. Mr. Kane asked you some questions about this agreed rescission of warranty deed, so I'm going to go back and ask you a few follow up questions.

MS. LINDAUER: Sydney, if you could pull up for me

Lender's Exhibit 67.
BY MS. LINDAUER:
Q And, Mr. Marx, do you see this email dated May 30th, 5:49? Of course, again, this was on the holiday. This says: "Joyce, this is what I would advise my client to agree to."
Do you see that?
A I do.
Q Okay. And if we look at Exhibit 67A, which is the exhibit right behind that, do you see a document, agreed rescission of special warranty deed document?
A I do.
MS. LINDAUER: And, Sydney, if you can scroll through that for us.
BY MS. LINDAUER:
Q Mr. Marx, what redlines do you see on this document?
A I don't think we were ever provided a redline from Mr. Kane's office.
Q Okay. So just to be clear, this version that Mr. Kane forwarded at the end of the day on May 30th to myself just attaches a document that is not redlined. Is that right?
A Right.
Q And, Sydney, run back up, please.
Am I looking at that correctly, Mr. Marx?
A That is correct.
Q And then we were also looking at -- this is Debtor's

Exhibit D14. Mr. Kane asked you about the -- I believe it's the last five or six pages of that document. Go to the end, Sydney. Again, a document called agreed rescission of special warranty deed. Do you see that document?

A Yes. Which one is -- this one is -- at what page does that start?

Q It starts -- unfortunately, I don't have pages good, but D14, that's a debtor's exhibit, it's --

A I think that was Page 20, it looks like.

Q I think, yeah, Page 20, I think, of 25. And Mr. Marx, just to be clear, that's the debtor's version of that document. Is that your understanding?

A Yes.

Q And just so we're clear, the debtor version, Page 20 of 25, that you have in front of you up on the screen, it's your testimony that this version was an -- or is an acceptable document. Is that correct? Do you want to look at it for a minute?

A Well, let me just check. You know, there may be a typo or two in there. I didn't see any now. Generally, I think it's a form that would have been acceptable had it been agreed to by the lender.

Q And for the record, Mr. Marx, you have never seen a fully executed version of either B14, last five pages, or Exhibit 67A. Is that correct?

A That's correct.

Q So is it your understanding, Mr. Marx, that the parties, HNGH, and the reorganized debtor, were not in agreement as to what needed to be signed on May 30th or 31st as a rescission document? Is that your understanding?

A Correct. Likely because it was generated in December and was first circulated sometime in May.

MR. KANE: Objection. Non-responsive. Move to strike testimony after that is correct.

THE COURT: Sustained.

MS. LINDAUER: Your Honor, if I might re --

THE COURT: Sustained.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: Well, let me -- we keep -- we keep. Ms. Lindauer, we keep talking over each other.

MS. LINDAUER: I'm sorry, Your Honor.

THE COURT: That objection is sustained. Go ahead.

BY MS. LINDAUER:

Q Mr. Marx, just to be clear on this record, those are the two -- seem to be the two operative versions that people were dealing with, Exhibit 67A and D14. I want to be clear that those -- there was no agreement between the parties on a form of rescission document. Is that your understanding, Mr. Marx?

A Correct.

Q All right. Mr. Marx, going back to Exhibit D28 which is

the demonstrative. And, Mr. Marx, because this is being used as a demonstrative, I'm going to ask you to turn to Page 5. And, Sydney, if you can pull that up, that's where the boxes start. There we go. All right.

And I'm going to ask you, Mr. Marx, to testify if you would or give us answers that actually place your boxed comments into the actual document itself so we can follow that in the record. And so I'm going to try to be very specific about your comments so that we get this in the record. So on Paragraph 3 of that document at the top with the paragraph starting, whereas grantee and grantor have agreed as ordered by the bankruptcy court. Do you see that paragraph?

A Yes.

Q Okay. The box change you have at the top of the page draws a line to what provision?

A It's the first sentence in that paragraph, after the defined term agreed orders, that grantee shall rescind. I found objectionable because it's just some additional required action in the future.

Q And that's reflected in your box on the left-hand or right-hand side of the page at the top where you highlight the word shall. Is that the way I read that?

A Yes.

Q And to be clear, the shall that was added there, shall rescind, was a comment made by HNGH to the version of the

document provided by the reorganized debtor. Is that your understanding?
A Yes.
Q The next box you have starts, upon effectuation of all conditions precedent. Where should that comment be reflected in this particular page of this document?
A In that same third paragraph on the third line down there's a comma that then it starts, which shall be retroactive and effective as of October 29, '21, upon effectuation of all conditions and precedent set forth in the agreed order. It's that insertion of the words -- excuse me -- upon effectuation of all conditions precedent set forth in the agreed order that I found objectionable. It's somewhat vague and suggests that there may exist other conditions outside of this instrument that will be required before the rescission is effective when the entire purpose of this document is to effectuate herein a current rescission.
Q Right. And also you noted, I believe, that there's a defined term, agreed orders with an S. Is that correct? In the Paragraph 3 on this Page 5.
A There is on the beginning of the third line, but down here in this language that I found objectionable, it only recites agreed order, which, you know, is a type. But as is, it's kind of a dangling. And that minor change should be fixed as well.
Q Okay. And that's because agreed orders refers to the

December 10th and March 17th order -- orders as agreed orders. There is no defined term, agreed order. Is that what you're telling us?

A Yes. I mean, it may refer to one or the other or both. I'm not really sure what they were intending. And it's -- should be fixed.

Q Okay. And then just to be clear, the next comment that you talk about, and thus this may be construed as creating an encumbrance. Do you see that in that box also on the right-hand side?

A Yes. That's what I was referring to.

Q Okay. And again, that's referring to the language, upon effectuation of all conditions precedent. Is that right?

A Yes. In effect they're -- yes. In effect they're subjecting this instrument to those conditions precedent.

Q Mr. Kane didn't ask you about this, but I will. Is there any attachment of agreed orders to this document?

A No.

Q So if there were terms in those agreed orders, you wouldn't know what they were based on what is attached to this document. Is that correct?

A Correct.

Q That's one of your concerns about this language, conditions precedent in the orders? Because we don't actually have the orders as exhibits.

MR. KANE: Objection. Leading.

THE COURT: Overruled.

BY MS. LINDAUER:

Q Mr. Marx --

A Yes. It just refers to something outside the record.

Q If you wanted to include a condition precedent in this document, would it then be appropriate? Well, first of all, I think you told us it's not appropriate, but would it be necessary to attach the agreed orders to the document so that at least you could see what the terms in those documents were?

A Oh, that's an if then.

Q Okay.

A It's not appropriate to subject, but I guess if one intended to then the -- an exhibit of what you're subjecting to appeared to be more appropriate to include it.

Q Mr. Kane asked you about the whereas paragraphs as being recitals. Do you recall that?

A Generally, yes.

Q Okay. If you look at the first now therefore, do you see that in the middle of the page on Page 5? I think Ms. Ollar put a little red dot.

A Yes.

Q Okay. And correct me if I'm wrong. Now therefore grantor and grantee hereby incorporate by reference the recitals above. Do you see that?

A Yes.
Q So the recitals are then pulled into the now therefore provisions of this document. Do you see that?
A In this instrument, that is the case. That was not the case in the earlier defective, in my opinion, instrument first received from HNGH counsel.
Q But by pulling the recitals into the now therefore provisions of the document, does that give any force and effect to those recitals as being what you call operative provisions in the document?
A Yes, it does.
Q So the recitals as operative provisions needs to be completely accurate and correct, right?
A Yes.
Q All right. If you look at the next box below the larger box, the little small box, so it's RPM note.
A Yes.
Q And if you could, for the record, explain to me exactly what provision of the document are you looking at when you say this appears now not to be accurate.
A In the paragraph that starts, further, as a result of such rescission. This is on Page 5. And the first subsection, I'd call a small a. At the end of that subsection there is the phrase, HNGH, the current payee and holder of the note, which I have highlighted on this demonstrative aid. And my note and my

testimony is that this appears not to be accurate and that that would require some confirmation somewhere or correction, whichever is appropriate, because a rescission of the deed requires the grantor and the grantee to execute. And then a reinstatement of the obligations, whether it's in this instrument or in the standalone instrument. It needs to be signed by the holder of the note and the obligor.

Q And who was your understanding was the holder of the note on May 30th and 31st?

A I now understand that it is Happy State Bank. And so my comment is then that this instrument, if this is going to be the instrument by which we reinstate the note, should be signed by Happy State as well as by HNGH.

Q Would it be appropriate that there be language in this document to clarify that as of, at least the date of this document, the holder of the note was Happy State Bank?

A Yes. That change as well as having Happy State sign, of course. Excuse me.

Q All right. If we go to Page 7, so ahead two pages. And again, what I'm trying to do is pick up your boxed comments and get those clearly in the record what those are referring to. So you have a comment at the top, RPM comment add the following. Do you see that?

A Yes.

Q Okay. And what are you pointing to where you think that

the following needs to be added?
A In response to these insertions in romanette at 3 and 4, which are inappropriate, I sought to address and amplify what I don't think is unclear, but just to placate that concern that what this paragraph relates to is the deed being rescinded. So I would suggest and did suggest here that the words -- that the first -- that first paragraph start out, grantee represents, warrants, and affirms that by way of the deed being rescinded hereby. And then the sentence continue with those affirmations.
Q Okay. All right. So we understand in the first box, the little -- the box on the side that's a much bigger box, starting with the quotes, upon rescission, end quote. Do you see that?
A Yes.
Q And exactly -- so that, upon rescission, appears in the romanette little 4 provision. Do you see that?
A I do. That's on Page 7 at the top of the paragraph.
Q And your comment to that provision, upon rescission, as it appears in the little romanette 4 provision, is what?
A Well, I think that the insertion of upon rescission there is objectionable. It suggests that there's some other instrument that might be required to rescind when this is the very document that is rescinding, okay. And further, that those insertions are not appropriate or required.

Q Okay. And then your next comment in the same box is that per acceptable provision included only in express definitive statement. Do you see that?
A Yes. I mean, the whole paragraph is merely an expressed statement from the lender that by way of the deed being rescinded it did not require, you know, these 1 through 4 items.
Q All right. And again for the record, we're looking at the full paragraph at the top of Page 7 of the demonstrative that's marked as Exhibit Debtor 28. Is that correct?
A Yes.
Q Now Mr. Kane asked you about romanette little 3 in that same paragraph. The original provision said that it has no claims related to the property stock. I mean, there would be -- that would be the end of that provision. Is that the way it was presented by the debtor?
A Correct.
Q Okay. And then there was added, except as set forth herein through reinstatement of its note and first lien deed of trust. What was your comment with regard to the inclusion of that wording?
A Well, that wording, I think, confuses the entire paragraph, as was -- as does the additional assertion where I was expecting, I guess romanette 4 because this paragraph is drafted to relate to the deed that's being rescinded. And

these insertions are not appropriate here in the actual instrument of rescission.

Q And then --

A They're confusing the references.

Q And then if we're looking at the romanette 4 provision, again, I want to pick up your comment on that. It starts off, and that upon rescission it shall have acquired no rights, title, or interest of any kind in the property other than the reinstatement of its note and first lien deed of trust in accordance with the agreed orders. And you flagged that provision also. What was the concern with that provision, the language in that provision?

A Well, to have -- it sort of reads as an if then. It's upon rescission, then shall, okay. If then, in effect. And it suggests that there is some other instrument that might be necessary to effectuate the rescission. And that's not the case. This is the operative instrument. And so to have it have a upon rescission shall suggests that there's some further action. And I thought it was objectionable for that reason.

Q What about the next provision, the effect of this rescission shall be? Do you see that provision?

A Yeah. I didn't see anything objectionable there.

Q Okay.

A It uses some of that same shell language, but it doesn't -- it's not as blatant an error as where you have upon

rescission, which is more of a conditional or a subjecting the document. I did not find that last section objectionable.

Q And just to be clear for the record, again, Mr. Marx, going back to the demonstrative Debtor's Exhibit D28. Are there any other sections in that particular demonstrative that should be made part of the record by your specific testimony besides what you've already identified for us? And take a moment and look through that. I just want to make sure we haven't missed anything.

A What I have otherwise previously testified was that there is a Texas Delaware flaw actually in the disputed deed that was filed by HNGH. And some instrument needs to be, in my opinion, recorded before this instrument hits the records, okay. And that would be some sort of corrective instrument to properly identify the lender. And then the fact that this instrument was not agreed to. I apologize. Uh-oh. Okay. And then I made reference to the Happy State need to sign an appropriate reinstatement. I think those subsections or summary addresses the issues created by this document.

Q And, Mr. Marx, I'm going to go back to some of the questions that counsel asked you, Mr. Kane asked you. In particular, Mr. Marx, if you could -- and Sydney, if you would pull up for me -- this will be Debtor's Exhibit 12. And, Mr. Marx, the reason I'm pulling this up -- if we could, Sydney, drop to the second page of this document, the order adjudged

and decree at the top. There you go.

Mr. Kane asked you a hypothetical about if the rescission deed were filed outside of escrow whether the lender could withdraw their funds after the rescission had been filed and thus creating, I guess, a problem in connection with the closing. Do you remember that series of questions?

A Yes.

Q Okay. If you look at -- I think this is what you were referring to, Mr. Marx. If you look at the first ordered provision -- and I know we've been over this several times. In this order there is an actual sequence of events in the order that was supposed to occur in a particular order. Are you familiar with that, Mr. Marx?

A Yes. I think the -- it's on Page 2 and the sequencing contemplated here is that there would be -- the language is which note shall be reinstated immediately prior to the debtor's payment to HNGH. And then elsewhere there is reference to the deed. So the sequencing here, and I think Mr. Kane asked and I confirmed that it would be the preparation of and holding of a rescission deed or instrument of rescission. Then the reinstatement and then the third item here would be the payoff. Those three can be gleaned from this document. And that's how I interpreted it.

Q Okay. So there would never be a situation where the rescission deed would have actually been recorded prior to an

actual payoff. Is that correct?
A I could not contemplate a situation where the parties or a title company would allow that to happen.
Q All right. And you gleaned from this provision that the -- just to be clear -- the order of documentation was that there would be a drafting and execution of a rescission deed. That would be event number 1. Is that right?
A Yes.
Q Okay. And where are you getting that understanding from?
A It's in the first full paragraph on Page 2.
Q Okay.
A In the one, two -- I'd call it the third full line from the bottom of that paragraph.
Q Could you just read that into the record briefly for us?
A It starts, and counsel for HNGH shall hold the rescission deed during the pendency of the term of this agreed order.
Q So your interpretation of that is step one is drafting and holding of a rescission deed. Is that right?
A Yes.
Q And then step 2, I think you told us the note would be reinstated.
A Yes. Because of the merger doctrine. There's an argument that the note was -- and liens were extinguished. And so I think the parties and the Court properly were of like mind that a reinstatement of the obligations would be the next step.

Q And then the last step would have been what?

A Well, now that the title is restored and the obligations reinstated, then the payoff would occur.

Q And in your experience, Mr. Marx, would it be typical that this type of transaction would occur with the use of a title company?

A Yes. I don't see a means by which this could be accomplished without a title company.

Q And also, to be clear, I think the judge asked you some questions, Mr. Marx, and I want to be clear on the record. Your clients during these transactions in May, you testified were TCC2022. Is that right?

A Yes.

Q and that one of your clients was also an entity called Enoch. Is that right?

A Yes.

Q And to be clear, TCC2022 and Enoch were entities that would have been aligned with the debtor in the sense that they would be providing funding to the debtor entity or an entity to pay off HNGH. Is that correct?

A Yes.

Q And I think you were trying to explain that, maybe not very precisely. But just to be clear, the debtor and your clients were essentially on the same pages as the --

MR. KANE: Objection. Leading.

THE COURT: Sustained.

BY MS. LINDAUER:

Q Just to be clear for the record, Mr. Marx, what was the relationship between the reorganized debtor and your clients during this process at the end of May of 2022?

A They both consented to my review of these materials on behalf of the lender. And to that degree, they had a commonality of interest and requiring that a proper restoration and closing occur.

Q And, Mr. Marx, what would have happened with your clients if the debtor had said, we don't approve a particular document?

A Then it's not approved. I'm not going to -- and they have their own, you know, consent rights or objection rights throughout the entire process.

MS. LINDAUER: Your Honor, I'll pass the witness.

THE COURT: Mr. Kane.

MR. KANE: Yeah. Very briefly.

RECROSS-EXAMINATION

BY MR. KANE:

Q Mr. Marx, I believe you previously testified that Enoch Investments could not close a transaction on May 31st because First Guaranty Bank needed additional time, correct?

A I'm not sure what exactly the question was back then, but it's accurate that First Guaranty Bank was still reviewing title and needed -- wanted more time. And they reached out to

you.

Q Okay. And so is it a correct synopsis of your testimony then that Enoch could not close by May 31st for lack of funding?

A Not with that lender. I am unfamiliar with their other abilities.

Q Okay.

A But not with that lender.

Q And TCC2022, I believe you previously testified that its money party, its funding source, had lost his driver's license and so couldn't get his money in time for a May 31st, 5:00 p.m. closing. Is that correct?

A Well, that's incomplete. I testified that because of the state of title and the logistical problem that he was having, that was correct.

Q Okay. So do you know I the debtor received any comments from any other potential funding sources?

A Yes. I think Mr. -- there was a Mr. Garrison. I forget his last name. Kicker, Kickoff.

Q Did you represent --

A -- made some of the same -- Garrison Kickham.

Q Yeah. I'm sorry. And did you represent that individual?

A No. But I was to some degree involved in those correspondences. And they raised questions or issues regarding the title as well.

Q Okay. And I believe that you previously testified you were familiar with statements by Mr. Kickham in a PLN letter in which he had noted that his underwriting group could not approve closing for a transaction before the plan confirmation order went final. Do you recall that?
A That was a part of that letter. Yes.
Q Okay. So do you know if there was any commentary from any other funding source that was capable of actually funding a closing on May 31st by 5:00 p.m. to the debtor?
A Well, there were a number of discussions with First Guaranty Bank which we covered.
Q Right.
A There is a -- another funding source. I think it was in -- I'm not sure how they are handling the identifying these.
Q And are you aware of whether that funding source provided comments to HNGH's special warranty deed or the agreed rescission instrument that you prepared?
A No. They weren't asked specific on that. They raised the issues regarding the title not being with the borrower.
Q Okay. So do -- I'm talking specifically about the HNGH special warranty deed, rescission document, rescission deed, or the rescission instrument that you prepared. Are you aware of whether the debtor received comments from any of its other funding sources that it sought to close with related to any of those documents?

A No. There wasn't time at that moment.

MR. KANE: Okay. I have no further questions.

MS. LINDAUER: Your Honor, if I might, just follow up question off of Mr. Kane's questions.

THE COURT: Is it something -- well, go ahead.

MS. LINDAUER: Okay.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Marx, were you personally involved in all of the funding transactions that were being worked on by the debtor on May 30th and 31st?

A No.

MS. LINDAUER: No further questions, Your Honor, of Mr. Marx.

THE COURT: Thank you, Mr. Marx. You're excused.

THE WITNESS: Thank you, Your Honor.

(Witness excused)

MS. LINDAUER: Your Honor, Your Honor, our next witness would be Mr. Kane, but I think if we could take a break now that would allow you and me both to maybe get something to eat before we have hearings at 1:30, so I would ask the Court if we could take a break at this time. We're at quarter of 1:00.

THE COURT: Thoughts, Mr. Kane?

MR. KANE: I'm ready to proceed now. It's up to Your

Honor.

THE COURT: Ms. Lindauer, you indicated that your 1:30 hearing is not contested. Is that right?

MS. LINDAUER: It shouldn't be, Your Honor. I'm not aware of any objections that have been filed. I don't know exactly. You may have it in front of you. What Judge -- I think it's Judge -- no, it's Judge Morris. It's a case call Khaf Corporation. I don't know what else he has on his docket at 1:30 presently in front of me, so I don't know how many other matters he has, but our matter should take -- unless -- like I said, unless a lender shows up, maybe 10 or 15 minutes. It's a final hearing on use of cash collateral.

THE COURT: And what's the name of your -- what's the name of that case?

MS. LINDAUER: It's called Khaf Corporation, K-H-A-F. It should be shown as final hearing on use of cash collateral.

THE COURT: So that's not contested?

MS. LINDAUER: Not that I'm aware of, Your Honor. There's no written objections filed.

THE COURT: Okay. I was looking at the docket. Do you have -- it looks like you have another matter set at 1:30, or do you?

MS. LINDAUER: I don't know. Not that I -- I'm not sure. What do you see? You're looking at something I can't see.

THE COURT: I'm just looking at the docket. The one that you're referring to is Docket Number 20 and the Khaf Corporation. I just happened to notice as I was scrolling down here that you're listed as counsel in the Texas Commission Company case motion as well.

MS. LINDAUER: Oh, that's a -- yeah. That's a Chapter 7. That's a sale of assets. I don't believe we have really a position on that, Your Honor, so yeah. We don't -- I wouldn't need to necessarily attend that one.

THE COURT: Okay. Why don't we go for ten minutes with Mr. Kane and then we'll take a break at 1:00.

MS. LINDAUER: All right.

THE COURT: Actually, pause one second.

MS. LINDAUER: Yep.

(Pause)

THE COURT: Okay. For myself, I was, I think willing to go ten more minutes, but I have staff that has to eat. And so I appreciate Mr. Kane's willingness and ableness to start now, but we will break so that my staff and I can all eat lunch and get ready for our 1:30 hearing.

MS. LINDAUER: Thank you, Your Honor. I appreciate that.

THE COURT: Ms. --

MS. LINDAUER: Well, how do you want me to report back to you? Do you just want us to notify your courtroom

staff when I get done with Judge Morris and let you know?

THE COURT: Yes, please.

MS. LINDAUER: Okay. We'll do that, Your Honor. As soon as I get finished over there, I'll let you all know.

THE COURT: All right.

MS. LINDAUER: Thank you.

THE COURT: Thank you.

MR. KANE: Thank you.

(Recess at 12:50 p.m./Reconvened at 3:13 p.m.)

THE COURT: (In progress) Acquisitions case, Case Number 21-31954.

Appearances, please.

MR. KANE: Your Honor --

MS. LINDAUER: Your Honor. Joyce -- I'm sorry. Go ahead, John.

MR. KANE: John Kane on behalf of HNGH Turtle Creek, LLC, the pre-petition lender.

MS. LINDAUER: And, Your Honor, Joyce Lindauer and Ray Rodriguez here on behalf of 2999TC Acquisitions, the reorganized debtor.

THE COURT: All right. Are we ready to proceed then with Mr. Kane's questioning?

MS. LINDAUER: Yes, we are, Your Honor.

THE COURT: All right. Before I swear Mr. Kane in, I just want to caution both parties. I trust and expect that

both of you will do your best not to argue. This is not the time for argument but to just do it in as business-like fashion as you can, question and answer. And then, again, because it's WebEx, I've just been reading over the transcripts over the last several days, there are many times when parties talk over each other, and I know that's a function of WebEx. It's harder to do this than in person in trial, so try your best not to talk over each other so that we get a clean record of the questions and answers.

So with that, I will ask Mr. Kane to raise your right hand.

JOHN JOSEPH KANE, DEBTOR'S WITNESS, SWORN

THE COURT: All right. Thank you.

Mr. Rodriguez?

MR. RODRIGUEZ: Yes, Your Honor.

MS. LINDAUER: Do you have a point for him?

MR. RODRIGUEZ: No, I do not have a point, Your Honor. I'm sorry. You called out my name.

THE COURT: No. I thought you were going to do the questioning. If I'm mistaken, then I'll turn it over to Ms. Lindauer.

MR. RODRIGUEZ: Yes. They're good friends. We think it'll go a lot easier that way.

THE COURT: Okay. You looked like you were ready to write, so I just assumed you were doing the questioning. So my

apologies. Ms. Lindauer, go ahead.

MR. RODRIGUEZ: No, Your Honor. I like to look busy. My client is watching me closely. You know how it is.

THE COURT: Got it. All right.

Ms. Lindauer, you may proceed.

MS. LINDAUER: Thank you.

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Kane, would you state your full name for the record?

A My name is John Joseph Kane.

Q And, Mr. Kane, how are you employed?

A I am a lawyer at the law firm Kane Russell Coleman Logan PC.

Q And is there a particular area of practice, Mr. Kane, that you specialize in at Kane Russell Coleman Logan PC?

A Yes. I specialize in in- and out-of-court workout and have also assisted with a number of pieces of federal court litigation arbitrations over the years.

Q Do you also work on bankruptcy case matters?

A Yes. That would fall under the category of in-court-workout and restructuring, yes.

Q Okay. All right.

And when did you first get involved with 2999TC Acquisitions, LLC?

A That would probably be early October of 2021.

Q All right. And what was your involvement in early October of 2021?
A I was retained generally to advise HNGH Turtle Creek, LLC, regarding in and out-of-workout, or in and out-of-court workout matters and potential bankruptcy planning.
Q And when you say "potentially" -- I'm sorry, it's not coming out very well -- "potential bankruptcy planning," on behalf of whom were you looking at bankruptcy planning?
A There was a concern at HNGH that 2999TC Acquisitions LLC would default on its maturity date obligations on October 29th and attempt to file a bankruptcy proceeding in order to avoid the HNGH enforcement of remedies under the loan documents, forbearance agreement, and related documents.
Q Prior to October of 2021, had you had any prior involvement with HNGH or 2999TC Acquisitions?
A I don't believe so.
Q All right. You mentioned to the Court and we went through a number of litigation matters that involved 2999TC Acquisitions. Did you have any involvement with any of those litigation matters prior to October of 2021?
A I may have been peripherally aware of them but I did not participate or represent HNGH, Mr. Nambiar, or any other related entity in any of those litigation proceedings.
Q And if I remember the testimony correctly, I believe HNGH was using Wick Phillips, that law firm to handle some of these

matters prior to the involvement of your firm. Is that correct?
A That is my understanding.
Q Okay. All right.
And when you got involved in or about October of 2021, were you at all involved in any negotiations regarding a proposed further extension or forbearance?
A I was not.
Q And you heard the testimony of Mr. Barton, I believe, and also of Mr. Nambiar that there were some discussions at the end of October of 2021 regarding an extension of the maturity date. Do you remember those discussions?
A I did hear that.
Q But you didn't have any involvement in that particular process. Is that correct?
A Not at the time, no.
Q All right. And you were involved, I think Mr. Kane, in or about the time that the deed in lieu of foreclosure was taken out of escrow and sent to Dallas County for filing. Is that correct?
A I had been in discussions with HNGH prior to that. I was not actively working with HNGH on the deed in lieu issue at that time.
Q Shortly after the bankruptcy case was filed by 2999TC Acquisitions, I believe you did enter an appearance on behalf

of HNGH Turtle Creek LLC. Is that right, in the bankruptcy case?
A That is correct.
Q And I think that one of the first things you filed, it appears, and I'm looking at, I believe these are your exhibits. So we're going to kind of go through some of those. Some of them are backgrounds we'll go through fairly quickly, but I'm looking at -- these will be Lender's Exhibit numbers.
MS. LINDAUER: And so, Sydney, I'm going to have you pull up some of these for us to look at.
BY MS. LINDAUER:
Q One of the first things that I think was filed in the case was marked as Exhibit 1. This is Docket Entry Number 9. It appears that it was filed on -- sorry. It's filed on November 4, 2021.
Do you see this docket entry?
MS. LINDAUER: And Sydney, you might scroll up a little bit.
THE WITNESS: I do see this, yes.
BY MS. LINDAUER:
Q Okay. So this was filed -- the case itself was filed on October 29th. This was filed basically around a week later. Is that right?
A It was filed on November 4, 2021.
Q Okay. But that was just fairly shortly after the case

itself had been filed. Is that right?
A Yes.
Q Okay. And just to be clear, your firm is shown as counsel on that particular filing, correct?
A Correct.
Q If we look at Exhibit Number 2, again, in the Secured Lender's binder. This is another filing. This one was done on November 8, 2021. This is an objection to the debtor's expedited motion to enforce the automatic stay and for sanctions?
Do you see that?
A I do.
Q Okay. Then, if you take a look at Exhibit 3 in the Secured Lender's binder, this is a complaint that was filed by 299TC [*sic*] Acquisitions on or about November 11, 2021, and I assume you're familiar with that complaint.
A I am familiar with the complaint, yes.
Q Okay. And then, there is also, if you look at Exhibit 4, this was a motion to dismiss a motion for sanctions that was filed by HNGH Turtle Creek. And it appears it was filed on December 8, 2021. Are you familiar with that filing?
A I am, yes.
Q Okay. And just to be clear, that's filed in the same adversary proceeding where we saw the complaint filed. Is that right?

A That's correct.

Q If we look at Exhibit 5, I think you asked some questions about this exhibit. This is an agreed judgment in the Northern District of Texas, Dallas Division. And just to be clear, looking on the last page, 3 of 3, of that document, counsel for HNGH Turtle Creek, as well as some other defendants, is listed as Wick Phillips Gould and Marin [*sic*] LLP. Is that correct?

A It does appear to say that, yes.

Q Okay. All right.

So just to be clear, just based on your testimony, you and your firm really had no involvement in connection with this litigation matter that was pending. I know you can read the pleadings, but obviously your firm wasn't directly involved in this matter, correct?

A That's correct. We did not appear or participate in that litigation.

Q Okay.

A little bit out of order. Okay.

And then, just to complete the record a bit, along with the pleadings that we just ran through with the Court that were filed by HNGH, the debtor likewise filed responses and pleadings in response to the various motions that were being filed by HN (audio interference), right?

A Yeah. I believe that they filed responses to a number of the pleadings that HNGH filed.

Q Okay. And, Mr. Kane, you, on behalf of your client, were involved in the preparation of what's been marked as, and again, I'll go back to a Lender's Exhibits. This would be Exhibit 8, which I think we've referred to as Docket 64.

And this agreed order, Mr. Kane, I think you would agree with me, was intended to resolve a number of pending matters, a motion to lift stay, a motion to dismiss, a motion for sanctions, and a motion to enforce, each of those referenced as docket entries in the title. Is that correct?

A That is correct.

Q Okay. And you were involved in the negotiation of this order. I was involved in it. Mr. Barton was involved in it. Mr. Nambiar was involved in it. Were there any other persons on your side that you recall being involved in the preparation of this document?

A I do not recall. Mr. Christensen may have had some input on our side, but that's privileged.

Q Okay. Do you remember if there was a gentleman named Sada Cumber was involved at all in negotiating this order?

A I recall that Sada Cumber attempted to play the role of intermediary between the debtor and HNGH in an effort to facilitate some kind of reasonable resolution between the parties as he saw it. I do not recall whether he actually engaged in negotiations over the terms of this agreement. I don't think he actually did.

Q Okay.

THE COURT: Mr. Kane, would you mind giving us a spelling on that so that the transcript is clear of the name?

THE WITNESS: Yes. I believe it's S-A-D-A is the first name, Sada. And then, Cumber, C-U-M-B-E-R.

THE COURT: Thank you.

BY MS. LINDAUER:

Q And just for the record, I think his name has come up maybe once before. Do you have an understanding, Mr. Kane, of who Mr. Cumber is?

A I don't really understand who Mr. Cumber is other than someone who has at least some mutual respect from Mr. Barton and Mr. Nambiar.

Q Do you understand that he's some sort of an ambassador?

A I know that Mr. Barton has referred to him as an ambassador. I do not know if he is or is not.

Q All right.

With regard to this particular order that we're looking at, this is Exhibit 8, Page 1 of 4, obviously, you're familiar with the terms of this particular agreed order, correct?

A That's correct.

Q Okay. And at the bottom, do you see the little footer says, "Agreed order Page 1"?

MS. LINDAUER: And it's at the bottom of the first page, Sydney. There you go.

BY MS. LINDAUER:

Q Do you see that footer on the left hand side?

A I do.

Q Okay. Do you see a number on the right hand side that says 8932972V3? Is that a footer that's put on there by your law firm to identify this particular document in your system?

A I would say, yes, typically, but if changes are made to the document and the footer is not manually updated, it could show this is Version 3, even though the actual document that is filed with the Court is Version 4, 5, 6, 7. Who knows?

Q Okay. Do you have any recollection on how many versions we actually went through on this order?

A I do not.

Q Okay. But typically, would the V3 mean Version 3?

A Typically, yes. It would suggest that there are at least three versions.

Q And I believe my recollection is is that I think your office, and you were the, I think, the last scriveners, if we will, of the particular order that we're looking at. I think it was your version that was submitted to the Court. Is that correct?

A I believe so, but I don't know for certain. I really don't.

Q Okay. And this -- so I recall, I know that this order was negotiated late into the evening the night before a hearing and

then we all showed up in Court the next morning with Judge Hale and announced that an agreement had been reached. And then, what I recall is that later that day, the order was sent into the Court. I may be off on my timing, but is that basically what your recollection was of how this order came about?

A I believe that's correct.

Q Looking at the second page of this order, I don't think there's any dispute that there was an agreed payoff date of March 15th at 5:00 Central to pay off HNGH. Is that right?

A That's right.

Q Okay. And the payoff amount at this point in time was placed under seal so that the amount owed to HNGH, or being paid to HNGH, was not made public record. Do you recall that?

A Yeah.

I think the idea behind that was to ensure that if the debtor was able to sell the property or obtain financing in excess of that amount, it would inure to the benefit of the debtor, and the payoff amount was a negotiated agreed amount that was, if I recall correctly, somewhere in between the amount that HNGH asserted was due and owing as of the petition date and the amount that the debtor asserted was due and owing as of the petition date.

Q All right. And looking at that first full paragraph because that one seems to be generating a lot of -- well, just generating comments, anyway. Looking at that very first

paragraph, do you recall, Mr. Kane, who drafted that first paragraph of this order?
A I do not.
Q Do you remember there being discussions about holding a rescission deed in escrow? Do you recall those discussions?
A I do recall those discussions, yes.
Q Was the concept in this first paragraph that the rescission deed would be prepared and held during the pendency of the term of this agreed order by your firm?
A Yes. I think that the idea was that the rescission deed would be prepared in advance so that, in the event a closing were to take place, that document would be in essence prepared and ready to go to help kind of resolve the issues that are included in this agreed order.
Q Okay. And if there wasn't a closing and the debtor didn't pay HNGH off as agreed, then what would have happened with that rescission deed?
A Right. So, presumably the rescission deed would have never seen the light of day because the deed in lieu would have been enforceable.
Q Okay. So ultimately the rescission deed would have just been, as I think one of the witnesses testified, just have been destroyed, right?
A Right. It was only necessary in the event of a potential closing.

Q All right. And the order went on a little further to say that the rescission deed would be held and that the parties holding it would have no liability to the debtor or any other party for holding the deed or ultimately releasing it in connection with the terms of the agreed order. Do you see that?

A I do.

Q And I recall that was a provision that was negotiated between the parties regarding how the rescission deed would be basically treated during the time that this order was in effect. Is that your recollection?

A Not entirely.

Q Okay.

A No.

Q All right. You would agree with me, Mr. Kane, that a rescission deed was not drafted right after this order was entered. Is that right?

A I would say that's correct. It was not drafted until sometime in January.

Q And was there some triggering event in January as to why the deed was drafted at that time?

A January is moving closer to the March 15th deadline and it was important to me and my client that a draft of that was prepared significantly in advance of a potential March closing so that if the debtor did actually appear to have a closing in

reasonable contemplation that the parties could ensure that the form of rescission deed was agreed to so that it did not cause the problem that it appears to have caused at this closing.

Q Okay. And I think Mr. Christensen testified, and I know you heard this also, that he had the opportunity, I think, to see a draft rescission deed sometime in January of 2022. So is that consistent with what you recall with regard to the rescission deed?

A Honestly, I don't recall when he saw it first. But it is my recollection that the rescission deed was drafted in January of 2022.

Q And, at the time that it was drafted, was a copy provided to the debtor or the debtor's counsel?

A It was not provided to the debtor or the debtor's counsel until May 12th.

Q Is there any reason why it wasn't provided earlier than May 12th?

A There was no discussion at any point in time prior to that about a potential closing of the transaction.

Q Well, I guess I'm a little confused because the whole idea, I think you told us, was that the rescission deed would be prepared and then it would be ready to go if and when there was a closing (audio interference).

A That's correct.

Q Wouldn't it have made sense to provide a copy of that

sooner than May 12, 2022, to the debtor or the debtor's attorney?
A Yeah. I mean, I guess we could have circulated that closer to May 10th. Part of the reality here is it didn't really seem like a necessary item for a lot of work if the debtor was not going to come remotely close to a closing, which is what had happened in March. And so we were waiting on some feedback from the debtor about movement towards a potential closing. It could have probably have been circulated in early January, I suppose that's the case. I certainly would have anticipated comments from the debtor between May 12th and May 27th when the executed copy was delivered before HNGH had received any comments whatsoever to the document.
Q And I assume that the rescission deed was not something that you prepared. Is that correct?
A That is correct.
Q You, as in you.
A I did not. I did not personally prepare that document. That is correct.
Q Okay. And did someone in your law firm prepare that document?
A Yes.
Q Okay. And somebody in your real estate section?
A Yes, I believe it was actually work from a series of attorneys in our real estate section, given the, as I

understand it, the lack of frequency with which a rescission instrument or rescission deed is used in commercial real estate transactions.

Q And you sort of led into my next question, which is, how often have you run across the need for a rescission deed in connection with a commercial real estate transaction?

A Me personally, zero times.

Q Well, not zero times. This time. So one time, right?

A Yes. Yes. Before this case, zero times.

Q Right. Okay.

After the rescission deed was drafted by your firm, did anyone from HNGH actually sign that document prior to May 12, 2022?

A Prior to May 12th, no.

Q And just, again, going back to that first paragraph that's up on the screen, there were a series of events to occur. There was a payoff deadline. There's a payoff amount. There's a reinstatement of a note. There's a rescission deed. And then there's, again, a payment, or payoff amount, and then there's the concept of holding this deed. That's all in that first paragraph. Is that right?

A The first paragraph at the top of Page 204?

Q Correct?

A Yes.

Q Okay. Right. Now, there's also in the second paragraph,

and I know we haven't spent a lot of time on this, but there was also some terms in this order dealing with the adversary proceeding that I pointed your attention to. Do you recall that also?
A I recall the adversary proceeding, yes.
Q Okay. And the adversary proceeding was ultimately to be dismissed. Is that what happened to that matter?
A Yes, that is correct, as set forth in the modified agreed order at Docket Entry Number 94 --
Q Okay.
A -- and the agreed judgment in the adversary proceeding.
Q Do you recall, Mr. Kane, who came up with these $100,000 per month payments, how that originated?
A I believe that originated through the negotiations of the parties.
Q Right. But do you recall -- you don't recall any particular party basically setting up those particular payments?
A I think that there were a number of different payment structures, payoff amounts, time periods discussed between the parties that it's my understanding was that this is what the parties agreed to.
Q Okay. If we look at the next page, Page 3 of 4, in the first full paragraph, the agreed order the judge decreed regarding the adversary proceeding. Do you see that specific

paragraph?
A I do.
Q And, in particular, the last part of that paragraph, where it starts with "If a payoff event occurs."
A Okay. I see that.
Q Okay. So it says: "If a payoff event occurs, upon notice of the payoff event to the court and a request by the debtor, this court shall enter an order ruling that the deed in lieu filing is avoided and rescinded, and that HNGH shall take all reasonable actions necessary to immediately instruct its counsel to deliver the rescission deed to the debtor and to ensure title to the property is returned to the debtor."
Do you see that provision?
A I do.
Q Okay. Do you know why that provision was included in this particular order?
A Yes. So the order was supposed to be binary and the adversary proceeding remained ongoing at the time. And so if a payoff occurred, the idea was that the adversary proceeding would be resolved and that an order would be entered in essence avoiding so granting relief to the debtor in the adversary proceeding, which would cause the avoidance of the deed in lieu. To provide the debtor some additional satisfaction, right, they would be able to use a rescission deed as opposed to just the avoidance of the deed in lieu.

Now, frankly, it probably would have been easier if that had taken place on March 15th to just have the avoidance and maybe a filing of the order avoiding the deed in lieu transaction on the Dallas County real property records, but this was a mean of, in essence, providing the debtor the opportunity to go file and record the executed rescission deed if it determined that was necessary.

Q Okay. All right.

And that provision in the order that we just went over, that one dealing with the adversary proceeding, that actually got altered in the March order. Is that correct?

A That is correct.

Q Okay. All right.

So, just because it would look without looking at the March order and understanding the underlying, what was going on, it would appear that this provision would be somewhat different than what you saw on Page 2 of 4 under the first paragraph dealing with the rescission deed and the pendency of the agreed order and all of that.

So just to harmonize those two provisions, they are slightly different but this one, in effect, and we'll look at it in a minute, goes away in connection with the March order, right?

A That's right.

Q Okay. And to be clear, just so the Court, and I think the

Court already knows this, but if you go back to Page 2 of Exhibit 8, that first full paragraph, there's nothing in the March order that changed the terms of that paragraph save and except for the date of the payoff. Is that right?
A I don't believe so.
Q Okay. Well, we can look at it. I don't -- this isn't a pop quiz, so I'm not asking you to try to necessarily remember everything.
Okay. So if we go to the next agreed order, and that's referred to as, I think we call it Docket 94, that --
MS. LINDAUER: Sydney, that's Exhibit D13. It's a debtor exhibit.
BY MS. LINDAUER:
Q And, Mr. Kane, you were involved in the drafting of this order also. Is that right?
A Yes, I was.
Q Again, the little footnotes down at the bottom, the right hand corner, there's a little 9144417V1. Is that, again, a Kane Russell Coleman Logan sort of footer that you place on your documents?
A Yeah, it is.
Q Okay. And would V1 imply version one?
A It would imply that there is at least one version.
Q Okay. Do you know how many versions of this particular order there were?

A Unfortunately, I don't.
Q Okay. And is this an order that you were involved in drafting on behalf of your client, HNGH?
A Yes.
Q And without going through every term of the order, what are the significant differences between Docket 64 and Docket 94 with regard to the party's agreement?
A Yeah, so off the top of my head, one, the adversary proceeding was resolved. And as with reference to a specific form of agreed judgment dismissing the claims with prejudice, so that altered that provision that we saw on Docket Entry Number 64.
Q Okay.
A Payoff deadline was extended to May 30th at 5:00 p.m. The debtor Barton and certain Barton entities, I believe that's how it's defined in this, had an obligation to, or not -- didn't have an obligation to, as a result of the order, waived and released an expansive set of claims. They also agreed to indemnify HNGH if they had later asserted any such claims.

It altered the March payments provision, which is the third to last paragraph on Page 2. So instead of the consideration payments that we saw in the Docket Entry 64, there are different consideration payments here.

Let's see what else.

I think that's all. I don't entirely recall. I believe

that's all though.
Q Okay. And, in particular, I think, Mr. Kane, we looked at this briefly. I think it's actually Lender's Exhibit 15.
MS. LINDAUER: Do you want to pull that up, Sydney?
BY MS. LINDAUER:
Q This is a joint stipulation and agreed order modifying order on motion to dismiss and for relief from stay. This was actually the motion, or I guess the stipulation that was filed, that appended that agreed order that we just looked at to it for entry by the Court. Do you recall that Mr. Kane?
A I do.
Q Okay. And if you look at Exhibit B. There we go. There's a document called agreed order of judgment and dismissal of adversary proceeding with prejudice to refiling.
Do you see that?
A I do.
Q Okay. So as part of the second order, the March order, the parties agreed to, as you said, resolve the pending adversary proceeding that was still pending after December of 2021 and this is the order that the parties agreed to that allowed for the dismissal of the adversary proceeding. Is that right?
A That's correct, and it was actually entered in the adversary proceeding.
Q Okay. Were there any claims, Mr. Kane, in the adversary

proceeding that would deal with things like inadequacy of a rescission deed, that particular issue?
A I don't believe so.
Q Okay. And there would be no claims regarding either party's failure to perform under either the December or March orders that we've looked at, Docket 64 and 94, right?
A In the adversary proceeding, that's correct.
Q Correct.
The adversary proceeding, and the Court has got it, but the adversary proceeding really was geared more to complaints about, I think, performance under the forbearance agreement and then, I think, issues that arose as a result of the filing of the bankruptcy sort of 548, 550 issues. Is that right?
A I believe those were some of the claims, yes.
Q All right. And do you know if this agreed order of judgment or dismissal was actually ultimately signed by the Court and entered as a agreed judgment in connection with the pending adversary proceeding?
A It was entered as Docket Entry Number 15 in the adversary proceeding, yes.
Q Okay. And so now, we're up to March, roughly, of 2022, and do you recall, Mr. Kane, when it first came to your attention that Sendera Title was working on some title issues regarding the closing to pay off HNGH?
A I believe that was May 10th.

Q And did you have any involvement with Sendera prior to May 10th?
A I don't believe so.
Q And, again, we're still in your exhibits. If you look at Exhibit 24, we'll pull that up for you.
A I have it.
Q Okay. All right.
And do you see that's May 10th at 3:10 a.m., -- she writes) a.m., but -- and it just says: "I'm forwarding your email to Mr. John Kane, counsel for HNGH, and Joyce Lindauer, counsel for 299TC Acquisition [*sic*]. Provide the responses directly to you and cc us on all of this email."
Do you see that email --
A I do.
Q -- from Walji? Okay.
And is that your recollection of when you first got in the loop with Sendera Title on the closing documents?
A I believe that is. Yes, that's my recollection.
Q Okay. If you look to the first email is May 10th and it's forwarding to you also as a cc party an email from Julie Lyssey dated May 9th at 5:11 p.m. That's the email below.
MS. LINDAUER: Sydney, if you -- yeah. There you go.
THE WITNESS: Okay. I see that.
BY MS. LINDAUER:
Q Yeah. Okay.

And do you recall receiving this email?
A I recall, yes, receiving the forwarded chain on May 10th that included the May 9th email.
Q Okay. And this one is addressed to a person named Bella, and it just says: "I just heard back from my underwriter, see below what we will need."
And then it says: "Julie, I'm assuming that the borrower in your transaction is 299TC [*sic*] Acquisitions or some related Barton company." And then based upon that assumption, then "even though HNGH filed a deed in lieu, they've agreed to withdraw it if they are paid off by 5:30. See attached agreed modified order, which sets forth the agreements of Barton and HNGH."
Do you see that?
A Yes. Yes.
Q Okay. And then, it says: "So as to ER, where is what" -- I think it's supposed to be "here is what we need," but it says, "where is what we need." If you look on the next page, do you see the three items that Julie Lyssey identifies?
A I do.
Q Okay. And you were made aware of these items, obviously, in the May 10th email that you received.
A That is correct.
Q Okay. And the first one is a payoff from HNGH, but the second is confirmation that "the interim events referenced in

the modified order have occurred and HNGH is prepared to cancel the DIL," assume that's the deed in lieu, "of record at closing," and then "either an order permitting DIP financing or proceed to confirmation of the Chapter 11 plan before closing provides for takeout financing, in which case, the order confirming the plan will be sufficient."

Do you see those three items?

A I do.

Q Okay. On Item 2, "confirmation that HNGH that the interim events referenced in the modified order have occurred." Do you see that comment?

A Yes.

Q Do you have any understanding of what the "interim events referenced in the modified order" refer to?

A It could have been those March payments?

Q Anything else?

A The entry of the adversary proceeding order.

Q Okay. Anything else?

A Not that I recall right now.

Q All right.

So just to be clear, when you're looking at this Julie Lyssey email regarding these items, again, this is her email, so it would be, I guess, what she understood. But I guess my question to you is, upon reading this, did you have any understanding of what Ms. Lyssey may have been looking for for

confirmation related to the modified orders?
A No, but I responded to Ms. Lyssey regarding these three items.
Q Okay. We'll look at that in just a second.
A Okay.
Q And do you see further down if we drop down again, now, this is on May 9th. It's an email from Bella at JMJ Development to Julie Lyssey at Sendera.
And it just says: "Good morning, Julie, can you please provide a list of documents, information we need for closing? I'll be your point of contact so I'll make sure everything is sent to you in a timely manner."
Do you see that?
A I do see that.
Q Okay. All right.
Let's look at the, again -- now, again, the email you received copy of was on May 10th. That was Exhibit 24. Let's take a look at Exhibit 25, which is the next page.
Okay. This is a follow-up email from Julie where she just is basically responding to an email from Mr. Walji, the same one we saw before. And she just makes the comment, "Thank you." And I think it was because he was forwarding this information on to you and others for your responses.
Do you see that?
A I see that.

Q Okay. And then, we'll take a look at Exhibit 26, and I think this is the one you may have been referring to, where you actually responded to Ms. Lyssey. Do you see that email?

A I do see that email, yes.

Q Okay. Is this the one that you were thinking of when I asked you about Julie's email on May 10th?

A Yes.

Q Okay. And you said, "Julie, attached is the payoff amount, the confidential Exhibit A filed under seal which I circulated and approved by 2999TC's counsel on March 11th, and was previously provided to 2999TC's counsel, again, on April 29th. HNGH has a copy of the rescission deed ready to file in accordance with the applicable orders."

Okay. This is on May 10th. As of May 10th, did you actually have in hand a signed copy of a rescission deed?

A No. I should have clarified. HNGH has a draft of the rescission deed ready to file in accordance with the applicable orders.

Q Okay. But you told -- just to be clear, Mr. Kane, you told Ms. Lyssey, Mr. Walji, myself, Ms. Accord (phonetic), Ms. Manley (phonetic), and Ms. Cusaw (phonetic) that HNGH has a copy of their rescission deed ready to file in accordance with the applicable orders. And that really wasn't correct, is it?

A No, that's wrong.

Q Okay.

A Now, I want to clarify so you don't misinterpret my answer. When I say, "ready to file in accordance with the applicable orders," the applicable orders required the filing and recording of that document at closing. We did believe that we were prepared to file that document at closing.
Q I understand that. But the representation being made to all the people in that email was that it was basically ready to file right then is the way I would have read that. HNGH has a copy ready to file in accordance with the orders.
A You know, Ms. Lindauer, I can't speak to your interpretation of that email. I believe Mr. Walji did take the stand.
Q Okay. All right.
And just to be clear, Mr. Kane, you are not holding as of May 10th an executed rescission deed. Is that correct?
A That is correct.
Q You also make the comment, if we read a little further, "HNGH expectation is that it will file and record the rescission deed at closing when funds are wired into escrow for HNGH's payoff. And the filing of the rescission deed is the only condition precedent to closing remaining."
Do you see that statement?
A I do.
Q Okay. So was it your position that HNGH would actually be the one filing and recording the rescission deed at closing?

A Either HNGH or the title company. I mean, I suppose last time we filed the deed in lieu was the title company that filed it on our behalf.
Q Okay. But when you said that it was your expectation that it will file and record the rescission deed at closing, it doesn't say that we're going to deliver it to you Ms. Lyssey to file and record, right?
A It does not say that.
Q And you make the comment that it's the only condition precedent to closing remaining.
Do you see that?
A I do see that.
Q Okay. When we looked at that order, Mr. Kane, the December order that we're all very familiar with, there were some other conditions, right, prior to the filing and recording of the rescission deed, right?
A Right.
Q Okay. So that wasn't just the only condition to closing, was it?
A That's incorrect.
Q Well, if you thought that was the only condition, read your next sentence, "But please let me know if there's any additional documentation you require from me on HNGH's behalf."
Do you see that comment?
A I do.

Q Okay. So -- and you're going to be made aware in a minute that of course there are additional documents that are being requested. Is that right?
A I don't know what you're going to make me aware of in a minute.
Q Well, these are your emails, uh-huh. Okay. We'll get there. All right. But --
A If you'd like, I'm happy to clarify my response because I think you're asking me a series of questions about it and I think I understand that you're going to show me another Exhibit 33 or something that has a list of documents that Sendera requested for closing. I want to be clear about my answer here.
Q Sure.
A We understood that the rescission deed would be filed when the closing was ready to roll and the appropriate documents were in escrow to pull the trigger on closing. That's what I mean by "only condition precedent remaining to closing," right. Money's funded into escrow, other necessary documents are ready to go, and the last piece of the puzzle is the filing of the rescission deed, the form of which at the time, we believed -- well, I'll say it right now -- that we believed would reinstate the note and deed of trust.
Q Okay. So mechanically, let me understand from your side. So what you anticipated happening at closing was that you would

deliver the rescission deed and then, I wrote down, "and other necessary documents." Is that right?

A If there were other necessary documents, yes.

Q Okay. And --

A And I want to be clear that, be careful there -- is that -- or I want to be careful there. I am not saying that we were going to deliver all of the documents that the debtor believed were necessary for closing.

Q I understand that. But -- and, again, just to be clear, this email is going to the title company, Ms. Lyssey, and also to Mr. Walji. Those are the two to's, and then, all the other people are just cc'd. So when you're directing this email to Ms. Lyssey and Mr. Walji, to be clear, you're saying, please let me know if there's other -- "any additional documentation you require from me on HNGH's behalf." This is on May 10th of 2022.

A I did say that. That is correct. That is the second to last line of my email.

Q Okay. Let's take a look if we could at Exhibit -- this is 28. This is another email.

THE COURT: Lender's Exhibit 28, correct?

MS. LINDAUER: Yeah, Your Honor. I'm sorry. We're sort of going to stay in these exhibits for a bit, so just -- if I -- the 28, 29, et cetera.

BY MS. LINDAUER:

Q Now, looking at --

THE COURT: It's easier for reading the transcript if you would just refer to it as Lender or Lender's Exhibit.

MS. LINDAUER: Okay. Will do, Your Honor. I'll try to be better about that.

BY MS. LINDAUER:

Q Looking at Lender's Exhibit 28, Mr. Kane, again, now, this is an email from Julie Lyssey to you and Mr. Walji, cc'd a number of other people again.

And it says, "John," -- so this is directed directly to you -- "We are clear on the UW underwriting requirements for one and two. We will need the following to clear all requirements from the underwriter." And then, there are two things mentioned, "an order permitting DIP financing or to proceed with confirmation. Please send once you have the above information."

Do you recall that email?

A I do. Yes.

Q Okay. Did you have anything to do with an order permitting DIP financing or a confirmation order?

A No, I did not. And I was very enthusiastic to learn at this point that those were the only documents needed for the underwriter.

Q Well, in a minute, you're going to learn that there are more documents needed, right.

A Right. But I'm talking about my recollection at this time on May 10th.

Q Right.

A I was quite pleased to see this email.

Q Let's take a look if we could at Exhibit 29, and this -- I'm sorry, Lender's Exhibit 29. It's the next email.

And your response to Ms. Lyssey is "299TC [*sic*] Acquisitions LLC's counsel, Joyce Lindauer, will be seeking plan confirmation today at 1:30 hearing on the matter. I've not seen a proposed confirmation order yet."

Do you see that?

A I do see that.

Q Okay. And so that was your -- and, again, this is on May 10th. All of these are on the same date. And that's your response to Ms. Lyssey regarding these particular requirements. Is that right?

A Yes.

Q And then on Exhibit 30, Lender's Exhibit 30, this is two days later than the documents that we were just looking at with Ms. Lyssey. This is an email from me to you.

It says: "Can you send me the rescission deed you've drafted in 2999TC? Thank you."

A I do see that.

Q Okay. All right.

And just to be clear, the time on that email was 1:07 p.m.

on May 12th.

A I see that.

Q If we look at Exhibit 31. Now, this will be Lender's Exhibit 31. This is an email from you to me at 5:51, same day, May 12th, and it says: "Rescission deed, and that -- so it's HN Capital Partners JMJ Development special warranty deed, and then, there's a document reference number.

Do you see that?

A I do.

Q Okay. And then there is an attachment referenced to your email and that's marked as Lender's Exhibit 31A, Page 1 of 7. And if we look at that, that's a document called special warranty deed.

Do you see that document?

A I do.

Q Okay. And this is the document that you said, I think, was drafted sometime in the first part of 2022. Is that right?

A Yes, in January of 2022.

Q Okay. And if we look at the footer on that particular document at the very bottom, it's got a number. It says D050930V2. Do you see that?

A I do.

Q Okay. Is that a document reference number that you use at your law firm to identify different versions of a particular document?

A It is a style, yes.
Q And, again, Mr. Kane, I'm assuming that you're not the one that actually prepared this document. Is that correct?
A That is correct.
Q Do you know if in fact this version of the document is the version that was actually executed by Mr. Nambiar on or about May 27, 2022?
A I do not recall.
Q When you provided the copy of this document, the special warranty deed, you were just responding to an email that I had sent asking for a copy of the document. Is that right?
A I believe that is correct, yes.
Q And you would agree with me that this particular document appears to have some attachments. Is that correct?
A Hold on a second.
Q You can flip through it.
A I believe it references attachments, yes.
Q Yes, sir.
A It does. That's correct.
Q All right. Okay.
It's supposed to have an Exhibit A, which is a property description. Is that right?
A And it does have that, yes.
Q Okay. It's supposed to have a copy of the deed in lieu attached as Exhibit B.

A Yes. The final form of this would and did.
Q Okay. And it was also supposed to have an agreed order attached to it. Do you see that?
A Right. That's correct.
Q Okay. If you look at the agreed order issue, Exhibit C, you see it says --

MS. LINDAUER: Sydney, scroll down. It's Page 7 of 7. Okay.

BY MS. LINDAUER:
Q Do you see it says "Exhibit C Agreed Order, see attached?" And obviously on this draft, there's no order attached. And you don't recall sending a copy of the actual attachments along with the deed, do you, Mr. Kane?
A Not at this time, no.
Q If we go back to the Page 1 of 7, the first page. This is, again, Lender Exhibit 31A.

Okay. If you look at the second "whereas" paragraph of that document, do you see it tells you: "The agreed order regarding motion to lift stay, Docket 10, motion to dismiss, Docket 9, motion for sanctions, Docket 15, motion to enforce stay, Docket 14, signed December 10, 2021, the agreed order, a copy of which is attached hereto."

Do you see that?
A Yep, I do.
Q All right. So the agreed order that was to be attached to

the special warranty deed that you provided was the December 10, 2021, agreed order. Is that right?
A That's correct.
Q Okay. Why was the March agreed order not also attached to this document?
A Because this document was drafted in January and the March agreed order had not been entered.
Q Well, when you provided it in May, did it occur that maybe -- that that provision needed to be updated?
A Not necessarily because the payoff requirement, the payoff obligations, the reinstatement of the note, the rescission, that portion, that first paragraph of, I think it was Page 2, was not modified by the modified order.
Q But we did go through, there were some significant changes made to the December order by the March order. Is that right?
A That's correct, but not in the event of a payoff.
Q Well, for one, the payoff date changed, right?
A That is correct.
Q And I think some of the terms also of the payoff changed in the sense that there was about 3.5 million paid under the March order that wasn't due under the December order, correct?
A That would not have affected the payoff amount at the payoff deadline.
Q And, Mr. Kane, you recall looking at the rescission of deed and it actually referenced both orders. Is that right?

A I don't recall. I believe it may have.

Q Well, we'll get there in a second, but you would agree with me that this particular special warranty deed makes no mention of there being two orders, just of there being one agreed order. Is that right?

A Yes, that's what this document says.

Q Okay. And to be clear on the record, this document, Exhibit 31A of the lender's documents, that's the version that Mr. Nambiar ultimately signed on behalf of HNGH and was delivered on May 27th to the title company. Is that correct?

A I don't know. It was obviously revised because the document that Mr. Nambiar signed did not have yellow highlighted blanks.

Q Okay. Let's take a look if we could, this will be under -- I know this is a little hard to do these side-by-side, but if you can look at Lender 31A, Page 1 of 7, the one we've been looking at, and then if we pull up Debtor Exhibit 14, and we scroll to --

MS. LINDAUER: -- and I'm bad on the page numbers, Your Honor. I apologize on that. But it's the special warranty deed that Mr. Nambiar signed. It's about midway in the documents. It's before -- Sydney, the agreed rescission. There you go, it's that document.

THE COURT: But we're on -- you're switching to Debtor's Exhibit 14, correct?

MS. LINDAUER: Correct, Your Honor. The problem is my 14 doesn't have the pages numbered, and I know we've been referring to page numbers but it's the special warranty deed signed by Mr. Nambiar that appears about mid-stack there on documents and it's up on the screen. These are admitted exhibits, so I think it's page -- I show around Page 11, a document called special warranty deed.

THE WITNESS: I believe it's on Page 12 of 25.

MS. LINDAUER: Okay. Thank you, John.

BY MS. LINDAUER:

Q Okay. And if you just put those side-by-side, so we're looking at Lender Exhibit 31A and then we're looking at Debtor's Exhibit 14. You told us Page 12. Those are the special warranty deed references. Is that right?

A Yes.

Q Okay. And I think you pointed out that one difference between these is that the yellow highlight on Exhibit 31A of the Lender's Exhibits, where it says document number, was actually filled in.

A Yes.

Q Okay. In two places, actually. There's a document reference number at the top and then there's another document reference number kind of mid-stack there on Item 2 that was also filled in.

MR. KANE: Your Honor, I'm going to raise the

objection. The documents speak for themselves. If there's a specific question about these documents, I'm happy to answer it, but if we're just going to do a comparative analysis of this version against that version, I don't understand how that --

MS. LINDAUER: Well, Your Honor, I'll get to a question. I was just --

THE COURT: So Ms. Lindauer, I've given you -- so I'll sustain the objection. I've given you a lot of leeway, but I do want to remind you of the protocol that I established when I let you call Mr. Kane to the stand. Again, going back to that Shelton three part test.

MS. LINDAUER: Understood, Your Honor.

THE COURT: And the first part of that test is that there's no other means to obtain the information. And I don't know, I'm thinking 85 to 90 percent of what we've covered so far does not satisfy that test.

So you indicated you had some other questions that you could only get from Mr. Kane, so you might want to stick to those. So that objection is sustained.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q All right. Let's turn if we could to Exhibit 32, Lender's Exhibit 32.

Okay. This is an email from Julie Lyssey directed to you,

Mr. Kane, dated May 23, 2022. "Can you please send us a copy of the rescission deed where HNGH will deed back to 299TC Acquisition [*sic*]. Do you see that request?

A I do.

Q And did you send to Ms. Lyssey a copy of the rescission deed?

A I did.

Q Did you include those emails in what was provided to the Court in connection with this hearing?

A I believe that there is an email record that we couriered a wet signed rescission deed to Julie Lyssey at Sendera Title in the early afternoon on Friday, the 27th, which was actually our second effort to do so.

MS. LINDAUER: Your Honor, I'm going to object, non-responsive. My question was directed to the email on May 23rd where she specifically said, "Can you please send us a copy? Not the original. Can you please send us a copy of the rescission deed?" That was the request.

And my question to Mr. Kane is, did you send Ms. Lyssey a copy of the rescission deed on or about May 23, 2022?

THE COURT: So I'll overrule your objection, Ms. Lindauer. I believe he was answering the question.

MS. LINDAUER: Well, if your answer -- let me clarify his answer then.

BY MS. LINDAUER:

Q If your answer, Mr. Kane, is, "Yes, we sent a wet signature on May 27, 2022 to Sendera Title." Was that your response to Ms. Lyssey's email on Monday, May 23rd?

A Yes, I believe it was. But as I stated, we actually tried to courier that, I believe it was the day before but had a hangup with availability and notarization of the document that was originally executed by Mr. Nambiar.

Q Okay. All right.

Looking at Lender's Exhibit 33. Again, this is an email from Ms. Lyssey to you, Mr. Kane, copied to others --

A Uh-huh.

Q -- where she's specifically asking you, "Good morning, John. I'm hoping you can help us with some items on Schedule C of the title commitment regarding assignments from Axos Bank and Happy State Bank."

Do you see that?

A I do.

Q And on that date, May 24th, did you receive also a copy of what's been marked as Lender's Exhibit 33A?

A Yes.

Q Had you received a copy of Exhibit 33A prior to May 24th of 2022?

A No.

Q And with regard to the items listed in 33A that are

attached, did you have a chance to review those particular items?
A I have.
Q Did you have a chance to review at the time that you received Ms. Lyssey's email?
A I did.
Q Okay. All right. And if you read her email, let's go back to Page 1 of Exhibit 33. You see her comment? Also, since Happy State Bank will not receive any payoff funds or be signing a release of lien with HNGH, we will need Happy State Bank to collaterally assign back to HNGH. Do you by chance have the assignments?
Do you see that question?
A I do.
Q Okay. All right. Did you provide Ms. Lyssey proof that HNGH would not be paying off Happy State Bank, or that there would be a collateral assignment back to HNGH as part of this transaction?
A I'm sorry, will you repeat that question?
A Sure. So Ms. Lyssey asked you that -- says since Happy State Bank will not receive any payoff funds, this is May 24th.
A I see it. Yeah.
Q Or be signing a release of lien with HNGH, we will need Happy State Bank to collaterally assign back to HNGH. Do you by chance have the assignments. Do you see that request?

A I do.

Q Okay. Now, Ms. Lyssey was asking you, with regard to Happy State Bank, whether you had a release of lean or an assignment back to HNGH of the collateral assignment. Do you see that request?

A No. I think she was only asking if I had an assignment back from Happy State Bank to HNGH.

Q Okay. And at the time that she made that request, were you holding an assignment back from Happy State Bank?

A I was not.

Q And did Ms. Lyssey also have conversations with you, Mr. Kane, about the other items that were identified in Schedule C? That would be Lender's Exhibit 33A.

A I sent -- let me clarify. I sent a number of items to Ms. Lyssey. I did not have any conversation with Ms. Lyssey ever.

Q Okay. How did she get the impression that Happy State Bank will not receive any payoff funds?

A Yes. I'm happy to explain that. And I'm glad that you asked that question.

Q Okay.

A I assume it was from Khudabuksh Walji. So in emails that we haven't gotten to yet, I hope that we do, on May 16th after having this kind of initial exchange with you and Sendera Title, I had not heard any update whatsoever on what was

happening with the closing.

So I emailed the debtor's counsel in an attempt to find out what was happening and proposed a conference call. I received, I believe some feedback from you that you would be interested in a conference call, Ms. Lindauer.

Q Okay.

A Again, no confirmations of available times. So on May 18th, I reached out again and asked are we going to be getting documents for closing from you guys? Are we going to have this conference call? Are we going to get an update on what's happening with closing?

And on the 19th, finally Mr. Walji said I'm available tomorrow at X time for a conference call. So on the 20th, we finally had that conference call. That's Friday, May 20th. And on that conference call, I was assured things were going swimmingly with preparation for closing, the debtors were working on the documents that they were going to need for closing.

But there was just one concern of Mr. Walji's. And that was that there was a collateral assignment of a note and lien. I don't recall if he actually said that, or if there was an issue with a lien on the note or some interest in the property by Happy State Bank.

And on that conference call, I told him that the payoff was going to be with HNGH, and that I was not aware of any

collateral assignment, note or lien or interest of Happy State Bank in the property. And so we need to be focusing on a payoff of HNGH, not of Happy State Bank.

Now on the 24th, when I received the correspondence in 33 and 33A from Ms. Lyssey and saw on Schedule C the collateral assignment and note and lien by clicking through on the live link that was included on that document, and reviewing the collateral assignment and note and lien, I raised that issue with my client.

And I raised that issue immediately the same morning internally with our KRCL real estate counsel in an effort to try and get that resolved as quickly as possible, because I recognized that might be a title issue that needed to get resolved at closing.

Q All right. So wait a minute. So you think that Ms. Lyssey somehow learned from someone, Mr. Walji or someone, that Happy State Bank would not be receiving any payoff of funds. Is that right?

A It is my assumption that Mr. Walji had that follow up conversation after our Friday conference call on May 20th. Yes.

Q All right. When did you actually notify Mr. Walji or myself that you were wrong about this collateral assignment with Happy State Bank?

A I didn't believe that I needed to notify you or Mr. Walji

that I was wrong. You were already aware of the existence of the collateral assignment of note and lien before May 20th. It was just a title issue that needed to get resolved. And so we began working immediately to resolve it.

I know that by the 27th, we had provided you information on our efforts and attempts to resolve the issue, that we were working with Happy State Bank. We provided you a draft of the proposed collateral assignment release that we were circulating contemporaneously with Happy State Bank.

Q Right. So let me be clear. On May 20th, in a conversation, telephone conversation between yourself, Mr. Walji, and myself, you told us that Happy State Bank was not an issue. Is that correct?

A I don't recall my exact words.

Q Okay. Well that was the substance of what you told us.

A I believed that the closing needed to be focusing on a payoff of HNGH. That's correct.

Q All right. So Mr. Walji and myself leave that conversation thinking, based on what you told us, that Happy State Bank was just simply something we didn't need to be concerned with, and that we needed to focus on just a payoff to HNGH. Is that right?

A Was that your understanding at the time? I can't testify to your understanding.

Q Well, based on what you told us, is that a reasonable

interpretation of what you told us on the 20th?
A It may have been. But again, on the 20th, I did not have the 33A schedule that was, as I understand it, in your and Mr. Walji's possession. So I was unaware of the document, and you were not. So it's a tough call for me to make sitting from here about whether you should have taken some decision or not, since you had more information than I did.
Q Okay. But just to be clear, Mr. Kane, you just told us you never picked up the phone and called me or Mr. Walji 'til after May 27th to discuss with us that there was still an issue with Happy State Bank. Is that correct?
A That's not correct. It was not after May 27th. I believe it was on May 27th.
Q Okay. So on May 27th, four days before closing, Friday before a holiday weekend, you claim you notified us that there was an issue with the Happy State Bank collateral assignment of note and lien. Is that right?
A I'm not claiming it. Mr. Walji confirmed it in email correspondence following the call. I also provided a solution on that call to resolve the Happy State Bank issue.
Q Just to be clear, the special warranty deed that you delivered with wet signatures on the same day, May 27th, 2022, to Sendera Title signed by your client, Mr. Vipin Nambiar, makes no mention of the Happy State Bank collateral assignment of note and lien. Is that correct?

A That's correct.

Q Now, you heard Mr. Christensen say, I believe in his testimony when I asked him about Lender's Exhibit 33A, that in fact they had documents in hand that would've satisfied the requirements in item 11.

MS. LINDAUER: You want to pull that up, Sydney? It's Lender's Exhibit 33A, item 11.

BY MS. LINDAUER:

Q That they had in hand documents that would've satisfied Exhibit -- the item 11. Did you hear him testify to that?

A I did.

Q Okay. And were those documents ever delivered to anyone on this side of the table, whether it's the debtor or to Sendera Title?

A I don't believe so.

Q Have you yourself actually seen the documents responsive to item 11?

A I have seen a draft of the incumbency certificate that Mr. Christensen was working on.

Q We'll get to that in just a second. Exhibit -- if we look at Exhibit -- Lender's Exhibit 34, Page 1 of 2. This is an email, Mr. Kane, from you to a John, I don't know how to pronounce his name, Inepet? Maybe you can help me with that.

A It's a tricky one. Inabnett.

Q Inabnett, okay. And I assume he's a lawyer at your law

firm?
A He is a lawyer at my law firm.
Q Okay. And it says: "John," -- I assume this is John saying to John -- "Can you take a look at this email below and the attachment and the referenced Exhibit C. Curious about these assignments. I don't really follow the assignments to Axos, and I think it's a typo, but Happy State Bank as they're really just a lender to HNGH, and HNGH is the lender to 299TC. Can you help me get a handle on this and what we need to get to title company to facilitate a closing next Tuesday?"
Do you see that comment?
A I do, yes.
Q Okay. And were you provided with any assistance with regard to the assignments to Axos and Happy State Bank?
A Yes, I believe I was.
Q Okay. Did you provide that information to either Ms. Lyssey or to Mr. Walji or myself?
A Indirectly, yes. We provided the Axos termination documents to Ms. Lyssey. We drafted and circulated to you and Mr. Walji a proposed draft of the Happy State Bank release of collateral assignment of note and lien. I explained those things to you on a conference call on May 27th, as well. So I believe that the answer is yes.
Q Okay. Let's take a look at the next exhibit. This will be Lender's Exhibit 35. And this is an email from you to

Ms. Lyssey at the title company. This is dated May 26th, the day before you sent over the signed special warranty deed.

And your email to her says: "We are working with Happy State Bank to try to get this issue resolved. I will circulate an executed and notarized rescission of deed for Tim Barton's signature to be held in escrow pending funding tomorrow, as well."

Do you see that?

A Yes. And to clarify, Tim Barton would be signing, as I understood it, on behalf of the debtor as he has substantially every document.

Q Okay. I didn't ask that question. I just asked did you see your answer, your statement in that email.

A I do see my statement in that email.

Q Okay. All right. And again, this was to Ms. Lyssey at Sendera Title. And the issue you say is we are working with Happy State Bank to try to get this issue resolved.

A Uh-huh.

Q What issue were you trying to resolve with Happy State Bank on May 26th?

A I believe that -- can you scroll down a little bit?

Q Sure.

A Yeah, there it is. So this is the Happy State Bank issue, getting the release of the assignment, or the collateral assignment of note and lien. That's what we were working with

Happy State Bank to get resolved.
Q And again, you didn't correct Ms. Lyssey when she said Happy State Bank will not receive any payoff funds. You didn't send anything to her about that issue, did you?
A That wasn't important for a title company at the time.
Q Well, wasn't the title company going to be the one that was going to be paying out the money at closing?
A Yes. Out of HNGH's proceeds.
Q So wasn't it important for the title company to know who was supposed to be receiving the payoff funds?
A Yes. But I want to be clear here. Once the money is paid into escrow, that money is in essence the proceeds owed to HNGH. At that point, it just becomes a line item issue of where HNGH wants to direct the funds.
Q Okay.
A Whether it all goes to HNGH or whether it goes to Happy State Bank, it doesn't matter. We did provide instructions to Julie Lyssey clarifying that issue.
Q And who hired Julie Lyssey on behalf of HNGH?
A I don't think that's how this title company thing works at closing.
Q So just to be clear, Julie Lyssey was a person that had been retained by the debtor at Sendera Title to assist with the closing. Is that correct?
A That is correct. But the debtor does not get to determine

where HNGH's proceeds go. HNGH does.

Q Okay. And what obligation did Julie Lyssey have to HNGH to pay the proceeds where you directed them to go?

A You mean where HNGH directed them to go?

Q Correct.

A Well, once the money is paid into escrow, and the payoff is to go to HNGH, it is my understanding from every closing I've ever been a part of whether residential on my own home, whether a commercial transaction for oil and gas properties, for commercial real estate properties acquiring a business, it is --

MS. LINDAUER: Your Honor, I'm going to object. Non-responsive. I had a very simple question to Mr. Kane.

THE COURT: Overruled.

THE WITNESS: It is --

THE COURT: Go ahead. Finish your objection.

MS. LINDAUER: Okay. Well, Your Honor, I think my question was much simpler than that. And I'm getting a lengthy narrative answer. And all I was asking was, was Ms. Lyssey was acting as whose agent. I'm clarifying my question. Whose agent in connection with this closing.

THE COURT: All right. That objection's overruled.

THE WITNESS: Okay. So in this new question, then I would say the parties to the closing.

BY MS. LINDAUER:

Q What contractual relationship did HNGH have with Sendera Title to act as its escrow agent at closing?

A I have not seen the contract. But I believe as the payee, HNGH would in essence be a third-party beneficiary of the escrow agent.

Q As you sit here today, though, there is no written agreement between HNGH and Sendera Title for them to act as an escrow agent for HNGH. Is that correct?

A Not signed by HNGH. That's correct.

Q Have you seen one signed by Sendera and the debtor, 2999TC Acquisitions?

A I have not.

MS. LINDAUER: Your Honor, taking a look again, we're still in Lender's exhibits. Taking a look at Exhibit 36.

BY MS. LINDAUER:

Q Mr. Kane, are you familiar with this particular series of emails?

A Yes.

Q And can you tell us who Cindy Davis (phonetic) is?

A Cindy Davis is my administrative assistant at Kane Russell Coleman Logan.

Q And looking at Exhibit -- Lender's Exhibit 36, 1 of 3. This is an email from Cindy Davis to you. And it says: "HNGH needs some help."

Do you see that? That's the reference subject.

A Yeah. HNGH - need some help. Yes.

Q All right. And the question Cindy's answering, yes I did. Doc attached. And that's responsive to your request to her, did you courier the signed document. And also, will you email me a copy of the signed rescission deed or me email me where a copy is saved so I can email that around. Do you see that?

A I do see that.

Q And then at the bottom down there it says, last part of that chain. Again, this is May 27th at 12:57 from you to Cindy: Cindy, this is the person to whom you need to courier the signed, notarized deed after you save PDF copy to the system for HN Capital under the JMJ sub number."

Do you see that?

A I do.

Q Okay. "And cover letter needs to say from Mr. Kane. This executed rescission deed must be held in escrow pending funding of the payoff amount owed to HNGH Turtle Creek, LLC."

Do you see that?

MR. KANE: Objection, document says what it says. If you have any questions, I'd be happy to answer them.

MS. LINDAUER: Okay. Mr. Kane, just to be clear, you're the only --

THE COURT: I will -- I will sustain the objection.

BY MS. LINDAUER:

Q Okay. Mr. Kane, is there any reference in your email

cover instructing Sydney -- Cindy what to put? Is there any mention that payoff amount owed to HNGH or Happy State Bank? Any mention of Happy State Bank?

MR. KANE: Again, objection. The document speaks for itself.

MS. LINDAUER: Okay. Well, you would agree with me there is no mandate --

THE COURT: So I will sustain that objection.

BY MS. LINDAUER:

Q Mr. Kane, you would agree with me that there's no reference in anything that you sent over to the title company at this point talking about Happy State Bank. Is that correct?

A I believe that you just showed email correspondence between me and Ms. Lyssey about Happy State Bank from May 26th.

Q That's not my question.

A That's Lender's Exhibit 35.

MS. LINDAUER: Objection, non-responsive. I'm asking specifically about this email on May 27th at 12:57.

MS. LINDAUER: Okay. Objection, document speaks for itself.

THE COURT: So I'll overrule the first objection because I think he was responding your question. Go ahead and ask another question.

BY MS. LINDAUER:

Q Okay. Mr. Kane, if we look at this is Lender Exhibit 36A

attached to your email. Do you see that document?
A 36A? Yes, I have this up.
Q Okay. You would agree with me that there's no cover letter attached to Exhibit 36, is there?
A That's correct. There is not.
Q Had you ever provided us a copy of a cover letter showing exactly what you told Ms. Lyssey at Sendera Title?
A I have not.
Q And the special warranty deed that's attached to your email, you have that document? That's Lender's Exhibit 36A in front of you?
A I see it. Yes.
Q Does it have all of the attachments to it? The Exhibit A and Exhibit B and Exhibit C to the special warranty deed.
A I believe it does not.
Q So you would agree with me this is not a complete document attached to your email on May 27th between you and Ms. Davis. Is that right?
A No. I don't believe so. And when I say no, I don't believe that you're right. This is what Ms. Davis passed along to me.
Q Okay.
A It was my understanding that the couriered document did include the attachments, which is what I provided to you on the 27th. And that's at Exhibit 57 with attachments.

Q Okay. And, but I don't have a copy of any cover letter showing that, in fact, that's the document that you sent to the title company with the attachments.
A Ms. Lindauer, I haven't seen the cover letter.
Q Well, who signed the cover letter?
A May have been miss Ms. Davis. I may have signed it. So I should -- I guess I should clarify my testimony. I haven't seen a PDF copy of the cover letter. I may have seen the cover letter and executed it, and out the door it went.
Q All right. But just to be clear, I've gone through all of your Exhibits and there's not a copy of any cover letter in these Exhibits provided to the Court. Is that correct?
A That's correct. And actually, I should clarify. I don't believe I did execute the cover letter. So I'm not sure I actually have seen the cover letter. So I provided you what Ms. Davis provided me, and then a full copy of what actually went out the door to the courier.
Q Okay. Again, when you take a look at -- this is -- taking a look at, you know, I'm going in order of your exhibits. This is Lender Exhibit 39.
A Yes.
Q And this is -- there's going to be a series of emails on it. I'm going to going to kind of lump them together. But starting with 39, it says: "Attached is the" -- and this is from you to me. "Attached is a sealed Exhibit A with the

payoff, the form and amount, which you approved in a responsive email on March 11."

Do you see that?

A I do.

Q You would agree with me, Mr. Kane, that in this series of emails, 40, and then there's 40, 39, 40. I'll let you look at these.

A I'm familiar with these exhibits. Which ones do you want to stop at, 42?

Q Yeah. The whole list of the payoff emails, right?

A Yes. I'm very familiar with these documents.

Q Okay. So we're looking at Lender's Exhibits 39 through 42, which is a series of payoff emails regarding the amount to be paid to HNGH. You're familiar with those, right?

A Yes I am.

Q And just to be clear, there's no mention in any of those documents, 39, 40, 41, or 42 of Happy State Bank, correct?

A That's correct.

Q Okay. Let's take a look if we could at secured lender, Exhibit 55. This is an email on your -- go back up at the top again. Printed off by you, because it's got your name at the top. Do you see that John J. Kane?

A Yes. I was a CC recipient of this email from Vipin Nambiar.

Q Right. And it's from Mr. Nambiar, your client

representative, to Ms. Blakeley at Happy State Bank, CC to you and Nate Christensen. Do you see the reference? HNGH collateral assignment of note and lien. Do you see that?
A I do.
Q And it's May 27th, 2022 at 9:35 p.m. That would be in the evening, right?
A That's correct.
Q Okay. And Mr. Nambiar is instruct or saying to Julie, Julie, we want to make sure that borrower doesn't claim that this assignment procedure requires more time. It is purely procedural, but I want to make sure we are ready Tuesday morning if an expedited hearing is requested.
A That's right.
Q Can you please -- sorry?
A I was confirming your reading. Yes.
Q Okay. Can you please get your counsel sensitive to this so they review and clear the document as soon as possible. John has been asked, and I assume the John that's being mentioned there is you, has been asked to hold the line on the payoff date, and I don't want any procedural delays to cause a problem on our payoff or remedies, whatever the outcome may be. Do you see that?
A I do.
Q And then down below it says, "Thank you, John. I will have it reviewed and let you know if there are any comments.

I've requested a payoff letter, but it may be Tuesday morning before it is sent out."

Do you see that?

A I do.

Q Okay. Now these are all communications between you, your client rep Mr. Nambiar, and Happy State Bank's representatives. Is that right?

A That's right.

Q And but not -- no debtor representatives are copied on any of these emails. Is that right?

A That's correct.

Q So on May 27th, the same date that you couriered over the wet signatures of Mr. Nambiar earlier in the day, Mr. Nambiar is contacting -- Friday evening contacting Ms. Blakeley telling her that he didn't want any hiccups in this matter and that he wanted to basically hold the line on the payoff date. Do you see that?

MR. KANE: Objection. The document speaks for itself. Also, this is a Shelton v. American Motors issue, and that these questions could have been asked of Mr. Nambiar when he was on the stand called by the debtor.

MS. LINDAUER: Well, but, Your Honor, on the second point -- first of all, the document does speak for itself. That's fine. But on the second point, John has been asked to hold the line on the payoff date. And so my question was

really going to be directed to Mr. Kane based on that statement.

THE COURT: So I'll sustain both objections.

BY MS. LINDAUER:

Q Okay. Mr. Kane, what was your understanding --

THE COURT: I'm sorry. I apologize. I apologize. Yeah, I'm sorry. I sustained Mr. Kane's objections on the I call it the Shelton doctrine, but yes, Shelton vs. American Motors. So that objection is sustained. And the document speaks for itself. That objection was also sustained. Go ahead.

BY MS. LINDAUER:

Q All right. And just to be clear, Mr. Kane, as of May 27th, 2022, you had not spoken to the debtor's counsel regarding the collateral assignment of note and lien with Happy State Bank. Is that right?

A That's wrong.

Q Okay. On that date, you did speak to us?

A Yes.

Q On the 27th?

A Yes.

Q What was the conversation on the 27th?

A That I already raised this issue with Happy State Bank, that we were preparing a draft of the Happy State Bank collateral release document, that we intended to deliver that I

think it was on the 27th, that we were working with Happy State Bank to try and get that released timely for closing.

Q And did you send an email on that date to either me or Mr. Walji to that effect?

A We had a conference call on that Friday. Mr. Walji sent an email immediately afterwards memorializing five bullet points that he believed were takeaways from that call, including our discussion about Happy State Bank.

Q Okay. Let's take a look at that. We'll get to that in just a second.

A It'll be bullets 3 and 4 of Mr. Walji's email in Exhibit 58.

MS. LINDAUER: Your Honor, I don't think there was a question pending at the time that Mr. Kane provided his answer.

THE COURT: Sustained. Are you going to ask him to turn to Lender's Exhibit 58?

MS. LINDAUER: Oh, well, Your Honor, I don't know. that was just, that was kind of a random -- I don't know if I even had that on my list of questions, to be honest. In fact, I don't think --

THE COURT: I'm not suggesting that you have to. I was going to laugh if you did, but go ahead and ask him whatever you want to ask him.

MS. LINDAUER: No. And actually, I didn't have that. The next Exhibit I had was Exhibit 59.

BY MS. LINDAUER:
Q And this was an email, if we go to 59. Okay. Again, this is May 27th at 5:23 p.m. Again, this was the Friday before the holiday. It's an email to me from you. I want to see this close. I'm working hard on my side to make it happen. I'm pulling my RE, I believe real estate guys, off of other deals and closings to they can address this case as quickly as possible since we're getting material title doc demands four business days before closing.
My question to you is what are you referring to, Mr. Kane, on May 27th, Friday at 5:23, material title doc demands four days before closing? What were you referring to?
A I believe that was a series of documents included on Exhibit 33A provided by Sendera Title on May 24th.
Q All right. So on May 27th, you were aware that there were other documents being requested for this closing. Is that right?
A Yes. It is my understanding in part that Sendera was asking for a series of specific documents . Among those were documents related to Axos Bank, documents related to Happy State Bank. I think that Mr. Christensen was working on incumbency certificate considerations, payoff and release of lien was something that we were working on so that we could circulate that. I think we were reviewing the request for a clarification on the assignment of leases and rents issue that

was included on that 33A.
Q Okay. So your reference right here, just so I understand, is to the 33A title commitment that we've seen that's Secured Lender's Exhibit 33A. Is that right?
A In part, yes. We didn't necessarily believe that all the documents on 33A were necessary at closing based on our experiences with closings, especially with distress closings.
Q All right. Let's take a look at Exhibit 30. I'm sorry, 60. That'd be Lender's Exhibit 60. This is an email again on Friday, May 27th at 5:00 p.m. from you to Julie Blakeley asking her to have her team review the attached. It will be held in escrow pending payment in full. Please also provide a payoff for May 31st if you can. Do you see that?
A I do see that.
Q Okay. And this is an email specifically between you, Ms. Blakeley, your client, Mr. Nambiar, and their general counsel, Mr. Christensen, is that right?
A That's correct.
Q If we turn the, Page 60A, Secured Lender's 60A, Page 1 of 3. This is a copy of a draft of the document release of collateral transfer of note and lien?
A Yes.
Q Do you see that document?
A I do.
Q And did Happy State Bank ever actually execute that

document?
A I believe it's my understanding that they did according to their -- Ms. Blakeley's testimony.
Q Did you ever see the executed version of that document?
A I did not.
Q Was it ever delivered to any title company?
A I believe it was Ms. Blakeley's testimony that they endeavored to deliver it to a title company, but never received title company information from the debtor.
Q It's your understanding that, from Ms Blakeley's testimony, that the release of collateral transfer of note and lien would not be effective until Happy State Bank received payoff funds.
A Yeah. So I'm a little confused on that. I thought Ms. Blakeley would've found a concurrent closing acceptable. But I have not read a transcript of her testimony.
Q Well, and you've got a copy of her testimony. Correct, Mr. Kane?
A I believe I do.
Q To be clear, your firm drafted this release of collateral transfer of note and lien that's marked as Lender's Exhibit 60A. Is that right?
A Yes, that's correct.
Q And when this document was drafted, on Page 1 of 3, you see where it says HNGH Turtle Creek, LLC, a Delaware Limited

Liability Company. Do you see that?

A Yes, I do.

Q Okay. So on this document, your firm or someone got it right and made it a Delaware Limited Liability Company. But when we did the special warranty deed, same day, same time, it was a Texas Limited Liability Company. We've looked at that, right?

A Yeah. And I believe Mr. Christensen and Mr. Nambiar have both testified to that. So the issue there was not that they didn't initially catch it on the draft. It was they did catch that the special warranty deed should have been a Delaware Limited Liability Company and informed me of that.

Q Okay.

A And in the process of trying to get it resigned and notarized, I made the mistake, me personally, of not updating the draft. I thought I did, to be honest. I was honestly a little bit surprised going through the evidence to see that it still set Texas Limited Liability Company. I thought I did.

I don't know if I didn't save it, I don't know. But when it was executed and notarized, they missed it on the second go around. I missed it on the second go around. So the special warranty deed said Texas Limited Liability Company.

Q And just to be clear on the record, no one, you nor your client, has ever corrected that special warranty deed to make it a Delaware Limited Liability Company document, right?

A Yeah. So the special warranty was rejected by the debtor which, and the purported funding source, which to us kind of negated the utility of that document based on the representations that we were receiving, that it would not and could not be satisfactory to the parties to closing.
Q And you agreed that whatever was signed for the rescission of deed or rescission deed needed to be signed by both parties, right?
A Yes. I do agree with that.
Q Okay. It wasn't a unilateral document. It had to be something that both parties were agreeable to. And even in the version that Mr. Nambiar signed, it did require a signature by 2999TC Acquisitions. Is that right?
A Yes, that's correct.
Q Okay.
A Yes.
Q Okay. Let's take a look at Exhibit 61, Lender's Exhibit 61. I believe, Mr. Kane, this is what you were talking about, that a copy of the form of release that was in Happy State Bank's possession pending review and comment, that that's where you copied myself and Mr. Walji, I believe on that form of release. Is that right?
A Yes.
Q Okay. And that was on Friday, May 27th at 5:14 p.m. Do you see that?

A I do see that. Do you know if anybody responded to your email on Friday, May 27th at 5:14 p.m.?

A Did they respond at May 27th at 5:14? Or did they respond generally to this email?

Q No. Was there a response sent back?

A Yes. On May 29th, I believe you sent a responsive email saying don't do anything else, we might have some comments. And then on May 30th, I believe you provided a revised release of collateral transfer of note and lien, which I then forwarded to Happy State Bank that same evening.

Q Let's take a look at -- I want to look at Secured Lender's -- or Lender's -- just a second. Take a look at Lender's Exhibit 64. And if you drop down, this is an email on May 30th at 10:18 from me to you.

And it says: "I should have a detailed email to you shortly. They're trying to get all the documents lined up and still have several funders working on the closing. There are several documents that need attention before closing to clean up the title, the main one being the rescission deed."

Do you see that?

A I do.

Q It says: "A prior deed has to be rescinded for several reasons. Significantly, it will create a huge tax problem if it's treated as just a conveyance. It has to roll back to the original ownership to keep from having a gain on the

transaction. So our people are putting together what needs to be reviewed and signed to rescind the transaction."
Do you see that?
A Yes, I do see that.
Q Okay. And then shortly, you were in fact provided, I think, with a rescission of deed. Remember that document? We've looked at that several times.
A Yeah. It was five hours after this, but yes.
Q Okay. And then actually the same day, May 30th at 10:32 a.m., a comment from me to you, "Evidently title did not like that document. So I'm sending what they want."
Do you see that?
A Yes. I believe that to be false.
Q I didn't ask if it was false. I just asked, do you see that comment?
A I do see that comment.
Q Let's take a look at Exhibit 65. And you were sent by my legal assistant a Dropbox link on May 30th regarding closing documents. Do you see that?
A Yes.
Q It says: "Dropbox link to the folder with the closing documents and checklist."
Do you see that?
A I do.
Q And were you provided, Mr. Kane, on May 30th at 3:24 p.m.

this Dropbox link that included a closing checklist and documents?

A I was.

Q And what did you do with that checklist and documents after you were provided that?

A I opened it and reviewed the documents that were contained inside.

Q And how long was it until you responded to that Dropbox link and checklist regarding the documents that were included there?

A I believe it was about two hours.

Q Okay. We've seen the letter. For some reason it didn't copy very well, but it's Lender Exhibit 65A, Page 1 of 4.

MS. LINDAUER: It would be the next one, Sydney.

THE WITNESS: Yeah. You -- just, this is for the sake of the benefit of the Court. I think you have this in Debtor's Exhibits.

MS. LINDAUER: We do.

THE WITNESS: And somehow when this got uploaded to the Court, it looks like it got corrupted partially. And so if we want to look at this from Debtor's exhibits, I believe it is the same document, just an uncorrupted version.

BY MS. LINDAUER:

Q All right. If we take, and we've already gone over this letter, but if we take a look at Exhibit 66. This is again

May 30th at 3:28 p.m. On the rescission, we want to go with the agreed rescission. Do you see that?

A I do see that.

Q Okay. And basically, that's where I was asking you or telling you that we want to go with our version of the agreed rescission document, correct?

A Are you telling me that now? I mean, the document speaks for itself.

Q Okay.

A Yes.

Q Well, let me ask it a different way. What was your understanding of what I was saying to you on May 30th at 3:28 p.m.?

A That we want to go with the agreed rescission. I don't know who we was. I don't know if it was the debtor. I don't know if it was your funding source. But, so I don't know who the we was.

Q Okay. Let's take a look at Lender Exhibit 67. Okay. And just to be clear, my email to you was at 3:28 p.m. You responded about two hours later at 5:49 and say Joyce, this is what I advised my client to agree to. Do you see that?

A That's correct.

Q Okay. And that was, if we turn to Lender Exhibit 67A, this is the agreed rescission of special warranty deed that we spent quite a bit of time talking to Mr. Marx about this

morning. This is the HNGH version of the agreed rescission. Is that right?
A That is right.
Q And as we already noted, there is not a redline of this document provided by you. Is that right?
A That is correct.
Q And then, I guess just to be clear, this was provided on May 30th. You told us that this was the version you would recommend. I will advise my client to agree to, right?
A Yes.
Q On May 30th?
A Yes.
Q All right. And was this version ever executed by your client?
A No.
Q Why not?
A Because we never got the green light from the debtor or any feedback on this document at all, despite me bugging you on multiple occasions the following morning. Do we have an agreement to this document. Is this form of document okay. We're running out of time. If you need wet signatures on these documents, we need approval. And we got none back.
The only thing we got back was from Khudabuksh Walji at like 2:00 on May 31st. And it was just a rejection. No, we want to use our form of document. No explanation, no proposed

comments, no proposed revisions, nothing.
Q All right. Let's be clear, Mr. Kane. Exhibit 67 from me to you on May 30th, the day before the final closing. I say on the rescission, we want to go with the agreed rescission. Do you see that? And you had that document from us.
A I did.
Q Right?
A Yes.
Q All right. And your response two hours later is, is this is what I will advise my client to agree to. And that's Exhibit 67A, correct?
A Yes. I turned revisions to the proposed draft that you submitted within like an hour of me actually seeing it.
Q Well, I don't know how long it was before you saw it. But irrespective, even your version that you sent us was not signed. Is that right? So this is the one I'll recommend, I advise my client to agree to. And this one wasn't signed. Was it?
A Yeah. The expectation was that we would get confirmation from you that this document was acceptable or not. And here are the proposed revisions.
Q And you got confirmation from us that it wasn't acceptable, that we wanted to go with our version, right?
A Yes, in the mid afternoon the following day.
Q Okay. And did you sign our version?

A No.

Q As we sit here today, have the parties ever agreed, HNGH or 2999TC Acquisition, on a form of agreed rescission of deed?

A No.

Q And you would agree with me that that is one of the most important documents that had to be put into escrow and signed before the payoff to HNGH. Is that right?

A I agree that it was a critical document for closing under the agreed orders. Yes.

Q Let's take a look at Exhibit 68. That's Lender's Exhibit 68. This is May 30th, the holiday that we're all working on trying to get this thing closed, at 6:05 p.m. Do you see that?

A I do.

Q And your email to me is, "Need to know what is actually necessary to close. The list of deliverables included in the Dropbox provided at 3:24 before closing must take place is ridiculous. I've been involved in enough sales and payoffs to know that most of this stuff isn't necessary to get this deal done, especially considering the implementation of plan remains subject to bankruptcy court jurisdiction. And we have two orders establishing the obligation of the parties. What does your side actually need to close?"

Do you see that?

A I do.

Q All right. If we look at this again as Exhibit 71, Secured Lender's Exhibits.

THE COURT: Just so you know, Ms. Lindauer, we're going to stop at 5:25.

MS. LINDAUER: Okay. Thank you, Your Honor.

BY MS. LINDAUER:

Q Okay. Mr. Kane, we're looking at, and now we're on May 31st, the next day, at 9:00 a.m. Do you see that?

A I do.

Q An email from me to you: "John, I think we should discuss how to get this transaction closed and when it can close by. I hate to see the wheels fall off now. But as I stated in the letter I sent yesterday, lots of fine points to closing this transaction, which is why I sent you a checklist."

And then I said, "Tim is willing to buy some time to get this right so he can get the funding he needs and the payoff your clients want. I don't see how all these things get done today. Let me know how we can handle this without having to gear up things. Thanks."

Do you see that?

A Yes, Ms. Lindauer. I see that.

Q Okay. And your response to me at 9:47 below was: "I'm away from my computer, but you can run the redline as easy as I can. You have the draft you sent me and mine both in Word."

What are we referring to?

A Well I think if you continue to scroll down.
Q Sure.
A Let's see. There's an email, "Because time is of the essence to get this deal approved and funded, can you send me a redline of the rescission deed you approved and sent back earlier tonight?"
So I think it was like three hours after I sent you the revised rescission deed, you reached out and asked me to run a redline for you.
Q Right.
A Right.
Q And you --
A It was 9:45. So I responded: "I'm away from my computer. You can do it. You have the draft you sent me and mine both in Word." So I don't --
Q Okay. I just --
A What is the confusion about?
Q Okay. And so just to be clear, I mean, obviously whatever we ran wasn't right. But anyway, now what I'm more focused on is, is okay. And you and I both were working on May 30th, 8:59, 9:47 at night and then the next thing in the morning to try to keep going on these documents. Right?
A That is what these documents indicate.
Q Okay. Okay. You saw my email May 31st at 9:00 a.m. We looked at that, right?

A I believe that's still up.
Q Okay.
A Yeah.
Q All right. And take a look at your Lender's 72, same day. This is an email from you to me, to Mr. Walji, to Ms. Lyssey at Sendera Title. Right?
A Are we done with Exhibit 71?
Q We are.
A Okay. Yes. I see this.
Q Exhibit 72, same day, May 31st, 1103 a.m.
A Yes.
Q And you included Ms. Lyssey at Sendera Title on this email. Is that right?
A That's correct.
Q Okay. And you said: "Attached is the payoff statement for the Happy State Bank collateral assignment resolution. The amount due to HNG at closing is therefore the HNG payoff amount previously provided minus this amount."
Do you see that?
A Right. Yes.
Q Prior to May 31st at 11:03 a.m., had a payoff statement for Happy State Bank ever been provided to the debtor or any of its representatives?
A I don't believe so.
Q Had that payoff statement ever been provided to Ms. Lyssey

at the title company?

A No, I don't believe so.

Q And when you sent this email over on May 31st at 11:03 a.m., first of all, you sent it. You sent it, not -- it didn't come directly from Happy State Bank, correct?

A That's correct.

Q And if we look at the payoff statement, Exhibit 72A, did you have a chance to look at this before you actually sent it over?

A I may have. I don't recall. I believe I did briefly. Yes.

Q And do you see on this payoff statement, it does provide where to submit payoff funds. There is a provision on here.

A I believe that document speaks for itself. Do you have questions for me about it?

Q Okay. So later in the day, when you provide the wire transfer instructions to us for the payoff of HNGH --

A Yes.

Q Did you ever indicate to us in that wire transfer that part of the funds were to be wire transferred to Happy State Bank?

THE COURT: Ms. Lindauer, I think you might have misspoken, because I'm confused. You said did he ever mention in that wire transfer? Did you --

THE WITNESS: Yeah. I don't understand what you're

referring to.

MS. LINDAUER: We can look at that in a minute, Your Honor. I was just jumping ahead a little bit on the wire transfer information that was provided. I can pull it up real quick.

THE COURT: All right. I think I know what you intended to ask, but I think there was maybe --

MS. LINDAUER: Did I say it wrong.

THE COURT: But, but go ahead and ask it again.

MS. LINDAUER: Let me ask it again. Maybe I said it wrong.

BY MS. LINDAUER:

Q Okay. Later in the day on the 31st --

A Right.

Q -- you provided wire transfer instructions, is that right, for HNGH?

A Yes, I did.

Q Okay. And did those wire transfer instructions include any information regarding payoff in those instructions to Happy State Bank?

A No, they did not because we had provided our instructions at 11:03 a.m. that day.

Q All right. And at the time that you provided these instructions at 11:03 a.m., had you also provided an executed release of the collateral assignment and note and lien as part

of these instructions?

A I had not. I believe that Mr. Carruth was trying to do that right around this same time.

Q Okay. And why didn't you, Mr. Kane, tell Mr. Carruth that you were communicating with Sendera Title, Julie Lyssey, on your email at 11:03 a.m. on May 31st, and that he could provide his information to Sendera Title?

A Sure.

So on Friday afternoon during our conference call, you and Mr. Walji made it abundantly clear that you were working with three different title companies and multiple potential parallel tracks for funding. We did not know which funding source you guys were using, and therefore, which escrow agent or which title company you were going to actually close the transaction with.

Out of an abundance of caution, I was sending information directly to you and cc'ing Julie Lyssey, hoping that if Julie Lyssey was the title representative who was actually going to be closing the transaction, then she would have the information necessary to do so if the debtor was prepared to close by the end of the day.

But when Mr. Carruth asked me specifically for who the title company was because he needed the title co file number and the GF number, I asked you to provide that information because I figured you would be in a much better position to

identify which of the three specific title companies the debtor was actually intending to close with.

You already had the information from me. You could forward it to that entity with our documentation, if it was Sendera, then Sendera would have it. But because I did not know concretely which one of those title companies you were actually going to use to close the transaction, I asked you to provide that information to Mr. Carruth. And you told me that you were working on it at around 11:00 in the morning. That's why I asked you to provide that, not me.

Q All right. And if we look at Exhibit 84, Lender's Exhibit 84, Mr. Walji specifically told you that the title company was Sendera Title. You see that?

A I do see that.

Q And that the escrow officer is Julie Lyssey, the same person you had been copying. Is that right?

A That is correct. It does say that.

Q Right. So why didn't you provide that information to Jeff Carruth?

A At 3:17?

A Right. Why didn't you provide -- it's May 31st.

A I guess I should have. I mean, I guess this is one of those deals where I had asked you to provide that information repeatedly at 11:00. I think I followed up with you two separate occasions, including at like 1:45 when Jeff Carruth

reached out to me and said who's the title company.

I think at that point, by about 3:17, it had become pretty clear to us that the debtor was incapable of closing a transaction by that time. And I think an hour later, you confirmed that. But about 30 minutes after this, Mr. Walji started sending the letters from the lenders about how they couldn't close for this reason or the other. And I believe at about 3:36, you filed your emergency motion to extend the payoff deadline.

Q All right. Let's be clear.

At, you're saying Exhibit -- I'm having a hard time following you, Mr. Kane, because your facts aren't following your emails. Exhibit 84, you're copied on an email. You're not disputing that you received this email on or about 3:17 on May 31st telling you Sendera Title is the title company, right?

A That's not the document that's on your screen.

Q Okay. Pull up 84. Lender's Exhibit 84. Sorry. All right. You see, as I mentioned below, the title company is Sendera Title. Do you see that?

A I see his email. Yes.

Q And Sendera is the one that you had sent your special warranty deed over to on the 27th, correct?

A That is correct.

Q And Sendera Title had provided the schedule that we call Lender's Exhibit 33A, which is the title commitment

information, correct?
A Also correct.
Q And you're telling us that at 3:17, you had made the decision that the debtor was not going to close. Is that right?
A I didn't make any decisions on behalf of the debtor. So no, that's not correct.
Q No. You made the decision on behalf of your client at 3:17 that the debtor was not going to close on the 31st. Is that right?
A That isn't right. I said I suspected the debtor was not going to close.
Q All right. When did you make the decision on May 31st that the debtor was not going to close on May 31st?
A Oh. That would've been around 4:15, 4:25.
Q Okay. Did you at some point come to realize that, or did you tell the people in your firm to go pens down on drafting documents?
A Yes. I believe that I did.
Q Okay. What time was that when you said go pens down?
A Call it 4:30, something like that. 4:40.
Q Let's take a look at Lender's Exhibit 76. This is an email from you to me, copied to Nate Christensen. Do you see that?
A I do.

Q Okay. This is dated Tuesday --

THE COURT: I'm sorry. I'm sorry. We are -- Ms. Lindauer?

MS. LINDAUER: Okay. Yes, Your Honor.

THE COURT: We are going to have to stop for the day.

MS. LINDAUER: Okay.

THE COURT: So I didn't mean to interrupt you mid-question, but --

MS. LINDAUER: It's okay.

THE COURT: -- it's 5:26, and we do have to stop. So we are going to pick back up I'm not going to say tomorrow, because I've made that mistake several times. We're going to pick back up on Friday at 1:30. Is that what everybody -- I think that's, we had discussed that before.

MS. LINDAUER: That is what I have down Your Honor, Friday at 1:30.

THE COURT: Is that what you have, Mr. Kane?

MR. KANE: Yes it is, Your Honor.

THE COURT: Okay. We will be in recess until Friday at 1:30.

MR. RODRIGUEZ: Your Honor, just one more comment. I don't want to sandbag the Court. I've been researching this issue of quote, the document speaks for itself, as an objection. I don't ever remember learning that in 30 years practice. And I found a Fifth Circuit case that Your Honor I

think should take a look at.

THE COURT: I'm sorry. I'm sorry, Mr. Rodriguez. Some of my staff have to leave. The very important recording person who operates the recording equipment has to leave. So we will take this up on Friday. So I did warn everybody we had to stop at 5:25. It's 5:28. So I don't mean to cut anybody off. Don't read anything into that. But we do have to stop.

MR. RODRIGUEZ: I will submit a brief so no one says I delayed. But I just found this case which undercuts this objection. I think we're going to have to reexamine Mr. Kane. I want to give everybody fair notice. But thank you, Judge.

MS. LINDAUER: Thank you.

MR. RODRIGUEZ: We'll see you on Friday at 1:30.

THE COURT: We'll be in recess until Friday.

(Proceedings concluded at 5:28 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, CRYSTAL THOMAS, and KAREN K. WATSON, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Michelle Rogan

MICHELLE ROGAN

/s/ Crystal Thomas

CRYSTAL THOMAS, CET-654

/s/ Karen K. Watson

KAREN K. WATSON, CET-1039

LIBERTY TRANSCRIPTS DATE: July 8, 2022