IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Friday, July 8, 2022<br>1:32 P.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For the Debtor: | Joyce Lindauer Attorney, PLLC<br>BY: JOYCE LINDAUER, ESQ.<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| | Fee Smith Sharp & Vitullo LLP<br>BY: OSCAR REY RODRIGUEZ, ESQ.<br>13155 Noel Road, Suite 1000<br>Dallas, Texas 75240 |
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |
| For Tim Barton: | Metzger Law PLLC<br>BY: STEVEN C. METZGER, ESQ.<br>3626 North Hall Street, Suite 800<br>Dallas, Texas 75219 |

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

# I N D E X


| | Page |
|---|---|
| Case called | 3 |
| Court's Ruling | 16 |
| End of Proceedings | 141 |
| Certification of Transcriber | 141 |

WITNESSES

FOR THE DEBTOR:

JOHN KANE

| | |
|---|---|
| Direct Examination (Resumed) by Ms. Lindauer | 29 |
| Cross-Examination/Narrative Testimony by Mr. Kane | 107 |

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |

(None)

FOR HNGH TURTLE CREEK:

(None)

(Proceedings commenced at 1:32 p.m.)

THE COURT: -- 21-31954. I'll take appearances, please.

MS. LINDAUER: Your Honor, Joyce Lindauer and Rey Rodriguez here on behalf of 2999TC Acquisitions, the reorganized debtor in these proceedings.

THE COURT: Good afternoon.

MS. LINDAUER: Thank you, Your Honor.

MR. KANE: Your Honor, John Kane on behalf of HNGH Turtle Creek, LLC, the pre-petition lender.

THE COURT: Good afternoon, Mr. Kane.

MR. KANE: Thank you.

THE COURT: Anybody else wish to make an appearance?

(No audible response)

THE COURT: All right. Hearing none, when we broke last, Mr. Kane was on the stand and, unfortunately, we had to leave. I did not intend to cut anybody off, but it's just we had to leave. So we're going to pick back up where we left off.

And when we left off, Mr. Rodriguez was stating an objection regarding the best evidence rule. And I read the trial brief that Mr. Rodriguez filed. Mr. Rodriguez, are you prepared to argue that issue now?

MR. RODRIGUEZ: Certainly, Your Honor. Yes.

THE COURT: Mr. Kane, are you prepared to go forward

with this? It was an oral -- well, I'm not sure what it was. He raised it during the hearing. There's a trial brief. Are you ready to address this now, as well, Mr. Kane?

MR. KANE: Actually, I am, Your Honor. Even before I saw the trial brief, I went and found U.S. v. Nelson and read through it. So I'm more than prepared.

THE COURT: Okay.

All right. Mr. Rodriguez, go ahead.

MR. RODRIGUEZ: Thank you, Your Honor.

You know, as we know, throughout the examination of Mr. Kane and other witnesses, HNGH has asserted as an objection the statement that the document speaks for itself. And I heard it so many times in these proceedings, Your Honor, I thought well, these are very experienced lawyers. This must be an objection I never learned about in law school.

THE COURT: Mr. Rodriguez, we lost --

MR. RODRIGUEZ: -- (indiscernible) --

THE COURT: Mr. Rodriguez, you briefly went muted. So I heard you say you didn't learn about this in law school, and then I couldn't hear you. So why don't you back up a little bit and start again.

MR. RODRIGUEZ: Okay. Very good. Can you hear me now, Your Honor?

THE COURT: I can. Thank you.

MR. RODRIGUEZ: All right. Great. Sorry about that

hiccup. And I just was scanning my memory. I couldn't remember anything about this. So I jumped on to Lexis while the proceedings were going on and ran that phrase and very quickly came up with that Fifth Circuit decision that we've provided and circulated, and Mr. Kane has studied.

And it pretty clearly says there is no such objection as the document speaks for itself. Proper objection potentially could be under Rule 403 or another specific rule. But the Fifth Circuit says where a document's been admitted and you have a witness on the stand who either has personal knowledge of the facts at issue or is an expert, it's entirely appropriate to permit that witness to be examined on the content of that particular document.

And in fact, the Fifth Circuit goes on to say that the best evidence objection is not a prohibition on that kind of actual factual or expert witness testimony. And I did some further research. And of course I found a number of cases in the district courts, and one particularly entertaining one out of the District Four in Illinois where the judge noted that, you know, over decades of being on the bench, they've actually never heard a document utter any speech or make any sound kind of tongue-in-cheek dealing with this particular objection.

So from my vantage, I wanted the Court to be aware of this error that has occurred throughout these proceedings. I wanted to ask that going forward, those types of objections

from HNGH be properly overruled, and that the Court please reconsider its prior rulings sustaining those objections so that Ms. Lindauer can go back through the documents, back through with Mr. Kane, and ultimately I think with the other witnesses to get the missing testimony and missing evidence that should be in this case.

So in the spirit of trying to put together the best record and most error-free record, I raised that issue as soon as it came to my mind, and of course followed up with that trial brief.

THE COURT: Okay. Do you have anything else?

MR. RODRIGUEZ: That's my opening, Your Honor. Thank you. Of course, I'll reply to Mr. Kane if I can.

THE COURT: Sure. Before I turn it over to Mr. Kane, are you able to identify all the instances in which you believe this objection was made and sustained improperly?

MR. RODRIGUEZ: We will be able to do that, Your Honor. Of course it will require us to pull up the transcripts and do the word searches and find them by witness and by page. So, you know, that would be the process for the historical stuff, unfortunately a little time consuming but something, you know, we could certainly knock out over the weekend, I'm sure.

THE COURT: You don't have it now, and I'm assuming Ms. Lindauer does not have it now. Correct?

MR. RODRIGUEZ: We do not have it now, Your Honor.

No.

THE COURT: All right.

Mr. Kane?

MR. KANE: Yes, Your Honor.

Mr. Rodriguez is correct in asserting that U.S. v. Nelson does address the issue of an objection on the document speaking for itself. I believe that his interpretation of U.S. v. Nelson is erroneous, though.

The Fifth Circuit does not say that that objection is entirely inappropriate. If a party is testifying and the document says blah, blah, blah, and it's just reciting the statements that are contained in the document, then the objection is appropriate. The document does speak for itself.

Do you see here where the document says this? Yes. Do you see here where the document says this? Yes. It's not appropriate testimony because the document says what it says. The document speaks for itself.

U.S. v. Nelson addressed a criminal court proceeding in which a party attempted to ask a witness about facts referenced in the document in question, but was precluded from doing so on an objection that the document spoke for itself. And that, Your Honor, is why the Fifth Circuit addresses the issue in a footnote, because there is a large delta between questioning witnesses about facts that are specifically referenced in the document and does the document say this.

When Ms. Lindauer questioned me about facts referenced in the document, the objection was not asserted. When Ms. Lindauer raised questions do you see where it says this, and then do you see where I emailed you that, those are not fact-based questions. Those are questions about the recitation of the actual text of the document.

And so the objection, the document speaks for itself, is appropriate in those instances. I would agree that if there are specific facts in an email that Ms. Lindauer wants me to answer questions about, that that objection would be inappropriate for the reasons that Mr. Rodriguez stated, and for the reason set forth in U.S. v. Nelson.

But the objection itself is not something that is entirely inappropriate. And I do not believe that Your Honor has misapplied or misruled on that objection. I certainly was asked to answer and did answer many questions about facts referenced in the documents that were presented before this Court yesterday.

THE COURT: Mr. Rodriguez, brief response?

MR. RODRIGUEZ: Yes, Your Honor.

Tellingly, Mr. Kane can cite to the Court not a single case, not a single secondary authority that makes this kind of creative distinction to support the mythical "document speaks for itself" objection. There is none. And there is legion of case law saying there is no such objection.

Your Honor, the distinction Mr. Kane tries to make is very creative, but it's a distinction without a difference. The contents of the document are a fact of significance to the proceedings that the witness was aware and is aware of the language in the document is a fact. And what the -- you know, whether the witness agrees with the recitation or disagrees with it, or has any knowledge or any understanding are all facts that bear on this.

Likewise, the dates of emails, and contents, and what they -- what the actors understood. If -- Your Honor, if this were the rule, when we would have trials, no one would be able to talk about the contents of the contracts, or what they say, or the facts that are recited, or what they stand for. We would just have summary judgments based on documents.

So, you know, there is no case law, unfortunately for Mr. Kane and his clients, that support their position and support this kind of a mincing of the question. Ms. Lindauer was permitted to ask those questions. They could be foundational to additional questions. But in these proceedings, it has shut down the inquiry on sensitive topics many, many times.

So I do think, Your Honor, if you want additional briefing, we're happy to submit the Northern District cases that we've found, the other district courts. I'm sure there are other circuit courts. I now recall reading about this in

some very good CLE papers. Maybe one that Judge Bill Greendyke who was my partner at Fulbright & Jaworski pointed me to on, you know, intricacies of evidence law. It's vague in my mind. But I can try to dig that up.

But, Your Honor, this small skirmish here, you know, highlighting what does look to be a reversible and very likely harmful error in the admission of evidence, I think it also underscores why it is so important that Your Honor and the parties have the complete collection of documents, the complete writings under Rule 106 relative to these emails. Mr. Kane has said, without evidence, that we have I think what he has in terms of what was sent or received.

But the emails that Mr. Kane has produced don't show that they came from the sent files. They don't show when they were assembled. And as Your Honor knows, the PDFs and the attachments in Word, they are dynamic. They are not static.

And so if the version that Mr. Kane used when he printed has an attachment that has commentary from Mr. Vipin, just as an example, that says I want you to tank this deal, I don't want them to have a rescission deed, I want to extract millions of more dollars from them so change it so it's not an effective rescission, that's going to be a critical piece of evidence. But we're never going to see it unless we have access to the documents.

If the documents are to speak for themselves, Your

Honor, they need to speak full-throatedly and completely. So that kind of meshes in to my 106 request for relief. But --

MR. KANE: Which the debtor withdrew before this hearing.

THE COURT: Right. I was just going to say, Mr. Rodriguez, I looked at the docket before I came in here. And Docket Number 232 filed today is a notice of withdrawal of the motion that you appeared to just argue right now. So I'm not going to address those arguments because that motion to compel has been withdrawn.

So are there any other comments to the issue that I've asked the parties to address today, which is the best evidence issue that Mr. Rodriguez raised on July 6th and filed the trial brief yesterday or the day before? Are there any other arguments on that point, Mr. Kane, going back to you?

MR. KANE: No, Your Honor. We don't have any further arguments.

THE COURT: All right. I'm going to take a brief recess.

(Recess at 1:46 p.m./Reconvened at 1:49 p.m.)

THE COURT: All right. We're back on the record.

Mr. Rodriguez and Mr. Kane, are you there?

MR. RODRIGUEZ: Yes, Your Honor.

MR. KANE: Yes, Your Honor.

THE COURT: Okay. So I do appreciate, Mr. Rodriguez,

your willingness to stop the other day when we had to stop. In presenting your arguments today, that gave me a chance to review your brief and consider the arguments that were made here today.

So I'm going to construe your trial brief and your statements today as really three different requests. You did ask for guidance going forward on this issue of whether or not the document speaks for itself is an appropriate objection. And I'm going to address that first.

So I'm familiar with Nelson. I've read it. I did read it again after you cited it, Mr. Rodriguez, in your trial brief. The first thing I'll note is that this "document speaks for itself" objection has been raised and made several times during the course of this hearing by both sides, including by Mr. Rodriguez and Ms. Lindauer and Mr. Kane. So that's the first thing to note. Both sides, all attorneys have made that same objection.

And when I considered those objections, I ruled based on what my understanding of the law is on this "document speaks for itself" objection. And I think all parties will agree that that's a little bit of an imprecise objection. But I think the Nelson case gives us the guidance that we need. And I'll go to footnote four of the Nelson case. That's what I believe what Mr. Rodriguez cited in his trial brief.

First, it says, "We take this opportunity to observe

that the opinion testimony of a witness with personal or expert knowledge helpful and pertaining to a document is not objectionable on the ground that the document speaks for itself." And it cites Federal Rules of Evidence 701 and 702. So I agree with that a hundred percent. If there is opinion testimony of a witness that's helpful and pertaining to a document, then the document speaks for itself-type objection would not be appropriate.

But the footnote goes on. It says, "Properly made," -- and again, that is referring to the "document speaks for itself" objection. It says, "Properly made, such an objection" -- again, that's the "document speaks for itself" objection -- "may pertain to the character and scope of testimony under Rules 403 and 611." So I'll just get out my rule book.

Rule 403 provides that the Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undo delay. And then the last two are really what's most important here, wasting time, or needlessly presenting cumulative evidence.

The Fifth Circuit case, in addition to citing Rule 403, cites to Rule 611 in that, after that same sentence. Rule 611 talks about the mode and order of examining the witnesses and presenting the evidence. And under Rule 611(a), the Court should exercise reasonable control over the mode and

order of examining witnesses and presenting evidence so as to: number one, make those procedures effective for determining the truth; two, avoid wasting time; and three, protect witnesses from harassment or undue embarrassment.

So I think the Nelson case itself recognizes that "the document speaks for itself" type objection, which again is imprecise, but if it's made properly, it might be a valid objection. I think the Nelson Footnote 4 recognizes that. It goes on to talk about the original writings rule under Rule 1002 should not be misunderstood as a best evidence device to exclude otherwise admissible opinion testimony, interpreting a writing after it has been introduced into evidence.

So of all the times that I recall anybody on either side making this "document speaks for itself" objection, I didn't construe it to be a Rule 1002-type objection. I construed it to be a Rule 403 objection on the basis that, for example, if an attorney is simply asking the witness to read a document and agree that that's what it says, then I think it would be an entirely appropriate objection to say the document speaks for itself. But again, it would be better to be more precise and tie it to Rule 403.

Just as another example, before we began the examination of Mr. Kane -- I apologize. Before we began the examination of Mr. Kane, I kind of gave everybody the kind of the guidelines, given the unusual request to examine opposing

counsel of, you know, what type of objections might be appropriate.

And again, going back to the Shelton doctrine, this is the Shelton vs. American Motors case, the party seeking to take the deposition, or in this case, the trial testimony of an opposing counsel must show that, number one, no other means exist to obtain the information than to depose opposing counsel; two, the information sought is relevant and non-privileged; and three, the information is crucial to the preparation of the case.

And so I think the first factor there is the most relevant one. And if, when I told Ms. Lindauer that we were going -- I was going to allow her to put Mr. Kane on the stand, it was my expectation that the questions would not include simply reading a document and asking the witness if that's what it says, because I think that does run afoul of the Shelton doctrine under that first prong.

So Mr. Rodriguez, with respect to your guidance going forward, that's kind of my read on Nelson and "the document speaks for itself" objection. In some cases, it might be appropriate. In some cases, it might not. And again, both sides have raised that identical objection. And in each case, I ruled based on what my understanding of the law is. So that's my guidance going forward.

With respect to the other requests, you asked in the

trial brief me to overrule all sustained objections on the basis of the document speaks for itself during the pendency of this hearing, and to permit the debtor to reexamine all witnesses and documents where the Court sustained Mr. Kane's "document speaks for itself" type objections.

So I did ask the parties if you were prepared to go forward, and I haven't heard a single instance, you haven't given me anything to show me examples of where you thought -- not examples. But you haven't told me what rulings you thought that I made were inappropriate based on the "document speaks for itself" objections.

So I'm going to overrule and deny those second requests. And, again, I'm just giving the parties guidance going forward. But without any specific examples you can point me to that I can reconsider, I'm just not going to give you a do-over, you know. Today is the day I was hoping to address this issue.

So I'm only giving you guidance going forward. I'm denying the present request to re-examine all the witnesses and documents where the Court sustained that type objection. And I'm going to overrule the request to sustain all objections on that basis during the pendency of the motion to enforce.

So I think that covers my ruling on the "document speaks for itself." And perhaps all counsel on both sides, if you wish to make that objection again, my ears are going to be

very attuned to that objection. And I'm hoping that the objections will be a little more precise. But I'm not aware based on my recollection of any improper rulings that I made on that basis.

So with that said, the only other thing I will note is that if there are concerns about how I rule on an objection, really the time to make those concerns to make me aware of those concerns is at the time. So I know Ms. Lindauer has done a lot of the Q and A of the witnesses. If there's a concern about my overruling of an objection, really you ought to make me aware of that at the time and not days or potentially weeks later. So that's my guidance going forward.

And I'll now return it over to Ms. Lindauer to continue your questioning of Mr. Kane.

And, Mr. Kane, I'll just remind you that you are still under oath.

MR. KANE: Understood. Thank you, Your Honor.

MS. LINDAUER: Your Honor, I did want to raise one other issue if I might, before we go back to the questions of Mr. Kane. The Court appropriately noted, and I just want to be sure we get this on the record. So there was a motion filed that appears that Docket 160. The Court mentioned that, the motion to compel.

And there was a response filed, it appears, at Docket 230. Mr. Kane and I did reach an agreement with regard to

those matters. And I'd like to put the agreement on the record.

The reason we filed a withdrawal, Your Honor, is I didn't want you to have to, and I should like to have done it sooner, but I didn't want you to spend a lot of time looking at the 160 issue and the response. But Mr. Kane and I did work out this morning an agreement.

And I think you'll agree, but just for the record, Mr. Rodriguez had sent a very specific letter to Mr. Kane that identified certain documents which have been listed as exhibits in these proceedings and questioned whether the attachments had been provided with those documents. I spent about three hours yesterday going through the list of those particular documents.

And I was able to locate many of them in our system where I'd either been copied on them or Mr. Kane had forwarded them to me or whatever. So I reached out to Mr. Kane and I said look, I think what makes sense here, it's a time consuming task to go back and look at all these things. So that makes sense to do it right now.

But can we have an agreement that to the extent that there's been an exhibit noted, listed, and these are primarily lender exhibits, and there is a referenced attachment and for some reason the attachment is either missing, or is corrupted, or we can't find it or whatever it is, can I come back and can we have an understanding that you will assist me with providing

the email and the attachment?

So in good faith, I'm going to go through and I have gone through a number of them. I've identified right now of the, I don't know how many were on that list, but there's about 17 of them still that I just need to click on them and go through them and see what they are.

So, Mr. Kane and I agreed that if I can identify specific emails that have attachments or appear to have attachments and I'm missing those, and he would have them, because some of them are not even coming from him. They're maybe coming from someone else. If he has them, that he'll provide those to us. So that was basically our agreement, Your Honor.

So the issue didn't really entirely go away. It's just been settled, and I think that's a reasonable way to resolve it. So anyway, hopefully over the weekend I can go through those. I don't think there are going to be that many. There's just a few that -- but for the most part, I was able to track them. And Mr. Rodriguez didn't have the benefit of that, because he wasn't involved in the case during the time that these emails were going back and forth.

So, Your Honor, that's our agreement. I just wanted to put it on the record so that if it does become an issue later, the parties have acknowledged that that's the way that we'll handle it. So the monkey is first on my back to go

through those, that list and see if we do have the attachments. And if we do, no big, you know, it's handled.

If we don't for some reason, then Mr. Kane's agreed that I can contact him and he'll see if he's got the email with the attachment, he'll provide that to us. So I think that's a sensible way to handle that, Your Honor. So I did want to put that on the record though, so that you'll know the issue didn't entirely go away. It's just been, it's been resolved by the parties.

MR. KANE: That is my understanding, Your Honor. And that the list of documents are limited to documents that have been admitted into evidence.

MS. LINDAUER: That's right. For this purpose, Your Honor. That makes sense. Right.

THE COURT: Okay. Anything else before we go back to Mr. Kane's testimony?

MS. LINDAUER: A couple of other things.

I know you've asked us previously to check your calendar. I don't know if you've looked at your calendar for next week, but assuming that we're not going to get done today with everything, and in particular in taking closing arguments, we did reach out to your court coordinator to find out what your schedule looks like next week.

And she did tell us that you, I think you're here on Monday and Tuesday. I'm not sure about the rest of the week.

But you said I think you do have time both those days. I do have some conflicts on Monday. So of those two days, Tuesday would be better for on our side. So I did want to put that out there before we get to the end of the day.

And then lastly, I think Mr. Kane and I, subject to the Court, of course, being okay with this, we both agreed that I think both of us have fairly I really wouldn't say extensive, but at least some information to run through in closing arguments. And I think that John and I both agreed that probably subject to your availability, Your Honor, maybe an hour to an hour and a half per side for closing.

And that being the case, I think we both agreed it would be better for us to do closing on one day rather than break it up. So rather than maybe John start his closing today, get cut off, have to come back. And then, so if that's amenable to the Court, the parties would like to have you pick a time when we're ready, when the evidence is closed, pick a time where we could just do closing arguments.

And both sides would have an opportunity to do them same day, same bat time, same bat channel, so that we don't get broken up. And I think that's fair. And I think Mr. Kane also thought that that seemed more appropriate also. So I wanted to put that out there so we could all be planning. It is Friday afternoon. So we'll be planning for next week sometime. So I did want to get that out there also.

MR. KANE: That is again, Your Honor, correct. We anticipated based on our conversation, we took to heart what you had said previously about, you know, getting together and talking about some of these blocking and tackling items. I think we do believe that we'll get through all of our evidence today. And then would have a, as Ms. Lindauer presented, kind of a special setting to knock out closing arguments and be done with this, and that that would likely take place early next week, if at all possible.

THE COURT: Okay. Let me -- we're going to go off the record real quick for a two-minute recess to look at my calendar, and I'll be right back.

MS. LINDAUER: Okay. Thank you, Your Honor.

(Recess at 2:07 p.m./Reconvened at 2:11 p.m.)

THE COURT: Okay. We're back on the record. And I'm looking at the calendar.

Ms. Lindauer, did you say that Monday was out for you?

MS. LINDAUER: Yeah. Monday is a rough day for me, Your Honor. I have several other matters. But Tuesday looked okay. And I think you had time on your calendar for Tuesday also, unless they were wrong on that.

THE COURT: So I think previously, somebody mentioned that Mr. Phelan was doing the closings, but then you said you were doing the closing. Is that right? You were doing the

closings now for your side?

MS. LINDAUER: Yeah. We switched it, Your Honor.

THE COURT: Okay. So --

MS. LINDAUER: If I might, I do have a couple of requests before we set the closing. One, and I'd like to ask the Court if we might file a post -- either post-closing or pre-closing, post-close of evidence a brief, if we can be allowed to do that. And, if so, that may hinge a little bit on what date you pick for closing. So that's one issue. And I should have mentioned that before.

And second, I do think it has been, and I don't know if Mr. Kane's been getting the transcripts of the hearings, but it has been helpful to us to have those transcripts. So assuming either today or, you know, maybe part of a day next week, assuming the evidence closes at that point, I would like us to have access to the transcripts, or at least the final transcripts.

I think we are up to July what? What's the -- are we all caught up except for today I think? Yeah. I think we're all caught up except for today. So this would be the only one that would still be missing. So again, just maybe looking a little later next week, I don't know what the Court's schedule looks like.

But again, I think those two things, a brief and also having access to transcripts. I don't know if Mr. Kane has

been getting copies of the transcripts too, but those are helpful.

THE COURT: So on the transcript issue, I'm not too sure what I can do. I know we get the drafts and then we review them. And then once we -- I guess once we approve them, they go to you. I suppose we could tell the court reporter that if you want access to the preliminary transcripts pending, you know, our review and approval that you can have the preliminaries. I don't know if that would help or not.

MS. LINDAUER: Well, no. I think where I was going with that is, is I think they've been doing these on about a two-day turnaround. They've been doing them pretty quick. So assuming we were to get mostly -- or let's just hypothetically say we get done today on evidence and we ordered our transcript this afternoon or first thing over the weekend or first thing Monday morning, we'd probably have it back maybe on Tuesday.

So that was my only concern about having closing arguments on Tuesday was I think it would be helpful to have the final transcript of the evidence and then, second, to have an opportunity to file with you either prior to the closing argument or after the closing argument, a simple brief. So I guess I'm just factoring that into dates and deadlines is trying to kind of noodle with you, Your Honor, on what makes sense as far as timing goes on these matters. I mean, surely we're --

THE COURT: I was about to give you July 12th, because it's open.

MS. LINDAUER: Okay. What's today, 8th? That's Tuesday. Okay.

MR. KANE: Your Honor, that date works for HNGH.

THE COURT: So --

MS. LINDAUER: What about how does the rest of next week look, Wednesday, Thursday, Friday?

THE COURT: I've been invited to speak at the Consumer Bankruptcy Conference in Galveston. So I'm going to be out Wednesday through Friday next week.

MS. LINDAUER: Oh. Okay. I don't want to interfere with that, for sure.

John, do you have any problem going to the next week? Monday?

MR. KANE: Yeah. I think we would prefer to get this done sooner rather than later.

MS. LINDAUER: Right. Well, I understand that. I'm just thinking timing-wise, just to be, just to make sure we have all our ducks in a row.

THE COURT: I mean, would you be prepared to make your closing arguments on the 12th, and then if you need an opportunity to submit post-trial briefs, then you'll have access to the transcripts to make whatever other points that you want to make that you weren't able to based on not having

the transcripts by the 12th?

MS. LINDAUER: Yeah. I think that would work. If we could do -- what time are you thinking on the 12th? In the afternoon or in the morning?

THE COURT: No, morning.

MS. LINDAUER: Morning? Okay. So the morning of the 12th. And then with the understanding that based on if we get transcripts or have additional information we want, I assume that, and maybe I'm wrong on this, but once we make our closing arguments, we would have an opportunity to provide you with a post-trial brief before you actually rule.

So taking that into account, if we get actually finished with everything on the 12th, then could we look at -- and I guess you can make, we can talk about this on the 12th, giving us an opportunity to file a follow-up final brief, if you will.

THE COURT: All right. Let me ask --

MS. LINDAUER: Yeah.

THE COURT: I'm sorry. Go ahead, Mr. Rodriguez.

MR. RODRIGUEZ: Thank you, Your Honor.

I was going to suggest maybe even a briefing schedule for opening briefs and, you know, response briefs I think would be very helpful. You know, we've done that in commercial disputes like this in arbitration context. But that's just an idea, Your Honor.

THE COURT: So it sounds like you're telling me the closing arguments would work on the 12th from 9:00, let's say from 9:00 to noon.

MS. LINDAUER: Noon, okay.

THE COURT: And at the conclusion of the closing arguments, we can then talk about some, you know, hopefully relatively brief period where you have an opportunity to submit post-trial briefs. And I don't want to try to pin down those dates today.

But, Mr. Kane, is there any objection to having the closing arguments on the 12th and discussing on that date when an appropriate deadline would be for post-trial briefs?

MR. KANE: No. We support closing argument on the 12th. I think our opinions on the briefing schedule will probably be considerably more compact than the debtor, if any. But I'm happy to have those discussions.

THE COURT: And again, I'm not making any decisions right now on how long I'm going to give you. I'm just trying to get a feel for whether there's any objection to the general idea of providing post-trial briefs after oral argument because if there's no --

MR. KANE: No. That's fine, Your Honor.

THE COURT: If that's the case, then I think, Ms. Lindauer, unless you tell me you can't or would prefer not to, I think it makes sense to have closing arguments on the

12th. And then once you get those transcripts, if there's any particular item you want to include in your post-trial brief, you can. Does that make sense?

MS. LINDAUER: No. That makes complete sense, Your Honor. I think we can work with that. I just didn't want to, you know, foreclose. We had the kind of a similar issue with a court up in Wisconsin. The judge was very nice. The transcripts were going to take eight weeks, which is not what we have here by any means.

But he did agree that we could file briefs after we got the final transcript, so we could have a chance to look at those. So I guess having gone through that before, I do know that that could be helpful to be able to have the complete set of transcripts. And we may not have those by the 12th. But we can surely put on our closing argument on the 12th. And then anything -- like you mentioned, anything that surfaces in other documents, we can include those in our brief. I think that would solve the issue, Your Honor.

THE COURT: Okay. Well, we'll discuss the briefing deadlines on the 12th. And why don't we just plan on having closing arguments on the 12th starting at 9:00.

MS. LINDAUER: Okay.

THE COURT: And do I understand the parties correct? You think you're going to finish Mr. Kane, his potential two additional -- was it two rebuttal witnesses?

MS. LINDAUER: Yes, two rebuttal witnesses.

THE COURT: And then, Ms. Lindauer, another rebuttal witness for you. We're going to finish all that today?

MS. LINDAUER: I'm hopeful, Your Honor. I can't speak to Mr. Kane's witnesses. But --

THE COURT: All right. Well, let's get going.

MS. LINDAUER: Get going and see. Yeah.

THE COURT: Let's get going back to the questioning of Mr. Kane. Is everybody ready for that?

MR. KANE: Yes, Your Honor.

MS. LINDAUER: Yes, Your Honor. We are.

THE COURT: All right. Mr. Kane, you're still under oath.

Ms. Lindauer, go ahead.

MS. LINDAUER: Thank you.

JOHN KANE, DEBTOR'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (RESUMED)

BY MS. LINDAUER:

Q Mr. Kane, I'm going to go back. I tried to keep pretty good notes of where we left off as far as questioning. And so I'm going to go back and kind of revisit or visit the Happy State Bank issues.

MS. LINDAUER: And I'm going to ask Ms. Ollar to pull up this would be Lender's Exhibit 54.

THE WITNESS: Okay. I'm at that document.

BY MS. LINDAUER:

Q Good. Thank you.

So, Mr. Kane, this is an email looks like it was sent from you on Thursday, May 26th, 6:54 p.m., to Julie Blakeley. And I think we've identified her as being the representative of Happy State Bank. Is that your understanding?

A Yes, that's correct.

Q Okay. And Vipin Nambiar, that's your client representative for HNGH. Is that correct?

A Yes, it is. Yes, he is.

Q Thank you. Nate Christensen. That's the general counsel for HNGH. Is that correct?

A That's correct.

Q And John Inabnett, I probably said that wrong again. Anyway, he's he is an attorney with your firm. Is that right?

A He is a real estate partner at my firm. And Sara Reams is a real estate associate at my firm.

Q Okay. All right. Very good. Thank you. And there was an attachment to this particular email. It said collateral transfer of note and lean. Do you see that?

A I do.

Q Okay. And that's the same collateral transfer of note and lien that we have seen before. That's not a different document than the one that's been identified previously. Is that right?

A Yeah. Just to clarify, I believe that is the recorded instrument collaterally assigning the note and lien to Happy State Bank.
Q Okay. All right. And, Mr. Kane, for the record, was this your first contact with Julie Blakeley in or about the end of May regarding the projected closing on May 30th and 31st?
A I don't recall. I may have had some contact with Ms. Blakeley about the Matt Fleeger conflict waiver. And that would've been related obviously to this transaction and closing. But I, honestly, I can't recall.
Q Okay.
A It may been.
Q And we did look at, I think, some of those emails previously where Mr. Fleeger had obtained permission from your client, Mr. Nambiar, to be able to visit with Happy State Bank about their loan. Is that right? Is that your recollection?
A Yes. And I guess potentially about obtaining additional financing from Happy State Bank to close the transaction related to the property here.
Q Okay. And your email starts off with Julie, I represent HNGH Turtle Creek, LLC. Do you see that?
A I do.
Q And so that's more the nature of some of an introduction between you and Ms. Blakeley. Is that right?
A Yes, it does appear that way.

Q Okay. And then you say it appears 2999TC Acquisitions, LLC, the debtor in bankruptcy, is steadily moving towards a closing that would fund on May 31st, 2022 by 5:00 p.m. Do you see that?

A I do.

Q Okay. And at that point in time, on May 26, what understanding, if you know, would Ms. Blakeley have about 2999TC Acquisitions actually being in bankruptcy? Had you advised her that they were in bankruptcy, or someone on your behalf told her about the bankruptcy?

A I don't recall. Mr. Nambiar may have, but I would be speculating. I don't recall.

Q And your letter says steadily moving towards a closing. I assume that's the what we call, I guess, the payoff event and closing that was to occur originally May 30th and then was moved to May 31st. Is that right?

A That is what I was referring to. Yes.

Q Okay. Then your next statement is this is a funky closing to say the least. Do you see that statement?

A I do, yes.

Q Okay. So why did you call this a funky closing?

A Sure. It's my understanding that there aren't all that many commercial real estate closings that involve rescission deeds to unwind or return title to an entity that had title. And then on top of that, the timing of this bankruptcy case and

the effect of timing on the deed in lieu, and then the administration of the adversary proceeding, I think we can all, well, it's my understanding this is a little bit of a unique closing in its mechanics and the use of a rescission deed or rescission instrument in a commercial real estate deal.

Q And I don't know if I've previously asked you, have you been involved in any restructuring, either outside of court or inside of court, that involved a rescission deed?

A I have not. No.

Q So this would be the first one?

A For me, yes.

Q Okay. Now you mentioned some things that we really haven't focused on a whole lot that I did want to spend a few minutes talking about. You mentioned that when you look at this funky closing issue, the timing of some of the events that occurred in connection with the bankruptcy case and the deed in lieu are important. I think you would agree with me on that.

So just to remind the Court, because again, Judge Everett wasn't our judge initially in connection with this matter, the deed in lieu that we've seen dated October 29th, 2021, that deed in lieu was pulled out of escrow, correct me if I'm wrong, on October 29th, 2021. Is that right?

A That's correct.

Q Okay. And then the deed in lieu was taken out of escrow by a title company, as I recall. And then it was sent to

Dallas County to be recorded. Is that right?

A Yes. I believe the title company filed it with the county clerk for recording.

Q And it didn't actually get recorded until November 1st of 2021. Is that your understanding?

A I think that date's correct. In any event, it was not recorded until early after the bankruptcy case was filed.

Q Right. And I believe the record will reveal that the bankruptcy case was actually filed on October 29th, 2021, later in that afternoon. I think it was about maybe 5:00 or shortly thereafter. Is that your recollection?

A Yeah. So maybe two or three hours after the deed in lieu was filed with the Dallas County Clerk in real property records.

Q Well, actually, that's not entirely correct what you just said. It was transmitted for filing to Dallas County. It wasn't actually filed in the records until November 1st, right?

MR. KANE: I think that this is -- I'll make a Shelton v. American Motors core objection here. I didn't handle that piece. So I'm going with the best of my recollection. That's testimony that you can get from some other party.

MS. LINDAUER: Okay. Well, I think, and I will go through some of this. I think I may have asked Mr. Nambiar or Mr. Christensen those same questions. And I think they may

have punted that to their counsel. But you may not have been the counsel they were punting it to. So let me ask another question. All right?

THE COURT: Well, let me -- there was an objection. I think you asked Mr. Kane if it was his understanding about the timing of the filing. So I will overrule that objection.

BY MS. LINDAUER:

Q Mr. Kane, just so we get a clear record, what was your understanding on or about October 29th of 2021 regarding the actually filing of what we've called the deed in lieu of foreclosure?

A Yeah. So my understanding is that there is a difference between the submission date to the Dallas County Clerk and when the document is actually recorded. It's my understanding that the deed was submitted to the Dallas County Court for recording prior to the petition actually being filed. That it was not actually recorded in the real property records until after the petition date.

(02:30:09 p.m.)

Q And that gap, if you will, between submission and recording, you would agree with me created a legal question about the effect of the automatic stay. Is that right?

A Well, not necessarily about the automatic stay. I think that any bankruptcy attorney worth his salt would immediately identify that you might run into a potential avoidance action

in this situation.

Q And, in fact, an avoidance complaint was filed by the debtor pretty shortly after the bankruptcy case was filed, right?

A That's correct.

Q Okay. Challenging whether in fact that recordation of that deed was in fact a voidable transfer, whether it was a valid transfer, whether it was avoid -- all of those different ideas, correct?

A I don't really believe that's the case.

Q Okay.

A I believe that the debtor's adversary proceeding was filed seeking to show that the transfer was either a preference under 547 or a fraudulent conveyance under Section 548, which I think is actually different.

Q Okay. The reason I'm mentioning that is that, and we haven't spent a lot of time on this but I think it's relevant, is in the December order that is one of the operative documents that we've been looking at, it does talk about the special, or the deed in lieu being void. Do you recall that term?

We can pull it up.

A Yeah.

MS. LINDAUER: Pull up the December 4th order for just a second, Sydney.

THE WITNESS: I'm on that document if you want to

tell me where to look.

MS. LINDAUER: I think actually December 10th, I'm sorry. If you'll drop down a little bit, Sydney, in those provisions of that order going on down.

Go on down a little bit further.

Keep going.

Okay. I want stop right there.

BY MS. LINDAUER:

Q Okay. If you look at the larger ordered, adjudged, and decreed talking about the adversary proceeding that I mentioned, that provision.

A Yeah, third from the bottom. I see that.

Q Correct. Yeah. Right.

And basically it says that stipulates and agrees the deed in lieu filing and recording is not avoidable and was -- or that's in the event that the adversary, there's a default, right? That's the default provision.

A Yes.

Q Okay.

A In this order, yes.

Q Right.

And in the payoff event situation, the next sentence, the order talks about "This order shall -- the Court shall enter an order ruling that the deed in lieu is avoided and rescinded."

Is that right?

A Yeah, I do see that.

Something being voidable and being void is different, which is why I hesitated with my prior answer. This document doesn't ever say that the deed in lieu would be deemed void, but it does say that if a payoff occurred, the adversary proceeding would be resolved by entry of an order showing that the deed in lieu is avoided and rescinded.

Q Okay. And what I'm focusing on is the use of those two words in conjunction, avoided and rescinded.

A Uh-huh.

Q Did you see that?

A Yes, I did.

Q Okay. So you would agree, Mr. Kane, that avoiding something is potentially different than rescinding something, correct?

A Well, yes.

So in adversary proceedings under a 540 blank statute, like 544 or 547, 548, you first have to avoid something before it is recoverable. So the idea was that you would have an avoidance and then the rescission would allow the recovery of title by the debtor.

Q Okay. So the avoidance would in effect undo the prior transaction. Is that right?

A Well, no, it's the combination of those things.

It's really the avoidance determines that you may now

unwind that transaction. The rescission would in essence be your result under Section 550 of the Bankruptcy Code which allowed the recovery of the avoided asset.
Q Okay. The reason I'm going here is that --
MS. LINDAUER: And let's go back up into that earlier paragraph, Sydney, on the second page.
BY MS. LINDAUER:
Q When we talk about the concept of a rescission deed --
MS. LINDAUER: Keep going, up a little bit further.
Well, maybe not. Go back down. I'm sorry. I may have be in the wrong place. There you go.
BY MS. LINDAUER:
Q Okay. It's in that paragraph at the top there that "shall hold the rescission deed." Do you see that?
A I do.
Q Okay. What was your understanding of what the effect of the rescission deed was supposed to be?
A Yeah, it was my understanding that the effect of the rescission deed would, in essence, unwind the deed in lieu transaction or, in essence, deliver title back to the debtor effective as of October 29th, 2021, so that there was clean and continuous title for the debtor. That was my understanding of what the rescission deed was intended to accomplish when we entered into this agreed order.
Q Was the deed in lieu also supposed to be avoided as part

of that transaction?

A So yes and no. And I think I testified about this earlier, right, is that on a payoff, there's two parts, right. So there's the filing of the rescission deed, which in my opinion would accomplish that anyway. But at the time you had an adversary proceeding that was also floating around out there that would need to get adjudicated one way or the other.

And so the idea behind the agreed order and the later provisions, that third from the bottom, was that there would be a mechanism in the bankruptcy adversary proceeding that would clean up the claims that were currently outstanding and finally resolve the adversary proceeding by having an order entered that avoided and rescinded the deed in lieu transaction. So, in essence, it's probably duplicative, but procedurally, it cleans up the open adversary proceeding issue.

Q Okay. So where I'm going with this is, so you have the original order that we're looking at --

A Right.

Q -- and in the first paragraph, it talks about rescission deed --

A Uh-huh.

Q -- the mechanical rescission deed. Then later on, as you mentioned, it talks about the adversary proceeding that did include avoidance type actions, correct?

A That's correct.

Q Okay. And specifically talks about "avoid and rescind." We saw that, those words together, correct?
A Right. Right.
Q Okay.
A That's what the order would hold, yes.
Q Yes. So but then when we get to the March order, the adversary proceeding gets dismissed. It just goes away. So there's no avoid and rescind connected with the adversary proceeding because the adversary proceeding by agreement gets dismissed, right?
A Yes. That leaves exclusively the rescission deed route.
Q Right. Except for the concept of the rescission deed -- I guess my question is that comes out of an order that also included "rescind and avoid." That document, the rescission deed, was paired in this order with the concept of rescind and avoid, right?
A Yes. Yes, I understand. That is correct. Again, that provision was modified and superseded though, as agreed to by the parties so that concept of avoid and rescind is no longer applicable and is not in Docket Number 94.
Q Well, I understand that's your position, may not be in the next document, but out of fairness and, again, Judge Everett, wasn't there when this order got entered, but in reading the order in its entirety, this order, it included the concept of a rescission deed along with the rescind and avoid concept and

our my point being that if you read the December 10th order and you read all of the provisions that were in effect, if you later take out -- let's say you take out this provision about the adversary, you still have to take that into account to understand the December order, right, because that was part of the December order, right?

A Yeah. I want to return to that --

Q Okay.

A -- because that avoid and rescind language was specific to an order in the adversary proceeding resolving the claims involved. The mechanism that would return title to the debtor was the rescission deed, not the agreed order that would be entered in the bankruptcy court. You still had to have a recordation filed in the Dallas County Real Property Records or an instrument filed in the Dallas County Real Property Records.

And so our understanding is that that document would be the rescission deed.

Q Okay.

A Once this order was modified, the avoid and rescind concept for resolving the adversary proceeding went away, was no longer applicable, had no bearing, no enforcement, and I believe the stipulation and the modified agreed order both make that abundantly clear in writing.

Q Okay. So look again, Mr. Kane, at the first sentence of the log or -- and that's what I'm focusing on. It says,

"Ordered, adjudged, and decreed that if the debtor pays HNGH the payoff amount within the payoff period, then simultaneous with the payoff event, the deed in lieu filing, which was submitted for filing pre-petition but recorded on November 1st, shall be deemed rescinded and avoided."

Do you see that?

A I do.

Q Okay. "And the debtor shall retain all title to the property."

So that's irrespective of any adversary proceeding. That was a mechanical thing that was supposed to automatically happen, right?

A I do see that.

Q Okay.

A Yes, it appears so.

Q Okay. The rescission deed is just the memorialization, like you said, something to put in the deed records to memorialize this particular event that's in the first sentence of that full paragraph. Is that right?

A Yes, that was the mechanism by which to accomplish the agreed order.

Q All right. Let's go back to -- and the reason I'm spending some time is because let's go back to 54, which is the letter to Julie Blakeley.

A Uh-huh.

Q Okay. And after you said, "This is a (indiscernible) closing, to say the least," you said, "If you recall, HNGH filed a special warranty deed taking title to the property right when the debtor filed for bankruptcy."

Right?

A Right.

Q There's no disagreement on that, correct?

A That's correct.

Q And then, you said the deed in lieu would have satisfied the note, "but because of the bankruptcy filing and case settlements through agreed orders, the debtor can still reinstate the note and, in essence, buy back the property through a payoff."

Do you see that?

A I do.

Q Okay. So let's break this down a little bit because, again, this would be your position on behalf of your client, HNGH, correct? You're acting as their counsel?

A Yes. Yes.

Q All right. So the first thing you tell us is the deed in lieu would have satisfied the note, right?

A That is the first thing I said.

Q Okay. And so in a normal transaction, if we did not have an intervening bankruptcy and you took title to a piece of real estate through a deed in lieu, you would have basically

extinguished the note. Is that right?
A Yes.
But this references more -- that's what the forbearance agreement references, so yes. Although it wouldn't necessarily have extinguished, Mr. Barton's guaranty if other costs and expenses had been incurred. But, yes, it was our understanding that in this transaction, the deed in lieu would have satisfied the debtor's note obligation.
Q And that would have been because the property was worth as much as the note?
A No, not necessarily.
Q Okay.
A You can have a property worth considerably less.
But with an agreement for a deed in lieu of foreclosure, it's my understanding that typically, execution of a deed in lieu satisfies the outstanding obligation of the note, regardless of the value of the asset involved. And there was an agreement of the parties that that mechanism would be a remedy available to HNGH under the terms of the forbearance agreement.
Q Okay. But let me understand on the value side of things.
If you record a deed in lieu to a property and you take title to the property, forget the bankruptcy for a second, you take title to the property, your position is correct that you would have satisfied the note. And was it the position of HNGH

in this email that you would have satisfied the note in full or in part?

A No, I believe it was our understanding that the note would have been satisfied in full by the deed in lieu under the terms of the forbearance agreement.

Q So how would there still be an obligation owed by Mr. Barton on his guaranty?

A Well, if Mr. Barton, say, had a bunch of ancillary litigation, that would have given rise to additional claims, costs, and rights to recover under the terms of the note, or under the terms of the forbearance agreement, given that I believe there were some releases and potentially indemnification provisions in that agreement, then Mr. Barton would exclusively have an obligation to cover those obligations, the debtor would not.

Q All right. But just to be clear, as to the financial obligation under the note, that would have been taken care of, right?

A Yes, Ms. Lindauer. I'm sorry. I believe --

Q I've said that -- I know you've said that several times. I understand.

Okay. All right. And the reason you're mentioning that is, I guess to Happy State Bank's person is, is that at this point in time, they were actually holding the note and deed of trust lean by virtue of the collateral assignment, correct?

A I think more accurately, I was explaining that because we were requesting a release of the collateral assignment of note and lien --
Q Okay.
A -- and so I wanted to provide the context of the request.
Q So let me ask you, did you need a release of the collateral assignment of note and lien if the note had been extinguished by the filing of the deed in lieu?
A That's a hypothetical. I think it was our position that because of the automatic stay continuing all the way through May 31st and the debtor's possession of the property that it was still a little bit up in the air exactly what the parties' respective call it -- well, let me retract that.
Will you ask your question again? I want to make sure I'm answering your question.
Q Yeah. Let me just read the next part of your statement here.
A Sure.
Q Okay. And I think this is part of what you were just telling us. "But because of the bankruptcy filing and case settlements through agreed orders" --
A Right.
Q And can you tell us, more particularly, what agreed orders are you referencing there?
A Docket Entry Number 64, Docket Entry Number 94.

Q Okay. And both of those would have been in place at the time you wrote this email, correct?

A Yes, that's correct.

Q Okay.

All right. You said, "The debtor can still reinstate the note." Do you see that?

A Yes, I do.

Q All right. So where do you get the concept that the debtor can still reinstate the note?

A The agreed orders.

Q And, again, we're going -- I'm not going to pull it up, but we're going back to the December 10th order where it says the note would be reinstated, correct?

A Yeah. I believe that provision continues through to the March 17th order at Docket Number 94.

Q Okay. So let me understand. The debtor can reinstate the note or the lender can reinstate the note or does it take both parties to reinstate the note?

A You know, sitting here right now, I don't really know. I can't really say with certitude which one of those is correct. But what I can tell you is that it was an obligation under the agreed orders. There was an agreement and an obligation. There is a court order requiring the reinstatement of the note in a scenario where a payoff was going to take place. So whether it needed to be signed by one party or the other or

could take effect as a result of the Court's order, any way you slice it, I think that our understanding was that the note would be reinstated for a payoff if a payoff was to take place.
Q And really where I'm going with that, Mr. Kane, is when you say the "debtor can reinstate the note," whose obligation was it to provide the reinstatement of the note under the December 10th order? Who had that obligation?
A I honestly don't recall. But I think that our understanding was that the parties would agree that the note was reinstated to afford the debtor an opportunity to make a payoff.
Q So under what you just told us, you believed that that was a requirement of both the debtor and HNGH to work together on a note reinstatement. Is that right?
A In a manner, yes.
Q Okay. All right.
And then, your next sentence says, "In essence, buy back the property through a payoff." Do you see that?
A Yes.
Q Okay. So really that's not true because the debtor wasn't buying the property back. The debtor was actually supposed to be being put back into the position it was in as of October 29th, right, prior to the deed in lieu being filed?
A So, yes and no. I mean, look I appreciate the legal distinctions here. So I think that an argument could be made

on May 26th that because the avoidance action had been dismissed with prejudice, the debtor had no legal means of unwinding the deed in lieu of foreclosure, but the stay remained in place and the debtor remained in possession of the property. And there was an agreement and a court order that provided the debtor an opportunity to reinstate its note if it was prepared to pay that note off.

Prior to the reinstatement of the note, I believe that recorded title, unavoidable recorded title, was in favor of HNGH Turtle Creek, LLC. And so, is the debtor buying the property from HNGH in the closing? No, not really, because under the terms of the agreed order, there is a mechanism for the reinstatement of the note and satisfaction of that note, right. And that coincides with the filing of the rescission deed, which would, in essence, be the only means remaining to unwind the deed in lieu. Once the deed in lieu was unwound, then perhaps, yes, the note was reinstated. It's not a buyback of the property through payoff, it is a satisfaction of the note obligation, if that's the technical answer you're looking for from me.

Q Yeah. Well, the reason I'm going down this path is I think there were divergent thoughts about what was happening at closing on May 30th and 31st. I think HNGH, if we literally read what you have here in this first paragraph, you viewed that transaction as the deed in lieu would have satisfied the

note so the debtor would be able to reinstate the note and buy back the property through a payoff.

And that position you're taking there seems consistent with your idea that a special warranty deed provided on May 27th would allow the debtor to, in essence, buy back the property through a payoff. That's consistent with your document that you provided. You understand --

A (Indiscernible).

Q You understand the debtor has a very different position of what was supposed to be happening on May 30th and 31st, right?

A I think that's a good preview of your closing argument. But I only understand what I understand.

Q Okay. Understood.

All right. But where I'm going is, and I think the Court's following it, I guess, is that the order of December 10th, and we've dissected and trisected and bisected that little beast several times, that there appear to be differing views from what you understood and your client understood and what perhaps the debtor and its group understood was supposed to happen, right? So --

A Again, I can't know what your side understood was going to happen. I've explained thoroughly that my understanding was that on May 26th, there was no adversary proceeding, there was no means at all for the debtor to avoid and rescind the deed in lieu under any circumstance other than payment of the payoff

amount on the payoff deadline.

Q Okay.

A It wasn't a sale of property. This was -- you know, I think I've made clear I understood that the rescission deed would allow for the reinstatement of the note. So once the rescission deed is filed, then the note is reinstated. It isn't a property sale. Okay. There you -- I'm saying that right now. We understood it was a note payoff transaction.

Our understanding of the special warranty deed, HNGH's rescission deed, was that that would provide the debtor the benefit of clean title so that I could get, or its payoff party or the SPE was transferring it to or whatever entity, would be able to successfully obtain a title policy for the property so that it could close and payoff of --

Q I appreciate --

A -- the note and move forward.

Q Hang on, Mr. Kane. I appreciate your closing argument, as well, but maybe if we could just answer --

THE COURT: Ms. Lindauer. Ms. Lindauer.

You're both talking over each other and our --

MS. LINDAUER: Your Honor --

THE COURT: -- honestly, I've been -- there hasn't been objections, so I've been giving you some leeway, but this is just counsel arguing back and forth.

MS. LINDAUER: I know.

THE COURT: You are giving me a preview of your closing arguments.

MS. LINDAUER: Right.

THE COURT: So I'll just remind you again. The Shelton doctrine has three requirements and I gave you some guidance at the beginning and you're just arguing -- appears to be, you're just arguing with Mr. Kane.

Do you have specific questions --

MS. LINDAUER: I do.

THE COURT: -- that you are not able to get from any other source?

MS. LINDAUER: Well, Your Honor, this is his email to HSB and these are his words. So anybody else who would be saying these words or looking at this email would merely be reading what Mr. Kane had to say, so he is --

THE COURT: Well, why don't you ask him questions? You are -- during the last five minutes, you are arguing and partially testifying, so --

MS. LINDAUER: Okay.

THE COURT: Why don't you ask him -- like I said at the beginning, this is question and answer.

MS. LINDAUER: Understood.

THE COURT: This is not really the appropriate time for you to argue with Mr. Kane. You can ask questions and let him answer.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q All right. Mr. Kane, looking at the next part of this, it says, "At closing, the following has to occur."

Do you see that?

A I do.

Q Okay. Where did you take these four items from that you say have to occur at closing?

A That was my understanding of how we would work the agreed orders.

Q And for the record, just to be clear, when you say agreed orders, what documents are you referring to?

A Docket 64, Docket 94.

Q All right. And who put together this particular four bullet point order?

A I drafted this email.

Q All right. And your Point Number 1 is "funding of the payoff amount into escrow." Do you see that?

A Yes.

Q Did that event, according to your email and your statement here, have to occur first?

A I believe the answer is, yes, absolutely.

Q Is that in the order of December 10th that the funding and the payoff has to occur before these other events?

A I don't believe that those express words are in that

order.

Q Item Number 2, "filing of a rescission deed re-vesting the Turtle Creek property with 2999TC, the debtor."

Is that specific wording in the December 10th order?

A No, it is not.

I don't think it is anyway.

Q Okay. Item Number 3, "reinstatement of HNGH note, security agreement, and deed of trust."

Is that in the December 10th order?

A Those specific words, no.

Q And "release of the payoff to HNGH."

Is that in the December 10th order?

A Those specific words, no.

Q All right. Look at the next sentence. This is your words. "Title company is struggling with a hitch."

Do you see that?

A I do.

Q What did you mean by "the title company is struggling with a hitch"?

A The title company asked us to assist in part with resolving the collateral assignment of note and lien to Happy State Bank.

Q And what title company was that?

A That was Sendera Title.

Q Did any other title company reach out to you, Mr. Kane, to

ask you to assist with any struggles regarding Happy State Bank?

A No, though I was put in touch with one other title company.

Q For the purpose of resolving the issue with Happy State Bank?

A No.

Q And then, we're told on -- this, again, your email, "On December 2, 2020, HNGH collaterally assigned its note and lien through the deed of trust to Happy State Bank via the attached document." Do you see that?

A I do.

Q Why would you be telling Julie Blakeley at Happy State Bank that on December 2nd, HNGH -- wouldn't she already know that?

A I don't know what Julie Blakeley knows. You had her on the stand.

Q But why were you telling Julie Blakeley about the collateral assignment of note and lien?

A I was bringing the issue to the forefront of her attention because I was asking her for assistance resolving it and didn't want her to have to spend time going and looking for documents or trying to pull documents to figure out exactly what I was referring to.

Q Does that refresh your recollection of when the first time

it was that you might have actually spoken to Julie Blakeley about this particular issue?

A About this particular issue, yeah?

Q Correct.

A Yeah. I don't think I testified that this wasn't the first time I spoke with Julie Blakeley about this specific issue.

Q All right. And then, your next sentence, "We." Who is the "We would like"? Who is that?

A HNGH Turtle Creek, LLC, my client.

Q "[W]ould like Happy State Bank to agree to rescind the collateral transfer of note and lien." Do you see that?

A I do.

Q Okay. Why didn't you use the word "release"?

A Ms. Lindauer, to err is human.

Q Okay. So that's just a mistake?

A Yeah, I should have said release.

Q Okay.

A I mean, the document that we prepared and delivered is a release, not a rescission.

Q And you would agree with me that rescission is different than release, right?

A Yes.

Q Okay.

Then, you said "The rescission filing, which we are

preparing, would be signed and notarized by Happy State Bank but held in escrow pending closing." Again, is that just an inartful statement on your behalf?
A Yes, it's referencing the release document that we provided.
Q And so it's your testimony, Mr. Kane, just to be clear, that you, on behalf of HNGH, were not asking Happy State Bank to rescind the collateral transfer note. You were actually asking them to release the collateral transfer note, right?
A Yes.
Q Okay. Then, if we read on. "Once funding has taken place, the rescission deed," okay. And the rescission deed that you're providing for there, okay, on the 26th, that's a document that your firm had already prepared, correct?
A That's correct. That's the HNGH rescission deed or special warranty deed.
Q And we know that on May 26th, that deed had not yet been executed, correct?
A No. That's inconsistent with my prior testimony. I believe on the 26th, the document had been executed but it had not been notarized and my client had pointed out a mistake. So that was, in essence, terminated and not sent to the courier until the following day.
Q I think I missed that testimony. So tell me what happened on the 26th.

A Yes. So I believe on the 26th, we had a final document that I was attempting to get my client to execute.
Q Okay.
A But it was executed and then not notarized, and it needed to be notarized. And then, as I've testified on, I think two different occasions, or Mr. Christensen has also testified, my client pointed out the Texas LLC v. Delaware LLC issue and asked that we address that. So addressed the notary issue, but I made the mistake of failing to correct, though I thought I -- really, I thought I did. I don't know if I failed to save the appropriate version with the Delaware correction or what, but on the 27th, a document that was signed and delivered to Sendera Title was executed and notarized and then delivered.
Q And you would agree with me that the document that was sent to Sendera on the 27th still reflected a Texas limited liability company, correct?
A That is what the document says.
Q So you're saying, in your office, you had a proper document that said Delaware, it just didn't get signed?
A Yeah, so I thought I made that correction. I don't know if, you know, I had forgotten that and then opened it up while it was part of an email attachment that I was sending back over and made the correction and then it didn't save, or what. But my client had advised me of the mistake and then did not catch it when they executed and had the document notarized the second

time. That was my fault.

Q Okay. And did you keep the first executed document or did y'all destroy that?

A I think it was destroyed.

Q Do you think, or you know?

A Well, I don't know. I mean, we didn't use it, so I don't know if I've got a PDF somewhere but, you know.

Q So you think that there is a special warranty deed document in your office somewhere that does show HNGH, a Delaware limited liability company, right?

A Yeah. So I want -- I mean, I don't know how I can testify to this more clearly. I thought I made that revision on a draft.

Q Right.

A There was never a signed draft that said Delaware LLC.

Q Okay. And as you sit here today, there's never been a special warranty deed document that you prepared that says Delaware LLC that's been signed by your client. Is that right?

A Yeah. So --

Q Okay.

A -- I believe my clients both testified (indiscernible) --

MS. LINDAUER: Objection.

THE WITNESS: -- (indiscernible) real estate.

MS. LINDAUER: Objection. Non-responsive. His answer was just yes, and that was the question.

THE COURT: So I'll overrule.

THE WITNESS: So I'll repeat.

I believe that my clients have both testified to that. But, yes, that's correct. The executed special warranty deed from HNGH says Texas LLC.

BY MS. LINDAUER:

Q Okay. And when you talk about your client representatives, you're talking about Mr. Nambiar and Mr. Christensen, correct?

A That's correct.

Q Okay. All right.

Then, your next sentence on this email says, "What we propose is that Happy State Bank also provide a payoff statement with wiring instructions so that Happy State Bank can receive payment in full concurrently with the recording of the rescission of the collateral assignment." Again, you use the phrase "rescission of the collateral assignment."

Do you see that?

A Yes, I do. I see that.

Q Okay. And you're telling us that that is just an error on your part. It should say "release of the collateral assignment"?

A Yes, Ms. Lindauer.

It says release on the document we delivered to the debtor and to Happy State Bank. So, yes. I guess I had rescission on

the mind, but it should have said release.
Q Okay. Well, and you would agree with me, Mr. Kane, that rescission, as we've already discussed, is different than release, right?
A Again, you already asked me that and I did already agree with you.
Q Okay. I'm not trying to be argumentative. I'm just trying to understand your email where you use the word "rescission" I think four times. So I'm just trying to figure out what was going on on the 26th.
A Yes, Ms. Lindauer.
Q All right. Okay.
A That's why I clarified.
Q I understand. All right.
So it says, "So that Happy State Bank does not ever face exposure."
What does that mean?
A Sure. So the thought process behind this is there are multiple ways to skin a cat, right?
There's a cloud on title because of the collateral assignment of note and lien. And so if HNGH gets a release from Happy State Bank but there is no payoff directly to Happy State Bank, then Happy State Bank is in a position where it is, for a very brief period of time, an unsecured creditor who's given up its right to proceeds because it's released its lien

on the note and deed of trust. And we wanted to ensure that we could address this cloud on title in a manner that would be very difficult for Happy State Bank to say no or cause delay or anything like that.

So our proposal was that, of HNGH's proceeds, there would be a line item in the closing statement that would deliver funds to Happy State Bank. That would ensure they never became an unsecured creditor and it would ensure that they really wouldn't have any reason to disagree with this means of resolving that cloud on title.

So we thought that this was the easiest mechanism to address that cloud on title since it wouldn't affect the payoff amount and would ensure that Happy State Bank would be likely to perform.

Q Could your client simply have just paid off Happy State Bank and avoided all of this release, rescission, all of these issues?

MR. KANE: Objection under Shelton v. American Motors. You could have asked that of Mr. Nambiar or Mr. Christensen.

MS. LINDAUER: Okay. Well, I think he -- I'm going to go back and look, but I think they punted to --

THE COURT: Ms. Lindauer, what is your response to the objection?

MS. LINDAUER: Your Honor, and we'll go through some

of that testimony when we get there, but I believe some of those issues were in fact directed to Mr. Kane by his clients, that those were issues to be addressed with their counsel.

So if you want me to, I'll just reserve that question and we'll look at the testimony of Mr. Christensen and Mr. Nambiar on that particular issue if Mr. Kane doesn't recall his clients telling us that that's something better addressed to Mr. Kane.

MR. KANE: Okay. Your Honor, I don't believe that that was an issue that was punted.

MS. LINDAUER: That's fine.

MR. KANE: But the other response that I'm happy to give Ms. Lindauer is, I don't know.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q And then, if we look down the next sentence again, "If you are amenable to that, we will circulate the proposed rescission of the collateral assignment tomorrow for your review and comment." Again, you're saying that that, again, is an error, that it would be the release.

Is that right?

A That's right. It should have said release.

Q All right.

And this is May 26th at 6:54 p.m., which you would agree with me is after normal business and banking hours for most

banks. Is that right?

A Yes.

Q Okay. And then, did Ms. Blakeley respond to you in regard to this particular email?

A I think so.

Q Okay. And how did she respond to you?

A I don't recall, but I believe she either said she was alerting outside counsel or, you know, was aware of the issue after receiving my email or something like that. But honestly, I don't recall.

Q All right.

MS. LINDAUER: If we drop down a little bit, same Exhibit 54, and go to the next page.

BY MS. LINDAUER:

Q This is a Julie Blakeley to Vipin Nambiar copied to you email where Ms. Blakeley is thanking Mr. Vipin, "I'm happy to give Matt a call this morning." What was this referring to?

MR. KANE: So to try and expedite this, I'm going to make a Shelton objection on this. You had Ms. Blakeley on the stand.

MS. LINDAUER: Well, I think you can still answer the question if you know what this is referring to. You were copied on it. I'm not limited by Shelton to only asking one witness these questions, Mr. Kane. I think I can ask you. If you don't know, that's fine. I'll assume you don't know what

it's talking about.

THE COURT: Ms. Lindauer, I think the first prong of Shelton is if there's no other means exist to obtain the information than the deposed, or in this case, ask opposing counsel, and on that prong, I'm going to sustain the objection.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q All right. Looking down a little further, Mr. Kane, this is your email to Mr. Nambiar. Do you see that?

A I do.

Q And you said to your client, "Just saw this after we talked." Is that right?

A I do.

Q Okay. This is your particular email addressed to Mr. Nambiar where you're saying, you're telling him you just saw this, right?

A Yes.

Q And that's on May 20th at 5:22. Is that right?

A Yes.

Q All right. Let's take a look if we could at Exhibit Number 76, that's Lender Exhibit 76.

THE COURT: Ms. Lindauer, how much more --

BY MS. LINDAUER:

Q Mr. Kane, have you seen this?

THE COURT: Ms. Lindauer, can you give me a time

estimate? I think you're way over your original time estimate and I'm trying to gauge whether or not everybody's hope and expectation that we were going to finish the witnesses today is correct.

How many more -- what's your time estimate?

MS. LINDAUER: Let me look at the questions I have left to ask.

I would think right about one hour, maybe a little bit longer.

THE COURT: Okay. I'll just ask you, again, to the extent possible, not just ask him to agree that that's what the document says. You haven't always done that, but we could probably save some time if you would not do that. Documents say what they say, but go ahead.

MS. LINDAUER: Okay. Let me jump to some quicker questions and then I'll come back.

If we could turn to Exhibit, Sydney, 83. That's Lender's Exhibit 83.

BY MS. LINDAUER:

Q Mr. Kane, this is an email from you dated May 31st at 3:04. Do you see that?

A I do.

Q You would agree with me, Mr. Kane, that that's the date that everyone was trying to close the payoff to HNGH. Is that right?

A That is the payoff deadline.

Q Okay. And this is a specific email from you to me to Mr. Walji copied to your client rep, Nate Christensen. Is that right?

A Correct.

Q All right. And you said we will provide the incumbency certificate confirming authority to enter into the agreed rescission deed we sent over for this transaction to give the title company some comfort. Do you see that?

A Yes. Do you have a question about that?

Q Yes. Did you ever provide an incumbency certificate to the title company?

A No. This was condition on a confirmation of authority to (indiscernible) --

MS. LINDAUER: Your Honor, objection. Non-responsive. That was a simple question.

BY MS. LINDAUER:

Q Did you ever provide an incumbent certificate to the title company?

A No.

Q Did you actually draft an incumbency certificate, Mr. Kane?

A Yes.

Q Did you provide a copy of the incumbency certificate to the debtor's attorneys, myself, and Mr. Walji?

A I believe you could answer that. The answer is no.

Q And if you read the rest of that, it says "Notwithstanding the court order mandating, we provided the rescission deed at close and payoff." Do you see that?

A I do.

Q Then you also said, "Per ordinary course of business." Tell me what "per ordinary course of business" meant in this email on May 31st at 3:04 p.m.

A Yes.

It's my understanding that it is customary to deliver an incumbency certificate for a private fund, especially if there are confidentiality agreements in place with investors, to the escrow company or the title company to be held in confidence.

So the idea here is that you're providing the incumbency certificate so that the title company has comfort that the party who is entering into the transaction or is providing the recorded instruments or is having, you know, their signature on rescission deeds or whatever, actually has the authority to enter into those transactions so that they aren't unwound by some legal action at a later date.

So --

Q And this -- go ahead. I'm sorry.

A Yeah.

So you want the title company to have comfort so the title company can issue a title policy for the benefit of the

counter-party to the transaction.

So it's my understanding that "ordinary course of business" is that these incumbency certificates are provided exclusively to the title company so the title company can provide that title policy or have that comfort and that they hold that in confidence and do not disclose it to the other parties.

Q And that step never occurred. Is that correct?

A Correct.

Q And, in fact, your statement below says, "Will you please provide the title company information to us so that we can provide that certificate?" Do you see that?

A I do, yes.

Q And wasn't it just a few minutes later that Mr. Walji sent you an email, we can look at it again, where he provided the title company information to you?

A Yes, Mr. Walji provided the title company information at 3:19 p.m.

Q Okay. Fifteen minutes after your email --

A That's correct?

Q -- correct?

A That's correct.

Q And did you forward, 15 minutes after the email received from you to Mr. -- the exchange with Mr. Walji, just to be clear on the record, did you provide an incumbency -- executed

incumbency certificate to the title company?
A Of course not.
MS. LINDAUER: Let's take a look, if we could, at Exhibit 86, that's Lender's Exhibit 86.
BY MS. LINDAUER:
Q Mr. Kane, you provided this email only to me. Is that right?
A Yes, that's correct.
Q At 3:52 p.m. Is that right?
A That's right.
Q And it's HNGH wire instructions for title company. Do you see that?
A Yes, I do.
Q Why did you not provide this email to the title company?
A Yeah. Again, that's an easy explanation.
Hold on. Let me -- give me one second to confirm my recollection here.
But it was my understanding that Mr. Walji had provided the title company information at 3:19, and at that same time, Mr. Walji disclosed for the very first time who the actual funding party was going to be. And he noted that it was Mr. Garrison Kickham.
At 3:40, Mr. Walji circulated a letter, found at Exhibit 85 and Exhibit 85A, noting that the funding party could not close on May 31st. Knowing that the debtor had allegedly

been running multiple parallel tracks, if Sendera Title had been working for Mr. Garrison Kickham, I was not sure if Sendera Title was working for any other entity. I assume they were working for TCC2022, but I believe we also, at around that same time learned that they could not close.

So I sent these wire instructions to the debtor and really also, I sent them to the debtor knowing that the debtor already had them in its possession.

Q Well, okay. Okay. Let's unpack that for a second.

Let's look at Lender's Exhibit 84.

A Okay. I'm there.

Q Okay. So he says, this is your email you were referring to from Mr. Walji.

A 3:17.

Q You were copied on it. "For the record, the funding party is not a Barton affiliate." Do you see that?

A Yes.

Q He says, "In the meantime, I'm reaching out to Mr. Garrison, the principal of the funding party for his availability." Do you see that?

A I do, yes.

Q He also says, "As I mentioned below, the title company is Sendera Title. The escrow officer is Julie Lyssey who has requested the information described in Item 3."

Do you see that?

A I do, yes.
Q And then, again, he says, "Lastly, the Happy State Bank speaks to a payoff amount. Is there a current loan by HNGH with Happy State Bank, which involves 2999TC, as my understanding, based on our earlier conversations, was that it was not the case, or did I misunderstand, again?"
Is this the email you're referring to?
A Yes.
MS. LINDAUER: So drop on down, further.
Drop on down further.
And stop. Okay.
BY MS. LINDAUER:
Q And this is from you on May 31st at 12:12. Is that right --
A In part.
Q -- Mr. Kane?
A In part. So some of the text that is --
MS. LINDAUER: Your Honor, objection. Non-responsive.
BY MS. LINDAUER:
Q This is an email from you. It's from John J. Kane, right?
Not asking about anything else, just that it's from you. The "from" says your name.
THE COURT: So I'm going to overrule the objection because I didn't even begin to hear the response. So go ahead.

THE WITNESS: Right. So --

MS. LINDAUER: Your Honor, I'm going to withdraw the question and I'll ask a different question. Let's go at it that way.

BY MS. LINDAUER:

Q Mr. Kane, we're looking at an email sent on Tuesday, May 31st at 12:12 p.m. Is that correct?

A No.

Q The set doesn't say Tuesday, May 31, 2022, 12:12 p.m.? Am I reading that incorrectly?

A The body of this includes interlineations from other emails sent --

MS. LINDAUER: Your Honor, I'm going to object. Non-responsive. I am just asking him to read. I don't want to say the document speaks for itself. It says "sent," and all I'm asking is, is that correct? Tuesday, May 31, 2022, at 12:12 p.m.

THE WITNESS: No.

THE COURT: Okay. So I'm going to --

MS. LINDAUER: Is that what it says?

THE COURT: I'm going to over the objection. I can read what it says. And so --

MS. LINDAUER: Right.

THE COURT: -- I'm -- Mr. Kane was trying to explain something and I'm going to let him respond. I don't need

people to --

MS. LINDAUER: (Indiscernible) --

THE COURT: I don't need people to tell me or direct my attention to that date. I understand you're trying to point it out, but let Mr. Kane respond, and then, if you have any follow-up questions, you may.

MS. LINDAUER: Well, Your Honor, I don't think there is a question pending right now, is there?

THE COURT: Well, I believe you had asked him is this email dated May 31, 2022, at 12:12 p.m. I thought that was the last question you asked before --

MS. LINDAUER: The last --

THE COURT: -- Mr. Kane started to respond.

MS. LINDAUER: Okay, Your Honor. I'll withdraw that question. Just make it easy.

I really am trying to get done today and the way we're going at this is making it very difficult. Okay.

All right.

THE COURT: Ask a question.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q The blue comments in this email, are those your statements, Mr. Kane, or someone else?

A I believe those are my statements.

Q Thank you.

MS. LINDAUER: Your Honor, can we take a five minute break? I would really appreciate that.

THE COURT: It's 3:26. We'll come back at 3:31.

MS. LINDAUER: Thank you.

(Recess at 3:26 p.m./Reconvened at 3:32 p.m.)

THE COURT: We're back on the record. Ms. Lindauer, Mr. Kane.

MR. KANE: Your Honor, I'm present.

MS. LINDAUER: Present, Your Honor.

THE COURT: All right. Ms. Lindauer, I'm going to allow you to go until 4:30 because we're going to finish with Mr. Kane today.

MS. LINDAUER: Okay.

THE COURT: I think you're over your estimate already. Again, I don't want to unnecessarily limit you, but we're spending a lot of time on -- for example, the email we were just talking about, it's pretty obvious what the issue was, that there's an email dated May 31st. Some of the text was sent on that date based on the different colors. So this really isn't something we need to be spending time on. And so you objected when he said yes and no. I understood already what Mr. Kane -- I believe what Mr. Kane's point was. And I think we all know that this email has text that was entered at different times.

Is that your understanding, Ms. Lindauer?

MS. LINDAUER: That is my understanding, Your Honor.

THE COURT: So there's really no need to belabor that point with both sides objecting. I get it. So let's try to move along with the questions, and again, keep them narrowly focused like you indicated you would at the beginning. Ask Mr. Kane things that you cannot get from any other source.

MS. LINDAUER: Sure. All right. Ms. Ollar, if we could pull up Exhibit 84 again, Page 205.

BY MS. LINDAUER:

Q Mr. Kane, what was the purpose of this email that was sent on May 30 -- what was your purpose for sending this email on May 31st, at 12:12?

A You asked me what items that I could deliver or not deliver at 11:08 on Tuesday morning. And so, I was trying to prepare quickly a list of things that we could deliver. I may have had some commentary about things that we might not be able to deliver, but that was my response in blue.

Q All right. And again, what I'm looking at is on Page -- Exhibit 84, Page 4 of 5, down at the bottom. That's what you're -- that's what you're referring to as my email to you. Which items on the list can you deliver today or not deliver? Thank you. That's what you were responding to. Is that correct?

A Yes.

Q Okay. All right. And then if we scroll up a little bit.

The comments in red that are appearing in this email, who do you understand those comments to be from?

A Yes. If you scroll up, Khudabuksh Walji says, "I have responded under each of the items below in red."

Q All right. So looking at the items on May 31st that you identified as the items that you could provide, Number 1, what item were you agreeing -- and you may need to go to Page 2 of 5. What item, Mr. Kane, did you identify that HNGH could provide?

A It says agreed rescission deed.

Q And what does it say further? What were you telling us further under 1a?

MR. KANE: Your Honor, I'm going to object to this question under 403 of the Federal Rules of Evidence. This is cumulative, not probative, and a waste of time.

THE COURT: All right. Ms. Lindauer, we can all read what it says. We've seen this email before, have we not?

MS. LINDAUER: I don't think we've spent any time, Your Honor. I think we have seen it before, but I don't think we've spent any time walking through it, which is why I was taking some time to walk through it.

THE COURT: So if you need a minute to familiarize yourself with it, Mr. Kane, go ahead so that you can ask the more specific questions other than is that what this says.

BY MS. LINDAUER:

Q Mr. Kane, looking at Item 1a, you provided sort of a list of the agreed rescission deed items. Is that what I'm reading here first of all?
A Yes.
Q Okay. When you mention revised agreed rescission deed provided by debtor 5/30, at 3:24 p.m., what are you referring to?
A I am referring to the, I believe it was agreed rescission of deed instrument prepared by Mr. Marx and delivered by the debtor in the Dropbox link on May 30th, at 3:24 p.m.
Q What are you referring to when you say revised draft circulated 5/30 to debtor? Do you see that?
A I'm referring to the draft that I revised of the agreed rescission of deed instrument and circulated to the debtor about two hours after 3:24 p.m. on May 30th.
Q Why did you include a time on the one provided by debtor, but you did not provide a time on the one that you circulated back?
A Yeah. I think I might be showing how I thought it was pretty preposterous that the debtor had no revisions to our form of rescission deed and provided no responsive document until 5/30 --

MS. LINDAUER: Your Honor, objection. Non-responsive. I asked simply about time.

MR. KANE: I think that --

MS. LINDAUER: Why was --

THE COURT: Go ahead.

MS. LINDAUER: Why was --

THE COURT: Ms. Lindauer, go ahead and finish your objection.

MS. LINDAUER: Okay. Why -- I asked you why you provided a time on the 5/30 at 3:24, and then on your comment, revised draft circulated 5/30 to debtor, there was no time mentioned on that comment. That's all I asked is why was there no time mentioned.

THE COURT: Objection overruled. Mr. Kane was answering the question.

MS. LINDAUER: Okay.

MR. KANE: So do you want me to continue to answer the question?

THE COURT: Yes, please.

MR. KANE: Thank you. Yes. I included the specific 3:24 p.m. on May 30th time because I thought it was ridiculous that the first time I received any responsive draft back of anything related to the rescission deed was 18 days later on a federal holiday of almost 24 hours from the deadline by which the debtor had to close a transaction. I noted that I circulated my draft on the same day. I did not feel it was necessary to include a time at that point.

BY MS. LINDAUER:

Q Where in your Item 1a does it say, I believe this is ridiculous that I've waited 18 days to get a comment?
A Ms. LIndauer, I believe reading the specific words under Paragraph 1a, it doesn't say that, but you asked for my explanation, so I provided it.
Q I asked the time. I didn't ask for an explanation, but anyway, Your Honor, let's move on. Mr. K. Walji responded to your 1a and explained to you that at -- that they were -- that we were not signing the form of agreed rescission deed. Do you see that?
A I do see that.
Q What time did you receive Mr. K. Walji's response to your email, Mr. Kane?
A Almost 2:00 p.m. on the closing deadline.
Q And did Mr. K. Walji provide you or any party on behalf of the debtor with a document that we told you would be acceptable for closing?
A Yes. It was just a rejection of all of the comments that we had provided, so it was just the document that you delivered at 3:24 p.m. to which I had comments and concerns about, which I had previously expressed in writing to you.
Q All right. Item 2, payoff letter and release of deed of trust. Were there any comments made to your Item Number 2a?
A We never received any comments or approval to execute.
Q Why did the debtor have to provide approval to execute a

release of deed of trust by HNGH?
A We were providing a courtesy to the debtor to ensure that the debtor had no issues because the form of release of deed of trust also had a release of the assignment of leases and rents incorporated into it, and we just wanted to make sure that that was satisfactory to the debtor.
Q And for the record, that document that you drafted on behalf of your client was never signed. Is that correct?
A That's correct.
Q Is it your testimony, Mr. Kane, by including Item 2 in your email you're acknowledging that the payoff letter and release of deed of trust was a required document for the closing and the payoff to HNGH?
A So I believe a payoff letter and release was included on the list that you provided at May 30th, and that's what I was responding to. But I also do believe that, yes, there needed to be a payoff and release of deed of trust as part of the closing transaction. I do believe that, yes.
Q So, Mr. Kane, just to be clear, the December 10th order did not require a release of the deed of trust by HNGH. Is that correct?
A Are you making that assertion?
Q No. I'm asking you that. Did the December 10th order require the delivery of a release of the deed of trust by HNGH?
A I don't believe so.

Q But you're saying here in response to a letter from me and acknowledging that there were documents that were needed for the payoff and closing that were not identified in the December 10th order. Is that correct?

A Yes. Yeah. I believe -- like I said, I believe that a payoff letter and release of deed of trust was a necessary part of this transaction.

Q Why was a payoff letter a necessary part of this transaction, Mr. Kane, when there was an order that set the payoff amount?

A Right. So the order may have been sufficient. The concern is more title company oriented. And what we wanted to do was ensure that there was a record that the note had been paid in full when the payoff had taken place. So we thought that, one, that would show that the obligations, the payoff obligations under the agreed order had been actually satisfied and that there would be record of that, which would enure to the benefit to the debtor. Showing that there was a release of the deed of trust would also presumably show that there was a clear path of title, which we also believed would enure to the benefit of the debtor.

Q Was a payoff letter provided to the debtor or the title company on or about May 30th or 31st pursuant to your email dated May 31st?

A Yes.

Q You actually have a payoff letter?

A Yes. We delivered that payoff letter to you at approximately 6:00, 6:15 p.m. on May 30th.

Q Okay.

A That's why I commented, draft circulated 5/30, no comments from debtor.

Q Are you talking about a -- a copy of the agreed order with the payoff or are you talking about an actual payoff letter signed off on by your client?

A Yeah. I'm talking about an actual payoff letter, a form of which had been approved by my client, which I circulated to you at approximately 6:00 p.m. on May 30th.

Q Is that marked as an exhibit as part of these documents?

A Yes.

Q What exhibit is that?

A Let me -- give me one second.

Q Sure.

A That is Exhibit 69 and 69A.

MS. LINDAUER: Okay. Can we pull up 69 and 69A, Sydney?

BY MS. LINDAUER:

Q Okay. I've got 69 pulled up. Let me know if this works. Payoff letter full release, release of lien. Is that what you're calling the payoff letter?

A Yes. That's what it is.

Q Okay. Go down, Sydney.
A You're on Exhibit 69. Exhibit 69A is --
Q Exhibit 69A. Because this is what you're calling the payoff letter and release. Is that correct?
A That's correct.
Q And as you sit here today, was this document signed by HNGH?
A No, it was not.
Q All right. Going back to Exhibit 84. All right. If we go to Item Number 4. You said Happy State Bank collateral assignment release. What did you mean by that?
A It was the release of the collateral assignment of note and lien to Happy State Bank.
Q And it shows -- is this your statement? What did you mean by prepared and circulated to HSB 5/27? What does that mean?
A Yeah. So I prepared a draft of that document and circulated it to Happy State Bank on May 27th and concurrently sent, I believe you, a draft of that document for your review and comment as well.
Q And just to be clear, Mr. Kane, that document you drafted in reference here was never executed by Happy State Bank and delivered. Is that correct?
A That was a multi-part question. I believe it was executed by Happy State Bank. I do not believe it was delivered.
Q Do you have a copy in your files of an executed release of

the collateral assignment?
A I do not. I'm relying on the representations of Happy State Bank's counsel.
Q And that's not been marked as exhibit. Is that correct?
A What is that?
Q The release. It's not been marked as an exhibit in these proceedings, the executed release.
A I believe that is correct.
Q Item 5, release of assignment of rents, 2.4. What does that mean, 2.4?
A It refers back to 2.4. So if you scroll up.
Q Okay.
A I don't know why it has the point 4. Or that may have been the reference to the document in 2.4 of your list, but it was included in the payoff letter and release of deed of trust by HNGH. So this is one of the reasons why we wanted to get some clarification from the debtor on approval of the form. But that document incorporates not just a release of the deed in trust, but also the recorded assignment of leases and rents.
Q Okay. So there was not a separate release of assignment of rents. Is that correct?
A That's correct. The release of the assignment of rents was included in the payoff and release of lien letter, which is a recordable instrument.
Q Right. Item 6 on your list, release of UCC-1 in favor of

HNGH if HNGH has a UCC-1. I didn't file one for them. What is meant by that?
A Yeah. So if you recall from the initial docket entry number 64, agreed order, there is a provision that allows HNGH to file a UCC-1 on all of the debtor's personal property in the amount of the allowed claim, I believe. I don't recall ever filing that. I'm not sure if Nate Christensen coordinated internally to have that UCC-1 filed. So, again, you know, I think that we -- we acknowledged that we would be able to provide those releases, but also clarified that we didn't believe that UCC termination statements were really necessary at closing anyway.
Q And just to be clear, what you just said there, that's the opinion of HNGH, that you did not believe UCC termination statements were a necessary part of closing. Is that correct?
A Yeah. It's also my personal experience and my opinion.
Q If we look at 6a, the top of the next page, again, does that reflect what you just told us, your opinion?
A And experience, yes.
Q Mr. Kane, have you represented secured lenders before?
A I have, yes.
Q Have you represented them in lending transactions where they are loaning money to someone and taking liens?
A Yes, I have.
Q Okay. And have they required that the prior liens on a

property be released before they loan money?
A They have a written acknowledgment that is part of the transaction. The liens will be released. They often obtain those UCC-3s significantly later. I'm working on a transaction right now with another secured lender in which notes that are being transferred to the secured lender, there are eight separate notes. Those notes are post-closing deliverables. The UCC-3s, the assignments of those UCC-3s or terminations if the prior lender's UCC-1s, those are also post-closing issues. Delivery of title to titled vehicles. In that transaction, there are over 200 titled vehicles, also a post-closing item.
Q Was there any court order that made delivery of the UCC-3s a post-closing obligation in this case?
A No. Just like there's no order requiring it to be a delivery for this case.
Q But you told us that there were documents that needed to be delivered as part of the closing that are not in the December or March orders, correct?
A Yes.
Q And again, we're working off -- these are your items on your list that you provided to us. Is that correct?
A In part, yes. This is a list of items that I said that we could deliver or was providing written assurances so that you guys would have it in writing if you needed it for a potential funding party that HNGH would as a post-closing item deliver

certain things.
Q Okay. Did you provide a written commitment to the debtor or any other party stating signed by HNGH that they would provide UCC-3s upon payoff of the liens on personal property, your Item B?
A No. As counsel for HNGH, I believed my Item B would bind them to provide those UCC-3s upon a payoff to release liens on the personal property.
Q Okay. It says HNGH will commit. So you're saying that's a binding commitment?
A In this instance, yes. Absolutely. On payoff, HNGH would have no right to continue to assert a lien on personal property. The payoff of note would have already been recorded showing that the payoff was in full, and so HNGH had no continuing claim against the debtor's assets.
Q I understand that, but let me ask you, Mr. Kane. What happens the day after closing and HNGH fires you and I have this HNGH will commit in your email? How am I going to enforce that?
A Certainly the Bankruptcy Court continued jurisdiction over the agreed orders would allow you easy and expedited, if not emergency, relief.
Q And where in the agreed orders does it say that I can demand you provide a UCC-3 upon payoff to release the lien on personal property?

A It does not.
Q Item 7, written confirmation in an email that the petition for participation agreement is terminated. Do you see that?
A Right.
Q Okay. Did you provide or draft anything that showed that the participation agreement had in fact been terminated at the time of closing?
A So yes and no. We provided you the documentation showing the transfer in its entirety of all the obligations and the loan documents and everything to HNGH Turtle Creek, LLC, which I believe satisfied that issue. But no, I did not provide a separate document that specifically said the participation agreement is terminated.
Q And when you said you believed satisfied that requirement, that was satisfied on your behalf, not from the debtor's perspective. Do you have anything from the debtor that says they were satisfied that Item 7 had been satisfied?
A Ms. Lindauer, we didn't receive feedback on pretty much any of the documents that we submitted to the debtor, so no.
Q Well, you didn't submit a document to the debtor, written confirmation. Is that right?
A That's correct.
Q So how would I -- how would we provide feedback on something that wasn't provided on Item 7?
A Right. So as I -- as I previously said, we delivered a

document showing the assignment and transfer of the loan documents and I believe all of the corresponding rights and documents thereunder in their entirety to HNGH Turtle Creek, LLC. So I believe that that was absolutely satisfactory of the concern over whether the participation agreement was in place or not.

Q Item 8. We'll -- who's we'll? Provide the original note.

A That was HNGH.

Q HNGH did not have the original note when you wrote this email. Is that correct, Mr. Kane?

A That's correct.

Q So HNGH would provide the original note marked paid in full upon funding. Do you see that?

A Yeah, I do.

Q And will provide evidence of possession of the original note. Is that right?

A That's also correct.

Q And again, on May 31st HNGH did not have possession of the original note. Is that right?

A That's right.

Q This Item Number 9, sequencing agreement referenced in 7.1. Do you see that?

A Yes.

Q Who came up with this sequence of events?

A I believe I did.

Q All right. And did you get any input from anyone besides your client when you put together Item 9?
A I do not believe I did.
Q Did you get any input from the debtor or any of its representatives when you came up with your sequence of events?
A No. I believe the debtor asked that I prepare a sequence of events, so no.
Q Okay. Let's look at your sequence of events. Number 1, circulate final settlement statement for approval by HNGH, HSB, debtor, and buyer. Is that right?
A Yep. Yes. Yes.
Q Who was supposed to prepare the final settlement statement and circulate it?
A I don't think I've ever been to any closing where a title company did not prepare and circulate that.
Q And was the title company addressed as a party on your email on May 31st at 12:12 p.m.?
A I was unaware of which title company the debtor was using at that time, so no.
Q Mr. Kane, Mr. Kane, you keep telling us that, yet you delivered the special warranty deed to Sendera. Mr. Walji told you who the title company was. Yet you keep insisting that there were other title companies. Yet, I have seen only one instance of there even being a mention of another title company. You knew who the title company was. That is a

question.
A Yeah. Actually, I believe you said, you knew who the title company was. So what is the question?
Q Did you know who the title company was on May 31st?
A No. I -- let me -- and I'm happy to provide clarity on that if you'd like me to.
Q All right. Did you just deliver a special -- executed special warranty deed to any other title company on the 27th of May?
A No.
Q All right. Number 2. Obtain approval of a final settlement statement and authorization to close. Who was supposed to provide that document?
A Yeah. So, again, one was circulate the final settlement statement. Two was make sure the parties who were beneficiaries of the settlement statement approved it. So I would expect that there would be approval from HNGH that HSB or HNGH would deliver HSB's approval. The debtor would sign off. And whatever the funding source would sign off?
Q Okay. Why did HNGH need to be a party to a settlement statement?
A Yeah. Easy. They're the payoff party, so if the payoff settlement statement perhaps said 37 million instead of 40,882,500, they would certainly need to review that and approve that beforehand.

Q Okay. When you go and you close on a refinance or a purchase of a piece of real estate, are the parties that are loaning the money on this settlement statement, do they approve the settlement statement prepared by the title company?

A Well, that's a -- yes, sometimes. I guess we should say --

Q But not normally. If you're borrowing money to provide a payoff on a refinance, the lender provides their payoff, right?

A Right.

Q They're not -- they're not required to sign off on a settlement statement, are they?

A The party receiving the payoff?

Q Correct. They don't sign the settlement statement. They provide a payoff.

A Right. Unless there is some direction, I believe, of where proceeds are being delivered. So I respectfully have seen it both ways.

Q Your request was that this settlement statement in your email would be circulated to your client for approval and to Happy State Bank. Is that correct?

A That's correct.

Q If we look at the next one, 3, fund into escrow. Do you see that?

A Yes.

Q Who would be funding into escrow?

A The funding source.

Q The next point was file agreed rescission deed. Do you see that?

A Yes.

Q When was the rescission deed actually going to be delivered to escrow or is that just a step missing in your line items?

A Yeah. I guess it's a step missing in the line item.

Q And would the agreed rescission be delivered prior to or after the funding into escrow?

A Tough to say. I would say in a normal transaction it would probably be delivered beforehand. In this multi-parallel track transaction where parties were still negotiating the forms of that, I would think that that would create a toss-up on the timing of when that needed to be delivered. But I --

Q All right. So you --

A Let me clarify that. I mean, I'll tell you right now. When we submitted our -- HNGH's special warranty deed, we obviously endeavored to deliver that to an escrow agent in advance of funds being paid into escrow.

Q But again, just going through your sequence of events here that -- is that right?

A Yes. It is. That's right.

Q Okay. All right.

A It appears so.

Q All right. You said file agreed rescission deed. And then your next item is file HSB rescission of collateral assignment. Is that right?
A That's right.
Q So your order of events -- first of all, there's -- you don't have anything of a delivering the rescission of collateral assignment to the escrow agent, right? That's just a step that's missing.
A Right. I mean, I -- I understood that that was in the process of taking place, so I didn't -- I didn't believe that that was -- it was necessary for that to be included. I thought that was in transit or so.
Q Okay. So, and again, I'm just trying to understand. So in your sequence you would file the agreed rescission deed.
A Right.
Q And then after that was filed, you'd file the rescission of collateral assignment. Is that right?
A That's right.
Q And after those documents were filed, you would then wire the funds to whom?
A Right. So a portion of the funds would be wired to HNGH and a portion of the funds would be wired to Happy State Bank.
Q Okay. Just to be clear, you would file HSB's rescission prior to their actually receiving funds. Is that right?
A Yeah. I mean, the idea here is that it's a concurrent

closing, but yes.
Q All right. And then you said file payoff and release of lien.
A Hold on. Let me actually think about that for a second. I may have that order slightly flipped, but let me think about this. Yeah. You might wire funds first. I don't think it really mattered if it was a concurrent closing, but you may wire funds before you file the HSB rescission of collateral assignment. And again, it says rescission. It should just be release of collateral assignment.
Q All right. If we go down, file payoff and release of lien. We've covered that, right? That would be the next thing.
A Yes.
Q And then we would stamp the note, paid in full, and deliver the stamped original.
A That's correct.
Q And when was HSB supposed to deliver the original note to the escrow agent?
A I actually think that it would be HNGH delivering the original note to the escrow agent on the closing date immediately after funds were wired.
Q Mr. Kane.
A I'm sorry.
Q No. I'm just changing gears for a minute.

A Okay.
Q The Judge said 4:30, so I'm watching my time. Mr. Kane, do you know why a rescission deed approach was taken in the December order?
A Yeah. Sorry. I think I've testified to that, but it was my understanding at the time that the goal was to have a recordable instrument that would return title to the debtor effective October 29, 2021, so that the debtor, on the real property records, would have a continuity of title from October 29th forward.
Q Was Mr. Nambiar incorrect, Mr. Kane, when he -- this is different -- when he said when I -- when was -- I asked, when was the first time it came to your attention that there was an issue with this particular deed. That's the issue regarding Texas, the Texas issue on the document.
And Mr. Nambiar says, "The error was pointed out to me by my counsel, Mr. Kane, at some point after May 31st. I don't exactly recall when." That's Mr. Nambiar's testimony. That's different than what you told us. You told us that you brought it to his attention before the special warranty deed was signed.
Is he simply incorrect?
A Yeah. So I can't recall. It may have been Mr. Christensen that brought -- okay. So there's -- let me -- I think I can clarify that.

Q Okay.

A I think that Mr. Nambiar was aware that there was a Texas LLC issue on one draft that he signed, but I believe that Mr. Nambiar had voiced a concern. Maybe it was Mr. Christensen, but I think that Mr. Christensen has testified to that, that it was supposed to be a Delaware LLC and that I failed to catch it.

Once it was executed, it still said Texas LLC, so I think Mr. Nambiar may have overseen that, just missed it when he was executing it and having it notarized and believed on a go forward basis because that issue had been brought up that the document that he signed said Texas LLC.

So he may not have actually learned that the executed, notarized document that had been delivered said Texas LLC, the second signed document, I'll say, until sometime after May 31st. So that statement is likely correct.

Q All right. Then Mr. Nambiar said when I asked him, do you know if your company were to retain title to this property how this error in this document could be corrected, and he said, that's a question for my counsel.

So I'm asking you, Mr. Kane. If the debtor is entitled to retain title or obtain title to this property, how is it that that issue regarding Delaware and Texas is going to be corrected?

A I want to try and clarify that. Do you mean if HNGH

retains title to the property?

Q Either way. If HNGH retains title, how do you correct that error?

A With a correction deed.

Q Signed by whom?

A Signed by HNGH Turtle Creek, LLC.

And if necessary, and I don't know if it's necessary. I admit I'm not, you know, a 40 year trained real estate lawyer, but presumably there's no dispute that the deed in lieu was to be a valid recording given the agreed judgment and agreed findings of facts that are included in that agreed judgment. So presumably the debtor would not have a very good argument that the Texas LLC be Delaware LLC was anything other than a scrivener's error or mistake. And so a correction deed should just be filed addressing that issue.

Q Okay. And what about the other way? What if the debtor has the right to retain ownership or obtain ownership of this property? How is the error corrected?

A Right. So I'm trying to see. You mean if they're -- if the debtor -- let's say hypothetically the debtor had satisfied the payoff and it was going to retain the property?

Q Right.

A In that instance, a rescission deed would have been filed, but the rescission deed -- I mean, if a rescission deed or a rescission instrument was filed, it would unwind the deed in

lieu in the first place and put title back in the possession of the debtor, so I don't think that the issue would still exist.

If you're asking if the debtor had agreed to the form of HNGH rescission deed special warranty deed and signed it and that had been filed, then I think there would still have to be a correction, which as I understand it, a correction deed is no big deal.

Q All right. But we would have to come back to you and your client to get that correction deed, right?

A Maybe.

Q Well, you don't --

A I don't know.

Q You don't know?

A I don't know.

I don't know if we would have to be a necessary signatory on it or not. I'll tell you if there had been a payoff and that issue had been noticed after the fact, I certainly don't know any reason why HNGH wouldn't agree to that correction deed.

Q And just to be clear, Mr. Kane, your clients told us, Mr. Nambiar and Mr. Christensen, that you're the person that would best know when that special warranty deed that you drafted -- what you call the rescission deed -- was drafted and held by your office. Is that a fair statement?

A Yeah.

Q Mr. Nambiar testified that regarding the closing on the 31st that they were working on signing the documents. And that's when I heard from Mr. Kane in the afternoon that we had been told to go pencils down. No closing was occurring. Are you the one, Mr. Kane, that instructed the pencils to be put down?

A Yes.

Q And why did you instruct the pencils to be put down on the 31st?

A Because I received an email from you at approximately 4:24 p.m. noting that this was not going to close on May 31st, so we did no further work.

Q Can you tell us what email that was? Is it marked as an exhibit?

A It is. Just a moment.

Q Sure.

A Yeah. It's 4:26 p.m. It's Exhibit Number 90 at the bottom. You state, "Jeff, my client is still trying to close this transaction" -- blah, blah, blah -- "but all the title documents are coming in so late or not at all. We are not able to close today."

Q Okay. Let's take a look. Let's pull that exhibit up. Exhibit 90, Page 1 of 2.

A Okay. I'm there.

Q All right. And this is an admitted exhibit. It's an

email from to Jeff Carruth and I believe you're copied on this, the one in the middle. Is that right?
A I'm copied, I believe, on all of these.
Q Okay. The email at 4:39 says, "We've not seen a signed release. We also asked to have the original note and did not get an answer to that. We assume your client is holding it. Jeff, a few weeks back we were told Happy State Bank had nothing to do with this deal at all. Now we're being told the title company is supposed to pay the bank at closing. This deal needs to fund and close and can if done in an orderly manner."
Do you see that?
A I do.
Q That was at 4:39. Is that right?
A Correct.
Q Look at the next page, Page 2 of 2. Again --
A Yes.
Q -- an email that you're copied on.
A Uh-huh.
Q "My client is trying to close this transaction with HNGH, but all the title documents are coming in so late or not at all. We're not able to close today. Please make sure nothing happens on your end until we can sort this out. We never received anything except the payoff notice today. I think you were going -- trying to get a release. Also, don't recall

seeing a release. We did not see an executed release. And then we talk about not paying off Happy State Bank."
     Do you see that?
A    I do.
Q    Okay. Were those emails specifically addressed to you?
A    I am copied. I see my email address, jkane@krcl.com.
Q    All right. Did I send you an email specifically, Mr. Kane, telling you to ask your clients to put pens down, that this transaction is not going to close?
A    With that language specifically? No.
Q    And just to be clear, the decision to put pens down on your client's side was made by you. Is that right?
A    I believe that's correct.
Q    Okay. And, Mr. Kane, is it true when your client said he was -- this is Mr. Nambiar -- was never provided a list of the Item 33a exhibit, Lender's Exhibit Schedule C from Sendera Title? Is that an accurate statement?
A    I don't recall.
Q    When Mr. Nambiar said "that's something that we were leaving to our counsel to handle," is that referring to you?
A    I don't know if that was referring exclusively to me or also to Mr. Christensen.
Q    When I asked Mr. Nambiar what the emergency for having these hearings was, his answer was, that's a question for my counsel. Is that a question that's supposed to be directed to

you?

A I believe Mr. Nambiar later testified to the damages that were being incurred. I filed the emergency motion.

MS. LINDAUER: Your Honor, if we could take a break for a couple of minutes, I may be done at this point.

THE COURT: I'll just sit here and you can --

MS. LINDAUER: Okay.

THE COURT: -- take whatever time you need. I don't want to take a recess again. Just let me know when you're ready, but I'm going to stay right here.

(Off the record from 4:20 p.m. to 4:22 p.m.)

MS. LINDAUER: Your Honor, I'm going to pass the witness at this time. Thank you.

Did that come on? I don't know. Can you hear? Sydney, can you hear me?

THE COURT: Okay. There we go. Thank you.

MS. LINDAUER: All right. Sorry. Sorry, Your Honor. So I said --

THE COURT: So I put a time limit on you. Are you satisfied you were able to ask the questions you wanted to ask?

MS. LINDAUER: I hope so, Your Honor, but I think so. Thank you. Thank you for asking that.

THE COURT: Mr. Kane.

MR. KANE: Yeah. Thank you, Your Honor.

I'm trying to use these -- if I can also have -- and

I apologize for this. I just didn't quite get finished with whatever I was trying to do. Just two minutes to get my exhibits up, which I think will greatly expedite my rehabilitation, which I will try and keep fairly short, Your Honor.

THE COURT: Okay. That's fine.

MR. KANE: I just need a few minutes.

THE COURT: That's fine. I'm going to mute myself and stop the video. But when you're ready, let me know.

MR. KANE: Thank you, Your Honor. I will.

(Off the record from 4:23 p.m. to 4:26 p.m.)

MR. KANE: Your Honor, this is John Kane. I'm back and ready to go.

THE COURT: All right. Ms. Lindauer, I see you. Are you ready?

MS. LINDAUER: We are, Your Honor. Thank you.

THE COURT: So, given the unusual nature of what's going on here with questioning counsel and now the, I guess redirect, I don't want to tell you to testify slowly, but be deliberate so that if the other side wants to object, they can. So we'll go from there.

Go ahead, Mr. Kane.

MR. KANE: Thank you, Your Honor. And just for clarification on that, I did understand that I was allowed to rehabilitate myself with narrative testimony, so I am intending

to do that.

THE COURT: Yes. I understand. And that was my point was that if while you're providing your narrative testimony they object, I'm not sure of what else to say other than we'll see how this goes.

But, yes, go ahead.

MR. KANE: Okay.

CROSS-EXAMINATION

MR. KANE: The first thing I'd like to do is address some of the timing of Sendera Title's request, which was the subject of my testimony on Wednesday.

And as shown on Exhibit -- Lender's Exhibit 24, Sendera requested only three things on May 10th: a payoff amount, acknowledgment that HNGH would go through with a rescission deed to return title to the debtor at payoff, and a confirmation order.

MR. RODRIGUEZ: Objection, Your Honor. The document speaks for itself. Already in evidence. He can argue this in his closing brief. This is not having anything to do with rehabilitating his own testimony.

THE COURT: So is your objection the document speaks for itself?

MR. RODRIGUEZ: Yes, Your Honor.

THE COURT: Under which rule?

MR. RODRIGUEZ: How about 403, 611?

THE COURT: Okay. I'll sustain the objection. I'm familiar and actually, I remember that email and I remember the three things that were requested, so I will sustain the objection.

MR. KANE: Okay. HNGH delivered responses on May 10th. We received no further correspondence or I, personally, had no further correspondence with Sendera Title for nearly two weeks. The first time that we received a response was on May 23rd from Sendera Title. And then on May 24th, Tuesday, a week before closing, Sendera requested assistance with certain exhibits, which is shown on Exhibit 33 and 33A.

My understanding is Sendera's request at Exhibit 33, which I'm happy to put on the screen --

MR. RODRIGUEZ: Objection, Your Honor. That is beyond the scope of the direct examination. And again, the document here speaks for itself. I'm citing Federal Rule of Evidence 403 and 611.

THE COURT: So the 403 and 611 objection is overruled because he's -- in his preamble, he said that his understanding is going to be something. And the -- remind me the first objection.

MR. RODRIGUEZ: Beyond the scope of direct, Your Honor.

THE COURT: That's overruled.

(4:30:00)

MR. KANE: So Your Honor, my understanding of this document was not necessarily that Sendera Title was looking for HNGH to clear up every little item included on Schedule C. But that there was a focus that Sendera Title was asking HNGH to address related to Axos' termination and the Happy State Bank collateral assignment of note and lien.

After receiving this, I focused on addressing those specific issues first. Because I was concerned that those might be the most time consuming and that those could be clouds on title that might preclude a title company from issuing a title policy, which could slow down the potential closing process.

I eventually learned that the Axos termination was already recorded. And so I didn't feel like I needed to draft anything new or to contact Axos Bank to try and get some resolution from them. And that Axos Bank termination that was recorded was provided to the debtor's counsel on may 27th.

With that, Your Honor, I turn my attention to the Happy State Bank issue. But before I address that, I do want to make clear that up to that point, the only request that we had received prior to May 24th, from Sendera Title, the debtor, from any party, was related to the rescission deed and the payoff amount.

Once we received this request from Sendera Title, shown as Exhibit A -- or Exhibit 33, and the title commitment

at Exhibit 33A, I immediately contacted my real estate lawyers for assistance addressing those specific issues. And to figure out how to resolve specifically the Happy State Bank issue.

Now at this point, on May 24th, it was still unclear to me what closing documents the debtor was expecting from HNGH. Our belief was that this was the debtor's closing. And I anticipated that the debtor would likely run first drafts of closing documents. Since I had received silence from May 10th, I reached out to the debtor to see what the status was of the potential closing.

And that, Your Honor, is at Lender's Exhibit 45. At this point, Your Honor, I was requesting a status conference from the debtor, to see if we were actually going to have a closing. We wanted to know where the debtor's team stood on moving along with the potential closing.

I received a response from Ms. Lindauer, that yes, she would be interested in having a conference call, but no dates were circulated. So I followed up again on May 18th. And that, Your Honor, is shown on Lender's Exhibit 48.

I asked Ms. Lindauer if we could have a conference call. And one of the things I was specifically concerned about was what documents the debtor was going to provide. When would we get drafts of closing documents? At this point, on May 18th, I anticipated that the debtors' attorneys, Walji and Ms. Lindauer, and whoever else they had working on this

transaction, would be preparing material drafts of closing documents for our review.

For HNGH's review other than the rescission deed. Now part of my discussion with Ms. Lindauer, on the 16th, was about whether the Barton guarantee suit was causing a problem for Mr. Barton and his ability to raise money.

Now I did not believe that any sophisticated party reading the agreed orders would actually share that concern. But we did seek to appease the debtor on that point So as shown on Exhibit 47 -- this is Lender's Exhibit 47. Now here we had an explanation from Ms. Lindauer, I know the document speaks for itself.

I suggest you just sign the dismissal order. And this part of the exhibit, this Joyce Lindauer email down, is actually in the Debtor's Exhibit list, also. And has been admitted. But this top piece was left off of theirs. I have attempted during this case to appease Ms. Lindauer's concerns and to assist the debtor in its efforts to raise funds.

And this is one of those examples. Where Ms. Lindauer requested that we have a dismissal order in hand, so if any party was concerned about the outstanding Barton guarantee suit, it could be resolved.

I offered to have that executed and held in escrow, if Ms. Lindauer would just send over a draft of that document. But no such draft was ever sent over. So the 18th is shown on

Lender's Exhibit 48. We have another email exchange about what's happening with closing where I want a list of documents that we're going to be receiving soon, and a closing checklist. What does the debtor need at closing.

I did not receive that checklist, but we did have a conference call. On May 20th, Mr. Walji, Ms. Lindauer and I had a conference call to discuss the status of closing. I received assurances from Mr. Walji that the debtor was moving to a closing. That the debtor was working on documents. But that an issue had come up with the title company regarding Happy State Bank.

Now as I noted in Ms. Lindauer's questioning, I informed Mr. Walji that I did not believe that Happy State Bank was a party to the closing. And that the debtor needed to be focused on insuring that HNGH was paid off at the closing. While I was aware at the time of my client's relationship with Happy State Bank, I was not personally aware of the Happy State Bank collateral assignment of note and lien.

That was Friday, May 20th. As shown on Exhibit 33, we received the title commitment on May 24th, from Sendera. After reviewing the title commitment, looking at 33A, looking at schedule C, clicking through on the links for the Happy State Bank collateral assignment of note and lien, I realized that the Happy State Bank issue was going to have to be dealt with by closing.

THE COURT: I apologize, Mr. Kane. It was May 24th you said?

MR. KANE: The conference call was on May 30th, Exhibit 33 and 33A, the title commitment, was first provided to me by Sendera Title on May 24th, the following Tuesday.

THE COURT: Okay. I gotcha. Now I'm with you.

MR. KANE: So after reviewing the Happy State Bank collateral assignment, I agreed that the Happy State Bank collateral assignment of note and lien was something that would need to be addressed to provide clean title at closing. And at that point, I immediately reached out to my real estate counsel in the firm, to try and get assistance, to see what documents we would need to resolve that dispute.

Now I was asked a lot of questions about this Happy State Bank issue. And I understand that the debtor, based on Exhibit 33A was aware of the Happy State Bank cloud on title sometime between May 15th and May 18th at the latest. And that's shown on schedule C of Exhibit 33A which have links to the collateral assignment of note and lien.

So it was my understanding that everyone on the debtor's side knew that that Happy State Bank collateral assignment of note and lien had to be addressed. Now whether it was going to be addressed at a payoff. Whether HNGH was going to pay off Happy State Bank and obtain the release of lien is a different story. And I understand that other people

could have had different understandings about how the Happy State Bank issue was going to be resolved.

But it's my understanding, and it was my understanding, that all parties understood the Happy State Bank collateral assignment of note and lien did have to be resolved by closing. And so I understood that there are multiple ways to skin the proverbial cat.

Our firm determined that the path of least resistance was to just ensure that Happy State Bank was paid off from HNGH's proceeds at closing. From our perspective, from my understanding, from my experience, it's just a line item on a closing statement from funds that are already paid into escrow for closing by the third party.

It doesn't effect the third party payor. Right. The money comes into the escrow account. The only issue after that is about how it is disbursed. And it is my understanding and it was my understanding while I was working on this Happy State Bank issue, that any party paying money into the escrow account for funding at closing, would want to have clean title.

And one of the ways to ensure clean title was to ensure a pay off of Happy State Bank at closing from the funds that were in the payoff amount due to HNGH. No more money for any other party. All it was, was a line item on the closing statement.

So it was my understanding that if money was paid

into escrow, and I believe that Mr. Barton admitted it wasn't, that a concurrent closing would have satisfied the Happy State Bank issue and clear title.

It was also my understanding that that would obligate Happy State Bank to deliver to HNGH the original note. And it was my understanding that Ms. Blakely was on standby to deliver the note. And that Mr. Christensen was prepared to get in his car and go pick it up, so that HNGH could deliver the note to the title company at closing.

Now we provided clarity of our plans to the debtor at 11:00 a.m., four hours before any potential wire deadline and provided Happy State Bank's wire instructions to the -- so the title company could execute the line item. And that, Your Honor, is at Exhibit 72. That's HNGH's Exhibit 72. And Exhibit 72A.

And now I want to go back to this Exhibit 72 and address some of the questions that I received from Ms. Lindauer. I was questioned on why I didn't provide Happy State Bank's lawyer title company information.

THE COURT: Mr. Kane, can I stop your real quick?

MR. KANE: Yes, Your Honor.

THE COURT: My brain's following along. You had mentioned that the issue with Happy State Bank would be satisfied with a concurrent closing. And I've heard other testimony. It might have been Mr. Barton that said this could

have been done at a simultaneous closing.

So with the Happy State Bank note, am I correct that Ms. Blakely would provide the note to somebody who would take it to the title company, which would hold it in trust?

MR. KANE: Some --

THE COURT: And then when the funds were received -- help me. I'm just trying to understand the mechanics.

MR. KANE: Yes, Your Honor.

MS. LINDAUER: Your Honor --

THE COURT: In my mind I've heard simultaneous closing, concurrent closing. And that's kind of what --

MS. LINDAUER: Your Honor, let me address that because I think the best thing to do would be to actually read what Ms. Blakely said.

THE COURT: No. I'm asking for Mr. Kane's understanding of how this --

MS. LINDAUER: Understanding. Okay. That's different.

THE COURT: -- was going to --

MS. LINDAUER: Understand. Okay. Understand now.

THE COURT: I want to know Mr. Kane's understanding of the mechanics of how the concurrent closing would happen with the note.

MR. KANE: Yes. Yes, Your Honor.

So it was my understanding on the 27th, on the 30th,

on the 31st, that what would happen is Happy State Bank would retain possession of the note. There would be an acknowledgment that the note would be delivered upon payment.

Payment would take place and the release of collateral assignment of note and lien would be recorded. At that point in time, Happy State Bank can't stamp the note paid and delivered. It can't do it. Because the note hasn't been satisfied in full, just because HSB got its money. Right.

When HSB gets its money, the note and -- or the collateral assignment is terminated. It's released. And the note must be delivered back to HNGH. So it was our understanding -- it was my understanding. Let me clarify that. It was my understanding as counsel for HNGH, that Mr. Christensen would haul butt in his car over, get the note, and go deliver it wherever it needed to be, stamped paid in full. Because the wires have been exercised.

So that at --on the same closing date, the party that was participating in the closing, could receive the note stamped, paid in full.

THE COURT: All right. Thank you.

MR. KANE: So I do want to direct the Court's attention to this Exhibit 72 because I received a series of questions about why I didn't provide Jeff Carruth, HSB's counsel, the title company information. And I believe Ms. Lindauer has noted previously that this email in which

instructions about payment are being delivered was also delivered to Julie Lyssey.

And this was before Mr. Walji at 3:17 p.m. disclosed who the title company was. So here is first why Julie Lyssey was included on this email and these instructions. This is really an email to the debtor's counsel. We did know that Sendera was one of the title companies that was participating in parallel tracks in a potential closing.

And so out of an abundance of caution, we delivered these instructions to the debtor's attorney, and also to Julie Lyssey. I would have delivered it to both other title companies who are purportedly involved in this transaction if I had what I believed was solid contact information for those individuals. I didn't have it.

I hadn't received any correspondence from those individuals who are actively engaged in parallel tracks, to my knowledge, other than Julie Lyssey. But that does not mean I was not informed that the debtor was working with multiple companies, multiple escrow agents, or title companies, at that time.

And I do want to walk through that. So Ms. Lindauer questioned me some about a conference call that I engaged in on Friday, May 27th with Ms. Lindauer and Mr. Walji. And at that point it's a high-stress conference call. I understood the debtor was working on trying to get their closing locked up.

And we were, too. That was my understanding at the time.

I understood at that point that First Guaranty Bank anted more time, couldn't close by May 31st. I also had learned at that time that First Guaranty Bank had not been using Sendera Title. On the call with Ms. Lindauer and Mr. Walji we discussed that the debtor was running multiple parallel tracks.

It is my recollection that at that point, I learned from Ms. Lindauer and Mr. Walji that the debtor was actually engaging with at least three title companies. Now I did not know who those title companies were, other than Sendera. And if they were disclosed on that conference call, contact information for the individual escrow agents at the other title companies was certainly not provided then.

And so given the debtor running multiple parallel tracks, I did not know during that call, or after that call, which title company the debtor would actually close with on May 31st. Now I'd like to direct the Court's attention to Exhibit 58.

And I'll scroll down to Mr. Walji's email to me. Because this was, and I believe Mr. Walji had testified to some degree about it, an email where he set forth points from the conference call.

And it's my recollection, Your Honor, that this was very shortly after the conclusion of our conference call. And

so on this conference call -- this shows that the call took place. I don't need to read through it. But you can see that there's a huge disagreement about this bottom points which refers to this point 5 in Mr. Walji's email, which refers to a potential extension. I believe Mr. Walji provided some testimony on that.

But at this point, when this exchange took place, after the call at 4:45 p.m. on Friday afternoon, I had been informed the debtor was working with multiple, at least three, different title companies and was pursuing these parallel tracks.

Now at that time, I had already couriered the wet signed HNGH rescission deed to Sendera Title. That took place before I learned that there were three title companies in town.

So I just --I can't stress enough that we did deliver documents to Sendera Title. That is correct. They are the only entity to which we delivered the wet signed rescission deed to. But that is because that took place before I learned that there were multiple title companies in play. Now we still were getting requests about this exhibit -- or about the Axos termination.

So we located the Axos' termination documents. And I apologize. I have to pull this up, Your Honor. And we delivered them to debtor's counsel. And this is at debtor's -- or sorry, Lender's Exhibit 56 and 56A.

THE COURT: Is this the one that Mr. Nambiar said he pulled over on the side of the road to obtain?

MR. KANE: It was Mr. Christensen, but yes.

THE COURT: Mr. Christensen, I'm sorry. Okay.

MR. KANE: Right. And so we had delivered this to the debtor at about 4:25 on May 27th. I don't think that Mr. Walji was aware of that until during the conference call, when I had disclosed that we had already sent it during the call or immediately before our call.

THE COURT: Is this -- I'm having a hard time reading it. Is this Exhibit 56 or 58? Are we still on 58?

MR. KANE: This is Exhibit 56.

THE COURT: 56, okay.

MR. KANE: Right. And then Exhibit 56A, Your Honor, this is just the Axos' termination, that was attached to that email. I don't need to spend any time on this. I just -- for full disclosure, I didn't want to provide 56, without showing what the attachment was.

And then I also sent over to the debtor on that same evening, this -- I'm sorry, Lender's Exhibit 61. Which included a draft of the Happy State Bank collateral assignment of note and lien. Or release of that document.

It's mentioned in the attachment here. It's not included as Exhibit 61A. It's the same document that was included in Exhibit 60A. And this is that Lender's Exhibit

60A.

It's just a release of the collateral transfer of note and lien related to Happy State Bank. Again, don't need to spend any time on this. I just wanted to disclose to Court what was actually sent to the debtor. Now the important part of that, Your Honor, is that at Lender's Exhibit 62, there is an exchange between me and Ms. Lindauer, that took place after the conclusion of that Friday, May 27th afternoon call between me, Mr. Walji and Ms. Lindauer.

Now after I provided the recorded termination of the Axos Bank collateral assignment and release, Ms. Lindauer here at 5:11 asks me to send it to the title company. And Your Honor, I responded that I didn't know because the debtor was working with multiple title companies. And Ms. Lindauer confirmed my understanding, noting that that's fair.

So on May 27th at 5:19 p.m., my understanding was that the debtor was working with three different title companies, and me not delivering it just to Sendera was a fair move because the debtor was working with multiple title companies at the time, as it pursued its parallel tracks towards closing.

So 5:11 after Mr. Walji's synopsis from the call, I forward the instrument. 5:11 I immediately respond I didn't know who to send it to. 5:19 that evening, that's fair.

Now that's not to say I didn't request information

about who the final closing title company was. Because I did that. And if Your Honor turns to Lender's Exhibit 73, you scroll down to the bottom. I received a request from the attorney that I understand to be Happy State Bank's counsel, requesting very specific information.

And that specific information was not just hey, what title company it is. Have you had any contact with any title company. It was what's the name of the escrow officer. What is the title company file number or G.F. number And then do you have contact info for the title co escrow office, plus physical address.

Now again, this is following an exchange that I had with Ms. Lindauer where I was informed they were working with multiple different title companies.

So I asked Ms. Lindauer just four minutes after Happy State Bank asked me that question, if she could provide the information to HSB's counsel. And what I understood from Ms. Lindauer's response, that she was working on it now. Was that she was preparing to deliver the title company information to Happy State Bank. That's what I understood working on it now to mean.

I received contact from Mr. Carruth at a later point in time that same day, noting that he had still never heard anything from the debtor about who the final closing title company was going to be.

And I would turn your attention, Your Honor, to Lender's Exhibit 78. And this, Your Honor, I think aptly shows what I was doing at that time. I again asked Ms. Lindauer, will you please provide that. I understood at the time that Ms. Lindauer had been working on it for two hours, but had still not delivered the final title company information, including the title company file number or whatever to Mr. Carruth.

So I asked her again. I know you're working on this, but we're running out of time. Will you please get this information to Happy State Bank. And Your Honor, to my knowledge, that information was never provided.

And if we look at Lender's Exhibit 90, we see a considerable email chain where Mr. Carruth asserts on multiple occasions that he had a executed release ready to deliver all day long. And what was waiting on was the delivery of title company information.

And as I noted on my testimony, it's fine that Mr. Walji said at 3:19, the funding party -- or 3:17 p.m. that same day, the funding party is Mr. Kickham and Sendera is the title company. But within 20 minutes after that, he also circulated a letter that showed that Mr. Kickham and the PLN Group couldn't close on May 31st.

And so running parallel tracks, that means then that the funding party, if the closing was going to take place, had

to be somebody else.

And if it was going to be somebody else, then it was again unclear who the title company would be.

So Your Honor, it was never my understanding, at any point on May 31st, that it was my obligation or HNGH's obligation, to deliver the debtor's title company information to Happy State Bank.

I felt like, at the time that was an intentional stymie by the debtor, to prevent the delivery of documents that were necessary for closing so it would have a scapegoat.

Now I -- that wasn't the only reason I believe that a stymie was taking place. I had not received any comments back from the debtor on our revised -- the HNGH revised agreed rescission instrument.

It wasn't until sometime around 2:00 that Mr. Walji just rejected HNGH's proposal, with no proposed revisions; no proposed comments; no attempt to meet in the middle. Nothing. I received no comments on HNGH's proposed payoff and release of lien and release of assignments of leases and rents.

And Your Honor, this goes back to my understanding on May 18th through May 20th, that the debtor would be preparing these documents in the first place, because this was the debtor's closing. Now I will readily admit that in most of my secured creditor transactions, it is the secured creditor that is willing to prepare and provide a payoff of lien release and

release of assignment of leases and rents.

That is why I provided it. But having not obtained approval on any of the other forms of documents that I had previously circulated to the debtor, I felt it was not only prudent, but necessary to ensure that we had the authorization of the debtor for the form of the closing documents that we were seeking to have HNGH execute.

Now when I confronted Ms. Lindauer on that issue, on the closing date, Ms. Lindauer informed me that she was circulating those documents to the interested parties. And that, Your Honor, is found at Lender's Exhibit 75.

I asked if we had a green light to get the agreed rescission of deed signed. And I asked if we had any comments to our payoff and release letter. Again, I was informed that Ms. Lindauer was just circulating those documents for review.

That was very disconcerting to me at the time. And another hour passed, Your Honor, and I had still not received any comments, which I found deeply unsettling. So I contacted Ms. Lindauer again at about 12:48, which is shown on Exhibit 77. That's Lender's Exhibit 77.

And again noted that I hadn't heard back. And I pleaded with Ms. Lindauer that if we were going to have wet signatures on recorded instruments, if we were going to have signatures and notarizations, if we were going to have courier documents over, we needed approval, and we're running out of

time.

Now Your Honor, I do not recall ever receiving any redlines of the payoff of release and lien. We didn't ever receive a redline or any proposed revisions on the agreed rescission instrument.

I understood at 12:48 that Ms. Lindauer was going to be providing the title company information to Happy State Bank. I understood later, at around 4:25 on May 31st, that that never took place.

So when I circulated this email at 12:48 p.m. on May 31st, I admit that I had grown quite skeptical that the debtor didn't have its money lined up, and was financially incapable of closing a transaction.

We'd circulated documents on May 12th, with no comments until May 30th. I had circulated documents regarding Axos on May 27th. Mr. Walji was asserting that the Axos termination was still an outstanding issue at 1:44 on May 31st. And that in that interlineated email exchange that we previously looked at.

I circulated the Happy State Bank collateral assignment and release. I did get comments from the debtor on that on May 30th. I circulated those back to Happy State Bank that same evening.

I understood that they were executed and ready to deliver. But that the debtor wouldn't take the menial step of

providing title company information to allow that to take place. We circulated the agreed rescission instrument with comments after HNGH's rescission deed was -- I'm sorry. After HNGH's special warranty deed was rejected. Two hours after I received that document, and we never received comments back.

The indicated to me, Your Honor, that the debtor was really not in a position to close. And that it was really a financial position issue. There was nothing else that I understood at that time, that could explain why the easy blocking and tackling wasn't taking place.

Why we weren't getting comments. Why we weren't getting authorizations. Why Happy State Bank didn't receive title company information.

And so that led me to believe, Your Honor, that the debtor was setting a trap, so that it could blame us for its failed closing. I knew for a fact that the debtor already possessed HNGH's wiring instructions, because the debtor had not only sent wires to HNGH during the bankruptcy case, but it had other parties send HNGH the consideration payments due under the agreed order at Docket Number 64.

I sent those wiring instructions anyway on May 31st, so the debtor couldn't claim, well, we couldn't never close because the condition precedent to closing was our receipt of wiring instructions and you never sent them.

And Your Honor, my delivery of those was at Exhibit

86. Lender's Exhibit 86 and Lender's Exhibit 86A. I readily admit that those were delivered at 3:52 p.m. I delivered them at 3:52 in an effort to avoid a trap. And Your Honor, I've been questioned about why they were delivered so late, as if I had held them to trap the debtor. Which was absolutely not the case.

And I want to be abundantly clear, my testimony is on the record. That the reason this was sent late, despite the fact that I knew the debtor already possessed this instructions, was so we had evidence that we sent them before the expiration of the payoff deadline.

And last, Your Honor, I do want to address this encumbrance certificate issue at Lender's Exhibit 83. It is my understanding that the encumbrancy certificate is typically provided to show authority to enter into a specific transaction.

It is not just we have authority to enter into any transaction. It is showing that there is authority to enter into the transaction in question. The issue here with the delivery of the encumbrancy certificate is that there wasn't an agreement between the parties about what instrument was going to be recorded to rescind the deed in lieu.

The reason that my email includes a reference into entry into the agreed rescission deed we sent over, was because that is what I had authority from my client to enter into.

I had already expressed concerns to the debtor through my revisions, that a number of provisions of their proposed agreed rescission of deed instrument, circulated on May 30th was not sufficient. I believed that there were provisions of that document, representations and warranties, that were materially inaccurate that I could not advise my client to sign.

Right. The rescission deed would require my client -- or the rescission instrument that Mr. Marx provided, would require my client to represent and warrant that it had no interest in the property. And concurrently with the filing of that document, would be a reinstatement of a note and deed of trust.

That was one of the revisions that I believe, me, personally, was fatal to the instrument. And so I proposed what I believe were very insignificant, but necessary revisions.

I did not believe that it substantively changed the document. There was no nefarious reasons, as Mr. Rodriguez has suggested on multiple occasions, for certain revisions made to that document. It was to clean up what I believe were inconsistences factually, between Mr. Marx's draft and the agreed adversary proceeding judgment.

And then also to resolve certain provisions that I felt were inconsistent with the agreed order and the

reinstatement of the note and deed of trust. And there's been questions about whether an executed reinstatement of note and deed of trust have been provided. And whether that would be a condition precedent to any closing, because they're required of the agreed order.

The HNGH special warranty deed that we circulated would be a written agreement between the parties, executed by both. Illustrating the intent to reinstate and in my opinion, would reinstate, or allow the reinstatement of the note and deed of trust.

I understand that that provision was removed in Mr. Marx's draft and there may have been oversight on that issue. I believed and I do believe that the agreed order would be enforceable for the reinstatement of the note. And that a separate legal document, or separate document might not be necessary anyway.

MS. LINDAUER: Your Honor, hang on.

MR. RODRIGUEZ: Your Honor, we'd like to lodge an objection to all the instances where Mr. Kane self-identifies that he's giving an opinion.

MS. LINDAUER: Right.

MR. RODRIGUEZ: And also object to his testimony relative to his beliefs. That's not probative of anything in this case. And it's not something that anybody can ever cross him about when he claims to have subjective belief.

So anything relative to opinions or bear beliefs, Your Honor, should be stricken from the record. That is our objection.

THE COURT: So when -- it's 5:07. Mr. Kane has been on his, I guess redirect quite a while. I didn't hear any objections from Ms. Lindauer at the time. So I don't even know what opinion testimony you're talking about Mr. Rodriguez.

This is why it's important to raise objections timely because you've just lumped together and I don't even know what you're talking about.

MR. KANE: Well, Your Honor --

MR. RODRIGUEZ: well, Judge --

MR. KANE: -- to make this easy. Very easy. I'll stipulate that when I said it's my opinion. I'm not providing my opinion as an expert. I'm explaining what my understanding was at the time of this closing, which I do think is very relevant. I do believe it's probative and I do believe it was the subject of almost all of Ms. Lindauer's questioning of me.

THE COURT: Right. And Ms. Lindauer has been asking the questions so I'm not sure why we're tag-teaming here, Mr. Rodriguez. So I guess --

MR. RODRIGUEZ: Your Honor, I'm sorry. I don't know if you have a local rule or anything, or judge specific rule that prohibits, you know, multiple lawyers being involved. But I understand my comments are not welcome and I will not provide

any further.

Thank you.

MS. LINDAUER: Your Honor, I think at least as to the last series of questions, Mr. Kane was giving his opinions on the terms of the December order and what was necessary according to his opinion and why the things they had done met the requirements.

Exactly the kind of testimony I think that we agreed perhaps that Mr. Dooley should not be giving the Court opinions on, which is his legal interpretation, his legal understanding. His opinion. So again, at least as to the last series of questions. I'm sorry Mr. Kane was going so fast, I really didn't want to interrupt him, but maybe I should have.

But at least as to that series of questions, I do think those are outside the scope of what he should be attesting to. And maybe I just need to be more -- I really didn't want to cut him off during this soliloquy, but Your Honor, I -- you know, I will do a better job of that.

But I do think at least as to his last series of answers or statements, to the extent that he used opinion, opinion, opinion, I would lodge an objection to those.

So Your Honor --

THE COURT: So here's the thing. I'm not stating that your objections are not welcome in theory. But one of the problems when you have two counsel like this, is that Mr. Kane

was asking the questions originally. And during Mr. Kane's response, I was expecting that if there was going to be an objection, Ms. Lindauer would raise the objections timely.

That's why when we started, I suggested, you know, that there's going to be a potential problem here. I wanted to make sure that Ms. Lindauer had the opportunity to object. And so I have been I think fairly flexible over the course of these hearings, in allowing both attorneys to speak. But I'm pointing out a problem here that when you raise an objection this far into what he said, I'm not sure specifically what you're referring to.

MS. LINDAUER: I think --

THE COURT: Ms. Lindauer --

MS. LINDAUER: -- if Your Honor --

THE COURT: Ms. Lindauer did ask Mr. Kane several times his understanding of a lot of issues.

MS. LINDAUER: Sure.

THE COURT: And now Mr. Kane is responding with his rebuttal testimony about his understanding of a lot of issues. I'm not taking anything that Mr. Kane is saying as expert opinion testimony.

MS. LINDAUER: Okay.

THE COURT: So --

MS. LINDAUER: Well, I think what drew the objection, Your Honor, was the use of the word my opinion. And I think

Mr. Kane used that several times. And when we get the transcript, we'll have a better opportunity to look at that. But I think it was the use of the phrase my opinion.

It's different to say it's my opinion versus it's my understanding.

THE COURT: Right. It's easy for you to say that now. But he's been going for so long, it's kind of difficult to say after all this time, I want you to strike all the times he said it's my opinion. Because I don't have instant perfect recollection of everything that he said.

That's why it's important to have timely objections, Mr. Rodriguez. And that's the problem when you have two counsel lodging objections and frankly this one came a little bit late. So as I understand it, there's an objection to giving a legal opinion as an expert.

I didn't take any of his testimony as the legal testimony of an expert. Does that satisfy that objection?

MR. RODRIGUEZ: I think it does, Your Honor.

And likewise, thank you, Mr. Kane, for making the stipulation that when he is using the phrase opinion, he's not testifying as a legal expert, he's giving us his understanding. And the debtor's lawyers will try to be much faster. We're just not as smart as everybody else in these proceedings.

Thank you, Your Honor.

THE COURT: And that's why I cautioned everybody at

the beginning of this hearing that I wanted Mr. Kane -- I even said, I don't necessarily want you to testify slowly, even though that's what I said. I wanted him to be deliberate, so that if there was an objection, it could be lodged timely.

And that's the problem with perhaps examination of counsel. Is that we've gone so far into his rebuttal testimony, I don't specifically which objections -- or which opinion statements you're referring to, Mr. Rodriguez.

So do my comments address your concern about opinion testimony?

MR. RODRIGUEZ: Perfectly, along with Mr. Kane's stipulation. Thank you, very much.

THE COURT: All right. Mr. Kane.

MR. KANE: Your Honor, that was the conclusion. I'll pass myself.

THE COURT: It's 5:13. I don't know if I ever want to ask for a time estimate in this case ever again because things just seem to go a lot longer than everybody anticipates.

Are there further questions of Mr. Kane?

MS. LINDAUER: Your Honor, I think we would have a few. I think given the nature of his testimony and how he testified without it being questions and answers, it would be a lot easier for us to ask him questions if we did have his transcript of his testimony.

I know that's not terribly helpful to the Court, but

again, because it wasn't done in a question/answer format, it's a little difficult for us to -- I do have some questions, but I don't know that I have them very thought through right now because there was so much information given in a non-sporadic format, it's a little difficult for us.

I do think if we -- again we're going to come back on Tuesday. If we could just have a little bit of a break. And I promise you can put the stopwatch on me. I won't ask him more than ten minutes of questions on Tuesday. But that would give me an opportunity to at least read what he said.

So if Your Honor is willing to allow me to do that. And again you can hold me to ten minutes, and I'll be happy to do that.

THE COURT: Okay, Ms. Lindauer what -- tell me what your conflicts are on Monday, because we do have a lot of time on Monday. Or is there a --

MS. LINDAUER: Let me --

THE COURT: -- is there no chance, because I'm also concerned -- I heard everybody say we're going to get through Mr. Kane and two or three other witnesses today. And that didn't happen.

MS. LINDAUER: Right.

THE COURT: So I'm not confident that we're going to finish on Tuesday, given the time that we've taken so far. Tell me, if you would, what your conflicts are on Monday.

Because we do have --

MS. LINDAUER: Okay, can I have just a minute to go check my calendar real quick? And I'll let you know.

THE COURT: Sure.

MS. LINDAUER: And I'll see if there's something maybe that can be handled by somebody else. Hang on.

(Pause)

MS. LINDAUER: Your Honor, I've got my calendar for Monday. I could be available Monday afternoon at about 3:00 on. That would give us two hours. That might allow us to finish up witnesses and still keep our closings on Tuesday. If that would work for the Court.

THE COURT: What do you have in the morning because I'm wide open in the morning.

MS. LINDAUER: So Monday morning, I have a 9:30. It's a state court matter, Centennial Bank vs. 4G with a state court judge, via Zoom. I don't know how long that will take. I'm thinking it will take maybe 30 minutes. It's a motion to seal a judgment.

So that's the main thing. I mean if -- I hate to tell you, because again I don't know what -- just like any other court, I don't know what other matters that judge might have besides us. It's always my worry.

So but I could do the afternoon -- well, do you have nothing in the afternoon?

THE COURT: I have some 1:30 matters. I'm going to put you on pause, while I take a quick --

MS. LINDAUER: Yes.

(Pause)

THE COURT: Okay, I'm back. Are the parties there?

MS. LINDAUER: Yes, Your Honor.

MR. KANE: Yes.

THE COURT: So we have some matters Monday afternoon at 1:30. One of them has an hour and a half time estimate. So I think what I'm going to do, if everybody's available, I'm going to ask you to come back at 3:15.

You can -- everybody can dial in at 3:15 and if I'm still going on with the other cases, you can put us on mute. Turn the cameras off and then I'll get to you when we're done. How's that.

MS. LINDAUER: Your Honor, on the transcripts, I know you have to review and okay them. I think we've already ordered the one from today. I believe Mr. Rodriguez has already ordered that. If possible, is there some way you could approve that if they have it Monday morning so that we could have it for Monday afternoon? That would be helpful.

THE COURT: So I guess -- I don't -- I haven't been on the bench long enough here to know in Dallas whether it's always the same court reporter. I think it is.

MS. LINDAUER: It's Liberty Transcripts is who's been

doing it.

THE COURT: Okay. So I guess we can tell them that when they send us the draft to send you the draft?

MS. LINDAUER: Oh, that would be great. Thank you, Your Honor. That would be very helpful.

THE COURT: With the understanding that it's a draft and that when I have a chance to review it, you'll get it once it's approved. But at least you can have the draft. How's that?

MS. LINDAUER: That's excellent. Thank you. Appreciate that.

THE COURT: Okay. Mr. Kane, are you available Monday afternoon, 3:15-ish?

MR. KANE: I am, Your Honor. And we'll try and get a notice of hearing -- or amended notice of hearing on file before that.

THE COURT: Ms. Lindauer, your 3:15-ish works for you?

MS. LINDAUER: That works for me on Monday. Yes, Your Honor.

THE COURT: Mr. Rodriguez?

MR. RODRIGUEZ: Yes, Your Honor. Of course.

THE COURT: And you are, of course, welcome.

(Laughter)

THE COURT: All right. So why don't we recess now

and plan on coming back at 3:15 or so on Monday. Hopefully that other matter does not go over their estimate, but we'll just have to play that by ear.

MR. KANE: Might have another three-week hearing on your hands.

THE COURT: I sure hope not. All right.

(Proceedings concluded at 5:25 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, MICHELLE ROGAN, CRYSTAL THOMAS, and KAREN K. WATSON, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel
DIPTI PATEL, CET-997

/s/ Michelle Rogan
MICHELLE ROGAN

/s/ Crystal Thomas
CRYSTAL THOMAS, CET-654

/s/ Pattie Mitchell
PATTIE MITCHELL

/s/ Karen K. Watson
KAREN K. WATSON, CET-1039

LIBERTY TRANSCRIPTS DATE: JULY 10, 2022