IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Monday, July 11, 2022<br>3:18 P.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For the Debtor: | Joyce Lindauer Attorney, PLLC<br>BY: JOYCE LINDAUER, ESQ.<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

# I N D E X


| | Page |
|---|---|
| Case called | 3 |
| End of Proceedings | 86 |
| Certification of Transcriber | 86 |

WITNESSES

FOR THE DEBTOR:

JOHN KANE

| | Page |
|---|---|
| Redirect Examination by Ms. Lindauer | 10 |

FOR HNGH TURTLE CREEK:

CHARLES ASTER

| | Page |
|---|---|
| Direct Examination by Mr. Kane | 52 |
| Cross-Examination by Ms. Lindauer | 58 |

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| 29 | -- | 51 |
| FOR HNGH TURTLE CREEK: | | |
| 122 | -- | 51 |

(Proceedings commenced at 3:18 p.m.)

THE COURT: (In progress) 2999TC Acquisitions case, Case Number 21-31954.

I'll go ahead and take appearances, please.

MS. LINDAUER: Your Honor, Joyce Lindauer for 2999TC Acquisitions, the reorganized debtor.

MR. KANE: John Kane on behalf of HNGH Turtle Creek, the pre-petition lender.

THE COURT: No Mr. Rodriguez or Mr. Phelan nor Ms. Simmons this afternoon. Is that right?

MS. LINDAUER: That is correct, Your Honor. Mr. Rodriguez had a conflict and, so yeah, so we've gone from what, five engines down to one.

THE COURT: Okay.

MS. LINDAUER: I guess that's what happens.

THE COURT: Okay. On that point, there's something I know I was giving --

MS. LINDAUER: (Audio interference)

THE COURT: -- I was giving a little bit of guidance at the last hearing on some of my other rulings such as the "document speaks for itself" ruling and Mr. Rodriguez is not here and I was actually going to mention this to him.

In case he was curious, at the beginning of the hearing, I know I had said I'm generally a proponent of, you

know, "one riot, one ranger," meaning that my preference is to have one attorney handle the, you know, examination of a witness. And I think at the last hearing that we had Mr. Rodriguez was a little bit surprised that I had raised the issue that there appeared to be some double-teaming or some tag-teaming.

So anyway, we got that resolved at the last hearing, but I did want to let the parties know that at least that was the practice here in the Northern District when I was growing up practicing and it actually is based on a local rule, and it's in Local Bankruptcy Rule 2090-1(e). So not a big deal, but it's just something since there appeared to be a little bit of surprise at the fact that I was generally in favor of having one attorney handle a witness, I just thought I would make that clear.

And, again, I've been fairly flexible throughout the hearing and, in fact, at one point I think I asked Mr. Kane early on when he was not on the stand if he opposed both counsel making objections. And I think at that time he indicated no. So anyway, that was just a heads-up for everybody. I don't want to belabor the point.

So when we last broke, I think, Ms. Lindauer, you said you had about 10 more minutes with Mr. Kane.

MS. LINDAUER: I'm going to try, Your Honor. We did have the ability to get a copy of the transcript, so I do

appreciate y'all releasing that. And I did have a chance to run through it and I'm probably a little more than 10 minutes, but just to go through the cross-examination. I did have a chance to actually have a chance to go through that. But I'll try very hard to keep it down.

There is one issue, I guess. I guess Mr. Kane is still planning on calling two rebuttal witnesses. Is that correct, John?

MR. KANE: Yes. I'll call Charles Aster first as a rebuttal expert to Mr. Dooley. His testimony should be very brief.

MS. LINDAUER: Okay.

MR. KANE: As I previously stated, there are no additional exhibits. He will have a very brief reference to 33A. That is all.

MS. LINDAUER: Okay.

MR. KANE: And then, I will call Mr. Hayden Littlefield. And, on this one, Your Honor, I'm going to try and do my best. Mr. Littlefield is an appraiser who had previously appraised this property I'll be calling as a rebuttal witness to rebut Mr. Barton's testimony of value.

Mr. Littlefield has been available almost every day for about the last five or six different settings. He is traveling today. He forgot his laptop so he's going to attempt to do this by WebEx on his telephone, his smart phone, and he

will be very brief also. But I'm going to try and do my best on that one, given the kind of unfortunate travel circumstances that he's dealing with. He's in Oklahoma at a work project and will likely have to pull over on the side of the road to do his best. And then, we will be done.

MS. LINDAUER: The only reason I brought that up is I think we had one additional witness also, Your Honor, we talked about, which is Mr. Donahue. Both the debtor and HNGH had appraisals done early on in connection with the bankruptcy case both about the December time frame of 2021.

I did visit with Mr. Donahue this afternoon and he did have a conflict this afternoon, but he is available at nine o'clock tomorrow morning. So, John, I don't know if that helps you at all with Mr. Littlefield, but I know the Court has the whole day blocked out tomorrow. We were going to suggest, and again, it's subject to the Court's calendar, but if you would prefer Littlefield in the morning, we could do Donahue in the morning, and then we could look at where we are for closing arguments in the afternoon. But I don't know if that puts you at a disadvantage at all, but that's kind of the schedule we were looking at.

MR. KANE: And, Your Honor, with regards to schedule, I'm happy to take that up in just a bit, but I would like to lodge an objection to the debtor calling Mr. Donahue. A rebuttal witness is specifically to rebut testimony by the

opponent's case-in-chief. The debtor has had an opportunity to call substantive fact witnesses to testify on the topic of value and did so with Mr. Barton. So this idea of a rebuttal to a rebuttal witness when the debtor has had the opportunity to address the issue on a case-in-chief is inappropriate and Mr. Donahue's testimony should be disallowed.

MS. LINDAUER: Well, Your Honor, then I would like to call him in my case-in-chief, then. I won't call him as a rebuttal. But I think the issue of value, honestly, is -- while I think it's important in the overall scheme of things, I didn't anticipate -- and let's be real fair here. Mr. Kane rested the very first day of these hearings and we've allowed him to question every witness as though they were basically his witnesses, right. I mean, he's basically building his case.

Well, I know he's smiling, but that's essentially what he's doing is he's building his case out of our witnesses, and I think that's fine. But when we last left last week, the Judge was very clear. These are the remaining witnesses. We all agreed. There was no issue about -- Mr. Donahue's been out there for a while and there was no issue about Mr. Donahue.

So, you know, then I reserve the right to call him in my case-in-chief then because, again, the value issue, as I said I think is important in the overall scheme of things. But we think that because their appraisal is so low compared to the actual value of this property and there is a CBRE report out

there that I do think it's important to have good opinion testimony, not just the debtor, the debtor's fine, but good opinion testimony on value if the Court feels that value is an issue.

So I think it would, out of fairness, if Mr. Kane had raised that maybe last week. But I know when we left last Friday, Your Honor, we went over remaining witnesses and I know Mr. Donahue was up there as a remaining witness. So I hear Mr. Kane complaining, but then I'd like the opportunity just to call him in my case-in-chief. I won't call him as a rebuttal, I'll just call him in my main case.

THE COURT: So I guess that leads to the question. Was he -- I'm looking at your witness list. I don't see him on a witness list, or did I miss (audio interference)?

MS. LINDAUER: He was not on a witness list, Your Honor. He was kind of added after the fact after they raised this fact that they were going to put on these rebuttal witnesses. Of course, none of the rebuttal witnesses are on any witness list. But after they raised that issue, Your Honor, about value, then we made it very clear that since we had an appraisal at the same time they did, that we would like the CBRE witness to be able to testify about value. So that was the reason that he kind of came in a little late.

And, again, let's not forget, this is -- I know it doesn't seem like it, but this was an emergency motion to

enforce orders set on short notice without proper, you know, 30 days, no discovery, nothing. So, unfortunately, we're treating these hearings, in effect, like they are discovery. We're having to call witnesses that we would otherwise probably have either deposed or questioned possibly another way.

So, again -- but Mr. Donahue has been out there. He has been a known quantity and so I would like to have the right to call him as witness.

THE COURT: Okay. Well, why don't we finish up with Mr. Kane and then first, and then we'll take that up after Mr. Kane is off the stand.

MS. LINDAUER: Okay. Thank you, Your Honor.

THE COURT: So are you ready, Ms. Lindauer, then?

MS. LINDAUER: I am, Your Honor. I don't know how you want to -- normally, I think, you know, we would have Mr. Kane say that he's still under oath and all of that, so --

THE COURT: Right, right. No, I was just asking if there no other comments and if you're ready to begin your questions.

MS. LINDAUER: Oh yeah, no, no, no. No, we're ready. We're fine.

THE COURT: Okay.

MS. LINDAUER: We're ready, Your Honor.

THE COURT: Okay. All right.

Mr. Kane, you're still under oath.

MR. KANE: Understood, Your Honor.

THE COURT: Go ahead, Ms. Lindauer.

MS. LINDAUER: Okay.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Kane, I am going to go through some of your testimony on your cross to the Court. And then the first issue you addressed in your cross was the issue regarding I believe Sendera Title. Do you recall that testimony?

A I don't recall exactly which issue about Sendera Title. I admit I haven't reviewed the transcript of my testimony.

Q Okay.

MS. LINDAUER: If we could pull up -- this would be Secured Lenders Exhibit 24.

And if you drop on down Sydney.

BY MS. LINDAUER:

Q All right. And this was an exhibit, Mr. Kane, that we looked at from Julie Lyssey at Sendera Title where you testified that she identified three things on May 10th that she was looking for. And I believe then this email was forwarded to you to address certain of those items. Do you recall that?

A Yes.

Q Okay. Just to be clear, Mr. Kane, her email does not limit her request to just those three things. Nowhere does she say, "and these are the only things that I need," does she?

MS. LINDAUER: (Audio interference) you drop down a little bit, Sydney, to the next page.

THE WITNESS: Right. It says, "So I just heard from the underwriter as to the BR here." I assume that was supposed to be here, "is what we need," and then, there are three things listed.

BY MS. LINDAUER:

Q Okay. And what did you understand BR to be?

A I guess with regard to the bankruptcy.

Q Okay. All right. And it's not clear. I'm not trying to trick you. It's just not clear from her email what she's referring to when she says BR, but I think all of us would take that bankruptcy. Is that right? That's the way you read it.

A That's what I just said, yes.

Q Okay. All right.

But nowhere in her email does she not say that they still need items that were identified on Lender's Exhibit 33A. We've talked about that one quite a bit. She doesn't ever say, "Oh and by the way, I don't need anything else," does she?

A Not in this email, no.

THE COURT: I'm sorry, Mr. Kane. I didn't catch what you said.

THE WITNESS: Yeah. Sorry. I said not in this email, no.

THE COURT: Okay.

BY MS. LINDAUER:
Q Okay. Then, in your testimony, you did acknowledge, Mr. Kane, that, in or about -- on or about May 23rd and 24th, you said a week before closing, that Sendera did request assistance with certain exhibits shown on -- or certain -- yeah, it says exhibits -- shown on Exhibits 33 and 33A. Is that correct?
A Correct.
Q And you would agree with me that the list in 33A is far more extensive than the items that are shown in the email on the screen above. Is that right?
A There are more than three items listed on Exhibit 33A, Schedule C.
Q And you would agree with me that the items on 33A are more typical items you would see in connection with a real estate closing, correct?
A They are items that I would typically see in association with a title commitment related to a real estate closing, yes.
Q Okay. You also testified that it was your understanding of this document that it was not necessarily Sendera Title was looking for H and H [*sic*] to clear up every little item on Schedule C, but there was a focus asking about the Axos termination and the Happy State Bank collateral assignment of note and lien. Do you recall that testimony?
A Yeah. What are you talking about? I had nothing to do

with Exhibit 24.

Q No. I'm just talking about -- I'm not referring to Exhibit 24. Just your prior testimony was that you were aware that Sendera was also looking for documentation regarding the Axos termination and the Happy State Bank collateral assignment of note and lien. Is that right?

A Yeah, I believe my testimony was that when I received the correspondence from Sendera on May 24th that that was what I understood to be their primary request from HNGH.

Q But you also testified that you eventually learned that the Axos termination had already been recorded. We had some testimony about that, and you did provide a copy of the Axos termination I believe to Sendera Title. Is that right?

A I believe I provided the Axos termination to you.

Q Okay.

A And you asked me to send it to a title company, and I told you I didn't know which one you wanted me to send it to because you were working with three. That was related to the Axos termination.

Q Okay. Did you have any understanding that the Axos termination had not been sent to Sendera Title?

A I don't understand your question.

Q Okay. Well, if you sent it to me, do you have any reason sitting here today to believe that we didn't forward that on to Sendera Title?

A Yes. I do.

Q Yes, you believe we didn't send it to Sendera Title?

A That's correct.

Q Okay. And why do you think that?

A Because Mr. Khudabuksh Walji, at around 2:00 p.m., in his email correspondence to me on May 31st, indicated that Sendera Title, or I think it was just the title company, I don't think he referenced Sendera Title, but the title company still had questions or concerns about Axos.

Q Okay. Let's take a look at Debtor's Exhibit 8. And this was marked as one of our exhibits that's been previously admitted. This is an email on May 31st at 11:22 a.m. from Julie Lyssey at Sendera Title where she is requesting not a termination. She's requesting an assignment from Axos Bank to 299 [*sic*] Turtle Creek. Do you see that?

A I do see that.

Q And was Sendera Title ever provided with an assignment from Axos Bank to 2999 Turtle Creek?

A Yeah. I think that that was already in their possession as they hot-linked in Exhibit 33A to the collateral assignment to Axos Bank at Instrument Number 202000001928.

Q Okay. So you're saying on 33A, there's already a provision that says that they had the assignment?

A Yes.

Q Okay. Let's take a look at 33A. I'm sorry. This is

Lenders 33A.

MS. LINDAUER: Drop down, Sydney, to the list of items. All right. (Audio interference)

BY MS. LINDAUER:

Q All right. Do you see notice of collateral assignment to Axos Bank? Do you see that? It's under five, the second point under five, notice of collateral assignment?

A I do, yes.

Q Do you see anything that says that that item has been satisfied?

A I think if you click on that instrument, it takes you to that, so I'm not sure why Sendera Title would be needing that document. They already have the hot link to it.

Q Okay. Actually, if you click on that document, Mr. Kane -- have you actually clicked on that document?

A I believe I have.

Q Okay. What comes up is a notice of assignment, not the actual assignment. Isn't that correct?

A Yeah. So I understood that to be the assignment.

Q Okay. Well, if you click on it, and we can do that for the Court in a minute, it actually comes up as a notice of assignment, not the actual assignment. And so, again, on May 31st, the closing date, Sendera was still looking for the actual assignment of deed of trust and loan documents.

A I really don't know that to be the case.

Q Well, I showed you her -- let's go back to D8 real quick. "I still need the assignment." That's pretty clear to me that on May 31st at 11:22, she was still looking for the assignment from Axos Bank, right?

A That's not clear to me.

Q Okay. So how would you read this email from Julie Lyssey on May 31st if it's not clear to you?

A Well, I think I would read it the same way that Mr. Marx did, which was that that had already been satisfied and that she was already in possession of the notice of collateral assignment and the termination, so I really don't know what she could possibly have been asking about.

Q Okay. Well, let's be real clear. Mr. Marx was representing a lender that was going to provide funding for the closing, right?

A I believe that was his testimony.

Q Okay. Mr. Marx was not representing a title company or Sendera Title, correct?

A I believe he did not testify to that, yes.

Q Okay. So with regard to the title company, on the 31st, they still had an outstanding item regarding the assignment. Whether Mr. Marx thought that that had been provided or not is really not the day [*sic*]. The question is what did the title company request, and they were still looking for an assignment on May 31st based on this email is. Is that -- am I incorrect?

A That seems like a great question for Ms. Lyssey.

Q Okay. But you would agree with me that if all we have in front of us is this email on the 31st, it would appear that Sendera was still looking for an assignment, right?

A I really don't know what Sendera was referring to in this. I've explained that I don't believe that the assignment issue remained outstanding. I don't know if she is using the term assignment colloquially. I don't know if she's misusing the term, like I accidentally used rescission instead of release.

I really don't know what she's referring to. I understood the Axos issue to be completely resolved unless the debtor did not forward the Axos termination documents.

Q And that's speculation on your part, whether or not the Axos termination document had been forwarded, correct?

A That's correct. I do not know if you forwarded it or not.

Q Okay. But you can clearly see on the 31st at 11:22, Ms. Lyssey wasn't asking for a termination. She was asking for an assignment.

A Ms. Lindauer, we can both read this email. I'm telling you, I don't understand what she was actually asking for here by referencing capital A, Assignment. I don't know what she was asking for.

Q Okay. You testified that immediately after receiving the Exhibit 33A, that list that we just looked at, that you contacted your real estate lawyers for assistance in addressing

those specific issues. Do you remember that testimony?
A I believe so, yes.
Q And, in particular, you said and how to resolve specifically the Happy State Bank issue. Do you remember that?
A I believe I do.
Q You testified that you were expecting that the debtor was going to provide first drafts of closing documents. Is that right?
A Yes, that was my inquiry to the debtor and my expectation back on May 18th when I sent that correspondence to the debtor asking for the status of drafts and if they were going to do so.
Q What documents were you expecting the debtor and its counsel to draft?
A I don't recall exactly off the top of my head. I would have expected, aside from, you know, I later learned about the Happy State Bank collateral assignment release document, so that wouldn't have been in mind at the time. I guess, you know, ordinary closing documents, release of assignment of leases and rents, if it wanted to draft the payoff and release of lien and deed of trust. You know, those are the kind of more basic closing documents that I guess I would've expected.
If they wanted to prepare UCC termination statements, that would have been an easy one. They don't require a signature from HNGH. So that was one that the debtor could have prepared

or had the title company prepare.

Q Okay. So let me go through these. So it's your testimony when you did your cross that you were expecting the debtor to provide -- and let me just run three of these. Was the debtor supposed to provide the reinstatement of note?

A At the time, the reinstatement of note was incorporated into HNGH's special warranty deed, so no.

Q Okay. Well, if the debtor disagreed with incorporating it into the special warranty deed, was the debtor expected to provide the reinstatement of note?

A I would have been great since it was something that we understood was taken care of until 3:24 on May 30th, yes.

Q Okay. How about the releases of HNGH deed to trust? Were we supposed to provide those?

A That's something that the debtor could have easily provided.

Q Okay. Were we supposed to provide the release of assignment of rents and leases?

A That's something that the debtor could have easily provided.

Q And what about the release of the UCCs? You said that's something we could have provided. Is that right?

A Easily, yes. Yes.

Q And the debtor could have provided the lender payoff letter?

A Well, that's usually incorporated into a payoff and release of lien, so that would have been incorporated into the release of deed of trust. Yes, the debtor could have prepared that.

Q All right. And we could have prepared the release of the Happy State Bank collateral assignment of note and lien. Is that right?

A I suppose you could have, but I would recognize that that would have been HNGH's obligation because of its contractual relationship with Happy State Bank.

Q And what about all the corporate authority documents? The debtor could have prepared those?

A No, I think that the incumbency certificate, which would have incorporated either references to or copies of that were things that probably should have been provided by HNGH. And as I said and I believe Mr. Christiansen testified, that was in the works, though authority references the entry into specific documents and there wasn't an agreement to enter into any rescission instrument at the end of the day. So that was a bit of a hold up there. Although some of the documents that are incorporated on 33C related to authority are documents that are of public record that could have easily been pulled both by the title company and the debtor and I suspect, but that is speculation, that the title company actually did that.

Q Why don't you give me an example of the ones you believe

that could have been pulled by public record?

A Okay. Will you please turn to 33A and we can look at it --

Q Sure.

A -- together?

Q Sure.

A Okay. If you'll scroll down, please to I believe it's 11.

Q Okay.

A Yeah. So, as Mr. Marx pointed out, the debtor was aware that this was a -- that HNGH Turtle Creek was a Delaware LLC. So pulling out a certificate of existence from the Secretary of State of Delaware would have been very easy and it's a public record, certificate of good standing from the State Comptroller, similarly, also something I believe is a matter of public record that can be obtained on request.

Resolution obviously is built into the incumbency certificate. Articles of organization and amendments thereto and regulations adopted by members are not available so those probably would have been in the incumbency certificate.

Q So let me ask you, in the agreed order dated December 10, 2021, where in that order did it require the debtor to provide a reinstatement of note, releases of a deed of trust, release of an assignment of rents and leases, release of UCCs, lender payoff statement, release of HSB, although you said you would do that one, the Happy State Bank, and then the corporate

authority documents? Where in the order does it say that all of those have to be provided by the debtor?
A I think it's right next to where it says they have to be provided by HNGH, which means it's not in the document.
Q Right. Right. And you already testified that there were reasonable and necessary documents beyond what was in the agreed order that needed to be provided as part of this closing, correct?
A Yes, I believe none of which were drafted by the debtor.
Q And if the debtor had drafted those documents and sent them over to you, your client would have wanted to make changes to those, or you would have, correct?
A It depends on the form of document, but possibly, yes.
Q Okay. Well, Mr. Kane, have you looked at the documents that are attached to the two motions we recently filed with the Court that attach all of those documents? Have you had a chance to review those?
A No, I do not believe that that's relevant or necessary given that they were filed on the Court's docket weeks after the expiration of the payoff deadline.
Q So you have not taken the opportunity to look and see if the documents that debtor drafted would have satisfied any of these requirements. Is that (audio interference) --
A That's correct, I did not.
Q Okay. Did you ever send an email or letter to me or

Mr. Walji outlining what documents you expected the debtor to provide as part of this closing?
A No, I do not believe that I did.
Well clarify, I did send an email requesting a closing checklist that I did not receive. And on our conference call on May 20th, I was assured that the debtor was moving things along and that it was preparing for the closing.
Q Let's just --
A But just --
Q I'm sorry. Go ahead.
A And that was when Mr. Walji assured everything was going swimmingly. Things were being prepared appropriately. We just had this issue with Happy State Bank. And that's when I told him that I didn't believe the Happy State Bank issue was a key issue and they needed to be focused on the closing with HNGH.
Q And in that conversation, did you say Ms. Lindauer and Mr. Walji, we expect on behalf of HNGH that you will prepare all of these documents, a reinstatement, a note, a release of deed of trust, a release of assignment of rent -- did we ever discuss the debtor or the debtor's counsel preparing those documents?
A No, not specifically. Certainly not. I understood from Mr. Walji's assurances that the appropriate closing documents were being prepared, but we had no specific discussion about what documents those were.

Q And, in fact, one of your complaints to this Court is that you did draft documents, you did draft a release of deed of trust, you did draft release of a collateral assignment of note and lien, and you complained that we didn't give you comments on those documents. Is that correct?
A That's correct.
I will clarify on that point. I did receive comments on one document and that was the Happy State Bank release of collateral assignment of note and lien, which I accepted and forwarded to Happy State Bank the same day I received it.
Q Your client was the plaintiff in a lawsuit against Mr. Barton as guarantor. Is that correct?
A No, not technically.
Q Okay. Then, who was the plaintiff?
A I don't recall. It may have been a Madison entity and we were an intervener, or intervener plaintiff.
Q Okay.
A But we have asserted claims against Mr. Barton on his personal guaranty. That is correct.
Q And the solution on that you pointed the Court to was that we, the debtor's counsel, would draft a document dismissing the claims against the guarantor. You said I offered to have that executed and held in escrow if Ms. Lindauer would just send over a draft of that document. So your solution there was that we would draft the document and send it to you to dismiss your

lawsuit against Mr. Barton on his guaranty. Is that right?
A No, that's wrong.
Q Okay.
A I'm happy to clarify that point, if you'd like.
Q Well, it was your lawsuit. Did you ever draft a dismissal order dismissing Mr. Barton from the guaranty suit?
A Yes.
Q Okay. Did you send that over to us?
A No.
Q Why not?
A Well, if you're assuming prior to May 31st, it was because the debtor hadn't missed the payoff deadline. If you're referring to why haven't I sent it over after the debtor missed the payoff deadline causing a default under the agreed orders, it's because of this pending litigation.
Q What does this pending litigation have to do with your obligation to dismiss Mr. Barton?
A I think it's exactly what I questioned Mr. Barton on.
So there's a condition precedent in the agreed order about the dismissal of the guaranty lawsuit. And while we believe that the conditions precedent have taken place, it is very clear from the debtor's positioning in this case and Mr. Barton's arguments that the debtor does not believe so and is trying to seek a ruling or some other judgment from this Court that is excused from performance.

So if the debtor was excused from performance on May 31st and a later payoff deadline is extended, then it was excused of the default, the default hasn't occurred, and there is no basis for the dismissal of the guaranty lawsuit.

So from a legal context, I think it's pretty clear why we haven't dismissed Mr. Barton from his guarantee suit. Also haven't proceeded forward with any hearings or trying to enforce the guaranty or obtain a judgment.

Q And there are no hearings right now set in that lawsuit to -- I thought there was a motion to dismiss that had been filed and was set for hearing.

A It may have been. I don't know. I have not attended any hearings in that guaranty lawsuit.

Q Okay. And you're not the one at your firm handling the guaranty lawsuit. Is that correct?

A I believe I have a litigation attorney that is also assisting me with that guaranty lawsuit. If there was a June hearing, we may have missed it. The case may be dismissed for lack of prosecution. I don't know. That's not where our focus is right now.

Q Well, that might not be where your focus is, but other people might have that issue in hand.

A Is that the debtor's focus?

Q Well, Mr. Kane, there were several provisions in that order that you said were supposed to be self-effectuating and

one of them was to dismiss the guarantor.

A So the debtor stipulate that it has defaulted under the terms of the agreed order, I'm sure we're happy to do that.

Q Not at all. In fact, if you read the order, he was supposed to be dismissed either way, if, whether there was a default or there was a payoff, right?

A Right. So is it the debtor's position that a default has occurred because a payoff has not?

Q No. Not at all. Our position --

A Then, Mr. Barton shouldn't be dismissed from the lawsuit because neither of those conditions precedent had been met. Is that the debtor's position?

Q No. And it's -- this is my questioning of you, not me answering questions for you.

A I'm sorry.

THE COURT: Ms. Lindauer. Ms. Lindauer, you're --

THE WITNESS: I was just trying to get clarification.

THE COURT: Wait, wait, wait, wait. You're kind of arguing back and forth as opposed to answering -- asking questions and having the witness answer. So ask a question please.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q Mr. Kane, looking at your testimony regarding Happy State Bank, that was the next big issue you addressed. You testified

that you informed Mr. Walji that you did not believe that Happy State Bank was a party to the closing and that was about May 20th of this year. Is that correct?

A It was May 20th. It was not about May 20th. But yes.

Q And then, you said the debtor needed to be focused on ensuring that HNGH was paid off at the closing. That was your statement, correct?

A I believe that is correct, yes.

Q And at any time, Mr. Kane, did you ever advise Mr. Walji, myself, or the debtor that Happy State Bank had not been paid off prior to May 30, 2022?

A Had not been paid off prior to May 30th?

Q Correct.

A No.

Q So was it unreasonable --

A Hold on. Wait, wait, wait, wait. I want to clarify that.

Yes. Yes, absolutely.

Q Yes, you advised us that they had been paid off?

A That they had not been paid off.

I'm sorry. I may have gotten confused. What was your question?

Q Okay. When did you advise us that they had not been paid off?

A Well, I believe it would have been when I circulated a draft for the release of the collateral assignment and note on

the 27th. Or, actually, before that because we had a conference call on the 27th where Happy State Bank was discussed and I disclosed that we were working and we had been working to try and resolve the Happy State Bank issue.

Q Was it unreasonable for Mr. Walji and myself to believe that when you circulated a release of the Happy State Bank collateral assignment of note and lien that, in fact, your client had paid them off prior to May 30th and that that no longer was an issue to be concerned about?

A Well, since they hadn't executed the release and we're talking about a draft, yes, I think that that would be an unreasonable position to assume.

Q You testified that you understood that the Happy State Bank matter was going to have to be an issue addressed at closing. Is that what you told the Court?

A Yes.

Q And you said when you realized that there was an issue with the Happy State Bank matter that you reached out to lawyers in your firm that handle your real estate matters to ask for their assistance. Is that right?

A That's correct.

Q You said there were several ways that that cat could be skinned and that one of them would be to structure a payoff at closing with the debtor where the debtor would pay off Happy State Bank. Is that right?

A That's correct.

Well, no. Hold on. I want to clarify that.

The debtor is not paying off Happy State Bank, right. The third party that is funding the transaction pays the money into escrow. When the funds are released, it is HNGH's proceeds that HNGH is directing to Happy State Bank. So from HNGH's money, Happy State Bank is getting paid. So it isn't the debtor.

It's not the debtor's money. At that point, it's not the funding sources money. It's the concurrent closing. It is, at that point, HNGH's proceeds from the payoff transaction that are going to Happy State Bank. It isn't the debtor's money.

Q Okay. And you said in your testimony, "Our firm determined that the path of least resistance was to ensure that Happy State Bank was paid off from HNGH's proceeds at closing." Is that correct?

A I don't have the transcript in front of me. If you do, yes, that sounds like what I said, and I believe that that is correct, yes.

Q Okay. All right.

And where did the debtor agree that it needed to pay part of -- or have part of the proceeds paid over to Happy State Bank?

A So I guess it isn't the debtor's call. So the debtor may never have agreed, but it's HNGH's proceeds. And why the

debtor would try and halt a means of removing a cloud on title that would facilitate closing is something that I cannot comprehend.

Q Well, Mr. Kane, you're asking the debtor to wire in $40 million to a title company and then the day of closing, you're asking part of that money instead of going to HNGH to go to Happy State Bank. And there was no agreement that the money would go to anybody but HNGH, was there?

A So again, it's -- we provided specific instructions to the debtor that the money that was going to pay Happy State Bank was from HNGH's proceeds. So again, the debtor's not wiring any money to Happy State Bank. The amount of money that is paid into escrow doesn't change. It removes a cloud on title. I truly -- I don't understand why the debtor -- and maybe I didn't understand your question, but why the debtor felt like its consent was required for that.

Q Because we had an agreement, the debtor and HNGH, to pay HNGH. What HNGH did with the money after it left the escrow was between HNGH and whomever. But our agreement was simply to deliver funds to your client, period.

THE COURT: Ms. Lindauer, can you ask questions so that we can --

MS. LINDAUER: Sure.

THE COURT: -- get Mr. Kane off the stand? You're way past your 10-minute estimate from last week that you

promised you could meet.

MS. LINDAUER: Right.

THE COURT: I've given you some flexibility. But at this point, you're just arguing with Mr. Kane.

MS. LINDAUER: Understood.

THE COURT: So ask questions, please.

BY MS. LINDAUER:

Q You testified that Mr. Christensen was prepared to get in his car and drive over to Happy State Bank and pick up the original note and take that to HNGH on May 31st. Is that correct?

A That's correct.

Q And you understood Ms. Blakeley's testimony was that she wasn't going to release the note until the money was actually in her account. You understood that, right?

A Yes.

Q There's no way that the money was going to be in her account on May 31st, was it?

A That is not my understanding.

Q Okay.

A Well, I guess I should clarify.

I think that that's correct but only because the debtor didn't have a funding party prepared to close and the debtor had precluded the execution of documents necessary for closing. It was my understanding that initially the debtor was pursuing

a closing that would fund money, would fund the payoff amount so that it could be in parties accounts that day.

Q Well, in parties accounts, we were prepared to put it in HNGH's account through the escrow that day, right?

A I don't know what the debtor understood.

Q Okay. And you also don't know that we didn't have a funding party ready to fund that day, do you?

A I have not seen any evidence to suggest that was the case.

Q But you yourself don't have any personal knowledge of whether in fact there was a funding party ready to close that day. Isn't that correct?

A I guess that's correct.

MS. LINDAUER: Your Honor, I'll pass the witness.

THE COURT: Mr. Kane, have you had enough of yourself?

THE WITNESS: I have only one very short issue and it relates to Ms. Blakeley's testimony and our exchange of the executed release of collateral assignment of note and deed of trust. There were some questions about why I didn't just provide the title company information to Mr. Cruz (phonetic) so he could deliver it.

Ms. Blakeley testified that Happy State Bank --

MS. LINDAUER: Your Honor, I'm going to object. This exceeds the scope of my redirect or whatever you want to call it. But I tried to be very specific and limit my questions,

and so this -- I didn't ask anything about that issue of Mr. Kane just now. I tried to be very specific about what I just asked him. So, Your Honor, I think he's outside the scope of -- we had his cross. We had redirect. And we're outside the scope now because I didn't ask him anything about that.

MR. KANE: Your Honor, I suppose this relates to the delivery of the Happy State Bank release.

MS. LINDAUER: I didn't ask about that.

MR. KANE: Okay. Well, that's fine. If that's outside of the scope, then it's not necessary and I'll pass myself.

THE COURT: All right. So are you not wanting to --

MR. KANE: I know.

THE COURT: I haven't ruled yet. I was listening to each side's argument, so I haven't ruled yet. But you tell me what you want to --

MR. KANE: So, I'll explain, I guess in generalities what I would be addressing, and then, I would ask Your Honor make a determination of whether it falls outside of the scope of Ms. Lindauer's testimony. It does reference statements made by Julie Blakeley on the stand, which I do understand wasn't -- I mean, I didn't get any questions about what Ms. Blakeley said.

But it does pertain to why wasn't the collateral release or collateral assignment delivered into escrow, which

would have presumably facilitated the Happy State Bank release or payoff or whatever it was. And so I would be explaining why I didn't personally do it to clarify that point of testimony only. So that would be the basis of my only statement on rehabilitation.

THE COURT: Okay. I will allow that.

THE WITNESS: Okay. Then, *in toto*, Ms. Blakeley had testified that Happy State Bank sent me, personally, an executed copy of the Happy State Bank of release of collateral assignment. I just want to clarify for the Court that that is not correct. I've reviewed my emails and specifically all correspondence from Happy State Bank and I did not receive, based on my diligence, any executed collateral assignment release from Happy State Bank that I could have delivered to the debtor and Julie Lyssey or any other party.

Otherwise, I believe I would have delivered it unless Happy State Bank had instructed me not to do so. But, again, I didn't receive that document. I think that Ms. Blakeley was mistaken and just wanted to clarify that point for the Court. Excuse me.

THE COURT: All right. Thank you, Mr. Kane.

MR. KANE: And I have nothing further, Your Honor.

THE COURT: Would either side mind if I ask Mr. Kane a question just to clear something up for me?

MS. LINDAUER: No, Your Honor, as long as I can ask a

follow up question if there is one.

THE COURT: Sure.

Just going back to Debtor's Exhibit Number 8.

THE WITNESS: Debtor's Exhibit 8.

Okay. Yes, I'm there, Your Honor.

THE COURT: So let me pull it up on my end here.

So I know Axos has been talked about quite a bit during these hearings. Am I remembering correctly that Axos was in a similar position to Happy State Bank? They received a collateral assignment. Was it from the original lender? Am I remembering that correctly?

THE WITNESS: Yeah, I believe that that is correct.

THE COURT: And this email is asking -- so an original assignment would have been from the original lender to Axos, right, if it was a collateral assignment? Again, I'm really just trying to understand this issue. I thought I had written down somewhere that Axos was in a similar position to Happy State Bank.

THE WITNESS: Yes.

THE COURT: For some reason, I was thinking it was the original lender that --

THE WITNESS: Right.

THE COURT: -- that did a collateral assignment.

THE WITNESS: That's correct. So 2999 Turtle Creek LLC had a collateral assignment of its note and deed of trust

to Axos Bank. That is my understanding. And that 2999 Turtle Creek LLC is the entity that's been referred to on occasion as Madison. That's what I understand.

THE COURT: So this email asking for an assignment from Axos, it's not asking for an assignment from 2999 Turtle Creek to Axos. It's asking for an assignment from Axos to 2999 Turtle Creek LLC.

THE WITNESS: Yeah, right. So that's why we believe that it was really a request for the termination document because it's --

MS. LINDAUER: Your Honor, I'm going to object to his answer. That's a little beyond what you just asked him. You asked him about the assignment. Now, he's --

THE COURT: So, I think I understand the issues now. I just wanted to confirm my understanding that Axos was in a similar position to Happy State Bank with respect to the original lender.

THE WITNESS: That is my understanding, Your Honor, yes.

THE COURT: All right. So, I think I understand Exhibit 8, or at least you've answered my question about Exhibit Number 8.

All right. Mr. Kane, thank you.

MS. LINDAUER: Your Honor, the only other witness we would call would be Mr. Donahue. And, as I mentioned, he has a

conflict this afternoon and I guess there's an issue about his testimony regarding value so, Your Honor, I can't have him available this afternoon. But I would like to preserve my right to call him as a witness in our case if allowed by the Court because, again, now that value has become apparently more of an issue then, I would like to have the right to call a certified appraiser.

THE COURT: Before we get to that, when I finish with Mr. Kane, I assume since you didn't want to ask any questions that you don't have any further questions of Mr. Kane, correct?

MS. LINDAUER: I do not, Your Honor. I'll pass him as a witness.

THE COURT: All right. So Mr. Kane, you are off the virtual stand and back to acting as a lawyer.

MR. KANE: Thank you, Your Honor.

Can I, and Ms. Lindauer, maybe a proposal on this?

MS. LINDAUER: Sure.

MR. KANE: Can we just submit the competing appraisals and the Court can review the competing appraisals for their probative values since they're appraisals from December 8th -- or I guess they're prepared for the December 9th hearing. That resolves the need for both of the appraisers to testify. And we can submit them for notice purposes.

MS. LINDAUER: That might be acceptable. I do need

to probably talk to my client representative who's not here right now just to make sure that they're okay with that stipulation. So maybe we can hold that issue in advance for a minute and if you want to go ahead and call your witness, John, we could go ahead and call your witness.

MR. KANE: Okay.

THE COURT: Why don't we take a -- if your client's available, we can --

MS. LINDAUER: I can --

THE COURT: -- a quick recess and then we can --

MS. LINDAUER: Sure.

THE COURT: -- button that issue up or not.

MS. LINDAUER: Okay. That would be fine, Your Honor. Thank you. Just like 10 minutes?

THE COURT: Yeah, is that enough time?

MS. LINDAUER: Yeah, I believe so.

THE COURT: Let's do that.

MS. LINDAUER: Thank you.

THE COURT: Let's do that.

We'll be in recess.

(Recess at 4:12 p.m./Reconvened at 4:26 p.m.)

THE COURT: All right. We're back on the record. Is everybody ready to go?

MS. LINDAUER: We are, Your Honor. And we did visit and we are prepared to agree on the appraisals. John, the one

we're offering is going to be marked as Exhibit D29. And for the record, Your Honor, that is our -- it's a CBRE appraisal. John's got -- I know Mr. Kane has a copy of it. It's dated December 8, 2021. And it's the appraisal from Kevin Donahue, MAI. And so we'll need to upload that to the port. We can do that this afternoon, as a separate exhibit.

But that would be the appraisal that Mr. Donahue prepared. And then with that, we would agree to the admission of your appraisal. I think it's Newmark. Is that right?

MR. KANE: It's -- yeah, it is a Newmark appraisal by Hayden Littlefield.

MS. LINDAUER: Correct.

MR. KANE: Which we will file Supplemental Exhibit, I believe 122.

MS. LINDAUER: Okay.

MR. KANE: He said with confidence.

MS. LINDAUER: It sounds reasonable, but --

MR. KANE: I think it's 122. Whatever the next in the line is. And we'll provide a copy of the marked exhibit to Ms. Lindauer as well.

MS. LINDAUER: Okay. Same thing.

THE COURT: You'll file that on the docket as well?

MR. KANE: Yes, Your Honor.

THE COURT: And is the -- maybe each side can tell me, what purpose or purposes you believe valuation goes to, I

heard somebody say good faith. Help me understand that.

MS. LINDAUER: Well, Your I think, Your Honor, at least from the debtor's perspective, this is obviously a Court of equity and valuation is always a key in any bankruptcy proceeding, right.

And so, of course, we have a confirmed plan that does require, not only that we pay off Mr. Kane's client, HNGH, but that we also pay the other creditors that were part of the bankruptcy case. So, of course, the value of the property becomes important because obviously that's, at least from the debtor's perspective, that's the source of funding, is monies to be borrowed against that asset. So obviously to the extent that that asset is worth 56 million, or whatever, there should be adequate equity there to pay of the $40 million debt.

So that's one issue. But I think the other issue is just looking at the question of -- in my mind it's a question of forfeiture, is if in fact the Court determines that those orders have not been complied with on the debtor's side, and that the payoff was not made by may 31st, then, of course, the debtor loses about, I guess depends on what you believe, but about $16 million worth of value.

So that's a pretty substantial hit. If you believe the lender's appraisal, that the property was only worth 30 -- well, so let's say 39,750 -- $40 million, roughly, then it's basically a push. They're basically getting property back

worth a little bit less, or equal to the amount of their debt.

And so, of course, from their standpoint there's no gain and there's no particular loss. But I think in looking at the equities, which I think in bankruptcy we spend quite a bit of time doing that, I do think that the value of the asset is relevant in the overall scheme of things. Which is why I think both sides have put in some valuation testimony.

And so I think at least from our perspective, that's why we thought having valuation information was important for the Court to analyze sort of the pros and cons, if you will, of each side's positions, and who gains and who loses at the end of the day. And maybe that's already fait accompli, but I think that that is the thinking.

So I don't know what Mr. Kane's position is. I would think it would be somewhat similar, but -- but again --

THE COURT: On those -- Ms. Lindauer, on those two issues, the equities and forfeiture.

MS. LINDAUER: Right.

THE COURT: Are those related to your motions that are set? That are -- well, they're now set -- I'll have to look at the docket. I can't remember if they're been set. But if they haven't been set, we're planning to set them concurrently with your closing arguments. Because I think you said you didn't need any other evidence. So are those two issues were your motions, or you view them also as relevant to

defending against Mr. Kane's, or the lender's motion?

MS. LINDAUER: I think in both aspects, Your Honor. But I think maybe defending more against their motion, really. Those issues. Because again, you know, and I don't want to preview our closing argument. But I mean, obviously, you've got issues from this evidence on both sides, right.

And so your left sort of balancing the equities here to a certain extent. I mean there's a contract the parties agreed to in the form of agreed orders. You have to interpret those. But the overall grand scheme of things, too, is a question of equity, which is what is the right outcome. Maybe not always what exactly is the legal outcome is what is the right outcome, taking into account all the equities in the case.

And so looking at that, I mean, obviously I think the outcome -- if the property's worth $100 million and the debt's 40, then that's something the Court should be aware of, right. If however, the property's worth 10, and the debt's 40 million, then obviously the likelihood of the debtor ever being able to pay off HNGH becomes pretty remote, even if we had funders, right.

So and again to what end. To what end are you paying them off, if in fact the property is way under water. So I think again that's the thinking on the value part of it. But I think in defending against the motion, I think value becomes

relevant. And I think also on the question of modifications.

But there really haven't been that many challenges to value during this case. I think both sides had more or less tabled that issue. Assuming that there was a net value here to pay off a $40 million debt. So that being said, but I think just to complete the record, the value is an issue for the reasons I stated, Your Honor.

And I think it goes to both. Our motions and then their responses to theirs.

THE COURT: Okay. Mr. Kane, what is your take on what is the purpose or the purposes for the valuation evidence, I guess, by each side.

MR. KANE: Right. So the reason that we didn't include valuation issues in our case-in-chief is because we do not believe that it is relevant at all to the proceeding that is currently pending before this Court. We understood from Mr. Barton's testimony that the debtor was trying to bring in evidence of value to make an equities argument.

Which is why we intended to include Mr. Littlefield's testimony and our appraisal as rebuttal. Because we believe that Mr. Barton's testimony was -- provided evidence of a gross overstatement of value. As Ms. Lindauer suggested, our appraisal shows that the property is worth close to $40 million.

And if there is any equities' consideration, and to

be quite frank, whether there is a default under the terms of the agreed order, I don't really believe that that is an equitable argument. And that the agreed orders were binary.

And so I don't really think value comes into play here. But if the Court were inclined to consider value, we wanted to ensure that there was not uncontroverted testimony of value in the record for this Court. Because we do believe that the value at $50 something million is considerably overstated. And that our appraisal and the comps that are referenced in the appraisal show that for Turtle Creek Real Estate, it doesn't quite fit at 50 something million, and really should be closer to 40 million.

We think that that should really kind of put to bed this big argument over equities. But again, we don't think that there should be an argument over the equities related to value because that isn't relevant to the legal dispute that is currently before this Court on our motion.

THE COURT: What about Ms. Lindauer says that value is relevant to those two issues, equities and forfeiture, not only in defending your motion, which I just heard you say you don't think it's relevant for your motion. She also believes it's relevant to their two motions, which we haven't argued yet, but they're going to be, I guess, you'll have to cover that at closing arguments.

What's your position on whether valuation is relevant

to the debtor's two motions?

MR. KANE: Right. So our objection deadline is tomorrow for those. So we're preparing, and will file objections on that. But I don't think that equity is relevant. Let me try and put it in the way I believe it's appropriate.

As far as modifying a plan goes, the value of the property is in my opinion irrelevant. It is about whether the modification of the plan adversely effects a creditor's rights under the plan. On that motion, value is not relevant. The agreed order set a payoff deadline. There was supposed to be a binary event that took place on the payoff deadline.

The binary event should be enforced, extending the payoff deadline to allow for some different closing, or the debtor additional opportunities to satisfy its obligations, in my opinion isn't effected by value. The other motion is in essence, a request to change the terms of the agreed orders, as I interpret it.

Which again, is not really a play about value. It's whether there is a legal basis to do so because of -- I mean can't begin to explain what. So I still don't really think that value is a critical component, or even a material component of the analysis of the legal issues at play, or even the interpretation of the agreed orders.

And part of that goes back to, look, there's a deed in lieu that predated all of this. And the agreement of the

parties was that the deed in lieu would be enforceable if there wasn't a payment at maturity. And there was no argument about value effecting the parties' rights. Or the equities involved at that stage. I know that there was an attempt by the debtor to bring its equities and value argument up at the initial hearing on the motion to dismiss.

You know, and we were prepared to contest it at that point. Because we believe that the debtor's valuation is grossly over-inflated. And to some degree, you know, our position has long been if the Court is going to argue that this property has this tremendous amount of value, then it should have been unbelievably easy for the debtor to raise the funds necessary. Even from an institutional lender, to pay off HNGH.

And it hasn't happened since the commencement of the case. So we think this equitable argument is kind of a bologna attempt to extract additional, you know, deadline extensions. Just like the debtor has been attempting to use it the entirety of this case.

And we think it's improper.

THE COURT: So I'm not trying to put words in Ms. Lindauer's mouth, but as I understand it, at least her argument is that on the motion that contemplates an extension of the deadlines, her position is that if the properties were substantially more than the debt, then somehow the equities ought to play into whether or not I grant that motion and

extend the deadlines.

Is that at least one of your arguments, Ms. Lindauer?

MS. LINDAUER: Your Honor, I think that's always an argument in every bankruptcy case, right? Every bankruptcy case looks at the question of equity. That's just bankruptcy 101 in every case, which is, is there value here for the debtor. Is there value here for the creditor. Is there value here for the other creditors. Right. So this is not a two-party dispute.

There are some other creditors in this case that are standing by. But at the end of the day value is always something I think the Court has to be cognizant of. If in fact the property is worth substantially more than HNGH is owed, which it is. I don't think there's really any substantial dispute on that. It is. We filed a disclosure statement that was approved with a value in it. No objections.

So again, all the way through the case it's been presumed, by everyone, that there was value here. And based on that, the debtor paid HNGH what, over $4 million during the pendency of the case, to get to this point.

So again, I think it is important when the Court is weighing all of these issues to way well, wait a minute. If HNGH prevails, what are they getting? What do they gain? They get ownership of property that is worth what? $56 million. $40 million. $75 million. Whatever it is. If a debtor

prevails and pays off HNGH, then that value enures to the benefit of every other creditor in the case as well as the debtor.

So I think that's always an issue in every bankruptcy case is looking at that issue. Because I think it has to be weighed in the context of the case, right. There's a confirmed plan in this case. There was a contemplated pay off. There is a still a desire to pay off HNGH. Okay. And so Your Honor, I do think that -- and you can weight this along with the other factors that you're looking at in deciding this issue.

But I do think when you look at questions regarding a plan, plan modification, and then the ultimate outcome here, I think that the Court has to be cognizant of what actually happens. What happens at the end of the day. Who benefits? And why would a lender -- why would a lender -- we raised this, Your Honor. The predacious lender. That word nobody knew what it meant.

But Your Honor, why would they not agree to just let us pay them off now. We've asked. Can we just give you the check, Mr. Kane. Give us the documents. And the answer has been no. Why would it be no, if the property --

MR. KANE: That's a lie. Hold on. Hold on. Joyce, this is --

THE COURT: Wait, wait, wait. Before we --

MR. KANE: Not true.

THE COURT: I'm sorry.

MR. KANE: That's a lie.

MS. LINDAUER: Okay. Well -- if Mr. Kane --

THE COURT: Okay. Okay. Let's stop. Let's stop.

MR. KANE: That's all.

THE COURT: My questions were fairly narrow. My questions went to whether each side -- what the purpose or purposes each side thought the valuation went to. So I understand the arguments on both sides.

I don't expect either side to agree with the other side's positions. But I didn't want to get to squabbling back and forth on that issue. So both of you will be prepared to address that issue, I supposed in your closing argument. So with respect to these appraisals, each side is agreeing that to the extent it's relevant, I'm not deciding now whether it's relevant or not.

MS. LINDAUER: Right.

THE COURT: To the extent the valuation is relevant, each side is agreeing that each side's appraisal can be considered for the truth of the matter stated in the appraisals, right?

MS. LINDAUER: That is correct, Your Honor.

MR. KANE: Yes, Your Honor.

THE COURT: Okay. Okay. So I think that does free up a little bit of time. So we don't have to have two experts

on the stand. So I do appreciate the suggestion and the agreement to just allow those to come in.

So Mr. Kane, that leaves just Mr. Aster.

MR. KANE: It does, Your Honor. And we are prepared to call Mr. Aster to the stand as a rebuttal witness to Mr. Dooley's testimony.

THE COURT: Okay, so Ms. Lindauer are you resting -- well, I will admit, I don't have the appraisals yet. But I will conditionally admit those appraisals once they are uploaded. So that's going to be Debtor's Exhibit 29, I believe. I'm going to have to go back and confirm this. But Debtor's Exhibit 29 and then I believe Lender's Exhibit 122.

(Debtor's Exhibit 29 admitted into evidence)

(HNGH's Exhibit 122 admitted into evidence)

THE COURT: So if we're off on the numbering when you're uploading it, just confirm that that's the correct number. Because you did have a prior supplemental exhibit. Correct, Mr. Kane?

MR. KANE: That's correct, Your Honor.

THE COURT: And then I don't recall from the docket, did you file that corrected exhibit? I don't think it was 121, but it was a different one.

MR. KANE: Yeah, I believe it was 86A. The redacted wire instructions. Yeah, we did file that.

THE COURT: Okay. Thank you. So at least my

recollection was, and I think my notes indicate that it would be 122. So I will conditionally admit both of those into evidence once they're uploaded on the docket.

And so with that, Ms. Lindauer, you rest and close?

MS. LINDAUER: Your Honor, we would rest and close at this time.

THE COURT: Okay. So Mr. Kane, that leaves Mr. Aster. And he is on, I believe.

MR. KANE: Yes. I believe he just needs to unmute himself and turn his video on. And there he is.

MR. ASTER: Good afternoon, Your Honor.

THE COURT: All right. Good afternoon, Mr. Aster. And we're going to swear you in. Or I'm going to swear you in. If you would, please, raise your right hand.

CHARLES ASTER, HNGH'S WITNESS, SWORN

THE COURT: All right. Thank you. Go ahead, Mr. Kane.

MR. KANE: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. KANE:

Q Mr. Aster, will you please spell your last name -- or you can give me your full name and then spell your last name for the record, please.

A Charles Edward Aster, A-S-T-E-R.

Q And what do you do for a living, Mr. Aster?

A I'm an attorney at the law firm of Kane, Russell, Coleman and Logan.
Q And what is your role and title at Kane, Russell, Coleman and Logan?
A I'm a director in the Real Estate Acquisition and Finance Group.
Q And when did you get your juris doctor?
A 40 years ago in 1982.
Q And from where did you get it?
A George Washington University Law School.
Q Have you been practicing since then?
A Continuously.
Q And private practice?
A Private.
Q And what is your main focus?
A Real estate acquisition and finance. In other words lending -- buying and lending.
Q And just if you could ballpark about how many commercial real estate or financing closings do you participate in each year?
A Let's say two a week, for 100 a year.
Q Okay. So what's best guess for commercial closings that you've been a part of in the past 10 years?
A I think that comes to 4,000.
Q Okay. And what would you say is the average size of the

transaction that you participate in for closings?
A Anywhere between 10 million and 100 million. Sometimes they're smaller, sometimes they're much larger.
Q And so you've had experience then with $40 million transactions?
A Yes.
Q $100 million transactions?
A Yes.
Q $500 million transactions?
A Yes.
Q Have you participated in raw land closings?
A Yes.
Q Hotel closings?
A Yes.
Q Three and four party transactions?
A Yes.
Q Now I'm going to direct your attention to what has been referred to as Lender's Exhibit 33A.
A I have it.
Q Okay. And do you see these items on Schedule C?
A Yes.
Q Okay. I'm going to keep scrolling down so you can review these. You see 5 references a number of different documents?
A Yes.
Q And if we scroll down, 6 references UCC statements?

A Yes.
Q 7 references lis pendens?
A Yes.
Q 9 references various documents. 10, 11. You see all those?
A Yes.
Q Now Mr. Dooley testified that it would take 7 to 10 days to draft the documents necessary to address those. Do you agree with that?
A That is a simplistic answer that doesn't approach the reality of the transaction.
Q Is it --
A No, I don't -- I agree that yes, you can draft these pieces of paper in 7 to 10 days, but you cannot get them negotiated, reviewed or closed in 7 to 10 days. Not normally. By any stretch of the imagination.
Q Okay. Based on your experience and expertise, how long before closing is it customary for a seller to pursue these documents?
A This is a very big generalization, but I think the easiest answer would be about a month before closing date.
Q Okay. And based on your experience would all the documents resolving all these items need to be in-hand at the title company before a funding party would close a transaction like this?

A Under a schoolbook answer, yes. But not in reality, no. Nor under the way that we typically close transactions in the State of Texas, of this type.

Q Okay. So would it be common for a buyer to close a transaction without UCC terminations in hand with the title company on the funding date?

A Sometimes.

Q Would it be fairly common for those then to be provided after payoff?

A Yes.

Q How about if the seller has little to no personal property subject to UCC warrants?

A Especially in those situations. Because usually the parties are focusing on things which have the most value as the highest priority. If something has no value, it is given the lowest priority level.

Q Okay. Would it be fairly common for a note to be stamped paid and delivered the day after a payoff?

A Oh, yeah.

Q Is it common for a seller or other party getting paid off, to direct a title company to remit a portion of its proceeds to another party?

A That happens in every closing.

Q Now finally, are recision deeds common in commercial real estate transactions?

A No.

Q How many closings do you think you've been a part of that required -- commercial real estate closings, that required a recision deed or recision instrument?

A In 40 years of constant practice, this is the first time I've ever seen one asked for. And that's because it's a bankruptcy case.

Q Now have -- are you -- let me. What is the goal -- or let me rephrase that. Is the goal at closing in real property transactions generally to deliver clean title to the purchaser?

THE WITNESS: I'm thinking the best way to answer that, Your Honor. That is the theoretical answer, yes. But that is not the practical answer. And what I mean by that, Your Honor, is who determines what is clean title. And the answer to that 9 times out of 10 is the title company.

So what most transaction parties are striving for is to get the transaction to a point where the title company says it has all it needs to insure and close the deal. Now I can't read the minds of title companies, but they are willing -- if they're willing to say we have all the documents or all the things that we need to give this title policy an insurance policy, then the parties close on that.

MR. KANE: Your Honor, I'll pass the witness.

THE COURT: Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

CROSS EXAMINATION

BY MS. LINDAUER:

Q Mr. Aster, how long have you been with Kane, Russell, Coleman and Logan? That law firm.

A A little over 18 years.

Q And is HNGH, the lender in this case, a client of your firm?

A Yes.

Q And have you done legal work for them, besides as it relates to this 299TC [sic] transaction?

A Not to my knowledge.

Q And do you know if your firm has done other legal work for that entity?

A I would not know.

Q Have you done other legal work for a gentleman named Vipin Nambiar?

A I'm sorry, can you repeat the name?

Q Have you done other legal work for a gentleman named Vipin Nambiar?

A I don't believe I've ever heard that name, or am familiar with that name.

Q And are you billing for your time today to your client, HNGH?

A Yes.

Q And Mr. Aster, were you asked to review documents prior to

your testimony today?
A Yes.
Q Can you tell us generally what documents you reviewed prior to testifying today?
A The Exhibit 33 and I went back and looked at the deed, the special warranty deed --
Q Okay.
A -- that was prepared by our firm.
Q Any other documents?
A Documents, like exhibits or things of that nature?
Q Anything that you've looked at prior to testifying today, as it relates to this particular case or this matter.
A No other documents.
Q So Mr. Kane didn't provide you with an exhibit binder for the hearings where you could flip through the various documents that have been discussed?
A No.
Q All right. And you have sat through a number of the witnesses that have testified; is that right?
A I've sat through hours of the past few days' testimony.
Q Is there a reason why you sat through hours of testimony?
A Because I was supposed to be called the moment you finished your case. And we never knew when you were going to finish your case. So since I needed to be handy and available to the Court, here I was.

Q Okay. Did you sit through Mr. Dooley's testimony?
A Yes. That was last week, correct?
Q Correct. And do you know Marshall Dooley from any business transactions?
A No.
Q And of the closings that you've handled, that Mr. Kane asked you about, what percentage of those in the last 10 years, have you been representing the lender versus the borrower?
A I'm sorry, may I ask a clarification?
Q Sure, of course.
A You mean like what percentage on buying and selling deals versus lending deals? Or specifically lender versus borrower?
Q Well, let's start with lender versus borrower. That's pretty simplistic.
A Well, probably about 40 percent of my time when I'm working on lending and borrowing transactions.
Q Okay. So let's be clear then, the lenders that you represent, are those institutional lenders, like banks; large companies that are buying and selling property?
A They cover the wide spectrum. All the way up from large insurance companies such as I represented the lenders on the American Airline Center construction loan, for a sense of size. To small transactions for raw land acquisition. I mean it's all over the place.
I have a very broad breadth of experience.

Q Do you have particular clients that you would consider more as your clients that you represent?

A Of course.

Q And can you give us some of -- maybe some of those clients that you represent on a regular basis?

THE WITNESS: I apologize, Your Honor. Does that involve any confidentiality issues with my clients?

MR. KANE: So Your Honor, can I advise Mr. Aster on that very briefly?

THE COURT: Sure.

MR. KANE: All right. So Charles if you believe that there is a confidentiality issue -- so in essence if there are documents that have not been filed of public record, or you believe that the client would not like the disclosure, you can provide a description of those clients, and not the name of those clients.

THE WITNESS: All right. Thank you. Okay, so as a sample of clients that I have, I represent -- do you need the names or do you need the type of clients? The description?

BY MS. LINDAUER:

Q Well, I think type of client is fine.

A Okay. I represent a very large hotel client buying and selling hotels across the United States. And in each acquisition, they undertake large financings. Anywhere from 50 to $100 plus million to buy the hotels.

I represent clients in New York, who are buying and selling New York real estate and real estate around the country. Those acquisitions and the refinancings of their loans are office buildings in New York City.

Commercial retail centers throughout the Northeast. I represent one of the largest mobile home park buyers in the United States. They are -- well, they think they're one of the largest. Probably technically. If that makes somebody large, probably.

They're buying mobile home parks all over the place. And we represent them in not just the acquisition, but negotiating their loans. I represent a number of banks here in Texas, where we make real estate acquisition loans. Real estate financing loans on all kinds of assets, stretching from office buildings to apartment buildings to retail centers to, as I mentioned, stadiums.

I've done a number of stadium finances. So the breadth is very broad.

Q Okay. Have you ever done work for Happy State Bank?

A I can only -- I think I had to give an opinion letter in a loan transaction where I represented the borrower, and they were the lender. So I wasn't representing them.

Q Okay.

A But that's a memory and that was a few years ago.

Q Besides sitting through some hearings and the documents

you mentioned, you did have a chance to review, do you have some understanding of the real estate that is involved in this particular dispute?

A I'm sorry. Say that again, please.

Q Yep. Any understanding of the real estate that is involved in this particular dispute?

A Just that it's -- just that it's undeveloped land.

Q Okay. Do you know where it's located?

A No. Wait, I did at one point, but I don't recall now.

Q All right. Do you know if it's located in Dallas?

A I think it's -- as long as it's in the State of Texas, it really doesn't matter to me from a legal point of view.

Q When you said looking at --

MS. LINDAUER: Pull it up, Sydney, if you could, Exhibit 33A.

THE WITNESS: I'm sorry, could you repeat that, please.

BY MS. LINDAUER:

Q No, I'm asking my associate to pull up a document for you to look at.

A Oh.

Q Mr. Aster, when you looked at Exhibit 33A, which is the commitment for title insurance.

A You have-huh.

Q You said you had a chance to look at that prior to today

as well. Is that correct?
A Yes, ma'am.
Q Okay. And you said that -- and I may have written this down wrong, but you said this was -- appeared to be somewhat of a complicated closing. Is that correct?
A No. I never used those words.
Q Okay. What did you say it was?
A I don't recall that I described it.
Q Okay. Well, could you describe looking at this title commitment, how complicated this closing is.
A Yes. Well, I don't have control of your mouse. I have to use the mouse on mine to look at the different documents.
Q Sure. I can -- we can run that down for you. Are you looking at -- do you want to look at the items that are listed below? We can run that down for you.
A Well, we're starting at -- yeah, starting at 5. These items are typical -- these items are -- what you're seeing in item 5 are typical items that you would see on a loan -- on a transaction when you're paying off the debt or the lien, or removing the lien that is presently on there, so another party can take -- take title to that.
And in this scenario, these are not unusual documents at all.
Q Okay. Well, not unusual, just -- so for example a deed of trust. You would expect that the deed of trust, item 5, that

that document would be released as part of the payoff, correct?
A After payoff.
Q Okay. How about the assignment of leases and rents. Is that something that would be released?
A Same.
Q Okay. Notice of filing assignment of deed of trust. Is that --
A Clarify your question.
Q Sure.
A In all loan -- in all loan documents they say that the documents will be released upon payment, after payment. Not before payment.
Q Okay. Well, in this instance -- okay, and again, I think you made an important point here. In loan documents. What documents are you referring to?
A The deed of trust, the assignment of lease and rents. That you pointed out.
Q Okay. In this transaction, Mr. Aster, were you asked to look at a couple of Court orders of the bankruptcy court that have some involvement in this case?
A I did look at the -- the Court order. Yes.
Q Okay. What are you calling the Court order? Can you tell us what you were looking at?
A The one that is referenced in the deed.
Q The one that's referenced in the deed. Okay.

A In the whereas.

MS. LINDAUER: Sydney, okay, all right. Sydney pull up the exhibit, the December 10th order. That's this March. There you go. And scroll down to the first paragraph on the second page. Stop there.

BY MS. LINDAUER:

Q Mr. Aster, were you asked to look at this particular order at all. And in particular this provision at the top.

A If this is the order referenced in the deed, then this is the order I looked at.

Q Okay. All right. Let's see if this refreshes your recollection. The first order paragraph, you've got that up there on the screen. And it starts right after the payoff amount. Do you see that?

A Yes.

Q It says, "Which note shall be reinstated immediately prior to the debtor's payment to HNGH of the payoff amount." Do you see that?

A Yes, ma'am.

Q Okay. This order called for a note to be reinstated immediately prior to the debtor's payment to HNGH. Is that what the order says?

A That's what the -- that's what the English language says.

Q Okay. Do you understand why in this particular instance the note would need to be reinstated prior to the debtor's

payment to HNGH?

MR. KANE: Your Honor, I'm going to object. This goes outside the scope of my examination of Mr. Aster.

MS. LINDAUER: Your Honor, he offered him as an expert and he asked him questions and I don't think he limits by doing that, what questions he can be asked.

MR. KANE: He was offered as a rebuttal expert on very specific grounds, this narrow scope. He's not offered as a fact witness. And even if he was a fact witness he would still have to be crossed within what I offer. And none of involved the interpretation of this agreed order.

MS. LINDAUER: Your Honor, the reason I'm bringing it up is actually Mr. Kane, and I wrote it down. Said that the note would be marked paid after the payoff event. And he specifically talked about the note itself.

And that is not what the Court order says. So if he's just offering Mr. Aster just to wildly tell us what he thinks happens in real estate transactions, that's fine. But this order had a specific order of events and the note was supposed to be reinstated prior to the payoff amount.

And my question to Mr. Aster is, was he aware of these particular terms when he gave his testimony.

MR. KANE: Okay, so --

THE COURT: Mr. Kane, didn't he testify that this is the order that he reviewed because it was referenced in Exhibit

33A.

MR. KANE: I believe that he said he has reviewed this order. His testimony was on what was general and customary from an expert's testimony, just like Mr. Dooley testified.

THE COURT: So Ms. Lindauer, that's kind of what I heard him testify about. And now you're asking him I guess specifics about the order.

MS. LINDAUER: Well, Your Honor, he said he reviewed this order. And the way I understood it, and we haven't got there yet, but my understanding is that he did review the order and he was familiar with its terms. And I think it's fair game if he's an expert, for me to be able to ask him a few questions about that.

But if all he's talking about --

THE WITNESS: May I clarify that? May I clarify that?

THE COURT: Well, not yet. Not yet. I have to --

MR. KANE: No, no, you may not, Charles.

THE COURT: I have to resolve the pending objection first.

MS. LINDAUER: And Your Honor, if he's just -- if his testimony is being offered simply for the usual and customary practice of a real estate closing, then that's fine. But if he's offering his testimony as to how this transaction was

supposed to be handled, then I think I have the right to ask him specific questions about this transaction, so Your Honor, I think there is a distinction there.

MR. KANE: And I'm happy to clarify that. Mr. Aster is not testifying -- he's not providing his legal opinion or any opinion about how the agreed order mechanics were supposed to work. He was testifying as to what is general and customary and appropriate practice for real estate closings, based on his experience and expertise.

MS. LINDAUER: Your Honor --

THE COURT: But didn't he also -- didn't he testify that -- well, let me look at my notes. I thought he said when talking about how long it would take to get to a closing, that it couldn't be done in 7 to 10 days. It would take usually a month. Not only to draft them, but to negotiate them and get to closing.

Isn't he testifying about this kind of a deal?

MR. KANE: Yes. Based on his experience. I think he testified it would be general and customary that it would take longer than 7 to 10 days, as Mr. Dooley testified to have the documents, or the documents of the type referenced in Schedule C, negotiated and executed by parties, to a normal real estate closing or similar real estate closing.

THE COURT: But if he's testifying about what similar deals would -- how long similar deals would take to get to

closing, isn't it fair game to talk about why or why not this deal might not be typical? And I thought that was where Ms. Lindauer was headed.

MR. KANE: If she's headed there, I'm sorry, I was not quite on that same page.

MS. LINDAUER: I think, Your Honor, that is where I was headed so do you want me to ask another question and we can just maybe move on.

THE COURT: So I'll overrule the objection for now, I guess. And I'll see what the next question is and whether or not there's an objection.

BY MS. LINDAUER:

Q Mr. Aster, in looking at this first paragraph here, is this particular provision, is it reflective of a normal and usual customary closing?

A In more precise -- well, you asked me two questions.

Q Sure.

A One was, was I familiar with the way that this was structured regarding the reinstatement of the note. So the answer to that was when I looked at this order, no. Because I focused on what the terms of the deed had to say. I was not asked to look at this and give my opinion as to the overall structure of the deal at the time.

So I only looked at the provisions that I needed to, to try to figure out how to draft the deed.

Q Okay. Let me ask you on the next part. Where it says, "Counsel for HNGH shall hold the recision deed during the pendency of the term of this agreed order." Do you see that provision?

A Okay. Yes, I do.

Q "And shall have no liability to the debtor or any other party by way of holding such deed." Do you see that?

A Yes.

Q Okay. Reading that provision, Mr. Aster, as a real estate attorney, would you have an understanding of whether that deed being held was a draft of a deed or an executed deed, by reading that provision?

A Let me read the whole paragraph.

Q Sure, nope, take your time.

A Instead of just a sentence, please.

(Witness reviewing document)

MR. KANE: And Your Honor, I'm going to object again that this goes outside of the scope of my examination of Mr. Aster.

MS. LINDAUER: And Your Honor, I think the same response, which is I think the door's been opened to ask these questions, given the questions that Mr. Kane asked him about the nature of this particular closing.

MR. KANE: Ms. Lindauer is asking Mr. Aster to interpret the terms of this agreed order.

THE COURT: Ms. Lindauer, this does seem different than the prior question. Because he originally testified, or I thought he testified that a deal like this typically would not be able to get done in 7 days. That it would take 30 to not only negotiate, or to draft, but also to negotiate and close.

And so the prior question I think was fair game because that went to whether or not this was more complicated or not than the typical transaction.

MS. LINDAUER: Your --

THE COURT: I'm not seeing how your pending question fits within the scope of what he testified about.

MS. LINDAUER: Okay. So let me clarify that.

BY MS. LINDAUER:

Q If in fact the recision deed is being held -- executed and held, that's a material term of this particular closing. If it's already a drafted deed that's been executed and is being held then there's no need for there to be a lot of significant time spent on the issue of recision deed, right. So again, if we're talking 7 to 10 day closing, but one of the most critical documents has already been executed and is being held, then it would seem to me like the 7 to 10 days would seem a lot more realistic, because you're not having to, you know, run down people or get these documents done.

They were supposed to have already been done, so --

THE COURT: I think you can make that point with an

argument about --

MS. LINDAUER: Sure.

THE COURT: -- what the order requires. So I don't think asking Mr. Aster what the order requires is anything other than asking his legal interpretation of the order. So I'll sustain that objection.

BY MS. LINDAUER:

Q Mr. Aster, were you aware that this transaction involved a prior deed in lieu?

A Yes.

Q Okay. And does that change your analysis of how long it would take to close this transaction, when you have a prior deed in lieu, and then this recision deed that's supposed to be provided?

A No. Why -- why would that change anything?

Q I don't know. That's why I'm asking you.

A No.

Q So why would it -- I'm still confused. Why would it take more than 7 to 10 days to draft the documents -- go back to 33A, that are on Exhibit 33A?

A That's a -- well, here's -- in your typical transaction such as this, first of all, it's quite normal for the attorneys not to agree initially on how things are going to work out. Or how documents should read.

That is why it is crucial to get documents out as quickly

as one can get them to the other side. And then the other side is supposed to give comments to those documents, to the drafting attorney. And it can go either way. I mean whoever the drafters are. Or it's also common to have a call and say, hey, you divvy up the -- let's divvy up the rest and get things done if we're under time pressure.

But what is not usual is for documents, you know, the crucial document as Ms. Lindauer is talking about, to be drafted and sent and then for comments on that document, which should be coming back as quickly as possible, so that the two sides can discuss whatever the issues are, for those comments to come back the very first time two and a half weeks later, the day before closing.

That is incredibly unusual.

Q Let me ask you. On these documents, the deed of trust, normally you would see a release of a deed of trust, correct? That would be the typical document drafted to address that issue. Correct?

A A release, yes.

Q Okay. So who drafts the release of the deed of trust?

A It can be done -- well, it depends. Again if you have a call amongst the attorneys and they say, okay, we got -- here the list. Sometimes they'll divvy up the list. Sometimes one side will take the lead. Sometimes the other side will take the lead.

Q Okay.

A In this case the lender -- the lender was taking the lead. I was not involved in the drafting of the release, but I believe we did draft it.

Q Okay. All right. What would be the usual and customary practice as far as these particular loan documents to be drafted? Who would take responsibility for those?

A Normally the lender usually drafts its own release documents. But I've been in -- I've been in transactions where I was the borrower, I was under a time crunch, so I got all the documents drafted so the lender only needed to review, to make the lender's life easier.

It's not about pride of authorship. It's about getting the documents done as quickly as you can and getting them ready to close. Because it's not just drafting the documents. It's you have to draft them. You then send them to the other side to get the attorneys to give their comments. And then once the attorneys say okay, this document looks -- looks good to the two of us.

You then still have to send it to the title company and the clients for them to sign off on. And then on top of that, not only do you have to get all those parties to agree that what you and the other side have agreed is what you're going to live with, and that they'll sign off of it, and in the title company's case, insure it.

But you also have to make sure that people aren't out of town who have to sign documents. So you need to build in days for that. Because sometimes, especially in the summer months, especially around Labor Day, people are gone.

So you can't live on the edge like this, because you'll get caught.

Q Okay, let's drop down to look at paragraph 11. And you said you did have a chance to review this 33A, right?

A Uh-huh. Yeah.

Q All right. You see that there was a request that HNGH Turtle Creek provide various corporate documents. Do you see that?

A Yes.

Q And is that usual and customary in this situation?

A Yeah. Well, it's kind of. Sometimes yes and sometimes no. It's odd sometimes to have the lender, if I'm not mistaken, is not HNGH the lender here?

Q Well, HNGH is the lender, but you're aware, Mr. Aster, there was some confusion over whether it was a Texas entity or a Delaware entity. Are you aware of that?

A Is that the entity that the Texas Delaware question was about that I heard?

Q Correct. It was HNGH.

A That is not -- that's not germane to the question that -- what I'm responding to. What I'm responding to was you asked

what is normal. It is possible that the items in 11 were put there because of the question you raised. But what is normal, no, it's not normal to see the lender have to provide these documents. Not -- not impossible, but not normal.

Why is it not normal? Because lenders are big companies. And big company -- I'm not -- I'm not making light of this. The bigger the company, like a Chase Manhattan. Getting a resolution from Chase or J.P. Morgan sometimes that's impossible.

So getting lender documents like this, or the request for lender documents like this, is not -- not your usual.

Q Okay, well, then let's go back.

A If that's the specific question, then -- then so. But not normal.

Q Well, do you know how big HNGH Turtle Creek, LLC is?

A I do not represent them on a consistent basis. So no, I do not.

Q All right. And if the title company was asking for these particular items to be provided in order for there to be a closing, wouldn't it be incumbent on HNGH Turtle Creek to provide these documents to facilitate the closing?

A Yes. But I haven't heard anything that said they weren't going to.

Q Well, did you hear that they actually provided them?

A Usually a lot of these documents are provided at the

closing table. There was no closing table, to the time when a lot of documents arrive never occurred.

Q And you had characterized this as a hostile closing, correct? These parties didn't like each other that were closing this transaction, correct?

A I'm making that simply on the basis that it was a bankruptcy. And after my personal experiences, that after years of bankruptcy or months of bankruptcy, the parties are not buddy-buddy. But that's my personal view.

Q So the parties are not buddy-buddy. So they're expected that after the money is sent in, to wait to get these documents from the lender, so that this transaction can be completed. Is that your testimony?

A Could you ask that again?

Q Sure.

You just said, and I'll represent to you, I don't think Mr. Kane will disagree that HNGH and 299TC [sic] Acquisitions were not exactly best friends on May 31st of 2022. So my question to you is, when there's a more or less a hostile closing, is either side going to be willing to wait until after closing to get important documents that are needed for a closing?

A Yes.

Q So you would recommend that your client pay $40 million --

A I didn't say that. I didn't say that, Ms. Lindauer.

Q Okay.
A That isn't the question you asked me.
Q All right. Well, let me ask it a different way. Would you recommend your client pay $40 million without having the items on this 33A resolved?
A See, Ms. Lindauer, this is where you're not being a real estate attorney shows that you don't understand the practical element of this.
Q Okay.
A It's not me that is the important party. It's the title company. And the reason for that is the title company will gather all the documents and all the money that it thinks that it need to say we are close and we will insure the new loan and the new deed. And when that occurs, that's when we close.
Q Okay. So if the title company --
A It's not my --
Q If the title company is telling you that these things are still outstanding as of the closing date and have not been satisfied, then there isn't going to be a closing. Is that correct?
A If they're saying they're not ready to insure. That doesn't mean -- just because some things are not -- for instance, the fact that UCCs weren't in yet, would not stop the title companies from insuring the deal. That's an example in my experience.

Q Okay. And do you know in this particular instance if Sendera Title was satisfied --

A I do not know.

Q -- with the fact that -- you do not know.

A I do not know.

THE COURT: So why don't you -- there's a little bit of talking over each other. Why don't you ask that question in its entirety.

MS. LINDAUER: Sure.

THE COURT: Mr. Aster wait until she finishes. Because it really muddles up the transcript. If you don't --

THE WITNESS: No problem, Your Honor.

THE COURT: -- the answer gets out first.

BY MS. LINDAUER:

Q I'm sorry. In this particular instance, you're not aware, Mr. Aster, of what Sendera -- the title company's position was on the day of closing with regard to these particular items. Is that right?

A Was there a day of closing?

Q There was supposed to be a day of closing.

A Okay. I do not know.

Q Okay. Do you know what the closing date was supposed to be?

A I have only heard vis-a-vis that the discussions that you and Mr. Kane have had.

Q Now you testified that in your experience, a note can be marked paid in full after a closing. Is that correct?

A Yes.

Q And if the --

A Well, if you think about it, it's kind of logical, because it's after the bank receives the money it marks the note paid in full.

Q What if the bank that has the note is not the entity that's being paid off?

A Well, your question is asking -- is not precise.

Q All right. Let me ask a more precise. Are you aware that there was a collateral assignment of note and lien involved in this particular instance with Happy State Bank?

A I am based on listening to testimony over the last few days.

Q Okay. And that Happy State Bank told us that they were holding the original promissory note. You're aware of that.

A That is what I've heard.

Q So in order to obtain the original promissory note from Happy State Bank, Happy State Bank would have had to have been paid off. Is that correct?

A Yes. And that, from what I understand was the pathway because the bank -- excuse me, HNGH requested of the title company to make a portion of the payment to HNGH to be wired transferred to Happy State Bank.

Q Okay.
A And that's what you normally do.
Q Okay.
A This is not a unique situation. This is how they all work like this.
Q Well, if you had been told that Happy State Bank didn't have anything to do with this transaction, would you still expect them to be showing up at closing, expecting to be paid off?
A It would be immaterial. That may not be the most --
Q All right.
A -- that may not be the best word. Let me restate that.
Q Sure.
A Are you asking me that from your position as the debtor here.
Q Paying off -- the party paying off.
A Okay. Again, then in that -- from that viewpoint it would be immaterial. Your contract relationship is with HNGH.
Q Correct.
A How HNGH once it receives the money gets you the note marked paid in full is immaterial. HNGH has fulfilled its duty of receiving payment and then getting you the note marked paid in full. That's all it was obligated to do.
Q Okay.
A How it did it, immaterial.

Q Okay. And all I was -- all my client was obligated to do was to pay HNGH. Correct? That was our agreement. We would pay them.
A That's right.
Q Okay.
MS. LINDAUER: No further questions, Your Honor.
MR. KANE: And Your Honor, if you don't have any questions for this witness, I do not. And we can pass Mr. Aster and have him released.
THE COURT: I don't have any questions. Thank you, Mr. Aster, you are released.
THE WITNESS: Thank you so much. I can click out now?
THE COURT: Yes, you're free to leave.
THE WITNESS: Thank you.
(Witness excused)
THE COURT: So Mr. Kane, are you resting and closing now?
MR. KANE: Yes, Your Honor. We have no further witnesses.
THE COURT: Okay. So looking at the calendar for tomorrow, okay, can everybody be ready at 9:00 in the morning?
MR. KANE: Yes, Your Honor.
MS. LINDAUER: Your Honor, we were going to ask about that. I think you've got us down for the whole day. Is that

right?

THE COURT: Yes, but we have a lot going on. So it would be my strong preference to have the closing arguments in the morning.

MS. LINDAUER: Okay. Can we do 9:30, so I can get people organized.

THE COURT: Mr. Kane, any objection to 9:30?

MR. KANE: I'm not opposed to 9:30. That's fine.

THE COURT: Okay. All right. We'll plan on closings at 9:30.

MR. KANE: I will warn the Court and maybe we can rectify this. But my paralegal filed a notice of hearing for 9:00 for tomorrow. So I can reach out and we can see if she can't get that revised to 9:30.

THE COURT: That's fine. And then did I understand from the comments the other day that -- well, let me just ask you. Mr. Kane, how much time do you expect for your closing arguments?

MR. KANE: So I guess with the incorporation of the two other motions that are now being -- that we're going to have, I guess argument on.

THE COURT: Yeah.

MR. KANE: I think that an hour and a half is more than enough.

THE COURT: Ms. Lindauer, I'm hoping that your time

estimate isn't any greater than an hour and a half.

MS. LINDAUER: We were estimating about an hour and a half, also, Your Honor. So about the same.

THE COURT: Okay. All right. So we'll plan on starting at 9:30 and just if all goes well, we should be able to finish everything before lunch.

So have a big breakfast and let me pause one second. I'll be right back.

(Pause)

THE COURT: Okay. Thank you for your patience. So I don't have any other questions. We'll just plan on beginning closing arguments at 9:30. And I guess if -- I know Ms. Lindauer, your motions haven't been argued before, but I guess I'm thinking that Mr. Kane would address everything all at once.

I suppose you can divide up your time however you want, but it seems to make sense that Mr. Kane would probably go first and address not only his motion, but responding to your two motions. And then have you go after that. Because -- what are your thoughts on that?

MS. LINDAUER: That's pretty much what I anticipated unless you think something different.

THE COURT: Mr. Kane?

MR. KANE: Yeah, that's fine, Your Honor. I'll do my best on those two other motions, and we'll be prepared.

THE COURT: Okay. Well, very good. We'll be in recess until 9:30.

(Proceedings concluded at 5:35 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, KAREN K. WATSON, and PATTIE MITCHELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Karen K. Watson

KAREN WATSON, CET-1039

/s/ Pattie Mitchell

PATTIE MITCHELL

LIBERTY TRANSCRIPTS DATE: July 15, 2022