IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 21-31954 |
| 2999TC ACQUISITIONS, LLC, | Earle Cabell Federal Building<br>1100 Commerce Street<br>Dallas, Texas 75242 |
| Debtor. | Tuesday, July 12, 2022<br>9:33 A.M. |

TRANSCRIPT OF HEARING ON HNGH'S MOTION TO ENFORCE AGREED ORDERS
FILED BY CREDITOR HNGH TURTLE CREEK, LLC

**BEFORE HONORABLE SCOTT W. EVERETT**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For the Debtor: | Joyce Lindauer Attorney, PLLC<br>BY: JOYCE LINDAUER, ESQ.<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| | Fee Smith Sharp & Vitullo LLP<br>BY: OSCAR REY RODRIGUEZ, ESQ.<br>13155 Noel Road, Suite 1000<br>Dallas, Texas 75240 |
| For HNGH Turtle Creek, LLC: | Kane Russell Coleman Logan, PC<br>BY: JOHN KANE, ESQ.<br>901 Main Street, Suite 5200<br>Dallas, Texas 75202 |

Proceedings recorded by electronic sound recording, transcript produced by a transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

# I N D E X


| | Page |
|---|---|
| Case called | 4 |
| Closing Arguments | |
| By: Mr. Kane | 4 |
| By: Ms. Lindauer | 64 |
| By: Mr. Kane | 130 |
| Court takes matters under advisement | 146 |
| End of Proceedings | 147 |
| Certification of Transcriber | 148 |

WITNESSES

FOR THE DEBTOR:

(None)

FOR HNGH TURTLE CREEK:

(None)

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| (None) | | |
| FOR HNGH TURTLE CREEK: | | |
| (None) | | |

(Proceedings commenced at 9:01 a.m.)

THE COURT: [In progress] the 9:30 docket. The only matter set is the 2999TC Acquisitions case, Case Number 21-31954. I'll take appearances.

MR. KANE: Your Honor, John Kane for HNGH Turtle Creek, LLC, the pre-petition lender.

THE COURT: Good morning.

MS. LINDAUER: Your Honor, Joyce Lindauer and Ray Rodriguez here for 2999TC Acquisitions, the reorganized debtor.

THE COURT: Good morning.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: Are we expecting anybody else?

MS. LINDAUER: No, Your Honor.

THE COURT: Okay. Well, I think we're set for closing arguments this morning.

And, Mr. Kane, I think you're up first. Are you prepared?

MR. KANE: I am, Your Honor.

THE COURT: All right. You may proceed.

MR. KANE: Okay, Your Honor. I'm going to go ahead and share my screen. I believe, like Ms. Lindauer, I also have a closing demonstrative slide that -- that we'll upload with the Court following closing argument, but I'll just go ahead and share my screen for the time being.

THE COURT: Sure. And that's a good idea. I was going to mention that.

If either or both sides had PowerPoint, I think it is a good practice to file them as -- you know, you can file it as a notice of demonstrative or however you want to style, but I think that's a good idea.

MR. KANE: Okay.

MS. LINDAUER: And, Your Honor, we did do that this morning and ours appears at Docket Number 250 for the Court's reference, so we've already done that so that you have a copy when we make our presentation. So thank you.

THE COURT: All right. Thank you.

MR. KANE: All right, Your Honor. Without further ado, I do want to begin our closing argument by thanking you for the time and patience that you've had during this lengthy contested matter, contested evidentiary hearing. I think that this is our 16th setting, which is a bit unusual. So I certainly appreciate the Court's patience for that.

As we get into this closing argument, we do want to set a little bit of a roadmap for the Court about what we're going to discuss. So the first is why are we here. Then we're going to look at the relief requested and the enforcement of orders in HNGH's motion to enforce.

And we're going to look at some of the debtor's arguments about why its performance should be excused under the

agreed orders and then compare that with a timeline of critical events, a review of some of the facts underlying that timeline and evidence that's in this Court's record, and then a series of red herrings that are set forth by the debtor and that we anticipate in the debtor's closing argument.

And then finally, a brief explanation of why the Court should grant HNGH's motion to enforce. And we also intend to address the debtor's motion to clarify or revise the agreed orders and motion under 1127(b) to modify the plan of reorganization, and in doing so, will address that equities argument that was raised by Ms. Lindauer yesterday.

So first, Your Honor, why are we here? As Ms. Lindauer even noted during opening statements on the first day, June 10th, of our hearing, the agreed order should be self-executing orders. And we tend to agree with that. The December 10th agreed order does make clear that there is a binary outcome. There's either a payoff or HNGH, in essence, has the opportunity to take title to the property and dismiss the adversary proceeding.

But we can go one step further because we know that the adversary proceeding was resolved with an agreed order of judgment that included agreed findings of fact that were entered into and executed by the debtor, Mr. Barton, and the various Barton parties. And those findings of fact noted that the debtor defaulted on its maturity date payment obligation on

October 29th, that HNGH properly exercised its right to file the deed in lieu.

The debtor's avoidance action was dismissed with prejudice, and that in that agreed order the debtor waived all claims it could have asserted in that adversary proceeding, all claims related to the loan documents and the interaction between the parties. And that, Your Honor, is found at Exhibit 7, Adversary Docket Number 15.

But that's not where we stop. We also have a stipulation between the debtor, Barton, and the Barton parties. They summarized the terms of the agreed order and the stipulation. The debtor has to close if it wants to salvage any ownership of the property. And the deadline to do so was going to be May 30, 2022.

And in that, the debtor, Barton and the Barton parties, released all claims that were known or unknown, now or in the future in any way related to the property, the loan documents, or related matters. And that's at Exhibit 15, Docket Number 91.

We're going to take it even one more step further. The parties memorialized the stipulation through an agreed order entered by this Court on March 17th that extends that deadline, the payoff deadline, to May 30, 2022.

Now, HNGH unilaterally and voluntarily agreed to extend that to May 31st to accommodate the debtor and that

Memorial Day timing. In the agreed order the debtor, Barton, the Barton parties again released all claims known or unknown, now or in the future, in any way related to the property, the loan documents, or any related matter. And on top of that, the debtor, Barton, and the Barton parties, agreed to indemnify HNGH should they later assert those claims. That is Exhibit 16, Docket Number 94.

The orders come down to a very clear binary outcome. If the debtor satisfies he payoff amount by the payoff deadline, it gets back title to the property. And that gets back is important because if it doesn't, HNGH retains ownership of the property through that deed in lieu. The debtor doesn't have any further chances after May 31st at 5:00 p.m., 2022.

But if the orders are all self-executing, why are we here? The reality is that the debtor has a default. We're seeing the debtor's blame game. There's a history of litigation. We've seen a deluge of motions just as we anticipated. There's bad faith roadblocks to HNGH taking possession. You hear Mr. Barton talking about how he is still attending city council or zoning meetings and asserting that he is the owner of the property. And we see a disregard by the debtor for prior Court orders.

So HNGH is here because it seeks protection from a litigious debtor. HNGH is here because it wants the Court to see the facts underlying this purported closing. And HNGH

wants this Court to enforce its prior orders. It isn't new or extraordinary relief. It's the enforcement of the adversary judgment, the enforcement of this stipulation, the enforcement of the December 10th agreed order, and the enforcement of the March 17th agreed order.

To be clear here, HNGH is not seeking new awards. The debtor has made a series of arguments in its responses to HNGH's motion to enforce claiming that HNGH is seeking all new awards that can only be granted under Rule 7001 in an adversary proceeding. It notes that asserting the deed in lieu as a valid conveyance would be a determination of rights and property, but the agreed adversary judgment entered into by the debtor already says that.

The debtor claims that a release of lis pendens would require an adversary proceeding because, again, it affects a right and property. But the adversary judgment that was agreed to by the debtor already dismissed all of the claims in the adversary proceeding. And the notice of lis pendens as related to the pending adversary proceeding which has been dismissed.

The debtor claims that if it's not allowed to assert further claims against the property that's some kind of deprivation of another claim against property, but the debtor has already waived those rights. It's already waived those claims in the adversary judgment, in its stipulation, in its modified agreed order.

The debtor claims that the show cause provisions of HNGH's proposed order will constitute an injunction that can only be granted under Rule 7001, but again, the show cause provisions are not an injunction.

The debtor, Mr. Barton, they can assert the claims, but they will have to go before the Court in a show cause hearing to provide good cause evidence that their claims are valid, meritorious, and should proceed without being held in contempt of Court.

In essence, if they've waived and released the claims, they're held accountable for their waiver and release. If they have a good faith claim for the basis and the Court agrees, they can still proceed with those claims without being sanctioned or held in contempt of Court. So, again, it's not an injunction.

And finally, if there was some kind of contempt, if there was some kind of sanctions and there was an award that was granted as part of the Court's enforcement of its prior orders, first, as I'll get into later, that's completely allowed by the statutory and inherent powers of the Court under Section 105A. But otherwise, indemnification is required of the debtor, of Barton, of the Barton parties, in the stipulation and the modified agreed order. So I want to go back to --

THE COURT: Mr. Kane. Mr. Kane, I'm going to try not

to interrupt parties during their closing arguments, but one question I did have is the lis pendens, is that in the record somewhere?

MR. KANE: Your Honor, it's shown on Exhibit 33A. There's a reference to the debtor's lis pendens.

THE COURT: I saw -- we saw the -- I saw the reference to that, but is the actual lis pendens document in the record somewhere?

MR. KANE: I can't recall if there is a hot link in 33A that can direct the Court to this, but no, I -- it may not be.

THE COURT: Okay. All right. All right. Sorry to interrupt.

MR. KANE: No. That's fine, Your Honor. I appreciate the inquiry.

And so, Your Honor, continuing, the debtor Bankruptcy Rule 7001 arguments, they all fail. There is no new adversary proceeding that's required. The adversary proceeding has already adjudicated claims to a final judgment. The waivers and releases in the agreed orders are already enforceable because they are agreed orders entered by this Court, and the Court has broad power under 105(a) to enforce its prior orders.

Now there is a considerable amount of statutory authority for this Court. And we've incorporated this into our reply to the debtor's various responses. But hitting on these

very quickly, Your Honor, the Court's broad statutory power under 105A is recognized in a series of circuit court decisions and in Chambers v. Nasco, a 1991 United States Supreme Court decision.

And there are a series of cases that address the Court's ability to issue sanctions, grant cost, grant fees, hold parties in contempt of Court in contested matters without requiring an adversary proceeding. And these are just a few of the cases that do so.

In a plan enforcement proceeding, that's allowed. In a post-confirmation dispute over the enforcement of a cash collateral order, that was allowed. In lift stay proceedings, it is routinely allowed if there is a willful violation of the automatic stay. So this is not something that courts have never seen or there aren't rulings from other jurisdictions addressing this type of issue. The Court has the authority to grant the proposed order submitted by HNGH under Section 105A of the Bankruptcy Code.

Now, the debtor would say, well, if an adversary proceeding isn't required and so I might be subject to some kind of accountability in this proceeding, the payoff deadline shouldn't be extended. And this is, in essence, an equitable estoppel argument from the debtor. It's not the debtor is entitled to title to the property or the deed in lieu of foreclosure should be unwound. Instead, it is an argument that

its performance should be excused.

To support that, the debtor argues: that HNGH didn't have an executed rescission deed on December 11th; that HNGH didn't deliver to the title company all of the Schedule C documents; that HNGH didn't deliver to the title company or the debtor all of the documents that the debtor set forth on its May 30, 3:24 p.m. list; and that the late request to pay Happy State Bank out of HNGH's proceeds was some new and insurmountable roadblock that the debtor could not possibly overcome on the closing deadline that was a hurdle that precluded a closing and a release of the Happy State Bank collateral assignment of note and lien.

The debtor further argues that it satisfied all of its closing arguments and the infamous Paragraph 19 on its objection to our motion to enforce, the debtor had secured funding and was preparing to make the final payoff, but for HNGH. And we will address all of those. But we think that those arguments should be looked at in a context, the context of a timeline. The timeline shows the inaccuracy of the debtor's various position and logic handles the rest.

Nate Christensen said in his testimony that the draft rescission deed was prepared in January. It wasn't circulated before May 12th because there was no closing in contemplation before that date. The debtor ignores a causal reality that rescission deed not being executed before May 27th was not a

cause for the debtor's non-payment because, as we see, the debtor rejected the rescission deed, and we'll return to that point.

First, Your Honor, I do want to walk through the timeline. And I'll try and do this quickly, but I think it is critically important that we look at this lending relationship in the history of the debtor's actions because there's been a lot of arguments by the debtor that HNGH is a loan to own or is a predatory lender. So let's take a look at this.

On September 20, 2019, we have the note date and the debtor defaults by February 1st for failure to pay property taxes. By April 20 when the lender at the time sought to enforce its remedies on account of the debtor's default, the debtor files a lawsuit in state court seeking claims and causes of action against individuals involved in the proceeding. June 1, 2020, you have a default. July 1st, default. August 1st, default. September 1st, default. October 1st, default.

And on October 22nd after the state court lawsuit failed, the debtor commenced a federal court lawsuit in an effort to enjoin continued proceedings to assert -- that asserted -- I'm sorry, Your Honor. That asserted basically the exact same claims and causes of action that the debtor asserted in the state court proceeding.

By February of 2021, HNGH and the debtor, as Mr. Barton testified, were engaged in negotiations with Tall Ship.

Evidence of predatory lending, HNGH is trying to sell its note during foreclosure proceedings. That's not exactly indicative of loan to own. And on March 1, 2021, HNGH agrees to allow the debtor to enter into a forbearance agreement. The forbearance agreement reduced the applicable interest rate by more than four points and provided the debtor with a short-term forbearance through July 30th, and if the debtor wasn't in default, a further forbearance through October 29th at noon, Central time, 2021.

So what happens as the debtor approaches the October 2021 maturity date? Mr. Barton testified that sometime in October he began discussions with potential takeout finance partners, an insurance companies, Colliers, Beal Bank. That's when he began to seek takeout financing.

So unsurprisingly, what happens on October 29th? There is a maturity date default. Mr. Barton and the debtor failed to have appropriate financing in order to satisfy the payoff obligation on the maturity date.

Well, under the forbearance agreement that Mr. Barton had executed on behalf of the debtor, there was an agreement that a previously executed special warranty deed, the deed in lieu, could be filed and recorded if the debtor failed to meet its maturity date obligation, which it did. So HNGH files the deed in lieu or, as the debtor would ask this Court to parse up, submits the deed in lieu to the Dallas County Real Property

Records Clerk for recording in the real property records before the petition is filed on October 29, 2021.

The debtor blocks that by filing for bankruptcy relief. On November 11th, the debtor files its lawsuit. Consistent pattern of behavior. When a lender attempts to enforce its rights or remedies under agreed documents like the forbearance agreement, like the note, the debtor commences litigation. So we have a lawsuit to avoid the deed in lieu of foreclosure.

That is, in essence, put on hold because the parties reach this panacea, the agreed order for December 10th that provides a March 15th payoff deadline. It, in essence, has allowed the debtor from October 29th through March 15 to get its affairs in orders, to obtain financing, and to pay off HNGH.

Well, as the parties approach that March 15th deadline, there is nothing by radio silence. HNGH seeks a status conference from this Court that is set for March 11th. And after that, when it appears clear that the debtor is going to have to stand before the Court with some accountability before that March 15th deadline, a flurry of activity occurs and the debtor attempts to negotiate a settlement agreement extending the payoff deadline further.

Now it does so, but attempts to renegotiate the deal. On March 14th, files an emergency motion to extend that March

15th deadline. Why? Because the parties hadn't executed an agreement at that point and time. Eventually March 15th comes and goes. There is a default. There is no payoff on March 15th, but the parties did enter into an agreement. And so HNGH waived the payoff deadline default. Again, indicative of a predatory lender, loan to own? It had the debtor in its palm if it desired the property.

The debtor provided financial consideration in exchange for an extension and HNGH agreed to provide the extension. But given the prior litigious nature of this debtor, it wanted some protection. So the parties enter an agreement. It has a stipulation that includes waivers, releases, and the extension of the payoff deadline.

March 17th an order is entered by this Court. It's the March modifying order at Docket Number 94. As the waivers, the releases, the extension, March 18th the adversary judgment is entered dismissing the adversary proceeding with prejudice. At that point and time, the debtor loses all right to contest the validity of the deed in lieu. And so record title is in the name of HNGH. The only way the debtor can get the property back at that point is through performance under that March 18th or March 17th modifying order.

So we continue forward. The debtor asserts that if it has a confirmed plan it won't have to seek DIP financing, provides it additional opportunity to raise funds. Wants to

have a fast plain of or plain confirmation. HNGH supports that.

On April 29th, HNGH provides the payoff amount to the debtor at the debtor's request. On May 10th, the debtor confirms the plan on expedited notice with the consent of HNGH. On May 10th Walji and Lyssey from Sendera Title request three documents or three -- two documents and an assurance. And that's shown on Exhibit 24. HNGH provides Sendera its payoff amount and acknowledges that it intends to perform the rescission deed obligations under the March 17th and December 10th orders.

On May 12th, HNGH provides the debtor a draft of the rescission deed. And, Your Honor, this is a critical date from HNGH's perspective. And that's shown in Exhibit 31 and 31A. And we know from all the testimony provided and the documents in evidence, that the debtor never provided any comments to the HNGH rescission deed draft or executed at any time prior to May 30, 2020. It never provided any markup of that document. It never provided any redline, any proposed revisions to specific terms, or even an explanation about what provisions caused the HNGH form rescission deed, that special warranty deed, to be dissatisfactory to the debtor.

On May 16, 2022, HNGH seeks a status call about the possible closing. Are we going to have a possible closing? On May 18th, HNGH seeks the status of closing documents and

requested checklist of closing items. Here is that correspondence.

I'd like to discuss timing, counter parties, closing checklists. How likely a closing at this point? Will we get draft documents for a closing soon? We did not get a checklist until May 24th by the title company, and none from the debtor or its potential finance parties until May 30th at 3:24 p.m. Mr. Marx acknowledged that those lists were materially different.

So on May 20, 2022, we have that status call re closing. And as I admitted, Your Honor, we had a discussion about Happy State Bank. And I noted that this wasn't about Happy State Bank. It was about a payoff to HNGH. The debtor quite clearly at this time is still actively seeking finance parties.

And on May 20th through 21st, HNGH facilitates Matt Fleeger's discussions with Happy State Bank. HNGH clears conflicts for a new potential equity partner, and so that equity partner could possibly raise some kind of financing from Happy State Bank to expedite closing on a transaction, as Mr. Fleeger testified. On May 24, 2022, Sendera follows up regarding Happy State Bank, Axos, and Schedule C.

Now, this directly contradicts Mr. Walji's timing regarding the debtor's knowledge of Happy State Bank matters and when HNGH first received a copy of this Sendera title

commitment. On May 24, 2022, HNGH counsel discusses Happy State Bank and closing issues internally. And, Your Honor, that's at Exhibit 34.

And this is, in my opinion, very clear evidence that HNGH and its counsel were acting in good faith attempting to promptly address closing matters, and to address the outstanding Happy State Bank collateral assignment of note and lien in an expedited and professional fashion.

Two days later on May 26th, HNGH coordinates with Sendera and the debtor regarding Happy State Bank. This, as shown on Exhibit 35, directly contradicts Mr. Walji's statements again regarding the timing of the debtor's knowledge that Happy State Bank will have to be resolved at closing. On May 26, 2022, HNGH coordinates with Happy State Bank regarding the release. That's at 54 and 54A.

On May 27th the debtor and HNGH have a status call regarding closing. This is late in the afternoon after Happy State Bank -- or I'm sorry -- after HNGH delivered its executed rescission deed to Sendera Title. HNGH makes clear it will not provide the debtor with an extension through June 2.

That June 2 deadline is important. While Mr. Walji argued that it was just a coincidence that he incorporated that June 2 extension into his email, the reality is other exhibits of the debtor show that multiple potential finance parties refused to close because they could not get underwriting for a

transaction that would take place while the plan confirmation order remains subject to potential appeals.

On May 27th, HNGH gets the signed rescission deed to Sendera. Again, this was before that status conference call regarding closing and before the debtor or before HNGH -- sorry -- actually learned that the debtor was working with three different title companies.

Later that afternoon, that evening, HNGH delivers the Axos termination. That's at Exhibit 56 and 56A and Exhibit 62. That afternoon at 5:19 p.m., we have the exchange that shows that the debtor knew confusion regarding the title companies was possible given the debtor's involvement with three different title companies. I wrote on May 27th at 5:11, I don't know which title company to send it to, referring to the Axos Bank termination. You're working with three. I'll let you forward it to the appropriate parties. And Ms. Lindauer acknowledged on behalf of the debtor, that's fair.

Mr. Walji is CC'd on this correspondence. There was no responsive correspondence from Ms. Lindauer or Mr. Walji stating, just send it to Sendera. That's the only title company that we are using. That's the title company we are going to close with. That doesn't exist.

So as May 27th progresses, HNGH circulates the draft of the proposed Happy State Bank release around, again, confirming for all parties involved that the Happy State Bank

collateral assignment of note and lien had not yet been executed, but would need to be signed by Happy State Bank. Two days later the debtor, recognizing this, comments to HNGH, stop working pending comments to the release. That's Exhibit 63.

On May 30th at 3:24 p.m., we have the debtor's infamous Dropbox drop, right, with a list of documents. Exhibit 65 includes 25 items that the debtor claimed were mandatory closing deliverables on its list, including numerous never before seen requested items and items that Mr. Marx later testified on the stand were not really necessary deliverables for closing. And this is also the first time that the debtor's proposed rescission instrument is ever circulated, the document Mr. Marx drafted.

Despite not having any comments to its proposed rescission deed for 18 days, HNGH returns the edited rescission instrument within two hours. An hour later, HNGH asked the debtor to clarify what it actually needs. Not what it wants, but what it actually needs to close the transaction. And the debtor never provided a responsive, narrowed list at any time before the expiration of the closing deadline. 6:35 p.m., HNGH delivers its payoff release of lien and release of assignments of leases and rents. Again, HNGH requested that the debtor approve the form prior to execution and never received any response from the debtor.

Now, the closing day timeline is crucially important

to this motion. And I think it's crucially important because it absolutely ruins the debtor's purported equitable estoppel argument. At 9:00 a.m., the debtor offers to buy time, acknowledging that it's not likely to be able to close a transaction. At 11:00, HNGH delivers the Happy State Bank payoff instructions.

This should not have been an issue, Your Honor. And we'll discuss this in more detail, but this is HNGH informing the debtor and Julie Lyssey, because at that point it was the only contact information that HNGH had in its possession for any of the three title companies, how HNGH's proceeds at closing were supposed to be delivered to resolve the outstanding title issues.

At 11:08, Happy State Bank's counsel, Mr. Carruth, seeks title company information to deliver its executed release. And this is important, Your Honor, because as we seen on Exhibit 73, the request is not just, hey, have you talked to any title company? It wants specific information like the title company file number or GF number.

So four minutes later on seeing this email from Mr. Carruth, HNGH's counsel asks the debtor to provide Happy State Bank title company information. And at 11:32, the debtor agrees that it will do so. So we see, Joyce, can you provide this information to Happy State Bank's counsel? Working on it now. A reasonable inference can be made from that that Joyce

Lindauer agreed to provide and was working on getting and circulating the title company information to Mr. Carruth.

Now at 11:34 the debtor still lacks and needs list for closing. As shown on Exhibit 74, the debtor is still waiting for a good list from the title company and its lender on missing items for closing. At 11:44, HNGH seeks comments to the closing documents. That's shown on Exhibit 75. HNGH asks the debtor, do we have the green light to execute the agreed rescission instrument? Do we have comments to the payoff and release of lien instrument?

Three minutes later, HNGH learns that the debtor is circulating -- present tense -- documents to everyone in response. Here is that, Your Honor. Do we have the green light to get the agreed rescission deed signed? Comments to our payoff and release letter. We never received the green light. We never received comments to the payoff and release letter. Here's Ms. Lindauer. Circulating the documents to everyone. At 11:47. Thanks.

So at 12:12, as that day progresses, HNGH provides a list of items that it can deliver for closing. Points out documents that have been awaiting the debtor's approvals and provides written assurance of certain post-closing deliverables like the UCC termination statements.

And, Your Honor, we'll hit on this in a little bit, but the UCC termination statements are farcical in this case.

The debtor's own schedules show that the debtor has no personal property at all. No equipment. No FF&E. No goods. No inventory. No whip. None of that. The only thing that the debtor has is some of the contracts related to the Mandarin Oriental Hotel, which would be a sign of all their personal contracts anyway, personal services contracts. So that issue is just preposterously overblown.

May 31st, 12:48 p.m., HNGH seeks comments and approvals again. And we'll take a look at this, but Exhibit 77. No comments. We're running out of time. 1:27 p.m., HNGH has now received a call from Mr. Carruth wondering why the debtor won't provide it any of the title company information so it can deliver its executed collateral assignment release into escrow with instructions to the escrow agent. HNGH again at 1:27 asks the debtor to get that information to Happy State Bank's counsel.

May 31st, 1:44 p.m., we see Mr. Walji again arguing that the Axos documents are continuing to create some cloud on title. There's no comment to revise rescission instrument. We just see a rejection to at that point. There is no, okay, HNGH's draft incorporates the substantive concerns we have, but we need a minor revision on this paragraph or that paragraph because we don't like the shall language, even though it's already incorporated in other places in our draft. There's none of that, Your Honor. It's just a we reject your comments.

You have to sign our document, which HNGH already found objectionable and delivered that message on May 30th, at 6:00 p.m.

Here it is again, Your Honor. This is it the Exhibit 77 where I note to Ms. Lindauer, we haven't heard back on any of the documents that we circulated or the status of closing. If the debtor is going to need wet signatures on recorded instruments, I have to have approval so I can get those signatures and notarizations. We're running out of time. Did I ever get those approvals from the debtor? I did not.

Here is again at 1:27 where HNGH requests that the debtor simply provide the title company information for closing to Happy State Bank. Jeff just reached out. He still doesn't have that. I know you're working on this a couple hours ago, but we're running out of daylight. Can you please get that information to Mr. Carruth, Happy State Bank's counsel? The debtor doesn't.

2:39, HNGH provides additional documents. 2:55, this is again, as I understood it, were already recorded instruments, Your Honor. 2:55, debtor needs title to accept the form of assignment document. This is in response to HNGH following up. May 31st at 3:04 p.m. HNGH assures that it will provide the incumbency certificate. And you have heard a lot of testimony about the incumbency certificate. Exhibit 83 notes that the incumbency certificate -- and if you look at

Section 33A and what the requirements are, it's resolutions to enter into a specific transaction.

So HNGH was requesting authority from the debtor, an agreement, to enter into the agreed rescission instrument that HNGH had revised. It needed that authority so it would be able to complete the incumbency certificate because the authorization was related to a specific transaction and there was no agreement with the debtor on the form of rescission instrument despite HNGH's turn of comments within two hours of receipt.

We get to 3:17 p.m. and for the first time the debtor discloses the funding party, Mr. Garrison Kickham is principal of the funding party. That refers to private lender network. And that's shown at Exhibit 84.

Now, at 3:32 p.m., the debtor files its motion to extend deadlines. That was the motion that the debtor filed that was later withdrawn. It's a 44 page pleading, Your Honor. I think a very reasonable inference can be made the reason that Ms. Lindauer could not deliver title company contact information to Mr. Carruth or wasn't providing comments to documents is because the debtor was busy preparing a 44 page pleading seeking to extend the deadlines instead of focusing its efforts on resolving title related issues for the closing in this case.

At 3:40, Mr. Walji circulates correspondence making

abundantly clear that its funding party, the funding party that identified at 3:17 p.m., couldn't close on time. And Exhibit 85A, as we'll take a look at in a little bit when we look at all the funding party information, cannot close no matter what because in any event its underwriter cannot approve a deal while the confirmation order remains subject to appeal. Simply put, the debtor's funding party, PLN, Mr. Garrison Kickham, couldn't close by May 31st at 5:00 p.m. no matter what.

At 3:54 the debtor seeks a no consideration extension perhaps acknowledging that its funding sources couldn't get a deal done no matter what. And at 3:55 p.m., the debtor admits that TCC2022, Mr. Marx's client, cannot close on time. And that's shown at Exhibit 88 and Exhibit 88A, and Mr. Marx testified tot his at length.

While TCC2022 may have wanted some additional documents for title issues at closing, the principal hadn't even determined whether it was going to provide equity for a loan. It didn't know at what amount because it didn't know if First Guaranty Bank was going to be a participant or not. It hasn't finished the contract documents. No money was ready to fund on May 31st due to a lost driver's license.

4:26, the debtor admits in correspondence to HNGH and Happy State Bank and Mr. Marx and others that it is not able to close on May 31st. 4:32 p.m., Happy State Bank notes that it had executed release ready to roll all day long. 4:32 p.m.

Here's that correspondence from Mr. Carruth, counsel for Happy State Bank.

I asked for title co info repeatedly today. Had no information on where to send a release. The release was ready to roll all day, but no response as to where and who to send wet or scanned signature, which is not information that HNGH could have provided anyway.

So 6:34, debtor sends HNGH a litigation hold letter already beginning to posture for that anticipated litigation. As I've noted, in any instance in which a lender seeks to enforce its remedies, the debtor has almost immediately commenced litigation. June 1 after reading a copy of the motion to extend filed by the debtor, HNGH sends a Rule 11 sanctions notice citing to allegations contained in the debtor's motion to extend deadline and compel.

On June 2nd at 6:19, HNGH rejects the debtor's request to continue the hearing on the debtor's motion to compel. And at 6:56 after that rejection, the debtor withdraws the motion to extend deadlines and that motion to compel.

So we've seen the timeline, Your Honor. I think it's important now to dive into some of the facts underlying that timeline. And as we proceed, we have to look at what the orders require because this is, Your Honor, a motion to enforce this Court's orders. And the orders require a rescission deed. It references the deed, such deed.

And as Mr. Marx acknowledged on his June 21st transcript, Page 41, 11 through 14, under the Texas Property Code a deed requires specific elements. It has to be in writing. It has to identify the grantor grantee. It has to have a description of property. And it has to have language evidencing a conveyance and an attempt to convey.

Mr. Marx has acknowledge that the HNGH special warranty deed is a deed. I'll recognize that Mr. Marx testified he thought it had fatal flaws, but he acknowledged that it was a deed. He acknowledged that it showed intent to reinstate the note and deed of trust. He acknowledged that it showed an intent to rescind the deed in lieu. He acknowledged that it referenced the grantor and grantee, a description of the property, and had language of conveyance.

Now, having acknowledged that HNGH's special warranty deed, its rescission deed, is a deed, Mr. Marx also acknowledged on multiple occasions that Sendera Title approved HNGH's special warranty deed, this rescission deed, for the purposes of issuing a title policy. Now, Mr. Marx didn't like the form of special warranty deed for the purposes of rescission, but he did acknowledge the title company approved it.

This is the June 15th transcript. Mr. Marx, is it your understanding that Sendera Title approved HNGH's rescission deed for title insurance purposes? Yes. I do think

that there was an expression along those liens from Sendera. He actually gets considerably more specific.

On June 23rd, I may have asked this before, and if so, I apologize. I just don't recall exactly what your testimony was, but was it your understanding that Sendera or their underwriter had approved this form of special warranty deed for the purposes of issuing a title policy? Yes. I understood that Mr. Pruitt approved this. I believe that's approved this. For insurability purposes.

So the HNGH special warranty deed, rescission deed, the debtor received it on May 12th, provided zero comments to that form of special warranty deed for May 30th, on May 30th flatly rejected it. No interlineations or a proposed redline to cure Mr. Marx's proposed or purported fatal flaws. Just a rejection of HNGH -- I'm sorry. And also, and the debtor rejected HNGH's comments to the agreed rescission of deed.

But there's a problem. Mr. Marx acknowledged that the debtors, Mr. Marx's, agreed rescission instrument, that rescission of deed, not rescission deed, wasn't a deed. And Mr. Marx acknowledged that he wasn't aware of any provision of the Texas Property Code that allowed such an instrument outside of a residential foreclosure proceeding. He also acknowledged that the title company had not approved the rescission instrument that he prepared for title purposes before May 31st.

The agreed rescission of deed prepared by Mr. Marx

does not reinstate the note and deed of trust. And the factual assertions contained therein are inconsistent with the agreed adversary judgment. And here's Mr. Marx's acknowledgment about how the title company hadn't approved his form for the issuance of a title policy before May 31st.

Well, first, he talks about what's important. What's important when you're preparing an instrument like this? Well, let's put it this way. I would suggest that when one refused or reviews a rescission instrument, it can be reviewed from the most basic level would be whether it's insurable. Okay. Isn't it correct that Sendera's underwriter did not approve the use of this instrument for the issuance of title policy before May 31st? I don't recall the never reviewing this instrument.

Okay. So you never received information from the title company then that this would be an acceptable form of rescission instrument for the issuance of the title policy. It wasn't even requested of the title company, according to Mr. Marx. So the title company could not have approved the form that the debtor was mandating for the issuance of a title policy under 33(c). It didn't have it. The title company approved HNGH's form of rescission deed, not the debtor's proposed rescission instrument. But the debtor claims that the document that HNGH provided was inadequate for a closing, when in reality the title company never even approved the form that the debtor attempted to thrust on HNGH.

So it we look at what happened with the debtor's agreed rescission instrument prepared by Mr. Marx, it was received at 3:24 p.m., and within two hours, HNGH turned comments. Mr. Marx testified on multiple occasions including under this Court's questioning on May 23rd that HNGH's revised instrument satisfied his substantive concerns.

It was only later that Mr. Marx had a change of heart. On May 30th, HNGH, after providing its comments to Mr. Marx's draft, noted that it would advise its client to sign if the debtor approved. So even though there was a whole change in the structure of the transaction document, because this is what the debtor wanted, because this was the avenue that the debtor sought to pursue for its closing, HNGH agreed to play ball. The comments were not nefarious as you've heard on a number of occasions from the debtor's counsel. The comments were in a good faith effort to resolve concerns that HNGH had over the provisions of that document.

And again, what did the debtor do? No substantive comments, outright rejection, rejection not provided until almost 2:00 p.m. on May 31st, nearly a full day after HNGH provided its proposed revisions. But the debtor blames HNGH for a lack of progress on the rescission deed issue.

And, Your Honor, just in summary, we believe that the debtor's argument is absolutely nonsensical and really doesn't support its equitable estoppel argument. HNGH -- I mean, this

is basically the argument. HNGH defaulted because it didn't have an executed rescission deed on December 11th, the day after the agreed order was entered. HNGH's agreed rescission deed didn't work though. The debtor refused to comment on the rescission deed because of the form. The debtor refused to entertain comments to the rescission instrument though even though they were comments to the debtor's form.

So HNGH just had to use the form that the debtor submitted no matter what, but HNGH not possessing its own executed form was somehow a default excusing the debtor's performance. It becomes cyclical, Your Honor. It's a big, giant circle. It's a snake biting its own tail. The argument doesn't work. The argument is basically HNGH needed to read the debtor's mind and execute on December 11th a form of rescission instrument that the debtor inherently would have approved had the debtor ever actually had the closing that it could close.

Now, I want to turn a little bit, Your Honor, to the facts around this Sendera Title Schedule C and the debtor's arguments that HNGH didn't provide the appropriate documents to satisfy those concerns. First, we know that from Mr. Marx's testimony and I believe Mr. Walji's testimony, the debtor had the Sendera title commitment on May 18th. It didn't deliver it to HNGH until May 24th, nearly a week later, and only four business days from closing.

Mr. Dooley argued that the documents would take seven to ten days to prepare. Your Honor, there weren't seven to ten days from the date that HNGH received Exhibit 33A from Sendera Title to the closing deadline. The debtor didn't provide comments or approve the form of documents that HNGH submitted to the debtor that were related to 33A concerns. Again, we've already talked about the rescission deed, but once again no comments there.

Then the debtor refused to facilitate the delivery of the Happy State Bank release which would have resolved the Title C or the title commitment Schedule C issue involving Happy State Bank. And then the debtor refused to allow a wire to Happy State Bank at HNGH's direction from HNGH's proceeds even though the wire would, in essence, eliminate the Happy State Bank cloud on title and allow for the timely delivery of the note at closing. So, Your Honor, there is no equitable estoppel argument here. This is the debtor precluding its own closing, and it's doing so because it didn't have money.

But even Mr. Barton agreed that comments need to be timely turned if the parties were going to get to a timely closing. So, Mr. Barton, you agree when those closing documents are prepared they're typically subject to some review and negotiations? Yes. Again, not accounted for in Mr. Dooley's testimony. Just drafted seven to ten days. Would you agree that it's important that comments to this document should

be promptly circulated then to facilitate a closing? Mr. Barton answering, but yes, all, both sides. No disrespect to lawyers, you know. Always have some comments going back and forth. That is a process of the closing. So you have an acknowledgment by the debtor that these are documents subject to the negotiation and agreement. It's not just drafts signed and delivered.

Now, I also want to touch base on this. The debtor is relying almost entirely on Exhibit 33A to show that HNGH couldn't have satisfied some potential title issue, but Mr. Marx admits in his testimony that he's seen an updated Schedule C. So we would argue that Schedule C isn't even the best evidence of what the title company still needed on March 31st to close the transaction and that the debtor provided no testimony from any title company agent, no updated list, no checklist, no proof that the title company was otherwise prepared or unprepared to close. So, Mr. Marx, was that a yes or no question? Is there an updated Schedule C from the title company? I think so.

Now, returning to this UCC-3 termination statement, the debtor argues that it had to have the UCC-3 termination statements at closing to fund, but HNGH's expert, Mr. Astor, testified that his transactions regularly close without UCC-3s. Your Honor, on the stand as a fact witness I testified that I am currently working on transactions where part of the

transaction has closed and no UCC-3s were delivered prior to closing. No notes were delivered prior to closing. No titles were delivered prior to closing.

The debtor's schedules, as I mentioned, and that's at Exhibit 22, Document Number 51, showed no personal property other than non-transferrable Mandarin Oriental agreements. And in a forty plus million dollar transaction, the debtor has argued in its schedules or has testified under penalty of perjury that the total value of those contracts, that intellectual property, is maybe a quarter million dollars.

Now I want to turn to this Happy State Bank roadblock because the facts associated with Happy State Bank, I believe, are damning to the debtor's equitable estoppel position. The debtor had the Sendera Title on May 18th. The title commitment identifies the Happy State Bank title issue. If counsel for HNGH was unaware of the Happy State Bank issue on May 20th, and I was, the debtor was not. It had already seen that there was a title issue related to Happy State Bank.

The debtor causes delivery of Exhibit 33A to HNGH on May 24th. This was after the conversation between me and Mr. Walji about Happy State Bank and the Sendera email requests help resolving specifically the Happy State Bank issue. The Happy State Bank title issue did not disappear just because I initially stated on May 20th that the proceeds at closing would not go to Happy State Bank. The title issue still had to be

resolved.

So let's talk about resolving the Happy State Bank issue. The evidence shows that there was no lack of HNGH effort to get that done. I promptly requested assistance from real estate attorneys in my firm. I coordinated the preparation and circulation of the release of the Happy State Bank collateral assignment of note and lien. Through our pressures, through Mr. Nambiar's pressure, Happy State Bank executes the release and attempts to deliver it to the debtor on the morning of the closing date.

The debtor refused to facilitate the delivery of a release instrument that would remove a necessary cloud on title for closing. The debtor refused to allow Happy State Bank to receive HNGH's proceeds at closing even though doing so would allow Happy State Bank to deliver the note to HNGH so HNGH could deliver the note at closing, which was purportedly, according to the debtor, a necessary condition precedent to finalize closing on the closing deadline.

The debtor created a hurdle to its own performance, Your Honor. This isn't about HNGH's failure of performance. This isn't about equitable estoppel. This is a blocking tactic by the debtor because it didn't have its money.

And here's Blakeley, Julie Blakeley from Happy State Bank addressing these issues. When asked if she had the document in her file, the executed collateral release or the

release of collateral assignment, Ms. Blakeley responds, the one that I am referring to that we had were asked to sign, we executed it. We never had directions of where to deliver it, and so we have since shredded it.

In other testimony, okay, was it your understanding that the only reason that the release wasn't provided for at closing was because the debtor failed to deliver title company information to Happy State Bank's counsel? Ms. Blakeley, that's what we were told from our counsel was that we did not have instructions of what the correct title company was. We didn't have a place to send it.

Now the idea that this Happy State Bank issue is some kind of never before seen roadblock was debunked even by the debtor's own expert. Mr. Dooley testified that this Happy State Bank loan on loan type of transaction is not unusual. Mr. Nambiar agrees with Mr. Dooley about that. Happy State Bank type of transaction is not unusual. Mr. Astor agreed with Mr. Dooley on that point.

The Happy State Bank type of transaction is not unusual. It happens all the time. This isn't some contractual privity complaint like the debtor argues about. This is simply HNGH directing a title company where to send the proceeds of HNGH's payoff. This is evidence that HNGH took very real and concerted efforts to facilitate clear title at closing to be able to deliver a note stamped paid and the debtor blocked it.

Now, Ms. Blakeley again, you said you were prepared to send the original note to the title company. Is that correct? We were prepared to release that upon payoff, yes. Now, let's be clear about that, upon payoff. So if you had gotten a wire, let's say by 3:00 in the afternoon, would you have been prepared to deliver your note to HNGH or the title company? We would have been prepared to deliver what we needed to, yes. So again, it is the debtors own refusal to play ball that precluded this critical component at closing.

And, Your Honor, this is something I can't figure out and I'm struggling to draw any reasonable inference for it. Why refuse to allow HNGH to direct the application of its own proceeds? That's perfectly common at closings. It would have resolved the title issues regarding Happy State Bank on Exhibit 33A that have been the subject of so much discussion in this hearing. It would have facilitated delivery of a note stamped paid in full by HNGH. And it wouldn't have affected the payoff amount or the buyer's deliver of cash to the title company. It doesn't change the dollar amount in play.

Once the payoff party funds the money, it's performed. All that has to happen is the title company sends one extra wire to Happy State Bank. As Mr. Astor noted, this happens in literally every commercial real estate transaction of any kind of material size. It is illogical to refuse to allow the application of HNGH's proceeds to HSB, Happy State

Bank. It's a false impediment to closing.

The proceeds in escrow, as you've heard from Mr. Astor, are the property of HNGH. HNGH was directing the title company where to wire HNGH's own proceeds. And the debtor refused to allow that to take place. It would have expedited the closing process, but the debtor refused to allow that to take place. The only reasonable reference that can be drawn from the debtor's behavior is at that time the debtor knew it couldn't close and it needed a scapegoat.

Now, why would the debtor need a scapegoat? Its property is purportedly worth more than $58.5 million. Its debt is only about 41 million. Well, if that were the case, it seems like the debtor would have raised the money necessary to finance a transaction in the 215 days the debtor had from the commencement of closing. It should have been easy. That loan to value margin is considerable.

Well, let's look at the debtor's financing, right. After 215 days, here is what we have from the debtor. We have evidence that Reveri financing had a hard stop, according to Jeff VanNote, who Mr. Walji identified as the principal or one of the principals of Reveri Funding. No underwriting before the confirmation order went final in June. So the only evidence regarding Reveri is that it couldn't close by 5:00 p.m. on May 31st.

Well, how about Mr. Garrison Kickham and the Private

Lender Network? In any event, our underwriting won't approve before the confirmation order goes final, i.e., June 1st. The Private Lending Network couldn't fund and close the transaction on May 31, 2022.

How about TCC2022, Mr. Marx's client? Mr. Marx has testified at length he prepared the letter that was circulated about his principal and that it was a true letter with no material misstatements. Funding source didn't have money ready and had lost his license, so couldn't get it by May 31, 2022.

Well, how about Enoch Investments? Mr. Marx testified at length about Enoch Investments. It only had $10, $12 million of equity at play and needed a lending party. And its lending party, its partner, was supposed to be First Guaranty Bank. Well, we've looked at Debtor's Exhibit 4 and we've heard Mr. Marx's testimony, the 33 and change million dollars required from First Guaranty Bank could not come in by May 31st at 5:00 p.m., the payoff deadline.

Well, how about Mr. Fleeger? He testified that he paid money into his own attorney's trust account, not into any kind of escrow account at a title company for closing, but his portion was only equity and he still required a lending party. And First Guaranty Bank was out, so Mr. Fleeger sought some kind of loan from Happy State Bank because he understood that Happy State Bank was familiar with this property. How? Almost certainly because Mr. Barton knew that Happy State Bank was

involved despite Mr. Walji's denial to the contrary.

Mr. Fleeger testifies, well, it would have been a heck of a lot more difficult to try and obtain financing is Happy State Bank was out, and they were out. And so Mr. Fleeger, while he may have had some equity, he didn't have a loan partner and so could not close by May 31st at 5:00 p.m.

We've already addressed First Guaranty Bank. The term sheet at Exhibit D4, at Lender's Exhibit D4 -- sorry, Debtor's Exhibit D4 -- shows that the term sheet wasn't even executed until May 27th and that First Guaranty Bank required ten additional business days to close. Again, that doesn't put us anywhere close to 5:00 p.m. at May 31st. That is the only evidence in the record about any funding source other than some of Mr. Walji or Mr. Barton's testimony, which is not substantiated by any written evidence, whether it was filed under seal, whether there was a motion for a protective order. None of that took place.

So all you have is some testimony that other parties might have been farther along than PLN, Mr. Kickham's entity, despite the fact that we know at 3:17 p.m. Mr. Walji was representing to Happy State Bank representatives, HNGH representatives, Mr. Marx, its fellow or Mr. Walji's fellow attorney, Ms. Lindauer, that the funding source for closing was Mr. Kickham and the Private Lending Network.

And really, Your Honor, that's the reality. The

debtor didn't have any money, right? We've seen this Private Lender Network letter. Even if it had all the documents, it's still going to require five business days to close and fund. Exhibit 85A, 3:45 p.m., Private Lender Network already knows it's out.

Critically, the Private Lender Network said, finally our underwriting stated that the May 18, 2022, plain confirmation order has a 14 day appeal period. And that would be after May 30, 2022, i.e., June 1, 2022. And thus, May 30, 2022, could not have been possible to satisfy our underwriter. In that sense, closing by the payoff deadline, that i.e., June 1, before June 1, was an impossibility.

Now the debtor is, in essence asking this Court to just ignore that lack of funding. It says really the issue is inequitable estoppel and it's all about document delays. The funding would have been there despite all the statements by those funding parties that they couldn't possibly fund on May 31st if only the documents had come in a little bit earlier. But as we've noted, Mr. Dooley says it's seven to ten days to draft the documents and that SEndera Schedule C on the title commitment wasn't provided until seven days -- I think four business days -- prior to the May 31st closing deadline.

Now, Mr. Astor said, well, it may take seven to ten days to draft, but then you have to negotiate. And Mr. Barton agreed with that. And so what Mr. Astor suggested was that

your typical closing, if you want to get all these documents in a timely fashion, needs to take place no less than 30 days in advance. That's when you need to start sitting down, having conversations, addressing who's going to do what to ensure that documents are timely provided. This was the debtor's closing and the debtor didn't do that.

As we've showed in the timeline May 16th, May 18th, it was HNGH asking, hey, are we going to have a closing checklist? Hey, when are we going to see drafts of the documents that you guys are providing?

Now, Barton testified that the debtor has now drafted some closing documents, but it waited until after May 31st to do that. And while the documents might be in a form acceptable to the debtor, they would still have to be negotiated. And the documents are going to require HNGH approval and the documents are going to require takeout lender approval, and Barton proves the point. His testimony establishes the point.

The debtor needed to start its closing prep in March or April. It knew on March 15th. It knew on March 17th when the modified agreed order went in that it was going to have until May 31st, actually May 30th, and that it had to have its ducks in a row and it had to have a finance party. And it didn't provide a list of documents that the debtor was going to want for closing, any list, until May 21st or 24th, four business days before closing, and then May 30th.

And that, Your Honor, we think is absurd. It shows that there's no merit to the equitable estoppel argument. The closing failed because the debtor didn't have money on the payoff deadline. The debtor sought closing documents too late and it waited so long because it didn't have a solid closing party for its May 31st closing. And that's why it's trying to get a commitment letter from a bank on May 27th. That's why the debtor and Mr. Barton are begging HNGH, Mr. Nambiar, me, Julie Blakeley, to waive conflicts so Matt Fleeger can go try and get a loan from Happy State Bank to try and close the transaction.

We know that the debtor failed to provide comments critical to the rescission deed for three weeks. The debtor didn't provide any comments to the payoff of note, release of lien, release of assignment of leases and rents. The debtor stonewalled the Happy State Bank release. The fact that the debtor has now prepared closing documents proves, if anything, that the debtor could have done so in a timely fashion had it actually had a closing party and a desire to get things done.

But the reality is closing failed because the debtor didn't have money. The debtor sought closing documents too late. No closing party. No comments to key documents. No comments to the rescission instrument. No comments to other payoff instruments and recorded instruments. No allowance of HSB to complete the release of its collateral assignment and

delivery of the note to HNGH so HNGH could provide the note stamped paid. The debtor didn't prepare closing documents until after the payoff deadline. The closing failed, simply put, because of the debtor.

Now, the debtor is trying to put a bunch of red herrings out there to distract this Court from the reality of this closing, okay. And the first one, the big one that we've seen through this, is this rescission deed dispute. And I'll be quick here because we've mostly addressed this.

The argument that the HNGH didn't have the rescission deed in its possession, or I didn't, on December 11th is somehow a breech that excuses all further debtor performance, right? It's this that's the first breach and since they breached, then our performance is excused. That's the equitable estoppel argument.

But that has obvious holes in it, right. The debtor still had an obligation to pay the consideration payments. The debtor still had an obligation to make their March payments. The debtor still had the obligation to make tax payments and did perform and understood that it had an obligation to perform, and in fact, is using its performance as some evidence of good faith in its behavior exonerating itself from its failed closing at this point in the bankruptcy case.

And the reality is because there's no causal relationship on the failure to close. HNGH not holding an

executed rescission deed on December 11th had nothing to do with the debtor's failure of closing. The debtor could have turned its attention to the form of rescission deed on May 12th or May 13th or May 14th or May 15th or May 16 and on and on and on. It didn't do so. It just chose to ignore the issue, even when it had an opportunity to address it well in advance, weeks in advance of any potential closing. And the timing shows that. We go May 12th to May 30th before there's any kind of proposed comments.

And the debtor has made this argument that while the rescission instruments don't have a reinstatement of the note and so that's another trap for HNGH. And really, the issue is that HNGH's rescission deed purported to address that. It talks about rescission, that deed in lieu is rescinded and avoided effective as of October 29th. The following are reinstated effective immediately prior to the occurrence of the payoff event, okay. This would be executed by both parties.

This is from HNGH's rescission deed, the special warranty deed. It incorporated the obligations of the agreed order. It returns title to the debtor effective as of October 29th and rescinds and avoids the deed in lieu. That is a -- that would have been, if recorded, of public record. It also reinstates the note and deed of trust satisfying the obligations of the agreed order.

Now, what happened is the debtor sought to replace

that document with a rescission instrument that was not a deed that did not reinstate the note and deed of trust, and then immediately at that point argue, well, you don't have a separate document reinstating the note and deed of trust, and so that's another breach. We should have our performance excused because now you're going to agree to use our form of instrument. And so once you've done that and you've gotten rid of your HNGH rescission deed, ha, we've found another issue to stick you with. And we think that that leaves the debtor in really a kind of bad faith position, right?

Now, the agreed orders required a deed and the debtor's rescission instrument wasn't a deed, and we know that and Mr. Marx had acknowledged that, right. Is HNGH document a deed? Yes. Is the debtor's? No, it is not. And we know that Mr. Marx never provided any comments to any of the instruments directly to HNGH. So this is, in essence, another trap. HNGH defaulted now because the instrument reinstating the note disappeared. If we accept the debtor's instrument, now we have a different default and the debtor is preying on that point. Again, not an equitable estoppel argument. That is an inequitable argument, to say the least.

The next red herring is these payments to HNGH by the debtor. This has been addressed, so again I'm going to go quickly. That math does not equal $9 million and there were no $500,000 consideration payments. There were $100,000

consideration payments, and there were five of them. And this is that section of Exhibit 8, the agreed order at Docket Number 64 that addresses that.

Now, the debtor has made this argument that because it paid money and now HNGH is going to enforce its rights under the agreed orders, it must be a predatory lender. But Mr. Barton and Nambiar acknowledge that ad valorem tax payments paid to taxing authorities by a borrower are not anything but customary. It's totally usual.

The debtor has only paid $6.2 million dollars-ish to HNGH since January 1, not $9 million. And, Your Honor, that amount, I mean, this is evidence that there is no predatory relationship. That's below -- below -- the note carry rate. Mr. Barton acknowledged the note rate is 12.4 percent. The forbearance rate was 8 percent. The rate applicable here is below 12 percent even if you go back as far as January 1 and carry it forward all the way through May 31, 2022. There is no evidence of predacious lending, predatory lending of loan to own lending. There's a discounted extension rate and there is a whole bunch of extensions, right?

We've already seen in this bankruptcy case you have 215 days. Again, not evidence of predatory lending. And Mr. Barton acknowledged on the stand that come March 15th the debtor didn't have a closing party. The debtor didn't have any of these arguments. The debtor was dead to rights if HNGH

wanted to just say, we're not going to extend you. We'll go to Court. You can argue your motion to extend the deadline, but we didn't. HNGH didn't. HNGH accepted monetary consideration, right, that still showed the payments from the debtor since January of 2021 are below the note rate. So it's not some exorbitant amount. There's no dagger in the ribs by HNGH to the debtor here for an extension of time.

And this was supposed to be the last shot. The debtor just failed to perform. And this just goes to show, Your Honor, if we use the note interest rate from the payoff obligation, the interest over the 17 months that we've been discussing, this 7.15 million. The amount paid by the debtor was 6.17 million, 6.18 million. The extent -- the extensive extensions by HNGH inured to the benefit of the debtor.

The next red herring is the value of the property. And this is part of the debtor's appeal to equity that it forecast yesterday. You have some major inconsistencies in the valuation of the property from the debtor. You see the adversary complaint at 50 million. Then the SOFA goes to 51. Then Schedule A goes to 58.5, even though that was filed concurrently with this statement of financial affairs. Then you have an amended schedule at 56.4. Now, you know, the debtors argue that it's work 58.5, 60 million, 65 million, something like that.

And the argument there is, Your Honor, don't deprive

the creditors of the potential windfall under the plan that they could receive if the debtor is only just successful at closing a transaction, right? But we can look at the Newmark appraisal that's shown at Exhibit 122, right. Newmark is an exceptionally reputable firm. And the value in late December, mid December, sorry, is $39.75 million. It's about a push with the financial obligations under the payoff amount. Even if that has increased in value some, the expectation that that number would jump to almost $60 million, a 50 percent increase in value, is preposterous.

Now, what is the probative value of these competing appraisals for the purposes of the debtor's equitable argument, this benefit to creditors? Well, Your Honor, this has nothing to do with paying creditors under the plan, right? This has nothing to do with the satisfaction of creditor claims. Docket Number 72, this is the debtor's own schedules, shows that the total general unsecured claims are about $558,000. And this number largely consists of engineering firms and law firms that have been stiffed over the last two or three years and an SBA debt that has never before shown up on any of the debtor's schedules.

Now, while HNGH believes that that list of general unsecured creditors is very questionable, even if we're talking about equitable treatment of those creditors, the plan only proposes to pay like 50 cents on the dollar in a series of

payments to those unsecured creditors. But the debtor is making the argument, oh, Your Honor, don't deprive the creditors of all this equity value in the property.

If it was really about paying off creditors from the equity in the property and the property was wroth $58 million, the debtor could have easily tested the market and sold this. And this is from the March 22 transcript at Page 3, 20 through 25. And this is Ms. Lindauer's statements before Judge Hale. And again, just for some context, Your Honor, this is a hearing that took place after the March 17th order was entered where the Court had a setting to basically get the parties together to discuss what next steps were heading into this May 30th, May 31st payoff deadline.

And Ms. Lindauer notes for the Court, the second thing, the debtor has contacted Jones LaSalle, JLL, as a broker. And they're looking at hiring them as a listing agent for the property as really as a backup to the Tall Ship transaction, which we know petered out and failed miserably. In the event for some reason that transaction doesn't come to fruition, the debtor wants to have an opportunity to try and market and sell the property.

The debtor never did that. The debtor never sought to sell this property. The debtor never hired a broker during the course of its bankruptcy case. And, Your Honor, you can take judicial notice of that. Look at the docket. There's

never a motion to employ a broker here to sell the property. There's never a 363 sale motion that ever took place. This really has nothing to do with realizing the equity for the benefit of creditors. This isn't some 105(a) we want to support our plan payments argument, right.

This is about preserving Tim Barton's, JMJ Development's, whomever's, purported upside if the debtor is ever able to raise the $380 million that Mr. Barton has testified would be necessary to actually develop the Mandarin Oriental property that he's spoken about on a number of occasions. This is about a preservation of Mr. Barton's personal opportunity. It has nothing to do with realizing equity for the benefit of creditors under a plan. It's just a convenient argument, but not one based on reality.

And really, that's in part because the reality is this property is not worth $60 million. Newmark is a reputable appraisal. The Newmark appraisal is based on sales comps in the Turtle Creek area, not for hotels in other cities like Miami or Austin or anything like that. And if this property is worth $60 million, it's hard to imagine why the debtor couldn't obtain financing from October 29, 2021, when it admitted it started trying to work with banks for takeout, to May 31, 2022. It's had seven months.

This isn't a 75 day extension from March 15th to May 31st that got a little sticky for the debtor. This is seven

months of opportunities resulting in a catastrophic failure by the debtor.

Now, Your Honor, I want to spend just ten minutes addressing the plan modification motion and the -- what I'll call the order clarification motion or plan implementation motion. And these are the motions that the debtor filed that are also set for today. And the plan modification motion is the -- at Docket Entry 174 and looks at Section 1127(b) in an effort to modify the plan.

And what the debtor proposes to do is modify the plan by extending the payoff deadline to some later date and forcing HNGH after the expiration of the earlier May 31st payoff deadline to execute a series of documents to close on a transaction that is purportedly something the debtor can actually do at this point, right? Although there's not been evidence of that.

And, Your Honor, the modification motion fails for a number of reasons. The most obvious one is In Re U.S. Brass, which was actually cited by the debtor in its motion. If there is an adverse modification after plan confirmation, it is disallowed. And here it could not be more obvious that this proposed modification adversely affects HNGH, right?

So In Re Viking Offshore addressed kind of a similar issue in which there was a post-confirmation modification that the Court determined was adverse. In that situation, there had

been a liquidation of assets and there was money available for a distribution. The potential parties receiving the distribution on the waterfall under the plan had engaged in a series of negotiations and for the most part had come to an agreement of about how those proceeds would be shared. And the proceed sharing was slightly different than that contemplated in the plan.

And despite the fact that the parties had mostly agreed, there was at least one party who had not expressed an express agreement to the terms of that pay sharing. And what the Court determined was there wasn't evidence that some party under the plan wasn't going to be adversely affected by the revised sharing of proceeds. And so the modification was denied. And that was Judge Letitia Paul in Houston.

And that one seems like a pretty obvious one, right? If you're going to receive less money under the plan that you initially anticipated, that's an adverse modification. And so what we did was we tried to look at some research under Section 1127 about whether the extension of the deadline could be considered an adverse material effect on a party's rights.

And there's a case out of New Mexico called In Re Sanford. And In Re Sanford is a little bit of a different issue. It addresses a different provision of 1127. I believe it's 1127(e), addressing the modification after the fact with a settlement agreement instead of a plan. And it's important

because the Court goes into some analysis about whether the extension of a sale deadline, a payoff deadline under the settlement agreement, is something that if extended would be materially adverse and would affect the substantive rights of the secured lenders in that case.

And what the Court found was that where the lenders had been waiting an extended period of time to be able to exercise their rights and remedies and for that deadline was going to be further pushed to try and accommodate the debtor's efforts in that situation to close the sale transaction, that that extension was a material adverse change to the parties' substantive rights under the settlement agreement. And so the Court refused to allow that modification of the settlement agreement.

And that same analysis takes place and there's an additional fact in that <u>In Re Sanford</u> case that is important here because it ties into this equitable argument asserted by Ms. Lindauer about equity in the property. In <u>Sanford</u>, what the debtor put in front of the Court was some evidence that it had entered into an LOI to sell its property for a price that would allow the debtor to actually recover close to a half million dollars in equity in the property. Total debts were about $3.5 million. LOI was optimistically at $4 million. And that's what was presented by the debtor in that case.

And the Court said, doesn't matter, right. One, it's

still speculative of whether a closing at $4 million is going to take place. And two, extending that deadline when that was the bargained for consideration agreed to by all the parties would adversely affect the substantive rights of the secured lenders, Capital S, Capital L in that case.

And, Your Honor, that's exactly what we're dealing with in this case, right. The debtor purports to have the ability to close. It purports to have equity in the property, but it has had seven months to take care of business. And even before that, it had a full year after its initial maturity date default.

So right now, Your Honor, we're like at one year and eight months. This has been an extraordinarily long time. There has been a fixed deadline in place on a number of different occasions and the debtor has blown it in each instance. It would be a material adverse modification in violation of U.S. Brass to amend the plan to require HNGH to be subjected to an extended payoff deadline and be subjected to the documents of the debtor's choosing.

The payoff deadline expired and at some point, there has to be an end of the day. And so we believe that this Court would be well within its rights under U.S. Brass, under In Re Viking Offshore, and the analysis of In Re Sanford, to deny the Court or the debtor's Docket Number 174 plan modification motion.

And next, Your Honor, I do want to talk about what I call the plan implementation motion. And that's at Docket Number 173. This is really a scattershot by the debtor of a series of different means of trying to change the terms of the agreed orders.

And I'll get into this in a little bit more depth in just a little bit, but attempting to change the terms of the agreed orders inherently changes the terms of the plan because Section 2.0 and Section 6.01 of the plan make abundantly clear, right, that the agreed orders are incorporated into the plan and define the rights of HNGH. But not only that, the agreed orders supercede the terms of the plan.

So even if you were to modify the plan, modification of the plan alone would not modify the agreed orders. And since the agreed orders control, any modifications to the plan would be mooted. So there can't be a modification to the plan without a modification of this Court's agreed orders. And that's where we turn in part to this plan implementation motion. It's really a motion filed under 11 U.S.C. 1142, but 1142 isn't about a modification of any of the terms of a plan or an order. 1142 is about the implementation of provisions of a plan.

And where we've seen this take place is you have a 363 sale and the 363 sale is incorporated into a plan. And this is us personally. I'm not citing to the case in this

case. And there is something that says like, you know, there is a cooperation provision where the debtor agrees to release a UCC-1 or a UCC-3 or something like that just to ensure that there's clear title even though the Court's order is self-effectuating, could be used as a recorded estimate to show that this party has clear and unfettered title without any, you know, liens, claims, or encumbrances. Well, if a party wants to have that cooperation, it can file a 1142 motion to direct the debtor to, you know, implement some document that it has already agreed to provide.

Now, that's a little bit different in this case because what the debtor is proposing to do is extend deadlines and provide additional obligations on HNGH that HNGH did not previous have under the agreed orders. And so what this really is, is an attempt to substantively revise the terms of the agreed orders to then shift those obligations into the plan and force HNGH to comply with the debtor's request for an extended payoff deadline and execution of documents and all the like.

So really it is a motion to revise the agreed orders. And the means of revising an agreed order included in that motion is really just a reference to Rule 60(b), but I think that might be just kind of a mistake because Rule 60(b) is not applicable to clerical mistakes and the implementation motion cites to a clerical mistake, right. The use of Rule 60 to resolve a clerical mistake.

Well, what is a clerical mistake? The Fifth Circuit has addressed this almost 40 years ago, made abundantly clear. It's still controlling case law. That any modification affecting the substantive right of a party in an order cannot be considered a clerical mistake. So what the debtor is attempting to do is rewrite obligations into the agreed order. And rewriting those obligations in the agreed order of who is supposed to prepare what documents and who has to sign what documents and when has nothing to do with the clerical mistake.

And the debtor has not cited to any provision in 60(b) that would allow for that substantive rewrite. It hasn't argued that there was some kind of excusable neglect or that there are new facts that are supporting its position enabling it to rewrite. It hasn't made any of those arguments in its motion. It argues exclusively that under Rule 60(a) the agreed order should be revise because of a clerical mistake, and that's inapplicable.

And really, we get back to Sanford, right? What the debtor is really trying to do here is change the agreed orders to extend the payoff deadline like in Sanford the debtor was trying to get a revision to a settlement agreement to extend the sale deadline. But as the Court noted in Sanford, that is a substantive and adverse modification. So what we really get to is the debtor is seeking to have a substantive adverse modification of an agreed order which would in effect adversely

modify the plan after confirmation which is precluded by Fifth Circuit precedent.

And so any way you try and slice it under this plan implementation motion at Docket 173 or the plan modification motion at 174, you run afoul of controlling Fifth Circuit case law. And so, Your Honor, we would ask that this Court deny those motions and we would ask that the Court grant HNGH's motion to enforce and execute the proposed order that was included therewith, or if the Court determines that it's necessary to make some minor modifications to the order, that the Court grant the motion and then do so as it sees fit.

And with that, Your Honor, we appreciate the Court's time.

THE COURT: All right. Thank you, Mr. Kane.

Ms. Lindauer, I think I'd like to take about a ten minute recess before we start if you don't mind.

MS. LINDAUER: That would be helpful, Your Honor. And in the meantime, could Mr. Kane email us a copy of his PowerPoint so that we have that to speak to. He has -- obviously has a copy of ours, but we would like to have a copy of his if that's possible.

MR. KANE: Yes, Ms. Lindauer. I'll try.

MS. LINDAUER: Okay.

MR. KANE: I think it's really big, and so I can't just email it to you. I think I have to get my paralegal to

send it over in a file share.

MS. LINDAUER: That's fine.

MR. KANE: So I will try and do that in the next couple of minutes.

MS. LINDAUER: Okay. Very good. Thank you, Your Honor.

THE COURT: All right. We'll be in recess for about ten minutes.

(Recess taken at 11:11 a.m/Reconvened at 11:27 a.m.)

THE COURT: All right. We're back on the record in the 2999TC Acquisitions case. I see Mr. Kane.

MR. KANE: And, Your Honor, we filed our demonstrative on the Court's docket during the interim break.

THE COURT: All right. Thank you.

MS. LINDAUER: Thank you, Your Honor.

Your Honor, it's 11:30 at this point. And we were wondering if we could just -- this will give us a better chance to respond to some of the points raised by Mr. Kane in his PowerPoint. I do appreciate him sending us a copy of that.

If we could take a lunch break at this point and then come back, because otherwise we're going to run our closing argument right through the middle of your staff's, yours and everyone else's lunch. Plus, Mr. Rodriguez tells me he has some blood sugar issues that do require him to eat. So I don't know if we could go ahead and take a break now and then come

back and we'll do our presentation.

It's 11:30.

THE COURT: Can you -- let's see. Would you be able to start at 12:15?

MS. LINDAUER: Yes. I'm told that's fine, Your Honor.

THE COURT: Mr. Kane?

MR. KANE: Yeah, that's fine, Your Honor.

THE COURT: Okay. We'll, we'll take a lunch recess and then we'll plan on starting at 12:15.

MS. LINDAUER: Very good. Thank you, Your Honor, for that.

THE COURT: All right.

(Recess taken at 11:29 a.m/Reconvened at 12:16 p.m.)

THE COURT: All right. We're back on the record in the 2999TC Acquisitions case.

I see Ms. Lindauer.

Mr. Kane, are you there?

MR. KANE: I am, Your Honor. Thank you.

THE COURT: Okay. Ms. Lindauer, give me just a minute here.

MS. LINDAUER: Sure.

(Pause)

THE COURT: There we go. Okay.

I'm ready when you are.

MS. LINDAUER: Very good. Thank you, Your Honor.

And, Your Honor, for the record, Joyce Lindauer and Rey Rodriguez for 2999TC Acquisitions, the reorganized debtor in this matter.

Sydney, if you can go ahead and pull up our PowerPoint.

As I mentioned, Your Honor, this was filed at Docket 250. It appears on the Court's docket in Case Number 21-31954. This is the debtor's closing argument in response to the motion filed by HNGH Turtle Creek.

Go to the next slide.

Your Honor, we styled this as HNGH Turtle Creek, a Delaware LLC versus 2999TC Acquisitions, also a Delaware LLC, because the motion that the Court has in front of it, the first motion, the motion to enforce, puts the secured lender and the debtor in an adversarial context, which they have been in throughout these proceedings.

I think that becomes important in looking at the arrangement between these parties. These parties have never been posited as being on friendly terms with each other. And, therefore, any closing that was proposed, whether it was in March or May, was and should be viewed as a hostile closing, which means that the cooperation between the parties while cordial and professional was not cooperative in the sense that both parties were posed in positions to in somewhat be opposed

to each other.

The next one.

Next slide, Sydney.

As we stated, and I think Mr. Kane stated, the fundamental principle here does rely in part on equitable estoppel, which precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes, as well.

We have essentially one significant contract, although there are three court orders. There's the December order, there's the March order, and there's the confirmation order that make up the realm of orders involving the parties in this dispute. I think it's fundamental that the Court realize the significance of the obligations imposed on each party in connection with those court orders.

I would point out that HNGH while it spent time going through an extensive timeline which we'll address, it fails to focus on the fundamental obligations of the parties under the applicable orders that the Court has in front of you.

Next slide.

So what is before the Court? First, there are agreed orders to which the motion to enforce refers, and the agreed orders are an agreed order regarding motion to lift stay and related motions. We refer to that one as Docket Number 9- -- I'm sorry, Docket Number 64, the first agreed order. And then

there's a second agreed order which is referred to as Docket Number 94.

Next box.

The actions HNGH request the Court to take in the motion to enforce the agreed orders are identified as follows:

HNGH requests the Court to enter an order substantially in the form of their attached Exhibit A to their motion. And what do they ask the Court to do? They ask the Court to confirm that HNGH is the rightful and legal owner of the property with all right, title, and interest therein free and clear of any liens, claims, encumbrances, and clouds on title asserted or that could be asserted by the debtor, Tim Barton, and any other entities set forth in the stipulation and agreed orders.

Second, HNGH further requests that this Court require the debtor to talk all steps necessary to release its lis pendens and to actually cause the release of its lis pendens not later than seven days after entry of an order approving this motion.

Next, HNGH requests that this Court hold the debtor, Tim Barton, and any other necessary party in contempt of court should they interfere with HNGH's enjoyment of the property or seek to assert litigation against HNGH that they have previously waived, released, adjudicated to judgment, or had dismissed with prejudice to re-fight.

The relief requested by HNGH cannot be granted as a procedural matter. And by that, Your Honor, we're pointing to the fact that this is a motion to enforce. The scope of the relief being sought by HNGH is not merely to enforce an existing order or orders of this Court.

The relief being sought by HNGH extends beyond -- and Mr. Phelan did a good job of arguing this in the opening statements -- extends beyond the relief that should be available in this context without the filing of an adversary proceeding or other litigation. And let's pick that apart.

Let's go to the next.

It's axiomatic that in law that a party to a contract such as the agreed orders cannot seek to enforce a contract if the party has breached the contract, and we'll come back to this in a second. But what I want to focus on is the type of relief being sought here today because the motion to enforce is the operative document you have in front of you, Your Honor.

You do not have an adversary proceeding. You do not have a motion for summary judgment. You do not have the procedural safeguards that should be granted in connection with the type of relief that Mr. Kane seeks.

They seek a declaratory judgment that they hold title to the property. They seek to enjoin parties from acting, including third parties, Tim Barton and any other necessary party as well as seeking contempt should those persons or

parties take any action.

Again, parties not before the Court in this proceeding, yet, they seek to prevent those parties from asserting whatever rights or relief that they may seek.

Let's take a look at -- no, go back -- the operative order, and I think this is what's important. And Mr. Kane spent no time really talking about the language in the orders. And I think that's really important for the Court to focus on. We're all looking at, and we give you the footnote reference below, Debtor's Exhibit B12, Page 2. And we'll do that throughout the slides.

But "ordered, adjudged, and decreed that the automatic stay shall remain in full force and effect" and then we go on to say that "once there is a payoff event, which note shall be reinstated immediately prior to the debtor's payment to HNGH of the payoff amount and counsel for HNGH shall hold the rescission deed during the pendency of the term of this agreed order."

The reason that we yellow and blued those provisions are those are central to what the parties agreed to. So back in December of 2021 when the parties reached an agreement regarding some pretty nasty filings by both sides, admittedly, the relief that was agreed to by both sides was that the note would be reinstated and prior to the payoff. And counsel would hold the rescission deed.

Why were those provisions so important? Lest we forget the underlying transaction that occurred. There had been a deed in lieu filed. Title to the property was in the name of HNGH. The filing of the deed created a merger of the underlying loan documents into title. The legal effect was a merger.

So there was no note on December 10th. And in order for there to be a note, it had to be reinstated. And as we'll see as we go through this, that in and of itself becomes problematic. And then counsel was supposed to hold the rescission deed and why?

And they were supposed to hold the rescission deed so that the deed in lieu transaction would be held in abeyance. And Nate Christensen in his testimony told you as he tried to answer when I asked him who owned the property after November 1st. And he said, well, I'm not really that -- so -- and kind of bumbled around. And the reason he did was because the concept was that the debtor would have all trappings of ownership save and except the actual title to the property during these payoff periods.

And why does this become so important? It becomes important because as we approach closing deadlines and dates, this order in large part dictates the role of each party in connection with the transactions to come.

Next slide.

What is before the Court? HNGH failed to execute and hold a rescission deed which was ordered to be a live document held in trust by HNGH's counsel. Mr. Kane makes light of the fact that, well, so what, so what that we weren't holding an executed rescission deed. It was a part of a court order. It was a requirement that they hold that deed, and they didn't do so. And we know that, and we'll get into the facts of that in a minute.

What's the next point?

HNGH cannot reinstate the promissory note immediately before payoff. And we know that because the promissory note was being held by Happy State Bank. So at the time that HNGH agreed to the terms of this agreed order, it made no mention of Happy State Bank, and it agreed to a provision to reinstate a promissory note that it did not hold.

Next provision.

HNGH failed to deliver documents necessary to ensure title of the property to the debtor. And we know that from the email exchanges that went back and forth during the month of May that there were a series of documents that were going back and forth. And what's ironic to me is that Mr. Kane complains I didn't get any comments, they didn't provide me any comments.

They didn't get any comments on a special warranty deed, yet, they executed it and delivered it to Sendera Title on May 27th. They never executed the release of the deed of

trust. They never executed the UCC financing statements. And they make light of all that and say, well, those were not material documents, those could have been executed later.

And that's not what the agreement was. The agreement was that each party would be put in a place where in this instance the debtor had the necessary documents in hand not only to pay off HNGH but to obtain funding.

All right. So next point.

HNGH's material breaches of their obligations under the agreed orders renders the debtor unable to perform. And we'll see that in some of the exhibits and orders and letters that were sent regarding the debtor's ability to perform.

Next.

HNGH is equitably estopped from enforcing the agreed orders. And this again goes to the basic concept that those that asked to enforce have to come to the Court with having performed and clean hands. And what Mr. Kane urges you over and over to agree is that what they did was enough to meet their obligations, and we beg to disagree, Your Honor. They did not meet their obligations to shift the burden then to the debtor to perform.

Next.

HNGH is bound by the confirmation order even though it did not vote on the plan. That's just basic bankruptcy law. That's yet another order that binds HNGH.

Next.

And, finally, debtor stands to pay its obligations to HNGH, has evidence of such, and as a result debtor requests the Court's assistance.

Let's go to the next slide.

What's before the Court? I asked Mr. Nambiar

"Q What's the emergency for having these hearings.
"A That's a question for my counsel.
"Q So you don't have any understanding of that?
"A I have a layman's understanding, but that's a question for my counsel."

We're here on emergency motion to enforce court orders, as the Court knows, with no discovery, with no ability to take depositions to ask questions. And these hearings have gone on for an extended period of time because, in essence, the discovery has been put in front of you for us to call witnesses, ask the questions, and have you analyze that.

And the Court challenged Mr. Phelan and said, why didn't you agree to an emergency order. We agreed to emergency hearing because we believed, Your Honor, that on the first day of the hearings, the motion would be denied. And why would it be denied? Because the relief being sought was outside what we believed the Court had the ability to do in the context of motion practice.

Mr. Phelan spent, and I read the transcript, page

after page explaining to the Court how the type of relief being sought is not appropriate in this context. It needs to be framed in the context of an adversary. And why? So that each party, the debtor and the creditor, have the same safeguards, procedural safeguards, that are given in the context of an adversary proceeding.

There is no question that there's been no depositions. There's no question that there's been no discovery. There's no question. And I do appreciate the Court's time and giving us hour after hour to present evidence. But let's not forget HNGH rested its case on a series of documents that had been admitted for the limited purpose of providing notice. And that's what they rested their case on. At that point, HNGH failed to meet its burden for you to grant a motion to enforce.

So what did the debtor do? Realizing that that wasn't going to be the end of the fight, it started calling its witnesses one after another -- Randy Marx, all of the witnesses that we put before the Court to explain to the Court why HNGH was wrong and why HNGH should not be entitled to the relief that it seeks.

Next slide.

And what does *[sic] [sic]* Acquisitions own? It owns this property on Turtle Creek Boulevard in Dallas, Texas right next to the Mansion Hotel. This is the property that the

debtor seeks to retain and pay off the debt to HNGH. This is the property now that HNGH seeks to retain and not allow the debtor to pay off the debt to HNGH.

Let's go to an overview of events leading to the bankruptcy filing. First, December 7, 2020, HNGH Turtle Creek buys 100 percent lender position. As Mr. Barton testified, this was only eight months remaining on the loan until it came due. HNGH became what amounts to a predatory lender at that point, Your Honor, is our position.

On March 1st, 2021, just three months later, four months later, HNGH and 299 *[sic]* execute a forbearance and settlement agreement to resolve litigation. Mr. Kane showed you these documents. And HNGH modified the loan to increase the principal to 40,073,171 from 32,500,000 dollars, roughly a -- what is that, about a seven-, eight-million-dollar increase. And in exchange, there was an extension of the maturity until October 29, 2021.

In each instance you will see that when the debtor negotiated with HNGH, it always paid significant sums of money in exchange for those negotiations and those extensions. And there's no complaint that there was an increase in the amount paid to HNGH in exchange and in resolution of that forbearance agreement. And as a result of the forbearance agreement -- Sydney, next point -- HNGH holds a deed in lieu in escrow according to the terms of the forbearance.

Next point.

And then 299TC *[sic]* makes all the forbearance payments up to the extended maturity date. Didn't hear any defaults in those payments.

Go to the next one.

On October 27th and 28th, the testimony couldn't have been clearer, the parties were actively working on and verbally agreed to an extension of the forbearance agreement with HNGH to prepare the documents. And on October 29th, unbeknownest to 299TC *[sic]*, HNGH ignores their promises for an extension and asks for the deed held in escrow to be removed from escrow and sent for recording on the basis that it claims 299TC *[sic]* had defaulted.

We know what happened. The deed is sent to Dallas County after hours for recording. And on October 29th at 5:48 p.m., 299TC *[sic]* defensively files a Chapter 11 bankruptcy petition. It files that petition to save its property and also to stop whatever activity was going on late in the day on October 29th when they sent the deed off for recording.

The timeline would show that on October 29th when the bankruptcy was filed, that was the first time 299TC *[sic]* was made aware that the lender had in fact pulled the deed out of escrow and had taken action on that document.

Next slide.

November 1st, 2021, the deed is recorded in Dallas

County records by HNGH with full knowledge and notice of 299TC's *[sic]* bankruptcy filing. Very clear HNGH did nothing to try to stop the filing of the deed in the Dallas County records after the bankruptcy was filed.

299TC *[sic]* asserts the bankruptcy makes this filing void and a violation of the automatic stay. HNGH disagrees, yet naked title is now of record to HNGH with the filing occurring after the bankruptcy filing. HNGH's loan and security instruments have now merged with the deed.

And why does that become important? Because when the parties agreed to the December 10th order, it was clearly contemplated that this transaction would have to be undone. November 4th, HNGH files a motion, Docket 10, asking for the deed to be good and treated effective as of 10/29 to avoid stay issues and voiding issues.

On November 5th, 299TC *[sic]* files its motions to enforce the stay and sanctions, Documents 14 and 15. On November 11th, 299TC *[sic]* files an adversary proceeding raising all these related recording issues and seeking to avoid the deed.

The parties then conduct limited discovery on the matters related to the motion to lift stay. There was some reference to Mr. Barton's deposition that was taken during this period of limited discovery. And then the hearing is set on the motions for December 9th, 2021.

And what happens at the hearing? At the hearing, the parties announce an agreement, which is reflected at Debtor's Exhibit 12, Page 2. And this is the agreed order and two key provisions out of that order. The first we've already addressed, which involve the reinstatement of the note and the holding of the rescission deed. And then the second provision was that the deed in lieu which was submitted for filing shall be deemed rescinded and avoided and debtors shall have the right to retain title to the property. That was made the subject of the adversary proceeding.

On December 10th just prior to the December 9th hearing, the parties settled and the first agreed order is entered the following day. This order holds the deed as void and allows debtor to retain title to the property, assuming in key part that there is a payoff event. However, these conditions precedent set up by the parties, parties used the concept of a rescission deed.

The effects of the December 10th order. Title to the property is held in abeyance by HNGH, the holding of an executed rescission deed. HNGH was to prepare and hold this document in trust. And that is very clear from the December 10th order. And I think if you want to talk about red herrings, the testimony of Mr. Christensen and Mr. Nambiar that they merely had to hold a draft makes absolutely no sense. Why would counsel for HNGH have any liability for holding a draft

document? They were supposed to be holding a live document.

And why does that become important? I think it becomes important on two reasons. One, it meant that the title as between the parties -- the debtor and HNGH -- never vested because there was supposed to be a deed being held between the parties that would allow the debtor to regain record ownership of the property.

Second, if there had been a deed held, then when we asked for a copy of that deed, we would have seen a signed document, not a draft document. And why was that important? Because the draft document that was provided was not a final document. It was just that; it was a draft subject to comment, further changes, whatever.

Now had the special warranty deed that was filed on May 27th been provided on the 12th signed, I think that the parties would have been in a much more serious situation about dealing with those documents. But when instead we get a draft document that is later then criticized, if you will, Your Honor, I think that that's important because it shows that, first, the order was not followed but, second, it shows that the document was not final. It was not a final document to be executed. It was merely a draft.

And then, last, since October 29th, 2021, debtor has been in possession of the property, operated the property, pays bills and taxes, and maintained all the outward signs of

ownership. And this is what the parties agreed to.

The payoff extension. The March payoff date was extended by agreement. And what's important is every time the debtor agreed and HNGH agreed to an extension, the debtor gave up valuable consideration. Not only did they give up claims and causes of action that they had against HNGH or others, they also made payments, significant payments of money. And they did that with the understanding that they would have some cooperation from HNGH when it came time to close.

As I've pointed out, it was crucial for HNGH to be holding the executed rescission deed at all times so that everything seemed normal to the world even though title was not as recorded. To the extent that a rescission deed had been executed as between the debtor and HNGH, just like that deed in lieu that was executed by the debtor and being held by HNGH, that rescission deed as between the parties would have been effective from and after December 10th as the parties had agreed.

Next.

The debtor pays consideration for all the extensions in good faith. And look at the monies -- and we'll go through this in more detail -- that have been paid. 3.5 million dollars was paid in March. But look at all the other monies that have been paid.

And this is a revised list, Your Honor. I believe it

matches the actual testimony. I believe Mr. Kane is going to dispute this, is that these are the actual dollars paid, some for taxes, clearly. Two of the large amounts were for taxes for the benefit of the property. But the rest are interest, extension fees, and additional consideration and agreed order payments totaling $7,010,607.87.

This is on a debt of $32,500,000. Roughly one-fifth, one-fourth of the total of the debt was paid in fees and expenses and interest to HNGH. So why is the debtor here arguing about performance under agreed orders? It has made a significant contribution to HNGH for which it now seeks a return. It asked to be given the property.

Next slide.

"Q How should this closing have proceeded?"

And this is Mr. Dooley.

"A My understanding from reading the order that was entered by the Court, there were two fundamental aspects of it that were covered by the order, that being there would be a rescission deed that was held in escrow, and I gathered that they were supposed to have been prepared and executed long while before the closing as extended by the subsequent order.

And then my understanding was that in reading the order that the promissory note was to be reinstated immediately prior to the closing and the payoff."

Immediately prior to the payoff.

Next slide.

"Q How should closing have proceeded?

"A But in my practice, particular with an adversarial-type closing like this, the better practice is to see that the note is actually delivered to the title company and preferably instructed by closing instruction letters that will authorize the title company to mark as paid in full and to return it, deliver it to the borrower or at least a commitment to do so."

That's Randy Marx's testimony.

And then things are not as they should be. Number one, 299TC *[sic]* finds out there's no executed rescission deed that is in fact being held. Next, HNGH has never prepared, signed, and delivered to its counsel a presently effective, unconditional rescission deed as the orders require.

"Q And through this process, did we discover that in fact the deed was not being held?

"A The first time I saw the draft was on May 12th was the first time I saw them."

And I don't think there's any dispute that the first time the debtor's counsels saw a draft of a rescission deed was on May 12th.

Next slide.

Things are not as they should be. 299TC *[sic]* finds out from HNGH's counsel that the rescission deed was purportedly drafted in January 2020, however, there's no

evidence that it was ever drafted prior to May of 2020.

"Q Okay. And was it actually executed by anyone in or about January?

"A No, no. It was our view that we were going to win." So no, no."

And that's Nate Christensen's testimony on June 24th.

Overview of current matters. HNGH Turtle Creek is a hyper-opportunistic lender interested in owning the property instead of its loan being paid off and/or extracting millions of dollars in the windfall, extra payments from the reorganized debtor, and imposing encumbrances and unilateral HNGH control over 299TC's *[sic]* property to extra even more millions of dollars as windfalls.

Next point.

HNGH breached the agreed order prior to the debtor's obligation to perform. One, HNGH failed to prepare the required rescission deed per the agreed orders. Two, HNGH failed to hold the required rescission deed per the agreed orders. Three, HNGH unable to reinstate the promissory note held by Happy State Bank which had merged into the deed filed by HNGH.

Next point.

HNGH failed to deliver the required closing documents. The title company required documents under Schedule C of the title commitment and other necessary documents as

highlighted by the agreed orders. To be noted, the note was a 12-month land loan which is highly unusual. This is Mr. Barton.

"A Somewhere along the line during COVID, we got a letter. I opened it up and remember the letters H-N something. Basically a notification that they had bought a minority share of my land loan which is highly highly confusing.

When you have a 12-month land loan, there's almost no reason that someone would buy a minority position in a land loan of 12 months. You buy a participation in a longer loan, something that has more reason to be there. But a 12-month loan, it didn't make sense to me.

I didn't really pay attention to it. There was nothing I could do to object to. So I just took note of it. But as God as my witness, I looked at my paper and I said I wonder if this was Vipin."

Who is HNGH Turtle Creek, LLC? HNGH Turtle Creek, LLC is a Delaware Limited Liability Company, not a Texas LLC. It's a purchaser of the acquisition loan on 2999 Turtle Creek Boulevard from the original lender. It's a hotel project owner and/or manager. And it's a loan-to-own lender.

There's been a total of 6,263,496 paid since January 1, 2021. At the payoff, debtors will have paid a total of 48 million on a 32.5-million investment in less than two years. That's approximately a 42.4 percent total return, approximately

a 29.95 annual rate of return, which is a much higher rate of return considering the collateral loan accelerates the note.

They do not want a payoff. They want to keep the 7,010,607.87 which is the amount they've been paid plus the taxes plus receive a windfall by taking the property valued well in excess of the debt. And they want to own and develop the property. And they defaulted on the agreed orders prior to the debtor's obligation to perform.

And then who is HNGH?

"Q Thanks. And since May 31st, 2022, is HNGH still looking to be paid off?

"A No. Since there's been a default on May 31st, HNGH is looking to exercise the remedies under the prior agreed order.

"Q What is your understanding of the remedies?

"A The remedies would be we would get title to our collateral, and we will go monetize that collateral and get paid off."

Next page.

"Q Who is HNGH?

"A I think to me that was a purely procedural matter. I mean we all understood what the issue at hand here was, which was, you know, we wanted to get paid off and Mr. Barton wanted to, you know, essentially get relief from our efforts to collect on the loan and get possession of the title back."

Next page.

And, again, who is HNGH? They're a Delaware Limited Liability Company. And we know that because in their documents, they tell us they're a Delaware Limited Liability Company.

If you look at who they are not, they are not a Texas Limited Liability Company, yet the special warranty deed that was delivered, the deed in lieu of foreclosure identified them as a Texas Limited Liability Company, and then the deed that they posed as the rescission deed also identified them as a Texas Limited Liability Company.

And this error appears in two key documents creating a cloud on title to the property: the first, the deed in lieu and then the second would be the special warranty deed had it been filed of record, what they call the rescission deed.

Who's the debtor? 299TC *[sic]* Acquisitions is a Texas Limited Liability Company. It borrowed $32,500,000 to acquire 2999 Turtle Creek Boulevard, Dallas, Texas. It's a developer of mixed-use hotel and residences. It's paid $4 million to HNGH since the filing of the bankruptcy case. It paid $6,263,496 to HNGH January 1 of 2021. It was prepared to close and ready to fund on May 31st. It's still ready to date closed to date and pay off HNGH. It's only been a good faith actor throughout these proceedings.

Who is Tim Barton? He's the president of 2999TC Acquisitions. He's an accomplished businessman and real estate

developer. He's got over 35 years of experience. He's got a proven history in commercial real estate and estate commercial real estate development, and he was the guarantor of the loan.

HNGH's recorded deed. HNGH recorded a deed held in escrow on November 1st, 2021 in violation of the automatic stay. The recorded deed created a cloud on title. It was recorded in the name of HNGH incorrectly as a Texas entity instead of a Delaware entity. And to date, no correction instruction has been drafted or recorded to correct that error.

How did HNGH commit the first default under the orders? One, HNGH breached the agreed orders before the debtor was obligated to perform. The December 10th order is a contract between debtor and HNGH which laid out specific steps to a payoff event. Underlined those and we've covered those.

First, HNGH's counsel failed to hold the executed rescission deed during the pendency of the term of the agreed orders. Second, HNGH was not the holder of the promissory note and was unable to reinstate the note prior to debtor's payment. And it could only happen after the payoff because of Happy State Bank because HNGH owed Happy State Bank approximately 26 million which was unbeknownst to the debtor and remains unpaid. And then, last, HNGH failed to deliver the requested closing documents timely to the debtor and the title to it.

First, no rescission of the deed was held. Clearly, we know from the testimony of various persons that no executed

instrument rescinding the October 29th, 2021 deed was held by HNGH's counsel beginning on December 10th of 2021. First, my comment, this is on May 16th,

"I suggested you to sign the dismissal order, no judge signature yet, and place in hand with the rescission deed your holding, that way Mr. Kane can show it signed by you even if not by the judge."

That was on May 16th. Mr. Kane never ever or any party on behalf of HNGH ever emailed myself or Mr. K. advising us that that was incorrect, that the rescission deed was not being held, that the rescission deed remained in draft form only and had never been executed as required by the agreed order.

Next one. May 30th, 10:19, the day before the closing.

"I should have a detailed email to you shortly. They are trying to get all the documents lined up and still have several funders working on the closing. There are several documents that need attention before closing to clean up the title, the main one being the rescission deed. The prior deed has to be rescinded for several reasons."

And I go in and explain what those reasons are.

The rescission deed had it been held and signed and delivered as agreed when requested on May 12th would have

alerted the debtor and all of its counsel that there was a live document signed by Mr. Nambiar. It would have alerted everyone, hey, wait a minute, there appears to be an error here. There's a Texas entity, not a Delaware entity. And it would have had everyone on notice that there had been compliance with the Court's order, which did not occur.

No rescission of the deed. HNGH failed to comply with the agreed orders and couldn't cure the first breach on May 27th, 2021 because it never had the rescission deed.

Next.

Breach occurred when it sent a special warranty deed rather than the rescission deed. The document that was provided was a reconveyance from HNGH leaving HNGH in the chain of title. It was not a rescission. It created tax and other potential issues. It failed to put the parties back in their original position, created a property use restriction to the benefit of HNGH unilaterally and for the first time in all the exchanges.

Next.

It was subject to the agreed order which created an encumbrance unable to determine title based solely on the instrument itself. And last, it failed to cure the cloud on title based on a defective deed in lieu, again, referring to the confusion between Delaware and Texas LLCs.

If the Court will recall the testimony, the first

deed provided by HNGH called the special warranty deed signed by Vipin Nambiar and delivered to Sendera Title on May 27th, 2022, included important provisions in its preambles. It included the reinstatement of the note in a "whereas" preamble provision. It incorporated a re-lease alleged release in a preamble provision. And then it granted ownership of the property appearing effective as of May 27th, not retroactive as required by a rescission deed. And lastly, it included an unapproved encumbrance in favor of HNGH in a restriction.

That document in and of itself was never to be a valid rescission deed.

No rescission of deed. Julie Lyssey on May 23rd asked,

"Can you please send us a copy of the rescission deed where HNGH will deed back to 299TC *[sic]* Acquisitions?"

On May 11th,

"Can you send me the rescission deed you drafted for 299TC *[sic]*?"

And they never drafted a rescission deed. What they drafted was a special warranty deed.

No rescission of the deed.

"Q And who typically would prepare those documents?

"A Well, typically in this instance, the corrective instrument which I call a rescission of deed, just so that

we're clear, would be generated by the grantor, that -- by the HNG seller's side, I'll call it. That would be what's customary.

And moreover, in this situation, when I read the agreed orders, the contract, it appeared to be that that was an obligation of HNGH counsel. Those orders speak to that document was to have been held by HNGH counsel. I think it said in escrow. I just know that it was to be held by them. So that's where that instrument should have been prepared and held."

Next page.

"Q Okay. What about the other two documents you mentioned, the reinstatement document? Who would be required to prepare that?

"A That would be the second step. And in this instance, it would be prepared by HNGH as the kind of wearing their lender hat. Again, that could be done in a standalone instrument or it could arguably be done as part of the rescission of deed, but it's critical that it be done and in my opinion properly.

"Q All right. And what about the third document you mentioned which is the release itself?

"A The release of lien, in my practice, it more customarily comes from the title company. But I think that's the preferred practice."

Next page.

There's no agreement on the rescission of deed. The revised draft of the rescission deed delivered on May 31st failed to meet the requirements to rescind the October 29th deed. It failed to cure the cloud on title. There should have been a separate correction instrument in order to correct the distinction between Texas instead of Delaware, and that was never done.

The document was not approved by the debtor or the title company as revised. It could not be provided to the debtor's funding sources timely for review and approval. And it contained a note reinstatement provision which would not be effective. Reinstatement is an agreement that should be attached to a note, like an allonge. Happy State Bank was the holder of the note, not HNGH. And HNGH never executed a final document.

And what's frustrating here from the debtor's standpoint is we said use our document. And instead, they revised our document. And, look, what difference did it make to HNGH? HNGH could have simply signed the document that we provided. Had they signed our document, I believe there would have been a closing May 31st and HNGH would have been paid off. But instead, at the end of the day, we're still arguing about the form of a document or a rescission.

And so Mr. Kane said, as well, you know, we wanted to make some comments. I don't know what their excuse is. All

they had to do if they wanted this thing to close was sign our document. What difference did it make to HNGH? They were going to get paid off. If the debtor wanted a particular document signed, sign it. Don't haggle over its terms.

And they have never explained to you why it was important to haggle over the terms. Simply sign it, give it to the title company, and make us pay you. And that never happened. And they know the one document they gave us was not sufficient on all of these problems we've outlined for the Court.

Next slide.

This is Randy Marx.

"Q A week before the closing, would that be enough time in the normal business world to have prepared these particular documents that we've mentioned, the deeds, the liens, the releases, those documents?

"A Yes.

The only thing all this was within the ability and the normal course of counsel to HNGH. The one thing that may have taken longer may related to this Happy State Bank instrument of record that even that a week should have been time sufficient to get all these documents prepared to a satisfactory form, most of them a recordable form, all of them executed and delivered to the title company with appropriate closing instructions."

There was no rescission of the deed agreed to. On May 30th, my comment at 3:28 was, "On the rescission, we want to go with the agreed rescission." And on May 30th, Mr. Kane's comment, "Joyce, this is what I will advise my client to agree to."

They could have just signed our document, and they didn't. That's a lot of the reason that we're here arguing over the terms of these orders is because they could have done something very simple. If they wanted to put us in default, sign the documents. Sign the release of a deed of trust. Sign the payoff letter. Sign all of the necessary documents you drafted, Mr. Kane, and give them to the title company.

And then, I think you'd be hard pressed to say the debtor didn't have to fund and make its payoff. But none of that happened. All we heard was complaints about we sent them documents and they didn't give us comments. Well, if we didn't give you a comment, then sign the document and give it to the title company.

Next one.

No rescission of the deed is agreed to. May 30th, 6:35 p.m., "Let me know if this works. This would be recorded after the rescission deed and release of the collateral assignment." What this shows is that late in the day on the 30th and into the 31st, there were documents still being provided from HNGH. Clearly, this transaction was fraught at

that point and was likely not going to close because the documents were still coming in the day before the closing.

Turn the page.

"Q Mr. Nambiar, after you signed this document" -- referring to the special warranty deed -- "did you have any concerns about signing a different form of document if that is what was being requested by 299TC *[sic]* Acquisitions in order to close this transaction on May 31st?

"A No.

If it was approved by my counsel, I had no problem signing it."

Mr. Nambiar even admitted that if only his counsel had approved a rescission of deed, he would have signed it and this closing would have occurred as agreed.

Let's look at the revised rescission deed. This was a demonstrative. And without going through every one of these changes, the Court saw this, this was the version of the rescission of deed that was provided by HNGH. And Mr. Marx went through in some great detail and explained to the Court all of the changes that had been made and why those were problematic. And, again, my question to HNGH and its counsel, Mr. Nambiar said, "if 299 *[sic]* had a document they wanted us to sign, I would have signed it if my counsel had approved it."

So instead of signing the document that had been provided -- good, bad, or indifferent -- these were the changes

that were requested to that document. And as Mr. Marx went through these line by line and point by point, these were material changes. And why were they material? Because first of all, they included typographical errors, but that aside, they included conditions, conditions precedent that made the document ineffective. We'll receive, send and avoid the deed which shall be retroactive and effective as of December -- October 29th upon effectuation of all conditions precedent set forth in the agreed order.

Why was that necessary? Why were those provisions so important that you would blow up a closing over changes to a document that your client had already said they would agree if their counsel would approve?

Next page.

Same thing. This is Demonstrative D28, Page 8, more changes. And, again, Mr. Marx goes through each of those and explains to the Court why these changes in this document were material and why they made the document ineffective.

Now whether the document the debtor provided was an effective document or not is really ridiculous because at the end of the day, what difference did it make to HNGH? They were going to get their money, and we were going to get the property. And if we gave them a bad document, so be it on the debtor.

But to go through and try to edit the document that

was provided by the debtor seems to me like it's a fool's errand. It just ensured -- it's like driving the stake into the coffin and ensure that this deal would not go through.

The next big point, Your Honor, was the reinstatement of the note. We all know the legal effect of recording a deed in lieu. The note merged into the deed recorded on November 1, and the note reinstatement requires the deed to be rescinded, else the debt is owed without owning the property.

Looking at the requirements, first, HNGH had to be the holder, payee, and endorsee under the note. HNGH would not confirm who was the holder of the note. In fact, their proof of claim was wrong. Lender's Exhibit 17, Page 6.

Second, they had to ensure the note had not been transferred to a third party, holder, or payee in order to reinstate it. Third, the note was endorsed to and held by Happy State Bank as security for an HNGH loan from Happy State Bank allegedly to purchase the note from the original lender.

Next, Happy State Bank refused to deliver the note to HNGH until actually paid with money received in their bank account. That was the testimony of Julie Blakeley.

Next, HNGH was unable to pay the 26,297,296.96 debt owed to Happy State Bank first. It required the closing in order to fund the payoff to Happy State Bank. Two, the reinstatement of note needed to occur according to the court order immediately prior to the debtor's payoff under the agreed

order, not simultaneously. It said immediately prior to the debtor's payoff.

Next, it required an executed reinstatement agreement. A reinstatement agreement is not a unilateral document. It requires a signature of the debtor and HNGH.

Next, the debtor cannot agree to reinstate the note and incur the debt if it doesn't own the property at the same time which was the reason for the rescission of deed.

And, last, finally, the note was to be marked paid in full and delivered by HNGH upon the debtor's payoff. The first event, as we've marked, did not occur. The second event did not occur. And then, lastly, the third event did not occur. The reinstatement of the note never occurred.

Next slide.

Reinstatement of the note. This is from Marshal Dooley's testimony.

"A One of the big obstacles that I don't think I was made aware of initially was that the promissory note in question that needed to be a reinstatement was being held by Happy State Bank. And clearly, that needed to be reinstated per the order prior to the payoff event."

Next slide.

Mr. Nambiar.

"Q Did HNGH have 26,297,296.96 to pay off Happy State Bank on May 31st, 2022?

"A No.

I didn't need to pay Happy State Bank on that debt unless there was an overall transaction occurring."

Reinstatement of the note. Happy State Bank was not paid so there was no way to close. To this day, closing cannot occur until Happy State Bank is paid. Vipin Nambiar said HNGH had no funds to close and get the note back, so there's no way to close until Nambiar pays Happy State Bank.

The reorganized debtor and even the Court have absolutely no contractual, no agreed order, no other legally cognizable relationship with which to obligate Happy State Bank to do anything. Even if the debtor and the Court personally deliver a cashier's check for 26 million, Happy State Bank is not legally obligated to the debtor or the Court to do anything.

Reinstatement of the note. And I understand from the testimony of Mr. Nambiar that they did not have the funds to do that other than the proceeds. They were relying on the proceeds to be paid by the debtor and its lender. And it's just sort of a -- it's not a catch-22 or a "chicken and egg." The issue was per the order that the note needed to be reinstated before the payoff event. And the lender who was going to be making the financing available to provide the payoff amount clearly would want the note reinstated and be willing to have the rescission deed and all the other documents

that I described in the title company so that the new lender would be assured that it would have a first lien.

Who's Happy State Bank? They're the lender to HNGH. They loaned approximately 26 million. They hold a collateral transfer of the note and lien as secured.

How was HSB represented -- Happy State Bank? HNGH filed a proof of claim that fails to disclose the interest of HSB. John Kane disavows any involvement of HSB with the HNGH loan. Julie Blakeley disavows any interest in the note. Khudabuksh Walji asked about HSB involvement and assured again none.

HSB appears on May 31st, 2022. HNGH said the payoff from 299TC *[sic]* to be paid to Happy State Bank. Happy State Bank did not transfer the note to HNGH or the title company. Happy State Bank did not release or provide a proper release of collateral to the title company. 299TC *[sic]* was not made aware of HSB and either agreed order nor did HSB execute a consent. And HSB testifies,

"Q We are not going to release documents without the money actually going into your bank account, correct?
"A I believe that is correct."

So what did we show the Court while HNGH wants to claim that the debtor, oh, we knew all about Happy State Bank all along? When counsel for HNGH was asked in May point blank is Happy State Bank involved in this transaction, Mr. Kane

admitted that he did not know of that relationship and told us no.

We later find out that in fact they are involved. But it's not our problem. That's HNGH's problem to deal with. They're not part of any agreed order. They're not part of any plan. They're not disclosed in any proof of claim. And for all that the debtor knew, Happy State Bank had some sort of lending relationship with HNGH that would be dealt with outside of this particular closing.

And why did we think that? I'll show you why we thought that. How was HSB represented?

"Q All right. Is there some reason that Mr. Kane in the first part of May of this year would not have known that Happy State Bank was still involved in this transaction?"

This is the answer from his own client.

"A No."

Next one.

May 31st from Mr. Walji.

"Lastly, Happy State Bank speaks to a payoff amount. Is there a current loan by HNGH with Happy State Bank which involves 299TC *[sic]* as my understanding based on our earlier conversations was that it was not the case, or did I misunderstand again?"

Next.

HNGH tries to set up a payment default. So Mr. Kane

says the debtor was trapping HNGH, that we were complaining about documents, we weren't signing documents, we were providing changes to documents at the eleventh hour. And I gave you a simple answer, sign your documents. Sign the documents you prepared that you thought were sufficient. The only document that was in dispute was the rescission document, and all they had to do is sign the one that we gave them.

So what does HNGH do? They try to set up a payment default. So at 3:52 on May 31st, they send over wiring instructions, and they do that knowing full well that there's still disagreement on the actual documents being exchanged. And what they try to do is set up a payment default. Here's the wiring instructions, send us the money. But ironically, the wiring instruction are sent to me. They're not sent to Julie Lyssey. They're not sent to the title company. And, in fact, it says wiring instructions for title company.

Next, HSB testifies that the funds sent that late was Happy State Bank would not likely have been received in time. If a wire had been sent out, let's say, 4:00 or 5:00 on the 31st and all you had at that point, you would not have received the wire, right? You wouldn't receive it until the next day. If they're sending it past that cutoff, we may not be able to receive it until the next day.

3:52 they sent over their wire instructions, and the argument is, oh, well, they already knew where to wire the

money to. Well, did we know where to wire the money to? Earlier that day you had asked part of the money to be wired to Happy State Bank. Now you're asking that all the money be wired to HNGH. Or are you? Or are you only asking that part of the money be wired to HNGH?

The debtor didn't create that confusion. The debtor didn't create this problem. And HNGH will not own up to its own responsibility that it created a conundrum by the Happy State Bank issue not being earlier disclosed. Their motion could have been filed with this Court. An agreement could have been reached between HNGH and the debtor to deal with Happy State Bank, and none of that was sorted out in advance of May 30th and 31st.

Next.

We're told that Mr. Nambiar says pens down at 4:00 on May 31st. And Kane, Mr. Kane gives instructions for pens down. Doesn't tell the debtor or its counsel and instead sends the wiring instructions. Here's the testimony.

"Q All right. When did you make the decision on May 31st that the debtor was not going to close on May 31st?

"A Oh, that would be around 4:15, 4:25.

"Q Okay. Did you at some point come to realize that or did you tell the people in your firm to go pens down on drafting documents?

"A Yes. I believe that I did.

"Q Okay. And what time was that when you say go pens down, call it 4:30, something like 4:40.
"A Yes.
I was -- I was asked to stand by to sign a number of documents, and it wasn't I think until I was told that you instructed Mr. Kane to go pencils down that I left the office."
Next.
HNGH tries to set up a payment default.
"Q Was it still possible" -- this is to Mr. Nambiar -- "for this transaction to have closed on May 31st from your understanding, Mr. Nambiar?
"A Yes.
My understanding is that everything that the title company actually required to close this transaction and provide a title policy, you know, I had provided instructions to our team to work through those diligently and get to that point. And I believe we did until we heard there was no closing occurring."
This is from Mr. Walji. You jumped ahead. There you go.
"Q What's the debtor's position with regard to the performance of HNGH under the agreed orders?
"A It defaulted December 2021 for not having the rescission deed held by the HNGH counsel. It did not have the promissory note in the original form in its possession to reinstate. It did not disclose that Happy State Bank would have to be paid as

a condition of this order. And there's no mention of Happy State Bank having to be paid according to that order."

And those three things that were required of HNGH before the debtor would be responsible for paying along with the documents -- next page -- Mr. Walji suggests we will extend the closing date on a daily basis from May 31st until all the Item 4 deliverables are set by John to the title company, which is anticipated to be accomplished by June 2nd.

This was Mr. Walji's suggestion in order to avoid these multiple defaults that occurred. And Mr. Walji suggested that we would go day by day until the documents were completed and the money could be paid.

Let's talk about Sendera Title for a minute. Sendera Title was serving as the title company and escrow agent for the closing of the payoff of the HNGH loan. HNGH wants the Court to believe that there were several title companies involved which made it impossible to act. HNGH was aware and communicating with Sendera Title as early as May 10th. On May 27th, HNGH sent an original executed deed to Sendera Title.

Sendera Title would issue a title policy at closing, and a title commitment was provided to counsel for HNGH no later than May 24th that identified of course HNGH as a Texas entity and required a list of documents. And that was a commitment from Sendera Title.

And the email on May 10th John Kane says:

"Here's he payoff amount, the confidential Exhibit A filed under seal, which I've circulated and had approved by 299TC's *[sic]* counsel on March 11th which I previously provided to 299TC *[sic]* counsel again on April 29th. This was a flat out misstatement. HNGH has a copy of the rescission deed ready to file in accordance with the applicable orders."

This was on May 10th. HNGH did not have an executed rescission deed ready to file on May 10th.

Next page.

Email from Mr. Kane to me and Mr. Walji and Ms. Lyssey at Sendera Title.

"Attached is the payoff statement for Happy State Bank collateral assignment resolution. The amount due to HNGH at closing is, therefore, HNGH payoff amount previously provided minus this amount."

This is May 31st at 11:03 a.m. from Mr. Kane including Sendera Title. Clearly, Mr. Kane knew on May 31st that Sendera Title was still involved in this transaction. Why else would he be forwarding a payoff statement to Sendera Title? He didn't send the payoff statement to any other title company.

Next one.

"The wet deed was couriered over to Sendera Title to be held in escrow but attached is the PDF for your

records."

May 27th Mr. Walji and myself again acknowledging Sendera Title was the escrow entity that was involved in this transaction. Sendera Title provided the commitment requirements. Those were listed in Exhibit 33A, Pages 7 and 8. And of each of those items, and we'll drop down, the majority of those as reflected were never provided by HNGH.

Next page.

Same problem. Again, those documents were not provided. Mr. Nambiar's testimony,

"Q All right. Have you -- I know you sat through and I don't want to spend a ton of time on this, but the list of documents that showed up Schedule C items from Sendera Title you have provided a list of those documents?

"A I was not provided a list of those documents, no.

"Q Is that something you were leaving to your counsel to handle?

"A Yeah. I was mostly leaving that to our counsel to handle.

I mean, you know, we've been involved with several real estate transactions and closings. They seem to be competent to figure out exactly what was actually needed to get something done, and I believe that they had, you know, ultimately gotten to the end of fact."

Next document.

This is the special warranty deed discussion. As the

Court's aware, there was a cloud on title created by the deed in lieu but has never been corrected or addressed. The special warranty deed recorded on November 1st, HNGH erroneously listed it as a Texas Limited Liability Company and not a Delaware Limited Liability Company. The title company could have resolved the cloud if they had complied with the Item 11 on Schedule C of the title commitment.

Mr. Kane says, well, we could have resolved Item 11 on Schedule C by providing an incumbency certificate, yet, no incumbency certificate was drafted or prepared by HNGH. They offered the preparation of such a certificate, but we never saw as an exhibit and you'll never see as an exhibit an actual incumbency certificate.

So they were aware of these defects that there were problems with the Texas versus Delaware issue. They offered a suggestion, but they never fulfilled or went through with that suggestion. An instrument correcting the cloud needed to be prepared and recorded before a rescission which was not done.

Mr. Christensen.

"Q Okay. All right, Mr. Christensen. Was anything been done on your side on behalf of HNGH Turtle Creek, a Delaware Limited Liability Company, to correct this particular document?

"A I think that's why we're -- I think that's part of why we're here. I think that I wasn't aware of this mistake until we got into this hearing, and so I was confused as to why the

rescission deed had Texas LLC on it.

And then I came to find out that that's counsel that prepared the rescission deed used this as the -- as the example to tie it to. And so the error that was made by Wick Phillips at the time carried forward into the rescission deed."

And then Mr. Kane testifies.

"Q So you're saying in your office you have a proper document that said Delaware, it just didn't get signed?

"A Yeah. So I thought I made that correction. I don't know if, you know, I had forgotten that and then opened it up while it was part of an email attachment I was sending back over and made the correction and didn't save or what."

So while Mr. Kane says he corrected it, his client, Mr. Christensen knew nothing about that correction until we got into court hearings.

Next one.

"Q And did you keep the first executed document or did y'all destroy that?

"A It was destroy -- I think it was destroyed.

"Q Do you think or you know?

"A Well, I don't know. I mean we didn't use it, so I don't know if I've got a PDF somewhere. But you know --

"Q So you think there's a special warranty deed document in your office somewhere that does show HNGH, a Delaware Limited Liability Company, right?

"A Yeah. So I want -- I mean I don't know how I can testify to this more clearly. I thought I made that revision on a draft.

"Q Right. There was never a signed draft that said Delaware LLC?"

Next page.

"A This was sort of an issue that I faced because, you know, that November 1st deed had a chilling effect or constituted sort of a cloud, I'll call it, which was addressed in Schedule C, obviously.

"Q And I was going to ask the way the title to this property looks at the effective date, you're showing essentially two owners to the property. Is that what I'm seeing?

"A Yeah. That's unusual. That's a little bit funky, I'll call it. And it's just because they made more sense to -- I mean it could have been handled either way."

Next page.

"A But they were more comfortable reflecting it in this fashion, and I was fine with that because a reverence to HNGH here and I guess MR. BENTLEY: resolved itself or would have or should have resolved itself by a rescission deed, a rescission deed which was referenced in the requirements.

"Q Okay. So to be clear, on your Item 3, had a rescission deed or rescission deed been filed, that would have resolved the second indication of ownership in that name of HNGH. Is

that my understanding?"

"A Yes."

Payoff to HSB prior to closing, Julie Lyssey, May 24.

"Good morning, John. I'm hoping you can help me with some items on Schedule C title commitment."

We saw this before. The assignments from Axos Bank and Happy State Bank. This is what she said.

"We will need a collateral assignment signed by Axos Bank to 299 *[sic]* Turtle Creek LLC. Also, since Happy State Bank will not receive any payoff funds or be signing a release of lien with HNGH, we will need Happy State Bank to collaterally assign back to HNGH. Do you chance have those assignments?"

So on May 24th, the title company reached out to Mr. Kane and said on Happy State Bank that they would not be receiving payoff funds for signing a release of lien. And let's look at the next one.

This is to Julie Blakeley. "Julie" -- now look at the date. May 24th, Julie Lyssey at the title company sends Mr. Kane an email regarding title requirements. Two days later, Mr. Kane contacts Julie Blakeley.

"I represent HNGH Turtle Creek. It appears 299TC *[sic]* Acquisitions, the debtor in bankruptcy, is steadily moving towards a closing that will fund on May 31st. This is a funky closing to say the least."

And then it says,

"At closing, the following has to occur, funding of the payoff amount, filing of a rescission deed, reinstatement of the note security agreement and deed of trust, and release of payoff to HNGH. Do you see those requirements?"

Next page. And this is the next day. That was the 26th. On the 27th, Mr. Nambiar reaches out to Ms. Blakeley and says,

"Julie, we want to make sure that borrower doesn't claim that this assignment procedure requires more time. It is purely procedural. But I want to make sure we're ready Tuesday morning if an expedited hearing is requested."

Mr. Nambiar is already predicting on Friday, May 27th, after he delivers later in the day the special warranty deed to -- or his counsel does -- to Sendera Title that there's going to be a problem because of the Happy State Bank assignment. And it says,

"Can you please get your counsel sensitive to this so they review and clear the document as soon as possible?"

So by May 27th, the Friday right before the closing to occur in a couple of days, Mr. Nambiar is predicting that the closing will not occur. And who's controlling the

documents at this point? HNGH. And who is he talking to? Happy State Bank.

And then, he goes on to say, "John" -- we only assume John Kane -- "has been asked to hold the line on the payoff date. I don't want any procedural delays to cause a problem on our payoff or remedies, whatever the outcome may be." It wasn't just "our payoff or remedies," "whatever the outcome may be."

May 24th.

"Mr. Kane, can you take a look at this email below?"

It says, "Can you help me get a handle on this and what we need to get to the title company to facilitate a closing next Tuesday?"

Again, Mr. Kane recognizes that because of the Axos transactions and the Happy State Bank transactions that this closing was not going to be that simple or that straightforward.

Next page. Julie Lyssey, Sendera Title, May 31st at 11:22, the closing date, to me.

"I still need the assignment from Axos Bank to 299 *[sic]* Turtle Creek LLC."

This is at 11:22 on May 31st.

"To date, no one has provided that assignment."

What Mr. Kane argues is, well, we provided a termination of the assignment. And so you did. You did

provide a termination. But nobody actually provided the assignment and that was still being asked for. And the assignment was with Axos Bank and 299 *[sic]* Turtle Creek. And let's not forget, 299 *[sic]* Turtle Creek was the party we call Madison. So Axos Bank had a collateral assignment similar to Happy State Bank and the title company was still looking for that document on May 31st.

Next email is May 31st at 12:12. Not going to go through every one of these, but I do want to hit on a few of them. These are the comments to the statements made by Mr. Kane in his email on May 31st. And what we start off with is if you could look at the note at the top. On 5/10, Kane stated to Ms. Lyssey he had a copy of the rescission deed ready to file. And then, if we look at the first item, agreed rescission deed, draft circulated on 5/12. That's two days after he told Ms. Lyssey that they had a copy ready to file.

And so going through each of these exhibits as we've done, Your Honor, I think we can show that Mr. Kane's email on May 31st contained numerous inconsistencies, was contrary to other exhibits offered, and, in fact, a number of the items referenced in his email, if you turn the page, you'll see the heading "missing, missing, missing." Items still missing on the 31st from HNGH.

Turn the page. Again, all the red boxes are all the items that we say are inconsistent and the majority of which

fall into the category of missing.

Next page. On May 31st at 2:39, Mr. Kane sends to Mr. Walji and me an email saying,

"See attached. These are either recorded docs or provide reference to recorded docs, so your title company can just file the -- can just something -- the file stamped copies."

I think it means record. 299 *[sic]* Turtle Creek collateral assignment, termination, assignment to HNGH. And then, you have the HNGH collateral assignment providing the termination of collateral assignment. That brings us right back to HNGH for reinstatement, rescission, and payoff. Clear line, Point A to Point B to Point C.

Here's Mr. Kane's version of the closing events taken from Exhibit 76, which he admitted candidly when asked about it was really not in the right order. First of all, he said, you'd circulate a final closing statement. Second, you would obtain approval of the final statement, and then you would fund into escrow. Well, that's ironic because funding into escrow in the agreed orders was the last of the events.

Then you would file the agreed rescission deed, you'd file the HSB rescission of collateral assignment, you would wire funds, you would file the payoff and release, and then you'd stamp the note paid in full and deliver the stamped original. And honestly, that sequence of evidence we know is

incorrect. There's no way that that would have been the proper sequence of events under the agreed order because under the agreed order, you had to immediately reinstate the note, you had to have in hand the executed rescission of deed ready to file, and then, you will trigger a payoff event.

This was not a standard real estate closing -- commercial loan closing that could be done simultaneous. And this is why not? HNGH is not only is not only a current lender, but it reported the deed taking title to the property which had to be unwound and rescinded first. This creates the necessity to produce additional documents for closing which are not typical for an existing lender so the title can be insured by the title company through a rescission.

The note and security documents merged into the recorded deed and likewise had to be reinstated prior to the debtor's payoff. And HNGH could not reinstate the note before payoff because it did not hold the note. It had to pay off Happy State Bank first in order to get the note. And only then could a standard closing between a debtor and its new lender or buyer occur.

The debtor had secured funding and was preparing to make the final payoff on May 31st as required by the agreed orders. However, after and because HNGH failed on May 30th to comply with the terms of the agreed orders, the lenders of course would not loan without compliance by HNGH with the

agreed orders. If HNGH had not defaulted, 2999TC was funded and ready to close on May 31st and remains ready to close today.

Next page.

"Q And just so we're very clear with the Court, you were prepared to close on May 30th and May 31st if everything had been ready to close. Is that right?

"A That's correct.

If the orders were adhered to, the rescission deed was in place, the promissory note was reinstated, and then to find out Happy State Bank was paid off and the note was delivered, we were ready to push the button and fund and move on."

"Q And just to be clear, Mr. Barton, are you still ready to push the button and fund and move on and keep this property? Is that right?

"A We will be doing that. That is correct.

"Why should the Court deny HNGH's requested relief? HNGH requests relief from the Court on an expedited basis because it cannot be granted first without the filing of an adversary proceeding. Specifically, HNGH requests a determination by the Court of an interest in property, a determination of the validity and extent of a lien against the property, a declaration that HNGH owns the subject property, and injunctive relief against the debtor, other parties,

and its counsel."

Mr. Kane makes great stead in his opening argument -- or his closing argument, I'm sorry, that the relief that they seek is merely enforcement of prior orders of this Court. And that's not correct. It's not correct at all because as Mr. Kane pointed out, the relief previously granted, the adversary proceedings themselves, had been dismissed and the claims related in those proceedings dismissed.

What Mr. Kane fails to recognize is what he's asking the Court to do is to find that HNGH could do whatever it wanted at the closing and the debtor had to respond with money. And in that regard, HNGH says, well, they complained we didn't provide all the necessary documents. We didn't sign all the necessary documents and that they acted us -- the debtor acted in bad faith in connection with the closing.

What they failed to recognize that claims related to the closing itself, the failure to perform that the debtor claims that HNGH did not perform are not claims that could be released and released in the sense of released in orders already entered by the Court because that would mean that HNGH could show up at the closing and simply do nothing and the debtor would have no recourse. And that is not what anyone agreed to.

The debtor filed an adversary proceeding claiming that HNGH breached the obligations under the agreed order. I

believe we've shown you on several occasions without a doubt they did breach the obligations under the agreed order. As a result, though, HNGH would have you believe that those breaches should be forgiven because the debtor did not put its money in the title company. There's ample evidence here for the Court to find that the debtor was waiting to put the last thing that was supposed to happen is the payoff event. There were other things that had to occur first.

The motion would have the Court adjudge and declare that the deed in lieu was a valid conveyance and HNGH is the owner of the property and the debtor opposes and claims cannot be done without an adversary proceeding. It isn't the prior orders entered by the Court that give the Court the basis to determine the validity of the conveyance. It's an analysis of what happened on May 30th and 31st.

The Court has to find that the failure to meet the payoff event was the debtor's failure, irrespective of HNGH had done as part of the closing. And that, Your Honor, we cannot agree to. The title of this property was supposed to be rescinded back to the debtor, not conveyed to the debtor. The debtor was supposed to maintain its ownership as of October 29th to be placed back in the position it was the day it filed bankruptcy. That was the party's agreement. That is still the position the debtor desires to be placed into. The debtor is still prepared to pay off HNGH.

The motion would further have the Court adjudge and declare that the debtor has no right, title, or interest in the property, nor any lien, claim, or encumbrance or cloud against the property, which the debtor claims cannot be done without an adversary proceeding. And, again, HNGH is misfocused. It's not the avoidable transactions that occurred on the 29th and November 1st. It's the things that happened on May 30th and 31st that the debtor complains were a breach of the agreements.

The motion would also have the Court mandate that the debtor remove a *lis pendens* it filed against the subject property and grant affirmative injunctive relief against parties without an adversary proceeding.

Next. Why should the Court deny HNGH's requested relief? The motion would have the Court prevent debtor and its counsel from filing further possible pleadings and award sanctions. And I would challenge the Court to go back and look at the Court's docket at how many motions HNGH has filed requesting sanctions against the debtor and its counsel in connection with these proceedings. Over and over again, rather than a carrot, they use a stick to beat the debtor and its counsel into submission by saying, "If you do this, we will seek sanctions against you." That is a redundant theme throughout their pleadings. Where is a place for relief for the debtor in these proceedings?

And then lastly, the motion seeks the above relief on

an emergency basis. Yet, there are no facts supporting the alleged emergency presented. The subject property is fully insured and secured by the debtor. The debtors paid the property taxes. HNGH offered no evidence to justify the debtor of its procedural and substantive due process protections, including, but not limited to, those providing in Rule 7001 to be fully developed and measured through a trial and allow the debtor to seek what should be appropriate relief for breach of contract.

And the Court is called upon -- Mr. Kane didn't want to talk about value. But the Court is called upon to balance the equities. This is the appraisal prepared by CBRE. Value as of December 4th, $56,400,000; value as of December 1, 2023, 144 million; December 2025, $156 million.

The Court is well aware that the value of real estate in Dallas, Texas, has done nothing but go up. And if you carefully read the Newmark appraisal that counsel refers you to, you'll observe that the properties that it claims are comparables for the debtor's property are not in the same area of the debtor. They're not in Turtle Creek. They're not properties that are comparable, which is why you have two appraisals at virtually the same period in time. One from Newmark and one from CBRE that substantially conflict as to the value of the property and it's because the comparables used by Newmark were not comparable properties.

And so whether HNGH agrees with our value or not is really not the issue for the Court. The debtor contends and has believed throughout the proceedings, starting with its schedules and with an appraisal, that the property is worth at least $16 million greater than the amount owed to HNGH. And so, Your Honor, weighing all of that evidence that we provided to the Court, not just argument, but the actual evidence, that's why we took the time to go through the exhibits, go through each of the testimonies and pull out succinct statements to show the Court that you can call it a dog when it's a cat. You can call it smoke when it's a fire. But at the end of the day, each party had performance obligations here. The debtor had obligations, the lender had obligations, and the lender failed to meet its obligations.

The debtor called it to task and it still failed. And so, Your Honor, our position is that the motion, and I'll address our motions in a minute, but the motion before the Court to enforce Court orders should be simply in all things denied, should have been denied the first day of these hearings and it should be denied now. And that's the simple answer to that particular matter.

THE COURT: Ms. Lindauer, just a --

MS. LINDAUER: Sure.

THE COURT: -- quick interruption. So I'm going to let you finish, but I would like to know -- well, Mr. Kane, I

think went five minutes over his one and a half hour estimate. So and you're about 15 minutes over your estimate. Again, I'm going to let you --

MS. LINDAUER: Sure.

THE COURT: I'm not going to cut you off. I'm going to allow you to finish.

MS. LINDAUER: Right.

THE COURT: But I would like to know, I guess from Mr. Kane -- my goal was to provide each side equal time. And so after Ms. Lindauer finishes, are you, Mr. Kane, going to want equal time, or are you going to be satisfied with not having equal time?

MR. KANE: I'm not going to demand that I get some kind of additional extra time or something like that if Ms. Lindauer goes past me a little bit. I am curious about, I mean, how much longer she has, but I don't intend to, you know, all of a sudden say, well, she got 20 minutes longer, so I'm going to burn out the entirety of my 20 minutes on rebuttal. I think I'll have a brief rebuttal, but I'm not a real stickler on this about if Ms. Lindauer takes another 10 minutes or 15 minutes or whatever. That's fine by me.

THE COURT: That's fine. And, again, I wasn't planning to cut Ms. Lindauer off. I was just curious for planning purposes what was going to happen when she was finished. So, Ms. Lindauer, you may proceed.

MS. LINDAUER: Thank you.

Addressing the motions that are before the Court, that would be the next slide, Sydney.

And, Your Honor, these are our responses to the objections filed to Dockets Number 173 and 174. And granted we haven't filed formal responses because I understand Mr. Kane just filed his objections last night. But I would like to go through those briefly.

First of all, the modifications that are being sought are not material and adverse to any party. They only serve to clarify the prior plan and its terms and regarding the required closing documents. And I think the point being, Your Honor, is if nothing else can be gained from the last six weeks of hearings that have gone on in this matter is that clearly, clearly the orders that were entered and agreed to by the parties were deficient with regard to the closing documents. I don't think there's any question about that.

Each party thought there were certain documents that needed to be prepared. Each party thought who they thought was going to prepare those documents. And now we learn, of course during these hearings, that there is some confusion on what needed to be done. And next point, even now after weeks of hearings and at the 11th hour, HNGH has argued that the basic closing documents of the lender were to be prepared by the debtor in its counsel. Mr. Kane made that point yesterday.

And, Your Honor, that clearly is not what was happening in this case.

The lender was preparing the lender documents. The debtor was preparing its own documents in order to obtain its funding. And there's just no disagreement that that is what needed to happen. And so to shift that over to the debtor and its counsel, I think, is inappropriate.

Next, there's nothing customary, reasonable, or necessary about such documents being prepared by a debtor, the borrower, rather than the lender. And, in fact, such position is expressly contrary to their argument that it was preparing such documents and its complaints to the debtor had failed to provide comments to such documents, which other than the rescission deed and payoff documents were not objectionable to the debtor.

And lastly, the requested relief being sought is to fill the gaps that each party has recognized exist in the closing to pay off HNGH.

Next page. The debtor only seeks to fix that which both parties have now acknowledged is broken. How is what the debtor seeks adverse to HNGH? It is only adverse if HNGH wants a valuable property rather than money. They claim that the plan has been substantially consummated, but that's just wrong. 11 U.S.C. Section 1102(1)(2) defines substantial consummation and requires all three events to occur, transfer property,

assumption, to the extent that there was an assumption, and commencement of distribution under the plan. We all know that those events have not occurred. A and C clearly have not occurred.

So the debtor was within its rights to ask the Court to modify the plan to address the missing terms, if you will. I remember the very first day of opening, the Court asked the parties, "Mr. Phelan, where in the order does it say that there's a requirement for these other documents, the release of the deed of trust, the release of the UCCs, the release of the assignment of rents?"

And Mr. Phelan said, "Well, Your Honor, those are the commercially reasonable documents that would be needed for this type of closing."

The fact that the parties can't even agree to date who was supposed to be drafting what. Now, HNGH says, well, the debtor should have been drafting those documents. Look, we've sent emails saying, where are the documents? And then HNGH drafts the documents and sends those to us and complains we don't give them comments.

So it's that confusion, Your Honor, that was engendered by those orders that were asking to fix. That is not an adverse request. That is a proper request because the orders themselves, the plan itself, did not have all the necessary terms clearly to close this transaction on May 31st.

I don't think there could be anything clearer than that, Your Honor. And that was the purpose of filing those two motions, Your Honor.

Next, they say it's interesting that HNGH argues that the conveyance of property to HNGH constitutes substantial consummation. HNGH claims such event occurred on April 29th. There's no (indiscernible) conveyance of anything. Rather, the only conveyance to occur under the plan was the payment of money, which everyone has acknowledged has not occurred.

And then, next, HNGH cannot use its own default to claim somehow that the plan is substantially consummated. The disclosure statement, and I will call the Court's attention to that, reads as follows:

> "Claimant should be aware there are substantial risks involved in consummation of the plan. The plan is dependent on the debtor's ability to obtain funds for the plan or a sale."

Section 11.1 of the disclosure statement.

All the debtor is doing is seeking to address what needs to be done as a result of HNGH's default. A small delay in closing is not a material and adverse affect. And the requested relief that the debtor seeks, we laid it out very clearly, are the execution of the following documents to be provided to the title company as agreed.

You can run through those, Sydney. There you go.

And then, lastly, the process in bankruptcy of a post-recording of a deed in lieu, understanding the importance of the correct rescission deed of the reinstatement of note, which is encumbered by an unrelated party, cannot be done prior to the payoff. These are complex matters as stated by our real estate experts and, thus, the Court should consider appointing as we requested a knowledgeable person to help resolve this disagreement. That was in our supplement to the motion to enforce. And, ultimately, the debtor still seeks to pay off HNGH.

I would like to address the In re Sanford case just briefly. That's the case that they relied on from the District of New Mexico. That's a 2013 case. It's Number 11-1014424TS. And I think what's interesting in that case is the conclusion.

If you will pull that up briefly, Sydney, for the Court. It's on Page 5 of 5.

You can blow that up a little bit.

This is the case cited by HNGH and here's the conclusion.

"If the evidence indicated that a property sale closing truly were imminent, then the court likely would have grant the debtor some relief, despite the agreed upon August 15, 2000 *[sic]*, conversion date under a 'no-harm no-foul' theory.

"The motion, letter of intent, and hearing testimony,

however, do not convince the court that a closing can be reasonably counted on in the near future. Thus, the lender's right to the benefit of its bargain outweighs the debtor's reasonable desire for a little more time to find a buyer and close a sale."

And so, Your Honor, at the end of the day, this isn't a question of the debtor asking the Court for more time simply as a naked request. It's a request by the debtor in the motions it's filed to address serious concerns regarding the documents in this case, whether it's the confirmed plan or the agreed orders to provide for the missing terms that should have been included and under a "no-harm no-foul theory," clearly the Court should grant that relief.

Your Honor, I do want to reserve the right to, and I think we discussed this previously, file a post-closing brief for really two reasons. One, I would like to have a greater opportunity to address the two motions we have filed. We only received their objections last night and I know that was timely, but still we're on short notice on that. And second, to address some of the issues raised in the PowerPoint provided by Mr. Kane.

There are some things in that PowerPoint, honestly, that we find very troubling. And I'll tell you why just briefly is some of the references to the exhibits, while correct in part, fail to address the entirety of the actual

exhibit. So he'll take a snippet and he'll reference that in his timeline without actually providing for the entirety of the document itself. And I think that's important.

And a good example is Mr. Kickham's letter that he provides where he starts off by saying, "if the documents were in order, we would have been prepared to close. But given the fact that the documents are not in order," and then so on and so forth.

So, again, it's that type of theme that we feel should be addressed in the items identified in Mr. Kane's PowerPoint so I would like to have the opportunity. And, of course, Mr. Kane would be given the same right to provide some sort of a brief at closing to more fully address those issues, and to the extent required also, give you some more legal authority.

So, with that, Your Honor, we'll close.

Thank you.

THE COURT: All right. Mr. Kane, so if I'm counting my minutes correctly, I think you're about 22 minutes down on Ms. Lindauer. I'm not encouraging you to take all those minutes, but if you have anything you'd like to say now, go ahead.

MR. KANE: Okay. Your Honor, and I apologize for this, but I would like to go down the hall just for a second.

THE COURT: Oh, sure.

MR. KANE: So could we take just a five minute recess?

THE COURT: Yeah. We'll do that.

MR. KANE: All right. Okay.

THE COURT: Five minute recess.

(Recess at 2:15 p.m./Reconvened at 2:22 p.m.)

THE COURT: All right.

I see Mr. Kane. Ms. Lindauer, are you there as well?

MS. LINDAUER: Yep, Your Honor. Thank you. Present.

THE COURT: All right. Mr. Kane, it's back to you.

MR. KANE: Thank you, Your Honor.

I do just want to hit a few small issues, or rather I should say short issues, on rebuttal. And the first is the debtor's mantra that we heard in really the prime portion of Ms. Lindauer's closing argument. And that was to just sign the documents. Just sign the documents. If you'd only signed the documents, then the debtor would have been in default.

The debtor also argued that if the rescission deed had been signed and delivered around May 16th or so that would have alerted the team of an error needing correction. And then, they would have also known that HNGH was in compliance of the agreed order and I guess they wouldn't be excused from some kind of performance under the agreed order. But what I couldn't understand is an explanation of how the fact that the draft circulated on May 12th excused feedback, comments,

considerations, a requirement for the delivery of those comments by the debtor.

I fail to see how if that document had been executed on the 12th we wouldn't be in the exact same position that we are currently in. The debtor had purported comments but inexplicably said it didn't need to address those because the document wasn't executed, and in an argument to me, Your Honor, is totally nonsensical.

It also, or the debtor also argued that the rescission deed could never have worked because it was supposed to be effective on October 29, 2021, to return title to the debtor as if it never lost title. But because it was signed on May 27th, then it would have been effective May 27th as a deed and so that would have created some kind of problem. And so I wanted to just bring the Court's attention to the express language of Exhibit 57A. That's Lender's Exhibit 57A.

And this is, Your Honor, the draft of the special warranty deed. Or I should say, this is the HNGH executed copy of the special warranty deed. And there's clear intent here in Numeral I, the deed in lieu is rescinded and avoided effective as of October 29, 2021, an order for fee simple title to the property to remain vested in 2999TC. And there's a big argument that the inclusion of this language in a "whereas" provision makes it ineffective.

So let's scroll down to the first "now, therefore."

Okay. This is the reconveyance of the asset back.

So when is the reconveyance effective under this provision? Effective as of October 29, 2021, which means, Your Honor, that the debtor would have had title to the property under this document on October 29, 2021, immediately before the maturity date, and immediately after the maturity date, on October 29, 2021, the debtor would still have title to this property with an executed agreement by both parties showing a clear intent in Roman Numeral I to have the deed in lieu actually rescinded and avoided, the specific language that Ms. Lindauer cited to when taking my testimony under the agreed order effective as of October 29, 2021.

And, Your Honor, I would like to reiterate, this is the only one of the rescission instruments, rescission deed, you name it, that was ever approved by Sendera Title. And Mr. Marx testified to that on multiple occasions. But the debtor says, well, just sign our rescission instrument. Just sign it. You don't have any stake in the game, just sign it. How dare you not sign it. You're not allowed to provide any comments. You're not allowed to suggest revisions. You just need to sign this document.

Well, I think we had some problems with that, Your Honor. And if we look at Exhibit D6, down on Page 4 of 7, one of the issues with this Marx instrument, and this shows our revisions to one of the drafts of Marx's instruments, is that

it has representations and warranties that HNGH did not believe, through its counsel, I did not believe, were correct.

It also does not account for the reinstatement of the note. And so the revisions to this provision of the document, which Mr. Marx found objectionable, were intended to acknowledge the reinstatement of the note and first lien deed of trust and to ensure that there was nothing in this document that would preclude, again, the reinstatement of its note and first lien deed of trust in accordance with the agreed orders.

There was a lot of guff from Mr. Marx about a provision in here that had a "shall" on effectuation of all conditions precedent. Well, the agreed order had a series of things that needed to take place. So again, nothing nefarious. This is intended to ensure that this document tracked the terms of the agreed orders which were defined in this agreement.

So, again, this is just one of those situations where, had the debtor not put up a roadblock instead of just demanding, we reject your signed document, you have to accept our signed document, just provide a little feedback. As Mr. Marx testified, he provided feedback to the debtor. He never provided it to HNGH and HNGH did not provide that feedback back to the debtor.

Now, obviously, the "just sign it and deliver it" mantra that Ms. Lindauer espoused repeatedly during her closing argument didn't work for the rescission deed. That was an

executed document that was sent over. So that is a specious argument. The rescission deed rodeo is why, that's exactly why, HNGH sought approval for the forms of the documents that it was submitting. It wanted to ensure that it had an agreement with the debtor to the executed form of document to ensure that those did not provide an impediment to closing.

Now, I do want to speak very briefly about this idea that the wiring instructions were somehow delivered at a time after I had told my client to go pencils down. Now, Ms. Lindauer said this will not close, and I'll show that exhibit here, at about 4:26 p.m. And that's shown here, Your Honor. 4:26 p.m., all -- all, right, or so, they are coming in later or not at all. "We are not able to close today." We understood at that point that the debtor was done.

The document that showed the wiring instructions was not provided before that. It was provided at 3:52 p.m., and at that time, my client was not pencils down.

Now, I do want to briefly hit on that exhibit. Now, after the -- wiring instructions aside. I'm sorry. I want to hit on this exhibit that Ms. Lindauer referenced because there was a suggestion that my client, Mr. Nambiar, was intending to sabotage closing. I think that was actually the exact term that was incorporated into Ms. Lindauer's closing argument. And I think that that's a silly argument, because if you actually read what this is in context, right, this is May 27th.

This is after Julie Blakeley at Happy State Bank had received the collateral assignment of note and lien release document that HNGH circulated for Happy State Bank's execution.

After that, Mr. Nambiar is asking her to expedite that issue. Mr. Nambiar is asking Ms. Blakeley to please ensure that there is a focus on getting that release executed and delivered so the debtor cannot artificially assert some roadblock. And this did anticipate at that point that the debtor would likely seek some kind of extension just like it did on March 14th when it filed an emergency motion seeking to extend the deadline. And, in fact, we know at about 3:30, Ms. Lindauer did file an emergency motion seeking an extension. And so this was something that we kind of anticipated because of the way the closing process was taking place, because of the lack of response we were getting, because of the gaps that were taking place from the delivery of documents to any response at all at a critical time in the closing process.

But this has nothing to do with a sabotage. This is a nudge along. This was just a notice to Ms. Blakeley, and, obviously, I was aware of this as well, Your Honor, that Mr. Nambiar did not have an interest in providing the debtor with an additional extension beyond May 31st. So it was his perspective, as I understood it at the time, and I think it's a reasonable inference from this exhibit, that Mr. Nambiar was fine with the payoff. If the payoff didn't happen, then

Mr. Nambiar would attempt to exercise his remedies. But, again, this is all in the context of facilitating the resolution of the Happy State Bank cloud on title to ensure that a clean title closing could actually take place.

And I think that that context, Your Honor, really speaks everything about this hearing. You can see HNGH throughout this process working to draft documents, provide documents, obtain authority from the debtor to execute the documents, trying to get documents in. And what you see from the debtor is repeated stymies, refusal to accept documents, a refusal to grant the green light, a refusal to provide comments, right. We see a refusal to assist with the resolution of the Happy State Bank issue. We see a repeated reference to this Axos assignment or Axos termination, but no effort to actually attempt to resolve that issue. And that, we do believe, is indicative of how this actually took place.

So it isn't really as the debtor described it, just a series of failures by HNGH. It isn't that at all. And I would ask that the Court really take the evidence into context when reviewing it and take this closing argument in context that HNGH was working hard and in good faith to resolve this closing, despite extraordinarily late notice, a late series of requests by the debtor, which followed HNGH trying to set up conference calls. It followed HNGH asking for drafts of documents. It followed HNGH seeking checklists from the debtor

so that it could check in on the progress and determine whether a closing was actually likely to take place.

So with that, Your Honor, we would repeat our request that the Court approve the motion to enforce. If the Court determines that some adjustment needs to be made to our proposed form of order, then so be it. But we do request protection from this Court from a debtor that has, throughout this process, been litigious, been difficult to deal with, and has disregarded the prior forms of Court orders.

So with that, Your Honor, we rest.

THE COURT: All right. Thank you, Mr. Kane. Thank you, Ms. Lindauer.

I'm just going to briefly mention something before I take another recess before I come back for final comments. And this is not related to your closing arguments. It's just something that I had made a note to mention and didn't do that before closing. So, again, this is not related to your closings and it's probably not material, but I thought it's something that, for transparency purposes, I thought probably should be noted on the record. And this goes back to the in camera document that was sent to chambers.

And just to recap, there was some discussions during the hearing about a list of potential sources that were, you know, ready to fund on May 31st. And as I understood it, the in camera list was going to contain a list of the sources that

the debtor did not want to be identified because it was concerned about HNGH doing something with that information. And so that list came over and I think I had mentioned this on the record previously that there were five entities on that list and they're numbered 1, 2, 3, 4, 5.

And I just noticed during the hearing that Numbers 2 and 5 on that list appear to -- well, Number 5 definitely was an entity that has been discussed during the hearing so I'm not sure why it's on the list. Number 2, the name on that list is substantially similar to an entity that was also discussed during the hearing and the contact person for that entity is the same as the contact person that was mentioned during the hearing for that entity.

So, again, this is probably not material. I don't want you to read too much into this other than the fact that I noted that the list that came over had five entities that I understood were entities that the debtor didn't want disclosed and were different than the entities that had been discussed on the record. And it was just my observation that it appears that only three of those five really should have been on the list.

So, again, don't read too much into that. It may not be material but it's something I thought -- I could tell from reading the transcripts and hearing the testimony that there was an issue. I don't think Mr. Kane would have any reason to

know that and I just thought in fairness and for purposes of transparency, I just thought I would mention that on the record.

So we're going to take a short recess, maybe a 10-minute recess, and then I'll probably come back with some final comments.

(Recess at 2:37 p.m./Reconvened at 3:04 p.m.)

THE COURT: Okay. We're back on the record in the 2999TC Acquisitions matter.

Mr. Kane, I see you.

MR. KANE: I'm here.

THE COURT: Ms. Lindauer and Mr. Rodriguez?

MS. LINDAUER: Your Honor, I was rounding up the people from the hallway, so if you'll just give us a second, we'll have everybody back.

THE COURT: Sure.

MS. LINDAUER: Okay.

Your Honor, I think we have everybody back now. Thank you.

THE COURT: Okay.

So right before the break, I mentioned the in camera list that came over, and since I raised it and it was not really tied to your closing arguments, if the debtor has any brief comments, I'll allow you to -- do you have any comments that the debtor may wish to make?

MR. RODRIGUEZ: Your Honor, comments and also a request for relief.

I'm sorry. I have never had this experience before so I'm treading on entirely new ground. But, you know, as a lawyer and with a duty to the Court and to the system, I have to raise this and I think it's going to make me even less popular with Your Honor. But it's something I think that has to be done. And we need your guidance maybe of a system and a process going forward.

Your Honor, *sua sponte*, you just issued purported findings and conclusions about the identity of funding sources that were provided to the Court in camera for a very good reason. And we can put on evidence if you'd like to hear it or maybe make it part of the record that for instance Mr. Vipin Nambiar in the past is alleged to have pretended to be an investor in this project so as to get confidential information about the financing sources, the owner of the note, et cetera, and then use that to his advantage and the advantage of his personnel.

In fact, it resulted in litigation. And these releases that you hear so much about, Your Honor, that's what the releases were for, for that kind of tortuous interference and, you know, allegedly fraudulent conduct. So there was a very good reason that these names were submitted to Your Honor *in camera*. And, you know, at the outset, I've now reconferred

with my clients on these issues and Your Honor's factual conclusions as they've been stated are actually incorrect.

I think your comment was that titles or names are substantially similar and then you disclosed your view that the representatives were the same. At the threshold, I'm informed that one of those sources, in fact, is one that you questioned Mr. Barton about. And that testimony, Your Honor, and that potential funding source was relative to the adversary proceeding back in December, not as to the successive agreed orders that were put into place and required an entirely new transaction.

So, Your Honor, the, you know, the team members on the basketball court for the game relative to the two agreed orders is a different assembly than what happened relative to the adversary proceeding. And I think Your Honor has concluded that because there may have been lender A, B, or C relative to a proceeding back in time, that that's the same group and that list is not confidential so it can now be released in perpetuity going forward as to anything.

And that, Your Honor, is going to cause, we anticipate, some very real damage to my client. Mr. Kane is on this call. Nate Christensen is on this call. Jeff Carruth, Asher Bublick, just looking at the numbers, and a host of individuals who now have information that they didn't have before Your Honor *sua sponte* made what we will be able to show

was at least one very erroneous conclusion as to these new funding sources.

I think, Your Honor, we are going to need some time to analyze what has happened and what, you know, steps my clients need to take to protect themselves going forward. You know, Your Honor has had a number, I think, of questions about the debtor's counsel, the debtor's representation, the debtor's witnesses, and you have raised them directly with us and our witnesses pointedly at times.

And I think if you had a question, you needed to not jump to the conclusion, Your Honor, that because they're substantially similar people or et cetera that this is the same team of potential funders from some time passed and therefore they're not entitled to any kind of confidentiality. And so my clients have suffered real prejudice here and we need time to examine what the best course is for them and for this case.

As you can imagine, I will share, you know -- well, Your Honor, I'm afraid to talk any further about, you know, what I might think is a similar situation until we've looked at the authorities and maybe consult with some experts in this scenario. But, you know, making a *sua sponte* fact finding without a fully developed evidentiary record, and I can put witnesses on, Your Honor, which is further going to prejudice my clients. I don't think that's the appropriate role for, you know, an impartial and fair court taking evidence, hearing it,

and considering it because, you know, you're reaching the conclusion, I think, without even asking the question.

And, you know, in the past where that has happened, you will see cases, and I'm not making this allegation here, Judge. I'm not asserting it now. We want time to look at it and see, but a third-party observer might question whether or not, you know, we're able to get a fair and impartial consideration of the legal issues in this case.

And if we don't examine it and study it and raise it now, Mr. Kane and others will assert that, you know, we gained the system. We wanted to see what the outcome was before we raised the complaints about violation of the in camera, about, you know, findings of fact and conclusions of law without proper evidence, with, you know -- and basically impugning the veracity and character of, you know, my witnesses with no evidence.

And so, Judge, I'm so very sorry. This is maybe where we're going. You may be getting a motion if we think there's a basis for it and we, you know, we confer with some experts. We may be moving to recuse you. And I am very sorry. I can tell you my experience. I've had this happen one time and it happened in a Bostic (phonetic) case. It was a -- what's the substance? I can't even talk, I'm so scared of you, Judge, I'm shaking here -- asbestos case, and it was tried in state court. And the father of the decedent had just finished

giving testimony and the poor man apparently suffered a heart attack on the stand. Okay.

And the judge called for 9-1-1 and the sheriff. The judge jumped off the bench in front of the jury and tried to render aid to this man. He was taken out on a gurney by emergency. He died that night. He didn't come back. And the next day, when the jury was assembled, the judge told the jury, you saw what happened. The stress and strain of reliving the trauma of, you know, his son dying, gave the man a heart attack and he's dead. We're not going to be able to hear the rest of his testimony. I want you to know what happened.

And so, you know, I looked at that, brought in as an appellate lawyer over the weekend, and I said, you know, I think at that moment, the judge interjected herself into the course of events and she took a position that a litigant would take or that the opposing lawyer would take. And I think there's a colorable basis to say she lost the ability to be a fair and impartial arbiter of justice to a third party. We, you know, filed a motion, Judge. She denied it. It was assigned to the assigned judge, a very distinguished tax judge, and it was briefed fully and, ultimately, the recusal was ordered and the case was ordered back to a new judge for a new trial.

I'm not saying -- please understand me. I'm not saying that I've done the analysis, I've made that conclusion.

I'm not. But as an appellate lawyer, I know I have to raise it right now or it's gone forever. And I want to put that on the record. I'd ask the Court if we could discontinue these proceedings and permit us opportunity to look at the cases. Maybe Mr. Kane can help us in his group and see if we can come up with some kind, you know, a solution or way forward.

I don't know if we can seal the record. I don't know if we can get a confidentiality agreement from all of the opposing counsel and the witnesses are here. I just don't know. But I need to protect my client and I think this has come off the rails a little bit and I need time to analyze it properly.

So, Your Honor, would it be okay to discontinue? You know, Mr. Kane's got additional closing argument to make. Could you give us, you know, a little bit of time, a couple of days to look at this and see what we need to do because, you know, I think that's where we are. I just wish, as you had done before, maybe you had raised it with the lawyers or even in chambers, you know, something. And I'm sorry, but I think I'm duty bound to raise this and bring it to the Court's attention, especially with the experience I had, you know, with a very good fair minded judge. She just got caught up in the emotion of what was going on and that standard is not very high as the Court knows.

So we're asking for a few days, Your Honor, to

research this issue and reconvene with the Court.

MR. KANE: And, Your Honor, I did want to clarify one point. I don't have further closing argument and we would oppose an extension on these grounds.

THE COURT: All right. Thank you for your comments, Mr. Rodriguez.

I'm going to take this matter under advisement. Trial briefs, I would like to give the parties 14 days. And so by my calendar, that would be July 26th at 5:00 p.m.

Ms. Lindauer or Mr. Kane or Mr. Rodriguez, I think two weeks would be sufficient for post-trial briefing. So I think, unless somebody's going on an extended vacation, I think two weeks would be sufficient. That would give us that would give you until July 26th at 5:00 p.m.

MR. KANE: Your Honor, John Kane for HNGH. Is there any guidance that we should take from the Court on what specific legal or factual issues the Court might be interested in obtaining some additional briefing on? Or is this "if we feel necessary, address what we want" type of issue.

THE COURT: Yeah, it's solely within your discretion.

I think Ms. -- I can't remember who asked for post-trial briefing first. I think it might have been Ms. Lindauer, so I'm really doing that at her prompting.

I'm not ordering the parties to file post-trial briefing. The PowerPoints are helpful. I do appreciate that

those were filed, you know, on the docket for each one of you. So that, that helps quite a bit. So I'm not ordering the parties to file post-trial briefing on any particular issue, but if you would like to file post-trial briefing, you may.

And, again, I think July 26th at 5:00 p.m., rather than have staggered briefing deadlines and deadlines for responses and replies, I'm just going to have the same deadline for all parties. And, again, that would be July 26th at 5:00 p.m.

So, with respect to Mr. Rodriguez's request to discontinue the matter, I'm going to deny that. If you desire to file any type of motion, you are free to do so, and I'll rule based on the papers. Or if that's a request that you're making of me in the future, I will entertain any motion that's filed before me that I have the authority to rule on. So the request to discontinue this matter is denied.

And, again, I will take it under advisement and I'll be looking for post-trial briefs at no later than July 26 at 5:00 p.m.

MR. RODRIGUEZ: Thank you, Your Honor.

MS. LINDAUER: Thank you, Your Honor.

MR. KANE: Thank you, Your Honor.

THE COURT: All right. Thank you.

We'll be in recess.

(Proceedings concluded at 3:22 p.m.)

* * * * *

**C E R T I F I C A T I O N**

We, DIPTI PATEL, CRYSTAL THOMAS, and KAREN K. WATSON, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

/s/ Crystal Thomas

CRYSTAL THOMAS, CET-654

/s/ Karen K. Watson

KAREN K. WATSON, CET-1039

LIBERTY TRANSCRIPTS DATE: July 15, 2022