CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 28, 2022**

**United States Bankruptcy Judge**

---

**United States Bankruptcy Court**
**Northern District of Texas**
**Dallas Division**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **2999TC Acquisitions, LLC,** | § | **Case No. 21-31954-swe-11** |
| | § | |
| **Debtor.** | § | |

***Order (a) granting in part and denying in part HNGH Turtle Creek, LLC's Motion to Enforce Agreed Orders; (b) denying the Debtor's plan-related motions; and (c) granting and denying ancillary relief***

Timothy Barton, through his real estate development company, indirectly owns and develops real-estate projects through single-purpose entities. One of those single-purpose entities is the Debtor, which wants to raze a building on its real property in Dallas so it can develop a luxury hotel and residential condominiums, at a total cost of $395 million. But the Debtor's project did not get off to a great start. In 2020, the Debtor defaulted eight times under its $32.5 million loan with its secured lender.

Despite the many defaults, the lender, HNGH Turtle Creek, LLC, agreed to a forbearance that gave the Debtor one last chance: If the Debtor paid HNGH in full by October 29, 2021, the Debtor would retain the real property securing the loan; if the Debtor failed to pay HNGH in full by that deadline, HNGH would record a deed in lieu of foreclosure, becoming the property owner. The Debtor failed to pay by the agreed October 29 deadline but filed bankruptcy shortly before the deed in lieu was recorded.

The parties then litigated—both in an adversary proceeding and in the main bankruptcy case—HNGH's asserted rights to the property. The parties resolved the litigation through an agreed Court order that gave the Debtor yet another chance: Pay HNGH in full by March 15, 2022, and the Debtor would keep the property; fail to pay, and HNGH would own the property through the previously filed deed in lieu.

The Debtor failed to pay by the March 15 deadline but requested and secured *yet another* agreed Court order extending the deadline, this time to May 31, 2022.

And here we are once more. The Debtor—blaming HNGH—missed the May 31 deadline and seeks yet another extension.

Fed up with the delay, HNGH filed a motion to enforce its ownership rights under the agreed Court orders, only to suffer yet more delays, as the Debtor contested the motion to enforce in a hearing that lasted over fifty hours, stretched out over two months. For the most part, the Debtor's witnesses were not credible, and its arguments were not persuasive. In short, the Debtor—not HNGH—was responsible for its failure to meet the deadline, so HNGH now owns the property under the agreed Court orders and the previously filed deed in lieu.

Enough is enough. With a few minor caveats, the Court grants HNGH's motion to enforce.

## I. Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O), as the Court is being asked to interpret and enforce prior Court orders that resolved core matters related to the automatic stay, ownership of alleged estate property, and requested dismissal of the Debtor's bankruptcy case. Venue for this contested matter is proper pursuant to 28 U.S.C. § 1409(a).

## II. Background

### A. The key players

The following individuals and companies are the key players or witnesses in this dispute:

- 2999TC Acquisitions, LLC is the Debtor in this Chapter 11 bankruptcy case. The Debtor owns a building at 2999 Turtle Creek Boulevard in Dallas, Texas. The Debtor wants to raze the building so it can develop a luxury hotel and residential condominiums on the property, at a total cost of $395 million. 6/30/22 tr. at 80, 87–89.
    - Timothy Barton is the president of the Debtor.
    - Khudabuksh K. Walji, sometimes called "Mr. K," is the outside general counsel for the Debtor and other Barton entities.
    - Joyce Lindauer is one of the Debtor's bankruptcy counsel. Lindauer did not testify, but she was involved in many of the emails and discussions that were considered in this contested matter.
    - JMJ Development is Barton's real estate development company that indirectly owns and develops various real-estate projects through single-purpose entities, at least nine of which (including the Debtor) have wound up in bankruptcy since 2020.[1]
- Randy Marx is an attorney who represents Barton-related entities in other transactions, but in this dispute, he represented a potential lender to the Debtor called TCC 2022, LLC.
- Sendera Title was one of at least three title companies the Debtor was working with as it attempted to close a transaction to pay off HNGH.
    - Julie Lyssy is an employee of Sendera Title.

[1] *See In re Dallas Real Estate Investors, LLC*, Case No. 21-41488 (Bankr. N.D. Tex.); *In re 2999TC LP, LLC*, Case No. 20-43204 (Bankr. N.D. Tex.); *In re AVG West, LLC*, Case No. 20-43414 (Bankr. N.D. Tex.); *In re BM318, LLC*, Case No. 20-42789 (Bankr. N.D. Tex.); *In re JMR100, LLC*, Case No. 20-42790 (Bankr. N.D. Tex.); *In re LDG001, LLC*, Case No. 20-43110 (Bankr. N.D. Tex.); *In re Mansions Apartment Homes at Marine Creek, LLC*, Case No. 20-43643 (Bankr. N.D. Tex.); *In re D4MC, LLC*, Case No. 21-41371 (Bankr. N.D. Tex.).

- HNGH Turtle Creek, LLC is the Debtor's lender, which had a security interest in, and claim to, the Debtor's real property.
  - Vipin Nambiar is the managing partner of HN Capital Partners, LLC, which is HNGH's manager.
  - Nate Christensen is general counsel for HN Capital Partners.
  - John Kane is bankruptcy counsel for HNGH. He was involved in many of the emails and discussions that were considered in this contested matter. The Debtor's counsel called him to the stand to testify.
- Happy State Bank made a loan to HNGH, the Debtor's lender, and took a collateral assignment of the loan documents between HNGH and the Debtor.
  - Julie Blakeley is a commercial loan officer at Happy State Bank.

### B. The prepetition indebtedness

On September 20, 2019, HNGH's predecessor in interest, 2999 Turtle Creek LLC (the "**Original Lender**"), made a loan to the Debtor (formerly known as MO 2999 TC, LLC) in the principal amount of $32,500,000 evidenced by that certain *Secured Promissory Note* dated as of September 20, 2019 (the "**Note**"). The Note is secured by a parcel of land located at 2999 Turtle Creek Boulevard in Dallas, Texas (the "**Property**"), including all improvements and fixtures, as evidenced by that certain *Deed of Trust, Security Agreement and Fixture Filing* made as of September 20, 2019 (the "**Deed of Trust**"), and recorded in the real property records of Dallas County, Texas. The Debtor's obligations under the Note and Deed of Trust are guaranteed by Barton pursuant to a *Guaranty* dated as of September 20, 2019 (the "**Guaranty**").

### C. Happy State Bank loan to HNGH

HNGH acquired a participation interest in the loan from the Original Lender to the Debtor in January 2020, but HNGH later acquired 100% of the loan from the Original Lender through an assignment and

assumption agreement.[2] To obtain the funds to acquire 100% of the Original Lender's loan to the Debtor, HNGH obtained its own loan from Happy State Bank, which secured the loan by obtaining a collateral assignment of the Note and Deed of Trust. HNGH Ex. 54a. Although Happy State Bank held the original Note as collateral for its secured loan to HNGH, HNGH was not in default of its Happy State Bank loan and was—at all relevant times—entitled to enforce the Note, Deed of Trust, and Guaranty. *See, e.g.*, Blakeley test., 6/23/22 tr. at 121.

### D. After eight defaults in 2020, the Debtor seeks delay by filing district court litigation

The Note matured on October 1, 2020. The Debtor failed to qualify for a maturity date extension under the terms and conditions of the Note because in 2020, the Debtor defaulted at least eight times under the Note by its (i) failure to pay the real estate taxes in connection with the Property due on or about February 1, 2020; (ii) failure to replenish the interest reserve in the amount of $1,376,916.67; (iii) failure to pay a portion of the monthly interest payment due on June 1, 2020, in the amount of $11,194.45; (iv) failure to pay monthly interest payments due on July 1, August 1, September 1, and October 1, 2020; (v) failure to pay the principal amount of $32,500,000 as of October 1, 2020; and (vi) failure to pay property taxes totaling $337,827.55 for the Property that were owed and due to be paid by January 31, 2021. Forbearance Agreement (defined below), Recital C, HNGH Ex. 6.

Following the Debtor's maturity date default, the Debtor and Barton filed suit against HNGH, HN Green Hollow Capital Partners, LLC,[3] Nambiar, and other defendants in the District Court for the Northern District of Texas (Case No. 3:20-CV-3229) (the "**District Court Case**"). *See Plaintiffs' First Amended Complaint* (the "**District Court Complaint**"), attached as Exhibit 1 to *Motion to Dismiss and Motion for Sanctions*, HNGH Ex. 4.

---

[2] Copies of the Note, the Deed of Trust, the participation agreement, the assignment and assumption agreement, and other related documents are attached to HNGH's filed proof of claim. *See* Debtor Ex. D17.

[3] HN Green Hollow had acted as advisor to HNGH under an advisory agreement that gave it authority to execute documents on HNGH's behalf when acting in its advisory role. Christensen test., 6/24/22 tr. at 196.

In the District Court Case, the Debtor and Barton raised the same fraud-by-nondisclosure claim that they later brought in this Court against HNGH, HN Green Hollow, and Nambiar (discussed below). Notably, both fraud-by-nondisclosure claims allege that HNGH, HN Green Hollow, and Nambiar sought and obtained confidential information from the Debtor and Barton for the purpose of orchestrating a scheme to take control of the loan and wrongfully foreclose on the Property. *Compare* District Court Complaint ¶¶ 99–105 *with* First Bankruptcy Court Complaint[4] ¶¶ 53–54.

On January 10, 2021, in connection with the Forbearance Agreement (discussed next), the District Court entered an Agreed Final Judgment dismissing *with prejudice* the fraud-by-nondisclosure claims and other claims against HNGH, HN Green Hollow, and Nambiar. *See Agreed Final Judgment,* attached as Exhibit 2 to *Motion to Dismiss and Motion for Sanctions*, HNGH Ex. 4. Even so, the Debtor included the same allegations from the District Court Case in its First Bankruptcy Court Complaint in the First Adversary Proceeding (both discussed below).

### E. The Debtor delays its payment obligations by securing the Forbearance Agreement

Despite the Debtor's defaults, HNGH agreed to temporarily delay foreclosing on the Property in early January 2021, in exchange for an immediate partial interest payment by the Debtor of $100,000, plus an additional $100,000 payment on February 2, 2021 (the "**Delay Payments**"). Forbearance Agreement, Recital E, HNGH Ex. 6. Thereafter the Debtor and HNGH negotiated and entered into a *Forbearance and Payoff Agreement* made effective on March 1, 2021 (the "**Forbearance Agreement**").

Under the Forbearance Agreement, the Debtor's outstanding defaults and accrued default interest were converted into principal-payment obligations under the Note effective as of December 31, 2020. Therefore, effective on December 31, 2020, the principal balance of the loan and Note became $40,073,171. That amount, in addition to any accrued and unpaid interest or other obligations under the Forbearance Agreement, would come due on July 31, 2021. Though the Debtor once again failed

[4] Defined below.

to satisfy its debts at maturity, HNGH allowed it to exercise its extension option under the Forbearance Agreement. The three-month forbearance extension pushed the maturity date to October 29, 2021, more than one full year after the initial Note maturity date.

### F. HNGH attempts to stop future delays by negotiating the Deed in Lieu as part of the Forbearance Agreement

Given the Debtor's numerous prior defaults, HNGH required valuable consideration in exchange for the forbearance. In addition to interest payments and Barton's ratification of his Guaranty, the Debtor agreed to provide HNGH a deed in lieu of foreclosure, so the Debtor executed a special warranty deed and transferred the deed into escrow (the "**Deed in Lieu**"). The Deed in Lieu was to be released to HNGH upon a forbearance default, upon which HNGH had "the right to elect in Lender's sole discretion to record the Deed [in Lieu] in the real property records of Dallas County, Texas to effect the transfer of the Property to Lender." Forbearance Agreement § 9(a), HNGH Ex. 6.

The parties anticipated that the Forbearance Agreement would provide the Debtor an extended out-of-court workout opportunity as an alternative to a bankruptcy proceeding. Instead of foreclosing on the Property and precipitating a bankruptcy filing, HNGH agreed to provide the Debtor an additional five to eight months to achieve an out-of-court workout that would enable the Debtor to satisfy HNGH in full either through a sale, refinance, or otherwise. If the Debtor failed, HNGH would be able to record its Deed in Lieu, thereby resolving the debts owed by Barton and the Debtor to HNGH without either party incurring the costs and expenses of further legal proceedings.

The scope of the "last chance" period provided by HNGH was significant. In the Forbearance Agreement alone, HNGH provided the Debtor with up to eight months to develop the Property, find a buyer, or refinance HNGH's debt. Further, when the Forbearance Agreement was executed, HNGH had already refrained from foreclosing on the Property for five months—from the October 1, 2020 Note maturity date through February 28, 2021. In total, HNGH provided the Debtor an aggregate of 13 months of forbearance, a period longer than the initial term of the Note. The Debtor's allegation that HNGH is a "predatory" lender is undercut by HNGH's extended forbearance prior to the bankruptcy and by

HNGH's agreed payment extensions after the bankruptcy (discussed below).

### G. The Debtor delays its payment obligations through the bankruptcy filing

On October 29, 2021, the Debtor defaulted on the Forbearance Agreement and Note by failing to pay all amounts due and owing at maturity. HNGH then sought to enforce its rights and remedies under Section 9(a) of the Forbearance Agreement by recording its Deed in Lieu in the Dallas County records. HNGH submitted the Deed in Lieu for recording before the Debtor filed its petition for bankruptcy relief in the evening on October 29, 2021 (the "**Petition Date**"). The County Clerk recorded the filed Deed in Lieu at 1:36 p.m. on November 1, 2021, after the Petition Date.

### H. The Debtor attempts to delay its payment obligations by filing a lis pendens, followed by the First Adversary Proceeding

On November 5, 2021, the Debtor recorded a lis pendens against the Property in the Official Public Records of Dallas County, Texas, as Instrument No. 202100333511 (the "**Lis Pendens**"). The Lis Pendens clouds HNGH's title to the Property.

On November 11, 2021, the Debtor filed its *Complaint to Avoid and Recover Preferential and/or Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548 and 550* (the "**First Bankruptcy Court Complaint**") against HNGH, Nambiar, and HN Green Hollow (together, the "**Defendants**"), initiating adversary proceeding No. 21-3085 (the "**First Adversary Proceeding**"). HNGH Ex. 3. The First Bankruptcy Court Complaint asserted claims to avoid and recover the transfer of the Property as a preferential and fraudulent transfer under the Bankruptcy Code. The complaint also asserted fraudulent-inducement claims and the same fraud-by-nondisclosure claims that were dismissed with prejudice in the District Court Case.

The parties resolved the First Adversary Proceeding through an *Agreed Order of Judgment and Dismissal of Adversary Proceeding with Prejudice to Refiling* (the "**Adversary Judgment**"). HNGH Ex. 7. Pursuant to the Adversary Judgment, which was agreed to as part of the March 2022 Agreed Order (discussed below), the Court ordered, adjudged, and

decreed—and the parties stipulated—that, among other things, (a) all claims and causes of action asserted by the Debtor in the First Bankruptcy Court Complaint were *unmeritorious* and were denied in their entirety and dismissed with prejudice to refiling; and (b) the Debtor and Barton provided releases and indemnifications to the Defendants in exchange for the denial of any sanctions against the Debtor or Barton in the First Adversary Proceeding.

Notwithstanding resolution of the First Adversary Proceeding and the entry of the Adversary Judgment, the Debtor has not removed the Lis Pendens against the Property.

### I. The Debtor delays its payment obligations through the December 2021 Agreed Order

The parties litigated not only in the Adversary Proceeding, but also in the Debtor's main bankruptcy case, where HNGH wanted the case dismissed or the automatic stay lifted and the Debtor sought to enforce the automatic stay. That litigation was resolved (at least temporarily) through an agreed order dated December 10, 2021 (the "**December 2021 Agreed Order**"), that set a "**Payoff Deadline**" of 5:00 p.m., March 15, 2022, for the Debtor to pay an agreed "**Payoff Amount**" that would satisfy the Note in full. HNGH Ex. 8. As consideration for obtaining this extended Payoff Deadline, the Debtor agreed to make "**Consideration Payments**" totaling $500,000 from December 2021 through March 1, 2022.

Although the December 2021 Agreed Order did not specify who was obligated to prepare a "rescission deed," the order required counsel for HNGH to "hold the rescission deed" during the pendency of the order. If a timely "**Payoff Event**" were to occur, the Deed in Lieu would be deemed rescinded and avoided, HNGH would deliver the rescission deed to the Debtor (so the Debtor could record it in the real property records), the Debtor would retain all title to the Property, and HNGH would be granted a $2 million allowed claim (the "**Allowed Claim**") against the Debtor's estate.

On the other hand, if no timely Payoff Event were to occur, or if the Debtor were to miss other payment deadlines for the Consideration Payments or for unpaid property taxes, such a failure would constitute a "**Default**," upon which the Deed in Lieu would be deemed a valid, unavoidable prepetition transfer that the Debtor would be barred from

contesting. December 2021 Agreed Order at 2–3, HNGH Ex. 8. In other words, HNGH would become the owner of the Property automatically upon a Default.

### J. The Debtor attempts to delay its payment obligations by filing an emergency motion to extend the Payoff Deadline for a purported Tall Ship transaction

On March 14, 2022—one day before the Payoff Deadline under the December 2021 Agreed Order—the Debtor filed an emergency motion to extend the Payoff Deadline, claiming that the Debtor had just signed a term sheet with Tall Ship Texas Partners, LLC for the sale of the Property and that more time was needed to close the transaction. HNGH Ex. 10. Even though the Debtor secured an extension of the Payoff Deadline (as noted below), nothing ever came of the Tall Ship transaction.

### K. The Debtor delays its payment obligations through the March 2022 Agreed Order

HNGH objected to the Debtor's request to extend the Payoff Deadline, but the parties reached an agreement memorialized in a joint stipulation dated March 15, 2022 (the "**Joint Stipulation**"), HNGH Ex. 15, and an agreed order dated March 17, 2022 (the "**March 2022 Agreed Order**"), HNGH Ex. 16, under both of which—

- the Debtor acknowledged it was not in a position to satisfy the Payoff Amount by the Payoff Deadline;
- the parties extended the Payoff Deadline to May 30, 2022[5] (the "**Extended Payoff Deadline**");
- the Debtor agreed to pay $3.5 million to HNGH in March 2022 (the "**March 2022 Payments**"), $2 million of which would satisfy the Allowed Claim and $1.5 million of which would reduce the Payoff Amount;
- the Debtor and Barton provided releases and indemnifications to HNGH and certain related parties;

---

[5] Because the deadline fell on a holiday, the parties later agreed to make the Extended Payoff Deadline May 31, 2022.

- the parties agreed that the Adversary Proceeding would be dismissed with prejudice through the entry of the Adversary Judgment (discussed above); and

- the terms of the December 2021 Agreed Order were still in effect, except as modified by the March 2022 Agreed Order.

### L. The Debtor's Plan is confirmed

On April 25, 2022, the Debtor filed its *Third Amended Plan of Reorganization* (the "**Plan**"), Debtor Ex. D26, which incorporated the December 2021 Agreed Order and the March 2022 Agreed Order (together, the "**Agreed Orders**"). The Agreed Orders control in the event of any conflict between the terms of the Plan and the Agreed Orders. Plan §§ 2.01, 6.01. HNGH's treatment under the Plan is thus simply the treatment to which it was entitled under the Agreed Orders.

The Plan was confirmed on May 10, 2022, the Debtor submitted a proposed confirmation order to the Court on May 12, and then the Debtor uploaded a revised order for Court consideration on May 16, 2022. On May 18, 2022, the Court entered its *Order Confirming Debtor's Third Amended Plan of Reorganization* (the "**Confirmation Order**"), Debtor Ex. D27. By its own terms, the Plan became effective three days later, on May 21, 2022 (the "**Effective Date**"), though the Confirmation Order remained subject to appeal until after the Extended Payoff Deadline. As one potential funding source later noted, it could not get underwriting approval to close a transaction by the Extended Payoff Deadline because the confirmation order remained subject to potential appeals. *See* HNGH Ex. 85a.

### M. The Debtor delays paying HNGH when it misses the Extended Payoff Deadline

Even though the Agreed Orders gave the Debtor over five and a half months to satisfy the Payoff Amount by marketing and selling the Property or by refinancing the Property, the Debtor never sought any closing documents from HNGH until May 10, 2022, when it forwarded a request by Sendera Title (one of the title companies the Debtor was working with) for a payoff amount, a rescission deed from HNGH, and a confirmation order. HNGH Ex. 28 (5/10/22 email from Khudabuksh Walji, the Debtor's general counsel, to John Kane, HNGH's counsel, forwarding email request by Julie Lyssy of Sendera for three documents). HNGH

provided the payoff amount that same day and provided a draft rescission deed for comments on May 12, just two days later. HNGH Exs. 31, 31a. Sendera Title accepted HNGH's draft rescission deed for closing purposes. Marx test., 6/15/22 tr. at 74.

Sendera Title did not seek any additional closing documents from HNGH until Tuesday, May 24, 2022, just four business days before the Extended Payoff Deadline. Sendera asked for documents to resolve the Happy State Bank collateral assignment, as well as a collateral assignment that the Original Lender had made to its own lender (Axos Bank). HNGH Exs. 33, 33a. HNGH promptly resolved those requests before the Extended Payoff Deadline. *See, e.g.*, 6/13/22 tr. at 55–56 (Marx testifying that Kane helped Sendera confirm that Axos issue was resolved); 6/23/22 tr. at 94 (Blakeley testifying that HNGH's hard work ensured that Happy State Bank was prepared to deliver the release necessary to resolve the Happy State Bank issue at closing).

The Debtor did not provide HNGH with a full list of documents that the Debtor determined were necessary for closing until 3:24 p.m. on Memorial Day, Monday, May 30, 2022 (the "**Memorial Day Checklist**"), the day before the Extended Payoff Deadline. HNGH Exs. 65, 65a.

Many of the documents requested from HNGH in the Memorial Day Checklist were readily available instruments recorded in the Dallas County Public Records, which a title company should have been able to easily access weeks before the Extended Payoff Deadline.

The Debtor admitted to HNGH that it was working with multiple title companies and multiple potential funding sources the day before and the day of the Extended Payoff Deadline. When HNGH and Happy State Bank asked for contact information for the closing title company, the Debtor failed to provide it promptly despite multiple demands, effectively precluding or at least delaying parties from delivering documents necessary for closing. *See, e.g.*, HNGH Ex. 62 (Kane May 27, 2022, email: "Don't know which title co to send to. You're working with 3 [title companies], I'll let you forward it to the appropriate parties." Lindauer response: "That's fair.").

The Debtor provided no comments to the draft rescission deed HNGH circulated on May 12, 2022, until May 30, 2022 (the day before the Extended Payoff Deadline), after HNGH had signed, notarized, and

delivered the prior form to Sendera Title to be held in escrow for closing. HNGH Exs. 64, 65, 65d. The Court emphasizes the Debtor's delay here, which is significant in length and timing. As the Court notes in the discussion below, the Debtor and HNGH both are at fault for not agreeing to a form of rescission deed before they signed the December 2021 Agreed Order. But the Debtor never asked for a draft until May 10, 2022, five months later, when the Debtor forwarded Sendera's request for a rescission deed. HNGH and its counsel (who, based on the Debtor's request, thought that a payoff transaction might finally be in the works) provided a draft rescission deed promptly, two days later, on May 12. The Debtor then waited *two and a half weeks*, until late in the afternoon the day before the Extended Payoff Deadline, before sending back a draft of its own. The length and timing of the delay were not commercially reasonable for a May 31 closing.

The form of rescission deed that the Debtor circulated at 3:24 p.m. on May 30, 2022 contained factual representations contradictory to the agreement of the parties memorialized in the Agreed Orders.

HNGH turned a revised draft of the Debtor's proposed rescission deed within hours of receipt on May 30, 2022, which rectified the materially false statements that were in the Debtor's prior draft.[6]

The Debtor thereafter never provided comments responsive to HNGH's revised draft rescission deed, which HNGH was prepared to execute and deliver at closing. Neither did the Debtor ever provide comments to the draft Payoff and Release of Lien instrument HNGH provided to the Debtor. The Debtor's failure to provide further comments on these documents speaks volumes about the Debtor's alleged intent to close a transaction on or before the Extended Payoff Deadline.

HNGH was prepared to deliver, or to cause Happy State Bank to be prepared to deliver, by closing, substantially all documents reasonably requested at that time. No title company ever delivered a proposed closing statement to HNGH despite multiple requests.

The Debtor did not satisfy the Payoff Amount by the Extended Payoff Deadline. As explained in further detail below, notwithstanding its

---

[6] The false statements, and HNGH's corrections, are discussed below in the Discussion section.

allegations to the contrary, the Debtor did not have any lender or other source of financing that was ready, willing, and able to satisfy (or to enable the Debtor to satisfy) the Payoff Amount by the Extended Payoff Deadline.

### N. The Debtor attempts to further delay its payment obligations by filing a motion to extend the Extended Payoff Deadline, only to withdraw it without explanation

At 3:32 p.m. on May 31, 2022 (the Extended Payoff Deadline), the Debtor filed a motion to extend the Extended Payoff Deadline even further, and to compel HNGH to provide various "deliverables," such as the Debtor's preferred form of rescission deed and other closing documents from the Memorial Day Checklist (the "**Motion to Extend and Compel**"). HNGH Ex. 17. The Motion to Extend and Compel contains seventeen detailed paragraphs and includes nine exhibits, including a seventeen-paragraph declaration by Barton detailing his allegations about HNGH's alleged failure to provide the documents the Debtor thought were necessary for closing. In the Motion to Extend and Compel, the Debtor also threatened HNGH with litigation for allegedly interfering with the Debtor's potential third-party financing sources: "Debtor recognizes that such claims and related claims and causes of action are better presented in a complaint that may be filed against those who have participated in frustrating the transaction between the Debtor and HNGH." Motion to Extend and Compel ¶ 17, at 9.

When considering the Motion to Extend and Compel, including the timing of its filing (on the day the Debtor alleges it was trying to close the transaction), the detail of its allegations and the amount of time taken to prepare the document, and all of the other evidence at the contested matter that is the subject of this Order (including the testimony of the witnesses, discussed below), the Court finds and concludes that the Debtor knew it could not close a transaction on or before the Extended Payoff Deadline because it did not have funding sources in place and would not have them in place, regardless of alleged deficiencies in closing documents. The Debtor's representatives, including Barton and Walji, testified that HNGH's alleged delays and trickery thwarted their ability to close by the Extended Payoff Deadline, but that testimony was not credible.

Instead, the Debtor—which, after months and months of delay, waited too long to close a transaction timely—was attempting to set a trap for HNGH by raising alleged closing-document issues that could have and should have been resolved had the Debtor intended to close a transaction timely.[7] HNGH and its counsel did everything they reasonably could to prepare for a May 31 closing, including promptly sending drafts or redrafts of documents when requested and sending legal documents that were available.[8]

Just two days later, on June 2, 2022, the Debtor filed a notice of withdrawal of the Motion to Extend and Compel, which stated, without explanation, "Debtor no longer desires to pursue the Motions at this time."[9] HNGH Ex. 19.

### O. HNGH tries to stop the delays by filing its Motion to Enforce

HNGH filed its *Motion to Enforce Agreed Orders* (the "**Motion to Enforce**") on June 3, 2022. HNGH Ex. 20. The proposed order for the Motion to Enforce requests (among other things)—

---

[7] The Court was skeptical of HNGH's allegation of a trap, made in opening arguments, but as the hearing progressed, the Court became convinced that HNGH's analysis was spot-on.

[8] The Debtor's demonstrative closing-argument presentation contains a portion of a May 27, 2022 email from Walji to Kane and Lindauer, which the Debtor describes as the Debtor's "offer" of a day-by-day extension to allow time for HNGH to correct documents and close the transaction. *See* ECF No. 250, at 56/90. The Debtor's slide is incomplete and misleading. When the entire email is reviewed, it is evident that Walji was sending Kane a self-serving email that purported to "recap" the key points of a conversation between Walji, Kane, and Lindauer earlier that day. Kane responded to that email immediately, pointing out that while the Debtor requested an extension, Kane and HNGH agreed to no such extension. *See* HNGH Ex. 58. After considering the evidence, including Kane's credible testimony, the Court believes HNGH agreed to no such extension on the May 27 call, and the email was not an "offer" as the Debtor suggests.

[9] The Debtor referred to "Motions" because the Clerk's office had docketed the Motion to Extend and Compel as two motions given the request for two forms of relief (to extend a deadline and to compel production of documents).

- findings that a Default occurred under the Agreed Orders based on the Debtor's failure to satisfy the Payoff Amount by the Extended Payoff Deadline;
- findings that the releases, waivers, and indemnifications in the Joint Stipulation, March 2022 Agreed Order, and Adversary Judgment are binding and enforceable;
- a determination that HNGH is the owner of the Property based on the Default under the Agreed Orders;
- a determination that the Debtor must remove the Lis Pendens;
- a determination that the Debtor will be sanctioned in the future if it attempts to relitigate the Motion to Extend and Compel; and
- a determination that the Debtor and its affiliates will indemnify HNGH and its affiliates for any expenses incurred in future litigation related to the Property or the HNGH loan documents.

HNGH's counsel conferred with the Debtor's counsel for a hearing date on the Motion to Enforce. The Debtor agreed to a hearing starting on June 10, 2022. Before the hearing, the Debtor prepared and filed two detailed responses to the Motion to Enforce. ECF Nos. 145, 149. In the first response, the Debtor argued that it was excused from its funding obligations under the Agreed Orders because HNGH had not delivered "necessary and important documents" for a closing and because HNGH had failed to disclose a Happy State Bank lien on the Property. In the second response, the Debtor requested the appointment of a real estate lawyer as a third-party mediator or a Federal Rule of Evidence 706 "expert" to oversee a delayed closing on or before June 21, 2022. In neither response did the Debtor allege that an adversary proceeding was required to resolve the issues raised in the Motion to Enforce.

### P. The Debtor attempts to delay its payment obligations again, this time by filing yet more litigation, the Second Adversary Proceeding

At 8:00 p.m. on June 9, 2022 (the day before the date the Debtor *agreed* to start the hearing on the Motion to Enforce), the Debtor filed a

complaint against HNGH (the "**Second Bankruptcy Complaint**"), commencing Adversary Proceeding No. 22-3061 (the "**Second Adversary Proceeding**"). In the Second Bankruptcy Complaint, the Debtor alleges that HNGH breached the Agreed Orders by—

- "failing to place an executed Rescission Deed into escrow with its counsel during the pendency of the term of the Agreed Order[s];"
- "refusing to timely provide a Rescission Deed to be held in escrow pending closing of the transaction and instead providing a non-conforming Special Warranty Deed;"
- "failing to timely provide the necessary HNGH [closing] Deliverables to effectuate closing;" and
- "not delivering confirmation and evidence of the proper indorsement and delivery of the Promissory Note from HSB to be thereafter marked paid in full, terminated, or voided at closing by HNGH or at HNGH's direction and HSB's ratification and consent of HNGH's actions taken as related to the Agreed Order and the Loan."

The Second Bankruptcy Complaint also asks the Court to declare that the Debtor is the rightful owner of the Property and that the Lis Pendens is valid and enforceable until clear title in the Debtor's favor is reestablished. The allegations and arguments in the Second Bankruptcy Complaint largely mirror the Debtor's allegations and arguments in response to the Motion to Enforce.

### Q. The Court commences a hearing on the Motion to Enforce, denies two requests by the Debtor to delay the proceeding, and conducts the hearing for over fifty hours, over fifteen nonconsecutive days

The Court started the hearing on the Motion to Enforce on Friday, June 10, 2022, as agreed by the parties, with a three-hour time estimate. At the beginning of the hearing, the Debtor's new co-counsel, appearing for the first time, made what the Court construed as an oral motion to continue the hearing based on the newly filed Second Bankruptcy

Adversary Proceeding. The Court declined to continue the hearing.[10] The parties made opening statements, and HNGH began to put on its case-in-chief, but the parties bogged down over the admission of HNGH's 120 proposed exhibits. The Court recessed for the parties to resolve objections to the admissibility of the exhibits, restarting the hearing later in the afternoon when the parties presented a detailed agreement regarding the admissibility of HNGH's nearly 120 exhibits (some admitted for all purposes, some admitted for limited purposes), after which HNGH rested its case-in-chief.

Although the Court allowed the Debtor a full and fair opportunity to present its case, the Court quickly became concerned that the Debtor's mode of witness examination and trial strategy were designed to draw out the hearing, potentially to allow the Debtor more time to come up with its hoped-for funding for a transaction (even though the Extended Payoff Deadline had passed). For example:

- At the continued hearing, Monday, June 13, 2022, two new attorneys appeared for the Debtor (bringing the total to four, each from a different law firm).[11] New counsel first asked the Court to repeat the detailed and lengthy agreement the parties had reached and announced just days before regarding the nearly 120 HNGH exhibits. The Court denied that request because of time concerns.

- Also on June 13, new counsel pressed another motion for continuance that was filed the night before based on the alleged need to work out witness availability for the Debtor's eleven listed witnesses. *See* ECF No. 158. The Court denied that request for a continuance given the parties' agreement to start the hearing on June 10 and given the Court's confidence that the parties would be able to work together to schedule witnesses (they did).

- Also on June 13, the Court declined new counsel's request to entertain, on the spot, a motion filed the night before (which was not set for hearing) to compel HNGH to deliver, in one day,

[10] This Order supplements the Court's findings of fact and conclusions of law made on the record regarding denial of the Debtor's oral motion for continuance, as well the Court's denial of the Debtor's filed motion for continuance, discussed next.

[11] Five if you count the attorney representing Barton individually.

unspecified missing attachments from HNGH's exhibits that were admitted *by agreement* just days before. *See* ECF No. 160.[12]

- On July 7, 2022, after *twelve* days of trial, the Debtor filed a "Trial Brief" that requested permission to re-examine *all* witnesses and documents where the Court sustained "the document speaks for itself" objections by HNGH's counsel. ECF No. 231. The Debtor's counsel said he researched the issue because he had never learned that objection in law school or in thirty years of practice. 7/6/22 PM tr. at 115–16; 7/8/22 tr. at 4. In support, he pointed the Court to *United States v. Nelson*, 732 F.3d 504 (5th Cir. 2013).
    - The Court denied the request for reexamination of witnesses and documents, first observing that the Debtor's counsel himself, and the other counsel for the Debtor, had also made the same "document speaks for itself" type objections during trial. *See, e.g.*, 6/23/22 tr. at 123–24 (Lindauer); 6/24/22 tr. at 59 (Rodriguez), 96 (Rodriguez), 98 (Rodriguez); 6/28/22 tr. at 21 (Lindauer), 23 (Lindauer), 27 (Lindauer); 7/1/22 tr. at 119 (Rodriguez).
    - More important, the Court noted that it had construed the parties' "document speaks for itself" objections, which admittedly were vague, as objections under Federal Rule of Evidence 403. In other words, if a witness is simply reading into the record what a document says (which is the only time the Court recalled the objection being made), the objection may or may not be sustained, depending on whether the Court—trying to determine the truth while not wasting time—concludes the probative value of reading the document out-loud outweighs any concern about wasting time. *See* FED. R. EVID. 102, 403, 611. The *Nelson* opinion expressly recognizes the propriety of such an objection under those circumstances. *See Nelson*, 732 F.3d at 518 n.4 ("We take this opportunity to observe that the opinion testimony of a witness with personal or expert knowledge, helpful and pertaining to a document, is not objectionable on the ground that the document 'speaks for itself.' *See* FED. R.

[12] The Debtor eventually withdrew the motion to compel. *See* ECF No. 232.

EVID. 701, 702. *Properly made, such an objection may pertain to the character and scope of testimony under Rules 403 and 611.*") (emphasis added).

- Finally, after fifteen days of trial, after closing arguments, because the Court was genuinely confused about an issue related to the Debtor's *in camera* list of funding sources (discussed below), the Court made very brief comments about that list of names. 7/12/22 tr. at 137–39. One of the Debtor's attorneys then asked the Court, on the record, to "discontinue" the proceedings so the Debtor could investigate whether to file a motion to "recuse" based on the Court's comments. The Court denied that request because it believed then (and the Court believes even more so now) that the request was completely without merit.[13]

All told, the hearing lasted over fifty hours, stretched out over fifteen nonconsecutive days over two months.

**R. The Debtor attempts to delay its payment obligations by filing Plan-related motions**

On June 20, 2022, while the contested Motion to Enforce was ongoing, the Debtor filed two Plan-related motions that the Court construes as attempts to extend the already expired Extended Payoff Deadline. The first motion (the "**Order-Modification Motion**") asks the Court to modify the Agreed Orders and the Confirmation Order to require HNGH to provide various closing documents, including the Debtor's preferred form of rescission deed. ECF No. 173. An unstated assumption in the Order-Modification Motion is that the Extended Payoff Deadline should be extended for the Debtor to obtain its financing and close a transaction. The second motion (the "**Plan-Modification Motion**") asks the Court for the same relief requested in the Order-Modification Motion, only this time through the procedural vehicle of modifying the Plan and Confirmation Order. ECF No. 174.

---

[13] No motion to disqualify or recuse has since been filed.

## III. Discussion

The Debtor did not satisfy the Payoff Amount by the Extended Payoff Deadline, so there has been a "Default" under the Agreed Orders, and thus the Deed in Lieu—automatically—is deemed a valid, unavoidable prepetition transfer to HNGH. *See* Agreed Orders. In other words, HNGH now owns the Property. To avoid this straightforward conclusion, the Debtor raises various procedural and substantive arguments, none of which have merit.

### A. The Court can grant the relief requested in the Motion to Enforce without the filing of another adversary proceeding

As a preliminary matter, the Debtor argues that the relief HNGH seeks through the Motion to Enforce can be granted only with the filing of an adversary proceeding. According to the Debtor, Bankruptcy Rule 7001 requires an adversary proceeding because HNGH seeks a determination of who owns the Property and because HNGH seeks injunctive and other equitable relief (such as an award of attorney's fees and costs). *See* FED. R. BANKR. P. 7001(2), (7) (requiring an adversary proceeding if the proceeding seeks to determine the validity of an interest in property or seeks injunctive and other equitable relief).[14]

If the parties and the Court were starting with a clean procedural slate, the Debtor might be right. But we're not starting with a clean slate. Instead, the parties were knee deep in litigation in both the First Adversary Proceeding and the bankruptcy case, and they resolved that litigation by negotiating the Agreed Orders. Those orders contemplate Court resolution of just one simple, primary issue: Has there been a Default under the Agreed Orders or not? If there has been a Default by the Debtor, then HNGH owns the Property. On the other hand, if there has not been a Default, then the Debtor still owns the Property. The Court

---

[14] The Debtor filed the Second Adversary Proceeding shortly before the start of the hearing on the Motion to Enforce, inviting the Court to determine the disputes in that proceeding instead. The Court declines that invitation because the Court can and should determine the issues in this contested matter involving enforcement of the Agreed Orders. The Court firmly believes the Debtor filed the Second Adversary Proceeding simply as a delay tactic.

does not need, and the parties are not entitled to, yet another adversary proceeding to resolve that simple issue. Nor is an adversary proceeding required to consider the other relief HNGH requests (such as attorney's fees and release of the Lis Pendens), which is simply part of the Court's enforcement of its own orders.

Even the Debtor's own Plan recognizes that HNGH can enforce its rights through the Motion to Enforce, without the filing of yet another adversary proceeding: "If the Debtor or Reorganized Debtor fails to cause HNGH to be paid in full in accordance with the terms of the Agreed Orders, *then HNGH shall be entitled to exercise all of its rights and remedies under the Agreed Orders*." Plan § 6.01 (emphasis added), Debtor Ex. D26.

In short, the Court will not allow the Debtor to throw up an unnecessary procedural roadblock (and thus more delays) to resolving whether there is an unexcused Default by the Debtor under the Agreed Orders. The Court can resolve that issue and related ancillary issues by interpreting and enforcing the Agreed Orders in connection with the Motion to Enforce.

### B. The Debtor's breach-of-contract arguments fail

The Debtor next argues that "Debtor had secured funding and was preparing to make the Final Payoff on May 31, 2022, as required by the Agreed Orders. However, after – and *because* – HNGH failed on May 30, 2022 to comply with the terms of the Agreed Orders the lenders, of course, would not loan without compliance by HNGH with the Agreed Orders." *Debtor's Opposition to Motion to Enforce Agreed Orders*, ECF No. 145 (the "**Debtor's Opposition**") ¶ 19, at 7. The factual predicate for this argument is simply false, and the Debtor's related legal and factual arguments concerning HNGH's alleged breaches of the Agreed Orders likewise do not withstand scrutiny.

#### *1. The Debtor had not secured funding to satisfy the Payoff Amount by the Extended Payoff Deadline*

The thrust of paragraph 19 of the Debtor's Opposition is that the Debtor had secured funding and would have closed a transaction on May 31, 2022, *but for* HNGH's alleged breaches. Having read that assertion, the Court watched carefully during the multi-day hearing for the arrival of credible evidence of such funding. The credible evidence never arrived.

What arrived instead was a hodgepodge of evidence demonstrating that the Debtor was in a mad scramble with multiple potential funding sources, *none* of which were prepared to fund on or before the Extended Payoff Deadline on May 31, 2022:

- **Marx client who lost driver's license**. Randy Marx acted as counsel to the Debtor on other transactions, but in connection with this dispute, he represented TCC 2022, LLC, which was doing due diligence for a potential $40,882,500 "first lien" loan to the Debtor or "preferred equity interest" in the Debtor. HNGH Ex. 88a. On May 31, 2022, Marx—at Walji's request, 6/23/22 tr. at 23—wrote a letter "To Whom It May Concern," stating that the principal investor in TCC 2022, LLC had lost his Texas driver's license and thus could not fly to Missouri to access his funds in an account there until he obtained a replacement driver's license. HNGH Ex. 88a. The earliest his client would likely be able to make the loan or equity investment was June 7, 2022. *Id.* Walji forwarded the Marx letter to counsel for the Debtor and counsel for HNGH on May 31, 2022 (the Extended Payoff Deadline), at 3:55 p.m. HNGH Ex. 88. TCC 2022, LLC was not ready, willing, and able to fund a transaction on or before the Extended Payoff Deadline.

- **First Guaranty Bank**. First Guaranty Bank was a potential lender to Enoch Investments LLC, an insider entity owned by a trust in which Barton is a beneficiary. Enoch was potentially going to purchase the Property from the Debtor. First Guaranty Bank provided a commitment letter to Enoch for a loan of $33,840,000, but it was still subject to various due-diligence items and it had an estimated closing date far past the Extended Payoff Deadline: "The estimated date of closing is 10 (ten) business days from the Acknowledgement Date of this Commitment, *subject to any additional time* identified in order to obtain good title, insurance, legal review, or other common and ordinary needs identified by First Guaranty Bank to complete closing." Debtor Ex. D4 (emphasis added). Because the acknowledgment date of the letter was May 27, 2022, the estimated closing date was June 10, 2022, at the earliest, subject to any additional time for due diligence. First Guaranty Bank was not ready, willing, and able to fund a transaction on or before the Extended Payoff Deadline.

- **Matthew Fleeger**. Matthew Fleeger (or his unnamed company) was a potential funding source who was going to "bridge the gap" between the potential $33,840,000 First Guaranty Bank loan to Enoch and the amount needed to satisfy the Payoff Amount (in excess of $40 million). Walji test., 6/24/22 tr. at 27–28. Fleeger testified briefly that he wired $12.5 million to his attorney's account at some unspecified time before May 31, 2022, in anticipation of being involved in a payoff of HNGH. 6/30/22 tr. at 67. Fleeger didn't testify about whether he had done any due diligence for the transaction, whether the funds in his attorney's account were somehow committed to the transaction, or whether Fleeger had made any other commitment to fund the transaction. There is no credible evidence that Fleeger was ready, willing, and able to "bridge the gap" as a funding source on or before May 31, 2022. Even if Fleeger had been prepared to bridge the gap, First Guaranty Bank (as noted above) was not prepared to fund its contemplated $33,840,000 loan by the Extended Payoff Deadline.

- **PLN**. The Private Lender Network ("**PLN**") was a potential funding source. In a letter dated May 31, 2022, to Walji, Garrison Kickham of PLN stated that (a) even if all unresolved issues concerning "title" and the rescission deed could be resolved on May 31, PLN's underwriting department would require five business days to close and fund the transaction (*i.e.*, until June 7); and (b) given the 14-day appeal period for the May 18, 2022 Confirmation Order, PLN's underwriting department would not have been satisfied until the 14-day appeal period had run on June 1, 2022. HNGH Exs. 85, 85a.[15] PLN thus was in no position to fund a transaction on or before the Extended Payoff Deadline.

- **ReveriFinancing PM LLC**. ReveriFinancing was a potential funding source. The Debtor introduced a May 20, 2022 term sheet between the Debtor and ReveriFinancing that is nonbinding on ReveriFinancing and is subject to due diligence and other conditions.

[15] Walji denied helping to prepare the PLN letter at HNGH Ex. 85a, but his denial was not credible. 6/24/22 tr. at 93–94. The Court believes Walji did help prepare the letter and that PLN was simply parroting what the Debtor told it. There is no credible evidence that PLN had any independent concerns about HNGH's draft rescission deed or other documents being prepared for closing. Any Walji testimony to the contrary was not credible.

Debtor Ex. D11a. No witness from ReveriFinancing testified about the due diligence, if any, the potential lender had done for a potential transaction. Walji testified that ReveriFinancing was not capable of closing on the Extended Payoff Deadline because of the open items on Schedule C of the Sendera title commitment, but Walji's testimony was not credible, and as noted below, the Court finds and concludes that the Debtor was at fault for any unresolved closing documents. In any event, there is no credible evidence that ReveriFinancing was ready, willing, and able to fund a transaction on or before the Extended Payoff Deadline.

- **Dubai party**. Walji testified that there was an overseas potential lender in Dubai, 6/24/22 tr. at 32, 64–65,[16] 158, but no witness from this unspecified potential lender testified, and there were no exhibits demonstrating any funding commitment or anything else about this unnamed potential lender. There is no credible evidence that an overseas lender in Dubai was ready, willing, and able to fund a transaction on or before the Extended Payoff Deadline.

- **Tall Ship DTC LLC**. The Debtor introduced a March 14, 2022, term sheet with Tall Ship that prompted the Debtor to file its emergency motion to extend the initial Payoff Deadline, HNGH Ex. 10 (term sheet attached to Debtor's motion), but there was no evidence whatsoever that anything ever came of that Tall Ship transaction or any other transaction with Tall Ship. There is no credible evidence that Tall Ship was ready, willing, and able to fund a transaction on or before the Extended Payoff Deadline.

- "**N Entity**." Walji testified that he was involved in a potential transaction with an unspecified entity that starts with the letter N, whose name he did not want to disclose because of confidentiality concerns. There was no credible evidence from Walji or any other source (witness or documents) that the "N Entity" was ready, willing, and able to fund a transaction on or before the Extended Payoff Deadline.

[16] Page 64 of the transcript refers to "divide," which should have been transcribed as Dubai.

- ***In camera* list**. Barton testified that several unnamed funding sources were prepared to lend the Debtor money on May 31, 2022. According to Barton, he did not want to disclose the names of those parties because he was concerned that HNGH would somehow tortiously interfere with those funding sources. The Court finds Barton's testimony about potential HNGH misconduct not credible,[17] but the Court allowed the Debtor to submit a list of the alleged funding sources to the Court for *in camera* inspection so that Barton could testify about them without naming them.[18] Barton then testified about five anonymous funding sources (whose names were on the *in camera* list) that allegedly were prepared to fund a transaction on May 31, 2022. All that was needed, according to Barton, were appropriate closing documents: "[T]ake all those little pieces of paper that are required and I will take this heavy load of money, we'll go to the title company and exchange them like we're supposed to, like honorable men. Show up with the papers, I'll show up with the money. That's all." 7/1/22 tr. at 153–54. After considering Barton's demeanor, the complete lack of supporting documentation for the alleged funding sources, the balance of Barton's testimony, and all the other evidence at trial, the Court finds that Barton's testimony was not credible. There is zero credible evidence that the five funding

---

[17] His testimony on this point appeared to be a variation on the fraud-by-nondisclosure claims that the Court previously found, and the parties previously agreed, were unmeritorious. *See* Adversary Judgment.

[18] The Debtor's counsel reported to the Court during the hearing that they were sending over to the Court for *in camera* inspection not only the list of names they previously indicated would be coming, but also various other documents for *in camera* inspection. The Court admonished the Debtor's counsel not to send over documents for *in camera* inspection that the Court had not requested. In response, counsel for the Debtor requested permission to send additional documents to the Court that were not listed on any exhibit list and had not been offered into evidence, and the Court denied that request. *See* 6/30/22 tr. at 108–14.

If the Debtor wanted the Court to consider alleged supporting documentation but had confidentiality concerns, the Debtor should have attempted to make them part of the record with appropriate safeguards—such as by offering them into evidence under seal or with redactions. The Court does not believe it would be appropriate, however, to consider materials that are outside the record and unavailable to opposing counsel.

Ultimately the Debtor's counsel sent over to chambers just the list of names, as they previously said they would.

sources on the *in camera* list were ready, willing, and able to fund a transaction on or before the Extended Payoff Deadline.

- **Any other funding sources**. The testimony from Barton, Walji, and Marx about funding sources was at times a little vague and confusing. To the extent there were other alleged potential funding sources that the Court has not specifically addressed above, the Court finds and concludes that there is no credible evidence that any other funding source was ready, willing, and able to fund a transaction on or before the Extended Payoff Deadline.

### *2. HNGH did not breach the Agreed Orders, or if it did, the breaches were nonmaterial or the breaches were waived by the Debtor*

The Debtor argues that HNGH breached the Agreed Orders in several respects, and that those breaches excused the Debtor's funding obligation. The Debtor is wrong.

#### a. Alleged breach #1: HNGH's failure to "hold" an executed rescission deed as of December 10, 2021

The Debtor first argues that HNGH breached the December 2021 Agreed Order because its counsel did not "hold" a fully executed rescission deed starting on December 10, 2021, when the term of the order began. The December 2021 Agreed Order did require counsel for HNGH to "hold the rescission deed during the pendency of the term of this Agreed Order," but did not make either party solely responsible for drafting it. *See* December 2021 Agreed Order at 2. The Debtor and HNGH each have their own views about what a rescission deed or rescission instrument should contain, but the competing draft rescission documents eventually prepared by *both* parties contain signature blocks for HNGH *and* the Debtor. If the Debtor truly expected HNGH to be holding a fully executed rescission document starting on December 10, 2021, why didn't the Debtor ask for a draft for review and comment before that date so it could sign the document? Instead, the Debtor never inquired about a draft until May 10, 2022, when it forwarded to HNGH a request by Sendera (the Debtor's title company)[19] for a draft rescission

---

[19] Silver Star Title, LLC dba Sendera Title was the "Title Insurance Agent," and its affiliate Title Resources Guaranty Company was the Title Insurance Company.

deed. Both parties are equally at fault here, and the Debtor's position that it was shocked—shocked—to learn that HNGH was not holding a fully executed rescission deed on December 10, 2021, is not credible.

The Debtor's failure to inquire about a draft rescission deed until May 10, 2022, supports the Court's conclusion that any failure by HNGH to hold a signed rescission deed on December 10, 2021, was—if it was a breach at all—a nonmaterial breach. No rescission deed was necessary until the Debtor was serious about a transaction to satisfy the Payoff Amount. Moreover, the Debtor's failure to take the steps necessary for HNGH to hold a rescission deed—such as the Debtor's drafting, revising, or signing a rescission document prior to May 2022—constitutes a waiver of any complaint the Debtor may have about HNGH's failure to hold a rescission deed on December 10, 2021.

#### b. Alleged breach #2: HNGH's failure to deliver an "effective" rescission deed for closing

The Debtor next argues that HNGH breached the Agreed Orders because HNGH failed to deliver for closing an "effective" rescission deed, with the Debtor pointing to alleged deficiencies in HNGH's proposed forms. This argument likewise lacks merit.

##### *i. The Debtor's actions and inactions stymied HNGH*

A recap of the Debtor's actions—and inactions—in the weeks leading up to the Extended Payoff Deadline is critical here. HNGH provided the Debtor a draft rescission deed on May 12, 2022. The Debtor then waited *two and a half weeks*, until 3:24 p.m. on May 30, 2022 (a holiday), the day before the Extended Payoff Deadline, before sending back a completely different draft of its own. By May 27, 2022, HNGH had already signed, notarized, and delivered its prior form to Sendera, which agreed with and accepted HNGH's form (the "**HNGH May 27 Rescission Document**") for purposes of closing and issuing title insurance.

Even though its own title company found the HNGH May 27 Rescission Document acceptable, the Debtor never explained to HNGH why the document was not acceptable. What's worse, the Debtor's own form that it sent back in response on May 30, drafted by Marx (the "**Debtor May 30 Rescission Document**"), contained factual representations that were inconsistent with the Agreed Orders. For example, the Debtor May 30 Rescission Document required HNGH to represent, warrant, and

affirm that it has no claims related to the Property. Debtor May 30 Rescission Document, HNGH Ex. 65d, at 3. Under the Agreed Orders, though, the Deed in Lieu was to be rescinded and the Note and Deed of Trust reinstated so that the Note could then be paid off and the Property would belong to the Debtor. Therefore, upon rescission, HNGH *would* have a claim related to the Property in that it would have a claim secured by the Property, at least until it was paid off immediately thereafter. The Debtor's document needed to be revised to address that agreement.

After finally receiving the Debtor's new draft on the day before the Extended Payoff Deadline, HNGH turned a revised draft of the Debtor May 30 Rescission Document within hours of receipt on May 30, 2022 (the "**HNGH May 30 Rescission Document**"), which rectified the materially false statements that were in the Debtor May 30 Rescission Document (by making clear that HNGH claims no right or interest in the Property once the rescission becomes effective other than claims related to the reinstatement of the Note and Deed of Trust). After that, the Debtor never provided comments on the HNGH May 30 Rescission Document, which HNGH was prepared to execute and deliver at closing.

The Debtor now, at trial, cites various reasons why HNGH's rescission documents were not sufficient, *none* of which it ever shared with HNGH prior to the Extended Payoff Deadline. After considering all the evidence at trial, the Court finds and concludes that the Debtor purposefully throttled communications regarding revised drafts of the rescission deed (and the other closing documents, discussed below) because it knew it had run out of time and did not have financing sources lined up for a transaction that had to close by May 31, 2022. Lindauer admitted as much on the morning of the Extended Payoff Deadline, when she emailed Kane to tell him that she did not see how everything for a closing could get done that day, that Barton was willing to "buy" an extension to finish the closing documents and get the funding he needs, and that she wanted to handle the matter "without us having to gear up things," which was an obvious threat of litigation. HNGH Ex. 71. And we now know that the Debtor was busy during the time leading up to the Extended Payoff Deadline drafting a comprehensive motion and supporting declarations and documentation to extend the payoff deadline yet again.

The Debtor's actions—and inactions—were not commercially reasonable and were not in good faith. Moreover, there is *zero credible evidence* that any potential lender or finance source was ready, willing, and able to fund a transaction but refused to do so based on the HNGH May 30 Rescission Document (or even the original HNGH May 27 Rescission Document). Any testimony from the Debtor's witnesses to the contrary was simply not credible.

The Debtor cannot now claim to be excused from its Default based on alleged deficiencies in HNGH's form of rescission document when the Debtor purposefully throttled communications and negotiations about the document and when the Debtor's funding sources were not ready for the transaction in any event. For these reasons, the Debtor is not excused from its Default under the Agreed Orders regardless of the alleged deficiencies in HNGH's form document that the Debtor raises only now, after the fact.

Even if the Court were to consider the Debtor's rescission arguments, they are without merit.

*ii. The Debtor's original rescission-deficiency arguments were already addressed by HNGH*

In the Debtor's Opposition to the Motion to Enforce, the Debtor raises only two issues regarding HNGH's form of rescission deed. First, the Debtor argues that the HNGH May 27 Rescission Document was a "deed" that reconveyed title back to the Debtor and did not accomplish a rescission *of* the Deed in Lieu. According to the Debtor, a reconveyance back to the Debtor—through a "deed"—would be problematic for tax and other reasons; a rescission "of" deed is needed instead. Second, the Debtor argues that the HNGH May 27 Rescission Document contained an inappropriate "deed restriction," which the Debtor clarified at trial was the provision stating that "the Property may only be used for hotel and residential condominium purposes." Debtor Ex. D14, at 12/25 of PDF file. There are at least four problems with the Debtor's arguments.

First, the Debtor's own title company, Sendera Title, accepted the HNGH May 27 Rescission Document for closing. A title company's decision to accept a document for closing (thus shifting to the title insurer any title risks) is significant, as explained credibly by Charles Edward Aster, HNGH's expert witness. 7/11/22 tr. at 57.

Second, the December 2021 Agreed Order called for a "rescission deed," so it is hard to fault HNGH for drafting a rescission "deed" since that's what the Agreed Orders call for. And to top things off, Sendera Title—the Debtor's title company—specifically asked HNGH's counsel to "send us a copy of the Rescission Deed where HNGH will *deed back* to 2999 TC Acquisition. Thank you." HNGH Ex. 32 (emphasis added). Again, it is hard to fault HNGH for sending over to the Debtor's own title company the specific document they requested.

Third, the hotel/condominium use restriction in the HNGH May 27 Rescission Document is the same use restriction in the original deed by which the Debtor acquired the Property. *See* Debtor Ex. D14, at 1/25 of the PDF file.[20] When that was pointed out during trial, Marx said that HNGH would be the enforcement party under the HNGH May 27 Rescission Document, as opposed to the original grantor from which the Debtor acquired the Property. Neither Marx nor any witness for the Debtor explained credibly how HNGH would be an "enforcement party" if the Deed in Lieu were rescinded, leaving HNGH with no rights in the Property and leaving it in its original position before the Deed in Lieu filing. In any event, Marx admitted that he never shared his enforcement-party concern with HNGH, 6/21/22 tr. at 46–47, and there is no

---

[20] Unfortunately, the Debtor included several separate documents in its Exhibit D14. That exhibit contains 25 PDF pages. Here is a table of contents for the documents in that 25-page PDF file:

- PDF page 1: The Special Warranty Deed by which the Debtor acquired the Property in 2019.

- PDF page 7: The Deed in Lieu (titled as a "Special Warranty Deed") that was recorded in the real property records on November 1, 2021.

- PDF page 12: HNGH's form of rescission deed (titled as a "Special Warranty Deed") that was originally circulated on May 12, 2022, and that was signed by HNGH and delivered to Sendera Title on May 27, 2022. It is defined now as the HNGH May 27 Rescission Document.

- PDF page 20: Marx's form of rescission deed (titled as an "Agreed Rescission of Special Warranty Deed"). This document is also found at HNGH Ex. 65d. It is defined now as the Debtor May 30 Rescission Document.

To round out the various deeds, HNGH's May 30, 2022, revised document, which was based on the Debtor May 30 Rescission Document, is found at HNGH Ex. 67a. It is now defined as the HNGH May 30 Rescission Document.

evidence that the Debtor or its counsel shared that concern with HNGH before the Extended Payoff Deadline.

Fourth, and most important, to help facilitate a closing, HNGH abandoned its HNGH May 27 Rescission Document and circulated a new draft, the HNGH May 30 Rescission Document, which was based on the Debtor May 30 Rescission Document. The HNGH May 30 Rescission Document—like the Debtor's document from the same date—is called an "Agreed Rescission of Special Warranty Deed" (*i.e.*, a "rescission *of* deed" and not a "deed"), and it contains no purportedly inappropriate "deed" conveyance language. It also contains no hotel/condominium use restriction. *The Court reiterates this stunning point:* The only two alleged rescission deficiencies the Debtor raised in its Opposition to the Motion to Enforce—which kicked off a fifty-plus hour contested hearing—were *already addressed* by HNGH on May 30, 2022, before the Extended Payoff Deadline.

*iii. The Debtor's after-the-fact rescission-deficiency arguments likewise lack merit*

The Debtor's witnesses testified unpersuasively about why they thought the HNGH May 30 Rescission Document was not effective as a rescission instrument or was otherwise objectionable.

**Walji**. Walji discussed the Debtor's Exhibit D6, which is a redline prepared by Lindauer's office showing changes between the Debtor May 30 Rescission Document and the HNGH May 30 Rescission Document.[21] Based on his review of the redline, Walji had various critiques of the HNGH document:

- Walji criticized a paragraph in the HNGH document that referred to the Debtor's bankruptcy case: "This one concerned me because it made reference to the bankruptcy case which was not part of the – of a rescission. And my version that – well, our version or the debtor's version did not have that reference on this particular

[21] The redline is not perfect because it appears to show changes to a slightly earlier version of the Debtor May 30 Rescission Document. For example, the redline shows in certain places a change from "Deed in Lieu" to "Deed" when neither document exchanged by the Debtor and HNGH on May 30 contained the "Deed in Lieu" language. Overall, however, the redline appears to show all material changes between the Debtor May 30 Rescission Document and the HNGH May 30 Rescission Document.

rescission." 6/24/22 tr. at 42. Here Walji appears to suggest that HNGH's document inappropriately refers to the Debtor's bankruptcy case while the Debtor's form does not.

- But the Debtor's own form has the same reference to the bankruptcy case, only moved to a following paragraph. *See* HNGH Ex. 65d, at 2. If Walji meant something else by this criticism, the Court cannot decipher it.

- Walji criticized the HNGH document's reference to the Grantee (HNGH) dating the Deed in Lieu (called the "Deed" in the redline) as of October 29, 2021, because Barton signed the Deed in Lieu in March 2021. 6/24/22 tr. at 42–43.

  - But this language is in a purely informational recital, and HNGH's language is factually accurate. As HNGH's recitals correctly reflect, Barton signed the Deed in Lieu on March 1, 2021, but HNGH dated the document as of October 29, 2021, when the Debtor defaulted and HNGH was ready to record the document. *See* Deed in Lieu, Debtor Ex. D14, at PDF pages 7–8.

- Walji criticized HNGH's deletion of language about how the Debtor did not consent to HNGH's recording of the Deed in Lieu. 6/24/22 tr. at 43.

  - But HNGH added only slightly different language, noting that the Debtor contested the filing and recording of the Deed in Lieu by HNGH, and that HNGH asserted that the filing and recording were appropriate. Moreover, this language is in a purely informational recital and has no effect whatsoever on the operative provisions of the document.

- Walji criticized the background information added by HNGH to make clear that the parties had agreed through the Agreed Orders that HNGH "shall" rescind the Deed in Lieu and that the rescission "shall" be effective as of October 29, 2021, upon effectuation of all conditions precedent set forth in the Agreed Orders (*i.e.*, satisfaction of the Payoff Amount). According to Walji, this language added conditions to the rescission document that

require parties to look outside the document to determine whether the rescission is effective. 6/24/22 tr. at 44–45.[22]

- But Walji's view (and the Debtor's interpretation) of the added language is myopic. HNGH's added language is in a purely informational recital paragraph and simply paraphrases what the Agreed Orders say: that HNGH shall rescind the Deed in Lieu and that the rescission shall be effective upon satisfaction of certain conditions—namely, payment of the Payoff Amount. Later language in the HNGH document makes abundantly clear that the rescission document is effective immediately, without having to refer outside the document.[23] The document would never be recorded unless the Debtor actually paid HNGH. HNGH's new language does not make the rescission conditional or require parties to look outside the document to determine its effectiveness.

In short, Walji's testimony does not demonstrate any defects in the HNGH May 30 Rescission Document. And if the point of his testimony was to highlight that HNGH never sent the unsigned, never-agreed-to document to Sendera for closing, then Walji's testimony misses the mark. HNGH did not breach the Agreed Orders simply because the Debtor secretly and silently disagreed with HNGH's changes. Walji's testimony instead highlights the Debtor's unreasonable throttling of

---

[22] The Debtor's counsel expanded on this argument during another part of the hearing, suggesting that the language changes the document from a present and effective rescission to a qualified and possibly contingent instrument that may be void for vagueness. 6/23/22 tr. at 178–82. Marx made a similar statement during his testimony. 7/6/22 AM tr. at 60.

[23] For example:

> NOW THEREFORE Grantor and Grantee hereby incorporate by reference the recitals above, and **HEREBY RESCIND AND AVOID** in full, ***ab initio***, the execution, delivery, granting, and recording of the Deed and any and all grants, bargains, sales, transfers, and conveyances related to the Property otherwise effected in the hereby rescinded Deed, including any and all restrictions made therein, are HEREBY **EXPRESSLY RESCINDED** in full, ***ab initio***.

HNGH May 30 Rescission Document, HNGH Ex. 67a, at 2.

communications over a document that could have and should have been—with any appropriate minor tweaks—signed by the parties and used at closing (had the Debtor's finance parties actually been prepared to fund).

**Marx**. Marx testified about the Debtor's Exhibit D6 redline document before Walji testified. Marx testified that (a) he would "prefer" that HNGH's added language about satisfaction of "conditions precedent" in the Agreed Orders not be included because "it seems to want to subject this to the Agreed Orders," and (b) although the "conditions precedent" language was not acceptable, HNGH's revised document appeared to largely satisfy his client's and the Debtor's concerns. 6/21/22 tr. at 73–74; 6/23/22 tr. at 55. Although the Court, as noted above, disagrees with Marx's conclusion that the additional "conditions precedent" language rendered HNGH's rescission ineffective, his testimony was credible at least insofar as it relayed his views of the document. What happened next was less credible.

After Marx finished testifying, one of the Debtor's counsel said Marx was "mistaken," 6/23/22 tr. at 181, and explained the Debtor's legal theories about why the HNGH May 30 Rescission Document was not effective. Later in the hearing, after Walji testified and after the Debtor's counsel circulated transcript hearings to Marx and others, the Debtor asked to recall Marx to the stand because he thought his testimony needed further "clarification."[24] 6/29/22 tr. at 6; 7/6/22 AM tr. at 33. According to the Debtor's counsel, Marx was concerned that the Debtor's Exhibit D6, which he previously testified about, was not a true redline comparing the Debtor May 30 Rescission Document and the HNGH May 30 Rescission Document. 7/6/22 AM tr. at 21, 30–31.[25] Over HNGH's strenuous

---

[24] The Debtor initially tried to "clarify" Marx's testimony with a filed Marx declaration, but the Court granted HNGH's motion to strike it, so the Court did not consider it. The Court instead allowed Marx to retake the stand.

[25] As the Court already noted, the Debtor's Exhibit D6 was not a perfect redline because it showed changes from "Deed in Lieu" to "Deed" when "Deed in Lieu" was not used in either party's respective May 30 documents. The Court has now page flipped through the Debtor's Exhibit D6 redline, the subject of Marx's original testimony, and the redline Marx testified about when recalled to the stand, which is an exhibit to Marx's stricken declaration. *See* redline attached to declaration at ECF No. 198. The Court did not consider, and still has not considered, the declaration, but the Debtor's counsel

objection, the Court allowed Marx to retake the stand, where he testified about a new redline document he himself prepared during this trial showing changes between the parties' respective May 30 documents. So after a six-day break after his initial testimony, after having time to read the trial transcripts (which included Walji's testimony and the comments of the Debtor's counsel about how HNGH's document was deficient and how Marx's testimony was "mistaken"), Marx testified again with renewed vigor about how the HNGH May 30 Rescission Document had several problems, including these alleged problems he did not raise in his earlier testimony:

- Marx observed that the HNGH May 30 Rescission Document refers to HNGH as the current payee and holder of the Note; according to Marx, there would need to be confirmation that HNGH is the holder of the Note, and if not, Happy State Bank would have to sign the rescission document. 7/6/22 AM tr. at 67.
    - But this same language is in the Debtor May 30 Rescission Document, and (as explained below) Happy State Bank was prepared to deliver the Note to HNGH for the closing, so Happy State Bank would not need to sign the rescission document.
- Marx criticized the language HNGH added to clarify that, upon rescission, it had no rights in the Property other than its reinstated Note and Deed of Trust. According to Marx, this language muddled the otherwise "definitive" statement (drafted by Marx) that HNGH had no interest in the Property, thus somehow creating a cloud on title to the Property.
    - But Marx's original definitive statement—that HNGH had no interest in the Property—was simply false, as the parties and the Court recognized in the Agreed Orders. The paragraph at issue is a representation-and-warranty paragraph, and HNGH should not be required to represent

walked Marx through his new redline on the screen during his reinvigorated testimony. The Debtor's Exhibit D6 redline and Marx's new redline are the same in all material respects. The Court fails to see how Marx could have been truly confused about the Debtor's Exhibit D6 redline as Marx claims. 7/6/22 AM tr. at 53–54.

> something that simply is not true.[26] HNGH's revisions were limited and appropriate and did not cause the document to be ineffective.

**Barton.** Barton's testimony about the rescission deed added little, if anything, beyond what the other witnesses said.

**Marshal Dooley.** Dooley, the Debtor's real-estate expert, testified mainly about various documents that he thought should have been prepared for a closing, and he also testified in some detail about the HNGH May 27 Rescission Document. But he had only one sentence to add regarding why he would not advise a commercial real estate lender or borrower to accept the HNGH May 30 Rescission Document: "Because the rescission was contingent on some matters that were included in the edits to the deed. And so you have to go to outside that document to be able to determine whether or not it was an effective rescission." 7/1/22 tr. at 202.

Dooley's brief and vague testimony appears to be a repeat of what Walji and Marx said about HNGH's revisions. For the same reasons discussed above, Dooley's testimony about the HNGH May 30 Rescission Document was not persuasive.

**c. Alleged breach #3: Happy State Bank roadblock**

This argument is a tempest in a teapot. As noted above, to obtain the funds to acquire 100% of the Original Lender's loan to the Debtor, HNGH obtained its own loan from Happy State Bank, which secured the loan to HNGH by obtaining a collateral assignment of the Note and Deed of Trust. In other words, Happy State Bank held the original Note and Deed of Trust (the loan documents between the Debtor and HNGH) as collateral for its own loan to HNGH. Happy State Bank also filed in the real property records an instrument reflecting the collateral transfer of

---

[26] Marx's new redline contained, in a comment box, proposed language to address Marx's concerns. The Court concludes that HNGH's language was not problematic to begin with, but the fact that Marx proposed even newer language—during the trial—to address his concerns simply highlights the Debtor's throttling of communications near the Extended Payoff Deadline and its failure to provide these comments when they were needed—before the deadline.

the Note and Deed of Trust. *See* HNGH Ex. 33a, Schedule C, ¶ 5 (noting Collateral Transfer of Note and Lien to Happy State Bank).

According to the Debtor's Opposition to the Motion to Enforce, the Debtor was "surprise[d]" to receive a payoff statement from Happy State Bank on May 31, 2022, and a directive to pay Happy State Bank, because HNGH previously indicated that Happy State Bank had nothing to do with the transaction. "HNGH had not provided a similar instruction to the Debtor. Rather on May 31, 2022, contrary to [Happy State Bank's] Payoff Statement, HNGH provided via its wiring instructions that all funds to be sent to it. HNGH never told Debtor that a portion of the funds should be sent to [Happy State Bank]." The Debtor's allegations are a combination of outright falsehoods and half-truths, culminating with this: "The Debtor was then faced with conflicting instructions for payment of millions of dollars from a third-party lender. It is in no way surprising - and in no way Debtor's fault - that, faced with such a dilemma, the closing could not timely continue." Debtor's Opposition ¶ 30, at 11.

The Debtor's arguments and allegations are disingenuous and without merit. The collateral transfer of the Note and Deed of Trust was reflected in the real property records. The Debtor was aware, at the very latest, by May 18, 2022, that Happy State Bank possessed a cloud on the Debtor's title because it was set forth plainly in Sendera's title commitment. *See* HNGH Ex. 33a, Schedule C, ¶ 5. While on May 20, 2022, Kane expressed his belief that Happy State Bank was not going to be a party to closing and that the Debtor needed to focus on paying off HNGH, Kane corrected that misunderstanding just days later. By May 27, 2022, HNGH and the Debtor had discussed how to address the Happy State Bank cloud on title. *See* HNGH Ex. 58 (Walji bullets 3, 4 referencing Happy State Bank matters for closing). Shortly thereafter, HNGH provided drafts of the documents necessary to resolve the issue. HNGH Exs. 60, 60a, 61. The Debtor even commented on the proposed form of the Happy State Bank release. HNGH Ex. 65c. And HNGH specifically told the Debtor that HSB would be paid at closing out of the proceeds that would otherwise go to HNGH. *See, e.g.*, HNGH Exs. 72, 89.

As Julie Blakeley testified, HNGH's hard work ensured that Happy State Bank was prepared to deliver the release necessary to resolve the Happy State Bank issue at closing. 6/23/22 tr. at 94.

The Debtor also made much ado about how Happy State Bank was not in "privity" with the Debtor, suggesting that the Debtor was not obligated to pay Happy State Bank at closing. In other words, according to the Debtor, its only obligation was to pay HNGH at closing. This argument demonstrates that the Debtor was prepared to derail a closing by taking commercially unreasonable positions that were poorly designed to deflect attention away from its failure to have financing lined up. The evidence—and common sense—*overwhelmingly* demonstrates that HNGH properly directed the payment of a portion of its proceeds as it saw fit. Just as a seller can direct the payment of a broker commission from its own proceeds at closing, so too can HNGH direct a portion of its proceeds to be paid to Happy State Bank at closing. HNGH's position is commercially reasonable. The Debtor's position is not.

Perhaps because the evidence did not support the Debtor's initial competing-demands-for-payment argument, or its contractual-privity argument, the Debtor's theory on HNGH's breach shifted during trial. The Debtor's new "hostage Note" argument runs like this:

- The Agreed Orders require that the Note be reinstated immediately before HNGH is paid off, and HNGH must hold the Note to reinstate it.

- HNGH does not hold the Note because it was collaterally assigned to Happy State Bank.

- Julie Blakeley of Happy State Bank testified that the bank would not release the Note back to HNGH until HNGH paid its $26 million debt to Happy State Bank.

- HNGH admitted that—without the payoff funds from the Debtor—it did not have $26 million to pay back Happy State Bank.

- Therefore, HNGH could not possibly have reinstated the Note because it did not have an extra $26 million lying around to acquire the hostage Note back from Happy State Bank; and until HNGH acquires the hostage Note back from Happy State Bank, the Note cannot be reinstated, thus preventing the Debtor from paying off HNGH.

The Debtor's legal logic ignores the reality that the parties could have achieved the desired result with a simultaneous or nearly simultaneous closing. For example, Happy State Bank—which had a good working relationship with HNGH, 6/23/22 tr. at 123—could have delivered the Note to the title company to be held in escrow pending the title company's receipt of the roughly $41 million the Debtor needed to pay off HNGH. Pursuant to a joint instruction letter to the title company from Happy State Bank, the Debtor, and HNGH, upon the title company's receipt of the roughly $41 million, the Note could have been deemed released to HNGH for Note reinstatement, followed immediately by payment of $26 million to Happy State Bank and the balance to HNGH. Happy State Bank would not be at risk for the deemed release of the Note to HNGH shortly before payment to Happy State Bank.

Although the precise details of such a closing were not laid out in detail during trial, witnesses from all sides, including Marx, Dooley, Nambiar, Christensen, Kane, and Blakeley—testified that the situation with Happy State Bank could have been addressed with a simultaneous or concurrent closing. *See, e.g.*, 6/13/22 tr. at 100 and 6/15/22 tr. at 26–27 (Marx); 6/29/22 tr. at 121–22 (Dooley); 6/27/22 tr. at 68–70 (Nambiar); 6/24/22 tr. at 219–21 (Christensen); 7/8/22 tr. at 114–15 (Kane); 6/23/22 tr. at 120–21, 128–31 (Blakeley).

To avoid the common-sense conclusion that a simultaneous closing is feasible, the Debtor highlights Blakeley's answer to this question: "**Q** You're not going to release documents without the money actually going into your bank account, correct? **A** I believe that is correct." 6/23/22 tr. at 131. In other words, the Debtor would have the Court believe, based on that limited testimony, that Happy State Bank would hold up a closing that would repay it $26 million by refusing to deliver the Note and Deed of Trust to a title company pursuant to joint instructions from all parties that would protect Happy State Bank's interests during the very limited time the Note would be deemed returned to HNGH to allow reinstatement and then payment to HNGH and Happy State Bank.[27]

[27] Or some other reasonable closing mechanism that provided for Note reinstatement, followed immediately by payment to HNGH and Happy State Bank.

The Court finds that Blakeley's impromptu answer to the hostage-note question is not determinative. The Court has the highest degree of confidence that Happy State Bank and its counsel would have and could have cooperated in a simultaneous closing and would not have held the Note hostage as the Debtor now argues. Even Barton himself impliedly rejected the Debtor's closing-is-impossible-due-to-hostage-Note argument when he asked the Court for another chance to close by exchanging the "little pieces of paper" and the "heavy load of money" at a title company. 7/1/22 tr. at 153–54. Barton would not be trying so hard for another shot at closing if the Debtor truly believed closing is impossible due to a hostage Note.

Finally, the Debtor points to the logistical problems of the 3:00 p.m. wire-transfer cutoff time for banks on the Extended Payoff Deadline. According to the Debtor, even though Blakeley may have been ready to deliver the Note for closing on May 31, 2022, she would not have released the Note that day because it was too late in the day for Happy State Bank to receive its $26 million payoff by wire. This argument fails for two reasons.

First, HNGH provided the Debtor the payoff information and wire instructions for Happy State Bank at 11:00 a.m. on May 31, four hours before any wire-cutoff deadline. *See* HNGH Exs. 72, 72a.

Second, even if there were logistical issues on May 31, 2022, these logistical issues were entirely the Debtor's making. The Debtor started the entire process too late to achieve an orderly closing by the Extended Payoff Deadline. Even on that date, HNGH and Happy State Bank were desperately asking for contact information for whichever of the Debtor's three title companies was actually going to handle the closing, only to be met with throttled communications, if any. *See, e.g.*, 6/23/22 tr. at 96, 118–19 (Blakeley testimony that she didn't receive directions on which title company to deliver documents to); HNGH Ex. 90 (Happy State Bank counsel waiting for instructions on where to send release document).

We now know why the Debtor throttled communications: The Debtor knew there was not going to be a closing because none of its funding sources were ready, and the Debtor and its counsel were now—on that very day—focusing their efforts instead on preparing yet another motion to extend the payoff deadline.

#### d. Alleged breach #4: HNGH's failure to provide necessary closing documents

Finally, the Debtor alleges in its opposition to the Motion to Enforce that HNGH caused the Debtor not to close on a transaction by failing to deliver various necessary closing documents (besides the rescission deed). The Debtor's allegations are without merit.

In the weeks leading up to the Extended Payoff Deadline, Kane had more than once asked Lindauer for a closing checklist and a status of the potential closing. *See, e.g.*, HNGH Ex. 48. The Debtor and Sendera, however, requested only limited information from HNGH until the very last minute. On May 10, 2022, in a limited request, the Debtor and Sendera asked HNGH for payoff amount, a rescission deed from HNGH, and a confirmation order. HNGH Ex. 28. HNGH provided the payoff amount that same day and provided a draft rescission deed for comments on May 12, just two days later.[28] HNGH Exs. 31, 31a.

Then on May 24, 2022, just four business days before the Extended Payoff Deadline, Sendera asked for documents to resolve the Happy State Bank collateral assignment, as well as a collateral assignment that the Original Lender had made to its own lender (Axos). HNGH Exs. 33, 33a. HNGH promptly resolved those requests before the Extended Payoff Deadline. *See, e.g.*, 6/13/22 tr. at 55–56 (Marx testifying that Kane helped Sendera confirm that Axos issue was resolved); 6/23/22 tr. at 94 (Blakeley testifying that HNGH's hard work ensured that Happy State Bank was prepared to deliver the release necessary to resolve the Happy State Bank issue at closing).

Not until 3:24 p.m. on Memorial Day, Monday, May 30, 2022, the day before the Extended Payoff Deadline, did Lindauer send Kane the Memorial Day Checklist with the laundry list of documents the Debtor demanded for closing. HNGH Exs. 65, 65a. Kane replied immediately, pointing out the absurdity of sending the checklist the day before closing and asking what the Debtor actually needs to close. HNGH Ex. 68.

The Court is convinced that by this time, the Debtor knew it would not be able to close a transaction by the Extended Payoff Deadline because

[28] The record is not clear, but the Court assumes the Debtor provided Sendera a copy of its own Chapter 11 plan confirmation order.

it did not have its funding sources lined up. As noted above, Lindauer admitted as much the next morning, on the Extended Payoff Deadline, when she emailed Kane to tell him that she did not see how everything for a closing could get done that day, that Barton was willing to "buy" an extension to finish the closing documents and get the funding he needs, and that she wanted to handle the matter "without us having to gear up things," which was an obvious threat of litigation. HNGH Ex. 71. And we now know that the Debtor was instead focused on preparing its papers to seek another extension. In addition, the Debtor was not taking other actions that would indicate it was actually preparing for a closing, such as circulating a closing statement, whether prepared by the Debtor or its title company. *See*, *e.g.*, Christensen test., 6/24/22 tr. at 222–23.[29]

The Debtor's allegation that HNGH failed to deliver closing documents is simply an attempt to deflect attention from the Debtor's failure to have funding sources lined up by the Extended Payoff Deadline, and its failure to communicate regarding a closing checklist and closing documents until absurdly close to the Extended Payoff Deadline. And as noted above, there is zero credible evidence that any alleged funding source was unwilling and unable to fund on the Extended Payoff Deadline *because of* alleged deficiencies in closing documents. Any testimony from the Debtor's witnesses or Marx to the contrary was simply not credible. The Court thus need not consider the Debtor's arguments about missing closing documents because those alleged deficiencies did not cause the Debtor's failure to close and did not excuse the Debtor's payment default.

Even if the Court were to consider the alleged closing-document deficiencies, the Court rejects them. HNGH delivered or confirmed that it was preparing and would deliver in the ordinary course of business documents necessary to facilitate a closing by the Extended Payoff Deadline. HNGH went "pencils down" only when it became clear that the Debtor had no intention of closing by the Extended Payoff Deadline. Had the Debtor been willing to try to close by the Extended Payoff Deadline,

---

[29] Walji was not credible when he suggested that it was not the Debtor's responsibility to prepare a closing statement, that a closing statement was not required by the "order," and that he didn't recall whether Sendera was preparing a closing statement. 6/24/22 tr. at 57, 62.

the parties could have resolved any open document issues. But the Debtor's failure to cooperate—together with a lack of funds—made a closing doubly impossible.

Finally, a small sampling of the Debtor's document-deficiency allegations is telling:

- **Texas/Delaware issue**. The Debtor notes that in the Deed in Lieu, HNGH referred to itself as a Texas LLC, even though it is a Delaware LLC. HNGH repeated that mistake in its draft HNGH May 27 Rescission Instrument. Marx went so far as to claim that a failure to fix this "break in title" issue was "fatal." 6/23/22 tr. at 23, 47, 59.
    - But this clerical error could have been corrected with a simple correction instrument, as permitted by Texas Property Code section 5.028. That section allows the filing of a correction instrument to make a nonmaterial change that results from a clerical error, such as "an addition, correction, or clarification of . . . a party's name, including . . . a description of an entity as a corporation, company, or other type of organization." TEX. PROP. CODE § 5.028(a)(2)(A). Surely a clarification of HNGH's status as a Delaware LLC (and not a Texas LLC) falls squarely within this nonmaterial-correction statute. Marx appears to have admitted that some type of corrective instrument would have been appropriate. 6/21/22 tr. at 68–69.
    - And just as important, if Marx or the Debtor thought this issue was "fatal," why didn't they say something to HNGH or Kane before the Extended Payoff Deadline? Even though Kane was aware of the mistake on the Deed in Lieu, the record does not reflect that he likewise considered the issue "fatal." Marx never told Kane or anybody at HNGH before the Extended Payoff Deadline that he considered the issue a dealbreaker for closing, and the Court can locate no evidence that the Debtor took this small step toward a closing by notifying HNGH of the alleged fatal defect. Moreover, even if HNGH had not noticed or corrected the error, it appears that the Debtor and Marx had personal knowledge of HNGH's LLC status and thus could have filed the

correction instrument themselves, with notice to HNGH. *See* TEX. PROP. CODE § 5.028(c), (d).

- **Note reinstatement**. The Debtor alleges that HNGH never offered to the Debtor any document reinstating the Note. *See Debtor's Post-Hearing Brief* ¶ 8, at 9, ECF No. 276.
    - This allegation is flat out false. Marx admitted that a Note reinstatement did not need to be a separate document but could be included in a rescission instrument, and that the HNGH May 27 Rescission Document reflected the parties' agreement to reinstate the Note. 6/13/22 tr. at 50; 6/21/22 tr. at 52. Moreover, the HNGH May 30 Rescission Document, like the Debtor May 30 Rescission Document it was based on, also has Note-reinstatement language, although moved from a recital into a separate, operative paragraph.

For all the reasons outlined above, the Debtor's breach-of-contract arguments fail.

### C. The Debtor's equitable-estoppel argument fails

According to the Debtor, because HNGH materially breached the Agreed Orders, it is now equitably estopped from seeking to enforce the Agreed Orders. ECF No. 276 ¶ 17, at 13. As explained above, HNGH did not breach the Agreed Orders. What's more, the Debtor failed to plead and prove the specific elements of equitable estoppel.

Equitable estoppel is an equitable doctrine based on the principle that a party that, by its conduct, has induced another to act in a particular manner should not be permitted to adopt an inconsistent position and thereby cause a loss or other injury to the counterparty. *In re Perry*, 423 B.R. 215, 287 (Bankr. S.D. Tex. 2010). A party seeking equitable estoppel bears the burden of proving its essential elements, and failure to provide supporting evidence on any element is "fatal" to the defense. *Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 341 F.3d 415, 422 (5th Cir. 2003). Under Texas law, equitable estoppel is established when (1) a false representation or concealment of material facts (2) is made with knowledge, actual or constructive, of those facts, (3) with the intention that it should be acted upon, (4) to a party without knowledge or means of obtaining knowledge of the facts, (5) who detrimentally relies on the representations. *Id.*

During the hearing, the Debtor sought to show that HNGH made false statements or concealed material facts by (i) representing that HNGH held the Note and that Happy State Bank would not be involved in the proposed closing; (ii) failing to prepare and hold an effective rescission deed beginning on December 10, 2021; and (iii) entering into Agreed Orders despite HNGH's purported lack of intent to perform. The Debtor's positions are not credible.

First, the Debtor was aware, at the very latest, by May 18, 2022, that Happy State Bank possessed a cloud on the Debtor's title because it was set forth plainly in Sendera's title commitment. *See* HNGH Ex. 33a. It is true that HNGH mistakenly stated in its filed proof of claim that it held the Note. It is also true that on May 20, 2022, Kane expressed his belief that Happy State Bank was not going to be a party to closing and that the Debtor needed to focus on paying off HNGH. But Kane corrected both misunderstandings just days later. By May 27, 2022, HNGH and the Debtor had discussed how to address the Happy State Bank cloud on title. *See* HNGH Ex. 58 (Walji bullets 3, 4 referencing Happy State Bank matters for closing). Shortly thereafter, HNGH provided drafts of the documents necessary to resolve the issue. HNGH Exs. 60, 60a, 61. The Debtor even commented on the proposed form of the Happy State Bank release. HNGH Ex. 65c. And Blakeley testified that she had signed and was willing to deliver the Note for a simultaneous closing. 6/23/22 tr. at 96, 118–21; 128–31. HNGH fully rectified its misstatements, and the Debtor did not rely to its detriment on either one.

Second, HNGH's failure to hold an executed rescission deed on December 10, 2021, was the fault of both the Debtor and HNGH because—as explained above—both parties needed to review and sign the document. Moreover, HNGH provided draft rescission documents in time for the Debtor to use them for closing, but the Debtor failed to provide comments to either the HNGH May 27 or May 30 Rescission Documents. Lack of diligence cannot be excused through equitable principles. *See United States v. Brink*, 795 F. Supp. 2d 565, 584 (S.D. Tex. 2011).

Finally, the Debtor argues that HNGH was a predatory lender that was waiting to seize the Debtor's Property and never intended to perform under the Agreed Orders. The Court rejects every iteration of this argument that the Debtor made before, during, and after trial. HNGH gave the Debtor ample time to find a source of funds to pay HNGH, agreeing to both prepetition forbearances and postpetition extensions of the

Court-ordered deadline to satisfy the Payoff Amount. And HNGH and its counsel bent over backwards near the Extended Payoff Deadline to accommodate the Debtor's absurdly tardy request for closing documents. In the end, the Debtor's failure to meet the deadline was entirely its own fault.

### D. The Court denies the Debtor's request for the appointment of an expert or mediator with expanded powers

In the Debtor's second response to the Motion to Enforce, the Debtor requests the appointment of a real estate lawyer as a third-party mediator or Federal Rule of Evidence 706 "expert" to oversee a delayed closing on or before June 21, 2022, and to call binding "balls and strikes" on various closing documents.

These proposed expanded powers to make binding determinations regarding closing documents go far beyond the powers of an expert under Federal Rule of Evidence 706 or even a mediator. Instead, the real estate lawyer with expanded powers looks eerily like a special master under Rule 53 of the Federal Rules of Civil Procedure, but the appointment of special masters in a bankruptcy case is prohibited. *See* FED. R. BANKR. P. 9031 ("***Masters Not Authorized.*** Rule 53 FR Civ P does not apply in cases under the Code.").

Even if the Court could appoint a real estate lawyer with expanded powers, the Court would decline to appoint one here. The Debtor had several chances before bankruptcy to pay HNGH. Then the Debtor had two chances during the bankruptcy to pay HNGH before the expiration of Court-ordered deadlines. The Court has little confidence that the Debtor would or could pay HNGH even if given another chance. Rather, the Court believes the likely outcome would be more delay and more litigation. The Court also doubts that it could extend the already lapsed Extended Payoff Deadline in any event because HNGH became the owner of the Property automatically once a Default occurred under the Agreed Orders. The Court need not decide that issue, however, because the Court would not extend the deadline even if it could. Enough is enough.

### E. The Court denies the Debtor's plan-related motions

Through the Order-Modification Motion and the Plan-Modification Motion, the Debtor—alleging that HNGH breached the Plan and Confirmation Order—seeks to compel HNGH to provide various closing

documents, including the Debtor's preferred form of rescission instrument, for use at yet another attempted transaction closing. There is no credible evidence that HNGH breached any provision of the Plan or Confirmation Order. Moreover, even if the Court had the authority to grant these motions (an issue the Court does not decide), the Court would, in the exercise of its discretion, deny them for the same reasons outlined above.

## IV. Conclusion

For the reasons described in this Order, the Court **ORDERS, ADJUDGES, AND DECREES** as follows:

- The Motion to Enforce [ECF No. 134] is **GRANTED** in part and **DENIED** in part as set forth in this Order.
- The Deed in Lieu was a valid conveyance, and HNGH is now the owner of the Property pursuant to that Special Warranty Deed recorded as Instrument Number 202100327172 in the real property records of Dallas County, Texas on or about November 1, 2021.
- The Debtor shall have no further right, title, or interest in the Property, nor any lien, claim, encumbrance, or cloud on title against the Property.
- The Debtor shall have seven days from the entry of this Order to remove its Lis Pendens, Instrument Number 202100333511, from the Property.
- When the Debtor removes its Lis Pendens against the Property, the Debtor shall provide notice to HNGH that the Debtor has done so, and HNGH shall then release Barton from his Guaranty and shall dismiss its personal guaranty case with prejudice.
- The balance of the relief requested in the ordered paragraphs of HNGH's proposed order attached to the Motion to Enforce as Exhibit A—specifically concerning contempt, sanctions, and indemnifications—is **DENIED** without prejudice to refiling later when and if such issues are ripe for decision.
- The Debtor's Order-Modification Motion [ECF No. 173] and Plan-Modification Motion [ECF No. 174] are **DENIED**.

- The Debtor's request to appoint a mediator or expert under Federal Rule of Evidence 706 is **DENIED**.

- All other relief requested by the Debtor, whether before, during, or after the contested hearing, and whether by written or oral request, to the extent not already specifically addressed in this Order, is **DENIED**.

- The terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

- The Court shall retain jurisdiction over all matters pertaining to this Order.

### End of Order ###